**REDACTED PUBLIC VERSION OF D.I. 107**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 15 |
| PAPAYA GAMING LTD., *et al.*, | : | Case No. 26-11217 (MFW) |
| Debtors in a foreign proceeding.[1] | : | **Re: Docket No. 4** |

**OBJECTION OF SKILLZ PLATFORM INC. TO VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF THE ISRAELI PROCEEDING AS A FOREIGN MAIN PROCEEDING OR, ALTERNATIVELY, A FOREIGN NONMAIN PROCEEDING**

[1] The Debtors in these Chapter 15 Cases, together with the last four digits of their business number or employee identification number, as applicable, are: Papaya Gaming Ltd. (2095); and Papaya Gaming Inc. (3649).

**CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................1

BACKGROUND ....................8

I. THE DEBTORS' DECEPTIVE AND FRAUDULENT ACTIONS RESULT IN A $729 MILLION FINAL JUDGMENT IN FAVOR OF SKILLZ ....................8

II. THE DEBTORS COMMENCED AN ISRAELI ACTION AND THESE CHAPTER 15 CASES AS A BOND-FREE SUBSTITUTE FOR APPEAL ....................11

ARGUMENT ....................15

I. RECOGNITION SHOULD BE DENIED AS TO BOTH DEBTORS OR, ALTERNATIVELY, SHOULD BE LIMITED TO A FOREIGN NONMAIN PROCEEDING ....................15

A. The Israeli Action Is Not A "Foreign Proceeding" Because It Targets A Single U.S. Creditor And Is Not A Collective Proceeding ....................16

B. Papaya Ltd.'s COMI Is In The United States, Not Israel ....................19

i. Papaya Ltd.'s Primary Asset Is The U.S.-Generated Revenue Stream ....................21

ii. The Creditors The Israeli Action Will Affect Are U.S.-Based ....................24

iii. U.S. Law Governs The Claims That Comprise Nearly All Of Papaya Ltd.'s Debt ....................25

iv. The Location Ascertainable By Third Parties Of Papaya Ltd. Is The United States ....................27

v. The Timing And Design of The Filing Thwart The Expectations Of U.S. Creditors And Reflect Bad-Faith COMI Manipulation ....................31

C. Papaya US's COMI Is In The United States, Not Israel ....................38

i. Papaya US Has Neither A Headquarters Nor Management In Israel, And Indeed Has Essentially No Decisions To Manage; Instead Its Only Physical Locations Are In The United States ....................38

ii. Papaya US's Primary Assets Are In The United States ....................41

iii. Papaya US's Creditors Are In The United States ....................43

iv. U.S. Law Governs Papaya US's Disputes ....................44

v. The "Location Ascertainable By Third Parties" Of Papaya US Is The United States ....46

vi. The Debtors' Actions And Assertions Reflect Bad-Faith COMI Manipulation....51

D. Papaya US Does Not Have An Establishment In Israel ....52

II. DISCRETIONARY RELIEF SHOULD BE DENIED ABSENT SUFFICIENT CREDITOR PROTECTIONS....58

A. The Debtors' Request For Protections Of Section 1521 Is Overbroad And Cannot Provide Sufficient Protection Of Creditors ....58

i. The Court Should Prohibit Distribution of U.S. Cash Outside of the U.S. Unless Needed To Make A Payment that Cannot Be Made From A U.S. Account. ....60

ii. The Proposed Order Should Not Authorize the Debtors to Make Intercompany Distributions from Papaya US to Papaya Ltd. ....66

iii. The Court Should Require the Debtors to Post a Bond as a Condition to Relief Under Sections 1520(a)(3) and 1521 ....69

B. The Debtors' Request For Relief Pursuant To Section 1507 Is Overbroad And Cannot Satisfy Section 1507(b) ....72

III. THE COURT SHOULD INVOKE ITS POWERS UNDER SECTION 1506 TO PROTECT U.S. POLICY INTERESTS....75

A. The United States Has A Strong Public Policy Interest In Policing Deceptive Conduct Within The U.S. Market....75

B. The Debtors' Pervasive Bad Faith Creates Independent Grounds To Deny Or Condition The Relief Sought By The Proposed Order....77

CONCLUSION....79

RESERVATION OF RIGHTS ....79

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. DE C.V.)*,
701 F.3d (5th Cir. 2012) ....................36, 59, 62, 73

*Adam v. Saenger*,
303 U.S. 59 (1938)....................49

*ARD Fin., S.A.*,
678 B.R. 711 (Bankr. S.D.N.Y. 2026)....................50

*Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*,
480 B.R. 129 (S.D.N.Y. 2012)....................16

*ASI, Inc. v. Foreign Liquidators (In re Manley Toys Ltd.)*,
597 B.R. 578 (D.N.J. 2019) ....................42, 49

*Bank of N.Y. & JCPL Leasing Corp. v. Treco (In re Treco)*,
240 F.3d 148 (2d Cir. 2001)....................62

*Barnhardt v. Sigmon Coal Co.*,
534 U.S. 438 (2002)....................60

*Bilski v. Kappos*,
561 U.S. 593 (2010)....................73

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)....................76

*Grogan v. Garner*,
498 U.S. 279 (1991)....................78

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)....................36

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
903 F.2d 186 (3d Cir. 1990), *holding modified by Am. Tel & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir. 1994)....................69

*In re ABC Learning Centres Ltd.*,
728 F.3d 301 (3d Cir. 2013)....................16, 76, 77, 78

*In re Ace Track Co., Ltd.*,
556 B.R. 887 (Bankr. N.D. Ill. 2016) ....................67

*In re Agrokor, d.d.*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018) ....................59, 60, 68

*In re Andrade Gutierrez Engenharia S.A.*,
645 B.R. 175 (Bankr. S.D.N.Y. 2022) ....................69

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ....................60, 61, 68

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ....................21, 53

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008) ....................53

*In re Betcorp Ltd.*,
400 B.R. 266 (Bankr. D. Nev. 2009) ....................18, 27, 46

*In re Brit. Am. Ins. Co. Ltd.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) .................... *passim*

*In re Chiang*,
437 B.R. 397 (Bankr. C.D. Cal. 2010) ....................27, 46

*In re Creative Fin. Ltd.*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016) .................... *passim*

*In re Elpida Memory, Inc.*,
No. 12-10947 (CSS), 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) ....................68

*In re ENNIA Caribe Holding N.V.*,
596 B.R. 316 (Bankr. S.D.N.Y. 2019) ....................60

*In re Fairfield Sentry Ltd.*,
539 B.R. 658 (Bankr. S.D.N.Y. 2015), *subsequently aff'd,* 690 F. App'x 761
(2d Cir. 2017) ....................27, 46, 68

*In re FTX Trading Ltd.*,
91 F.4th 148 (3d Cir. 2024) ....................74

*In re Gold & Honey, Ltd.*,
410 B.R. 357 (Bankr. E.D.N.Y. 2009) ....................18, 36, 78

*In re Hanjin Shipping Co., Ltd.*,
No. 16-27401 (JKS), 2016 WL 6679487 (Bankr. D.N.J. Sept. 20, 2016) ....................59

*In re Holm*,
75 B.R. 86 (Bankr. N.D. Cal. 1987) ....................71, 72

*In re Irish Bank Resol. Corp. Ltd.*,
No. 13-12159 (CSS), 2014 WL 9953792 (Bankr. D. Del. Apr. 30, 2014), *aff'd*, 538 B.R. 692 (D. Del. 2015) ....................19

*In re Manley Toys Ltd.*,
580 B.R. 632 (Bankr. D.N.J. 2018) ....................49

*In re Markus*,
610 B.R. 64 (Bankr. S.D.N.Y. 2019)....................60, 61, 68

*In re Mega Newco Ltd.*,
No. 24-12031 (MEW), 2025 WL 601463 (Bankr. S.D.N.Y. Feb. 24, 2025) ....................21, 37

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) ....................57

*In re Mod. Land (China) Co., Ltd.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022).................... *passim*

*In re Mood Media Corp.*,
569 B.R. 556 (Bankr. S.D.N.Y. 2017)....................56

*In re NFE Glob. Holdings Ltd.*,
No. 26-11268 (MG), 2026 WL 2032660 (Bankr. S.D.N.Y. July 14, 2026).................... *passim*

*In re OAS S.A.*,
533 B.R. 83 (Bankr. S.D.N.Y. 2015)....................50, 51

*In re Oi Brasil Holdings Coöperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017)....................42, 50, 51

*In re Olinda Star Ltd.*,
614 B.R. 28 (Bankr. S.D.N.Y. 2020)....................45

*In re Petition of Garcia Avila*,
296 B.R. 95 (Bankr. S.D.N.Y. 2003)....................36

*In re Qimonda AG*,
462 B.R. 165 (Bankr. E.D. Va. 2011), *aff'd sub nom. Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14 (4th Cir. 2013)....................76

*In re Rede Energia S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014)....................60

*In re Roth Amer., Inc.*,
975 F.2d 949 (3d Cir. 1992)....................67

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019) ........ *passim*

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006) ........ *passim*

*In re Suntech Power Holdings Co. Ltd.*,
520 B.R. 399 (Bankr. S.D.N.Y. 2014) ........ 51

*In re Tri-Cont'l Exch. Ltd.*,
349 B.R. 627 (Bankr. E.D. Cal. 2006) ........ 21

*In re Wally Findlay Galleries (N.Y.), Inc.*,
36 B.R. 849 (Bankr. S.D.N.Y. 1984) ........ 70

*In the Matter of Videology Limited*,
[2018] EWHC 2186 (Ch) (Snowden J.) ........ 38, 42

*Incarcerated Entm't, LLC v. CNBC LLC*,
331 F.Supp.3d 352 (D. Del. 2018) ........ 75

*Jaffe v. Samsung Elecs. Co., Ltd.*,
737 F.3d 14 (4th Cir. 2013) ........ 59, 74, 77

*Lavie v. Ran*,
406 B.R. 277 (S.D. Tex. 2009), *aff'd sub nom*, *In re Ran,* 607 F.3d 1017 (5th Cir. 2010) ........ 50, 52, 56

*Marsch v. Marsch (In re Marsch)*,
36 F.3d 825 (9th Cir. 1994) ........ 70

*Micron Tech, Inc. v. Qimonda AG (In re Qimonda AG Bank.y Litig.)*,
433 B.R. 547 (E.D. Va. 2010) ........ 68, 76

*Midlantic Nat. Bank v. Hansen*,
48 F.3d 693 (3d Cir. 1995) ........ 40, 53, 54

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
714 F.3d 127 (2d Cir. 2013) ........ *passim*

*Papaya Gaming, Ltd. v. Fair Play for Mobile Games*,
No. 1:25-cv-00470-MSN-IDD (E.D. Va. filed Mar. 14, 2025) ........ 49

*Papaya Gaming, Ltd. v. Fair Play for Mobile Games*,
No. 25CV5573 (DLC), 2026 WL 558698 (S.D.N.Y. Feb. 27, 2026) ........ 4, 65

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ........ 75

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014)....................75

*Skillz Platform Inc. v. Papaya Gaming, Ltd., et al.*,
No. 1:24-cv-01646 (DLC) (S.D.N.Y. July 27, 2026)....................2

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
No. 1:24-cv-01646-DLC (S.D.N.Y.)....................4

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
No. 24-cv-01646 (DLC), Opinion and Order (S.D.N.Y. July 27, 2026)....................9

*U.S. Int'l Dev. Fin. Corp. v. Crédito Real S.A.B. de C.V., SOFOM, E.N.R. (In re Crédito Real S.A.B. de C.V., SOFOM, E.N.R.)*,
677 B.R. 192 (D. Del. 2026)....................74

*U-Haul Intern. Inc. v. Jartran, Inc.*,
522 F.Supp. 1238 (D. Ariz. 1981), *aff'd* 681 F.2d 1159 (9th Cir. 1982)....................75

*Wm. Passalacqua Builders v. Resnick Developers*,
933 F.2d 131 (2d Cir.1991)....................54

*Zambelli Fireworks Mfg. Co., Inc. v. Wood*,
592 F.3d 412 (3d Cir. 2010)....................69

**STATUTES**

11 U.S.C.
§ 101(23)....................18
§ 109(a)....................36
§ 1129(a)(10)....................36
§ 1502(2)....................53
§ 1506....................77
§ 1507(b)....................74
§ 1516(c)....................38
§ 1520(a)(1)....................74
§ 1520(a)(3)....................67
§ 1521(a)(7)....................74
§ 1521(b)....................60
§ 1522(a)....................59, 60
§ 1522(b)....................65, 69

**RULES**

Fed. R. Civ. P. 62....................70

## OTHER AUTHORITIES

Bunn, *The National Law of Unfair Competition*, 62 *Harv.L.Rev.* 987, 1000 (1949) ....................76

H.R. Rep. No. 109-31, pt. 1 (2005)..........................................................................................77

U.S. Code Cong. Serv., 79th Cong.2d Sess. 1274 (1946) ............................................................76

United Nations Commission on International Trade Law. UNCITRAL Model Law of Cross-Border Insolvency with Guide to Enactment and Interpretation (2014), https://uncitral.un.org/sites/default/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf...........................73

Skillz Platform Inc. ("**Skillz**"), a judgment creditor of the above-captioned Debtors, hereby files this objection (this "**Objection**") to the *Verified Petition under Chapter 15 for Recognition of the Israeli Proceeding as a Foreign Main Proceeding or, Alternatively, a Foreign Nonmain Proceeding* [Docket No. 4] (the "**Verified Petition**") filed by Oriel Bachar in his purported capacity as an authorized foreign representative (the "**Foreign Representative**") of Papaya Gaming Ltd. ("**Papaya Ltd.**") and Papaya Gaming Inc. ("**Papaya US**" and, together with Papaya Ltd., the "**Debtors**") and the form of *Final Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding* attached thereto as Exhibit A (the "**Proposed Order**"). In support of this Objection, Skillz respectfully states as follows:

## PRELIMINARY STATEMENT

1. The parties are here because according to a Southern District of New York jury and judge, the Debtors—and their Foreign Representative personally—conducted a massive fraudulent scheme that misled U.S. customers, allowed the Debtors to establish themselves in the U.S. market, and harmed Skillz enormously. Through these Chapter 15 Cases (the "**Chapter 15 Cases**"), the Debtors' insiders seek this Court's assistance to retain the full benefit of this scheme through their continued ownership of the Debtors, while impairing Skillz's claims. Nothing in the Bankruptcy Code compels or permits such a result.

2. The Debtors' business is based almost exclusively within the United States, and the creditors expect a forum here in the United States. When a United States District Court was about to reduce a jury verdict premised on that fraudulent conduct to an enforceable judgment, the Debtors declined to file a case here and instead commenced an action in Israel calibrated to impair that U.S. judgment while leaving existing equity, insiders, other U.S. creditors, and every Israeli counterparty unaffected. That conduct, and those intentions, are directly relevant to the questions

before the Court based on standards and case law relied upon by the Debtors:[1] whether each Debtor should be granted main or nonmain case recognition, and whether the discretionary relief the Foreign Representative seeks sufficiently protects the interests of U.S. creditors. As further set forth below, the answer to each of those questions is no.

3. These Chapter 15 Cases are brought by the Debtors' purported Foreign Representative whose debilitating conflicts of interest and lack of credibility dictate the outcome here. He (i) holds 17.048% of the equity in the Debtors;[2] (ii) sits on the governing board of the Debtors [redacted] (iii) is the Debtors' co-founder and the Chief Executive Officer who "oversees the general strategic direction of the business"[4] and was found by the United States District Court for the Southern District of New York (the "**SDNY Court**") to have "willfully and intentionally created and controlled a scheme to profit from its deception of consumers and at the expense of a competitor like Skillz";[5] and (iv) now wears a new hat as the Foreign Representative who is meant to act on behalf of the Debtors to "benefit the Debtors' creditors by ensuring that the value of the Debtors' assets is preserved, protected and maximized for the benefit of all stakeholders."[6] [redacted]

---

1 *See, e.g.*, *In re SPhinX, Ltd.*, 351 B.R. 103, 121 (Bankr. S.D.N.Y. 2006); *In re Creative Fin. Ltd.*, 543 B.R. 498, 513 (Bankr. S.D.N.Y. 2016).

2 *See* Corporate Ownership Statement [Docket No. 1] at 5.

3 [redacted] References to "[Exhibit _]" mean the exhibits in the Appendix filed concurrently with this Objection.

4 *See* Papaya's January 2023 Investor Memorandum, at 17.

5 *See* Docket No. 1004 at 72, *Skillz Platform Inc. v. Papaya Gaming, Ltd., et al.*, No. 1:24-cv-01646 (DLC) (S.D.N.Y. July 27, 2026).

6 Docket No. 5 ¶ 45.

[redacted]

4. The Debtors lack even a semblance of independent corporate governance. No independent director sits on either Debtor's board. [redacted] What the Debtors did instead is a matter of record. The Debtors have continued to pay every ordinary-course creditor in full while deferring any payment to Skillz.[10] [redacted]

---

[redacted]

[redacted]

[redacted]

10 *See* Verified Petition ¶ 34 ("Under the proposed Debt Arrangement, the Debtors will continue to operate in the ordinary course of business and will pay in full all ordinary-course obligations to employees, suppliers, service providers, and trade counterparties as and when due.").

[redacted]

[redacted] And after the SDNY Court entered the Final Judgment, they commenced an action in Israel rather than a case in the United States, and now ask this Court to endorse placement of the Debtors' U.S. revenue stream beyond the reach of U.S. creditors, the very same revenue stream that the SDNY Court stated should be available to Skillz for satisfaction of its judgment.[14]

5. Importantly, the Debtors could have commenced a bankruptcy case in the United States. The overwhelming substance of their business and their creditors are in the United States. They conceded the jurisdiction of the SDNY Court, and brought their own case in the Eastern District of Virginia.[15] But of course the Debtors did not want to bring a U.S. bankruptcy case, because they could not have crammed down a creditor who will not receive payment in full, while allowing existing equity to retain ownership and control without contributing new value, and also

---

[redacted] [redacted]

[redacted] [redacted]

14 "At that time [when the Final Judgment is entered], Papaya will have to satisfy the judgment or obtain a bond to cover the amount, pending appeal. Now, the law permits, as most relevant here, this prejudgment restraint where there is a showing of or a concern that assets will be dissipated to avoid a judgment. I don't think Papaya can reasonably evade enforcement of a judgment here. Its operations are principally in the United States. ***It[]s stream of revenues will be available to the plaintiff shortly***, unless a bond is posted." Tr. of May 15, 2026 Hr'g at 14:12–21, *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 1:24-cv-01646-DLC (S.D.N.Y.) ("**May 15 Hr'g Tr.**"), attached as Exhibit D to *Skillz's Objection to the Motion for Provisional Relief* [D.I. 23] [Exhibit 3] (emphasis added). The court repeated the point in declining to weigh the Debtors' deceptive conduct, citing "***the commercial realities that will accompany the enforcement of the judgment where the companies, the defendant's revenue stream is largely based on its U.S. operations and will be available to the plaintiff once judgment is entered***." May 15 Hr'g Tr. at 15:1–5 [Exhibit 3] (emphasis added).

15 *See Papaya Gaming, Ltd. v. Fair Play for Mobile Games*, No. 25CV5573 (DLC), 2026 WL 558698, at *14 (S.D.N.Y. Feb. 27, 2026) (imposing $1 million in sanctions against Papaya and its counsel for filing dismissed counterclaims in Virginia).

could not have achieved approval of nonconsensual third-party releases of insiders. The Debtors' own Israeli insolvency counsel [redacted]"[16] They instead filed an emergency action in Israeli court to obtain the benefit of a stay there, even though they should have reasonably expected that the Debt Arrangement could never be approved. Far from a routine, check-the-box exercise to recognize a foreign proceeding, these Chapter 15 Cases arose from forum shopping designed to allow the Debtors' insiders to retain value and control while preventing Skillz from recovering on its judgment claim.

6. And even if this disturbing context did not compel denial of the requested relief, a fair analysis of the traditional factors for recognition and discretionary relief would compel the same result. Papaya Ltd.'s center of main interests ("**COMI**") is the United States, not Israel. Its Israeli incorporation and the residence of its executives are the only facts pointing to Tel Aviv, and a COMI determination turns on neither. Everything that matters under the applicable standard points to the U.S.: [redacted]

---

[redacted] [redacted]

[redacted] the creditors the Israeli Action would actually impair are U.S. claimants, with a single U.S. judgment accounting for roughly 95% of the debt to be administered;[18] the claims comprising that debt arise under U.S. statutes and were reduced to judgment by a U.S. court whose jurisdiction Papaya Ltd. never contested and whose forum it affirmatively invoked to press its own claims;[19] [redacted] Nothing in the public domain would have led any U.S. player or counterparty to perceive this enterprise as centered in Israel. And the fact that the Israeli Action was commenced three days after the July 27 Order and one day before the Final Judgment was entered, reflects the Debtors' bad-faith COMI manipulation, not an Israeli center of gravity.

7. This is even more true for Papaya US. As a Delaware corporation, Papaya US's presumptive COMI is here; nothing in the record comes close to rebutting that presumption. It has no employees, no offices, and no operations anywhere outside of the U.S. Papaya's only argument is that Papaya US is "managed" from Israel, but the evidence is that there is nothing to manage; its sole officer described his officer role as [redacted] and its US director admits that [redacted] What Papaya US does have is entirely U.S. in focus: five payment-processor agreements with U.S. counterparties, [redacted]

---

[redacted]

18 *See* August 26 Order ¶ 3 [Exhibit 6]; Verified Petition ¶ 36.

19 *See* Final Judgment, Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 1:24-cv-01646-DLC (S.D.N.Y. July 28, 2026), ECF No. 1005 [Exhibit 7]; Answer, Affirmative Defenses, and Counterclaims ¶¶ 43-58, *id.*, ECF No. 46 [Exhibit 8].

[redacted]

[redacted][24] U.S. bank accounts [redacted];[25] [redacted] and a creditor body composed almost exclusively of U.S. claimants, the largest of which is Skillz.[27] Every address Papaya US has ever given a third party—to its processors, to its banks, to the IRS, even to its only Israeli bank—is a U.S. address.[28] None of its outward-facing activity would have led any counterparty to perceive Papaya US as an Israeli enterprise. And the establishment analysis fails for the same reasons and even more: an establishment requires a place of operations from which local ***market-facing*** (*i.e.*, external economic activity) is conducted, and yet Papaya US has no office, no lease, no employee, no customer, and no contract in Israel other than an internal services agreement with its own parent, signed by the same individual on both sides. "Management" from Israel performing a "really meaningless" role, an intercompany balance, and a bank account [redacted] the records of which list a Delaware address do not establish a place of operations in Israel. Papaya US therefore has neither a COMI nor an establishment in Israel, and the Israeli Action cannot be recognized as to Papaya US in any form.

8. The Court should deny recognition or, alternatively, narrowly limit any relief and impose protections sufficient to protect U.S. creditors' rights with respect to the Debtors' assets located within the United States. Far from plotting to destroy the Debtors' business, Skillz is

---

24 *See* Verified Petition ¶ 67; *infra* ¶¶ 76, 81.

25 *See infra* ¶ 82.

[redacted]

27 *See* Verified Petition ¶¶ 24, 26-27; [redacted]

28 *See infra* ¶¶ 70, 81-84; [redacted]

seeking to preserve value for the benefit of creditors and all stakeholders by continuing the Debtors as a going concern and allowing all required payments. But Skillz asks this Court to limit the relief requested by the Debtors so as to maintain U.S. assets within the U.S. (and, by extension, this Court's jurisdiction), to the extent possible. The Debtors' existing management cannot be trusted to protect the interests of creditors; they are hopelessly conflicted and have shown themselves to pursue their interests over creditors'. That is precisely why the Court should ensure sufficient U.S. creditor protections by declining to authorize distribution of U.S.-generated revenues from the U.S. to Israel (other than any ordinary course expenses that must for some reason be paid only through a foreign bank account). To the extent Debtors' necessary expenses require U.S.-generated cash, they can simply be paid from the U.S. accounts of the Debtors, which both Debtors maintain, and which enable foreign currency transactions. As further set forth below, Skillz is proposing a set of narrowly tailored measures that are designed to preserve going-concern value while also protecting U.S. creditors. Comity is not a cover to protect the fruits of fraud, and Chapter 15 was never intended to protect fraudsters or allow them to preserve their equity at the expense of creditors.

## BACKGROUND

### I. THE DEBTORS' DECEPTIVE AND FRAUDULENT ACTIONS RESULT IN A $729 MILLION FINAL JUDGMENT IN FAVOR OF SKILLZ

9. On March 4, 2024, Skillz filed a complaint against the Debtors in the SDNY Court, alleging false advertising claims under the Lanham Act and violations of the New York General Business Law ("**GBL**"). Skillz sought, among other things, actual damages, disgorgement of the Debtors' profits, and injunctive relief.

10. After a jury trial held in April 2026, the jury found that Skillz established that the Debtors engaged in false advertising in violation of the Lanham Act and a deceptive act or practice

in violation of the GBL. The jury awarded Skillz $420 million in actual damages and returned an advisory verdict of $719 million on Skillz's disgorgement-of-profits theory. *See Skillz Platform Inc. v. Papaya Gaming, Ltd.,* No. 24-cv-01646 (DLC), Opinion and Order at 12–13 (S.D.N.Y. July 27, 2026) [ECF No. 1004] (the "**July 27 Order**") [Exhibit 12]. The July 27 Order was based on, among other things, the fact that "Papaya's fraudulent conduct was extraordinary." *See* July 27 Order at 37 [Exhibit 12]. In the course of this conduct, the Debtors deliberately deceived customers, payment processors, app stores and other third parties. *Id*. at 29 [Exhibit 12].

11. After post-trial briefing, the SDNY Court denied the Debtors' motions for judgment as a matter of law, for a new trial, and for remittitur, adopted the jury's advisory disgorgement verdict, and entered final judgment (the "**Final Judgment**") on July 31, 2026 in favor of Skillz and against the Debtors in the total amount of $729,213,615.60, comprising $719,000,000.00 in disgorgement, $10,144,354.04 in attorneys' fees, and $69,261.56 in costs, plus post-judgment interest pursuant to 28 U.S.C. § 1961.

12. In the July 27 Order, the SDNY Court detailed the significant fraudulent and willful misconduct perpetrated by the Debtors. Specifically, the SDNY Court found that "Papaya's founders decided to enter the real-money skill-based mobile gaming market in 2019 by deceiving the public and others about the nature of its product." July 27 Order at 6 [Exhibit 12]; *see also id*. at 9 [Exhibit 12] ("Papaya not only misrepresented its tournaments in its advertising to and communications with consumers, it misrepresented them to app stores, its payment processers, and its advertising channels."); *id*. [Exhibit 12] ("Papaya's executives were intimately involved in the deception."). Among other things, Papaya represented to U.S. consumers and U.S. businesses that Papaya's customers were participating in skill-based games and tournaments against other individuals. In actuality, Papaya's services were a scheme—customers were regularly matched

against computer opponents with unmatched theoretical skill, and Papaya would tune the computer's performance to effectively choose whether the human player won or lost the tournament based on which outcome would maximize Papaya's long-term profits. The SDNY Court further recounted that, near the close of fact discovery, the Debtors' "executives invoked their Fifth Amendment right against self-incrimination at their depositions." *Id*. at 13 [Exhibit 12].

13. The fraud was not incidental to the Debtors' business; it was the means by which that business was built and the current customer base created. The SDNY Court found that (i) "Papaya used that advertising's false description of its platform to enter the RMSB market, to compete with Skillz, to woo away Skillz customers, and to build market share" July 27 Order at 18 [Exhibit 12]; (ii) "[t]hat false advertising concerned the very nature of the product; it was not a false statement about some incidental feature" *id.* [Exhibit 12]; and (iii) "[w]ithout its false advertising, it could not have entered the U.S. market or swiftly achieved its significant market share and the billions of dollars in revenue that came with that market share." *Id*. at 53 [Exhibit 12]. Papaya could not have acquired its user base without those channels—the app stores that distributed its games, the processors that collected player deposits and paid out winnings—and it obtained access to each of them by misrepresenting what it was selling.

14. The SDNY Court also found "there was overwhelming evidence at trial that Papaya intentionally engaged in an advertising scheme to deceive consumers about the nature of its product and was liable under both the Lanham Act and the GBL . . . ." *Id*. at 11 [Exhibit 12]. The SDNY Court found the case "exceptional" and awarded over $10 million in attorneys' fees.

15. Between the jury verdict and the SDNY Court's entry of the Final Judgment, Skillz brought a motion in the SDNY Court seeking to restrain the Debtors from expatriating any revenue earned in the United States. The SDNY Court declined to grant that pre-judgment relief, but it did

so on an express premise that the Debtors' U.S. revenue stream would be available to Skillz once judgment was entered, namely, the same revenue stream that has been diverted since the commencement of these Chapter 15 Cases.[29]

## II. THE DEBTORS COMMENCED AN ISRAELI ACTION AND THESE CHAPTER 15 CASES AS A BOND-FREE SUBSTITUTE FOR APPEAL

16. Only three days after the SDNY Court entered the July 27 Order (and in anticipation of the forthcoming Final Judgment, which was issued on July 31), the Debtors commenced an *ex parte* action in the Israeli District Court (the "**Israeli Action**") on July 30, 2026. These Chapter 15 Cases were filed shortly thereafter on August 2, 2026.

17. The Debtors brought an action under Part J of the Israeli Insolvency Law. *See* Yaniv Decl. ¶ 22 [Docket No. 6]. Pursuant to applicable Israeli law, the Debtors filed a proposed Debt Arrangement [Exhibit 13] as the basis of the Israeli Action.

18. The Israeli Action contains certain material differences from a comparable process commenced in the United States under chapter 11 of the Bankruptcy Code. For example, while chapter 11 provides robust creditor protections and court oversight of the debtor's operations, the Israeli debt arrangement process permits the debtor to retain substantially greater control and flexibility, including with respect to the treatment of different creditor classes. As an example, the Arrangement Administrator in the Israeli Action has no authority to operate the Debtors' business; act on their behalf; take executive decisions with regard to the operating plan; or investigate claims on behalf of the Debtors' estate. Because their role is largely limited to observing and reporting on the Debtors' affairs during the Israeli Action, the principal means for the Arrangement Administrator to respond to any misconduct or deviations from the operating plan by the company

---

[29] May 15, 2026 Hr'g at 14:12–15:5 [Exhibit 3].

is to report the misconduct or deviations to the Israeli court and/or inform the Israeli court that the conditions for a temporary stay ceased to exist.

19. Additionally, the Debt Arrangement contains certain terms which are generally inconsistent with the applicable requirements for a chapter 11 reorganization plan. For example, the Debt Arrangement (i) leaves the shareholders with ownership and control of the company while the affected U.S. creditors (overwhelmingly Skillz) will not receive payment in full of their claims, (ii) unfairly discriminates between claims of equal dignity by providing for Excluded Creditors to be unimpaired and for Contingent Creditors (overwhelmingly comprised of Skillz) to be impaired, and (iii) includes nonconsensual releases that waive creditors' claims against insiders in exchange for no consideration. Here, the Debt Arrangement proposes to pay trade creditors in full while impairing Skillz and other judgment creditors—disparate treatment that would be impermissible under the Bankruptcy Code's absolute priority rule, cram down protections, and classification requirements.

20. On August 1, 2026—one day after commencing the Israeli Action and one day after the Final Judgment was entered—the Israeli court entered an order on an *ex parte* basis, temporarily staying all proceedings against the Debtors and their assets. *See Decision, Application No. 1*, Case No. 87154-07-26 (Dist. Ct. Tel Aviv-Yafo Aug. 1, 2026) (the "**Ex Parte Stay Order**") (certified English translation attached as Exhibit E to the Yaniv Declaration [Docket No. 6-5]) [Exhibit 14]. The Debtors sought that relief on an emergency basis, notwithstanding that no enforcement proceeding was then pending[30] and a 30-day stay existed in the U.S., because [redacted]

---

[30] The Israeli court expressly recorded that "the Applicants themselves stated in the Application . . . that the enforcement and collection proceedings initiated by SKILLZ in the United States were unsuccessful under a decision issued in mid-May 2026, such that there is currently no immediate enforcement or collection proceeding that the Applicants seek to stay." Ex Parte Stay Order at 1 [Exhibit 14].

[redacted] The Debtors also withheld from the Israeli court the very U.S. decision on which that admission rested: the court noted that the Debtors "did not attach the 15.05.2026 decision of the United States court referenced in paragraph 41 of the Application, or any other decisions relating to the enforcement proceedings," such that it was "not possible to determine whether the temporary stay would stay proceedings to enforce the judgment in the United States . . . or whether it would conflict with other decisions issued in those proceedings," and it directed the Debtors to clarify the point no later than August 4, 2026. *Id.* [Exhibit 4]. The Debtors simultaneously obtained a nonpublication order barring disclosure of the application and every decision entered in the proceeding, which remained in effect until August 6, 2026. *Id.* [Exhibit 4]. Consistent with that secrecy, the Debtors gave Skillz no notice of the Israeli Action until 10:33 a.m. (ET) on August 3, 2026—four days after commencement—and then only incidentally, when Skillz received notice of the commencement of these Chapter 15 Cases. *See* Provisional Relief Objection [Docket No. 23] ¶¶ 2, 11.

21. In addition to filing the Verified Petition, on August 2, 2026, the Foreign Representative, on behalf of the Debtors, filed the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* [Docket No. 7] (the "**Provisional Relief Motion**").

22. The Provisional Relief Motion sought relief pending the Court's disposition of the Verified Petition, including the application of sections 362 and 365(e) of the Bankruptcy Code to stay proceedings and enforcement actions against the Debtors and their property within the territorial jurisdiction of the United States and to prevent counterparties from terminating or modifying the Debtors' executory contracts and unexpired leases solely because of the commencement of these Chapter 15 Cases.

23. On August 4, 2026, Skillz filed the *Objection to the Debtors' Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* [Docket No. 23] (the "**Provisional Relief Objection**"), which set forth grounds on which it opposed the Provisional Relief Motion, *inter alia*, the Debtors failed to meet the requirements for relief under section 1519, the Debtors should be required to post a supersedeas bond prior to obtaining stay relief in respect of the Final Judgment, and that the Debtors had failed to make an appropriate showing regarding the sufficient protection of creditors under section 1522(a).

24. On August 5, 2026, the Court entered an *Order Granting Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* [Docket No. 39] (the "**Provisional Relief Order**"). The Provisional Relief Order granted the Debtors provisional relief under sections 105(a), 362, 365, 1519, and 1521(a)(3), (4), and (7) of the Bankruptcy Code pending entry of an order concerning recognition of the Israeli Action, including by provisionally applying section 362 to the Debtors and their property within the territorial jurisdiction of the United States, enjoining actions stayed by section 362 within that jurisdiction, applying section 365(e) to the Debtors' executory contracts and unexpired leases, and granting the Foreign Representative the protections of sections 306 and 1510.

25. Three weeks later, on August 26, 2026, following a hearing held on August 25, the presiding court in the Israeli Action issued an order (the "**August 26 Order**") (a certified translation of which is attached as Exhibit 6 hereto) which, *inter alia*, extended an interim stay of proceedings for 45 days until October 11, 2026 (as later clarified) and appointed an Arrangement Administrator. August 26 Order ¶¶ 9, 12 [Exhibit 6]. Critically, the Israeli court sustained Skillz's objection to scheduling a creditors meeting. *Id.* ¶ 8 [Exhibit 6]. The court found the proposed arrangement inadequate because it "is based solely on income from continued activity, with all the

inherent risks involved, without guarantees, without owner contributions, etc.," and directed the Debtors to "improve the settlement and present a [new] model that would incorporate income from continued activity as well as from additional sources." *Id.* ¶ 5 [Exhibit 6]. During the August 25 hearing, the court further explained that "[t]he model proposed in the settlement is not good enough" and that the Debtors must bring "some larger amount on the table at the beginning" rather than relying solely on projected future profits. August 25 Hr'g Tr. at 13, 19 (certified translation) [Exhibit 15].

26. The August 26 Order stated that the Debtors' insolvency was almost entirely a result of the Final Judgment, which constitutes "approximately $719 million" of the Debtors' total estimated debt of $754 million. August 26 Order ¶ 3 [Exhibit 6]. Outside of the judgment, the Debtors have an accessible cash balance of approximately $151 million. *Id.* [Exhibit 6].

27. As of the date hereof, no revised arrangement has been proposed either by the Debtors or by the Arrangement Administrator. The Debt Arrangement the Debtors filed—the one that the Israeli court found inadequate—remains the best evidence of what the Debtors intended and intend to accomplish through the Israeli Action: full payment of ordinary-course and Israeli creditors, deferred and conditioned payment of Skillz in less than the full amount owed, retained ownership and control for existing equity, and nonconsensual releases for insiders in exchange for no consideration.

28. On September 2, 2026, following discovery disputes and motion practice, the Court entered the *Order Granting, in Part, Skillz Platform Inc.'s Motion to Compel Production of Documents and Witness for Deposition* [Docket No. 92].

## ARGUMENT

### I. RECOGNITION SHOULD BE DENIED AS TO BOTH DEBTORS OR, ALTERNATIVELY, SHOULD BE LIMITED TO A FOREIGN NONMAIN PROCEEDING

29. Recognition should be denied for four independent reasons, each addressed in turn below. *First*, the Israeli Action is not a "foreign proceeding" at all, because it is not collective: it is calibrated to impair a single U.S. judgment creditor; virtually every other creditor is paid in full. *Second*, Papaya Ltd.'s COMI is the United States, not Israel, and the Israeli Action therefore cannot be recognized as a foreign main proceeding as to Papaya Ltd. *Third*, because Papaya US's COMI is likewise the United States, the Israeli Action cannot be recognized as a foreign main proceeding as to Papaya US. *Fourth*, Papaya US has no establishment in Israel, so the Israeli Action cannot be recognized as to Papaya US in any form.

30. If the Court were nonetheless to find an Israeli establishment as to Papaya US, recognition should be limited to a foreign nonmain proceeding, and all protections or relief sought by the Foreign Representative must be subject to protection of creditors pursuant to sections 1521, 1522 or 1507.

### A. The Israeli Action Is Not A "Foreign Proceeding" Because It Targets A Single U.S. Creditor And Is Not A Collective Proceeding

31. A foreign proceeding must be "instituted for the benefit of creditors generally rather than for a single creditor or class of creditors," *In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010), and what matters is how the proceeding operates rather than the label the foreign statute supplies, *see Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, at 136–37 (S.D.N.Y. 2012); *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 310 (3d Cir. 2013). As deployed here, the Israeli Action reaches only tort claimants, and in substance, singles out just one of them: Skillz is assigned a separate class on the ground that its interest is "materially distinct." Verified Petition ¶ 36. Indeed, Skillz holds approximately $719 million of

roughly $754 million in estimated debt that would be impaired as Contingent Creditors,[31] August 26 Order ¶ 3 [Exhibit 6]. Suppliers, employees, tax authorities, and players are designated "Excluded Creditors" who are paid in the ordinary course and need not file proofs of debt. Verified Petition ¶ 23; Debt Arrangement ¶¶ 4–5, 21 [Exhibit 13].

32. Skillz is not the only Contingent Creditor, but it would be subject to discriminatory treatment compared to other Contingent Creditors. The Milberg U.S. consumer class action settlement of $15 million is part of the same class.[32] Verified Petition ¶ 26; Debt Arrangement ¶ 10(b) & Definitions [Exhibit 13]. Yet, in practice the Debt Arrangement treats the two claims nothing alike. Once pending appeals of the U.S. class action are resolved, the $15 million claim could be satisfied in a single stroke out of the $60 million the Debtors would be obligated to deposit within fourteen days of the effective date. And the Milberg settlement is unaffected by the arrangement's failure to accrue post-judgment interest until after appeals are concluded, because the Milberg settlement is not effective (*i.e.*, owed) until appeals are concluded.

33. In contrast, it is undisputed that Skillz's judgment will be impaired. The $730 million Administrator Fund is admittedly insufficient even to pay all existing liabilities. [redacted] even though there is already the Milberg $15 million settlement, plus any other judgments that occur. Based on the findings of the SDNY Court, additional claims should be expected. But the impairment is even worse, because that also means there is not any money to pay Skillz post-

---

31 The Debt Arrangement defines "**<u>Contingent Creditor</u>**" as a creditor that is not an Excluded Creditor and that: (a) as of the date of filing, is pursuing legal proceedings against the Companies based on causes of action relating to past practices involving the use of bots; (b) has a cause of action to commence such proceedings; or (c) holds a foreign judgment against the Companies that remains subject to appeal and has not yet become an Enforceable Monetary Judgment in Israel. *See* Debt Arrangement, Definitions [Exhibit 13].

32 The settlement was approved in March 2026 and is subject to appeal by certain dissenting plaintiffs.

judgment interest, [redacted] That unpaid interest will be in the nine figures given the six-plus years over which Skillz will supposedly be paid, and which Skillz is entitled to receive starting on July 27, 2026, rather than possibly years from now when Papay finally stops its appeals process (which could even include Supreme Court certiorari petitions). In addition, there is immense uncertainty whether the Debtors will even make the scheduled contributions, as they are based on deeply speculative projections over a period of over six years. These impairments are unique to Skillz, because its repayments are stretched over the next six years, unlike the Milberg $15 million settlement which can be paid promptly out of the very first fund contributions as soon as the pending appeal concludes.

34. A proceeding aimed at impairing a single creditor is not the collective administration chapter 15 contemplates, *see* 11 U.S.C. § 101(23); *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009) (contrasting a collective proceeding with a single-creditor receivership), and the mismatch is not a technicality. It is part of the Debtors' bad faith effort to forum shop for the most advantageous tool to use against their litigation adversary. The Debtors here deployed an insolvency statute against the one creditor whose judgment they wished to defer and compromise, left every ordinary-course creditor untouched, preserved their own equity, and sought releases for the insiders who directed the conduct that produced the judgment—then asked this Court to treat that machinery as proof that their affairs are centered in Israel. *Gold & Honey* is instructive: there, a single creditor drove an insolvency process against a debtor; here, a debtor drives one against a single creditor. *In re Gold & Honey, Ltd.*, 410 B.R. 357, 368, 370–71 (Bankr. E.D.N.Y. 2009). Either way, the process is a litigation device aimed at a discrete claim. This

Court need not question Israeli law or the Israeli court to say so. It need only look at what the Debtors have done with the proceeding they commenced, which is what the bad-faith inquiry asks.

**B. Papaya Ltd.'s COMI Is In The United States, Not Israel**

35. COMI is not a mechanical test, and the Court's task is not to tally factors. On the question whether a foreign proceeding is "main" or "nonmain," "the Bankruptcy Code provides considerable but not complete discretion." *SPhinX*, 351 B.R. at 117; *see In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 278–79 (Bankr. S.D.N.Y. 2019) (describing COMI as "a flexible determination and not a rigid application of factors"). The factors set out below are "not [to be] appl[ied] . . . mechanically"; they "should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *SPhinX*, 351 B.R. at 117; *accord Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.),* 714 F.3d 127, 137 (2d Cir. 2013) (consideration of the factors is "neither required nor dispositive"). When a court weighs them, "the protection of creditors' interests is paramount," *In re Mod. Land (China) Co., Ltd.*, 641 B.R. 768, 788 (Bankr. S.D.N.Y. 2022) (treating the expectations of the creditors whose debt the foreign proceeding was convened to restructure as central to the COMI determination), and the creditors that matter are those "who would be affected by the case," *SPhinX*, 351 B.R. at 117.

36. Within that framework, courts often look to five factors—sometimes known as the *SPhinX* factors. *See Constellation, 600 B.R. at 273* . The *SPhinX* factors are: [1] the location of the debtor's headquarters; [2] the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); [3] the location of the debtor's primary assets; [4] the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; [5] and/or the jurisdiction whose law would apply to most disputes. *See id*. (citing *In re SPhinX, Ltd.* at 117; *see also In re Irish Bank Resol. Corp. Ltd.*,

No. 13-12159 (CSS), 2014 WL 9953792, at *16 (Bankr. D. Del. Apr. 30, 2014) (applying SPhinX factors), *aff'd*, 538 B.R. 692 (D. Del. 2015). Those factors are nonexclusive, and, as set out below, additional considerations—third-party ascertainability, the expectations of the creditors the proceeding will actually affect, and the timing and design of the filing itself—confirm the answer here. Ultimately, "every debtor has one and only one COMI." *Constellation*, 600 B.R. at 276.

37. That discretion extends to the purpose for which the foreign proceeding was commenced. The intent behind a filing is not an overlay on the COMI analysis; it is part of it. *SPhinX* itself—the very decision that supplied the factors—declined to find a COMI supporting foreign main recognition because the debtors' "litigation strategy . . . appears to be the only reason for their request for recognition." 351 B.R. at 121. *Creative Finance* did the same, denying recognition where the debtors' principals were "guilty of bad faith in numerous respects," including "orchestrating this entire chapter 15 case to deprive their only noninsider creditor of much or all of the fruits of its judgments." 543 B.R. at 513.

38. Courts have grown more insistent on that scrutiny, not less. In *NFE Glob. Holdings*, Judge Glenn recently held that where a foreign proceeding is used to restructure the debt of a company whose business lies elsewhere, "a chapter 15 court should scrutinize COMI closely to be sure the Scheme or Plan has not been used unfairly to favor one group of creditors over others to achieve a result that could not be achieved in a chapter 11 case," and that "[i]nsider exploitation, untoward manipulation, and overt thwarting of third-party expectations may result in a refusal to recognize and enforce the foreign scheme or plan for bad faith COMI manipulation." *In re NFE Glob. Holdings Ltd.*, No. 26-11268 (MG), 2026 WL 2032660, at *49–50 (Bankr. S.D.N.Y. July 14, 2026) [Exhibit 17]. The court described itself as "particularly sensitive to 'bankruptcy tourism' and concerned by the opportunity for its abuse via COMI manipulation." *Id.* at *48. Judge Wiles

expressed the same concern in *Mega Newco*: if a debtor may select its restructuring forum at will, "[t]he laws of the chosen jurisdiction would govern a restructuring, no matter how those laws might affect the legitimate expectations of creditors and regardless of whether the debtor had chosen a particular jurisdiction for the purpose of favoring insiders or for other improper reasons." *In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463, at *3 (Bankr. S.D.N.Y. Feb. 24, 2025) (*quoted in NFE Glob. Holdings*, 2026 WL 2032660, at *49). Those principles frame each of the factors that follow.

39. Although Papaya Ltd. is incorporated in Israel, and is run by executives who reside there, those facts do not alone establish where its center of main interests lies. COMI is a holistic, fact-driven, and discretionary inquiry in which no single factor controls, and the location of a debtor's headquarters and management is not a proxy for the answer. *See Fairfield Sentry Ltd.*, 714 F.3d at 137; *SPhinX*, 351 B.R. at 117.[33] Nor does the presumption drawn from Papaya Ltd.'s registered office carry the Foreign Representative's burden here. The presumption exists "for speed and convenience in instances in which the COMI is obvious and undisputed" and is "especially inappropriate in a case where there is a substantial dispute." *Creative Fin. Ltd.*, 543 B.R. at 514–15, 517. It also "does not shift the risk of nonpersuasion," which at all times rests on the Foreign Representative. *In re Tri-Cont'l Exch. Ltd.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). Every other consideration points to the United States.

### ***i. Papaya Ltd.'s Primary Asset Is The U.S.-Generated Revenue Stream***

[33] *See, e.g., In re Brit. Am. Ins. Co.,* 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010) (finding COMI in Trinidad, not Bahamas, where debtor was incorporated and regulated, because debtor "outsourced essentially all of its central management" to a wholly-owned subsidiary in Trinidad and the debtor's "administrative hub" remained there).

40. The location of primary assets strongly favors the United States. Papaya Ltd.'s principal asset is the U.S.-generated revenue stream, together with the U.S. customer base that produces it. The SDNY Court reached the same conclusion about where this enterprise operates, finding that Papaya's "***operations are principally in the United States***" and that its "***stream of revenues*** will be available to the plaintiff shortly, unless a bond is posted." May 15 Hr'g Tr. at 14:19–21 [Exhibit 3] (emphasis added). The Debtors' own actions confirm this: [redacted]

41. And the operations—comprising the primary asset here—are American. [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] That revenue stream is not incidental—it is the core operating asset from which the Debtors' value (and the Final Judgment debt) arose, as evidenced by their statement to the Israeli court and their accounting method. Likewise, Papaya Ltd.'s audited financial statements confirm that Papaya's enterprise is directed towards the U.S., and that the U.S. Dollar is the "primary economic environment" in which Papaya Ltd. operates. That customer base, which generates the U.S. revenue is itself an asset of the enterprise, and it was purchased, built, and maintained in the United States. Put simply, Papaya Ltd.'s business, which is its chief asset, is overwhelmingly U.S.

42. Papaya Ltd.'s intellectual property does not point to elsewhere. Its portfolio comprises [redacted] That portfolio is overwhelmingly U.S.-focused, and whatever its formal situs, it has value only because it is monetized through a U.S.-facing business.

---

[redacted] [redacted]

[redacted] [redacted]

43. As for cash, the Debtors admit this is not Papaya Ltd.'s primary asset. But regardless, Papaya Ltd. holds U.S. bank accounts at Silicon Valley Bank / First-Citizens Bank. [redacted] That transfer violates the Debtors' own board-adopted investment policy, [redacted]

*ii. The Creditors The Israeli Action Will Affect Are U.S.-Based*

44. The location of creditors affected by the case also overwhelmingly points to the United States, as the Israeli court's findings establish. In the August 26 Order, that court found the Debtors to have "estimated debts totaling approximately $754 million, of which approximately $719 million stems from" the Final Judgment entered in favor of Skillz. August 26 Order ¶ 3 [Exhibit 6]. The court then itemized what makes up the remainder: "additional debts to the users of the companies for monetary prizes, and debts arising from the current operations of the Companies and a settlement reached by the Companies as part of a class-action suit filed against them in a California court." *Id.* [Exhibit 6]. That itemization is the point. Virtually every category of debt subject to the debt arrangement is U.S.-facing, and the court identified no Israeli creditor

---

[redacted]

[redacted]

whose claim the proceeding addresses.[42] Papaya Ltd. does have Israeli counterparties: its accountants, its landlord, its lender under a Tel Aviv credit facility, and its employees. But the Debtors themselves confirm that those obligations are paid in the ordinary course and are unaffected by the proposed arrangement.[43]

45. The selective impairment of U.S.-based creditors is critical. *SPhinX* asks not only where a debtor's creditors are located generally but where "a majority of the creditors who would be affected by the case" are located, 351 B.R. at 117, and courts in this Circuit weigh the expectations of the creditors whose claims the foreign proceeding will actually resolve, *see Modern Land*, 641 B.R. at 788. Where a single U.S. judgment accounts for approximately 95% of the debt, and where virtually every remaining covered claim is likewise American, this factor points decisively to the United States.

#### *iii. U.S. Law Governs The Claims That Comprise Nearly All Of Papaya Ltd.'s Debt*

46. Likewise, U.S. law would apply to essentially all claims against the Debtors that are impaired under the proposed arrangement.[44] Indeed, essentially every claim in the class of Contingent Creditors that the Debt Arrangement itself creates is governed by U.S. law: Skillz's Lanham Act and GBL judgment; the claims of the U.S. consumer class settled in Los Angeles

---

[42] All four lawsuits identified in Exhibit A to the Lists and Statements Filed Pursuant to Bankruptcy Rule 1007(a)(4) [D.I. 1] were filed in the United States, and of the sixty-six creditors listed in Exhibit B, exactly one carries an Israeli address while forty-three are U.S. entities.

[43] The only even potential impact on an Israeli creditor is that one of the Contingent Creditor litigations is an ostensible class action in Israel. But no class proceeding has yet been allowed, and the only named plaintiff is a British resident.

[44] The Debtors' terms of service provide for the applicable law based on the customer's location (i.e., a dispute with a U.S. customer would be subject to New York), but that clause does not reach the claims at issue. The Final Judgment rests on the Lanham Act and New York General Business Law, asserted by a competitor rather than a customer, and the Debtors have never treated the clause as governing consumer claims either: the U.S. consumer class action proceeded in Los Angeles County Superior Court and the individual consumer claim in a U.S. arbitration, while the sole proceeding the Debtors face in Israel was brought on behalf of non-U.S. consumers. Verified Petition ¶ 26. The Debt Arrangement confirms the point, fixing each creditor's entitlement by the outcome of its own proceeding "whether in Israel or elsewhere." Debt Arrangement ¶ 29 [Exhibit 13].

County Superior Court; and the Pavlovich arbitration claim. Indeed, Papaya Ltd. declined to contest jurisdiction in its litigation with Skillz; to the contrary, Papaya Ltd. invoked U.S. jurisdiction to assert its own counterclaim,[45] and in March 2025 it filed suit as plaintiff in the Eastern District of Virginia, invoking federal jurisdiction to litigate claims arising from the U.S. market.[46] Papaya Ltd. has treated U.S. courts as the predominant venue for disputes about its business.

47. [redacted] The Foreign Representative's misguided framing is that Israeli law governs Papaya Ltd.'s "corporate affairs, its employment relationships, its proceeding before the Israeli Court, and the rights of its creditors," (although realizing the weakness of this argument, he then claims that this factor is "neither required nor dispositive"). Opposition ¶ 34. But this is not the law that governs "most disputes" when virtually all of the impaired claims arise under U.S. law. Courts applying this factor look to the law governing the claims the foreign proceeding will actually resolve, not the law of the debtor's internal affairs. *See Constellation*, 600 B.R. at 284 (weighing that the objecting creditor's "claims against Constellation Overseas to be resolved by the arbitral tribunal are, therefore, New York law governed claims").

---

[45] *See* Answer, Affirmative Defenses, and Counterclaims ¶¶ 44–58, 43, Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 1:24-cv-01646-DLC (S.D.N.Y. Aug. 5, 2024), ECF No. 46 [Exhibit 8].

[46] Complaint ¶¶ 31–33, Papaya Gaming, Ltd. v. Fair Play for Mobile Games, No. 1:25-cv-00470-MSN-IDD (E.D. Va. filed Mar. 14, 2025), ECF No. 1 [Exhibit 24].

### *iv. The Location Ascertainable By Third Parties Of Papaya Ltd. Is The United States*

48. "[T]he COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Fairfield Sentry*, 714 F.3d at 130, 137 (the *SPhinX* factors—headquarters, management, primary assets, creditor location, and governing law—are "neither required nor dispositive"). The factor is objective, measured "based on the viewpoint of third parties (usually creditors)," *In re Chiang*, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010), and by examining factors "in the public domain" a court can confirm that a COMI is "regular and ascertainable [and] not easily subject to tactical removal," *Fairfield Sentry*, 714 F.3d at 136–37. What matters is thus not only "what a debtor does, but . . . what a debtor is perceived as doing." *British Am.*, 425 B.R. at 912 (quoting *Betcorp*, 400 B.R. at 291). The third parties whose perception matters here are the U.S. players whose claims animate this proceeding.

49. Measured from that vantage point, what a U.S. market participant could observe about this enterprise points to the United States. The Debtors' own website, the most public source of all, discloses no Israeli presence whatsoever. Its landing page presents imagery of players in an American city, and its contact pages identify no Israeli address, office, or telephone number—nothing anywhere on the site would tell a visitor that this is an Israeli enterprise.[47] [redacted]

---

[47] *See* Papaya Gaming website, https://www.papaya.com (last visited September 9, 2026) [Exhibit 25].

[redacted]

50. Likewise, under the Debtors' payment-processor agreements, the games could be offered only to customers [redacted]

51. [redacted] That is, they were required to [redacted].[54]

52. Papaya Ltd. was equally explicit with the advertising counterparties who carried its message to those players. [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] An [redacted] it, holds itself out to the market as a U.S. business.

53. The counterparty a player actually transacted with was American as well. The entity that took the player's deposit and returned his winnings was Papaya US, a Delaware corporation, acting through five U.S. payment processors and U.S. bank accounts.[62] The address

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

Papaya US gave those processors for customer notices was 106 West 32nd Street, Floor 2, New York, New York.[redacted] [redacted] A player who deposited

---

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

money, won a prize, received a U.S. tax form, and had a dispute about any of it would have found an American counterparty at every step.

54. Taken together, these facts describe the enterprise as the overwhelming majority of customers (who are American) encountered it—and it is their perception this factor protects. They found the game on a U.S. storefront, promoted by a website that disclosed no Israeli presence. They could install and play it [redacted]; [redacted] They accepted terms naming a U.S. entity as their counterparty and sending any dispute to a New York court or a New York arbitration. And the counterparty that held their deposit, paid their winnings, and reported those winnings to the Internal Revenue Service was a Delaware corporation operating from New York, Delaware [redacted]. Nothing in that sequence disclosed Israel, and nothing could have: the platform was built to exclude every player outside the United States, so no U.S. player who saw would perceive an Israeli enterprise. That is what the ascertainability inquiry measures, because it asks where "the primary components of [the debtor's] business, which directly touch" its customers and creditors actually occur. *Brit. Am.*, 425 B.R. at 914. And those perceptions govern, because a COMI may be located in a jurisdiction only where activities there supply "a meaningful basis for the expectations of third parties." *Creative Fin.*, 543 B.R. at 501. On this record, those expectations ran to the United States alone.

#### *v. The Timing And Design of The Filing Thwart The Expectations Of U.S. Creditors And Reflect Bad-Faith COMI Manipulation*

---

[redacted] [redacted]

[redacted] [redacted]

55. The timing and design of the filing confirm what the factors already establish: this proceeding exists to impair U.S. creditors holding U.S.-law claims arising from fraudulent misconduct in the U.S. market—the lifeblood of Papaya's entire enterprise and means by which it rapidly gained market share—and no one else. A court "may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith." *Fairfield Sentry*, 714 F.3d at 137. Here, the Debtors filed in Israel three days after learning the amount of the award and one day before the Final Judgment was entered, so that the Israeli Action was in place before the judgment against them became enforceable.

56. The two months surrounding the trial confirm that design. [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

57. [redacted] How much longer is unknown only because discovery reached no further, and because the Debtors resisted producing pre-petition bank records at all.[75] [redacted]

58. [redacted]

---

[redacted]

[redacted]

[redacted] *Order Granting, in Part, Skillz Platform Inc.'s Motion to Compel Production of Documents and Witness for Deposition* [Docket No. 92].

[redacted]

[redacted]

[redacted]

[redacted][79] [redacted] The record supports one inference: the Debtors were positioning U.S.-generated cash beyond the reach of U.S. creditors and manufacturing an Israeli footprint for Papaya US in anticipation of the filings that followed.

59. What and where the Debtors filed confirms the point. A bona fide restructuring reorders a capital structure following a holistic analysis of what is the best outcome under the circumstances: creditors are impaired, equity absorbs the loss or contributes new value, and the enterprise emerges on a sustainable footing. The Debt Arrangement does none of that. Its impairment runs in one direction only. The claimants it reaches assert claims arising from Papaya's misconduct. Papaya Ltd.'s Israeli counterparties, its accountants, its landlord, its Tel Aviv lender, and its Israeli workforce, are untouched. What recovery there is to Skillz is entirely contingent on [redacted] And even worse, even if the Debtors make these speculative payments through 2033, [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

60. In contrast, and despite the impairment of Skillz, existing equity rides through unimpaired, contributing nothing, while insiders retain substantial personal benefits: [redacted]]. Indeed, based on Papaya's projections, [redacted] with Skillz still years away from being paid in full. That expectation of continued compensation stands in stark contrast to the founders' refusal to put any of their own money back into the company to help satisfy the Final Judgment before filing the Israeli Action. [redacted] Having extracted those dividends, the Debtors' insiders now obtain releases from the very judgment liability the proceeding was convened to address, while contributing nothing and being paid for business as usual. A proceeding that leaves Israeli creditors and every equity holder whole, asks nothing of either, permits insiders to retain bonuses [redacted], and is calibrated to selectively impair U.S. claimants is not a rehabilitation but rather an attempt to reap the proceeds of a fraud.

61. Of course, none of this relief could be obtained in a U.S. bankruptcy case. The Debtors could have filed in the United States, because each of them is eligible to do so: Papaya Ltd. maintains bank accounts here, its market-facing commercial agreements are [redacted], and its revenue is overwhelmingly generated here. A foreign corporation

with assets in the United States "is generally amenable to filing bankruptcy in the United States." *Gold & Honey*, 410 B.R. at 361 n.7; *see* 11 U.S.C. § 109(a); *Constellation*, 600 B.R. at 269 (a debtor's "contract rights, including rights pursuant to debt that [is governed by] New York [] law and [contains] a forum-selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a)"). Nor does Israeli law stand in the way of the Debtors filing in the United States. But they chose not to for an obvious reason: they never could have obtained in this country the result they are trying to get in Israel. Existing equity could not have retained its ownership and control while impairing its largest creditor, because "a plan that pays the unsecured creditors less than the allowed amount of their claims, but permits shareholders to retain their interests, violates the fair and equitable test," absent consent or a contribution of new value. *In re Petition of Garcia Avila*, 296 B.R. 95, 111 n.21 (Bankr. S.D.N.Y. 2003). In addition, the insiders could not have obtained the releases the Debt Arrangement confers on them, because the Bankruptcy Code "does not authorize a [nonconsensual] release [of third-party claims against non-debtors] . . . as part of a plan of reorganization under Chapter 11." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 206–07 (2024). The Debtors could not have confirmed a plan on the strength of their own constituencies' support, because in the United States "insider voters cannot themselves push through a plan where there is a class of dissenting creditors." *Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. DE C.V.)*, 701 F.3d at 1066 n.39 (5th Cir. 2012); *see* 11 U.S.C. § 1129(a)(10).

62. A chapter 11 case would also have supplied the oversight that is conspicuously absent here: fiduciary duties enforceable by this Court, an official committee to represent unsecured creditors, disclosure and solicitation requirements, avoidance actions reaching [redacted]

and the appointment of an examiner or trustee if management proved unfit to serve. The Debtors cannot tolerate any of that. They sought a forum in which equity keeps the enterprise without contributing a dollar, insiders keep their dividends and their [redacted] and walk away with releases, every trade and financial creditor is paid in full, every other creditor but Skillz is paid in full or has the opportunity for payment in full ahead of Skillz, and no one is empowered to ask how the judgment debt arose or pursue claims against insiders.

63. The timing, the one-directional impairment, and the thwarted expectations of every U.S. claimant, viewed together, are the hallmarks of the bad-faith conduct the authorities set out above condemn. Insiders retain their equity and receive releases—the "[i]nsider exploitation" and "untoward manipulation" that *NFE Global Holdings* identifies. *NFE Glob. Holdings,* 2026 WL 2032660 at *49 [Exhibit 17]. The proceeding was commenced to blunt one creditor's enforcement of one judgment, so that, as in *SPhinX*, "litigation strategy appears to be the only reason for the [] request for recognition," 351 B.R. at 121, and, as in *Creative Finance*, the arrangement is designed to deny a disfavored creditor the opportunity to benefit from the proceeding. 543 B.R. at 513. And the parties who dealt with Papaya in the U.S. market find their claims removed to a forum none of them anticipated—the "overt thwarting of third-party expectations" that may warrant refusing recognition and enforcement of a foreign arrangement. *NFE Glob. Holdings*, 2026 WL 2032660 at *49-50 [Exhibit 17]. This is "bankruptcy tourism" in its plainest form: a forum chosen not for any connection to the enterprise's business but for the treatment its law promises insiders. *See Id.* at *48; *Mega Newco*, 2025 WL 601463, at *3.

64. COMI is a fact-driven inquiry, and the facts here are not typical. The limited arrangement contemplated by the Debtors affects U.S. claimants almost (if not entirely) exclusively, targets a U.S. judgment under U.S. law, and relies on a U.S.-generated revenue stream.

Papaya Ltd.'s Israeli incorporation and management cannot outweigh the remaining COMI factors representing the overwhelming substance of the Debtors' value and creditors.

**C. Papaya US's COMI Is In The United States, Not Israel**

65. The same is true, but even more so, for Papaya US. Papaya US's COMI is the United States. Papaya US is a Delaware corporation and is presumed to have its COMI in the United States. 11 U.S.C. § 1516(c). The Foreign Representative concedes that he must rebut that presumption. Verified Petition ¶ 72. He has not done so.

***i. Papaya US Has Neither A Headquarters Nor Management In Israel, And Indeed Has Essentially No Decisions To Manage; Instead Its Only Physical Locations Are In The United States***

66. The first two *SPhinX* factors—the location of the debtor's headquarters and the location of those who actually manage it—ask where Papaya US's own activities are "directed and controlled." *Fairfield Sentry*, 714 F.3d at 138 n.10 (a court "may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI"); *accord Constellation*, 600 B.R. at 279. That inquiry is debtor-specific. Because COMI is determined on a debtor-by-debtor basis, "courts should be wary of using the location of the senior management of groups of internationally operated companies as evidence of the COMI of one subsidiary company within the international group." *Constellation*, 600 B.R. at 278. *Constellation* applied that principle in endorsing *In the Matter of Videology Limited*, [2018] EWHC 2186 (Ch) (Snowden J.), which declined to place a U.K. subsidiary's COMI in the United States despite a U.S.-resident sole director and a U.S.-based senior-executive team. *Id*. at 277–78. *Videology* is instructive: the fact that a subsidiary was directed by executives sitting abroad did not relocate the subsidiary's COMI to the executives' jurisdiction. The governing distinction is thus between where a subsidiary is directed from and where the subsidiary itself carries on its own business: a subsidiary that takes direction from a parent located abroad

does not thereby acquire its own place of management in the parent's jurisdiction. *See id*. at 278. That distinction disposes of the Foreign Representative's entire theory of Papaya US's COMI.

67. Measured against that standard, the Foreign Representative's showing fails on its own terms. He invokes the concept of an enterprise-level headquarters to support an Israeli COMI for Papaya Ltd., but tellingly does not apply it to Papaya US; his submission as to Papaya US is only that the entity is managed by its parent's personnel in Israel.[81] [redacted], expressly rejecting the Debtors' representation in the Verified Petition, *see* Verified Petition ¶ 73(e) ("Its sole U.S.-based director and independent contractor serves solely as a local point of contact, reporting to and taking direction from Papaya Israel's CEO, Mr. Bachar."). Even assuming the statement in the Verified Petition is true (it is not), that describes direction received, not direction exercised, and under *Constellation* and *Videology* it does not place Papaya US's headquarters or its management in Israel.

68. The record goes further still. Papaya US is not actively managed anywhere, because there is nothing to manage. [redacted]

[81] *Compare* Verified Petition ¶ 71 (identifying Israel as the location of Papaya Ltd.'s senior management where all business decisions are made) with Verified Petition ¶ 73 (noting that Papaya US has no employees and is "entirely managed and operated by Papaya [Ltd.] ***and its employees and management***.").

[redacted] In other words, decision-making is of particularly limited relevance here, because there are essentially no decisions to make; Papaya US is on autopilot. Likewise, while Bachar is its [redacted]

69. That is dispositive of the first two factors. An entity that requires no active management has no management to locate, and the Foreign Representative cannot satisfy the first two *SPhinX* factors with decisions that are never made. Courts do not "strain to locate a principal place of business when no such place in reality exists." *Midlantic Nat. Bank v. Hansen*, 48 F.3d 693, 697–98 (3d Cir. 1995). SPhinX itself declined to locate a COMI in the debtors' jurisdiction of registration where the debtors had no genuine operating presence there. *See SPhinX*, 351 B.R. at 119, *quoted in Brit. Am.*, 425 B.R. at 913. Papaya US's position is weaker still: [redacted]

70. Instead, the only geographic locations that Papaya US has ever identified to anyone are in the United States. Its government filings say so first: [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] It likewise gave all third parties a U.S. location, [redacted] Papaya US has never identified an Israeli location to any third party. Indeed, the Foreign Representative admitted in the Verified Petition: "Papaya US has no offices or facilities and has no real property interest of any kind." Verified Petition, ¶ 22.

***ii. Papaya US's Primary Assets Are In The United States***

71. Undisputedly, the third factor, principal assets, overwhelmingly favors a United States COMI. For an entity whose business is collecting customer payments, the "primary assets" inquiry is not an exercise in locating factories or rigs; it asks where the entity's realizable value—its receivables, contract rights, and bank accounts—actually sits. Courts have adopted precisely that formulation. In *Constellation*, Judge Glenn quoted with approval the English court's reasoning in *Videology* that a subsidiary's COMI lay where "its customer and creditor

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

relationships are established . . . and where its main assets (the receivables and cash at bank) are located"—and emphasized that "[a]ll of those factors will be visible and immediately ascertainable . . . by the customers, and in particular by the trade creditors, of the Company." *Constellation*, 600 B.R. at 277–78 (quoting *In re Videology Ltd.*, [2018] EWHC 2186 (Ch) ¶ 72). Likewise, in *Manley Toys*, the court identified the debtor's "primary assets" as its "bank accounts" and its "potential claims against insiders," and weighted them by whether they were "hard / realizable (i.e., cash)." *ASI, Inc. v. Foreign Liquidators (In re Manley Toys Ltd.)*, 597 B.R. 578, 585-86 (D.N.J. 2019).

72. Measured by that standard, every identified Papaya US asset is American.[88] Papaya US's business (its main asset) is defined by the Debtors themselves solely with reference to activities within the United States. *See* Verified Petition ¶ 2 (noting that Papaya US's "function is limited in scope to collecting payments from end customers in the United States," and "[i]n furtherance of that function, Papaya US enters into agreements with U.S.-based payment processors."); ¶ 15 ("The United States accounts for the majority of the Debtors' total revenues."). The cash Papaya US itself collects is overwhelmingly U.S.-sourced, and has been for years. [redacted]

[88] Assets of affiliates in Israel or elsewhere should not be evaluated on this factor. COMI must be determined "for each debtor entity rather than for collective corporate groups," and "each debtor entity must be considered, rather than making a single top-down decision on the basis of the COMI of the parent company of the group." *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 207 (Bankr. S.D.N.Y. 2017); *Constellation*, 600 B.R. at 278.

[redacted]

73. As for hard assets, Debtors' own section 109(a) disclosure identifies Papaya US's United States-based bank accounts; five payment-processor agreements [redacted]; a $200,000 security deposit held by Worldpay; a claim for tax withholdings erroneously remitted to the IRS; an expected 2024 federal tax refund; and a retainer with Delaware counsel. Verified Petition ¶ 67. Those contract rights are American property as a matter of situs law. *Constellation*, 600 B.R. at 269. ("This Court has previously held that a debtor's contract rights, including rights pursuant to debt that contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a).")

74. An entity whose receipts, contract counterparties, and customers are all U.S.-based does not have its principal assets in Israel. That is so for the additional reason that the components of the business "which directly touch" the customers and counterparties whose payments create those assets occur exclusively in the United States. *Brit. Am.*, 425 B.R. at 914.

### *iii. Papaya US's Creditors Are In The United States*

75. The fourth factor, location of creditors,[90] is likewise overwhelmingly U.S. The Debtors admit Papaya US has no funded debt and no material third-party liabilities apart from payment-processing arrangements and intercompany balances owed to its parent. Verified Petition ¶ 24. Papaya US's non-insider creditor body is therefore composed almost entirely of U.S.-based

---

89 [redacted]

90 *SPhinX, Ltd.*, 351 B.R. at 117; *Modern Land*, 641 B.R. at 788.

creditors.[91] Verified Petition ¶¶ 26–27. The Foreign Representative's own interrogatory answers confirm as much.

76. [redacted]

*iv. U.S. Law Governs Papaya US's Disputes*

[91] U.S.-based creditors include: Skillz, which holds the Final Judgment against Papaya US itself; the U.S. consumer class whose claims were settled for $15 million in the Los Angeles County Superior Court, with a dissenting-plaintiff appeal still pending; Dawn Pavlovich, who opted out of that settlement and asserts claims in a separate Los Angeles action; the individual claimant in the pending U.S. arbitration; and the New Jersey Attorney General, whose consumer investigation the Debtors have designated an "Excluded Creditor" under the Debt Arrangement.

[redacted]

77. The fifth factor—the jurisdiction whose law would apply to most disputes—is likewise overwhelmingly U.S., [redacted] A purely interparty agreement, [redacted], is no evidence at all of COMI.

---

93 *See Constellation*, 600 B.R. at 283–84 (weighing, under this factor, that the objecting creditor's "claims against Constellation Overseas to be resolved by the arbitral tribunal are, therefore, New York law governed claims"); *In re Olinda Star Ltd.*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020) ("[T]his factor weighs in favor of a COMI in" the jurisdiction whose law governs the debtor's agreements); *accord Modern Land*, 641 B.R. at 790–91 ("When conducting a COMI analysis, [c]ourts in this Circuit additionally consider the jurisdiction whose law would apply to most disputes.").

[redacted]

[redacted]

[redacted]

[redacted]

78. The customer relationships that generate the deposits Papaya US collects point the same way: Papaya's Terms of Service (of which Papaya US is a party) provide that, for users who reside in or use the services in the United States, the Terms are governed by New York law and the user consents to the exclusive jurisdiction and venue of the state and federal courts in New York County.[98]

#### *v. The "Location Ascertainable By Third Parties" Of Papaya US Is The United States*

79. A debtor's COMI must be "readily ascertainable by third parties." *British Am.*, 425 B.R. at 912. The controlling principle is that "the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties," and the inquiry is objective, made "based on the viewpoint of third parties (usually creditors)." *Fairfield Sentry*, 714 F.3d at 130; *In re Chiang*, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010). By examining factors "in the public domain," a court can determine whether that COMI is "regular and ascertainable [and] not easily subject to tactical removal." *See Fairfield Sentry*, 714 F.3d at 136–37. Critically, "COMI is affected not only by what a debtor does, but by what a debtor is perceived as doing." *British Am.*, 425 B.R. at 909 (quoting *Betcorp*, 400 B.R. at 291). Nothing in the public domain signaled to Papaya US's counterparties that its affairs were centered in Tel Aviv.

80. [redacted], and courts treat precisely that category of document as proof of where a debtor is centered.

81. [redacted]

[98] Papaya Terms of Service § 20 ("Governing Law and Jurisdiction") [Exhibit 9]; [redacted]

[redacted]

82. [redacted]

---

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

83. [redacted] and a debtor's representation to a taxing authority about where it sits is itself competent COMI evidence. *See Constellation*, 600 B.R. at 280–81 (a debtor's position with tax authorities as to the location of its "central administration" is "itself readily ascertainable evidence to third parties of a connection . . . beyond a letter box"). [redacted]

84. In contrast, no known document in Papaya US's files identifies Israel as Papaya US's location. [redacted]

---

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] The "location ascertainable by third parties" was thus the United States—and only the United States—which ends this inquiry. *See Manley Toys*, 597 B.R. at 585 (grounding COMI finding in evidence that the debtor's "purchase orders, contracts, invoices, and other documents all state that the Debtor is located in Hong Kong," together with its annual return, bank accounts, and the location of its financial operations) (quoting *In re Manley Toys Ltd.*, 580 B.R. 632, 645–46 (Bankr. D.N.J. 2018)).

85. Further, the Debtors did not contest U.S. courts' authority over them; in their answer they expressly declined to challenge personal jurisdiction or venue;[110] and Papaya Ltd. went further, separately suing as plaintiff in the United States District Court for the Eastern District of Virginia.[111] A party that invokes a U.S. court to prosecute its own claims submits to that court's authority.[112] Their own litigation conduct thus confirms that the affairs producing the Final Judgment were centered where the judgment was entered. That conduct is also exactly what the case law predicts of a debtor whose true operating locus is the United States: "[t]he presumption is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor, regardless of whether such

---

[110] *See* Answer, Affirmative Defenses, and Counterclaims ¶¶ 15-16, Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 1:24-cv-01646-DLC (S.D.N.Y. Aug. 5, 2024), ECF No. 46 [Exhibit 8] ("Papaya avers that it is not contesting personal jurisdiction or venue in this Court in this specific matter.").

[111] Complaint, *Papaya Gaming, Ltd. v. Fair Play for Mobile Games*, No. 1:25-cv-00470-MSN-IDD (E.D. Va. filed Mar. 14, 2025), ECF No. 1 [Exhibit 24].

[112] *Adam v. Saenger*, 303 U.S. 59, 67–68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence.").

resolution is informal, administrative or judicial." *Ran*, 607 F.3d at 1026. Skillz did precisely that, and the Debtors answered on the merits.

86. The case law confirms that evidence such as this dictates a U.S. COMI. In *British American*, the debtor issued no policies, held no bank accounts, processed no claims, and had no directors or employees in its chartering jurisdiction, leaving creditors "little reason . . . to believe" that the "hub of its business operations" was there. *Brit. Am.*, 425 B.R. at 912–13. Papaya US's relationship with Israel is exactly the same: no Israeli players, no Israeli deposits, no Israeli contracts, and although it holds one Israeli bank account, the bank agreement governing that account states that Papaya US is located in the US, not Israel.

87. Courts in this Circuit evaluate creditor expectations "through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments," *Oi Brasil*, 578 B.R. at 228; *accord ARD Fin., S.A.*, 678 B.R. 711, 715 (Bankr. S.D.N.Y. 2026), and treat the protection of creditors' interests as paramount, *Modern Land*, 641 B.R. at 788. In *OAS*, the court found a Brazilian COMI for an Austrian-registered debtor because noteholders "understood that they were investing in Brazilian-based businesses," the debtor "had no separate, ascertainable presence in Austria; it was part of, and inseparable from, the OAS Group located in Brazil," and creditors "had no legitimate expectation that the Austrian courts would play any role in the determination or payment of their claims." *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015). The same logic controls. Papaya US has no separate, ascertainable presence in Israel, and the conduct that produced the Final Judgment occurred entirely within the United States. Skillz—the largest creditor in this case who does not operate in Israel and was harmed in the United States—is an involuntary creditor that never selected a foreign forum, and it had no

reason to expect that Israeli courts would play any role in determining the merit or payment of its claim.

88. Nor can the Foreign Representative answer that the creditor-expectations cases turn on investor disclosures that have no analogue here. In those cases, expectations were measured against offering memoranda, indentures, and comparable disclosures through which creditors voluntarily assumed the risk of a foreign forum. *Oi Brasil*, 578 B.R. at 228–32; *OAS*, 533 B.R. at 102–03; *In re Suntech Power Holdings Co. Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014); *Constellation*, 600 B.R. at 274. There is no such document here—and there could not be. The only affected creditors, and so the relevant creditors here, are tort claimants.

89. Where creditors never bargained for a foreign forum, deference to their expectations points to the forum in which they actually pursued their rights. As *OAS* held, even where creditors' "rights were governed by New York law" and the debtor "consented to the jurisdiction and service of process in New York," their expectations pointed elsewhere because "the purchasers expected to receive repayment from the cash generated by the operations of the [corporate group]." 533 B.R. at 103. Here, that cash is generated in the United States. The Foreign Representative has identified no offering document, contract, disclosure, or public statement by which any Papaya US counterparty could have expected an Israeli forum. There is none.

#### ***vi. The Debtors' Actions And Assertions Reflect Bad-Faith COMI Manipulation***

90. Finally, where, as here, the Debtors' structure is used to thwart the expectations of an involuntary creditor holding a U.S. fraud judgment, courts have cautioned that such conduct may constitute bad faith COMI manipulation. *See NFE Glob. Holdings,* 2026 WL 2032660 at *50

[Exhibit 17].[113] That analysis, set out above with respect to Papaya Ltd., applies with greater force to Papaya US. Both Debtors availed themselves of the U.S. market through Papaya US, and that market activity, occurring within the United States, gave rise to the vast majority of the Debtors' outstanding obligations. [redacted]. Were that enough, a parent could fix the insolvency forum of any subsidiary by election rather than by fact—the "bankruptcy tourism" concern the cases identify. *NFE Glob. Holdings*, 2026 WL 2032660 at *48 [Exhibit 17]. The Court should not permit Papaya US to evade application of U.S. law through its trivial COMI assertions.

**D. Papaya US Does Not Have An Establishment In Israel**

91. Papaya US is a Delaware corporation with no employees, no offices, and no operations in Israel. The Foreign Representative nonetheless asks this Court to find that Papaya US maintains a "place of operations" in Israel. But that term has a settled meaning that disproves the Foreign Representative's argument: a "place of operations" is "a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional." *Lavie v. Ran*, 406 B.R. 277, 284 (S.D. Tex. 2009), *aff'd sub nom*, *In re Ran,* 607 F.3d 1017 (5th Cir. 2010). The inquiry is thus ***externally*** directed: it asks not where a debtor is administered, but where it faces a market. And the burden of that showing rests entirely with the Foreign Representative. The existence of an establishment is "essentially a factual

---

[113] *See also Oct. 9, 2020 Hr'g Tr. at 21, In re Codere Fin. 2 (UK) Ltd*, No. 20-12151 (MG), (Bankr. S.D.N.Y. Oct. 9, 2020) [ECF No. 13] ("Those sorts of things could evidence bad faith COMI manipulation . . . . I want to be clear that if ***there were objections that established exploitation or untoward manipulation or thwarting of third-party expectations, it is doubtful that this Court would recognize and enforce this scheme of arrangement.***").

question, with no presumption in its favor," and "the bar is rather high." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 338 (S.D.N.Y. 2008) ; *Bear Stearns I*, 374 B.R. at 131. The consequence of failure to show either a COMI or an establishment is dispositive: "[i]f a proceeding does not qualify as a main or nonmain proceeding, it cannot be recognized under chapter 15." *Constellation*, 600 B.R. at 271.

92. The Debtors' own admissions disprove an establishment in Israel. Papaya US "has no employees, no physical offices or facilities, and no independent decision-making authority." Verified Petition ¶ 18. [redacted]

Papaya US "has no offices or facilities and has no real property interest of any kind," and its "presence in the United States is limited to a registered mailing address." Verified Petition ¶ 22. An entity with no offices, facilities, or employees anywhere cannot have its "place of operations" in Israel. 11 U.S.C. § 1502(2). *See also Midlantic Nat'l Bank*, 48 F.3d at 697-98 ("We do not find persuasive the argument that. . . Congress intended that the courts strain to locate a principal place of business ***when no such place in reality exists***.") (emphasis added).[114]

---

[114] *Midlantic Nat'l Bank* is instructive in this instance. The Third Circuit, assessing the term "principal place of business" as used for a corporate citizenship determination under 28 U.S.C. § 1332(c), declined to follow other circuits' determination that Congress intended both prongs of corporate citizenship to be applicable in all circumstances, such that an inactive corporation should "be deemed a citizen both of its state of incorporation and

93. Papaya US does conduct real economic activity—but what activity it conducts is solely in the United States. Its market-facing function is receiving player deposits from U.S. customers into U.S. bank accounts under five merchant-service agreements with U.S.-based counterparties. Verified Petition ¶ 18 & n.8. [redacted] Every step of Papaya US's payment-processing function occurs in the United States, and [redacted]

of the state in which "'it last transacted business....'" 48 F.3d at 697 (quoting *Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 141 (2d Cir.1991)). Instead, "reject[ing] the notion that implicit in the statute's terms is the requirement that all corporations be deemed to have a principal place of business," the court held that the inactive corporation was more properly deemed to be a citizen "of its state of incorporation only." *See id.* at 696-98. The Debtors' attempts here to attribute the operations of Papaya Ltd.'s "nerve center" to Papaya US are a flavor of the very principle that was flatly rejected in *Midlantic*. If Papaya US is merely a shell entity that does not manage its limited operations, it plainly does not have its own "nerve center," and this court ought not "strain to locate [one] when no such place in reality exists." *See Midlantic Nat'l Bank*, 48 F.3d at 698.

[redacted]

[redacted]

[redacted] What becomes of that money is governed by the Intercompany Services Agreement between the two Debtors (the "**Intercompany Agreement**"). [redacted]

94. Papaya US has no effect on the Israeli marketplace. Establishment requires "a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property." *Creative Finance*, 543 B.R. at 520. In *Creative Finance*, "the tenuous nature of the connection between the debtor's business activities and the BVI marketplace supported the court's denial of recognition as a foreign nonmain proceeding." *Id.* at 520–21. *Modern Land* denied nonmain recognition on the same basis, holding that a "negligible effect on the local marketplace" and the "failure to engage the local economy excludes the Debtor from a foreign nonmain classification." 641 B.R. at 786. Papaya US unmistakably serves the U.S. market. It has no market-facing presence in Israel at all.

95. The Foreign Representative's entire establishment case is that Papaya US is (i) managed from Israel, (ii) [redacted] and (iii) is party to an intercompany services agreement governed by Israeli law. Verified Petition ¶¶ 73, 77. None of those facts identifies any local market-facing activity that Papaya US physically conducts from Israel.

---

[redacted] [redacted]

[redacted] [redacted]

96. *First*, the fact that persons in Israel conduct limited back-office management of Papaya US is simply irrelevant. In *In re Mood Media Corp.*, 569 B.R. 556, 562–63 (Bankr. S.D.N.Y. 2017), the court denied nonmain recognition to U.S. subsidiaries despite shared management and financial, cash-management, accounting, treasury, internal-audit, legal, risk-management, human-resources, and procurement functions; management fees paid to the Canadian parent; oversight by the parent's directors; guarantees of Canadian debt; intercompany payments; and Canadian intellectual-property licenses. *See id*. The rule in *Mood Media* is categorical: "hiring others to provide services for you" does not "amount[] to establishing a place of operations from which you conduct economic activity of your own in a jurisdiction"; "having liabilities or paying debts in a jurisdiction does not mean that the U.S. companies have a place of operations there"; and "[t]he statute does not merely require economic activity; it requires the existence of a place of operations in the foreign country from which the economic activity is conducted." *See id*. That rule follows directly from the definition set out above. Relying on *Lavie*, the *Mood Media* court explained that "the definition contemplates the existence of a place of business in the foreign country from which market-facing activities are conducted." *Id*. at 562.

97. *Second*, that Papaya US holds a bank account in Israel is likewise irrelevant. "The mere presence of assets in a given location does not, by itself, constitute a place of operation." *Lavie*, 406 B.R. at 284. Nor do debts: "the existence of debts . . . would not in principle satisfy the definition of establishment." *Modern Land*, 641 B.R. at 785 (quoting the UNCITRAL Guide); *accord British Am.*, 425 B.R. at 915. An account designed to facilitate intercompany transfers, an intercompany balance, and management performed by a parent inherently reflect only the "mere . . . record-keeping" that has been rejected in comparable cases. *See Creative Finance*, 543 B.R. at 520; *British Am.*, 425 B.R. at 914-15. [redacted]

[redacted]

98. *Third*, the Intercompany Agreement described above is likewise irrelevant, as it is by definition not market-facing. In fact, it shows that Papaya US conducts no market-facing activities in Israel: it confines Papaya US to fronting and payment processing for its parent and denies it any authority to contract in Papaya Ltd.'s name. The agreement therefore confirms that Papaya US conducts no market-facing activity in Israel—or anywhere outside the United States—and supplies no local effect or "place of operations" under section 1502(2).

99. The Foreign Representative's own establishment authority and in particular, his reliance on *Millennium Glob. I* for the establishment factors, defeat his position as to Papaya US. Those factors are "the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence," evidenced by "engagement of local counsel and commitment of capital to local banks." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 85–86 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012). None of these factors is present here. Papaya US has no organization in Israel to maintain at any level, and it presents no objective appearance of an Israeli local presence to anyone—least of all to the U.S.

---

[redacted] [redacted]

consumers, payment processors, and banks with which it actually deals. Verified Petition ¶¶ 18, 22.

## II. DISCRETIONARY RELIEF SHOULD BE DENIED ABSENT SUFFICIENT CREDITOR PROTECTIONS

### A. The Debtors' Request For Protections Of Section 1521 Is Overbroad And Cannot Provide Sufficient Protection Of Creditors

100. If the Court grants recognition, it should condition that relief on a requirement that cash generated within the United States remain within the United States, except to the extent a particular payment can only be made from a non-U.S. bank account, and it should not authorize any administration, distribution, or transfer of U.S. assets. That condition costs the Debtors nothing. Both Debtors maintain U.S. bank accounts, so any payment either Debtor needs to make can be made from a U.S. account. The condition is also urgently needed, because nothing yet protects any U.S. creditor, much less sufficiently. The Israeli court has directed the Debtors to propose a revised arrangement, and they have not done so as of the date hereof. And even once an arrangement is approved, the Debtors' first deposit into the Settlement Administrator Fund is not due until fourteen days after it becomes effective. Debt Arrangement ¶ 11(a) [Exhibit 13]. Until then, without any business or legal justification, the Debtors remain free to move U.S.-generated cash to Israel with no fund, no security, and no supervision in place. The balance of this Section explains why that condition is required by sections 1521 and 1522 of the Bankruptcy Code before any relief is issued.

101. While the Verified Petition suggests that the Debtors have invoked section 1521 for only limited—and purportedly benign—relief, the Proposed Order, as drafted, creates an overbroad and impermissible expansion of such relief. *Compare* Verified Petition ¶¶ 6, 38, 82 (invoking section 1521 solely as a basis for stay relief and to apply section 365(e) to the Debtors' executory contracts and unexpired leases) *with* Proposed Order ¶ 8 ("The Foreign Representative

and the Debtors shall be entitled to the ***full protections and rights enumerated under section 1521*** of the Bankruptcy Code.") (emphasis added). This language is at best overbroad, and in any case, it is impermissible and improper. Paragraph 8, in particular, should be stricken from the Proposed Order.

102. While section 1521(a) provides a court with discretion to issue "any appropriate relief," courts may reject attempts to obtain relief that would be more reasonably granted under an alternative provision with a different or more restrictive standard. *See In re Agrokor, d.d.*, 591 B.R. 163, 188 (Bankr. S.D.N.Y. 2018) (requiring a distribution of assets to meet the standard under § 1521(b) rather than § 1521(a)); *c.f. Vitro, S.A.B.*, 701 F.3d at 1054 (limiting the scope of "appropriate relief" under § 1521(a) to "relief previously available under Chapter 15's predecessor, § 304.").

103. A court's decision to grant relief under section 1521(a) is further subject to the terms of section 1522, including the requirement that "the interests of creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). Courts have generally interpreted section 1522(a) to create a balancing test among the interests of all stakeholders. *See Jaffe v. Samsung Elecs. Co., Ltd.*, 737 F.3d 14, 29 (4th Cir. 2013) ("§ 1522(a)'s sufficient protection requirement requir[es] a particularized balancing analysis that considers the 'interests of the creditors and other interested entities, including the debtor.'") (quoting 11 U.S.C. § 1522(a)); *In re Hanjin Shipping Co., Ltd.*, No. 16-27401 (JKS), 2016 WL 6679487, at *5 (Bankr. D.N.J. Sept. 20, 2016) ("[Analysis] of § 1522(a) . . . is 'logically best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented . . .'") (quoting *Jaffe*, 737 F.3d at 27-28). Because relief under section 1521 is discretionary and available only "at the request of the foreign representative," it is the Debtors, as the movants, who

bear the burden of establishing both a proper basis for the relief sought and that the interests of creditors and other interested entities are sufficiently protected. *See In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322-23 (Bankr. S.D.N.Y. 2019) (granting section 1521 relief only upon finding that "the Foreign Representative has satisfied the requirements of sections 1521(a) and 1522(a)"); *In re Rede Energia S.A.*, 515 B.R. 69, 93-94 (Bankr. S.D.N.Y. 2014) (addressing objection that the foreign representative "cannot meet his burden with respect to the applicable balancing tests and factors" under sections 1521 and 1522).

### ***i. The Court Should Prohibit Distribution of U.S. Cash Outside of the U.S. Unless Needed To Make A Payment that Cannot Be Made From A U.S. Account.***

104. First, to protect U.S. creditors, the Court should require that any cash generated in the United States stay in a United States account, other than to the extent a transfer to a foreign account is required to make a payment in a foreign currency that cannot be made from a United States account.

105. Any transfer of assets that is not necessary to support immediate operating expenses is properly assessed as a "distribution" under section 1521(b) and must be premised on the Court's prior determination that "the interests of local [*i.e.*, U.S.] creditors are 'sufficiently protected.'" *See Atlas Shipping*, 404 B.R. at 740.[120] Notably, section 1521(b) embodies a stronger protective standard than the balancing test applicable to section 1521 relief, generally, via section 1522(a).[121]

---

[120] *Accord Markus*, 610 B.R. at 76; *Agrokor*, 591 B.R. at 187-88.

[121] *Compare* 11 U.S.C. § 1521(b) ("…provided that the court is satisfied that **the interests of creditors in the United States** are sufficiently protected." (emphasis added)) *with* § 1522(a) ("only if **the interests of the creditors and other interested entities, including the debtor,** are sufficiently protected." (emphasis added)). In other words, the sufficient protection standard applicable to section 1521(b) was drafted to consider *only* the interests of U.S. creditors—it does not incorporate or balance competing considerations of the debtor or other parties. *See Barnhardt v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

Courts have therefore assessed sufficient protection under section 1521(b) to embody three basic, creditor-centric principles: (1) "the just treatment of all holders of claims against the bankruptcy estate," (2) "the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding," and (3) "the distribution of proceeds of the foreign estate substantially in accordance with the order prescribed by U.S. law." *See Markus*, 610 B.R. at 77 (citing *Atlas Shipping*, 404 B.R. at 740).

106. Here, the Debtors have not made, and cannot make, a showing that creditors are sufficiently protected for purposes of section 1521(b). *First*, the Israeli arrangement is patently inconsistent with principles of "just treatment of all holders of claims." As detailed above, the Israeli Action is a limited action commenced for the specific purpose of impairing U.S. tort claimants for the benefit of other stakeholders, primarily the Debtors' prepetition equity holders. This treatment is unfair, discriminatory, and inconsistent with the Bankruptcy Code's principles of just treatment, including, *inter alia*, those embodied in the absolute priority rule of section 1129(b)(2).

107. *Second*, the proposed distribution of proceeds creates a risk for U.S. creditors of further prejudice and inconvenience. U.S. claimants in this case, particularly Skillz, are primarily asserting contingent claims that remain dependent on issues of U.S. law. The Debtors have repeatedly attempted to convince the Israeli Court that, *inter alia*, the Final Judgment is likely to be overturned on appeal. While the Debtors have not yet attempted any equivalent of a claims estimation, it seems likely that they will seek to submit Skillz's claim—and the underlying U.S. law issues—for adjustment by a foreign court.

108. That risk is heightened by the Debtors' own prepetition conduct. [redacted]

[redacted]. A debtor that [redacted] should not be entrusted with unsupervised authority to continue remitting U.S.-generated cash abroad during these Chapter 15 Cases.

109. *Third*, the proposed distribution of proceeds pursuant to the Israeli arrangement is not "substantially in accordance" with the order prescribed by U.S. law. *See Vitro*, 701 F.3d at 1065-67; *see also Bank of N.Y. & JCPL Leasing Corp. v. Treco (In re Treco)*, 240 F.3d 148, 158-59 (2d Cir. 2001) ("Because the same foreign priority rules may be 'substantially in accordance' with United States law as applied in some circumstances but not as applied in others, a comparison of the priority rules cannot be conducted in the abstract. A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented."). As it stands, the Debt Arrangement is the only arrangement concept put before the Court. There is every reason to believe that the Debtors will continue to seek every possible avenue that preserves equity value at the expense of U.S. tort claimants. Such an outcome would be plainly inconsistent with the order of distribution prescribed by U.S. law, including, *inter alia*, under the absolute priority rule.[124]

---

[redacted]

[redacted]

[124] The risk of distributions not substantially in accordance with U.S. law is further supported by reference to additional provisions of the Bankruptcy Code, including sections 1141(d)(3)(C) and 727(a)(2), each of which prohibits discharge of a debtor who has transferred property within one year before the date of the filing of an

110. *Finally*, both Papaya US and Papaya Ltd. have United States and Israeli bank accounts, and the Debtors have not demonstrated any need to move cash from a U.S. account to an Israeli account. To the extent the Debtors show that certain counterparties can only accept payments from Papaya Ltd. rather than Papaya US (of which there is no evidence currently), Papaya Ltd. can make them from its United States accounts, [redacted] If for some reason there is some payment that cannot be made from Papaya Ltd.'s U.S. account, the Debtors can provide evidence of that and the Court can authorize transfers of U.S. cash to a Papaya Ltd. account for that purpose. So far there is no evidence of such payments that cannot be made from U.S. accounts. But even if there are, those payments might also be able to be satisfied through cash generated by Papaya Ltd.'s other subsidiaries. In any event, the weight of evidence shows that the Debtors have more than sufficient funding for ordinary course operations during the pendency of these cases. They currently have approximately $151 million of cash in Israel. August 26 Order ¶ 3 [Exhibit 6]. Indeed, there is no requirement that any excess funds (*i.e.*, those not needed to fund operations) be held in Israel pending distribution, whether under Israeli law or otherwise. Really, there is no harm to the Debtors of keeping U.S. generated cash in the U.S.—except that it ensures that U.S. creditors can be protected by that cash, the exact reason why the Debtors have moved excess cash out of the United States recently and seek to continue doing so. This protection would preserve the status

---

applicable petition with the intent to hinder, delay, or defraud creditors. [redacted]

[redacted]

quo the SDNY Court assumed would continue, and the Debtors may return to this Court to seek release of the funds upon the showings required by sections 363, 1521, and 1522.

111. [redacted]

[redacted]

[redacted] They are departures from the Debtors' practices and policies—and departures in a single direction, away from the jurisdiction where the Debtors' revenue is generated and where their principal creditor holds an enforceable judgment.

112. Further, the Debtors' lack of progress in developing and presenting an alternative arrangement supports a pause on non-essential distributions until this Court may assess such arrangement and make a determination regarding its distributive effects and any prejudicial effects on creditors. *NFE Glob. Holdings*, 2026 WL 2032660, at *15 [Exhibit 17] ("[A] chapter 15 court, before enforcing provisions of a foreign plan, must carefully scrutinize the plan, and determine whether any foreign plan provisions conflict with applicable provisions of U.S. or state law.").

113. Overall, in these unique circumstances, where U.S. tort claims predominate over the Debtors' other liabilities, and Israeli creditors face essentially no risk of prejudice or impairment, there is simply no justification to look past the requirements of section 1521(b) and permit premature distributions of U.S. funds beyond U.S. territorial jurisdiction. It is just, necessary, and appropriate based on the history of the Debtors' misconduct for the Court to condition *any* relief at this stage on the addition of affirmative language preventing transfers of excess funds currently located, or later generated, within the territorial jurisdiction of the United States.[127] To the extent that the Debtors seek to later distribute such funds for use in the Israeli

---

[127] *See* 11 U.S.C. § 1522(b) ("The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond."). Here, the Debtors have a pervasive history of bad faith tactics, including paying dividends to equity holders during the pendency of the [Skillz Litigation] and engaging in sanctionable litigation tactics. *See Papaya Gaming, Ltd. v. Fair Play for Mobile Games*, 2026 WL 558698, at *13-14 (S.D.N.Y. Feb. 27, 2026) (imposing sanctions and fees on Papaya and its counsel for "duplicative and vexatious" litigation conduct undertaken in bad faith). Notably, the same entities which controlled the Debtors during their recent history of bad acts seek to maintain control through the pendency of these Chapter 15 Cases and following emergence from the Israeli Action.

Action in a manner that would not run afoul of section 1521(b), they may come back before the Court to justify such distributions at the appropriate time.

***ii. The Proposed Order Should Not Authorize the Debtors to Make Intercompany Distributions from Papaya US to Papaya Ltd.***

114. As an initial matter, the Proposed Order should not be read to authorize intercompany distributions from Papaya US to Papaya Ltd. The Proposed Order seeks unlimited relief pursuant to sections 1507 and 1521 of the Bankruptcy Code without any offer of protection to creditors. It operates as a bald attempt to circumvent the legal and procedural protections in the Bankruptcy Code against asset dissipation. The Debtors made no specific effort to provide a legal basis for authority to administer or transfer any assets from Papaya US to Papaya Ltd. *See generally* Verified Petition (omitting any direct citation or reference to sections 1521(a)(5) or 1521(b), which govern, respectively, the administration and distribution of assets presently located with the United States).

115. This omission is shocking, given the scale of cash flows that the Debtors are seeking to transfer from Papaya US to Papaya Ltd. Specifically, based on the Debtors' books and records, Skillz estimates that the Debtors seek to transfer at least tens of millions of dollars from Papaya US to Papaya Ltd. each month during the pendency of these Chapter 15 Cases. *See* August 4 Budget.[128] [redacted] In essence, rather than

[128] Skillz's initial position regarding the Debtors' actual cash needs is based on the 14-week budget provided to the Court in connection with the August 4 provisional relief hearing (the "**August 4 Budget**") and remains subject to further change based on applicable discovery and additional proceedings before the Court.

[redacted]

putting these transactions before the Court, the Debtors have seemingly taken the cursory and presumptive position that these transactions are nothing more than ordinary course transactions pursuant to the Intercompany Agreement. *See* Verified Petition ¶¶ 18, 24 (characterizing the payments pursuant to the Intercompany Agreement as "ordinary course obligations").[130] Presumably, though without having stated so directly, the Debtors will take the position that these intercompany transactions may continue, regardless of size or circumstance and without any judicial oversight, as ordinary course transactions allowed pursuant to section 1520(a)(3).[131] Such a presumption, entitling the distribution of tens of millions of dollars from Papaya US to Papaya Ltd. without any court proceedings to assess its reasonableness, would be extraordinary in any case. In these circumstances, it is deeply concerning.

116. Instead, if the Debtors seek to facilitate these transfers during the Chapter 15 Cases, the Debtors must justify them under the relevant legal standards, which will ultimately require a series of additional showings that the Debtors have not yet attempted. *First*, the Debtors must

---

[redacted]

[130] The Third Circuit employs a two-step test to determine whether a transaction occurs in the ordinary course. The first step is a "horizontal" question of "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *In re Roth Amer., Inc.*, 975 F.2d 949, 953 (3d Cir. 1992). The second is a "vertical" question of whether the transaction would subject a hypothetical creditor to "economic risk of a nature different from those he accepted when he decided to extend credit." *See id.* (explaining that while "[t]he primary focus thus is on the debtor's pre-petition business practices and conduct," "a court must also consider the changing circumstances inherent in the hypothetical creditor's expectations.") (internal quotations omitted). Thus, the mere fact that the Debtors have historically engaged in a transaction does not mean that the postpetition repetition of such transaction will be deemed to have occurred in the ordinary course.

[131] *See* 11 U.S.C. §§ 1520(a)(3) ("[U]nless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section[] 363 . . ."); 363(c)(1) (permitting a trustee to use property of the estate and enter into transactions in the ordinary course of business without notice or a hearing); *but see In re Ace Track Co., Ltd.*, 556 B.R. 887, 914-16 (Bankr. N.D. Ill. 2016) (finding that a foreign representative's transactions were not authorized when occurring outside of the ordinary course and not otherwise pursuant to express court approval).

show that these transfers are ordinary course transactions within the contemplation of section 363(c)(1) despite the terms of their own investment policy (described below), and if they cannot, the Debtors must justify these transfers through the prevailing standards of section 363(b)(1), following further notice and hearing. *See In re Fairfield Sentry Ltd.*, 539 B.R. 658, 673 (Bankr. S.D.N.Y. 2015), *subsequently aff'd,* 690 F. App'x 761 (2d Cir. 2017) ("[A] foreign representative . . . can no more 'opt out' of § 363 than can a debtor in possession under chapter 11 or a trustee under chapter 7.").[132] *Second*, to the extent that such transfers can be justified under section 363, the Debtors must then make a factual showing that any action implicating administration of the Debtors' property within the territorial jurisdiction of the United States pursuant to section 1521(a)(5) (or otherwise under section 1521) properly balances the interests of creditors under section 1522. *See Micron Tech, Inc. v. Qimonda AG (In re Qimonda AG Bank.y Litig.)*, 433 B.R. 547, 557-58 (E.D. Va. 2010) (remanding with instructions to "articulate more fully and explicitly" the factual basis on which to order § 1521 relief, "consistent with the requirements of § 1522."). *Finally*, to the extent that the Debtors seek to transfer property from Papaya US to Papaya Ltd., the Debtors must make the additional showing that the "interests of creditors in the United States are sufficiently protected" under section 1521(b). *See Agrokor*, 591 B.R. at 187-88 ("[Section 1521(a)(5)] is not to be confused with the optional relief provided by section 1521(b), which. . . allows the debtor's assets to exit the United States for distribution.").[133] The Debtors have not yet

[132] As Judge Sontchi explained in *In re Elpida Memory, Inc.*, a court's discretionary powers under sections 1507 and 1521 cannot overcome the mandatory and automatic application of section 363 to the Debtors' interests in property within the territorial jurisdiction of the United States via section 1520(a). No. 12-10947 (CSS), 2012 WL 6090194, at *8 (Bankr. D. Del. Nov. 20, 2012) (refuting the argument that the court's powers under sections 1507, 1519, 1521, and 1522 or, alternatively, principles of comity, can "authorize[] amendment of section 1520 to make section 363 inapplicable.").

[133] *Accord In re Markus*, 610 B.R. 64, 76 (Bankr. S.D.N.Y. 2019) (" Section 1521(a)(5) permits the delivery of assets located in the United States to a foreign representative or another person for administration or realization **but stops short of allowing repatriation or distribution**.") (emphasis added); *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) ("In other words, § 1521(a)(5) allows the foreign representative to collect

made these showings, nor have they attempted to grapple with the applicable legal standards. *See generally* Verified Petition (omitting any direct citation to sections 363, 1521(a)(5), or 1521(b)). As a result, the Proposed Order must make clear that the Court is providing no authorization at this time—whether express or implicit—to facilitate any intercompany administration or transfer of assets from Papaya US to Papaya Ltd.

#### *iii. The Court Should Require the Debtors to Post a Bond as a Condition to Relief Under Sections 1520(a)(3) and 1521*

117. Separately, the Court should condition any relief granted to the Debtors on the posting of a bond in respect of the Final Judgment. Section 1522(b) supplies express authority: the Court "may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond." 11 U.S.C. § 1522(b).[134] Courts accordingly recognize that they may condition chapter 15 relief on "the posting of some form of security or a bond." *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 181 (Bankr. S.D.N.Y. 2022). Outside of chapter 15, the Third Circuit treats security as the rule rather than the exception: a Rule 65(c) bond is "almost mandatory," and the narrow exception applies only where compliance "raises no risk of monetary loss" to the restrained party. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010); *see Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir. 1990),

property in the United States, and § 1521(b) allows the foreign representative to distribute the property in the foreign case, provided that creditors in the U.S. are sufficiently protected pursuant to § 1521(b) and § 1522(a).").

[134] In making its arguments in this section, Skillz acknowledges that certain amounts remitted by Papaya US to Papaya Ltd. for the sole purpose of funding necessary operating expenses may not constitute "distributions" for purposes of section 1521(b). Skillz does not necessarily oppose such remittances, provided that the Debtors create, and demonstrate to the Court compliance with, a budget sufficient to ensure that any amounts so remitted are reasonably calculated to meet actual operating needs and are actually applied to preserve value for stakeholders.

*holding modified by Am. Tel & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir. 1994).

118. The condition is warranted because these Chapter 15 Cases are functioning as a bond-free substitute for a stay pending appeal. The Debtors have never sought a stay of the Final Judgment in the SDNY Court, and they have never offered a supersedeas bond under Rule 62 of the Federal Rules of Civil Procedure. They instead commenced the Israeli Action three days after the July 27 Order, filed these Chapter 15 Cases on August 2, 2026, and filed a notice of appeal on August 31, 2026, thereby obtaining the practical benefit of a stay while avoiding the security that the Federal Rules would require of any other appellant. Courts have long viewed the use of an insolvency filing as a "substitute for a supersedeas bond" as a litigation tactic rather than a legitimate use of the bankruptcy laws. *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (quoting *In re Wally Findlay Galleries (N.Y.), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984)); *see id.* at 831 (describing a chapter 11 filing as a "transparent attempt" to use the resulting stay as "an inexpensive substitute for the bond required under state law").

119. A bond also restores the express premise on which the SDNY Court declined to restrain the Debtors before judgment. As set forth above, the SDNY Court denied prejudgment relief because "Papaya will have to satisfy the judgment or obtain a bond to cover the amount, pending appeal," and because the Debtors' "stream of revenues will be available to the plaintiff shortly, unless a bond is posted." May 15, 2026 Hr'g Tr. at 14:12-21 [Exhibit 3]. The Debtors have since inverted that premise: they have neither satisfied the Final Judgment nor posted a bond, and they now seek to place their U.S. revenue stream beyond Skillz's reach. A bond requirement does no more than hold the Debtors to the law that a U.S. court found would apply when it declined to restrain them.

120. The Debtors have the means to post at least a partial bond without disrupting their operations, which is the dispositive consideration in the case law. In *Holm*, the court permitted a chapter 11 filing to substitute for an appeal bond only where "the judgment against the debtor is so large that the debtor faces severe disruption of his business if enforcement of the judgment is not stayed," and held that a debtor able to satisfy the judgment or post a bond without such disruption must post the bond before prosecuting its appeal. *In re Holm*, 75 B.R. 86, 87-88 (Bankr. N.D. Cal. 1987). Here, the Israeli court found that the Debtors hold an accessible cash balance of approximately $151 million. August 26 Order ¶ 3 [Exhibit 6]. [redacted]

121. The concern identified in *Holm*—that requiring a bond from an insolvent debtor may give the judgment creditor "a nonstatutory priority over other unsecured creditors"—has little

[redacted]

[redacted]

force on these facts. *Id.* at 87-88. The Debtors have no funded debt, and the Final Judgment accounts for approximately $719 million of the Debtors' estimated $754 million of total liabilities. August 26 Order ¶ 3 [Exhibit 6]. Skillz does not seek to prevent the Debtors from paying ordinary course obligations; only to hold the Debtors to their own statements to this Court that the Debtors remain balance sheet solvent.

122. If the Court declines to require a bond in full, the Court may order a bond in a narrower manner. In the alternative, Skillz requests that any relief granted under sections 1520(a)(3) and 1521 be conditioned on the Debtors posting a bond in respect of the Final Judgment, funded solely from incremental cash generated within the territorial jurisdiction of the United States that is not required to fund ordinary course operating expenses under a budget acceptable to the Court.

### B. The Debtors' Request For Relief Pursuant To Section 1507 Is Overbroad And Cannot Satisfy Section 1507(b)

123. In a similar manner to their invocation of section 1521, the Debtors have initially cited section 1507 as a limited basis to obtain specified relief, then sought essentially unlimited relief through the Proposed Order. *Compare* Verified Petition ¶¶ 6, 38 (citing section 1507 solely as a basis for specified relief under sections 361, 362, and 365) *with* Proposed Order ¶ 4 (stating that "**[a]ll relief afforded to a foreign main proceeding pursuant to sections 1507** and 1520 of the Bankruptcy Code is granted to the Debtors and the Foreign Representative, as applicable." (emphasis added)). Once again, this language in the Proposed Order, to the extent it purports to supply relief beyond the specific measures mentioned in the Verified Petition, is both overbroad and improper.

124. As courts have acknowledged, "the relationship between § 1507 and § 1521 is not entirely clear." *Vitro*, 701 F.3d at 1054.[137] While not yet settled within the Third Circuit, the Fifth Circuit's careful consideration of the interplay between these two provisions and their respective uses of the ambiguous terms "additional assistance" and "appropriate relief," has provided a compelling framework for consideration of when relief is appropriately assessed under one provision or the other. *See id*. at 1056-57. According to the *Vitro* court, a court's first step is to determine "whether the relief requested falls under one of [the] explicit provisions [of section 1521(a)(1)-(7) or (b)]." *Id*. at 1056 (citations omitted). Next, the court should determine whether the relief can be considered "appropriate relief" under section 1521(a)—a measure that the *Vitro* court and others have identified with relief previously available in pre-chapter 15 practice under 11 U.S.C. § 304 (repealed pursuant to the codification of chapter 15) or otherwise available under other federal statute. *Id*. at 1056-57. Last, and "***only*** if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law, should a court consider § 1507." *Id*. at 1057 (internal citation omitted) (emphasis added).

125. When application of section 1507 is appropriate, section 1507(a) allows a court to provide "additional assistance" to a foreign representative, subject to a balancing test under section 1507(b) that considers (1) "the interests of creditors," (2) "the protection of assets," (3) "the

---

[137] While the *Vitro* court correctly acknowledged that litigants are frequently "uncertain as to which provision they should rely on for relief" and therefore generally cite to both provisions, the *Vitro* court's framework reflects the idea that it is somewhat illogical to suggest that Congress intended both provisions to provide the same relief. *See Vitro*, 701 F.3d at 1056-57 (noting that "specific terms prevail over the general" (citations omitted)); *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (discussing "the canon against interpreting any statutory provision in a manner that would render another provision superfluous" (citations omitted)). Relatedly, discussion within the official UNCITRAL enactment guide suggests that Article 7 (the equivalent to section 1507) was designed as an apparently optional provision to ensure that existing cross-border insolvency provisions of the enacting state could still be enforced (at least, to the extent not otherwise repealed pursuant to enactment of the model law)—an even narrower formulation than that adopted by the *Vitro* court. *See* United Nations Commission on International Trade Law. UNCITRAL Model Law of Cross-Border Insolvency with Guide to Enactment and Interpretation, at 53, (2014), https://uncitral.un.org/sites/default/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf.

treatment of stakeholders," and (4) "whether relief would be consistent with the principles of comity." *U.S. Int'l Dev. Fin. Corp. v. Crédito Real S.A.B. de C.V., SOFOM, E.N.R. (In re Crédito Real S.A.B. de C.V., SOFOM, E.N.R.)*, 677 B.R. 192, 199-200 (D. Del. 2026) (citation omitted).

126. Here, the Debtors have not explained what their invocation of "[a]ll relief afforded to a foreign main proceeding pursuant to section[] 1507" in the Proposed Order is meant to encompass, nor why such relief is properly granted under section 1507 as opposed to other provisions of U.S. law. Assuming that the Debtors could show proper grounds for recognition, all relief sought with respect to sections 361 and 362 would be more properly obtained under sections 1520 or 1521(a)(7).[138] Similarly, the relief sought with respect to section 365 is most appropriately assessed under section 1521(a)(7). *See Jaffe*, 737 F.3d at 18, 26-27 (affirming application of section 365 pursuant to exercise of bankruptcy court's section 1521 powers).

127. In other words, the Debtors have provided no basis for relief under section 1507, let alone the wide-ranging relief suggested by paragraph 4 of the Proposed Order. This ambiguity, alone, defeats the invocation of section 1507, as it does not permit the Court any cognizable basis to consider whether the "additional assistance" being requested is consistent with the requirements of section 1507(b). *See* 11 U.S.C. § 1507(b) ("In determining whether to provide additional assistance . . . the court ***shall consider*** . . . ."); *cf. In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) ("We have held that 'shall' in a statute is interpreted as 'must,' which means 'shall' signals when a court must follow a statute's directive regardless of whether it agrees with the result.") (citation omitted).

---

[138] *See* 11 U.S.C. § 1520(a)(1) ("sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States"); 11 U.S.C. § 1521(a)(7) ("court may… grant any appropriate relief, including… additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).").

128. But, concerningly, a close read of the Verified Petition suggests that the Debtors may anticipate wielding the Proposed Order with a much broader stroke than expressly stated. The Verified Petition alludes in several places to the contemplated enforcement of the Israeli arrangement against U.S. creditors. *See* Verified Petition at ¶¶ 85-87 (drawing no distinction between U.S. and foreign creditors and suggesting that comity, alone, will require this Court to bind U.S. creditors to the terms of the Israeli arrangement). An order granting recognition should not result in application of all orders of a foreign court without further scrutiny. *In re NFE Glob. Holdings Ltd.*, No. 26-11268 (MG), 2026 WL 2032660, at *15 [Exhibit 17]. The reference to section 1507 should either be stricken from paragraph 4 of the Proposed Order or otherwise narrowly tailored to the specific relief that the Court elects to grant with reference to that section.

## III. THE COURT SHOULD INVOKE ITS POWERS UNDER SECTION 1506 TO PROTECT U.S. POLICY INTERESTS

### A. The United States Has A Strong Public Policy Interest In Policing Deceptive Conduct Within The U.S. Market

129. As further described above, the Israeli Action arises out of the Debtors' violations of U.S. law, specifically the Lanham Act. Courts have regularly identified Congressional intent that the Lanham Act operate as an additional means of indirectly protecting "the public at large" from commercial falsehoods within the U.S. market. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 116 (2014).[139] This public interest aspect of Lanham Act claims persists even though the actual claims are brought by private plaintiffs. *See U-Haul Intern. Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1243 (D. Ariz. 1981) ("The Lanham Act is itself a public interest statute intended to protect the consuming public and competitors from false and deceiving statements . . . .")

[139] *See also PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127-28 (4th Cir. 2011) ("There is a strong public interest in the prevention of misleading advertisements." (quotation omitted)); *Incarcerated Entm't, LLC v. CNBC LLC*, 331 F.Supp.3d 352, 357 (D. Del. 2018) ("The [Lanham] Act protects the general public from two types of unfair competition….").

(citation omitted), *aff'd* 681 F.2d 1159, 1162 (9th Cir. 1982) (explaining that, in enacting Lanham Act, "Congress intended 'to protect the public from imposition by the use of . . . false trade descriptions.'") (quoting U.S. Code Cong. Serv., 79th Cong.2d Sess. 1274, 1275 (1946) (internal quotations omitted). In other words, when Skillz obtained the Final Judgment in respect of the damages that it suffered individually, it did so pursuant to a statutory structure that deliberately leveraged private interests to police U.S. markets and protect the public against false advertising.[140] In the same vein, the Debtors' tortious conduct is not merely remarkable for the extent of its damage to Skillz's business but for the exceptional (and, in quantitative terms, unprecedented) scope of damage caused to the United States's public interest in fair and trustworthy commercial markets. *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 941 (3d Cir. 1993) (explaining that Congress enacted portions of the Lanham Act "[b]ecause honesty and fair play are prominent arrows in America's quiver of commercial and personal ideals").

130. That public dimension matters because it defines what section 1506 protects. The exception is not an invitation to review Israeli insolvency law in the abstract. It applies where recognition "would impinge severely a US constitutional or statutory right." *ABC Learning*, 728 F.3d at 309 (quoting *Qimonda AG Bankr. Litig.*, 433 B.R. at 570). *Qimonda* is the closest example. There, the court refused to defer to German law that would have erased the protections Congress gave licensees of U.S. patents under section 365(n), because doing so would "'severely impinge' an important statutory protection" and "undermine a fundamental U.S. public policy." *In re Qimonda AG*, 462 B.R. 165, 185 (Bankr. E.D. Va. 2011), *aff'd sub nom. Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14 (4th Cir. 2013). The same is true here. Congress chose private suits as the means

---

[140] *See* Bunn, *The National Law of Unfair Competition*, 62 *Harv.L.Rev.* 987, 1000 (1949) ("Under the Lanham Act [market competitors] have an action, since, clearly, they are likely to be damaged by the illegal competition… [T]he defendant's conduct is illegal by force of federal law, [but] [t]here is no real reason to require the FTC to spend public money to proceed against trade liars if private competitors are willing to take on the job.").

of enforcing a public prohibition on deceiving American consumers. Relief that neutralizes the Final Judgment therefore does not simply move a loss from one company to another. It switches off the enforcement mechanism Congress selected, for the benefit of the adjudicated wrongdoers and the shareholders who profited from the deception.

131. Even if this Court does not deny recognition outright to protect that interest, as *Qimonda* supports, any relief should be conditioned on appropriate creditor protections. Section 1522(a) gives courts "broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H.R. Rep. No. 109-31, pt. 1, at 116 (2005); *see Jaffé*, 737 F.3d at 29 (section 1506 supplies "an additional, more general protection of U.S. interests that may be evaluated apart from the particularized analysis of § 1522(a)"). The public interest in the integrity of U.S. markets should therefore inform each discretionary decision before the Court: whether to recognize the Israeli Action, what relief to extend, and what conditions must attach to protect the U.S. claimants the Lanham Act exists to redress.

**B. The Debtors' Pervasive Bad Faith Creates Independent Grounds To Deny Or Condition The Relief Sought By The Proposed Order**

132. The Court should refuse the relief requested by the Verified Petition because it is manifestly contrary to the public policy of the United States based on the Debtors' well-documented and pervasive bad faith conduct leading up to these Chapter 15 Cases. Congress has provided courts with wide-ranging authority to "refus[e] to take an action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Section 1506's "public policy exception" provides the court with authority to act at the earliest stages of a chapter 15 case "where recognition would impinge severely a US constitutional or statutory right." *ABC Learning*, 728 F.3d at 309 (quotations omitted).

133. Here, the Court's immediate and firm intervention is warranted by the "exceptional circumstances" of this case. *See ABC Learning*, 728 F.3d at 309. The Debtors have supplied no examples of a court granting recognition to a proceeding filed for the sole purpose of impairing a Lanham Act judgment entered by a U.S. court, followed by a two-week jury trial, a unanimous verdict, full post-trial briefing, and a 78-page opinion containing multiple findings of bad faith and fraudulent conduct by such U.S. court. Conversely, at least on one occasion, a court has invoked section 1506 where recognition would offer future bad actors a roadmap to act in contravention of U.S. statutes. *See In re Gold & Honey, Ltd.*, 410 B.R. 357, 372-73 (Bankr. E.D.N.Y. 2009) (denying recognition on account of the "serious ramifications that would ensue in derogation of fundamental United States policies" if future parties "could follow [the bad actor's] lead.").

134. More pointedly, and as further described above, the Debtors are using the Israeli Action—a limited action which lacks many of the core characteristics of a collective insolvency proceeding—as a strategic tool to evade responsibility for their deceptive conduct. If successful, the Debtors' conduct might well create the sort of "serious ramifications" cited in *Gold & Honey*, namely the development of a roadmap for foreign tortfeasors to aggressively engage in anti-competitive and harmful conduct within the U.S. market, only to flee back to foreign jurisdictions in search of favorable insolvency relief immediately upon being caught. *See id*. While foreign courts have every right to adjudicate collective insolvency proceedings that arise from the misfortunes of an "honest but unfortunate foreign debtor," comity cannot reasonably require a United States court to invert U.S. public policy and "favor[] the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The possibility of such an outcome, alone, underscores the importance of

Congressional intent in enacting section 1506 as the Court's failsafe measure in such circumstances.

135. Here, the Israeli Action is, fundamentally, a limited action that is designed solely to impair tort creditors holding judgments arising from misconduct within the U.S. market, while allowing the perpetrators—the shareholders—to keep their ownership and control unabated. To date, every indication has suggested that the Debtors mean to use this action to retain the wrongful proceeds of their tortious conduct for existing equity holders—at the expense of U.S. businesses and U.S. consumers. This Court should exercise its powers under section 1506 to deny or condition any applicable relief sought by the Verified Petition.

## CONCLUSION

136. For the foregoing reasons, Skillz respectfully requests that this Court: (a) as to Papaya Ltd., deny recognition of the Israeli Action, or, in the alternative, recognize the Israeli Action as a foreign nonmain proceeding; (b) as to Papaya US, deny recognition in any form; (c) if any recognition is granted, strike paragraphs 4 and 8 of the Proposed Order, or narrow them to the specific relief sought and justified in the Verified Petition; (d) confirm that the Proposed Order authorizes no administration, transfer, or repatriation of Papaya US's U.S. assets, including intercompany transfers to Papaya Ltd., absent further order of this Court; (e) condition any relief on the posting of a supersedeas bond in respect of the Final Judgment in an amount determined by the Court or, in the alternative, on the retention of U.S. cash in excess of ordinary-course operating expenses in a segregated Papaya US account within the territorial jurisdiction of the United States; (f) decline, pursuant to section 1506, to recognize or enforce the Israeli arrangement against U.S. creditors; and (g) grant Skillz such other and further relief as is just and proper.

## RESERVATION OF RIGHTS

137. Skillz files this Objection based on the record as it exists today. Discovery remains ongoing, with certain issues unresolved, including to the extent the Foreign Representative produces additional information or documents through discovery. The Israeli Court has rejected the Debt Arrangement as deficient, and the Debtors have yet to propose a revised arrangement that is acceptable to the Israeli Court. Skillz reserves all rights to supplement, amend, or modify this Objection; to submit additional evidence and declarations; to examine and cross-examine witnesses at any hearing; to respond to any reply, supplemental pleading, or revised form of order; and to be heard on all matters relating to the Verified Petition and the Proposed Order. Nothing in this Objection constitutes a waiver of, and Skillz expressly reserves, all rights, claims, defenses, and remedies, including with respect to the Final Judgment and its enforcement, any request to dismiss or terminate these Chapter 15 Cases, any objection to the Israeli arrangement or its enforcement in the United States, and any claims against the Debtors, their insiders, or their affiliates. Skillz further reserves the right to seek relief from any stay and to raise any argument not asserted herein.

[*Remainder of page intentionally left blank.*]

Dated: September 11, 2026
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP
*/s/ Sean M. Beach*
Sean M. Beach (DE Bar No. 4070)
Michael S. Neiburg (DE Bar No. 5275)
Joshua Hall (DE Bar No. 7510)
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: sbeach@ycst.com
mneiburg@ycst.com
jhall@ycst.com

-and-

Ray C. Schrock (*pro hac vice*)
Christopher Harris (*pro hac vice*)
Adam J. Goldberg (*pro hac vice*)
Michael Ardeljan (*pro hac vice*)
Tianjiao "T.J." Li (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
christopher.harris@lw.com
adam.goldberg@lw.com
michael.ardeljan@lw.com
tj.li@lw.com

Amy C. Quartarolo (*pro hac vice*)
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (213) 485-1234
Email: amy.quartarolo@lw.com

-and-

Lazar P. Raynal (*pro hac vice*)
Michael A. Lombardo (*pro hac vice*)
**KING & SPALDING LLP**
110 N Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312)-995-6333
Email: lraynal@kslaw.com
mlombardo@kslaw.com
***Counsel for Skillz Platform Inc.***