**REDACTED PUBLIC VERSION OF D.I. 108**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 15 |
| PAPAYA GAMING LTD., *et al.*, | : | Case No. 26-11217 (MFW) |
| Debtors in a foreign proceeding.[1] | : | **Re: Docket Nos. 4 & 107** |

**APPENDIX TO OBJECTION OF SKILLZ PLATFORM INC. TO VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF THE ISRAELI PROCEEDING AS A FOREIGN MAIN PROCEEDING OR, ALTERNATIVELY, A FOREIGN NONMAIN PROCEEDING**

[1] The Debtors in these Chapter 15 Cases, together with the last four digits of their business number or employee identification number, as applicable, are: Papaya Gaming Ltd. (2095); and Papaya Gaming Inc. (3649).

## Exhibit List

| Exhibit No. | Description | Date | Bate Stamp |
|---|---|---|---|
| 1. | Deposition Transcript of Oriel Bachar (“**Bachar Dep. Tr.**”) | September 3, 2026 | N/A |
| 2. | [redacted] Account Statements for Papaya Gaming Ltd. | Jan and Feb 2026 | PAPAYA_000004624; PAPAYA_000004579; PAPAYA_000004587 |
| 3. | May 15, 2026 Hr’g Tr. at 14:12–21, *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 24-cv-01646 (DLC) (S.D.N.Y.) (“**May 15 Hr’g Tr.**”), attached as Exhibit D to Skillz’s Objection to the Motion for Provisional Relief [Docket No. 23] | May 15, 2026 | N/A |
| 4. | Deposition Transcript of Pinni Yaniv (“**Yaniv Dep. Tr.**”) | September 9, 2026 | N/A |
| 5. | Interrogatory Responses | September 1, 2026 | N/A |
| 6. | Israeli District Court Opinion (87154-07-26) [Certified English Translation] (“**August 26 Order**”) | August 26, 2026 | N/A |
| 7. | Final Judgment, *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 24-cv-01646 (DLC) (S.D.N.Y. July 28, 2026) [ECF No. 1005] | July 28, 2026 | N/A |
| 8. | *Answer, Affirmative Defenses, and Counterclaims, Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 24-cv-01646 (DLC) (S.D.N.Y. Aug. 5, 2024) [ECF No. 46] | August 5, 2024 | N/A |
| 9. | Papaya Terms of Service | October 30, 2025 | N/A |
| 10. | Services Agreement | February 1, 2023 | PAPAYA_000002647 |
| 11. | Deposition Transcript of James Kong (“**Kong Depo. Tr.**”) | September 8, 2026 | N/A |
| 12. | *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 24-cv-01646 (DLC), Opinion and Order at 12-1312–13 (S.D.N.Y. July 27, 2026) [ECF No. 1004] (the “**July 27 Order**”) | July 27, 2026 | N/A |
| 13. | Debt Arrangement | N/A | N/A |
| 14. | *Decision, Application No. 1,* Case No. 87154-07-26 (Dist. Ct. Tel Aviv-Yafo Aug. 1, 2026) (the “**Ex Parte Stay Order**”) (certified English translation attached as Exhibit E to the Yaniv Declaration [Docket No. 6-5]) | August 1, 2026 | N/A |
| 15. | Israeli District Court Hearing Transcript (87154-07-26) [Certified English Translation] (“**August 25 Hr’g Tr.**”) | August 25, 2026 | N/A |
| 16. | Application for Approval of a Debt Arrangement and for Convening of Creditors’ Meetings (Isr. Dist. Ct. Tel Aviv-Jaffa) [Certified English Translation] (“**Israeli Application**”) | July 30, 2026 | PAPAYA_00000021 |

| Exhibit No. | Description | Date | Bate Stamp |
|---|---|---|---|
| 17. | *In re NFE Glob. Holdings Ltd.*, No. 26-11268 (MG) (Bankr. S.D.N.Y. July 14, 2026) [Docket No. 30] | July 14, 2026 | N/A |
| 18. | Supplemental Interrogatory Responses | September 7, 2026 | N/A |
| 19. | Papaya Gaming Ltd. (Solo) Balance Sheet and Profit & Loss Statement (unaudited) | December 31, 2025, | PAPAYA_000003948 |
| 20. | Papaya Gaming Inc. (Solo) Balance Sheet and Profit & Loss Statement (unaudited) | December 31, 2025 | PAPAYA_000003947 |
| 21. | Papaya Gaming Ltd. and Its Subsidiaries, Consolidated Financial Statements | July 30, 2026 | PAPAYA_000000457 |
| 22. | Papaya Gaming Ltd., Unanimous Written Resolution of the Board of Directors in Lieu of a Meeting | July 24, 2025 | PAPAYA_000002770 |
| 23. | Investment Policy (April 2025) | April 2025 | PAPAYA_000002773 |
| 24. | Complaint, *Papaya Gaming, Ltd. v. Fair Play for Mobile Games*, No. 25-cv-00470 (MSN-IDD) (E.D. Va. Mar. 14, 2025) [ECF No. 1] | March 14, 2025 | N/A |
| 25. | Papaya Gaming Website, https://www.papaya.com | N/A | N/A |
| 26. | PayPal Global Merchant Agreement, Schedule 1 (Sales Channels) | N/A | PAPAYA_000003499 |
| 27. | PayPal Global Merchant Agreement, [redacted] Addendum § 3.1 (Physical Location) | N/A | PAPAYA_000003507 |
| 28. | Merchant Agreement between PayPal, Inc. and Papaya Gaming Inc. | November 2021 | PAPAYA_000003484 |
| 29. | [redacted] Addendum, App'x A (Solitaire Cash—41 states plus Washington D.C.) | November 2021 | PAPAYA_000003510 |
| 30. | [redacted] Addendum, App'x A (Bubbles Cash—44 jurisdictions) | November 2021 | PAPAYA_000003511 |
| 31. | [redacted] Addendum, App'x A (21 Cash—41 jurisdictions) | November 2021 | PAPAYA_000003512 |
| 32. | [redacted] Addendum, App'x A (Bingo Cash—jurisdictions) | November 2021 | PAPAYA_000003513 |
| 33. | [redacted] Addendum § 7.5 | November 2021 | PAPAYA_000003509 |
| 34. | Amendment to PayPal Merchant Agreement | N/A | PAPAYA_000003476 |
| 35. | Insertion Order, Papaya Gaming Ltd. & [redacted] | July 10, 2023 | PAPAYA_000005060 |
| 36. | Insertion Order, Papaya Gaming Ltd. & [redacted] | September 26, 2023 | PAPAYA_000003076 |

| Exhibit No. | Description | Date | Bate Stamp |
|---|---|---|---|
| 37. | Insertion Order, Papaya Gaming Ltd. & [redacted] | May 31, 2022 | PAPAYA_000002975 |
| 38. | Insertion Order | July 2021 | PAPAYA_000003111 |
| 39. | Insertion Order | October 1, 2022 | PAPAYA_000003066 |
| 40. | Purchase Order (World Solitaire Championship), | N/A | PAPAYA_000003058 |
| 41. | Insertion Order | December 16, 2022 | PAPAYA_000003067 |
| 42. | Insertion Order, [redacted] & Papaya Gaming Ltd. | December 7, 2025 | PAPAYA_000003684 |
| 43. | Insertion Order, [redacted] & Papaya Gaming Ltd. | May 21, 2024 | PAPAYA_000003137 |
| 44. | Group Structure Chart Reflecting Incorporation of Papaya Gaming Inc. in Delaware | July 2016 | PAPAYA_000005002 |
| 45. | Merchant Services Agreement between [redacted] and Papaya Gaming Inc. | August 12, 2025 | PAPAYA_000003394 |
| 46. | Gaming — Bank Card Merchant Agreement between Worldpay Gaming Solutions, LLC and Papaya Gaming Inc. | February 2021 | PAPAYA_000003638 |
| 47. | Cybersource Agreement | October 15, 2023 | PAPAYA_000003353 |
| 48. | SVB Merchant Account Application | January 27, 2022 | PAPAYA_000003518 |
| 49. | [redacted] Services Agreement | July 23, 2021 | PAPAYA_000003227 |
| 50. | [redacted] Bank Account Confirmation for Papaya Gaming Inc. (Hebrew) | N/A | PAPAYA_000001441 |
| 51. | [redacted] Application Listing Merchant Address [redacted] | August 14, 2025 | PAPAYA_000003473 |
| 52. | Worldpay Merchant Agreement, Schedule 3, Part A, listing Papaya Gaming Inc. in New York | N/A | PAPAYA_000003674 |
| 53. | Letter Repeating the [redacted] Office Address. | March 10, 2026 | PAPAYA_000004854 |
| 54. | [redacted] § 28.9, requiring a gaming notice displayed before payment information is requested, covering rules of play, odds, payout ratios, and responsibility for compliance with U.S. gaming law. | N/A | PAPAYA_000003469 |
| 55. | [redacted] § 6.3.3, requiring display of the merchant's address and country(ies) of domicile | N/A | PAPAYA_000003408 |

| Exhibit No. | Description | Date | Bate Stamp |
|---|---|---|---|
| 56. | SVB Merchant Operating Terms, requiring display of the principal place of business, including country of domicile, on the checkout screen. | N/A | PAPAYA_000003532 |
| 57. | [redacted] § 29, addressing reportable gambling winnings under I.R.C. § 6041, payee identity verification, and furnishing Forms W-2G, 5754, 1042, and 1042-S, with withholding under I.R.C. §§ 3402(q), 3406, 1441(a), and 1442(a). | N/A | PAPAYA_000003470 |
| 58. | Same § 29, merchant assuming all responsibility and liability for those functions. | N/A | PAPAYA_000003471 |
| 59. | Minutes of a Meeting of the Board of Directors of Papaya Gaming Ltd. | March 5, 2026 | PAPAYA_000001607 |
| 60. | Minutes of a Meeting of the Board of Directors of Papaya Gaming Ltd. | January 20, 2026 | PAPAYA_000001606 |
| 61. | Minutes of a Meeting of the Board of Directors of Papaya Gaming Ltd. | May 3, 2026 | PAPAYA_000001605 |
| 62. | Minutes of a Meeting of the Board of Directors of Papaya Gaming Ltd. | July 28, 2026 | PAPAYA_000001604 |
| 63. | Unanimous Written Resolution of the Board of Directors | March 6, 2026 | PAPAYA_000002870 |
| 64. | [redacted] Bank Account Confirmation for Papaya Gaming Inc | N/A | PAPAYA_000001432 |
| 65. | Papaya Gaming, Inc. Certificate of Incorporation | July 3, 2016 | PAPAYA_000001015 |
| 66. | [redacted] Application and Agreement | March 16, 2023 | PAPAYA_000003369 |
| 67. | CyberSource Payment Solutions Agreement | Oct. 15, 2023 | PAPAYA_000004837 |
| 68. | Worldpay Merchant Agreement, Schedule 3, Part A | N/A | PAPAYA_000003657 |
| 69. | Israeli Part J Application (Certified English Translation) | July 30, 2026 | PAPAYA_0000000001 |
| 70. | Services Agreement between Papaya Gaming Ltd. and Papaya Gaming Inc. (Feb. 2023) §§ 1.1, 2.1 | February 2023 | PAPAYA_000000974 |
| 71. | [redacted] [redacted] Payment Detail Reports: PAPAYA_000004646 [redacted]); PAPAYA_000004647 [redacted]); PAPAYA_000004648 [redacted]); PAPAYA_000004677 [redacted]); PAPAYA_000004649 [redacted]); PAPAYA_000004650 [redacted]); PAPAYA_000004651 [redacted]); PAPAYA_000004678 [redacted]). | October 2025 - May 2026 | PAPAYA_000004646; PAPAYA_000004647; PAPAYA_000004648; PAPAYA_000004677; PAPAYA_000004649; PAPAYA_000004650; PAPAYA_000004651; PAPAYA_000004678 |

Dated: September 11, 2026
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean M. Beach*

Sean M. Beach (DE Bar No. 4070)
Michael S. Neiburg (DE Bar No. 5275)
Joshua Hall (DE Bar No. 7510)
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: sbeach@ycst.com
mneiburg@ycst.com
jhall@ycst.com

-and-

Ray C. Schrock (*pro hac vice*)
Christopher Harris (*pro hac vice*)
Adam J. Goldberg (*pro hac vice*)
Michael Ardeljan (*pro hac vice*)
Tianjiao "T.J." Li (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
christopher.harris@lw.com
adam.goldberg@lw.com
michael.ardeljan@lw.com
tj.li@lw.com

Amy C. Quartarolo (*pro hac vice*)
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (213) 485-1234
Email: amy.quartarolo@lw.com

-and-

Lazar P. Raynal (*pro hac vice*)
Michael A. Lombardo (*pro hac vice*)
**KING & SPALDING LLP**
110 N Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312)-995-6333
Email: lraynal@kslaw.com
mlombardo@kslaw.com

***Counsel for Skillz Platform Inc.***

**EXHIBITS 1 - EXHIBIT 2**

**FILED UNDER SEAL**

# EXHIBIT 3

## EXHIBIT D

**[Hearing Transcript]**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SKILLZ PLATFORM, INC.,

Plaintiff,

v. 24 Civ. 1646 (DLC)

PAPAYA GAMING, LTD., and
PAPAYA GAMING, INC.,

Conference

Defendant.

------------------------------x

New York, N.Y.
May 15, 2026
10:00 a.m.

Before:

HON. DENISE COTE,

District Judge

APPEARANCES

KING & SPALDING LLP
Attorneys for Plaintiff
BY: LAZAR P. RAYNAL
ZOE BEINER

KIRKLAND & ELLIS LLP
Attorneys for Defendant
BY: ALLISON M. BROWN
SAMUEL LEIFER

(Case called)

MR. RAYNAL: Your Honor, Lazar Raynal.

MS. BEINER: Zoe Beiner.

MS. BROWN: Good afternoon, your Honor.

Alli Brown for Papaya.

MR. LEIFER: Good morning, your Honor.

Samuel Leifer for Papaya.

THE COURT: Thank you.

I have an emergency motion brought by the plaintiff, and I scheduled expedited briefing, and I'm holding this conference because I think it would be helpful to the parties if I rule on this motion before Monday's settlement conference.

I've read the briefs. Most recently, Skillz filed its reply, and so all hear from defense counsel and then from Skillz.

MS. BROWN: Thank you very much, your Honor.

Should I move over here?

Good morning, your Honor.

Skillz has come to the Court with an emergency motion that seeks unprecedented relief that would severely disrupt Papaya's business and needed risk halting operations entirely. We submit your Honor that this motion should be denied, as Skillz has failed to establish any of the factors that the Court's consider when granting relief under 5229. They have

failed to point the Court to any precedent that would support the requested relief that will unquestionably and undoubtedly disrupt ordinary operations.

And as a practical matter, your Honor, the requested injunction would accomplish the very opposite of what 5229 is designed to provide. Namely, it would jeopardize Skillz's prospect of collecting on a judgment that it purports to be here to protect.

First, your Honor, I'd like to address the factors that courts consider when issuing relief under § 5229, and they are simply not present here. While the only statutory prerequisite to 5229 relief is, indeed, a favorable verdict, all of the cases that were cited by either party interpreting this provision identified that there must be some evidence of danger of asset dissipation or financial distress before relief is requested. Here, Skillz has identified none.

The cases in the briefing your Honor, have a list of different types of evidence that was identified on both of those issues. For example, many of the cases have actual testimony of financial distress that came in during the trial, during closing arguments, in evidence. Some of the cases, as well, have factual findings about defendant's making inconsistent statements about their assets. Others, your Honor, have evidence of movement of money post-a jury verdict or a verdict from the Court.

None those factors are at issue here, and Skillz identifies in both of its motions, no evidence or argument that Papaya is in financial distress.

As to the dissipation of assets, your Honor, Skillz does not take issue at all with the fact that all of Papaya's asset are transferred solely as a routine business practice. In our case, there is no doubt as to the location of Papaya's assets. All assets remain with Papaya, whether either here in the United States or in Israel. And indeed all remain with a named defendant, Papaya LTD.

These assets, as explained in the decoration, your Honor, are used to generate revenue, not dissipate it. And Papaya -- and I think this is perhaps the most important -- your Honor, Papaya hasn't changed a single thing in its business operations since the jury verdict. It has not done anything out of the ordinary course of business in terms of how cash moves to Israel, how vendors and employees are paid, how the business is operated. Skillz is not able to point to a single event that has taken place in the recent three weeks since the verdict that would raise a red flag or in any way suggest an effort to shield, move, or otherwise dissipate asset, as is required under 5229.

Plainly, your Honor, in this context where all a defendant has done is operate under the status quo from before the verdict, kept all assets with a named party, and continued

operation as usual, there is no basis to find the danger or the concern for a dissipation of assets that's discussed in the case law and, therefore, no basis to grant relief under 5229.

Next, your Honor, Skillz offers no support for the extreme remedy they seek here that would unquestionably grind operations to a halt. As we set forth in the declaration that accompanied the opposition, your Honor, there is a practice in the ordinary course of moving the money to Israel, to pay employees, to pay vendors, to continue the ordinary operation of the business, and Skillz does not dispute that its requested relief would force Papaya to stop being able to do these ordinary course operations including paying employees, paying rent, complying with vendor contracts, or meeting requirements that are outlined in the declaration under both Israeli and European law.

In fact, Skillz does not dispute at all -- and I think actually admits in the reply brief, your Honor -- that certainly being able to carry on the operations of the business is exempted from any 529 relief.

Skillz identifies no example of any court anywhere granting relief that would halt the operations of the business, and in fact, I think the case law notes quite the opposite.

I noticed in the reply, your Honor, that Skillz highlighted that we didn't mention the *Fortress* case in our

opposition, but I think that case, like the others that were cited, is instructive on this very point. Because in that case, the Court held that reasonable accommodations for expenditures required in the ordinary course of maintenance and operation of the business must be exempted by any relief called for under 5229.

That's consistent, your Honor, the *Gallegos* case, which states that relief under should not render defendants without the means to operate the business successfully.

One example, your Honor I wanted to quickly address in the papers is Skillz assertion that Papaya's expenses are not reasonable or appropriate. And the example that they gave in the papers was, they claim that user acquisition costs is not an ordinary business exception, and nothing could be further from the truth. In terms of evidence, your Honor, that came in during this very trial, there was trial testimony from cofounder Casey Chafkin that user acquisition spend is definitely related to revenue.

Separately, your Honor Skillz's own damages expert, Mr. Jim Bergman, provided testimony about the user acquisition spend having a direct relationship to revenue, and separately, your Honor, even trial counsel in this case made public statements following the verdict, in connection with an award that they nominated themselves for, that it was testimony on user acquisition that allowed them to demonstrate how that

went to Papaya's profits. And so the one example that they gave, your Honor, is belied by the testimony that came in at trial and by the facts and the truth.

Papaya has continued to operate as usual. It has continued to pay its employees, to do everything needed to carry on the business, and the requested relief would grind that to a halt.

There is no case that they have pointed to that would support any type of restraint that would bring a company to a screeching halt, which is what the requested relief of stopping all revenue from going to Israel would degree do for Papaya.

And finally, your Honor, we submit that this relief should be denied, because it would have the opposite of affect of the purpose of 5229. Federal and state courts, in interpreting 529, have ruled that courts must exercise discretion in light of the purpose of the statute. The purpose is to prevent a party from disposing of assets in order to avoid judgment.

That purpose would not be served by Skillz's requested extreme relief here. In joining Papaya's ordinary course transfer of assets risks Papaya to incur significant penalties and liabilities in Israel, limit its operations or stop operating all together. All of these outcomes would reduce the funds available for Skillz to collect rather than protect it, as Skillz claims it's here to do.

Your Honor, importantly, in the three weeks since the verdict came down, Papaya has done nothing but conduct business as usual. There is not a shred of evidence that Papaya has taken a single action outside the ordinary course and in any effort to dissipate or shield or move assets.

The relief requested here would interfere tremendously with ordinary business operations. It has no support in the law or the facts. It contravenes the purpose of 5229 and would have the practical affect of diminishing the very assets Skillz seeks to protect.

For those reasons, your Honor, we respectfully request that the motion be denied.

THE COURT: Thank you Ms. Brown.

Mr. Raynal.

MR. RAYNAL: Thank you, your Honor.

Good morning, your Honor.

Thank you for scheduling this so quickly, and I apologize for not being in my more formal suit I would normally wear, but I just happened to be in New York when your Honor's order came down, so I stayed for this hearing and this jacket is what I had, so I apologize I'm not in a more formal suit, your Honor, which I would normally wear before you.

Your Honor I would just start with a couple points, because I think it really undermines most of the position that Papaya's taken. The relief we've come for is for exactly this

situation. You have a large award, where between the time of verdict and its -- you know, temporary relief between the time of verdict and a judgment, because we're not able to do anything to protect the verdict that we've received, and that's what exactly the statute that we've moved under says. We haven't moved under Rule 65.

And the law is very clear. There are no requirements other than the fact that we've received this verdict and what the courts, in fact, focus on is, while some them will look at some factors, they actually say, specifically -- and I know the lesser case that we cited -- it says: The test of the statute does provide for such requirement that courts have placed say there's no such requirement, and that's talking about the point of the judgment creditor making some showing of dissipation of assets.

Now, we knew -- we didn't have -- like, there was a mention, in some cases, there was evidence that was brought out during trial of how they moved assets and so forth. As your Honor knows, we didn't have that evidence in this case because of the fact that the executives had taken the Fifth Amendment, so we weren't able to ask them about how they moved money.

We assumed they were moving money from Israel, but then when they filed their response, Mr. Riva -- who, I will say, in his self-serving declaration, and we have reason to believe he was not truthful in his deposition, and I would have

-- we didn't get a chance to bring that out in front of your Honor where he was untruthful in his deposition, but he's not the most reliable candidate, I would say, is also from a firm, a company that has shown itself in this case to have committed fraud and lied at every turn, lied repeatedly over and over.

So we have a company that's been found to have a large liability against it. It has now told us in this declaration of Mr. Riva that they're moving all of the money out of the U.S., all of it. They are shipping it all out of the U.S. And then they're saying they're spending it all. If that's not dissipation, I don't know what is, your Honor.

They don't actually say anything about: Well, how much money do the already have in Israel; how long could they float their operations for without transferring any money. For example we don't know if they can continue to float their operations for three months or six months or the rest of the year or into next year, because they haven't provided any of that information. What they've told us is, all of the money is leaving the United States as revenue.

We didn't say that user acquisition costs were not customary expenses. What we said is, they don't get to pick and choose who would be ordinary expenses to keep paying, because you could ratchet up or down your user acquisition spend, just as we saw in the trial of this case. Companies made decisions to do it.

At some point Skills said, we can't afford to keep spending this rate of user acquisition. So, remember that they reduced their user acquisition spending. They can reduce user acquisition spend. They can reduce their user acquisition spend. But they also don't tellus how much money they already have in Israel that they can continue to use to spend on those things. They haven't told us why it is they have to send every penny of revenue they receive in the United States out of U.S. in this interim period prior to us receiving our judgment.

And in the *Fortress* case -- which was mentioned by Ms. Brown -- which was a case where Kirkland & Ellis, on behalf of Fortress, was able to obtain an order, and in that order, Judge Cohen said, you know, CPLR 5229 provides that before judgment is entered upon motion of the party, and in whose favor a verdict or decision is rendered, the trial judge may order examination of the adverse party and/or restrain with the same effect as if a retaining notice had been served upon him after judgment. And he goes on to say that this is to prevent the adverse party to disposing the assets to avoid the judgment and that the only requirement is the application for relief.

And he goes on to say, at least in that case, that there actually was no question of the person of -- I'm just -- ironically, the defendant's name was also Cohen -- that Mr. Cohen was acting in bad faith or his business or anything was acting in bad faith, but he said: Look, this is what this

statute is for is this exact situation. You have a large verdict. It's unclear whether they going to be able to pay if they continue to dissipate assets. Here, I think Papaya is essentially telling us they're not going to be able to pay, because they're going to take all of the money out of the U.S. and they're going to spend it in Israel, and we're never going to see any of that money.

And the Court also, in the *Fortress* case, said that CPLR 5229 is a common tool employed by plaintiffs awaiting imminent entry of a judgment after a decision has been rendered in their favor.

And I won't go on with some of the other favorable comments I think that are in the opinions, your Honor. I know your Honor knows the law, I am sure, better than I do. But I would show that we did cite in the financials that we have -- and we don't have more recent financials. In the last financials we saw from 2025 alone, they were spending $478 million in UA spend, so if they're going to keep sending money out of the U.S. to go spend it in Israel or do whatever they want to do within Israel, as Mr. Rivas says, without any protection for our verdict in what ultimately is going to be the damage in this case, we think that's exactly what the statute is meant for this particular -- if not this case, I can't think of a better case than the case we actually have here.

And we don't have to show that they're doing it for any improper. Purpose. We just have to show they are dissipating, and they've told us now they're dissipating it, and we don't even have to show that they're dissipating it, under the statute. So I think this is a pretty clear case, Judge, that this temporary relief for this period of time until your Honor enters the judgment, we ask that this be entered.

THE COURT: Thank you.

Skillz has brought a motion, pursuant to CPLR § 5229, to restrain Papaya from expatriating any revenue earned in the U.S. and from interfering with any assets necessary to satisfy the judgment that will be entered in favor of Skillz.

I entered this expedited briefing schedule and this conference this morning, as I mentioned, so that I could rule today in advance of your settlement conference with Judge Preska on Monday.

The parties agree that I have authority to grant the plaintiff's request. They also agree that the decision is subject to the exercise of this Court's discretion. In exercising that discretion I'm going to apply the factors set out in the *Gallegos* decision, which the Weinstein treatise notes has an excellent discussion of the precedent and the factors to be weighed.

I'm going to decline to grant this request, even as

modified by Skillz in its reapply. Skillz is willing to carve out an exception for transactions necessary in the ordinary course of business with one exception to that, and that is an exception for those assets or revenues used for user acquisition expenses so it would seek to retrain any revenue generated in the United States for that purpose, once transferred abroad.

I think the parties can reasonably expect a judgment to be entered in this case within a few months following their briefing of motions, which will be fully submitted in June 19. The Court will work, to as expeditiously as possible, resolve those motions and enter an appropriate judgment. At that time, Papaya will have to satisfy the judgment or obtain a bond to cover the amount, pending appeal.

Now, the law permits, as most relevant here, this prejudgment restraint where there is a showing of or a concern that assets will be dissipated to avoid a judgment. I don't think Papaya can reasonably evade enforcement of a judgment here. Its operations are principally in the United States. It's stream of revenues will be available to the plaintiff shortly, unless a bond is posted.

Now, Skillz points to the deceptive behavior that Papaya has engaged in, in connection with its U.S. operations and, in particular, in the years following its entry into the U.S. market. I think this has limited relevance to this

particular motion, given the commercial realities that will accompany the enforcement of the judgment where the companies, the defendant's revenue stream is largely based on its U.S. operations and will be available to the plaintiff once judgment is entered.

So, counsel, thank you for accommodating my scheduling request and good luck on Monday.

Thank you.

MS. BROWN: Thank you, your Honor.

MR. RAYNAL: Thank you, your Honor.

(Adjourned)

**EXHIBITS 4 - EXHIBIT 5**

**FILED UNDER SEAL**

# **EXHIBIT 6**

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/08/27**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Hebrew

To:

- English (USA)

The documents are designated as:

- 2026 08 26 (78-17) Exhibit Q

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Samuel Wu

Signature of **Samuel Wu**, Managing Director



299 South Main Street, Suite 1300
Salt Lake City, UT 84111

[Emblem of the State of Israel]
**Tel Aviv-Jaffa District Court**

**Insolvency 87154-07-26 Papaya Gaming Ltd. et. al v. Insolvency Supervisor – Tel Aviv District et. al**

**Motion no.: 1**

**Before the Honorable Judge Iris Lushi-Abudi**

**In the matter of: Insolvency and Financial Rehabilitation Law, 5778-2018 "the Law"**

**And in the matter of: Insolvency and Financial Rehabilitation Regulations, 5779-2019 "the Regulations"**

**And in the matter of: 1. Papaya Gaming Ltd., company no. 515422095**
**2. Papaya Gaming Inc.**
**A company incorporated in Delaware, US**
**Both represented by Adv. Pini Yaniv and/or Liron Sapir et. al "the Applicants"**

**And in the matter of: Skillz Platform Inc.**
**represented by Adv. Yaron Elkawi and/or Amnon Bis and/or Maya Ben Meir "Skillz"**

**And in the matter of: Jane Barsel (foreign citizen), representative of the class of claimants in the claim**
**At a court in California, case no.: 3262624STCV**
**represented in the US by the Milberg PLLC law firm**
**by Adv. Nadav Lev and Adv. Avichai Eliyahu "Milberg"**

**And in the matter of: Ms. Cassie Robinson, the plaintiff in the class-action suit**
**represented by Adv. Shir Eshkol "the Representative Plaintiff"**

**And in the matter of: Insolvency and Financial Rehabilitation Supervisor – Tel Aviv-Jaffa**
**represented by Adv. Hadar Naot "the Supervisor"**

**Decision**

1. Before me is a motion for a stay of proceedings, appoint a settlement administrator, and to convene meetings of creditors of the Applicants for the purpose of approving a debt settlement pursuant to Chapter J of the Insolvency and Financial Rehabilitation Law, 5778-2018 (hereinafter: "**the Law**").

2. The Applicants are two companies: one, Papaya Gaming Ltd., incorporated in Israel (hereinafter: "**the Parent Company**"), and the second, Papaya Gaming Inc., incorporated in the state of Delaware in the United States (hereinafter: "**the Subsidiary**"), which are engaged in, as argued in the motion, the development and marketing of mobile games on the basis of a proprietary platform developed by the Parent Company, which enables gamers to compete in multi-participant tournaments that bear prizes, in games based on skills and abilities. It is further argued that the Subsidiary provides the Parent Company payment clearing and processing services in the US and other countries, and that the lion's share of the income of the Parent Company comes from operations and users in the US.

[Stamp: illegible]

[Emblem of the State of Israel]
**Tel Aviv-Jaffa District Court**

3. The Companies are in a state of cash flow insolvency, with their estimated debts totaling approximately $754 million, of which approximately $719 million stems from a debt that was ruled by a Federal District Court in New York on July 27, 2026 in favor of Skillz (hereinafter: "**Skillz**"), which in also engaged in the field of skill-based mobile games and is a competitor of the Companies, and additional debts to the users of the companies for monetary prizes, and debts arising from the current operations of the Companies and a settlement reached by the Companies as part of a class-action suit filed against them in a California court. Conversely, the companies have a cash balance of approximately $151 million.

4. Following the filing of the motion for a temporary stay of proceedings, I ordered in my decision dated August 1, 2026, a temporary stay of proceedings and the receiving of responses, and subsequently, on August 16, 2026, I also ordered the receiving of responses to main motion to convene meeting and the appointment of a settlement administrator. Following that decision, an announcement was published on the website of the Supervisor.

5. The Companies wish to propose a debt settlement for their creditors, which will ensure payment of up to 100 percent of the debts, despite the cash flow insolvency. The proposed settlement including continuing operation of the Companies, while protecting their profits (except for a fixed amount for current management) in a special fund that will be managed by the settlement administrator for a period of seven years, until the fixed cap in the debt settlement, and for the purpose of distributing them to creditors. For the purpose of my decision, I deem it fit to specify all the details of the settlement in its current form, because it is based solely on income from continued activity, with all the inherent involved, without guarantees, without owner contributions, etc.; arguments that were even raised in the objection on behalf of Skillz. I therefore believed that the Applicants should improve the settlement and present a model that would incorporate income from continued activity as well as from additional sources.

6. In addition to objecting to the content and details of the settlement, Skillz raised a principled objection to the actual filing of the application under Chapter J of the Law, and believed that the conduct of the Companies, which the Federal District Court in New York elaborated in its ruling, justified considering the application as not under Chapter J of the Law, but under the track set forth in Part B thereof, including issuing an order to initiate proceedings and appointing a trustee to investigate the managers of the Companies.

7. As part of the hearing on the motion, I discussed the difficulties of this position, including the expected loss of value to the Companies if an order to initiate proceedings is issued in their case. Ultimately, and taking into account the comments of the other creditors, I believed that there is room to improve and better the debt settlement and that this could be done through a settlement administrator, who would act to draw up and shape the settlement in accordance with the comments of the creditors and in accordance with the comments of the Supervisor and the court in the hearing.

[Stamp: illegible]

[Emblem of the State of Israel]
**Tel Aviv-Jaffa District Court**

8. As is known, the court may issue a temporary stay of proceedings order pursuant to Section 319G of the Law if it found that all the conditions in the section are upheld. In our case, I believe that these conditions exist: thus, there is a reasonable chance that a debt settlement will be approved, which will result in the financial rehabilitation of the Companies as set forth hereinabove, and that a temporary stay of proceedings order is necessary for that; there is no reasonable concern that the operations of the Companies during the period of the stay will harm the creditors, and there are means to finance the expenses inherent in operating the Companies until approval of the debt settlement. It should be noted that the representative of Skillz stated in his notice from this morning that he does not agree to the court's proposal to issue a 45-day temporary stay of proceedings, but, as aforesaid, I believed that there was a need to stay the proceedings in order to allow for a debt settlement to be drawn up, and in any case, the objection of Skillz to the proposed wording of the settlement was accepted, so that all parties agree that there is a need to draw up another settlement, and therefore, and for this reason, the proceedings should be stayed anyway.

9. Therefore, I accept the motion in a way that temporary order will become a temporary stay of proceedings order, which will remain in effect for 45 days, counted from the date of lifting of the gag order on August 3, 2026.

10. Because publication of the filing of the motion was only made on the website of the Supervisor, and considering that the Companies also have creditors outside of Israel, this publication is insufficient, and therefore, by virtue of my authority under Regulation 7 of the Insolvency and Financial Rehabilitation Regulations, 5779-2019, I order that the publication of the main motion and this decision be carried out by sending an email (in English) to all the relevant parties which were customers of the Companies and their users during the period relevant to the Skillz claim. The Applicants will send the emails pursuant to the declaration of their attorney for the record,according to which there is no difficulty in locating these customers, and the attorney for the Applicants will file an appropriate notice with the court approving the publication in this manner.

11. The period of time for filing debt claims is hereby extended, as proposed by the Supervisor, and will 14 days from the date of the additional publications as set forth in Section 10 hereinabove.

[Stamp: illegible]

12. Without criticizing the professionalism, expertise, and extensive experience of each of the candidates proposed in managing insolvency cases of all types, including operational and complex proceedings, and corporate case (as I am also aware of the update notice filed today on behalf of one of the candidates and the subsequent update notice of the Supervisor, and of the position of the Applicants) and taking into account my decision of August 16, 2026, which referred to the special characteristics of these proceedings, and taking into account the immediate need to improve the settlement while ensuring compliance with the commitments associated with operating the Companies pursuant to American law and to preserve the profitable operations of the companies in the United States, and in accordance with my authority under Section 33 (b) of the Law, I order the appointment of Adv. Gil Oren of the Yigal Arnon & Co. law firm as the settlement administrator (hereinafter: "**the Settlement Administrator**"). It should be noted that Adv. Oren is also on the list of trustees in operational and complex proceedings (see also the position of the Supervisor in Insolvency Case 39303-07-22). The appointment is subject to the immediate issue of an affidavit on the absence of a conflict of interests and the deposit of a Letter of Commitment in the sum of NIS 300,000. The powers of the Settlement Administrator are as set forth in Section 319M of the Law.

13. The orders I issued on August 1, 2026, and August 16, 2026, ill remain in force, except for exception with respect to the continuation of the legal proceedings in the class- action suits against the Applicants, and for this purpose, the Applicants will file an exception ruling for my signature in accordance with the matters heard at the hearing.

14. The Settlement Administrator will act to draw up the debt settlement and file an appropriate motion to convene meeting within a period of time that will enable the foreign creditors to consider their position between the publication date of the settlement and the date the meetings are convened.

15. The secretary will urgently send a copy of my decision to the Parties, the Supervisor, and Adv. Gil Oren.

16. Follow-up by the secretary in 45 days.

Issued today, 13 Elul 5786, August 26, 2026, in the absence of the Parties.

[Stamp: illegible]

[signature]
**Iris Lushi-Abudi, Judge**

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SKILLZ PLATFORM INC., Plaintiff, -v- PAPAYA GAMING, LTD., and PAPAYA GAMING, INC. Defendants. | : | 24cv1646 (DLC) ORDER |

DENISE COTE, District Judge:

An Opinion of July 27, 2026 denied Papaya's post-trial motions attacking the verdict and granted in part Skillz's post-trial motions for requested relief. Accordingly, it is hereby

ORDERED that Skillz provide Papaya with a proposed judgment reflecting the awards made in the July 27 Opinion by **July 28, 2026.**

IT IS FURTHER ORDERED that the parties shall submit by **July 30, 2026** to the Court a proposed judgment, with any disagreements noted.

Dated: New York, New York
July 27, 2026

DENISE COTE
United States District Judge

# **EXHIBIT 8**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SKILLZ PLATFORM INC.,
a Delaware corporation,

Plaintiff,

-against-

PAPAYA GAMING, LTD., a foreign corporation; and PAPAYA GAMING, INC., a Delaware Corporation,

Defendant.

---

PAPAYA GAMING, LTD.,

Counterclaim-Plaintiff,

-against-

SKILLZ PLATFORM INC.,

Counterclaim Defendant,

and

TETHER STUDIOS LLC, GOLDEN WOOD COMPANY, LTD., LUCKYO LIMITED, GAMENEXA STUDIOS PRIVATE LIMITED and DNR GAME STUDIO,

Additional Counterclaim-Defendants.

---

1:24-cv-01646-DLC

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

# ANSWER

Defendants and Counterclaim-Plaintiffs Papaya Gaming, Ltd., and Papaya Gaming, Inc. (collectively, "**Papaya**"), by and through their attorneys, for their Answer to the Complaint of Plaintiff and Counterclaim-Defendant Skillz Platform Inc. ("**Plaintiff**" or "**Skillz**"), assert as follows:

## I. INTRODUCTION

1. Paragraph 1 consists principally of Plaintiff's characterization of its asserted claims in its Complaint for which no response is required. To the extent that a response is required, Papaya denies the allegations in Paragraph 1, and avers that mobile games offered by Papaya are legal, fair, and skill-based.

2. Papaya admits that (a) the mobile gaming industry has grown in popularity over the past ten years, (b) the Skillz platform has hosted games titled "Solitaire Cube" and "21 Blitz," and (c) games on the Skillz platform offer head-to-head competitions that may include cash prizes. Papaya otherwise denies the allegations in Paragraph 2, including the allegation that Skillz's gaming platform is "revolutionary," except that Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning the specifics of the Skillz purported "matching process."

3. Papaya admits that it has offered games titled "Solitaire Cash" and "21 Cash," and that it has described its games as a "fair and fun experience for everyone." Papaya otherwise denies the allegations in Paragraph 3, except that Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning what Papaya's unspecified "players believe."

4. Papaya admits that it has described its games, competitions, and tournaments as "games of skill," and that certain Papaya materials or communications include the language selectively quoted in Paragraph 4, except for the purported quotation that "[f]rom all entries received for each competition, the individuals who use their relevant skill and knowledge to accumulate the winning score or points according to the corresponding rules will be the winner(s)." Papaya further admits that its games are intended for players who are 18 years of age or older. Papaya otherwise denies the allegations in Paragraph 4.

5. Papaya admits that certain Papaya materials or communications include the language selectively quoted in Paragraph 5, except for the word "house," which is Skillz's self-serving term and is not a way in which Papaya has described its operations. Papaya otherwise denies the allegations in Paragraph 5.

6. Papaya denies the allegations in Paragraph 6.

7. Papaya denies the allegations in Paragraph 7.

## II. <u>THE PARTIES</u>

8. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8.

9. Admitted.

10. Papaya denies the allegations in Paragraph 10, except admits that Papaya Gaming, Inc. is a Delaware corporation.

11. Papaya is unable to admit or deny the allegations in Paragraph 11 because it fails to specify the "Papaya" entity at issue.

## III. JURISDICTION AND VENUE

12. Paragraph 12 consists of Plaintiff's characterization of its claims for which no response is required.

13. Paragraph 13 consists of legal conclusions for which no response is required. Papaya avers that it is not contesting subject matter jurisdiction in this matter based on the claims in the Complaint.

14. Paragraph 14 consists of legal conclusions for which no response is required. Papaya avers that it is not contesting subject matter jurisdiction in this matter based on the claims in the Complaint.

15. Paragraph 15 consists of legal conclusions for which no response is required, except that (a) Papaya admits that certain Papaya materials or communications include the language selectively quoted in Paragraph 15 and footnote 1, including the binding arbitration and governing law clauses in Papaya's Terms of Use, (b) Papaya admits that its games 21 Cash, Bingo Cash, Bubble Cash, and Solitaire Cash are available for free download on the Apple App Store, and (c) Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning the purported but unspecified "various Papaya users that are based in this District" that are "identifie[d]" on a Facebook page. Papaya avers that it is not contesting personal jurisdiction or venue in this Court in this specific matter.

16. Paragraph 16 consists of legal conclusions for which no response is required. Papaya avers that it is not contesting personal jurisdiction or venue in this Court in this specific matter.

17. Paragraph 17 consists of legal conclusions for which no response is required. Papaya avers that it is not contesting personal jurisdiction or venue in this Court in this specific matter.

## IV. FACTUAL ALLEGATIONS[1]

18. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18.

19. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19.

20. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20, except admits that Skillz operates a mobile gaming platform that is open to third-party game developers.

21. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21, except denies Skillz's characterization that it developed "several groundbreaking technologies."

22. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22, except admits that games on the Skillz platform offer online digital head-to-head competitions.

23. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23, except admits that the mobile gaming industry has grown in popularity, and denies Skillz's allegations that (a) it developed "revolutionizing technology" and

[1] This Answer does not include the Complaint's section sub-headers, which are not factual allegations. To the extent that any response to the sub-headers is necessary, Papaya denies Skillz's self-serving (mis)characterizations reflected in those sub-headers.

(b) such Skillz technology was responsible for, or "fueled," the growth of the mobile gaming industry.

24. Papaya admits that mobile gaming is in the mainstream, but denies Skillz's allegation that "Skillz's technology and drive" were responsible for that.

25. Insofar as Skillz does not identify the source of the "estimate[ ]" at issue, Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25.

26. Admitted.

27. Papaya denies the allegations in Paragraph 27, except admits that Skillz operates a mobile gaming platform that is open to third-party game developers.

28. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28.

29. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29, except admits that "bracketed tournaments" have appeared in games on the Skillz platform.

30. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30, except admits that the Skillz platform hosts games titled "Solitaire Cube," "21 Blitz," "Blackout Bingo," and "Bubble Cube 2."

31. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31, except admits that the term "liquidity" can refer to the ability of players to readily find opponents, and avers that matching up players with opponents is a component of some skill-based mobile gaming operations.

32. Papaya denies the allegations in Paragraph 32 because they are oversimplified and abstract, and because the allegation of an "appropriate opponent" is vague and undefined.

33. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33, including without limitation what unspecified "users" may "want." Papaya admits that fair and quick matchmaking is a feature that certain skill-based mobile gaming platforms seek to offer to players.

34. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34, except denies that Skillz is able to, or aims to, "ensure that each tournament is fair."

35. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35.

36. Papaya denies the allegations in Paragraph 36.

37. Papaya is unable to admit or deny the allegations in Paragraph 37 because the allegation is not clear in its reference to "[m]any" of "Skillz's games." Papaya admits that certain games that may be available on the Skillz platform have included chat functions for players.

38. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38, except Papaya admits that certain games on the Skillz platform have included chat rooms for players.

39. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39, except Papaya admits that user profiles are available on the Skillz platform.

40. Papaya denies the allegations in Paragraph 40, except admits that it was founded in 2016.

41. Admitted.

42. Papaya denies the allegations in Paragraph 42, except admits that certain games on the Skillz platform bear similarities to Papaya's games, and avers that Papaya offers skill-based gaming while Skillz purports to also offer skill-based gaming.

43. Papaya denies the allegations in Paragraph 43, except denies knowledge or information sufficient to form a belief about the cited "rank[ing]" metric, and admits that: (a) the cited November 8, 2021 "Calcalist" article (footnote 5) states that, "From 2020 to today, [Papaya's] games have . . . hit the milestone of 4 million downloads" and "its employee headcount has skyrocketed from 10 employes to roughly 70"; (b) in a May 19, 2023 blog post on the Papaya website (cited in footnote 6), Papaya refers to "over 50,000 daily downloads"; and (c) the cited January 10, 2024 "Calcalist" article (footnote 7) states that "[t]oday the company has 20 million downloads and 1 million daily users worldwide."

44. Admitted.

45. Papaya denies the allegations in Paragraph 45, except admits that in the cited November 8, 2021 "Calcalist" article (footnote 8), it states that Papaya's co-founder "confirmed that 95% of its players were American."

46. Papaya is unable to admit or deny the allegations in Paragraph 46 because it does not know what the allegation means when it refers to "numerous" Papaya players, and Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning where players "live."

47. Papaya denies the allegations in Paragraph 47, except admits that certain games on the Skillz platform bear similarities to Papaya's games, and both Papaya games and games on the Skillz platform can offer cash prizes. Papaya avers that it offers skill-based gaming while Skillz purports to also offer skill-based gaming.

48. Papaya is unable to admit or deny the allegations in Paragraph 48 because it does not know what the allegation means when it refers to "a typical user." Papaya further lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48 regarding what an unspecified "individual player would be motivated to choose." Papaya otherwise denies the allegations in Paragraph 48, except admits that (a) both Papaya games and games on the Skillz platform offer in-game rewards that players can accumulate, and (b) generally speaking, playing more games on certain platforms can lead to more in-game rewards. Papaya avers that Papaya's games offer features and possibilities of greater rewards that may make its games more attractive than games on the Skillz platform to some players.

49. Papaya denies the allegations in Paragraph 49, and specifically that Papaya and Skillz are in a "zero-sum game," which is a characterization that ignores the differing features of the two platforms, the fact that the mobile gaming industry is expanding, and the existence of other skill-based mobile gaming platforms.

50. Paragraph 50 presents speculative hypotheticals about what "players expect" and what "could result," and thus cannot be simply admitted or denied. To the extent a response is required, Papaya denies the allegations in Paragraph 50 as oversimplified and lacking context.

51. Papaya lacks knowledge or information sufficient to form a belief as to whether Skillz's games uniformly "utilize a head-to-head matchup, where two players are matched up against each other, for a one to one matchup." Papaya avers that the games on the Skillz

platform of which Papaya is aware offer such head-to-head or one-to-one matchups, where two players are matched up against each other.

52. Papaya admits that its games offer multiplayer tournaments, where players can compete against several other players, and that some games may consist of up to 20 players or more. Papaya further admits that, in a May 19, 2023 blog post on the Papaya website (cited in footnote 9), it notes that the VP of Product at Papaya Gaming "explain[ed]" that "Papaya Gaming's secret to success lies in its ability to transform single-player games into multiplayer, skill-based, real-money tournaments." Papaya otherwise denies the allegations in Paragraph 52.

53. Papaya denies the allegations in Paragraph 53 as written, but admits that because its tournaments involve more players than head-to-head matchups offered by Skillz, Papaya games may present the prospect of larger cash prizes for the same entry fees, and that such a prospect "is enticing" to some users.

54. Papaya denies the allegations in Paragraph 54, but admits that players in Papaya cash-entry games typically pay entry fees. Papaya avers that, prior to any cash-entry competition or tournament, Papaya discloses, among other things, the number of players, the prize pool, and the payments that will be made to the top finishers based on their position in the standings.

55. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55 concerning why "some users of Skillz" might "have migrated over to Papaya." Papaya admits that its games offer the chance at larger cash prizes, and that such a prospect "is enticing" to some users.

56. Papaya denies the allegations in Paragraph 56, except admits that (a) Papaya claims to (and does) match players based on relative skill level based on its matchmaking algorithm, (b) head-to-head games on Skillz's platform require only two players while Papaya's

games may include more than only two players, and (c) such games therefore require more players to completely fill up.

57. Papaya denies the allegations in Paragraph 57, except, to the extent that Paragraph 57 is intended to convey that Papaya games generally take longer to fill with similarly-skilled players than Skillz's games, Papaya lacks knowledge or information sufficient to form a belief about such allegation insofar as Papaya does not have data regarding Skillz's purported matchmaking and/or algorithms.

58. Papaya denies the allegations in Paragraph 58, including Skillz's generalized and self-serving characterizations of how Papaya "advertises to the public," what such advertising "unmistakenly implies," and that such advertising is "false." Papaya refers to specific advertising and/or marketing materials for their complete and accurate contents.

59. Papaya denies the allegations in Paragraph 59 to the extent the quoted language is described as an "instance" confirming the accusations in Paragraph 58. Papaya admits that the FAQ on the Solitaire Cash website includes the quoted language, and Papaya refers to that website for its complete and accurate contents.

60. Papaya denies the allegations in Paragraph 60 to the extent the quoted language is described as an "addition[al]" instance confirming the accusations in Paragraph 58. Papaya admits that the Apple App Store preview page for Solitaire Cash includes the quoted language, and Papaya refers to that page for its complete and accurate contents.

61. Papaya denies the allegations in Paragraph 61 to the extent the quoted language is described as a "similar[ ]" instance confirming the accusations in Paragraph 58. Papaya admits that the Apple App Store preview page for 21 Cash includes the quoted language, and Papaya refers to that page for its complete and accurate contents.

62. Papaya denies the allegations in Paragraph 62 to the extent the quoted language is described as "also" an instance confirming the accusations in Paragraph 58. Papaya admits that the Apple App Store preview page for Bingo Cash includes the quoted language, and Papaya refers to that page for its complete and accurate contents.

63. Papaya denies the allegations in Paragraph 63, except admits that the Apple App Store preview page for Bubble Cash refers to the game as a "multiplayer game" that leverages players' "skills," and where "[a]ll users receive the same layout." Papaya refers to the page for its complete and accurate contents.

64. Papaya denies the allegations in Paragraph 64, except admits that Paragraph 64 depicts one "Help" section appearing on the Solitaire Cash app on or around the date of the filing of the Complaint. Papaya refers to the "Help" pages on the app for their complete and accurate contents.

65. Papaya admits that one "Help" section on the Solitaire Cash app includes the quoted language and is as depicted in the screenshot in Paragraph 65, and Papaya refers to the "Help" pages on the app for their complete and accurate contents.

66. Papaya denies the allegations in Paragraph 66, except admits that Paragraph 66 depicts one "Help" section appearing on the Solitaire Cash app on or around the date of the filing of the Complaint. Papaya refers to the "Help" pages on the app for their complete and accurate contents.

67. The allegations in Paragraph 67 are comprised of Skillz's generalized characterization of unspecified "publicly available descriptions" of three Papaya games. Papaya denies the allegations in Paragraph 67 as written, except admits that it advertises Solitaire Cash, 21 Cash, and Bingo Cash as games that are skill-based and played by players.

68. The allegations in Paragraph 68 are comprised of Skillz's generalized characterization of unspecified "publicly available descriptions" of three Papaya games. Papaya denies the allegations in Paragraph 68 as written, except admits that it advertises Solitaire Cash, 21 Cash, and Bingo Cash as "fair."

69. Papaya denies the allegations in Paragraph 69, except admits that the webpage set forth in footnote 16 includes the quoted language, and Papaya refers to that page for its complete and accurate contents, including language concerning which states do not support cash tournaments.

70. Papaya denies the allegations in Paragraph 70, except admits that Papaya games do not offer a chat function.

71. Papaya denies the allegations in Paragraph 71, except admits that Papaya games do not offer a function for users to access a competitor's gaming history.

72. Papaya denies the allegations in Paragraph 72, except admits that (a) the quoted language is included in an exchange with an unverified, anonymous poster among the posts at the link in footnote 17, (b) in response to such post, Papaya did "not actually deny or refute . . . accusations that it deploys bots," and (c) Papaya describes its games as a "fun and fair experience for everyone."

73. Papaya denies the allegations in Paragraph 73 to the extent the pasted exchange is described as an "example" of any wrongful conduct alleged in Paragraph 72. Papaya admits that the pasted content reflects an exchange on the Apple App Store review pages for Solitaire Cash based on a post by an unverified, anonymous poster identified only by the handle "Niedhoffer" (who may or may not be a real Papaya user or a Skillz employee), dated September 9, 2023.

74. Papaya denies the allegations in Paragraph 74 to the extent the pasted exchange is described as "likewise" demonstrating any wrongful conduct alleged in Paragraph 72. Papaya admits that the pasted content reflects an exchange on the Apple App Store review pages for Solitaire Cash based on a post by an unverified, anonymous poster identified only by the handle "Fisherman6767" (who may or may not be a real Papaya user or a Skillz employee), dated January 6, 2024.

75. Papaya denies the allegations in Paragraph 75 to the extent they reflect Skillz's selective and self-serving characterizations of reviews of Solitaire Cash, which has a highly favorable overall rating on the Apple App Store. Papaya admits that the pasted content reflects an exchange on the Apple App Store review pages for certain Papaya games based on posts by unverified, anonymous posters identified only their handles ("honesty19149", "LCC_Modified", "Ankoku15")—who may or may not be real Papaya users or Skillz employees—with indeterminate listed dates (listed only as "1y ago" and "2y ago"), and with some of the pasted content reflecting that the posts had been "edited."

76. Papaya denies the allegations in Paragraph 76, and refers to the response to Paragraph 75 with respect to the selective quotations from the unverified, anonymous post by "LCC_Modified" (who may or may not be a real Papaya user or a Skillz employee), and response thereto.

77. Papaya denies the allegations in Paragraph 77, except admits that (a) Papaya's Terms of Use did not, at the time of the Complaint, state that Papaya matches users against bots, and (b) the pasted content reflects language included within the December 27, 2023 Papaya Terms of Use cited in footnote 19, and Papaya refers to such Terms of Use—as well as Papaya's current Terms of Use—for its complete and accurate contents.

78. Papaya denies the allegations in Paragraph 78, except admits that Papaya's games are presented as (and are) skill-based and fair.

79. Papaya denies the allegations in Paragraph 79 with respect to what Papaya's Terms of Use supposedly "imply," and Papaya refers to the Terms of Use for its complete and accurate contents.

80. Papaya denies the allegations in Paragraph 80 and avers that, as of the date of the filing of this Answer, Papaya does not deploy bots to compete against live human players other than in tutorial games.

81. Papaya denies the allegations in Paragraph 81.

82. Papaya denies the allegations in Paragraph 82.

83. Papaya denies the allegations in Paragraph 83.

84. Papaya denies the allegations in Paragraph 84, which constitutes Skillz's self-serving characterization of unverified and anonymous online posts.

85. Papaya denies the allegations in Paragraph 85, except admits that the pasted content reflects an exchange on the Apple App Store review page based on a post by an unverified, anonymous poster identified only by the handle "Yubee224" (who may or may not be a real Papaya user or a Skillz employee), of an indeterminate time but listed as "edited" on "Apr 10."

86. Papaya denies the allegations in Paragraph 86, except admits that the pasted content reflects an exchange on the Apple App Store review page based on a post by an unverified, anonymous poster identified only by the handle "bestbyrns" (who may or may not be a real Papaya user or a Skillz employee), of an indeterminate time but listed as "edited" on "Apr 20."

87. Papaya denies the allegations in Paragraph 87, except admits that the pasted and cited content reflects exchanges on the Apple App Store review page based on posts by unverified, anonymous posters identified only by the handles "Lilith333" (with a listed date of "Apr. 12") and "spoecadetspam" (with a listed date of "May 16"), each of whom may or may not be a real Papaya user or a Skillz employee.

88. Papaya denies the allegations in Paragraph 88, except admits that the pasted content appears to be posts on social media by unverified and often anonymous posters (*e.g.*, "Truth Storm Part 2") who may or may not be real Papaya users or Skillz employees.

89. Papaya denies the allegations in Paragraph 89, except admits that the pasted content appears to be a post on social media by an unverified and anonymous poster, "TheRealMandy" (who may or may not be a real Papaya user or a Skillz employee).

90. Papaya denies the allegations in Paragraph 90, except that Papaya lacks knowledge or information sufficient to form a belief about the accuracy of the purported quotation because Paragraph 90 does not provide the source of such quotation.

91. Papaya denies the allegations in Paragraph 91.

92. Papaya denies the allegations in Paragraph 92, except admits that the pasted content appears to be a Facebook comment by a user listed as "Andrea Wiggins" (who may or may not be a real Papaya user or a Skillz employee).

93. Papaya denies the allegations in Paragraph 93 with respect to what Papaya "apparently recognized," except admits that the Papaya Promotion Rules (which are separate from the Terms of Use) include the language pasted in Paragraph 93 without the emphases added by Skillz. Papaya refers to the Promotion Rules, Terms of Use, and other documentation for their complete and accurate contents.

Case 24-11647-MFW Doc 46 Filed 09/05/24 Page 51 of 104

94. Paragraph 94 is a purported description of New York law for which no response is required. Papaya refers to the cited sections of the New York State Constitution and to the New York Penal Law for their complete and accurate contents.

95. Paragraph 95 is a purported description of New York law for which no response is required. Papaya refers to the cited sections of the New York Penal Law for their complete and accurate contents.

96. The allegations in Paragraph 96 constitute legal conclusions regarding "the definition of gambling" for which no response is required. To the extent any response is required, Papaya denies the allegations in Paragraph 96.

97. The allegations in Paragraph 97 constitute legal conclusions regarding what would "not be considered illegal gambling" for which no response is required. To the extent any response is required, Papaya denies the allegations in Paragraph 97.

98. Papaya denies the allegations in Paragraph 98, except admits that Papaya has (accurately) marketed its games as skill-based.

## FIRST CAUSE OF ACTION
## (False Advertising Under the Lanham Act (41 U.S.C. § 1125(a)(1)))

99. Papaya refers to and incorporates by reference its responses to each of the foregoing Paragraphs as though fully set forth herein.

100. Papaya denies the allegations in Paragraph 100, except admits that Papaya (accurately) markets its games as fair.

101. Papaya denies the allegations in Paragraph 100, except admits that Papaya (accurately) markets its games as skill-based.

Case 26-11617-MFW Doc 123 Filed 09/16/26 Page 52 of 655

102. Papaya denies the allegations in Paragraph 102, except admits that certain Papaya marketing and advertising materials refer to "players" and "individuals," and Papaya refers to such materials for their complete and accurate contents.

103. Papaya denies the allegations in Paragraph 103, except admits that certain Papaya materials include the language quoted in Paragraph 103 (save for the bracketed language added by Skillz), and Papaya refers to such materials for their complete and accurate contents.

104. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 104 with respect to how unspecified "Papaya users" "act reasonably." Papaya admits that Papaya users may pay to enter cash-entry gaming tournaments on Papaya's platforms.

105. Papaya denies the allegations in Paragraph 105.

106. Papaya denies the allegations in Paragraph 106.

107. Papaya denies the allegations in Paragraph 107.

108. Papaya denies the allegations in Paragraph 108.

109. Papaya denies the allegations in Paragraph 109.

110. The allegations in Paragraph 110 concerning what "is required" constitutes a legal conclusion for which no response is required. Papaya otherwise denies the allegations in Paragraph 110, and refers to the cited judicial decision for its complete and accurate contents.

111. Papaya denies the allegations in Paragraph 111.

112. Papaya denies the allegations in Paragraph 112.

113. Papaya denies the allegations in Paragraph 113.

114. Papaya denies the allegations in Paragraph 114.

115. Papaya denies the allegations in Paragraph 115.

116. Papaya denies the allegations in Paragraph 116.

**<u>SECOND CAUSE OF ACTION</u>**
**<u>(Violations of New York General Business Law (GBL) §349)</u>**

117. Papaya refers to and incorporates by reference its responses to each of the foregoing Paragraphs as though fully set forth herein.

118. Papaya denies the allegations in Paragraph 118, except admits that Papaya (accurately) markets its games as fair.

119. Papaya denies the allegations in Paragraph 119, except admits that Papaya (accurately) markets its games as skill-based.

120. Papaya denies the allegations in Paragraph 120, except admits that certain Papaya marketing and advertising materials refer to "players" and "individuals," and Papaya refers to such materials for their complete and accurate contents.

121. Papaya denies the allegations in Paragraph 121, except admits that certain Papaya materials include the language quoted in Paragraph 121 (save for the bracketed language added by Skillz), and Papaya refers to such materials for their complete and accurate contents.

122. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 122 with respect to how unspecified "Papaya users" "act reasonably." Papaya admits that Papaya users may pay to enter cash-entry gaming tournaments on Papaya's platforms.

123. Papaya denies the allegations in Paragraph 123.

124. Papaya denies the allegations in Paragraph 124.

125. Papaya denies the allegations in Paragraph 125.

126. Papaya denies the allegations in Paragraph 126.

127. Papaya denies the allegations in Paragraph 127.

128. Papaya lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 128 with respect to how unspecified "Papaya users" "act reasonably." Papaya admits that Papaya users may pay to enter cash-entry gaming tournaments on Papaya's platforms.

129. Papaya denies the allegations in Paragraph 129.

130. Papaya denies the allegations in Paragraph 130.

131. Papaya denies the allegations in Paragraph 131.

132. Papaya denies the allegations in Paragraph 132.

133. Papaya denies the allegations in Paragraph 133.

## V. PRAYER FOR RELIEF

Papaya denies that Plaintiff is entitled to any of the relief sought in the Complaint.

## VI. DEMAND FOR JURY TRIAL

No response to the Demand for Jury Trial is required.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

### Second Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of laches.

### Third Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of acquiescence.

### Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

### Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

**<u>Sixth Affirmative Defense</u>**

Plaintiff's claims are barred in whole or in part by the applicable statute(s) of limitations.

**<u>Seventh Affirmative Defense</u>**

Plaintiff has failed to take reasonable steps to mitigate or minimize damages.

**<u>Eighth Affirmative Defense</u>**

Any amount owed to Plaintiff should be reduced by the amount that Plaintiff owes to Papaya.

## COUNTERCLAIMS

Papaya Gaming, Ltd. ("**Papaya**"), by and through its attorneys, for its Counterclaims against Skillz Platform Inc. ("**Skillz**"), Tether Studios LLC ("**Tether**"), Golden Wood Company, Ltd. ("**Golden Wood**"), Luckyo Limited ("**Luckyo**"), GameNexa Studios Private Limited ("**GameNexa"**), and DNR Game Studio ("**DNR**"), upon personal knowledge as to itself and upon information and belief as to all others, states and alleges as follows:

## INTRODUCTION

1. This action seeks to end a campaign of consumer deception, fraud, defamation, and trademark and copyright infringement orchestrated by Skillz to cut down Papaya in a desperate effort to save Skillz's cratering mobile gaming platform.

2. Papaya is an industry-leading developer of skill-based mobile games. Since 2019, Papaya's games have offered customers the opportunity to earn rewards, including cash prizes, through their skill at gameplay.

3. Skillz has been unable to keep pace with Papaya's player-friendly games, and as a result Skillz stands on the cusp of financial ruin.

4. Skillz's fiscal condition is deteriorating, it has been unable to submit required financial statements to regulators, and its leadership faces significant exposure from a shareholder lawsuit.

5. Rather than focusing on ways to improve its own business model and attract more players—or simply returning what was left of squandered money to its investors—Skillz has launched an aggressive, deceptive, and multi-faceted campaign to take out other mobile gaming companies at all costs, with a particular focus on smearing Papaya.

Case 2:26-01162-DLF Document 46 Filed 09/05/24 Page 57 of 104

6. Skillz's campaign revolves around a central theme that is patently false: that Skillz—and Skillz alone—can be trusted to provide players with a fair and skill-based mobile gaming experience. Indeed, Skillz hypocritically positions itself as a noble defender of fairness in the mobile gaming space while defrauding players and defaming more successful platforms like Papaya.

7. Skillz has furthered this false narrative in several ways, including (a) launching a fraudulent website from the shadows, presenting wholly fabricated data concerning customer "complaints" about Papaya and seeking to weaponize state agencies to pursue investigations of Skillz's competitors, (b) deceiving consumers by claiming, falsely, that the Skillz platform is absolutely free of computerized opponents, and (c) attacking other gaming platforms for supposed bot use and "scams," including false accusations that Papaya previously "admit[t]ed" bot use in this case.

8. ***First***, Skillz directed the creation, operation, and control of a fabricated website, 4fairplay.org (the "**4FairPlay Website**"), that was replete with false representations designed to strike at Papaya's reputation and ruin Papaya's standing among mobile gaming customers under the guise of an independent advocacy organization.

9. Among other fraudulent activity, the 4FairPlay Website featured fabricated customer complaints and statistics to create the illusion of widespread customer discontent with Papaya, and to induce 4FairPlay Website visitors to submit complaints about Papaya to state attorneys general.

10. Everything about the 4FairPlay Website was consciously designed by Skillz to provide a false sense of legitimacy and impartiality.

11. The 4FairPlay Website's home page displayed a fake tracker that purported to show the volume of complaints about Papaya and other mobile gaming companies (except Skillz) that customers had submitted to law enforcement agencies.

12. The tracker continued to increase in number as a visitor stayed on the page, at a pace of one additional complaint every few seconds, giving the impression that complaints against Papaya and other companies were continuing to rise in real time.

13. But the tracker was pure fiction, displaying the same number each time a visitor opened the 4FairPlay Website, and showing that number continually increasing at the same rate while the visitor stayed on the page.

14. The 4FairPlay Website also displayed fake and fictitious content, including (a) a pie chart that purported to convey the percentages of complaints submitted per game—with Papaya's games supposedly the subject of a plurality of all complaints, (b) a supposed map of "Complaints by [U.S.] state," and (c) purported quotations and other details included in complaints submitted by visitors.

15. Tellingly, Skillz deliberately obscured any connections to the 4FairPlay Website by engaging a series of third-party consultants and hiding behind a front company.

16. Legal process has since compelled Skillz to admit, however, that it was behind the 4FairPlay Website.

17. Other evidence secured by Papaya has revealed that Skillz controlled the contents and design of the 4FairPlay Website, with officials as senior as its CEO and founder, Andrew Paradise, issuing directives related to design elements.

18. For example, Paradise suggested that the 4FairPlay Website should "feel more legal."

Case 24-10116-LMF Document 4 Filed 09/05/24 Page 25 of 104

19. ***Second***, at the same time that it hurls accusations at Papaya and other companies, Skillz deceives multitudes of players by promising that the games on its own platform will feature only human opponents and will be absolutely free from bots.

20. Skillz's representations to the public about bot usage are express and unequivocal. Skillz trumpets the message repeatedly, including on its website: "Every Skillz tournament is between real players. Never bots."

21. Skillz knows full well, however, that its showy language and public pronouncements regarding the absence of bots conflicts with reality.

22. Numerous players have reported that, while playing Skillz-platform games, it became clear that they were facing bot opponents.

23. Player criticisms of Skillz's bot usage both expressly identify Skillz's false statements and how the players were deceived by those statements.

24. Skillz's Developer Documentation—directed at game developers who seek to offer games on the Skillz platform—explicitly provides for "utilizing bots in gameplay."

25. Moreover, in its opposition to Papaya's motion to dismiss in this litigation, Skillz conspicuously made a far more careful and narrow statement that Skillz "does not sponsor any bots in cash games on its platform" (ECF No. 35 at 25)—a far cry from the broad and categorical public declarations about bot usage that Skillz feels comfortable making outside the courthouse.

26. ***Third***, Skillz's marketing strategy is rooted in false and defamatory messaging that Papaya is a "scam" and offers games that are unfair and not skill-based.

27. Even well after it filed the current lawsuit, Skillz republished on its social media pages a post from the website Bonus.com that incorrectly stated that Papaya had "admit[ted] bot use" in this litigation.

28. Skillz knew that was not true, but nonetheless exploited the post as an opportunity to defame Papaya by accusing it of "fraud" and actively operating "a scam," and to attempt to position Skillz in the public eye as the only company that can "protect innocent players."

29. Papaya does not incorporate "bots" or computerized opponents into its games other than in tutorial matches, which introduce new players to the rules of each game, do not involve payment of cash entry fees, and disclose the presence of automated "opponents."

30. Upon information and belief, Skillz facilitated the creation and/or publication of the Bonus.com post.

31. Bonus.com is a portfolio website of Catena Media, a public relations company that creates content for clients in exchange for payment.

32. Upon information and belief, Skillz leveraged Bonus.com to make it seem as if the information in the post was generated independently and not at Skillz's behest.

33. ***Fourth***, Skillz conveys to consumers that cash that they deposit and/or win on the Skillz platform is accessible immediately and can be withdrawn "at any time."

34. In practice, however, that is not the case, leading to numerous complaints from players that they were not able to access their money as promised, let alone do so "at any time."

35. Skillz has even been accused of suspending or banning accounts as pretexts to refuse to pay players their winnings.

36. Upon information and belief, Skillz has delayed or impeded cash withdrawals by players to secure additional revenues.

37. Skillz's operation of the fraudulent 4FairPlay Website, willful false advertising, and defamatory statements harm consumers, who are coaxed into believing that Papaya is a bad actor, that Skillz is the only mobile gaming platform where players will not face bots and have a

Case 1:24-cv-01646-DLC Document 46 Filed 08/05/24 Page 27 of 104

"fair" opportunity to not only earn rewards, and that players can receive their cash withdrawals from the Skillz platform immediately.

38. Skillz's conduct obviously also is intended to directly harm, and does directly harm, its competitor Papaya.

39. Skillz's attacks on Papaya and false promises of purportedly fair and bot-free competition injure Papaya's (and other non-Skillz operators') reputation, and draw players to Skillz-platform games and away from Papaya's games—games in which Papaya has invested significant time and energy, and that offer fair, enjoyable, skill-based play alongside popular features that Skillz-platform games lack.

40. At the same time as Skillz has engaged in its false marketing campaign, it has coordinated with various game developers—namely, Tether, Golden Wood, Luckyo, GameNexa, and DNR—to willfully violate Papaya's copyright and trademark rights to free-ride on the goodwill and creativity of Papaya and its games.

41. Important to Papaya's success is the intellectual property subsumed within Papaya's games, including but not limited to strong (a) federally registered and common law trademark rights that Papaya has developed in the names and icons of its games through their continuous use in the U.S. market, and (b) federally registered copyrights in original artistic expression such as the games' imagery and visual designs.

42. In a naked attempt by Skillz and mobile game developers to co-opt the success and notoriety of Papaya's games, the Skillz platform features later-released copycat games that willfully imitate the names, iconography, and other visual elements of Papaya's games.

43. Skillz's conduct constitutes willful false advertising under Section 43 of the Lanham Act, willful consumer deception under New York General Business Law § 349,

defamation and civil conspiracy under New York common law, trademark infringement, false designation of origin, and unfair competition under Sections 32 and 43 of the Lanham Act, and copyright infringement under the Copyright Act.

**THE PARTIES**

44. Papaya Gaming Ltd. is a mobile gaming company incorporated and with its principal place of business in Israel. Its registered office is located at 35 Hamasger Street, Tel-Aviv-Yafo, Israel.

45. Skillz Platform, Inc. is a mobile gaming company incorporated in Delaware with its principal place of business at 6625 Badura Avenue, Las Vegas, Nevada 89118.

46. Tether Studios LLC is a Delaware corporation with its principal place of business at 2505 Anthem Village, Dr. E598, Henderson, Nevada 89052.

47. Golden Wood Company, Ltd. is a Colorado corporation with its principal place of business at 1312 17th Street Ste 2110, Denver, Colorado 80202.

48. Luckyo Limited is a foreign limited liability company with its principal place of business at 6/F Alexandra HSE, 18 Charter Rd, Central District, Hong Kong, Hong Kong.

49. GameNexa Studios Private Limited is a foreign limited liability company with its principal place of business at 1-98/9/C/5, Plot NO: 1, Near Image Gardens, Madhapur, Hyderabad, Telangana, India, 500081.

50. DNR Game Studio is a foreign limited liability company with its principal place of business at Capitol Heights, T2, F-604 Jat Tarodi, Near Medical Square, Nagpur, Maharashtra, India.

## JURISDICTION AND VENUE

51. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367(a).

52. This Court has personal jurisdiction over Skillz because Skillz transacts business in this District, directs its conduct toward consumers in this district, and committed a tortious act causing injury within this District.

53. This Court has personal jurisdiction over Tether because Tether transacts business in this District, directs its conduct toward consumers in this district, and committed a tortious act causing injury within this District. Tether offers standalone game applications, which are marketed, offered, distributed to, and utilized by users in this District and throughout the State of New York from whom Tether derives revenue.

54. This Court has personal jurisdiction over Golden Wood because Golden Wood transacts business in this District, directs its conduct toward consumers in this district, and committed a tortious act causing injury within this District. Golden Wood offers standalone game applications, which are marketed, offered, distributed to, and utilized by users in this District and throughout the State of New York from whom Golden Wood derives revenue.

55. This Court has personal jurisdiction over Luckyo because Luckyo transacts business in this District, directs its conduct toward consumers in this district, and committed a tortious act causing injury within this District. Luckyo offers standalone game applications, which are marketed, offered, distributed to, and utilized by users in this District and throughout the State of New York from whom Luckyo derives revenue.

56. This Court has personal jurisdiction over GameNexa because GameNexa transacts business in this District, directs its conduct toward consumers in this district, and

committed a tortious act causing injury within this District. GameNexa offers standalone game applications, which are marketed, offered, distributed to, and utilized by users in this District and throughout the State of New York from whom GameNexa derives revenue.

57. This Court has personal jurisdiction over DNR because DNR transacts business in this District, directs its conduct toward consumers in this district, and committed a tortious act causing injury within this District. DNR offers standalone game applications, which are marketed, offered, distributed to, and utilized by users in this District and throughout the State of New York from whom DNR derives revenue.

58. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b).

## FACTUAL ALLEGATIONS

## I. PAPAYA'S HIGHLY SUCCESSFUL MOBILE GAMING OPERATIONS

### A. Papaya Is A Fast-Growing Mobile Gaming Company

59. Papaya is an industry-leading, skill-based mobile gaming company that was founded in 2016.

60. Papaya develops and supports mobile application-based games that feature skill-based multiplayer tournaments. In Papaya competitions, players can compete for real cash prizes and in-game currency rewards known as "gems."

61. Papaya's games feature competitive, multiplayer tournament play and the opportunity for winning players to earn both cash and non-cash prizes (each, a "**Papaya Game**" and collectively, the "**Papaya Games**").

62. The Papaya Games are available for download on the Apple iOS App Store and the Samsung Galaxy Store.

63. The Papaya Games are games of skill that control for random elements to ensure that the winner of each game is determined by skill, rather than chance.

64. For example, in the card-based game SOLITAIRE CASH, all competing players are presented with the same digital card deck, in exactly the same order, ensuring that the winner of the game will be the player that is best able to exercise their skill and knowledge of the game to outscore their opponents (*e.g.*, by using their dexterity, speed, and knowledge to solve the deck more quickly).

65. To maximize both entertainment value and fair play, Papaya Games feature a skill-based matchmaking algorithm to match players with other players who typically achieve similar game scores.

66. Each Papaya Game categorizes players' skill level based on their previous scoring and other factors.

67. Over time, as players continue to play, Papaya's matchmaking algorithm learns more about each player's skill level and is better able to match that player against other players with similar skill.

68. Papaya's matches permit players to compete against other opponents, and typically feature between five and twenty opponents who are competing for the highest score.

69. In Papaya tournaments, the players who achieve the highest scores receive a fixed (and pre-disclosed) cash or in-game currency prize of ascending value based on their placement on the leaderboard.

70. As Skillz acknowledges in its Complaint, Papaya Games offer the "prospect of having a larger cash prize, but the same entry fee," and that feature may be "enticing to many users" of competitive mobile games. (ECF No. 1 ¶ 53.)

71. With their innovative gameplay and features, the Papaya Games have been popular and successful.

72. The Papaya Games have over 37 million total downloads, and over 4 million monthly active users.

73. The Papaya Games enjoy high user ratings on mobile app marketplaces like the Apple App Store.

**B. <u>Papaya Owns Valuable Intellectual Property Rights In Its Popular Games</u>**

74. Among the Papaya Games featuring competitive, multiplayer tournament play are SOLITAIRE CASH, BINGO CASH, and 21 CASH.

75. Papaya has continuously offered SOLITAIRE CASH for over five years, during which time it has been downloaded and played by millions of players in the United States.

76. SOLITAIRE CASH is a game in which players compete to win points by clearing the most cards from the board as quickly as possible and by creating sequences of cards in descending order, alternating by color.

77. As of the date of these Counterclaims, SOLITAIRE CASH has amassed over 340,000 ratings on the Apple App Store and boasts an impressive 4.6 out of 5 star overall rating.

78. As a result of continuous and exclusive use, Papaya has accrued valuable trademark rights in the SOLITAIRE CASH name and icon (pictured below). Moreover, these marks have developed strong secondary meaning, as mobile gamers associate them with Papaya and its high-quality, entertaining game.



79. Papaya has a federal trademark registration for the word mark "SOLITAIRE CASH" based on a first use in commerce on December 29, 2018 (U.S. Reg. No. 6115365).

80. Papaya also has a federal trademark registration for the SOLITAIRE CASH icon or logo based on a first use in commerce on December 29, 2018 (U.S. Reg. No. 6818227).

81. Papaya has continuously offered BINGO CASH since 2021, during which time it has been downloaded and played by millions of players in the United States.

82. BINGO CASH is a game in which players compete to win the most points by "daubing" called numbers on the Bingo board as fast as possible before time elapses. "Daubing" refers to marking off the appropriate squares on a Bingo board at the time they are announced.

83. As of the date of these Counterclaims, BINGO CASH has amassed over 150,000 reviews on the Apple App Store and boasts an impressive 4.7 out of 5 star overall rating.

84. As a result of continuous and exclusive use, Papaya has accrued valuable trademark rights in the BINGO CASH name and icon (pictured below). Moreover, these marks have developed strong secondary meaning, as mobile gamers associate them with Papaya and its high-quality, entertaining game.




85. Papaya has a federal trademark registration for the word mark “BINGO CASH” based on a first use in commerce on March 18, 2021 (U.S. Reg. No. 6374879).

86. Papaya also has a federal trademark registration for the BINGO CASH icon or logo, irrespective of color scheme, based on a first use in commerce on September 14, 2021 (U.S. Reg. No. 6821168).

87. Papaya has continuously offered 21 CASH since 2021, during which time it has been downloaded and played by millions of players in the United States.

88. 21 CASH is a game in which players compete to win the most points by quickly creating the most stacks of cards adding up to a value of 21, out of a deck of 52 cards and within a set time limit.

89. As of the date of these Counterclaims, 21 CASH has amassed nearly 16,000 reviews on the Apple App Store, and like BINGO CASH, Papaya’s 21 CASH GAME has a 4.7 out of 5 star overall rating based on reviews.

90. As a result of continuous and exclusive use, Papaya has accrued valuable trademark rights in the 21 CASH name and icon (pictured below). Moreover, these marks have developed strong secondary meaning, as mobile gamers associate them with Papaya and its high-quality, entertaining game.




91. Papaya has a federal trademark registration for the word mark “21 CASH” based on a first use in commerce on April 18, 2021 (U.S. Reg. No. 6374878).

92. Papaya also has a federal trademark registration for the 21 CASH icon or logo, irrespective of color scheme, based on a first use in commerce on April 29, 2021 (U.S. Reg. No. 6821167).

93. Along with the trademark rights Papaya has in the names and iconography of the Papaya Games, Papaya also has copyright in the unique artistic expression encompassed within the Papaya Games. This artistic expression includes without limitation icons, play screens, game boards, and the overall user interface of the Papaya Games.

94. The foregoing artistic expression in BINGO CASH is the subject of U.S. Copyright Registration No. PA0002481705.

## II. SKILLZ’S FAILING MOBILE GAMING BUSINESS

### A. <u>Skillz Offers Only Head-to-Head Mobile Gaming</u>

95. Skillz develops and markets software that hosts and supports head-to-head play in mobile games created by third-party developers, including games that require cash entries and permit players to win cash prizes.

96. Like the Papaya Games, Skillz's games are available for download on the Apple iOS App Store and the Samsung Galaxy Store.

97. Skillz represents that its cash competitions are available to "all players over the age of 18 in areas of the world where cash gameplay is enabled."[2]

98. Skillz's website also notes that cash games on its platform are available in New York State.[3]

99. In cash games on Skillz's platform, Skillz administers the collection of entry fees from competing players, and controls the electronic transfer of cash prize payments to winning players. Cash prizes are funded by the entry fees of players competing in each game or tournament, with Skillz collecting a fee for administering the tournament.

100. Skillz claims to match players together based on players' ability level and game history.

101. Unlike the Papaya Games, games on the Skillz platform offer head-to-head competition against only one opponent at a time.

102. Skillz-platform games, on balance, offer smaller cash prizes to winning players (relative to a player's entry fee) than do the Papaya Games.

103. Papaya and Skillz compete for many of the same players and prospective players, including players in New York.

---

[2] *What is Skillz?*, Skillz, https://support.skillz.com/hc/en-us/articles/203748889-What-is-Skillz.

[3] *Who is eligible to compete in Skillz competitions?*, Skillz, https://support.skillz.com/hc/en-us/articles/203685899-Who-is-eligible-to-compete-in-Skillz-competitions.

**B. Skillz's Business and Financial Condition Are Deteriorating**

104. Skillz is in the midst of a financial downturn that has lasted for three years.[4]

105. Skillz's quarterly earnings reports demonstrate a drop in Skillz's year-over-year revenue, which totaled $44.4 million in the first quarter of 2023,[5] but fell to only $25.2 million in the first quarter of 2024.[6]

106. Moreover, Skillz's second quarter sales in 2024 fell 43% compared to 2023.[7]

107. Skillz has lost nearly half of the average monthly paying users active on its platform in the same time span.

108. In July 2024, Moody's Investor withdrew all credit ratings of Skillz, affecting $130 million in outstanding debt.[8]

109. Consumers have asserted that Skillz unreasonably delays and/or outright denies compensating players who seek to withdraw funds.

110. Skillz also has had difficulty submitting required regulatory filings in a timely manner.

---

4 StockStory, *Skillz (NYSE: SKLZ) Misses Q1 Sales Targets*, Globe and Mail (May 9, 2024), https://www.theglobeandmail.com/investing/markets/indices/TXCX/pressreleases/26100097/skillz-nyseskl z-misses-q1-sales-targets/.

5 *Skillz Announces First Quarter 2023 Results*, Skillz (May 9,2023), https://investors.skillz.com/news/news-details/2023/Skillz-Announces-First-Quarter-2023-Results/.

6 *Skillz Announces First Quarter 2024 Results*, Skillz (May 9, 2024) https://investors.skillz.com/news/news-details/2024/Skillz-Announces-First-Quarter-2024-Results/.

7 *Skillz Inc 2Q Observed Sales Fall 43% Bloomberg Second Measure*, Bloomberg (July 8, 2024).

8 *Moody's Ratings withdraws Skillz's ratings*, Moody's Investor (July 1, 2024), https://ratings.moodys.com/ratings-news/424237.

111. For example, Skillz filed a notice indicating that it was not able to timely file its Form 10-Q for the first quarter of 2024 with the U.S. Securities and Exchange Commission, asserting that Skillz needed additional time to complete the necessary financial audits.[9]

112. Approximately two months prior, Skillz submitted a notice indicating that it was unable to file its Form 10-K for 2023 within the statutorily required period.[10]

113. As of the filing of these Counterclaims, Skillz still has not filed its Form 10-Q or Form 10-K.

114. Skillz's last three Chief Financial Officers have left shortly after assuming their role, with an average tenure of a little over a year.[11]

115. Skillz and/or its senior executives are facing significant exposure from, among other legal issues, a shareholder derivative action filed in Delaware state court: *Hanna v. Paradise*, No. 2024-0228 (Del. Ch. filed Mar. 8, 2024).

116. The plaintiffs in the *Hanna* action have alleged that former and current Skillz executives manipulated the disclosure of material nonpublic information to maximize their profit from sales of Skillz stock at the expense of the company and other stockholders.

## III. SKILLZ RESORTS TO FRAUD, DECEPTION, AND ATTEMPTING TO WEAPONIZE STATE AGENCIES TO TRY TO SALVAGE ITS BUSINESS

117. Rather than address its serious corporate, financial, and operational issues head-on or seek to improve its own product, Skillz has resorted to misguided, underhanded, and unlawful tactics to try to save its failing operations.

---

9 Skillz Inc., Notification of Late Filing (Form 12b-25) (May 10, 2024).

10 Skillz Inc., Notification of Late Filing (Form 12b-25) (Mar. 14, 2024).

11 Skillz Inc., Current Report (Form 8-K) (May 5, 2021); Skillz, Inc., Current Report (Form 8-K) (June 30, 2022); Skillz Inc., Current Report (Form 8-K) (Jan. 8, 2024).

118. Those tactics include a multi-faceted campaign of deception and fraud intended to position Skillz's mobile gaming platform as uniquely free from reproach, and inherently more "fair" than those of other mobile gaming companies like Papaya.

**A. Skillz Creates and Hides Its Involvement In the Fraudulent 4FairPlay Website**

119. Skillz created and funded a false-front organization whose sole objective was to mislead the public into believing that a neutral unaffiliated organization was soliciting and receiving complaints about Papaya Games.

120. Through this false-front organization, and its public-facing website 4fairplay.org, Skillz intentionally misled and deceived consumers with the specific intent of harming Papaya.

***1. The Use of the 4FairPlay Website To Tarnish Skillz's Competitors and Manipulate State Law Enforcement***

121. From approximately September 2023 through late February 2024, the 4FairPlay Website was active and displayed content to the public.[12]

122. The 4FairPlay Website was taken down at some point between February 28, 2024 and March 9, 2024—*i.e.*, within days of Skillz's filing of the Complaint against Papaya in this litigation on March 4, 2024.

123. The operator of the 4FairPlay Website was identified on that website as an organization called "4 Fair Play," the fictitious alternative name of a Virginia corporation called "Fair Play for Mobile Games."

124. Skillz and/or its executives created and funded Fair Play for Mobile Games.

[12] Although the Website is no longer accessible, its contents were archived on several dates throughout its lifespan. This Complaint describes the contents of the Website as they existed on February 28, 2024. Based on a review of the Website as archived, the contents of the Website were substantially similar from the date of the first archive (November 7, 2023) through the remainder of its existence. Screenshots of the contents of the February 28, 2024 archive are attached as Exhibit ("**Ex.**") 1.

125. The "About" page on the 4FairPlay Website stated that "4 Fair Play is on a mission to bring fairness to mobile gaming. We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing. Our organization was founded to educate the public on fair play and provide tools and resources players need to protect themselves if they've been scammed."




126. Fair Play for Mobile Games was dissolved on March 1, 2024—*i.e.*, three days before Skillz's filing of the Complaint against Papaya in this litigation.

127. The working title of the 4FairPlay Website at its inception was "Fight Fraud For Papaya."[13]

128. The 4FairPlay Website included at least three sub-pages, including: (a) a home page purporting to display data related to the submission of customer complaints to state law enforcement agencies and encouraging visitors to file a complaint; (b) a "File a Complaint" page urging visitors to use a pre-populated form to submit a complaint against three companies,

---

[13] *See* Ex. 2 (Screenshot of draft 4FairPlay Website).

including Papaya, to a state law enforcement agency; and (c) a Frequently Asked Questions ("**FAQs**") page providing information about submitting a complaint to state law enforcement agencies and lauding companies that supposedly provide fair gaming experiences.

129. Referring specifically to "fraudulent games" from mobile gaming operators Papaya, Avia Games, and Acerena—but *not* Skillz—the 4FairPlay Website implored visitors to "Act now" and "Fight back against scam games" to prevent operators from "steal[ing] your money and get[ting] away with it."







130. Visitors were invited to submit complaints to the attorney general in their state of residence, and were told that they "may be entitled to compensation."




131. The 4FairPlay Website further promised that "[w]ith enough claims, the state attorney general will investigate the scam companies," and that "[a] successful investigation could force the companies to pay consumers for damages."




132. To target only Skillz's chief competitors, route complaints directly to state attorneys general, and facilitate submission of complaints with minimal visitor effort and engagement, the 4FairPlay Website auto-populated the complaint forms.

133. The auto-populated forms listed only games developed by Papaya, AviaGames, or Acerena.

134. The auto-populated forms did not list games developed or hosted by Skillz.

135. A visitor who sought to submit a complaint about a game developed or hosted by another company (such as Skillz) was not presented with any option to do so.

136. Skillz took additional steps to ensure that the 4FairPlay Website would not impugn games on Skillz's platform.

137. For example, one of the Website's FAQs indicated that not "all" mobile cash-entry games are a "scam," preserving the possibility that Skillz—the company conspicuously absent from the 4FairPlay Website—is not "taking advantage of players by withholding money and creating unfair playing environments."




### 2. *The 4FairPlay Website Featured Wholly Fabricated Data and False Representations to Both Smear Papaya and Make the Website Appear Impartial and Legitimate*

138. Central to the fraudulent messaging of the 4FairPlay Website was the presentation of Skillz's biased and self-interested claim that Papaya "scam[s]" customers under the guise of supposedly impartial, objective data. But that "data" was utter fiction.

139. ***First***, the home page displayed a banner with an increasing counter purporting to show the number of complaints allegedly submitted to state law enforcement agencies about Papaya and two other mobile gaming companies. Accompanying text stated that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money," followed by a button that visitors could click to "File A Complaint."




140. The counter was a fabrication, and did not reflect an actual number of complaints filed against mobile games or mobile gaming operators.

141. Each time a visitor navigated to the 4FairPlay Website, no matter the date or time, the counter presented the same fixed number: 12,594.

142. The counter on the 4FairPlay Website increased by an additional complaint every few seconds, whether or not a complaint was actually filed or submitted during that time.

143. The counter was not linked to any live database.

144. The number of complaints listed in the counter did not correlate with any complaints submitted through the 4FairPlay Website.

145. The source code of the 4FairPlay Website shows that the initial complaint figure and the rate of the increase were chosen by Skillz.

146. Skillz identified and publicized the 12,000 figure long before the website launched and complaints supposedly were collected. A March 2023 article—published roughly

six months before the 4FairPlay Website went live—quoted a Skillz official as stating that "[p]resently, over 12,000 folks have filed a grievance towards cellular video games over being deceived by AI bots, with on-line gamer safety platform 4 Honest Play."[14]

147. There does not appear to be a website or other platform named "4 Honest Play," and the "over 12,000" figure was made up.

148. ***Second***, the home page featured a pie chart purporting to show the proportion of complaints submitted by game. A note accompanying the pie chart stated that "Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far followed by Solitaire Clash from Avia Games."




[14] Gaming News, *This Gaming Firm Takes an Anti-AI Stance in Newest Advert*, AIWorkTime (Mar. 12, 2023), https://www.aiworktime.com/2023/03/12/this-gaming-firm-takes-an-anti-ai-stance-in-newest-advert/.

149. Papaya developed three of the games on the pie chart, listed as representing a total of 40.2% of all complaints, with the remaining games developed by Acerena, AviaGames, and MOBIRIX Corporation.

150. In conjunction with the ticker on the home page, the pie chart thus suggested that complaints about Papaya represented 40.2% of the "12,594" and "counting" complaints submitted to state attorneys general, and that a new complaint was being filed against Papaya every several seconds.

151. Like the ticker, however, the pie chart was not correlated with any actual complaints submitted via the 4FairPlay Website.

152. The figures in the pie chart remained static throughout the Website's existence and were not linked to any live database.

153. To the extent that visitors to the website actually submitted any complaints, Skillz controlled the content of the complaints by priming visitors with false and incendiary statements about Papaya and ensuring that visitors could complain about only certain companies (most notably, Papaya).

154. Skillz thus falsely represented that Papaya was the leading target of complaints and that it was the predominant wrongdoer among mobile gaming companies.

155. ***Third***, the 4FairPlay Website's home page displayed a map purporting to show the number of complaints submitted per state. Accompanying the map was a statement that "[s]cam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions."




156. The map also presented invented data unconnected to any live database, and the map remained unchanged throughout the life of the Website.

157. ***Fourth***, the Website displayed purported quotations from customer complaints submitted to law enforcement agencies and a supposed table of complaints listing names, states of residence, and subject games of visitors' complaints.


What Players Are Telling Us
Solitaire Cash, Bingo Cash, Solitaire Clash and Bingo Clash. We can't stand by and let them get away with it. And you should not allow this to happen to many citizens in your state. Take action now.
– L.G.S. from Pennsylvania
This is absolutely intolerable and just plain false advertising and just out right thievery and the companies are continuing to make millions from a public that trusts them. We can't stand by and let them get away with making a fool out of honest people and the government anymore.
– C.S. from Virginia
I've been playing Bingo Tour and Bingo Cash. And they always show that I am a 1 out of 3 winner and when the game is done processing, they bump me down to 3rd or 5th as if they [are] adding fake players to make sure I am not a winner.
– C.H. from California
With Solitaire Cash, the time they complete the game in many cases seems impossible. I have complained to the company and asked if I was playing against real people and they didn't answer.
– J.P. from Florida
Bingo Tour – I could tell something wasn't right. One minute you're about to be the number one winner but while you're waiting on 2,3 to 4 players, you're kicked right out the spot.
– K.S. from Texas
Solitaire Cash: I have hundreds of screenshots showing opponent names that were clearly automatically generated to create a bot profile – usually half of the players in each individual tournament were obviously fake.
– H.N. from Washington


Thousands of players have been scammed out of their money playing against bots
"The creators made 'competitive' bingo game where you play against other 'players' when in reality it's just AI that will always beat you…"
– Bingo Clash player
"I have genuinely never played a game that is so rigged in my life"
– Battle Bingo player
"It's stimulated to make you think your [sic] winning until you invest real money… BOTS BOTS BOTS"
– Bingo Cash player
"This game is 100 a bot scam that tries to trick you into thinking you're facing real players when you aren't"
– Bubble Cash player
"The generated bot names and pictures aren't fooling anyone. Wins/losses are predetermined once you hit play…"
– Solitaire King player
"Bottom line, the devs have rigged this app so it's almost impossible to win any money"
– Bubble Clash player

## Real People, Real Action

Real people across the country shared their frustration and anger from playing scam games with their hard-earned money.

| NAME | STATE | Games |
|---|---|---|
| ELLEN A. | NY | Bingo Cash, Bingo King, Battle Bingo |
| DERRICK W. | NE | Bubble Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| LAUNCE G. | IN | Bingo Cash, Bubble Cash, Bingo Tour |
| ANDREW H. | NY | Bingo Cash |
| AMIR G. | VA | Bingo Clash |
| BRITTANY K. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Bingo Tour, Solitaire King, Battle Bingo |
| VERLINDA S. | IL | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| NOBUKO S. | CA | Battle Bingo |
| ELLEN F. | MS | Solitaire Cash, Solitaire Clash |
| VIVIAN A. | CA | Bingo Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| SHARON N. | CA | Solitaire Cash, Bingo Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| KASSANDRA Y. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Solitaire King |
| SUSAN S. | NY | Solitaire Cash, Bingo Cash, Solitaire Clash |

158. Upon information and belief, some or all of the quotations from and details about the complaints were fabricated.

159. Alternatively, the quotations and table created the misleading impression that customers overwhelmingly complained about Papaya (along with the two other mobile gaming companies), when, in fact, Skillz had provoked visitors with anti-Papaya propaganda and then manipulated the submission process to ensure that only supposed complaints about those three companies were submitted.

### *3. Skillz Sought to Hide Its Involvement in the 4FairPlay Website By Using "Fair Play for Mobile Games" As A Front Organization*

160. Skillz took steps to shield its creation of, and involvement in, Fair Play for Mobile Games and the 4FairPlay Website from public disclosure.

161. Papaya nevertheless has been able to definitively link Skillz to the 4FairPlay Website after conducting pre-service discovery in a separate court proceeding filed against John Doe defendants in Virginia state court.

162. For example, the 4FairPlay Website was altered to remove any information that could lead back to Skillz.

163. Adam Shen, the designer whom Skillz paid to design the Website, deleted several default web pages that would have provided information regarding its design.[15]

164. The Website had no easily attributable identifiers, and all of the graphics on the 4FairPlay Website, aside from the logo, were stock images.

165. Skillz anonymously obtained the 4FairPlay Website's domain from registrar Tucows Inc. ("**Tucows**"), and facilitated the transfer of the domain from Tucows to an individual named Josh Levin.

166. On August 7, 2023, Levin retained The Gober Group PLLC ("**The Gober Group**") on behalf of Fair Play for Mobile Games (a Virginia corporation of which Levin was the Executive Director).[16]

167. Fair Play for Mobile Games registered the fictitious alternative name "4 Fair Play" on August 23, 2023.[17]

168. A disclaimer at the bottom of the 4FairPlay Website states that it was "Paid for by 4 Fair Play."

---

[15] *See* Exs. 3 (Invoice); 4 (Email from M. Lombardo to M. McIntosh (July 1, 2024)).

[16] *See* Exs. 5 (The Gober Group Acknowledgment of Terms of Service and Fee Schedule); 6 (Fair Play for Mobile Games, Articles of Incorporation).

[17] *See* Ex. 7 (Fictitious Name Certificate).

169. Following its incorporation, Fair Play for Mobile Games executed a consulting agreement with Square Strategies LLC ("**Square Strategies**"), a firm controlled by Levin.[18]

170. Square Strategies performed a variety of services for Fair Play for Mobile Games, including establishing email service, using web engine hosting, facilitating Google advertisements, and working with a consultant at Assemble the Agency to draft op-eds supporting the Website's mission.[19]

171. Fair Play for Mobile Games paid Square Strategies over $75,000.[20]

172. Levin facilitated the dissolution of Fair Play for Mobile Games on March 1, 2024—a mere three days before Skillz filed its lawsuit against Papaya.[21]

173. Skillz has admitted through counsel that it (a) "provided monetary funds to Fair Play for Mobile Games," (b) made payments "related to 4fairplay.org to" the freelance web developer that designed the 4FairPlay website, "Mr. [Adam] Shen," and (c) had "relationship[s]" with Shen The Gober Group.[22]

174. Shen shared draft versions of the 4FairPlay Website with Skillz officials via Figma, a collaborative web application for interface design.[23]

175. Skillz officials, including VP of Brand and Insights Orit Peleg, provided specific, detailed direction regarding the form and contents of the 4FairPlay Website.

---

18 *See* Exs. 8 (Consulting Services Agreement); 9 (Letter from J. Levin to Fair Play for Mobile Games Board of Directors (Aug. 14, 2023)); 10 (Fair Play for Mobile Games, Unanimous Written Consent of the Board of Directors).

19 *See* Exs. 11 (Square Strategies Invoices); 12 (Draft Op-Ed Draft).

20 *See* Ex. 11.

21 *See* Ex. 13 (Fair Play for Mobile Games, Articles of Dissolution).

22 *See* Ex. 4.

23 *See* Ex. 14 (Figma Screenshot).

176. A comment on the draft design obtained by Papaya reveals that "Andrew" reviewed and provided detailed input on the 4FairPlay Website's contents. The "Andrew" referred to in that comment is Skillz's CEO and founder, Andrew Paradise.

177. Paradise ordered the developers to "rethink the design to feel more legal firm."




178. Paradise made this suggestion to lend credibility to the falsehoods that Skillz sought to leverage to prompt government investigations of its competitors.

179. Skillz also conducted lobbying activities in at least California and New Jersey through Fair Play for Mobile Games, including lobbying attorneys general.[24]

180. In its California disclosure, Fair Play for Mobile games described its lobbying activities as unspecified outreach concerning "Attorney General action relating to mobile gaming."

181. Upon information and belief, Skillz peddled fabricated or misleading data from the 4FairPlay Website to state law enforcement officials in an effort to prompt investigations into Papaya and other competitors.

182. In light of the foregoing, it is clear that Skillz utilized Fair Play for Mobile Games as a front organization, and sought to hide its involvement in, and control over, both that organization and the 4FairPlay Website.

**B. Skillz Falsely Presents Its Own Platform As Absolutely Bot-Free**

***1. Skillz's False "No Bot" Marketing Campaign***

183. The central but patently false message of Skillz's marketing to consumers is that its platform and matchmaking technology are inherently more "fair" than those of other mobile gaming companies like Papaya. Indeed, Skillz stakes out a claim of being the *only* option for consumers seeking a fair, skill-based, bot-free game.

184. Skillz posted on its website a "letter to our community" from Andrew Paradise titled "Founded on Fairness." That letter stakes out a purported "commitment to fairness on our platform," and accuses "[a]n increasing number of" other mobile games of using bots.

185. Although this letter and its associated "fairness" subpage on the Skillz website (https://www.skillz.com/page/fairness) were taken down recently, an iteration of the "players"

---

[24] *See* Exs. 15 (California lobbying record); 16 (New Jersey lobbying record).

Case 1:24-cv-01646-DLF Document 46 Filed 08/05/24 Page 54 of 104

subpage of the Skillz website continues to display the hyperlinked text referring to "a special message from our CEO" that linked users to that letter:[25]




186. Both in this "open letter" and elsewhere, Skillz represents to players and consumers that the games hosted on Skillz's platform have never featured, and will never feature, competition against bots.

187. In the letter, Skillz asserts that it is "committed to rooting out and eradicating" bots, and that players of Skillz-platform games "can be sure we will continue to . . . only match you against real human opponents of equal skill. No unfair bots, not ever."

188. Similar representations are prominently featured on various other pages on Skillz's website. For example:

- Skillz states on its FAQ page that "Every Skillz tournament is between real players. Never bots," and that "[w]hen you play Skillz-powered games [*i.e.*, games on the Skillz platform], you are matched with real players at your skill level."[26]

---

[25] *See* https://www.skillz.com/players/#:~:text=Committed%20to%20Fair%20Competition,a%20fair%20chance%20to%20win. The content of the letter also remains visible as part of a separately uploaded slide deck on Skillz's website that appears to be related to the "2024 Game Developers Conference," which Skillz attended. (*See* https://www.skillz.com/wp-content/uploads/Skillz_GDC_2024.pdf).

[26] *The Home of Competition*, Skillz, https://www.skillz.com/page/3/.

## Frequently Asked Questions

### What is Skillz?

Skillz is the leading mobile gaming platform that connects players and developers through fun, fair competition. Skillz provides the opportunity for casual gamers to turn their skills into real money and prizes.

### Does Skillz use bots?

Every Skillz tournament is between real players. Never bots. Competing against bots is against the fundamental tenets of fair play and real competition on which we were founded. When you play Skillz-powered games, you are matched with real players at your skill level

- Skillz's website features a graphic which prominently states: "Only Real People, No Unfair Bots Here."[27]




- On its "About Us" page, Skillz represents that in Skillz-platform games, "you play with real people, based on your skill level, and win real-world prizes."[28]

---

27 *Players*, Skillz, https://www.skillz.com/players/.

28 *About Us*, Skillz, https://www.skillz.com/about-us/.




189. Skillz makes similar deceptive statements on social media. Skillz claims on X (formerly Twitter), for example, that its "mission" is to "eradicate unfair bots from [competitive mobile gaming]."[29]




190. Skillz also represents that players will face only real opponents, and never bots, in advertising for the individual games playable on its platform and within those applications themselves.

191. For example, Skillz's webpage has listed "5-Hand Poker," developed by Foxpaint AB, as Skillz's "Featured Game." The listing for 5-Hand Poker on the Apple App Store represents that players will "[f]ace off against real opponents."[30]

---

[29] X Post, @skillz (Mar. 5, 2024), https://x.com/skillz/status/1765111655741161817.

[30] *"5-Hand Poker, Skillz Real Money Card Game*," Apple App Store, https://apps.apple.com/us/app/5-hand-poker/id6461255719.

192. In short, Skillz's message to consumers is clear that Skillz-platform games are the only trustworthy option for players, because Skillz players will not encounter, and never need to be concerned about, bot opponents.

***2. Contrary to Skillz's Public Statements, Its Platform Is <u>Not</u> Bot-Free***

193. Notwithstanding its promises and representations to players, games on Skillz's platform have permitted bot opponents.

194. Skillz's own online Developer Documentation—directed at game developers who seek to host games on the Skillz platform—sets forth parameters for developers' "utilizing bots in gameplay," and expressly permits "integrating bots into your gameplay experience."[31]




195. The Developer Documentation further provides that bots are permitted "to deliver consistent experiences" and/or for a certain number of "tournaments a player goes through after a new install."

196. Skillz's express approval and encouragement of bot use alone eviscerates the categorical "no bots" pledge that it touts.

197. Skillz has claimed in this litigation that its acquiescence to, and encouragement of, bot use Skillz-platform games somehow serves to "ensur[e] gameplay fairness." (*See* ECF No. 35 at 25.)

---

31 *See Skillz Random and Fairness*, Skillz, https://docs.skillz.com/docs/randomness.

198. Skillz does nothing to explain this claimed distinction to consumers, who are informed that Skillz will "never" use bots.

199. Moreover, in its opposition to Papaya's motion to dismiss, Skillz eschews the broad declaration of "never bots" that it presents to consumers in favor of a carefully crafted statement that Skillz "does not *sponsor* any bots in *cash* games on its platform." (*Id.* at 25 (emphasis added).)

200. The notable qualification of the bots claim in the court filing—conceding, at minimum, the presence of bots in certain games on the Skillz platform—presents a stark contrast with what Skillz tells the public, indicating that Skillz knows its broader advertising claims cannot withstand scrutiny.

201. In addition to being undermined by Skillz's own bot-deploying and/or bot-approving practices, Skillz's unqualified representation that Skillz gamers will only face "real players" and "[n]ever bots" in Skillz-platform tournaments is problematic because Skillz is unwilling and/or unable to fully guarantee that third-party players and game developers are not employing bots on the Skillz platform.

202. Upon information and belief, Skillz's capabilities to prevent third-party bot usage are deficient, notwithstanding the company's false promises regarding "state of the art security protocols" and "advanced quantitative analytics" that supposedly foreclose such cheating.[32]

203. Third-party developers seeking to host games on Skillz are highly incentivized to incorporate bot opponents into their games to artificially increase active player metrics.

[32] *How do I know that my opponent isn't cheating?*, Skillz (February 17, 2024), https://support.skillz.com/hc/en-us/articles/203685859-How-do-I-know-that-my-opponent-isn-t-cheating.

204. Prior to monetizing a third-party game on Skillz's platform, Skillz requires the developer to demonstrate that the game exceeds a minimum threshold of 100 active players.

205. Upon information and belief, Skillz does not adequately police or prevent the implementation of bots by third-party developers.

206. The use of bots in Skillz-platform games has also been observed by many Skillz players who have publicly shared their negative experiences playing these games, often referring to clear indicia that their opponents could not have been human (despite Skillz's promises to the contrary).

207. Further, and unlike the vague online comments concerning Papaya Games that form the basis of Skillz's accusations against Papaya (*see* ECF No. 1 ¶¶ 73-93), many consumers complaining about bot use in Skillz-platform games point to statements by Skillz that misled them—specifically, statements promising that players will face only real human opponents in Skillz-platform games and will never face bots. For example:

- A Galaxy Store review of the Skillz-platform game Solitaire Cube states that the player was deceived and "robbe[d]" by Skillz because the game "gives you deals that are impossible to win" and there are impossible matches against "bots for the app just so you lose and developers get your cash."[33]

[33] *"Solitaire Cube: Classic Card Game" Reviews*, Galaxy Store, https://galaxystore.samsung.com/detail/com.tetherstudios.solitaire.klondike?langCd=en.


rach**

2022.11.10

Don't waste your time or money! This app does nothing but pit you against more advanced players though ads say that you are against players of the same level. Then it gives you deals that are impossible to win. You only get 3 times through the draw cards before it starts taking points away from you. This app is nothing but highway robbery. I'm willing to bet those players are bots for the app just so you lose and developers get your cash. Luckily I only spent $5!

- A Samsung Store review of the Skillz-platform game Blackout Bingo states that the player believes Skillz's advertising is "deceptive" because of her experience playing against bots, and not "other people."[34]


pink**

2023.08.29

Seriously? How is this just not unregulated gambling? At least on other cash games you can win gems to try for cash prizes. Of course it takes a long time and you rarely win, but still... This is you HAVE to deposit your real cash to play cash games and MAYBE win.... and, are you really playing other people, or bots? And do you even win cash, or stupid prizes? Where is the "withdrawl" feature?? Hard pass, deceptive advertising.

- Another Blackout Bingo player states that the game "100% feels like a scam" and that "the longer you play the harder the bots get," preventing players from continuing to earn prize money after a certain number of games.[35]

---

[34] *"Blackout Bingo – Real Cash Prizes Smash Hit" Reviews*, Galaxy Store, https://galaxystore.samsung.com/geardetail/com.bigrunstudios.blackoutblitz.

[35] *Id.*

> kayl**
> 2023.06.06
> This game 100% feels like a scam. They send you checks in the mail according to the cash out page, and the longer you play the harder the bots get and you can no longer make any money, only lose money. Save yourself and go to a casino or something instead. This is not a good app unless you have money to waste and get nothing back.

- Another reviewer of Blackout Bingo states that "when you first start playing you will win pretty often," but eventually will begin "playing bots and not real people . . . so they [Skillz] don't ever lose money."[36]

> dark**
> 2022.03.20
> Literally rigged. Of course when they say you can win real money you expect a certain level of BS but this game takes the cake. First, the promo code for free money on your first deposit doesn't work. Always says invalid. Second the game is literally rigged. I've been playing win real money games for years and for the most part they are legit. This one is not. So when you first start playing you will win pretty often. I decided to deposit $5 and try the money games. That's when I found out the promo code was bogus and a lie. First 3 games I played were $0.60 to enter and you could win $1.00. I won those. Then I tried a $1.00 game to win $3.00. I won that. Obviously there is some luck involved but I was feeling good. That's when you will notice you are now playing bots and not real people. I have lost 7 games in a row and now have only $0.40 left. This game is a complete scam. You either play bots or people who are connected to them so they dont ever lose money. Don't bother. SCAM!!!!!!

- An Apple Store Blackout Bingo player complains that Skillz "claim[s] that [it doesn't] use bots . . . when in fact you all do," because Skillz will "still make the bot win" no matter how well the player plays.[37]

---

36 *Id.*

37 *"Blackout Bingo: Win Real Cash" Ratings and Reviews*, Apple App Store.



100% SCAM
2y ago
Dimbery

You all claim that you don't use bots for some cash games when in fact you all do. you say that would be illegal to make bots for cash games we'll that's just laughable I have plenty of proof ALL SKILLZ GAMES ARE A SCAM. I'm not saying they don't pay out they do use bots maybe not every time but the point is they use bots in at least some cash games they do pay out but they make nothing but profit if even 1 out of 1,000,000 people cash out on a good amount I would even be surprised about that but just better off saving your money it doesn't matter how good you do most games they will still make the bot win.

208. Skillz reviewers also recount impossibly high scores and other irregularities that made clear their matched opponent was a bot, and not another real human player.

209. For example, an Apple App Store review of Solitaire Cube states that the reviewer "could see that I'm playing with bots" because competitors were "[w]inning with ridiculously high scores in a short amount of time."[38]

[38] *"Solitaire Cube" Ratings and Reviews*, Apple App Store (Feb. 2, 2024).


Corrupt just like the others Feb 2
★☆☆☆☆ Desireeherbold
I have downloaded eight or nine solitaire games in hopes to win real money. I did actually win real money on Solitaire Clash. But after a while, I could tell it was rigged when I found skills solitaire, and saw that you are actually playing with real players and even have a chat option, I was thrilled. But again, after a while, I could see that I'm playing with bots. Not real players. Winning with ridiculously high scores in a short amount of time. They won't respond in a chat. And sometimes you can't watch the video replay. Extremely disappointed. I thought this game was different. I would like a fair game to bet my hard earned money on and win or lose it fair & square.

210. Skillz players, like the poster immediately above, have also observed that Skillz's "match replay" feature often is unavailable after the user loses a fairly high proportion of matches in a suspicious manner.[39]

211. For example, 21 Blitz player "CardSharkJG" specifically states a belief that Skillz "lie[s] about how fair the platform is," in part because of the absence of replay to verify that the match was played against a real human.

[39] *"21 Blitz – Blackjack for Cash" Ratings and Reviews*, Apple App Store (Oct. 6, 2020 and Feb. 10, 2023).

★☆☆☆☆

CardSharkJG, 10/06/2020

**Not to be trusted.**

I've had just about every kind of problem you can possibly think of with these Con Artists. That's exactly what they are. They lie about how fair the platform is but in reality they have over 30 different way to rip you off. Player support is no support at all. They treat you like you've stolen something from them after they rip you off. They respond to every single message with pre written generic responses. Which is only possible if they're already aware of the problem. Lost matches with no replay. You just have to take their word for it. I caught them cheating and stealing from me so many times until I was given $300 to be quiet. Skillz as a whole seem to me to be very unethical and I would rather my whole family starve to death than work for such a shadily crooked group of people. Every single person there should be incarcerated. And I have proof of everything I have stated and would testify under oath against them. SHAME ON YOU SKILLZ. I KNOW YOUR PARENTS TAUGHT YOU ALL TO BE BETTER THAN THE CROOKS THAT YOU ALL ARE. YOU DESERVE TO BE SUED IF NOT PLENTY YEARS OF JAIL TIME FOR ALL THE FALSE ADVERTISEMENT AND MISINFORMATION. THE WAY LEVEL OF UNETHICAL BEHAVIOR LETS ME KNOW THAT YOU ALL ARE MORE CORRUPT THAN POLICE AND POLITICIANS.

212. Another 21 Blitz player recounts that while "[m]ost of the time a replay is available to verify that there is no cheating taking place," around "25-30% of the time it is not [available] and all signs point to cheating."

★☆☆☆☆

Amyyyyyyyyyyyyyyyyy E, 02/10/2023

**Be prepared to lose money**

The game itself is fun. The way they match is unfair and you are set up to lose. Most of the time a replay is available to verify that there is no cheating taking place, however like 25-30% of the time it is not and all signs point to cheating. If you are curious about how cheating occurs, google it. It is apparently a widespread issue and as soon as anyone brings in it in the chat, they are immediately shushed and told to report it. Once reported you are never told the findings and they keep your money either way. To top it all off, they recently made some changes in their withdrawal policies, it would appear. I have always cashed out and within 2 days the money was back in my bank account. Now, I was informed after questioning it, they are sending paper checks and it will take weeks or months to receive them. They told me this occurs when the winnings are higher than the deposits, which I can assure you was not the care in my instance. User beware!

213. One Skillz player created a YouTube video exposing "why Skillz and the apps they produce are extremely corrupt," observing that opposing "players" have implausible score histories that would require "play[ing] the game nearly non-stop" and "win[ning] 80%+ of the time or more."[40] The player states that they have "long played [the Skillz-platform] Bubble Cube and Solitaire Cube game."[41] As a result of Skillz-platform games' use of bots, the player states that they feel they have been "screwed over" and wonders "how many people on [Skillz's] platform are actually real."[42]




214. The aforementioned Skillz player's YouTube video also included a video screen-capture recording of a bot opponent achieving an implausibly high score in a $5.00 match of Solitaire Cube:

---

40 The Adaptive Traveler, *Skillz Solitaire Cube Is Rigged!!*, YouTube (Sept. 3, 2022), https://www.youtube.com/watch?v=1FlpvHRC5sc.

41 *Id.* at 0:22.

42 *Id.* at 5:00-5:13.




215. The foregoing examples are just the tip of the iceberg, and there are many other instances of complaints by Skillz users.

216. Skillz users also have made clear that Skillz's representations about fairness, matchmaking, and bot usage induced them to play Skillz-platform games.

217. For example, the above-cited player reviews make clear that, once the players discovered that Skillz's promises of bot-free play were untrue, the players felt that Skillz-platform games were a "lie," a "cheat," a "scam," and rife with "deceptive advertising."

218. These players make clear that Skillz's representations about fair and bot-free play were material to their decision to play Skillz-platform games.

219. Many users who feel cheated by Skillz's false representations are also left with the impression that all mobile competitive gaming platforms are "corrupt" or rig their games against the player; such players stop playing similar games (such as Papaya Games), and advise others not to play such games.

220. One Skillz Blackout Bingo player recounts that Skillz "had [her] fooled," and advises players to "not spend a penny" on Skillz platform games.[43]




43 *"Blackout Bingo: Win Real Cash" Ratings and Reviews*, Apple App Store.

221. Another user notes that they "checked the replays," and has "records and photos to prove" that Skillz games "manipulate the outcomes."[44]




222. Upon information and belief, Skillz also blocks, mutes, or bans players who complain about bot use within games on Skillz's platform.

223. For example, the Solitaire Cube player below claims that he was "mute[d]" in the game's chat by Skillz or its moderators for raising a concern about the presence of bots.[45]




224. Similarly, a review of the "Pool Payday" game on the Skillz platform pointed out that Skillz "deleted [their] last review" after the player reported both bot usage and (as discussed further below) delays in receiving their cash withdrawals.[46]

---

[44] *Skillz Reviews*, https://skillz.worthepenny.com.

[45] *"Solitaire Cube — Win Real Cash" Ratings and Reviews*, Apple App Store.

[46] *"Pool Payday: 8 Ball Pool Game" Ratings and Reviews*, Apple App Store.




225. Given the above, it is clear that Skillz's repeated and highly publicized presentation of its platform as "never" incorporating bots is false and deceptive.

**C. Skillz's Other Hypocritical and Defamatory Anti-Papaya Marketing**

226. Despite Skillz's own use of bots and consumers' negative experiences with its platform, Skillz continues to publicly, and falsely, represent that Skillz is "combat[ing] the deceptive usage of bots . . . in [the mobile gaming] industry" to create "a fairer future in gaming," and accuse Papaya and other competitors in the space of utilizing bots in their games.[47]

227. Skillz makes similar misleading claims regarding bot use in the industry to its investors and other business partners.

228. In Skillz's Q4 2023 earnings call, Andrew Paradise claimed that Skillz is "the leading company that does not engage in bot fraud," and that "elimination of this practice would dramatically benefit [Skillz]."[48]

---

[47] Rachel Kaser, *Skillz CEO says company isn't done fighting bots in mobile gaming*, GamesBeat (May 9, 2024), https://venturebeat.com/games/skillz-ceo-says-company-isnt-done-fighting-bots-in-mobile-gaming/.

[48] Ahmed Abdulazez Abdulkadir, *Earnings call: Skillz Inc. reports Q4 results, outlines path to profitability*, Investing.com (Mar. 15, 2024), https://www.investing.com/news/stock-market-news/earnings-call-skillz-inc-reports-q4-results-outlines-path-to-profitability-93CH-3340001.

229. Paradise has also asserted that Skillz "stands alone" in its "commitment to fair play for skill-based gaming," to the exclusion of all others.[49]

230. Skillz's filing of the current lawsuit is an extension of its campaign to publicly position itself as a noble defender of consumers and denigrate Papaya as not offering "fair" or "skill-based" games—most saliently, by generating a great deal of additional publicity for Skillz's accusations.

231. In Skillz's Q1 2024 earnings call, Paradise referred to the current lawsuit against Papaya as a "key litigation matter[]," and part of Skillz's so-called "fairplay initiative[]" to "eliminate bot[s] that defraud consumers in our industry."[50]

232. Skillz also has explicitly and transparently leveraged litigation against Papaya (and other competitors) in Skillz's marketing.

233. For example, on June 25, 2024, Skillz posted on various social media links to a post on the website Bonus.com titled "Papaya Gaming Admits Bot Use, Claims No Deception."

234. Thanking Bonus.com for "covering this story," making statements such as "[f]raud is fraud," and attacking "scam[s]" as "fast becoming a systemic issue," Skillz exploited the Bonus.com post to once again crown itself champion of "protect[ing] innocent players from losing their hard-earned money" (notwithstanding that Skillz players frequently lose their money on the Skillz platform) and ask players to "[j]oin us" in challenging "#botfraud."

---

49 *Skillz Inc. (SKLZ) Q2 2023 Earnings Call Transcript*, Seeking Alpha (August 2, 2023), https://seekingalpha.com/article/4623032-skillz-inc-sklz-q2-2023-earnings-call-transcript.

50 *Skillz Inc. (SKLZ) Q1 2024 Earnings Call Transcript*, Seeking Alpha (May 10, 2024), https://seekingalpha.com/article/4692073-skillz-inc-sklz-q1-2024-earnings-call-transcript.

**Skillz**
18,627 followers
20h •

+ Follow ···

Fraud is fraud. Bot usage in skill-based, real money gaming is fast becoming a systemic issue. What makes this a scam?
1. Players are not aware they are playing against a bot
2. The company can fix the outcome of the game to its advantage
3. When a player loses to a bot the company keeps the money
It's time to put an end to this, and protect innocent players from losing their hard-earned money. We are on a mission to change this. Join us.
#fraud #botfraud #fairplay #scamalert #missiondriven
https://lnkd.in/eNsG9zbd



Papaya Gaming Admits Bot Use, Claims No Deception
bonus.com

52 · 10 reposts

**Skillz**
@skillz

Thank you @BonusUpdate for covering this story. Bot fraud is a systemic issue in the billions of dollars, affecting millions of players. We must put an end to this NOW! #esportsnews #fairplay #bots






235. Numerous Skillz employees then re-shared these posts on their individual LinkedIn pages.

236. Upon information and belief, the Skillz employees shared these posts on their individual LinkedIn pages at Skillz's direction.

237. This latest smear campaign by Skillz is particularly egregious for several reasons.

238. ***First***, notwithstanding Skillz's transparent efforts to paint itself as a benevolent organization concerned solely with "fair play," Skillz very much wants players to "los[e] their hard-earned money" to increase Skillz's bottom line.

239. ***Second***, as explained above, games on Skillz's platform are not bot-free despite Skillz's repeated assertions to the contrary.

240. ***Third***, Skillz knew full well that Papaya did not "admit" in this litigation that its platform features bots in light of the court proceedings and filings preceding the Bonus.com post.

Case 24-26-01247-DCW Document 123 Filed 09/05/24 Page 73 of 104

241. Moreover, at a May 10 Court conference that Skillz's counsel attended, Papaya's counsel represented that the platform does not incorporate bots (and that a written certification would be forthcoming, which was subsequently provided).

242. ***Fourth***, after the author of the Bonus.com post retracted the statement that Papaya "admits" bot usage and issued a correction in the post, Skillz continued to display its social media posts about the article which continued to feature the previous, retracted misrepresentations.

243. Upon information and belief, Skillz was involved in the financing, creation, and and/or dissemination of the Bonus.com post.

244. Bonus.com is a portfolio website of Catena Media, a public relations company that calls itself an "affiliate marketing partner for online sports betting and casino operators,"[51] and creates content for clients in exchange for payment.[52]

245. Upon information and belief, Skillz's crafting and/or disseminating of biased messaging concerning Papaya and other mobile gaming companies, and passing such messaging off as having been generated independently and not at Skillz's behest, is not limited to the Bonus.com post and the 4FairPlay Website.

246. Tellingly, when Papaya's counsel sent a cease-and-desist letter to Skillz's counsel concerning the Bonus.com post, Skillz's social media posts were removed.

---

51 *Homepage*, catenamedia, https://catenamedia.com.

52 *Strategy*, catenamedia, https://catenamedia.com/about-us/strategy/ ("Paid Media constitutes a large new vertical that will expand our reach and market exposure while reducing our dependence on state launches, creating a more resilient business over time.")

Case 1:24-cv-01216-DCC Document 46 Filed 09/05/24 Page 74 of 104

247. In July 2024, Skillz filed a very similar lawsuit against another a well-known mobile gaming competitor, Voodoo SAS, alleging that Voodoo SAS's games deploy bots and are falsely advertised as "fair" and "skill-based."[53]

248. Plainly, part and parcel of Skillz's campaign to aid its flailing prospects involves the rapid-fire institution of legal proceedings against other mobile gaming companies.

**D. <u>Skillz Dupes Consumers By Impeding Their Cash Withdrawals</u>**

249. In marketing itself as the only "fair" skill-based mobile gaming operator, Skillz touts how players using the platform can "win real-world prizes" including cash.

250. Skillz further informs players that they can "withdraw [their] winnings at any time."

251. For example, Skillz imparts that message on its "Support" page for the question, "How does Skillz work? Can I actually win real money?"

53 *Skillz Platform Inc. v. Voodoo SAS*, No. 24-cv-04991 (S.D.N.Y. filed July 1, 2024).



## How does Skillz work? Can I actually win real money?

March 16, 2024 13:06

Follow

Skillz is a multiplayer tournament platform that lets you compete in mobile games with other people around the world for either real cash or our virtual currency.

To play for real money, tap the **Store** button on the main menu and choose your deposit amount. You'll then be prompted to enter your credit card number or PayPal account information. Once you make a deposit, you can use that money to enter cash tournaments and win real cash prizes. You can then withdraw your winnings any time by going to **Menu>Account>Withdraw.**



252. Skillz also touts the withdrawal of player earnings from Skillz-platform games as a “[s]ecure” and “[s]afe” process, claiming that players can trust Skillz to handle withdrawals in an efficacious manner and that they will actually receive the funds they seek to withdraw.

253. In practice, however, players are *not* able to withdraw their cash “at any time,” and sometimes are prevented from withdrawing their cash at all.

254. Numerous players have complained about their inability to retrieve their money as promised, as they were frustrated to be informed that their winnings were delayed, or in some cases wholly unavailable.

255. For example, one player noted how a purported "service interruption" was used as the justification for Skillz being "no longer able to issue prize winnings" to their account, and the player's withdrawals were thus "cancelled."


T-drum • 2y ago

I have the same problem, I got this email

"Hi *******,

We wanted to reach out about your recent withdrawal(s). Due to the service interruption, we are no longer able to issue prize winnings for your account. We know this is frustrating and apologize for the inconvenience. Because of this, we have cancelled your withdrawal(s), and have instead refunded any deposits made into your Skillz account up to your real cash balance.

Thanks for playing, "

But my balance still show zero dollar.

256. Other examples of consumer dissatisfaction with what they viewed as fraudulent and deceptive conduct with respect to withdrawals are as follows (among many others):


Scam Jun 17
rayyvenne

Most of the reviews are people who are mad about losing, but i actually won money and tried to cash out back in September of 2022. I never received my check, i have reached out several times, they ask me to verify my address and then they ignore me. I've even asked if they can just credit the money back to my account and i still get ignored. The game can honestly be fun i would just be careful using real money.

Case 1:24-cv-01646-DLC Document 46 Filed 08/05/24 Page 77 of 104













257. As one player explained, Skillz is a "total scam" because "when it's time to cash out, they come up with all sorts of excuses to avoid paying you."[54]

[54] *Skillz Reviews*, https://skillz.worthepenny.com.

Jimmie.Lambert
April 27, 2023

"Avoid wasting your cash on this..."

Seriously, don't throw your money at this company! It's a total scam! They keep you playing by letting you add funds, but when it's time to cash out, they come up with all sorts of excuses to avoid paying you.

0 Reply

258. Upon information and belief, Skillz also has suspended and/or banned accounts in order to refuse to pay players their winnings.

259. For example, one player noted how their account was suspended because they were accused of "intentionally poor play."

catswithadhd • 3y ago

I didn't think Skillz was this shady until today... I play Blackout Bingo and the moment I cashed out (literally not even a huge amount only $100 and I put in $20 myself!!) they suspended my account for "intentionally poor play to falsely influence the algorithm, to be matched with opponents of lower skill, affecting the fairness of our platform." I'm pretty sure I'm not going to get my check now AND they just called me a shitty player lol

4 Reply Share ...

260. Another player asserted that they were "scammed" like "many players" when their account was banned and they were refused payment.

Thebood1 • 2y ago

Be careful when making deposits with Skillz, they have scammed many players in the past including me, and refused to pay players their winning by banning their accounts. Only deposit what you can afford to lose, and I recommend making withdrawals as soon as you can

261. Other players who have contacted Skillz to report the failure to receive funds they had withdrawn report that Skillz ignores the players' concerns and makes no attempt to resolve the issue or to confirm that the players will receive their winnings.[55]

> megl**
>
> ★☆☆☆☆ | 2024.02.01
>
> Close my account and stole my money for no reason customer support is completely useless avoid your question and just says we're sorry for the inconvenience wile not actually acknowledging that you said anything

**IV. SKILLZ AND DEVELOPERS OF GAMES THAT ARE HOSTED ON THE SKILLZ PLATFORM INFRINGE PAPAYA'S INTELLECTUAL PROPERTY**

262. As another facet of Skillz's efforts to unfairly compete with the highly successful Papaya Games, similar games have appeared on Skillz's platform that bear striking similarities to—and plainly misappropriate—the distinctive and original features of the Papaya Games (the "**Infringing Games**").

**A. <u>Infringing Game #1: "CASH OUT BINGO"</u>**

263. Skillz, in coordination with game developer Tether, offers a game titled CASH OUT BINGO on the Skillz platform.

264. CASH OUT BINGO was released on June 26, 2023, well after the release of Papaya's BINGO CASH and after BINGO CASH had proven to be highly successful.

265. The CASH OUT BINGO icon is deliberately similar to Papaya's BINGO CASH icon. Both icons feature the stylized word "Bingo" above three prominently featured, multi-

---

[55] *"Blackout Bingo – Real Cash Prizes Smash Hit" Reviews*, Galaxy Store, https://galaxystore.samsung.com/geardetail/com.bigrunstudios.blackoutblitz.

colored bingo balls. The center bingo ball in each icon features a dollar-sign set against a white circle:

**BINGO CASH (Papaya)** **CASH OUT BINGO (Skillz/Tether)**







266. CASH OUT BINGO also features a user interface that is deliberately similar to Papaya's BINGO CASH. The similarities include the use of a dark blue star against a lighter blue square for the Bingo board's center daub (or square), the use of a blue elongated pill-shaped "Bingo" button, the use of an elongated pill-shaped meter and two circles to display bonuses, and the use of parallel bonus names and icons:

**Bingo Cash (Papaya)** **Cash Out Bingo (Skillz/Tether)**






















267. The foregoing similarities between the Skillz/Tether and Papaya offerings go well beyond imagery and functionality intrinsic to Bingo-style games. Rather, CASH OUT BINGO includes specific artistic and creative choices—and confusingly similar names and icons—that can only be reasonably construed as willful copycatting.

268. Skillz's website page for CASH OUT BINGO provides a Skillz-branded QR code. When scanned with a mobile phone camera, the QR-code opens the mobile version of the Skillz website page for CASH OUT BINGO. At the top of this mobile page is a link reading "GET." When a user clicks that link, it opens a page for the CASH OUT BINGO app—for example, on the Apple App Store (on Apple devices), and from Skillz's own site (on Android devices)—from which a user can download the game directly onto their phone.

269. Upon information and belief, Skillz not only offers CASH OUT BINGO on its platform and approved the game for release, but also was involved in the development of the game and coordinated with Tether on gameplay designs, features, and marketing.

270. According to the Skillz website, Skillz provides the following "Skillz-Powered Features" to CASH OUT BINGO: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends (permitting a player to challenge friends in head-to-head matches).

**B. <u>Infringing Game #2: "BINGO FOR CASH"</u>**

271. Skillz, in coordination with game developer Golden Wood, offers BINGO FOR CASH on the Skillz platform.

272. BINGO FOR CASH was released on May 6, 2024, well after the release of Papaya's BINGO CASH and after BINGO CASH had proven to be highly successful.

273. BINGO FOR CASH features a user interface that is deliberately similar to Papaya's BINGO CASH. The similarities between the two games include using the color purple in the background, the use of yellow stars to convey daubed numbers, the highlighting of numbers in blue, and using the colors red, yellow, purple, green, and blue for the word "Bingo" across the top of the board:

**<u>BINGO CASH (Papaya)</u>**




**<u>BINGO FOR CASH (Skillz/Golden Wood)</u>**









274. The foregoing similarities between the Skillz/Golden Wood and Papaya offerings go well beyond imagery and functionality intrinsic to Bingo-style games. Rather, BINGO FOR CASH includes specific artistic and creative choices—and confusingly similar names—that can only be reasonably construed as willful copycatting.

275. Skillz's website page for BINGO FOR CASH provides a Skillz-branded QR code. When scanned with a mobile phone camera, the QR-code opens the mobile version of the Skillz website page for BINGO FOR CASH. At the top of this mobile page is a link reading "GET." When a user clicks that link, it opens a page for the BINGO FOR CASH app—for example, on the Apple App Store (on Apple devices), and from Skillz's own site (on Android devices)—from which a user can download the game directly onto their phone.

276. Upon information and belief, Skillz not only offers BINGO FOR CASH on its platform and approved the game for release, but also had involvement in the development of the game and coordinated with Golden Wood on gameplay designs and features.

277. According to the Skillz website, Skillz provides the following "Skillz-Powered Features" to BINGO FOR CASH: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends.

**C. <u>Infringing Game #3: "21 BASH"</u>**

278. Skillz, in coordination with game developer Luckyo, offers 21 BASH on the Skillz platform.

279. 21 BASH was released on May 5, 2023, well after the release of Papaya's 21 CASH and after 21 CASH had proven to be highly successful.

280. The 21 BASH icon is deliberately similar to Papaya's 21 CASH icon. Both icons feature the stylized number "21" in gold lettering against a purple background. Additionally, both icons prominently feature cards bearing the letters "A" and "J":

**<u>21 CASH (Papaya)</u>**




**<u>21 BASH (Skillz/Luckyo)</u>**




281. The foregoing similarities between the Skillz/Luckyo and Papaya offerings go well beyond imagery intrinsic to 21-style games. Rather, 21 BASH includes specific artistic and creative choices that can only be reasonably construed as willful copycatting.

282. Skillz's website page for 21 BASH provides a Skillz-branded QR code. When scanned with a mobile phone camera, the QR-code opens the mobile version of the Skillz website page for 21 BASH. At the top of this mobile page is a link reading "GET." When a user clicks that link, it opens a page for the 21 BASH app—for example, on the Apple App Store (on Apple devices), and from Skillz's own site (on Android devices)—from which a user can download the game directly onto their phone.

283. Upon information and belief, Skillz not only offers 21 BASH on its platform and approved the game for release, but also was involved in the development of the game and coordinated with Luckyo on gameplay designs and features.

284. According to the Skillz website, Skillz provides the following "Skillz-Powered Features" to 21 BASH: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends.

**D. <u>Infringing Game #4: "SOLITAIRE WORLD – WIN CASH"</u>**

285. Skillz, in coordination with game developer GameNexa, offers SOLITAIRE WORLD-WIN CASH on the Skillz platform.

286. SOLITAIRE WORLD-WIN CASH was released in 2023, well after the release of Papaya's SOLITAIRE CASH and after SOLITAIRE CASH had proven to be highly successful.

287. The SOLITAIRE WORLD-WIN CASH icon is deliberately similar to Papaya's SOLITAIRE CASH icon. Both icons feature three cards spread in an identical manner with the front-most card featuring a golden dollar sign both in its center and top left corner. Additionally, both icons are set against a green, radiating-pattern background:

| **SOLITAIRE CASH (Papaya)** | **SOLITAIRE WORLD-WIN CASH (Skillz/GameNexa)** |
|---|---|
|  |  |

288. The foregoing similarities between the Skillz/GameNexa and Papaya offerings go well beyond imagery intrinsic to solitaire-style games. Rather, SOLITAIRE WORLD-WIN CASH includes specific artistic and creative choices that can only be reasonably construed as willful copycatting.

289. Skillz's website page for SOLITAIRE WORLD-WIN CASH provides a Skillz-branded QR code. When scanned with a mobile phone camera, the QR-code opens the mobile version of the Skillz website page for SOLITAIRE WORLD-WIN CASH. At the top of this mobile page is a link reading "GET." When a user clicks that link, it opens a page for the SOLITAIRE WORLD-WIN CASH app—for example, on the Apple App Store (on Apple devices), and from Skillz's own site (on Android devices)—from which a user can download the game directly onto their phone.

290. Upon information and belief, Skillz not only offers SOLITAIRE WORLD-WIN CASH on its platform and approved the game for release, but also was involved in the development of the game and coordinated with GameNexa on gameplay designs and features.

291. According to the Skillz website, Skillz provides the following "Skillz-Powered Features" to SOLITAIRE WORLD-WIN CASH: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends.

**E. <u>Infringing Game #5: "SOLITAIRE CASH"</u>**

292. Skillz, in coordination with game developer DNR, offers a game called SOLITAIRE CASH on the Skillz platform.

293. The DNR SOLITAIRE CASH game has been listed on app stores as "SOLITAIRE CASH – JUST PLAY NOW" and "SOLITAIRE CASH: WIN REAL MONEY".

Case 24-26-01247-DFC Document 46 Filed 09/16/2605/24 Page 87 of 104

294. The DNR SOLITAIRE CASH game was released in 2024, well after the release of Papaya's SOLITAIRE CASH and after Papaya's SOLITAIRE CASH had proven to be highly successful.

295. The names of the two games are identical.

296. Skillz's website page for the DNR SOLITAIRE CASH provides a Skillz-branded QR code. When scanned with a mobile phone camera, the QR-code opens the mobile version of the Skillz website page for SOLITAIRE CASH. At the top of this mobile page is a link reading "GET." When a user clicks that link, it opens a page for the "SOLITAIRE CASH: WIN REAL MONEY", from which a user can download the game directly onto their phone.

297. Upon information and belief, Skillz not only offers the DNR SOLITAIRE CASH on its platform and approved the game for release, but also was involved in the development of the game and coordinated with DNR on gameplay designs and features.

298. According to the Skillz website, Skillz provides the following "Skillz-Powered Features" to SOLITAIRE CASH: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends.

**F. <u>Skillz's Involvement in the Dissemination of the Infringing Games</u>**

299. While Skillz has represented in the Complaint that Skillz "does not develop the games played on its platform itself," (ECF No. 1 ¶ 27), there is strong reason to doubt that is the case.

300. Upon information and belief, Skillz plays a direct role in development of the Infringing Games.

301. Skillz provides developers with critical software, testing environments, and other support.

302. Skillz develops, among other features, the tournaments and menus utilized in games on the Skillz platform.

303. Skillz also requires all developers to upload the build of their game to the "Skillz Developer Console."

304. According to Skillz, the upload of developers' binary game files to their servers "allows Skillz to verify that only specific builds of [their] game can access our production servers and generate matches."

305. Independent of Skillz's operations in a development capacity, it bears a number of other responsibilities with respect to the Infringing Games that appear on the Skillz platform, even beyond making those games available on its platform and/or for download via app stores and on Skillz's own site.

306. For example, Skillz reviews all games that are monetized on its platform.

307. In addition, Section 2 of Skillz's December 2023 Developer Terms and Conditions of Service provides that a developer "shall modify and upload the Game(s) through the SDK and developer.skillz.com ("Modified Game")" and that "Skillz may review each Modified Game and determine, in Skillz's sole discretion, if the Modified Game is eligible for the Monetization Services."[56]

308. Skillz further reports that it is responsible for paying the developers who offer "cash tournaments" through the Skillz Platform.[57] These payouts are subject to a revenue sharing arrangement which is thoroughly outlined in the Developer Terms and Conditions of Service and which renders Skillz a stakeholder in the success of the Infringing Games.

---

[56] *Developer Terms and Conditions of Service*, Skillz (October 13, 2024), https://www.skillz.com/legal/.

[57] *Receiving Payments*, Skillz, https://docs.skillz.com/docs/release-your-game-overview.

309. Skillz advertises the games developed on its platform through its own website, including by displaying the games' icons (near Skillz's own logo).[58]

310. As detailed above, the game listings on Skillz's website contain Skillz-branded links that allow users to download the Infringing Games directly onto their mobile devices.

311. As detailed above, Skillz acknowledges that it provides the following "Skillz-Powered Features" for CASH OUT BINGO, BINGO FOR CASH, 21 BASH, SOLITAIRE WORLD-WIN CASH, and SOLITAIRE CASH (or SOLITAIRE CASH: WIN REAL MONEY) specifically: free matches; all-games account; player chat; cash matches; progression rewards; live events; real-world prizes; and VS friends.

312. Accordingly, Skillz is—at minimum—both materially contributing to the infringement of Papaya's intellectual property and continuing to provide its services to developers it knows are infringing Papaya's intellectual property.

## V. SKILLZ'S UNLAWFUL CONDUCT HAS HARMED AND CONTINUES TO HARM PAPAYA

313. Skillz's willful false advertising, defamatory statements, fabricated data, and other deceptive conduct were intended to harm Papaya.

314. Papaya has been harmed by this conduct in at least the following ways.

315. Absent being deceived by Skillz's false representations both about itself and about Papaya, mobile gamers may have chosen to play Papaya Games instead of Skillz-platform games.

[58] *Skillz Homepage*, Skillz, https://games.skillz.com/.

316. The false suggestion that Papaya has been the subject of thousands of customer complaints, is the subject of a new complaint approximately every few seconds, and engages in "scam[s]" tarnishes Papaya's hard-earned goodwill and reputation.

317. Skillz's denigration of its competitors also harms Papaya by bringing disrepute to the mobile competitive gaming industry (save for Skillz), thus diverting consumers away from similar games (such as Papaya's).

318. Skillz's failure to honor its promises that there are "never bots" and that cash withdrawals can be made "at any time" on its platform also risks leaving consumers with the inaccurate belief that even unaffiliated mobile cash-gaming options are not trustworthy.

319. Skillz and the game developers' infringement of Papaya's intellectual property further harm Papaya by creating consumer confusion as to whether the inferior Skillz platform games are sourced by or affiliated with Papaya.

320. Papaya has received complaints and inquiries from customers who mistakenly associate Skillz and/or games on the Skillz platform with Papaya and/or Papaya Games.

321. Upon information and belief, Skillz and/or the other developers involved in the Infringing Games have received complaints or inquiries mistakenly identifying Papaya as involved in the Infringing Games and/or the Skillz Platform.

322. Consumer confusion regarding the Infringing Games prevents Papaya from having control over its own reputation and goodwill. For example, players dissatisfied with the Infringing Games are likely to blame Papaya for their unsatisfactory experience.

323. Papaya often cannot know who the specific aggrieved players are, and thus could not take steps to attempt to assure them that their complaints are not about Papaya at all.

324. The Infringing Games free-ride not only on Papaya's reputation and goodwill, but also on Papaya's creativity and original design content.

325. Notwithstanding these issues, Skillz continues to offer the Infringing Games on its platform and advertise those games on the Skillz website.

**<u>FIRST COUNTERCLAIM</u>**
**False Advertising (15 U.S.C. § 1125)**
**(Against Skillz)**

326. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

327. As detailed above, Skillz has made false and misleading statements about Papaya and other mobile gaming companies in connection with the fraudulent 4FairPlay Website, including by presenting fabricated data regarding purported complaints about Papaya and deceiving mobile game players into contacting state attorneys general.

328. As detailed above, Skillz sought to hide its involvement in the 4FairPlay Website and its associated front company.

329. As detailed above, Skillz repeatedly represents to consumers that the games available for play on its platform include only human opponents and never incorporate, or have incorporated, bot opponents.

330. As detailed above, Skillz repeatedly represents to consumers that other companies' games—and specifically Papaya's—are unfair and/or not skill-based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience.

331. As detailed above, Skillz further has represented to consumers that Papaya "admits" bot use and is engaging in "fraud."

Case 1:24-cv-01217-UNA Document 4 Filed 11/05/24 Page 96 of 104

332. As detailed above, Skillz represents to consumers that cash withdrawals from the Skillz platform are available "at any time."

333. Skillz's representations to consumers, including but not limited to the foregoing, are willfully false and/or misleading.

334. Skillz's representations are made in interstate commerce, in connection with the commercial advertising and promotion of Skillz's competitive gaming platform and the games offered on that platform.

335. Skillz's deceptive statements are material to consumers, who choose to play Skillz-platform games based on Skillz's representations.

336. By making these false and misleading representations to players and prospective players within Skillz advertisements, on Skillz's website and social media, and within its game applications, Skillz has diverted members of Papaya's player base, who would not have played Skillz-platform games absent Skillz's misrepresentations that players will be facing only human opponents.

337. By making these false and misleading representations to players and prospective players within Skillz advertisements, on Skillz's website and social media, and within its game applications, Skillz has diverted members of Papaya's player base, who would not have played Skillz-platform games absent Skillz's misrepresentations as to the ease of cash withdrawals.

338. Skillz's unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

339. Papaya also was forced to incur legal fees related to the false representations.

340. Skillz's deceptive statements also have harmed Papaya's reputation and goodwill in a manner not fully compensable by monetary damages.

**<u>SECOND COUNTERCLAIM</u>**
**Deceptive Trade Practices (New York General Business Law § 349)**
**(Against Skillz)**

341. As detailed above, Skillz has made false and misleading statements about Papaya and other mobile gaming companies in connection with the fraudulent 4FairPlay Website, including by presenting fabricated data regarding purported complaints about Papaya and deceiving mobile game players into contacting state attorneys general.

342. As detailed above, Skillz sought to hide its involvement in the 4FairPlay Website and its associated front company.

343. As detailed above, Skillz repeatedly represents to consumers that the games available for play on its platform include only human opponents and never incorporate, or have incorporated, bot opponents.

344. As detailed above, Skillz repeatedly represents to consumers that other companies' games—and specifically Papaya's—are unfair and/or not skill-based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience.

345. As detailed above, Skillz represents to consumers that cash withdrawals from the Skillz platform are available "at any time."

346. Skillz's representations, including but not limited to the foregoing, to consumers are willfully false and/or misleading.

347. Skillz's representations were made to consumers in the State of New York.

348. Skillz's representations are likely to deceive, and have deceived, consumers, including consumers in the State of New York.

349. Skillz's deceptive statements are material to consumers, who choose to play Skillz-platform games based on Skillz's representations.

350. By making these false and misleading representations to players and prospective players within Skillz advertisements, on Skillz's website and social media, and within its game applications, Skillz has diverted members of Papaya's player base, who would not have played Skillz-platform games absent Skillz's misrepresentations that players will be facing only human opponents.

351. By making these false and misleading representations to players and prospective players within Skillz advertisements, on Skillz's website and social media, and within its game applications, Skillz has diverted members of Papaya's player base, who would not have played Skillz-platform games absent Skillz's misrepresentations as to the ease of cash withdrawals.

352. Skillz's unlawful actions deceive the public and harm consumers.

353. Skillz's unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

354. Papaya also was forced to incur legal fees related to the false representations.

355. Skillz's deceptive statements also have harmed Papaya's reputation and goodwill in a manner not fully compensable by monetary damages.

**<u>THIRD COUNTERCLAIM</u>**
**Defamation (New York Common Law)**
**(Against Skillz)**

356. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

357. As detailed above, Skillz has made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by presenting fabricated data regarding purported complaints about Papaya and deceiving mobile game players into contacting state attorneys general.

358. As detailed above, Skillz has published and disseminated social media posts falsely accusing Papaya of being a "scammer[]" and a "fraud."

359. As detailed above, Skillz has also republished on its social media pages a post from the website Bonus.com with a headline that falsely claims that Papaya has "admit[ted]" to the use of bots in its games.

360. Upon information and belief, Skillz bears responsibility for the creation, financing, and/or coordination of the Bonus.com post described above, including the inclusion of the false assertion that Papaya has "admit[ted]" to the use of bots in its games.

361. Skillz disseminated these false statements with, at the time of their dissemination, knowledge of their falsity and with an intent to harm Papaya, or, at the very least, with reckless indifference to the veracity of the disseminated statements.

362. Skillz was not authorized to make and/or disseminate these false statements.

363. Skillz's false statements were published indiscriminately to third parties over the internet via Skillz's social media pages, including Twitter/X, Facebook, and LinkedIn.

364. Skillz's false statements impugn the basic honesty and integrity of Papaya's business, and have caused damage to Papaya's reputation in the eyes of the public.

365. Skillz's unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

366. Papaya also was forced to incur legal fees related to the false representations.

**FOURTH COUNTERCLAIM**
**Civil Conspiracy (New York Law)**
**(Against Skillz)**

367. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

368. Skillz conspired with one or more persons, including Fair Play for Mobile Games, Shen, Levin, The Gober Group, and Square Strategies, in connection with the 4FairPlay Website and related conduct.

369. Skillz and these co-conspirators agreed to pursue a common goal of causing harm to Papaya's business and unlawfully created, operated, and controlled the 4FairPlay Website to achieve that purpose.

370. Skillz and these co-conspirators cooperated to post false representations and fabricated data on the 4FairPlay Website with the purpose of willfully and maliciously injuring Papaya's business, with knowledge or reckless disregard for the falsity of the representations and data.

371. Skillz intentionally participated in the furtherance of an unlawful purposes, and its conduct constituted defamation and violated the Lanham Act.

372. As a direct and proximate result of Skillz's unlawful acts, which were committed in furtherance of the above-described conspiracy to harm Papaya's business, Papaya suffered damages, including through reputational harm and loss of goodwill.

373. Papaya also was forced to incur legal fees related to the false representations on the Website.

**FIFTH COUNTERCLAIM**
**Trademark Infringement (15 U.S.C. § 1114)**
**(Against Skillz, Tether, Golden Wood, Luckyo, GameNexa, and DNR)**

374. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

375. Papaya is the exclusive owner of the U.S. trademark registrations for names and icons of Papaya Games identified above (*supra* at Section I.B) (the "**Papaya Registrations**").

376. The federally registered Papaya trademarks reflected in the Papaya Registrations are valid, of great and incalculable value, have significant associated goodwill in the United States, are highly distinctive, and have become uniquely and universally associated in the public mind with Papaya in denoting high-quality mobile games and services.

377. The Papaya Registrations are valid and enforceable against third parties, including Skillz.

378. Without Papaya's authorization or consent, and with full knowledge of Papaya's rights in its federally registered trademarks, Skillz and the game developers have willfully misappropriated the use of those trademarks and/or colorable imitations thereof in interstate commerce.

379. The misappropriation of Papaya's federally registered trademarks is intended to, and is likely to, confuse and deceive consumers into believing, initially or otherwise, that the Infringing Games are affiliated with, associated with, or sourced by Papaya, and/or that Papaya has sponsored, endorsed, or approved those games.

380. The foregoing actions are likely to cause, have caused, and will continue to cause confusion, mistake, and deception in the minds of consumers as to the source or origin of Papaya's and/or Skillz's services.

381. As a result of these actions, Papaya has suffered monetary damages as well as irreparable injury including impairment of, and loss of the ability to control, its own reputation.

**SIXTH COUNTERCLAIM**
**Contributory and/or Vicarious Trademark Infringement (15 U.S.C. § 1114)**
**(Against Skillz)**

382. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

383. With full knowledge of Papaya's rights in its federally registered trademarks, Skillz has continued making its services available to developers whose games Skillz knows or has reason to know are misappropriating Papaya's federally registered trademarks or using colorable imitations thereof in interstate commerce.

384. Skillz, in partnership with these developers, exercises joint control of the Infringing Games.

385. In addition to its direct role in developing games on its platofmr, Skillz both provides the technology used to monetize the Infringing Games and receives a direct financial benefit from the success these games enjoy owing to their misappropriation of Papaya's federally registered trademarks or use of colorable imitations thereof.

386. Accordingly, in addition to directly infringing Papaya trademarks, Skillz bears responsibility for the infringing activities of the developers of the Infringing Games, including Tether, Golden Wood, Luckyo, GameNexa, and DNR.

387. As a result of these actions, Papaya has suffered monetary damages as well as irreparable injury including impairment of, and loss of the ability to control, its own reputation.

## SEVENTH COUNTERCLAIM
**False Designation of Origin, False Association, and/or Unfair Competition (15 U.S.C. § 1125(a)) (Against Skillz, Tether, Golden Wood, Luckyo, GameNexa, and DNR)**

388. Papaya incorporates by reference the allegations in the preceding paragraphs of these counterclaims as if fully set forth herein.

389. Papaya is the exclusive owner of the names and icons of Papaya Games discussed above (the "**Papaya Marks**").

390. The Papaya Marks are valid, of great and incalculable value, have significant associated goodwill in the United States, are highly distinctive, and have become uniquely and

universally associated in the public mind with Papaya in denoting high-quality mobile games and services.

391. The Papaya Marks are valid and enforceable against third parties, including Skillz.

392. Without Papaya's authorization or consent, and with full knowledge of Papaya's rights in the Papaya Marks, Skillz and the game developers have willfully misappropriated the use of those trademarks and/or colorable imitations thereof in interstate commerce.

393. The misappropriation of the Papaya Marks is intended to, and is likely to, confuse and deceive consumers into believing, initially or otherwise, that the Infringing Games are affiliated with, associated with, or sourced by Papaya, and/or that Papaya has sponsored, endorsed, or approved those games.

394. The foregoing actions are likely to cause, have caused, and will continue to cause confusion, mistake, and deception in the minds of consumers as to the source or origin of Papaya's and/or Skillz's services.

395. As a result of these actions, Papaya has suffered monetary damages as well as irreparable injury including impairment of, and loss of the ability to control, its own reputation.

**EIGHTH COUNTERCLAIM**
**Contributory and/or Vicarious False Designation of Origin,**
**False Association, and/or Unfair Competition (15 U.S.C. § 1125(a))**
**(Against Skillz)**

396. Papaya incorporates by reference the allegations in the preceding paragraphs of the Counterclaims.

397. In the alternative, with full knowledge of Papaya's rights in the Papaya Marks, Skillz has continued making its services available to developers whom it knows or has reason to

know are misappropriating Papaya's trademarks or using colorable imitations thereof in interstate commerce.

398. Skillz, in partnership with these developers, exercises joint control of the Infringing Games.

399. Skillz both provides the technology used to monetize the Infringing Games and receives a direct financial benefit from the success these games enjoy, owing to their misappropriation of Papaya's federally registered trademarks or use of colorable imitations thereof.

400. Accordingly, in addition to directly infringing Papaya trademarks, Skillz bears responsibility for the infringing activities of the developers of the Infringing Games, including Tether, Golden Wood, Luckyo, GameNexa, and DNR.

401. As a result of these actions, Papaya has suffered monetary damages as well as irreparable injury including impairment of, and loss of the ability to control, its own reputation.

**NINTH COUNTERCLAIM**
**Copyright Infringement (17 U.S.C. § 501)**
**(Against Skillz, Tether, and Golden Wood)**

402. Papaya incorporates by reference the allegations in the preceding paragraphs of the Counterclaims.

403. Papaya owns all right, title, and interest to the copyrighted elements in the game BINGO CASH, federally registered as U.S. Registration No. PA0002481705 (the **"Papaya Copyrights"**).

404. Without Papaya's authorization or consent, and with full knowledge of Papaya's rights in its federally registered copyrighted works, Skillz, Tether, and Golden Wood have

willfully copied, displayed, distributed, and/or made derivative works of the Papaya Copyrights in connection with the copycat game on the Skillz Platform named BINGO FOR CASH.

405. Skillz's, Tether's, and Golden Wood's infringements of the Papaya Copyrights have caused monetary damages and irreparable injury to Papaya.

**TENTH COUNTERCLAIM**
**Contributory and/or Vicarious Copyright Infringement (17 U.S.C. § 501)**
**(Against Skillz)**

406. Papaya incorporates by reference the allegations in the preceding paragraphs of the Counterclaims.

407. In the alternative, with full knowledge of the Papaya Copyrights, Skillz has continued making its services available to developers whom it knows or has reason to know are offering games that copy, display, distribute, or otherwise constitute derivative works of the Papaya Copyrights, including Tether and Golden Wood.

408. Skillz, in partnership with these developers, exercises joint control of the Infringing Games.

409. Skillz both provides the technology used to monetize the Infringing Games and receives a direct financial benefit from the success these games enjoy, owing to their misappropriation of the Papaya Copyrights.

410. Accordingly, in addition to directly infringing Papaya copyrights, Skillz is liable for the infringing activities of Tether and Golden Wood.

411. As a result of these actions, Papaya has suffered monetary damages as well as irreparable injury.

**PRAYER FOR RELIEF**

WHEREFORE, Papaya respectfully requests that the Court enter judgment in its favor:

A. Granting permanent injunctive relief:

(i) Prohibiting Skillz (inclusive of its agents, employees, or anyone working for, or on behalf of Skillz) from engaging in false or misleading advertising with respect to its gaming platform or gaming applications that run on its gaming platform, including but not limited to falsely representing that (a) Skillz-platform games never feature bots and that players will only play against other players of similar skill levels, while enabling and/or condoning bot use in games on the Skillz platform, and (b) that cash withdrawals are promptly available on the Skillz platform;

(ii) Prohibiting Skillz from engaging in false or misleading advertising with respect to Papaya's games or gaming platform, including but not limited to falsely representing that Papaya's games incorporate bots or that Papaya has "admitted" the same;

(iii) Requiring Skillz to remove all false or misleading advertisements and marketing, and to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of (1) its gaming platform or gaming applications that run on its gaming platform, or (2) Papaya's games or gaming platform, including without limitation, the placement of corrective advertising and providing written notice to the public;

(iv) Prohibiting Skillz from creating, facilitating, or coordinating any advertising, marketing, or other statements in a manner that suggests such materials originate from or are affiliated with parties other Skillz, or are otherwise unsolicited, including but not limited to online posts, purported customer statements or reviews, and blog or news "articles" on third-party websites or social media (*e.g.*, Bonus.com);

(v) Prohibiting Skillz from presenting any data or information concerning mobile gaming operators or mobile games absent sufficient factual support and disclosure of all sources of such support;

(vi) Prohibiting Skillz and the defendant game developers from using in commerce—or facilitating the use in commerce—or in connection with any goods or services any mark, name, or design that creates a likelihood of confusion with the Papaya Marks and from engaging in any other acts of unfair competition; and

(vii) Prohibiting Skillz and the defendant game developers from offering or facilitating the offering of any game or other content that infringes the Papaya Copyrights;

B. Awarding Papaya actual, compensatory, and consequential damages suffered as a result of Skillz's wrongful conduct, including but not limited to lost profits and revenues;

C. Awarding Papaya all revenues, profits, and/or unjust enrichment obtained by Skillz as a result of Skillz's wrongful conduct;

D. Awarding Papaya statutory, treble, and/or punitive damages;

E. Awarding Papaya its costs and expenses in this action;

F. Awarding Papaya reasonable attorneys' fees and costs, including without limitation pursuant to the fee-shifting provisions of the Lanham Act;

G. Awarding Papaya prejudgment and post-judgment interest; and

H. Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Papaya hereby demands trial by jury for all causes of action, claims, or issues in these counterclaims that are triable as a matter of right to a jury.

Dated: August 5, 2024
New York, New York

Respectfully submitted,

*/s/ Anthony J. Dreyer*

Anthony J. Dreyer
Jordan A. Feirman
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel: (212) 735-3000
Anthony.Dreyer@skadden.com
Jordan.Feirman@skadden.com

David B. Leland (*pro hac vice*)
Margaret E. Krawiec (*pro hac vice*)
Michael A. McIntosh (*pro hac vice* application forthcoming)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7000
David.Leland@skadden.com
Margaret.Krawiec@skadden.com
Michael.McIntosh@skadden.com

*Attorneys for Defendant and Counterclaim-Plaintiff Papaya Gaming, Ltd. and Defendant Papaya Gaming, Inc.*



2447191-NYCSR03A - MSW

# Exhibit 1


FILE A COMPLAINT
FAQ
ABOUT US
12,681 and Counting!
Thousands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money.
FILE A COMPLAINT


Complaints by state
Scam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions.
Over 1000+ Complaints
201-1000 Complaints
100-200 Complaints
Under 100 Complaints


Complaints by Game
Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far followed by Solitaire Clash from Avia Games
Others
Battle Bingo
Bingo King
Solitaire King
Bingo Tour
Bingo Clash
Solitaire Clash
Bubble Cash
Bingo Cash
Solitaire Cash
14.2%
14.7%
11.3%
12.1%
13.3%
10.4%
8.0%
7.6%
7.1%

# Real People, Real Action

Real people across the country shared their frustration and anger from playing scam games with their hard-earned money.

| NAME | STATE | Games |
|---|---|---|
| ELLEN A. | NY | Bingo Cash, Bingo King, Battle Bingo |
| DERRICK W. | NE | Bubble Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| LAUNCE G. | IN | Bingo Cash, Bubble Cash, Bingo Tour |
| ANDREW H. | NY | Bingo Cash |
| AMIR G. | VA | Bingo Clash |
| BRITTANY K. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Bingo Tour, Solitaire King, Battle Bingo |
| VERLINDA S. | IL | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| NOBUKO S. | CA | Battle Bingo |
| ELLEN F. | MS | Solitaire Cash, Solitaire Clash |
| VIVIAN A. | CA | Bingo Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| SHARON N. | CA | Solitaire Cash, Bingo Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| KASSANDRA Y. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Solitaire King |
| SUSAN S. | NY | Solitaire Cash, Bingo Cash, Solitaire Clash |

## What Players Are Telling Us

Solitaire Cash, Bingo Cash, Solitaire Clash and Bingo Clash. We can't stand by and let them get away with it. And you should not allow this to happen to many citizens in your state. Take action now.

– L.G.S. from Pennsylvania

This is absolutely intolerable and just plain false advertising and just out right thievery and the companies are continuing to make millions from a public that trusts them. We can't stand by and let them get away with making a fool out of honest people and the government anymore.

– C.S. from Virginia

I've been playing Bingo Tour and Bingo Cash. And they always show that I am a 1 out of 3 winner and when the game is done processing, they bump me down to 3rd or 5th as if they [are] adding fake players to make sure I am not a winner.

– C.H. from California

With Solitaire Cash, the time they complete the game in many cases seems impossible. I have complained to the company and asked if I was playing against real people and they didn't answer.

– J.P. from Florida

Bingo Tour – I could tell something wasn't right. One minute you're about to be the number one winner but while you're waiting on 2,3 to 4 players, you're kicked right out the spot.

– K.S. from Texas

Solitaire Cash: I have hundreds of screenshots showing opponent names that were clearly automatically generated to create a bot profile – usually half of the players in each individual tournament were obviously fake.

– H.N. from Washington

Case 1:24-cv-01646-DLC Document 46-1 Filed 08/05/24 Page 5 of 9

# About

4 Fair Play is on a mission to bring fairness to mobile gaming. We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing. Our organization was founded to educate the public on fair play and provide tools and resources players need to protect themselves if they've been scammed.

If you have questions or want to learn more about us, please feel free to contact hello@4fairplay.org.

Paid for by 4 Fair Play | Privacy Policy

FILE A COMPLAINT FAQ ABOUT US

# Fight back against scam games!

Don't let these games steal your money and get away with it! They promise fair competition, but secretly pair players like you against a bot that is programmed to make sure you lose more money than you win.

ACT NOW!



## File a complaint. It only takes a minute.

If you've lost money playing against bots, you're not alone—and you may be entitled to compensation. It's time you got your hard-earned money back by bringing those companies to justice.

File a complaint today.

By clicking 'submit', an email will auto-populate with your information so you can directly share your complaint with your local attorney general.
This is the most effective way of bringing these gaming companies to justice and receiving compensation.


How it works
You file a complaint here, and it's sent to the consumer protection authority in your state. This is the best way to ensure your claim gets noticed.
With enough claims, the state attorney general will investigate the scam companies. If you have family or friends who have been impacted, they can also file their own claim.
A successful investigation could force the companies to pay consumers for damages. Make sure you are one of them!


Thousands of players have been scammed out of their money playing against bots
"The creators made 'competitive' bingo game where you play against other 'players' when in reality it's just AI that will always beat you..."
– Bingo Clash player
"I have genuinely never played a game that is so rigged in my life"
– Battle Bingo player
"It's stimulated to make you think your [sic] winning until you invest real money... BOTS BOTS BOTS"
– Bingo Cash player
"This game is 100 a bot scam that tries to trick you into thinking you're facing real players when you aren't"
– Bubble Cash player
"The generated bot names and pictures aren't fooling anyone. Wins/losses are predetermined once you hit play..."
– Solitaire King player
"Bottom line, the devs have rigged this app so it's almost impossible to win any money"
– Bubble Clash player

## Frequently asked questions

### How do I know if I've been scammed?

If you notice suspicious players and experience repeated abnormal losses that suggest the "person" on the other side of the screen is really a bot, there's a good chance you are being scammed. If you are a strong player and keep losing, that should raise some concern. Similarly, if you play poorly and you seem to be winning in the first game or two, that can also be part of the scam to hook you in. When the game consists of real players only, there are not always going to be opponents available for certain game brackets or hours of the day. In that case you should get a 'waiting for opponent' message. But if you are always matched with a "player" instantaneously, that could mean you are playing against a bot.

### What if I want to report a game that is not listed here?

### Are all mobile real-money games a scam?

### What happens next?

## Frequently asked questions

### How do I know if I've been scammed?

### What if I want to report a game that is not listed here?

If you believe you have been scammed by other games from Papaya Gaming, Avia Games or Acerena Inc. that are not listed in this form, we encourage you to reach out directly to us at hello@4fairplay.org.

### Are all mobile real-money games a scam?

### What happens next?

## Frequently asked questions

How do I know if I've been scammed?

What if I want to report a game that is not listed here?

Are all mobile real-money games a scam?

Not at all! In fact, mobile gaming has witnessed tremendous growth over the last few years and people all over the country are spending their time playing games with their friends and against competitors. But sadly, a handful of companies have popped up who are taking advantage of players by withholding money and creating unfair playing environments, like deploying bots to ensure an unwinnable game (and more money lining their pockets).

What happens next?

## Frequently asked questions

How do I know if I've been scammed?

What if I want to report a game that is not listed here?

Are all mobile real-money games a scam?

What happens next?

Your complaint will be officially submitted to the Attorney General office in your state. If AGs receive enough complaints of fraudulent and anti-consumer practices, they are often compelled to investigate – which could mean the company is forced to pay damages to the players they scammed.



# Why do we collect this info?

If you use the tools on this page, your address determines which state official(s) or office receives your message. Your name, zip, and email tell the recipient who sent it.

# Information Collected

We collect the information you provide for the purpose of matching to your state officials, to deliver your message to them, and to keep a record of the messages delivered. This may include but is not limited to, your name, email, phone number, and zip code.

# Information Shared

We will share information that you provide with the people with whom you choose to communicate, and with our vendors only as needed to deliver your message. We may follow up with you to request more information on your experience. 4 Fair Play's name and contact information can be found on each page of this site.

Paid for by 4 Fair Play | Privacy Policy

# Exhibit 2

Fight Fraud for Papaya Games

FAIRPLAY.ORG

FILE A COMPLAINT FAQ LEARN MORE

# Fight Fraud.
# File A Complaint Today.

Don't let these games steal your money by promising fair competition but instead use bots to scam you. Act NOW!



## Filing A Complaint Is Simple.

Join others like you, who have filed a complaint. **You might be entitled to compensation.**

**Your Information**

*Required

First Name*

Last Name*

State*

Zip code

Email*

Phone Number (Optional)

**Game Details**

Which game would you like to report?*

Solitaire Cash

Bingo Cash

Bubble Cash

Approximately how much money have you lost?

Tell us what happened

# Exhibit 3

Invoice for 4FairPlay.org - 11/06/2023



**Adam** <inbox.adam@gmail.com>
to Jen

And or

Thank
- Adam

**One a**

| | |
|---|---|
| from: | **Adam** <inbox.adam@gmail.com> |
| to: | Jen Marek <jmarek@skillz.com> |
| date: | Nov 14, 2023, 3:33 PM |
| subject: | Invoice for 4FairPlay.org - 11/06/2023 |
| mailed-by: | gmail.com |



PDF Skillz_GEN70000...

Reply Forward

AS - 0001

# Exhibit 4

**From:** Michael Lombardo
**To:** McIntosh, Michael A (WAS); 'Noltie, Lisa'; Krawiec, Margaret E (WAS); 'Adam Hosmer-Henner'; 'Emily M. Dennis'
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C
**Date:** 7/1/2024 11:59:00 AM
**CC:** Lazar Raynal; 'Hostetler, Jennifer'
**BCC:**

**Message:**
Hi Mike:

As you are aware, Nevada R. Civ. P. 45(c)(1) offers protections to the recipients of subpoenas and requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court that issued the subpoena must enforce this duty and may impose an appropriate sanction-which may include lost earnings and reasonable attorney fees-on a party or attorney who fails to comply." Courts across the country interpreting identical language in Federal Rule of Civil Procedure 45 have repeatedly held that requests seeking "all communications and documents" are overbroad and do not comport with Rule 45. *E.g. Gropper v. David Ellis Real Estate, L.P.*, No. 13-CV-2068 (ALC) (JCF), 2014 WL 518234, at *4 (S.D.N.Y. Feb. 10, 2014) (request for "any and all" documents is inherently overbroad); *Rice v. Reliastar Life Ins. Co., Civ. A. No. 11-44-BAJ-CN*, 2011 WL 5513181, at *2 (M.D. La. Nov. 10, 2011) ("a request for 'any and all documents' relating to a particular subject is overbroad and amounts to little more than a fishing expedition"); *Badr v. Liberty Mut. Grp., Inc*., No. 3:06CV1208 (AHN), 2007 WL 2904210, at *3 (D. Conn. Sept. 28, 2007) (finding request for "any and all" documents overly broad); *Franzon v. Massena Mem'l Hosp*., 189 F.R.D. 220, 222 (N.D.N.Y. 1999) (finding request for "any and all documents" overbroad); *Richmond v. UPS Serv. Parts Logistics*, No. IP01-1412-C-H/G, 2002 WL 745588, at *4 (S.D. Ind. Apr. 25, 2002) (finding request for "any and all" employment records overbroad "on its face"). Nevada courts consider federal cases strong persuasive authority when interpreting parallel provisions of the Nevada Rules of Civil Procedure." *Dep't of Tax'n v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 136 Nev. 366, 369, 466 P.3d 1281, 1284 (2020).

With this legal framework in mind, Skillz has offered to provide the information actually sought by Papaya's subpoena: documents sufficient to show (1) Skillz's relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play. Skillz maintains that the invoices it agrees to produce provides this information. And, despite being informed of Skillz's position since June 13, Papaya has not articulated any reason for why Skillz's proposed production is insufficient to determine Skillz's involvement in 4Fairplay.org; Papaya simply repeats its demand for "all documents and communications" without consideration of the overbreadth and burden associated with such requests. Accordingly, Papaya's position does not comport with Nevada R. Civ. P. 45. Again, if Papaya can articulate a specific category of documents beyond the invoices Skillz agreed to produce that Papaya believes is necessary to determine Skillz's involvement in Fair Play for Gaming and/or 4fairplay.org, Skillz will consider Papaya's position. But Skillz does not agree to Papaya's overbroad requests for "[a]ll communications and documents," which Papaya has refused to narrow.

As to your question regarding the First Amendment privilege, Skillz maintains that Papaya's subpoena violates the First Amendment but has already disclosed to Papaya that it provided monetary funds to Fair Play for Mobile Gaming and agreed to produce invoices detailing the same in an effort to resolve

disputes without the need to burden a Nevada court with this dispute. Thus, Skillz is not withholding documents on the basis of First Amendment privilege for purposes of responding to Papaya's subpoena.

Best,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 27, 2024 11:13 AM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Mike,

Papaya's position has been clear from the outset: it is entitled to all documents responsive to the subpoena. Skillz's position appears to have shifted multiple times over the past several weeks. First, it refused to produce any responsive documents. Then, it offered to produce "documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen." And now it has reworked its position once more to offer to produce "invoices . . . sufficient to show: (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play."

The common thread has been Skillz's refusal to produce all documents responsive to the subpoena, as it is required to do under Nevada law. Please provide us with the legal basis for Skillz's position that it need not produce all responsive documents within its possession, custody, or control. Alternatively, if we misunderstand Skillz's position, please confirm that it agrees to produce all documents responsive to the subpoena.

Please also advise whether Skillz continues to withhold responsive documents based on a supposed First Amendment privilege.

If Skillz does not agree to produce all documents responsive to the subpoena, Papaya will file a motion to compel and seek a court order requiring Skillz to fully comply with the subpoena. Please provide your response by 12:00 p.m. EDT on Monday, July 1. If you do not respond by that time, we will presume that Skillz refuses to produce responsive documents and that it cannot offer a justification for that refusal, and we will proceed accordingly.

Thanks,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Wednesday, June 26, 2024 5:47 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike,

I am a bit perplexed about what you are seeking to move to compel. Your purported need for a subpoena to Skillz is to identify what role Skillz had with Fair Play for Mobile Games and 4fairplay.org. The information Skillz is agreeing to produce provides exactly that. Specifically, the invoices Skillz agrees to provide will provide documents sufficient to show: (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play.

To the extent Papaya chooses to proceed with frivolous claims against Skillz related to 4fairplay.org, Papaya is free to bring such claims, the parties can engage in discovery, and Skillz will address Papaya's claims in the litigation and reserves all rights regarding same. Papaya's attempt, however, to impose unilateral, burdensome discovery on Skillz through a "John Doe" complaint to obtain documents it does not need to identify Skillz's role in 4fairplay.org is inappropriate.

If Papaya believes there is specific information not within Skillz's proposed production that it believes it needs to determine Skillz's role in Fair Play for Mobile Games and/or 4fairplay.org, please identify what you believe you need and why, and we will consider it because what you are currently planning to move to compel is wholly unclear. We can also finalize the confidentiality agreement so Skillz can make its proposed production, and Papaya can confirm it has what it needs.

Lastly, as you know, I emailed you almost 2 weeks ago informing you we would be willing to make a production. It is unproductive for you to respond weeks after receiving our position with demands to respond to you within 48-hours' notice, especially during a time you know attorneys and clients are often on vacation.

To the extent you want to discuss the subpoena further on a call, I am currently pretty open on Friday other than 12 – 2 pm CT.

Best,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Tuesday, June 25, 2024 3:42 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Mike,

Thanks for your email. We note at the outset that producing “documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen” is not sufficient to satisfy Skillz’s obligations under the subpoena. Accordingly, we still intend to file a motion to compel Skillz to fully comply with the subpoena unless Skillz agrees by 5:00 p.m. EDT Thursday to produce all responsive documents.

We are willing to enter into a reasonable and appropriate confidentiality agreement to govern the production of the documents noted in your email.

Finally, we are not aware of the supposed “data directly rebutting the allegations” in Papaya’s underlying complaint to which you refer. We stand by the allegations in Papaya’s complaint, including that 4fairplay.org posted false representations and fabricated data as outlined in the complaint. Those allegations, and the corresponding claims, are amply supported.

Thanks,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 13, 2024 9:16 AM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel: Following up from our meet-and-confer, to resolve the issues raised during our call, Skillz agrees to produce documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen. Is there a confidentiality agreement in this matter? I can send over these documents today once we reach agreement on the confidential treatment of the financial information in these documents.

I also note that it is my understanding that the entities and/or individuals operating 4fairplay.org already provided you with data directly rebutting the allegations in your Virginia complaint that the content of 4fairplay.org was somehow fabricated. To the extent litigation is pursued against Skillz related to 4fairplay.org, Skillz reserves all rights related to any decision to pursue the frivolous claims included in Papaya's current complaint, which you now know are unsupported.

I am free this afternoon or tomorrow to discuss Skillz's proposed production and the confidential treatment of same.

Thanks,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 1:02 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Thanks, Mike. That time works for us. We'll circulate an invite later this afternoon.

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 6, 2024 12:32 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike – we are unavailable tomorrow for a meet and confer. Does 2:30 pm PT on Monday work for you?

Case 1:24-cv-01646-DLC Document 46-4 Filed 08/05/24 Page 7 of 10

Best,

---

**Michael Anthony Lombardo (Mike)**
*Senior Associate*

T: +1 312 764 6909 | E: MLombardo@KSLAW.com | Bio | vCard

King & Spalding LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606

kslaw.com

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 11:11 AM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Michael Lombardo <MLombardo@KSLAW.com>; Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Ms. Hostetler, Mr. Raynal, and Mr. Lombardo:

Following up on the below, please let us know your availability to meet and confer tomorrow.

Thank you,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** McIntosh, Michael A (WAS)
**Sent:** Wednesday, June 5, 2024 5:24 PM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Adam Hosmer-Henner <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>

**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** RE: [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel:

Please see the attached correspondence on behalf of Papaya. Please let us know your availability to meet and confer tomorrow or Friday.

Thank you,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Noltie, Lisa <LNoltie@lewisroca.com>
**Sent:** Thursday, May 30, 2024 5:29 PM
**To:** Diaz, Shirley (WAS) <Shirley.Diaz@skadden.com>; McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; Kelly, Todd D (WAS) <Todd.Kelly@skadden.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Leland, David B (WAS) <David.Leland@skadden.com>
**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

For your information and file, please see the attached copy courtesy with regard to the above-referenced matter.

Thank you,

**Lisa Noltie**
Legal Administrative Assistant

LNoltie@lewisroca.com
D. 702.949.8248

LEWIS ROCA

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
lewisroca.com

LEWIS ROCA ROTHGERBER CHRISTIE LLP

---

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

-----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error.
Click here to view our Privacy Notice.

-----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

-----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named

herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

# Exhibit 5

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

THEGOBERGROUP
GO further

## ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE

Fair Play for Mobile Games ("Client")

JL By initialing here, I acknowledge that I am authorized by Client to enter into an agreement between The Gober Group PLLC and Client for legal services.

JL By initialing here, I acknowledge that I have visited www.gobergroup.com/terms and have read The Gober Group's Terms of Service. I further acknowledge that I understand The Gober Group's Terms of Service, and that I agree that the attorney-client relationship between The Gober Group and Client will be governed by such Terms of Service.

JL By initialing here, I acknowledge that I have read the attached fee schedule(s), I understand the pricing specified in such fee schedule(s), and I agree to the pricing terms specified in such fee schedule(s).

JL By initialing here, I acknowledge that Client will pay a refundable security deposit in the amount of $1,500 to be held in The Gober Group's IOLTA as security against future unpaid fees ("Security Deposit"). In the event one or more of Client's invoices remain unpaid for more than 30 days after Client's receipt of such invoices(s), The Gober Group may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require Client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of Client. Upon termination of the attorney-client relationship between The Gober Group and Client, The Gober Group will return the remaining funds from the Security Deposit, if any, to Client following the payment of all unpaid invoices.

JL By initialing here, I acknowledge that Client will be charged a flat fee of $6,000 for The Gober Group to execute the nonprofit formation for Client, and that The Gober Group will charge hourly (see attached fee schedule) for all communications and other legal services on behalf of Client. Note, however, that the flat fee will be discounted to $4,500 if Client promptly notifies The Gober Group that Client will "self-declare" its 501(c)(4) status, meaning The Gober Group will not have to prepare the IRS Form 1024, Application for Recognition of Exemption Under Section 501(a).

JL By initialing here, I acknowledge that during each year of our representation, The Gober Group will provide Client with an "Annual Update Letter," which will provide you details about Client's Board of Directors meetings, filing deadlines, and other compliance obligations. Rather than billing hourly, we will minimize your costs by charging a $500 flat fee, invoiced in the month you receive the Annual Update Letter, to cover the time and labor associated with maintaining your file and preparing the letter. Please note that, because it is imperative for organizations to

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

**ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE**
**PAGE 2 OF 2**

practice good organizational hygiene, in addition to meeting their filing deadlines, the preparation of the Annual Update Letter is a standard part of our representation.

Understood and agreed to by:

| | |
|---|---|
| Josh Levin | Executive Director |
| Print Name of Client Representative | Title of Client Representative |
| DocuSigned by: Josh Levin 54B5F88A2F084FE... | 8/7/2023 |
| Signature of Client Representative | Date |

T | 202.417.3529
F | 877.437.5755
@GoberGroup
GoberGroup.com

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

THEGOBERGROUP
GO *further*

DS
JL

## RATE SHEET FOR HOURLY FEES

8/7/2023

**ATTORNEYS**

- Karen Blackistone Oaks: $750
- Tracey Frazier Wigglesworth: $625
- Chris Gober: $850
- Jenny Kim: $675
- Anna Mackin: $500
- Shannon O'Leary: $500
- Loree Anne Paradise: $500
- Eric Wang: $650

**OF COUNSEL ATTORNEYS**

- Steven Burk: $600
- Michael Garcar: $450
- Bryan Jacoutot: $350
- Diane LaRoss: $450
- Audrey Perry Martin: $625
- Bryan Tyson: $675

**SENIOR COMPLIANCE DIRECTORS**

- Kristen Lippstreu: $350
- Ashlyn Maeoka: $350
- Garret Scronce: $325

**LAW CLERK**

- Sara Cutter: $250

**PARALEGALS/RESEARCH SPECIALISTS**

- Universal Rate: $275

### Security Deposit Policy

It is the Firm's policy to charge new clients a refundable deposit to be held in the Firm's "IOLTA" trust account as security against future unpaid fees ("Security Deposit"). The amount of the Security Deposit, which will be specified in a separate "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement executed by the client, varies based upon the client type and the anticipated scope of work. In the event one or more of the client's invoices remain unpaid for more than 30 days after the client's receipt of such invoices(s), the Firm may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require the client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of the client.

### Commencement of Work Policy

It is the Firm's policy to **not** commence work until a new client has: (i) executed the Firm's "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement; **AND** (ii) paid the Security Deposit.

*Updated as of April 11, 2023*

T | 800.825.1730 | @GoberGroup
F | 877.437.5755 | GoberGroup.com

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

THEGOBERGROUP
GO further

DS
JL

8/7/2023

# FLAT FEE SCHEDULE FOR ESTABLISHING NONPROFIT ORGANIZATIONS

To provide our clients with additional transparency and budgetary certainty, The Gober Group offers a one-time flat fee to complete certain steps in the nonprofit formation process. While the following rate schedule does not contemplate every aspect of forming a nonprofit, it does cover the minimum requirements customarily performed by a law firm to establish the organization and begin operations.

**501(c)(3)** $7,500

**501(c)(4)** $6,000

**501(c)(6)** $7,500

| | Legal Services **Included** in Flat Fee |
|---|---|
| ✓ | Two initial conferences to determine type(s) of organization(s) necessary to accomplish goals |
| ✓ | Articles of Incorporation or a similar organizational document |
| ✓ | IRS Employer Identification Number (EIN) |
| ✓ | Generic bylaws |
| ✓ | Conflicts of Interest Policy, Whistleblower Policy, and Document Retention Policy |
| ✓ | Agenda, resolutions, and supporting documents for organizational board meeting |
| ✓ | Corporate minutes for the organizational board meeting |
| ✓ | IRS Form 1023/1024 - Application for Recognition of Exemption (as applicable) |
| ✓ | IRS Form 8976 - Notice of Intent to Operate Under Section 501(c)(4) (as applicable) |

| | Legal Services and Out-of-Pocket Fees **Not Included** in Flat Fee |
|---|---|
| ✗ | Customized bylaws (although generic bylaws will be provided) |
| ✗ | Insurance policies |
| ✗ | State-specific research, documents, and requests for tax exemption |
| ✗ | State-specific research, documents, and registrations for fundraising activities |
| ✗ | Lobbying research, registrations, and reports |
| ✗ | Responses to follow-up questions from the IRS regarding the Application for Recognition of Exemption |
| ✗ | Ongoing legal compliance |
| ✗ | Out-of-pocket fees and expenses, such as the IRS's filing fee for the Application of Recognition of Exemption ($600); state incorporation and registration fees; registered agent services; insurance premiums; and lobbying registration fees |

Please note the flat fee does not include a retainer fee and/or security deposit that may be required of new clients. Our pricing also assumes that the legal services included in the flat fee will be completed within 90 days of the client executing our engagement letter. Unless the delays are caused by our firm, any legal services performed beyond this 90-day window, regardless of whether they are normally included in the flat fee, will be billed at our standard hourly rates.

# Exhibit 6

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308086165059
Filing Date/Time: 08/08/2023 10:00 AM
Effective Date/Time: 08/08/2023 10:00 AM

# FAIR PLAY FOR MOBILE GAMES
# ARTICLES OF INCORPORATION

The undersigned, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:** The name of the Corporation is "Fair Play for Mobile Games" (the "Corporation").

**SECOND:** This Corporation is organized and operated exclusively for social welfare purposes within the meaning of section 501(c)(4) of the Internal Revenue Code of 1986. The purpose of the Corporation is to educate the general public about mobile gaming companies that promise fair competition but instead use gaming bots to scam players. The Corporation will advocate for fair play and to help consumers who have been the victims of mobile gaming fraud.

No part of the net income of the Corporation shall inure to the benefit of, or be distributed to, any director, officer, or other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this Corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:** The Corporation shall have no members.

**FOURTH:** The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy occurs on the Board of Directors, the vacancy

may be filled by vote of a majority of the Directors in attendance at a meeting of the Board called for such purpose.

The Corporation's initial director is:

Josh Levin
1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**FIFTH:** The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation located in the County of Chesterfield, that is authorized to transact business in Virginia.

**SIXTH:** The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA 23314

**SEVENTH:** The Corporation's initial principal office address is:

1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**EIGHTH:** The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the organization, including the distribution of the remaining funds of the organization consistent with the purposes stated herein.

Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes or for social welfare purposes as described in section 501(c)(4) or dispose of excess funds in accordance with

Case 2:26-cv-11217-MEW Doc 123 Filed 09/16/26 Page 170 of 655

Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any corresponding provision of any future United States Internal Revenue law, and any other applicable state or federal law.

**IN WITNESS WHEREOF** the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are his and to the best of his knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

[redacted]

Michael Garcar, Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, AUGUST 8, 2023

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective August 8, 2023.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 7

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308236220521
Filing Date/Time: 08/23/2023 10:11 AM
Effective Date/Time: 08/23/2023 10:11 AM

## Fictitious Name - Fictitious Name Certificate

### Entity Information

Entity Name: Fair Play for Mobile Games

Entity Type: Nonstock Corporation

### Fictitious Name

Fictitious Name: 4 Fair Play

### Signature Information

Date Signed: 08/23/2023

| Printed Name | Signature | Title |
|---|---|---|
| Rocky Matthews | Rocky Matthews | Chair |

# Exhibit 8

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

# CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("**Agreement**") is entered into by and between Fair Play for Mobile Games, a 501(c)(4) nonprofit and non-stock corporation ("**Organization**") and Square Strategies, LLC ("**Consultant**").

## SECTION 1: SERVICES AND RELATIONSHIP

1.1. **Services.** Consultant will perform the following services ("**Services**") for Organization: Consultant's employee ("Josh Levin") will serve as executive director of the Organization. Additionally, Consultant will perform all the duties and obligations as may be provided and determined in the Articles of Incorporation and Bylaws of the Organization, as the same may be amended from time to time by the Board of Directors.

1.2. **Legal Compliance.** Consultant represents to Organization that Consultant is knowledgeable of Organization's legal and compliance obligations, and Consultant agrees to comply with applicable laws, rules, and regulations in performing Services. Consultant further agrees to consult with Organization's legal counsel in the event Consultant has questions regarding the application of any federal, state, and/or local laws, rules, or regulations to Services.

1.3. **Relationship of the Parties.** Consultant is an independent contractor for Organization, not an employee. Unless stated in this Agreement or explicitly authorized by Organization in the future, Consultant does not have the authority to act for or on behalf of Organization, or to bind Organization to any legally binding agreement, written or oral, or to take any other legal act in the name of Organization without the prior approval of the Board of Directors or its designee.

## SECTION 2: TERM

2.1. **Commencement.** The terms of this Agreement will become effective upon its execution by both parties ("**Commencement Date**").

2.2. **Termination.** Either party may terminate this Agreement, at any time, by providing 30 days' written notice to the other party, and all accrued compensation and/or properly approved expenses incurred by Consultant up to and through this notice period will be paid and/or reimbursed by Organization. Organization may terminate this Agreement immediately for "**Cause**" (defined below), at any time, by providing written notice to Consultant, and Consultant will only be entitled to accrued compensation and/or properly approved expenses incurred by Consultant as of such notice. "Cause" means:

2.2.1. Consultant's material breach of Consultant's obligations under this Agreement, not cured after 10 days' notice issued by Organization;

2.2.2. Consultant's gross negligence in the performance of Services or intentional nonperformance of Services; or

2.2.3. Consultant's conviction of, pleading guilty or nolo contendere to, or commission of an act involving Consultant's lack of honesty, misappropriation, fraud, or moral turpitude.

## SECTION 3: COMPENSATION AND EXPENSES


JL 0042

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

**3.1. Compensation.** For the performance of Services in accordance with the terms of this Agreement, Organization agrees to pay Consultant $5,000, per month.

**3.2. Reimbursement of Expenses.** The Organization will reimburse Consultant for the business expenses that are reasonable, necessary, and incurred by the Consultant while performing Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as the Organization may reasonably require. Any expenditure exceeding $500 must be pre-approved in writing by the Organization's Board of Directors or its designee(s) prior to incurring such expense, and the Organization reserves the right to reject any such proposed expenditure.

**SECTION 4: OWNERSHIP AND CONFIDENTIALITY**

**4.1. Exclusive Ownership.** The Organization retains and reserves the right of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Consultant's Services. Consultant and Organization agree that the work described in Section 1.1. will be considered a "work for hire" for the purpose of the U.S. copyright law, 17 U.S.C. § 101 *et seq.*, and that Consultant hereby irrevocably assigns and transfers to Organization all rights, title, and interest in and to Consultant's work and Services to Organization and agrees to execute all documents reasonably requested by Organization for the purpose of applying for and obtaining any patent and copyright registrations.

**4.2. Confidential Information.** Consultant agrees to use "**Confidential Information**" (defined below) only in the performance of the Services, to hold such information in confidence and trust, and not to engage in any unauthorized use or disclosure of such information during the engagement and for so long thereafter as such information qualifies as Confidential Information; provided, however, that if under applicable law a post-employment time limitation on the foregoing restriction is necessary for enforcement as to Confidential Information that does not qualify as a trade secret, then such restriction will be limited to a period of five years following the termination of the engagement for the information that does not qualify as a trade secret. Trade secret information will remain protected for as long as it qualifies as a trade secret, and nothing in this Agreement shall be construed to reduce or eliminate Organization's rights and remedies related to information that would qualify for trade secret protection absent this Agreement. In this Agreement, "**Confidential Information**" means an item or compilation of information in any format, whether written or oral, whether marked "confidential" or not, as described in paragraph 4.2.1. below, disclosed to or learned by Consultant as a result of Consultant's engagement with Organization:

**4.2.1.** Confidential Information includes all non-public information of a private, proprietary, or confidential nature that Organization insists remain private or confidential, including, but not limited to, the business affairs of Organization and other information that is not generally available to the public.

**4.2.2.** Confidential Information does not include any information which Consultant can establish: (i) is or becomes publicly known and made generally available in the public domain through no action or inaction of Consultant; (ii) is already rightfully in the possession of Consultant at the time of disclosure, as shown by Consultant's files and records immediately prior to the time of disclosure; (iii) is obtained by Consultant from a third party without a breach of such third party's obligations of confidentiality; (iv) is independently developed by Consultant without

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

use of or reference to Confidential Information, as shown by documents and other competent evidence in Consultant's possession; (v) is excluded by other provisions of this Agreement; or (vi) is required or legally authorized to be disclosed by law or regulation, provided that Consultant abides by the terms set forth in section 4.3.

4.3. **Disclosures Required by Law or Regulation.** If Consultant is served with a subpoena, court order, or similar legal document requiring the disclosure of Confidential Information, Consultant will provide Organization as much notice as is possible (presumably five business days or more) before disclosure so that Organization may take legally permitted steps to protect the Confidential Information, unless such notice is prohibited by law.

4.4. **Return or Destruction of Confidential Information.** Upon termination of Consultant's engagement with Organization, unless otherwise instructed by Organization in writing (such as through a litigation hold notice), Consultant must destroy all documents and other materials constituting Confidential Information in Consultant's possession upon termination of Consultant's engagement with Organization. If requested by Organization, Consultant will promptly (i) deliver to Organization all documents and other materials comprising Confidential Information in the possession or under its control, together with all copies and summaries thereof; and/or (ii) certify to Organization in writing that all such information and materials have been delivered or destroyed and not retained in accordance with the terms of this Agreement. Upon request, Consultant will provide Organization reasonable means to access and verify that no Confidential Information has been retained by Consultant on personal computers, cell phones, email or cloud storage accounts, or in any other place that is subject to Consultant's ownership or control.

## SECTION 5: INDEMNIFICATION

5.1. **Mutual Indemnification.** Organization and Consultant, each an "**Indemnifying Party,**" agree to indemnify, defend, and hold harmless the other party, including such party's shareholders, officers, directors, members, partners, employees, and other agents (collectively, "**Indemnified Party**") from and against all claims, liabilities, causes of action, damages, judgments, attorneys' fees, court costs, fines and expenses of whatever kind, including reasonable attorneys' fees incurred by Indemnified Party (collectively, "**Losses**") which arise out of or are related to: (i) breach or non-fulfillment of any provision of this Agreement by Indemnifying Party; (ii) Indemnifying Party's failure to perform job functions or duties as required, or result from conduct while engaging in any activity outside the scope of this Agreement; (iii) any negligent or more culpable act or omission of Indemnifying Party, including any reckless or willful misconduct, in connection with the performance of its obligations under this Agreement; (iv) any bodily injury, death of any person, or damage to real or tangible personal property caused by the negligent or more culpable acts or omissions of Indemnifying Party, including any reckless or willful misconduct; or (v) any failure by Indemnifying Party to comply with any applicable federal, state, or local laws, regulations, or codes in the performance of its obligations under this Agreement.

5.2. **Notice of Third-Party Claims.** Indemnified Party will give notice to Indemnifying Party ("**Claim Notice**") within 10 days after obtaining knowledge of any Losses or discovery of facts on which Indemnified Party intends to base a request for indemnification under Section 5.1. Indemnified Party's failure to provide a Claim Notice to Indemnifying Party under this Section 5.2. does not relieve Indemnifying Party of any liability that Indemnifying Party may have to Indemnified Party, but in no

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

event will Indemnifying Party be liable for any Losses that result directly from a delay in providing a Claim Notice, which delay prejudices the defense of the related third-party claim. Indemnifying Party's duty to defend applies immediately, regardless of whether Indemnified Party has paid any sums or incurred any detriment arising out of or relating, directly or indirectly, to any third-party claim.

**5.3.** **Indemnified Party's Control of Defense.** Notwithstanding anything to the contrary in this Section 5, Indemnified Party may select its own legal counsel to represent its interests, and Indemnifying Party will: (i) reimburse Indemnified Party for its costs and attorneys' fees immediately upon request as they are incurred; and (ii) remain responsible to Indemnified Party for any Losses indemnified under Section 5.1.

**5.4.** **Settlement of Indemnified Claims by Indemnifying Party.** Indemnifying Party will give prompt written notice to Indemnified Party of any proposed settlement of a claim that is indemnifiable under Section 5.1. Indemnifying Party may not, without Indemnified Party's prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is being sought hereunder.

## SECTION 6: MISCELLANEOUS

**6.1.** **Complete Agreement**. This Agreement represents the complete and entire agreement between Organization and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof. Notwithstanding the foregoing, any agreement between Organization and Consultant specifically pertaining to confidentiality and nondisclosure is intended to supplement and will not replace, modify, or eliminate this Agreement.

**6.2.** **No Assignment.** This Agreement will not be assigned by either party without the prior written approval of the other party.

**6.3.** **Modification and Waiver.** No terms of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and is signed by both parties. The failure or omission of a party to require the other party's strict compliance with any terms of this Agreement, or to exercise any of its rights or remedies, will not constitute a waiver or relinquishment of any duties or rights under this Agreement, or otherwise affect the interpretation of this Agreement.

**6.4.** **Notices.** All notices required by this Agreement must be in writing and delivered to the other party by: (i) hand delivery; (ii) certified mail with return receipt; (iii) overnight delivery with delivery confirmation; and/or (iv) e-mail at the following address:

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

**If to Organization:**
Fair Play for Mobile Games
Attn: Rocky Matthews
Attn: Jenny Kim
1501 Wilson Blvd, Ste1050
Arlington, VA 22209
Rockybmatthews@gmail.com
fairplayformobilegames@gobergroup.com

**If to Consultant:**
Square Strategies, LLC
Attn: Josh Levin
PO Box 47028
Chicago, IL 60647

Josh@square-strategies.com

Notice will be deemed to be given: (i) on the date of actual delivery for hand delivery and overnight delivery; (ii) on the fifth calendar day after the postmark date for certified mail; and (iii) on the date of transmission for e-mail. Notice will not be deemed to be given if an attempted notice is returned to sender as undeliverable.

6.5. **Survival and Remedies.** Sections 4 and 5 of this Agreement will survive the expiration or termination, for any reason, of this Agreement. Consultant agrees not to challenge the enforceability or scope of Sections 4 and/or 5 of this Agreement. The parties recognize and affirm that in the event of a breach or threatened breach of Sections 4 and/or 5 of this Agreement, money damages would be inadequate and Organization would not have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of Sections 4 and/or 5 of this Agreement, Organization may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof without posting a bond or other security.

6.6. **Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party will be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

6.7. **Choice of Law and Venue.** Organization and Consultant agree that the terms of this Agreement will be deemed to be made under, governed by, and construed in accordance with, the laws of Virginia without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions may only be instituted in Arlington County.

6.8. **Dispute Resolution. Any dispute arising out of, or relating to, this Agreement will be finally settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect to be held in Dallas County, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the amount in controversy exceeds $500,000, arbitration will be conducted under the Procedures for Large, Complex Commercial Disputes.**

6.9. **Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions will continue in full force and effect, and the invalid, void, or unenforceable provisions will be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement are held to be excessively broad as to duration, activity, or subject, then it will be reformed by limiting and reducing it to the minimum extent necessary so as to be enforceable to the extent compatible with

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

applicable law.

**6.10.** **Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties. This Agreement may be executed via electronic means, and the signatures of the parties via electronic means will be deemed to be their original signatures for all purposes.

[REST OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

By signing below, each party acknowledges that it has carefully read and fully understands this Agreement, and it agrees to be bound by the terms of this Agreement.

**Fair Play for Mobile Games**

Dated: 8/18/2023

Signature: DocuSigned by: Rocky Matthews 9A0D8D0D43784A2...

Print Name: Rocky Matthews

Title: Board Member

**For Square Strategies:**

Dated: 8/18/2023

Signature: DocuSigned by: Joshua Levin 54B5F88A2F664FE...

Print Name: Josh Levin

# Exhibit 9

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

To: Fair Play for Mobile Games Board of Directors

From: Josh Levin

**Re: Conflict of Interest**

Date: August 14, 2023

Dear Directors,

As you are aware, Fair Play for Mobile Games (the "Corporation") has a Conflict of Interest policy contained within the Corporation's Bylaws. This provision requires that any director who believes they have an actual or possible conflict of interest with the Corporation disclose the existence and nature of the interest.

The purpose of this letter is to inform you of a potential conflict of interest that exists between myself as a director of the Corporation and Square Strategies, LLC ("Square Strategies"), a company that I have an ownership interest in which is also interested in entering into a consulting agreement with the Corporation.

I am the sole owner of Square Strategies. Square Strategies is uniquely positioned to provide the type of consulting services the Corporation is in search of given my company's experience and subject matter expertise pertaining to the mobile gaming industry.

Given the conflict of interest, I will recuse myself from any discussions or deliberations pertaining to the proposed agreement. If you need additional material facts about this proposed agreement or the conflict of interest, please put such a request in writing, and I will do my best to answer questions promptly.

Very truly yours,

DocuSigned by:
Joshua Levin
54B5F88A2F084FE...
Josh Levin 8/18/2023

# Exhibit 10

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

# FAIR PLAY FOR MOBILE GAMES
# UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

Pursuant to the Virginia Nonprofit Corporation Act, the undersigned, being the duly authorized disinterested directors of the Board of Directors (the "Board") of Fair Play for Mobile Games, a Virginia non-stock corporation (the "Corporation"), hereby consent to the adoption of the following resolutions by unanimous written consent in lieu of a meeting of the Board.

## Resolution 1

WHEREAS, the Corporation wishes to enter into an agreement with a consultant to oversee the operations of the Corporation under the director of the Board (the "Consulting Services");

WHEREAS, the Board wishes to enter into an agreement Square Strategies, LLC ("Square Strategies") to provide the Consulting Services to the Corporation and believes that such a decision is in the best interest of the Corporation given Square Strategies experience and subject matter expertise in the mobile gaming industry;

WHEREAS, Director Levin is the sole owner of Square Strategies;

WHEREAS, pursuant to Article VII of the Corporation's Bylaws, the Board is prohibited from entering into an agreement with an Interested Person unless the appropriate procedures for addressing the conflict of interest are taken;

WHEREAS, in examining the material facts, the Board determines that a conflict of interest does exist;

WHEREAS, after conducting due diligence, the Board has determined that a more advantageous agreement that would not give rise to a conflict of interest is not reasonably attainable; and

WHEREAS, the Board believes that entering into a consulting agreement with Square Strategies is in the best interest of the Corporation.

BE IT RESOLVED, that Director Levin has disclosed the existence and nature of the conflict of interest and that the Board acknowledges that Director Levin is considered an Interested Person for purposes of the proposed Square Strategies agreement.

Case 2:26-01217-MEW Document 123 Filed 09/16/26 Page 186 of 655



FURTHER RESOLVED, that Director Levin has recused himself from the deliberation and voting on this resolution.

FURTHER RESOLVED, that the Board has conducted due diligence and made the determination that a more advantageous agreement with an entity not giving rise to a conflict of interest is not reasonably attainable.

FURTHER RESOLVED, the majority of disinterested Directors approves the agreement with Square Strategies for the purposes of providing Consulting Services, attached hereto and incorporated by reference herein as if restated in its entirety.

BE IT RESOLVED, that Director Matthews is authorized and directed to take any and all actions to enter into the consulting agreement with Square Strategies and to effectuate the purpose of this resolution.

IN WITNESS WHEREOF, the undersigned have executed this Consent:

| | |
|---|---|
| DocuSigned by: Rocky Matthews 9A0D8D0D43784A2... | 8/18/2023 |
| Rocky Matthews | Date |

# Exhibit 11

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**

Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2730
Terms: Net 10
Invoice date: 08/17/2023
Due date: 08/27/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | | **Professional Services** | Two months retainer | $10,000.00 |
| 2. | 08/11/2023 | **Billable Expenses** | New/Mode contact tools | $3,784.00 |
| 3. | 08/09/2023 | **Billable Expenses** | Domain registration | $29.34 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$13,813.34** |
| Payment | -$13,813.34 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2731
Terms: Net 10
Invoice date: 09/07/2023
Due date: 09/17/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/06/2023 | **Billable Expenses** | Fastmail email service | $50.00 |
| 2. | 08/25/2023 | **Billable Expenses** | Hotjar analytics tools | $39.00 |
| 3. | 08/19/2023 | **Billable Expenses** | WP Engine hosting service | $261.60 |
| 4. | 09/06/2023 | **Billable Expenses** | WP Engine hosting service | $406.16 |
| 5. | 08/30/2023 | **Billable Expenses** | Google ads | $10.00 |
| 6. | 08/30/2023 | **Billable Expenses** | Google ads | $200.00 |
| 7. | 08/30/2023 | **Billable Expenses** | Google ads | $350.00 |
| 8. | 09/01/2023 | **Billable Expenses** | Google ads | $439.81 |
| 9. | 09/01/2023 | **Billable Expenses** | Google ads | $500.00 |
| 10. | 09/02/2023 | **Billable Expenses** | Google ads | $500.00 |
| 11. | 09/03/2023 | **Billable Expenses** | Google ads | $500.00 |
| 12. | 09/04/2023 | **Billable Expenses** | Google ads | $500.00 |
| 13. | 09/05/2023 | **Billable Expenses** | Google ads | $500.00 |

| | | | | |
|---|---|---|---|---|
| 14. | 09/06/2023 | **Billable Expenses** | Google ads | $500.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$4,756.57** |
| Payment | -$4,756.57 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2732
Terms: Due on receipt
Invoice date: 09/14/2023
Due date: 09/14/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/13/2023 | **Billable Expenses** | Google ads, Sept 7-13 | $3,500.00 |

| | |
|---|---|
| **Total** | **$3,500.00** |
| Payment | -$3,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK | PayPal | venmo

### Note to customer

Please let me know if you'd like receipts for each individual Google charge. They bill in $500 increments, so there are seven documents.

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2733
Terms: Due on receipt
Invoice date: 09/19/2023
Due date: 09/19/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/19/2023 | **Billable Expenses** | Google ads, Sept 14-18 | $8,500.00 |

| | |
|---|---|
| **Total** | **$8,500.00** |
| Payment | -$8,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2734
Terms: Net 10
Invoice date: 09/21/2023
Due date: 10/01/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/21/2023 | **Billable Expenses** | Google ads, Sept 19-21 | $5,500.00 |
| 2. | 09/21/2023 | **Professional Services** | Processing costs @ 2% | $110.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,610.00** |
| Payment | -$5,610.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2735
Terms: Due on receipt
Invoice date: 09/26/2023
Due date: 09/26/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/26/2023 | **Billable Expenses** | Google ads, Sept 21-26 | $10,000.00 |
| 2. | 09/26/2023 | **Professional Services** | Processing costs @ 2% | $200.00 |
| 3. | 09/25/2023 | **Billable Expenses** | Hotjar site analytics | $39.00 |

| | |
|---|---|
| **Total** | **$10,239.00** |
| Payment | -$10,239.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2736
Terms: Net 10
Invoice date: 10/03/2023
Due date: 10/13/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/02/2023 | **Billable Expenses** | Google ads thru 10/2 | $3,075.56 |
| 2. | 10/02/2023 | **Professional Services** | Processing at 2% | $61.51 |
| 3. | 09/30/2023 | **Billable Expenses** | Hover - domain name expense | $18.17 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$3,155.24** |
| Payment | -$3,155.24 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2737
Terms: Net 10
Invoice date: 10/09/2023
Due date: 10/19/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/08/2023 | **Billable Expenses** | Google ads, 10/3 to 10/8 | $3,000.00 |
| 2. | 10/08/2023 | **Professional Services** | Processing at 2% | $60.00 |
| 3. | 10/06/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$3,714.00** |
| Payment | -$3,714.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

Case 1:24-cv-01646-DLF Document 45-11 Filed 08/05/24 Page 11 of 15

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2738
Terms: Net 10
Invoice date: 10/25/2023
Due date: 11/04/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/01/2023 | **Professional Services** | October management fee | $5,000.00 |
| 2. | 10/25/2023 | **Billable Expenses** | Google ads 10/9-10/23 | $1,500.00 |
| 3. | 10/25/2023 | **Professional Services** | Processing fee @ 2% | $30.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$6,530.00** |
| Payment | -$6,530.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2739
Terms: Net 10
Invoice date: 11/08/2023
Due date: 11/18/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 11/01/2023 | **Professional Services** | November management fee | $5,000.00 |
| 2. | 11/07/2023 | **Billable Expenses** | WP Engine hosting | $654.00 |
| 3. | 11/01/2023 | **Billable Expenses** | Google ads, Oct 24 to Nov 1st | $213.02 |

### Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,867.02** |
| Payment | -$5,867.02 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2740
Terms: Net 10
Invoice date: 12/01/2023
Due date: 12/11/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 12/01/2023 | **Professional Services** | Management fee, December | $5,000.00 |

| | |
|---|---|
| **Total** | **$5,000.00** |
| Payment | -$5,000.00 |
| **Balance due** | **$0.00** |

## Ways to pay

BANK

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2741
Terms: Net 10
Invoice date: 12/22/2023
Due date: 01/01/2024

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 12/22/2023 | **Professional Services** | Management fee, January | $5,000.00 |
| 2. | 12/07/2023 | **Billable Expenses** | Zoom premium service | $14.81 |
| 3. | 12/07/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,668.81** |
| Payment | -$5,668.81 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2742
Terms: Net 10
Invoice date: 02/28/2024
Due date: 03/09/2024

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 02/01/2024 | **Professional Services** | Feb monthly management fee, reduced | $1,000.00 |
| 2. | 03/01/2024 | **Professional Services** | March monthly management fee, reduced | $1,000.00 |
| 3. | 02/06/2024 | **Billable Expenses** | WP Engine hosting | $32.70 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$2,032.70** |
| Payment | -$2,032.70 |
| **Balance due** | **$0.00** |

**Paid in Full**

# Exhibit 12

**Don't Get Scammed By Bots This Holiday Season**

It's the holidays and everyone's in the yearly mad scramble, spending money on gifts and decorations to make the season festive. Many might have a side hustle to afford the extras right now, including turning to their smartphones and mobile games that promise to pay.

**Commented [1]:** Attempting to make it timely so they will be more likely to accept it

The advertising is enticing – who wouldn't want to play games and earn real money? But player beware. Not every real money mobile game is legit. Sadly, over the last few months, we've heard from thousands of Americans who've been defrauded out of their hard-earned money from gaming companies they thought they could trust.

Real money games are mobile skill-based games, like Solitaire or Bingo, where people play against real players in tournaments on their phone. They pay the entry fee and are matched with a player at their skill level. The winning player gets the cash.

Or at least that's the way it's supposed to work. But in many cases, players are getting scammed into believing they're playing real people and that they'll get paid real money when they win.

The real money mobile gaming industry has exploded over the last few years; it's a $10 billion market that is outpacing growth of the greater gaming sector. This rapid growth means more and more Americans could fall victim to unfair practices. While there are gaming companies that are good players in the market, newer companies have popped up over the years that – unfortunately for the consumer – don't abide by the rules of fair play.

We're learning more everyday of how some companies use false advertising and bots to unfairly cheat unsuspecting players out of their money. On November 20, NY Post reported that AviaGames — makers of Bingo Tour and Solitaire Clash — "has been slapped with a class-action lawsuit that claims users were duped into playing against bots instead of similarly skilled human players." Likewise, VentureBeat recently reported that players are suing AviaGames for "racketeering for disguising bots as humans in skill-based games."

As an organization dedicated to bringing attention to the issue of unfair game play, we launched a webpage earlier this year where players could submit complaints to their state Attorney General offices if they felt they'd been scammed by a real money mobile game.

In just a few months, we collected over 12,700 complaints from every state in the country – 600 of those complaints came from residents here in Nevada. The stories were devastating. People who were barely making ends described how their money had been stolen by games secretly matching them against bots. This practice, paired with advertising that falsely claims to match players with real people, amounts to fraud - plain and simple.

**Commented [2]:** This can be updated to wherever we want to submit first (NY, NJ, etc). Chose Nevada since the audience might be more familiar with gaming and we're already shopping the first op-ed in California.

Even worse, the games we received the most complaints about are some of the most popular on the App Store – Bingo Cash and Solitaire Cash (owned and operated by Papaya Games) and Bingo Clash (owned and operated by AviaGames).

Consumers should protect themselves – and their wallets – by doing their due diligence on the games they play now or plan to play in the future. Visit gaming company websites to get a sense of their commitment to fair play. And be alert when you're playing – if something seems suspicious, sounds too good to be true or customer service is non-existent, it's best to pass that game by.

Thankfully for those who enjoy playing real money games, there are good companies in this space. A recent article in the Daily Mail took companies who use gaming bots to task but also noted some bright spots in the industry, including Big Run Studios and Skillz, the maker of Blackout Bingo and Solitaire Cube, which is credited as a "legitimate company which does not use bots." These are gaming companies that have been operating for years and by all accounts offer games that play by the rules, have a track record of positive reviews online and display their consumer practices transparently and prominently on their websites.

And last, if you believe you've been scammed by a real money mobile game, protect yourself and others by reporting your experience to your state's consumer protection agency. Our website, 4fairplay.org, has an easy form that will send your complaint directly to your state Attorney General's office. Or visit usa.gov/state-attorney-general to find your AGs web page and file a complaint directly through their portal.

The more people who shine a light on this issue and call for lawmakers to investigate, the faster we can restore fairness and protect players from fraudulent and deceptive practices.

- *Josh Levin is the director of 4 Fair Play, an organization dedicated to promoting fair and transparent policies and practices for mobile gaming users across the country.*

# Exhibit 13

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2403086946851
Filing Date/Time: 03/08/2024 08:48 AM
Effective Date/Time: 03/08/2024 08:48 AM

## Nonstock Corporation - Articles of Dissolution

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Fair Play for Mobile Games | Entity Type: | Nonstock Corporation |
| Entity ID: | 11578266 | Formation Date: | 08/08/2023 |
| Status: | Active | | |

### Jurisdiction of Formation

Jurisdiction (Country): United States

Jurisdiction (State): Virginia

Date of Formation:

### Adoption and Vote

**Date of Adoption**

Date Articles were adopted: 03/01/2024

By the directors.

Statement as to why member action was not required.

Organization has no members

### Signature Information

Date Signed: 03/07/2024

| Printed Name | Signature | Title |
|---|---|---|
| Josh Levin | Josh Levin | Chairman and President |

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, MARCH 8, 2024

The State Corporation Commission has found the articles of dissolution submitted on behalf of

Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF DISSOLUTION

be issued and admitted to record with the articles of dissolution in the Office of the Clerk of the Commission, effective March 8, 2024.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 14


4Fairplay
Edit file
Share
23%
Page 3
Pages
Page 1
Logo
Page 3
image 1
4Fair-logo
File a submission
Homepage
12,594 And Counting!
FILE A COMPLAINT
Complaints By State
Scam mobile games are affecting players from across the country.
Complaints By Game
Real People, Real Action
INITIALS
STATE
ATTORNEY GENERAL
GAME
What Players Are Telling Us
About Us
Fight Fraud!
File A Complaint Today.
Act NOW!
Filing A Complaint Is Simple.
SUBMIT
How it works
Frequently asked questions
How do I know if I've been scammed?
Which company is behind these fraudulent games?
Are all mobile real-money games a scam?
What happens next?
About Us
1440 × 4006
Comment
Properties
Export
Search
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago
Hear from other players who have been scammed out of their money playing against bots
#68 · Page 1
Orit Peleg 1 year ago
Add: We want you to get back your hard earned money.
#67 · Page 1
Orit Peleg 1 year ago
this is going to change.
just add [LAW FIRM LOGO]


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago
Hear from other players who have been scammed out of their money playing against bots
#68 · Page 1
Orit Peleg 1 year ago
Add: We want you to get back your hard earned money.
#67 · Page 1
Orit Peleg 1 year ago
this is going to change.
just add [LAW FIRM LOGO]

AS - 0004


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#77 · Page 1
Orit Peleg 1 year ago
File a complaint in a few short and simple steps
#76 · Page 1
Orit Peleg 1 year ago
this section should be light grey Soumya
#74 · Page 1
Orit Peleg 1 year ago
should be in navy
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
Comment
Properties
Export
Search
#94 · Logo
Orit Peleg 1 year ago
Soumya this needs to be more unique like perhaps the circle in the center is bigger and it has a play symbol?
#93 · Logo
Orit Peleg 1 year ago
Soumya can we try a different color for the play part?
#92 · Logo
Orit Peleg 1 year ago
Soumya can the 4 and f be better connected so the line is the same height?
#91 · Logo
Orit Peleg 1 year ago
can the 4 be integrated to the F?
#90 · Logo
Orit Peleg 1 year ago
can play be in a different color?
#79 · Page 1
Orit Peleg 1 year ago
Complaints are used to help open an investigation against the company so they can be brought to justice and pa...
#78 · Page 1
Orit Peleg 1 year ago
Your complaint is emailed directly to the local attorney general in your state
V3
V4_FINAL

AS - 0006


4Fairplay
Edit file
Share
4%
Find
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#111 · Page 3
Jen Marek 9 months ago
Soumya missing line b montana and wyoming :)
1 reply
#109 · Page 3
Orit Peleg 9 months ago
Jen Marek do we have the copy
1 reply
#108 · Page 3
Orit Peleg 9 months ago
Soumya need to add a grid to expalin color
2 replies
#106 · Page 3
Orit Peleg 9 months ago
can we have first name initial and last name?
1 reply
#105 · Page 3
Jen Marek 9 months ago
Soumya needs a legend like the other example.
#104 · Page 3
Jen Marek 9 months ago
Soumya adam can make this suing the template we already have. Can you give guidance on colors?
1 reply
#94 · Logo
Orit Peleg 1 year ago
Soumya this needs to be more unique like perhaps the circle in the center is


4Fairplay
Edit file
Share
36%
Logo
Pages
Page 1
Logo
Page 3
Frame 147
Frame 146
Frame 1
4FAIRPLAY
4FAIR PLAY
4 FAIR PLAY
4 FAIR PLAY
4 FAIRPLAY
4FAIRPLAY
4FAIR PLAY
4FAIRPLAY
4FAIRPLAY
4 FAIR PLAY
4FAIRPLAY
4FAIRPLAY
4FAIRPLAY
4 FAIRPLAY
4FAIR PLAY
Comment
Properties
Export
Search
Orit Peleg
minimize gap here
Orit Peleg
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
Orit Peleg
Soumya leave this as 'law firm logo' we don't know who it will be
Orit Peleg
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc, as ...
Orit Peleg
Hear from other players who have been scammed out of their money playing against bots
Orit Peleg
Add: We want you to get back your hard earned money.
Orit Peleg
this is going to change
just add [LAW FIRM LOGO]

# Exhibit 15

Secretary of State Shirley N. Weber, Ph.D.

SECRETARY OF STATE | ELECTIONS | CAMPAIGN & LOBBYING | BUSINESS PROGRAMS | STATE ARCHIVES | REGISTRIES

Cal-Access Search
GO
Advanced Search

Cal-Access

- Cal-Access Home
- Campaign Finance
- Lobbying Activity
  - Individual Lobbyists
  - Lobbying Firms
  - Lobbyist Employers
  - $5,000 - Plus Payments To Influence
  - Daily Filings/ Directory Changes
- Resources
- For Filers Only
- Political Reform
- User's Manual

Lobbying Activity

# FAIR PLAY FOR MOBILE GAMES

**View:**

- General Information
- Financial Activity/Filing History

**Legislative Session**

- 2023 through 2024

**Quarterly reports are required for any quarter in which the person spends $5,000 or more to influence legislative or administrative action. Links to legislative bills or state agencies lobbied are also available.**

**2023-2024 LEGISLATIVE SESSION**

| LOBBYING PAYMENTS MADE | | | |
|---|---|---|---|
| SESSION | QUARTER | TOTAL OF PAYMENTS TO INFLUENCE | P.U.C. LOBBYING |
| 2023-2024 | 3rd | $41,287.01 | $0.00 |

| BILLS AND AGENCIES LOBBIED | | |
|---|---|---|
| SESSION | QUARTER | BILLS/AGENCIES LOBBIED (AS FILED) |
| 2023-2024 | 3rd | Attorney General action relating to mobile gaming |

To Search For The Full Text Of Bills, Resolutions, And Constitutional Amendments Click Here.

| ELECTRONIC FILINGS | |
|---|---|
| REPORT OF PERSON SPENDING $5,000 OR MORE TO INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION (F645) | |
| FILING PERIOD: 07/01/2023 - 09/30/2023 | FILED ON: 10/31/2023 6:34:26 PM |
| FILING NUMBER: 2855086 | ORIGINAL FILING |

# Exhibit 16

**CALENDAR YEAR 2023**

**REPRESENTED ENTITIES, GOVERNMENTAL AFFAIRS AGENTS AND PERSONS COMMUNICATING WITH THE GENERAL PUBLIC**
**LISTED BY EXPENDITURES RANKING**

| FORM | DATE | FILER | EXPENDITURES RANKING |
|---|---|---|---|
| L-2 | 2/1/2024 | BPS DEVELOPMENT COMPANY LLC | 13,500.00 |
| L-2 | 2/8/2024 | CITY OF TRENTON | 12,947.00 |
| L1-L | 2/12/2024 | ALLIANCE FOR PROFESSIONALISM IN DOG TRAINING | 12,775.79 |
| L1-A | 2/12/2024 | PILLSBURY WINTHROP SHAW PITTMAN LLP- AMENDED | 12,775.79 |
| L-2 | 2/12/2024 | SEPHORA USA INC | 12,630.50 |
| L-2 | 2/12/2024 | ASSOCIATION OF PERIOPERATIVE REGISTERED NURSES | 12,366.00 |
| L1-G | 2/15/2024 | FAIR PLAY FOR MOBILE GAMES | 12,075.77 |
| L-2 | 2/9/2024 | CATHOLIC CHARITIES, DIOCESE OF TRENTON | 12,000.00 |
| L-2 | 2/9/2024 | CORE5 INDUSTRIAL PARTNERS LLC O/B/O CP LAND NORTH URBAN RENEWAL LLC | 12,000.00 |
| L1-A | 2/14/2024 | DAVID MAYER | 12,000.00 |
| L-2 | 2/13/2024 | EARLY CHILDHOOD EDUCATION ADVOCATES (ECEA) | 12,000.00 |
| L-2 | 2/15/2024 | EMD PERFORMANCE MATERIALS | 12,000.00 |
| L-2 | 2/5/2024 | FEDWAY ASSOCIATES INC | 12,000.00 |
| L-2 | 1/23/2024 | NATIONAL ASSOCIATION OF THEATER OWNERS OF NEW JERSEY INC | 12,000.00 |
| L-2 | 2/15/2024 | NJ DENTAL HYGIENISTS ASSOCIATION | 12,000.00 |
| L-2 | 1/22/2024 | NJ OCCUPATIONAL THERAPY ASSOCIATION | 12,000.00 |
| L-2 | 2/16/2024 | OCEAN GROVE CAMP MEETING ASSOCIATION- AMENDED | 12,000.00 |
| L-2 | 2/14/2024 | SECURED FINANCE NETWORK | 12,000.00 |
| L-2 | 2/15/2024 | WESTERN UNION | 12,000.00 |
| L-2 | 2/14/2024 | ZOETIS | 12,000.00 |
| L1-A | 1/16/2024 | BREIDINGER & ASSOCIATES LLC | 11,884.43 |
| L-2 | 2/1/2024 | FRIENDS OF HATIKVAH | 11,325.00 |
| L-2 | 2/15/2024 | NW FINANCIAL GROUP LLC- AMENDED | 11,000.00 |
| L1-L | 1/31/2024 | HOUSING & COMMUNITY DEVELOPMENT NETWORK OF NJ | 10,997.11 |
| L-2 | 2/14/2024 | NJ CENTER FOR TEACHING & LEARNING INC (NJCTL) | 10,500.00 |

# EXHIBIT 9

# Papaya Gaming

# Terms of Use

# Effective as of October 30, 2025

IMPORTANT NOTICE: THESE TERMS ARE SUBJECT TO A BINDING ARBITRATION PROVISION AND WAIVER OF CLASS ACTION RIGHTS, AS DETAILED IN SECTION 18 BELOW. YOU AGREE THAT ANY CLAIM OR DISPUTE AT LAW OR EQUITY THAT HAS ARISEN OR MAY ARISE PURSUANT TO THESE TERMS OR THE ACCESS OR USE OF THE SERVICES, AS DEFINED BELOW, WILL BE RESOLVED IN ACCORDANCE WITH SECTION 18 BELOW. PLEASE READ THAT SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS AND OBLIGATIONS.

**Introduction**

These Terms of Use (“**Terms**”) constitute a binding legal agreement between Papaya Gaming Ltd. and its affiliates, which shall mean subsidiaries, parent companies, joint ventures and other corporate entities under common ownership, including but not limited to Papaya Gaming Inc. and Papaya Gaming UK Ltd. (collectively, “**Papaya**”, “**we**,” “**our**,” or “**us**”) and you (“**you**” or “**your**”), and govern your access to and use of all features, content, and other services provided by Papaya, including without limitation our website www.papaya.com (“**Website**”) and gaming applications (“**App(s)**”; collectively with the Website, “**Services**“). All references to “you” or “your,” as applicable, mean the person who accesses, uses, or participates in the Services in any manner, and each of your heirs, assigns, and successors.

If you are located in or reside in the United Kingdom, these Terms constitute a binding legal agreement between Papaya Gaming UK Ltd and you.

By registering an account, participating in any competitions and tournaments and using or otherwise accessing the Services, you affirm that you have read, understood, accept and agree to be bound by these Terms (including the arbitration agreement and class waiver in Section 18), our Privacy Policy and our respective Promotion Rules (the “**Rules**”), each incorporated herein by referenc

you do not agree to these Terms, Rules, or the Privacy Policy, you may not register an account or otherwise use or access the Services.

# 1. Use of our Services

Papaya's Services include an online arena for mobile game challenges, Cash Competitions (as defined below) and cash tournaments, using applications, tools and services that we may provide from time to time. Certain features and competitions may require you to register with Papaya and create an account by providing us with certain information about yourself.

All competitions and tournaments offered on the Services are games of skill. Winners are determined by the objective criteria described in the Rules, including, without limitation, scoring and any other applicable documentation associated with the competitions. The individuals who better use their relevant skill and knowledge and accumulate the highest scores will be the winner(s). Papaya uses skill matching as a means for matching individuals in competitions. See here for more information about skill matching and its effect on gameplay. The Services may not be used for any form of gambling.

By using Papaya's Services, you hereby agree and acknowledge that your participation is not part of your business and that you are not using it for gambling purposes and that it is only and solely a hobby.

# 2. Device Information

Using the Services requires an internet connection to our servers, and we may need to collect certain information from you and your internet-enabled device ("**Device**") in order to make the Services available to you, such as hardware system profile data, internet connection data and any other data related to the operation of the Services from any device that logs onto the Services using your account.

We do not warrant that our Services will work on all Devices. You are solely responsible for obtaining and maintaining compatible Devices necessary to access and use our Services, as updated from time to time.

# 3. Eligibility

Papaya's Services are intended solely for users who are at least eighteen (18) years of age or older, and can form legally binding contracts under applicable law. Any registration, use of or access to the Services by anyone under the age of 18 is unauthorized, unlicensed, and in violation of these Terms. If we have any reason to believe that you are under 18 years of age, we may terminate your account, delete any content or information that you have submitted to the Services, and prohibit you from using or accessing the Services (or any portion, aspect or feature thereof).

By accessing or otherwise using the Services, you represent and warrant that you: (i) are a natural person of at least 18 years of age or older, who is personally assigned to the email address and other information submitted in relation to your account; (ii) have the legal authority to form a binding contract with Papaya; (iii) are physically located in a jurisdiction in which participation in the competition you select is unrestricted by that jurisdiction's laws; and (iv) agree to at all times abide by these Terms and all applicable laws. Papaya reserves the right to request proof of age at any stage to verify that persons under the age of 18 are not using the Services. If you do not meet all of these eligibility requirements, you are not permitted to access or use any of the Services and agree that you will not do so and that Papaya may suspend or close your account with or without notice.

By making a deposit or entering a cash contest, you further represent that you are not subject to backup withholding tax because: (i) you are exempt from backup withholding; (ii) you have not been notified by the Internal Revenue Service (IRS) that you are subject to backup withholding as a result of a failure to report all interest or dividends; or (iii) the IRS has notified you that you are no longer subject to backup withholding.

# 4. Account Registration

Certain parts within the Services may require you to register for an account. When you register for an account, you will be asked to provide certain information, including, without limitation: (i) registering a unique username and password; (ii) contact information, such as your name, phone number, and email address; (iii) payment and billing information; and (iv) any other information we request on the account registration form. You may establish, maintain, use and control only one account on the Services. Each account on the Services may be owned, maintained, used and controlled by only one individual.

You are responsible for keeping your account information secure. Please do not share your account information with anyone. By registering an account, you agree to notify us immediately if you have lost control of your password or if you suspect there is unauthorized activity in your account. You remain fully liable for any actions taken in respect to your account, regardless of whether these actions were taken by you or an unauthorized third party that has gained access to your account.

As the holder of your account, you are solely responsible for complying with these Terms, and only you are entitled to all benefits accruing thereto. You may not allow any other person to: (i) access or use your account; (ii) access or use the Services through your account; or (iii) accept or use prizes from your account. Except as required by law, neither your account nor prizes won from participating in competitions is transferable to any other person or account.

We reserve the right to verify your account registration details, such as name, address, age, and payment methods used, at any time, by requesting copies of certain documents, including an identity card issued by a government agency, proof of address such as a utility bill, or proof of your payment method. We may request that document copies be notarized by a Notary Public. In the event that a request for copies of documents is not completed by you, Papaya may, at its sole discretion, terminate your account and withhold any funds that are present therein.

You agree to: (i) promptly update the registration data to keep it accurate, current and complete; (ii) provide additional information as part of ongoing efforts to prevent illegal and fraudulent activities; and (iii) comply with any other policies or protocols we elect to put in place. You agree that all information and data that you provide to us, either at the time you register for an account or at any subsequent time, will be truthful, accurate and verifiable in all respects and, by providing such information and data, you consent to us submitting them to third-party providers of age verification and identification services to verify your account.

We reserve the right at any time to investigate your account and the information provided pursuant to registration thereof, including performing background checks and credit checks, in order to ensure compliance with these Terms and our obligations, and to ensure that no improper or illegal activity is or has taken place. By registering an account, participating in any competitions and tournaments and accessing or otherwise using the Services, you affirm consent to such. In the event

that we determine that your account has been involved in any illegal or improper activity, we reserve the right to terminate your account without notice or liability.

In order to encourage users to succeed in our games, we may publish data relating to the most successful users in the games, as well as winners of competitions that require an entry fee paid in the applicable currency in which they can win prizes in that currency (“**Cash Competitions**”), in our sole discretion, and as required by law. Publishing data relating to the most successful users will vary according to categories of users and statistics. We may publish such statistics pertaining to successful users and create informal competitions between various categories of users in a manner which shall be viewable by all users of the game.

# 5. Compliance with Laws

You acknowledge that various rules, regulations and laws addressing sweepstakes, contests, and tournaments with entry fees and prizes may govern your participation in competitions (“**Gaming Laws**”) and that Gaming Laws are set up by each individual state, country, territory, or jurisdiction. Therefore, we do not offer Cash Competitions to users in any jurisdiction in which such competitions violate its Gaming Laws (“**Prohibited Jurisdiction**”), and if you are located in any Prohibited Jurisdiction, then you may not participate in Cash Competitions. Users located in Arizona, Louisiana, Michigan (in these states regarding all our games), Montana (for Solitaire Cash and Bingo Cash) and Maine (for card-based games; collectively "**Bonus Cash States**") may pay to participate in skill-based competitions, but all competitions for Bonus Cash States-based users are only for fun, and award prizes in an in-game currency called “Bonus Cash” that cannot be redeemed for real money. Bonus Cash earned from playing in Bonus Cash States is treated differently from other forms of Bonus Cash earned elsewhere (see section on Bonus Funds below).

We reserve the right to change the Prohibited Jurisdictions and Bonus Cash States, as determined in our sole discretion. In addition, Papaya has the right to monitor the location from which you access the Services and use technical measures to block your use of the Services to the extent you are located in a Prohibited Jurisdiction.

You are solely responsible for your compliance with all applicable laws. Access to competitions may not be legal for some or all residents of, or persons present in,

certain jurisdictions. Services and competitions are void where prohibited or restricted by applicable law. Your participation in competitions is at your own risk, and you agree not to hold us responsible or liable if the laws of your jurisdiction restrict or prohibit your access or participation in the Services. We make no representations or warranties, express or implied, as to the lawfulness of your participation in any competition or use of Services, nor shall any person affiliated, or claiming affiliation, with us have authority to make any such representations or warranties. We reserve the right (but have no obligation) to monitor the location from which you access the Services, and we may block access from any Prohibited Jurisdiction.

You must comply with all applicable export and sanction laws and regulations ("**Trade Controls**") and may not use, export, or transfer any portion of the Services or any related technical information or materials, directly or indirectly, except as authorized by such Trade Controls. Trade Controls are subject to change, and prohibit the use of the Services by any individual located in, under the control of, organized in, or a resident of any country or territory which is the target of sanctions by the U.S. government (currently, Cuba, Iran, Syria, North Korea, the Russian Federation, Belarus, Venezuela and the following region of Ukraine: the Crimea, Donetsk and Luhansk), any countries designated as an "enemy," that are not currently exempted, under Israel's Trading with the Enemy Ordinance of 1939 (currently, Syria, Lebanon, and Iran), or any country at Papaya's sole discretion due to local legislation requirements or any other reason upon its sole discretion, or anyone or any entity (or anyone or any entity 50% or more owned by such individual or entities) on any list of prohibited persons or entities maintained by the U.S., EU, UK or Israeli governments, or by the jurisdictions in which the Services were obtained.

# 6. User-Generated Content

The Services enable users to upload, post, transmit, or share content ("**User Content**"). This User Content may be used to produce additional User Content, either individually or collaboratively with other users, by extracting portions of User Content generated by other users. The User Content, which may include Papaya's proprietary materials, is not verified or endorsed by us. The opinions expressed by other users on the Services do not reflect our values or opinions. To utilize features that permit you to upload or transmit User Content through the Services or to

communicate with other users, you must adhere to the guidelines outlined in these Terms.

By uploading or sharing any User Content through the Services, you represent and warrant that you have, and you agree to grant us, all rights necessary to expressly grant to Papaya a royalty-free, sublicensable, transferable, perpetual, irrevocable, non-exclusive, worldwide license to use, host, store, reproduce, modify, adapt, edit, translate, distribute, syndicate, publicly perform, publicly display, transmit, communicate to the public, make available, make derivative works of all such User Content and without limitation any name, voice, image are/or likeness as contained in the User Content, in whole or in part, in any form, media or technology, whether now known or hereafter developed, for use in connection with the Services and Papaya's businesses.

Papaya reserves the right (but not the obligation) to remove, edit or refuse to transmit any User Content for the purpose of enforcing these Terms, or for any other reason in Papaya's sole discretion.

# 7. Prohibited Uses

You may use the Services only for lawful purposes. You are solely responsible for all of your activity in connection with the Services.

You may not (and shall not permit any third party to) either take any action, upload, submit, post, or otherwise distribute or facilitate distribution of any content or user submission (including User Content) on or through the Services that: (i) is illegal, violent, threatening, abusive, invasive of any person's privacy, harassing, defamatory, libelous, false, deceptive, fraudulent, misleading, untruthful, tortuous, obscene, offensive, pornographic, or otherwise inappropriate, as Papaya may determine in its sole discretion; (ii) infringes, misappropriates, uses or discloses without authorization, or otherwise violates any intellectual property rights or proprietary rights of any third party; (iii) violates any right of publicity, or other right of any person or entity, or any law or contractual obligation, including without limitation rights pursuant to data protection, anti-spam and privacy laws and regulations; (iv) involves commercial activity not expressly permitted by Papaya; (v) contains any harmful or malicious software or computer codes, files or programs that are designed or intended to damage, disrupt, interfere with, or limit, the proper functionality of any software or hardware, or that enables unauthorized

access to any system, data, password or other information of Papaya, its users, or any other individual or entity; (vi) uses or launches any automated system, including without limitation, “screen scrapers,” “bots,” “spiders,” “offline readers,” etc., that access the Services in a manner that sends more request messages to Papaya’s servers than a human can reasonably produce in the same period of time; (vii) impersonates any individual or entity, including, without limitation, employees or representatives of Papaya; or (viii) removes, infringes, violates, obscures or alters any copyright or other proprietary notices contained on or in or otherwise connected to the Services, including any copyright, trademark, patent, trade secret, mask work right, moral right, privacy right, right of publicity, trade dress and service mark right, goodwill and third-party rights. You shall be solely responsible for any and all content of any kind that you make available (by uploading or otherwise) or use through the Services.

You represent and warrant to us that you will not engage in any activity that interrupts or attempts to interrupt the operation of the Services. Anyone who engages in, participates in, aids and abets, or displays behavior that may be interpreted, in our sole discretion, as unfair methods of participating in the Services, including but not limited to: (i) the opening of or access or use of multiple accounts; (ii) the use of unauthorized or altered software or hardware to assist play; (iii) intentionally poor play in certain games to achieve competitive advantage; (iv) collusion with other players (e.g., intentionally losing matches in Cash Competitions); (v) deliberate transfer of money between accounts (e.g., money laundering); (vi) harassment of other participants; (vii) posting objectionable material; breach of these Terms; breach of security of your account; or (viii) any other act (whether through the use of automated technology or otherwise) that unfairly alters your chance of winning or constitutes the commission of fraud (collectively, “Abuse”), will be subject to immediate sanction (as determined by us in our sole discretion). Such a sanction may include, without limitation: (i) immediate termination of your account and blocking of your access to the Services; (ii) any prizes that you may otherwise have been entitled to receive shall be void and forfeited; and (iii) any prizes received by you shall be subject to disgorgement and recoupment. In addition to the foregoing, we reserve the right to disclose or report any money laundering or other illegal activity or suspected money laundering or other illegal activity to law enforcement and regulatory authorities.

Any attempt to deliberately damage the Services or undermine the legitimate operation of any competition is a violation of criminal and civil laws and should such an attempt be made, Papaya reserves the right to seek damages and other remedies from you to the fullest extent permitted by law.

You further acknowledge that the forfeiture and return of any prize as a result of a violation of these Terms shall in no way prevent Papaya from pursuing criminal or civil proceedings in connection with any Abuse.

# 8. Third-Party Services

The Services may provide links to third-party websites, applications, services, offerings, products or other activities ("**Third-Party Services**") that are not owned or controlled by us. These links are provided as a convenience to you and do not signify that Papaya endorses or is liable in any way for the content, products, services or materials displayed or offered by such Third-Party Services. Your use of such Third-Party Services is made at your own risk and shall be subject to the terms governing use of such Third-Party Services. You acknowledge that Papaya has no direct or indirect liability for your use of Third-Party Services. Any problems or complaints that you may have with regard to such Third-Party Services should be directed to such third parties. You understand that when you click on these links, any data that you provide afterwards is subject to that third party's terms of service and privacy policy, and not to our Terms or our Privacy Policy. We take no responsibility for the content, safety, privacy, or security of any Third-Party Services. You shall hold us harmless from any losses sustained by you or harm caused to you relating to or resulting in any way from any third-party content.

If you have downloaded the Apps from Apple, Inc. ("**Apple**") App Store or if you are using the Apps on an iOS device, you acknowledge that you have read, understood, and agree to the following notice regarding Apple. These Terms are between you and Papaya only, not with Apple, and Apple is not responsible for the Services and the content thereof. Apple has no obligation whatsoever to furnish any maintenance or support services with respect to the Services. To the maximum extent permitted by applicable law, Apple has no other warranty obligation whatsoever with respect to the Services. Apple is not responsible for addressing any claims by you or any third party relating to the Services or your possession or use of the Services, including: (i) product liability claims; (ii) any claim that the Services fail to conform to any applicable legal or regulatory requirement; and (iii)

claims arising under consumer protection, privacy, or similar legislation. Apple is not responsible for the investigation, defense, settlement and discharge of any third-party claim that the Services or your possession and use of the Apps infringe that third party's intellectual property rights. You agree to comply with any applicable third-party terms when using the Services. Apple, and Apple's subsidiaries, are third-party beneficiaries of these Terms, and upon your acceptance of these Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce this Agreement against you as a third-party beneficiary of these Terms. You hereby represent and warrant that: (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. Except as provided herein, there are no other third-party beneficiaries to these Terms.

# 9. Limitation of Liability

By using the Services, you understand and agree that Papaya's liability in connection with your use of the Services is as set forth below. Under no circumstances shall Papaya, its parents, subsidiaries, or affiliates, or the directors, officers, employees, agents, successors or assigns or other representatives of each of them (collectively, the "Papaya Entities and Individuals"), be liable to you or any other person for any loss or damages of any kind (including, without limitation, for any special, direct, indirect, incidental, exemplary, economic, punitive, or consequential damages) that are directly or indirectly related to: (i) the Website, the Services, or your uploaded information; (ii) the use of, inability to use, or performance of the Services; (iii) any action taken in connection with an investigation by Papaya or law enforcement authorities regarding your use of the Services; (iv) any action taken in connection with copyright owners; or (v) any errors, omissions or defects in the Services' technical operation, even if foreseeable or even if the Papaya Entities and Individuals have been advised of the possibility of such damages, whether in an action of contract, negligence, or strict liability tort. In no event will the Papaya Entities and Individuals be liable to you or anyone else for loss or injury, including, without limitation, death or personal injury, arising from your use of the Services. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you. In such cases, our liability will be limited to the fu[illegible] extent permitted by applicable law.

In no event shall the Papaya Entities and Individuals' total liability to you or any third parties for all damages, losses, or causes of action exceed in the aggregate one hundred U.S. Dollars ($100). The Papaya Entities and Individuals are not responsible for any damage to your and any third parties' computer, hardware, computer software, or other equipment or technology including, without limitation, damage from any security breach or from any virus, bug, tampering, fraud, error, omission, interruption, defect, delay in operation or transmission, computer line or network failure or any other technical or other malfunction. If you are dissatisfied with any of the Services, your sole and exclusive remedy is to discontinue accessing and using the Services. You recognize and confirm that in the event you incur any damages, losses or injuries that arise out of Papaya's acts or omissions, the damages, if any, caused to you are not irreparable or sufficient to entitle you to an injunction preventing any exploitation of any Services or other properties owned or controlled by Papaya Entities and Individuals, and you will have no rights to enjoin or restrain the development, production, distribution, advertising, exhibition or exploitation of the Services, your uploaded information on the Services, or any and all activities or actions related thereto.

By accessing the Services, you understand that you may be waiving rights with respect to claims that are at this time unknown or unsuspected. Accordingly, you agree to waive the benefit of any law that otherwise might limit your waiver of such claims, including, to the extent applicable, California Civil Code section 1542, which provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

# 10. Disclaimer of Warranties

You acknowledge and agree that you assume full responsibility for your use of the Services and any other User Content you upload to or make available through the Services. You acknowledge and agree that your use of the Services is at your own risk. You acknowledge and agree that any information you send or receive during your use of the Services may not be secure and may be intercepted or later acquired by unauthorized parties. The Services are provided on an "as is" and "as available" basis, without any warranty of any kind, either express or implied, including, without limitation, implied warranties of merchantability, fitness for a particular purpose or non-infringement. Papaya strives to keep its Services up and

running; however, all online services suffer occasional disruptions and outages. All information provided on the platform is subject to change without notice.

In addition, Papaya is not responsible in any way for the games you play or for your Device, including for any communication or other errors in such games or Device, and such errors might be counted as losses in competitions you participate in. Papaya is not responsible for any User Content made available on the Services. Papaya does not provide any warranty regarding the Services, Website or any service or content made available through the Services and expressly disclaims: availability, accuracy of the information displayed about game statistics, technical errors in the games, usability, quality, appropriateness, reliability, latency or loss of internet connectivity, timeliness, serviceability, warranty of title, non-infringement, merchantability, legality, or fitness for particular purpose. Papaya does not warrant or guarantee protection from viruses or other computer system malware. Papaya does not claim or guarantee that the Services shall be uninterrupted, or that Services shall be error-free. Papaya does not guarantee that any competitions you participate in will be fair or that other players will not cheat in such games. We do not and cannot guarantee that use of our Services will generate you any profits. We do not take responsibility for any losses to your account. Some jurisdictions limit or do not allow the disclaimer of implied or other warranties so the above disclaimer may not apply to the extent such jurisdiction's law is applicable to this agreement. In such jurisdictions, the liability of Papaya shall be limited to the fullest extent permitted by law. Additional disclaimers may appear within the Services and are incorporated herein by reference. To the extent any such disclaimers place greater restrictions on your use of the Services or the content contained therein, such greater restrictions shall apply. This limitation of liability shall apply to third party claims as well as claims between the parties. If applicable law does not allow all or any part of the above limitation of liability to apply to you, the limitations will apply to you only to the extent permitted by applicable law.

We may test new features or changes within our Services that may result in temporary variations in the experience for certain users, in order to improve our Services. Such tests may be offered to some, but not all, players. By using the Services, you acknowledge and agree that: (i) we can conduct such testing without any notice or obligation to you, and that such tests may affect your experience, causing temporary inconsistencies in functionality, content, or appearance, which are not representative of the permanent state of the Services. We disclaim any

liability for any discrepancies, disruptions, or changes arising from such testing or experimental features and reserve the right to modify, suspend, or terminate any testing or experimental feature without prior notice.

# 11. Papaya's Intellectual Property Rights

All title, ownership and intellectual property rights in and to the Apps, Website, images, text, graphics, illustrations, trademarks, brands, service marks, trade dress, copyrights, photographs, audio, videos and music, logos, designs, Virtual Items (as defined below), and any part thereof, including derivative works, of Papaya and other companies providing services to Papaya, are the property of Papaya or their respective owners. As a user of the Services, you agree not to use, copy, reproduce, publish or borrow any of the aforementioned content or trademarked work without explicit permission from Papaya or the owner thereof. Except as explicitly provided herein, nothing in these Terms shall be deemed to grant you or any other party a license in or under any such intellectual property rights, and you agree not to sell, license, rent, modify, distribute, copy, reproduce, transmit, publicly display, publicly perform, publish, adapt, edit or create derivative works from any materials or content accessible on the Services.

You may choose to or we may invite you to submit comments or feedback about the Services, including, without limitation, about your impression of the Services or how to improve them ("**Feedback**"). You understand that your Feedback is gratuitous, unsolicited, and will not place Papaya under any fiduciary or other obligation. By submitting any Feedback to us or any third party, you represent and warrant that: (i) you have the right to disclose the Feedback; (ii) the Feedback does not violate the rights of any other person or entity; and (iii) your Feedback does not contain the confidential or proprietary information of any third party. By submitting any Feedback, to us or any third party, you further: (i) agree that we are under no obligation of confidentiality, express or implied, with respect to the Feedback; (ii) acknowledge that we may have something similar to the Feedback already under consideration or in development; (iii) expressly permit and grant us an irrevocable, non-exclusive, royalty-free, perpetual, worldwide license to use, modify, prepare derivative works, publish, distribute and sublicense the Feedback; and (iv) irrevocably waive, and cause to be waived, against Papaya any claims and assertions of any moral rights contained in such Feedback. This Feedback section will survive any termination of your account or the Services.

Except as expressly set forth herein, no right or license is granted hereunder, express or implied, to any intellectual property rights and your use of the Services does not convey or imply the rights to use the Services in combination with any other information or products.

# 12. Virtual Items

The Services may include an opportunity to earn or obtain virtual, in-game currency, including but not limited to virtual coins, points, credits, bonuses, collectibles and chips - all for use in the Services (“**Virtual Items**”). Virtual Items can be either won or obtained within the Services. Virtual Items are licensed to you by us for your personal use through the Services, subject to the limitations and other terms set out in greater detail below. By paying for Virtual Items, you acknowledge and agree that such Virtual Items are licensed, not sold, to you under these Terms.

Virtual Items can never be redeemed or cashed out for “real world” money, goods, or any other item of monetary value from Papaya or any other party. You understand that you have no right, title or property interest in the Virtual Items appearing or originating in any of our Services, or any other attributes associated with an account or stored on the Services. Your acquisition of Virtual Items is final and is not refundable, transferable or exchangeable, except in Papaya’s sole discretion. You may not transfer, purchase, sell, or exchange Virtual Items except as permitted from within the Services. You may not attempt to sell, give or trade in the “real world” anything that appears or originates in the Services, unless otherwise expressly authorized by Papaya in writing.

Accordingly, you may not sublicense, trade, sell or attempt to sell in-game Virtual Items for “real” money, or exchange Virtual Items for value of any kind outside of the Services, without Papaya’s written permission. Doing so is a violation of these Terms. Any such transfer or attempted transfer is prohibited and void and may result in termination of your account and legal action taken against you. Other than a limited, personal, revocable, non-transferable, non-sublicensable license to use the Virtual Items with the Services, you have no right or title in or to any such Virtual Items appearing or originating with the Services, or any other attributes associated with use of the Services or stored within the Services. Papaya retains the right to manage, regulate, control, modify and eliminate Virtual Items at its sole discretion, and Papaya shall have no liability to you or anyone for the exercise of such rights. Prices and availability of Virtual Items are subject to change without

notice. In addition to the foregoing, Papaya may selectively remove or revoke Virtual Items associated with your account in its sole discretion.

Virtual Items may only be held by legal residents of countries where access to and use of the Services are permitted. Virtual Items may only be acquired or awarded from us or through means we provide on our Services or otherwise expressly authorized. Papaya does not recognize any purchases or transfers made outside of the Services on any other platform or e-commerce website, and shall not be liable for any claims or damages caused to the users with respect to Virtual Items purchased or obtained from third parties, and not through the means provided within the Services.

You acknowledge that Papaya is not required to provide a refund for any reason, and that you will not receive money or other compensation for unused Virtual Items when an account is closed, whether such closure was voluntary or involuntary. All Virtual Items are forfeited by you if your account is terminated or suspended for any reason, in Papaya's sole and absolute discretion, or if the Services are no longer available. If your account is terminated, suspended or if any Virtual Items are selectively removed or revoked from your account, no refund will be granted, no Virtual Items will be credited to you or converted to cash or other forms of reimbursement.

If you are a consumer based in the European Economic Area ("**EEA**"), you may have the right to withdraw from the purchase of a license to a Virtual Item or a Service within 14 days from the purchase of a license. You are not required to give a reason for exercising the right of withdrawal. However, you are not entitled to withdraw from a purchase if you have consented to the Virtual Item or Service being fully provided to you during the withdrawal period and acknowledged that you thereby forfeit your right of withdrawal.

To withdraw from the purchase of a license to a Virtual Item, you must inform us of your decision to withdraw by an unequivocal statement of your decision. You can do so by email to Papaya. If you withdraw from the purchase of a license to a Virtual Item or a Service, you are entitled to be reimbursed for the purchase without undue delay and in any event not later than 14 days from the day on which you informed us of your decision to withdraw from the purchase. The reimbursement will be carried out using the same means of payment as you used

for the initial payment, unless you have agreed otherwise. You will not incur any fees as a result of such reimbursement.

# 13. License to use the Services

Subject to these Terms, we grant to you a personal, non-exclusive, limited, non-transferable, non-assignable, non-sublicensable, limited license to install and access the Services on a Device owned or controlled by you, solely for the purpose of accessing and using the Services in accordance with these Terms. You may not network the software among devices. You may not directly or indirectly, or authorize any person or entity to: (i) reverse engineer, decompile, disassemble, re-engineer or otherwise create or attempt to create or permit, allow, or assist others to create the source code of the Services, or its structural framework; (ii) create derivative works of the Services; (iii) use the Services in whole or in part for any purpose except as expressly provided herein; or (iv) disable or circumvent any access control or related device, process or procedure established with respect to the Services. You are responsible for all use of the Services that is under your possession or control.

# 14. Winnings, Account Funds, Payments, Prize Forfeiture

All fees and payments for Services that require such ("**Fees**") shall be made known to you prior to entry in any competition or tournament. If you agree to enter a competition, you agree to pay the Fees associated with entry. All Fees must be prepaid and are non-refundable. You are fully responsible and liable for all charges, deposits and withdrawals made under your account, including any unauthorized charges, deposits or withdrawals. We may change the price of Services at any time, but no price change will affect your past purchases.

We may require you to pay Sales Tax, Value Added Tax, and Goods and Services Tax, as required by applicable law. Please note that all taxes payable will be calculated and added on top of any withdrawal or deposit amounts, as applicable. You agree to pay us the applicable charges for any Fees, including applicable taxes incurred by use of your account, using a valid credit card or other payment method we may accept in accordance with the billing terms and prices in effect at the time the Fees become payable. Other than charges to your account, you agree to notify us about any billing problems or discrepancies within thirty (30) days after

they first appear on your account statement. If you do not bring them to our attention within thirty (30) days, you agree that you waive your right to dispute such problems or discrepancies. You are responsible for and agree to reimburse us for all reversals, chargebacks, claims, fees, fines, penalties and other liabilities incurred by us (including costs and related expenses) that were caused by or arising out of payments that you authorized or accepted. You understand that we may suspend or terminate your account if for any reason, a charge you authorize us to make to your credit card or other method of payment cannot be processed or is returned to us unpaid and, if such an event occurs, you shall immediately remit to us payment for such a charge through an alternative payment method.

We may change Fees with or without notice to you. By providing us with a payment method, you: (i) represent that you are authorized to use the payment method that you provided and that any payment information you provide is true and accurate; and (ii) authorize us to charge you for the Services using your payment method. We may bill you: (i) in advance; (ii) at the time of purchase; or (iii) shortly after purchase, in our sole discretion. If you believe that you have paid any Fees in error, you must notify us within thirty (30) days after the error occurs. We will then promptly investigate the charge. If you don't notify us within that time, we will not be liable for any losses resulting from the error and we will not be required to correct the error or provide a refund. If we identify a Fee error, we will correct that error within ninety (90) days. You must pay for all reasonable costs we incur to collect any past due amounts, including, without limitation, reasonable attorneys' fees and other legal fees and costs.

If you play a competition without depositing real money into your account for that competition, then you are a "Non-Cash Player" with respect to such competition. However, if you play in a Cash Competition, then you are a "Cash Player." You may be placed in a Cash Competition with Cash Players who may have paid more or less than you to enter the competition, and may win a different prize that is more or less than the prize that you would win for a particular placement. The entry fees that other Cash Players pay (or the prizes that they may win) have no impact on the prizes you will receive, or the amount of your own entry fee. Nor will it affect the fact that you are playing against other Cash Players (and matched according to your skill level, using our skill-matching system), or that your ability to win a prize depends on your skill, and how well you perform against those other players. Certain competitions may conclude even if they do not meet the number of participants for which the competition was initially designed. This will not affect

your entry fee or the pre-announced prizes you can win. As a Cash Player, you hereby acknowledge that we reserve the right to change the following at our sole discretion, without giving you prior notice: (i) any method for calculating the balance of or evaluating your funds; and (ii) any withdrawal-related rules, including the minimum withdrawal amount, withdrawal methods and withdrawal fees. Upon a withdrawal request, you may be required to submit the following current and correct information: your full name, your permanent residential address, a copy of your governmental-issued ID, your phone number, and your credit card or other payment information. Failure to provide the required information may result in our inability to process your withdrawal for any winnings. Participating in Cash Competitions may, in our sole discretion, require establishing a positive account balance prior to entry. If you are a Cash Player, by submitting this information, you consent to allowing us to share your personal and payment information in confidence with third-party service providers for the purposes of validating your identity and assessing the transaction risk associated with accepting your selected method of payment, and for any other purposes as detailed in our Privacy Policy. In addition, Papaya reserves the right to issue or process withdrawals solely via payment methods supported by Papaya. If you make a credit card deposit, we may submit an authorization request to the issuing bank for your credit limit. In addition, your personal account (whether it's a bank account, credit card, PayPal or other) may incur additional fees and commissions for receiving funds from your Papaya account. We are not responsible for paying those fees and commissions, even if such fees or commissions exceed the withdrawn amount itself.

Papaya may allow you to withdraw your funds either in cash or in an alternative way offered by Papaya's third-party partners. These methods may vary by jurisdiction or prize type and could include, for example, the use of digital wallets, voucher platforms or other service providers. Such third-party services are subject to change and may include varying discounts and offers. By withdrawing or redeeming your funds through such third parties, you acknowledge that the redemption and use of the withdrawn funds will be subject to the terms of use of such third parties and that Papaya shall not be responsible for such terms. Papaya has no direct or indirect liability for your use of such third parties. You shall hold us harmless from any losses sustained by you or harm caused to you relating to or resulting in any way from any third-party content.

Rewards within the Services may be displayed in a currency different than the currency used in your jurisdiction. Notwithstanding the foregoing, certain withdrawal methods may process transactions in the local currency of the player. In such cases, the amount awarded will be converted from the currency in which they are displayed in the Services to the applicable local currency using the exchange rate in effect at the time of processing (exchange rate may include mark-ups). Please note that this rate may differ from the exchange rate in effect at the time the reward was won or the withdrawal was initiated. When you play in a Cash Competition or any other competition that we offer, you may be playing against an opponent who is participating in the tournament at or around the same time as you, earlier or later than you, or as part of our Extra Play benefit, which we describe in Section 15 below.

Papaya no longer offers games where you can win real money to people located in Michigan and Montana (for Solitaire Cash and Bingo Cash). However, if you are located in Bonus Cash States, you can play for fun using the daily Gems that Papaya awards, or by playing for and with Bonus Cash that cannot be redeemed for real money. Bonus Cash earned in Bonus Cash States is subject to special rules that do not apply to Bonus Funds (as defined below). Users located in Bonus Cash States may withdraw any existing balance using the available withdrawal methods. For support, please contact our Customer Support team at terms-inquiries@papayagaming.com. For purposes of the above paragraph of the Terms you are still considered a Cash Player if you have deposited real money in your account, even if you use it to play in Bonus Cash tournaments.

If you are a Cash Player located outside Bonus Cash States, then we may, from time to time in our sole discretion, grant you free bonus funds and credits ("**Bonus Funds**"). Bonus Funds can be used to enter Cash Competitions, but cannot be withdrawn or used for any other service. When you enter a Cash Competition, we may deduct a certain amount of the Bonus Funds as an entry fee. Notwithstanding the foregoing, additional Bonus Funds will be used to enter Cash Competitions if it is the only currency available in your account. When you win a Cash Competition, for which you pay an entry fee using Bonus Funds (in whole or in part), your prize may consist of a combination of Bonus Funds and the applicable currency, in amounts that are based on the ratio of Bonus Funds and applicable currency that you use to enter the Cash Competition, although we reserve the right to adjust the ratio to award you a greater proportion in the applicable currency. If you withdraw fu[illegible] from your account, you will forfeit all Bonus Funds currently in your account.

If you do not enter a Cash Competition within a continuous ninety (90) day period, all Bonus Funds in your account
will be forfeited.

If you are a Cash Player, you may request a withdrawal of funds from your available account balance at any time. Processing of requested funds may take up to ninety (90) days; provided, however, that we may freeze your account or delay a request for withdrawal of funds pending completion of any investigation of reported or suspected abuse or fraud, verification of eligibility, or to comply with applicable laws.

Unless otherwise specified in the Rules, you must claim your prize within sixty (60) days of winning the competition. If you fail to claim your prize within sixty (60) days, Papaya reserves the right, in its sole discretion, to forfeit your prize. In the event that you forfeit your prize by failing to claim it within sixty (60) days, Papaya shall have no further obligation to you and, at Papaya's sole discretion, may award the prize to another player.

If you choose to close your account, any funds in your account will be forfeited. If you want to withdraw funds from your account before closing it, you must request to do so prior to terminating your account. If we unilaterally close or terminate your account due to a violation involving fraud, illegal behavior, or cheating (as determined in our sole discretion) of these Terms, funds in your account may be forfeited and not returned to you.

If your account becomes inactive (i.e., you have not entered at least one (1) competition or tournament) for six (6) consecutive months or more, we reserve the right to charge a maintenance fee of $2.00 or €2.00 or £2.00 per month – according to the applicable jurisdiction (or any amount in the applicable currency up to the equivalent thereof, the "Monthly Maintenance Fee"). The Monthly Maintenance Fee will be deducted from your account for each consecutive month that it remains inactive. The Monthly Maintenance Fee will not be deducted from your account if there are no funds in your account.

Unless otherwise required by law, all Fees are final and no refunds are given.

If [illegible] are eligible to receive prizes, we may require that you provide us with proof th[illegible] you are, or were at the time of your participation in the competition, eligible to

participate in accordance with these Terms and that your participation was in accordance with these Terms. If you do not provide us with such proof to our reasonable satisfaction, then you will not receive the prize. If you receive a prize in error, we may reverse or require the return of the prize. You agree to cooperate with us in our efforts to do this. We may also reduce payment to you without noticing you to adjust for any previous overpayment.

Competition results and prize calculations are based on the final statistics and scoring results at the completion of the competition. Once competition results are reviewed and graded, prizes are awarded. The scoring results of a competition will not be changed regardless of any official statistics or scoring adjustments made at later times or dates, except in Papaya's sole discretion.

Papaya reserves the right to cancel competitions at any time. In the event of a cancellation, all entry fees will be refunded to you except as specifically provided in these Terms or applicable competition rules.

Guaranteed prizes may be offered in connection with some of the competitions offered by the Services and will be made known in the Rules. Each competition is governed by its own set of rules. Papaya encourages you to read such rules prior to entry.

You must promptly notify us of any changes to the credit card account number provided to Papaya as part of account registration, its expiration date and your billing address, or if your credit card expires or is canceled for any reason. We are not liable for any loss caused by any unauthorized use of your credit card or other method of payment by a third party in connection with the Services. Any attempt to defraud through the use of credit cards or other methods of payment, regardless of the outcome, or any failure by you to honor legitimate charges or requests for payment, will result in immediate termination of your account, forfeiture of winnings, and pursuit of civil litigation and criminal prosecution.

You are solely responsible for recording, paying and accounting to any relevant governmental, taxation or other authority for any tax or other levy that may be payable on any winnings paid to you. We may provide you with, or require you to provide, federal or state tax forms and other appropriate form(s). Without limiting the foregoing, we may withhold from your existing account balance and from future winnings any amount required to be withheld by applicable laws, including

amounts due in connection with your failure to complete relevant tax documentation, but you remain solely responsible for paying all federal, state and other taxes in accordance with all applicable laws.

If you win a Cash Competition, you consent to our use of your name, voice, likeness, and location in connection with the publishing of winners pursuant to these Terms and the development, production, distribution and exploitation (including marketing and promotion) of the selected contest and other Papaya contests and Papaya generally, unless otherwise prohibited by law. You agree that participation in and (where applicable) the winning of a prize in connection with a contest constitutes complete compensation for your obligations under this paragraph, and you agree not to seek to charge a fee or impose other conditions on the fulfillment of these obligations. The Rules specific to certain contests may contain additional publicity obligations or may require a written signature on a separate publicity waiver.

# 15. Skill Matching

Papaya uses skill matching to pair customers with other players with similar skill. Matching up a beginner or intermediate player with an expert player is not fun for either player, therefore, we try to find you opponents who are near your level of play. Skill levels are determined separately for each game and updated after each contest. Our matchups for you are based on several factors, including the following:

- Number of paid contests played.
- Scores and results in previous contests. When you beat players of a similar skill level, we will increase your skill level or find you stiffer competition and vice-versa.
- Length of time playing the game title.
- Performance in tournaments with different entry fees.

As your skill level increases, the difficulty of your matchups may increase as well. Your opponents may not all have the exact same skill level as you – you may often be matched with players of slightly greater or lesser skill. As you win more contests, your matchups may keep getting harder.

After your initial free tutorial games, you will only be matched with or play against human players in our contests. Papaya's games undergo periodic testing by an independent third party to confirm that human players are not being matched with bots. A copy of our current certificate confirming that Papaya does not match players with bots can be found here.

When you enter a Cash Competition or Gems tournament (your "**Initial Competition**(s)"), you're not just entering a single contest, you're gaining access to a series of tournaments using your profile, your score and your skill level in the Initial Competition, for up to 30 days after your Initial Competition. Your performance in the Initial Competition may continue to compete for the prizes in these tournaments (which we'll call "**Extra Play Tournaments**"), even after your Initial Competition has ended. We call these prizes Extra Play Cash, and they're designed to give you more opportunities to win without requiring extra effort on your part, or any additional entry fees up front. If you're matched and competing for Extra Play Cash, you'll automatically enter Extra Play Tournaments and compete for tournament prizes. After your Extra Play Tournament period is over, if you win, you'll get the prizes from those tournaments after we subtract the respective entry fees, and if these entry fees exceed the prizes you win, you won't owe us the difference.

If you'd prefer to not participate in the Extra Play benefit, you can opt out at any time by emailing us at terms-inquiries@papayagaming.com, with the subject line, "Extra Play Opt Out." Be sure to include your username(s) and the app(s) you play on. Please note: if you opt out, you'll lose any pending Extra Play Cash balances that haven't yet been credited at the time we process your request.

We may update, pause, or discontinue the Extra Play benefit, or make changes to eligibility or prize distribution, at any time and at our discretion. And even if you're eligible for the benefit (and haven't opted out), we can't guarantee that we'll use your performance in any of your Initial Competitions for any Extra Play Tournaments.

Our games are designed to provide entertainment and challenge, serving as enjoyable pastimes rather than reliable sources of income. Consistently winning is unlikely, and while short-term success may be achieved, it's not guaranteed to continue over extended periods.

Please note that you may be matched with opponents from different jurisdictions, using different currencies. This will not impact the skill matching and the prizes offered to you.

# 16. Indemnification

You agree to defend, indemnify, and hold Papaya, its affiliates, officers, directors, agents, partners and employees harmless from any loss, damage, claim, liability, cost, demand and expense, including reasonable attorneys' fees, arising in any way from your use of or access to the Services, including, without limitation: (i) any data or work transmitted or received by you; (ii) your violation of these Terms, including without limitation, your breach of any of the representations and warranties above; (iii) your violation of any third-party right, including without limitation any right of privacy, publicity rights or intellectual property rights; (iv) your violation of any law, rule or regulation of any jurisdiction as applicable to you and Papaya; (v) any claims or damages that arise as a result of any of your user submissions or any other content that is submitted via your account; (vi) any other party's access and use of the Service with your unique username, password or other appropriate security code; or (vii) any other claim made by any third party in connection with your use of the Services.

# 17. Term and Termination

Papaya reserves the right at any time to modify, suspend, discontinue, or terminate, temporarily or permanently, the Services, with or without notice. You agree that Papaya shall not be liable to you or any third party for any modification, suspension or discontinuation of the Services.

We do not guarantee that the Services will be available at all times or at any given time or that we will continue to offer the Services for any particular length of time. We may change and update the Services without notice to you. We make no warranty or representation regarding the availability of the Services and reserve the right to modify or discontinue the Services in our sole discretion without notice, including, for example, ceasing a competition or other Services for technical reasons (such as technical difficulties experienced by us or on the internet) or to allow us to improve user experience.

NOTWITHSTANDING ANYTHING TO THE CONTRARY, YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES MAY BE TERMINATED IN WHOLE OR IN PART AT OUR SOLE DISCRETION WITHOUT NOTICE TO YOU. YOU ASSUME ANY AND ALL RISK OF LOSS ASSOCIATED WITH THE TERMINATION OF THE SERVICES.

These Terms apply from the date that you accept them as provided herein. You may terminate your Papaya account at any time and for any reason by sending us a support request at: terms-inquiries@papayagaming.com or following the instructions provided on the Website or Apps. Upon termination of your account, you must immediately discontinue use of the Services and your account. Immediately upon termination of your account, all licenses and rights granted to you under these Terms automatically terminate.

Papaya may permanently or temporarily terminate, suspend, or otherwise refuse to permit your access to the Services without notice and liability upon any violation of these Terms. Upon termination for any reason, your right to use the Services will immediately cease and you continue to be bound by these Terms.

# 18. Agreement to Arbitrate/Class Action Waiver

PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT.

You agree that any claim or dispute at law or equity that has arisen or may arise between you and Papaya relating in any way to or arising out of these Terms or your use of or access to the Services will be resolved in accordance with the provisions set forth in this Section 18. Please read this section carefully. It affects your rights and will have a substantial impact on how claims you and Papaya may have against each other are resolved.

Legal notices shall be served at the address provided in the contact section (in case Papaya is served) or your email address on file with us (in case you are served). Notice by us to you shall be deemed given twenty-four (24) hours after the email is sent. Alternatively, we may give you legal notice by mail to the physical address associated with your account. In such a case, notice shall be deemed g three (3) days after the date of mailing, regardless of whether any such

notice is returned to us. It is your responsibility to keep your contact information updated.

You and Papaya will attempt to resolve any dispute through informal negotiation within sixty (60) days from the date the notice of dispute is sent. That notice should contain proof of your relationship with Papaya, the nature and legal basis for your or Papaya's dispute, and an individual monetary demand if you or we are seeking such relief. During this period, the parties shall use their best efforts to settle any dispute, claim or disagreement. Any applicable limitations period will be tolled during this 60-day informal dispute resolution period. Filing any claims before the end of this period and without engaging in this process could result in the award of fees in arbitration. If the dispute is not resolved within such time period, you agree that any and all disputes or claims that have arisen or may arise between you and Papaya relating in any way to or arising out of these Terms or your use of or access to the Services shall be resolved exclusively through final and binding arbitration. If you reside in the US, the Federal Arbitration Act governs the interpretation and enforcement of this agreement to arbitrate. If you reside in the UK, the Arbitration Act 1996 governs the interpretation and enforcement of this agreement to arbitrate. Otherwise, the Israeli Commercial Arbitration Law, 5784-2024, as amended, or, if the International Arbitration Law is deemed inapplicable, for any reason, the Israeli Arbitration Law, 5728-1968, shall govern the interpretation and enforcement of this agreement to arbitrate.

In all events, each party hereby knowingly, voluntarily and intentionally waives (to the extent permitted by applicable law) any right it may have to a trial by jury of any dispute arising under or relating to these Terms or your use of or access to the Services. The parties further agree that, if and to the extent this agreement to arbitrate is held not to apply to any claim, that claim will be tried in a court of competent jurisdiction before a judge sitting without a jury.

Regardless of the jurisdiction in which you reside, except as provided in this section, you agree that each of us may bring claims against the other only on an individual basis and not as a plaintiff or class member in any purported class, representative, or private attorney general action whether in arbitration or litigation and the parties expressly waive their right to file a class action or seek relief on a class basis. Unless Papaya agrees otherwise in a separate writing, the arbitrator may not consolidate or join more than one person's or party's claims and may not otherwise preside over any form of a consolidated, representative,

class, or private attorney general action or proceeding. Where Papaya does consent, consolidation may be allowed. In individual cases, the arbitrator may award relief (including monetary, injunctive, and declaratory relief) only in favor of the individual party seeking relief and only to the extent necessary to provide relief necessitated by that party's individual claim. In consolidated cases, the relief may cover the consolidated claims. Any relief awarded cannot affect third parties not involved in the individual or consolidated claims. If a court decides that applicable law precludes enforcement of any of this paragraph's prohibitions on class, representative, or private attorney general actions or proceedings as to any claim, then that claim (and only that claim) must be severed from the arbitration and resolved in court, subject to your and Papaya's right to appeal the court's decision. All other claims will be arbitrated.

The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this agreement to arbitrate, any part of it, or of the Terms including, but not limited to, any claim that all or any part of this agreement to arbitrate or the Terms is void or voidable, whether a claim is subject to arbitration, and any dispute regarding the payment of administrative or arbitrator fees (including the timing of such payments and remedies for nonpayment). The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The parties agree that the arbitrator may allow the filing of dispositive motions if they are likely to efficiently resolve or narrow issues in dispute.

If you reside in the US, the arbitration will be conducted by the National Arbitration and Mediation ("**NAM**") (under their rules and procedures, as applicable, including the commercial arbitration rules, as modified by this agreement). If you reside in the UK, the arbitration will be conducted by the London Court of Internation Arbitration ("**LCIA**" under their rules and procedures, as applicable). Otherwise, the arbitration will be conducted by the Israeli Institute of Commercial Arbitration, except as they may be modified herein.

The parties agree that NAM has discretion to modify the amount or timing of any administrative or arbitration fees due under NAM's rules where it deems appropriate, including by setting reduced fees for consolidated cases, provided that such modification does not increase the costs to you, and you waive any objection to such fee modification. The parties also agree that a good-faith

challenge by either party to the fees imposed by NAM does not constitute a default, waiver, or breach of this Section while such challenge remains pending before NAM, the arbitrator, or a court of competent jurisdiction. The arbitration may also impose sanctions in accordance with NAM rules for any claims the arbitration determined to be frivolous or improper and to apply the standards set forth in Federal Rule of Civil Procedure 11.

The arbitration shall be held in Tel Aviv, Israel (London for UK residents or New York City for U.S. residents) or at another mutually agreed upon location. For the avoidance of doubt, the availability of a more convenient forum for arbitration proceedings shall have no effect on the governing law and venue specified in Section 20 regarding litigation. If the value of the relief sought is $10,000 or less, either you or Papaya may elect to have the arbitration conducted by telephone or based solely on written submissions, which election shall be binding on you and Papaya, subject to the arbitrator's discretion to require an in-person hearing. The arbitrator's award shall be final and binding, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

To the extent the filing fee charged to any individual claimant for arbitration exceeds the cost of filing an individual lawsuit, the arbitrator may require Papaya to pay the additional cost. You are responsible for your own attorneys' fees unless the arbitration rules or applicable law provide otherwise. If the arbitrator finds the arbitration to be non-frivolous, Papaya will pay the remaining filing and arbitrator fees for the arbitration, provided your claim or the consolidated claims do not exceed $75,000. For claims above $75,000 or consolidated claims, fees and costs will be determined in accordance with applicable arbitration rules and the arbitrator's decision.

The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

To the extent permitted by applicable law, any claim or dispute under these Terms and related to your access or use of the Services must be filed within one (1) year from the date of the cause of action. If a claim or dispute is not filed within one year, you acknowledge that you shall have waived and will be deemed permanently barred from bringing such a dispute.

If there is a final judicial determination that applicable law precludes enforcement of this Section's limitations as to a particular remedy, then that remedy (and only that remedy) must be severed from the arbitration and may be sought in court. The parties agree, however, that any adjudication of remedies not subject to arbitration shall be stayed pending the outcome of any arbitrable claims and remedies.

With the exception of any of the provisions in the class action waiver, if an arbitrator or court decides that any part of this agreement to arbitrate is invalid or unenforceable, the other parts of this agreement to arbitrate shall still apply.

Exception – Litigation of Intellectual Property and Small Claims Court Claims: Notwithstanding the parties' decision to resolve all disputes through arbitration, either party may bring an action in state or federal court to protect its intellectual property rights ("**intellectual property rights**" means patents, copyrights, moral rights, trademarks, and trade secrets, but not privacy or publicity rights). Either party may also elect to have disputes or claims resolved in a small claims court that are within the scope of that court's jurisdiction. Either party may also seek a declaratory judgment or other equitable relief in a court of competent jurisdiction regarding whether a party's claims are time-barred or may be brought in small claims court in your state and county of residence. Seeking such relief shall not waive a party's right to arbitration under this agreement.

**30-Day Right to Opt Out**: You have the right to opt-out and not be bound by the arbitration clause by sending written notice of your decision to opt-out to the following address: terms-inquiries@papayagaming.com. The notice must be sent within 30 days of your first use of the Services, or the issuance of a materially changed clause, whichever is later, otherwise you shall be bound to arbitrate disputes in accordance with the terms of those paragraphs. If you opt-out of a new clause, the prior clause will continue to govern any disputes between you and Papaya. If you opt-out of arbitration, Papaya also will not be bound to arbitrate. You agree that, if at some point in the future Papaya removes this Section 18 entirely, restoring the right to proceed in court, no opt out from that change would be required.

Changes to this Section: Papaya will provide 30 days' notice of any material changes affecting the substance of this Section 18. Changes will become effective

on the 30th day. If you continue to use the Services after the 30th day, you agree that any unfiled claims are subject to the revised clause.

# 19. Modification of Terms or Services

We reserve the right, at any time in our sole discretion, to amend or replace any part of these Terms and any document referred to herein, or any part thereof, at any time, without prior notice. You agree that we may notify you of any updated or new Terms by posting notice on the Services so that they are accessible via a link from the home page or by providing you notice at the email address associated with your account. Except as explicitly set forth herein, all such changes are effective immediately when we post them, or such later date as may be specified in the notice of updated Terms. Your continued use of the Services after such notice confirms your consent to and acceptance of such amendment. The most current version of these Terms will govern your use and access of the Services, including, without limitation, any content made available on or through the Services. If you object to any such changes, your sole recourse is to cease accessing the Services.

We reserve the right, at any time and from time to time, temporarily or permanently, with or without notice, in whole or in part, to: (i) stop offering or supporting the Services or any particular game or part of the Services; (ii) terminate or suspend your license to use the Services or any part of it; (iii) modify or discontinue the Services; (iv) modify or remove any of the information contained in the Services; (v) limit the Services' availability to any person, geographic area, or jurisdiction we choose; (vi) charge fees in connection with the use of the Services; (vii) modify or waive any fees charged in connection with the Services; and (viii) offer opportunities to some and all users of the Services. If that happens, Papaya is not required to provide refunds, benefits or other compensation to players in connection with discontinued elements of the Services or for virtual goods previously awarded or purchased. You agree that we will not be liable to you or to any third party for any modification, suspension or discontinuance of the Services, in whole or in part. Your continued use of the Services after such changes will indicate your acceptance of such changes in the Services and in these Terms.

# 20. Governing Law and Jurisdiction

For any dispute, including any petitions to compel arbitration, if you reside or use our Services in the US, these Terms shall be governed by and construed in accordance with the laws of the State of New York, US, without regard to conflict of law principles thereof. For all disputes not subject to arbitration, you hereby consent to the exclusive jurisdiction and venue of the state and federal courts in New York County, New York, US and waive any objections as to personal jurisdiction or as to the laying of venue in such courts due to: (i) inconvenient forum or (ii) any other basis or any right to seek to transfer or change venue of any such action to another court.

For any dispute not subject to arbitration, if you reside or use our Services in the UK, these Terms shall be governed by and construed in accordance with the laws of England and Wales and the parties hereby submit to the jurisdiction of the English Courts.

Otherwise, for any dispute, these Terms shall be governed by and construed in accordance with the laws of the State of Israel, without regard to conflict of law principles thereof. You hereby consent to the exclusive personal jurisdiction and venue of Tel Aviv, Israel.

# 21. No Waiver and Force Majeure

Papaya's failure to exercise or enforce any right or provision in these Terms shall not be considered a waiver of such right or provision, unless agreed upon in writing. Papaya will not be responsible for any failures to fulfill any obligations due to causes beyond its reasonable control.

# 22. Survival

Any and all terms and conditions within these Terms that should, by their nature, survive termination of your account, will survive such termination, including: Compliance with Laws, Prohibited Uses, Limitation of Liability, Winnings, Account Funds and Payments, Prize Forfeiture, Indemnification, Papaya's Intellectual Property Rights, Term and Termination, Agreement to Arbitrate/Class Action Waiver, and Governing Law.

# 2[illegible] Assignment of Rights

You may not transfer, assign, sublicense, or pledge in any manner whatsoever your account or any of your rights or obligations under these Terms. Papaya may transfer, assign, sublicense, or pledge in any manner whatsoever any of its rights and obligations under these Terms to any subsidiary, affiliate, or successor thereof or to any third party whatsoever, without notifying you or receiving your consent. Notwithstanding the above, if you are located in or reside in the UK, Papaya will notify you in writing if any transfer, assignment, sub-license, or pledge occurs.

# 24. Notification Procedures

Papaya may provide notifications, whether such notifications are required by law or are for marketing or other business-related purposes, to you via email notice, written or hard copy notice, or through conspicuous posting of such notice on the Services, as determined by Papaya in our sole discretion. Papaya reserves the right to determine the form and means of providing notifications to you, provided that you may opt out of certain means of notification as described in these Terms or Papaya's Privacy Policy.

# 25. Entire Agreement and Severability of Clauses

The Terms posted on this page, and the policies and agreements that are incorporated herein by reference, as amended, constitute the entire Terms between you and Papaya. If any part of these Terms is held by a court of law to be invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect the original intentions of the parties, and the remaining portions shall remain in full force and effect.

# 26. Language

You acknowledge that these Terms, and all related documents (including any Rules and the Privacy Policy) have been prepared in English. If these Terms are translated into another language, the English language text shall in any event prevail.

# 27. Contact Us

If you have any questions about these Terms or Papaya's Services in general, please contact us at: terms-inquiries@papayagaming.com. Subject to the content of your inquiry, Papaya may request that you provide additional information in order to allow the appropriate handling of your inquiry.

**EXHIBITS 10 - EXHIBIT 11**

**FILED UNDER SEAL**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SKILLZ PLATFORM INC., Plaintiff, -v- PAPAYA GAMING, LTD., and PAPAYA GAMING, INC., Defendants. | : | 24cv1646 (DLC) OPINION AND ORDER |

APPEARANCES:

For the plaintiff Skillz Platform Inc.:

Craig Carpenito
Amy Katherine Nemetz
Curtis Ryan Crooke
Jessica C. Benvenisty
Kathleen Elizabeth McCarthy
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

Lazar Pol Raynal
Michael Anthony Lombardo
King & Spalding
110 N Wacker Drive, Suite 3800
Chicago, IL 60606

Barry Antoine Kamar
King & Spalding
200 South Biscayne Blvd.
Suite 4700
Miami, FL 33131

For the defendants Papaya Gaming, Ltd. and Papaya Gaming, Inc.:

Devora Whitman Allon
Gilad Bendheim
Giancarlo Francis Carozza
Kirkland & Ellis LLP

601 Lexington Avenue
New York, NY 10022

Allison M. Brown
Kirkland & Ellis LLP
2005 Market Street,
Suite 1000
Philadelphia, PA 19103

Cole Carter
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654

Adam R. Alper
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104

George W. Hicks, Jr.
Quinn Zhang
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004

Samuel Carno Leifer
Kirkland & Ellis LLP
200 Clarendon Street
Boston, MA 02116

Argie Lagrimas Mina
Michael W De Vries
Kirkland & Ellis LLP
695 Town Center Drive
Suite 1700
Costa Mesa, CA 90067

Sharre Lotfollahi
Kirkland & Ellis LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067

Danielle Renee Sassoon
Jeffrey Thalhofer
Clement & Murphy, PLLC

767 Fifth Avenue
Ste 15th Floor
New York, NY 10153

I. Evidence at Trial ........................................ 4
II. Procedural History ........................................ 13
Discussion........................................................ 14
I. Papaya's Motions ........................................ 14
A. Motion for Judgment as a Matter of Law ................ 14
1. Harm Must Flow from Deception ........................ 16
2. Enterprise Damages ........................................ 20
3. Lanham Act Claim ........................................ 26
4. GBL Claim ........................................ 33
B. New Trial ........................................ 34
C. Remittitur ........................................ 35
1. Intrinsically Excessive Award ........................ 36
2. Attacks on Bergman's Damages Model ................... 40
II. Skillz's Motions ........................................ 47
A. Disgorgement and Request for Enhanced Monetary Relief .. 47
1. Legal Standard ........................................ 48
2. The Disgorgement Award ........................................ 51
B. Attorney's Fees, Prejudgment Interest, and Costs ....... 68
1. Attorney's Fees ........................................ 68
2. Prejudgment Interest ........................................ 76
3. Costs ........................................ 77
Conclusion........................................................ 78

DENISE COTE, District Judge:

In this hard-fought false advertising lawsuit, the plaintiff Skillz Platform Inc. ("Skillz") won a substantial award of damages at a jury trial that concluded on April 23, 2026. This Opinion addresses the parties' post-trial motions, including the motions by defendants Papaya Gaming, Ltd. and

Papaya Gaming, Inc. (together, "Papaya") to set aside the verdict and by Skillz for an award of over $1 billion in damages. For the following reasons, Papaya's attacks on the verdict are rejected and Skillz is awarded $719 million plus its attorney's fees for the years 2024 and 2025 and certain costs.

The parties compete in the real money skill-based mobile gaming ("RMSB") market. Participants in the market pay money to win cash prizes or game rewards in tournaments run on online platforms. Skillz created the first RMSB platform in 2012. Papaya entered this market in 2019 and quickly took a significant market share.

Skillz filed this action against Papaya on March 4, 2024, asserting that Papaya's success was due to unfair competition. Skillz brings false advertising claims under the Lanham Act, 15 U.S.C. § 1125, and New York General Business law ("GBL") § 349 against Papaya. Taken in the light most favorable to Skillz, the evidence at trial showed the following.

I. Evidence at Trial

Skillz created the first RMSB online platform in 2012. It permits customers to win cash awards in online tournaments while playing games such as Solitaire against other customers. To play in a Skillz tournament, Skillz's customers download the Skillz app from an app store, such as the Apple App Store or

Samsung Galaxy Store. Its customers pay entry fees to enter a tournament and Skillz keeps a percentage of those fees, paying the remainder to winners of the tournaments. For example, in a two-person tournament with a per-person entry fee of $0.60, the winner will receive $1.00 and Skillz will keep $0.20.

There is a significant barrier to entry into the RMSB market. A successful platform needs a customer base large enough to match players of similar or comparable skill in tournaments within a reasonable amount of time. This density of players is referred to as "player liquidity" or "liquidity." The expectation is that the quicker a player learns she has won or lost, the more likely the player is to enter another tournament either to win again or to try to win. Through a substantial investment in advertising and other customer acquisition efforts, Skillz created a sizeable customer base. This customer base was large enough to create a "network effect," making it even easier for Skillz to attract more users and retain existing users. Nonetheless, while Skillz has invested over $1 billion in its business, it had not yet turned a profit as of the time of the trial.

Skillz considers its tournaments to be games of skill as distinguished from games of chance or gambling. Online gambling in the United States is regulated by the States and is legally

available to only a fraction of the public. Skillz is not a licensed gambling business and does not intend to become one. Therefore, to establish its business, Skillz was required to and did represent to app stores, payment processors, and advertising hosts that it was not engaged in gambling and that the outcome of its tournaments was determined by the skill of the players and was not determined by Skillz or due to chance.

Papaya's founders decided to enter the RMSB market in 2019 by deceiving the public and others about the nature of its product. Instead of running tournaments in which the players who had paid entry fees competed against each other, Papaya decided to solve the problem of building liquidity by running tournaments in which multiple participants were not other human players but were instead "bots." Papaya's bots were essentially scores designated by Papaya's algorithms; they were not artificially intelligent players. In these tournaments, a player's score was compared to the scores Papaya assigned to its bots. In this way, Papaya was always able to run a tournament, including tournaments with what appeared to be a dozen or more participants, at any time of night or day. Papaya gave its bots usernames and profiles to make them appear to be individual customers.

Broadly speaking, Papaya's bots were of two kinds. Liquidity bots were used to create immediately accessible tournaments of various sizes, including up to 20 or more "players". Thus, a 20-player tournament might have one human player and nineteen bots. This permitted a player in a Papaya game to learn quickly whether it had won or lost a tournament, thereby increasing the odds that he would pay to enter another Papaya tournament. Other bots were used to give a player a designated win or loss. For instance, a player who had a losing streak could be given a "win" to motivate them to keep playing in more tournaments. These bots, called tailored bots, operated in over 630 million Papaya tournaments, or in roughly one-quarter of the 2.6 billion tournaments that Papaya hosted during the years 2021 to 2024.

Overall, between 2021 and 2024, bots accounted for over 13 million of the participants on Papaya's platform, compared to about 11 million human players. More than 6.1 million of those human beings played in at least one tournament where tailored bots were designed to give them a loss, while more than 7.3 million played in tournaments with tailored bots designed to give them a win.

Papaya's use of bots allowed it to build liquidity without the substantial investment that would otherwise have been

required. Not surprisingly then, its reliance on bots was greatest in the initial phases of its business. In January 2021, for example, Papaya used bots in about 90% of its cash tournaments, or 4.5 million of Papaya's 5 million tournaments. Because of its use of bots, Papaya only paid customers roughly $2 billion of the $6.7 billion that it advertised had been awarded in prizes. And just before Papaya stopped using bots near the end of 2023, Papaya was still using bots in roughly 50% of its cash tournaments. Thus, Papaya quickly achieved a substantial presence in the RMSB market while investing only a fraction of the money expended by Skillz to do so. When seeking investors, it bragged about this strategy: Papaya described its multiple-player tournaments, its "unique" platform capabilities, and that its revenue growth was "8 times more than the industry leaders."

In its advertising, Papaya never disclosed that it deployed bots in its tournaments. Instead, it purposely engaged in false advertising. It claimed that its games were "fair" and "skill-based," that it has "no vested interest" in who wins or loses a tournament, and described the participants in its tournaments with pictures and in terms that apply to human players. For example, it stated that only "players" above the age of 18 would be allowed on the platform. It assured consumers that they

would be matched with other players within the same skill level to ensure a "fair experience for everyone."

When players complained to Papaya that they suspected it was deploying bots, Papaya flatly denied it was doing so. For example, it told complainants that it "want[s] to clarify that we do not use bots or computer players." Papaya's executives were intimately involved in the deception.[1] Papaya instructed its staff to escalate complaints about bot use to management. Papaya removed posts complaining about its suspected use of bots from its Facebook group.

Papaya not only misrepresented its tournaments in its advertising to and communications with consumers, it misrepresented them to app stores, its payment processers, and its advertising channels. As had been true for Skillz, these entities required assurance from Papaya that it was not offering an online platform for gambling. For example, Papaya obtained a sixty-one page legal opinion for use with payment processors that explained why its RMSB product was not prohibited as illegal gambling under four federal laws and the laws of most States. It did not disclose Papaya's use of bots as players in

[1] For example, in response to a complaint about bot use, co-founder and CTO Andrey Birman directed staff to close the complainant's account, stating that the user "smells like trouble."

its tournaments, instead emphasizing that Papaya's games are "games of skill" and not games of chance. According to the opinion, Papaya "eliminates" elements of chance by giving "each player" the same hand and having them compete against each other "head-to-head." The letter explained, "Papaya is strictly a head-to-head, multiplayer, or tournament gaming platform. Players do not play against the house or bank, and players will never be involved in a game in which they are playing against Papaya."

Papaya did not stop using bots until late 2023. By that time, Skillz's revenue had fallen by 60% in just two years, tumbling from $384 million in 2021 to $152 million, while Papaya's revenue skyrocketed from $163 million to $461 million over the same period.

Skillz's witnesses at trial included its co-founder and former Chief Strategy Officer Casey Chafkin, survey expert Dr. Andreas Groehn, gaming expert Dr. Jose Zagal, and damages expert James Bergman. Papaya called its damages expert Jonathan Orszag and gaming expert Dr. Christoffer Holmgard as its witnesses. Papaya also introduced excerpts from the depositions of Skillz CEO Andrew Paradise, former Skillz Vice Presidents Orit Peleg and Kate Paiz, and former Skillz Head of Engineering Meidad Glory.

Because there was overwhelming evidence at trial that Papaya intentionally engaged in an advertising scheme to deceive consumers about the nature of its product and was liable under both the Lanham Act and the GBL,[2] the parties principally litigated before the jury the amount of damages to award to Skillz. And, because the Court had determined that it would receive an advisory jury verdict on disgorgement, 2026 WL 812016 (S.D.N.Y. Mar. 23, 2026), Skillz sought a jury award of both damages and disgorgement. The jury was instructed that "Skillz is not entitled to duplicative monetary recoveries and the Court will ensure that Skillz only recovers once for any injury it has shown it suffered."

Skillz's damages expert Bergman presented two theories of disgorgement: the amount of Papaya's unjust profits and Papaya's unfairly obtained cost savings.[3] He also presented his calculation of the actual damage to Skillz.

Bergman's models relied on his calculation of Skillz's and Papaya's costs of acquiring and retaining users. He divided

[2] During Papaya's summation, its counsel apologized to the jury. "Now, I am the first to acknowledge that the response to these [customer] complaints was not the right response." Defense counsel later stated: "Papaya has taken responsibility for its actions. It stopped giving those customer complaint responses. It stopped using bots."

[3] In its post-trial motions, Skillz pursues an award relying on the unjust profits model.

those costs by the number of paying monthly active users ("PMAU"). He performed this calculation for Papaya for the years 2021 and 2022; he did the same for Skillz in the years 2019 and 2020. Comparing the two numbers, he calculated that Skillz spent 2.1 times as much as Papaya to acquire and retain a user ("UA Acquisition Ratio" or "Ratio").

Bergman used the Ratio to calculate Papaya's cost savings as $652.6 million. Bergman also used the Ratio to calculate Papaya's unjust profits, which he opined were $719 million.

Finally, for the actual damages model, Bergman calculated the enterprise value of Skillz as of 2025, or in other words, what Skillz would have been valued in 2025 if Papaya had not engaged in illegal activity. Bergman calculated Skillz's lost enterprise value as $637.5 million.

The jury found Papaya liable for false advertising under both the Lanham Act and the GBL.[4] It awarded Skillz $420 million in damages, or two-thirds of the requested amount. It awarded

---

[4] On April 17, after the plaintiff had rested, Papaya moved for judgment as a matter of law pursuant to Rule 50(a), Fed. R. Civ. P. With respect to damages, Papaya argued that Skillz is unable to recover enterprise value damages as a matter of law because it was not completely destroyed and that all of Skillz's theories of damages flow from bot usage, not false advertising. It also argued that Skillz had not proven any element of false advertising under the Lanham Act -- falsity, materiality, or injury -- and therefore had failed to prove a GBL violation as well. That motion was denied.

an advisory disgorgement verdict of $719 million for Papaya's unjust profits and $652 million for Papaya's unfair cost savings.

II. Procedural History

Skillz filed this lawsuit on March 4, 2024. In March of 2025, near the close of the fact discovery period, Papaya's executives invoked their Fifth Amendment right against self-incrimination at their depositions. About a year later, on the eve of trial, those same executives sought to withdraw their invocation of the Fifth Amendment privilege. The tortured pre-trial history of this case and in particular Papaya's litigation conduct is set out in Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 915251, at *1 (S.D.N.Y. Apr. 3, 2026) ("Fifth Amendment Privilege Opinion"). The Fifth Amendment Privilege Opinion is incorporated by reference and familiarity with it is assumed.

The trial began on April 13, 2026 and the jury returned its verdict on April 23. The parties submitted their post-verdict motions on May 15. Papaya renewed its motion for judgment as a matter of law and moved as well for a new trial and remittitur. Skillz submitted motions for an award of disgorgement, enhanced monetary relief, a corrective advertising injunction, as well as attorney's fees, costs, and prejudgment interest. Specifically,

Skillz seeks an award of twice the disgorgement amount of $719 million, that is, $1.438 billion. Alternatively, it asks for a trebling of the award of actual damages of $420 million, that is, $1.260 billion. The motions became fully submitted on June 19.

**Discussion**

Papaya's motions challenging the verdict will be addressed first. For the reasons that follow, Papaya's motions are denied. This Opinion then grants Skillz's motions in part. Skillz will be awarded $719 million in disgorgement as well as its attorney's fees accrued in the years 2024 and 2025 and certain costs. A separate Opinion will address Skillz's request for injunctive relief.

I. Papaya's Motions

Papaya has filed two post-trial motions. One is for judgment as a matter of law; the other is for a new trial or remittitur of the damages award. To the extent the arguments overlap, they will be principally addressed during the discussion of the first motion.

A. Motion for Judgment as a Matter of Law

Papaya moved at the close of Skillz's presentation of evidence at trial for judgment as a matter of law ("JMOL") and now renews its motion under Rule 50(b), Fed. R. Civ. P. Papaya

faces a "particularly heavy" burden in seeking to overturn the jury's verdict. Cross v. New York City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005). A court may not grant judgment as a matter of law unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

Ortiz v. Stambach, 137 F.4th 48, 61 (2d Cir. 2025) (citation omitted). This standard "is a high one, met only in rare occasions." Conte v. Emmons, 895 F.3d 168, 171 (2d Cir. 2018) (citation omitted). "The court must draw all reasonable inferences in favor of the nonmoving party and although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Ortiz, 137 F.4th at 61 (citation omitted). "In ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony." Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007). Thus, a court must "defer" to the credibility assessments of the jury. Ortiz, 137 F.4th at 61 (citation omitted).

Case 1:24-cv-01646-DLC Document 104 Filed 07/27/26 Page 55 of 78

Papaya makes two arguments in support of its Rule 50(b) motion. It argues first that judgment must be entered in its favor because Skillz's damages expert erred (1) by measuring bot use and not the impact of any false advertising, and (2) by calculating an enterprise value for Skillz despite the fact that Skillz continues to exist. It then argues that Skillz failed to present evidence to support each element of its Lanham Act and GBL claims.

1. Harm Must Flow from Deception.

Papaya argues that Skillz presented no legally competent evidence of an injury that flowed directly from Papaya's false advertising because it relied on the wrong but-for world. As described by Papaya, Skillz's damages expert Bergman improperly relied on a but-for world in which Papaya did not use bots and its advertising statements were true; in Bergman's models, Papaya's expenses were greater and its profits were diminished because it did not rely on bots to build its business. Papaya contends that Bergman was required to model a different but-for world, specifically one in which Papaya removed all false statements from its advertising while not altering its business model or its use of bots. According to Papaya, the only world that should have been measured was one in which it told the world that it was using bots.

Papaya fails to explain how any expert could have created the but-for world it describes. Skillz proved at trial that Papaya could not have entered the RMSB market by using bots in the way that Papaya did -- to create liquidity and determine the outcome of tournaments -- and at the same time truthfully describe that use and its product to consumers in its advertising. Papaya has offered no authority to suggest that a plaintiff's expert must create a but-for world that could not exist.

If Papaya had not misled consumers in its advertising and instead truthfully disclosed that consumers paying cash to compete in Papaya tournaments would be playing against bots, Skillz proved that Papaya would not have been allowed into the RMSB market. Papaya's statements to the consuming public -- that its tournaments were games of skill, for instance -- were of a piece with the statements it was required to make to payment processors and others to enter this online industry. Skillz showed that entry into this online world required RMSB companies to demonstrate that their cash tournaments were not gambling. In other words, the but-for world Papaya proposes could not exist because if Papaya had been truthful, there would have been no Papaya games to play. Skillz also showed at trial, including through evidence of Papaya's responses to consumer

suspicions that it was using bots, that Papaya understood both that consumers did not want to "play" against bots and that it was important to hide its use of bots from consumers.

On the other hand, the but-for world which Bergman posited to create his damages models could exist. In a world where Papaya had not used bots, its statements would no longer be false, but it would have had to make far larger investments to build a sufficiently liquid player base to begin to be profitable and its profits would have been significantly reduced as it built that liquidity. That but-for world was the only world available for Skillz's expert to measure.

As significantly, Skillz showed at trial that the damages that Bergman measured flowed directly from Papaya's false advertising. Papaya used that advertising's false description of its platform to enter the RMSB market, to compete with Skillz, to woo away Skillz customers, and to build market share. That false advertising concerned the very nature of the product; it was not a false statement about some incidental feature. And Skillz showed that it was that very advertising that caused consumers to complain to Papaya about Papaya's use of bots.

Papaya also argues that Bergman's analysis is flawed because it wrongly assumes that Papaya had a duty to disclose its use of bots. It points to legal authority for the

proposition that the Lanham Act imposes no affirmative duty of disclosure. That argument misses the point. This is not an omission case; it is a false statement case. The law forbids false advertising. If a company cannot exist unless it misrepresents the nature of its product to the marketplace, then it cannot exist. That is a distinct issue from whether there is an independent duty under the law to disclose omitted information.

Finally, Papaya argues that Souza v. Exotic Island Enters., Inc., 68 F.4th 99 (2d Cir. 2023), required Bergman to build a model in which Papaya continued to use bots but made no false statement in its advertising. Souza is inapposite. In Souza, the Second Circuit held that the plaintiffs, who were professional models, could not recover damages when a gentleman's club used their images in advertisements without their consent because the models had failed to offer any evidence that they had lost income due to that unauthorized use of their images. Id. at 120. The plaintiff here offered substantial evidence that it was directly injured by Papaya's false advertising. Through the false statements, Papaya was able to attract consumers and build liquidity without having to make the enormous user acquisition investments that Skillz had made. There was evidence that the RMSB market is a zero-sum

world and that one platform's gain is another platform's loss. That evidence was reinforced by proof that Skillz's revenue fell sharply as Papaya's soared.

2. Enterprise Damages

Papaya also challenges Skillz's right to a damages award based on its lost enterprise value. In calculating the actual damages that Skillz incurred due to Papaya's false advertising, Skillz's expert Bergman calculated its loss in enterprise value by multiplying Papaya's "additional" revenue in 2025[5] by Skillz's market share of 39% in 2021, the year in which Papaya entered the RMSB market. Bergman then multiplied that number by the "enterprise multiple" that an investment bank had used when assessing Papaya's enterprise value.[6] After making other adjustments, Bergman testified that Skillz's lost enterprise value as of 2025 was $637.5 million. Papaya contends that Skillz may not recover enterprise value damages as a matter of law because enterprise value damages are only available when a

---

[5] Bergman calculated that Papaya's increased or additional revenue from its use of bots was $1.34 billion, which would have been the amount of revenue available to other RMSB companies.

[6] In work done for Papaya in 2022, UBS determined that Papaya's enterprise multiple was 4.1, based on the median enterprise multiple of the gaming industry. Bergman testified that the enterprise multiples in the industry were "basically the same" in 2025.

business has been completely driven from the market. Papaya is wrong.

The goal of compensatory damages is to make the victim of tortious conduct whole, that is, to place the victim in a position "substantially equivalent" to that which he would have enjoyed "had no tort been committed." Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 52 (2d Cir. 2015); 16 N.Y. Prac., New York Law of Torts § 21:3; 36 N.Y. Jur. 2d Damages §§ 6, 54; 3 Dan B. Dobbs, Dobbs Law of Remedies § 3.1 ("Dobbs"); Restatement (Second) of Torts § 903. The goal is to make sure the defendant's breach "does not leave the plaintiff with assets or net worth less than that to which [it] is entitled." Schonfeld v. Hilliard, 218 F.3d 164, 177 (2d Cir. 2000) (quoting Dobbs § 3.3(3) (General Damages or Market Measures)). While a plaintiff may not recover damages when it is "uncertain" whether it has been injured by the defendant's wrongdoing, "[o]nce the plaintiff meets this burden, the defendant bears the risk of uncertainty as to the amount of damages." Anderson Grp., 805 F.3d at 53. Damages are not limited to past and present injury but may include prospective damages that proximately result from the misconduct and flow from the past harm with reasonable certainty. New York Law of

Case 24-26-01146-DLFC Document 1404 Filed 07/27/26 Page 25 of 78

Torts § 21:13; N.Y. Jur. 2d Damages §§ 17, 74; Restatement (Second) of Torts § 910.

Many harms are measured by general or "market" damages, "meaning market-measured compensation calculated by the value of the very thing to which plaintiff was entitled." Dobbs § 3.3(1). Market value damages are based on the idea that the plaintiff's asset suffers "a loss of net worth as a result of defendant's" misconduct and are "pervasive" in cases involving fraud and harm to property. Id. § 3.2. The value of the asset in market value damage calculations "is the amount of money for which the subject matter could be exchanged or procured." Restatement (Second) of Torts § 911. Each asset has "its own market value, and it is the diminution in the value of that [asset] that is the measure of the owner's loss." In re Sept. 11 Litig., 802 F.3d 314, 335 (2d Cir. 2015).

A plaintiff may seek to recover an asset's lost value so long as the asset has "a determinable market value." Schonfeld, 218 F.3d at 177. In determining the market value of intangible assets, courts employ the hypothetical market standard, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Id. at 178 (citing Dobbs § 3.5

(Constructing Market Value)); see In re Sept. 11 Litig., 802 F.3d at 335. "If no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced." Schonfeld, 218 F.3d at 178; see Dobbs § 3.5 (Constructing Market Value).

Skillz was entitled to pursue a theory of lost enterprise value. The jury found that the asset at issue here -- the Skillz business -- decreased in value as a result of its competitor's false advertising. Skillz offered evidence from which the jury could find that Papaya's false advertising, in which it misrepresented the nature of its product, caused Skillz to lose customers, revenue, market share, and ultimately suffer a loss in the value of its entire business. In compensation, Skillz was entitled to an award equal to the loss in the value of its enterprise.[7]

In arguing that a loss in enterprise value is unavailable to Skillz as a matter of law, Papaya primarily relies on the following language taken from Indu Craft, Inc. v. Bank of Baroda: "when the breach of contract results in the complete

[7] During the trial, Papaya pointed to other reasons for the decline in the value of Skillz's business, including its reduction during the years 2022 to 2024 in the amount it spent on customer acquisition and retention. It is noteworthy that the jury awarded Skillz $420 million in damages, which decreased the amount of lost enterprise value calculated by Bergman ($637.5 million) by one-third.

destruction of a business enterprise and the business is susceptible to valuation methods, [enterprise value] provides the best method of calculating damages." 47 F.3d 490, 496 (2d Cir. 1995). Papaya's reliance on Indu Craft is misplaced. Indu Craft does not state that damages measured by a loss in enterprise value are only available when a business is completely destroyed; it states instead that that measure of damages is the best method in those circumstances. Skillz was entitled to seek compensation from the jury that would restore the enterprise value it lost due to Papaya's false advertising.

Papaya relies as well on a footnote in Ne. Tel. Co. v. AT&T Co., 651 F.2d 76, 95 n.30 (2d Cir. 1981), for the proposition that enterprise value damages are also unavailable to a struggling business. Papaya misreads the decision. The plaintiff in that antitrust case sought to recover both lost profits and damages to its "going concern" value.[8] The court held it could not recover both types of damages "for the same period." Id.

In a related argument, Papaya contends that Skillz can only recover its lost profits from Papaya's false advertising. Acknowledging that Skillz had still not made a profit as of the

---

[8] Because Skillz is entitled to submit a damages theory based on enterprise value to the jury, Papaya's arguments that Skillz was not an "almost" completely destroyed business are not addressed.

time of trial, Papaya argues that Skillz cannot recover enterprise value damages simply because Skillz prioritized growth over profits in the years it was developing its business. The evidence at trial showed that Skillz invested heavily in developing its business and enlarging its customer base to achieve not only substantial liquidity but also a network effect. Papaya cites no relevant authority for its argument that Skillz can only recover lost profits. Based on the legal authority recited supra, Skillz was entitled to present the enterprise value theory of damages to the jury, the merits of which the parties robustly debated before the jury.

Finally, Papaya argues that enterprise value damages overcompensate Skillz because Skillz would not have had access to its full business value in cash. Instead, a public company like Skillz has its enterprise value reflected in its stock price and not in money in its bank account. Papaya has presented no case law supporting this proposition. To the contrary, market value damages are a recognized form for valuing harm and compensating an injured party. The jury weighed the evidence at trial and granted Skillz two-thirds of its requested damages amount. Papaya could have, but did not, present any alternative model or damages figures for the jury to consider.

Papaya has not met the heavy burden it faces in contending that the jury's verdict should be overturned.

3. Lanham Act Claim

Papaya next contends that it is entitled to JMOL because Skillz did not prove that Papaya had violated either the Lanham Act or GBL. Its arguments regarding the Lanham Act will be addressed first. As to the Lanham Act, Papaya contends that no reasonable jury could find that its statements were false or material, or that the statements caused any harm to Skillz. Skillz offered sufficient evidence to support the jury's verdict on each of these issues.

The elements of a Lanham Act claim are well established. A plaintiff must prove that the defendant (1) made a statement that was false or misleading; (2) the statement was material; (3) the statement was placed in interstate commerce;[9] and (4) the statement caused actual injury to the plaintiff. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 131-32 (2014); Zesty Paws LLC v. Nutramax Lab'ys, Inc., 157 F.4th 194, 197 (2d Cir. 2025).

"A plaintiff can demonstrate falsity either by showing: (1) literal falsity, i.e., that the challenged advertisement is false on its face, or (2) implied falsity, i.e., that the

[9] The parties did not contest this element.

advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." Int'l Code Council, Inc. v. UpCodes Inc., 43 F.4th 46, 57 (2d Cir. 2022) (citation omitted). A plaintiff may establish literal falsity either by showing that the statement is expressly false or by establishing that the statement is "false by necessary implication, meaning that the advertisement's words or images, considered in context, necessarily and unambiguously imply a false message." Zesty Paws, 157 F.4th at 198 (citation omitted). "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Id. (citation omitted).

There are two ways to demonstrate that a statement, which may be an ambiguous statement, is false by implication. The falsity may be demonstrated through either "extrinsic evidence of consumer confusion" or "evidence of the defendant's deliberate deception." UpCodes, 43 F.4th at 57 (citation omitted).

Papaya describes Skillz's Lanham Act claim as focused on the following phrases in Papaya's advertising: that its games were fair, the games were skill-based, the games included "players" in terms that described the players as human, and that Papaya had no vested interest in the outcome of the games.

Papaya recognizes as well that the false advertising claim was focused on its video advertisements that displayed images of human players.

i. Falsity

Papaya first contends that no reasonable jury could find that the above-listed statements that Papaya made in its advertising were either literally false or impliedly false. Skillz, however, presented an abundance of evidence from which a reasonable jury could conclude that Papaya made statements in its advertising that were literally false. It was undisputed at trial that Papaya populated its tournaments with liquidity bots to bolster the entry rosters and tailored bots to control the outcome of its tournaments. When a bot "won" one of these tournaments, Papaya kept all entry fees. The jury could have also concluded that the statements were false by necessary implication because a reasonable consumer in the RMSB market would have unambiguously interpreted the statements to mean that only humans played against each other in Papaya's tournaments. Moreover, there was also evidence to support a finding of implied falsity. A reasonable juror could have relied on the significant evidence of actual confusion,[10] as well as the

[10] The jury also heard testimony from Skillz's survey expert Dr. Groehn. He conducted a "perception" survey to determine the impact of Papaya's advertisements on players' assumptions about

evidence that Papaya deliberately engaged in the deception of consumers. That purposeful deception was part and parcel of Papaya's deceit of the third parties, such as app stores and payment processors, whose permission was essential to Papaya's entry into the RMSB market. Evidence of deliberate deception "creates a rebuttable presumption of consumer confusion." UpCodes, 43 F.4th at 57 (citation omitted).

Papaya argues that at least some of the phrases it used in its advertising are susceptible to a reasonable interpretation that would render them true and not literally false. To the extent that was so, Papaya had an opportunity to convince the jury of its position. It has not shown that a rejection of its arguments would have been unreasonable.

Papaya next argues that Skillz failed to show that its advertising statements were impliedly false. In doing so, Papaya principally challenges the consumer survey evidence offered by Skillz. Papaya's attacks on that evidence go to its weight and not its admissibility. Papaya was afforded the opportunity to cross-examine Dr. Groehn, Skillz's survey expert, and present its own survey evidence, which it did not. It was

---

bots. He found that 45.8% of respondents watching a Papaya video advertisement and 60% of respondents reading a mock compilation of Papaya's advertising statements believed that only humans played Papaya games.

not error for the jury to weigh the results of Dr. Groehn's surveys or to find those results persuasive. See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2025 WL 3012836, at *7 (S.D.N.Y. Oct. 27, 2025) (denying motion to exclude Dr. Groehn's survey). Moreover, there was abundant evidence that Papaya engaged in deliberate conduct "of an egregious nature" to deceive consumers, which created a presumption of deception. Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 256 (2d Cir. 2014) (citation omitted). It was not unreasonable for the jury to find that Papaya failed to overcome the presumption that at least a significant number of consumers were deceived. Id. at 258.

ii. Materiality

Papaya also argues that Skillz failed to meet its burden to prove that the advertising statements were likely to influence a consumer's purchasing decision. There was abundant evidence, however, that the false statements were material to consumers.[11] As explained above, consumers of Papaya's games complained to Papaya and on social media about Papaya's use of bots. Some of

[11] The jury was instructed that a "material" statement "is one that is likely to influence the purchasing decisions of consumers. To be material, the statement must involve an essential or inherent quality or characteristic of the product that matters to a reasonable consumer when deciding whether to make a purchase."

the complaints lodged with Papaya refer directly to Papaya’s advertising, including Papaya’s statements about fairness. In response, Papaya closed their accounts, deleted their remarks, and lied to them. The jury was entitled to find that Papaya’s own conduct confirmed the materiality of the false statements it had made in its advertising. In addition, in Dr. Groehn’s “likelihood” survey, two-thirds of respondents (66.8%) stated that they would stop playing Papaya’s games if they learned that some of their opponents were bots.

Papaya criticizes Dr. Groehn’s survey for asking respondents whether they would stop playing the game upon learning that the other players were bots, since the phrasing of the question captures consumers’ reactions to learning they had been deceived and does not address their decision about whether to play a game that included bots. Papaya made this point during its cross examination of Dr. Groehn and the jury was free to consider it when weighing Dr. Groehn’s testimony. Papaya chose not to present its own survey evidence and has not shown that the jury was without sufficient admissible evidence to find that its false advertising was material to consumers.

iii. Causation

Finally, Papaya argues that no reasonable jury could have found that any harm suffered by Skillz flowed directly from the

false advertising as opposed to Papaya's use of bots. The jury was instructed:

> The last element that Skillz must prove is that it was actually injured by Papaya's materially false or misleading statements. Skillz must show, by a preponderance of the evidence, that the false or misleading statements proximately caused an injury that Skillz has proven it sustained, such as by a diversion of sales.
>
> Proximate cause means that there must be a sufficient causal connection between the false or misleading statement or statements and any injury or damage sustained by Skillz. The injury or damage must flow directly from the statement and be fairly traceable to it. A statement is a proximate cause if it was a substantial factor in bringing about or actually causing injury. On the other hand, a proximate cause need not be the nearest cause either in time or space and there may be more than one proximate cause of an injury or damage. Many factors may operate at the same time, either independently or together, to cause an injury.

Skillz introduced ample evidence that it was directly injured by Papaya's false advertising. Bergman's testimony regarding the damages and disgorgement models he created provided the jury with tools to quantify that injury.

To the extent Papaya is arguing that the Bergman models measured only injury from its undisclosed use of bots rather than its false advertising, that argument has been discussed above and rejected. To the extent Papaya contends that there were reasons other than Papaya's false advertising for Skillz's loss of revenue, such as Skillz's decision to reduce its user-

acquisition expenses, that issue was litigated at trial and apparently taken into account by the jury when it reduced its award of damages to Skillz by about one-third of the amount Bergman had calculated. This argument provides no basis to reject the jury's verdict.

4. GBL Claim

Papaya recognizes that to the extent its motion has been denied with respect to the Lanham Act claim, then those same arguments should be denied with respect to the GBL claim. Papaya makes one additional argument, however, that applies to the GBL claim alone. Papaya argues that any award to Skillz of damages under the GBL must be limited to financial harm that resulted from Papaya's deception of New York consumers.

The Court denied this same request from Papaya at the charging conference. It is denied again.

To support its argument, Papaya relies on Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314 (2002). For several reasons, Goshen is inapposite. The plaintiffs in Goshen were consumers, not a competitor. And the activity that injured the Florida consumers in Goshen occurred in Florida. Id. at 326. Because the GBL only reaches acts "directed to consumers" and the deceptive acts "took place in Florida," the GBL claims of the Florida plaintiffs were dismissed. Id. Here, there is no

dispute that Papaya advertised to New York consumers and the plaintiff also operated in the New York market. Skillz is entitled to be fully compensated for the injury it incurred through Papaya's wrongdoing even though that injury also impacted consumers who resided outside New York.

B. New Trial

Papaya moves in the alternative for a new trial in the event its motion for JMOL is denied. Under Rule 59(a), Fed. R. Civ. P., a court may grant a new trial only for reasons "for which a new trial has heretofore been granted in an action at law in federal court." Rule 59(a)(1)(a), Fed. R. Civ. P. "A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634 (2d Cir. 2002) (per curiam) (citation omitted).

Papaya argues that it should be granted a new trial because Skillz's presentation of evidence moved the trial's center of gravity away from Papaya's false statements and any harm Skillz suffered from those statements to Papaya's unfair use of bots to gain a competitive advantage. Papaya contends that Skillz's flawed theory of liability led it to present the jury with a defective damages model in which Skillz's expert Bergman failed

to evaluate a but-for world in which Papaya had not engaged in false advertising.

This argument reiterates arguments Papaya made in its motion for JMOL. The motion for a new trial is denied for the reasons already given. Papaya has not shown that the verdict was against the weight of the evidence or that a miscarriage of justice has occurred.

C. Remittitur

Finally, Papaya moves for remittitur of the $420 million damages award. Papaya suggests various alternative award amounts, including an award of one-third of that figure, or $140 million, and an award of $1.386 million, or 3.3% of the $420 million.

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Anderson Grp., 805 F.3d at 51 (citation omitted).

> Remittitur is appropriate in two situations: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

Id. (citation omitted).

Because the calculation of damages is to be done by the jury, the district court's role in reviewing a motion for remittitur "is limited to determining whether the award is so high as to shock the judicial conscience and constitute a denial of justice." Dancy v. McGinley, 843 F.3d 93, 113 (2d Cir. 2016) (citation omitted). The district court should "not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages." Id. (citation omitted). "In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993) (citation omitted). The question is whether the verdict "lies within the reasonable range." Dancy, 843 F.3d at 113.

1. Intrinsically Excessive Award

In support of remittitur, Papaya makes three arguments to support its claim that the damages award is intrinsically excessive. Each argument is addressed in turn.

Papaya first argues that the award is excessive in comparison to other false advertising awards. Papaya has located a trebled false advertising damages award in the Second Circuit of $527,000 and suggests that most false advertising

cases return damages awards in tens or hundreds of thousands of dollars, not millions of dollars. It also identifies an out-of-circuit award of $271 million in damages, <u>Monster Energy Company v. Vital Pharmaceuticals, Inc.</u>, No. 5:18cv-1882-JGB-SHK, ECF No. 890 (C.D. Cal Sept. 29, 2022), but contends that that case is not comparable. Papaya argues that the jury award here of $420 million could only have occurred because the jury concluded that Papaya should not have entered the market or used bots, which Papaya contends is a conclusion that is "irrelevant" to its Lanham Act liability.

Papaya does not contend that there was any error in the jury charge regarding the standard the jury should apply in determining the amount of damages to award. The jury was instructed that "Skillz must prove by a preponderance of the evidence that Papaya's unlawful conduct was the proximate cause of its damage" and that it may "not award damages to Skillz based on any other factors that caused harm to Skillz."

The jury's award does not shock the conscience when measured against that legal standard and the trial evidence. Skillz and Papaya were competing with each other in a new online industry where billions of dollars in revenue were available to the successful RMSB company. Papaya's fraudulent conduct was extraordinary. Papaya's false advertising concerned the very

nature of the only product that Papaya offered: its RMSB tournaments. By deceiving consumers through false advertising, the jury was entitled to find that Papaya usurped Skillz's consumer base and market share. Papaya's revenue skyrocketed while Skillz's plummeted. This occurred despite Papaya spending only a fraction on user acquisition compared to what Skillz had spent. The jury was entitled to find that Papaya's false advertising campaign both drove its successful entry into the market and inflicted hundreds of millions of dollars of damages on Skillz. While witnesses explained that many start-ups wait years to see a profit, it is nonetheless true that Skillz has yet to turn a profit and the jury was entitled to consider that as well in assessing the damages due to Papaya's false advertising. Papaya has cited no comparable case and therefore cannot rely on the Lanham Act awards in other cases to argue that the jury's award here was intrinsically excessive.

Papaya complains that Skillz presented no evidence of how many players saw the advertisements containing the false statements. But this is not an argument for remittitur of the jury's damages award. In any event, the statements at issue

appear throughout the Papaya advertisements introduced at trial, and Papaya failed to offer evidence to the contrary.[12]

Papaya next argues that the award of $420 million is excessive because it is four times Papaya's profits from 2020 to 2023, which were $122 million. Even if it were appropriate to assess the reasonableness of Skillz's damages by the amount of Papaya's profit, the comparison that Papaya offers has several deficiencies. It fails to account for Papaya's decision to reinvest revenue as it built its business and to consider the growth in Papaya's revenue. During the years 2020 to 2023, Papaya reinvested almost $600 million of its revenue into its advertising. Then, in 2024 and 2025, benefitting from the large user base that it had built through its false advertising and that reinvestment, Papaya's revenue increased further. As explained elsewhere in this Opinion, the jury was entitled to find that confining an assessment of Papaya's financial success to only the very first years it entered the market would not fairly measure the impact of its false advertising campaign.

Finally, Papaya argues that the award is excessive because Bergman failed to disaggregate other causes of Papaya's success

[12] Skillz rightfully observes that Papaya's argument should be disregarded because it failed during discovery to provide the very data that it now complains Skillz should have introduced at trial.

and Skillz's decline, such as Papaya's superior graphics and bot use by other competitors. But the jury reduced by one-third Bergman's calculated damages, suggesting that it carefully weighed each of Papaya's arguments and the evidence. Papaya then pivots and argues that in reducing Bergman's calculation the jury must have used the more conservative enterprise multiplier of 2.7 which Papaya argued should be applied, instead of the multiplier of 4.1 that Bergman applied, and that demonstrates that the reduction was still inflated since it does not account for additional factors. This argument falls flat. There is no reason to find that the jury ignored any of the evidence or Papaya's arguments. At bottom, Papaya has not shown that it is entitled to remittitur on the basis that the jury erred in weighing evidence or that the award is intrinsically excessive.

2. Attacks on Bergman's Damages Model

Papaya next offers a critique of Bergman's damages model. None of these challenges warrants remittitur.

First, Papaya asserts that the damages award must, as a matter of law, be proportional to the extent of consumer confusion and materiality. In making this argument, Papaya relies on awards in trademark cases in which this Court considered the extent of consumer confusion shown in surveys in

awarding the plaintiff either its lost profits or the defendant's profits. River Light V, L.P. v. Lin & J Int'l, Inc., No. 13CV3669 (DLC), 2015 WL 3916271, at *8 (S.D.N.Y. June 25, 2015); Volkswagen Aktiengesellschaft v. Uptown Motors, No. 91CV3447 (DLC), 1995 WL 605616, at *2 (S.D.N.Y. July 13, 1995). Papaya's reliance on these trademark cases fails. In Volkswagen, the plaintiff did not have proof that it was damaged by the defendant's violation of its trademark rights and elected to seek disgorgement of the defendant's profits. To calculate what percentage of the defendant's revenue could be attributed to the infringing conduct, the Court relied on a confusion survey offered by the plaintiff. Id. Here, Skillz has evidence of injury to its entire business and seeks damages as well as disgorgement. In River Light, the plaintiff sought its own lost profits as a measure of its damages, using its own confusion survey as a measure of that loss. 2015 WL 3916271, at *7. Neither of these cases suggests that enterprise value damages are inappropriate, much less that such damages should be calculated by using consumer survey results.

Papaya next argues that Bergman improperly calculated the two companies' PMAU, a component of his calculation of the Ratio between their user acquisition spending. Papaya complains that Bergman did not calculate Papaya's PMAU by averaging the two

figures -- Papaya's data for January 2021 and October 2022 -- that he used to project Papaya's year-end PMAU values. Papaya notes that, in contrast, Bergman did average the Skillz monthly data for each year. As Bergman explained, however, he extrapolated Papaya's PMAU from the only two data points for Papaya he had been given, while he had monthly data for Skillz that could be averaged.[13] He explained that estimating and then averaging Papaya's monthly PMAU numbers would have been imprecise and that he did not know whether that estimation would have resulted in higher or lower PMAU numbers for Papaya given the scarcity of the data.[14] This issue was actively litigated before the jury. Papaya's expert Orszag admitted that Bergman's extrapolation from Papaya's two data points was "an acceptable way" of projecting year-end PMAU numbers for both years, but explained why it was better, in his view, to project and then

[13] Papaya did not produce any other PMAU data during the discovery period.

[14] Bergman averaged the monthly PMAU data he had for Skillz to calculate its average PMAU values for the years 2019 and 2020. For Papaya, he extrapolated PMAU values using a linear PMAU growth rate from January 2021 to December 2022 using the two data points from January 2021 and October 2022. He then used the projected year-end PMAU (i.e., for December 2021 and December 2022) as the PMAU value for those respective years. For both companies, he averaged the two year-end PMAU figures he had calculated for that company to calculate his final PMAU for each party.

average monthly PMAU numbers from the two Papaya datapoints. It bears noting that Orszag did not present his own methodology for calculating the damages incurred by Skillz. The jury was entitled to weigh the experts' testimony and to reject Papaya's argument, which it apparently did.[15] This argument does not suggest that a remittitur is appropriate.

Papaya next asserts that Bergman's damages model is inflated because he used Papaya's revenue in 2025, which was two years after Papaya stopped employing bots as players in tournaments. According to Papaya, this confirms that Bergman was improperly measuring the effect of Papaya's bot use and not the effect of its false advertising. As explained above, in calculating the actual damages that Skillz incurred due to Papaya's false advertising, Bergman calculated its loss in enterprise value by multiplying Papaya's "additional" revenue in 2025 by Skillz's market share of 39% in 2021, the year in which Papaya entered the RMSB market. Bergman testified that Skillz's lost enterprise value as of 2025 was $637.5 million.

There was credible evidence at trial that Papaya benefitted from the network effects of its false advertising even after Papaya ceased using bots to fill and control tournaments. In

[15] While the jury reduced the damages Skillz requested, it did not reduce the requested disgorgement amounts, each of which also depended on use of the Ratio.

other words, there was evidence that Papaya was generating revenue in 2025 by running tournaments for the player base that it had built while engaging in false advertising. According to Bergman, his model captured that ongoing harm to Skillz.

Papaya asserts that even if there was some residual benefit in later years, that benefit would have ceased long before 2025 and that "advertising has no analogous carry-forward effect once the alleged mismatch between the advertising and the product no long exists." This argument misapprehends the nature of the service Papaya sold through the false advertising. The trial evidence showed that the goal of Papaya's false advertising campaign was to entice customers who would repeatedly play on its platform and thereby to build a liquid player base and create a network effect that would keep and attract customers. The goal of the advertising was not to sell a single product at one point in time in a unique transaction. Accordingly, the jury was entitled to find that the impact of the false advertising scheme would reverberate after the advertising had ceased to be false. Indeed, Orszag, Papaya's damages expert, testified that the number of Papaya's tournaments fell only 20% after it turned off the bots, suggesting that Papaya continued to benefit from the liquidity it had built through its false advertising.

Papaya contends Bergman erred in using Skillz's market share of the RMSB industry as of June 2021 -- 39% -- in his damages calculation. Papaya argued at trial that the correct market against which to measure Skillz's market share was not the RMSB market but a multi-billion dollar market that included video entertainment, music entertainment, social networking and other forms of leisure, and therefore included the markets in which Sony, Amazon, Meta, Apple and Alphabet, among others operated. Papaya calculated that Skillz's share of that relevant market was just 1.3%, which would have dramatically reduced Bergman's calculations and, according to Papaya, reduced the jury's award to 3.3% of the amount it awarded. Papaya's expert Orszag, however, did not conduct a relevant market analysis to support this contention. Moreover, this was another issue that was vigorously contested at trial. For instance, Skillz pointed to evidence that Papaya's internal documents described its market as the RMSB market and measured itself against Skillz in calculating its market share of that market. Skillz's former Chief Strategy Officer, Chafkin, explained that the RMSB market was a zero-sum market in which one competitor's gain in users equated to losses in users by other RMSB companies. The jury was entitled to reject the relevant market

argument on which Papaya relied at trial and presses again here. Its argument does not provide a basis for a remittitur.

Lastly, Papaya asserts that it is entitled to a remittitur because Bergman failed to account for the fact that Skillz shares 50% of its revenue with its developers. At trial, Skillz's Chafkin explained that the developers' effective revenue share was roughly 7%. Skillz's expert Bergman explained that he reviewed revenue sharing agreements and found that, due to their different formulas, they ultimately had effective developer-revenue-share rates of between 2 and 8%. Bergman also explained the several ways in which his calculation of actual damages had been conservative. For his part, Papaya's expert Orszag noted that the sharing of revenue with a developer is a cost to a business. He did not offer, however, a competing quantitative analysis of the effective revenue-share rate or a competing damages model. This issue was litigated before the jury and Papaya has not shown an error that entitles it to a new trial or remitter of the damages award.

In sum, Papaya's motions for JMOL or a new trial or a remittitur are denied. The evidence at trial amply supported the jury's verdict on liability and its award of damages. Papaya has not shown that the verdict was against the weight of the evidence or unreasonable.

II. Skillz's Motions

Papaya's attacks on the verdict having failed, the Opinion will now address Skillz's requested relief. It seeks disgorgement of Papaya's unlawfully-obtained profits, an enhancement of that award, attorney's fees, prejudgment interest, and costs. These requests are addressed in turn. Skillz's request for an injunction is addressed in a separate Opinion.

A. Disgorgement and Request for Enhanced Monetary Relief

The issue of disgorgement was submitted to the jury for it to render an advisory verdict. See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 812016 (S.D.N.Y. Mar. 23, 2026). It is within the district court's discretion whether "to accept or reject, in whole or in part, the verdict of the advisory jury." Ragin v. Harry Macklowe Real Est. Co., 6 F.3d 898, 907 (2d Cir. 1993) (citation omitted).

Skillz pursued two alternative theories of disgorgement at trial: Papaya's profits and Papaya's cost savings. The jury returned an advisory verdict of $719 million on the former and $652 million on the latter. Skillz requests that the Court double the disgorgement-of-profits amount of $719 million. It alternatively requests that the Court treble the $420 million

damages award.[16] For the following reasons, the Court adopts the jury's advisory verdict and awards disgorgement in the amount of $719 million. Skillz's request to enhance that award to over $1.4 billion is denied.

1. Legal Standard

Section 35 of the Lanham Act authorizes, "subject to the principles of equity," recovery of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to . . . disgorgement of the defendant's ill-gotten profits under § 1117(a)." Lexmark, 572 U.S. at 135–36.

There are three theories under which a district court may enter an award of a defendant's profits under § 35 of the Lanham Act: "(1) unjust enrichment, (2) compensation, and (3) deterrence." Merck, 760 F.3d at 262 (citation omitted). "The deterrence rationale is not compensatory in nature, but rather seeks to protect the public at large." Id. at 261 (citation omitted). The profits a defendant reaped from its unlawful conduct need not be calculated with mathematical certainty.

[16] Skillz does not move to enhance damages under the GBL, which only permits enhancements up to $1,000. GBL § 349(h) (2024 version).

Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973 (2d Cir. 1985). See Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (As long as one of the three rationales for awarding disgorgement is met, the plaintiff need not prove that the "defendant's wrong is the exclusive or even the predominant source of the defendant's profit.").

Whatever theory supports the award of a defendant's profits, however,

> a district court must still balance equitable factors in assessing the propriety of a profits award. These include, but are not limited to: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands.

4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 214 (2d Cir. 2019). A district court must assess the relative importance of these factors and determine whether, on the whole, "the equities weigh in favor of" disgorgement. George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1540 (2d Cir. 1992). While "a defendant's mental state is relevant to assigning an appropriate remedy," it is nonetheless true that a finding of the defendant's willful intent is not a precondition for awarding disgorgement. Romag Fasteners, Inc v. Fossil, Inc., 590 U.S. 212, 219 (2020) (abrogating willful intent

requirement). Nor is actual consumer confusion a prerequisite to an award of a defendant's profits. 4 Pillar, 933 F.3d at 212. A court should, however, "fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall." Id. at 214.

Finally, a plaintiff seeking compensation "for the same injury under different legal theories is only entitled to one recovery." US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 67 n.10 (2d Cir. 2019) (citation omitted) (antitrust). Consequently, Skillz may not recover both its damages and Papaya's profits if that relief would overcompensate Skillz for its injury. See also 5 McCarthy on Trademarks and Unfair Competition § 30:73 (5th ed.).

The Lanham Act also provides for enhancements of an award to a plaintiff. 15 U.S.C. § 1117(a). "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Id. An award disgorging a defendant's profits may also be enhanced.

> If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

Id. Under principles of equity, enhanced monetary relief is warranted when the enhancement reflects the "intangible benefits" that accrued to the defendant as a result of its false advertising, and in particular, the defendant's "usurpation of [the plaintiff's] market share." Merck, 760 F.3d at 263 (citation omitted).

2. The Disgorgement Award

Through its advisory verdict, the jury awarded Skillz $719 million in Papaya's profits. That award was amply justified by the trial evidence and will be adopted as the amount to be awarded in this judgment, in addition to certain attorney's fees and costs.

The award of $719 million is principally justified by the need to prevent Papaya's unjust enrichment. It will also compensate Skillz for the injury it incurred from Papaya's false advertising in violation of the Lanham Act and GBL. The third factor that supports a disgorgement of a wrongdoer's profits, the need to deter the wrongdoer from future illegality, is less relevant. While this award will help to deter other companies that may be inclined to enter a market with false advertising about the essential nature of its product, Skillz has not shown that disgorgement is necessary to deter Papaya from engaging again in false advertising regarding the composition of its

tournaments.[17] It appears that Papaya largely ceased its false advertising in late 2023 by discontinuing the use of bots in its tournaments and there is no realistic possibility that Papaya will return to its false advertising campaign now that the unlawful advertising has been publicly revealed and addressed in this judgment.

Skillz has shown that equity requires that Papaya be deprived of the profits it achieved through its intentional multi-year violation of the laws against false advertising. Its successful entry into the RMSB market with a relatively small investment and its swift growth to become a major participant in that market was achieved through a years-long scheme to deceive consumers, as well as others, about the core features of its product. Instead of disclosing that it would use bots to achieve instantaneous player liquidity and to motivate losing players to enroll in more tournaments on its platform, it falsely advertised its games in terms that conveyed -- in multiple ways -- that human beings would compete with each other

[17] The Court is aware that Papaya continues to deny that it used false advertisements. For instance, in arguing that Papaya's violation of the Lanham Act was not willful, Papaya's brief in opposition to Skillz's motion for disgorgement asserts that "Papaya did not use false advertisements to gain entry into the market; Papaya's advertisements were not 'the result of a deceptive and willful decision to induce customers.'"

in Papaya's cash tournaments and that their individual skill would fairly determine the outcome.

Depriving Papaya of the profits it obtained unfairly from this deceptive and unlawful advertising campaign is justified by each the relevant equitable factors. Those factors are addressed next.

It cannot be fairly disputed that Papaya reaped enormous profits from its false advertising scheme. Without its false advertising, it could not have entered the U.S. market or swiftly achieved its significant market share and the billions of dollars in revenue that came with that market share. Certainly, Papaya's relatively modest financial investment in its start-up business did not explain its explosive growth and Papaya did not suggest at trial that it could or that it did. Even large, deep-pocketed U.S. companies that had contemplated entering the market to compete with Skillz, which had already achieved a network effect, decided against doing so.

While an award of Skillz's loss in enterprise value, which the jury determined was appropriately calculated as $420 million, is available as a remedy, equity weighs in favor of depriving the wrongdoer of the benefits of its illegal scheme. Papaya is still a substantial player in the market and, because players tend to stay on a platform with which they are familiar,

the impact on Skillz of Papaya's wrongdoing will continue for the foreseeable future.

As for the role of Papaya in effectuating the scheme, that factor also weighs strongly in the award of Papaya's profits to Skillz. The false advertising program was run and controlled by the executives who founded and managed Papaya. These executives actively controlled Papaya's response to consumers who came to suspect, despite the representations in its advertising, that Papaya was running cash tournaments in which players "competed" against bots and not human beings. Even when Skillz sued Papaya, they did not forthrightly admit their employment of bots but required Skillz to expend significant resources and energy to prove that that had been so and the degree to which it had been done.

There has been no unreasonable delay by Skillz in asserting its claims against Papaya that could weigh against this disgorgement of Papaya's profits. While Skillz came to suspect and then believe in 2023 that Papaya's success was due to its false advertising and employment of bots, Skillz was entitled to sufficient time to develop the reasonable grounds necessary to plead its claim in federal court in early 2024. Since that filing, Skillz has proceeded with diligence to prosecute this lawsuit, despite Papaya's strategy of making Skillz's assembly

of the proof of its claims difficult and expensive. Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 915251, at *1 (S.D.N.Y. Apr. 3, 2026) (Fifth Amendment Privilege Opinion); Papaya Gaming, Ltd. v. Fair Play for Mobile Games, No. 25CV5573 (DLC), 2026 WL 558698, at *14 (S.D.N.Y. Feb. 27, 2026) (imposing sanctions against Papaya and its counsel for filing dismissed counterclaims in Virginia).

Finally, there is no evidence that Skillz has unclean hands. To the contrary, because Skillz did not use bots as "players" to create liquidity in its tournaments, its tournaments were largely confined to two-player tournaments. While Papaya tried to cobble together a theory that Skillz's conduct -- in managing the system by which players of similar skill were matched in tournaments -- constituted unclean hands, that theory did not survive scrutiny. See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2025 WL 438387, at *13 (S.D.N.Y. Feb. 7, 2025) (dismissing certain counterclaims); Skillz, 2025 WL 918411, at *7 (S.D.N.Y. Mar. 26, 2025) (denying motion for leave to file further amended counterclaims); Skillz, 2025 WL 3268799, at *7 (S.D.N.Y. Nov. 21, 2025) (granting summary judgment to Skillz on Papaya's counterclaims); Papaya Gaming, Ltd. v. Fair Play for Mobile Games, No. 25CV5573 (DLC), 2026 WL 558698, at *14 (S.D.N.Y. Feb. 27, 2026) (imposing

sanctions against Papaya and its counsel for filing dismissed counterclaims in Virginia).

Weighing each of these factors, and considering the evidence presented at trial, a disgorgement award of $719 million to reflect Papaya's illegally obtained profits and to compensate Skillz is amply justified. Skillz's request for an enhancement of the disgorgement award of $719 million or alternatively an enhancement of the damages award of $420 million, however, is denied.

Skillz is correct that through Papaya's violation of the Lanham Act, Papaya usurped Skillz's market share and that the amount awarded in disgorgement could be properly enhanced under the law. See Merck, 760 F.3d at 263. As an exercise of the Court's discretion, however, no enhancement will be made. The magnitude of the award that will be given here is sufficient to meet each of the equitable factors a court must weigh, including when those factors are weighed together.

If no disgorgement award were available, however, the Court would enhance the actual damages award by doubling it (but not by tripling it as Skillz requests). The actual damages awarded by the jury in the amount of $420 million would be enhanced to $840 million.

As was true in Merck, the fact of actual damage to Skillz cannot be fairly disputed; it was severe but hard to quantify. The jury discounted by one-third the request made by Skillz for the award of $637.5 million, which Bergman calculated was the amount of Skillz's lost enterprise value as of the end of 2025. An enhancement of the jury award of $420 million would be appropriate for several reasons, including the following. The damage inflicted by Papaya on Skillz included a loss in revenue and market share which will last into the foreseeable future. Papaya has created its own network effect and no longer requires its undisclosed use of bots and false advertising to remain the dominant RMSB business that it has become. Moreover, the changes within Skillz in 2023 and thereafter, such as its reduction in user acquisition expenditures and its executive turnover, which Papaya was apparently successful in arguing should offset the Bergman calculation of lost enterprise value, could have just as properly been disregarded. The evidence suggested that these changes were themselves tied to Papaya's false advertising. Skillz had studied why it was losing ground to Papaya despite the very hefty expenditures it had made to build its user population. It looked at Papaya's advertising and found no explanation there. It compared aspects of its platform and marketing to Papaya's and again found no adequate

explanation. The evidence at trial, however, revealed that Papaya's explosive growth was due to false advertising and the liquidity achieved through that advertising and its undisclosed use of bots.

Because the disgorgement award of $719 million is sufficient to meet the relevant equitable concerns, however, it is that amount that will constitute the judgment. Papaya makes several arguments in opposition to the disgorgement of its profits in the amount of $719 million. None succeeds in showing that Papaya should not be required to disgorge that amount, as representing its wrongfully-obtained profits.

Papaya begins by reasserting arguments that have been discussed above and rejected. Papaya argues that Bergman's calculation of its profits is unreliable since he measured its profits from its use of bots and not from the advertisements that the jury found to be false. Papaya argues that it would have made the profits that Skillz seeks to disgorge even if it had never made the false statements in its advertising. Not so. Skillz demonstrated conclusively at trial that these two issues are inextricably intertwined. Skillz could not have successfully entered the market with its relatively modest investment, much less have made billions of dollars in revenue, without the use of bots, and it could not have used those bots

as "players" in its tournaments without its program of false advertising. Papaya's effort to disentangle these issues is rejected.

Similarly, Papaya again argues that Bergman constructed the wrong but-for world. It argues that he should have assumed that Papaya had used bots as it did but did not make the false statements in its advertisements. As explained supra, that argument is fundamentally flawed. Papaya did not explain to the jury or in this briefing what such advertisements might have looked like. In contrast, Skillz presented an abundance of evidence to show that any truthful description by Papaya of its use of bots in its cash tournaments would have doomed Papaya's entry into the market. There was unrefuted evidence at trial that Papaya was required to describe its product as skill-based and fair, and to distinguish it from gambling to get access to the U.S. market.

Papaya next attacks the model Bergman used to calculate the disgorgement of Papaya's "additional" profits gained from its false advertising. That model is as follows. To calculate the profits that Papaya earned from its false advertising, Bergman modeled a but-for world. He first calculated the amount that Papaya spent to acquire a paying monthly average user ("PMAU"),

which was $297.[18] He then calculated Skillz's PMAU as 2.1 times that amount. Bergman designated that 2.1 figure as the User Spend Ratio or Ratio. Applying the 2.1 Ratio to Papaya's total revenue of roughly $2.1 billion from 2020 through 2025, Bergman calculated that Papaya's but-for revenue without the use of bots would have been $731 million, making a difference of $1.34 billion in revenue. Deducting certain costs from the $1.34 billion, Bergman concluded that Papaya's profit from its false advertising was $719,003,023, which the jury apparently rounded to $719 million when it awarded disgorgement of Papaya's profits.

Papaya first argues that Skillz failed to show that the Ratio of 2.1 had anything to do with Papaya's bot use. It contends that reliance on the Ratio ignores the multiple factors that could have made Papaya's expenditure on user acquisition more efficient than Skillz's, such as the better quality of Papaya's games, its better marketing, its excellent user interface, its well-regarded brand and effective social media presence, in contrast to Skillz's deficient performance on each of these metrics. Papaya emphasizes that Skillz cut its historically hefty user acquisition spending in 2022, in 2023,

[18] Papaya's attack on Bergman's PMAU calculation is addressed supra.

and again in 2024, which coincided with a substantial reduction in Skillz's revenue over those years. Each of these arguments was made to the jury and Skillz responded to each of them with its own evidence and arguments. Skillz's evidence included testimony from its executive about the futile efforts it made to try to understand why it could not compete effectively against Papaya. Teams at Skillz and its consultants tested the apparent differences between the Skillz and Papaya platforms and could not identify a difference that accounted for Skillz's declining market share.

In sum, Papaya failed to show at trial that the 2.1 Ratio was not a reliable metric to use when calculating the "additional" revenue that Papaya made through its false advertising. The evidence was overwhelming that Papaya was able to reach, in its own words, "hyper-growth" within a year. Papaya attributed its "exponential" revenue growth to its "very liquid ecosystem," a not-so-veiled reference to its extensive use of bots to create player liquidity.

Papaya next challenges Bergman's use of its revenue in 2024 and 2025 to calculate the profits that should be disgorged, instead of restricting the calculations to its revenue in the years 2020 through 2023. It emphasizes that it ceased using bots to create liquidity in cash tournaments in November of

2023. The revenue from those first three years was just under $1 billion, as opposed to over $2 billion over the course of the five-year period. This argument carries little weight. Notably, Papaya did not argue at trial that it did not continue to benefit in 2024 and 2025 from the players it acquired through its multi-year false advertising and employment of bots before 2024. Restricting disgorgement of Papaya's wrongful profits to just those years in which it employed bots would result in a massive understatement of both the benefit of the false advertising to Papaya and the injury to Skillz.

Papaya argues that Bergman should also have deducted even more than he did from Papaya's revenue to arrive at a profit figure.[19] Papaya argues that Bergman failed to deduct its operating expenses, R&D expenses, sales and marketing expense, and general and administrative costs. Even though the burden to identify deductible expenses rests on a defendant, Bergman made certain deductions in his disgorgement calculation and Papaya did not contend at trial that Bergman failed to deduct fewer expenses than he should have. The Court will not undertake such an examination now. While its brief in opposition to the award

[19] Bergman subtracted 54% of Papaya's revenue to account for its costs or $621 million from the $1.3 billion in additional revenue to arrive at an additional profit figure of $719 million.

of disgorgement lists a few documents that reflect expenses that it would now like to have deducted from Bergman's calculation, any fair assessment of that data and this request would require a bench trial. Reliable fact-finding at that trial would be complicated by Papaya's failure to produce certain relevant financial data in discovery. Such an undertaking though is unnecessary. Skillz is not required to prove the disgorgement amount with precision, and the record amply supports the magnitude of the amount of disgorgement awarded by the jury.

As a final attack on Bergman's calculation, Papaya argues that any disgorgement amount should be reduced by 13% to remove non-U.S. revenue. The Lanham Act is not extraterritorial. Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 415 (2023).[20] Skillz has the burden to show therefore that Papaya's U.S. revenue is used in the disgorgement calculation. Papaya's audited financial statements, which were introduced at trial, did not disaggregate U.S. sales from foreign sales.

To prove that its revenue should be reduced by 13%, Papaya relies on a single graphic in a single document: a January 2023

[20] At Skillz's request during the charging conference, the Court removed from its jury charge language in the instruction that, to obtain an award of Papaya's profits, Skillz must show the amount of revenue from Papaya's sales "in the United States" that was proximately caused by the unlawful conduct. The Court explained that that issue affected only the disgorgement calculation and had not been discussed before the jury.

PowerPoint presentation prepared by a third-party for Papaya, apparently to entice investors. (As of that time, Papaya was still engaged in false advertising in the United States.) The presentation disclaims that it is an "audit or due-diligence review"; it warns that the author does not give "any representation or warranty, express of implied, as to the accuracy or completeness of the information" in the document. The document states that there is an opportunity to invest in Papaya, which is "the only scaled profitable skill gaming business." The document repeatedly compares Papaya to Skillz, projecting that Skillz's market share would continue to decline and Papaya's would continue to grow. It represents that Papaya only operates in jurisdictions where its games are legal and not subject to license, "including in the US". At page ten, where the graphic at issue appears, the document explains that Papaya is well positioned to expand, including into new territories. The graphic represents that Papaya's gross non-U.S. revenue grew from the third-quarter of 2020 to the third-quarter of 2022 from 5% to 13%.

No adjustment to the $719 million disgorgement figure is necessary. It is undisputed that the U.S. was Papaya's target market when it began its RMSB business and that all but a fraction of Papaya's revenue has been derived over the years

from U.S. customers who paid to participate in its cash tournaments. Papaya denied Skillz access during the discovery period to relevant information that Skillz sought, including the information that would permit Skillz to accept the representation in this graphic, to dispute it, or to place it in context.[21] Papaya has not offered any other document to show whether its percentage of foreign revenue remained at 13%, increased, or declined over the period following the third-quarter of 2022. Given this record, there is no need to adjust the disgorgement figure, which in any event need not be proven with precision.

Papaya makes several other arguments to suggest that a disgorgement award of $719 million is excessive. First, it contends that the disgorgement award should be reduced by about 70% to reflect an absence of consumer confusion. Papaya reaches this figure by cobbling together some of the responses given in Skillz's consumer confusion and likelihood surveys.[22] Papaya has

[21] At the charging conference, Skillz noted that it had no information on how the 13% number was derived, including whether it reflected foreign nationals playing Americans in Papaya tournaments.

[22] Papaya multiplies the 45.8% of consumers who believed, upon viewing a compilation of statements from Papaya advertising, that Papaya's games would involve only human players, with the 66.8% of players who answered that they would likely stop playing if they learned that their opponents were bots. From

Case 24-cv-01646-DII  Document 1004  Filed 07/27/26  Page 66 of 78

not shown that the disgorgement of its illegally obtained profits should be reduced because of the Skillz survey numbers. Without the false advertising, Papaya would not have been able to enter the market or make any profit. The principles which dictate that Papaya be deprived of its unjust enrichment and that Skillz be adequately compensated for its losses do not support a reduction in the award of $719 million.

Papaya contends that its net operating profit of $122 million[23] for the years 2020 through 2023 is the proper starting point for any disgorgement analysis. As described above, Bergman's calculation of the amount of Papaya's profits that should be disgorged began with a calculation of Papaya's revenue, not its net operating profit, and included the revenue for the years 2020 through 2025, not just the first three years of its operations. Despite Papaya's efforts at trial, the jury accepted Bergman's analysis and rejected Papaya's arguments for reducing the disgorgement award. The jury's conclusion was well supported by the record. As Skillz points out, it appears that Papaya chose to increase its market share as quickly as possible

---

this multiplication, it argues that only about 30% of players would have been affected by bots.

[23] Generally speaking, net operating profit is calculated by subtracting operating expenses and the cost of goods sold from revenue.

Case 1:24-cv-01646-DLC Document 104 Filed 07/27/26 Page 67 of 78

by reinvesting the bulk of its profits into its business. That decision suggests that Bergman was correct to use Papaya's revenue (as opposed to its net operating profit) as the starting point for his disgorgement calculation. And, as already discussed above, it was appropriate to include Papaya's revenue from 2024 and 2025 when measuring the unlawful profits that Papaya accrued due to its multi-year false advertising campaign during the years 2020 through 2023. An award of $719 million therefore properly reflects the magnitude of the benefit that Papaya improperly received from its false advertising campaign.

Turning to issues of equity, Papaya contends that the award of damages in the amount of $420 million, or even a lesser amount, would be sufficient not only to compensate Skillz but also to prevent unjust enrichment. To support this argument, Papaya asserts that Skillz's loss of users and revenue were not tied directly to the gains made by Papaya in users and revenue.[24]

---

[24] For example, Papaya points out that when it stopped using bots at the end of 2023, the number of its tournaments declined but Skillz did not see any increase in users of its platform. Of course, a decline in the number of tournaments, when Papaya was no longer using "liquidity bots" to instantaneously fill tournaments, does not necessarily mean that Papaya experienced a decline in its user base or market share. There was evidence at trial that users tend to stay with the platform that they know and no evidence that Papaya lost any users. Papaya also points to Skillz's decline in revenue in 2023 and 2024. The multiple potential reasons for that decline were the focus of significant testimony and argument at trial. While those reasons could appropriately account for a reduction in the damages awarded by

That assertion does not withstand scrutiny. There can be no doubt that through its false advertising, Papaya entered the RMSB market and in lightning speed took market share from Skillz. Papaya's user base, revenue and market share grew by leaps and bounds during the years of its false advertising. It will benefit for the foreseeable future from the massive user base it created during the years 2020 to 2023. A disgorgement in the amount of $719 million is amply supported by the trial record to prevent Papaya's unjust enrichment.

B. Attorney's Fees, Prejudgment Interest, and Costs

Finally, Skillz requests approximately $16.6 million in attorney's fees, $173.5 million in prejudgment interest, $1.94 million in costs, as well as post-judgment interest.[25] Skillz's request is granted in part.

1. Attorney's Fees

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "[A]n 'exceptional' case is

---

the jury, those reasons do not suggest that the amount of the disgorgement award determined by the jury should be adjusted. The disgorgement award properly accounted for Papaya's unjust enrichment.

[25] Papaya does not oppose Skillz's request for post-judgment interest.

simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530 (2d Cir. 2018) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).

In deciding whether a case is "exceptional," courts should "evaluate the totality of the circumstances, [and] consider[] a wide variety of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Sleepy's, 909 F.3d at 530 (citation omitted). Exceptional circumstances may include "willful infringement" and bad faith, both with respect to the infringing conduct and the conduct of the litigation process. Merck, 760 F.3d at 265 (citation omitted). In Merck, the Court of Appeals affirmed an award of attorney's fees where the defendant's false advertising was willful and done in bad faith and the defendant's "litigation strategy was conducted in bad faith, with senior officials, including [the CEO], frustrating the litigation process at every turn, from withholding documents in discovery and obstructing

depositions to testifying falsely under oath." Id. at 265 (citation omitted).

Under the GBL, "[t]he court may award reasonable attorney's fees to a prevailing plaintiff." GBL § 349(h) (2024 version). Factors to consider when awarding reasonable attorney's fees include the "time and skill required in litigating the case, the complexity of issues, the customary fee for the work, and the results achieved." Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992) (applying New York law).

When a court awards attorney's fees, the familiar lodestar method is used as the starting point for calculating a "presumptively reasonable fee." Millea v. Metro-N. R. Co., 658 F.3d 154, 166 (2d Cir. 2011) (citation omitted). Calculating the lodestar requires "determining a reasonable hourly rate by considering all pertinent factors . . . and then multiplying that rate by the number of hours reasonably expended." Lilly v. City of New York, 934 F.3d 222, 230 (2d Cir. 2019).

The calculation of attorney's fees "should not result in a second major litigation," because "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838 (2011) (citation omitted). Therefore, a court "may take into account [its] overall sense of a suit" in imposing a fee award, "and may

use estimates in calculating and allocating an attorney's time." Id.

Skillz seeks an award of roughly $16.6 million in attorney's fees incurred in this litigation through the end of the trial. It requests an additional award of the fees incurred from this post-trial motion practice. The motion is granted, but only for the period through December 31, 2025, which will apparently reduce by roughly $6.5 million the requested amount of $16.6 million. Papaya does not dispute the lodestar calculation tendered by Skillz; it does dispute that any award of attorney's fees should be made.

This case is exceptional and fees are awarded under both the Lanham Act and the GBL. At its heart, this false advertising case revealed that Papaya entered the U.S. market through a massive deception. It falsely described its product to consumers, unfairly competed with Skillz, and lied to app stores, payment processors and others. There is ample evidence that Papaya acted willfully and in bad faith, a relevant but not controlling factor. As one example, taken from the document that Papaya's lawyers prepared to obtain access for Papaya to the services of payment processors,[26] Papaya understood that

[26] The record is silent on how Papaya described its platform to its attorneys.

online gambling for cash would violate both federal law and the laws of many States. Therefore, the document is rife with false and misleading statements about the Papaya product. In sum, Papaya's founders and executives willfully and intentionally created and controlled a scheme to profit from its deception of consumers and at the expense of a competitor like Skillz (who did not employ bots as players in its cash tournaments). Given Papaya's wide-ranging and multi-year deception about its only product and its exploitation of that deception through its massive employment of bots, this case stands out from others. Skillz's proof of Papaya's liability is overwhelming whether assessed from either a legal or factual perspective. Consideration of Papaya's continued defense against a finding of liability as presented in its post-trial briefing does not alter that assessment.

This case is also exceptional because of the unreasonable manner in which Papaya litigated the case in 2024 and 2025. This litigation would have cost both the plaintiff and the defendant only a fraction of what it did in 2024 and 2025 if Papaya had complied forthrightly with its discovery obligations. Instead, Papaya slow-walked and obstructed the production of critical discovery material through the entire discovery period.

This strategy required persistence from Skillz,[27] imposed excessive litigation costs on both parties, and burdened the Court. The ramifications of Papaya's strategy continues to ricochet through this litigation. For example, during the presentation of the defense case, Skillz learned for the first time that Papaya had wrongfully redacted highly relevant passages from its documents by marking the material "nonresponsive," including pages that graphed such things as the number of Papaya's app store "installs" between 2020 and 2022, and its 2022 market share in comparison to Skillz.[28]

Skillz seeks this award of attorney's fees not only for Papaya's obstruction of discovery but also for Papaya's pleading of flawed counterclaims and some of Papaya's motion practice. These aspects of Papaya's defense do not warrant a finding that

---

[27] Skillz's attorney Ms. Amy Nemetz was called upon repeatedly to demonstrate her impressive command of the record and discovery production in the many conferences with the Court in which Skillz sought documents and answers to interrogatories long after they were due.

[28] As described on the record on April 16, when Papaya gave notice that it would be offering DX 144 at trial, which was a highly redacted Papaya business record produced in discovery, Skillz asked for and received the unredacted version, which can be found as Court Exhibit 4. DX 144 identified redacted material as "nonresponsive", even though it was highly responsive to Skillz's document demands. The next day the Court was advised that Papaya would not seek to offer any of the redacted documents that appeared on its exhibit list for trial and would provide Skillz with unredacted copies of each of them.

this is an exceptional case for which an award of attorney's fees is warranted. It is not unusual for defendants facing enormous damages awards to plead multiple counterclaims and engage in repetitive motion practice where its likelihood of success on those pleadings and motions is slim. As Papaya phrases it, its defense was proportionate to its exposure. But, while those pleadings and that motion practice do not merit an award of attorney's fees on their own, they also do not weigh against the award that will be granted here.

Accordingly, the Court will award the attorney's fees incurred by Skillz in 2024 and 2025. This award is neither a punishment nor a penalty. It is imposed under principles of equity for this exceptional case. The Court declines, however, to award the attorney's fees Skillz incurred this year. The award for the first two years of this litigation is sufficient to reflect the extraordinary nature of Papaya's violation of the law as well as its obstruction of the discovery process. This year, Papaya changed counsel and the parties were largely involved in preparing for the April trial. From any point of view, it was reasonable for Papaya to litigate the amount to be awarded in damages and that was largely the focus of the trial.

Skillz argues that some of the motions brought by Papaya in 2026, including the motion filed on the eve of trial to permit

its executives to withdraw their invocations of the Fifth Amendment privilege and to testify at trial, justify an award of fees incurred in 2026 as well.[29] It is the Court's assessment that the award of attorney's fees for the first two calendar years of this litigation is sufficient to account for both the extraordinary nature and conduct of the litigation.

Papaya suggests that, should any fees be imposed, that the Court identify specific positions that it took during the pretrial period and calculate the fees associated with any "unreasonable" delay associated with those specific events. It identifies roughly $800,000 associated with its reliance on the Hague Convention in 2024 to resist discovery and about $500,000 associated with its executives' invocation of the Fifth Amendment in 2025. The Court will not undertake such a time-consuming task. In any event, the exceptional nature of this litigation is associated with not just the defendants' obstruction of discovery, which caused undue delay, burden and expense, and deprived Skillz of relevant information. The award

---

[29] For instance, Skillz also points to the fact that it had to respond to Papaya's efforts at trial to discredit Dr. Groehn's survey testimony for not relying on data when that data was not disclosed in discovery; Papaya's attempt to introduce evidence at trial related to Papaya's counterclaims, thus warranting a motion in limine; and, crucially, to Papaya's motion to supplement the expert opinion of Orszag after discovery had closed and summary judgment on the counterclaims had been granted.

of attorney's fees is also appropriate because of Papaya's willful, bad faith violation of the law through its false advertising scheme.

2. Prejudgment Interest

As for the prejudgment interest that may be awarded under the Lanham Act, the law "draws no distinctions between the showing required to support such an award and that required to justify an award of attorney's fees." 4 Pillar, 933 F.3d at 216. Accordingly, such an award is "within the discretion of the trial court and is also normally reserved for 'exceptional' cases." Id. at 215 (citation omitted). The Court of Appeals has expressed its preference "for the district court to explicitly state its reasons for awarding prejudgment interest." Merck, 760 F.3d at 264 (citation omitted).

Skillz requests an award of prejudgment interest of over $173 million, assuming a $719 million disgorgement award. That disgorgement award, as explained above, represents Papaya's unlawfully obtained profits as of December 2025. The Court declines to award prejudgment interest.

Although this is an exceptional case from several perspectives, the award of attorney's fees is sufficient to address that exceptional nature. Moreover, unlike a case with a straightforward calculation of damages that reflects an out-of-

pocket loss to a plaintiff at a specific point in time, or even a reasonable substitute for that loss, the award here is of the defendant's profits. The amount of disgorgement is calculated to deprive Papaya of its unjust enrichment. While disgorgement will also serve to compensate Skillz for the significant injury it suffered, in the Court's judgment it is not appropriate to award prejudgment interest on the disgorgement amount of $719 million and the Court declines to do so.

3. Costs

As stated above, "subject to the principles of equity," a Lanham Act plaintiff may recover "the costs of the action." 15 U.S.C. § 1117(a). The Court of Appeals for the Second Circuit has reviewed Lanham Act awards of the cost of litigation under the same standard for -- and in conjunction with -- the award of attorney's fees. See Merck, 760 F.3d at 265.

Skillz is awarded all costs incurred in 2025 that were associated with the invocation of the Fifth Amendment by the Papaya witnesses, including the costs of travel to London in connection with those depositions. While this is a fraction of the amount it seeks, it is sufficient in light of the award of attorney's fees to address the extraordinary nature of this litigation.

**Conclusion**

Papaya's May 15, 2026 motions are denied. Skillz's May 15, 2026 motions are granted in part. Skillz is awarded a total of $719 million in disgorgement, its attorney's fees for 2024 and 2025, and the costs it incurred in 2025 from the invocation of the Fifth Amendment by the Papaya witnesses.

Dated: New York, New York
July 27, 2026

DENISE COTE
United States District Judge

# EXHIBIT 13

**Exhibit C**

**Debt Arrangement**

**(Hebrew and Certified English Translation)**

**Debt Arrangement**

**(Original Hebrew)**

# הסדר חוב בין חברת פאפאייה גיימינג בע#מ ו Papaya Gaming Inc. לבין נושיהן

## בהתאם להוראות חלק י) לחוק חדלות פירעון ושיקום כלכלי- התשע#ח 3129.

## א# פרשנות והגדרות

בהסדר זה תהיה למונחים הבאים המשמעות המצוינת בצדם להלן, אלא אם יצוין במפורש אחרת:

| | |
|---|---|
| #החוק# | חוק חדלות פירעון ושיקום כלכלי, התשע״ח-2018. |
| #התקנות# | תקנות חדלות פירעון ושיקום כלכלי, התשע״ט-2019. |
| #בית המשפט״ | בית המשפט המחוזי בתל אביב-יפו הדן בבקשה לאישור ההסדר. |
| #הבקשה לאישור ההסדר# | בקשה למתן צו לכינוס אסיפות לצורך אישור הסדר חוב זה המוגשת לבית המשפט. |
| #הממונה# | הממונה על הליכי חדלות פירעון ושיקום כלכלי. |
| #ההסדר או הסדר החוב# | הצעת הסדר חוב זו, וככל שתאושר בשינויים מסוימים - כפי שתאושר. |
| #החברות# | פאפאייה גיימינג בע״מ, ח.פ. 515422095 (״פאפאייה ישראל״), וכן חברת Papaya Gaming Inc, מספר חברה 32-0533649 (״פאפאייה ארה#ב״), (וביחד: ״החברות״). |
| ״מועד כניסת ההסדר לתוקף# | המועד בו יתמלא התנאי המתלה לכניסת ההסדר לתוקף (כהגדרת מונח זה בהסדר). |
| #מועד הוכחות החוב# | המועד להגשת תביעות חוב (להלן גם: ״הוכחות חוב״) כקבוע בסעיף 22 בפרק ו׳ להלן, או מועד אחר ככל שייקבע כך על ידי בית המשפט. |
| #נושים מוחרגים# | כל אחד מאלה:<br>(א) כלל הספקים והעובדים של החברות;<br>(ב) כלל השחקנים, למעט בעילות הקשורות לפרקטיקות של שימוש עבר בבוטים וכל הנובע מכך והכרוך בכך, במישרין או בעקיפין.<br>(ג) רשויות מס, המוסד לביטוח לאומי, קופות גמל וקופות פנסיה;<br>(ד) התובע הכללי של מדינת ניו ג׳רזי. |
| #נושה מותנה# | נושה שאינו בין הנושים המוחרגים ואשר - |

| | |
|---|---|
| | (א) נכון ליום הגשת הבקשה לאישור ההסדר הוא מנהל נגד החברות, או איזו מהן, הליכים משפטיים התלויים ועומדים בערכאות בעילות הקשורות לפרקטיקות של שימוש עבר בבוטים וכל הנובע מכך והכרוך בכך, במישרין או בעקיפין; או<br>(ב) נכון ליום הגשת הבקשה לאישור ההסדר יש לו עילה לנקוט הליך משפטי בעילות כאמור; או<br>(ג) נכון ליום הגשת הבקשה לאישור ההסדר, ניתן לזכותו פסק דין זר נגד החברות או איזו מהן, אשר עודנו כפוף לערעור ולפיכך טרם הפך לפסק דין כספי אכיף בישראל. |
| #חוב מותנה# | חוב נטען מכוח אחת העילות המנויות בהגדרת נושה מותנה. |
| #פסק דין כספי אכיף# | פסק דין בר-אכיפה בישראל, כדלקמן:<br>(א) ביחס לפסק דין שניתן במדינה זרה - פסק חוץ העומד בכל התנאים לאכיפת פסק חוץ, כמשמעותם בסעיף 3 לחוק אכיפת פסקי-חוץ, התשי"ח-1958;<br>(ב) ביחס לפסק דין שניתן במדינת ישראל - פסק דין שניתן על-ידי בית משפט מוסמך בישראל אשר לא ניתן לגביו צו לעיכוב ביצוע. |
| #נושה מותנה זכאי# | נושה מותנה שניתן לזכותו פסק דין כספי אכיף בישראל כנגד מי מהחברות. |
| #פיקדון מנהל ההסדר# | כסף המופקד על פי ההסדר בקופת מנהל ההסדר, וישמש כמקור כספי ייעודי לפירעון חובותיהן של החברות כלפי נושים מותנים זכאים כקבוע בהסדר זה ועבור שכרו של מנהל ההסדר בלבד. |
| #צו בית משפט# | הצו האמור בפרק ד' להסדר זה. |
| #התנאי המתלה לכניסת ההסדר לתוקף# | התנאי המתלה להסדר המפורט בפרק ד' להסדר זה. |
| #בעלי מניות# | כל אדם או תאגיד המחזיק, במישרין או בעקיפין, במועד כניסת ההסדר לתוקף, במניות של החברות. |

| | |
|---|---|
| #יתרת מזומנים פנויה# | יתרת המזומנים המוחזקת בחשבונות הבנק של פאפאייה ישראל, בניכוי אך ורק של (א) הסכומים המשועבדים לטובת הבנקים שבהם מוחזקות היתרות, כדלקמן: פיקדונות להבטחת ערבות בנקאית למשכירי נכסים ולתשלומים בגין כרטיסי אשראי ולעסקאות גידור; ו-(ב) בניכוי יתרות זכות של שחקנים; ו-(ג) בניכוי סך של 30 מיליון דולר ארה״ב, המיועד לניהול תפעולי שוטף. |
| #דולר# או #$# | דולר ארצות הברית. |

ב. <u>הסדר החוב – כללי</u>

1. מטרתו של הסדר זה היא: (1) להבטיח את יכולת פירעון כלל החובות המותנים ככל שיהפכו לחובות אכיפים בישראל, והכל בהתאם לתנאי ההסדר, ו-(2) לאפשר את המשך פעילותן העסקית של החברות.

2. לחברות יש חוב מותנה כלפי נושים מותנים, אשר היקפו עולה על יתרות המזומנים שלהן, וזאת בשל פסק דין זר (לא חלוט וכפוף לערעור) שניתן לטובת חברת Skillz Platform Inc.[1].

3. החל ממועד כניסת ההסדר לתוקף, יהווה הסדר זה את המסגרת הבלעדית, הסופית והממצה להסדרת מערכת היחסים, הזכויות וההתחייבויות שבין החברות והנושים המותנים.

4. ההסדר לא יחול על הנושים המוחרגים ואישור ההסדר לא יביא לשינוי בזכויותיהם או בבירור זכויותיהם של הנושים המוחרגים, וכל התחייבויותיהן השוטפות של החברות לנושים המוחרגים תמשכנה להיות משולמות כסדרן ובמועדן.

5. בהתאם, הנושים המוחרגים אינם נדרשים להגיש תביעת חוב. הסכומים המגיעים להם, כמפורט בבקשה לאישור ההסדר ובנספחיה, ימשיכו להשתלם כסדרם ובמועדם. פירוט הסכומים בטופס 1 נובע מדרישות הדין בלבד, ומובהר שלא יהיה בו כדי למנוע מנושה מוחרג לחלוק, במהלך העסקים הרגיל, על הסכומים שצוינו שם.

6. בדומה לכך, שחקנים שהפקידו או יפקידו כספים תוך שימוש בפלטפורמה של החברות יוכלו להוסיף ולפעול בכספים אלה אם לשימוש במשחקים ואם למשיכתם, והכל במהלך עסקים רגיל, בהתאם לתנאי השימוש.

7. כלל ההליכים התלויים ועומדים בערכאות נגד החברות או איזו מהן ביום הגשת הבקשה לאישור ההסדר, אשר יעוכבו מכוח בקשה לצו עיכוב ההליכים המוגשת במקביל לבקשה זו,

---

[1] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y).

Case 26-11217-MFW Doc 23-3 Filed 01/06/26 Page 339 of 655

יעוכבו רק עד למועד כניסת ההסדר לתוקף. עם כניסת ההסדר לתוקף, יפקע צו עיכוב ההליכים, והליכים אלה יחודשו וימשיכו להתנהל כסדרם. תשלומו של כל פסק דין לזכות נושה מותנה זכאי יבוצע, ככל שיידרש, בהתאם להוראות הסדר זה.

8. בתקופת ההסדר, תמשכנה החברות לפעול במהלך העסקים הרגיל, והנהלות החברות ודירקטוריון החברות ייוותרו בתפקידיהם, כשלצידן פועל מנהל ההסדר, לשם הבטחת המשך פעילותן העסקית המיטבית.

## ג. <u>תנאי ההסדר המוצע לנושים</u>

9. כללי:

(א) בתקופת ההסדר ישולמו כלל ההתחייבויות השוטפות לכלל הנושים המוחרגים לפי תנאי פירעונן, בדרך העסקים הרגילה.

(ב) החובות המותנים ישולמו רק לנושים מותנים זכאים, כלומר רק לאחר שיהיה בידי הנושה המותנה פסק דין כספי אכיף, ובהתאם להוראות שלהלן.

10. פירעון החובות המותנים ייעשה באופן הבא:

(א) נושה מותנה זכאי, אשר ניתן לטובתו פסק דין כספי אכיף נגד מי מהחברות בסכום שאינו עולה על 5,000,000 $ (חמישה מיליון דולר), ישולם לו מלוא סכום פסק הדין במהלך העסקים הרגיל, ולא מתוך פיקדון מנהל ההסדר.

(ב) נושה מותנה זכאי, אשר ניתן לטובתו פסק דין כספי אכיף נגד מי מהחברות בסכום העולה על $5,000,000 (חמישה מיליון דולר), יהיה זכאי לקבלת מלוא סכום פסק הדין מתוך פיקדון מנהל ההסדר, כמפורט בסעיף 12 להלן.

11. הקמת פיקדון מנהל ההסדר והפקדות אליו

(א) בתוך 14 יום ממועד כניסת ההסדר לתוקף, תפקיד פאפאייה ישראל לחשבון בנק ייעודי שייפתח על ידי מנהל ההסדר סכום ראשוני בסך $60,000,000 (שישים מיליון דולר).

(ב) נוסף על ההפקדה הראשונית כאמור בסעיף קטן (א), תפקיד פאפאייה ישראל לחשבון פיקדון מנהל ההסדר מדי שנה, לא יאוחר מיום 15.1 (חמישה עשר בינואר), סכום השווה ליתרת המזומנים הפנויה נכון ליום 3.1 (שלושה בינואר) באותה שנה, אך בכל מקרה לא יותר מהסכומים הנקובים ב<u>נספח 1</u> להסדר זה.

(ג) מנהל ההסדר יהיה רשאי לפנות לבית המשפט בבקשה להקטין או להגדיל את הסכום שנדרשת פאפאייה ישראל להפקיד במועדי ההפקדות הנ״ל, לעומת הסכומים הנקובים בנספח האמור, בשים לב לסך יתרת המזומנים הפנויה, ולכלל הנתונים שבפניו. בית המשפט הנכבד יכריע בבקשתו של מנהל ההסדר לאחר מתן זכות טיעון לצדדים הנוגעים בדבר.

(ד) הכספים המצויים בפיקדון מנהל ההסדר יושקעו באיגרות חוב של ממשלת ארצות הברית בעלות מועד פדיון של שנה אחת (One-Year U.S. Treasury Securities), או בפיקדון בנקאי הנושא ריבית שנתית בשיעור השווה לתשואה על איגרות חוב כאמור. כל הרווחים, התשואות ו/או ההכנסות שיצטברו ו/או שייווצרו בקשר עם הפקדה ו/או השקעה של כספים אלה, ייזקפו לזכות פיקדון מנהל ההסדר, וייעשה בהם שימוש אך ורק לצורך התשלומים על פי הסדר זה ובהתאם להוראותיו בלבד.

12. השימוש בפיקדון מנהל ההסדר ותשלומים מתוכו;

(א) נושה מותנה זכאי יפנה למנהל ההסדר לאחר מתן פסק דין כספי אכיף לטובתו בסכום העולה על 5,000,000 $, וימציא למנהל ההסדר את כל המסמכים הנדרשים לביסוס תביעתו. מנהל ההסדר יבחן את המסמכים שהוצגו לו וישלם לנושה המותנה הזכאי, מתוך הפיקדון שבידו, את סכום פסק הדין הכספי האכיף תוך שלושים יום, בכפוף לאמור להלן.

(ב) נושה מותנה זכאי כאמור, אשר סכום פסק הדין הכספי האכיף שניתן לטובתו עולה על הסכום ששולם לו בשנה קלנדרית מסוימת, יהא זכאי להוסיף ולקבל ממנהל ההסדר תשלומים מדי שנה, וזאת עד לסילוק מלוא סכום פסק הדין הכספי האכיף שניתן לטובתו.

(ג) ככל שבמועד כלשהו שבו יש לבצע תשלום מתוך פקדון מנהל ההסדר, יהיו בפני מנהל ההסדר יותר מפסק דין כספי אכיף אחד לתשלום, יחלק מנהל ההסדר בין אותם נושים הזכאים לתשלום כאמור, את הסכום המשולם, באופן יחסי (פרו-ראטה), בהתאם ליחס שבין סכומי פסקי הדין הכספיים האכיפים העומדים לתשלום באותו מועד.

(ד) סכומו של כל פסק דין כספי אכיף יומר לדולר ארה״ב בהתאם לשער היציג של הדולר במועד שבו פסק הדין הכספי הפך להיות אכיף בישראל. אם לא שולם פסק הדין, או חלקו, על ידי מנהל ההסדר תוך 30 יום כאמור בפסקה (א) לעיל, יישא החלק שלא שולם ריבית שנתית בשיעור האמור בסעיף 11(ד) לעיל, החל מתום 30 יום ועד למועד תשלומו בפועל.

(ה) היה ובטלה זכאותם של כל הנושים המותנים, בין מחמת שנפרע חובם, בין מחמת דחייה ו/או יישוב ו/או מחיקה של תביעתם, וכיוצא באלה, ו/או הייתה פאפאייה ישראל יכולה להוכיח יכולת תשלומם במהלך העסקים הרגיל, אזי תפקע חובת ההפקדה השנתית לפיקדון מנהל ההסדר, ומנהל ההסדר יעביר לידי פאפאייה ישראל את יתרת הפיקדון, ככל שנותרה בידו.

13. הסדר זה יבוא אל סיומו לאחר השלמת ביצוען המלא של כלל ההתחייבויות והפעולות הקבועות בו, בהתאם ובכפוף להוראות הסדר זה.

## ד/ <u>תנאי מתלה לביצוע הסדר החוב</u>

14. תנאי מתלה לכניסת הסדר החוב לתוקף הינו קבלת אישור בית המשפט להסדר זה (״צו בית המשפט״), ובכלל זה קבלת צו המורה על הפטר מלא, סופי, מוחלט ומחייב של החברות

כמפורט בהסדר זה, בהתאם לפרק ז׳ להסדר זה, בין אם במסגרת אישור ההסדר, או במסגרת החלטה שיפוטית נלווית.

15. לא התקיים התנאי המתלה לכניסת הסדר זה לתוקף, או שהסדר זה לא נכנס לתוקף מכל סיבה שהיא, אזי מבלי לגרוע מכל זכות או טענה העומדת לחברות על פי דין, יחולו ההוראות שלהלן:

(א) הסדר זה, על כל הוראותיו ונספחיו, ההסכמות, ההצעות, הוויתורים, המצגים, ההצהרות, ההתחייבויות והעמדות שהועלו, נמסרו או נשקלו במסגרתו או בקשר אליו, יהיו בטלים, נעדרי תוקף ולא יחייבו את החברות בכל דרך שהיא;

(ב) לא יהיה בהסדר זה, בכתבי בי-דין בהליכים לאישורו של הסדר זה, ובהליכים קשורים, או בכל חלק מהם, כדי לשמש ראיה, הודאה, מצג, השתק, ויתור, הסכמה, בסיס לטענה בדבר היקף חוב, תוקפו, שיעורו, סיווגו, עדיפותו או אופן פירעונו, או בסיס לכל טענה, דרישה, תביעה או הליך מכל מין וסוג.

(ג) אף צד לא יהיה רשאי להסתמך על כל דבר שנאמר בהסדר זה או בכתבי בי-דין בהליך לאישורו של ההסדר, או בהליכים קשורים, בכל הליך שיפוטי, מעין-שיפוטי, בוררות, מנהלי או אחר, בישראל או מחוצה לה;

(ד) במקרה כאמור, יהיו הצדדים מושבים ככל הניתן, למצבם המשפטי, הדיוני והמסחרי כפי שהיה ערב הגשת הבקשה לאישור ההסדר.

## ה׳ <u>מנהל הסדר</u>

16. בית המשפט הנכבד יתבקש למנות, במסגרת הסדר חוב זה, מנהל הסדר בהתאם להוראות סעיף 326 לחוק, אשר יפעל בהתאם להוראות הדין ולהוראות הסדר זה ולהחלטות בית המשפט הנכבד.

17. שכרו של מנהל ההסדר, וכן הוצאותיו כפי שיאושרו על ידי בית המשפט הנכבד, ייקבעו וייפסקו על ידי בית המשפט הנכבד בהתאם להוראות הדין.

18. על אף האמור בכל מקום אחר בהסדר זה, שכרו של מנהל ההסדר והוצאותיו ישולמו מתוך פיקדון מנהל ההסדר, ויהיו בעלי מעמד בכורה ביחס לכל תשלום אחר שישולם מתוך פיקדון מנהל ההסדר.

19. מנהל ההסדר יהיה מוסמך לבצע כל פעולה הנדרשת לשם יישומו, ניהולו, ביצועו ואכיפתו של הסדר זה, והכל בהתאם להוראות הדין, הוראות הסדר זה והחלטות בית המשפט הנכבד.

20. מבלי לגרוע מכלליות האמור לעיל, מנהל ההסדר יהיה מוסמך, בין היתר:

(א) לקבל, לבדוק, לברר ולהכריע בהוכחות חוב ובתביעות חוב, כולן או חלקן;

(ב) לדרוש מכל נושה, מן החברות או מכל צד רלוונטי אחר כל מסמך, אסמכתה, נתון, תצהיר, הבהרה או מידע שימצא לנכון לצורך מילוי תפקידו;

(ג) לאשר, לדחות או לתקן הוכחות חוב, כולן או חלקן, וכן לקבוע את שיעורו, מעמדו וסיווגו של כל חוב לצורכי הסדר זה;

(ד) לנהל את פיקדון מנהל ההסדר, לרבות קבלת כספים לידיו, החזקתם, השקעתם בהתאם להוראות ההסדר, ככל שהדבר מותר על פי דין או לפי הוראות בית המשפט, וביצוע תשלומים מתוכו בהתאם להוראות הסדר זה;

(ה) לקבוע את אופן הגשת המסמכים והפניות אליו, לרבות מועדים, מתכונת, אופן המצאה ודרישות צורניות;

(ו) לפנות לבית המשפט הנכבד, מעת לעת, בבקשה למתן הוראות, לאישור פעולה, להכרעה במחלוקת, להבהרת הוראות הסדר זה או לכל סעד אחר הדרוש, לפי שיקול דעתו, לשם ביצוע תפקידו;

(ז) להסתייע ביועצים, מומחים, רואי חשבון, עורכי דין ובעלי מקצוע אחרים, ככל שימצא לנכון לצורך מילוי תפקידו, והוצאות כאמור ייחשבו כהוצאות מנהל ההסדר.

ו/ <u>מנגנון הוכחות החוב</u>

21. הואיל וההסדר קובע שכלל התחייבויותיהן השוטפות של החברות לנושים המוחרגים ימשיכו להיות משולמות כסדרן ובמועדן, הנושים המוחרגים אינם נדרשים להגיש הוכחות חוב כתנאי להמשך תשלום הסכומים השוטפים המגיעים להם, כמפורט בטופס 1 המצורף לבקשה לאישור ההסדר, והם ישולמו להם כסדרם ובמועדם.

22. הזמנת הנושים המותנים להגיש הוכחות חוב נועדה לאפשר בירור של חובות מותנים או טענות של נושים מותנים שאינם ידועים לחברות במועד הגשת הבקשה לאישור ההסדר. לפיכך, כל נושה מותנה הטוען כי עומד לזכותו חוב מותנה כלפי מי מהחברות, בין מחמת שלא נזכר בטופס 1 ובין אם מחמת שהוא חולק על הסכום הנקוב לצד שמו בטופס 1, נדרש להגיש למנהל ההסדר הוכחת חוב בתוך 21 ימים ממועד מינויו של מנהל ההסדר ("מועד הוכחות החוב").

23. מנהל ההסדר יהיה רשאי לקבל הוכחת חוב שהוגשה לאחר מועד הוכחות החוב רק אם שוכנע כי קיימת הצדקה מיוחדת לאיחור בהגשתה; ואולם, בשום מקרה לא תתקבל הוכחת חוב לאחר מועד אישור ההסדר על ידי בית המשפט. נושה מותנה שנדרש להגיש הוכחת חוב בהתאם להוראות הסדר זה ושלא הגיש הוכחת חוב במועד, או שהוכחת החוב שהגיש לא אושרה, לא יהיה זכאי להצביע ביחס להסדר חוב זה, ולא תהיה לו כל תביעה, דרישה או טענה כלפי מי מהחברות ביחס לחובות המותנים.

24. מנהל ההסדר יהיה רשאי לדרוש כל מסמך ו/או נתון שיידרש לו לפי שיקול דעתו לצורך ההכרעה בהוכחת החוב של נושים מותנים שהגישו תביעות חוב, בין אם לצרכי הצבעה או

לצורך בירורן לגופן. לא הומצאו המסמכים או הנתונים שנדרשו בתוך המועד שיקבע מנהל ההסדר, יהיה מנהל ההסדר רשאי להכריע בהוכחת החוב על יסוד החומר המצוי בידיו, או לדחות את הוכחת החוב, כולה או חלקה.

הכרעה בתביעות חוב לצורכי הצבעה:

25. כל נושה מותנה המפורט בטופס 1 אשר לא יגיש הוכחת חוב בתוך מועד הוכחות החוב, ייחשב, לצורכי הצבעה על הסדר זה, כמי שהסכים לגובה החוב הנקוב לצד שמו בטופס 1, כמי שהגיש הוכחת חוב בסכום האמור, וכמי שהוכחת החוב שלו אושרה בסכום זה לצורכי הצבעה על הסדר זה.

26. הכרעת החוב לצורכי הצבעה לא תהווה הכרעה בהוכחת החוב לגופה.

27. נושה אשר יהא מעוניין לערער על הכרעת החוב לצורך הצבעה, יהא רשאי לעשות כן בפנייה לבית המשפט תוך ארבעה עשר (14) יום מהמועד בו קיבל את הכרעת החוב בכתב (ולרבות בדואר אלקטרוני או בפקסימיליה). ערעור שיוגש לאחר מועד זה לא יתקבל, אלא אם כן בית המשפט יורה אחרת.

הכרעה בתביעות חוב לגופן לצרכי חלוקה;

28. לצורך בירור תביעות החוב לגופן לא תידרש הגשת הוכחת חוב נוספת, והוכחת החוב שהוגשה לצרכי הצבעה תשמש גם לצורך זה.

29. ההכרעה בהוכחות החוב לגופן תיעשה כדלקמן: (א) ככל שתביעת חוב של נושה מותנה היא נושא להליך משפטי תלוי ועומד, בישראל או מחוצה לה, ההכרעה לעניין זכאותו של אותו נושה לתשלום לפי הסדר זה, תיעשה בהתאם לפסק דין כספי אכיף, כמשמעותו בהסדר; (ב) ככל שהוכחת חוב של נושה מותנה אינה נושא להליך משפטי תלוי ועומד, בישראל או מחוצה לה, יכריע מנהל ההסדר בתביעת החוב על יסוד הוכחת החוב, המסמכים והנתונים שיומצאו לו וכל חומר רלוונטי אחר שימצא לנכון;

30. נושה אשר יהא מעוניין לערער על הכרעת החוב לגופה, יהא רשאי לעשות כן בפנייה לבית המשפט תוך שלושים (30) יום מהמועד בו קיבל את הכרעת החוב לגופה בכתב (ולרבות בדואר אלקטרוני או בפקסימיליה). ערעור שיוגש לאחר מועד זה לא יתקבל, אלא אם כן בית המשפט יורה אחרת.

31. כל חוב בר-הוכחה שלא הוגשה בגינו הוכחת חוב בתוך מועד הוכחות החוב, מקום שבו נדרשה הגשת הוכחת חוב לפי הוראות הסדר זה, או שלא אושר במסגרת מנגנון הוכחות החוב, לא יקנה לנושה כל זכות תביעה, דרישה, קיזוז או היפרעות כלפי מי מהחברות, והוא ייחשב כמסולק לצורכי הסדר זה.

32. החל ממועד כניסת ההסדר לתוקף לא ניתן יהיה להיפרע ממי מהחברות בגין חוב מותנה, אלא על פי הוראות הסדר זה.

ז. <u>פטור ויתור</u>

Case 24-11217-MFW Doc 33 Filed 06/12/24 Page 41 of 295

33. הסדר זה יגבש ויבטא באופן סופי, בלעדי ומוחלט את מערכת היחסים, הזכויות וההתחייבויות שבין החברות והנושים המותנים, והוא ימצה ויסדיר את מעמדם של כלל החובות המותנים של החברות. בהתאם, עם כניסתו לתוקף של הסדר זה, יחולו ההוראות שלהלן:

(א) לא תהיה למי מהנושים המותנים כל עילה, טענה, דרישה או תביעה מכל מין וסוג ובכל עילה שהיא, כלפי החברות ו/או כלפי מי מטעמן בכל עניין הנוגע ו/או הקשור לחובות המותנים, למעט אלו שאושרו כתביעות חוב;

(ב) הנושים המותנים לא יהיו זכאים לנקוט כל סעד עצמי מכל מין וסוג בקשר עם החובות המותנים, כלפי החברות, או מי מטעמן, לרבות קיזוז, עיכבון, עיקול, תפיסת נכסים, מימוש בטוחה או ערבות, המחאת חוב, מימוש זכות עיכוב או כל פעולה עצמאית אחרת שמטרתה גבייה, אכיפה או היפרעות.

(ג) כל כתב פטור, כתב שיפוי, זכות שיפוי, ביטוח נושאי משרה או זכות אחרת להגנה, לשיפוי או לפטור, שניתנו או העומדים לזכותם של נושאי משרה, דירקטורים ובעלי תפקידים בחברות לפי מסמכי ההתאגדות של החברות, לפי הסכם, לפי פוליסת ביטוח או לפי כל דין, יוסיפו לעמוד בתוקפם המלא ולא ייגרע מהם דבר מחמת אישורו או ביצועו של הסדר זה;

(ד) בכפוף להוראות הדין ולהוראות הסדר זה, ייכנס לתוקפו, החל ממועד כניסת ההסדר לתוקף, פטור מלא, סופי ובלתי חוזר לטובת החברות, נושאי המשרה בהן, הדירקטורים, העובדים, השלוחים, היועצים, נציגיהן, בעלי מניותיהן וכל אדם או גוף שפעל או פועל מטעמן או בשמם, מפני כל עילה, טענה, דרישה או תביעה, מכל מין וסוג, ידועה או בלתי ידועה, קיימת, מותנית או עתידית, בקשר עם החובות המותנים.

## ח/ <u>הוראות כלליות</u>

34. המבוא להסדר זה והנספחים לו מהווים חלק בלתי נפרד ממנו; כותרות הסעיפים הינן לצורך הנוחות בלבד ולא יסתמכו עליהן בפירוש או בביאור הסדר זה.

35. לצרכי פרשנות הוראות הסדר זה, תחשבנה הוראות הסדר זה והוראות איזה מנספחיו כמשלימות זו את זו וככאלו הדרות בכפיפה אחת.

36. כל שינוי, תיקון או תוספת להסדר, לא יהא להם תוקף וייחשבו כלא נעשו, אלא אם כן ייעשו בכתב, ייחתמו על ידי החברות, ויאושרו על ידי בית המשפט הנכבד.

37. התייחסות להסדר זה או להוראה ספציפית בהסדר זה או למסמך אחר כלשהו, תפורש כהתייחסות להסדר זה, להוראה האמורה או למסמך האמור, כפי שהינם בתוקפם באותה העת ובכלל זאת כפי שתוקנו, שונו, או הושלמו מפעם לפעם, נכון לעת הרלוונטית.

38. בהסדר חוב זה לשון יחיד כוללת רבים, ולהיפך; לשון מין זכר כוללת מין נקבה, ולהיפך; המונח "אדם" כולל כל אדם פרטי, תאגיד, חברות, שותפות (בין רשומה ובין שאינה רשומה), עמותה, נאמנות, גוף מאוגד או בלתי מאוגד וכל ישות משפטית אחרת.

39. הסדר זה, ביחד עם נספחיו, ממצים את כל ההסכמות, ההתניות וההצהרות בין החברות לנושים המותנים בקשר עם העניינים המוסדרים בו, ולא יהיה תוקף לכל הצעה, סיכום, הבנה, מצג או הבטחה בקשר אליהם שנעשו או ניתנו קודם לכניסתו לתוקף של הסדר זה ע"י מי מהצדדים, בין בכתב ובין בעל-פה, בין במפורש ובין במשתמע, אלא כאמור בהסדר זה.

40. הימנעות של מי מהצדדים משימוש בזכות כלשהי הנתונה לו לפי הסדר זה או על פי דין, או דחיה או שיהוי בשימוש כאמור, לא יחשבו כוויתור על הזכות האמורה, ולא יהיה בהפעלה חלקית או חד-פעמית של זכות כאמור כדי למנוע הפעלה נוספת או אחרת שלה, או של כל זכות אחרת. ארכה או הקלה שניתנו, או ויתור או פשרה שנעשו, במקרה כלשהו, ע"י איזה מהצדדים, לא יפורשו כתקדים או כוויתור לגבי מקרה אחר ולא יגרעו מזכויות אותו צד, לפי הסדר זה או לפי דין.

41. שום טיוטות של הסדר זה ונספחיו לא תהיינה קבילות כראיה בפני גופים שיפוטיים ו/או מעין שיפוטיים, לרבות בוררים ו/או פוסקים, ולא ישמשו לפרשנות הסדר זה, תניותיו או נספחיו.

42. על הסדר זה יחולו דיני מדינת ישראל בלבד והוא יפורש על פי ובהתאם להם.

43. הסמכות המקומית הייחודית והבלעדית בכל עניין הנוגע להסדר זה תהא נתונה לבית המשפט המוסמך בתל אביב-יפו. אין באמור כדי לגרוע מנקיטת הליכים לפי פרק 15 ל- U.S. Bankruptcy Code. ואולם, פנייה כאמור לא תיחשב כהסכמה לסמכות שיפוט של ערכאה זרה ביחס לכל מחלוקת הנוגעת לפרשנותו, יישומו וביצועו של הסדר זה.

44. הריבית המצטברת על פי הסדר זה על החובות המותנים תבוא במקום כל ריבית אחרת על פי דין או הסכם.

45. בכל מקרה של סתירה, אי התאמה בין הוראות הסדר זה לבין הוראות מי מנספחיו, תגברנה הוראות הסדר זה, אלא אם נקבע אחרת במפורש.

46. מבלי לגרוע מהוראות הסדר זה, יהא מנהל ההסדר, וכן כל אחד מהצדדים, רשאי לפנות לבית המשפט בבקשה למתן הוראות בכל עניין הנוגע לפרשנותו, יישומו, ביצועו או אכיפתו של הסדר זה.

47. הוראות הסדר זה תחייבנה ותזכינה את הצדדים לו, וכן את חליפיהם, נמחיהם, נעבריהם, יורשיהם, וכל הבא מכוחם, לפי העניין ובכפוף להוראות הדין.

נספח 2 . לוח תשלומים לקופת מנהל ההסדר

## לוח תשלומי פאפאייה לקופת מנהל ההסדר

פריסת ההפקדות הכספיות של פאפאייה לקופת מנהל הסדר החוב תהא כדלקמן :

1. בתוך 14 יום ממועד כניסת ההסדר לתוקף, סך של $60,000,000 (ששים מיליון דולר).
2. תוך 15 יום מתום שנת 2026, סכום של $30,000,000 (שלושים מיליון דולר).
3. תוך 15 יום מתום שנת 2027, סכום של $60,000,000 (ששים מיליון דולר).
4. תוך 15 יום מתום שנת 2028, סכום של $85,000,000 (שמונים וחמישה מיליון דולר).
5. תוך 15 יום מתום שנת 2029, סכום של $100,000,000 (מאה מיליון דולר).
6. תוך 15 יום מתום שנת 2030, סכום של $120,000,000 (מאה ועשרים מיליון דולר).
7. תוך 15 יום מתום שנת 2031, סכום של $130,000,000 (מאה ושלושים מיליון דולר).
8. תוך 15 יום מתום שנת 2032, סכום של 145,000,000$ (מאה ארבעים וחמישה מיליון דולר).

# Debt Arrangement

## (Certified English Translation)

# Debt arrangement between Papaya Gaming Ltd. and Papaya Gaming Inc. and their Creditors

## In accordance with the provisions of Part 10 of the Insolvency and Economic Rehabilitation Law, 5778-2018

## A. Interpretation and Definitions

Unless expressly stated otherwise, the following terms shall have the meanings set forth opposite them below in this Arrangement:

| | |
|---|---|
| **"The Law"** | The Insolvency and Economic Rehabilitation Law, 5778-2018. |
| **"Regulations"** | The Insolvency and Economic Rehabilitation Regulations, 5779-2019. |
| **"The Court"** | The Tel Aviv-Yafo District Court hearing the Application for Approval of the Arrangement. |
| **"Application for Approval of the Arrangement"** | An application for an order convening meetings for the purpose of approving this Debt Arrangement, filed with the Court. |
| **"The Commissioner"** | The Commissioner of Insolvency Proceedings and Economic Rehabilitation. |
| "Arrangement" or "Debt Arrangement" | This proposed Debt Arrangement and, if approved with certain amendments, as so approved. |
| **"The Companies"** | Papaya Gaming Ltd., Company No. 515422095 ("**Papaya Israel**"), and Papaya Gaming Inc., Company No. 32-0533649 ("**Papaya US**") (collectively, "**the Companies**"). |
| "**Arrangement Effective Date**" | The date on which the Condition Precedent to the Arrangement Effective Date (as that term is defined in the Arrangement) is satisfied. |
| **"Proof of Debt Deadline"** | The deadline for filing debt claims (also referred to as "**Proofs of Debt**") as provided in Section 22 of Chapter F below, or such other deadline as may be determined by the Court. |

| | |
|---|---|
| **"Excluded Creditors"** | Each of the following:<br>(a) All suppliers and employees of the Companies;<br>(b) All players, except with respect to causes of action relating to past practices involving the use of bots and anything arising therefrom ora related thereto, directly or indirectly;<br>(c) Tax authorities, the National Insurance Institute, provident funds, and pension funds;<br>(d) The Attorney General of the State of New Jersey. |
| **"Contingent Creditor"** | A creditor that is not one of the Excluded Creditors and that:<br>(a) As of the date of filing of the Application for Approval of the Arrangement, is pursuing legal proceedings against the Companies, or either of them, that are pending before courts or tribunals and are based on causes of action relating to past practices involving the use of bots and anything arising therefrom or related thereto, directly or indirectly; or<br>(b) As of the date of filing of the Application for Approval of the Arrangement, has a cause of action to commence legal proceedings on the aforesaid grounds; or<br>(c) As of the date of filing of the Application for Approval of the Arrangement, a foreign judgment has been rendered in its favor against the Companies, or either of them, which remains subject to appeal and has therefore not yet become an Enforceable Monetary Judgment in Israel. |
| **"Contingent Debt"** | An alleged debt arising from any of the grounds enumerated in the definition of Contingent Creditor. |
| **"Enforceable Monetary Judgment"** | A judgment enforceable in Israel, as follows:<br>(a) With respect to a judgment rendered in a foreign state: a foreign judgment that satisfies all the conditions for the enforcement of a foreign judgment, within the meaning of Section 3 of the Foreign Judgments Enforcement Law, 5718-1958;<br>(b) With respect to a judgment rendered in the State of Israel: a judgment rendered by a court of competent jurisdiction in Israel for which no stay of execution has been ordered. |

| | |
|---|---|
| **“Eligible Contingent Creditor”** | A Contingent Creditor in whose favor an Enforceable Monetary Judgment in Israel has been rendered against either of the Companies. |
| **“Arrangement Administrator Fund”** | Funds deposited pursuant to the Arrangement in the account of the Arrangement Administrator, which shall serve as a dedicated source of funds solely for payment of the Companies' debts to Eligible Contingent Creditors as provided in this Arrangement and for payment of the Arrangement Administrator's fees. |
| **“The Court Order”** | The order referred to in Chapter D of this Arrangement. |
| **“Condition Precedent to the Arrangement Effective Date”** | The condition precedent to the Arrangement set forth in Chapter D of this Arrangement. |
| **“Shareholders”** | Any person or corporation that, directly or indirectly, holds shares in the Companies on the Arrangement Effective Date. |
| **“Available Cash Balance”** | The balance of cash held in Papaya Israel's bank accounts, less only: (a) the amounts pledged in favor of the banks in which the balances are held, as follows: deposits securing bank guarantees issued to property lessors and payments in respect of credit cards and hedging transactions; (b) players' credit balances; and (c) a total of US$30 million allocated for ongoing operations. |
| **“Dollar”** or **“$”** | United States dollar. |

## B. <u>The Debt Arrangement – General</u>

1. The purposes of this Arrangement are: (1) to ensure the ability to pay all Contingent Debts if and to the extent that they become enforceable debts in Israel, all in accordance with the terms of the Arrangement; and (2) to enable the Companies to continue their business operations.

2. The Companies have Contingent Debt owing to Contingent Creditors, the amount of which exceeds their cash balances, due to a foreign judgment (which is not final and remains subject to appeal) rendered in favor of Skillz Platform Inc. [1]

3. As of the Arrangement Effective Date, this Arrangement shall constitute the exclusive, final, and exhaustive framework governing the relationship, rights, and obligations between the Companies and the Contingent Creditors.

4. The Arrangement shall not apply to the Excluded Creditors, and approval of the Arrangement shall not result in any change to the rights of the Excluded Creditors or to the adjudication of those rights. All current obligations of the Companies to the Excluded Creditors shall continue to be paid in the ordinary course and when due.

5. Accordingly, the Excluded Creditors are not required to file a Proof of Debt. The amounts due to them, as set forth in the Application for Approval of the Arrangement and the annexes thereto, shall continue to be paid in the ordinary course and when due. The itemization of the amounts in Form 1 results solely from the requirements of law, and it is clarified that it shall not preclude an Excluded Creditor from disputing, in the ordinary course of business, the amounts stated therein.

6. Similarly, players who have deposited, or who will deposit, funds using the Companies' platform may continue to use those funds, whether for participating in games or for withdrawal, all in the ordinary course of business and in accordance with the Terms of Use.

7. All proceedings pending before courts or tribunals against the Companies, or either of them, on the date of filing of the Application for Approval of the Arrangement, which will be stayed pursuant to an application for a stay of proceedings filed concurrently with this Application, shall be stayed only until the Arrangement Effective Date. Upon the Arrangement becoming effective, the stay of proceedings order shall expire, and such proceedings shall resume and continue in the ordinary course. Payment of any judgment in favor of an Eligible Contingent Creditor shall be made, if required, in accordance with the provisions of this Arrangement.

8. During the term of the Arrangement, the Companies shall continue to operate in the ordinary course of business, and the management and boards of directors of the Companies shall remain in office, with the Arrangement Administrator acting alongside them to ensure the optimal continuation of their business operations.

[1] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y.)

## C. Terms of the Proposed Arrangement for Creditors

9. **General**:

(a) During the term of the Arrangement, all current obligations to all Excluded Creditors shall be paid in accordance with their payment terms and in the ordinary course of business.

(b) The Contingent Debts shall be paid only to Eligible Contingent Creditors, that is, only after the Contingent Creditor holds an Enforceable Monetary Judgment, and in accordance with the provisions below.

10. **The Contingent Debts shall be paid as follows:**

(a) An Eligible Contingent Creditor in whose favor an Enforceable Monetary Judgment has been rendered against either of the Companies in an amount not exceeding $5,000,000 (five million dollars) shall be paid the full amount of the judgment in the ordinary course of business and not from the Arrangement Administrator Fund.

(b) An Eligible Contingent Creditor in whose favor an Enforceable Monetary Judgment has been rendered against either of the Companies in an amount exceeding $5,000,000 (five million dollars) shall be entitled to receive the full amount of the judgment from the Arrangement Administrator Fund, as set forth in Section 12 below.

11. **Establishment of and Contributions to the Arrangement Administrator Fund**

(a) Within 14 days after the Arrangement Effective Date, Papaya Israel shall deposit an initial amount of $60,000,000 (sixty million dollars) into a dedicated bank account to be opened by the Arrangement Administrator.

(b) In addition to the initial deposit referred to in subsection (a), Papaya Israel shall deposit annually into the Arrangement Administrator Fund account, no later than January 15 (the fifteenth day of January), an amount equal to the Available Cash Balance as of January 3 (the third day of January) of that year, but in no event more than the amounts specified in Annex 1 to this Arrangement.

(c) The Arrangement Administrator may apply to the Court to reduce or increase the amount that Papaya Israel is required to deposit on the aforesaid deposit dates, as compared with the amounts specified in the said Annex, having regard to the total Available Cash Balance and all the information before the Arrangement Administrator. The Honorable Court shall rule on the Arrangement Administrator's application after affording the relevant parties an opportunity to be heard.

(d) The funds held in the Arrangement Administrator Fund shall be invested in United States government bonds with a one-year maturity (One-Year U.S. Treasury Securities), or in a

bank deposit bearing annual interest at a rate equal to the yield on such bonds. All profits, yields, and/or income that accrue and/or are generated in connection with the deposit and/or investment of such funds shall be credited to the Arrangement Administrator Fund and shall be used solely for payments under this Arrangement and strictly in accordance with its provisions.

12. **Use of and Payments from the Arrangement Administrator Fund:**

(a) Following the rendition of an Enforceable Monetary Judgment in its favor in an amount exceeding $5,000,000, an Eligible Contingent Creditor shall apply to the Arrangement Administrator and furnish all documents required to substantiate its claim. The Arrangement Administrator shall review the documents submitted and shall pay the Eligible Contingent Creditor, from the Fund held by the Arrangement Administrator, the amount of the Enforceable Monetary Judgment within thirty days, subject to the provisions below.

(b) An Eligible Contingent Creditor as aforesaid, where the amount of the Enforceable Monetary Judgment rendered in its favor exceeds the amount paid to it in a particular calendar year, shall be entitled to continue receiving annual payments from the Arrangement Administrator until the full amount of the Enforceable Monetary Judgment rendered in its favor has been satisfied.

(c) If, at any time when a payment is to be made from the Arrangement Administrator Fund, more than one Enforceable Monetary Judgment is pending for payment before the Arrangement Administrator, the Arrangement Administrator shall distribute the amount being paid among the creditors entitled to such payment on a pro rata basis, according to the ratio between the amounts of the Enforceable Monetary Judgments pending for payment at that time.

(d) The amount of each Enforceable Monetary Judgment shall be converted into United States dollars in accordance with the representative exchange rate of the dollar on the date on which the monetary judgment became enforceable in Israel. If the judgment, or any part thereof, is not paid by the Arrangement Administrator within 30 days as provided in subsection (a) above, the unpaid portion shall bear annual interest at the rate specified in Section 11(d) above, from the expiration of the 30-day period until the date of actual payment.

(e) If the entitlement of all Contingent Creditors terminates, whether because their debts have been paid, their claims have been dismissed and/or settled and/or stricken, or for any similar reason, and/or if Papaya Israel is able to demonstrate that it can pay them in the ordinary course of business, the obligation to make annual deposits into the Arrangement

Administrator Fund shall terminate, and the Arrangement Administrator shall transfer to Papaya Israel the balance of the Fund, to the extent any balance remains.

13. This Arrangement shall terminate after all obligations and actions provided for herein have been fully performed and completed, in accordance with and subject to the provisions of this Arrangement.

## D. Condition Precedent to Implementation of the Debt Arrangement

14. The condition precedent to the Debt Arrangement becoming effective is the Court's approval of this Arrangement (the "**Court Order**"), including the issuance of an order granting the Companies a full, final, absolute, and binding discharge, as set forth in this Arrangement and in accordance with Chapter G hereof, whether as part of the approval of the Arrangement or in an ancillary judicial decision.

15. If the Condition Precedent to this Arrangement becoming effective is not satisfied, or if this Arrangement does not become effective for any reason, then, without prejudice to any right or argument available to the Companies under law, the following provisions shall apply:

(a) This Arrangement, including all its provisions and annexes, and all agreements, proposals, waivers, representations, declarations, undertakings, and positions raised, submitted, or considered thereunder or in connection therewith, shall be null and void, shall have no force or effect, and shall not bind the Companies in any manner whatsoever;

(b) Nothing in this Arrangement, in the pleadings filed in the proceedings for approval of this Arrangement, in related proceedings, or in any part thereof shall constitute evidence, an admission, a representation, an estoppel, a waiver, consent, a basis for any contention concerning the scope, validity, amount, classification, priority, or manner of payment of any debt, or a basis for any allegation, demand, claim, or proceeding of any kind whatsoever.

(c) No party may rely on anything stated in this Arrangement or in any pleading filed in the proceeding for approval of the Arrangement, or in related proceedings, in any judicial, quasi-judicial, arbitral, administrative, or other proceeding, whether in Israel or elsewhere;

(d) In such event, the parties shall, to the greatest extent possible, be restored to the legal, procedural, and commercial positions in which they stood immediately prior to the filing of the Application for Approval of the Arrangement.

## E. Arrangement Administrator

16. The Honorable Court shall be requested, as part of this Debt Arrangement, to appoint an Arrangement Administrator pursuant to Section 326 of the Law, who shall act in

accordance with the provisions of law, the provisions of this Arrangement, and the decisions of the Court.

17. The Arrangement Administrator's fees, as well as the Arrangement Administrator's expenses as approved by the Court, shall be determined and awarded by the Court in accordance with the provisions of law.

18. Notwithstanding anything to the contrary elsewhere in this Arrangement, the Arrangement Administrator's fees and expenses shall be paid from the Arrangement Administrator Fund and shall have priority over any other payment made from the Arrangement Administrator Fund.

19. The Arrangement Administrator shall be authorized to take any action required for the implementation, administration, performance, and enforcement of this Arrangement, all in accordance with the provisions of law, the provisions of this Arrangement, and the decisions of the Court.

20. Without limiting the generality of the foregoing, the Arrangement Administrator shall be authorized, inter alia, to:

(a) Receive, examine, adjudicate, and determine Proofs of Debt and debt claims, in whole or in part;

(b) Require any creditor, the Companies, or any other relevant party to provide any document, supporting evidence, data, affidavit, clarification, or information that the Arrangement Administrator deems appropriate for the performance of the Arrangement Administrator's duties;

(c) Approve, reject, or amend Proofs of Debt, in whole or in part, and determine the amount, status, and classification of each debt for purposes of this Arrangement;

(d) Manage the Arrangement Administrator Fund, including receiving and holding funds, investing them in accordance with the provisions of the Arrangement, to the extent permitted by law or by order of the Court, and making payments therefrom in accordance with the provisions of this Arrangement;

(e) Determine the manner in which documents and communications are to be submitted to the Arrangement Administrator, including deadlines, format, method of service, and formal requirements;

(f) Apply to the Court from time to time for instructions, approval of an action, determination of a dispute, clarification of the provisions of this Arrangement, or any other relief required, in the Arrangement Administrator's discretion, for the performance of the Arrangement Administrator's duties;

(g) Engage advisers, experts, accountants, attorneys, and other professionals as the Arrangement Administrator deems appropriate for the performance of the Arrangement Administrator's duties, and such expenses shall be deemed expenses of the Arrangement Administrator.

## F. Proof of Debt Mechanism

21. Whereas the Arrangement provides that all current obligations of the Companies to the Excluded Creditors shall continue to be paid in the ordinary course and when due, the Excluded Creditors are not required to file Proofs of Debt as a condition for the continued payment of the current amounts due to them, as detailed in Form 1 attached to the Application for Approval of the Arrangement, and such amounts shall be paid to them in the ordinary course and when due.

22. The invitation to the Contingent Creditors to file Proofs of Debt is intended to permit the adjudication of Contingent Debts or claims of Contingent Creditors that are not known to the Companies on the date of filing of the Application for Approval of the Arrangement. Accordingly, any Contingent Creditor that alleges that it holds a Contingent Debt against either of the Companies, whether because it is not listed in Form 1 or because it disputes the amount stated beside its name in Form 1, is required to submit a Proof of Debt to the Arrangement Administrator within 21 days after the appointment of the Arrangement Administrator (the "**Proof of Debt Deadline**").

23. The Arrangement Administrator may accept a Proof of Debt filed after the Proof of Debt Deadline only if satisfied that there is special justification for the delay in filing it; provided, however, that under no circumstances shall a Proof of Debt be accepted after the date on which the Arrangement is approved by the Court. A Contingent Creditor that was required to file a Proof of Debt in accordance with this Arrangement and failed to file it on time, or whose Proof of Debt was not approved, shall not be entitled to vote on this Debt Arrangement and shall have no claim, demand, or allegation against either of the Companies in respect of the Contingent Debts.

24. The Arrangement Administrator may require any document and/or data deemed necessary, in the Arrangement Administrator's discretion, to determine the Proofs of Debt of Contingent Creditors that filed debt claims, whether for voting purposes or for substantive determination. If the requested documents or data are not furnished within the deadline established by the Arrangement Administrator, the Arrangement Administrator may determine the Proof of Debt on the basis of the material in the Arrangement Administrator's possession, or may reject the Proof of Debt, in whole or in part.

**Adjudication of Debt Claims for Voting Purposes:**

25. Any Contingent Creditor listed in Form 1 that does not file a Proof of Debt by the Proof of Debt Deadline shall be deemed, for purposes of voting on this Arrangement, to have agreed to the amount of the debt stated beside its name in Form 1, to have filed a Proof of Debt in that amount, and to have had its Proof of Debt approved in that amount for purposes of voting on this Arrangement.

26. A determination of a debt for voting purposes shall not constitute a substantive determination of the Proof of Debt.

27. A creditor seeking to appeal a determination of a debt for voting purposes may do so by applying to the Court within fourteen (14) days after the date on which it received the written determination of the debt (including by email or facsimile). An appeal filed after that deadline shall not be accepted unless the Court orders otherwise.

**Adjudication of Debt Claims on the Merits for Distribution Purposes:**

28. No additional Proof of Debt shall be required for substantive adjudication of the debt claims, and the Proof of Debt filed for voting purposes shall also be used for that purpose.

29. Proofs of Debt shall be determined on the merits as follows: (a) if the debt claim of a Contingent Creditor is the subject of pending legal proceedings, whether in Israel or elsewhere, the determination as to that creditor's entitlement to payment under this Arrangement shall be made in accordance with an Enforceable Monetary Judgment, as that term is defined in the Arrangement; (b) if the Proof of Debt of a Contingent Creditor is not the subject of pending legal proceedings, whether in Israel or elsewhere, the Arrangement Administrator shall determine the debt claim on the basis of the Proof of Debt, the documents and data furnished to the Arrangement Administrator, and any other relevant material the Arrangement Administrator deems appropriate;

30. A creditor seeking to appeal the substantive determination of a debt may do so by applying to the Court within thirty (30) days after the date on which it received the written substantive determination of the debt (including by email or facsimile). An appeal filed after that deadline shall not be accepted unless the Court orders otherwise.

31. Any provable debt for which no Proof of Debt was filed by the Proof of Debt Deadline, where the filing of a Proof of Debt was required under this Arrangement, or that was not approved under the Proof of Debt mechanism, shall confer on the creditor no right of action, demand, setoff, or recovery against either of the Companies and shall be deemed discharged for purposes of this Arrangement.

32. As of the Arrangement Effective Date, no recovery may be made from either of the Companies in respect of a Contingent Debt except in accordance with the provisions of this Arrangement.

## G. Release and Waiver

33. This Arrangement shall definitively, exclusively, and conclusively establish and embody the relationship, rights, and obligations between the Companies and the Contingent Creditors, and shall exhaustively resolve and regulate the status of all Contingent Debts of the Companies. Accordingly, as of the Arrangement Effective Date, the following provisions shall apply:

(a) No Contingent Creditor shall have any cause of action, allegation, demand, or claim of any kind or on any ground whatsoever against the Companies and/or anyone acting on their behalf in any matter concerning and/or relating to the Contingent Debts, other than debt claims that have been approved;

(b) The Contingent Creditors shall not be entitled to exercise any self-help remedy of any kind in connection with the Contingent Debts against the Companies or anyone acting on their behalf, including setoff, lien, attachment, seizure of assets, realization of collateral or a guarantee, assignment of debt, exercise of a right of retention, or any other independent action intended to effect collection, enforcement, or recovery.

(c) Any release, indemnification undertaking, right to indemnification, directors' and officers' insurance, or other right to protection, indemnification, or release that has been granted or is available to officers, directors, and officeholders of the Companies under the Companies' organizational documents, any agreement, any insurance policy, or any law shall remain in full force and effect and shall not be impaired in any respect by reason of the approval or performance of this Arrangement;

(d) Subject to the provisions of law and this Arrangement, as of the Arrangement Effective Date, a full, final, and irrevocable release shall take effect in favor of the Companies, their officers, directors, employees, agents, advisers, representatives, and Shareholders, and any person or entity that acted or acts on their behalf or in their name, from any cause of action, allegation, demand, or claim of any kind, whether known or unknown, existing, contingent, or future, in connection with the Contingent Debts.

## H. General Provisions

34. The preamble to this Arrangement and the annexes hereto constitute an integral part hereof; the section headings are for convenience only and shall not be relied upon in interpreting or construing this Arrangement.

35. For purposes of interpreting the provisions of this Arrangement, the provisions of this Arrangement and the provisions of any annex hereto shall be deemed complementary and shall be read together.

36. No change, amendment, or addition to the Arrangement shall be valid or effective unless made in writing, signed by the Companies, and approved by the Honorable Court.

37. A reference to this Arrangement, to a specific provision of this Arrangement, or to any other document shall be construed as a reference to this Arrangement, the said provision, or the said document, as in effect at that time, including as amended, modified, or supplemented from time to time, as of the relevant time.

38. In this Debt Arrangement, words in the singular include the plural, and vice versa; words importing the masculine gender include the feminine gender, and vice versa; the term “person” includes any individual, corporation, company, partnership (whether registered or unregistered), nonprofit organization, trust, incorporated or unincorporated body, and any other legal entity.

39. This Arrangement, together with its annexes, embodies all agreements, stipulations, and declarations between the Companies and the Contingent Creditors in connection with the matters regulated herein, and no proposal, summary, understanding, representation, or promise in connection therewith made or given by any party prior to the Arrangement Effective Date, whether in writing or orally, expressly or impliedly, shall have any effect, except as provided in this Arrangement.

40. The failure of any party to exercise any right available to it under this Arrangement or by law, or any postponement or delay in such exercise, shall not constitute a waiver of that right, and the partial or one-time exercise of such a right shall not preclude any further or other exercise thereof or the exercise of any other right. Any extension or relief granted, or any waiver or compromise made, by any party in a particular case shall not be construed as a precedent or waiver with respect to any other case and shall not derogate from that party's rights under this Arrangement or by law.

41. No draft of this Arrangement or its annexes shall be admissible as evidence before judicial and/or quasi-judicial bodies, including arbitrators and/or adjudicators, or be used in interpreting this Arrangement, its provisions, or its annexes.

42. This Arrangement shall be governed exclusively by the laws of the State of Israel and shall be interpreted in accordance therewith.

43. Exclusive local jurisdiction over any matter relating to this Arrangement shall be vested in the court of competent jurisdiction in Tel Aviv-Yafo. The foregoing shall not derogate from the commencement of proceedings under Chapter 15 of the U.S. Bankruptcy Code.

However, any such application shall not be deemed consent to the jurisdiction of a foreign tribunal with respect to any dispute concerning the interpretation, implementation, or performance of this Arrangement.

44. Interest accruing under this Arrangement on the Contingent Debts shall be in lieu of any other interest under law or contract.

45. In the event of any conflict or inconsistency between the provisions of this Arrangement and the provisions of any annex hereto, the provisions of this Arrangement shall prevail, unless expressly provided otherwise.

46. Without prejudice to the provisions of this Arrangement, the Arrangement Administrator and each of the parties may apply to the Court for instructions on any matter concerning the interpretation, implementation, performance, or enforcement of this Arrangement.

47. The provisions of this Arrangement shall bind and inure to the benefit of the parties hereto, as well as their successors, assigns, transferees, heirs, and all persons claiming through them, as applicable and subject to the provisions of law.

**Annex 1 - Payment Schedule for the Arrangement Administrator Fund**

## Papaya Payment Schedule for the Arrangement Administrator Fund

Papaya's cash deposits into the Arrangement Administrator Fund shall be scheduled as follows:

1. Within 14 days after the Arrangement Effective Date, an amount of $60,000,000 (sixty million dollars).

2. Within 15 days following the end of 2026, an amount of $30,000,000 (thirty million dollars).

3. Within 15 days following the end of 2027, an amount of $60,000,000 (sixty million dollars).

4. Within 15 days following the end of 2028, an amount of $85,000,000 (eighty-five million dollars).

5. Within 15 days following the end of 2029, an amount of $100,000,000 (one hundred million dollars).

6. Within 15 days following the end of 2030, an amount of $120,000,000 (one hundred twenty million dollars).

7. Within 15 days following the end of 2031, an amount of $130,000,000 (one hundred thirty million dollars).

8. Within 15 days following the end of 2032, an amount of $145,000,000 (one hundred forty-five million dollars).

TRANSPERFECT

I, Victoria Costa, hereby certify that I am competent to translate from Hebrew to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the document entitled "Creditors' Arrangement" from Hebrew to English.

Victoria Costa

[name]

31.07.26

[Date]

# EXHIBIT 14

# Exhibit E

## Israeli Court's *Ex Parte* Stay Order

## (Hebrew and Certified English Translation)

**Israeli Court's Ex Parte Stay Order**

**(Original Hebrew)**

בשים לב להבהרה, ניתנות בזה ההוראות הבאות:
בהתאם לסעיף 319ה.(א) לחוק חדלות פירעון ושיקום כלכלי, התשע"ח-2018 (להלן: "החוק") המבקשות ימציאו לממונה ולנושים המהותיים ובכלל זה ל SKILLZ העתק מהבקשה לצו עיכוב הליכים זמני ומהמסמכים שצורפו לה, לתגובתם עד ליום 9.8.26 שעה 10:00.
מסירה אישית מיידית על-ידי המבקשות.
אף שהמבקשות עצמן ציינו בבקשה (סעיפים 20, 40-41) כי הליכי אכיפה וגביה ש SKILLZ נקטה בהם בארה"ב נכשלו עוד בהחלטה שניתנה באמצע חודש מאי 2026, כך שאין בשלב זה הליך אכיפה או גביה מיידי אותו מבוקש לעכב (מעבר לקושי שבעיכוב הליך אכיפה המתנהל בארה"ב), הרי שהמבקשות מודות כי אינן יכולות לפרוע את החוב כלפי SKILLZ ככל שחוב זה יהפוך לאכיף, וכן את יתר חובותיהם, וכי עדיין קיים חשש להליכי אכיפה או גביה שיהיה בהם כדי לגרום נזק של ממש למבקשות כמפורט בסעיף 42 לבקשה.
לפיכך שוכנעתי כי קיים חשש סביר שהשהיית קבלת ההחלטה עד לאחר שמיעת הצדדים תסכל את מטרת הצו או תגרום למבקשות או מי מהן, נזק חמור.
אשר על כן ניתן בזה צו עיכוב הליכים זמני בהתאם לסעיף 319ז'.(ה) לחוק, שיעמוד בתוקפו עד לקבלת תגובות או עד להחלטה אחרת, או עד לדיון בבקשה שיתקיים בפניי ביום 16.7.26 שעה 10:00.
עם זאת, אציין כי המבקשות לא צרפו את החלטת בית-המשפט בארה"ב מה 15.5.26 המוזכרת בסעיף 41 לבקשה, או החלטות אחרות הקשורות להליך האכיפה, כך שלא ניתן לבחון האם אין במתן צו עיכוב ההליכים הזמני כדי לעכב הליכי ביצוע פסק הדין בארה"ב, ככל שננקטו הליכים נוספים כאלה, או לעמוד בסתירה להחלטות אחרות שניתנו במסגרת הליכים אלה.
עניין זה יובהר על-ידי המבקשות מיידית ועד ליום 4.8.26.
מבלי לגרוע מהאמור לעיל, אין בצו עיכוב ההליכים כדי לפגוע בזכותם של שחקנים לעשות ביתרות זכות שלהם, ככל שישנן, שימוש במהלך העסקים הרגיל.
ניתן בזאת צו איסור פרסום על תוכן הבקשה ועצם הגשתה, ועל ההחלטות שניתנו בגדר הליך זה עד כה, שיעמוד בתוקפו עד ליום 6.8.26 שעה 10:00.
לאחר פקיעת צו איסור הפרסום יפורסם דבר הגשת הבקשה בישראל, בארה"ב, ובאתר הממונה.

הודעת הבהרה בהמשך להחלטה מיום 30.7.2026

מעקב מזכירות.

# Israeli Court's Ex Parte Stay Order

## (Certified English Translation)

18 Av 5786 — 01/08/2026 DECISION
Application No. 1 in Case No. 87154-07-26
Judge Iris Lushi-Abudi

In light of the clarification, the following directions are hereby issued:
Pursuant to Section 319C(a) of the Insolvency and Economic Rehabilitation Law, 5778–2018 (hereinafter: “the Law”), the Applicants shall serve on the Commissioner and the material creditors, including SKILLZ, a copy of the Application for a Temporary Stay of Proceedings and the documents attached thereto. Responses shall be submitted by 07.08.2026, at 10:00 a.m.
The Applicants shall effect immediate personal service.
Although the Applicants themselves stated in the Application (paragraphs 20 and 40–41) that the enforcement and collection proceedings initiated by SKILLZ in the United States were unsuccessful under a decision issued in mid-May 2026, such that there is currently no immediate enforcement or collection proceeding that the Applicants seek to stay (apart from the difficulty inherent in staying an enforcement proceeding pending in the United States), the Applicants acknowledge that they are unable to pay the debt owed to SKILLZ if that debt becomes enforceable, as well as their remaining debts. They further acknowledge that there remains a risk that enforcement or collection proceedings may be initiated that could cause the Applicants substantial harm, as detailed in paragraph 42 of the Application.
Accordingly, I am convinced that there is a reasonable concern that delaying a decision until after the parties have been heard would frustrate the purpose of the requested order or cause serious harm to the Applicants or any one of them.
A temporary stay of proceedings is therefore hereby entered pursuant to Section 319G(e) of the Law. The stay shall remain in effect until responses are received, until further order, or until the hearing on the Application before me on 16.07.2026, at 10:00 a.m.
Nevertheless, I note that the Applicants did not attach the 15.05.2026 decision of the United States court referenced in paragraph 41 of the Application, or any other decisions relating to the enforcement proceedings. It is therefore not possible to determine whether the temporary stay would stay proceedings to enforce the judgment in the United States, to the extent any such additional proceedings have been commenced, or whether it would conflict with other decisions issued in those proceedings.
The Applicants shall clarify this matter promptly and, in any event, no later than 04.08.2026.
Without limiting the foregoing, the stay of proceedings shall not impair the players’ right to use, in the ordinary course of business, any credit balances they may have.
An order prohibiting publication is hereby entered with respect to the contents and filing of the Application and the decisions issued in this proceeding to date. The order shall remain in effect until 06.08.2026, at 10:00 a.m.
Upon expiration of the nonpublication order, notice that the Application has been filed shall be published in Israel, in the United States, and on the Commissioner’s website.

Clerk’s Office to monitor.

Case 26-11217-MFW Doc 16-5 Filed 08/06/26 Page 6 of 6

TRANSPERFECT

I, Victoria Costa, hereby certify that I am competent to translate from Hebrew to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the document entitled "Order 1 - Decision on Motion for Temporary Relief" from Hebrew to English.

Victoria Costa
______________________
[name]

02 August 2026
[Date]

# EXHIBIT 15

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/08/28**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Hebrew

To:

- English (USA)

The documents are designated as:

- 'tempPdfFile.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

“To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents.”

Signature of **Samuel Wu**, Managing Director



299 South Main Street, Suite 1300
Salt Lake City, UT 84111

-

**The Tel Aviv Magistrate Court Insolvency (T2T) 87154-07-26**
**Meeting from August 25, 2026**

Before: The Honorable Judge Iris Lushi-Aboudi

Transcription after human editing

Adv. Yaniv:
Thank you, Madam. First of all, I would like to thank her Honor because this review covers all the essential points and I would like to address a few of them.
First of all, regarding the cash-flow insolvency and the collective principle of paying creditors to what would be called regular creditors. It is important to say that I believe this sort of insolvency case doesn't come to these halls on a daily basis: a company that has a successful product, millions of customers as well as dozens of suppliers who received their money on time and still continues to earn profits. This is the main point. When we're talking about operations, because that's basically the term here, the operations are very profitable, not profitable on the margins. Many times, when we talk about operations, it is balanced [or] hanging by a thread; here, this is really not the case.

The Honorable Judge Lushi-Aboudi:
I don't know, I assume as such, I don't know.

Adv. Yaniv:
We file the motion exactly a month ago, basically a month ago, a month passed from our forecast, we're standing before a really good forecast, that's what it means.

The Honorable Judge Lushi-Aboudi:
Yes, but there is need to see it long-term, excuse me, meaning I [need to see it].

Adv. Yaniv:
No, for sure.

The Honorable Judge Lushi-Aboudi:
Because one of the things you wrote about has a real effect upon the issue of competition. Now, competition will naturally continue, and we see this affects the statements and I assume this will also affect the future, but I haven't seen it expressed. But again, I am not making specific comments, I'm really being modest. I looked at the things, I read them, and I assume you need to dedicate much more time to this in order to understand and also see more updated documents, etc.

Adv. Yaniv:
We are definitely asking, and we have repeatedly asked that an arrangement administrator be appointed and enter the company, get a seat in the CFO's office and see everything that happens. The forecast provided is very serious and very reliable, it's not just throwing numbers around, it can be expanded upon, it is possible to bring an expert opinion, we have been working continuously despite the competition, despite the very hard litigation it has experienced over the last two years, which is constantly changing and developing. And that's really the board's ability, because we know when you're standing in place, you're going backward, you're not staying in place. It's an active, bustling market and is also a very important reason, and I think Her Honour hinted at such, to keep the board with an incentive to move forward, because that's what gives money to creditors.

The Honorable Judge Lushi-Aboudi:
And the other side is also like what I said, you don't need to forget it, that's fine, but it's the same board, the same board that caused this situation. So this board therefore needs to bring itself as well, and that is aside for ongoing management.

Adv. Yaniv:
So I want to say something.

The Honorable Judge Lushi-Aboudi:
Yes.

Adv. Yaniv:
Regarding the court ruling in the USA, we respect them very much. The commissioner's representative wrote a letter that if is even a small chance to appeal, then it is not the moment to lower the curtain on the company. So, I will honestly say, in a sentence, that I don't think that in her Honor's court it is possible to give a ruling for 719,000 USD, but NIS 719,000 without hearing the other party's witnesses. It would not have happened.

The Honorable Judge Lushi-Aboudi:
I am not getting into that.

Adv Yaniv.
I also am not getting into it, but Israel, they would say something about it.

The Honorable Judge Lushi-Aboudi:
At some stage or another they told them they cannot testify and then they said they were waiving the right to remain silent. And there was some sort of ping-pong of that type and rulings - I didn't see all of them, and I respect them because I assume these things passed through someone.

Adv. Yaniv:
They were examined by a judge.

The Honorable Judge Lushi-Aboudi:
Now let's see.

Adv. Yaniv:
An honorable federal judge.

The Honorable Judge Lushi-Aboudi:
Okay. So let's see, let's see.

Adv. Yaniv:
Like I said, we're not arguing here.

The Honorable Judge Lushi-Aboudi:
That's why I always say, I - I'm happy they are appealing because it's always good for another eye to see it. But in general we know that if the ruling is well reasoned and legally sound, then the chances of intervening in it aren't high.

Adv. Yaniv:
In the USA, there is also something called “remand the case”, meaning that if there were all sorts of procedural defects made, I’m not expressing a professional opinion, I’m not an American attorney.

The Honorable Judge Lushi-Aboudi:
Okay, Counsel, so really, let’s move on because I really don’t want to deal with something I can’t have any influence over.

Adv. Yaniv:
The issue of the use of bots is not illegal, the entire issue is no active disclosure of the use of bots, meaning false advertising. This board, with a correct verdict, committed an offence with false advertising, what in our commercial tort law would be called a false description.

The Honorable Judge Lushi-Aboudi:
That’s what the court wrote.

Adv. Yaniv:
And what the jurors decided it was right to take from it was unjust enrichment that was six times the revenues during the period.

The Honorable Judge Lushi-Aboudi:
By the way, what sort of effect does this ruling have? I first opened a parenthesis and I didn’t say this about the issue of an investor, but what sort of impact does this type of ruling on the public who plays? There is a public that could say, “I am no longer entering this sort of place if they are taking advantage of me; I don’t know if they are still taking advantage of me or if they also do so next time, I don’t want to enter”. And there is someone who will say, “What do I care? I log in, the platform is always working, there are games, there are people, one time I win, one time I lose, I think it’s somehow balanced per the regular rules that appear on these sorts of websites. I already have it, I already deal with the platform, Yalla, everything’s fine.

Adv. Yaniv:
I really would like to thank Your Honour for this question. We have two points in time to deal with. There is the jury’s ruling, that was given and was widely published in the media, that was initially 420,000 USD, with a professional opinion advising 719,000 USD – that was in April. And I asked that exact question, what about the impact on use? And the answer was unequivocal: There is no impact and there is no decrease and players continue to sign up. It should also be kept in mind that the judge – who was not suspected of bias toward the Plaintiffs, wrote on page 52 of her judgement that these bots are no longer in use.

The Honorable Judge Lushi-Aboudi:
That was according to the expert opinion you brought.

Adv. Yaniv:
No, no, that wasn’t the parties’ dispute, and she also ruled that there also was no chance of the Plaintiffs going back to this after that ruling.

The Honorable Judge Lushi-Aboudi:
There are no games in the USA. If someone does something illegal, that’s it, there is no second chance. It’s not like here. Even guests, et cetera, et cetera.

Adv. Yaniv:
By the way, Skillz still uses bots.

The Honorable Judge Lushi-Aboudi:
Because Skillz wasn't here over this issue.

Adv. Yaniv:
Yeah, but it's an interesting point. Now I also want to say something about what Her Honour spoke about.

The Honorable Judge Lushi-Aboudi:
By the way, if it's using bots and it states it, then according to "sir's" methodology, there is no problem.

Adv. Yaniv:
I just want to say, no, that what I'm emphasizing is that it is legal to use bots; whether it states it does or doesn't state it does and whether that is legal or illegal I don't know, but I do know that there also are class action lawsuits against it in the US over the use of bots, that are pending and underway.

The Honorable Judge Lushi-Aboudi:
Maybe.

Adv. Yaniv:
So, but it's true, it should be kept in mind. Now, regarding what I started speaking about, I started talking about the collective principle and payment to suppliers and customers, regular payments to suppliers. We need to keep in mind the rationale that says why there is a need to stop payments and there is a need to not pay past debts. The rationale is simple, not to harm the cash, not to harm creditors. Because if there is a company that is losing or is at the point of no income, every shekel you remove, every day that passes, you are harming real people. In a successful company, it's the opposite. If we stop paying suppliers who maintain the app stores, or a supplier who maintains the servers or the supplier who brings mineral water.

The Honorable Judge Lushi-Aboudi:
Or players.

Adv. Yaniv:
Excuse me? To

The Honorable Judge Lushi-Aboudi:
Or players.

Adv. Yaniv:
Or players, obviously. Clearly if the business stops bringing in revenues, that will actually harm people. That's why this subject needs to be treated as material and not as a principle.

The Honorable Judge Lushi-Aboudi:
Okay, that too.

Adv. Yaniv:
Clearly, it's known.

The Honorable Judge Lushi-Aboudi:
And I will refer to the law in this case, and rightfully so; that option exists in law.

Adv. Yaniv:
That's all well-known, what we're doing is this: increasing the company's profits so that there are funds to pay creditors. And no, certainly, in a situation like this, dividends are not withdrawn. One word about dividends: what should be said here is that tens of millions of dollars have been withdrawn since the lawsuit was filed.

The Honorable Judge Lushi-Aboudi:
58,000,000.

Adv. Yaniv:
Okay, so let's put things in order for a moment. This lawsuit as it was filed was not for an amount. No one imagined it would reach the amounts it did, which I would call unreasonable, to put it mildly. From the moment the lawsuit was filed, there was an expert opinion that stated the amount of 719,000 for the first time. No one believed it would reach a verdict, but that's what happened. From the moment that expert opinion was filed, basically no dividends were distributed at all, maybe 10,000 USD, but it really isn't the big deal it's being made out to be. It is also important to keep this in mind with regard to what was said based on customers, as if we had [any].

The Honorable Judge Lushi-Aboudi:
What was 10,000 USD?

Adv. Yaniv:
I believe 10,000 USD was at the end of 2025. The expert opinion was filed in the middle of 2025; since then, nothing was distributed other than that amount. I hope I'm not making a mistake, but that's it.

The Honorable Judge Lushi-Aboudi:
No, Counsel said that this distribution was essentially made, basically before there was a ruling.

Adv. Yaniv:
For sure.

The Honorable Judge Lushi-Aboudi:
You stopped the distribution based on the expert opinion, that's what Counsel wanted to say. Okay.

Adv. Yaniv:
Obviously, they are not distributing dividends under the Companies Law if they don't meet the criteria for it.

The Honorable Judge Lushi-Aboudi:
No, no, clearly. I just wanted to understand the chronology.

Adv. Yaniv:
For sure. Before the ruling, before the jury came to a decision, before the evidence, before everything. With regard to the client basis, that was, quote-unquote taken from someone, which has no evidentiary basis, but let's assume. Clients in this world come and most of them also leave. That's why advertising costs in this world are enormous. We spend millions of dollars per month on advertising and that's what makes the company profitable – the advertising – because as far as clients, a large portion of them leave within a month and an even greater portion leave.

The Honorable Judge Lushi-Aboudi:
That's not what they're saying.

Adv. Yaniv:
No, I just want to say, not here.

The Honorable Judge Lushi-Aboudi:
One second. I am putting this on the table. I didn't check how much you spent on advertising and how much they spent on advertising; they're saying they invest a ton of money into this.

Adv. Yaniv:
Yes.

The Honorable Judge Lushi-Aboudi:
The issue is that everyone here is basically saying that a player logs into this platform, if there are no players against him, he is like a person who came to a casino and if the casino is empty, he leaves. So they're saying, what did you create here?

Adv. Yaniv:
Not quite.

The Honorable Judge Lushi-Aboudi:
I didn't hear.

Adv. Yaniv:
Not quite

The Honorable Judge Lushi-Aboudi:
Why not quite? What, even if you go to Las Vegas and it's empty, what do you have to do there? You came to play alone? Play in a room.

Adv. Yaniv:
The social experience is it.

The Honorable Judge Lushi-Aboudi:
Okay, listen up. We know what's being spoken about: people log on because they want to have someone to play with them, more or less at their level, okay? If it's a matter of level. And if there is no such thing, 1,000 [NIS in] advertising expenses will not help you. That's what I'm trying to tell you: the advertising expenses are in their proper place, but come on, we know what happens in the field. What if Counsel tells me he spent – right now – 1,000 NIS in advertising on a nursery and all the saplings are rotten, then people will come?

The Honorable Judge Lushi-Aboudi:
Our saplings are not rotten.

Adv. Yaniv:
Okay, Counsel was caught.

The Honorable Judge Lushi-Aboudi:
I want to say.

The Honorable Judge Lushi-Aboudi:
I'm talking about that. There is something here, there is some agreement here, people enter, they want to be part of the players' world, that's everything.

Adv. Yaniv:
That's right, that's right. I am assuming that I really don't need to quote for her Honor that the really clear preference is always the option of recovery, that's even what I heard her Honor say.

The Honorable Judge Lushi-Aboudi:
Right.

Adv. Yaniv:
Here, looking at case law, we're really talking about settlement files, files that prefer rehabilitation. They say there are 20 workplaces here, because there are 30 workplaces there. Her Honor, here, we're talking about 300 families, which is indirectly thousands of people. I don't need to explain to her Honor, who knows this well, the wave of large collapse of suppliers, this company, the Plaintiffs, pay Israeli suppliers over NIS 200,000 per annum regularly to suppliers in Israel, that is a business that sustains many businesses and families in Israel, and so there really needs to be an effort to save it, and not like the other party is requesting – its liquidation, and this liquidation is clear.

The Honorable Judge Lushi-Aboudi:
They don't want, they are arguing, look.

Adv. Yaniv:
This liquidating is clearly coming from foreign considerations.

The Honorable Judge Lushi-Aboudi:
Second of all, Adv. Yaniv, look, I am saying something. Those who know me and enter this courtroom know that what I say is what I think, and I don't think – it is clear – there is something below the surface. We aren't so naïve to think the other side doesn't have long-standing scores to settle with you, and maybe he also wants you to get off the stage. I don't know if he will actively do something, but he will be happy, nobody wants to have competitors. But at the moment I can't catch them, quote-unquote, and tell them, "You're out of order with what you wrote". Even if what stands around the background to this is just a story about competition, etc., because I am saying the plan is insufficient and they have reasons to oppose it. The next stage will be next stage, let's examine it in the next stage. I will also tell Counsel that had they been here today, they would have an already enforceable ruling in Israel that can be enforced in Israel. They were following Article 18, they filed a motion for an order initiating a proceeding, right? Such a motion should have met standards, there is already a ruling by Justice Brenner about this matter, that if the person filing a motion is your competitor, then a thousand eyes are directed at this type of motion, and it is clear that this needs to be given weight and everything else along with other considerations, because the final considerations are obviously what the chances of rehabilitation are. Now they will have a hard time showing, and I am already saying it (in English), it will be hard for them to show what they say as an option, it's more than what you're saying, it will be hard. I am saying this and I won't be able to say it, I remember saying when the law went into effect, I was at some conference in Eilat and I said, there was the judge, there was Adv. Erez Hever, I don't know, I was on a panel and I said: "Listen up, trustees will need to start bringing an expert opinion under Article 318, that Amendment 4 later one, what brings in more money? And it will be very difficult. So he told me we simply won't bring one. So no one will bring one. So what do you think I can I say about that? In the end, we will let the creditors decide a lot, that's clear. But there needs to be a framework, there needs to be someone to supervise it, there needs to be someone who sees everything.

Adv. Yaniv:
I agree but I think one of the things, her Honor mentioned Amendment 4, which today is the improved Amendment 9, exactly.

The Honorable Judge Lushi-Aboudi:
We'll assume.

Adv. Yaniv:
Maybe relative to 4.

The Honorable Judge Lushi-Aboudi:
We'll assume, yeah.

Adv. Yaniv:
It's this exact thing that at the time came because of Covid-19, and there, in the explanatory notes, it wrote about an exogenous event. We are in that exact thing; it's an exogenous event that is totally irrelevant to the company's current operations and this sort of exogenous event is exactly the reason why we have Amendment 9.

The Honorable Judge Lushi-Aboudi:
I am prepared to say that it is an exogenous event in another context, not the content Counsel is talking about, because I'm not sure I fully agree with it. I think that it is an exogenous event in the context of these operations being illegal, or that the ruling that they deceptively stated it is exogenous. In that context that did not stick company operations as something fraudulent. That I am prepared to say is exogenous. But to call this incident exogenous? You did something, you have competitors, you, let's put it this way, this world, and I also saw other things, we know how it starts. Someone comes and says, I have an idea, lets bring in. I'm just saying this, it's not what happened: let's bring in a bot, we'll bring in a bot, it will earn us such and such profit, we'll bring in another, we'll pay for it, etc., etc. And we'll say our expenses for the bots are NIS 100 per year. So we only take 100, but if this works, we take 100, and then we take 300, and then we take 400. I am not saying that's what happened here, I just want to say it not so exogenous, these bots didn't come down from Mount Sinai with the Ten Commandments, how is that exogenous? It's an event where people have a hand and foot in part of such. Now to say whether it's okay or not, if people want to redevelop it, Adv. Yaniv, I am not expressing an opinion on that position. The court ruled what it ruled, that isn't the point. I am once again trying to say that I don't want to determine what is an exogenous event. Let's summarize it like this: I am willing to accept Counsel's argument in the context being deceptive, even in the context of not accepting the other party's argument that this sort of company should not be allowed to formulate an arrangement because of what it did. That I can agree to. Moving forward.

Adv. Yaniv:
Because there is no intent, no intent to defraud, it obviously isn't that type of thing. Now I want to say something in addition, I am not, this hearing is not about bots and it's not about the ruling in the USA, but her Honor is dragging me by the tongue so I will say one more sentence. Even if we buy securities on the stock market, we buy them from bots. The use of bots is something very common in industry and that is the sole factual argument of Skillz, which was not attested in the affidavit. They said: "No, that's not right," and that's the sole factual argument that is missing from their Declarant's affidavit, and it is not accidental. This is something very common in this industry and in all internet industries in general, what we buy, sell, use, import and export. So this.

The Honorable Judge Lushi-Aboudi:
Yesterday we also saw robots that run 100 meters.

Adv. Yaniv:
Excuse me?

The Honorable Judge Lushi-Aboudi:
A lot of things. Our entire world is going in this direction, unfortunately, I don't know who will argue before me in the end, whether it is a robot or not.

Adv. Yaniv:
And another thing about customers and bots that is important to keep in mind. For example, in the lawsuit, we have Milberg's attorney, from the Milberg office which is the Plaintiff's law office in the USA. They came to a compromise settlement and the customers, the players, could decide whether they wanted to receive the money into their bank account or into an application, to continue to play, because they were defrauded, quote-unquote, so the protocol understands.

The Honorable Judge Lushi-Aboudi:
What did they decide?

Adv. Yaniv:
Ten percent opted to get the money in their bank account, and that says a great deal about this world and how they feel?

The Honorable Judge Lushi-Aboudi:
The type of users, that's obvious.

Adv. Yaniv:
That's not it.

The Honorable Judge Lushi-Aboudi:
They give them grades.

Adv. Yaniv:
They like the expression of user experience, it's to enjoy, it's entertainment, like me playing my game on a phone, other people also play.

The Honorable Judge Lushi-Aboudi:
What game is counsel playing? Tell us, it'll give us something interesting. I started playing Cats. No, it's like this: it's matrices, it's a geometric thing that you need to think about. It's really complicated.

Adv. Yaniv:
That's more intelligent than mine. Fine. So there obviously are more points that I have to address, but I think at this stage, I obviously agree with what her Honor said as well as with what the commissioner's representation wrote, we need to look at the Respondents' comments; there are Respondents who want to make comments on the settlement and there is one respondent has said she opposes any settlement no manner what, and that's what also shows something.

The Honorable Judge Lushi-Aboudi:
I don’t know.

Adv. Yaniv:
That’s what I read there.

The Honorable Judge Lushi-Aboudi:
Okay, I want, I’ll hear them in a second, I don’t think that’s what they are saying, they cannot tell me that after everything I said.

Adv. Yaniv:
What?

The Honorable Judge Lushi-Aboudi:
Okay, if they say that after what I just said, it’s not good.

Adv. Yaniv:
And I am reminding her Honor the court in the court in Delaware as well, and Her Honour said what we wrote, there was a hearing about it two weeks ago, they cross-examined the Petitioner’s CEO as well as some other Israeli attorney. The court there ruled and the court there ruled it thinks the right thing to prevent irreversible harm is to grant the temporary injunctions; it also denied Skillz's motion to prevent the orderly transfer of funds to Israel, in order to truly enable the proceeding we have here. I think it is appropriate to appoint an arrangement administrator who will listen to the parties' comments. Some of their comments I actually agree with, some of the comments I strongly object to, but it's not me, the arrangement administrator will submit an amended, improved, upgraded arrangement.

The Honorable Judge Lushi-Aboudi:
I saw and I also asked. Look, the choice per law, if you give a temporary stay of proceedings, then you appoint an administrator, I haven’t yet given such stay, I wanted to hear the parties because I thought this was a special case that doesn’t need to go 1:1 per the narrative the law sets forth at the moment, maybe afterward. We need to see, this entire case needs to, even if there is a law you do it (English), there are allegations here. I also asked you for clarifications, there weren’t any, that’s a very serious matter. Yes, please, Adv. Alcavi.

Adv. Alcavi:
Greetings, her Honor. My good colleague said that this isn’t the place to deal with the ruling in the USA, but he is dragged by the tongue and said a lot about the ruling in the USA and he said really tried to downplay what was said there, and I think he didn't just try to downplay what was said there, he also tried to say that Skillz itself uses bots when in the ruling there is an explicit finding that there is no evidence of such. My colleague, I don’t think it's okay for someone who was found in the ruling to have been found [to have done] very serious things to take no responsibility, and his response to it is to defame the party that was harmed to the tune of hundreds of millions of dollars from such conduct. In contrast to what was determined inside the ruling, it infuriates me and I feel obligated to say this right at the beginning. There are no bots in the world; it is extremely unacceptable to have bots in a world of players playing for money.

The Honorable Judge Lushi-Abudi:
And if you tell them that there are bots?

Adv. Elkawi:
There are none. In the gaming world for money, there are no bots.

The Honorable Judge Lushi-Abudi:
I'm asking.

Adv. Elkawi:
Bots can always win.

The Honorable Judge Lushi-Abudi:
Why?

Adv. Yaniv:
These factual claims are not supported in the affidavit.

The Honorable Judge Lushi-Abudi:
I'm really not arguing at the moment. I don't have knowledge in this field, but I'm really asking logically; where is the logic that if anyone wants to enter the platform and he's willing to pay and he's willing to play against bots, where's the problem? If someone tells him, listen, there are bots, play against bots, if he's willing.

Adv. Elkawi:
But he's not ready, they lied to him

The Honorable Judge Lushi-Abudi:
Okay, so another question.

Adv. Elkawi:
Now, that was the question, but there was also a ruling, and the ruling did not mention facilitating terminology. The US court is a very serious court, and when it writes things that Papaya's fraudulent activity was extraordinary, or that Papaya's founders and managers knowingly and deliberately created and controlled a plan that was intended to generate profit by misleading consumers at the expense of a competitor like Skillz. And that Papaya entered the American market through widespread fraud and lied to the app stores, the payment processors, and others.

The Honorable Judge Lushi-Abudi:
And deleted responses from Facebook or I don't know from where, indeed, it's clear, sir, that these fantastic amounts that the court in the United States ruled, it did not merely rule, it ruled that there were things that it found that were wrong, so there's no need to persuade me about that. I was already persuaded.

Adv. Elkawi:
I understand that Madam was persuaded.

The Honorable Judge Lushi-Abudi:
I was persuaded. I was persuaded. The court in the United States persuaded me.

Adv. Elkawi:
When it decides, it decides. Now, I'll only say I'll refer to another point that my colleague said. For an entire year, the witnesses on behalf of Papaya said that they were not prepared to cooperate in preliminary testimony because of immunity from self-incrimination, so if everything is so fine, why are they afraid of an indictment? So now to come here and try to minimize this because there are appeals proceedings is really not serious.

The Honorable Judge Lushi-Abudi:
I don't know. I don't know why they used that. I haven't checked it. Maybe they had good reasons for doing so. I have no idea what was there. Everything I say here won't be serious.

Adv. Elkawi:
Madam, I wish to refer to a point raised here and I want, I think that it should be taken off the table, because it's illogical.

The Honorable Judge Lushi-Abudi:
What?

Adv. Elkawi:
The statement as if it's possible that Skillz is not acting for financial objectives, but with the objective of removing a competitor from the market. I wish to tell Madam that that is a financial absurdity. We're talking about a public American company, its parent company, its valuation today is $150,000, say it has a ruling of $730,000 in its favor. Papaya writes that it's a loss-making company that is in difficulties. It's completely clear that its sole material interest is to collect the money, there's nothing.

The Honorable Judge Lushi-Abudi:
I haven't seen it very clearly written in your little daughter Rachel, even though I'm prepared to assume that you, sir, mean that, but I can say that when people mean something, they should write it very clearly. And I'm telling you, sir, that what arises in your favor, again, has not been said that I think that you're silent about something, and I think that this bad blood is also expressed in the way it is expressed, so I am prepared to assume in your favor that I really don't want to tell someone here objects in bad faith and I have no reason to say that. But I can say that there is a sense that you're so angry that you said that we'll object to this in any event. And I am prepared to say that I read this and told myself that they don't mean that they'll object in any event, but they're objecting in any event to the currently proposed settlement because if we're dealing with a sweeping objection.

Adv. Elkawi:
No.

The Honorable Judge Lushi-Abudi:
So there's bad faith.

Adv. Elkawi:
We're not making a sweeping objection, us.

The Honorable Judge Lushi-Abudi:
So I brought you, sir, to a point that we can all agree on, that everything is a question of what will be in the settlement.

Adv. Elkawi:
Completely clear. And I will tell my associate something else. We're not asking to stop the activity. We understand that continuing the activity is something that is very important, to our chances of being repaid. I reiterate that our financial interest is clear - $730,000. I want a moment, because the things have been said, to take the other side and show how the claim of wanting to remove a competitor in order to make money is not financial. Papaya reports to us that it attached Annex 2 about its forecasts. It reports to us, Madam, that it lost $25,000 in 2025 and that it expects that that will be $36,000 in 2026. Now, let's assume that something is happening that we really don't want to happen and that Papaya leaves the market against our interest. What will Skillz gain from that? How much out of the $30,000 that they profit in a year, what Skillz can generate from that is ten percent of the market, is 20 percent of the market, is $15,000 a year.

The Honorable Judge Lushi-Abudi:
Advocate Elkawi, I always tell myself and always caution myself that I only see what people show me. What they don't show me, I don't know. Now, the heart desires, the fact that it's possible that Skillz really invested many years in development and wishes to do an engagement with the customers and did not succeed in a way that Papaya entered only in 2019 – and already achieved a breakthrough and already reached such achievements, after you invested a lot of money in this thing and didn't see. So I want to assume to your benefit that you want to receive the money, obviously. On the other hand, just as I always say in this hall, I also want to be beautiful and rich, and smart, and healthy to 120. So if I can both receive the money and do something nice to the other party, I'll do it for him, why not?

Adv. Elkawi:
But that's impossible.

The Honorable Judge Lushi-Abudi:
It's possible, everything, everything. Listen, everything is possible, everything is possible. They say that you, you want.

Adv. Elkawi:
We're not offering any solution that means stopping operations; on the contrary. Now we, our interest, as I said, is to reach a fair solution. Now, the fair solution, the solution they proposed, Madam, I wish to tell you, Madam, what they said actually said, what they basically said here and that's why we got angry. What they actually said here, listen, agree with us, we cheated you, but agree with us, we'll profit. We will continue to make a profit until 2032. We'll multiply our profits five-fold. Agree with us, nothing will happen on the road, no new technology will enter and you'll take all the risk.

The Honorable Judge Lushi-Abudi:
You don't need it.

Adv. Elkawi:
Without guarantees.

The Honorable Judge Lushi-Abudi:
Advocate Elkawi, you don't need it. I said that at the start of my remarks, reiterate it now in the protocols too. The model proposed in the settlement is not good enough. It doesn't take your justified concerns into account that there must be reference to you and improve this settlement. There's nothing to talk about.

Adv. Elkawi:
More than that now, Madam. I say that this settlement was drawn in a very problematic way. I want to understate, I'll explain because of what was actually written in it? They're trying to create a presentation as if there is some kind of 100 percent repayment.

The Honorable Judge Lushi-Abudi:
Just a moment, a second, let's open the brackets. My position is that the supervisor expressed his response that there is no need to order the convening of meetings at the moment.

Adv. Elkawi:
I understand, Madam.

The Honorable Judge Lushi-Abudi:
That therefore means, what is stated behind the page? It says that he should amend this settlement. So this settlement, as it is now, it won't be the settlement that will stand before the creditors. But, nonetheless, sir, I want to comment, so under my comment, sir, I will comment.

Adv. Elkawi:
I'll comment on that, because, in the context that they're saying as if our objection was to any settlement, I'll only say a few sentences, the settlement tells you, if we have more than $30,000 in cash flow, when we can determine whether we'll have cash flow or we won't have cash flow, we'll deposit money that in the end and after six years if we really do well and ensure that we'll have cash flow because, after all, we can invest, and there is no restriction on our investment and also, they say that there is no commitment in the agreement to repay the money, there's nothing, that means that you're looking, and I'll tell you further, I'm very angry about section 1 of the agreement, about how they want to distribute the funds between the branded creditors. What are they saying there, Madam? That if Milberg is paid today, its proceedings are over, and it has a consensual ruling of $15,000, they now want to take at my expense, this, maybe from the fund and if they don't pay all the money I'll end up in a situation where people who wanted the settlement to apply to them won't get pro rata. I am harmed because they're going for an appeal proceeding, and because Milberg closed a settlement with them. It will get the money before me, at my expense. Now, it's no coincidence that it's worded in that way, it's as if, I don't want to say a bribe, but it's a benefit to a creditor to support the settlement, now, with that.

The Honorable Judge Lushi-Abudi:
I hear you. I hear you. I respect what you are saying, sir. I only want to say that I also respect the other party, which did not conceal from me, put it on the table. That may be. I now have a kind of creditors settlement that I must decide something about a debtor, okay? So, in this section, something was decided that refers to some other section, you read the other section, it sends you to a different section. No, we want to know what we're talking about, it's explicitly written.

Adv. Elkawi:
It's still infuriating.

The Honorable Judge Lushi-Abudi:
Okay, but at least, sir, you know and everybody knows what we're talking about and there's no need to guess.

Adv. Elkawi:
Now, Madam, there's a question in this event, a question what is correct? Should proceedings be under Chapter L? Or Chapter B? I emphasize, Madam, we don't want liquidation, we want.

The Honorable Judge Lushi-Abudi:
Chapter B is not appropriate, not appropriate now. What is it appropriate? Tell us.

Adv. Elkawi:
I'll tell you.

The Honorable Judge Lushi-Abudi:
After all, the rehabilitation and recovery and liquidation option exists in Chapter B.

Adv. Elkawi:
Obviously.

The Honorable Judge Lushi-Abudi:
And investigations are not what matters to us now, investigations, no one argues that the creditors were knowingly defrauded in advance. We're talking about a ruling that retroactively determined that a particular conduct is misleading conduct, so let us state now that I give you a headline that you deliberately acted to defraud creditors, not certain, so why isn't Chapter J appropriate? So why isn't Chapter J appropriate? Moreover, your proposal, sir, that an investor will come and all, doesn't sit with Chapter J, Chapter J is quite a destroyer of value. I don't know, pardon, Chapter B. I cannot say exactly how much, and while we're talking about the destruction of value, we don't always know exactly what it does. We don't know. I won't, I'll tell myself that I don't always know, okay? But there is destruction of value here, because if the company continues to work and generate money and knows to tell you and someone objective tells me that it knows how to continue to generate that in the existing format. Let's assume that Chapter B will sell the company's activity and give the managers some kind of parachute who will continue to operate it well and skillfully for some period of time, I don't know how long. I don't know if they know to continue doing the same thing, how much you, sir, will see from the sale of this activity? I don't know. I said earlier that I struggle to see an investor who came today and put sums, let's assume, he needs to put $300,000 today, yes? In order to get 20, 30 percent under their forecasts. If I were to make a rough calculation, I don't know if it's correct, right? Here, I will say Mr. Bachar, yes, then yes $300,000. Then he has to put up $300,000 in a company that has a $720,000 ruling hanging over it. That has some kind of difficulty, it will have to, as I previously said, bring an opinion that this currently operating company, whose legal advisers will say, or someone will say that it's operating, that it has no problem in its operations under the American ruling, okay? Is that something that could change, correct? The investor wants to know, right? He also wants to know that he is investing money in the next step, in the next tact [sic] of the company, its development. Where is this company's development going? I don't know, there isn't investment in development here, this is investment here. To save it from the situation it is in. I don't know whether anyone would do that. Come, let's be logical. So under Chapter B, I see a very great limiting of options. I have the same options in Chapter J, they also exist, and if I don't succeed under Chapter J, I'll switch to Chapter B. That means that this so-called movement is possible from here to there, from there to here isn't so possible. Although I have Section 97 or something, but I don't think that it's possible to make this move to Chapter J already. So why should I sabotage myself? It's possible that this settlement might be appropriate for you, and if it's inappropriate for you, then we'll switch to Chapter B and retain the option. Why should I waive this option in advance? For what reason?

Adv. Elkawi:
I'll tell you, I'll tell you, Madam. First, I begin at the end. If I were thinking that, financially, Chapter B is something that would limit our chance of obtaining the consideration, I would offer this proposal. Second, Madam.

The Honorable Judge Lushi-Abudi:
Why is that important to me? Excuse me, I do not wish to offend, but why is it important to me what you, sir, think? After all, I need some kind of figure that will show me that I can work one vis-à-vis the other and say what will bring me more. I strongly respect what you think, sir, like the opinion of everyone here, but I cannot decide something on that basis. How can I say that what you, sir, are saying is correct, or if some imaginary editor [sic] will now stand up and tell me that it brings more, then I should, then how can I decide?

Adv. Elkawi:
So, I'll say, Madam.

The Honorable Judge Lushi-Abudi:
Okay.

Adv. Elkawi:
First of all, I think that one of the sources of this settlement should be personal responsibility imposed on the people who brought the company to this state. They are people who not only withdrew dividends, but are the people who caused this damage. Now this thing, it's the financial source that people can build on.

The Honorable Judge Lushi-Abudi:
Advocate Elkawi, they'll bring the managers, the shareholders, who should bring money. To tell him in advance that he is going to have personal responsibility and will continue to run the company and bring you money, he won't do that. Why should he do that? What can be said, and the Supervisor said that in his position, and I reiterate it, it's possible to say that if, in future, of course, that if this settlement is not completed, they also have to in future meet what is called taking charge of their fate in this matter and dealing with personal lawsuits, if any. But to say that in advance? How does that serve me? What does that serve me? Show me the money, not that. Show me how it is with the money that the manager came today and is willing to put in money today in order to buy the exemption. I'm not saying no, by the way, I'm not saying that it's impossible in the settlement that he will bring a donation, I'm not ruling that out, but not the opposite like you, sir, are saying. First, I'll tell them that they are personally liable and then that they, it's also a matter of wording. Why investigate? Why investigate? Now, why should I investigate now? What do I have to investigate now? What? Why should I waste, take a trustee who will now take I don't know what insane opinion, you paid millions in the United States and will have to pay millions more for an opinion in the United States, why all that money? That's money that people want, if it's $300,000 or if it's $15,000, what's the issue? I don't want to give it, I'm not prepared to give it, I won't approve a trustee to take such an opinion. Why? Not at this moment. If I learn that this business plan that you're building is mendacious and intended to extricate themselves and not bring the money, then, God willing, yes, it's possible to go to Chapter B, with the full arsenal of tools and they are talented people who had grounds prepared for them, they'll want to buy this thing for cash, apparently, that's all. So, for now, I asked you, sir, begin by shortening 45 days? Yes or no? That's my question and I add 45, because that's limited. We have holidays and people will have to work harder. You'll get the money, no problem; they'll also work during the holidays.

Adv. Elhawi:
Another point that I don't know, I would like to draw my lady's attention to.
The proceeding here, Madam, today is a that is being followed in Israel.

Hon. Madam Justice Iris Lushi-Abudi:
That's right.

Adv. Elhawi:
About an American company whose player is American, whose money she produces, she produces in the United States, the Court of Justice that determined that fraud was committed in an American Court of Justice.

Hon. Madam Justice Iris Lushi-Abudi:
Isn’t it an Israeli company?

Adv. Elhawi:
The parent company is.

Hon. Madam Justice Iris Lushi-Abudi:
Parent. Company

Adv. Elhawi:
The parent company is an Israeli company. And then after they receive a verdict and cannot comply with American rules, regarding the question of how to delay a verdict in the United States, which is to post bail, they take this whole incident to the State of Israel to circumvent the rules of the country where they are making the money.

Hon. Madam Justice Iris Lushi-Abudi:
Have you filed a motion for an adjournment on the threshold of the proceedings, sir?

Adv. Elhawi:
I say.

Hon. Madam Justice Iris Lushi-Abudi:
No, I am asking.

Adv. Elhawi:
I say this in context.

Hon. Madam Justice Iris Lushi-Abudi:
I now need, at the end of today's hearing, to discuss a request for summary dismissal due to, perhaps, a lack of subject matter jurisdiction.

Adv. Elhawi:
(English) I then say, I raise this point to.

Hon. Madam Justice Iris Lushi-Abudi:
What am I supposed to do? What should I say about this? I don't know, don't know.
I didn't receive a response, I didn't hear an argument, this is something that needs to be discussed from the beginning, so what can I say? So now it may be that you sir are right, what does this do to me now and contribute to me at the end of the hearing? How does this help me? Sir, I'll tell you, look, you made excellent arguments, your position was heard and in my opinion, it was acceptable, in a dispute, in the sense that this arrangement needs to change. But I do not accept that it is necessary to go to Part B. 'and I am asking for your position at the moment only on this matter, that I intend to go according to Part J, 'and my question is whether you have any objection to a temporary stay of proceedings of 45 days? And I understand that ultimately there is no point in opposing it if we accept the concept that if this proceeding does not succeed and this model does not improve then you...

Adv. Elhawi:
Madam, we will need to get confirmation from the client and inform you.

Hon. Madam Justice Iris Lushi-Abudi:
So, now yes.

Adv. Elhawi:
I don't know what time it is there now, but we can try.

Hon. Madam Justice Iris Lushi-Abudi:
So, we can try, because in the meantime I will take some kind of pause and I would like to hear from the supervisor.

Adv. Yaniv:
If I can.

Hon. Madam Justice Iris Lushi-Abudi:
His position.

Adv. Yaniv:
Before concluding, I would just like to briefly address two or three points that were made here.

Hon. Madam Justice Iris Lushi-Abudi:
Okay, even though this ping pong is over, but it is all right.

Adv. Yaniv:
No, not ping pong, really just a brief reference. First, this statement that Skillz does not operate for economic purposes that my friend, my good friend, Adv. Elhawi, wants to take off the table, is completely on the table, madam. We are not here in that discussion, when a hearing comes, if it comes on Section 87, then we will bring evidence
about it, many senior figures have left Skillz and they have something to say about what is driving this whole war. We can bring evidence about it, that is not a problem.

Hon. Madam Justice Iris Lushi-Abudi:
What evidence will you bring? I really hope so.

Adv. Yaniv:
He said, we didn't bring any evidence.

Hon. Madam Justice Iris Lushi-Abudi:
For you, don’t get to -87.

Adv. Yaniv:
I really hope for Skillz that they will actually vote.

Hon. Madam Justice Iris Lushi-Abudi:
No, I hope for you that you will also formulate something that will be good enough to be hard to oppose. Listen, listen, for the time being their resistance is perfectly fine, leave aside what you claim under the table, their resistance is justified.

Adv. Yaniv:
So why did this happen?

Hon. Madam Justice Iris Lushi-Abudi:
You have to try to improve it, that's all. So if you improve and they say it's wrong, then it will be harder.

Adv. Yaniv:
Of course I don't right now.

Hon. Madam Justice Iris Lushi-Abudi:
In the current situation, I'm already telling you, Sir, if a petition were submitted under 87, would you submit it? I wouldn't accept it.

Adv. Yaniv:
Madam, you have spoken clearly and I heard you well. I have no problem with this issue, I caught the very clear hints. I would like to say, however, that there are many arrangements that are approved in the Courts of Justice for active companies that are based on the operational profits, on the future operations, there are many such arrangements, it is not an improper thing.

Hon. Madam Justice Iris Lushi-Abudi:
Yes, but look, even a supervisor writes his own opinion that he can't comment on that.

Adv. Yaniv:
Let's remember, it's over two billion shekels. It's a huge arrangement and we can handle it.

Hon. Madam Justice Iris Lushi-Abudi:
Okay, I say to you once again, Sir, the additional effort should be not in increasing the amount, but in distributing it
differently over time, meaning, no matter how I repeat myself, issuing rights this way or another, investing, injecting, I don't know what, there must be some larger amount on the table at the beginning, and then if you want to base it on the continuation of the activity, fine.

Adv. Yaniv:
We are listening, we are listening.

Hon. Madam Justice Iris Lushi-Abudi:
That is fine.

Adv. Yaniv:
My colleague, Adv. Elhawi, raised one substantive argument regarding recent verdicts and distant verdicts.

Adv. Elhawi:
Only one?

Adv. Yaniv:
Yes, it was one, one substantive.

Hon. Madam Justice Iris Lushi-Abudi:
If he said, there is one already.

Adv. Yaniv:
Correct. And this matter, madam, at the end of the day, the ruling in this field is well-known for its long-term bond series and short-term bond series. Really, there are sometimes conflicts of interest among people in these matters. There is also a ruling by the Honorable Judge Varda Alshech on this. These conflicts of interest are well-known and can be dealt with. We as a company have no interest, I don't care who I pay, but we can find solutions for this. This shouldn't be a problem. Regarding Part B, "Really, there is nothing here to sell, because it's impossible to sell activity, because they're going to Part B, and speaking of lawsuits, it's impossible to retain the directors and the entire management team will leave, and then there won't be any activity and nothing to sell".

Hon. Madam Justice Iris Lushi-Abudi:
I know, I'm not 100 percent sure that's what will happen either.

Adv. Yaniv:
When a transaction is made, madam, by a willing seller to a willing buyer, there is a mutual commitment by the managers to remain for a period of one, two, or three years.

Hon. Madam Justice Iris Lushi-Abudi:
Adv. Yaniv, they will make an effort and if they have to, they will probably agree to stay for a while. But we are not there right now.

Adv. Yaniv:
That's right, we're not there.

Hon. Madam Justice Iris Lushi-Abudi:
Because I'm not sure that even if they were there and agreed to three years, we would see enough of it to pay the creditors. Certainly not what you're suggesting, which is 100 percent, which is fantastic, right?

Adv. Yaniv:
We definitely offer a result that is great in the sense of fantastic. Regarding the authority, as the authority claimed that it should have been argued at the first opportunity and it did not come up, but we explicitly stated in our petition the Section of the law, which is 319(1), by virtue of which this Court of Justice has authority, the next company is an empty company, it has no offices, it has no assets, it has almost nothing there, no employees. And the fact that there are customers in the United States certainly does not change the picture. Check Point is also a company that sells mainly in the United States, but it is still an Israeli company. It is very interesting what my friend said about, about how he has an interest in the continuation of the activity, because if the company stops, who knows how much of it he will profit, out of the 30,000 dollars, how much will really go to him. It is very interesting because it really completely contradicts the logic of the American verdict that says that every shekel that Skillz profits is actually at the expense of this competitor and not at the expense of the rest of the market, but even that, it is not off the record; the appeal is there. That is it, thank you.

Hon. Madam Justice Iris Lushi-Abudi:
Thank you. If only, Sir, could you come closer to one of the loudspeakers and say your name again, Attorney Milberg, yes.

Adv. Eliyahu:
Adv. Avichai Eliyahu.

Hon. Madam Justice Iris Lushi-Abudi:
Yes.

Adv. Eliyahu:
Attorney of the Milberg Group. At the outset, I would just like to address what my colleague, Adv. Elhawi, said, implying a bribe, some other benefit that was given.

Hon. Madam Justice Iris Lushi-Abudi:
God forbid, the word bribe was not mentioned. It was said that they want to produce some kind of positive incentive for the creditor. Let's use nice words. Even a positive incentive is something that bothers him.

Attorney Eliyahu:
I understand, madam, no, but he was talking indeed about the considerations of a compromise agreement, etc., I.

Hon. Madam Justice Iris Lushi-Abudi:
It's a positive incentive, what's wrong with that?

Attorney Eliyahu:
I understand, Madam, I am just for the avoidance of doubt, of course, any argument of that type is denied, also the law firm that represents there, the Milberg Group, is also a reputable law firm, they manage their clients' affairs with no discernment, while taking reasonable chances and risks. Of course, there is no need to expand on this point any further. Only regarding the temporary stay of proceedings order, I repeat what was said in our response, in particular in Section 7 which refers to Section 9 of the Appendix, and this is the distinction between the stay of collection proceedings and the stay of other legal proceedings. We will request that it not be applied, the stay of proceedings order will not apply to legal proceedings, everything that is derived from the need to continue the implementation of the approval of the compromise agreement in the Court of Justice, all of these things.

Hon. Madam Justice Iris Lushi-Abudi:
So, I'll tell you, Sir, a moment on this matter. I've also seen that the supervisor supports this position of yours. I'm not entirely sure that it's the right thing to do, because today she thinks that the company should invest its efforts in the arrangement and not in legal defenses. On the other hand, we're still under arrangement. So, at this stage, I'm ready to go with this stand, but I, like Adv. Yaniv said earlier, heard from within the ranks, don't know what to do next right now. If a trustee or a settlement manager comes and tells me that it's really bothering him, because now the lawyers also have to be paid, so that they can continue working, which is also some kind of maybe creditor preference, I don't know, it's a question, an interesting question and I'm not going into it right now, I think the supervisor should also give his opinion on this. If they paid in advance, they paid in advance, if they didn't pay in advance, then what now? The settlement manager should also ask me to approve now, pay some American lawyer, some other amount of 100,000 dollars for an appearance, why? Why do I need this? All of these things will be examined in a debt claim that will be submitted to the settlement manager, we will reach agreements, I'm sure they will be agreements that if you don't agree to, then it won't happen, so what? Like okay, I hear what you're saying because I respect, there's already a proceeding, I respect it, but look, look (English) as if you're talking about these things. I'm sitting here, what do I care? I'm going home later. What are you going to do? You need to run now, bring lawyers, pay them, I continue my affairs, like, and that's it, I'm not talking about wasting judicial time for the judge who has to hear this lawsuit now. Because it might be possible to end it in a different way. I am respectful right now. Okay? Okay.

Adv. Yaniv:
Thank you very much, madam. I didn't exactly understand what madam said about being respectful at the moment.

Hon. Madam Justice Iris Lushi-Abudi:
I am saying that if the settlement manager tells me that now the costs of lawyers are a preference for creditors, I will ask for a response from the supervisor, it is a matter of principle, it is not my business to decide on it at this moment.

Adv. Yaniv:
Okay, for the record, I say that I am Adv. Yaniv. It is very important to me to say that, contrary to what we wrote, that we are willing to agree to this type of thing, of reducing the scope of the order, in principle I have no problem with that, and as madam says, the settlement manager will decide, madam will decide, I have no problem with that in principle. But practically, I very much ask that no general change be made to the order, because this thing could cause damage, because this order, I remind Madam of what we started with.

Hon. Madam Justice Iris Lushi-Abudi:
What change?

Adv. Yaniv:
A change that will reduce the temporary order. That will reduce it only regarding the enforcement proceedings and not to litigation. The order, as I recall, also applies to the issue of what we call Section 66 of an existing contract, which is where we started this case the previous day.

Hon. Madam Justice Iris Lushi-Abudi:
Okay, but there is no impediment to explicitly make such a reduction when you submit your proposed order.

Adv. Yaniv:
Exactly.

Hon. Madam Justice Iris Lushi-Abudi:
Please indicate the proceeding.

Adv. Yaniv:
Exactly.

Hon. Madam Justice Iris Lushi-Abudi:
Tell me what this is about and right now, so I'll sign off on that, I won't change it,
I won't change the wildcard. Exactly. But there will be exceptions, and the exception will be submitted in your proposed order, okay?

Adv. Yaniv:
And I say, we will not oppose any pending proceeding that seeks to renew it, as long as...

Hon. Madam Justice Iris Lushi-Abudi:
Everything is egalitarian, yes, it is clear. madam, Adv. Eshkol, yes? She wrote a nice response.
Yes, good lawyer, since we've already arrived up to where we arrived.

Adv. Eshkol:
If possible, only a few words.

Honorable Judge Lushi-Abudi:
Yes, please, would the lady like to speak, yes. Until a woman wants to speak in my courtroom.

Attorney Eshkol:
That's right, by the way, that's one of the reasons I moved.

Honorable Judge Lushi-Abudi:
No, women get treated well here, favorably, favorably.

Attorney Yaniv:
Okay, bring Maya, Yaron.

Attorney Eshkol:
First of all, I simply hope.

Honorable Judge Lushi-Abudi:
Please come a little forward, to the microphone, yes, exactly.

Attorney Eshkol:
A few key points. First of all, at the substantive level, as we wrote in the response filed on August 18, essentially, the relief that Skills is seeking today is relief based on the laws of unjust enrichment, relief for the restitution of funds that came out of the consumers' pockets. And it is very important to me that it be clear that, at the heart of this matter, those who were harmed more than anyone else are the consumers, whose money came out of their pockets to finance all of the company's activities, including the legal battle, at costs of tens of millions of dollars, that's the point.

Honorable Judge Lushi-Abudi:
What is the significance of this?

Attorney Eshkol:
Because I think, I simply want it to be in the background regarding these matters.

Honorable Judge Lushi-Abudi:
That's fine, but I always ask myself, when someone tells me something, what am I supposed to do with it? Am I supposed to address it now in some way?

Attorney Eshkol:
I don't have anything operative at this point.

Honorable Judge Lushi-Abudi:
Okay, so the lady wanted to make the comment, all right.

Attorney Eshkol:
Yes.

Honorable Judge Lushi-Abudi:
Okay. As far as I'm concerned, I have nothing.

Attorney Eshkol:
The only thing is, it's not something that is concrete at the moment, but ultimately, there is a dispute here between two commercial companies, and the main concern is that, because of that same injustice inflicted on the consumers, the main concern is that, in the course of this dispute, the ones whose rights will be trampled are precisely the consumers.

Honorable Judge Lushi-Abudi:
Okay. My position is not popular, I think consumers are adults, they know what they are doing. I'm not so sure.

Attorney Elhawi:
So now.

Honorable Judge Lushi-Abudi:
I don't think consumers are unaware of what's going on, they know very well what is happening and they should make their own decisions.

Attorney Eshkol:
That was actually the next point I wanted to make, because I heard that there was a discussion here about the allegedly legal implications of the continuation of the consumers' game today? I think these questions have both factual and legal aspects, and the one who should be dealing with them is the court hearing the class action. I actually think it is important to say that the consumers are not aware of what is going on. We are talking here about consumers; the United States will read a judgment of tens of pages down to the details of the advertising.

Honorable Judge Lushi-Abudi:
What a nice representation.

Attorney Eshkol:
Ms. Robinson specifically does, yes, but of course, other consumers don't. All they know is that when they enter the app and see a profile, they assume that the profile is human. They don't just assume that; it is based on explicit representations and commitments.

Honorable Judge Lushi-Abudi:
The starting point is what appears in the settlement and in the motion, that the applicants are no longer engaging in any use that is contrary to the judgment, that's how I'll put it, full stop. So I'm not supposed to, no, I'm already telling you, I would say the same thing with protective orders, I'm not sitting here now, lying down here and checking every single thing, whether there is or isn't, that is not my role at all. If you find that there's some problem, you go to wherever you need to go. At the moment, within the framework of the settlement, what is the relevance of this? What am I supposed to do with it?

Attorney Eshkol:
No, I just wanted this to be in the protocol, since a discussion was held here and these matters, as stated, need to be clarified.

Honorable Judge Lushi-Abudi:
Okay.

Attorney Eshkol:
In the court that is hearing the class action.

Honorable Judge Lushi-Abudi:
They will be clarified, fine, thank you very much, ma'am. Appointed, since, as I understand it, ma'am's position is as she wrote it, and ma'am even proposed 45 days of a temporary stay, and that the deadlines for filing the claims of debt would apply from the date of the removal of the Gag order, if I'm not mistaken, that is what ma'am wrote.

Attorney Naot:
No, I proposed that the 45 days be counted from the date of the removal of the Gag order, but I am concerned that the date I specified, which is September 17, is –

Honorable Judge Lushi-Abudi:
Too short.

Attorney Naot:
No, it is actually later, meaning it is already beyond the 45 days, meaning the date I proposed. But of course, the settlement administrator, once appointed, will be able to file a request for an additional extension. I would, I did propose that an additional advertising be made, the purpose of which would be that it be, as I understand it, the advertisings at present are actually on the Supervisor's website. I don't think that this is sufficient advertising under the circumstances of users from all over the world. I don't think there is anyone who will go onto this website and understand what they are looking at, and therefore I also discussed this with Attorney Yaniv, and under the regulations at present, I'm sorry, I don't remember the regulation, when there are creditors abroad, the court should order advertising as it sees fit. I proposed to Attorney Yaniv that advertising be made in the apps themselves. Attorney Yaniv, if he wants me to say what he said, do you want to state your position? But in any event, I will leave this to the court's discretion, we will hear Attorney Yaniv and his position on the matter, and I will leave this to the discretion of the court. And I proposed that within two weeks from the date of the advertising, which, as I understand it, is supposed to be effective advertising, if we really want to ensure that this settlement will compensate the claims of anyone who claims to have been harmed as a result of this event, the proofs of debt should be submitted within two weeks from the date of the advertising. That was my proposal. Does this actually mean that such proofs of claim filed during these two weeks would, in effect, constitute a procedural bar, meaning that no additional class actions could be filed, for that matter, in the United States, or would they still be able to be filed? I received, It is important to me to raise this before ma'am, Attorney Yaniv was not.

Honorable Judge Lushi-Abudi:
Why would additional claims be filed?

Attorney Naot:
So I understood from Attorney Yaniv, but it is important for me to put these matters on the record so that the picture is complete.

Honorable Judge Lushi-Abudi:
I don't think so. Even if they are filed, I will stay them, I think that the stay of proceedings that I grant will apply there, nothing will help.

Attorney Naot:
Because what I was told,

Attorney Yaniv:
They are threatening to file.

Attorney Naot:
That once there is a check,

Honorable Judge Lushi-Abudi:
File proofs of debt here.

Attorney Yaniv:
Correct.

Honorable Judge Lushi-Abudi:
Yes, what is that?

Attorney Naot:
There will be recognition, I just want, I simply want to put ma'am's mind at ease that I considered the matter, I received the answers, I was told that according to (English), once there is recognition, such claims will be blocked anyway, and I wanted to make sure, to close the loop, that's what I'm saying.

Attorney Eshkol:
This is a substantive matter concerning the relationship between class action proceedings and insolvency proceedings. As part of the certification application that I filed, the application was submitted on behalf of all Papaya users, except that there are notification procedures whereby, when the action is certified as a class action, notices are sent to all users, and they have the option, if they wish, to opt out. I think I also addressed this in the response, carrying out now a procedure that is intended for users who have not yet filed a claim is not necessarily required, since they are already part of the class actions. If there is a judgment in the United States, then it includes everyone who has a claim in the United States, and when the proceeding is certified here in Israel on behalf of users from the rest of the world, then it will be relevant to users from the rest of the world. I think there may perhaps also be an attempt here to harm the users.

Honorable Judge Lushi-Abudi:
No, there is no attempt to harm them, there is an attempt to fence these matters in. And the fencing makes sense, especially if there is an alternative for those users, they can file a proof of debt. So I don't know if.

Attorney Eshkol:
I don't think it will be possible to hold users who have not filed a legal demand as having waived their claims, since there is a class action, which is intended to this matter.

Honorable Judge Lushi-Abudi:
I admit that this is a significant question, I have not heard enough about it or read enough about it. My intuitive inclination is that the solution is in proofs of debt, but I will have to hear about it. So she thinks that initially it will be necessary to say that these are proofs of debt and that they should file proofs of debt, and if any of them wants to argue otherwise, that is a different matter and the issues will be examined. I don't think that from the outset I should necessarily accept this position, but rather the opposite, the position that serves the insolvency proceedings. That is the position that, in my view, should be the leading one. If someone else wants to argue that another law conflicts with the insolvency proceedings and that proofs of debt should not be filed, but rather their right to join there should be preserved, let them file a motion, I will consider it. I will consider it according to the rules, after I hear the arguments.

Attorney Yaniv:
What Ms. Eshkol is saying, in my opinion, means that they do not need to join, but that they are already essentially included.

Honorable Judge Lushi-Abudi:
Yes, but according to what she is saying, they also don't, they also don't, whoever –

Attorney Eshkol:
Whoever does not file will be deemed to have waived their rights.

Attorney Naot:
So it is possible, so it is possible.

Honorable Judge Lushi-Abudi:
But they will be notified, if they receive, no, let Attorney Eshkol be, I'm not, I will address this, I'm currently. I don't see any point in saying this, but addressing it now in the decision, but it is obvious that if they are given the opportunity to know that there is such a proceeding and that they can file a proof of debt, and the wording will be such that if they do not file a proof of debt, they will not be considered to be included today in the current application, then they will consider their next steps. I don't know, but I cannot say in advance that I am giving them a carte blanche not to file proofs of debt.

Attorney Eshkol:
Okay.

Honorable Judge Lushi-Abudi:
No, that cannot be done.

Attorney Yaniv:
My good colleague, Attorney Naot.

Honorable Judge Lushi-Abudi:
Yes.

Attorney Yaniv:
My learned colleague, Attorney Naot.

Honorable Judge Lushi-Abudi:
You object to advertising in the app, you have, I have reasons.

Attorney Yaniv:
One, the relevant players are players who played three years ago. Players generally do not remain in this game for three years. Therefore, advertising today will cause harm, because it is clear that it will affect revenues, but on the other hand, it will not bring the hoped-for benefit because it does not target the right audience. The right audience is those who played up until November 23.

Honorable Judge Lushi-Abudi:
How are we going to make sure they know? We guarantee –

Attorney Yaniv:
Three years have passed. What I want to check,

Honorable Judge Lushi-Abudi:
I don't care whether it will be in the app or not.

Attorney Yaniv:
What I want to check is whether it is possible, I assume the company has the email addresses of those players from that period who are still active today, and to reach out to them by email. That is advertising.

Honorable Judge Lushi-Abudi:
What you are telling me right now, sir, is something that is going to take time.

Attorney Yaniv:
Why? Email is a quick.

Honorable Judge Lushi-Abudi:
No, the email, yes, but finding all these people.

Attorney Yaniv:
We are a very advanced high-tech company, everything is done at the push of a button.

Honorable Judge Lushi-Abudi:
Okay, so, sir, you go back to the office today, and tomorrow morning there is a notice regarding all the emails that were sent.

Attorney Yaniv:
Tomorrow morning?

Attorney Naot:
This evening.

Honorable Judge Lushi-Abudi:
Or this evening.

Attorney Naot:
This evening.

Honorable Judge Lushi-Abudi:
Okay, we've reached the interesting issue. I would like to hear from ma'am the reasons for each of the people who were excluded from the list. Why were they excluded?

Attorney Yaniv:
They are all plaintiffs.

Honorable Judge Lushi-Abudi:
It's not relevant, they are absent. I want to know the reasons for their inclusion, considering what I wrote in my decision, so please, if ma'am wants this to be done in another forum, then they will all leave and ma'am will explain it to me.

Attorney Naot:
Yes, I was going to, no, ma'am, you know what, I prefer that we do this in a broader forum. I just want to say, it was brought to my attention at the outset of the hearing, by Attorney Pini Yaniv, and this was confirmed on Google, that Erez Hever's firm represented Papaya. So I am concerned that I will not be able to present his candidacy, and we are in fact left with four candidates. We requested, first of all, I will say.

Honorable Judge Lushi-Abudi:
By the way, when you propose candidates, don't you check with them beforehand in such proceedings?

Attorney Naot:
But of course, there is an affidavit of no conflict of interest and linkage.

Honorable Judge Lushi-Abudi:
I'm asking, didn't Attorney Hever declare that?

Attorney Naot:
Ma'am.

Honorable Judge Lushi-Abudi:
That's the question.

Attorney Naot:
I will present it to ma'am and ma'am will see.

Attorney Yaniv:
It may be that he did not know, it was representation in the past, there is no –

Honorable Judge Lushi-Abudi:
Yes, Yaniv, I'm asking, I want to know.

Attorney Yaniv:
They also filed a claim against Papaya, by the way.

Attorney Naot:
I don't understand, they both represented and filed a claim against Papaya?

Attorney Yaniv:
The website says that he represents Papaya, there was also a claim against Papaya, in short, it's better not to go near him.

Honorable Judge Lushi-Abudi:
Okay, he should have written that, okay, please, ma'am, take this, apparently it is phrased in some way, I don't know, never mind, yes.

Attorney Naot:
Ma'am, I believe, first of all.

Honorable Judge Lushi-Abudi:
Yes, ma'am can, no, ma'am can take it, I saw.

Attorney Naot:
First of all, we approached the candidates in order of priority, that is a first condition, we requested.

Honorable Judge Lushi-Abudi:
In my view, this is not a first condition, the first condition is what the court writes in its decision, with all due respect to you. If the court tells you that a particular case requires certain knowledge, I think those are considerations. I'm asking, I didn't say that they are not, I asked to know what your reasons and considerations are, you want me to approve someone, I need to know what your considerations are, I'm not a rubber stamp here.

Attorney Naot:
I believe I can present to ma'am again those affidavits that were submitted by the proposed officeholders, the cases in which they acted are detailed there, whether as officeholders or as parties. Ma'am is welcome, I would be happy if ma'am would review these affidavits.

Honorable Judge Lushi-Abudi:
I will review them, ma'am.

Attorney Naot:
And based on what appears there, ma'am may perhaps truly be able to form an impression as to whether, in her understanding, they have the required experience or not. There are candidates here who have many cases. I think it is full of that.

Honorable Judge Lushi-Abudi:
So that it will not be hinted at, so that it will not be hinted at. All the candidates, respectable candidates, have extensive experience.

I'm asking about experience, here you also need a lot of understanding of American law and what is happening there, I want to know whether among those candidates whom ma'am says have extensive experience and many cases and they do their work faithfully, and I know them, they are all good, I'm asking about specific experience, and I want to know if ma'am knows how to tell me, based on the cases that appear in the conflict of interest affidavit, which of them?

Attorney Naot:
Ma'am, I don't know all the cases here. I'm sorry, I can't.

Honorable Judge Lushi-Abudi:
On what basis are you recommending this? That's what I want.

Attorney Naot:
Because we know the skills of these candidates, we assess what skills are required for the establishment of a complex creditors' arrangement, they are capable of performing this work well and to the satisfaction of all parties.

Honorable Judge Lushi-Abudi:
I hear ma'am, I think each of them is truly an excellent trustee, that was not my question, but okay, my decision will be given later, you will have a machine-generated **transcript** later, or tomorrow.

Attorney Elhawi:
I will just say to ma'am –

Attorney Yaniv:
Excuse me, when does the machine-generated **transcript** actually come out? Will it be today or tomorrow? Does the machine-generated transcript come out within a day, within two days? Because sometimes it takes weeks.

Honorable Judge Lushi-Abudi:
When there is pressure, I don't think there is any pressure at the moment.

Attorney Yaniv:
It's good that we're in recess.

Attorney Eshkol:
I wrote in the objection that we agree to 45 days, subject to the rights of the class being preserved. I also raised arguments regarding the convening of the meetings, and I would request that, if we file, as there will be a supervisor, also regarding the calculation of the aggregate value of the class for the purpose of filing a proof of debt, also regarding the convening of the meetings.

Honorable Judge Lushi-Abudi:
When a settlement administrator is appointed, ma'am will refer to the settlement administrator. At the moment, since I am not ordering the convening of meetings, we will accept the Supervisor's position on this matter.

Attorney Naot:
Ma'am, I request, since we have in fact presented four candidates, I request that ma'am allow me to present an additional candidate within the next 24 hours.

Honorable Judge Lushi-Abudi:
Okay, all right, ma'am will present, no problem.

Attorney Elhawi:
Just to complete the picture, unfortunately, we were unable to reach the client, and therefore

we cannot deviate from the documents that we filed and that were approved for us, in which we wrote what we wrote, it is simply impossible to reach them at the moment.

Honorable Judge Lushi-Abudi:
So, sir, please let me know by tomorrow morning. I assume that by then you will be able to know whether your client agrees to the 45-day period, as recommended by the Court. Okay?

Attorney Yaniv:
Okay,

Honorable Judge Lushi-Abudi:
Thank you all very much.

Attorney Yaniv:
Thank you very much.

- The recording ended -

**EXHIBIT 16**

**FILED UNDER SEAL**

# EXHIBIT 17

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>NFE Global Holdings Limited, *et al.*,<br><br>Debtors in a Foreign Proceeding. | **FOR PUBLICATION**<br><br>Case No. 26-11268 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION RECOGNIZING THE ENGLISH PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS AND GRANTING RELATED RELIEF**

***A P P E A R A N C E S:***

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
320 S. Canal St.
Ste 47th Floor
Chicago, IL 60606
By: Ron Meisler, Esq
Christopher Dressel, Esq.
Bryan Uelk, Esq.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
22 Bishopsgate
London EC2N 4BQ
By: Peter Newman, Esq.
Nicole Stephansen, Esq.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
920 N. King St.
Wilmington, DE 19801
By: Joseph Larkin, Esq.
Stephen Della Penna, Esq.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301
By: Jennifer Madden, Esq.

HERBERT SMITH FREEHILLS KRAMER LLP
*Attorneys for Ad Hoc Group of GLP Preferred Unit Holders*
1177 Avenue of the Americas
New York, New York 10036
By: Kyle Ortiz, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

The two foreign debtors in this chapter 15 case—NFE Global Holdings Limited, incorporated in 2021 in the U.K., and NFE Brazil Newco Ltd., incorporated in April 2026 in the U.K., are affiliates of New York-based New Fortress Energy Inc., a Delaware corporation. The two foreign debtors filed cases in the U.K. in March and April 2026 under Part 26A of the U.K. Companies Act 2006 seeking to implement debt swap plans designed to cut substantial debt from the New Fortress balance sheet while preserving a portion of existing equity holdings. Having succeeded in gaining approval of the plans in the U.K., the foreign debtors now seek recognition and enforcement of the Part 26A plans in the U.S. in this chapter 15 case. No objections were filed to the requested relief in this chapter 15 case. The Court has already entered an order granting the requested relief. In doing so the Court nevertheless indicated that it intended to issue an opinion explaining its reasoning.

Companies are increasingly seeking to take advantage of a foreign restructuring mechanism by which the companies seek to gain approval in the courts in the U.K. for plans under Part 26 (schemes of arrangement) or Part 26A (restructuring plans) and then to obtain recognition and enforcement of the plans in U.S. chapter 15 cases, particularly where the plans include modifications of New York-law-governed debt.[1] The U.K.-

[1] Where companies believe they need only a balance sheet restructuring rather than an operational restructuring, in which chapter 11 proceedings excel, the time and costs involved in pursuing the foreign court solution followed by a chapter 15 case is allegedly less.

approved plans—as is true in this case—often include releases of non-debtor affiliate guarantees of the original debt, as well as broad exculpation protection for the parties involved in the restructuring proceedings. The releases and exculpation provisions permissible under U.K.-law push the boundaries of available relief in a chapter 11 case. While at least one of the foreign debtors in this case was incorporated in the U.K. in 2021, the other foreign debtor was incorporated in the U.K. in April 2026 shortly before the U.K. proceedings were filed. Is "COMI tourism"—where a foreign debtor that is an affiliate of a U.S.-based (or other non-U.K.-based debtor) corporation was established specifically for the purpose of pursuing a foreign restructuring solution followed by a chapter 15 case—a basis to deny recognition and enforcement in a chapter 15 case? The Court has already entered its order recognizing and enforcing these foreign debtors' plans in this case. The Court obviously concluded that the foreign debtors in this case were entitled to the requested relief. While there is nothing in the text of chapter 15 that precludes recognition and enforcement in cases such as this, there are some cautionary principles that a chapter 15 court should consider before approving the requested relief.

The particular risk is that by establishing a U.K. debtor to file under Part 26 or Part 26A., a debtor may circumvent the requirements of the U.S. Bankruptcy Code to disadvantage some creditors. While not the case here, the Court discusses the issue in the context of these proceedings to describe the analytical framework that the Court applied before granting its approval.

## I. <u>BACKGROUND</u>

Pending before the Court are the *Chapter 15 Petition for Recognition of a Foreign Proceeding* (ECF Doc. # 1) and the *Verified Petition for (I) Recognition of Foreign Main*

*Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Verified Petition" or "VP," ECF Doc. # 3) filed in the above-captioned chapter 15 cases (the "Chapter 15 Cases") by Christopher Boas as the authorized foreign representative (the "Foreign Representative") of the above-captioned foreign debtors (the "Debtors[2]") that are the subject of proceedings (the "English Proceedings") pending before the High Court of Justice of England and Wales (the "English Court") concerning two restructuring plans (collectively, the "Restructuring Plans") proposed pursuant to Part 26A of the Companies Act of 2006 (as amended, the "Companies Act") seeking recognition of the English Proceedings as "foreign main proceedings."

In support of the Verified Petition, the Debtors submitted (a) the *Declaration of Nicole Stephansen in Support of the Verified Petition for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Stephansen Declaration, ECF Doc. # 4); (b) the *Declaration of Christopher Boas in Support of the Verified Petition for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Boas Declaration," ECF Doc. # 5); and (c) the *Supplemental Declaration of Nicole Stephansen in Support of the Verified Petition for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of*

---

[2] The Debtors and the last four digits of their foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053). The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

*the Bankruptcy Code* (the "Supplemental Stephansen Declaration," ECF Doc. # 17). On June 19, 2026, the Debtors filed a revised proposed order (the "Proposed Order," ECF Doc. # 18).

No objections were filed. The Debtors filed a *Certificate of No Objection* (ECF Doc. # 19) on June 22, 2026.

Additionally, in response to the Court's *Order for Production of Expert Report* (ECF Doc. # 22) requesting that "the Foreign Representative shall file on the docket . . . any expert affidavits or reports submitted to the U.K. Court in connection with sanction of the Part 26A Plan regarding recognition of the Part 26A Plan in the Chapter 15 case," the Foreign Representative filed the *Notice of Filing of Expert Opinion* (ECF Doc. # 23). Attached as Exhibit A is the *Expert Opinion of Daniel M. Glosband* (the "Expert Report"), which is "the only expert opinion submitted to the English Court that addresses recognition of the Restructuring Plans in the Chapter 15 Cases."

The Foreign Representative also filed the *Notice of Filing of Relevant Alternative Report* (ECF Doc. # 27). Attached as Exhibit A is the *Relevant Alternative Report* (the "RAR") prepared by Alvarez and Marsal ("A and M").

For the following reasons, the Court **GRANTED** the Requested Relief and (i) recognized the English Proceedings as "foreign main proceedings"; (ii) recognized the Foreign Representative as the "foreign representative" of the Debtors; (iii) found that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; and (iv) recognized the English Court's Sanction Order, giving full force to the Sanction Order and the Restructuring Plans, including the Plan Releases.

**A. General Background**

New Fortress Energy Inc. ("NFE" or the "Parent") is the ultimate parent of other direct and indirect subsidiaries (collectively the "Group") including the Debtors, NFE Global Holdings Limited ("NFE Global") and NFE Brazil Newco Limited ("NFE Brazil"). (VP ¶ 15.) The Group is an integrated gas-to-power energy infrastructure company that owns and operates natural gas and liquefied natural gas ("LNG") infrastructure, along with an integrated fleet of ships. (*Id.* ¶ 11.) Additionally, it builds modular LNG manufacturing facilities which can be deployed around the world and used to liquify natural gas. (*Id.*)

The Group's principal business activities are divided among two operating segments: (i) Terminals and Infrastructure and (ii) Ships. (*Id.* ¶ 12.) The Terminals and Infrastructure segment includes the entire production and delivery chain for LNG, spanning natural gas procurement and liquefaction to logistics, facilities, and conversion or development of natural gas-fired power generation. (*Id.*) The Group's Ships segment charters the Group's vessels under long-term or spot (short-term) arrangements with third parties in the LNG logistics industry. (*Id.*) In recent years, the Group has experienced financial headwinds brought on by an unfavorable pricing environment for LNG and significant capital expenditures for projects that have not come online within expected timeframes and budgets. (*Id.* ¶ 1.)

**B. Corporate Structure**

The Parent is a Delaware corporation with stock listed on the Nasdaq Global Select Market ("Nasdaq"). (Stephansen Decl. Ex. D ¶ 4.9.) Both Debtors are private companies limited by shares and incorporated under the laws of England and Wales. (VP

¶ 3.) The registered office of both NFE Global and NFE Brazil is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. (*Id.* ¶ 16.)

NFE Brazil was formed specifically for the purpose of promoting the restructuring of BrazilCo. (*Id.*) In furtherance of that purpose, NFE Brazil became a guarantor in respect of the obligations under the New 2029 Notes (as defined herein) on April 9, 2026. (*Id.*) The boards of both Debtors are comprised of four directors, one of whom is the Foreign Representative and a U.K. resident that does not sit on the board of any other Group entity. (*Id.*) In addition, the Debtors' books and records are maintained in the U.K., each Debtor maintains a bank account in the U.K., and Vistra Cosec Limited, a U.K. company, serves as the corporate secretary for both Debtors. (*Id.*)

**C. Capital Structure**

The Debtors have guaranteed external funded debt in a total outstanding principal amount of approximately $5.7 billion. (Boas Decl. ¶ 9.) NFE Global is an obligor on intercompany obligations with a total outstanding principal amount of $2.4 billion. (*Id.*) All of the below mentioned external funded debt and intercompany obligations (collectively, the "Plan Debt" and the holders of the debt, the "Plan Creditors") is in U.S. dollars and addressed by the Restructuring Plans, outlined below. (*Id.*) NFE Brazil is a guarantor on the New 2029 Notes (the "BrazilCo Plan Debt") and NFE Global is a guarantor on all other Plan Debt (the "CoreCo Plan Debt"). (*Id.*) The following table summarizes the Debtors' external funded debt:

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| **CoreCo Plan Debt** | | | |
| 2026 Legacy Notes | $510,879,63 | Common Collateral (*Pari passu* first lien claim) | September 30, 2026 |
| 2029 Legacy Notes | $236,728,231 | Common Collateral (*Pari passu* first lien claim) | March 15, 2029 |
| R-1 Revolving Credit Facility | $100,000,000 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>(*Pari passu* first lien claims)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | April 15, 2026 |
| R-2 Revolving Credit Facility | $560,400,000 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>Brazil Collateral<br>(*Pari passu* first lien claim)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | October 15, 2027 |
| Term Loan A | $294,999,563 | Common Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>Brazil Collateral<br>*(Pari passu* first lien claim)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | July 19, 2027 |
| Term Loan B | $1,266,077,800 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>(*Pari passu* first lien claim) | October 30, 2028 |
| **BrazilCo Plan Debt** | | | |
| New 2029 Notes | $2,730,126,770 | Brazil Collateral<br>(*Pari passu* first lien claim) | November 15, 2029 |
| **Total** | $5,699,211,827 | | |

(*Id.*)

**D. The Debtors' U.S. Assets**

The Debtors have property in the U.S. in the form of a retainer (the "Retainer") held in an account maintained in New York by Skadden, Arps, Slate, Meagher & Flom

LLP ("Skadden"). (*Id.* ¶ 20.) Additionally, the Debtors are obligators on U.S. dollar-denominated debt that is governed by New York law, including the instruments related to the Legacy Notes, the Term Loan A Facility, the Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes. (*Id.*)

**E. Events Leading to the English Proceedings**

1. <u>Challenges Facing the Debtors' Business</u>

The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted by permitting and construction delays and denials, the early termination of a FEMA contract in Puerto Rico, delays to certain scheduled power auctions in Brazil, fluctuations in natural gas feedstock, increases in cost of construction materials, swings in the shipping and freight markets, and environmental activist opposition. (VP ¶ 31.)

2. <u>The 2024 Refinancing</u>

On November 6, 2024, the Group entered into an exchange and subscription agreement with certain holders of its outstanding 2026 Legacy Notes and 2029 Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity. (*Id.* ¶ 33.) Pursuant to this agreement, NFE Financing (i) sold approximately $1.21 billion in aggregate principal amount of New 2029 Notes and (ii) issued approximately $1.52 billion in aggregate principal amount of New 2029 Notes in a dollar-for-dollar exchange for a portion of the Group's 2026 Legacy Notes and 2029 Legacy Notes. (*Id.*) The collateral provided in connection with securing the New 2029 Notes consisted of NFE Financing's interest in (i)

approximately 45% of the Group's Brazilian business; (ii) proceeds of NFE Financing's interest in the Series II Intercompany Loan Facility; (iii) the Brazilian Intercompany Loan Facility (which in turn is secured by the Brazilian Parent's approximately 55% equity interest in the Group's Brazil business and its interest in the proceeds of the Series I Intercompany Loan Facility); and (iv) land in Wyalusing, Pennsylvania owned by Bradford Partners, guarantor for the New 2029 Notes (the "PA Land"). (*Id.*) The Group utilized proceeds from the subscription transactions to redeem in full the outstanding aggregate principal amount of such notes. (*Id.*)

3. The Restructuring Support Agreement

In June and July 2025, the Group engaged restructuring professionals, including Skadden and Houlihan Lokey Capital, Inc., to explore possible restructuring transactions. (Boas Decl. ¶ 21.) In October 2025 the Group's advisors presented the Group's key creditors with the terms of a proposed restructuring that spun off the Group's Brazilian business. (*Id.*) After lengthy negotiations, on March 17, 2026, the Parent, NFE Global, certain other members of the Group, and members of an ad hoc group of New 2029 Noteholders, certain TLA Lenders, members of an ad hoc group of TLB Lenders, members of an ad hoc group of RCF Lenders, and members of an ad hoc group of 2026 Legacy Noteholders and 2029 Legacy Noteholders (collectively, the "RSA Parties") entered into the RSA which sets forth the terms of a restructuring of the groups principal funded debt obligations. (*Id.* ¶ 22.) The RSA was agreed to by 100% of the RCF lenders and TLA lenders and approximately 97% of the TLB lenders, 85% of the 2026 Legacy Noteholders, 87% of the 2029 Legacy Noteholders, and 99% of the new 2029 Noteholders. (*Id.*) NFE Brazil acceded to the RSA on April 9, 2026. (*Id.*) Pursuant to

Case 26-11301-MEW Doc 23 Filed 07/16/26 Page 415 of 655

the RSA, the RSA Parties have agreed to support the Restructuring Plans and forbear from exercising remedies while the RSA is in effect. (*Id.*)

**F. The Restructuring Plans**

The Restructuring will (i) reduce the Group's funded debt owed to creditors outside the Group from $5.7 billion to less than $1 billion, (ii) exchange existing debt obligations for a combination of new debt and preferred and common equity (the "Plan Consideration"), and (iii) separate the Group into two independent companies: one company comprising the Group's Brazilian operations and the PA Land ("BrazilCo"), which will be owned by certain of the Group's creditors, and another company comprising the Group's remaining operations ("CoreCo"), which will become 65% owned by the Group's creditors, while existing shareholders retain 35% (pre-dilution from the MIP and the convertible preferred equity being issued as Plan Consideration). (VP ¶ 2.) The Restructuring Plans will bind all Plan Creditors and release the obligations of the Group under the instruments governing the debt being restructured by the Restructuring Plans. (*Id.*)

The Debtors seek to effectuate the restructuring plan pursuant to Part 26A of the Companies Act. (Boas Decl. ¶ 24.) The key terms of the Restructuring Plans are described below:

| Key Terms of the Restructuring Plans | |
|---|---|
| Overview | The Restructuring Plans will provide for the following:<br><br>- The Group will separate into two independent companies: (i) New BrazilCo Parent and its direct and indirect subsidiaries ( "BrazilCo Group"), and (ii) NFE and its direct and indirect subsidiaries other than BrazilCo Group (collectively, "CoreCo Group").<br><br>- Obligations under the 2026 Legacy Notes, 2029 Legacy Notes, Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, New 2029 Notes, and Intercompany Credit Agreements will be exchanged (in each case on a ratable basis), as applicable, for BrazilCo Common Equity, New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, the FLNG 2 Term Loans, and/or the FLNG 2 Preferred Equity.<br><br>- NFE, as borrower, and each other CoreCo Group entity, as a guarantor shall enter into a senior secured, first-priority term loan credit facility for CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet. All letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be backstopped, rolled into, or replaced by letters of credit issued under separate new fully committed letter of credit facilities for each of CoreCo Group and BrazilCo Group (or, in the case of CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Facility Agreement).<br><br>- BrazilCo Group shall enter into one or more financing arrangements to provide liquidity for New BrazilCo on or prior to the date on which the conditions precedent to the Restructuring are satisfied or duly waived and the Restructuring has been fully implemented (the "Restructuring Effective Date"). Local Brazilian Debt Facilities shall, at the election of the Company Parties and with the consent of the majority of the ad hoc group of certain unaffiliated holders of New 2029 Notes represented by Paul Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, be refinanced in full or remain outstanding on their existing terms (subject to the elimination of the NFE corporate guarantee and any other obligations tied to CoreCo).<br><br>- Existing NFE Stockholders shall retain shares of NFE's common stock representing 35 percent of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP or any conversion of the CoreCo Preferred Stock into CoreCo Common Stock. |

| | | |
|---|---|---|
| Plan Consideration | Pursuant to the Restructuring Plans, the Plan Creditors will release their existing Plan Debt claims against the Group in return for Plan Consideration as set forth below. | |
| | Legacy Notes | CoreCo Common Stock CoreCo Preferred Stock |
| | New 2029 Notes | BrazilCo Common Equity |
| | Series I Intercompany Loan Facility | CoreCo Common Stock<br>CoreCo Preferred Stock |
| | Series II Intercompany Loan Facility | CoreCo Common Stock<br>CoreCo Preferred Stock |
| | R-1 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| | R-2 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| | Term Loan A | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| | Term Loan B | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| Certain Shareholder Approvals | The Company shall, in accordance with the Restructuring Milestones and the other provisions of the RSA, obtain the approval of holders of a majority of its existing common stock to, among such other matters as the Company and the Majority Supporting Creditors may determine advisable, (a) issue greater than 20% of its existing common stock, (b) amend its organizational documents to, among other things, authorize additional shares of common stock, (c) grant NFE's board of directors authority to effect a reverse stock split, and (d) approve the issuance of shares in respect of the CoreCo MIP, in each case, as required by applicable securities laws and exchange rules. | |
| Releases | The Restructuring Plans and the Transaction Implementation Deed provide for the Plan Releases. With effect on and from the Restructuring Effective Date, each "Plan Party" (defined as each of the Plan Companies, each Undertaking Party6 and each Plan Creditor) irrevocably, unconditionally, fully and absolutely waives, releases and forever discharges (i) any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs against each Released Party, whether | |

present or future, prospective or contingent, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performance of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case, that it ever had, may have or hereafter can, shall or may have, arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against each and any Released Party (as defined below) whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring or (b) the Plan Claims (including the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and (ii) all rights, title and interest it has in the Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such Plan Claims.

- Released parties (the “Released Parties” each individually a “Released Party”) include: (a) each of the Plan Companies and each member of the Group, and their respective direct and indirect subsidiaries from time to time; (b) the Plan Creditors party to or bound by the Plans and each Nominee (as applicable); (c) each Undertaking Party; (d) the Released Advisors,8 each Advisor Released Person,9 and any person acting on the instructions of the foregoing in connection with the Plans or the Restructuring; (e) each Affiliate of the persons listed in (a)-(d) above; and (f) each of the respective officers, directors, employees, partners, executives and agents of the persons listed in (a)- (e) above.

- The Plan Releases are subject to customary carve-outs, including for: (i) the Excluded Liabilities (as defined below); (ii) rights arising under or in connection with the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

- Excluded liabilities (“Excluded Liabilities”) include liabilities: (i) arising from criminal acts, fraud, gross negligence or willful misconduct, as determined by a judgment issued by a court of competent jurisdiction; (ii) arising from a Released Advisor’s duty of care to its client; (iii) of accounting, restructuring, or tax advisors subject to reliance letters; (iv) of outstanding professional advisor fees and costs properly incurred in connection with the Restructuring; (v) created by the Implementation Documents, the Restructuring Plans, or ancillary documents; (vi) indemnity or reimbursement obligations owed by lenders to their respective agents under the relevant facility agreements; (vii) in the case of a Group Company, liabilities of directors or Group Advisors arising from

| | |
|---|---|
| | negligence, default, or breach of duty, or that would be available upon the insolvency of such Group Company; and (viii) of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document.<br><br>- Each Plan Party also undertakes not to commence or continue any proceedings against any Released Party in respect of the released claims. Pursuant to the Restructuring Plans, NFE Global Holdings Limited shall, on behalf of itself and the CoreCo Plan Creditors, and NFE Brazil Newco Limited shall, on behalf of itself and the BrazilCo Plan Creditors, enter into the releases on the terms set out in the Transaction Implementation Deed. |

(*Id.* ¶ 23.)

**G. The English Proceedings**

On March 24, 2026 and April 10, 2026, respectively, NFE Global and NFE Brazil each formally commenced the English Proceedings. (VP ¶ 37.) On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative. (*Id.* ¶ 47.) The convening hearing in respect of the Restructuring Plans (the "Convening Hearing") was held on May 14, 2026. (*Id.*)

While certain creditors had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing, at the Convening Hearing they did not pursue either an objection or disclosure application. (*Id.* ¶ 41.) On May 14, 2026, the English Court made an order (the "Convening Order"), among other things, confirming the Foreign Representative's appointment, convening meetings of Plan Creditors to consider approval of the Restructuring Plans (the "Plan Meetings"), and scheduling a hearing to consider sanctioning of the Restructuring Plans for June 18, 2026 (the "Sanction Hearing"). (*Id.* ¶ 3.) In accordance with the terms of the Convening Order, the Debtors made available to all Plan Creditors a notice of the Plan Meetings and

the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors. (*Id.* ¶ 42.)

At the Sanction Hearing, the Debtors walked the English Court through the Plan Releases and the English Court considered whether they were appropriate. (Supp. Stephansen Decl. ¶ 10.) No Plan Creditor appeared to object to the Plan Releases or otherwise oppose sanction of the Restructuring Plans. (*Id.*) The English Court sanctioned the Restructuring Plans including the Plan Releases as proposed. (*Id.*)

**H. The Relevant Alternative Report**

The Foreign Representative filed the Relevant Alternative Report prepared by A and M outlining the projected recovery under the relevant alternative (the "RA") to obtaining chapter 15 recognition in this Court. (RAR at 14.) A and M indicates that under the RA, CoreCo would file for chapter 11 whereas BrazilCo would not and that business units ("BUs") are assumed to be sold via merger and acquisition transactions to maximize value. (*Id.*) A and M compared creditor recovery under the Restructuring Plans (RPs) against the RA, as outlined below:

| **Plan 1 CoreCo – RA vs. RP** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
| RA | 85 | 57 | 342 | 102 | 687 | 68 | 32 | 157 | 231 |
| RP | Excl. | 91 | 561 | 184 | 1,109 | 137 | 65 | 320 | 471 |
| Variance | Excl. | 34 | 219 | 82 | 422 | 70 | 33 | 163 | 240 |
| RA | 57% | 54% | 57% | 32% | 50% | 13% | 13% | 13% | 13% |
| RP | Excl. | 86% | 94% | 58% | 81% | 26% | 26% | 26% | 26% |
| Variance | Excl. | 32% | 37% | 26% | 31% | 13% | 13% | 13% | 13% |

Case 26-11301-MFW Doc 163 Filed 07/14/26 Page 15 of 55

| Plan 2 BrazilCo – RA vs. RP | |
|---|---|
| $m | New 29s |
| RA | 593 |
| RP | 1,177 |
| Variance | 584 |
| RA | 18% |
| RP | 35% |
| Variance | 18% |

(RAR at 16.) All Plan Creditors receive a better outcome under each Restructuring Plan compared to the RA. (*Id.*)

### I. Plan Voting

The Debtors held Plan Meetings on June 15, 2026 and the Restructuring Plans were approved with nearly unanimous consent, with unanimous votes in favor obtained in six out of the seven classes. (Supp. Stephansen Decl. ¶ 8.) The remaining class received a near-unanimous 99.84% vote in favor. (*Id.*) Only one Plan Creditor (holding less than 0.1% of the total Plan Debt) voted against one of the Restructuring Plans. (*Id.*) The turnout in each class was very high (99% to 100% by value across all classes, save for a single class where the turnout was 89.69% by value). (*Id.*) See below:

| Class | % turnout (by value) | % voting in favor (of those who cast a vote, by value) |
|---|---|---|
| **CoreCo Plan** | | |
| R-1 Lenders | 100% | 100% |
| R-2 Lenders | 99.89% | 100% |
| TLB Lenders | 99.89% | 100% |

Case 26-11017-MEW Doc 23 Filed 07/16/26 Page 422 of 655

| | | |
|---|---|---|
| TLA Lenders | 100% | 100% |
| Legacy Noteholders | 89.69% | 99.89% |
| Series I and II Lenders | 100% | 100% |
| **BrazilCo Plan** | | |
| 2029 New Noteholders | 99.67% | 100% |

(*Id.*)

The Plan Creditors were afforded extensive notice of, and multiple opportunities to review, consider, and object to, the Restructuring Plans and the Plan Releases. (*Id.* ¶ 9.) In particular, Plan Creditors were entitled to be heard with respect to the Restructuring Plans at both the Convening Hearing and the Sanction Hearing. (*Id.*) Plan Creditors received formal notice of the Plan Releases through multiple documents and proceedings and were provided with contact information for the Information Agent and the Debtors' advisors to direct any questions regarding the Restructuring Plans, including the Plan Releases. (*Id.* ¶ 10.) These materials and proceedings include the RSA, the Convening Hearing, the Explanatory Statement which serves a function comparable to that of a disclosure statement required under section 1125 of the Bankruptcy Code, the Plan Meetings, and the Sanction Hearing. (*Id.*) Further, the Restructuring is the result of a months-long, hard fought negotiation between the Debtors and the Plan Creditors, with creditors organizing into groups and retaining sophisticated advisors before ultimately accepting the terms of Plan Releases. (*Id.* ¶ 13.) The Foreign Representative characterizes the supporting creditors (the "Supporting Creditors") subject to the Plan Releases as "sophisticated investors who have had ample notice and opportunity to

review and understand the terms of the Restructuring Plans, including the Plan Releases, and who have independently determined to support the Restructuring." (*Id.* ¶ 15.)

## II. LEGAL ARGUMENT

Recognition of the English Proceedings in these chapter 15 Cases is a condition precedent to the effectiveness of the Restructuring, and failure to obtain an order approving recognition is a termination event under the RSA. (VP ¶ 46.) The Foreign Representative commenced these chapter 15 cases to obtain recognition of the English Proceedings and to give full force and effect to the Sanction Order and the Restructuring Plans, including the Plan Releases. (*Id.* ¶ 49.) The Foreign Representative argues that the Debtors satisfy the requirements, outlined below.

### A. The Debtors Meet the General Eligibility Requirements of Section 109(a) of the Bankruptcy Code

The Foreign Representative notes that the Debtors have an interest in funds deposited with Skadden as a retainer for services held in a client trust account in New York. (*Id.* ¶ 55.) Furthermore, the Debtors are obligors on U.S. dollar denominated debt, governed by New York law and containing New York law forum selection clauses. (*Id.*) The retainer and the New York law-governed indebtedness are independent bases for jurisdiction and satisfy the "property" requirement of section 109(a) of the Bankruptcy Code. (*Id.*)

### B. The Requirements of Section 1517(a) of the Bankruptcy Code are Satisfied

1. The English Proceedings are foreign main proceedings or, in the alternative, foreign nonmain proceedings, within the meaning of Section 1502 of the Bankruptcy Code.

The Foreign Representative argues that the English Proceedings meet the definition of "foreign proceedings" because (i) the Debtors commenced the English

Proceedings pursuant to Part 26A of the Companies Act, (ii) the English Proceedings are being overseen by the English Court in England and are being conducted pursuant to laws relating to insolvency or the adjustment of debts, (iii) the English Proceedings are collective in nature as they take into account the rights of all Plan Creditors, and (iv) the English Proceedings will facilitate the Restructuring of the Debtors as the implementation of the Restructuring Plans will address the Group's liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future. (Boas Decl. ¶ 29.)

The Foreign Representative argues that because the Debtors' registered office is in England, there is a presumption that England is the COMI for the Debtors. Additional factors supporting the COMI analysis include: the Debtors are private companies limited by shares incorporated under the laws of England and Wales; the Debtors' books and records are maintained in England; each Debtor maintains bank accounts in England; a U.K. company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors; and the Foreign Representative is an English citizen and resident and serves as a director of both Debtors. (*Id.* ¶ 31.)

Creditor expectation is also considered when making a COMI determination. (*Id.* ¶ 32.) The Debtors' COMI in England has been consistently ascertainable to third parties, and Plan creditors have supported the Restructuring Plans with 97% of the holders of the groups funded debt signing the RSA. (*Id.*) The Plan Creditors were aware they were entering into a restructuring with U.K. incorporated Debtors that would propose the restructuring plans in England, and that English law governed several key

agreements. (*Id.* ¶¶ 33-34.) The English Court held a Convening hearing and Sanction Hearing and has exclusive jurisdiction to hear and determine any proceeding and to settle any dispute in connection with the Restructuring Plans. (*Id.* ¶ 38.)

The Debtors engaged a U.K. based information agent located in London named Kroll Issuer Services Limited to serve as the information agent for the English Proceedings (the "Information Agent"). (*Id.* ¶ 40.) The Information Agent is responsible for communicating with plan creditors, distributing restructuring documentation, and fielding queries from plan creditors.

The Foreign Representative argues that because Recognition is a condition precedent to the effectiveness of the RSA, failure to recognize the English Proceedings would (i) jeopardize the overall transaction contemplated by the RSA (ii) lead to an alternative that destroys value (iii) upset creditor expectations and (iv) undermine these highly consensual restructuring transactions designed to de lever the group and facilitate corporate renewal. (*Id.* ¶ 41.)

The Foreign Representative argues in the alternative that the English Proceedings are considered foreign nonmain proceedings. (*Id.* ¶ 42.)

2. <u>The Chapter 15 Cases were commenced by a duly authorized foreign representative</u>

The Foreign Representative in this case is an individual who has been duly appointed by each of the Debtors' governing bodies to act as the foreign representative on behalf of the Debtors in connection with the English Proceedings and, pursuant to the Convening Order, the Foreign Representative was recognized as such by the English Court. (VP ¶ 90.) Accordingly, the Foreign Representative argues that he is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code. (*Id.*)

### C. Enforcement of the Restructuring Plans, Including the Plan Releases, and the Sanction Order is Proper

The Foreign Representative argues that recognition of the English Proceedings, enforcement of the Restructuring Plans (including the Plan Releases) and Sanction Order, and the issuance of an injunction enforcing the terms thereof in the United States is necessary to ensure that the Restructuring Plans, which have the support of the vast majority of the Plan Creditors, can be implemented without disruption or adverse actions being brought within this Court's jurisdiction. (Boas Decl. ¶ 47.) Otherwise, certain Plan Creditors could thwart the purpose of the Restructuring by commencing action in the United States for issues that have already been litigated. (*Id.* ¶ 48.)

The Foreign Representative states that the implementation of the Restructuring Plans will result in the Plan Creditors receiving the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration. (*Id.* ¶ 49.) The Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditors. (*Id.*)

As to the Plan Releases, the Foreign Representative argues that they are more narrowly tailored than releases approved in other chapter 15 cases. (*Id.* ¶ 51.) The Plan Releases comprise only (i) an exculpation of acts taken in connection with the negotiation, preparation, sanction or implementation of the Restructuring Plans and/or the Restructuring and (ii) releases of Group entities and related parties from claims arising from or related to the Plan Debt. (*Id.*) Such releases are also subject to customary carve-outs, including for: (i) the Excluded Liabilities; (ii) rights arising under the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts,

omissions or circumstances occurring after the Restructuring Effective Date. (*Id.*) The Foreign Representative argues the Plan Releases are "necessary and fundamental" to the Restructuring Plans because they provide a mechanism for the Plan Creditors to release their claims against the Parent, the Debtors, and the other Released Parties in exchange for the Plan Creditors receiving their Plan Consideration. (*Id.* ¶ 52.)

## III. LEGAL STANDARD: FOREIGN PROCEEDING RECOGNITION

### A. Eligibility to File under Chapter 15

"Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code." *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 268 (Bankr. S.D.N.Y. 2019). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Code. 11 U.S.C. § 109(a). Where a foreign debtor does not have a place of business in the United States, the question often arises whether the foreign debtor has "property in the United States" as a condition precedent to eligibility under section 1517. *See In re Cell C Proprietary Ltd.*, 571 B.R. 542, 550–52 (Bankr. S.D.N.Y. July 27, 2017). Section 109(a) does not address how much property must be present or when or how long property must have a situs in the United States. As this Court explained in *In re U.S. Steel Canada Inc.*, 571 B.R. 600 (Bankr. S.D.N.Y. July 31, 2017):

> Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a). *See, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y.

> 2015) ("The Court is satisfied that the retainer provides a sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a $400,000 retainer paid on behalf of the debtors to bankruptcy counsel in that case qualifies as sufficient property in the United States under section 109(a)).
>
> Further, "[c]ontracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor." *Berau Capital*, 540 B.R. at 83 (citing *U.S. Bank N.A. v. Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013)). Those property rights can be and typically are tied to the location of the governing law of the contract. *See id*. at 84 (holding that the situs of intangible property rights governed by New York law was New York). Accordingly, debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States. *See In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.") (footnote omitted).

*Id*. at 610; *see also Servicos de Petroleo Constellation S.A.*, 600 B.R.at 269 ("This Court has previously held that a debtor's contract rights, including rights pursuant to debt that is governed by New York law and contains a forum-selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a)."); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum-selection clauses in the *Berau* indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412-13 (Bankr. S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors' maintenance of original business documents in the United States constituted "property in the United States" under section 109); *Wallach v. Nowak (In re*

*Sherlock Homes of W.N.Y., Inc.)*, 246 B.R. 19, 23-24 (Bankr. W.D.N.Y. 2000) (stating that listing contracts between the debtor/broker dealer and prospective sellers bestowed contractual rights upon the parties and the contract rights were assets of the debtor); *Slater v. Town of Albion (In re Albion Disposal, Inc.)*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997) (noting that "it is well-established . . . that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of the estate").

**B. Proper Venue for Chapter 15**

28 U.S.C. § 1410 governs venue for cases under chapter 15, and provides that chapter 15 proceedings may be

> commenced in the district court of the United States for the district—(1) in which the debtor has its principal place of business or principal assets in the United States; (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410. Section 1410 establishes a "hierarchy of choices." 1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) ("Collier") (quoting H.R. REP. NO. 109–31, at 119 (2005)). "If the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district; if not, we turn to subparagraph two. If there is no litigation pending against the debtor in a district, subparagraph three then applies." *Suntech Power Holdings*, 520 B.R. at 414.

**C. Recognition of a Foreign Proceeding under Section 1517**

In seeking recognition of a foreign proceeding under 11 U.S.C. § 1517, a party must make a showing that:

(1) The foreign proceeding constitutes a foreign proceeding (either main or nonmain) as are defined under section 1502;
(2) The foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a)(2)-(3).

1. <u>1517(a)(1): Foreign Main Proceeding Recognition</u>

Section 1517(a) distinguishes between "foreign main" and "foreign nonmain" proceedings. Section 1517(b) establishes conditions for recognition of each. In relevant part, section 1517(b)(1) states that a foreign proceeding shall be recognized "as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1).

*a. "Foreign Proceeding"*

Section 101(23) defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Based on this definition, courts have held that a "foreign proceeding" requires:

(i) [the existence of] a proceeding;
(ii) that is either judicial or administrative;
(iii) that is collective in nature;
(iv) that is in a foreign country;
(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;
(vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and
(vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129, 136 (S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight & Control Com'n of Avánzit, S.A.*, 385 B.R. 525, 532–36 (Bankr. S.D.N.Y 2008) (discussing factors).

*b. Center of Main Interest ("COMI")*

While not defined by the Bankruptcy Code, the Code does presume "the debtor's registered office . . . to be the [debtor's COMI]." *Id.* § 1516(c); *see also In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008). The presumption can be overcome when making this determination. *See, e.g.*, *id.* (stating that "the COMI presumption may be overcome particularly in the case of a 'letterbox' company not carrying out any business" in the country where its registered office is located) (internal citation omitted). A debtor's COMI is determined based on the location of the debtor at the time of *filing* of the chapter 15 petition, not the historic operational activity of the debtor. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

In order to determine if the registered office presumption has been overcome, courts within this district have applied a list of non-exclusive factors (the "*SPhinX* factors") to determine a debtor's COMI. Those factors are: (i) the location of the debtor's headquarters; (ii) the location of those who actually manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and (v) the jurisdiction whose law would apply to most disputes. *In re Fairfield Sentry Ltd.*, 714 F.3d at 137

(citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). The Court in *SPhinX*, however, was clear to say that the factors should not be applied "mechanically": rather, "they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *SphinX*, 351 B.R. at 117.

When determining the "location of those who actually manage the debtor," courts consider more than the location of the board of directors of the debtor in isolation, and their analysis of the location of management is somewhat flexible to reflect the realities of the management of a particular business. For example,

> The headquarters of a corporate entity is more than the location of its board of directors. The term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business. Here, because [the debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered.

*In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010).

In addition to these factors, courts can also examine what the reasonable expectation of third parties and creditors, and whether there is any "objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office." *In re Olinda Star Ltd.*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020) (citing *Servicos de Petroleo Constellation*, 600 B.R. at 274). While creditor support can also be considered, it "only goes so far . . . the bankruptcy court still has the duty to make its own COMI determination." *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 733 (Bankr. S.D.N.Y. 2024); *see also In re Suntech*

*Power Holdings Co., Ltd.*, 520 B.R. 399, 420 (Bankr. S.D.N.Y. 2014) (finding a COMI despite creditor objections).

2. Foreign Nonmain Proceeding

If the requirements for a foreign main proceeding are not met, a foreign proceeding can still be recognized as a nonmain proceeding if the debtor has an "establishment" in the country, defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502. This requires a showing that the location constitutes "a seat for local business activity of the debtor . . . more than mere incorporation and record-keeping and more than just the maintenance of property." *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (quoting *In re Bear Stearns*, 374 B.R. at 131).

3. 1517(a)(2): Foreign Representative Recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

4. 1517(a)(3): Section 1515 Requirements

Per the Bankruptcy Code, an order of recognition shall be entered if the foreign representative meets the requirements of section 1515 in applying for recognition. 11 U.S.C. § 1517(a)(2)–(3). The requirements provided by section 1515 include presentation of:

> (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative;
> (2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or
> (3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative.

*Id.* § 1515(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the debtor, *id.* § 1515(c), and if applicable, a translation of the evidentiary materials into English, *id.* § 1515(d). The Court is entitled to presume the authenticity of such documents filed in connection with a chapter 15 petition. *Id.* § 1516(b).

**D. Automatic Relief Under Section 1520**

Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a).

**E. Application of Section 1521 Stay to Debtor and Non-Debtors**

There is not a reciprocal automatic stay placed on non-debtors in interest. Courts may grant relief under section 1521 of the Bankruptcy Code, which allows a court to grant a foreign representative "any appropriate relief" where necessary to effectuate the purpose of chapter 15 and to protect the debtor's assets or creditors' interests. 11 U.S.C. § 1521. This includes section 1521(a)(7), which allows a court to "grant[] any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." *Id.* Courts have in turn utilized section 105(a) of

the Bankruptcy Code, which allows for the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11]," 11 U.S.C. § 105(a), to apply the stay to third parties when "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

**F. Section 1522(a) May Limit Relief Available Under Section 1521**

In granting relief under section 1521, the court must also adhere to section 1522(a), which permits the Court to grant relief only if the interests of creditors are "sufficiently protected." "Sufficient protection" embodies "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025) (citing *In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009)); *see also In re Asbestos Corp. Ltd.*, 674 B.R. 855, 874–76(Bankr. S.D.N.Y. 2025).

Section 1522(a) is particularly relevant in cases in which a foreign sanctioned plan allegedly discriminates as to some creditors. For example, in *In re Mega Newco Ltd.,* No. 24-1203 (MEW), 2025 WL 601463, * 1 (Bankr. S.D.N.Y. Feb. 24, 2025), in concluding that the U.K. Scheme of Arrangement that modified the New York law-governed debt of the newly-created English affiliate of a Mexican company should be recognized and enforced in a chapter 15 case, my colleague, Judge Michael Wiles explained:

> Clearly, the structure before me could be used in another case as a way of frustrating and thwarting the legitimate expectations of creditors. This case, however, involves no such frustration or thwarting of creditor rights. Mega Newco was formed, and the English Scheme Proceeding was pursued, for laudable objectives. The Scheme of Arrangement will enable a broader restructuring to be accomplished efficiently and thereby will enhance all parties' recoveries. It will also maximize the value of the underlying businesses. In these respects, the enforcement of the Scheme of Arrangement is fully consistent with the stated purposes of Chapter 15.
>
> In addition, the procedures that the parties have followed were not implemented in any way that took unfair advantage of the holders of the U.S. Notes. The whole process was worked out with the involvement and consent of the affected creditors, and not for the purpose of harming them or of thwarting their expectations. The Noteholders and their Indenture Trustee are aware of the basis on which U.K. jurisdiction has been asserted and have not objected to it. There similarly is not a single objection to the recognition of the U.K. proceeding or the enforcement of the U.K. order.
>
> If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) (holding that COMI determinations should not be made "mechanically," that COMI should be assessed "in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value," that creditors presumably are in the best position to determine whether their own expectations are being thwarted, and therefore that "one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI"). Ironically, the only thing that would thwart creditor expectations in the case before me would be if I were to decline to enforce the English Court Order. It would be absurd for me to thwart the creditors' constructive desires and expectations in the guise of supposedly protecting them.

Judge Wiles echoed what I had explained earlier in Transcript of Hearing at 21–22 of 25, *In re Codere Fin. 2 (UK) Ltd.*, (No. 20-12151 (MG), ECF Doc. # 13), (Bankr. S.D.N.Y. Oct. 9, 2020), in recognizing and enforcing a U.K. Scheme of Arrangement for a Spanish gaming company that created a new English affiliate to promote the scheme:

> In order to obtain relief under Section 1521(a), and as in prior opinions of mine, recognizing and enforcing a scheme of arrangement is quite common under 1521(a) and 1507. But such relief can only be granted "only if the

> interests of creditors and other interested entities, including the debtor, are sufficiently protected." That's the test set out in Section 1522(a).
>
> On the record here I conclude that the requirement of 1522(a) has been satisfied, and for that reason and the others that I've described I'm going to go ahead and approve recognition of this as a foreign main proceeding and approve the recognition enforcement of the English scheme of arrangement.
>
> I made clear on the record . . . I've only done this in light of what I've described as the lack of objections and overwhelming support, . . . that the interest of creditors and other interested entities are sufficiently protected here. If faced with another case where an entity newly created in the U.K. solely for the purposes of accomplishing a scheme of arrangement, I would view it as essential to review all of the other factors that I've considered here.
>
> I've already addressed the issue about . . . the presumption is that the COMI of this entity is in the U.K., but Collier certainly raises the question whether the Court should look at how a group of companies is managed in order to determine the COMI. That's at 1 Collier, paragraph 13.04.
>
> And so, while the presumption may be established that the COMI of this entity is in the U.K., it doesn't necessarily automatically follow that that should be recognized as the COMI, and I would only note that if the COMI of this entity wasn't in the U.K. I don't think the Court could determine that it—that the U.K. proceeding is a non-main proceeding.

Section 1522(a) has also been applied to bar relief where a foreign plan expressly conflicts with relief under the Bankruptcy Code. In *Jaffe v. Samsung Electronics Co.*, 737 F.3d 14 (4th Cir. 2013), the court addressed a German court-approved plan, consistent with applicable German law, which terminated a patent license granted by the German debtor for a U.S. patent to a U.S. licensee. The German debtor then sought recognition and enforcement of the German plan in the U.S., including the patent license termination, in a chapter 15 case. *Id.* at 19-20. The Fourth Circuit invalidated the license termination, applying sections 1522(a) and 365(n) of the Code. *Id.* at 31. Section 365(n)(1)(B) provides that if a debtor terminates an executory contract that licenses intellectual property, the licensee retains the right to enforce the license (subject to certain

limitations). The court held that U.S. licensee was not sufficiently protected under section 1522(a). *Id.* at 30. "The bankruptcy court, however, may only grant discretionary relief under § 1521 if it determines that 'the interest of the creditors and other interested entities, including the debtor, are sufficiently protected." *Id.* at 24

The point here is that a chapter 15 court, before enforcing provisions of a foreign plan, must carefully scrutinize the plan, and determine whether any foreign plan provisions conflict with applicable provisions of U.S. or state law. As already stated, no objections were raised in this case, and the Court's scrutiny of the Plans has not found any provisions of the Restructuring Plans that appear problematic.

**G. Section 1506 Requirements**

Any relief that is appropriate under sections 1507, 1517, 1520, or 1521 still must not run afoul of section 1506. Section 1506 precludes any relief requested under the provisions in chapter 15 that is "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. S*ee, e.g., In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (stating that the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H.R.Rep. No. 109–31(I), at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted). The public policy exception should only be invoked "under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Black Gold S.A.R.L.*, 635 B.R. 517, 528 (B.A.P. 9th Cir. 2022) (collecting cases). In evaluating this "narrow" exception, courts consider whether the foreign

"insolvency laws or procedural protections for creditors" are "repugnant" to U.S. law, not the "misconduct or bad faith" of petitioners. *Id.* at 530.

Congress provided courts additional instructions when interpreting the phrase "manifestly" in the context of section 1506, noting "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States," which is the standard meaning ascribed to the term "manifestly" in international law when describing a nation's public policy. H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172; *Ephedra Prods. Liab. Litig.*, 349 B.R. at 336. Moreover, the official Guide to the Enactment of the Model Law on Cross–Border Insolvency expressly states that

> [t]he purpose of the expression "manifestly," used also in many other international legal texts as a qualifier of the expression "public policy," is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS–BORDER INSOLVENCY, ¶ 89, U.N. Doc A/CN.9/442 (1997). The House Judiciary Committee noted that the Guide "should be consulted for guidance as to the meaning and purpose of chapter 15's provisions." H.R.Rep. No. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101; *see also Ephedra Prods. Liab. Litig.*, 349 B.R. at 336.

In order to determine if foreign proceedings are "manifestly contrary to the public policy of the United States," federal courts have considered whether a foreign proceeding lacked certain common elements of American practice. *In re ARD Fin., S.A.*, No. 25-12794 (MG), 2026 WL 817458, at *17 (Bankr. S.D.N.Y. Mar. 25, 2026). "As Judge Rakoff noted in *Ephedra.*, as early as 1895, the Supreme Court held that a foreign

judgment should generally be accorded comity if 'its proceedings are according to the course of a civilized jurisprudence,' *i.e.*, fair and impartial." *Id.* at 336 (quoting *Hilton v. Guyot,* 159 U.S. 113, 205-06 (1895)); *see also In re Asbestos Corp. Ltd.*, 2025 WL 3023332, at *7. The Second Circuit reaffirmed this approach in *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986), noting the "narrowness of the public policy exception to enforcement . . . of foreign judgments," adding that, "[a]s Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.'" *Ackermann*, 788 F.2d at 842 (quoting *Loucks v. Standard Oil Co. of New York*, 224 N.Y. 99, 111 (1918)).

## IV. LEGAL STANDARD: PLAN RECOGNITION

### A. Relief Under Sections 1521 & 1507 of the Code

Courts in this district have previously noted that chapter 15 of the Bankruptcy Code adopted the substance and most of the text of the United Nations Commission on International Trade Law ("*UNCITRAL* ") Model Law on Cross–Border Insolvency and provides a framework for recognizing and giving effect to foreign insolvency proceedings. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d at 132; *In re Rede Energia S.A.*, 515 B.R. 69, 89–90 (Bankr. S.D.N.Y. 2014). A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings. *In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 114–15 (Bankr.S.D.N.Y.2012). If a foreign case is recognized as a foreign main proceeding, as it was here, certain relief automatically goes into effect pursuant to section 1520, and, under section 1521, a bankruptcy court may grant "any appropriate relief" in order to "effectuate the purpose of

this chapter [15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a).

Relief under section 1521(a) is discretionary. "The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the Debtor's assets and the interests of creditors," provided that the interests of creditors and other interested entities are sufficiently protected. *In re Olinda Star Ltd.*, 614 B.R. at 46 (quoting *In re Atlas Shipping A/S*, 404 B.R. at 740). This Court has held that "sufficient protection" is embodied by three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Olinda Star Ltd.*, 614 B.R. at 46 (quoting *In re Atlas Shipping A/S*, 404 B.R. at 740).

The Court may also grant relief under section 1507(a) of the Code in addition to the types of relief enumerated in section 1521. Section 1507 authorizes the Court to grant any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States," provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b). *In re Toft*, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011). *See also In re Agrokor d.d.*, 591 B.R. 163, 188–89 (Bankr. S.D.N.Y. 2018) (holding that relief under section 1507 may only be granted when "such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)") (quoting *In re Rede Energia S.A.*, 515 B.R. at 90.

Additionally, this Court has repeatedly noted that "[t]he interplay between the relief available under sections 1507 and 1521 is far from clear." *In re Avanti Comm'n Grp. PLC*, 582 B.R. 603, 615–16 (Bankr. S.D.N.Y. 2018). The Fifth Circuit in *Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB De CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1054 (5th Cir. 2012), instructed courts to

> first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider . . . § 1521's grant of any appropriate relief . . . [which is] relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.

701 F.3d at 1054.

**B. Third Party Releases and Exculpations in Chapter 15**

1. Third-Party Releases of Affiliate Non-Debtor Guaranties in Chapter 15 Cases Are Enforceable

It is commonplace for Part 26 schemes and Part 26 plans to include releases of affiliate guarantees of the debt that is being restructured. For any creditors that have voted in favor of the plan, the releases are wholly consensual. But for creditors who have voted against the approved plan or who have not voted, the releases are nevertheless effective. If so-called 'ricochet" claims against affiliate guarantors remained possible, the schemes or plans would fail. *See, e.g., In re Avanti Comm'n Group PLC*, 682 B.R. at 615–19; *see also In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*, Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF Doc. # 16); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF Doc. # 20); *In re Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y.

2013) (enforcing foreign plan containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF Doc. # 26); *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.")

2. Exculpation Provisions in Chapter 15 Cases Are Enforceable

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. HoldCo, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc*., 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). Most of the law in this district regarding exculpation clauses has developed in chapter 11 cases but is equally applicable in chapter 15 cases where the issue is whether to enforce exculpation provisions included in plans sanctioned by foreign courts. The plans sanctioned in this case by the U.K. court include exculpation provisions which carve-out from protection acts involving fraud or gross negligence.

"It is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (citations omitted). Such provisions in chapter 11 plans are "not uncommon" and are generally permissible "so

long as they are properly limited and not overly broad." *Id*. at *49 (quoting *In re Nat'l Heritage Found., Inc*., 478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

Generally, it has been recognized that:

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

In the chapter 11 context, "in general, exculpated parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision where they have been actively involved in all aspects of the Chapter 11 Cases and have made significant contributions to the success of the cases." *In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2024 WL 2767121, at *13 (Bankr. S.D.N.Y. May 29, 2024) (cleaned up). This Court in *Wythe Berry* exculpated a creditor group, among others, because its participation "was instrumental to the Debtor formulating a plan on an expedited basis, and their support was essential to the successful negotiation of the Plan" and related agreements. *Id.* (cleaned up). And while the exculpation reached beyond the set of estate fiduciaries, it still was limited just to "court-supervised and court-approved transactions." *Aegean Marine Petroleum Network*, 599 B.R. at 721. *See KG Winddown, LLC,* Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) (ECF Doc. # 494) (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 2, 2014) (ECF Doc. # 322) (approving exculpation provision in plan providing exculpation for non-estate fiduciaries); *In re Residential Cap.*

*LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan that contained exculpations for parties "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors")

"In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan . . . . Courts in this and other districts have approved exculpation provisions . . . for estate fiduciaries and non- estate fiduciaries." *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at *17–18 (Bankr. S.D.N.Y. Aug. 22, 2023). Finally, courts in the Second Circuit allow exculpation provisions so long as they apply to post-petition conduct and explicitly exclude gross negligence and willful misconduct. *Id*. ("Courts in the Second Circuit have held that [exculpation provisions] . . . are appropriate when confined to postpetition activity and explicitly exclude gross negligence and willful misconduct.").

Additionally, courts in this district have exculpated behavior that occurred after the effective date of a plan of reorganization when that behavior was "authorized by bankruptcy courts to carry out the bankruptcy process." *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 721 ("I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court supervised and court-approved transactions . . . . In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do."); *In re*

*Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause "for actions in connection, related to, or arising out of the Reorganization Cases," noting that the language "generally follows the text that has become standard in this district and is sufficiently narrow to be unexceptional" and that "the Plan provides exculpation only for acts or omissions in connection with the Plan and the bankruptcy cases. It requires, in effect, that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation."); *In re Flushing Hosp. & Med. Ctr.*, 395 B.R. 229, 235 (Bankr. E.D.N.Y. 2008) ("It is apparent that the exculpation provisions quoted above are not limited to pre-effective date claims. By their terms, these provisions apply to 'any act or omission in connection with, or arising out of . . . the administration of the Plan.' Adopting [the objector's] interpretation would render the 'administration of the Plan' clause meaningless, because conduct during the administration of the Plan necessarily occurs after the effective date of the Plan.").

## V. <u>DISCUSSION: FOREIGN PROCEEDING RECOGNITION</u>

### A. Eligibility Under Section 109(a) of the Code

Courts have consistently held that section 109(a) is a low bar for chapter 15 eligibility and a retainer held in a client trust fund is sufficient to establish eligibility. *In re B.C.I. Finances Pty Ltd.*, 671 B.R. 669, 676 (Bankr. S.D.N.Y. 2025); *see also In re Iovate Health Scis. Int' Inc.*, 673 B.R. 516, 526-27 (Bankr. S.D.N.Y. 2025); *ARD Fin., S.A.*, 2026 WL 817458, at *18. The Debtors must have an interest in the funds to qualify under section 109(a), but "[i]t is not relevant who paid the retainer, so long as the retainer is meant to cover the fees of the attorneys for all the Debtors." *Glob. Ocean Carriers*

*Ltd.*, 251 B.R. at 39; *see also In re JPA No. 111 Co., Ltd.*, No. 21-12075 (DSJ), 2022 WL 298428, at *6 (Bankr. S.D.N.Y. Feb. 1, 2022).

The Debtors have property in the United States in the form of a Retainer held in an account maintained in New York by Skadden. (Boac Decl. ¶ 20.) Additionally, the Debtors are obligators on U.S. dollar-denominated debt that is governed by New York law, including the instruments related to the Legacy Notes, the Term Loan A Facility, the Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes. (*Id.*) These satisfy the "property in the United States" requirement for eligibility under section 109(a). *See In re Avanti Comm'n Grp. PLC*, 582 B.R. at 619 (holding that a foreign debtor was eligible to be a debtor under section 109(a) of the Bankruptcy Code because of (a) an interest in the U.S. counsel's retainer account and (b) an instrument government by New York law). Accordingly, section 109(a) of the Code is satisfied.

**B. The English Proceedings are Foreign Main Proceedings**

1. The English Proceedings are "Foreign Main Proceedings" under section 1517(a)(1)

The Foreign Representative has sufficiently demonstrated that the English Proceedings are "foreign main proceedings" within the meaning of section 1517 of the Code. Section 1517 provides that "(1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).

Section 101(23) of the Code defines "foreign proceeding" as follows:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or

> adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

The Foreign Representative contends that the English Proceedings meet this criteria because (i) the Debtors commenced the English Proceedings pursuant to Part 26A of the Companies Act, (ii) the English Proceedings are being overseen by the English Court in England and are being conducted pursuant to laws relating to insolvency or the adjustment of debts, (iii) the English Proceedings are collective in nature as they take into account the rights of all Plan Creditors, and (iv) the English Proceedings will facilitate the Restructuring of the Debtors as the implementation of the Restructuring Plans will address the Group's liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future. (Boas Decl. ¶ 29.) Accordingly, the English Proceedings qualify as "foreign proceedings."

2. The Debtors' COMI is England

The Debtors' COMI is located in England. Both Debtors are private companies limited by shares and incorporated under the laws of England and Wales. (VP ¶ 3.) Both NFE Global and NFE Brazil have their registered office at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. (*Id.* ¶ 16.) The Foreign Representative has demonstrated that each of the Debtors has a registered office located in England and each is entitled to the presumption under section 1516(c) that the location of their registered office is also its center of main interest.

There appears to be nothing in the record to refute the COMI presumption. Additional supporting factors include that the Debtors' books and records are maintained

in England; each Debtor maintains bank accounts in England; a U.K. company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors; and the Foreign Representative is an English citizen and resident and serves as a director of both Debtors. (Boas Decl. ¶ 31.)

Therefore, the Debtors' COMI is in England, and the Court recognized the English Proceedings as "foreign main proceedings" pursuant to section 1502(4) and 1517(b)(1) of the Code.

**C. The Public Policy Exception Does Not Bar Recognition**

The English Proceedings are not fundamentally contrary to U.S. public policy. Succeeding on a public policy argument in an attempt to deny recognition is a high bar. Courts have noted that "even the absence of certain procedural or constitutional rights will not itself be a bar under [Section] 1506." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 871 (Bankr. S.D.N.Y. 2021) (quoting *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015)).

On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative. (VP ¶ 47.) The Convening Hearing was held on May 14, 2026. (*Id.*) While certain creditors had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing, at the Convening Hearing they did not pursue either an objection or disclosure application. (*Id.* ¶ 41.) On May 14, 2026, the English Court made the "Convening Order, among other things, confirming the Foreign Representative's appointment and convening the Plan Meetings. (*Id.* ¶ 3.) In accordance with the terms of the Convening Order, the Debtors made available to all Plan

Creditors a notice of the Plan Meetings and the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors. (*Id.* ¶ 42.)

Additionally, the RSA was agreed to after lengthy negotiations by 100% of the RCF lenders and TLA lenders and approximately 97% of the TLB lenders, 85% of the 2026 Legacy Noteholders, 87% of the 2029 Legacy Noteholders, and 99% of the new 2029 Noteholders. (Boas Decl. ¶ 22.)

In light of the lack of objections, opportunity for creditors to be heard, notice process, and overwhelming creditor support after a lengthy negotiation process, the English Proceedings provided for a fundamentally fair process that accords with due process standards in the United States.

**D. The Debtors Have Satisfied the Additional Requirements of Section 1517 and Rule 1007**

The Debtors have satisfied section 1517(a) of the Code, which requires the foreign representative that seeks recognition to be a "person or body." *See* 11 U.S.C. § 1517(a)(2). The foreign representative is a "person" as defined by section 101(41) of the Code.

On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative. (VP ¶ 47.) On May 14, 2026, the English Court made the Convening Order, among other things, confirming the Foreign Representative's appointment. (*Id.* ¶ 3.)

As such, the Foreign Representative in this case is an individual who has been (1) duly appointed by each of the Debtors' governing bodies to act as the foreign representative on behalf of the Debtors in connection with the English Proceedings and, (2) pursuant to the Convening Order, the Foreign Representative was recognized as such

by the English Court. (*Id.* ¶ 90.) Accordingly, Christopher Boas is a "foreign representative" as defined under the Bankruptcy Code.

### E. The Court Need Not Consider Recognition as a Foreign Nonmain Proceeding

Because the Court has concluded that the COMI of each chapter 15 Debtor is England and therefore that the English Proceeding constitutes a foreign main proceeding, the Court need not assess whether to grant recognition of the English Proceeding as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Code.

## VI. DISCUSSION: PLAN RECOGNITION

U.S.-based companies are increasingly seeking to accomplish a financial restructuring by establishing U.K.-based affiliates that file proceedings under Part 26 or Part 26A in the U.K., and if the U.K. plans are sanctioned, then filing a chapter 15 in the U.S. *See, e.g.*, Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code at 8 of 9, *In re Fossil (UK) Glob. Servs. Ltd.*, (No. 25-90525 (CML), ECF Doc. # 39) (Bankr. S.D. Tex. Nov. 12, 2025) (granting recognition and enforcement of the Part 26A plan of the recently established U.K. affiliate of Fossil Group International, a company incorporated and based in the U.S.) *See also In re Mega Newco Ltd.*, , 2025 WL 601463, at * 4 (recognizing and enforcing an English scheme of arrangement of a Mexican company that created an English "scheme" company that modified the Mexican company's debt governed by New York law); Tr. Hr'g at 21–22, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13) (recognizing and enforcing the scheme of arrangement that modified New York-law governed debt for a Spanish gaming company that established a new U.K. company as the scheme company).

While the Court does not disagree with the outcomes in *Fossil*, *Mega Newco*, or *Codere,* the Court is particularly sensitive to "bankruptcy tourism" and concerned by the opportunity for its abuse via COMI manipulation.

**A. Risks of COMI Manipulation**

Part 26 of the U.K. law (dealing with schemes of arrangement) and Part 26A (dealing with restructuring plans permitting cross-class cramdown) allow companies to restructure tranches of debt within a capital structure without putting an entire company into a costly and time-consuming chapter 11 case. Both approaches require approval of 75% in value of voting classes to obtain approval of the schemes or plans. To the credit of U.K. courts, they have carefully scrutinized the schemes and plans. The risk, however, is that by establishing an affiliate in the U.K. to file under Part 26 or Part 26A., a Debtor may circumvent the requirements of the U.S. Bankruptcy Code to disadvantage some creditors.

Eligibility to file a Part 26 or Part 26A proceeding in the U.K. is not based on COMI, but rather on "sufficient connection" of the plan company. COMI is the only basis for recognition and enforcement for cross border cases under chapter 15. "Sufficient connection" and "COMI" are not the same standards. In *In re Fossil*, the sufficient connection test was satisfied in the U.K. by changing the governing law of the debt from New York law to English law. If the U.S. court then declined to recognize the COMI in the U.K. of the plan company, the restructuring would fail.

In *In re Fossil*, the order entered by the Houston Bankruptcy Court does not analyze the issue of COMI. *See* Order, *In re Fossil (UK) Glob. Servs. Ltd.*, (No. 25-90525, ECF Doc. # 39) (entering an order concluding without analysis that "The U.K.

Proceeding is pending in England, where the Foreign Debtor has its 'center of main interests' as referred to in section 1517(b)(1) of the Bankruptcy Code"). In *In re Mega Newco Ltd.*, the court cautioned against allowing this structure in all cases, because the "ordinary predicate for chapter 15 relief could be stripped of meaning." *In re Mega Newco Ltd.*, 2025 WL 601463, at *3. Judge Wiles explained:

> Any debtor company could restructure its obligations anywhere it chose without even subjecting itself to a foreign proceeding. All that a debtor would need to do is to form a new subsidiary in a jurisdiction of its choice and then cause that new subsidiary to assume the parent company's obligations. The parent company's COMI would no longer be relevant to the parent's restructuring of its debts. The laws of the chosen jurisdiction would govern a restructuring, no matter how those laws might affect the legitimate expectations of creditors and regardless of whether the debtor had chosen a particular jurisdiction for the purpose of favoring insiders or for other improper reasons.

*Id.*

**B. Assessing COMI Manipulation**

In a case where a Part 26 Scheme or a Part 26A Plan is used to restructure debt of a non-U.K. company, a chapter 15 court should scrutinize COMI closely to be sure the Scheme or Plan has not been used unfairly to favor one group of creditors over others to achieve a result that could not be achieved in a chapter 11 case. *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) (holding that COMI determinations should not be made "mechanically," and that COMI should be assessed "in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value").

Insider exploitation, untoward manipulation, and overt thwarting of third-party expectations may result in a refusal to recognize and enforce the foreign scheme or plan for bad faith COMI manipulation. Tr. Hr'g at 21, *In re Codere Fin.*, (No. 20-12151, ECF

Doc. # 13) ("Those sorts of things could evidence bad faith COMI manipulation . . . . I want to be clear that if there were objections that established exploitation or untoward manipulation or thwarting of third-party expectations, it is doubtful that this Court would recognize and enforce this scheme of arrangement.").

A lack of objections and support for a scheme of arrangement or plan weigh in favor of recognition. Tr. Hr'g at 21-22, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13); *In re Mega Newco Ltd.*, 2025 WL 601463, at *4 ("If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection.").

The court in *In re Mega Newco Ltd.* highlighted that the scheme of arrangement was the product of negotiations with and consent of the affected creditors and that it enabled a broader restructuring with increased recoveries for all parties. *In re Mega Newco Ltd.*, 2025 WL 601463, at *4. The court deferred to the creditors in determining whether their expectations were thwarted. *Id.* (citing *In re SPhinX, Ltd.*, 351 B.R. at 117 (stating that "creditors presumably are in the bast position to determine whether their own expectations are being thwarted, and therefore that 'one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI'")).

After carefully reviewing the record in this case, the Court found no evidence that the Plans that were sanctioned by the U.K. court were the result of exploitation or untoward manipulation that would lead the Court to deny recognition and enforcement of the Plans.

### C. 11 U.S.C. § 1522(a) as a Guardrail

Notably, the Bankruptcy Code does not expressly prevent domestic entity from establishing a foreign affiliate to act as plan or scheme company and if a plan or scheme is sanctioned by a foreign court, seeking to have the foreign plan or scheme recognized and enforced in a chapter 15 case. However, U.S. courts should look closely at recognition requests, with particular attention to the requirements of section 1522(a). The "sufficiently protected" requirement of section 1522(a) provides a helpful guardrail to protect creditor interests. Tr. Hr'g at 21, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13) (stating that "such relief can be granted only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected"). The requirements and application of section 1522(a) are discussed in more detail below.

### D. Enforcing the Plan, Including the Releases, as Discretionary Relief under Sections 1507 and 1521 is Proper

Again, section 1521(a) of the Code authorizes this Court to grant enumerated forms of relief in addition to "any appropriate relief" necessary to effectuate the purposes of chapter 15 and to protect a debtor's assets and the interest of creditors. 11 U.S.C. § 1521. Further, section 1522(a) provides that the court may only grant discretionary relief under section 1521 if the interests of creditors are sufficiently protected. 11 U.S.C. § 1522(a). "Sufficient protection" has been interpreted as requiring "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Atlas Shipping A/S*, 404 B.R. at 740 (internal citation and quotation marks omitted) (alteration in the original).

Given the lack of objections in this case, and overwhelming creditor support, the Court found that the interests of creditors are sufficiently protected.

1. Just Treatment of Creditors

First, the Code requires the Court to inquire whether the additional assistance will reasonably assure just treatment of all holders of claims against or interests in the debtor's property. Just treatment is satisfied upon a showing that the applicable law "provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *In re Rede Energia S.A.*, 515 B.R. at 95 (quoting *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 170 (2d Cir. 2008)) (alterations in the original); *In re Oi S.A.*, 587 B.R. 253, 267 (Bankr. S.D.N.Y. 2018).

The record reflects that creditors were treated fairly in the English Proceedings. The Foreign Representative has made a sufficient showing that the English Proceedings constituted a "comprehensive procedure" for the purposes of section 1521. Pursuant to the RSA, there is overwhelming support for the Restructuring Plans from Plan Creditors. (VP ¶ 99.) Under the Restructuring Plans, Plan Creditors will receive the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration. (*Id.*) The Foreign Representative states that the Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditor. (*Id.*) Under the RAR, all Plan Creditors receive a better outcome under the Restructuring Plans compared to the Relevant Alternative. (RAR at 16.)

The Debtors held Plan Meetings on June 15, 2026 and the Restructuring Plans were approved with nearly unanimous consent, with unanimous votes in favor obtained in six out of the seven classes. (Supp. Stephansen Decl. ¶ 8.) Notably, the Legacy Noteholders, the only class where creditors voted against the Plans, has recovery of 13% under the Relevant Alternative compared with 26% under the Restructuring Plans. (RAR at 16.)

The terms of the Restructuring Plans require approval of the English Court in the form of orders sanctioning the Restructuring Plans. (VP ¶ 99.) The Plan Creditors were afforded extensive notice of, and multiple opportunities to review, consider, and object to, the Restructuring Plans and the Plan Releases. (Supp. Stephansen Decl. ¶ 9.) Plan Creditors were entitled to be heard with respect to the Restructuring Plans at both the Convening Hearing and the Sanction Hearing. (*Id.*) Plan Creditors received formal notice of the Plan Releases through multiple documents and proceedings and were provided with contact information for the Information Agent and the Debtors' advisors to direct any questions regarding the Restructuring Plans, including the Plan Releases. (*Id.* ¶ 10.) These materials and proceedings include the RSA, the Convening Hearing, the Explanatory Statement which serves a function comparable to that of a disclosure statement required under section 1125 of the Bankruptcy Code, the Plan Meetings, and the Sanction Hearing. (*Id.*)

Further, the Restructuring is the result of a months-long, hard fought negotiation between the Debtors and the Plan Creditors, with creditors organizing into groups and retaining sophisticated advisors before ultimately accepting the terms of Plan Releases. (*Id.* ¶ 13.) The Foreign Representative characterizes the Supporting Creditors subject to

the Plan Releases as "sophisticated investors who have had ample notice and opportunity to review and understand the terms of the Restructuring Plans, including the Plan Releases, and who have independently determined to support the Restructuring." (*Id.* ¶ 15.)

At the Sanction Hearing, the Debtors walked the English Court through the Plan Releases and the English Court considered whether they were appropriate. (*Id.* ¶ 10.) No Plan Creditor appeared to object to the Plan Releases or otherwise oppose sanction of the Restructuring Plans. (*Id.*)

Accordingly, the English Proceedings constitute a comprehensive procedure for the distribution of estate property, and the first factor is satisfied.

2. Protection of U.S. Claimants

Next, this Court has found that U.S. creditors must be protected against "prejudice and inconvenience in the processing of claims" in the foreign proceeding. *Atlas Shipping*, 404 B.R. at 740 (internal citation omitted). This prong is clearly met. The Restructuring Plans address and restructure only the claims of the Plan Creditors (who are the only affected creditors) and do not contemplate any other class of creditors other than the Plan Creditors being affected. (VP ¶ 100.) All of the Plan Creditors have been given adequate notice of the Restructuring Plans, and the process for participating in or objecting to the Restructuring Plans is the same for United States creditors as all other creditors. (*Id.* ¶ 99.) This is sufficient to satisfy this factor of the analysis.

Furthermore, no party has objected to the Motion or otherwise represented to the Court that the English Proceedings prejudiced the rights of U.S. Creditors. Accordingly, the Court found that the second factor is satisfied.

3. Distribution of Estate Proceeds

Section 1521(b), provides that the foreign representative may be entrusted with "the distribution of all or part of the debtor's assets located in the United States." 11 U.S.C. § 1521(b). Again, this Court has previously described the third element of "sufficient protection" as requiring that "the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Atlas Shipping A/S*, 404 B.R. at 740 (internal citation and quotation marks omitted) (alteration in the original).

Here, the Debtors seek to restructure the Debtors' and the Group's funded debt obligations, and the contractual terms of other classes of creditors or of other non-Plan Creditors are not the subject of the English Proceedings. (*Id.* ¶ 102.) Accordingly, the Foreign Representative submits that recognition and enforcement of the Restructuring Plans is necessary and appropriate and that the interests of creditors and other interested entities, including the Debtors, are sufficiently protected. (*Id.*)

4. Balancing of Interests

It is clear that that the balance of interests weighs in favor of grating the Requested Relief. The Requested Relief is necessary for the Restructuring and to carry out the provisions of the Restructuring Plans, which will benefit both the Debtors and their creditors.

Accordingly, the Court found that the balance of interests weighs in favor of granting the Requested Relief.

5. Additional Factors Considered

Relief is also appropriate under section 1507 of the Code. The analysis for section 1507 is broadly similar to that of section 1521, and having determined that the first, second and fourth factors have been met, which are identical to the section 1521 analysis, this Court found that these factors are also met for purposes of section 1507.

Section 1507(b)(3), the third factor, provides that the foreign proceeding must reasonably prevent "preferential or fraudulent dispositions of property of the debtor" 11 U.S.C. § 1507(b)(3). The English Proceedings are adequately protective, the third factor of section 1507 is also satisfied, and the Requested Relief is appropriate under section 1507 of the Code.

6. Enforcement of the Restructuring Plans are Not Manifestly Contrary to U.S. Public Policy

This Court has noted that the public-policy exception is an "exacting standard," *ARD Fin., S.A.*, 2026 WL 817458, at *19, and an objecting party must demonstrate the existence of "exceptional circumstances concerning matters of fundamental importance for the United States." *Id.* (quoting *Black Gold S.A.R.L.*, 635 B.R. at 528).

According to Daniel Glosband (the "Expert"), the author of the Expert Report, the Restructuring Plans should not raise public policy concerns because U.S. courts have previously recognized and given full force and effect to numerous schemes of arrangement and restructuring plans that included Non-Debtor Effects including third-party releases. (Expert Report ¶ 111.) Additionally, the Expert points out that the process required by the Companies Act 2006 is "broadly analogous to the disclosure, voting and confirmation framework applicable to chapter 11 plans under the US Bankruptcy Code." (*Id.* ¶ 115.) The Expert asserts that because similar relief could be

granted in a domestic proceeding, recognition and enforcement of the Plans would not be manifestly contrary to public policy. (*Id.*)

The Expert additionally argues that *Purdue* was limited to statutory interpretation under the provisions of chapter 11 and that the Supreme Court expressly acknowledged that "Congress may authorize" such releases, indicating that such releases are not "manifestly contrary to fundamental U.S. policy." (*Id.* ¶ 118; citing *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 670 B.R. 150, 164–72,(Bankr. D. Del. 2025).

As such, enforcement of the Restructuring Plans, including the Plan Releases, and the Sanction Order is not manifestly contrary to U.S. public policy.

## VII. CONCLUSION

For the reasons discussed above, the Court **GRANTED** the Requested Relief and (i) recognized the English Proceedings as "foreign main proceedings"; (ii) recognized the Foreign Representative as the "foreign representative" of the Debtors; (iii) found that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; and (iv) recognized the English Court's Sanction Order, giving full force to the Sanction Order and the Restructuring Plans, including the Plan Releases.

A separate Order has already been entered to reflect the Court's rulings.

Dated: July 14, 2026
New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge

**EXHIBITS 18 - 23**

**FILED UNDER SEAL**

# EXHIBIT 24

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| PAPAYA GAMING, LTD., Plaintiff, v. FAIR PLAY FOR MOBILE GAMES, JOSH LEVIN, SQUARE STRATEGIES LLC, LACIE NEWTON, ASSEMBLE THE AGENCY LLC, Defendants. | ) | Case No. _________ |

**COMPLAINT**

Plaintiff Papaya Gaming, Ltd. ("Papaya"), by and through its undersigned counsel, brings this action against Fair Play for Mobile Games ("4 Fair Play"), Josh Levin, Square Strategies LLC ("Square Strategies"), Lacie Newton, and Assemble the Agency LLC ("Assemble") (collectively "Defendants"), seeking relief for injuries caused by Defendants' tortious and unlawful acts.

**INTRODUCTION**

1. Papaya is an industry-leading developer of mobile games. Since 2019, Papaya's games have offered customers the opportunity to earn rewards, including cash prizes, through their skill at gameplay. Papaya provides skill-based games to allow players to compete against each other in an environment where ability, not luck or chance, determines the victor.

2. Defendants, in league with a competitor mobile gaming company, Skillz Platform Inc. ("Skillz"), embarked on a fraudulent crusade to smear Papaya and other mobile gaming

Case 24-11217-MFW Doc 123 Filed 09/13/24 Page 2 of 35

companies while positioning Skillz as the only company that can be trusted to provide players with a fair mobile gaming experience.

3. Defendants carried out this deceptive scheme in several ways, including by (a) soliciting, manipulating, and fabricating customer "complaints" about Papaya's and other mobile gaming companies' alleged bot use via 4fairplay.org (the "4FairPlay Website"); (b) seeking to provoke investigations of Skillz's competitors by disseminating these false or misleading complaints to state and federal officials; and (c) presenting false data on the 4FairPlay Website to deliberately mislead consumers regarding the existence and magnitude of supposed bot-related complaints against Papaya and other mobile gaming companies.

4. In particular, Defendants instituted an online campaign to convince mobile gaming customers to submit complaints about three mobile gaming companies—including Papaya and excluding Skillz—through the 4FairPlay Website, ostensibly for direct submission to state attorneys general, to directly and surreptitiously target Papaya.

5. But when viewers visited and submitted complaints through the 4FairPlay Website, the 4FairPlay Website failed to inform them that their personal identifying information and complaints would be shared with Skillz and its agents for purely competitive purposes.

6. Most importantly, Defendants deliberately concealed from viewers submitting complaints through the 4FairPlay Website that they had manipulated the submission process and, upon information and belief, systematically altered and fabricated the contents of the complaints themselves to damage Papaya's reputation and business relationships.

7. Upon information and belief, after altering the complaints, Defendants then submitted these false and misleading complaints to government officials to further Skillz's competitive agenda.

8. The 4FairPlay Website itself was replete with false representations designed to strike at Papaya's reputation and ruin Papaya's standing among mobile gaming customers under the guise of an independent advocacy organization.

9. Everything about the 4FairPlay Website was consciously designed by Defendants to provide a false sense of legitimacy and impartiality to the fraudulent website.

10. Among other fraudulent activity, the 4FairPlay Website featured, upon information and belief, fake customer testimonials and statistics based on the fabricated customer complaints to create the illusion of widespread customer discontent with Papaya about alleged bot usage, and to induce 4FairPlay Website visitors to submit complaints about Papaya that were then sent to state attorneys general.

11. The 4FairPlay Website's home page also displayed a fake tracker, or counter, that purported to show the volume of complaints about Papaya and other mobile gaming companies (except Skillz) that customers had submitted to law enforcement agencies.

12. The counter initially presented a very specific and non-round number (12,594), and the counter continued to increase in number as a visitor stayed on the page, at a pace of one additional complaint every three seconds. When read in conjunction with other fake data posted on the 4FairPlay Website, the counter falsely indicated that consumers were submitting eight complaints about Papaya every minute around the clock.

13. The false presentation of the increasing number of complaints was followed by the phrase "and Counting!" to further indicate to consumers visiting the 4FairPlay Website that the counter was tied to an active database of customer complaints.

14. But the counter was not tied to an active database of complaints. By displaying the same inaccurate number each time a visitor opened the 4FairPlay Website, and showing the number

continually increasing at the same rate while the visitor stayed on the page, the counter unambiguously and falsely represented that the website received a score of new complaints each minute.

15. Defendants published the fake counter to deliberatively deceive viewers of the 4FairPlay Website with content that they knew was likely to, and did, mislead viewers about the number of complaints about alleged bot use submitted through the 4FairPlay Website.

16. Finally, upon information and belief, the 4FairPlay Website displayed other fake content, including, as referenced above, false customer testimonials, a pie chart that purported to convey the percentages of complaints submitted per game—with Papaya's games supposedly the subject of a plurality of all complaints—and a supposed map of "Complaints by [U.S.] state."

17. Doubtless recognizing the legal exposure, Defendants deliberately obscured Skillz's and their connection to the 4FairPlay Website.

18. Levin—an individual with a history of incorporating entities in the Commonwealth of Virginia on behalf of unnamed parties—created 4 Fair Play, a front company that served as the public sponsor of the 4FairPlay Website.

19. Levin then served as Director of 4 Fair Play and hired his firm, Square Strategies, to perform consulting work for the entity, including establishing email service, using web engine hosting, and facilitating Google advertisements.

20. Upon information and belief, Assemble, a political strategy firm, and Newton, a communications strategist at Assemble who has a similar history of running public perception campaigns on behalf of anonymous parties, developed the public communications strategy and facilitated the complaint submission process, among other things.

21. Defendants Levin and Newton, with the support of their respective firms Square Strategies and Assemble, thus orchestrated and executed a smear campaign against Papaya.

22. All along, Defendants' objective, upon information and belief, was to use illicit means to allow Skillz to gain an unfair competitive advantage over Papaya and improve Skillz's dire financial condition. Skillz has been unable to keep pace with Papaya's player-friendly games and stands on the cusp of financial ruin; Skillz's fiscal condition is deteriorating, and its leadership faces significant exposure from a shareholder lawsuit.

23. Defendants' creation, operation, and control of the fraudulent 4FairPlay Website, as well as their knowing dissemination of fabricated customer complaints to government officials and the public, caused substantial and ongoing harm to Papaya.

24. The 4FairPlay Website's false statements, backed up by fabricated or misleading data, suggested to the public that Papaya was a bad actor bent on scamming innocent customers for economic profit. The resulting damage to Papaya's reputation, goodwill, and revenue has been significant. Papaya also has incurred legal fees related to the 4FairPlay Website's false representations and the dissemination of complaints to third parties. Papaya brings this Complaint to recoup its losses.

**PARTIES**

25. Plaintiff Papaya Gaming, Ltd. is a mobile gaming company incorporated and with its principal place of business in Israel. Its registered office is located at HaMasger Street 35, Tel Aviv-Yafo, 6721407, Israel.

26. Defendant Fair Play for Mobile Games is a 501(c)(4) corporation created to spearhead the campaign against Skillz's competitors. The entity was incorporated in Virginia on August 8, 2023 and dissolved on March 1, 2024. On August 23, 2023, Fair Play for Mobile Games

registered the fictious name "4 Fair Play." The corporation's registered address is 1501 Wilson Boulevard, Suite 1050, Arlington, VA 22209.

27. Defendant Josh Levin is a consultant who facilitated the creation, operation, and maintenance of 4 Fair Play and the 4FairPlay Website. Levin was the Director of 4 Fair Play and is the current or former director of other entities in the Commonwealth. Levin, through his company Square Strategies, also contracted to provide consulting services for 4 Fair Play. Levin is domiciled in Illinois.

28. Defendant Square Strategies LLC is a consulting firm, hired by 4 Fair Play, to perform a variety of services related to the 4FairPlay Website. Square Strategies is incorporated in Illinois with its principal place of business located at 2741 W. Logan Boulevard, Chicago, Illinois, 60647.

29. Defendant Assemble the Agency LLC is a political strategy firm, hired by 4 Fair Play, to perform a variety of services related to the 4 Fair Play campaign and website. Assemble is incorporated in Delaware, with its principal place of business located at 310 E 46th Street #4E, New York, New York 10017.

30. Defendant Lacie Newton is a communications strategist at Assemble, hired by 4 Fair Play, to consult on the 4 Fair Play campaign and website. Newton is domiciled in New York.

**JURISDICTION AND VENUE**

31. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332.

32. This Court has personal jurisdiction over Defendants pursuant to Va. Code Ann. § 8.01-328.1 because Defendants transacted business in the Commonwealth, contracted to supply services in the Commonwealth, caused tortious injury by an act or omission in the Commonwealth,

and participated in a conspiracy in which co-conspirators' activities in furtherance of the conspiracy within the Commonwealth are imputed to each co-conspirator.

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### I. Skillz's Business and Financial Condition Are Deteriorating

34. Skillz is in the midst of a financial downturn that has lasted for over three years.[1]

35. Skillz's earnings reports have demonstrated a persistent drop in Skillz's year-over-year revenue.

36. Skillz's revenue totaled $44.4 million in the first quarter of 2023,[2] but fell to only $25.2 million in the first quarter of 2024.[3]

37. Skillz's second quarter sales in 2024 fell 37% compared to 2023.[4]

38. Skillz again missed revenue estimates in the third and fourth quarters of 2024, with revenue down 32.6% year-over-year in Q3 and 35% year-over-year in Q4.[5]

---

1 StockStory, *Skillz (NYSE: SKLZ) Misses Q1 Sales Targets*, Globe and Mail (May 9, 2024), https://www.theglobeandmail.com/investing/markets/indices/TXCX/pressreleases/26100097/skillz-nysesklz-misses-q1-sales-targets/.

2 *Skillz Announces First Quarter 2023 Results*, Skillz (May 9, 2023), https://investors.skillz.com/news/news-details/2023/Skillz-Announces-First-Quarter-2023-Results/.

3 *Skillz Announces First Quarter 2024 Results*, Skillz (May 9, 2024), https://investors.skillz.com/news/news-details/2024/Skillz-Announces-First-Quarter-2024-Results/.

4 *Skillz Inc. Reports Earnings Results for the Second Quarter and Six Months Ended June 30, 2024* (Aug. 1, 2024), https://www.marketscreener.com/quote/stock/SKILLZ-INC-105997961/news/Skillz-Inc-Reports-Earnings-Results-for-the-Second-Quarter-and-Six-Months-Ended-June-30-2024-47540462/.

5 *Skillz Misses Q3 Revenue Estimates*, The Motley Fool (Feb. 26, 2025), https://www.fool.com/data-news/2024/11/07/skillz-misses-q3-revenue-estimates/#:~:text=Revenue%20for%20Q3%202024%20fell,than%20the%20expected%20%2D%241.1126; *Earnings Call Transcript: Skillz Q4 2024 Sees Revenue Drop, Stock Dips*, Investing.com (Mar. 13, 2025), https://www.investing.com/news/transcripts/earnings-call-transcript-skillz-q4-2024-sees-revenue-drop-stock-dips-93CH-3928260.

39. Skillz has lost nearly half of the average monthly paying users active on its platform in the same time span.

40. In July 2024, Moody's Investor withdrew all credit ratings of Skillz, affecting $130 million in outstanding debt.[6]

41. Skillz and/or its senior executives also face significant exposure from, among other legal issues, a shareholder derivative action filed in Delaware state court: *Hanna v. Paradise*, No. 2024-0228 (Del. Ch. filed Mar. 8, 2024).

## II. Defendants, at Skillz's Behest, Attack Papaya's Reputation and Manipulate Law Enforcement

42. Rather than address its serious corporate, financial, and operational issues head-on or seek to improve its own product, Skillz has resorted to misguided, underhanded, and unlawful tactics to try to save its failing operations.

43. Those tactics include a multi-faceted campaign of deception and fraud intended to position Skillz's mobile gaming platform as uniquely free from reproach, and inherently more "fair" and trustworthy than those of other mobile gaming companies like Papaya.

44. Defendants played an integral role in this campaign by manipulating and fabricating "complaints" about Papaya and other mobile gaming companies' alleged bot use; disseminating these false and misleading complaints to law enforcement in Virginia and elsewhere; and presenting fabricated data regarding the complaints to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints.

[6] *Moody's Ratings withdraws Skillz's ratings*, Moody's Investor (July 1, 2024), https://ratings.moodys.com/ratings-news/424237.

45. From approximately September 2023 through at least late February 2024, the 4FairPlay Website was active, displayed content to the public, and provided for the submission of customer complaints about certain mobile games.[7]

46. The 4FairPlay Website included at least three sub-pages, including: (a) a home page purporting to display data related to the submission of customer complaints to state law enforcement agencies and encouraging visitors to file a complaint; (b) a "File a Complaint" page urging visitors to use a pre-populated form to submit a complaint against three companies, including Papaya, to a state law enforcement agency; and (c) a Frequently Asked Questions ("FAQs") page providing information about submitting a complaint to state law enforcement agencies and lauding companies that supposedly provide fair gaming experiences.

47. Referring specifically to "fraudulent games" from mobile gaming operators Papaya, Avia Games, and Acerena—but *not* Skillz—the 4FairPlay Website implored visitors to "Act now" and "Fight back against scam games" to prevent operators from "steal[ing] your money and get[ting] away with it."


**Which companies are behind these fraudulent games?**

Papaya Gaming owns and operates Solitaire Cash, Bubble Cash, and Bingo Cash – as well as dozens of other mobile "cash" app games. Avia Games owns and operates Solitaire Clash, Bingo Clash and Bingo Tour as well as other similar games. Acerena Inc. owns and operates Solitaire King, Bingo King and Battle Bingo.

[7] Although the 4FairPlay Website is no longer accessible, its contents were archived on several dates throughout its lifespan. This Complaint describes the contents of the 4FairPlay Website as they existed on February 28, 2024. Based on a review of the 4FairPlay Website as archived, the contents of the 4FairPlay Website were substantially similar from the date of the first archive (November 7, 2023) through the remainder of its existence. Screenshots of the contents of the February 28, 2024 archive are attached as Ex. 1.




48. Visitors were invited to submit complaints to the attorney general in their state of residence. They were told that they "may be entitled to compensation."




49. The 4FairPlay Website further promised that "[w]ith enough claims, the state attorney general will investigate the scam companies," and that "[a] successful investigation could force the companies to pay consumers for damages."




50. Defendants, at the suggestion of a Skillz official named "Andrew," designed the 4FairPlay Website "to feel more legal firm" to lend credibility to the complaint submission process and the statements made on the website.[8] Upon information and belief, "Andrew" was Skillz's CEO and founder, Andrew Paradise.




[8] *See* Ex. 2 (Figma Screenshot).

51. To target only Skillz's chief competitors (not Skillz), generate as many complaints as possible, and route complaints to state attorneys general, the 4FairPlay Website auto-populated the complaint forms.

52. The auto-populated forms listed only games developed by Papaya, AviaGames, or Acerena.




53. The auto-populated forms did not list games developed or hosted by Skillz.

54. A visitor who sought to submit a complaint about a game developed or hosted by another company (such as Skillz) was not presented with any option to do so.

55. Defendants took additional steps to ensure that the 4FairPlay Website would not impugn games on Skillz's platform.

56. For example, one of the 4FairPlay Website's FAQs indicated that not "all" mobile cash-entry games are a "scam," preserving the possibility that Skillz—the company conspicuously absent from the 4FairPlay Website—is not "taking advantage of players by withholding money and creating unfair playing environments."


Frequently asked questions

How do I know if I've been scammed?

What if I want to report a game that is not listed here?

Are all mobile real-money games a scam?

Not at all! In fact, mobile gaming has witnessed tremendous growth over the last few years and people all over the country are spending their time playing games with their friends and against competitors. But sadly, a handful of companies have popped up who are taking advantage of players by withholding money and creating unfair playing environments, like deploying bots to ensure an unwinnable game (and more money lining their pockets).

What happens next?

57. If a visitor to the 4FairPlay Website sought to complain about one of the games listed in the auto-populated complaint form, they provided their personal identifying information, identified the specific pre-selected games about which they wished to complain, and indicated how much money they had spent playing the mobile games. Customers were then provided the opportunity to describe their complaint in their own words.

58. The Website claimed that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money."




59. But a spreadsheet of around 12,000 purported complaints provided by website developer Adam Shen shows that a tiny proportion included free-form comments at all, only a few of those free-form comments mentioned bots, and some free-form comments even complained about Skillz.

60. For example, one player stated, "I have lost winnings on every game I downloaded. Too many games to send in a message. Skillz don't honor any winnings that individuals win. So I wonder who's actually getting the winnings."[9]

61. Another player simply wrote, "Enjoy."[10]

62. Upon information and belief, the 4FairPlay Website's statement that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money," was premised on the complaints contained within this spreadsheet. Because the vast majority of submissions in the spreadsheet did not mention bots, it follows that Defendants deceived visitors of the 4FairPlay Website by falsely stating that around 12,000 complaint submissions complained of alleged bot use in mobile games.

---

[9] Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab – Row 2).

[10] Ex. 3 (Excel titled "Complaints data thru Oct 31 for web table" – "Working data" Tab – Row 13).

63. Upon information and belief, Defendants altered the contents of the customers' complaint submissions to align with the statements on the website before sending the complaints to law enforcement and without telling complainants that they would modify their complaints in any way.

64. Upon information and belief, after altering the complaints, Defendants turned over the fabricated and misleading complaints to state and federal law enforcement, including the attorney general in Virginia.

65. Upon information and belief, state and federal government officials thus received thousands of complaints ostensibly accusing Papaya of using bots in its games. Upon information and belief, at least some of those complaints were fabricated. All of the complaints were the product of an intentionally skewed solicitation and transmission process that Defendants designed to leave government officials with the impression that thousands of customers wanted the government to take action against Papaya.

66. Upon information and belief, Defendants did not disclose to government officials the ways in which they manipulated the complaint submission process and complaints to ensure a critical mass of ostensible complaints alleging bot use in Papaya's games.

## III. The 4FairPlay Website Featured Fabricated Testimonials and Data Intended to Harm Papaya

67. Defendants used the 4FairPlay Website as the hub of their campaign to collect, fabricate, and disseminate complaints and associated data to government officials and the public at large.

68. From its inception, when it bore the working title "Fight Fraud For Papaya Games," the 4FairPlay Website targeted Papaya.

69. As explained below, the 4FairPlay Website, upon information and belief, posted fake testimonials and false data to harm Papaya and boost Skillz's competitive standing.

70. ***First***, upon information and belief, the home page and File a Complaint page featured at least some phony customer testimonials in which fake customers complained about Papaya's games.







71. The testimonials do not match free-form comments included in the spreadsheet of purported complaints.

72. Upon information and belief, some or all of these testimonials were not genuine statements made by real customers; they were fabricated and entirely contrived by Defendants.

73. The website unambiguously presented the testimonials as real complaints in the words of real individuals.

74. Defendants, upon information and belief, posted the fake customer testimonials to intentionally mislead viewers of the 4FairPlay Website to believe that real customers submitted complaints about alleged bot use in Papaya games to 4 Fair Play.

75. Defendants intentionally paired the fabricated customer testimonials with the fake counter on the 4FairPlay Website, described further below, to cause viewers of the website to believe that a massive number of customers submitted complaints about Papaya that were similar in content to the testimonials featured on the website.

76. ***Second***, the home page displayed a banner with an increasing tracker, or counter, purporting to show the number of complaints allegedly submitted to state law enforcement agencies about Papaya and two other mobile gaming companies. Accompanying text stated that "[t]housands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money," followed by a button that visitors could click to "File A Complaint."



77. The counter was a deliberate fabrication. It did not reflect an actual number of complaints filed against mobile games or mobile gaming operators.

78. Each time a visitor navigated to the 4FairPlay Website, no matter the date or time, the counter presented the same fixed, specific number at the outset: 12,594 ("and Counting!").

79. The counter was literally false.

80. The counter unambiguously represented that exactly 12,594 complaints had been submitted as of the time of the opening of the webpage. That number was false.

81. The counter unambiguously represented that the number of complaints continued to increase at a rate of one every three seconds (between the combination of the phrase "and Counting!" and the addition of one complaint to the counter every three seconds). That representation was false. Complaints were not submitted at a metronomic rate of one every three seconds.

82. The counter unambiguously represented that it was connected to a live database (between the combination of the phrase "and Counting!" and the addition of one complaint to the counter every three seconds). That representation was false. The counter was not tied to an active database.

83. The 4FairPlay Website represented that approximately eight new complaints against Papaya were being submitted every minute, around the clock. (The counter represented that twenty new complaints were submitted each minute, and the pie chart, described below, represented that over 40% of the total complaints were submitted against Papaya.) That representation was literally false. The website was not receiving at least eight complaints about Papaya each minute.

84. The source code of the 4FairPlay Website shows that the initial complaint figure and the rate of the increase were chosen by Defendants.

85. Skillz identified and publicized the 12,000 figure long before the website launched and complaints supposedly were collected.

86. A Skillz official drafted, or at minimum contributed to and helped place for publication, a March 2023 article about bot use by mobile gaming companies. The March 2023 article reported that "[p]resently, over 12,000 folks have filed a grievance towards cellular video games over being deceived by AI bots, with on-line gamer safety platform 4 Honest Play."[11]

87. There does not appear to be a website or other platform named "4 Honest Play," and, upon information and belief, the "over 12,000" figure was made up.

88. Skillz has conceded that the specific number and rate of increase of the counter did not reflect actual data.[12]

89. The 4FairPlay Website itself provided no indication that the counter did not reflect actual data.

90. Reasonable consumers visiting the 4FairPlay Website thus would have been deceived into believing that the reason the counter was increasing during their visit to the website was that actual complaints were being submitted in real time by other visitors.

91. That was the purpose of the counter: to deliberately deceive viewers of the 4FairPlay Website to believe that customers were filing thousands of complaints against Papaya.

---

[11] Gaming News, *This Gaming Firm Takes an Anti-AI Stance in Newest Advert*, AIWorkTime (Mar. 12, 2023), https://web.archive.org/web/20240701203701/https://www.aiworktime.com/2023/03/12/this-gaming-firm-takes-an-anti-ai-stance-in-newest-advert/.

[12] Ex. 4 (Skillz Motion to Dismiss at 16, *Skillz Platform Inc. v. Papaya Gaming, Ltd., et al.*, No. 24-cv-01646 (S.D.N.Y. October 11, 2024), ECF No. 76.

92. The 4FairPlay Website's use of a fictitious counter purporting to show the complaints filed by users in real time is a paradigmatic example of an online deceptive and unfair practice termed by the Federal Trade Commission as a "False Activity Message"—that is, "[m]aking false claims about others' activity on a site or interest in a product; Example: '24 other people are viewing this.'"[13]

93. ***Third***, the home page of the 4FairPlay Website featured a pie chart and map purporting to show the proportion of complaints submitted by game and state, respectively.

94. A note accompanying the pie chart stated that "Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far followed by Solitaire Clash from Avia Games."

[13] *See Bringing Dark Patterns to Light*, Federal Trade Commission Staff Report (Sept. 2022), at 21 (https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf).




95. Papaya developed three of the games on the pie chart, listed as representing a total of 40.2% of all complaints, with the remaining games developed by Acerena and AviaGames.

96. Like the counter, however, the pie chart was literally false.

97. The pie chart unambiguously represented that 40.2% of all complaints submitted through the 4FairPlay Website complained about Papaya games. Upon information and belief, that representation was false because 40.2% of all complaints submitted through the website did not concern Papaya games.

98. The pie chart unambiguously represented that it was connected to a live database when it was introduced by the statement: “Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far.” The statement indicates that the pie chart represented a

current tally of complaints submitted through the 4FairPlay Website and would be updated over time as it was connected to an active database of complaint submissions.

99. But Defendants' representation that the pie chart was tied to a live database was false and made, upon information and belief, with the deliberate intention of misleading visitors to the website.

100. The pie chart was not tied to any live database.

101. The figures in the pie chart remained static throughout the 4FairPlay Website's existence and were not linked to any live database.

102. Thus, as Defendants intended, a reasonable consumer would have been deliberately deceived into believing that 40.2% of all complaints submitted through the 4FairPlay Website complained about Papaya games.

103. The map featured on the home page was also literally false.

104. Accompanying the map was a statement that "[s]cam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions."




105. Like the counter and pie chart, the map unambiguously represented that it was connected to a live database when it was introduced by the statement: "Scam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions." The statement indicates that the map represented a current categorization of complaints submitted through the 4FairPlay Website, including approximately 100–200 complaints submitted by Virginia residents.

106. But the representation that the map was tied to a live database was false and, upon information and belief, intended to deliberately mislead viewers.

107. The composition of the map remained static throughout the 4FairPlay Website's existence and was not linked to any live database.

108. Further, featuring the pie chart and map on the home page of the 4FairPlay Website below the banner reading, "[t]housands of players are filing complaints against mobile games who

use bots to deceive them out of their hard-earned money," unambiguously represented to viewers of the website that 40.2% of thousands of complaints submitted across the country complained about Papaya's alleged bot use. This representation was false.

109. As explained above, Defendants, upon information and belief, deceptively altered complaints submitted through the 4FairPlay Website. Thus, even if the counter, pie chart, and map could be interpreted to reflect data from complaints outside of a live database, the data incorporated complaints that were fabricated or misleading.

110. Presentation on the 4FairPlay Website of the counter, pie chart, and map representing the database of fabricated complaints deliberately deceived viewers of the website into believing that thousands of complaints had been submitted about Papaya's alleged bot use.

111. A reasonable consumer visiting the 4FairPlay Website would have been deceived into believing that thousands of complaints around the country had been submitted about Papaya's alleged bot use.

112. Defendants, upon information and belief, deliberately misled viewers of the 4FairPlay Website and communicated to viewers that thousands of customers around the country had submitted complaints about Papaya's alleged bot use to tarnish Papaya's reputation, harm its goodwill, and prevent consumers from playing Papaya games to Skillz's competitive advantage.

**IV. Defendants Obscure 4 Fair Play's Structure and Activities**

113. Defendants and Skillz went to great lengths to cover their tracks while soliciting, manipulating, and disseminating to law enforcement false and misleading customer complaints about Papaya via the 4FairPlay Website, presumably because 4 Fair Play's activities opened them up to significant legal exposure.

114. Papaya was able to definitively link Defendants and Skillz to the 4FairPlay Website in July 2024 only after filing a complaint in Virginia state court against the then-unknown John

Doe defendants that created, operated, and controlled the 4FairPlay Website; issuing ten third-party subpoenas; navigating repeated attempts by subpoena recipients to avoid producing documents; and moving to compel compliance with one of the subpoenas in Nevada state court.

115. The operator of the 4FairPlay Website was identified on the website as 4 Fair Play, the fictitious alternative name of a Virginia corporation called "Fair Play for Mobile Games."

116. The "About" page on the 4FairPlay Website stated that "4 Fair Play is on a mission to bring fairness to mobile gaming. We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing. Our organization was founded to educate the public on fair play and provide tools and resources players need to protect themselves if they've been scammed."




117. But neither 4 Fair Play nor Defendants Levin, Square Strategies, Newton, or Assemble was an organization "on a mission to bring fairness to mobile gaming." Rather, Defendants were on a mission to manufacture complaints about Papaya and other mobile gaming companies to allow Skillz to unfairly compete with those companies.

118. Defendants and Skillz were careful to cover their tracks. Indeed, as confirmed by former Skillz personnel, Skillz leadership specifically instructed personnel not to take written notes about the 4FairPlay Website when it was discussed at meetings.

119. By design, the 4FairPlay Website concealed any information that could connect Defendants or lead back to Skillz.

120. Adam Shen, the designer of the 4FairPlay Website whom Papaya identified by analyzing website code, deleted several default web pages that would have provided information regarding its design.

121. The 4FairPlay Website similarly had no easily attributable identifiers, and all of the graphics on the Website, aside from the logo, were stock images.

122. Defendants and Skillz anonymously obtained the 4FairPlay Website's domain from registrar Tucows Inc. ("Tucows") and facilitated the transfer of the domain from Tucows to Levin, which Papaya uncovered by issuing a third-party subpoena to Tucows in May 2024.

123. Levin then created a short-lived front company in Virginia, Fair Play for Mobile Games (later renamed 4 Fair Play), to function as the public-facing sponsor of the 4FairPlay Website and the complaint solicitation, manipulation, and dissemination campaign.

124. Levin served as Executive Director of Fair Play for Mobile Games.[14]

125. As Executive Director, Levin then retained The Gober Group on August 7, 2023,[15] which helped Levin register the fictitious alternative name "4 Fair Play" on August 23, 2023.[16]

---

[14] Ex. 5 (Fair Play for Mobile Games, Articles of Incorporation).

[15] Ex. 6 (The Gober Group Acknowledgment of Terms of Service and Fee Schedule).

[16] Ex. 7 (Fictitious Name Certificate).

126. As noted above, a disclaimer at the bottom of the 4FairPlay Website stated that it was "Paid for by 4 Fair Play."

127. Levin and The Gober Group are frequent collaborators and have used this same playbook—leveraging corporate formalities to shield the identities of persons who wish to anonymously promote their agendas—on multiple occasions.

128. For example, Levin linked with The Gober Group to incorporate Advancing Community Values, a Virginia entity that names Levin as director and used the same principal office address as 4 Fair Play.[17] Advancing Community Values also created a website that encouraged visitors to sign a petition in support of the corporation's mission to "stop and reconsider the EPA's proposed PFAS water regulations."[18] As with the 4FairPlay Website, the Advancing Community Values' website hides behind the faceless corporate entity and gives no information related to the identities of the persons who control that corporation.

129. Levin and The Gober Group worked together to create another entity called Mobile Gaming Fairness in Virginia. Levin served as the principal officer of Mobile Gaming Fairness with The Gober Group filing the relevant paperwork for 501(c)(4) status.[19]

130. Mobile Gaming Fairness's mailing address links it to VA Sports Betting Alliance, which in turn lists a Gober Group email address as its principal contact.[20]

---

[17] Ex. 8 (Advancing Community Values, Articles of Incorporation).

[18] *Tell Washington to stop the EPA's Water Tax,* Advancing Community Values, https://web.archive.org/web/20240722030053/https://www.advancingcommunityvalues.org/ (last visited Mar. 5, 2025).

[19] Exs. 9 (Mobile Gaming Fairness, Articles of Termination); 10 (July 19, 2022 IRS Letter for Mobile Gaming Fairness); Karen Blackistone, LinkedIn, https://www.linkedin.com/in/karenblackistoneoaks/ (last visited Mar. 12, 2025) (Karen Blackistone formerly worked as a partner at The Gober Group).

[20] *See* Va Sports Betting Alliance, Virginia Public Access Project, https://www.vpap.org/lobbying/client/437576-va-sports-betting-alliance/ (last visited Mar. 7, 2024).

131. The mailing address for Mobile Gaming Fairness, a UPS post office box, is also associated with at least forty-two other nonprofits.

132. After creating entities to shield the identities of donors, Levin and The Gober Group typically engage a political strategy firm to carry out their goals to influence the public. In particular, Levin and The Gober Group appear to work frequently with Assemble.

133. Upon information and belief, 4 Fair Play retained Assemble and Newton to orchestrate Skillz's campaign to smear Papaya and assist with lobbying activities.[21]

134. Newton has worked for Assemble since 2020 and has a similar track record of creating front entities to fund anonymous lobbying activity. For example, Newton was the president of Citizens for a Fair Economy, a Virginia entity that The Gober Group helped incorporate.[22] Citizens for a Fair Economy is one of the forty-two nonprofits that share a mailing address with Mobile Gaming Fairness.

135. Newton was involved in various aspects of 4 Fair Play's campaign against Papaya, including developing strategy for both public-facing media about the campaign and the internal complaint submission process.[23]

---

[21] Exs. 11 (California Lobbying Record) (showing payments to Assemble from 4 Fair Play); 12 (Draft Op-Ed) (showing feedback provided by Newton); 13 (Email from thanks@fairplay.org regarding complaint signed by "Lacie @ 4FairPlay").

[22] Exs. 14 (Citizens for a Fair Economy, Annual Report); 15 (Citizens for a Fair Economy, Articles of Incorporation).

[23] Ex. 12 (Draft Op-Ed) (showing feedback provided by Newton) (the exhibit contains two copies of the same draft op-ed); 13 (Email from thanks@fairplay.org regarding complaint signed by "Lacie @ 4FairPlay").

136. As revealed in documents produced by Levin in May 2024, 4 Fair Play, following its incorporation, executed a consulting agreement with Square Strategies, a firm controlled by Levin.[24]

137. Square Strategies performed a variety of services for 4 Fair Play, including establishing email service, engaging web engine hosting, facilitating Google advertisements, and working with Newton to draft op-eds supporting the 4FairPlay Website's mission.[25]

138. 4 Fair Play paid Square Strategies over $75,000.[26]

139. Levin facilitated the dissolution of 4 Fair Play on March 1, 2024—a mere three days before Skillz filed a lawsuit against Papaya in the Southern District of New York ("S.D.N.Y.") on March 4, 2024.[27]

140. Similarly, the 4FairPlay Website was taken down at some point between February 28, 2024 and March 9, 2024—i.e., within days of Skillz's filing of the complaint against Papaya in the S.D.N.Y. litigation.

141. Due to the foregoing information exposed by the Virginia state court action, Skillz was forced to admit through counsel in July 2024 that it (a) "provided monetary funds to Fair Play for Mobile Games," (b) made payments "related to 4fairplay.org to" the freelance web developer

---

24 Exs. 16 (Consulting Services Agreement); 17 (Letter from J. Levin to Fair Play for Mobile Games Board of Directors (Aug. 14, 2023)); 18 (Fair Play for Mobile Games, Unanimous Written Consent of the Board of Directors).

25 Exs. 19 (Square Strategies Invoices); 12 (Draft Op-Ed).

26 Exs. 19 (Square Strategies Invoices); 11 (California Lobbying Record) (showing payments to Square Strategies from 4 Fair Play).

27 Ex. 20 (Fair Play for Mobile Games, Articles of Dissolution).

that designed the 4FairPlay Website, "Mr. [Adam] Shen," and (c) had "relationship[s]" with Shen and The Gober Group.[28]

142. Serving as the go-between for Skillz, Defendants also conducted lobbying activities in at least California and New Jersey through 4 Fair Play, including lobbying attorneys general.[29]

143. In its California disclosure, 4 Fair Play described its lobbying activities as unspecified outreach concerning "Attorney General action relating to mobile gaming."[30] 4 Fair Play paid both Square Strategies and Assemble for their lobbying work.[31]

144. Upon information and belief, one aspect of this supposed lobbying was Defendants' coordinated scheme to disseminate knowingly fabricated customer complaints from the 4FairPlay Website to government officials with the malicious intent to prompt baseless investigations into Papaya and other competitors.

145. Even after the dissolution of 4 Fair Play and the termination of the 4FairPlay Website, Skillz continues to seek to weaponize law enforcement against its competitors. For example, Paradise noted during Skillz's Q2 2024 earnings call that Skillz was "hopeful that government authorities will take note of our progress in identifying fraudulent bot use in this industry and take the quick and needed actions to protect consumers."[32]

146. Paradise made similar statements in Skillz's Q4 2024 earnings call: "We will continue to do our part as we advocate for enhanced policies and legislation to strengthen the

---

[28] *See* Ex. 21 (Email from M. Lombardo to M. McIntosh (July 1, 2024)).

[29] *See* Exs. 11 (California Lobbying Record); 22 (New Jersey Lobbying Record).

[30] Ex. 11 (California Lobbying Record).

[31] Ex. 11 (California Lobbying Record).

[32] *Q2 2024 Skillz Inc Earnings Call*, Yahoo! Finance (Aug. 2, 2024), https://finance.yahoo.com/news/q2-2024-skillz-inc-earnings-173158053.html.

regulatory oversight of our space. This includes having regulatory authorities take the necessary actions to stop the billions of dollars of fraud, stealing the hard earned savings of American consumers."[33]

**V. Defendants' Unlawful Conduct Has Harmed Papaya**

147. Defendants' willful deceptive conduct was intended to harm, and has harmed, Papaya.

148. Absent being deceived by Defendants' numerous false representations about Papaya, upon information and belief, at least some mobile gamers would have chosen to play Papaya games.

149. The false suggestion that Papaya has been the subject of thousands of customer complaints, that it is the subject of more than eight complaints every minute, and that consumers complain about Papaya more than they complain about any other gaming company (including Skillz, which supposedly faces *no* complaints), have eroded Papaya's hard-earned goodwill and favorable reputation.

150. Defendants' denigration of Skillz's competitors also harmed Papaya by bringing disrepute to portions of the mobile gaming industry and diverting consumers away from Papaya.

151. Defendants likewise caused Papaya to incur expenses, including legal fees, related to the 4FairPlay Website's falsehoods and the foreseeable dissemination of complaints.

152. Papaya's loss of customers, reputational harm, and resulting expenses have caused damages that exceed $75,000.

---

[33] *Earnings Call Transcript: Skillz Q4 2024 Sees Revenue Drop, Stock Dips*, Investing.com (Mar. 13, 2025), https://www.investing.com/news/transcripts/earnings-call-transcript-skillz-q4-2024-sees-revenue-drop-stock-dips-93CH-3928260.

**COUNT I**
**Business Conspiracy in Violation of Va. Code Ann. § 18.2-499**
**(All Defendants)**

153. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

154. As detailed above, Defendants have made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data about the complaints about Papaya and other mobile gaming companies to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

155. Under Va. Code. Ann. § 18.2-499(A), "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of," among other things, "willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor." A corresponding statute permits "[a]ny person who shall be injured in his reputation, trade, business, or profession by reason of a violation of § 18.2-499" to initiate a civil action and "recover three-fold the damages by him sustained." *Id.* § 18.2-500(A).

156. Defendants are two or more persons who, along with Skillz, had a common goal of willfully and maliciously causing harm to Papaya's business and created, operated, and controlled the Website to achieve that purpose. They cooperated to fabricate customer complaints, present fabricated data about the complaints online, and disseminate altered complaints to law enforcement

with the purpose of willfully and maliciously injuring Papaya's business. They knew that statements on the 4FairPlay Website and in customer complaints were false.

157. Defendants' conduct was unlawful for several reasons, including because it, as set forth below, constituted defamation and violated the Lanham Act.

158. Defendants' conduct was also unlawful because it violated several state consumer protection laws. *See, e.g.*, Va. Code Ann. § 59.1-200 (West 2024); Cal. Bus. & Prof. Code § 17500 (West 2024); N.J. Stat. Ann. § 56:8-2 (West 2024). Defendants unfairly disparaged Papaya through many false and misleading statements on the 4FairPlay Website as part of Skillz's deceptive advertising campaign that misled consumers about the nature of Skillz's and its competitors' games, drove players away from Papaya's games to games on the Skillz platform, and harmed both Papaya and consumers.

159. Defendants' conduct was also unlawful because it violated federal and state law prohibiting individuals from lying to law enforcement. *See, e.g.*, 18 U.S.C. § 1001; N.Y. Penal Law § 175.30. Upon information and belief, Defendants knowingly and willfully manipulated complaints about Papaya's alleged bot use that they disseminated to federal and state law enforcement, all the while knowing that the complaints contained materially false statements.

160. As a direct and proximate result of Defendants' unlawful acts, which were committed in furtherance of the above-described conspiracy to harm Papaya's business, Papaya suffered damages, including through reputational harm and loss of goodwill.

161. Papaya also was forced to incur legal fees to respond to the false representations on the 4FairPlay Website and in complaints and the foreseeable consequences of their dissemination.

**COUNT II**
**Common Law Conspiracy**
**(All Defendants)**

162. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

163. As detailed above, Defendants have made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data concerning the complaints about Papaya and other mobile gaming companies to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

164. The tort of common law conspiracy imposes liability on two or more persons who combine to accomplish, by some concerted action, some criminal or unlawful purpose by a criminal or unlawful means, and whose acts committed in furtherance of the conspiracy cause damage.

165. Defendants are two or more persons who, along with Skillz, had a common goal of causing harm to Papaya's business and unlawfully created, operated, and controlled the 4FairPlay Website to achieve that purpose. They cooperated to fabricate customer complaints, present fabricated data about the complaints, and disseminate altered complaints to law enforcement with the purpose of willfully and maliciously injuring Papaya's business. They knew or recklessly disregarded that statements on the 4FairPlay Website and in customer complaints were false.

166. Defendants' conduct was unlawful, including because it constituted defamation and violated the Lanham Act and several state consumer protection laws.

167. As a direct and proximate result of Defendants' unlawful acts, which were committed in furtherance of the above-described conspiracy to harm Papaya's business, Papaya suffered damages, including through reputational harm and loss of goodwill.

168. Papaya also was forced to incur legal fees to respond to the false representations on the 4FairPlay Website and in complaints and the foreseeable consequences of their dissemination.

**COUNT III**
**Defamation**
**(All Defendants)**

169. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

170. As detailed above, Defendants have made false and misleading statements about Papaya in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data concerning the complaints about Papaya and other mobile gaming companies to deliberately mislead consumers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

171. The tort of defamation imposes liability on persons who publish an actionable statement with the requisite intent.

172. Defendants published actionable statements by posting knowingly false representations and fabricated data on the 4FairPlay Website, which was publicly accessible for at least a six-month period, as well as disseminating false and misleading complaints to law enforcement. Defendants knew or recklessly disregarded that these statements were false.

173. Defendants' conduct constituted defamation per se because the false representations and fabricated data posted on the 4FairPlay Website and contained within the false and misleading complaints disseminated to law enforcement prejudiced Papaya in its profession or trade by casting aspersions on its honesty and prestige as a business.

174. In addition, Defendants' conduct caused reputational harm to Papaya, which lost standing in the community as a result.

175. Defendants' unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

176. Papaya also was forced to incur legal fees related to the false representations.

**COUNT IV**
**False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B)**
**(All Defendants)**

177. All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth herein.

178. As detailed above, Defendants made false and misleading statements about Papaya and other mobile gaming companies in connection with the fraudulent 4FairPlay Website, including by fabricating customer complaints about mobile games' alleged bot use, presenting fabricated data regarding the complaints about Papaya and other mobile gaming companies to deliberately mislead viewers into believing that Papaya faced thousands of bot-related complaints and spur additional complaint submissions, and disseminating altered complaints to state attorneys general and federal law enforcement.

179. The Lanham Act imposes liability on persons who, among other things, "on or in connection with any goods or services . . . use[] in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial

advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

180. Defendants made claims about Papaya's services that were literally false, false by necessary implication, and/or misleading.

181. Defendants' statements on the 4FairPlay Website constituted a commercial advertisement. Knowingly conspiring with Skillz, which is in commercial competition with Papaya, Defendants made the false statements for the purpose of influencing customers to use Skillz's services instead of Papaya's. The statements, which were posted on a website available to the public throughout the United States, were disseminated sufficiently to and targeted toward the relevant purchasing public to constitute advertising within the mobile gaming industry.

182. Defendants' false statements on the 4FairPlay Website deliberately and actually deceived or had the tendency to deceive a substantial segment of the 4FairPlay Website's audience.

183. Defendants' false statements were material in that they were likely to influence customers' decisions to use Papaya's services.

184. By posting the false statements to the 4FairPlay Website, which was accessible throughout the United States, Defendants caused those statements to enter interstate commerce.

185. As a result of Defendants' conduct, Papaya has been injured through a loss of goodwill associated with its mobile gaming products.

186. Defendants' unlawful actions have harmed Papaya, including by way of lost revenue, market share, and profits, in an amount to be proven at trial.

187. Papaya also was forced to incur legal fees related to the false representations.

Case 26-11217-JTD Doc 123 Filed 09/16/25 Page 503 of 655

**JURY TRIAL DEMAND**

Papaya requests a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Papaya Gaming, Ltd. respectfully requests that this Court enter judgment against Defendants for the following:

1. Injunctive relief;

2. Monetary damages in the form of actual, compensatory, and consequential damages suffered as a result of Defendants' wrongful conduct;

3. Statutory, treble, and/or punitive damages;

4. Costs and attorneys' fees incurred in this action;

5. Pre- and post-judgment interest to the extent permitted by law; and

6. Such other relief as the Court may deem just and proper.

Dated: March 14, 2025

Respectfully submitted,

/s/ ___Todd D. Kelly___________________________

Todd D. Kelly (Va. Bar No. 92331)
Margaret E. Krawiec (*pro hac vice motion forthcoming*)
David B. Leland (*pro hac vice motion forthcoming*)
Michael A. McIntosh (*pro hac vice motion forthcoming*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
Phone: (202) 371-7000
Fax: (202) 393-5760
todd.kelly@skadden.com
david.leland@skadden.com
margaret.krawiec@skadden.com
michael.mcintosh@skadden.com

*Counsel for Papaya Gaming, Ltd.*

# Exhibit 1


FILE A COMPLAINT
FAQ
ABOUT US
12,681 and Counting!
Thousands of players are filing complaints against mobile games who use bots to deceive them out of their hard-earned money.
FILE A COMPLAINT


Complaints by state
Scam mobile games are affecting players from across the country with California and New York receiving the most complaint submissions.
Over 1000+ Complaints
201-1000 Complaints
100-200 Complaints
Under 100 Complaints


Complaints by Game
Bingo Cash and Solitaire Cash by Papaya Games have received the highest complaints so far followed by Solitaire Clash from Avia Games
Others
Battle Bingo
Bingo King
Solitaire King
Bingo Tour
Bingo Clash
Solitaire Clash
Bubble Cash
Bingo Cash
Solitaire Cash
14.2%
14.7%
11.3%
12.1%
13.3%
10.4%
8.0%
7.6%
7.1%

# Real People, Real Action

Real people across the country shared their frustration and anger from playing scam games with their hard-earned money.

| NAME | STATE | Games |
|---|---|---|
| ELLEN A. | NY | Bingo Cash, Bingo King, Battle Bingo |
| DERRICK W. | NE | Bubble Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| LAUNCE G. | IN | Bingo Cash, Bubble Cash, Bingo Tour |
| ANDREW H. | NY | Bingo Cash |
| AMIR G. | VA | Bingo Clash |
| BRITTANY K. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Bingo Tour, Solitaire King, Battle Bingo |
| VERLINDA S. | IL | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| NOBUKO S. | CA | Battle Bingo |
| ELLEN F. | MS | Solitaire Cash, Solitaire Clash |
| VIVIAN A. | CA | Bingo Cash, Bingo Clash, Bingo Tour, Battle Bingo |
| SHARON N. | CA | Solitaire Cash, Bingo Cash, Solitaire Clash, Bingo Clash, Solitaire King, Bingo King |
| KASSANDRA Y. | CA | Solitaire Cash, Bingo Cash, Bubble Cash, Solitaire Clash, Solitaire King |
| SUSAN S. | NY | Solitaire Cash, Bingo Cash, Solitaire Clash |

## What Players Are Telling Us

Solitaire Cash, Bingo Cash, Solitaire Clash and Bingo Clash. We can't stand by and let them get away with it. And you should not allow this to happen to many citizens in your state. Take action now.

– L.G.S. from Pennsylvania

This is absolutely intolerable and just plain false advertising and just out right thievery and the companies are continuing to make millions from a public that trusts them. We can't stand by and let them get away with making a fool out of honest people and the government anymore.

– C.S. from Virginia

I've been playing Bingo Tour and Bingo Cash. And they always show that I am a 1 out of 3 winner and when the game is done processing, they bump me down to 3rd or 5th as if they [are] adding fake players to make sure I am not a winner.

– C.H. from California

With Solitaire Cash, the time they complete the game in many cases seems impossible. I have complained to the company and asked if I was playing against real people and they didn't answer.

– J.P. from Florida

Bingo Tour – I could tell something wasn't right. One minute you're about to be the number one winner but while you're waiting on 2,3 to 4 players, you're kicked right out the spot.

– K.S. from Texas

Solitaire Cash: I have hundreds of screenshots showing opponent names that were clearly automatically generated to create a bot profile – usually half of the players in each individual tournament were obviously fake.

– H.N. from Washington

# About

4 Fair Play is on a mission to bring fairness to mobile gaming. We are dedicated to promoting fair, transparent policies and practices in the industry so everyone can enjoy playing. Our organization was founded to educate the public on fair play and provide tools and resources players need to protect themselves if they've been scammed.

If you have questions or want to learn more about us, please feel free to contact hello@4fairplay.org.

Paid for by 4 Fair Play | Privacy Policy

FILE A COMPLAINT FAQ ABOUT US

# Fight back against scam games!

Don't let these games steal your money and get away with it! They promise fair competition, but secretly pair players like you against a bot that is programmed to make sure you lose more money than you win.

ACT NOW!



## File a complaint. It only takes a minute.

If you've lost money playing against bots, you're not alone—and you may be entitled to compensation. It's time you got your hard-earned money back by bringing those companies to justice.

File a complaint today.

By clicking 'submit', an email will auto-populate with your information so you can directly share your complaint with your local attorney general.
This is the most effective way of bringing these gaming companies to justice and receiving compensation.

# How it works

You file a complaint here, and it's sent to the consumer protection authority in your state. This is the best way to ensure your claim gets noticed.

→

With enough claims, the state attorney general will investigate the scam companies. If you have family or friends who have been impacted, they can also file their own claim.

→

A successful investigation could force the companies to pay consumers for damages. Make sure you are one of them!

## Thousands of players have been scammed out of their money playing against bots

"The creators made 'competitive' bingo game where you play against other 'players' when in reality it's just AI that will always beat you..."

– Bingo Clash player

"I have genuinely never played a game that is so rigged in my life"

– Battle Bingo player

"It's stimulated to make you think your [sic] winning until you invest real money... BOTS BOTS BOTS"

– Bingo Cash player

"This game is 100 a bot scam that tries to trick you into thinking you're facing real players when you aren't"

– Bubble Cash player

"The generated bot names and pictures aren't fooling anyone. Wins/losses are predetermined once you hit play..."

– Solitaire King player

"Bottom line, the devs have rigged this app so it's almost impossible to win any money"

– Bubble Clash player

## Frequently asked questions

### How do I know if I've been scammed?

If you notice suspicious players and experience repeated abnormal losses that suggest the "person" on the other side of the screen is really a bot, there's a good chance you are being scammed. If you are a strong player and keep losing, that should raise some concern. Similarly, if you play poorly and you seem to be winning in the first game or two, that can also be part of the scam to hook you in. When the game consists of real players only, there are not always going to be opponents available for certain game brackets or hours of the day. In that case you should get a 'waiting for opponent' message. But if you are always matched with a "player" instantaneously, that could mean you are playing against a bot.

### What if I want to report a game that is not listed here?

### Are all mobile real-money games a scam?

### What happens next?

## Frequently asked questions

### How do I know if I've been scammed?

### What if I want to report a game that is not listed here?

If you believe you have been scammed by other games from Papaya Gaming, Avia Games or Acerena Inc. that are not listed in this form, we encourage you to reach out directly to us at hello@4fairplay.org.

### Are all mobile real-money games a scam?

### What happens next?

## Frequently asked questions

How do I know if I've been scammed?

What if I want to report a game that is not listed here?

**Are all mobile real-money games a scam?**

Not at all! In fact, mobile gaming has witnessed tremendous growth over the last few years and people all over the country are spending their time playing games with their friends and against competitors. But sadly, a handful of companies have popped up who are taking advantage of players by withholding money and creating unfair playing environments, like deploying bots to ensure an unwinnable game (and more money lining their pockets).

What happens next?

## Frequently asked questions

How do I know if I've been scammed?

What if I want to report a game that is not listed here?

Are all mobile real-money games a scam?

**What happens next?**

Your complaint will be officially submitted to the Attorney General office in your state. If AGs receive enough complaints of fraudulent and anti-consumer practices, they are often compelled to investigate – which could mean the company is forced to pay damages to the players they scammed.



# Why do we collect this info?

If you use the tools on this page, your address determines which state official(s) or office receives your message. Your name, zip, and email tell the recipient who sent it.

# Information Collected

We collect the information you provide for the purpose of matching to your state officials, to deliver your message to them, and to keep a record of the messages delivered. This may include but is not limited to, your name, email, phone number, and zip code.

# Information Shared

We will share information that you provide with the people with whom you choose to communicate, and with our vendors only as needed to deliver your message. We may follow up with you to request more information on your experience. 4 Fair Play's name and contact information can be found on each page of this site.

Paid for by 4 Fair Play | Privacy Policy

# Exhibit 2


4Fairplay
Edit file
Share
23%
Page 3
Pages
Page 1
Logo
Page 3
image 1
4Fair-logo
File a submission
Homepage
12,594 And Counting!
FILE A COMPLAINT
Complaints By State
Scam mobile games are affecting players from across the country.
Complaints By Game
Real People, Real Action
INITIALS
STATE
ATTORNEY GENERAL
GAME
What Players Are Telling Us
About Us
Fight Fraud!
File A Complaint Today.
Act NOW!
Filing A Complaint Is Simple.
We want you to get back your hard earned money.
SUBMIT
How it works
Frequently asked questions
How do I know if I've been scammed?
Which company is behind these fraudulent games?
Are all mobile real-money games a scam?
What happens next?
About Us
1440 × 4008
Comment
Properties
Export
Search
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago
Hear from other players who have been scammed out of their money playing against bots
#68 · Page 1
Orit Peleg 1 year ago
Add: We want you to get back your hard earned money.
#67 · Page 1
Orit Peleg 1 year ago
this is going to change.
just add [LAW FIRM LOGO]


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago
Hear from other players who have been scammed out of their money playing against bots
#68 · Page 1
Orit Peleg 1 year ago
Add: We want you to get back your hard earned money.
#67 · Page 1
Orit Peleg 1 year ago
this is going to change.
just add [LAW FIRM LOGO]

AS - 0004


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#77 · Page 1
Orit Peleg 1 year ago
File a complaint in a few short and simple steps
#76 · Page 1
Orit Peleg 1 year ago
this section should be light grey Soumya
#74 · Page 1
Orit Peleg 1 year ago
should be in navy
#73 · Page 1
Orit Peleg 1 year ago
minimize gap here
#72 · Page 1
Orit Peleg 1 year ago
Soumya can we go for this design but add a shield with a lock? faded in the background is fine.
#71 · Page 1
Orit Peleg 1 year ago
Soumya leave this as 'law firm logo' we don't know who it will be
#70 · Page 1
Orit Peleg 1 year ago
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc. as ...
#69 · Page 1
Orit Peleg 1 year ago


4Fairplay
Edit file
Share
4%
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#94 · Logo
Orit Peleg 1 year ago
Soumya this needs to be more unique like perhaps the circle in the center is bigger and it has a play symbol?
#93 · Logo
Orit Peleg 1 year ago
Soumya can we try a different color for the play part?
#92 · Logo
Orit Peleg 1 year ago
Soumya can the 4 and f be better connected so the line is the same height?
#91 · Logo
Orit Peleg 1 year ago
can the 4 be integrated to the F?
#90 · Logo
Orit Peleg 1 year ago
can play be in a different color?
#79 · Page 1
Orit Peleg 1 year ago
Complaints are used to help open an investigation against the company so they can be brought to justice and pa...
#78 · Page 1
Orit Peleg 1 year ago
Your complaint is emailed directly to the local attorney general in your state


4Fairplay
Edit file
Share
4%
Find
Page 1
Pages
Page 1
Logo
Page 3
V1
V2
V5_FINAL
V4_FINAL
V3
V3
V4_FINAL
Comment
Properties
Export
Search
#111 · Page 3
Jen Marek 9 months ago
Soumya missing line b montana and wyoming :)
1 reply
#109 · Page 3
Orit Peleg 9 months ago
Jen Marek do we have the copy
1 reply
#108 · Page 3
Orit Peleg 9 months ago
Soumya need to add a grid to expalin color
2 replies
#106 · Page 3
Orit Peleg 9 months ago
can we have first name initial and last name?
1 reply
#105 · Page 3
Jen Marek 9 months ago
Soumya needs a legend like the other example.
#104 · Page 3
Jen Marek 9 months ago
Soumya adam can make this suing the template we already have. Can you give guidance on colors?
1 reply
#94 · Logo
Orit Peleg 1 year ago
Soumya this needs to be more unique like perhaps the circle in the center is


4Fairplay
Edit file
Share
36%
Logo
Pages
Page 1
Logo
Page 3
Frame 147
Frame 146
Frame 1
Comment
Properties
Export
Search
Orit Peleg
minimize gap here
Orit Peleg
Soumya can we go for this design but add a shield with a lock? faded in the background is fine
Orit Peleg
Soumya leave this as 'law firm logo' we don't know who it will be
Orit Peleg
Soumya Andrew would like to rethink the design to feel more legal firm - grey colors, navy, more traditional etc, as ...
Orit Peleg
Hear from other players who have been scammed out of their money playing against bots
Orit Peleg
Add: We want you to get back your hard earned money.
Orit Peleg
this is going to change
just add [LAW FIRM LOGO]
4FAIRPLAY
4FAIR PLAY
4FAIR PLAY
4 FAIR PLAY
4 FAIRPLAY
4FAIRPLAY
4FAIR PLAY
4FAIRPLAY
4FAIRPLAY
4 FAIR PLAY
4FAIRPLAY
4FAIRPLAY
4FAIRPLAY
4 FAIRPLAY
4FAIR PLAY

# Exhibit 3

| Row # | F | L | Init | FirstN LastInit | State | AG | Games ready | Games 75% | Games halfway | Games raw | Submitted Time | District | First Name | Last Name | Solitaire Cash | Bingo Cash | Bubble Cash | Solitaire Clash | Bingo Clash | Bingo Tour | Solitaire King | Bingo King | Battle Bingo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | S | B | S.B. | Sharon B. | NY | Letitia A. James | x | x | | x | 10/24/2023 11:36 | New York | Sharon | Bryce | I have lost winnings on every game I downloaded. Too many games to send in a message. Skillz don't honor any winnings that individuals win. So I wonder who's actually getting the winnings. | | | | | | | | |
| 13 | V | H | V.H. | Vergis H. | NY | Letitia A. James | x | x | | x | 10/24/2023 19:24 | New York | Vergis | Harris | Enjoy | | | | | | | | |

Excerpt of Spreadsheet of Complaints Produced by Adam Shen on May 22, 2024

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SKILLZ PLATFORM INC.,
a Delaware corporation,

Plaintiff,

-against-

PAPAYA GAMING, LTD., a foreign corporation; and PAPAYA GAMING, INC., a Delaware corporation,

Defendants.

Civil Action No.: 1:24-cv-01646

Hon. Denise L. Cote

PAPAYA GAMING, LTD.,

Counterclaim-Plaintiff,

-against-

SKILLZ PLATFORM INC.,

Counterclaim Defendant,

And

TETHER STUDIOS LLC, GOLDEN WOOD COMPANY, LTD., LUCKYO LIMITED, GAMENEXA STUDIOS PRIVATE LIMITED and DNR GAME STUDIO,

Additional Counterclaim-Defendants.

**COUNTERCLAIM-DEFENDANT SKILLZ PLATFORM INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO SEVER AND DISMISS <u>PAPAYA GAMING, LTD.'s COUNTERCLAIMS</u>**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .................... 1

II. FACTUAL BACKGROUND .................... 2

A. Papaya's Barebones Allegations that Skillz Deceives Consumers .................... 4

B. Papaya—Which Advertises Its Games as "Fair"—Alleges that Skillz's Advocacy for Fairness Is Defamation .................... 5

C. Papaya Asserts Intellectual Property Counterclaims Against Skillz and Third-Party Developers .................... 7

III. MOTION TO DISMISS PAPAYA'S FALSE ADVERTISING, DEFAMATION, DECEPTIVE TRADE PRACTICES, AND COPYRIGHT COUNTERCLAIMS .................... 8

A. Papaya's False Advertising and Deceptive Trade Practices Counterclaims Should Be Dismissed Because Papaya Has Not Alleged A Materially False Statement By Skillz .................... 9

1. Papaya does not plausibly allege that Skillz's statements that its platform is free of bots are false .................... 10

2. Papaya does not plausibly allege that Skillz's statements to consumers about its competitors' deployment of bots are false. .................... 13

B. Papaya Fails to State a Claim for Defamation .................... 14

1. Papaya does not plausibly allege statements on the 4Fairplay Website are materially false .................... 15

2. The Bonus.com article is protected by Section 74 of the New York Civil Rights Law. .................... 17

C. Papaya Cannot Plausibly Allege Copyright Counterclaims Because They Seek Protection of Unregistered Aspects of Papaya's Works .................... 19

IV. MOTION TO SEVER PAPAYA'S COPYRIGHT AND TRADEMARK CLAIMS 21

A. The Court Should Exercise Its Discretion to Sever Papaya's Intellectual Property Claims from this Action .................... 21

1. The Intellectual Property Counterclaims rest on unrelated facts .................... 22

2. The Intellectual Property Counterclaims present no common questions of law or fact .................... 23

3. Severance would serve the interests of judicial economy .................... 23

4. Severance would avoid prejudice to Skillz .................... 24

5. The Intellectual Property Counterclaims require discovery from different witnesses and different documentary evidence........................................ 25

V. CONCLUSION........................................................................................... 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017) ............................15

*Anderson v. Unilever United States, Inc.*,
607 F. Supp. 3d 441 (S.D.N.Y. 2022)............................................................................4

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016)..........................................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................8, 12, 19

*Becher v. Troy Pub. Co.*,
589 N.Y.S.2d 644 (3d Dep't 1992)...............................................................................19

*Celle v. Filipino Rep. Enters., Inc.*,
209 F.3d 163 (2d Cir. 2000).........................................................................................14

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014).....................................................................................14, 22

*Clairol Inc. v. Gillette Co.*,
389 F.2d 264 (2d Cir. 1968)...........................................................................................7

*Clark v. Hanley*,
89 F.4th 78 (2d Cir. 2023) .............................................................................................8

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992).........................................................................................21

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
551 F. Supp. 3d 320 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. 2022)....................................15, 17, 18

*Doe v. Uber Techs., Inc.*,
551 F. Supp. 3d 341 (S.D.N.Y. 2021)..........................................................................13

*Erickson v. Pardus*,
551 U.S. 89 (2007)..........................................................................................................8

*Fourth Estate Public Benefit Corp v. Wall-Street.com, LLC*,
586 U.S. 296 (2019)......................................................................................................20

*Franklin v. Daily Holdings, Inc.*,
21 N.Y.S.3d 6 (1st Dep't 2015) ...............................................................................15, 19

*Greenberg v. Spitzer*,
62 N.Y.S.3d 372 (2d Dep't 2017)....17

*Int'l Code Council, Inc. v. UpCodes Inc.*,
43 F.4th 46 (2d Cir. 2022)....9

*Jem Accessories, Inc. v. JVCKENWOOD USA Corp.*,
2021 WL 706646 (S.D.N.Y. Feb. 22, 2021)....22, 24

*Karedes v. Ackerley Grp., Inc.*,
423 F.3d 107 (2d Cir. 2005)....18

*Komarov v. Advance Mag. Publishers, Inc.*,
691 N.Y.S.2d 298 (N.Y. Sup. Ct. 1999)....17

*McCracken v. Verisma Sys., Inc.*,
91 F.4th 600 (2d Cir. 2024)....9

*Medmix Switzerland AG v. Kettenbach GmbH & Co. KG*,
2024 WL 1973365 (E.D.N.Y. May 3, 2024)....22

*Morris v. Northrop Grumman Corp.*,
37 F.Supp.2d 556 (E.D.N.Y. 1999)....22

*Ndugga v. Bloomberg L.P.*,
2024 WL 3755564 (S.D.N.Y. Aug. 12, 2024)....23

*North Jersey Media Group, Inc. v. Fox News Network, LLC*,
312 F.R.D. 111 (S.D.N.Y. 2015)....22, 23

*Palmieri v. Thomas*,
814 N.Y.S.2d 717 (2d Dep't 2006)....18

*Reus v. ETC Hous. Corp.*,
148 N.Y.S.3d 663 (N.Y. Sup. Ct. 2021), *aff'd*, 164 N.Y.S.3d 692 (3d Dep't 2022)....17

*Rosner v. Amazon.com*,
18 N.Y.S.3d 155 (2d Dep't 2015)....14

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
241 F.3d 232 (2d Cir. 2001)....14

*Schering Corp. v. Pfizer Inc.*,
189 F.3d 218 (2d Cir. 1999)....11

*Schultz v. Lost Nation Booster Club*,
2014 WL 10038777 (S.D. Iowa Oct. 14, 2014)....21

*Gryl ex. rel. Shire Pharms. Grp. PLC v. Shire Pharms Grp. PLC*,
298 F.3d 136 (2d Cir. 2002)....7, 8, 10

*Tannerite Sports, LLC v. NBCUniversal News Grp*.,
864 F.3d 236 (2d Cir. 2017)....15, 16

**Statutes**

15 U.S.C. § 1094....7

15 U.S.C. § 1125(a)(1)(A)....9

17 U.S.C. § 101....21

17 U.S.C. § 411(a)....20, 21

N.Y. Civ. Rights Law § 74....17, 18, 19

N.Y. Gen. Bus. Law § 349....3, 9

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....14, 19

Fed. R. Civ. P. 21....22

Counterclaim-Defendant Skillz Platform, Inc. ("Skillz"), a United States public company, submits this Memorandum in Support of its Motion to Sever and Dismiss Counterclaim-Plaintiff Papaya Gaming, Ltd.'s ("Papaya") Counterclaims.

## I. PRELIMINARY STATEMENT

For years, Papaya misled the American public by representing that it provided a chance for players to compete against one another. In fact, human players unwittingly competed against Papaya's computer algorithms (so-called "bots"), which Papaya designed to masquerade as people, inducing customers to pay to play games they could not win. Even now that it has been sued in the instant matter, Papaya does not deny—because it cannot—that Papaya purposely and secretly deployed bots on its platform to mimic human players. Nor does Papaya deny that it has received subpoenas from government agencies investigating its deceptive bot use. Skillz sued Papaya in this action to hold it to account for its false advertising and deceptive trade practices.

Left with no strategy other than distraction, the foreign Papaya entity counter-sued Skillz, levying copycat false advertising and deceptive trade practices claims, meritless claims for defamation, and bogus copyright and trademark infringement claims against Skillz. As set forth below, Papaya fails to allege any facts that Skillz used bots to compete in cash games and took money from human players. Rather, Papaya's counterclaims make clear that the alleged "bot use" Papaya supposedly identified on Skillz's platform is limited to two narrow, fully-disclosed circumstances: (1) mandatory practice games for new players that ***do not involve cash*** wagers; and (2) bots controlling random elements in gameplay to ensure that ***two human players*** who compete against each other in a tournament experience the same level of difficulty (*i.e.*, no bot can win). As pleaded, Papaya fails to state a claim that such circumstances somehow render Skillz's statements about not using bots in cash games materially false or deceptive. Papaya's defamation

claims are likewise meritless and fail as a matter of law because Papaya does not plausibly allege that Skillz's statements that Papaya utilized bots in cash games or that Papaya was being investigated by government agencies were false.

Separately, Papaya's copyright and trademark claims are entirely unrelated to this litigation, seeking joinder of defendants that, to date, largely have not been served, and witnesses and documents that do not overlap with Skillz's claims in this case. Papaya's copyright infringement claims are particularly weak because public documents indicate that Papaya did not register with the U.S. Copyright Office any of the design elements that it claims Skillz and developers have infringed; rather, public documents indicate that Papaya sought and obtained copyright protection only for the underlying software code embedded in its mobile games, which is not something that any party to this action is alleged to have infringed.

Given that Papaya's counterclaims represent nothing more than subterfuge by its foreign controlling owners, intended to bog down this litigation and delay an ultimate resolution pleading deficiencies in Papaya's counterclaims, Skillz served a Rule 11 sanctions letter on Papaya demanding they withdrawn. In the meantime, as set forth below, Skillz respectfully submits that Papaya's (1) defamation claims, false advertising, and deceptive trade practices claims should be dismissed; (2) copyright claims should be dismissed or severed; and (3) trademark claims should be severed.

## II. FACTUAL BACKGROUND

Skillz filed this lawsuit on March 4, 2024, alleging that Papaya (one of several foreign companies defrauding U.S. consumers in the mobile gaming industry) has gained anticompetitive advantage, to Skillz's financial detriment, by falsely advertising its games as "fair" and "skill-based" when, in fact, Papaya controls the outcomes of its games by deploying bots. ECF No. 1. To

date, Papaya has not refuted that it used bots. ECF No. 28 ("MTD") at 9 ("Papaya does not represent that its games never include computerized opponents"); 10 ("Papaya has not denied or refuted that it deployed bots"); 24 ("Papaya has never denied or refuted the alleged bot usage"). The Court denied Papaya's MTD, holding that Skillz's Complaint "sufficiently allege[d] that Papaya's representations about the nature of its games are impliedly false" as to its use of bots, plausibly allege[d] that Papaya's representations implying that all competitors are human are material, and adequately allege[d] that Skillz suffered damages. ECF No. 40 at 7–9.

On August 5, 2024, Papaya filed its Answer and Counterclaims. Papaya brought ten bogus counterclaims against Skillz, which can be grouped into three categories. *First*, Papaya asserts claims under the Lanham Act for false advertising (counterclaim I) and under New York General Business Law § 349 for deceptive trade practices under (counterclaim II) based on Skillz's alleged bot usage (the "False Advertising Counterclaims"). *Second*, Papaya brings counterclaims for defamation (counterclaim III) and civil conspiracy (counterclaim IV) regarding (i) Skillz's statements that it favors "fairness" in the mobile gaming industry and opposes the deceptive use of bots by competitors such as Papaya, (ii) Skillz's involvement in the 4FairPlay Website, and (iii) the alleged reposting of an online article related to the arguments made in Papaya's motion to dismiss (the "Defamation Counterclaims"). *Third*, Papaya asserts intellectual property counterclaims against Skillz and five third-party developers, including alleged (i) trademark infringement upon Papaya's registrations and common law rights related to names and icons used for its Bingo Cash, Solitaire Cash, and 21 Cash games (counterclaims V and VII); (ii) counterclaims against Skillz for contributory and/or vicarious trademark infringement of Papaya's same names and icons (counterclaims VI and VIII) (together with counterclaims V and VII, the "Trademark Counterclaims"); and (iii) alleged copyright infringement by Skillz and five third-

party game developers of Papaya's Bingo Cash game, (counterclaims IX and X, the "Copyright Counterclaims").

### A. Papaya's Barebones Allegations that Skillz Deceives Consumers

In support of the False Advertising Counterclaims, Papaya asserts that Skillz uses bots.[1] ECF No. 46 ¶¶ 19, 21–23. Papaya relies solely on a handful of online customer reviews and one line from Skillz's Developer FAQs previously addressed in Skillz's Opposition to Papaya's MTD. *Id*. ¶¶ 194–96; 207–25. Papaya points to no other facts in support of its assertion that Skillz uses bots.

Skillz, for its part, has represented to this Court and to the public that it does not use, operate or enable computerized or artificial competitors, *i.e.*, "bots," to compete against and win money from human players in its cash games, that Skillz is "committed to rooting out and eradicating" bots, and that players of Skillz-platform games "can be sure we will continue to . . . only match you against real human opponents of equal skill. No unfair bots, not ever." *Id*. ¶¶ 199, 187. Cash games available for play on the Skillz platform "include only human opponents and never incorporate, or have ever incorporated, bot opponents." *Id*. ¶¶ 329, 333, 335. In other words, if a human player enters a cash competition on the Skillz platform, that individual is competing against another human player, and one of the human players will win the cash prize offered. It is the use of a bot as a ***competitor that can win a cash competition*** against a human player that Skillz has opposed, does not permit on its platform, and has accused Papaya of doing in its complaint.

Papaya deceptively relies upon selective information in Skillz's Developer FAQs to assert that Skillz's representations to consumers about not using bots in cash games are false. *Id*. ¶¶ 194–

[1] The factual allegations outlined in this motion are drawn from Papaya's Answer and Counterclaims (ECF No. 46) and "are assumed to be true for the purposes of resolving the instant Motion." *Anderson v. Unilever United States, Inc*., 607 F. Supp. 3d 441, 446 (S.D.N.Y. 2022).

96. The plain language of Skillz's Developer FAQs disclose the permitted use of bots in two narrow situations: allowing players to learn about gameplay on the platform upon downloading an app (*i.e.*, "Z tournaments," practice games against bots in which no cash is wagered), and controlling the random elements of the game when ***two human players compete against each other*** asynchronously and compare their scores to determine a winner.[2] Declaration of Craig Carpenito ("Carpenito Decl."), Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness").

### B. Papaya—Which Advertises Its Games as "Fair"—Alleges that Skillz's Advocacy for Fairness Is Defamation

Papaya claims that Skillz defamed it by making statements and funding an entity that promotes fairness in the mobile gaming industry. Specifically, Papaya claims that it was defamed by: (1) Skillz's involvement in a 501(c)(4) organization dedicated to fairness and transparency in mobile gaming; and (2) an article published by the website Bonus.com that interpreted Papaya's arguments in its motion to dismiss, which was republished by Skillz and its employees on social media. *Id*. ¶¶ 233–36, 357–60.

*First*, Skillz has been, and continues to be, a vocal advocate for fair play in mobile gaming that seeks to raise awareness of the deceptive use of bots in the real-cash mobile gaming industry. *Id*. ¶¶ 184–87, 189. Consistent with such efforts, Skillz provided funds to and worked with Fair Play for Mobile Games ("FPFMG"), a 501(c)(4) nonprofit organization. *Id*. ¶ 125. FPFMG collected complaints from customers who believed they were defrauded out of money by mobile gaming companies using bots (including Papaya), helped route those complaints to appropriate

[2] Skillz offers two gameplay modes: Real-time and Play-and-Compare. In Real-time mode, Skillz does not permit bots in cash games. In Play-and-Compare mode, players play at different times and compare their performances. In Play-and-Compare games, bots do not compete or win; rather, as Skillz's FAQs make clear, the bot controls the random elements of a game so when two human players enter a cash tournament against one-another, each human plays against the same bot so they experience the same level of difficulty, and only the ***human player*** with the highest score wins. Carpenito Decl., Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness").

state agencies, and reported certain information about those complaints on a website called 4FairPlay.org (the "4FairPlay Website"). *Id*. ¶¶ 128–30. The 4FairPlay Website reported the volume of complaints FPFMG received as to specific mobile gaming companies, with a ticker illustrating the fact that that FPFMG continued to receive complaints. *Id*. ¶¶ 139, 150. Papaya asserts without explanation that the ***number of*** complaints received by FPFMG as reported on the 4FairPlay Website was falsely represented. *Id*. ¶ 151. But Papaya does not dispute that the complaints themselves were genuine. Nor does it deny that it received communications from government agencies investigating its use of bots, or even that it used bots prior to or at the time the 4FairPlay Website was operational (*i.e.*, that the purported implications created by the website related to Papaya's bot use were false).

*Second*, on June 25, 2024, a website called Bonus.com published an article covering this lawsuit, whose headline stated that Papaya "admit[ted] bot use" in this lawsuit. *Id*. ¶ 233. The Bonus.com article reported on arguments at the parties' May 10, 2024 conference and directly quoted from the parties' filings. Carpenito Decl., Ex. B [Bonus.com article].[3] Without any factual basis and despite receiving contrary information from Skillz's counsel in this litigation, Papaya conclusively asserts without any factual basis that Skillz paid for the Bonus.com article to be written and published. The headline of the article was corrected by Bonus.com at Papaya's request on June 25, 2024 (the same day it was published). ECF No. 46 ¶¶ 27, 233–36, 242; Carpenito Decl., Ex. B [Bonus.com article]. Also at Papaya's request, Skillz and its employees promptly took

[3] While Papaya's Answer and Counterclaims extensively reference the Bonus.com article as the basis for Papaya's defamation claims, Papaya did not include the full article as an exhibit. Because the original Bonus.com article as published before the revisions requested by Papaya is no longer available online, Skillz attaches the Bonus.com article as currently published herein as Exhibit B.

down their social media posts resharing the article as it had been published by Bonus.com. *Id.* ¶¶ 233–35.

### C. Papaya Asserts Intellectual Property Counterclaims Against Skillz and Third-Party Developers

Papaya further alleges counterclaims for trademark and copyright infringement by Skillz along with five third-party developers over five mobile games on the Skillz platform: Cash Out Bingo, Bingo For Cash, Solitaire World–Win Cash, Solitaire Cash, and 21 Bash.

In its Trademark Counterclaims, Papaya falsely alleges infringement by the games Cash Out Bingo and Bingo For Cash on Papaya's alleged trademark rights in its Bingo Cash game, infringement by the games Solitaire World–Win Cash and Solitaire Cash upon Papaya's alleged trademark rights in its Solitaire Cash game, and infringement by the game 21 Bash upon Papaya's alleged trademark rights in its 21 Cash game. *Id.* ¶¶ 81–86, 263–98. All three of the word mark trademark registrations (for Papaya's games Bingo Cash, Solitaire Cash and 21 Cash) were issued on the Supplemental Register.[4] Papaya alleges that it alone has the right to use the word "cash" in connection with the generic terms "bingo," "solitaire," and "21." Papaya also asserts trademark claims as to certain registered design marks for its games, comprised generally of symbols and lettering including BINGO, dollar signs, playing cards or numbers with disclaimers of rights asserted in "bingo" and "21."[5]

---

[4] As noted by the Second Circuit in *Sulzer Mixpac AG v. A&N Trading Co.*, "[t]he supplemental register lists 'non-mark designations . . . that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning." 988 F. 3d 174, n.2 (2d Cir. 2021) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 19:33 (5th ed. 2020)). Thus, registration on the supplemental register does not confer the same benefits as does registration on the principal register, *see* 15 U.S.C. § 1094; in fact, it "does nothing to enlarge the substantive rights of the registrant." *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 267 (2d Cir. 1968).

[5] The U.S. Patent and Trademark Office certificates demonstrating the limited scope of Papaya's trademark registrations, submitted herewith as Carpenito Decl., Ex. F, are properly before the Court as their terms and effect were relied upon by Papaya in drafting the Counterclaims. The Court may properly consider documents incorporated by reference, as well as those "whose terms and effect are relied upon by the plaintiff in drafting the complaint." *Gryl ex. rel. Shire Pharms. Grp. PLC v. Shire Pharms Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002).

In its Copyright Counterclaims, Papaya alleges that the games Cash Out Bingo and Bingo For Cash infringe on its copyright rights in its Bingo Cash game. *Id*. ¶¶ 402–11. Papaya claims "copyright in the unique artistic expression encompassed within the Papaya Games" which "includes without limitation icons, play screens, game boards, and the overall user interface of the Papaya Games." *Id*. ¶ 93. While Papaya identifies U.S. Copyright Registration No. PA0002481705 it its Counterclaim, *id*. ¶¶ 94, 403, it suspiciously did not attach a copy of its registration as an exhibit. Carpenito Decl., Ex. C [Copyright.gov Printout Showing Particulars for Registration No. PA0002481705].[6] Papaya's registration for Bingo Cash with the United States Copyright Office is for its software code, not its artistic expression. *Id*. (registering Bingo Cash under form PA [performing arts] with the work identified as "computer files"). According to its copyright registration, Bingo Cash was first published in the United States. *Id*. (listing "Nation of First Publication: United States").

## III. MOTION TO DISMISS PAPAYA'S FALSE ADVERTISING, DEFAMATION, DECEPTIVE TRADE PRACTICES, AND COPYRIGHT COUNTERCLAIMS

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Dismissal is proper where a claim lacks "facial plausibility"—that is, where the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When assessing the pleadings on a motion to dismiss, a court may review "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken, as well as documents not expressly incorporated by

[6] This document is properly before the Court as a document incorporated by reference in Papaya's counterclaims. *Gryl*, 298 F.3d at 140.

reference in the complaint which are nevertheless integral to the complaint." *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (cleaned up).

### A. Papaya's False Advertising and Deceptive Trade Practices Counterclaims Should Be Dismissed Because Papaya Has Not Alleged A Materially False Statement By Skillz

Papaya asserts claims for false advertising by Skillz based on two different categories of representations to consumers: (1) statements that games on the Skillz platform are free of bots; (2) statements that "other companies' games" are "unfair and/or not-skill based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience"; and (3) statements that "cash withdrawals from the Skillz platform are available 'at any time.'" ECF No. 46 ¶¶ 329–30, 332. Papaya alleges deceptive trade practices based on these same representations, as well as Skillz's involvement in the 4FairPlay Website. *Id.* ¶¶ 341–46.

Section 1125(a)(1)(A) of the Lanham Act prohibits false or misleading descriptions or representations of fact "in commercial advertising or promotion" concerning "the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities." Accordingly, to state a claim for false advertising under the Lanham Act, a plaintiff must plausibly allege both falsity and materiality of each challenged statement. *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022). Similarly, to state a claim for deceptive business practices under New York General Business Law § 349, a plaintiff must allege that the defendant is engaged in (1) consumer-oriented conduct; (2) which is materially misleading; and (3) which injured the plaintiff was injured as a result. *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 607 (2d Cir. 2024). Because Papaya fails to plausibly allege that any of Skillz's representations are materially false, Papaya fails to state a claim for false advertising or deceptive trade practices.

### 1. Papaya does not plausibly allege that Skillz's statements that its platform is free of bots are false

Papaya fails to plausibly allege that Skillz's representations that it does not use bots on its platform are false. Although Papaya alleges that Skillz "repeatedly represents to consumers that the games available for play on its platform include only human opponents and never incorporate, or have incorporated, bot opponents," it does not sufficiently allege that these statements are materially false. ECF No. 46 ¶ 329. Papaya does not, because it cannot, allege that Skillz deploys bots that enter cash tournaments and take money from human players.

Papaya's argument that Skillz is actually using bots (and thus, lying to the public about it) rests on a snippet—taken out of context—from Skillz's Developer FAQs on its website.[7] *Id*. ¶ 194. The full section of the FAQ states:

> Skillz offers two distinct gameplay modes: Real-time and Play-and-Compare.
>
> Real-time mode
>
> In this mode, ***bots are only permitted during the First Time User Experience***, which consists of the mandatory Z tournaments a player goes through after a new install. The primary goal of the synchronous bot opponents is to educate the players on the game mechanics while also giving them an idea of the in-game experience.
>
> Play-and-Compare mode
>
> Given the asynchronous nature of this mode (where ***players "play and compare"***), when bots are present, players must ***face identical bots*** to ensure fairness. These bots are tailored to deliver consistent experiences.

Carpenito Decl., Ex. A (Skillz Developer FAQs § 2.1, "Skillz Random and Fairness") (emphases added).

[7] Because the Developer FAQs are incorporated by reference in Papaya's Counterclaims, they may properly be considered by the Court in reviewing this Motion. *Gryl*, 298 F.3d at 140.

The plain language of this FAQ shows makes clear that bots are used only a) to simulate the real "in-game experience" and b) to help facilitate *human to human* play in a specific "Play-and-Compare mode." These representations, in other words, do not in any way indicate that Skillz allows the use of bots to compete in and win cash competitions against human opponents on its platform. Furthermore, as re-printed above, the FAQ relates to only to "Z Games," which use Skillz's virtual currency and are not played for cash. Ex. D (Skillz Developer FAQs § 2.2, "Tournaments and Gameplay Parameters"). Skillz's representations that it does not allow bots on its platform the way *Papaya* uses them cannot be false, as they do not "conflict[] with reality." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).

Further, Papaya has not plausibly alleged materiality—*i.e.*, that the presence of bots in certain ***practice*** games, ***where no money is at stake***, is likely to influence players' purchasing decisions. A statement is material when it is "likely to influence purchasing decisions." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016). Papaya's counterclaims fail to allege how the limited use of bots in certain noncash practice games (as disclosed in the FAQ's on Skillz's website) is misleading or otherwise would be material to any user of any Skillz's platform. Papaya's claims related to the use of bots in practice games therefore fail. *Id.*

Papaya's allegations related to the use of bots in asynchronous games, where two human players play at separate times and compare their scores, fares no better. ECF No. 46 ¶¶ 194–95. Again, the plain text of Skillz's FAQ explains that when two human players compete against each other in an asynchronous game involving randomized elements impacting the game's difficulty level, a third-party developer may use bots to ensure that each human player competing against another human player for a high score faces the same randomized elements and gameplay, so that the comparison of one human player's score against another human player's score in a game to

determine the winner of the competition accurately reflects the player's skill (as opposed to having the outcome dictated by randomization).[8] Papaya has no plausible allegations that Skillz itself is deploying bots to masquerade as human players competing in cash games on its platform; that is simply not what the FAQ says. Thus, Papaya's reliance on Skillz's disclosures regarding the use of bots to ensure fairness in asynchronous *human to human* gameplay does not undermine the truth of Skillz's representations that it does not permit bots to compete against and win money from human players in cash competitions.[9]

*Second*, Papaya's reliance upon customer reviews to claim that Skillz uses bots to deceive customers out of their money is hypocritical at best because, *according to Papaya*, customer reviews alone are insufficient to raise a facially plausible claim. ECF No. 28 at 13. Papaya cites thirteen purported customer reviews, none of which Papaya asserts are true and provide sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; ECF No. 46 ¶¶ 207–25. Papaya's heavy reliance on these reviews—with practically nothing else—is insufficient to satisfy its pleading standard. Indeed, in contrast to Papaya's counterclaims, Skillz's original claims against Papaya are based on, among other things, plausible factual allegations concerning: (1) statements of Papaya's former employees; (2) the mobile gaming market, (3) player liquidity, (4) features of Papaya's own games; and (5) Papaya's failure to publicly deny bot usage. Together, all of this

[8] For instance, in a game involving randomized obstacles, bots can be utilized to ensure that players of the same game in an asynchronous competition face the same obstacles, depending on the decisions the player makes during the game. The two human players' scores would then be compared against each other to determine a winner; a bot is not permitted to compete and cannot win a competition or take any cash prize from a human competitor in any cash game on Skillz's platform.

[9] Skillz made all of this clear in its Opposition to Papaya's motion to dismiss. ECF No. 35 at 25 & n.8. Indeed, Skillz unambiguously clarified to Papaya that "posting guidelines for developer use of bots in designing a game and ensuring gameplay fairness is not the same as putting bot competitors into cash competitions and secretly pocketing those bots' 'winnings.'" *Id*. Thus, Papaya knew its strained, incorrect interpretation of Skillz's guidelines lacked merit when it filed its counterclaims, but it nonetheless filed its claims anyway.

information supported Skillz's claim that Papaya uses bots. *See*, *e.g.*, ECF No. 1 ¶¶ 6, 31–33, 51–57, 70–72, 81–83. Customer reviews only serve to further bolster these other plausible allegations and underscore that customers believed Papaya represented itself as not using bots and that they viewed such representations as material. ECF No. 40 at 8 ("The complaint also plausibly alleges that Papaya's representations regarding who is playing in the competition are material. The representations concern a material quality of the Papaya platform. To bolster this argument, the complaint recites negative online reviews of Papaya games in which those posting the reviews complain about Papaya's use of bots."). Indeed, Papaya's reliance on selected customer reviews as the sole basis for its allegations that Skillz deploys bots to compete in cash games on its platform to win prizes against human players is especially puzzling when it previously asserted to this Court that customer reviews cannot constitute proof of bot usage. ECF No. 28 at 13.

**2. Papaya does not plausibly allege that Skillz's statements to consumers about its competitors' deployment of bots are false.**

Papaya's similarly fails to plausibly allege that Skillz's representations about its competitors' use of bots are untrue. Papaya alleges that Skillz represents to consumers that "other companies' games" are "unfair and/or not-skill based, and that only Skillz can be trusted to provide a fair and skill-based gaming experience" and that "cash withdrawals from the Skillz platform are available "at any time." ECF No. 46 ¶¶ 330, 332. But Papaya pleads no facts demonstrating that these statements are actually false. *Skillz Platform Inc. v. AviaGames Inc.*, Case. No. 21-cv-02436-BLF (N.D. Cal 2023) (ECF No. 435 at 14–15; ECF No. 509 at 8–10) (finding statements made mobile gaming company, Avia Games Inc., related to bot use more likely than not constituted fraud); ECF. No. 46 ¶ 80 (Papaya's answer limiting its denial related to bot use to the date of its Answer). Skillz's statement that "only Skillz can be trusted," is a statement of opinion which cannot be proven true or false and is not actionable under New York law. *See Doe v. Uber Techs.,*

*Inc.*, 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) (statements which "convey only the seller's opinion that its product is superior" are not actionable). None of these statements can serve as the foundation for Papaya's false advertising allegations.[10]

Because counterclaims I-II fail to plausibly allege Skillz's statements are materially false, they should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

**B. Papaya Fails to State a Claim for Defamation**

Papaya's Defamation Counterclaims should be dismissed because they fail to state a claim under New York law. Papaya claims defamation in connection with statements made (1) on the 4FairPlay website, and (2) in an article published on Bonus.com. To prove libel under New York law, a plaintiff must prove "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Chau v. Lewis*, 771 F.3d 118, 126–27 (2d Cir. 2014). Falsity is a necessary element of a defamation cause of action and because "only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." *Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015) (internal quotation marks omitted). "Whether particular words are defamatory presents a legal question to be resolved by the court[] in the first instance." *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 177 (2d Cir. 2000). Furthermore, courts have held that "[b]ecause a defamation suit 'may be as

[10] Similarly, Papaya quotes an article in the Skillz Help Center for the proposition that Skillz promises consumers that they can withdraw their cash winnings "at any time." ECF No. 46 ¶¶ 33–34, 250, 253, 318, 332, 345. The Help Center home page contains a prominent list of articles on the topic of "Withdrawals and Deposits," including an article entitled "Why does it take 4-6 weeks to get my withdrawal." Carpenito Decl., Ex. G [Skillz Help Center Players homepage]. Skillz's statement that withdrawals can be made "at any time," viewed in the context available to users, is not false. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (holding that in a false advertising case, "'text must yield to context' . . . 'a court must consider the advertisement in its entirety and not engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately.'") (quoting *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986)) (cleaned up).

chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself,' courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

**1. Papaya does not plausibly allege statements on the 4Fairplay Website are materially false**

Statements on the 4FairPlay Website cannot be the subject of a defamation claim because Papaya does not sufficiently allege they were materially false—"a necessary element of any defamation claim." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 326 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. 2022). A plaintiff must therefore plead "facts that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).

"[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id*. at 242. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Id.* at 243. In assessing whether an allegedly defamatory statement meets this standard, "[c]ourts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader." *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6 (1st Dep't 2015).

Here, the 4FairPlay Website contained statements which would not plausibly "have a different effect on the mind of the average reader," *see id*., than the version of the truth that Papaya claims should have been disclosed. According to Papaya, the 4FairPlay Website purports to state: (1) Papaya used bots in its cash games; (2) many customers complained about such bot use; and

(3) Papaya was being investigated by state attorneys general related to its bot use. ECF No. 46 ¶¶ 9, 11, 14, 128. Papaya's counterclaims do not, because they cannot, assert that any of these statements are untrue. Specifically, nowhere in Papaya's 104-page Answer does it deny that it used bots as of the filing of Skillz's Complaint or at the time the 4FairPlay Website was live. Rather, Papaya conspicuously limits its responses to its practices as of the date of the filing of its Answer. *See id*. ¶ 29 ("Papaya ***does not*** incorporate 'bots' or computerized opponents into its games other than in tutorial matches"); *id.* [Answer] 80 ("***as of the date of the filing of this Answer***, Papaya does not deploy bots to compete against live human players other than in tutorial games.") (emphases added). Nor has Papaya alleged, because it cannot, that it is false to imply that Papaya has received complaints from customers related to bot use (it has)[11] or that government agencies are investigating (or have investigated) Papaya for its bot use. ECF No. 1 ¶¶ 72–75; 85–92. Papaya's Defamation Counterclaims therefore fail to plead facts that, if proven, would establish that the 4FairPlay Website's statements as not true. *See Tannerite Sports*, 864 F.3d at 247.

Further, Papaya takes issue with the 4FairPlay Website displaying the number of complaints Papaya and other companies received on its website, accompanied by a "ticker" illustrating that FPFMG continued to receive complaints. ECF No. 46 ¶¶ 11–13. This ticker serves as the ***entire factual basis*** for Papaya's conclusory allegations that the data on the 4FairPlay Website was "fabricated." But the ticker did not, as Papaya alleges, purport to show live data. Rather, it was an illustration demonstrating that the 4FairPlay website continued to receive complaints on an ongoing basis. Papaya's own counterclaims underscore that no reasonable person would believe the ticker was meant to represent "live data" given, as Papaya alleges: (1) the ticker

[11] Skillz is informed that Papaya has received data from FPFMG that shows data supporting over 26,000 complaints used for the 4Fairplay website. Yet, despite receiving such data, Papaya proceeded with its counterclaims anyway without any factual basis to allege such data was "fabricated."

was unmistakably on a timer; (2) no data on the website updated based on any "live data;" and (3) the starting number of complaints remained the same each time you entered the website. *Id*. ¶¶ 139–47. And, even if the ticker can somehow be interpreted as inflating the number of customer complaints against Papaya and others, whether those complaints totaled 27,000 versus 26,000 complaints would not "have produced any discernibly different impact on readers than the 'pleaded truth'" that players across the country have complained about Papaya's bot use. *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 391 (2d Dep't 2017). Thus, because Papaya has no factual basis to allege that the data included on the 4Fairplay Website was "fabricated" and, at best, alleges that the number of complaints against Papaya was immaterially inflated, Papaya's defamation claims related to the 4FairPlay Website fail as a matter of law.

**2. The Bonus.com article is protected by Section 74 of the New York Civil Rights Law.**

Papaya's claim that it has been defamed by the Bonus.com article is legally meritless and should be dismissed because the statements in that article were about judicial proceedings and thus are protected by New York's fair and true report privilege. "A plaintiff cannot prevail on a defamation claim where the statements complained of are privileged under state law." *Ctr. for Med. Progress*, 551 F. Supp. 3d at 328 (internal quotation marks omitted). Under New York law, "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." *Id*. (quoting N.Y. Civil Rights Law § 74). "The protections of section 74 extend to pleadings … and the release by the parties of background material regarding their positions in the case." *Id*. at 329. "The protections of Section 74 also extend to reports of judicial proceedings that are mixed with commentary or opinion." *Id*.; *see also Reus v. ETC Hous. Corp.*, 148 N.Y.S.3d 663, 668 (N.Y. Sup. Ct. 2021), *aff'd*, 164 N.Y.S.3d 692 (3d Dep't 2022) (A report "need not stem directly from a judicial proceeding, but rather, can be

*about* a judicial proceeding." (emphasis in original)); *Komarov v. Advance Mag. Publishers, Inc.*, 691 N.Y.S.2d 298, 300 (N.Y. Sup. Ct. 1999) (Section 74 privilege applies "to any pleading made within the course of the proceeding.").

New York law is decidedly pro-publisher and applies a liberal standard for what constitutes a "fair and true report": "the exact words of every proceeding need not be given if the substance be substantially stated." *Palmieri v. Thomas*, 814 N.Y.S.2d 717, 718 (2d Dep't 2006); *see also Ctr. for Med. Progress*, 551 F. Supp. 3d at 330. A "substantially accurate" publication is one that, "despite minor inaccuracies, [] does not produce a different effect on a reader than would a report containing the precise truth." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005).

Moreover, Papaya has no good faith basis to allege that Skillz was responsible for the Bonus.com article's headline and content.[12] And even if it did, the protections afforded by Section 74 clearly cover the statements in the Bonus.com article. First, the allegedly defamatory statements are, without question, about the pleadings made within the course of this judicial proceeding. *Ctr. For Med. Progress*, 551 F. Supp. 3d at 329. The article references the lawsuit repeatedly, names the judge and the court in which the Skillz's lawsuit was filed, references oral arguments at the parties' May hearing, and quotes directly from the parties' pleadings. Carpenito Decl., Ex. B [Bonus.com article]. And the statements are a "substantially accurate" summary of Papaya's pleadings and representations in this case. Papaya's own brief in support of its motion to dismiss, filed on the public docket, states: **"Papaya has never denied or refuted the alleged bot usage"** (ECF No. 28 at 24); **"Papaya does not represent that its games *never* include computerized opponents"** (*id.* at 9 (emphasis added)); and **"Papaya has *not* denied or refuted that it deployed bots"** (*id.* at 10 (emphasis in original)). It is a reasonable interpretation of these statements that

[12] Notably, Papaya has not sued Bonus.com for writing and publishing the article.

Papaya admitted it used bots.[13] Accordingly, Papaya does not allege any set of facts that "allows the court to draw the reasonable inference that the defendant is liable" for defamation. *Iqbal*, 556 U.S. at 678.

But even to the extent the Court finds Papaya's position ambiguous, any such doubts should be resolved in Skillz's favor. *See Becher v. Troy Pub. Co.*, 589 N.Y.S.2d 644, 646–47 (3d Dep't 1992) ("Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of statutes like [Section 74]. Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression.").

Lastly, given that Papaya's counterclaims still do not allege that Papaya never used bots in its cash games, the statements published do not create a "different effect on the mind of the average reader." *Franklin*, 21 N.Y.S.3d at 6. Papaya's defamation claims should therefore be dismissed.

**C. Papaya Cannot Plausibly Allege Copyright Counterclaims Because They Seek Protection of Unregistered Aspects of Papaya's Works**

Papaya also cannot state a claim for its Copyright Counterclaims, because it asserts claims regarding aspects of Papaya's works which were not registered with the U.S. Copyright Office as required by law. Papaya's Copyright Counterclaims assert copyright infringement for alleged violations of the copyright for Papaya's game Bingo Cash and contributory and/or vicarious copyright infringement against Skillz. These claims should be dismissed pursuant to Fed. R. Civ.

[13] Papaya intentionally mischaracterizes its counsel's remark to the Court at a conference on May 10. Papaya alleges that at that conference, its counsel represented that the platform "does not incorporate bots (and that a written certification would be forthcoming, which was subsequently provided)." ECF No. 46 ¶ 241. But as the Court surely knows, Papaya's counsel actually represented only that "the games *as currently constituted* do not use bots." 5/10/24 Hr'g Tr. 9:24–10:3 (emphasis added). Whether Papaya *currently* used bots as of May 10, 2024 is not relevant to the question of whether Papaya *previously* used bots as Skillz complaint alleges.

P. 12(b)(6). Papaya claims that it owns "copyright in the unique artistic expression encompassed within the Papaya Games" which "includes without limitation icons, play screens, game boards, and the overall user interface of the Papaya Games." ECF No. 46 ¶ 93. Papaya identifies only one copyright registration, namely, U.S. Copyright Registration No. PA0002481705. *Id*. ¶¶ 94, 403. Notably and suspiciously, Papaya did not attach a copy of its registration to its Counterclaim pleading. Carpenito Decl., Ex. C [Copyright.gov Printout Showing Particulars for Registration No. PA0002481705].

Though Papaya sued Defendants for infringement on the "unique artistic expression" in Bingo Cash, it has not registered the visuals, graphics, or "unique artistic expression" within the game with the U.S. Copyright Office. A copyright holder for a United States work may only sue after registering the work with the Copyright Office. 17 U.S.C. § 411(a); *Fourth Estate Public Benefit Corp v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019). Such registration "is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Id*. While Papaya has registered Bingo Cash's ***software code*** through the Copyright Office, it does not appear to have registered its "unique artistic expression" including "icons, play screens, game boards, and user interface" as alleged. *Compare* Carpenito Decl., Ex. C (Bingo Cash, U.S. Copyright No. PA0002481705 (filed Jul. 18, 2024) (registering Bingo Cash under form PA (performing arts) with the work identified as "computer files")), *with* Ex. E (Papaya Gaming, Inc.'s unasserted registration for Solitaire Cash, U.S. Copyright No. VA0002259316 (filed Jul. 18, 2021) (registering Solitaire Cash under form VA (visual arts) as "visual material")).[14] Though the copyright for Bingo Cash was registered by Papaya Gaming, Ltd., an Israel company,

[14] Papaya referenced the registration for Bingo Cash in its Answer and Counterclaims but did not append it as an exhibit. ECF No. 46 ¶¶ 94, 403.

Bingo Cash was first published in the United States. Carpenito Decl., Ex. C [Bingo Cash, U.S. Copyright No. PA0002481705] (listing "Nation of First Publication: United States"). A work is a United States work, requiring registration prior to enforcement of copyright claims, if it is first published in the United States. 17 U.S.C.A. § 101. Because Bingo Cash was first published in the United States, it requires registration with the Copyright Office prior to bringing any action for infringement, and Papaya did not register the aspects at issue in the Copyright Counterclaims.

Because Papaya's copyright registration for Bingo Cash covers only its computer code and not the visual aspects of the game, it cannot state a claim for Copyright infringement. To the extent Papaya claims infringement on aspects of Bingo Cash not registered with the Copyright Office (such as its "unique artistic expression" and visual elements), these claims are barred by § 411(a). *Schultz v. Lost Nation Booster Club*, 2014 WL 10038777, at *3 (S.D. Iowa Oct. 14, 2014) (holding "copyright registration of [the plaintiff's] HTML code does not extend to the visual presentation of the website"); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 703 (2d Cir. 1992).

Because Papaya's Copyright Counterclaims seek to protect aspects of Bingo Cash not included in its registration with the U.S. Copyright Office, Papaya cannot state a claim for either copyright infringement (counterclaim IX) or contributory and/or vicarious copyright infringement (counterclaim X). In the alternative, should the Court find that Papaya has stated a claim for the Copyright Counterclaims, these claims should be severed. *See infra* Section IV.

## IV. MOTION TO SEVER PAPAYA'S COPYRIGHT AND TRADEMARK CLAIMS

### A. The Court Should Exercise Its Discretion to Sever Papaya's Intellectual Property Claims from this Action

Papaya's Copyright Counterclaims and the Trademark Counterclaims (collectively, the "Intellectual Property Counterclaims") should be severed from this action because Skillz will be prejudiced by the additional time necessary to litigate Intellectual Property Counterclaims that

contain no common questions of law or fact with Skillz's original claims. In the interest of judicial economy, severance of the Intellectual Property Counterclaims is appropriate because they will require new evidentiary proof and witnesses that do not overlap with the original claims (or even Papaya's other counterclaims).

Rule 21 permits courts to add or drop a party "at any time, on just terms." Fed. R. Civ. P. 21. The court may also "sever any claim against a party" pursuant to Rule 21. *Id*. In deciding whether severance is appropriate, courts consider five factors: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d at 580. Any of these factors alone warrants severance of claims. *Medmix Switzerland AG v. Kettenbach GmbH & Co. KG*, 2024 WL 1973365, at *5 (E.D.N.Y. May 3, 2024); *see also Lewis*, 2000 WL 423517 at *2 (citation omitted). Here, *all five* factors militate in favor of severance of the Intellectual Property Counterclaims.

**1. The Intellectual Property Counterclaims rest on unrelated facts**

"Generally, counterclaims are severable when they are based upon an entirely different factual situation from that upon which the plaintiff's claims are based." *North Jersey Media Group, Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 115 (S.D.N.Y. 2015). More specifically, severance is appropriate where claims do not arise from the same series of transactions or occurrences. *Jem Accessories, Inc. v. JVCKENWOOD USA Corp.*, 2021 WL 706646, at *3 (S.D.N.Y. Feb. 22, 2021). While "[t]here is no rigid rule as to what constitutes the same series of transactions or occurrences,"

courts "repeatedly have interpreted the phrase 'same transaction' to encompass 'all logically related claims.'" *North Jersey Media Group, Inc.*, 312 F.R.D. at 115.

Here, the Intellectual Property Counterclaims do not arise out of the same set of transactions or occurrences as the Defamation Counterclaims. Indeed, the Intellectual Property Counterclaims do not allege facts related to the use of bots, false advertising or Skillz's assertion that Papaya uses bots in the operation of its games. They share not a single fact in common with the Defamation Counterclaims or the False Advertising Counterclaims.

Papaya improperly attempts to tie-in the Intellectual Property Counterclaims to the rest of this case by characterizing the underlying facts as "another facet of Skillz's efforts to unfairly compete with the highly successful Papaya Games." ECF No. 46 ¶¶ 262–98. But there is no logical relationship between the purported similarities in the games themselves (alleged in support of the Intellectual Property Counterclaims), which Skillz does not even design or develop, and the statements alleged in support of the Defamation and False Advertising Counterclaims.

**2. The Intellectual Property Counterclaims present no common questions of law or fact**

For the same reasons, Papaya's Intellectual Property Counterclaims also do not present any common questions of law or fact with its other counterclaims such that consolidation would conserve judicial resources or avoid prejudice. *Ndugga v. Bloomberg L.P.*, 2024 WL 3755564, at *3 (S.D.N.Y. Aug. 12, 2024) (severance appropriate where claims "share no overlap.").

**3. Severance would serve the interests of judicial economy**

Because the allegations against Skillz are completely distinct from those made in the Complaint and the False Advertising and Defamation Counterclaims, considerations of judicial economy and fairness would not be upheld if all counterclaims were resolved in a single suit. This Court has held that the requirements of Rule 20 are to be interpreted liberally to promote judicial

economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *Jem Accessories, Inc.,* 2021 WL 706646, at *3.

Continuing to litigate Papaya's unrelated Intellectual Property Counterclaims is likely to hinder settlement because there are five additional and necessary parties charged in those unrelated claims who have not been served and have not appeared. No judicial economy will be gained from joining Papaya's unrelated counterclaims because each claim, and defendant, requires their own legal strategies, witnesses, and defenses such that they would proceed as functionally separate actions. *See id*. at *5. Thus, the Intellectual Property Counterclaims will serve only to delay and stall this proceeding, with no likelihood of swift resolution. Severing these claims would allow each party to fully litigate each claim and reduce the potential for prejudice that could arise from the confusion of factual issues that do not pertain to the unrelated claims. *See id*.

**4. Severance would avoid prejudice to Skillz**

Skillz will be prejudiced if the Intellectual Property Claims remain in the current litigation because Papaya only asserted them to intentionally delay resolution of Skillz's original claims. The parties' short history in this litigation to date demonstrates that obfuscation is Papaya's only strategy: Skillz filed the Complaint on March 4, 2024 alleging causes of action surrounding Papaya's use of bots that are being falsely portrayed as human players (ECF No. 1 ¶¶ 1, 58); Papaya accepted service of the Complaint and therefore gained additional time to answer or move to dismiss; Papaya further requested that Skillz refrain from filing a preliminary injunction with the assurance that the platform ceased using bots after this litigation was filed (ECF No. 44); Papaya then refused to provide any actual evidence (other than the opaque and narrow report of a hired litigation expert) that it had ceased using bots. In the meantime, Papaya continues to reap the

benefit of its anticompetitive behavior to Skillz's detriment. Papaya should not be allowed to bog down this litigation for economic gain.

### 5. The Intellectual Property Counterclaims require discovery from different witnesses and different documentary evidence

Finally, the Defamation Counterclaims and the Intellectual Property Counterclaims require different witnesses and documentary proof, thus justifying severance. *Oram*, 979 F. Supp. 2d at 502–03 (2013). In the first instance, resolving Papaya's Intellectual Property Counterclaims requires discovery from *five* unrelated developers that Papaya joined as counterclaim defendants. Moreover, the advertising, coding, and customer reviews raised in Papaya's Answer and Counterclaim do not pertain to any of the documents or witnesses identified in Skillz initial disclosures. ECF No. 39. Even of the four Papaya-employee witnesses Papaya included in its Initial Disclosures, only one has any relevant knowledge about the Intellectual Property Counterclaims; all non-Papaya witnesses identified are related solely to the other counterclaims. *Id*. Therefore, keeping the Intellectual Property Counterclaims in this action would unduly broaden the case to require witnesses and documents well beyond the scope of discovery for the principal claims at issue in this matter.

All facts presented by both Skillz and Papaya weigh in favor of severance. In the interest of judicial efficiency and fairness, this Court should sever the Intellectual Property Counterclaims so that they may litigate separately without causing further delay in this action.

## V. CONCLUSION

For the foregoing reasons, Skillz respectfully submits that the Court should sever and dismiss Papaya's counterclaims.

Dated: September 4, 2024

KING & SPALDING LLP

By: <u>*/s/ Craig Carpenito*</u>

Craig Carpenito
ccarpenito@kslaw.com
Jessica Benvenisty
jbenvenisty@kslaw.com
Amy Nemetz
anemetz@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036-2601
Tel: (212) 556-2100
Fax: (212) 556-2222

Lazar P. Raynal (*pro hac vice*)
lraynal@kslaw.com
Michael A. Lombardo (*pro hac vice*)
mlombardo@kslaw.com
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333
Fax: (312) 995-6330

*Attorneys for Skillz Platform Inc.*

# Exhibit 5

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308086165059
Filing Date/Time: 08/08/2023 10:00 AM
Effective Date/Time: 08/08/2023 10:00 AM

**FAIR PLAY FOR MOBILE GAMES**
**ARTICLES OF INCORPORATION**

The undersigned, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:** The name of the Corporation is "Fair Play for Mobile Games" (the "Corporation").

**SECOND:** This Corporation is organized and operated exclusively for social welfare purposes within the meaning of section 501(c)(4) of the Internal Revenue Code of 1986. The purpose of the Corporation is to educate the general public about mobile gaming companies that promise fair competition but instead use gaming bots to scam players. The Corporation will advocate for fair play and to help consumers who have been the victims of mobile gaming fraud.

No part of the net income of the Corporation shall inure to the benefit of, or be distributed to, any director, officer, or other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this Corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:** The Corporation shall have no members.

**FOURTH:** The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy occurs on the Board of Directors, the vacancy

may be filled by vote of a majority of the Directors in attendance at a meeting of the Board called for such purpose.

The Corporation's initial director is:

Josh Levin
1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**FIFTH:** The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation located in the County of Chesterfield, that is authorized to transact business in Virginia.

**SIXTH:** The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA 23314

**SEVENTH:** The Corporation's initial principal office address is:

1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**EIGHTH:** The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the organization, including the distribution of the remaining funds of the organization consistent with the purposes stated herein.

Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes or for social welfare purposes as described in section 501(c)(4) or dispose of excess funds in accordance with

Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any corresponding provision of any future United States Internal Revenue law, and any other applicable state or federal law.

**IN WITNESS WHEREOF** the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are his and to the best of his knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

Michael Garcar

Michael Garcar, Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, AUGUST 8, 2023

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective August 8, 2023.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By [signature]

Jehmal T. Hudson
Commissioner

# Exhibit 6

THEGOBERGROUP
GO further

## ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE

Fair Play for Mobile Games ("Client")

DS JL _____ By initialing here, I acknowledge that I am authorized by Client to enter into an agreement between The Gober Group PLLC and Client for legal services.

DS JL _____ By initialing here, I acknowledge that I have visited www.gobergroup.com/terms and have read The Gober Group's Terms of Service. I further acknowledge that I understand The Gober Group's Terms of Service, and that I agree that the attorney-client relationship between The Gober Group and Client will be governed by such Terms of Service.

DS JL _____ By initialing here, I acknowledge that I have read the attached fee schedule(s), I understand the pricing specified in such fee schedule(s), and I agree to the pricing terms specified in such fee schedule(s).

DS JL _____ By initialing here, I acknowledge that Client will pay a refundable security deposit in the amount of $1,500 to be held in The Gober Group's IOLTA as security against future unpaid fees ("Security Deposit"). In the event one or more of Client's invoices remain unpaid for more than 30 days after Client's receipt of such invoices(s), The Gober Group may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require Client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of Client. Upon termination of the attorney-client relationship between The Gober Group and Client, The Gober Group will return the remaining funds from the Security Deposit, if any, to Client following the payment of all unpaid invoices.

DS JL _____ By initialing here, I acknowledge that Client will be charged a flat fee of $6,000 for The Gober Group to execute the nonprofit formation for Client, and that The Gober Group will charge hourly (see attached fee schedule) for all communications and other legal services on behalf of Client. Note, however, that the flat fee will be discounted to $4,500 if Client promptly notifies The Gober Group that Client will "self-declare" its 501(c)(4) status, meaning The Gober Group will not have to prepare the IRS Form 1024, Application for Recognition of Exemption Under Section 501(a).

DS JL _____ By initialing here, I acknowledge that during each year of our representation, The Gober Group will provide Client with an "Annual Update Letter," which will provide you details about Client's Board of Directors meetings, filing deadlines, and other compliance obligations. Rather than billing hourly, we will minimize your costs by charging a $500 flat fee, invoiced in the month you receive the Annual Update Letter, to cover the time and labor associated with maintaining your file and preparing the letter. Please note that, because it is imperative for organizations to

**ACKNOWLEDGEMENT OF TERMS OF SERVICE AND FEE SCHEDULE**
**PAGE 2 OF 2**

practice good organizational hygiene, in addition to meeting their filing deadlines, the preparation of the Annual Update Letter is a standard part of our representation.

Understood and agreed to by:

| | |
|---|---|
| Josh Levin | Executive Director |
| Print Name of Client Representative | Title of Client Representative |
| DocuSigned by: Josh Levin 54B5F88A2F084FE... | 8/7/2023 |
| Signature of Client Representative | Date |

T | 202.417.3529
@GoberGroup
F | 877.437.5755
GoberGroup.com

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

THEGOBERGROUP
GO further

DS
JL

## RATE SHEET FOR HOURLY FEES

8/7/2023

**ATTORNEYS**

- Karen Blackistone Oaks: $750
- Tracey Frazier Wigglesworth: $625
- Chris Gober: $850
- Jenny Kim: $675
- Anna Mackin: $500
- Shannon O'Leary: $500
- Loree Anne Paradise: $500
- Eric Wang: $650

**OF COUNSEL ATTORNEYS**

- Steven Burk: $600
- Michael Garcar: $450
- Bryan Jacoutot: $350
- Diane LaRoss: $450
- Audrey Perry Martin: $625
- Bryan Tyson: $675

**SENIOR COMPLIANCE DIRECTORS**

- Kristen Lippstreu: $350
- Ashlyn Maeoka: $350
- Garret Scronce: $325

**LAW CLERK**

- Sara Cutter: $250

**PARALEGALS/RESEARCH SPECIALISTS**

- Universal Rate: $275

### Security Deposit Policy

It is the Firm's policy to charge new clients a refundable deposit to be held in the Firm's "IOLTA" trust account as security against future unpaid fees ("Security Deposit"). The amount of the Security Deposit, which will be specified in a separate "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement executed by the client, varies based upon the client type and the anticipated scope of work. In the event one or more of the client's invoices remain unpaid for more than 30 days after the client's receipt of such invoices(s), the Firm may, at its sole discretion, apply the Security Deposit to pay the unpaid invoice(s), and require the client to replenish the Security Deposit balance within seven days before re-commencing work on behalf of the client.

### Commencement of Work Policy

It is the Firm's policy to **not** commence work until a new client has: (i) executed the Firm's "Acknowledgement of Terms of Services and Fee Schedule" or other letter of engagement; **AND** (ii) paid the Security Deposit.

*Updated as of April 11, 2023*

T | 800.825.1730
F | 877.437.5755
| @GoberGroup
| GoberGroup.com

DocuSign Envelope ID: 44FDF253-518D-4064-97D5-3A8178CAB62B

THE GOBER GROUP
GO further

DS JL

8/7/2023

# FLAT FEE SCHEDULE FOR ESTABLISHING **NONPROFIT ORGANIZATIONS**

To provide our clients with additional transparency and budgetary certainty, The Gober Group offers a one-time flat fee to complete certain steps in the nonprofit formation process. While the following rate schedule does not contemplate every aspect of forming a nonprofit, it does cover the minimum requirements customarily performed by a law firm to establish the organization and begin operations.

| 501(c)(3) | 501(c)(4) | 501(c)(6) |
|---|---|---|
| $7,500 | $6,000 | $7,500 |

| | Legal Services **Included** in Flat Fee |
|---|---|
| ✓ | Two initial conferences to determine type(s) of organization(s) necessary to accomplish goals |
| ✓ | Articles of Incorporation or a similar organizational document |
| ✓ | IRS Employer Identification Number (EIN) |
| ✓ | Generic bylaws |
| ✓ | Conflicts of Interest Policy, Whistleblower Policy, and Document Retention Policy |
| ✓ | Agenda, resolutions, and supporting documents for organizational board meeting |
| ✓ | Corporate minutes for the organizational board meeting |
| ✓ | IRS Form 1023/1024 - Application for Recognition of Exemption (as applicable) |
| ✓ | IRS Form 8976 - Notice of Intent to Operate Under Section 501(c)(4) (as applicable) |

| | Legal Services and Out-of-Pocket Fees **Not Included** in Flat Fee |
|---|---|
| ✗ | Customized bylaws (although generic bylaws will be provided) |
| ✗ | Insurance policies |
| ✗ | State-specific research, documents, and requests for tax exemption |
| ✗ | State-specific research, documents, and registrations for fundraising activities |
| ✗ | Lobbying research, registrations, and reports |
| ✗ | Responses to follow-up questions from the IRS regarding the Application for Recognition of Exemption |
| ✗ | Ongoing legal compliance |
| ✗ | Out-of-pocket fees and expenses, such as the IRS's filing fee for the Application of Recognition of Exemption ($600); state incorporation and registration fees; registered agent services; insurance premiums; and lobbying registration fees |

Please note the flat fee does not include a retainer fee and/or security deposit that may be required of new clients. Our pricing also assumes that the legal services included in the flat fee will be completed within 90 days of the client executing our engagement letter. Unless the delays are caused by our firm, any legal services performed beyond this 90-day window, regardless of whether they are normally included in the flat fee, will be billed at our standard hourly rates.

| 202.417.3529 | info@gobergroup.com | @GoberGroup | GoberGroup.com

# Exhibit 7

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2308236220521
Filing Date/Time: 08/23/2023 10:11 AM
Effective Date/Time: 08/23/2023 10:11 AM

## Fictitious Name - Fictitious Name Certificate

### Entity Information

Entity Name: Fair Play for Mobile Games

Entity Type: Nonstock Corporation

### Fictitious Name

Fictitious Name: 4 Fair Play

### Signature Information

Date Signed: 08/23/2023

| Printed Name | Signature | Title |
| --- | --- | --- |
| Rocky Matthews | Rocky Matthews | Chair |

# Exhibit 8

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11657083
Filing Number: 2402156861518
Filing Date/Time: 02/15/2024 02:58 PM
Effective Date/Time: 02/15/2024 02:58 PM

# ADVANCING COMMUNITY VALUES
# ARTICLES OF INCORPORATION

The undersigned, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:** The name of the Corporation is "Advancing Community Values" (the "Corporation").

**SECOND:** This Corporation is organized and operated exclusively for social welfare purposes within the meaning of section 501(c)(4) of the Internal Revenue Code of 1986. The purpose of the Corporation is to educate policymakers and influencers about environmental policy and its impacts on local communities throughout the United States.

No part of the net income of the Corporation shall inure to the benefit of, or be distributed to, any director, officer, or other private person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this Corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:** The Corporation shall have no members.

**FOURTH:** The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy occurs on the Board of Directors, the vacancy may be filled by vote of a majority of the Directors in attendance at a meeting of the Board called for such purpose.

The Corporation's initial director is:

Josh Levin
1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**FIFTH:** The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation located in the County of Chesterfield, that is authorized to transact business in Virginia.

**SIXTH:** The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA 23314

**SEVENTH:** The Corporation's initial principal office address is:

1501 Wilson Boulevard, Suite 1050
Arlington, VA 22209

**EIGHTH:** The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the organization, including the distribution of the remaining funds of the organization consistent with the purposes stated herein.

Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes as described in Section 501(c)(3) of the Internal Revenue Code or for social welfare purposes as described in Section 501(c)(4) of the Internal Revenue Code, or dispose of excess funds in accordance with Section 501(c)(4) of the Internal Revenue or any

corresponding provision of any future United States Internal Revenue law, and any other applicable state or federal law.

**IN WITNESS WHEREOF** the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are his and to the best of his knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

DocuSigned by:
MICHAEL GARCAR
0E57CC0837474BD...

Michael Garcar, Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, FEBRUARY 15, 2024

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

Advancing Community Values

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective February 15, 2024.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

# Exhibit 9

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11314734
Filing Number: 2212215286344
Filing Date/Time: 12/21/2022 09:39 AM
Effective Date/Time: 12/21/2022 09:39 AM

## Nonstock Corporation - Articles of Termination

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Mobile Gaming Fairness | Entity Type: | Nonstock Corporation |
| Entity ID: | 11314734 | Formation Date: | 12/07/2021 |
| Status: | Active | | |

### Signature Information

Date Signed: 12/21/2022

- [x] The corporation has not commenced business.
- [x] No debt of the corporation remains unpaid.
- [x] The net assets of the corporation remaining after winding up have been distributed.
- (●) A majority of the initial directors authorized the dissolution.
- ( ) Initial directors were not named in the articles of incorporation and have not been elected, and a majority of the incorporators authorized the dissolution.

| Printed Name | Signature | Title |
|---|---|---|
| Joshua Levin | Joshua Levin | Director |

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, DECEMBER 21, 2022

The State Corporation Commission has found the articles of termination submitted on behalf of

Mobile Gaming Fairness

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF TERMINATION

be issued and admitted to record with the articles of termination in the Office of the Clerk of the Commission, effective December 21, 2022.

STATE CORPORATION COMMISSION

By 

Judith Williams Jagdmann
Commissioner

# Exhibit 10

**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

**Date:**
07/19/2022
**Employer ID number:**
87-4007913
**Person to contact:**
Name: Customer Service
ID number: 31954
Telephone: (877)-829-5500
**Accounting period ending:**
December 31
**Form 990/990-EZ/990-N required:**
Yes
**Effective date of exemption:**
December 7, 2021
**Contribution deductibility:**
No
**Addendum applies:**
No
**DLN:**
26053453004482

MOBILE GAMING FAIRNESS
C/O KAREN BLACKISTONE
2308 MT VERNON AVE SUITE 762
ALEXANDRIA, VA 22301

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code (IRC) Section 501(c)(4). This letter could help resolve questions on your exempt status. Please keep it for your records.

Donors cannot deduct contributions they make to you under IRC Section 170(c)(2).

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-NC" in the search bar to view Publication 4221-NC, Compliance Guide for Tax-Exempt Organizations (Other than 501(c)(3) Public Charities and Private Foundations), which describes your recordkeeping, reporting, and disclosure requirements.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Stephen A. Martin

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

# Exhibit 11

CALIFORNIA
Secretary of State Shirley N. Weber, Ph.D.

SECRETARY OF STATE | ELECTIONS | CAMPAIGN & LOBBYING | BUSINESS PROGRAMS | STATE ARCHIVES | REGISTRIES

Cal-Access Search
GO
Advanced Search

Cal-Access

- Cal-Access Home
- Campaign Finance
- Lobbying Activity
  - Individual Lobbyists
  - Lobbying Firms
  - Lobbyist Employers
  - $5,000 - Plus Payments To Influence
  - Daily Filings/ Directory Changes
- Resources
- For Filers Only
- Political Reform
- User's Manual

Lobbying Activity

# FAIR PLAY FOR MOBILE GAMES

**View:**

- General Information
- Financial Activity/Filing History

**Legislative Session**

- 2023 through 2024

**Quarterly reports are required for any quarter in which the person spends $5,000 or more to influence legislative or administrative action. Links to legislative bills or state agencies lobbied are also available.**

**2023-2024 LEGISLATIVE SESSION**

| LOBBYING PAYMENTS MADE | | | |
|---|---|---|---|
| SESSION | QUARTER | TOTAL OF PAYMENTS TO INFLUENCE | P.U.C. LOBBYING |
| 2023-2024 | 3rd | $41,287.01 | $0.00 |

| BILLS AND AGENCIES LOBBIED | | |
|---|---|---|
| SESSION | QUARTER | BILLS/AGENCIES LOBBIED (AS FILED) |
| 2023-2024 | 3rd | Attorney General action relating to mobile gaming |

To Search For The Full Text Of Bills, Resolutions, And Constitutional Amendments Click Here.

| ELECTRONIC FILINGS | |
|---|---|
| REPORT OF PERSON SPENDING $5,000 OR MORE TO INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION (F645) | |
| FILING PERIOD: 07/01/2023 - 09/30/2023 | FILED ON: 10/31/2023 6:34:26 PM |
| FILING NUMBER: 2855086 | ORIGINAL FILING |

# REPORT OF PERSON SPENDING $5,000 OR MORE TO INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION

(Government Code Section 86116)

1/5

**FORM 645**
**1993**

**REPORT COVERS PERIOD FROM** 07/01/2023 **THROUGH** 09/30/2023

**CUMULATIVE PERIOD BEGINNING** 01/01/2023

**TYPE OR PRINT IN INK**

For information required to be provided to you pursuant to the Information Practices Act of 1977, see Information Manual on Lobbying Disclosure Provisions of the Political Reform Act.

**FOR OFFICIAL USE ONLY**

**A**

**B**

NAME OF FILER:

FAIR PLAY FOR MOBILE GAMES

| BUSINESS ADDRESS: (Number and Street) | (City) | (State) | (Zip Code) | TELEPHONE NUMBER: |
|---|---|---|---|---|
| | ARLINGTON | VA | 22209 | |

**PART I - LEGISLATIVE OR STATE AGENCY ADMINISTRATIVE ACTIONS ACTIVELY LOBBIED DURING THE PERIOD**
(See instructions on reverse.)

Attorney General action relating to mobile gaming

**SUMMARY OF PAYMENTS THIS PERIOD**

| | | |
|---|---|---|
| A. Total Activity Expenses (Part II, Section A) | $ | 0.00 |
| B. Total Other Payments to Influence (Part II, Section B) | $ | 41287.01 |
| Total (A + B above) | $ | 41287.01 |
| C. Total Payments in Connection with PUC Activities (Part II, Section C) | $ | 0.00 |

CAMPAIGN CONTRIBUTIONS: ☐ Part III completed and attached ☒ No campaign contributions made this period

## VERIFICATION

**I have used all reasonable diligence in preparing this Report. I have reviewed the Report and to the best of my knowledge the information contained herein and in the attached schedules is true and complete.**

**I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

| Executed on (Date) | At (City and State) | By (Signature of Filer or Responsible Officer) |
|---|---|---|
| 10/31/2023 | Chicago IL | Josh Levin |

| Name of Filer or Responsible Officer (Type or Print) | Title |
|---|---|
| Josh Levin | Director |

GG - 0033

PERIOD COVERED: 07/01/2023 09/30/2023

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

## PART II - PAYMENTS MADE THIS PERIOD

### A. ACTIVITY EXPENSES (See instructions on reverse.)

| Date | Name and Address of Payee | Name and Official Position of Reportable Persons and Amount Benefiting Each | | Description of Consideration | Total Amount of Activity |
|---|---|---|---|---|---|
| | | | $ | | $ |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

☐ If more space is needed, check box and attach continuation sheets.

TOTAL SECTION A (Activity Expenses). Also enter the total of Section A on Line A of the Summary of Payments section on page 1. $ 0.00

### B. OTHER PAYMENTS TO INFLUENCE LEGISLATIVE OR ADMINISTRATIVE ACTION

☒ NOTE: State and local government agencies do not complete this section. Check the box and complete Attachment Form 640 instead.

1. PAYMENTS TO LOBBYING COALITIONS (NOTE: Attach Form 630.) $ 0.00
2. OTHER PAYMENTS $ 41287.01

TOTAL SECTION B (1 + 2). Also enter the total of Section B on Line B of the Summary of Payments section on page 1. $ 41287.01

### C. PAYMENTS IN CONNECTION WITH ADMINISTRATIVE TESTIMONY IN RATEMAKING PROCEEDINGS BEFORE THE CALIFORNIA PUBLIC UTILITIES COMMISSION

(See instructions on reverse.) Also enter the total of Section C on Line C of the Summary of Payments section on page 1. $ 0.00

GG - 0034

PERIOD COVERED: 07/01/2023 --09/30/2023

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

**PART III - CAMPAIGN CONTRIBUTIONS MADE** (Monetary and non-monetary campaign contributions of $100 or more made to or on behalf of state candidates, elected state officers and any of their controlled committees, or committees supporting such candidates or officers must be reported in A or B below.)

A. If the contributions made by you during the period covered by this report, or by a committee you sponsor, are contained in a campaign disclosure statement which is on file with the Secretary of State, report the name of the committee and its identification number, if any, below.

Name of Major Donor or Recipient Committee Which Has Filed A Campaign Disclosure Statement: ______

Identification Number if Recipient Committee: ______

B. Contributions of $100 or more which have not been reported on a campaign disclosure statement, including contributions made by an organization's sponsored committee, must be itemized below.

| Date | Name of Recipient | I.D. Number if Committee | Amount |
|---|---|---|---|
| | | | $ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

☐ If more space is needed, check box and attach continuation sheets.

**NOTE: Disclosure in this report does not relieve a filer of any obligation to file the campaign disclosure statements required by Gov. Code Section 84200, et seq.**

# Attachment Form 640

(Attachment to Form 635 or Form 645)

CALIFORNIA 1993 FORM **640**

4/5

PERIOD COVERED: 07/01/2023--09/30/2023

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

**For Use By**: A state or local government agency that qualifies as a lobbyist employer or a $5,000 filer. Refer to the instructions on the cover page before completing this attachment.

**Other Payments to Influence Legislative or Administrative Action:**

| | |
|---|---|
| 1. Total payments for overhead expenses related to lobbying activity. Report as a lump sum. | $ 0.00 |
| 2. Total payments to Lobbying Coalitions. Report as a lump sum. (Form 630 must be attached) | $ 0.00 |
| 3. Total payments of less than $250 during the calendar quarter for lobbying activity (excluding overhead). Report as a lump sum. | $ 0.00 |
| 4. Total payments of more than $250 during the calendar quarter for lobbying activity (excluding overhead). Such payments must be itemized below. | $ 0.00 |
| 5. Grand total of "Other Payments to Influence Legislative or Administrative Action." Also enter this total on the appropriate line of the Summary of Payments section on Page 1 of Form 635 or Form 645. | $ 41287.01 |

Itemize below payments of $250 or more made during the quarter for lobbying activity. Provide the name and address of the payee, the amount paid during the quarter, and the cumulative amount paid to the payee since January 1 of the biennial legislative session covered by the report.

Also itemize dues or similar payments of $250 or more made to an organization that makes expenditures equal to 10% of its total expenditures or $15,000 or more in a calendar quarter to influence legislative or administrative action. Provide the organization's name and address, the amount paid to the organization during the quarter, and the cumulative amount paid to the organization since January 1 of the biennial legislative session covered by the report.

| Name & Address of Payee | Amount This Quarter | Cumulative Amount Since January 1 |
|---|---|---|
| [C] - Square Strategies LLC<br>Arlington VA 22201 | $ 1979.76 | $ 1979.76 |
| [C] - Mavan Group<br>Menlo Park CA 94025 | $ 8764.84 | $ 8764.84 |
| [C] - Assemble the Agency<br>Washington DC 200365584 | $ 7962.00 | $ 7962.00 |
| Subtotal of all payments itemized above | $ 18706.60 | |

[X] If more space is needed, check box and attach continuation sheets.

GG - 0036

ATTACHMENT FORM 640

# Attachment Form 640

(Continuation Sheet)

CALIFORNIA 1993 FORM **640**

5/5

PERIOD COVERED: 07/01/2023--09/30/2023

NAME OF FILER: FAIR PLAY FOR MOBILE GAMES

| Name & Address of Payee | Amount This Quarter | Cumulative Amount Since January 1 Biennial Legislative Session |
|---|---|---|
| [A] - Google<br><br>Mountain View CA 94043 | 4180.02 | 4180.02 |
| [A] - Realtime Technologies<br><br>Berlin DE 10115 | 18400.39 | 18400.39 |
| Subtotal of all payments itemized above | $ 22580.41 | |

GG - 0037

CAL2PDF Version3.8

# Exhibit 12

**Don't Get Scammed By Bots This Holiday Season**

It's the holidays and everyone's in the yearly mad scramble, spending money on gifts and decorations to make the season festive. Many might have a side hustle to afford the extras right now, including turning to their smartphones and mobile games that promise to pay.

**Commented [1]:** Attempting to make it timely so they will be more likely to accept it

The advertising is enticing – who wouldn't want to play games and earn real money? But player beware. Not every real money mobile game is legit. Sadly, over the last few months, we've heard from thousands of Americans who've been defrauded out of their hard-earned money from gaming companies they thought they could trust.

Real money games are mobile skill-based games, like Solitaire or Bingo, where people play against real players in tournaments on their phone. They pay the entry fee and are matched with a player at their skill level. The winning player gets the cash.

Or at least that's the way it's supposed to work. But in many cases, players are getting scammed into believing they're playing real people and that they'll get paid real money when they win.

The real money mobile gaming industry has exploded over the last few years; it's a $10 billion market that is outpacing growth of the greater gaming sector. This rapid growth means more and more Americans could fall victim to unfair practices. While there are gaming companies that are good players in the market, newer companies have popped up over the years that – unfortunately for the consumer – don't abide by the rules of fair play.

We're learning more everyday of how some companies use false advertising and bots to unfairly cheat unsuspecting players out of their money. On November 20, NY Post reported that AviaGames — makers of Bingo Tour and Solitaire Clash — "has been slapped with a class-action lawsuit that claims users were duped into playing against bots instead of similarly skilled human players." Likewise, VentureBeat recently reported that players are suing AviaGames for "racketeering for disguising bots as humans in skill-based games."

As an organization dedicated to bringing attention to the issue of unfair game play, we launched a webpage earlier this year where players could submit complaints to their state Attorney General offices if they felt they'd been scammed by a real money mobile game.

In just a few months, we collected over 12,700 complaints from every state in the country – 600 of those complaints came from residents here in Nevada. The stories were devastating. People who were barely making ends described how their money had been stolen by games secretly matching them against bots. This practice, paired with advertising that falsely claims to match players with real people, amounts to fraud - plain and simple.

**Commented [2]:** This can be updated to wherever we want to submit first (NY, NJ, etc). Chose Nevada since the audience might be more familiar with gaming and we're already shopping the first op-ed in California.

Even worse, the games we received the most complaints about are some of the most popular on the App Store – Bingo Cash and Solitaire Cash (owned and operated by Papaya Games) and Bingo Clash (owned and operated by AviaGames).

Consumers should protect themselves – and their wallets – by doing their due diligence on the games they play now or plan to play in the future. Visit gaming company websites to get a sense of their commitment to fair play. And be alert when you're playing – if something seems suspicious, sounds too good to be true or customer service is non-existent, it's best to pass that game by.

Thankfully for those who enjoy playing real money games, there are good companies in this space. A recent article in the Daily Mail took companies who use gaming bots to task but also noted some bright spots in the industry, including Big Run Studios and Skillz, the maker of Blackout Bingo and Solitaire Cube, which is credited as a "legitimate company which does not use bots." These are gaming companies that have been operating for years and by all accounts offer games that play by the rules, have a track record of positive reviews online and display their consumer practices transparently and prominently on their websites.

And last, if you believe you've been scammed by a real money mobile game, protect yourself and others by reporting your experience to your state's consumer protection agency. Our website, 4fairplay.org, has an easy form that will send your complaint directly to your state Attorney General's office. Or visit usa.gov/state-attorney-general to find your AGs web page and file a complaint directly through their portal.

The more people who shine a light on this issue and call for lawmakers to investigate, the faster we can restore fairness and protect players from fraudulent and deceptive practices.

- *Josh Levin is the director of 4 Fair Play, an organization dedicated to promoting fair and transparent policies and practices for mobile gaming users across the country.*

**Don't Get Scammed By Bots This Holiday Season**

It's the holidays and everyone's in the yearly mad scramble, spending money on gifts and decorations to make the season festive. Many might have a side hustle to afford the extras right now, including turning to their smartphones and mobile games that promise to pay.

The advertising is enticing — who wouldn't want to play games and earn real money? But player beware. Not every real money mobile game is legit. Sadly, over the last few months, we've heard from thousands of Americans who've been defrauded out of their hard-earned money from gaming companies they thought they could trust.

Real money games are mobile skill-based games, like Solitaire or Bingo, where people play against real players in tournaments on their phone. They pay the entry fee and are matched with a player at their skill level. The winning player gets the cash.

Or at least that's the way it's supposed to work. But in many cases, players are getting scammed into believing they're playing real people and that they'll get paid real money when they win.

The real money mobile gaming industry has exploded over the last few years; it's a $10 billion market that is outpacing growth of the greater gaming sector. This rapid growth means more and more Americans could fall victim to unfair practices. While there are gaming companies that are good players in the market, newer companies have popped up over the years that — unfortunately for the consumer — don't abide by the rules of fair play.

We're learning more everyday of how some companies use false advertising and bots to unfairly cheat unsuspecting players out of their money. On November 20, NY Post reported that AviaGames — makers of Bingo Tour and Solitaire Clash — "has been slapped with a class-action lawsuit that claims users were duped into playing against bots instead of similarly skilled human players." Likewise, VentureBeat recently reported that players are suing AviaGames for "racketeering for disguising bots as humans in skill-based games."

As an organization dedicated to bringing attention to the issue of unfair game play, we launched a webpage earlier this year where players could submit complaints to their state Attorney General offices if they felt they'd been scammed by a real money mobile game.

In just a few months, we collected over 12,700 complaints from every state in the country — 800 of those complaints came from residents here in Nevada. The stories were devastating. People who were barely making ends described how their money had been stolen by games secretly matching them against bots. This practice, paired with advertising that falsely claims to match players with real people, amounts to fraud — plain and simple.

Lacie Newton
Attempting to make it timely so they will be more likely to accept it
Reply

Lacie Newton
This can be updated to wherever we want to submit first (NY, NJ, etc). Chose Nevada since the audience might be more familiar with gaming and we're already shopping the first op-ed in California
Reply

¶

Even worse, the games we received the most complaints about are some of the most popular on the App Store — ▮▮ Bingo Cash and Solitaire Cash (owned and operated by Papaya Games) and Bingo Clash (owned and operated by AviaGames). ¶

¶

Consumers should protect themselves — and their wallets — by doing their due diligence on the games they play now or plan to play in the future. Visit gaming company websites to get a sense of their commitment to fair play. And be alert when you're playing — if something seems suspicious, sounds too good to be true or customer service is non-existent, it's best to pass that game by. ¶

¶

Thankfully for those who enjoy playing real money games, there are good companies in this space. A recent article in the Daily Mail took companies who use gaming bots to task but also noted some bright spots in the industry, including Big Run Studios and Skillz, the maker of Blackout Bingo and Solitaire Cube, which is credited as a "legitimate company which does not use bots." These are gaming companies that have been operating for years and by all accounts offer games that play by the rules, have a track record of positive reviews online and display their consumer practices transparently and prominently on their websites. ¶

¶

And last, if you believe you've been scammed by a real money mobile game, protect yourself and others by reporting your experience to your state's consumer protection agency. Our website, 4fairplay.org, has an easy form that will send your complaint directly to your state Attorney General's office. Or visit usa.gov/state-attorney-general to find your AGs web page and file a complaint directly through their portal. ¶

¶

The more people who shine a light on this issue and call for lawmakers to investigate, the faster we can restore fairness and protect players from fraudulent and deceptive practices. ¶

¶

- *Josh Levin is the director of 4 Fair Play, an organization dedicated to promoting fair and transparent policies and practices for mobile gaming users across the country.* ¶

¶

¶

¶

# Exhibit 13

**From:** Fair Play for Mobile Games <thanks@4fairplay.org>
**Sent:** Wednesday, November 1, 2023 3:31 PM
**To:** [redacted]
**Subject:** Re: Thank you for speaking up!

[redacted]-- Thank you for sending this email. **What games do you play that you think use bots? And would you be open to telling your story to a member of the press?**

We've been hearing alot of interest from reporters on this issue (This Daily Mail story just came out a few days ago! REVEALED: Game company that promises users real money in prizes is accused of pitting real life players up against BOTS to ensure they never win in 'illegal gambling operation') and everyone asks us if there's a harmed customer that would be willing to talk with them. Let me know if you're open to us sharing your feedback below and/or putting you in touch with a reporter who wants to learn more about this issue.

Let us know and thank you for your help!
Lacie @ 4FairPlay

On Wed, Oct 25, 2023, at 6:10 PM, [redacted] wrote:

> I have wasted so much money. If I am going to vet and I lose that's on me. I know that can happen. But when I'm playing against a computer and I know it isn't fair then that ruins any sort of fun. I know for a fact those games cheat. You will get unbearable hands and finish the game in record breaking times. Untill you deposit money. Then it's one lose after another. And foolish enough I keep going even deposit more money. They are so evil.
>
> On Tue, Oct 24, 2023, 8:18 AM "4 Fair Play" <civicinput@newmode.org> wrote:
>
> Thank you for taking action, [redacted]!
>
> Please help us spread the word by sharing this campaign with people you know:
>
> Post to FacebookShare on TwitterShare by email
>
> —The 4 Fair Play team
>
> Powered by New/Mode
> Launch your own campaign now

# Exhibit 14

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11083744
Filing Number: 2107163466099
Filing Date/Time: 07/16/2021 11:21 AM
Effective Date/Time: 07/16/2021 11:21 AM

## Nonstock Corporation - Annual Report

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Citizens for a Fair Economy | Entity Type: | Nonstock Corporation |
| Entity ID: | 11083744 | Formation Date: | 07/24/2020 |
| Jurisdiction: | Virginia | | |
| Status: | Active | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Entity | RA Qualification: | BUSINESS ENTITY THAT IS AUTHORIZED TO TRANSACT BUSINESS IN VIRGINIA |
| Name: | COGENCY GLOBAL INC. | Registered Office Address: | 250 Browns Hill Ct, Midlothian, VA, 23114 - 9510, USA |
| Locality: | CHESTERFIELD COUNTY | | |

### Principal Office Address

Address: PO BOX 320183, Alexandria, VA, 22320 - 1328, USA

### Principal Information

☐ **No Officers:** If the corporation does not have officers because an organizational meeting has not been held.

☐ **No Directors:** If the corporation does not have directors because (i) initial directors were not named in the articles of incorporation and an organizational meeting of the corporation has not been held or (ii) the board of directors has been eliminated by a written agreement signed by all of the shareholders, or by the adoption of provision in the articles of incorporation or bylaws that was approved by all of the shareholders.

| Title | Director | Name | Address |
|---|---|---|---|
| President | Yes | Lacie Newton | PO BOX 320183, Alexandria, VA, 22320 - 1328, USA |

### Signature Information

Date Signed: 07/16/2021

| Printed Name | Signature | Title |
|---|---|---|
| Lacie Newton | Lacie Newton | President |

# Exhibit 15

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11083744
Filing Number: 200724891612
Filing Date/Time: 07/24/2020 10:08 AM
Effective Date/Time: 07/24/2020 10:08 AM

**CITIZENS FOR A FAIR ECONOMY**
**ARTICLES OF INCORPORATION**

---

THE UNDERSIGNED, who is eighteen (18) years or older, for the purpose of forming a nonstock corporation pursuant to the Virginia Nonstock Corporation Act hereby certifies:

**FIRST:** The name of the Corporation is Citizens for a Fair Economy.

**SECOND:** This Corporation is organized and operated exclusively for social welfare purposes within the meaning of Internal Revenue Code section 501(c)(4). The purpose of the Corporation is to further the common good and general welfare of the citizens of the United States by educating the public on how tax payer dollars are used and the impacts on individual citizens and communities, while encouraging the public to become engaged in creating a fairer economy for all.

No part of the net income of the Corporation shall inure to the benefit of or be distributed to its directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make payments and distributions in furtherance of the purpose and objects set forth in the Second Article.

Notwithstanding any other provision of these Articles, this corporation shall not carry on any activity not permitted to be carried on by an organization exempt from federal income tax under section 501(c)(4) of the Internal Revenue Code of 1986, or corresponding provision of any future United State Internal Revenue law.

**THIRD:** The Corporation shall have no members.

**FOURTH:** The directors of the Corporation shall be elected or appointed as follows:

The Board of Directors shall have the authority to elect members of the Board of Directors, who shall be elected annually to serve one-year terms. If a vacancy shall occur on the Board of Directors, the vacancy may be filled by a majority of the Directors in attendance at a meeting of the Board of Directors called for such purpose.

**FIFTH:** The name of the Corporation's initial registered agent is:

Cogency Global Inc., a foreign stock corporation that is authorized to transact business in Virginia.

**SIXTH:** The Corporation's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent is:

250 Browns Hill Court
Midlothian, VA 23114
(Chesterfield County)

**SEVENTH:** The Corporation may be dissolved at any time by a majority vote of the Board of Directors of the Corporation who are in attendance at a meeting of the Board of Directors called for such purpose. Following such vote, the Board of Directors shall supervise the orderly dissolution of the Corporation, including the distribution of the remaining funds of the Corporation consistent with the purposes stated herein.

Upon the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, distribute the assets of the Corporation to another organization organized and operated exclusively for charitable purposes or for social welfare purposes as described in section 501(c)(4), or dispose of excess funds in accordance with Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any corresponding provision of any future United States Internal Revenue law, and applicable state or federal law.

IN WITNESS WHEREOF, the undersigned has signed these Articles of Incorporation and acknowledged that these Articles of Incorporation are her's and to the best of her knowledge, information and belief, and under penalty of perjury, the matters and facts set forth herein are true in all material respects.

______________________________

Karen Blackistone Oaks
Incorporator

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, JULY 24, 2020

The State Corporation Commission has found the accompanying articles of incorporation submitted on behalf of

Citizens for a Fair Economy

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective July 24, 2020.

The corporation is granted the authority conferred on it by law in accordance with the articles of incorporation, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By Mark C. Christie

Mark C. Christie
Commissioner

# Exhibit 16

# CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("**Agreement**") is entered into by and between Fair Play for Mobile Games, a 501(c)(4) nonprofit and non-stock corporation ("**Organization**") and Square Strategies, LLC ("**Consultant**").

## SECTION 1: SERVICES AND RELATIONSHIP

**1.1.** **Services.** Consultant will perform the following services ("**Services**") for Organization: Consultant's employee ("Josh Levin") will serve as executive director of the Organization. Additionally, Consultant will perform all the duties and obligations as may be provided and determined in the Articles of Incorporation and Bylaws of the Organization, as the same may be amended from time to time by the Board of Directors.

**1.2.** **Legal Compliance.** Consultant represents to Organization that Consultant is knowledgeable of Organization's legal and compliance obligations, and Consultant agrees to comply with applicable laws, rules, and regulations in performing Services. Consultant further agrees to consult with Organization's legal counsel in the event Consultant has questions regarding the application of any federal, state, and/or local laws, rules, or regulations to Services.

**1.3.** **Relationship of the Parties.** Consultant is an independent contractor for Organization, not an employee. Unless stated in this Agreement or explicitly authorized by Organization in the future, Consultant does not have the authority to act for or on behalf of Organization, or to bind Organization to any legally binding agreement, written or oral, or to take any other legal act in the name of Organization without the prior approval of the Board of Directors or its designee.

## SECTION 2: TERM

**2.1.** **Commencement.** The terms of this Agreement will become effective upon its execution by both parties ("**Commencement Date**").

**2.2.** **Termination.** Either party may terminate this Agreement, at any time, by providing 30 days' written notice to the other party, and all accrued compensation and/or properly approved expenses incurred by Consultant up to and through this notice period will be paid and/or reimbursed by Organization. Organization may terminate this Agreement immediately for "**Cause**" (defined below), at any time, by providing written notice to Consultant, and Consultant will only be entitled to accrued compensation and/or properly approved expenses incurred by Consultant as of such notice. "Cause" means:

**2.2.1.** Consultant's material breach of Consultant's obligations under this Agreement, not cured after 10 days' notice issued by Organization;

**2.2.2.** Consultant's gross negligence in the performance of Services or intentional nonperformance of Services; or

**2.2.3.** Consultant's conviction of, pleading guilty or nolo contendere to, or commission of an act involving Consultant's lack of honesty, misappropriation, fraud, or moral turpitude.

## SECTION 3: COMPENSATION AND EXPENSES

3.1. **Compensation.** For the performance of Services in accordance with the terms of this Agreement, Organization agrees to pay Consultant $5,000, per month.

3.2. **Reimbursement of Expenses.** The Organization will reimburse Consultant for the business expenses that are reasonable, necessary, and incurred by the Consultant while performing Services under this Agreement upon presentation of expense statements, receipts and/or vouchers, or such other information and documentation as the Organization may reasonably require. Any expenditure exceeding $500 must be pre-approved in writing by the Organization's Board of Directors or its designee(s) prior to incurring such expense, and the Organization reserves the right to reject any such proposed expenditure.

## SECTION 4: OWNERSHIP AND CONFIDENTIALITY

4.1. **Exclusive Ownership.** The Organization retains and reserves the right of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Consultant's Services. Consultant and Organization agree that the work described in Section 1.1. will be considered a "work for hire" for the purpose of the U.S. copyright law, 17 U.S.C. § 101 *et seq*., and that Consultant hereby irrevocably assigns and transfers to Organization all rights, title, and interest in and to Consultant's work and Services to Organization and agrees to execute all documents reasonably requested by Organization for the purpose of applying for and obtaining any patent and copyright registrations.

4.2. **Confidential Information.** Consultant agrees to use "**Confidential Information**" (defined below) only in the performance of the Services, to hold such information in confidence and trust, and not to engage in any unauthorized use or disclosure of such information during the engagement and for so long thereafter as such information qualifies as Confidential Information; provided, however, that if under applicable law a post-employment time limitation on the foregoing restriction is necessary for enforcement as to Confidential Information that does not qualify as a trade secret, then such restriction will be limited to a period of five years following the termination of the engagement for the information that does not qualify as a trade secret. Trade secret information will remain protected for as long as it qualifies as a trade secret, and nothing in this Agreement shall be construed to reduce or eliminate Organization's rights and remedies related to information that would qualify for trade secret protection absent this Agreement. In this Agreement, "**Confidential Information**" means an item or compilation of information in any format, whether written or oral, whether marked "confidential" or not, as described in paragraph 4.2.1. below, disclosed to or learned by Consultant as a result of Consultant's engagement with Organization:

4.2.1. Confidential Information includes all non-public information of a private, proprietary, or confidential nature that Organization insists remain private or confidential, including, but not limited to, the business affairs of Organization and other information that is not generally available to the public.

4.2.2. Confidential Information does not include any information which Consultant can establish: (i) is or becomes publicly known and made generally available in the public domain through no action or inaction of Consultant; (ii) is already rightfully in the possession of Consultant at the time of disclosure, as shown by Consultant's files and records immediately prior to the time of disclosure; (iii) is obtained by Consultant from a third party without a breach of such third party's obligations of confidentiality; (iv) is independently developed by Consultant without

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

use of or reference to Confidential Information, as shown by documents and other competent evidence in Consultant's possession; (v) is excluded by other provisions of this Agreement; or (vi) is required or legally authorized to be disclosed by law or regulation, provided that Consultant abides by the terms set forth in section 4.3.

**4.3. Disclosures Required by Law or Regulation.** If Consultant is served with a subpoena, court order, or similar legal document requiring the disclosure of Confidential Information, Consultant will provide Organization as much notice as is possible (presumably five business days or more) before disclosure so that Organization may take legally permitted steps to protect the Confidential Information, unless such notice is prohibited by law.

**4.4. Return or Destruction of Confidential Information.** Upon termination of Consultant's engagement with Organization, unless otherwise instructed by Organization in writing (such as through a litigation hold notice), Consultant must destroy all documents and other materials constituting Confidential Information in Consultant's possession upon termination of Consultant's engagement with Organization. If requested by Organization, Consultant will promptly (i) deliver to Organization all documents and other materials comprising Confidential Information in the possession or under its control, together with all copies and summaries thereof; and/or (ii) certify to Organization in writing that all such information and materials have been delivered or destroyed and not retained in accordance with the terms of this Agreement. Upon request, Consultant will provide Organization reasonable means to access and verify that no Confidential Information has been retained by Consultant on personal computers, cell phones, email or cloud storage accounts, or in any other place that is subject to Consultant's ownership or control.

## SECTION 5: INDEMNIFICATION

**5.1. Mutual Indemnification.** Organization and Consultant, each an "**Indemnifying Party,**" agree to indemnify, defend, and hold harmless the other party, including such party's shareholders, officers, directors, members, partners, employees, and other agents (collectively, "**Indemnified Party**") from and against all claims, liabilities, causes of action, damages, judgments, attorneys' fees, court costs, fines and expenses of whatever kind, including reasonable attorneys' fees incurred by Indemnified Party (collectively, "**Losses**") which arise out of or are related to: (i) breach or non-fulfillment of any provision of this Agreement by Indemnifying Party; (ii) Indemnifying Party's failure to perform job functions or duties as required, or result from conduct while engaging in any activity outside the scope of this Agreement; (iii) any negligent or more culpable act or omission of Indemnifying Party, including any reckless or willful misconduct, in connection with the performance of its obligations under this Agreement; (iv) any bodily injury, death of any person, or damage to real or tangible personal property caused by the negligent or more culpable acts or omissions of Indemnifying Party, including any reckless or willful misconduct; or (v) any failure by Indemnifying Party to comply with any applicable federal, state, or local laws, regulations, or codes in the performance of its obligations under this Agreement.

**5.2. Notice of Third-Party Claims.** Indemnified Party will give notice to Indemnifying Party ("**Claim Notice**") within 10 days after obtaining knowledge of any Losses or discovery of facts on which Indemnified Party intends to base a request for indemnification under Section 5.1. Indemnified Party's failure to provide a Claim Notice to Indemnifying Party under this Section 5.2. does not relieve Indemnifying Party of any liability that Indemnifying Party may have to Indemnified Party, but in no

event will Indemnifying Party be liable for any Losses that result directly from a delay in providing a Claim Notice, which delay prejudices the defense of the related third-party claim. Indemnifying Party's duty to defend applies immediately, regardless of whether Indemnified Party has paid any sums or incurred any detriment arising out of or relating, directly or indirectly, to any third-party claim.

5.3. **Indemnified Party's Control of Defense.** Notwithstanding anything to the contrary in this Section 5, Indemnified Party may select its own legal counsel to represent its interests, and Indemnifying Party will: (i) reimburse Indemnified Party for its costs and attorneys' fees immediately upon request as they are incurred; and (ii) remain responsible to Indemnified Party for any Losses indemnified under Section 5.1.

5.4. **Settlement of Indemnified Claims by Indemnifying Party.** Indemnifying Party will give prompt written notice to Indemnified Party of any proposed settlement of a claim that is indemnifiable under Section 5.1. Indemnifying Party may not, without Indemnified Party's prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is being sought hereunder.

## SECTION 6: MISCELLANEOUS

6.1. **Complete Agreement**. This Agreement represents the complete and entire agreement between Organization and Consultant and completely replaces and supersedes all previous agreements, whether written or oral, pertaining to the subject matter hereof. Notwithstanding the foregoing, any agreement between Organization and Consultant specifically pertaining to confidentiality and nondisclosure is intended to supplement and will not replace, modify, or eliminate this Agreement.

6.2. **No Assignment.** This Agreement will not be assigned by either party without the prior written approval of the other party.

6.3. **Modification and Waiver.** No terms of this Agreement may be amended, waived, or modified without a written agreement that expressly references this Agreement and is signed by both parties. The failure or omission of a party to require the other party's strict compliance with any terms of this Agreement, or to exercise any of its rights or remedies, will not constitute a waiver or relinquishment of any duties or rights under this Agreement, or otherwise affect the interpretation of this Agreement.

6.4. **Notices.** All notices required by this Agreement must be in writing and delivered to the other party by: (i) hand delivery; (ii) certified mail with return receipt; (iii) overnight delivery with delivery confirmation; and/or (iv) e-mail at the following address:

**If to Organization:**
Fair Play for Mobile Games
Attn: Rocky Matthews
Attn: Jenny Kim
1501 Wilson Blvd, Ste1050
Arlington, VA 22209
Rockybmatthews@gmail.com
fairplayformobilegames@gobergroup.com

**If to Consultant:**
Square Strategies, LLC
Attn: Josh Levin
PO Box 47028
Chicago, IL 60647

Josh@square-strategies.com

Notice will be deemed to be given: (i) on the date of actual delivery for hand delivery and overnight delivery; (ii) on the fifth calendar day after the postmark date for certified mail; and (iii) on the date of transmission for e-mail. Notice will not be deemed to be given if an attempted notice is returned to sender as undeliverable.

6.5. **Survival and Remedies.** Sections 4 and 5 of this Agreement will survive the expiration or termination, for any reason, of this Agreement. Consultant agrees not to challenge the enforceability or scope of Sections 4 and/or 5 of this Agreement. The parties recognize and affirm that in the event of a breach or threatened breach of Sections 4 and/or 5 of this Agreement, money damages would be inadequate and Organization would not have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of Sections 4 and/or 5 of this Agreement, Organization may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof without posting a bond or other security.

6.6. **Attorneys' Fees.** In the event either party must bring suit for any reason under this Agreement, the prevailing party will be entitled to recover all costs of such suit, including reasonable attorneys' fees, from the other party.

6.7. **Choice of Law and Venue.** Organization and Consultant agree that the terms of this Agreement will be deemed to be made under, governed by, and construed in accordance with, the laws of Virginia without regard to any conflict of laws rule or principle which might refer the governance or construction of this Agreement to the laws of another jurisdiction. Any action in regard to this Agreement or arising out of its terms and conditions may only be instituted in Arlington County.

6.8. **Dispute Resolution. Any dispute arising out of, or relating to, this Agreement will be finally settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules then in effect to be held in Dallas County, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the amount in controversy exceeds $500,000, arbitration will be conducted under the Procedures for Large, Complex Commercial Disputes.**

6.9. **Severability and Reformation.** If any of the terms or provisions contained in this Agreement are held to be invalid, void, or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions will continue in full force and effect, and the invalid, void, or unenforceable provisions will be deemed severable. Moreover, if any one or more of the provisions contained in this Agreement are held to be excessively broad as to duration, activity, or subject, then it will be reformed by limiting and reducing it to the minimum extent necessary so as to be enforceable to the extent compatible with

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

applicable law.

**6.10. Counterparts and Facsimile.** This Agreement may be executed in counterparts, and all counterparts will be considered as part of one agreement binding on all parties. This Agreement may be executed via electronic means, and the signatures of the parties via electronic means will be deemed to be their original signatures for all purposes.

[REST OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

By signing below, each party acknowledges that it has carefully read and fully understands this Agreement, and it agrees to be bound by the terms of this Agreement.

**Fair Play for Mobile Games**

Dated: 8/18/2023

Signature: DocuSigned by: *Rocky Matthews* 9A0D8D0D43784A2...

Print Name: Rocky Matthews

Title: Board Member

**For Square Strategies:**

Dated: 8/18/2023

Signature: DocuSigned by: *Joshua Levin* 54B5F88A2F084FE...

Print Name: Josh Levin

# Exhibit 17

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

To: Fair Play for Mobile Games Board of Directors

From: Josh Levin

**Re:** **Conflict of Interest**

Date: August 14, 2023

Dear Directors,

As you are aware, Fair Play for Mobile Games (the "Corporation") has a Conflict of Interest policy contained within the Corporation's Bylaws. This provision requires that any director who believes they have an actual or possible conflict of interest with the Corporation disclose the existence and nature of the interest.

The purpose of this letter is to inform you of a potential conflict of interest that exists between myself as a director of the Corporation and Square Strategies, LLC ("Square Strategies"), a company that I have an ownership interest in which is also interested in entering into a consulting agreement with the Corporation.

I am the sole owner of Square Strategies. Square Strategies is uniquely positioned to provide the type of consulting services the Corporation is in search of given my company's experience and subject matter expertise pertaining to the mobile gaming industry.

Given the conflict of interest, I will recuse myself from any discussions or deliberations pertaining to the proposed agreement. If you need additional material facts about this proposed agreement or the conflict of interest, please put such a request in writing, and I will do my best to answer questions promptly.

Very truly yours,

DocuSigned by:
Joshua Levin
54B5F88A2F084FE...
Josh Levin 8/18/2023

# Exhibit 18

Case 1:26-cv-01217-MPW Document 1-8 Filed 04/14/25 Page 60 of 255


# FAIR PLAY FOR MOBILE GAMES
# UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

---

Pursuant to the Virginia Nonprofit Corporation Act, the undersigned, being the duly authorized disinterested directors of the Board of Directors (the "Board") of Fair Play for Mobile Games, a Virginia non-stock corporation (the "Corporation"), hereby consent to the adoption of the following resolutions by unanimous written consent in lieu of a meeting of the Board.

## **Resolution 1**

WHEREAS, the Corporation wishes to enter into an agreement with a consultant to oversee the operations of the Corporation under the director of the Board (the "Consulting Services");

WHEREAS, the Board wishes to enter into an agreement Square Strategies, LLC ("Square Strategies") to provide the Consulting Services to the Corporation and believes that such a decision is in the best interest of the Corporation given Square Strategies experience and subject matter expertise in the mobile gaming industry;

WHEREAS, Director Levin is the sole owner of Square Strategies;

WHEREAS, pursuant to Article VII of the Corporation's Bylaws, the Board is prohibited from entering into an agreement with an Interested Person unless the appropriate procedures for addressing the conflict of interest are taken;

WHEREAS, in examining the material facts, the Board determines that a conflict of interest does exist;

WHEREAS, after conducting due diligence, the Board has determined that a more advantageous agreement that would not give rise to a conflict of interest is not reasonably attainable; and

WHEREAS, the Board believes that entering into a consulting agreement with Square Strategies is in the best interest of the Corporation.

BE IT RESOLVED, that Director Levin has disclosed the existence and nature of the conflict of interest and that the Board acknowledges that Director Levin is considered an Interested Person for purposes of the proposed Square Strategies agreement.

DocuSign Envelope ID: 437E8EB2-DD3B-4DE7-B764-29DA52EF4DB4

FURTHER RESOLVED, that Director Levin has recused himself from the deliberation and voting on this resolution.

FURTHER RESOLVED, that the Board has conducted due diligence and made the determination that a more advantageous agreement with an entity not giving rise to a conflict of interest is not reasonably attainable.

FURTHER RESOLVED, the majority of disinterested Directors approves the agreement with Square Strategies for the purposes of providing Consulting Services, attached hereto and incorporated by reference herein as if restated in its entirety.

BE IT RESOLVED, that Director Matthews is authorized and directed to take any and all actions to enter into the consulting agreement with Square Strategies and to effectuate the purpose of this resolution.

IN WITNESS WHEREOF, the undersigned have executed this Consent:

DocuSigned by:
Rocky Matthews
9A0D8D0D43784A2...

Rocky Matthews

8/18/2023

Date

# Exhibit 19

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2730
Terms: Net 10
Invoice date: 08/17/2023
Due date: 08/27/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | | **Professional Services** | Two months retainer | $10,000.00 |
| 2. | 08/11/2023 | **Billable Expenses** | New/Mode contact tools | $3,784.00 |
| 3. | 08/09/2023 | **Billable Expenses** | Domain registration | $29.34 |

| | |
|---|---|
| **Total** | **$13,813.34** |
| Payment | -$13,813.34 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2731
Terms: Net 10
Invoice date: 09/07/2023
Due date: 09/17/2023

| # | Date | Product or service | Description | Amount |
| --- | --- | --- | --- | --- |
| 1. | 09/06/2023 | **Billable Expenses** | Fastmail email service | $50.00 |
| 2. | 08/25/2023 | **Billable Expenses** | Hotjar analytics tools | $39.00 |
| 3. | 08/19/2023 | **Billable Expenses** | WP Engine hosting service | $261.60 |
| 4. | 09/06/2023 | **Billable Expenses** | WP Engine hosting service | $406.16 |
| 5. | 08/30/2023 | **Billable Expenses** | Google ads | $10.00 |
| 6. | 08/30/2023 | **Billable Expenses** | Google ads | $200.00 |
| 7. | 08/30/2023 | **Billable Expenses** | Google ads | $350.00 |
| 8. | 09/01/2023 | **Billable Expenses** | Google ads | $439.81 |
| 9. | 09/01/2023 | **Billable Expenses** | Google ads | $500.00 |
| 10. | 09/02/2023 | **Billable Expenses** | Google ads | $500.00 |
| 11. | 09/03/2023 | **Billable Expenses** | Google ads | $500.00 |
| 12. | 09/04/2023 | **Billable Expenses** | Google ads | $500.00 |
| 13. | 09/05/2023 | **Billable Expenses** | Google ads | $500.00 |

| | | | | |
|---|---|---|---|---|
| 14. | 09/06/2023 | **Billable Expenses** | Google ads | $500.00 |

| | |
|---|---|
| **Total** | **$4,756.57** |
| Payment | -$4,756.57 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2732
Terms: Due on receipt
Invoice date: 09/14/2023
Due date: 09/14/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/13/2023 | **Billable Expenses** | Google ads, Sept 7-13 | $3,500.00 |

| | |
|---|---|
| **Total** | **$3,500.00** |
| Payment | -$3,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK | PayPal | venmo

### Note to customer

Please let me know if you'd like receipts for each individual Google charge. They bill in $500 increments, so there are seven documents.

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2733
Terms: Due on receipt
Invoice date: 09/19/2023
Due date: 09/19/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/19/2023 | **Billable Expenses** | Google ads, Sept 14-18 | $8,500.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$8,500.00** |
| Payment | -$8,500.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**

Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2734
Terms: Net 10
Invoice date: 09/21/2023
Due date: 10/01/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/21/2023 | **Billable Expenses** | Google ads, Sept 19-21 | $5,500.00 |
| 2. | 09/21/2023 | **Professional Services** | Processing costs @ 2% | $110.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,610.00** |
| Payment | -$5,610.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2735
Terms: Due on receipt
Invoice date: 09/26/2023
Due date: 09/26/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 09/26/2023 | **Billable Expenses** | Google ads, Sept 21-26 | $10,000.00 |
| 2. | 09/26/2023 | **Professional Services** | Processing costs @ 2% | $200.00 |
| 3. | 09/25/2023 | **Billable Expenses** | Hotjar site analytics | $39.00 |

| | |
|---|---|
| **Total** | **$10,239.00** |
| Payment | -$10,239.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

## Ways to pay

BANK

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2736
Terms: Net 10
Invoice date: 10/03/2023
Due date: 10/13/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/02/2023 | **Billable Expenses** | Google ads thru 10/2 | $3,075.56 |
| 2. | 10/02/2023 | **Professional Services** | Processing at 2% | $61.51 |
| 3. | 09/30/2023 | **Billable Expenses** | Hover - domain name expense | $18.17 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$3,155.24** |
| Payment | -$3,155.24 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2737
Terms: Net 10
Invoice date: 10/09/2023
Due date: 10/19/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/08/2023 | **Billable Expenses** | Google ads, 10/3 to 10/8 | $3,000.00 |
| 2. | 10/08/2023 | **Professional Services** | Processing at 2% | $60.00 |
| 3. | 10/06/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$3,714.00** |
| Payment | -$3,714.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2738
Terms: Net 10
Invoice date: 10/25/2023
Due date: 11/04/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 10/01/2023 | **Professional Services** | October management fee | $5,000.00 |
| 2. | 10/25/2023 | **Billable Expenses** | Google ads 10/9-10/23 | $1,500.00 |
| 3. | 10/25/2023 | **Professional Services** | Processing fee @ 2% | $30.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$6,530.00** |
| Payment | -$6,530.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2739
Terms: Net 10
Invoice date: 11/08/2023
Due date: 11/18/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 11/01/2023 | **Professional Services** | November management fee | $5,000.00 |
| 2. | 11/07/2023 | **Billable Expenses** | WP Engine hosting | $654.00 |
| 3. | 11/01/2023 | **Billable Expenses** | Google ads, Oct 24 to Nov 1st | $213.02 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,867.02** |
| Payment | -$5,867.02 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2740
Terms: Net 10
Invoice date: 12/01/2023
Due date: 12/11/2023

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 12/01/2023 | **Professional Services** | Management fee, December | $5,000.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,000.00** |
| Payment | -$5,000.00 |
| **Balance due** | **$0.00** |

**Paid in Full**

# INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

## Fair Play for Mobile Games (deleted)

**Bill to**
Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**
Invoice no.: 2741
Terms: Net 10
Invoice date: 12/22/2023
Due date: 01/01/2024

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 12/22/2023 | **Professional Services** | Management fee, January | $5,000.00 |
| 2. | 12/07/2023 | **Billable Expenses** | Zoom premium service | $14.81 |
| 3. | 12/07/2023 | **Billable Expenses** | WP Engine web hosting | $654.00 |

## Ways to pay

BANK

| | |
|---|---|
| **Total** | **$5,668.81** |
| Payment | -$5,668.81 |
| **Balance due** | **$0.00** |

**Paid in Full**

Case 26-11217-MFW Doc 123 Filed 09/16/25 Page 623 of 655

## INVOICE

**Square Strategies LLC**
PO Box 47028
Chicago, IL 60647

billing@square-strategies.com
+1 (312) 882-2277

### Fair Play for Mobile Games (deleted)

**Bill to**

Fair Play for Mobile Games
1501 Wilson Boulevard
Suite 1050
Arlington, VA 22209

**Invoice details**

Invoice no.: 2742
Terms: Net 10
Invoice date: 02/28/2024
Due date: 03/09/2024

| # | Date | Product or service | Description | Amount |
|---|---|---|---|---|
| 1. | 02/01/2024 | **Professional Services** | Feb monthly management fee, reduced | $1,000.00 |
| 2. | 03/01/2024 | **Professional Services** | March monthly management fee, reduced | $1,000.00 |
| 3. | 02/06/2024 | **Billable Expenses** | WP Engine hosting | $32.70 |

| | |
|---|---|
| **Total** | **$2,032.70** |
| Payment | -$2,032.70 |
| **Balance due** | **$0.00** |

**Paid in Full**

### Ways to pay

BANK

# Exhibit 20

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11578266
Filing Number: 2403086946851
Filing Date/Time: 03/08/2024 08:48 AM
Effective Date/Time: 03/08/2024 08:48 AM

## Nonstock Corporation - Articles of Dissolution

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Fair Play for Mobile Games | Entity Type: | Nonstock Corporation |
| Entity ID: | 11578266 | Formation Date: | 08/08/2023 |
| Status: | Active | | |

### Jurisdiction of Formation

Jurisdiction (Country): United States

Jurisdiction (State): Virginia

Date of Formation:

### Adoption and Vote

**Date of Adoption**

Date Articles were adopted: 03/01/2024

By the directors.

Statement as to why member action was not required.

Organization has no members

### Signature Information

Date Signed: 03/07/2024

| Printed Name | Signature | Title |
|---|---|---|
| Josh Levin | Josh Levin | Chairman and President |

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, MARCH 8, 2024

The State Corporation Commission has found the articles of dissolution submitted on behalf of

## Fair Play for Mobile Games

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

## CERTIFICATE OF DISSOLUTION

be issued and admitted to record with the articles of dissolution in the Office of the Clerk of the Commission, effective March 8, 2024.

STATE CORPORATION COMMISSION

By [signature]

Jehmal T. Hudson
Commissioner

# Exhibit 21

**From:** Michael Lombardo
**To:** McIntosh, Michael A (WAS); 'Noltie, Lisa'; Krawiec, Margaret E (WAS); 'Adam Hosmer-Henner'; 'Emily M. Dennis'
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C
**Date:** 7/1/2024 11:59:00 AM
**CC:** Lazar Raynal; 'Hostetler, Jennifer'
**BCC:**

**Message:**
Hi Mike:

As you are aware, Nevada R. Civ. P. 45(c)(1) offers protections to the recipients of subpoenas and requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court that issued the subpoena must enforce this duty and may impose an appropriate sanction-which may include lost earnings and reasonable attorney fees-on a party or attorney who fails to comply." Courts across the country interpreting identical language in Federal Rule of Civil Procedure 45 have repeatedly held that requests seeking "all communications and documents" are overbroad and do not comport with Rule 45. *E.g. Gropper v. David Ellis Real Estate, L.P.*, No. 13-CV-2068 (ALC) (JCF), 2014 WL 518234, at *4 (S.D.N.Y. Feb. 10, 2014) (request for "any and all" documents is inherently overbroad); *Rice v. Reliastar Life Ins. Co., Civ. A. No. 11-44-BAJ-CN*, 2011 WL 5513181, at *2 (M.D. La. Nov. 10, 2011) ("a request for 'any and all documents' relating to a particular subject is overbroad and amounts to little more than a fishing expedition"); *Badr v. Liberty Mut. Grp., Inc*., No. 3:06CV1208 (AHN), 2007 WL 2904210, at *3 (D. Conn. Sept. 28, 2007) (finding request for "any and all" documents overly broad); *Franzon v. Massena Mem'l Hosp*., 189 F.R.D. 220, 222 (N.D.N.Y. 1999) (finding request for "any and all documents" overbroad); *Richmond v. UPS Serv. Parts Logistics*, No. IP01-1412-C-H/G, 2002 WL 745588, at *4 (S.D. Ind. Apr. 25, 2002) (finding request for "any and all" employment records overbroad "on its face"). Nevada courts consider federal cases strong persuasive authority when interpreting parallel provisions of the Nevada Rules of Civil Procedure." *Dep't of Tax'n v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 136 Nev. 366, 369, 466 P.3d 1281, 1284 (2020).

With this legal framework in mind, Skillz has offered to provide the information actually sought by Papaya's subpoena: documents sufficient to show (1) Skillz's relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play. Skillz maintains that the invoices it agrees to produce provides this information. And, despite being informed of Skillz's position since June 13, Papaya has not articulated any reason for why Skillz's proposed production is insufficient to determine Skillz's involvement in 4Fairplay.org; Papaya simply repeats its demand for "all documents and communications" without consideration of the overbreadth and burden associated with such requests. Accordingly, Papaya's position does not comport with Nevada R. Civ. P. 45. Again, if Papaya can articulate a specific category of documents beyond the invoices Skillz agreed to produce that Papaya believes is necessary to determine Skillz's involvement in Fair Play for Gaming and/or 4fairplay.org, Skillz will consider Papaya's position. But Skillz does not agree to Papaya's overbroad requests for "[a]ll communications and documents," which Papaya has refused to narrow.

As to your question regarding the First Amendment privilege, Skillz maintains that Papaya's subpoena violates the First Amendment but has already disclosed to Papaya that it provided monetary funds to Fair Play for Mobile Gaming and agreed to produce invoices detailing the same in an effort to resolve

disputes without the need to burden a Nevada court with this dispute. Thus, Skillz is not withholding documents on the basis of First Amendment privilege for purposes of responding to Papaya's subpoena.

Best,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 27, 2024 11:13 AM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Mike,

Papaya's position has been clear from the outset: it is entitled to all documents responsive to the subpoena. Skillz's position appears to have shifted multiple times over the past several weeks. First, it refused to produce any responsive documents. Then, it offered to produce "documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen." And now it has reworked its position once more to offer to produce "invoices . . . sufficient to show: (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play."

The common thread has been Skillz's refusal to produce all documents responsive to the subpoena, as it is required to do under Nevada law. Please provide us with the legal basis for Skillz's position that it need not produce all responsive documents within its possession, custody, or control. Alternatively, if we misunderstand Skillz's position, please confirm that it agrees to produce all documents responsive to the subpoena.

Please also advise whether Skillz continues to withhold responsive documents based on a supposed First Amendment privilege.

If Skillz does not agree to produce all documents responsive to the subpoena, Papaya will file a motion to compel and seek a court order requiring Skillz to fully comply with the subpoena. Please provide your response by 12:00 p.m. EDT on Monday, July 1. If you do not respond by that time, we will presume that Skillz refuses to produce responsive documents and that it cannot offer a justification for that refusal, and we will proceed accordingly.

Thanks,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Wednesday, June 26, 2024 5:47 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike,

I am a bit perplexed about what you are seeking to move to compel. Your purported need for a subpoena to Skillz is to identify what role Skillz had with Fair Play for Mobile Games and 4fairplay.org. The information Skillz is agreeing to produce provides exactly that. Specifically, the invoices Skillz agrees to provide will provide documents sufficient to show: (1) Skillz relationship with the requested individuals and entities; (2) the nature of Skillz's engagements related to 4fairplay.org; and (3) documents sufficient to identify the creator(s), operator(s), or controller(s) of 4fairplay.org or 4 Fair Play.

To the extent Papaya chooses to proceed with frivolous claims against Skillz related to 4fairplay.org, Papaya is free to bring such claims, the parties can engage in discovery, and Skillz will address Papaya's claims in the litigation and reserves all rights regarding same. Papaya's attempt, however, to impose unilateral, burdensome discovery on Skillz through a "John Doe" complaint to obtain documents it does not need to identify Skillz's role in 4fairplay.org is inappropriate.

If Papaya believes there is specific information not within Skillz's proposed production that it believes it needs to determine Skillz's role in Fair Play for Mobile Games and/or 4fairplay.org, please identify what you believe you need and why, and we will consider it because what you are currently planning to move to compel is wholly unclear. We can also finalize the confidentiality agreement so Skillz can make its proposed production, and Papaya can confirm it has what it needs.

Lastly, as you know, I emailed you almost 2 weeks ago informing you we would be willing to make a production. It is unproductive for you to respond weeks after receiving our position with demands to respond to you within 48-hours' notice, especially during a time you know attorneys and clients are often on vacation.

To the extent you want to discuss the subpoena further on a call, I am currently pretty open on Friday other than 12 – 2 pm CT.

Best,

Mike

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Tuesday, June 25, 2024 3:42 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Mike,

Thanks for your email. We note at the outset that producing “documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen” is not sufficient to satisfy Skillz’s obligations under the subpoena. Accordingly, we still intend to file a motion to compel Skillz to fully comply with the subpoena unless Skillz agrees by 5:00 p.m. EDT Thursday to produce all responsive documents.

We are willing to enter into a reasonable and appropriate confidentiality agreement to govern the production of the documents noted in your email.

Finally, we are not aware of the supposed “data directly rebutting the allegations” in Papaya’s underlying complaint to which you refer. We stand by the allegations in Papaya’s complaint, including that 4fairplay.org posted false representations and fabricated data as outlined in the complaint. Those allegations, and the corresponding claims, are amply supported.

Thanks,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 13, 2024 9:16 AM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel: Following up from our meet-and-confer, to resolve the issues raised during our call, Skillz agrees to produce documents sufficient to show that Skillz provided monetary funds to Fair Play for Mobile Games, and the payments Skillz made related to 4fairplay.org to Mr. Shen. Is there a confidentiality agreement in this matter? I can send over these documents today once we reach agreement on the confidential treatment of the financial information in these documents.

I also note that it is my understanding that the entities and/or individuals operating 4fairplay.org already provided you with data directly rebutting the allegations in your Virginia complaint that the content of 4fairplay.org was somehow fabricated. To the extent litigation is pursued against Skillz related to 4fairplay.org, Skillz reserves all rights related to any decision to pursue the frivolous claims included in Papaya's current complaint, which you now know are unsupported.

I am free this afternoon or tomorrow to discuss Skillz's proposed production and the confidential treatment of same.

Thanks,

Mike

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 1:02 PM
**To:** Michael Lombardo <MLombardo@KSLAW.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Thanks, Mike. That time works for us. We'll circulate an invite later this afternoon.

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Michael Lombardo <MLombardo@KSLAW.com>
**Sent:** Thursday, June 6, 2024 12:32 PM
**To:** McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** [Ext] RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Hi Mike – we are unavailable tomorrow for a meet and confer. Does 2:30 pm PT on Monday work for you?

Best,

**Michael Anthony Lombardo (Mike)**
*Senior Associate*

T: +1 312 764 6909 | E: MLombardo@KSLAW.com | Bio | vCard

King & Spalding LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606

kslaw.com

---

**From:** McIntosh, Michael A <Michael.McIntosh@skadden.com>
**Sent:** Thursday, June 6, 2024 11:11 AM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E <Margaret.Krawiec@skadden.com>; 'Adam Hosmer-Henner' <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>
**Cc:** Michael Lombardo <MLombardo@KSLAW.com>; Lazar Raynal <LRaynal@KSLAW.com>; 'Hostetler, Jennifer' <JHostetler@lewisroca.com>
**Subject:** RE: Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Ms. Hostetler, Mr. Raynal, and Mr. Lombardo:

Following up on the below, please let us know your availability to meet and confer tomorrow.

Thank you,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
**T: +1.202.371.7201** | **F: +1.202.661.8201**
**michael.mcintosh@skadden.com**

---

**From:** McIntosh, Michael A (WAS)
**Sent:** Wednesday, June 5, 2024 5:24 PM
**To:** 'Noltie, Lisa' <LNoltie@lewisroca.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Adam Hosmer-Henner <ahosmerhenner@mcdonaldcarano.com>; 'Emily M. Dennis' <edennis@mcdonaldcarano.com>

**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** RE: [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

Counsel:

Please see the attached correspondence on behalf of Papaya. Please let us know your availability to meet and confer tomorrow or Friday.

Thank you,

Mike

**Michael A. McIntosh**
Counsel
**Skadden, Arps, Slate, Meagher & Flom LLP**
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: +1.202.371.7201 | F: +1.202.661.8201
michael.mcintosh@skadden.com

---

**From:** Noltie, Lisa <LNoltie@lewisroca.com>
**Sent:** Thursday, May 30, 2024 5:29 PM
**To:** Diaz, Shirley (WAS) <Shirley.Diaz@skadden.com>; McIntosh, Michael A (WAS) <Michael.McIntosh@skadden.com>; Kelly, Todd D (WAS) <Todd.Kelly@skadden.com>; Krawiec, Margaret E (WAS) <Margaret.Krawiec@skadden.com>; Leland, David B (WAS) <David.Leland@skadden.com>
**Cc:** MLombardo@KSLAW.com; LRaynal@KSLAW.com; Hostetler, Jennifer <JHostetler@lewisroca.com>
**Subject:** [Ext] Papaya Gaming, Ltd. vs. John Doe et al., Case No. A-24-891941-C

For your information and file, please see the attached copy courtesy with regard to the above-referenced matter.

Thank you,

**Lisa Noltie**
Legal Administrative Assistant

LNoltie@lewisroca.com
D. 702.949.8248

LEWIS ROCA

3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
lewisroca.com

LEWIS ROCA ROTHGERBER CHRISTIE LLP

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

=================================================================================

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error.
Click here to view our Privacy Notice.

----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

=================================================================================

----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named

herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

# Exhibit 22

CALENDAR YEAR 2023

REPRESENTED ENTITIES, GOVERNMENTAL AFFAIRS AGENTS AND PERSONS COMMUNICATING WITH THE GENERAL PUBLIC
LISTED BY EXPENDITURES RANKING

| FORM | DATE | FILER | EXPENDITURES RANKING |
|---|---|---|---|
| L-2 | 2/1/2024 | BPS DEVELOPMENT COMPANY LLC | 13,500.00 |
| L-2 | 2/8/2024 | CITY OF TRENTON | 12,947.00 |
| L1-L | 2/12/2024 | ALLIANCE FOR PROFESSIONALISM IN DOG TRAINING | 12,775.79 |
| L1-A | 2/12/2024 | PILLSBURY WINTHROP SHAW PITTMAN LLP- AMENDED | 12,775.79 |
| L-2 | 2/12/2024 | SEPHORA USA INC | 12,630.50 |
| L-2 | 2/12/2024 | ASSOCIATION OF PERIOPERATIVE REGISTERED NURSES | 12,366.00 |
| L1-G | 2/15/2024 | FAIR PLAY FOR MOBILE GAMES | 12,075.77 |
| L-2 | 2/9/2024 | CATHOLIC CHARITIES, DIOCESE OF TRENTON | 12,000.00 |
| L-2 | 2/9/2024 | CORE5 INDUSTRIAL PARTNERS LLC O/B/O CP LAND NORTH URBAN RENEWAL LLC | 12,000.00 |
| L1-A | 2/14/2024 | DAVID MAYER | 12,000.00 |
| L-2 | 2/13/2024 | EARLY CHILDHOOD EDUCATION ADVOCATES (ECEA) | 12,000.00 |
| L-2 | 2/15/2024 | EMD PERFORMANCE MATERIALS | 12,000.00 |
| L-2 | 2/5/2024 | FEDWAY ASSOCIATES INC | 12,000.00 |
| L-2 | 1/23/2024 | NATIONAL ASSOCIATION OF THEATER OWNERS OF NEW JERSEY INC | 12,000.00 |
| L-2 | 2/15/2024 | NJ DENTAL HYGIENISTS ASSOCIATION | 12,000.00 |
| L-2 | 1/22/2024 | NJ OCCUPATIONAL THERAPY ASSOCIATION | 12,000.00 |
| L-2 | 2/16/2024 | OCEAN GROVE CAMP MEETING ASSOCIATION- AMENDED | 12,000.00 |
| L-2 | 2/14/2024 | SECURED FINANCE NETWORK | 12,000.00 |
| L-2 | 2/15/2024 | WESTERN UNION | 12,000.00 |
| L-2 | 2/14/2024 | ZOETIS | 12,000.00 |
| L1-A | 1/16/2024 | BREIDINGER & ASSOCIATES LLC | 11,884.43 |
| L-2 | 2/1/2024 | FRIENDS OF HATIKVAH | 11,325.00 |
| L-2 | 2/15/2024 | NW FINANCIAL GROUP LLC- AMENDED | 11,000.00 |
| L1-L | 1/31/2024 | HOUSING & COMMUNITY DEVELOPMENT NETWORK OF NJ | 10,997.11 |
| L-2 | 2/14/2024 | NJ CENTER FOR TEACHING & LEARNING INC (NJCTL) | 10,500.00 |

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Papaya Gaming, Ltd.

**(b)** County of Residence of First Listed Plaintiff: N/A
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Todd Kelly, Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW, Washington, DC 20005
(202) 371-7000

## DEFENDANTS

Fair Play for Mobile Games, Josh Levin, Square Strategies LLC, Lacie Newton, and Assemble the Agency LLC

County of Residence of First Listed Defendant: Arlington
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
N/A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
15 U.S.C. § 1125(a)(1)

Brief description of cause:
False Advertising under Lanham Act; VA Business Conspiracy (Va. Code Ann. § 18.2-499); Common Law Conspiracy; Defamation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** More than $75,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE Denise Cote (S.D.N.Y.) DOCKET NUMBER 1:24-cv-01646-DLC

DATE: Mar 14, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ Todd D. Kelly

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT 25


PAPAYA
WELCOME
BACK
TO PLAY
SCROLL TO PLAY

PAPAYA



WE BELIEVE IN

THE POWER OF PLAY


PAPAYA
JUMP INTO
OUR WORLD
PLAY ON

PAPAYA

SCROLL TO PLAY!

PAPAYA


© 2026 Papaya

# GET IN TOUCH

## WANT TO BECOME AN AFFILIATE?

Partner with Papaya Gaming! Promote our games. Enjoy high rewards and exclusive benefits. Leave your details to join!

## GOT GAMES?

Searching for a place for your games to shine? There's a new, genius platform just for that. Interested? Let's talk!

## OTHER INQUIRIES

Got feedback, suggestions, or something we haven't even thought of? We're all ears!

## PRESS & MEDIA MEMBER?

Partner with us for interviews, media coverage, and press materials.

## NEED HELP?

GAME HELP CENTER

 © 2026 Papaya

## SOLITAIRE CASH

40 Million+ Downloads

A classic we can all master. But with an exciting twist. Take on other players for real money prizes - and win if you've got the skills.

DOWNLOAD ON THE App Store

GET IT ON Google Play

# BINGO CASH

20 Million+ Downloads

Where a true classic and real cash prizes meet. Jump into a world of brain-teasing fun, and leave with your heart filled with nostalgia and pockets filled with rewards.

DOWNLOAD ON THE App Store

## BUBBLE CASH

20 Million+ Downloads

Retro fun meets real rewards. Get popping, compete in tournaments and be the star who picks up the prizes.

DOWNLOAD ON THE
App Store

# EXPERIENCING TECHNICAL DIFFICULTIES?

Help Center

# PAPAYA'S STORY

## HOW PAPAYA LEADS THE COMPETITIVE GAMING SPACE.

PAPAYA began with a belief that mobile play should feel meaningful. Instead of making one-off games, we built a technology platform that turns beloved single-player casual games into multiplayer, skill-based competitions.

In PAPAYA's games, all players receive identical settings, and the platform matches players based on similar skill levels while supporting massive-scale tournaments. That's how a solo habit like solitaire becomes a shared arena, first on your phone, then in live championships, where improvement matters, and results reflect how well you play.

We believe that every match should reflect real skill and real effort. Our games are built to elevate you, not distract you, turning even simple moments of play into opportunities for growth. And above all, we commit to a community where players push each other, support each other, and celebrate the human instinct to compete and improve together.

This is play with purpose. Play for Real.

**EXHIBITS 26 - 71**

**FILED UNDER SEAL**