**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>PAPAYA GAMING LTD., *et al.*,[1]<br><br>Debtors in a foreign proceeding. | Chapter 15<br><br>Case No. 26-11217 (MFW)<br><br>(Jointly Administered) |

**DECLARATION OF YARON ELHAWI IN SUPPORT OF SKILLZ PLATFORM INC.'S OBJECTION TO THE DEBTORS' MOTION FOR CHAPTER 15 RECOGNITION**

I, Yaron Elhawi, make this declaration pursuant to 28 U.S.C. § 1746:

1. I am a Partner with the Israeli law firm Gornitzky & Co. ("**GNY**"), based in Tel Aviv, Israel, and counsel to Skillz Platform, Inc. ("**Skillz**") in the debt arrangement proceeding under chapter 10[2] of the Insolvency and Financial Rehabilitation Law, 5778-2018 (the "**Israeli Insolvency Law**," a certified English translation of certain sections of which is appended as **Exhibit A** hereto), of the Debtors Papaya Gaming Ltd. ("**Papaya Ltd.**") and Papaya Gaming Inc. ("**Papaya US**" and, together with Papaya Ltd., "**Papaya**" or the "**Debtors**"), currently pending in the District Court of Tel Aviv, Israel (the "**Israeli District Court**"), Case No. 87154-07-26 (the "**Israeli Proceeding**").

2. I submit this declaration in support of Skillz's Objection to the Debtors' *Chapter 15 Petition for Recognition of a Foreign Proceeding* [D.I. 1] and *Motion to Allow / Verified Petition*

---

[1] As I understand, the Debtors in the above-captioned litigation (the "**Chapter 15 Cases**"), together with the last four digits of their business number or employee identification number, as applicable, are: Papaya Gaming Ltd. (2095); and Papaya Gaming Inc. (3649). The purported location of the Debtors' headquarters and Foreign Representative's contact address is 35 HaMasger St., Tel Aviv-Yaffo 6721407, Israel.

[2] For purposes of this declaration, I refer to the relevant "part" (*Helek* in Hebrew) of the Israeli Insolvency Law as "Chapter __."

*Under Chapter 15 for Recognition of the Israeli Proceeding as a Foreign Main Proceeding or, Alternatively, a Foreign Nonmain Proceeding* [D.I. 4].

3. I attended Bar Ilan University for my legal education, from which I graduated in 1998 with an LL.B. and an LL.M. I did my internship at GNY in 1998, and since I was admitted to the Israeli Bar in 1999, I have been practicing law at GNY. I have extensive experience representing parties in insolvency proceedings under the current Israeli Insolvency Law, as well as under the legislation that preceded it. This includes proceedings under Chapter 2 and/or Chapter 10 of the Israeli Insolvency Law, including the representation of major Israeli financial institutions in some of the most complex insolvency cases conducted in Israel. I am included on the list of trustees compiled by the Commissioner (as defined herein) pursuant to the Israeli Insolvency Law, and on various occasions, I have been appointed by courts to serve as trustee and/or arrangement administrator and/or receiver for companies undergoing insolvency proceedings.

4. I am experienced with the Israeli Insolvency Law, including the provisions concerning chapter 10 actions, and with the role and powers of an arrangement administrator in such proceedings (the "**Arrangement Administrator**"). In particular, in addition to various representations and nominations as trustee in Chapter 2 actions, I have represented parties in Chapter 10 actions five times, and have served as an Arrangement Administrator twice.

5. In this declaration, I address:

a. (i) The required majority for a creditor class to approve a debt arrangement, which as a practical matter cannot be obtained for Papaya's proposed debt arrangement (the "**Proposed Debt Arrangement**")[3] without Skillz's support given the magnitude of its judgment

[3] The Proposed Debt Arrangement was attached as Exhibit 2 to Papaya's Stay Motion (a certified translation of which is appended as **Exhibit C** hereto).

relative to the debts of Papaya's other creditors; (ii) Papaya's inability, according to the terms of the Israeli Insolvency Law, to enforce its Proposed Debt Arrangement against a dissenting creditor class, where, by its terms, equity holders receive consideration (such as retention of their shares and control over the company), yet creditors from a dissenting class are not assured to receive consideration equal to their full unpaid past debts; and (iii) the general rule that Israeli courts ordinarily grant motions requesting creditors to convene without first discussing or adjudicating objections to such motions; the fact that the Israeli District Court departed from this general rule when it did not grant Papaya's motion to convene a meeting of creditors to vote on the Proposed Debt Arrangement; and the fact that the Israeli District Court did not convene a meeting of creditors as requested by Papaya means, in my opinion, that the Israeli District Court views that Papaya's Proposed Debt Arrangement was unreasonable from the creditors' perspective;

b. The role and powers of an Arrangement Administrator in Chapter 10 actions, which are relatively limited compared to those of a trustee under Chapter 2, such that an Arrangement Administrator does not operate the company's business, cannot act on its behalf, and cannot investigate claims on behalf of the company's estate; and

c. The history and current procedural posture of the Israeli Proceeding, in which a temporary stay was granted until October 11, 2026, and in which Papaya to date has not proposed a reformulated debt arrangement nor suggested how it intends to treat Skillz's debt.

6. The statements set forth herein consist of both legal opinions and/or statements of fact. To the extent any statements are legal opinions, I opine on my views as to Israeli law consistent with my experience and knowledge. To the extent any statements concern facts, those statements are based upon my personal knowledge and/or documents or other information supplied to me and/or reviewed by me. All statements contained herein are true and accurate to the best of

my knowledge, information, and belief. Although my native language is Hebrew, I submit this declaration in English for convenience purposes. If called upon to testify, I could and would testify competently to the statements set forth herein, using a Hebrew translator. The headings in this declaration are for organizational convenience only and are not part of my declaration.

## I. THE ISRAELI INSOLVENCY LAW AND CHAPTER 10 ACTIONS

7. Chapter 10 of the Israeli Insolvency Law enables a corporation to seek financial rehabilitation through a debt arrangement, *i.e.*, a restructuring of its debt, while continuing to self-operate its business as a going concern. Under Chapter 10, a company may (but is not required to) seek a temporary stay at the commencement of the action, pursuant to which its past debts should not be repaid; legal proceedings against the company are stayed; and the company is prohibited from disposing of assets other than in the ordinary course of business. *See generally* Isr. Insolv. L. §§ 319G, 319I. Through Chapter 10, a company can seek approval of a debt arrangement by its creditors and the Israeli court, rather than immediately proceeding to a trustee-led insolvency proceeding under Chapter 2 of the Israeli Insolvency Law. That said, there is no provision in the Israeli Insolvency Law prohibiting a company from commencing insolvency proceedings in the United States instead.

8. In a Chapter 10 action, the company may then request that the Israeli court convene meetings of creditors (by class) to vote upon a proposed debt arrangement.[4] *See* Isr. Insolv. L. §§ 321-322. Assuming the company files the proposed debt arrangement in accordance with section 321(a) together with all supporting materials as required by section 321(b), section 322(a) dictates that the Israeli court "***shall*** order that the debt arrangement be brought for the approval of

---

[4] If the company's total assets exceed its debts, and the proposed debt arrangement provides to each creditor consideration equal to its full debt, then the equity holders shall also vote upon the proposed debt arrangement. Isr. Insolv. L. § 322(b).

the creditors", ***unless*** the court finds that "the very submission of the debt arrangement for the approval of the creditors constitutes harm to a proceeding pursuant to this section [Section B]" of Chapter 10 (concerning approval of a debt arrangement). *Id.* § 322(c) (emphases added).

9. As a general rule, Israeli courts typically grant motions requesting to convene creditor meetings without first discussing or adjudicating objections to a motion to convene such meetings, since an approval to convene creditor meetings is considered to be technical in nature. This is also the default rule under the Israeli Insolvency Regulations, pursuant to which the Israeli court will consider objections to the proposed debt arrangement after it is approved by the creditors, unless the court orders otherwise.[5] The circumstances under which an Israeli court would refrain from ordering the convening of creditor meetings are relatively limited, such as where creditors lack a sufficient and reliable factual basis enabling them to take an informed and knowledgeable position on the proposed debt arrangement, or where convening creditor meetings itself would prejudice the process. *See* Isr. Insolv. L. § 322(c).

10. A proposed debt arrangement is approved by a specific creditor class if a majority by number and 75% by dollar amount of creditors in such class vote in favor of the debt arrangement. *See* Israeli Insolv. L. § 324(a) (referring to *id.* § 85). If the required majority is not obtained, section 87 of the Israeli Insolvency Law permits an Israeli court to approve a debt arrangement over the objection of any dissenting creditor class(es); ***provided***, the court is satisfied that the proposed debt arrangement is fair and equitable with respect to each creditor in a dissenting class, and in this framework the court is satisfied that, *inter alia*, the following terms are met: (a) if the proposed debt arrangement is not approved, the company will inevitably be liquidated, and

---

[5] Israeli Insolvency Regulation 159I(d)) (a certified English translation of which is appended as **Exhibit B** hereto).

the consideration offered in a proposed debt arrangement to each creditor in a dissenting creditor class is no less than the consideration each such creditor would receive in the debtor's liquidation, *id.* § 87(1); and (b) the proposed debt arrangement does not provide consideration to the company's equity holders (including without limitation assets to which they have a right by virtue of their equity holdings), ***unless*** the proposed debt arrangement provides the creditors in a dissenting class assurance of consideration equal to the entire amount of their past debts, *id.* § 87(2).

11. The Israeli Insolvency Law, including Chapter 10 thereof, does not contain express provisions prohibiting a debt arrangement that (a) allows equity holders to retain control of their equity and control of the company even while creditors do not receive payment in full of their claims; (b) provides for releases by creditors of claims against the company and/or insiders (and in practice, debt arrangement often include provisions by which creditors waive such claims provided the company fulfills its obligations pursuant to the debt arrangement); or (c) discharges fraud claims in respect of known and fully disclosed fraud.

12. It should be noted that creditors can raise objections concerning the foregoing provisions in a debt arrangement, and the Israeli court may also decline to approve a debt arrangement containing such provisions, even if the debt arrangement was approved by the required majority of creditors. For example, approval of the debt arrangement may be denied on the basis it is unfair, such as where it deviates from the principle of equal treatment of creditors or the absolute priority rule. That said, if a debt arrangement with these provisions is approved by the required majority of creditors and then approved by the Israeli court, all creditors—including any dissenting creditors—would be bound by that debt arrangement. Isr. Insolv. L. § 320.

## II. THE ROLE AND POWERS OF THE ARRANGEMENT ADMINISTRATOR IN CHAPTER 10 ACTIONS

13. Following the grant of a temporary stay under Chapter 10, the Israeli court shall appoint an Arrangement Administrator who shall act on the court's behalf for the purposes described in section 319M(a) of the Israeli Insolvency Law. The Israeli Insolvency Commissioner (the "**Commissioner**") recommends candidates for Arrangement Administrator to the court, although the court may deviate from the Commissioner's recommendations. *See* Isr. Insolv. L. § 326(b) (referring to *id.* § 33).

14. The Arrangement Administrator's role and authorities under Chapter 10 are relatively limited compared to the role and authority of a trustee under Chapter 2. Whereas a Chapter 2 trustee upon appointment assumes all powers vested in the company's organs and officeholders, Isr. Insolv. L. § 43, the Chapter 10 Arrangement Administrator is limited to the specific roles assigned to him or her by law, which include (a) adjudicating creditors' voting rights and their share in the amount to be distributed to creditors, *id.* § 326(a); (b) receiving reports from the company regarding any material change in the company's business or financial condition, *id.* § 319L; (c) attending meetings of the company's board of directors and receiving all information which a director is authorized to receive (unless the Israeli court determines this is unnecessary), *id.* § 319M(b); and (d) reporting to the Israeli court and interested parties if the company acts in a manner unfavorable to the company's best interests or that may harm interested parties in the debt arrangement, *id.* § 319M(c). The Arrangement Administrator is also required to report to the Israeli court if any of the conditions for the grant of a temporary stay cease to exist. *See id.* § 319M(e). In addition, the Israeli Insolvency Law binds the company to provide the Arrangement Administrator with relevant information as specified thereto. See Isr. Insol. L. §§ 319(N)(1)-(5).

15. However, the Arrangement Administrator has no authority to operate the company's business; act on its behalf; take executive decisions with regard to the operating plan; or investigate claims on behalf of the company's estate. Because the role is largely limited to observing and reporting on the company's affairs during the Chapter 10 action, as noted above, the principal means for the Arrangement Administrator to respond to any misconduct or deviations from the operating plan by the company is to report the misconduct or deviations to the Israeli court and/or to file a motion with the Israeli court (such as a motion for instructions for the court to, *e.g.*, instruct the company to take or refrain from certain actions or to lift the stay if the conditions for a temporary stay cease to exist).

## III. HISTORY AND PROCEDURAL POSTURE OF THE ISRAELI PROCEEDING

### A. Papaya Initiated the Israeli Proceeding Before the Skillz Judgment Was Entered and Initiated the Chapter 15 Cases Shortly Thereafter.

16. I understand that in March 2024 Skillz sued Papaya in the United States District Court for the Southern District of New York, alleging that Papaya had engaged in false advertising and deceptive business practices in its use of "bots" against principally U.S. customers. Following two-and-a-half years of litigation, including a jury trial in April 2026, on July 27, 2026, United States District Judge Denise L. Cote published an opinion and order awarding Skillz $719 million in disgorgement, attorneys' fees for 2024 and 2025, and the costs incurred in 2025 in connection with certain of the Papaya witnesses' invocation of the Fifth Amendment privilege against self-incrimination. On July 31, 2026, final judgment was entered against the Debtors for approximately $729 million total that I understand is due and owing to Skillz (the "**Skillz Judgment**").

17. One day before the Skillz Judgment was entered, on July 30, 2026, Papaya filed an *ex parte* motion in the Israeli District Court pursuant to Chapter 10 for a temporary stay of proceedings (the "**Stay Motion**") and a motion to convene a meeting of their creditors (the

"**Creditor Meeting Motion**") to vote on Papaya's Proposed Debt Arrangement. Certified English translations of Papaya's Stay Motion (with exhibits) and Creditor Meeting Motion (without exhibits) are appended as **Exhibits C & D** hereto. On August 1, 2026, the Israeli District Court granted a provisional stay pending any further decision by the court on Papaya's Stay Motion.

18. I understand that three days later, on August 2, 2026, Papaya initiated the Chapter 15 Cases, seeking recognition of the Israeli Proceeding and related provisional relief.

**B. Representations in the Yaniv Declaration and at the August 4 Hearing.**

19. I understand that in support of the relief requested from this Court, Papaya submitted, among other things, the *Declaration of Pinni Yaniv In Support of the (I) Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding As A Foreign Main Proceeding or, Alternatively, A Foreign Nonmain Proceeding, and (II) Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* [D.I. 6] (the "**Yaniv Declaration**"), which I have reviewed. Mr. Yaniv also provided testimony to the Court at the August 4, 2026 hearing in the Chapter 15 Cases, a transcript of which I also have reviewed.

20. Much of the content of the Yaniv Declaration recites provisions of the Israeli Insolvency Law and related procedural matters. But there are several statements therein that warrant clarification. In his Declaration, Mr. Yaniv states: "Generally, the Israeli Insolvency Law requires that all creditors and interest holders be treated the same as similarly situated creditors and interest holders, respectively." [D.I. 6, ¶ 11.] However, the Proposed Debt Arrangement violates this principle by discriminating against creditors like Skillz, as follows:

21. The Proposed Debt Arrangement applies only to "Contingent Creditors"[6]—under which they include Skillz—but not to the majority of Papaya's creditors, classified as "Excluded Creditors."[7]

22. The Proposed Debt Arrangement offers to pay the Excluded Creditors (including their past debts, which amount to tens of millions of dollars) "in the ordinary course of business," *see* Stay Mot. ¶ 58 & App'x 6-7, whereas any repayments ultimately made to Allowed Contingent Creditors (*i.e.*, after exhaustion of all appeals) with enforceable judgments exceeding $5 million—including Skillz—are paid out over the span of six years, until January 2033, through installment deposits by Papaya into an "Arrangement Administrator Deposit."[8]

23. In addition, there is discrimination among Allowed Contingent Creditors. Allowed Contingent Creditors holding final enforceable judgments for less than $5 million receive payment in full from Papaya in the ordinary course of business, *see* Proposed Debt Arrangement ¶ 10(a), unlike other Contingent Creditors (under which they included Skillz) with judgments exceeding $5 million, whose payments are subject to the six year installment deposits, as mentioned above.

---

[6] This is defined as a creditor other than an Excluded Creditor, which as of the date of filing of the Creditor Meeting Motion on July 30, 2026, (i) has pending legal proceedings against Papaya, or any of them, on grounds relating to past practices involving the use of bots and any matter arising therefrom or connected therewith, directly or indirectly; (ii) has grounds to initiate legal proceedings on such grounds; or (iii) in respect of which a foreign judgment was awarded to such creditor against Papaya, or any of them, which is still subject to appeal and has therefore not yet become a monetary judgment enforceable in Israel. *See* Proposed Debt Arrangement at 1–2.

[7] This is defined as each of (i) all suppliers and employees of Papaya; (ii) all players, except with respect to claims relating to past practices involving the use of bots and any matter arising therefrom or connected therewith, directly or indirectly; (iii) tax authorities, the National Insurance Institute, provident funds, and pension funds; and (iv) the Attorney General of the State of New Jersey. *See* Proposed Debt Arrangement at 1.

[8] This is defined as funds deposited into the Arrangement Administrator's account, pursuant to the Proposed Debt Arrangement, as a specific source of funds for repayment of Papaya's obligations to "Allowed Contingent Creditors" and payment of the Arrangement Administrator's fees. *See* Proposed Debt Arrangement at 2. "Allowed Contingent Creditor" is defined as a Contingent Creditor in which favor a monetary judgment enforceable in Israel has been rendered against Papaya. *Id.*

24. To the extent that there are sufficient funds in the Arrangement Administrator Deposit, Allowed Contingent Creditors with final enforceable judgments exceeding $5 million are paid within 30 days, irrespective of any other Contingent Creditors with judgments still pending appeal that might not be paid in whole or in part if the Arrangement Administrator Deposit were depleted by other claims by the time that their judgments would be final and enforceable. *See* Proposed Debt Arrangement ¶ 12(a). This mechanism could therefore incentivize Contingent Creditors to agree to prompt settlements to receive payment of their claims before funds ran out in the Arrangement Administrator Deposit, diminishing the total pool remaining for other Contingent Creditors and resulting in unequal treatment of claims of the same priority.

25. According to the Proposed Debt Arrangement, beyond an initial deposit of $60 million into the Arrangement Administrator Deposit, Papaya is not obliged to make the scheduled deposits as detailed in Exhibit 1 of the Proposed Debt Arrangement (but rather only to deposit certain excess cash, if any, according to a formula subject to Papaya's "available cash balances"). In addition, even if it did make the scheduled deposits, those scheduled deposits have a maximum total of $730 million.[9] *See* Proposed Debt Arrangement ¶¶ 11(a)-(b). These conditions create a situation that, even if Papaya reached its projected profitability, Skillz is not paid in full for its judgment because the $730 million to be deposited in the Arrangement Administrator Deposit—equal to the principal of the Skillz Judgment—(a) has to be shared with other Allowed Contingent Creditors; and (b) does not account for post-judgment interest on the Skillz Judgment starting on July 31, 2026 (which I understand was awarded in the Southern District of New York). In contrast, under Israeli law, a creditor is entitled to interest accruing from

[9] The Proposed Debt Arrangement also provides that the Arrangement Administrator may apply to the court for an order reducing or increasing the amounts of the deposits, taking into account the available cash balance and other relevant information.

the date the judgment was entered (rather than the date any appeals are exhausted) and through the actual payment date, and a past debt to be paid includes such interest. *See* Isr. Insolv. L. § 4.

26. In his declaration, Mr. Yaniv further states, in reference to enforcing a debt arrangement upon dissenting creditors class(es) under the Israeli Insolvency Law, that the Israeli court "may approve a debt arrangement notwithstanding the failure of any class to approve the arrangement by the requisite majority, if the court is satisfied that certain conditions are met, mainly that the arrangement is fair and just with respect to each creditor in such dissenting class." [D.I. 6, ¶ 19 n.5 (citing Isr. Insolv. L. § 87)]. However, Mr. Yaniv's characterization is incomplete in at least one critical respect; namely, the Proposed Debt Arrangement provides that its equity holders retain all of their shares in the company and, immediately upon approval of the Proposed Debt Arrangement, Papaya's equity holders are released from all claims in exchange for no consideration. In other words, its equity holders receive consideration in the manner described in section 87.

27. But the Proposed Debt Arrangement could not be approved over creditor class objections unless it also assured that all creditors in a dissenting class would receive consideration equal to the full amount of their past debts. *See* Isr. Insolv. L. § 87. However, as described above, *supra* ¶ 25, Skillz is not expected to receive the full amount of the Skillz Judgment (including interest as part of its past debt) under the Proposed Debt Arrangement even if Papaya attained its projected profitability. Thus, in light of the requirements under the Israeli Insolvency Law to enforce a debt arrangement upon a dissenting creditor class, Papaya most likely would not be able to enforce the Proposed Debt Arrangement (contrary to what was argued in its reply to Skillz's

objection to the Stay Motion).[10] In fact, the Israeli District Court even noted at the August 25 hearing with regard to the Proposed Debt Arrangement that it would have denied a section 87 motion if Papaya had filed one.[11] And given the amount of Skillz's judgment against the Debtors—approximately $729 million, representing approximately 90% of Papaya's reported debts[12]—it will not be feasible to obtain the required majority for approval of a debt arrangement without Skillz's approval.

28. Lastly, at the August 4, 2026 hearing before this Court, Mr. Yaniv testified that if Papaya US were not permitted to transfer revenues generated in the U.S. to Israel, this would adversely affect Papaya's ability to proceed with the Proposed Debt Arrangement. [D.I. 78-16, at 61:8–23.] Mr. Yaniv's offered rationale was that Papaya's cash balance in Israel at the end of the operating period would be lower than the opening balance, thus resulting in a deficit operating plan, which would not be approved by the Israeli court. [D.I. 78-16, at 57:20–58:5.]

29. I believe that the specific geographic ***location*** of the funds is not relevant to the inquiry of whether Papaya would operate at a deficit during the temporary stay. The Proposed Debt Arrangement purported to apply to both Papaya entities—Papaya did not propose separate operating plans for Papaya Ltd. and Papaya US, nor did it specify in which geographic locations cash would be held. Thus, Papaya presented all cash flow, revenue, and expense forecasts in its

---

[10] Papaya argued that in these circumstances, it is likely that the Israeli court would approve the Proposed Debt Arrangement even without the required majority, in accordance with section 87.

[11] Exhibit E (August 25 Hr'g Tr.) at 19.

[12] The exact total amount of Papaya's debt is not clear from Papaya's pleadings in the Israeli Proceeding since (a) their debts were elaborated as of the end of June 2026, rather than on the date in which Papaya filed their motions with the Israeli District Court; and (b) it is unclear whether Papaya's obligations to players is included in the general creditors debts specified in the Form 1 for Papaya Ltd. and Papaya US (Exhibits 6-7 to the Stay Motion).

proposed operating plan to the Israeli District Court on a consolidated basis, arguing not only that the operating plan does not operate at a deficit, but also is profitable.[13]

30. Following the court's inquiry on this issue, Mr. Yaniv mentioned that the Israeli court might view retaining cash in the U.S. as a change in the ordinary course of business. However, the Israeli Insolvency Law does not include a provision that binds a company under a temporary stay to continue to act in the exact same manner as it did prior to the temporary stay. As an example of the fact that a company is not required to operate in exactly the same manner, section 319K(1) provides that, during the temporary stay, the company's business shall be operated ***solely*** in order to enable its continued existence as a going concern until the debt arrangement is formulated and in accordance with the approved operating plan, i.e. it should not operate in the same manner as before the stay if it could jeopardize its continued existence as a going concern. The reference under Chapter 10 to the company's operations in the ordinary course of business appears in two instances: 1) the prohibition on the corporation, during the stay period, from disposing of assets other than in the ordinary course of business (*See* Isr. Insolv. L. § 319I(a)(3)), and 2) the prohibition on the corporation during the stay from making any transactions other than in the ordinary course of business (*Id.*, § 319K(3)), both without leave of court. In my opinion, keeping U.S.-generated revenues in bank accounts in the U.S. would not be considered as a disposition of assets or a transaction, and thus would not be considered as a violation of the above prohibitions.

31. It should be noted, that the Israeli District Court has not ordered that the Debtors' cash be maintained in the bank accounts of one of the two Debtors specifically, or that the cash be maintained in a specific country as between Israel and the United States. Thus, if Papaya were to

[13] *See* Exhibit D (Creditor Mtg. Mot.) ¶¶ 87-88.

keep U.S.-generated revenues in bank accounts in the U.S. (either by taking such decision themselves or by a court order), it is unlikely that an Israeli court would view this as a deviation from the operating plan or a breach of the stay.

**C. <u>Skillz Objected to the Proposed Debt Arrangement Before the Israeli District Court.</u>**

32. Skillz opposed Papaya's Proposed Debt Arrangement on several grounds, including that (a) apart from the initial deposit of $60 million into the Arrangement Administrator Deposit, the sole source proposed for repayment of creditors' claims is future operating profits over a period of six years (without any external funding, equity contribution, other securities, or even a legal obligation to pay the amounts designated for repayment), irrespective of the inherent risks in relying on such future profits; (b) notwithstanding the foregoing, the equity holders retain all of their shares and, upon approval of the Proposed Debt Arrangement, also obtain an immediate release of all claims in exchange for no consideration; (c) the allocation mechanism among the Contingent Creditors could prejudice Skillz; and (d) the amounts included therein would be insufficient to repay even the principal amount owed to all Contingent Creditors, let alone any interest.

33. In its reply to Skillz's objection to the Stay Motion, Papaya argued that Skillz's vote at the creditor meeting is expected to be disqualified because Skillz does not truly seek recovery of its debt, but rather to collapse a competitor's—Papaya's—operations. However, the general rule is that Israeli courts will honor a creditor's vote except in extraordinary circumstances, such as where a creditor votes in bad faith or on the basis of irrelevant considerations "extraneous to the proceedings." In my opinion, Skillz's objection to the Proposed Debt Arrangement is based on legitimate economic foundations, as the Israeli District Court confirmed at the August 25, 2026

hearing on Papaya's motions[14] and in its August 26, 2026 decision.[15] The Israeli District Court Did Not Grant Papaya's Motion To Convene A Meeting Of Creditors To Vote On The Proposed Debt Arrangement.

34. On August 25, 2026, the Israeli District Court held a hearing on Papaya's Stay Motion and Creditor Meeting Motion. A certified English translation of the transcript for the August 25, 2026 hearing is appended as **Exhibit E** hereto.

35. On August 26, 2026, the Israeli District Court issued a decision (the "**August 26 Decision**," a certified English translation of which appended as **Exhibit F** hereto) that (a) did not grant Papaya's motion to convene creditor meetings to vote on the Proposed Debt Arrangement and noted that Papaya should improve its proposal by incorporating additional resources other than operating revenues, *see* Aug. 26 Dec. ¶¶ 5-7; (b) ordered a 45-day temporary stay of proceedings, Aug. 26 Dec. ¶ 9;[16] (c) appointed Adv. Gil Oren of Yigal Arnon & Co.—who had not been proposed as a candidate by the Commissioner—as the Arrangement Administrator, *id.* ¶ 12; and (d) directed the Arrangement Administrator to formulate the debt arrangement and file an appropriate motion to convene creditor meetings within a period that would permit foreign creditors to consider their position, *id.* ¶ 14.

36. In my opinion, the Israeli District Court's decision not to convene the creditors meetings reflects its views that the Proposed Debt Arrangement is unreasonable from the creditors' perspective and should be improved.

---

14 The court noted that the Proposed Debt Arrangement does not take into account Skillz's justified concerns, which needs to be addressed (Exhibit E (August 25 Hr'g Tr.) at 13); and that Skillz's objection is justified (*Id.* at 19).

15 Exhibit F (August 26 Order) ¶ 8, in which the court noted that "Skillz's objection to the Proposed Debt Arrangement was accepted."

16 In a subsequent ruling, the Israeli District Court ruled that the initial 45-day stay runs from August 26, 2026.

37. The temporary stay pursuant to the Israeli Proceeding is currently in effect through October 11, 2026. To date, Papaya has not yet presented an alternative debt arrangement, offered any additional shareholders investment or a plan to sell its assets, nor disclosed how it would propose treating Skillz's debt.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 16, 2026
Tel Aviv, Israel

*/s/ Yaron Elwahi*
Yaron Elhawi, Esq.