# EXHIBIT C

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/08/27**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Hebrew

To:

- English (USA)

The documents are designated as:

- convening meetings and approving a creditors' arrangement (In Hebrew) - Copy.pdf

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Samuel Wu

Signature of **Samuel Wu**, Managing Director



299 South Main Street, Suite 1300
Salt Lake City, UT 84111

Date of filing the document: 30.7.2026

**At the District Court**
**in Tel Aviv Yafo**

**Insolvency Case 87154-07-26**

| | |
|---|---|
| **On the matter of:** | **The Insolvency and Economic Rehabilitation Law 5778-2018**<br>The **"Law";** |
| **and on the matter of:** | **The Insolvency and Economic Rehabilitation Regulations 5779-2019**<br>The **"Regulations";** |
| **and on the matter of:** | **1. Papaya Gaming Ltd., Private Company 515422095**<br>of 35 Hamasger Street, Tel Aviv Yafo 6721407<br><br>**2. Papaya Gaming Inc.**<br>A company incorporated in the state of Delaware, the United States.<br><br>Represented by counsel Adv. Pinni Yaniv (LN 15378) and/or Liron Sapphire (LN 66525) and/or Yarden Tal-Dahan (LN 90826) and/or Yarin Nahaisi (LN 102568) and/or others of the Meitar Law Office<br>of 16 Abba Hillel Silver Road, Ramat Gan 5250608<br>Tel.: 03-6103100; Fax: 03-6103111; email: yardent@meitar.com<br>The "**Petitioner**"; |
| **and on the matter of:** | **The Insolvency and Economic Rehabilitation Commissioner - Tel Aviv Yafo District**<br>of 2 Hashlosha Street, Tel Aviv Yafo<br>Tel.: 073-3923222; Fax: 02-64674556<br>The "**Commissioner**"; |

## Urgent Motion (Ex Parte) for Issuing a Temporary Staying of Proceedings Order for Convening Meetings and Confirmation of a Creditors' Arrangement

## According to Part J of the Insolvency Law

The Honorable Court is hereby requested by the Petitioners, Papaya Gaming Ltd. (hereinafter: "**Papaya Israel**") and Papaya Gaming Inc. ("**Papaya USA**") (jointly: the "**Petitioners**") to exercise its power under Section 319G of the Insolvency and Economic Rehabilitation Law, 5778-2018 (the "**Law**") by ordering the awarding of the following forms of relief:

A) **Issuing, on an ex parte basis, an interim staying of proceedings order until the time of hearing the motion, and thereafter a temporary staying of proceedings order against the Petitioners for 45 days (hereinafter: the "Staying of Proceedings Period") for convening creditor meetings and confirming the debt arrangement thereby.**

B) **Issuing, on an ex parte basis, a gag order in relation to the act of opening the proceeding in question, its details and content, including in relation to all of the motions, documents, hearings and decisions that will be given within it, which will remain in effect until three business days from the time of the handing of the decision of the Honorable Court down to counsel of the Petitioners, and ordering of staying of serving the motion and any other document within the proceeding in the title to any third party during the gag order period;**

C) **Prohibiting during the staying of proceedings period the creditors of the Petitioners from realizing the assets of the Petitioners and/or performing actions constituting taking the law into their own**

**hands in relation to the assets of the Petitioners, including but not limited to enforcement of charges, offsetting, seizing of assets, assignment of a debt and/or right, lien, attachment including self-attachment, invocation of guarantees, and the like[1].**

**D) Ordering that during the staying of proceedings period, it will not be possible to continue or open in any proceeding against the proceedings and/or their assets, including motions for certification of class actions, individual legal proceedings and/or any other proceeding including collection, seizure, attachment and other such proceedings.**

**E) Ordering that during the staying of proceedings period, attachments and/or restrictions and/or impediments and/or charge enforcement proceedings and/or execution proceedings be canceled, to the extent instigated through to this time against the Petitioners.**

**F) For the removal of doubt and without derogating from the relief being requested above, ordering that the staying of proceedings order cannot prejudice the right of players to use their credit balances, if any, during the ordinary course of business.**

**G) Ordering that after the expiration of the gag order being requested as set forth above, the act of filing the motion be announced in the press in Israel and in the United States as set forth in the body of the motion and on the Commissioner's website.**

**H) Ordering that after the expiration of the gag order being requested as set forth above, that the motion be served only to the known conditional creditors, as defined in the debt arrangement, and to the secured credit, and that the Petitioners be exempt from personal delivery of the motion to the excluded creditors, even if they are major creditors, inasmuch as they are not affected by the debt arrangement.**

**I) Scheduling a hearing with the parties present and appointing an arrangement manager.**

**This motion is being filed at the same time as a motion for issuing an order for convening meetings for debt arrangement approval. In the circumstances of the matter, the debt arrangement approval that is being proposed is the best possible (and effectively only) way to repay the debts to the creditors, maintain the business affairs of the Petitioners through the oversight by an officer of maintaining the profits for repaying the debts to the creditors and maximize value for all stakeholders.**

**The forms of relief that are being requested are required for the purpose of prevention of unilateral actions that may result in value destruction until the approval of the debt arraignment for the Petitioners.**

**We are dealing with an urgent <u>ex parte</u> motion for staying of proceedings and for awarding temporary relief that is being requested until a hearing is held in the presence of the parties or until a decision to the contrary is made by the Honorable Court after convening of creditor meetings and a hearing with the major creditors present.**

---

[1] It is clarified that once the arrangement plan takes effect, there is no motion to stay proceedings against the Petitioners, and a mechanism has also been established for payment for claims that will end in an enforceable judgment in Israel.

| [Signature] | [Signature] | [Signature] | [Signature] |
|---|---|---|---|
| Pinni Yaniv, Adv.<br>LN 15378 | Liron Sapphire<br>LN 66525 | Yarden Tal-Dahan, Adv.<br>LN 90826 | Yarin Nahaisi, Adv.<br>LN 102568 |

**Meitar | Law Office**

Counsel for the Petitioners

**The reasons for the motion are as follows:**

## A. Foreword

1. The Petitioners are Papaya Israel, an Israeli private company, and Papaya USA, a fully owned subsidiary of Papaya Israel. These are successful, profitable companies, which operate in the field of skill-based cellular games.

2. Petitioner 1, Papaya Israel, engages in the development, marketing and operation of a technology platform for skill-based cellular games, in which players compete in tournaments for prizes. Papaya Israel is the company in which the activity of the group, the technological development, the business management, most employees and the intellectual property are concentrated.

3. Petitioner 2, Papaya USA, is a fully owned U.S. subsidiary of Papaya Israel, which provides Papaya Israel fronting services (i.e., it is the entity that has signed certain material agreements), and fulfills a technical and operational function for it in the field of clearing of players' payments and processing services. All of the activity of Papaya USA is effectively managed from Israel through the employees of Papaya Israel, and accordingly the managerial, operational and economic center of gravity of the Petitioners is located in Israel.

4. The Petitioners have millions of customers ("**players**"). They are very profitable, stable and have extensive business activity. Their annual incomes are in gigantic volumes of approximately half a billion dollars per year(!). The circumstances that led to the filing of this motion are not ordinary circumstances of a corporation that is facing regular cash flow difficulty or operational insolvency, but exceptional, unique circumstances of a one-time event that is endangering the Petitioners' business affairs as set forth below. And it should be stated that the Petitioners are also continuing today to fulfill all of their current obligations towards players, suppliers, service providers and employees in a timely fashion.

5. However, despite the financial strength of the Petitioners, and maybe for that very reason, a business competitor of the Petitioners, Skillz Platform Inc. ("**Skillz**"), has taken legal action against the Petitioners, as it also did against other competitors in this market, in an attempt to apply illicit pressure on them and oust them from the market.

6. The lawsuit by Skillz against the Petitioners was adjudicated in New York before a jury, and on 23.4.2026 the jurors ruled that the Petitioners would have to pay the plaintiff pecuniary compensation. On 27.7.2026, a decision was made by the court in that case requiring the Petitioners to pay skill a sum of more than 719 million dollars (the "**Skillz Judgment**" or the "**Judgment**"). For the sake of good order, it should be stated that the proceedings has not reached its formal end and a number of additional actions must be taken by the court in order for the said decision to become an operative judgment. These are expected to be completed in the next few days.

7. It should be stated that the sum of the Skillz Judgment is of particularly unprecedented scale, which significantly exceeds the sums that have been awarded by the courts in the United States under the relevant law (the Lanham Act). In addition, the said amount, which purports to reflect the profits of the Petitioners in the United States in the period relevant to the judgment, does not correspond with the actual profits of the Petitioners, which totaled approximately 106 million dollars.

8. Without derogating from the foregoing, and as set forth at length below, the sum of the Skills Judgment exceeds the Petitioners' current cash balances, and they intend to contest it. The Skillz Judgment is unenforceable in Israel as long as it is not final and binding, inasmuch as it does not meet the

requirements of the Enforcement of Foreign Judgments Law, 5718-1958 (the "**Enforcement of Foreign Judgments Law**"), and despite this there is an immediate risk facing the Petitioners in the form of attempts to take enforcement steps in the United States.

9. In these circumstances, the Petitioners are acting according to their duty to take reasonable actions to reduce the scope of and prevent the insolvency, to which end the Petitioners are applying at their own initiative and in advance, to suggest a debt arrangement according to Part J of the Law – which arrangement ensures full repayment to all creditors and their own continued activity – instead of passively waiting for the debt to form and the risk of collapse.

10. If Skillz is interested in repaying the debt towards it (to the extent that there is such a debt even after the appeal is decreed), i.e., even if the factor that motivates it is not the foreign, illegitimate consideration of ousting a competitor from the market, it and possibly primarily it has a material, significant interest for the Petitioners to continue their business activity, which consistently generates profits, so that they will may be used to repay the debt owed to it.

11. In these circumstances there is room to preserve the potential rights of Skillz to collect its debt, if and to the extent that the Skillz Judgment becomes enforceable in Israel in the future, and to make sure that the Petitioners will be able to continue to operate and generate profits, and that the profits be kept for fulfilling all of the obligations; to this end, the Petitioners' profitable activity should be preserved and the Petitioners and all other stakeholders therein should be protected – employees, suppliers, players and other conditional creditors that are managing claims against the Petitioners – against enforcement, invocation and collection steps that Skills could take, including in relation to assets located outside of Israel, which will result in the collapse of the Petitioners' business affairs.

12. The proposed arrangement balances these interests out appropriately, and ensures 100% repayment to all of the Petitioners' creditors.

13. The proposed arrangement is the only way to achieve the two superordinate goals of the Law, which are stated in Section 1 thereof "**Leading to the extent possible to the economic rehabilitation of the debtor"** and "**maximizing the proportion of the debt that will be repaid to the creditors**". The proposed arrangement ensures repayment of all (100%) of the Petitioners' debts, even if it may take a number of years, under the oversight of the officer, and ensures the economic rehabilitation of the Petitioners in a manner that will allow them to continue their business activity and continue to fulfill all of their obligations towards players, suppliers, service providers and employees. The arrangement also ensures the continued employment of hundreds of employees and the livelihoods of many families, the continued provision of regular service to millions of players of the Petitioners around the world, and continued payment of taxes to the state treasury totaling tens of millions of shekels per year.

14. As will be explained below, Skillz is a business competitor, whose operations to date have already shown that its true interest is not collecting its debt, but in leading to the collapse of the Petitioners' business operations. Thus, Skillz filed an aggressive motion for a temporary injunction in the United States, which was denied by the court there (the "**Failed Enforcement Proceeding**"), a motion to prevent the Petitioners from transferring money to Israel within their regular operations, which transfers were intended inter alia for payments to hundreds of employees of the company and to the tax authorities. Had Skillz succeeded in the Failed Enforcement Proceedings, the meaning would have been an immediate halt of the Petitioners' profitable operations and serious harm to their creditors, hundreds of employees and to third parties, as well as the recoverability of the debt to Skillz itself.

15. In view of the foregoing, **the temporary staying of proceedings order is required for preserving the existing state, preventing the instigation of individual proceedings that could harm the Petitioners or defeat the collective proceeding, and to allow the debt arrangement to be brought forth for approval in a fair, just manner.**

16. The idea underlying the arrangement is simple: whereas the Petitioners are earning very high sums each year, the only way to pay all of the potential debts to all of the creditors is to allow the Petitioners to continue their profitable business operations, while keeping the profits in a special fund, which will be managed by the manager of the arrangement for distribution thereof to the creditors.

17. The guiding principle is continuing of regular payments to all of the commercial creditors, so that these obligations will continue to be paid off during the ordinary course of business of the Petitioners. The Petitioners are fulfilling all of their obligations and are expected to continue to fulfill them and pay them off as planned without difficulty. Given this, the arrangement is based on the suppliers, employees and all regular business creditors continuing to receive their dues through ordinary working relations and an ordinary course of business.

18. At the same time, the Petitioners intend to operate in the United States too to secure recognition of the Israeli proceeding as a "foreign main proceeding". To that end, at the time of filing this motion, a separate motion is being filed on the matter of appointing a foreign representative.

19. The benefit lying in the proposed debt arrangement is clear, inasmuch as it also allows the purposes of the Law to be fulfilled: maintaining the profitable business activity of the Petitioners and maintaining their cash flow, maximizing the repayment of debts to the creditors, keeping hundreds of jobs in Israel, ensuring continued activity for millions of players and tax payments.

20. In addition, the balance of convenience also tends clearly to favor issuing of the order, inasmuch as without issuing the order, the Petitioners and all stakeholders therein may sustain heavy, **immediate and irreversible** damage as a result of taking individual proceedings or enforcement steps that could disrupt their business operations and defeat the advancement of the arrangement in a fair, just manner, such as the attempt by Skillz within the Failed Enforcement Proceeding. Conversely, issuing a temporary staying of proceedings order for a limited time does not cause the creditors damage, but only maintains the existing state for a short time and under supervision that will allow for fair, equal and effective examination of the proposed arrangement.

21. **This settles well with Amendment No. 9 to the Law, which has recently taken effect, and which effectively was passed for situations of this exact type, in which a profitable, active company that is capable of continuing significant activity is asking to protect its activity from extraordinary exposure through staying of proceedings until the approval of a debt arrangement.**

22. The amendment is intended to allow the corresponding companies limited, supervised breathing space for advancing a debt arrangement, without losing control over their financial affairs and without being required to stoop to a full insolvency proceeding with all resulting consequences, including value destruction. At the same time, the said amendment also expresses the need to protect the interests of the creditors and prevent misuse of the staying of proceedings by limiting its time frame. This is exactly the relevant balance in the case of the Petitioners.

23. **In the given circumstances, all of the conditions of Section 319G(A) of the Law for issuing a temporary staging of proceedings order are fulfilled.** <u>There is a reasonable chance of approval of the</u>

debt arrangement, inasmuch as the proposed arrangement is the only alternative that will allow **the creditors to pay off all 100% of their debts**. In addition, the Petitioners have no past debts to employees. Their operation during the interim period is not expected to harm the creditors, but actually to protect their interests through maintaining the activity of the Petitioners, thus allowing them to continue to generate profits, which may be used to pay off their debts. In addition, the Petitioners have full means for financing their regular operations until the arrangement is approved. In these circumstances, if any objection to the debt arrangement is raised, while the other option is expected to result in value destruction and unfavorable repayment, such an objection would not be a result of pertinent, legitimate considerations.

24. At the same time, in the case of the Petitioners none of the qualifications prescribed in Section 319G(B) of the Law apply. There is no concern that the Petitioners are operating with the aim of defrauding their creditors, inasmuch as the motion and the arrangement are intended to ensure judicial oversight of the Petitioners' operations for the benefit of all creditors; there is no concern that the Petitioners are operating to dispose of any of their assets with the intent of concealing assets from their creditors, inasmuch as the arrangement outline is actually based on maintaining available cash balances and depositing them in a supervised fund for the benefit of the conditional creditors. On the contrary, depositing the balances in a designated fund for the conditional creditors, despite these debts being unenforceable in Israel, improves their situation.

25. In addition, the motion was filed in clear good faith. This motion, as well as the motion to convene meetings for approval of a debt arrangement, are based on a full factual foundation and are supported by data, documents, forecasts and a concrete debt arrangement. The said motions are aimed at achieving the purpose for which the statutory arrangement in Part J of the Law was passed, particularly Amendment 9, which is **giving active, profitable companies an opportunity to receive supervised, temporary protection against individual steps in order to exhaust a collective proceeding for creditors that will ensure a favorable result for the creditors.**

26. Therefore, and for the additional reasons set forth below too, the Honorable Court is requested to grant the Motion, first issue a limited-time interim order on an ex parte basis, which will preserve the exiting state until a hearing is held in the presence of the parties, and thereafter issue a temporary staying of proceedings order that will allow the debt arrangement to be advanced.

27. If the interim order is not issued, even a short time until the hearing of the positions of the parties may be sufficient for enforcement actions to be taken or the operations to be disrupted in a manner that could render the entire proceeding unfeasible.

## B. Background on the Petitioners

28. Petitioner 1, Papaya Israel, is a private company that was incorporated in Israel in 2016, and engages in the development and marketing of cellular gams based on its proprietary platform. The platform allows players to compete in multi-participant tournaments of skill and ability based games for prizes.

➢ A copy of the registration extract of the Petitioners at the Registrar of companies is attached marked as **Appendix "1"**.

29. These are classic, popular games (like the examples of solitaire, bingo and babel), which Papaya Israel transforms into tournaments for money prizes, while neutralizing the luck component by creating equal opening conditions and contest conditions for all players, making the dominant element determining the

outcomes of games the player's skills. The assignment of players to tournaments is done by the platform automatically using an algorithm that assigns players to the various tournaments based on their playing level.

30. The unique platform that Papaya Israel has developed constitutes the technological basis for various games. Today it serves approximately a million different players per day and approximately 4 million different players a month, and runs approximately 15 million tournaments per day, at a global activity volume that reflects it success and its status as the leading company in this market segment.

31. Papaya Israel demonstrates impressive business and financial results, including annual revenues of approximately half a billion dollars, positive operating profit and significant net profit, while its forecasts indicate continued profitable, growing operations. Papaya Israel has met and continues to meet today all of its current obligations towards its suppliers, service providers and employees, in full and on time.

32. As part of its global activity, Papaya Israel holds subsidiaries, including fully owning Petitioner 2, Papaya USA, a subsidiary incorporated in Delaware, the United States. Papaya USA provides Papaya Israel fronting services (i.e., it is the entity that has signed certain material agreements), and fulfills a technical and operational function for it in the field of clearing of players' payments and processing services.

33. Papaya USA does not employ any employees at all. There is one person who is serving as a director in Papaya USA. Its physical presence in the United States boils down to a registered mailing address only, without office, and it fulfills a merely technical function in the field of clearing of payments. It has a bank account in Israel, and all of its operations, without exception, are performed, managed and operated by the employees of Papaya Israel.

34. In addition, all of the intellectual property, material activity, incomes and real assets of the group are owned by Papaya Israel, the Israeli company, and are managed by its employees in Israel.

35. Papaya Israel employs in Israel hundreds of employees constituting the backbone of its business and technological operations, including software engineers, technology experts, product people, designers, marketing people and support people. They have developed and are continuing to develop the proprietary platform and the games. The livelihood of hundreds of families in Israel directly depends on the continued existence and regular activity of Papaya Israel.

36. The Honorable Court has the jurisdiction to issue the orders that are being requested in relation to the two motions, pursuant to the provisions of **Section 319(1) of the Law**, inasmuch as the two Petitioners constitute a "corporation". Section 4 of the Law defines a "corporation" as including a "company", and defines a "company" as "a company and a foreign company as defined in the Companies Law, 5759-1999". Papaya USA is a foreign company (a corporation that was incorporated outside of Israel), meaning that it constitutes a "corporation" for the purposes of the Law.

37. Alternatively and additionally, the jurisdiction of the Honorable Court is also well established pursuant to **Section 5(B) of the Law**, insofar as Papaya Israel is a company registered in Israel, whereas Papaya USA conducts business and holds assets (such as bank accounts) in Israel. As set forth above, Papaya USA's business affairs are run from Israel, it has no employees and all of its activities, without exception, are performed by employees of Papaya Israel in Israel. In addition, all of the intellectual property,

material activity, incomes and real assets of the Petitioners are owned by Papaya Israel and are managed by its employees in Israel.

38. Beyond necessity, this Court is also the forum conveniens for hearing this motion in relation to the material connections too. Given the facts described above, the Petitioners' managerial, operational and financial center of gravity lies in Israel. This means that the convenient, effective and appropriate forum for hearing the debt arrangement proceeding and thus the temporary staying of proceedings order is also this Honorable Court.

## C. The urgent need to grant the requested relief

39. The continued operations of the Petitioners is the only factor that can ensure the ability to repay the requested obligations in full, including payment of all of the charge according to the Skillz Judgment, if it withstands the scrutiny of the appeal. This means that a temporary staying of proceedings order is required to allow their profitable business operations to be maintained while ensuring a source for full repayment.

40. The need for the temporary staying of proceedings order is clear and urgent. Given the judgment that was handed down in the United States on the Skillz matter, the Petitioners are unable to repay the full amount of the judgment out of their current balances. **There is genuine concern that in the interim period, until the approval of the debt arrangement, unilateral actions will be taken against the Petitioners or their assets, including in relation to assets lying in the United States, which may disrupt the activity of the Petitioners and defeat the proposed arrangement.**

41. In effect, Skillz has already acted in this vein within the Failed Enforcement Proceeding, and tried to get orders that would prevent the regular transfer of money from the United States to Israel, which would have stifled the Petitioners' operations within a short time. Such an order was requested from the judge hearing the Skillz claim, and on 15.5.2026 the judge denied the motion in that claim.

42. Note that enforcement and collection actions in the United States would result in incapacitation of the Petitioners and blocking of the Petitioners' revenue pipeline. This is given the fact that approximately 85% of the Petitioners' revenues originate from players in the United States. This is the Petitioners' main income source. Such "stifling" would defeat the purpose of the debt arrangement inasmuch as it could result in the Petitioners' continued operations being eliminated (and there is strong concern that this is the effective purpose of the said actions).

43. The regular transfer of money from the United States to Israel is essential for continuing the effective running of the Petitioners. If orders are issued in the United States that will block the money transfer mechanism, the Petitioners will not be able to continue to operate in the orderly manner in which they operate today and fulfill their regular obligations, let alone repay the judgment amount, assuming it will stand after the appeal, to Skillz.

44. This is underlined insofar as the proposed arrangement is based on continuing the Petitioners' profitable activity while having free balances deposited into a special fund in the form of a debt arrangement manager's deposit account, under the supervision of an officer of the court, who is the arrangement manager. To implement this outline, the Petitioners need a period during which the plan will not be defeated by taking of actions to destabilize the foundations on which the entire arrangement relies.

45. The staying of the proceedings is also required to concentrate the hearing under the supervision of the Honorable Court and the debt manager, in a manner that will prevent a collective adverse effect on all of the creditors as a result of individual actions of a specific creditor.

46. The filing of the motion in Israel and the concurrent action to seek recognition of the Israeli proceeding as a “foreign main proceeding” in the United States under Chapter 15, are intended to form a framework that will permit cooperation between the judicial instances and prevent attempts at procedural maneuvers before it is possible to exhaust the proposed debt arrangement proceeding. In these circumstances, any deferral in awarding the temporary relief may undermine the ability to secure the effectiveness of the entire proceeding.

47. **The balance of convenience clearly favors granting of the temporary staying of proceedings order.** If staying of proceedings is not granted, this may result in grave, immediate and irreversible damage to the Petitioners, their employees, suppliers, the players and all creditors, including impairing further business activity that yields hundreds of millions of dollars of revenue per year and employs hundreds of employees in Israel.

48. The transfer of money from the United States to Israel (which will be genuinely endangered in the absence of the requested order) serves inter alia for paying salaries and benefits to employees, drawing of money by players, payments to suppliers, tax charges and hedging actions (foreign currency protection). All of these actions are vital for continuing the running of the Petitioners’ business affairs. These payments are required owing to contractual and statutory duties applying to the Petitioners, according to Israeli law and European law alike. Failure to meet their obligations, whether in general or in the manner of delayed payments, will constitute a breach of contracts and violation of statutes.

Any such breach will lead to severe damage to the relations of the Petitioners with employees, banks, contractors, suppliers and business partners in many countries. In other words, the damage that will be inflicted on the Petitioners will be such damage that cannot be repaired by subsequent pecuniary compensation, and may result in their collapse. For example, if Papaya Israel is unable to pay its employees salaries, this would result in them leaving the company, resulting in loss of the enterprise knowledge that those employees possess. In addition, if the Petitioners will not be able to allow the players to draw their winnings from the games, this would lead to a significant decrease in their revenues.

49. Failure to issue an order may cause irreversible damage to all of the Petitioners. On the other hand, a temporary staying of proceedings order for 45 days will not cause any creditor any genuine damage, inasmuch as it is a temporary, time-limited order, for an interim period until the debt arrangement is approved.

## D. Service and announcement

50. The motion to convene meetings, which is being submitted at the same time as this motion, provides suggestions on the manner of announcement to known and unknown creditors in Israel and the United States.

51. In relation to the announcement and service of this motion, the request **at the first stage** is ex parte issuing of a gag order in relation to the act of opening this proceeding, its details and content, including in relation to all motions, documents, hearings and decisions that will be given within it, which will remain in effect for three workdays from the time of the decision of the Honorable Court being served

to the Petitioners, and ordering that the service and announcement only be made after the gag order expires.

52. The special, urgent reason for this is the need to allow the Petitioners a short, limited and essential time frame to instigate in the United States a proceeding for recognition of the Israeli proceeding as the "foreign main proceeding" pursuant to Chapter 15, and prevent attempts at procedural maneuvers in the short interim period until the filing of the said recognition proceeding. The gag order is being requested for **fulfilling the purpose of Section 319K(9) of the Insolvency Law**. The request is to prevent a state in which suppliers and providers of essential services in the United States will take unilateral steps, particularly **cancellation of vital agreements owing to the filing of this motion**. As known, in Israel, Section 319K(9) of the Law prevents agreement cancellation actions, including in relation to a cancellation that is made shortly before the temporary order is issued, but may be argued that this law has no extraterritorial effect. For receiving similar orders in the United States, a brief period lasting few days is required. Taking into account that this is a short period limited to just three workdays, the motion does not have the potential to cause true damage, impairment or burdening for any of the parties; conversely, granting the requested time is vital for preserving the existing state, preventing the defeating of the proceeding, and ensuring the practical feasibility of the proposed arrangement.

53. The Honorable Court has the power to grant the gag order that is being requested pursuant to Section 68(C) of the Courts Law [Consolidated Version], 5744-1984 (hereinafter: the "**Courts Law**"), which empowers the Court to order an interim proceeding, including a motion for temporary relief, to be conducted in camera, even if one of the causes enumerated in Section 68(B) of the Law does not apply. As a result of holding the hearing in camera, nothing about the hearing may be announced unless the Court gives its permission to do so, as stated in Section 70(A) of the Courts Law. This power applies particularly in the current circumstances in which the requested relief is localized and for a very limited time and is aimed at preventing the defeating of the entire proceeding.

54. **At the second stage**, after the gag order expires, the request is to order the Petitioners to proceed with all of the services and announcements as set forth below.

55. First, it is requested that it be ordered for the Petitioners to publish notices of filing the motion for a temporary staying of proceedings order in two financial newspapers **in Israel**, and also in two nationwide newspapers **in the United States**.

56. Second, shortly after the gag order period ends, the Petitioners will provide the officer with a copy of the temporary staying of proceedings motion, and a notice of its filing for having it published, in order for the officer to publish an announcement of filing of the motion on the Ministry of Justice's website (pursuant to Regulation 29A(A) of the Regulations).

57. Third, pursuant to Section 319E(A) of the Law, such a motion including its appendixes must be served to all of the major creditors. The definition of a major creditor in Section 319A of the Law includes (A) secured creditors; (B) creditors owed by the corporation more than NIS 75,000 or more than the total unsecured debts of the corporation, whichever the lower; and (C) a trustee for a series of certificates undertaking of the corporation (which does not apply to our case). Accordingly, the creditors for which personal delivery is required according to the Law in this case are:

(A) Dozens of suppliers and service providers, to each of which the companies owe at least NIS 75,000;

(B) Parties that are conducting legal proceedings against the companies that are pending in the judicial instances;

(C) The sole secured creditor – Bank Leumi.

58. The sums that are owed to suppliers, employees and players in the ordinary course of business will continue to be paid as usual and on time. Therefore, an exemption from personal service to these creditors is being requested.

59. In relation to suppliers and employees, it is mentioned that these are not past debts in the ordinary sense, but regular obligations at a random sampling time. A breakdown of the sums on Form 1 arises from statutory requirements only and does not prevent an excluded creditor from disputing the amounts stated therein in the ordinary course of business.

60. The exemption being requested arises from a number of key reasons:

(A) The purpose of personal service is being rendered moot: the Petitioners will continue to pay their obligations to these creditors during the ordinary course of business. They will not need to file debt claims and there is no need to convene them for meetings.

(B) Needless burdening: as set forth, the definition of a major creditor includes creditors whose debt amount exceeds NIS 75,000. In relation to the Petitioners, there are hundreds of suppliers. The demand for personal service to each of them would demand a huge investment in resources, which investment is likely to prove unfeasible.

(C) Business considerations: personally serving processes of court to hundreds of suppliers, employees, players and service providers is expected to have an adverse effect, owing to misunderstandings that could result from serving legal documents needlessly.

## E. The circumstances that led to the filing of the motion – the Skillz Platform Inc. v. Papaya Gaming Ltd. et al. claim[2]

61. Notwithstanding the Petitioners' strong economic state, business success and consistent profitability as described above, the Petitioners are now facing financial-legal exposure following the Skillz Judgment.

62. Skillz Platform Inc. is a public company incorporated in the United States and is a business competitor of Papaya Israel. In March 2024, Skillz filed a claim in the United States, in a federal court in New York State, against the Petitioners (above and hereinafter: the "**Skillz Claim**"), as part of an illicit strategy that is intended to contend with Skillz's ongoing business failure and inability to compete against rival companies in normal ways, after it has been unable over the years to improve its product and inferior business model that fundamentally differs from the Petitioners' business model.

63. As part of this strategy, Skillz also filed additional claims against other competing companies in the industry, while exploiting the vast sums that it raised in the capital market years earlier, which were intended to support business growth (rather than legal battles).

[2] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y.)

64. As an example, the Skillz vs. AviaGames claim was filed, in which Skillz made various arguments, including of unfair competition, copyright infringement and using bots, after it alleged that AviaGames had copied its platform[3].

65. As another example, the Skills vs. Voodoo claim was filed, within which Skills asserted misleading advertising and unfair competition, alleging that the defendant had offered fixed the games' outcomes and used bots[4].

66. In the Skillz claim against the Petitioners, Skillz also argued that they had advertised their games in a misleading manner inter alia owing to ostensible use of bots (false advertising). The claim was conducted in a federal court in New York State, the United States. In April 2026, the trial was heard before a jury, and on 23.4.2026, the jury handed down its verdict. On 27.7.2026, the presiding judge published her judgment, stating that the Petitioners were liable to pay more than 719 million dollars.

67. The Petitioners intend to appeal, as of right, the Skillz judgment to the appellate court – the second circuit, and believe that their chances of reversing or at least significantly reducing the judgment are high. The Petitioners and their legal advisors, including a U.S. law office that has a reputation in the appeals field, believe that there is a genuine legal foundation for the appeal to be accepted, resulting in a retrial or relief that will significantly change the outcome.

68. Naturally, the Petitioners are not objecting within this proceeding to the Skillz judgment, and despite this it should be clarified that the Petitioners believe (with all due respect) that the interim decisions that were given throughout the Skillz claim and in the Skillz judgment itself contained major errors of law and fact. As an example, the judgment made the misassumption that using bots was illegitimate in and of itself, whereas this is a common, accepted practice in the gaming industry, instead of examining whether the advertisements of the Petitioners were misleading or not. In addition, the judgment was not required to attend to significant evidence that the Petitioners showed, ruling out any causality between their advertisements and the claimed amount. Also, there was the judgment based on "profits" that the Petitioners ostensibly netted, which led on the one hand to the Petitioners being charged an astronomic sum that is several times greater than their net profit in the period relevant to the Skillz case, and on the other hand to the denial without any factual investigation of a counterclaim that Papaya Israel filed against Skillz, containing identical arguments to those that Skillz made against the Petitioners. Moreover, the counterclaims that Papaya Israel filed against Skillz, in which it was argued that Skillz itself used similar (and even worse) practices than those that it alleged against the Petitioners, were denied without any factual investigation. Moreover, the Court **refused to allow the witnesses of the Petitioners to testify in the trial**, significantly reduced the opinions of the experts for the Petitioners (to the point of rendering them irrelevant and devoid of content), reduced the arguments that the Petitioners were allowed to prevent before the jury during the trial and more. The Petitioners intend to elaborate on these and other matters before the appellate instance in the United States.

---

[3] Blake Brittain, Reuters: Mobile gaming company Skillz wins $43 million patent verdict against AviaGames (Feb. 10, 2024) https://www.reuters.com/legal/litigation/mobile-gaming-company-skillz-wins-43-mln-patent-verdict-against-aviagames-2024-02-09/

[4] Skillz Platform Inc. v. Voodoo SAS, 1:24-cv-04991, (S.D.N.Y.) (2024) https://cases.justia.com/federal/district-courts/new-york/nysdce/1%3A2024cv04991/624144/195/0.pdf

69. Therefore, the debt embodied in the judgment is controversial, and in any case is not enforceable in Israel at this stage, and therefore such a debt must not be allowed to lead to the collapse of a good, profitable Israeli company that sustains hundreds of families in Israel.

70. The judgment amount exceeds Papaya’s current cash balances. While Skillz cannot enforce the judgment in Israel owing to the requirement of the Law of there to be a final and binding judgment (Section 3(2) of the Enforcement of Foreign Judgments Law), it may still attempt to incapacitate the Petitioners and lead to their collapse through collection and enforcement actions in the United States, and as set forth it has already tried to do this within the Failed Enforcement Proceeding. This has resulted in this motion, without derogating of course from the fact that the foreign judgment cannot be enforced in Israel before the appeal is settled.

71. The arrangement being proposed within this proceeding upholds on the one hand the (potential) rights of Skills to recover the payment owed to it, if and when the judgment becomes enforceable in Israel, and it ensures overnight using an officer to ensure that the Petitioners do not divest themselves of their assets during the period until a decree on the appeal (in the unlikely case of the judgment withstanding a review by the appellate instance). On the other hand, it also ensures protection of the Petitioners, and all of the stakeholders (players, employees, creditors and third parties) from attempts by Skillz to damage a source that will allow 100% payment to all creditors: the Petitioners’ revenue flow. There is no dispute that the continued operations of the Petitioners will also serve the financial interests of Skillz itself. This is what makes this motion urgent.

72. The Petitioners are earning extremely high amounts each year, and the proposed arrangement ensures that the Petitioners’ available cash balance will be kept in a special fund under the supervision and management of an “officer of the court” (the arrangement manager) until the conditional creditors have a judgment that is enforceable in Israel.

## F. <u>The proposed debt arrangement and the benefit that will arise from the arrangement (Section 319C(B)(1) of the Law)</u>

73. The terms in this chapter, which deals with a breakdown of the debt arrangement outline, will have the meaning and definitions that were given to them in the debt arrangement.

➢ A copy of the proposed debt arrangement is attached marked as **Appendix “2”**.

74. The idea underlying the arrangement is simple: as the Petitioners are earning very high sums each year, the only way to pay all of the potential debts to all creditors is to allow the Petitioners to continue their profitable business activity, while keeping the profits in a special fund, which will be managed by the arrangement manager for distributing them to the conditional creditors, as defined in the debt arrangement (creditors to which a conditional, potential debt is owed, which are conducting legal proceedings against the Petitioners that are pending in various courts based on causes that are related to or arise from, directly or indirectly, alleged practices of past use of bots, or a creditor that conducted a proceeding based on such a cause and that won a judgment in the United States, subject to an appeal, or creditors that have a cause to conduct such proceedings).

75. The guiding principle is continuing regular payments to all commercial creditors, so that these undertakings will continued to be paid off during the ordinary course of business of the Petitioners. The Petitioners are fulfilling all of their obligations and are expected to continue to do so and pay them as usual without difficulty. Given this, the arrangement is based on suppliers, employees and all current

business creditors continuing to receive their dues in ordinary work relations and in an ordinary course of business.

76. This current activity will yield the profits that will allow, within a few years, for payment of the full debt to the conditional creditors (as defined in the proposed arrangement) to the extent that their debt results in judgments that are enforceable in Israel (both the plaintiffs in the various proceedings and Skillz). The available cash balances each year, except for a fixed sum for regular management purposes, will be directed to a dedicated fund, up to the limits set forth in the debt arrangement (hereinafter: the "**Arrangement Manager Deposit**"). The Arrangement Manager Deposit will be used for repaying various charges, if and do the extent that they become enforceable judgments in Israel in the future, including on the matter of Skillz.

77. According to the proposed debt arrangement, the Petitioners will deposit into the deposit fund annual deposits according to the available cash balance of the Petitioners, up to fixed limits as set forth in the debt arrangement. These are sums of tens of millions of dollars (and usually close to a hundred million dollars) each year that will be directed to the special fund.

78. As set forth, the profits of the companies will be kept in the Arrangement Manager Deposit, until any of the conditional creditors will have a judgment that is enforceable in Israel. The arrangement manager will be allowed to pay out of that deposit only to a party that possesses such a judgment.

79. If at any time the arrangement manager will have more than one enforceable judgment for payment, the arrangement manager will distribute the amount being paid out of the deposit, among the eligible conditional creditors, pro rata, according to the ratio between the amounts of the enforceable monetary judgments that are payable at that time.

80. In greater detail, the arrangement prescribes a mechanism of depositing, each 15th of January during each calendar year, amounts of money according to the available cash balance as it will be as of 3rd January in each calendar year. This is the cash balance as it will be in the bank accounts, less certain amounts,[5] but not more than the annual amounts prescribed for this in the arrangement. These amounts stand at close to 100 million dollars for 2026 (60 million dollars immediately and an additional amount at the end of 2026), and later amounts of many tens of millions of dollars in each of the following years too, as set forth in the arrangement. As the company may have more or less sums than expected available to it, the arrangement also states that the arrangement manager will be able to ask to increase or decrease these annual amounts, according to the true data that will be available to him.

81. In contrast to the common practice in debt arrangements, which usually lead to the termination of the conduct of motions for certification of class actions, here it is proposed that the motion for certification of a class action that was filed against Papaya Israel actually be allowed to continue as planned. This component of the proposed arrangement indicates the Petitioners' financial strength.

82. For the sake of equality in practice, the arrangement does not allow for payment out the Arrangement Manager Deposit to parties that do not have judgments that are enforceable in Israel. However, keeping money for them and ensuring reparability on an "if and when" basis is justifiable.

---

[5] After deducting only the amounts that are pledged to the banks in which the balances are held, to secure a bank guarantee to the lessors of properties and payments for credit cards and for hedging transactions; and less credit balances of players; and less a sum of 30 million U.S. dollars, which will be reserved for regular operational management.

83. The arrangement states that no money is actually to be paid to Skillz until a judgment is given in the appeal, for a number of reasons, which are set forth at length in the motion to convene creditor meetings. To put it very briefly; (A) the judgment is a foreign judgment that is subject to appeal, meaning that it is not final and binding and Skillz cannot enforce it in Israel; (B) as indicated by the financial statements, Skillz is a losing public company that is on the brink of insolvency and is expected to be unable to refund money that will be paid to it. The attached cash flow forecast was made by the Petitioners according to public information contained in Skillz's statements; (C) collection of money back from an entity based overseas is expected to require taking legal action overseas and long, expensive international collection proceedings; (D) Leaving money in the Arrangement Manager Deposit serves a purpose of preserving financial sources that are available for other conditional creditors, known and unknown alike (if owed to them).

➢ A copy of selected pages from Skillz's financial statements is attached marked as **Appendix "3"**.

➢ A copy of Skillz's cash flow forecast is attached marked as **Appendix "4"**.

84. **Claim debt filing mechanism:** the arrangement states that all of the Petitioners' current obligations (except for conditional debts) will be continued to be paid as usual and scheduled, and that the arrangement does not apply to them. Accordingly, only creditors that are defined as "conditional" will be required to file debt claims. The creditors that are defined as "excluded" are not affected by the arrangement, are not required to file debt claims and their meetings will not be convened. The breakdown appearing in Form 1, of debts towards these creditors, in the ordinary course of business, arises from statutory requirements, but they will be able to dispute the amounts stated therein, in the ordinary course of business, and they will not be estopped from doing so.

85. **The purposes of the debt arrangement and the benefit that will result from it**: the proposed arrangement is the only way to achieve the two superordinate goals of the law, which are prescribed in Section 1 thereof: "leading to the extent possible to the economic rehabilitation of the debtor" and "maximizing the proportion of the debt that will be repaid to the creditors".

86. The proposed arrangement achieves these goals and provides the following benefits: (A) it arranges for repayment of all (100%) of the debts of the Petitioners over a number of years; (B) it ensures the economic rehabilitation of the Petitioners in a manner that will allow them to continue their business activity while ensuring that all of the obligations of the Petitioners towards millions of players, suppliers, service providers and hundreds of employees continue to be fulfilled; (C) it ensures the continued employment of hundreds of employees and the livelihood of many families; (D) it allows for regular service to continue to be provided to millions of players of the Petitioners around the world; (E) it ensures continued payment of taxes to the state treasury to a sum of tens of millions of shekels each year.

**G. Operating plan and financing measures during the period of stay of proceedings**

**(Sections 319C(B)(2) and 319C(B)(3) of the law)**

87. In accordance with the requirements of Section 319C(B)(2) of the law, a projected operating plan is presented below, for the Petitioners, for a period of 90 days (August-October 2026). This plan demonstrates the financial strength of the Petitioners and their ability to continue to operate profitably and stably during the period of stay of proceedings and even continue to generate profits, for the purpose of repaying contingent liabilities, as they arise.

➤ A copy of a cash flow forecast for 90 days is attached and marked as **Appendix "5"**.

88. The forecast indicates that the operation is not run at a deficit, but on the contrary, the Petitioners will accumulate significant cash surpluses throughout the forecast period, in a manner that will allow the Petitioners to continue their activities and fulfill their current liabilities in an orderly and timely manner. The Petitioners' continued profitable operations, as reflected in the forecast, is key to the success of the proposed debt arrangement and to safeguarding the interests of all stakeholders, and in accordance with the requirements of Section 319C(B)(3) of the law, the Petitioners' operation will be feasible., not run at a deficit and will not harm the creditors.

**G (1). Expected revenues from the Petitioners' operation and from additional sources**

89. The operating plan is based on the expected revenues from Petitioners' operation. Total cash flow for projected revenues for the months of August-October 2026 totals about USD 116 million (about USD 38 million on average in each of the months of August, September and October).

**G (2). Expected expenses for the Petitioners' operation**

90. Total cash flow for projected operating expenses for the months of August to October 2026 totals about USD 101.8 million. These expenses reflect the current operating costs for the continued operation of the Petitioners and include, among others:

(a) Expenses for UA Direct: Marketing and player recruitment expenses totaling approximately USD 64 million.

(b) Expenses for Payroll: Salary expenses, including social benefits, amounting to approximately USD 15 million.

(c) Expenses for PSP Fees: Clearing fees totaling approximately USD 6 million.

(d) Expenses for Sales Taxes: Expenses for various taxes totaling approximately USD 7.2 million.

(e) In addition to the expected operating expenses, a capital expenditure (Capex) is expected for a total of approximately USD 300 thousand for the months of August to October.

91. As can be seen in the operating plan, in each of the three months from August to October, a positive (and significant) balance is expected for the petitioner's activity:

(a) In August 2026, a positive balance of approximately USD 3.4 million.

(b) In September 2026, a positive balance of approximately USD 6.8 million.

(c) In October 2026, a positive balance of approximately USD 5 million.

**G(3). <u>Business plan and other actions necessary for the Petitioners' operation</u>**

92. No changes to the operational or strategic model are required during the requested stay of proceedings.

**H. <u>Status of the petitioner' assets and liabilities</u>**

93. Below is a detailed summary of the Petitioners' main assets and liabilities. The full details are provided in Form 1, attached as an appendix.

- A copy of Papaya Israel Form 1 is attached and marked as **Appendix "6".**
- A copy of Papaya USA Form 1 is attached and marked as **Appendix "7".**

**H(1). <u>Petitioners' main assets and rights</u>**

94 **The Petitioners' main asset is their activity itself –** An activity that generates a constant positive cash flow.

95 **<u>Papaya Israel assets:</u> (**(A) **Intangible assets:** Papaya Israel is a technology company. The main intellectual property owned by Papaya Israel is: the technological platform, the human capital, the unique algorithms, the settlement and payment systems, brand names, etc. (B) **Cash**: Papaya Israel holds significant cash balances and short-term liquid investments in its bank accounts. At the time of filing this petition, the Petitioners' bank balances totaled approximately USD 151 million.

96. **<u>Papaya USA assets:</u>** Papaya USA has various assets in the USA such as bank accounts, a security deposit for settlement purposes, right to a tax refund from the US tax authorities, and contractual rights. The main Papaya USA's assets are operating contracts that give it the right to receive funds from clearing companies in the US, which it is obligated to transfer to Papaya Israel. It also has assets in Israel, such as a bank account.

**H(2). <u>Petitioners' main debts and liabilities</u>**

(A) **<u>Bank Leumi as a secured creditor:</u>** Deposits held by Papaya Israel are pledged in favor of Bank Leumi Ltd. in the bank, as a guarantee to ensure payment of bank guarantees given to property lessors. The liability to the bank indicated in this context in Form 1 is therefore a contingent liability that will only arise if a lawful demand for forfeiture of the bank guarantee arises. Apart from this contingent liability, Papaya Israel has no debt to Bank Leumi, and its accounts at the bank are in a credit balance.

(B) **<u>Lease agreement:</u>** Papaya Israel has entered into two long-term lease agreements, one until July 2027 and the second until September 2027, for the offices in the "Sky Tower" at 35 HaMasger Street, Tel Aviv-Yafo, from which it operates. In addition, the company entered into a management fee agreement, accompanying the lease agreements and whose period coincides with the rental periods. Total scope of liabilities remaining to be paid under these agreements until the end of the above periods amount to approximately NIS 10.5 million. The debt indicated in this context in Form 1 is a **future debt only**, until the end of the period. Rental payments are paid in advance and the Petitioners do not have any existing debt in respect of these agreements.

(C) **<u>Preferential creditors:</u>** The Petitioners have no preferential creditors.

(D) **<u>General and deferred creditors:</u>** The Petitioners have no "past" debts in the usual sense. Petitioners fulfill and pay regularly and on time all their liabilities to suppliers, employees and service providers. Of course, on each "cutting" day there are current debts, and these debts appear on Form 1 as the Petitioners' "past debts." In general, there are also liabilities to players on the platform. Any player who has a credit balance in the Papaya Israel account may withdraw said funds at any time. As of 06/30/2026, Papaya Israel's liability balance to players is approximately USD 12 million.

97. **<u>Petitioners' list of officeholders (Regulation 13(5) of the Regulations):</u>**

➤ A copy of the Petitioners' list of officeholders and officeholders who terminated their role within the year prior to the date of filing the petition, is attached and marked as **Appendix "8"**.

98. **<u>Copy of financial statements for the last two years (Regulation 13(6) of the Regulations):</u>**

➤ A copy of the financial statements for the last two years, prior to filing the petition is attached and marked as **Appendix "9".**

## I. <u>Conclusion</u>

99. An affidavit verifying the facts stated therein is attached to this petition.

100. Therefore, the Court of Justice is requested to order as requested in the head of this petition.

# Affidavit

I, the undersigned, Oriel Bachar, bearer of ID No. 201410008, after being warned that I must tell the truth and that if I will not do so, I will be subject to the penalties set forth in the law, I hereby declare as follows:

1. I serve as Director and CEO of Papaya Gaming Ltd. (hereinafter referred to as: "**Papaya Israel**")" and as Director of Papaya Gaming Inc. (hereinafter referred to as: "**Papaya USA**"; and together with Papaya Israel: "**the Petitioners**").

2. This affidavit is filed in support of a petition for a temporary stay of proceedings order, for the purpose of convening of meetings and approval of a creditors' arrangement, submitted by the Petitioners (hereinafter referred to as: “**the petition**”).

3. The facts detailed in this, my affidavit, are known to me from personal knowledge or by virtue of my position as CEO of Papaya Israel.

## A. Background about the Petitioners and the need to submit this petition

4. Papaya Israel is a private company incorporated in Israel in 2016 and engages in the development and marketing of mobile games based on its unique platform. The platform allows players to compete in multiplayer, prize-bearing tournaments of skill and ability-based games.

   ➤ A copy of the Registrar of Companies information sheet is attached and marked as **Appendix "1".**

5. These are classic and popular games (such as Solitaire, Bingo and Bubble), which Papaya Israel transforms into tournaments with cash prizes, while neutralizing the element of luck by creating equal opening and competition conditions for all players, so that the dominant component that determines the results of the games is the player's skills. The platform automatically distributes players into tournaments, using an algorithm that assigns players to the various tournaments based on their game level.

6. The unique platform developed by Papaya Israel constitutes the technological basis for various games.

   It currently serves about a million different players per day and about 4 million different players per month, and operates about 15 million tournaments per day, with a global scope of activity that reflects its success as the leading company in this market segment.

7. As part of its global operations, Papaya Israel holds subsidiaries, and among others, its fully owned by Petitioner 2, Papaya USA, a subsidiary incorporated in the State of Delaware, USA. Papaya USA provides fronting services for Papaya Israel (i.e. being the entity that signed certain significant agreements,) and plays a technical and operational role for it in the field of settlement and payment systems for players and their processing services.

8. Papaya USA employs no employees at all. There is one person who serves as Director at Papaya USA. Its physical presence in the US is limited to a registered mailing address only, with no offices, and it plays a purely technical role in the field of settlement of payments. It has a bank account in the State of Israel, and all its activities, without exception, are performed, managed and operated by Papaya Israel employees.

9. In addition, all the intellectual property, the essential activity, the group's actual income and assets are owned by Papaya Israel, an Israeli company, and are managed by its employees in Israel.

10. Papaya Israel employs hundreds of employees in Israel who constitute the backbone of its commercial and technology operations, including software engineers, technology experts, product management team, designers, marketing and support staff. These developed and continue to develop the unique platform and games. The livelihood of hundreds of families in Israel is directly dependent on the continued existence and the proper operation of Papaya Israel.

11. Papaya Israel presents impressive business and financial results, including annual revenues of about half billion dollars, a positive operating profit and a significant net profit, whereas the forecast indicates a continued profitable and growing activity. Papaya Israel met, and still meets today, all its current liabilities towards its suppliers, its service providers and its employees, in full and on time.

12. Despite the Petitioners' financial strength, and perhaps precisely because of that, a business competitor of the Petitioners, Skillz Platform Inc. ("Skillz"), has filed legal proceedings against the Petitioners, as it also filed against other competitors in this market, in an attempt to exert undue pressure on them and exclude them from the market.

13. Skillz claim against the Petitioners was heard before a jury in New York, and on 04/23/2026 the jury found that the Petitioners must pay the plaintiff a monetary compensation. Dated 07/27/2026 a decision was made by the Court there, requiring the Petitioners to pay Skillz a total of over USD 719 million dollars (**Skillz verdict** or "**the verdict**") (for the sake of good order, it should be noted that the proceeding has not yet reached its formal conclusion and it is necessary to take a number of additional actions by the Court, so that the said decision becomes an operative judgment. These are expected to be completed in the coming days).

14. It should be noted that the amount of the Skillz verdict is a particularly unprecedented amount, which significantly exceeds the amounts awarded by US courts under the relevant law (Lanham Act). In addition, the aforementioned amount, which purports to reflect the Petitioners' profits in the US, during the period relevant to the verdict, is not in line with the Petitioners' actual profits, which amounted to approximately USD 106 million.

15. Without detracting from the above and as I will explain in detail below, the amount of the Skillz verdict exceeds the Petitioners' current cash balances, and we intend to appeal it. According to the legal advice I have received, the Skillz verdict is not enforceable in Israel until it is final, but notwithstanding this, the Petitioners face an immediate risk of potential enforcement actions in the United States.

16. Under these circumstances, the Petitioners are acting in accordance with the legal advice they have been given and in accordance with their duty to take reasonable steps to reduce the scope of insolvency and prevent it, and therefore the Petitioners turn, proactively and in advance, to offer a debt arrangement that guarantees full repayment to all creditors and the continuation of their operations, instead of passively waiting for the debt to crystallize and facing the risk of collapse.

17. I will clarify that the Petitioners' continued activity is the only factor that can ensure the capacity for full repayment of the Petitioners' liabilities, including payment of the full amount due according to the Skillz verdict if they hold up on appeal. A temporary stay of proceedings order is required to allow the preservation of profitable business operations, while ensuring the source for full repayment.

18. The need for the requested temporary stay of proceedings order is clear and urgent. The Petitioners are unable to repay the full amount of Skillz verdict from their current balances. **There is a real concern that in the interim period, and until the debt arrangement is**

**approved, unilateral actions will be taken against the Petitioners or their assets, also in relation to the assets located in the US, that may disrupt the Petitioners operations and thwart the proposed arrangement.**

19. Actually, Skillz has already worked this way, and it has already shown that its real concern is not in collecting a debt, but in the collapse of the Petitioners' businesses. Therefore, Skillz has filed an aggressive claim for a temporary restraining order in the United States, which was rejected by the Court there ("failed enforcement proceeding"), in a request to prevent the Petitioners from transferring funds to Israel as part of their ongoing activities. These are transfers that are intended, inter alia, for payments to hundreds of company employees and to tax authorities. Had Skillz succeeded in the failed enforcement proceeding, this would have meant an immediate halt to the Petitioners' profitable operations and a substantial harm to their creditors, to hundreds of employees and third parties, as well as to the ability to repay the debt to Skillz itself. The said order was requested from the judge hearing the Skillz claim and, dated 05/15/2026, the judge there dismissed the request.

20. Please note: Enforcement and collection actions in the US will cause the Petitioners' operations to be paralyzed and the revenue pipeline to be blocked. In view of the fact that 85% of the Petitioners' revenue comes from the players in the United States, this constitutes the Petitioners' main source of income. This "strangulation" will thwart the purpose of the debt arrangement, as it may eliminate the Petitioner' continued activity (and there is a serious concern that this is, in fact, what such actions are intended to do).

21. Regular money transfers from the United States to the State of Israel are necessary for the Petitioners' continued proper management. If orders are issued in the USA that will block the mechanism for transferring funds, the Petitioners will not be able to continue operating, in an orderly manner, as they operate today, and will not be able to meet their current obligations, not to mention repaying the verdict amount, as long as they hold up on appeal in favor of Skillz.

22. This is especially true where the proposed arrangement is based on the Petitioners' continued profitable operations, by depositing the available balances into a special fund in the form of a deposit for the debt arrangement manager, under the supervision of a Court officer. In order to implement this outline, the Petitioners require a period in which the plan will not be thwarted by taking proceedings that would undermine the stability on which the entire arrangement rests.

23. The stay of proceedings is also required to concentrate the hearing under the supervision of the Honorable Court and the arrangement manager, and in a manner that will prevent collective harm to all creditors, as a result of individual actions of a specific creditor.

24. Alongside filing the petition in Israel, the Petitioners intend to simultaneously apply for recognition of the Israeli proceeding as "the main foreign procedure" in the United States, in accordance with Chapter 15, in order to create an environment that will enable collaboration between the courts that will prevent preemptive maneuvers before the proposed debt arrangement proceeding can be fully exhausted. Under these circumstances, any delay in granting the interim relief, may thwart the possibility of ensuring the effectiveness of the entire proceeding.

25. If no stay of proceedings is granted, a severe, immediate and irreversible damage may occur for the Petitioners, for their employees, for their suppliers, for the players and all creditors, including harm to the continuation of business activity that generates revenue of hundreds of millions of dollars a year and employs hundreds of employees in Israel.

26. Transferring funds from the United States to Israel (which would be put at real risk without the requested order being granted) serves, among other things, for the purpose of paying salaries and benefits to employees, withdrawal of funds by players, payments to suppliers, tax charges, and hedging operations (foreign currency protection). All these actions, are essential for the continued management of the Petitioners' business. These payments are required by virtue of contractual obligations and the law applicable to the Petitioners, both according to Israeli law and according to European law. Failure to meet their liabilities whether in general, whether in the form of late payments, would constitute a violation of both contracts and the law.

27. Any such violation will lead to serious damage to the Petitioners' relationship with employees, banks, contractors, suppliers and business partners in many countries. In other words, the damage that will be caused to the Petitioners will be a damage that cannot be repaired through retrospective financial compensation, and this could lead to their collapse. For example, if Papaya Israel will not be able to pay its employees' salaries on time, that will lead to them leaving the company, and as a result of this, a loss of organizational knowledge held by those employees. Likewise, if the Petitioners cannot allow the players withdraw their winnings from games, this will lead to a significant decrease in their income.

28. Failure to grant an order may cause irreversible damage to all creditors. On the other hand, a temporary stay of proceedings order for 45 days will not cause any creditor any real harm, since it would be a temporary and time-limited order, for an interim period until approval of the debt settlement.

29. It is also clear that there is no concern that the Petitioners are acting with the aim of defrauding their creditors, because after all, the petition and the arrangement are intended to ensure judicial oversight of the petitioner's actions for the benefit of all creditors; there is no concern that the Petitioners are working to strip an asset from their assets in order to evade their creditors, because the outline of the arrangement is based precisely on preserving the available cash balances and depositing them in a supervised fund for the benefit of the conditional creditors. On the contrary: according to the legal advice I received, depositing the balances in a designated fund for contingent creditors, although these are unenforceable debts in Israel, it improves their condition.

30. Likewise, the petition was submitted in clear good faith. This petition, as well as the petition to convene meetings to approve a debt arrangement, relies on a complete factual infrastructure and are supported by data, by documents, by forecasts and a concrete debt arrangement. The said petitions are directed **to allow a possibility for active and profitable companies to receive a temporary and supervised protection from individual steps, in order to exhaust a collective proceeding for creditors that will ensure a better result for creditors.**

## B. The circumstances that resulted in filing the motion – Skillz Platform Inc. v. Papaya Gaming, Ltd. et. al[1]

31. Despite the sound financial condition of the Applicants, their business success, and consistent profitability, the Applicants are now facing financial-legal exposure as a result of the Skillz ruling.

32. Skillz Platform Inc. is a public company incorporated in the US and is a business competitor of Papaya Israel. In March 2024, Skillz filed a claim against the Applicants with the Federal District Court in New York State in the US (hereinabove and hereinbelow: "**the Skillz Claim**"), as part of an unacceptable strategy that was designed to deal with the ongoing business failure of Skillz and its inability to compete with competing companies, in an accepted way, after it failed to improve the product and its underlying business model over the years, which is fundamentally different from the business model of the Applicants.

33. As part of this strategy, Skillz also filed other claims against other competitors in the industry, while exploiting the huge sums it raised in the capital market in the preceding years, which were intended to support business growth (not legal battles).

34. For example, the claim Skillz vs. AviaGames was filed, in which Skillz made various allegations, including unfair competition, copyright infringement, and use of bots, after it claimed that AviaGaming copied its platform.[2]

35. The claim Skillz vs. Voodoo was also filed, in which Skillz alleged misleading advertising and unfair competition because, according to it, the defendant offered pre-determined games and used bots.[3]

36. Skillz also filed a claim against the Applicants, in which Skillz alleged that they advertised their games in a misleading way, *inter alia*, because of the alleged use of bots (false advertising). The claim was heard at the Federal District Court in New York State, US. In April 2026, the trial was heard before a jury, and the jury delivered its verdict on April 23, 2026. The presiding judge announced her ruling on July 27, 2026, under which the Applicants had to pay a total of more than $719 million.

37. The Applicants intend to appeal, automatic right of appeal, the Skillz ruling with the Court of Appeals for the Second Circuit and it believes that it has a good chance of reversing the ruling, or least significantly reducing it. The Applicants assess, on the basis of legal advice I obtained from an American law firm with a reputation in appeals, there is a real legal basis for the appeal to be granted, resulting in a retrial or in the granting of relief that will significantly change the result.

38. Naturally, the Applicants are not filing against the Skillz ruling in these proceedings, but I nonetheless find it appropriate to clarify before the Honorable Court that in our opinion (and with all due respect) the interim decisions issued throughout the Skillz claim and in the Skillz ruling itself contained material factual and legal errors. Thus, *inter alia*, the ruling was based on the incorrect assumption that the use of bots is illegal in and of itself, although it is a common and accepted practice in the gaming industry, instead of examining whether or not the advertisements of the Applicants were misleading. Furthermore, significant evidence presented

---

[1] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y.)

[2] Blake Brittain, Reuters: Mobile gaming company Skillz wins $43 million patent verdict against AviaGames (Feb. 10, 2024) https://www.reuters.com/legal/litigation/mobile-gaming-company-skillz-wins-43-mln-patent-verdict-against-aviagames-2024-02-09/

[3] Skillz Platform Inc. v. Voodoo SAS, 1:24-cv-04991, (S.D.N.Y.) (2024) https://cases.justia.com/federal/district-courts/new-york/nysdce/1%3A2024cv04991/624144/195/0.pdf

by the Applicants that denies the existence of a causal connection between their advertisements and the amount claimed was not required in the ruling. Moreover, the ruling was based on "profits" the Applicants allegedly generated, which on the one hand, resulted in charging the Applicants an astronomical sum that is many times higher than their net profit in the period relevant to the Skillz claim, and on the other hand, to the dismissal without any factual investigation of a counterclaim filed by Papaya Israel against Skillz, which raised claims identical to those raised by Skillz against the Applicants. Moreover, the counterclaims that Papaya Israel filed against Skillz, in which it is alleged that Skillz was itself using similar (and even more serious) practices to the ones it alleges against the Applicants were dismissed without any factual clarification. Furthermore, *inter alia*, the court refused to allow witnesses of the Applicants to testify in the trial, significantly reduced the expert opinions on behalf of the Applicants (to the point of rendering them irrelevant and devoid of content), reducing the claims that the Applicants were allowed to present to the jury during the trial, and more. We intend to raise these and other issues in detail before the Court of Appeals.

39. Therefore, the debt embodied in the ruling is controversial, and in any case, according to the legal advice I obtained, it is not enforceable in Israel at this stage, and therefore such a situation should not be allowed in which a debt would result in the collapse of a good and profitable Israeli company that supports hundreds of families in Israel.

40. According to the legal advice I obtained, Skillz also cannot enforce the ruling in Israel at this stage, but it may try to paralyze the operations of the Applicants and result in their collapse through collection and enforcement actions in the US, which, as aforesaid, it has already tried to do as part of failed enforcement proceedings.

41. The settlement proposed as part of these proceedings preserves on the one hand the (potential) rights of Skillz to be paid, if and when the ruling becomes enforceable in Israel, and it ensures supervision by an official that the Applicants are not emptied of their assets during the period until the appeal is decided (this is, in the unlikely event that the ruling withstands the review of the Court of Appeals). On the other hand, it also ensures protection of the Applicants and all the stakeholders (gamers, employees, creditors, and third parties) against the attempts of Skillz to harm the source that would allow for 100% payment to all creditors: the income flow of the Applicants. It is undeniable that the continued operations of the Applicants will also serve the financial interest of Skillz. Hence, the urgency of the request.

### C. The proposed debt settlement and the benefit that would grow from it

42. The idea underpinning the settlement is simple: since the Applicants earn very high profits every year, the only to pay the full potential debts to all the creditors is to allow the Applicants to continue their profitable business operations, while keeping the profits in a special fund, which will be managed by an settlement manager for the purpose of distributing them to the conditional creditors as they defined in the debt settlement (potential conditional debt creditors, who are pursuing pending legal proceedings against the Applicants in various courts on grounds related to or arising directly or indirectly from alleged bot practices, a creditor who has pursued proceedings on such grounds and obtained a judgment in the US, subject to appeal, and creditors who have grounds to pursue said proceedings).

> A copy of the proposed debt settlement is attached and labeled as **Annex 2**.

43. The guiding principle is continuing current payments to all the commercial creditors so that these commitments will continue to be paid during the course of ordinary business of the Applicants. The Applicants are meeting all their commitments and are expected to continue to meet them in full and on time without difficulty. Therefore, the settlement is based on the fact that suppliers, employees, and all current business creditors will continue to receive what they are owed in ordinary work relations and the ordinary course of business.

44. These current operations will generate the profits that will allow, within a few years, the payment of the full debt to the conditional creditors as their debt becomes enforceable rulings

in Israel (both the Applicants in the various proceedings and Skillz). The cash balances available each year, with the exception of a fixed amount for the purpose of current management, will be directed to a designated fund, up to the caps set forth in the debt settlement (hereinafter: "**the Settlement Administrator's Deposit"**). The Settlement Administrator's Deposit will be used to pay conditional debts, if and to the extent that they become enforceable rulings in Israel in the future, including in the matter of Skillz, everything as set forth in the debt settlement.

45. Belying accepted practice in debt settlements, which according to legal advice I have obtained, usually result in the cessation of the management of motions for the approval of class-action suits, it is proposed here that the motion for the approval of a class-action suit filed against Papaya Israel will actually continue to proceed as usual. This element of the proposed settlement indicates the financial strength of the Applicants.

46. In order to act equitably, the settlement does not allow for payment from the Settlement Administrator's Deposit to those who do not possess enforceable rulings in Israel. However, there is justification for preserving funds for them and ensuring their ability to pay in the event of "if and when".

47. The settlement prescribes that no funds will be paid in practice to Skillz until a ruling in the appeal, for several reasons, elaborated in the motion to convene a creditors meeting. In brief: (a) according to the legal advice I obtained, the ruling is a foreign ruling subject to appeal, and is therefore not final and Skillz cannot enforce it in Israel; (b) as appears from its financial statements, Skillz is a loss-making public company that is on the verge of insolvency, and is expected to be unable to repay funds paid to it. The attached cash flow forecast was prepared by the Applicants based on the public information included in the statements of Skillz; (c) collecting funds back from an entity domiciled abroad will likely require taking legal proceedings abroad and international collection proceedings, which are lengthy and expensive; (d) leaving the funds in the Settlement Administrator's Deposit serves the purpose of keeping available financial sources for the benefit of other known and unknown conditional creditors (to the extent they are owed).

> A copy of selected pages from the financial statements of Skillz is attached and labeled as **Annex 3**.

> A copy of the cash flow forecast of Skillz is attached and labeled as **Annex 4**.

48. The settlement prescribes that all the current commitments of the Applicants (except for conditional debts) will continue to be paid as usual and on time, and the settlement does not apply to them. Accordingly, only creditors defined as "conditional" will be required to file debt claims. The creditors defined as "excluded" are not affected by the settlement, they are not required to file debt claims, and their meetings will not be convened.

49. The proposed settlement generates the following benefits: (a) it regulates payment in full (100%) of the debts of the Applicants over a several years; (b) it ensures the financial recovery of the Applicants in a way that will make it possible for them to continue their business operation and thereby ensuring the continued upholding of the commitments of the Applicants vis-à-vis the millions of gamers, hundreds of suppliers, service providers, and hundreds of employees; (c) it ensures the continued employment of hundreds of employees and the livelihoods of many families; (d) it ensures the continued provision of regular service to millions of gamers of the Applicants worldwide; (e) it ensures the continued payment of taxes to the treasury totaling tens of millions of shekels annually.

### D. <u>Operating plan and means of financing during the stay of proceedings</u>

50. We will present below a projected operating plan for the Applicants for a 90-day period (August-October 2026). This plan highlights the financial strength of the Applicants and their

ability to continue to operate profitably and stably during the stay of proceedings and even to continue to generate profits for the purpose of repaying conditional debts, as they come up.

> A copy of the projected 90-day cash flow is attached and labeled as **Annex 5**.

51. The forecast indicates that the operations are not deficit-driven; on the contrary, the Applicants will accumulate substantial cash surpluses throughout the forecast period, in a way that will allow the Applicants to continue their operations and uphold their current commitments in a timely manner. The continuation of the profitable operations of the Applicants, as reflected in the forecast, is key to the success of the proposed debt settlement and to protect the interests of all stakeholders. The operations of the Applicants will be applicable, not deficit-driven and will not harm creditors.

**D (1). <u>Projected income from the operation of the Applicants and other sources</u>**

52. The operating plan is based on the projected income from the operations of the Applicants. Total cash flow for the projected income in August-October 2026 is approximately $116 million (an average approximately $58 million per month in August, September, and October).

53. Total cash flow for the projected operating expenses in August-October 2026 is approximately $101.8 million. These expenses reflect the current operating costs for continuing the operations of the Applicants, including, *inter alia*:

(a) Direct UA expenses: marketing and gamer recruitment expenses totaling approximately $64 million.
(b) Payroll expenses: payroll expenses, including social benefits totaling approximately $15 million.
(c) PSP fees expenses: clearance fees totaling approximately $6 million.
(d) Sales taxes and taxes expenses: various tax expenses totaling approximately $7.2 million.
(e) In addition to the expected operating expenses, capital expenditures (Capex) are expected to total approximately $300,000 in August-October.

54. As can be seen from the projected operating plan, a (substantial) positive balances are expected for the operations of the Applicants in August-October.

(a) A positive balance of approximately $3.4 million in August 2026.
(b) A positive balance of approximately $6.8 million in September 2026.
(c) A positive balance of approximately $5 million in October 2026.

**D (2). <u>Business planning and other necessary activity for operations of the Applicants</u>**

55. No changes in the operating or strategic plan are necessary during the requested stay of proceedings.

**E. <u>Assets and liabilities status of the Applicants</u>**

56. A summary of the main assets and liabilities of the Applicants is below. The full itemization is provided in the attached Form 1.

> A copy of Form 1 of Papaya Israel is attached and labeled as **Annex 6.**

> A copy of Form 1 of Papaya US is attached and labeled as **Annex 7.**

**E (1). <u>Main assets and rights of the Applicants</u>**

57. **The main asset of the Applicants is their actual operations** – operations which generate regular positive cash flow.

58. **<u>Assets of Papaya Israel</u>**: (a) **intangible assets**; Papaya Israel is a technology company. The main intellectual properties that Papaya Israel possesses are the technology platform, human capital, proprietary algorithms, clearance and payment systems, branch names, etc. (b) **cash**:

Papaya Israel holds substantial cash balances and short-term liquid investments in its bank accounts. As of the filing of this affidavit, the bank balances of the Applicant total approximately $151 million.

59. **Assets of Papaya US**: Papaya US has various assets in the US, such as bank accounts, a security deposits for clearance purposes, an IRS tax refund right, and contractual rights. The main assets of Papaya US are operating contracts that grant it a right to receive funds from US clearance companies, which it is obligated to transfer to Papaya Israel. It also has assets in Israel, such as a bank account.

**E (2). Main debts and commitments of the Applicants**

(a) **Bank Leumi as a secured creditor:** the deposit held by Papaya Israel in the bank is encumbered as collateral to secure payment of bank guarantees issued to property lessors is in favor of Bank Leumi Ltd. The debt to the bank set forth in this context in Form 1 is therefore a **conditional** debt that will only be created if there is a lawful demand for forfeiture of the bank guarantee. Except for this conditional debt, Papaya Israel has no debt to Bank Leumi, and its accounts in the bank have credit balances.

(b) **Lease agreement**: Papaya Israel entered into two long-term lease agreements, one through July 2027 and the second through September 2027, for office in Sky Tower at 35 Hamasger St., Tel Aviv, where it operates. The company also entered into a management fees agreement, which accompanies the lease agreements, and the period of which overlaps the lease periods. The total scope of the outstanding commitments by virtue of these agreements through the aforesaid expiry is approximately NIS 10.5 million. The debt set forth in this context in Form 1 is **only a future** debt, until the expiry. The rent was paid in advance and the Applicants have no current debt for these agreements.

(c) **Priority creditors**: the Applicants have no priority creditors.

(d) **General and deferred creditors**: the Applicants have no "past" debts in the ordinary sense. The Applicants regularly pay all their commitments to the suppliers, employees, and service providers on time. Obviously, there are current debts on each "cut-off" day, and these debts appear in Form 1 as "past debts" of the Applicants. They also include commitments to gamers on the platform. Any gamer who has a credit balance in their Papaya Israel account may withdraw said funds at any time. As of June 30, 2026, the outstanding commitment to gamers was approximately $12 million.

60. **List of company officers at the Applicants:**

> A copy of the list of company officers at the Applicants and company officers who terminated their positions in the 12 months preceding the day the motion was filed is attached and labeled as **Annex 8.**

61. **A copy of the financial statements for the past two years**:

> A copy of the financial statements for the past two years preceding the day the motion was filed is attached and labeled as **Annex 9.**

This is my name, this is my signature, and the content of my affidavit is true.

[signature]
Uriel Bachar

I certify that on *07/29/2026* Mr. *Oriel Bachar*, bearer of ID No. *201410008* appeared before me, Attorney at Law *Ifat Schteinman*. He is known to me personally, and after I warned him that he must declare the truth or else he will be liable to the penalties prescribed by law, he confirmed the accuracy of the aforementioned declaration and signed it before me.

| | |
|---|---|
| *07/29/2026* | [signature] |
| Date | [seal: Ifat Schteinman, Atty.<br>L.N. 23949<br>Attorney at Law] |

# Table of Contents


| No. | Annex name | Page |
|---|---|---|
| 1 | Registrar of Corporations Information Sheet | 41 |
| 2 | Debt Settlement | 54 |
| 3 | Selected Pages from the Financial Statements of Skillz | 57 |
| 4 | Cash Flow Forecast for Skillz | 69 |
| 5 | 90-Day Cash Flow Forecast | 91 |
| 6 | Form 1 of Papaya Israel | 98 |
| 7 | Form 1 of Papaya US | 382 |
| 8 | List of Company Officers at the Applicant and Company Officers Who Completed Their Positions in the 12 Months Preceding the Filing of the Motion | 422 |
| 9 | Financial Statements for the Preceding Two Years Before the Filing of the Motion | 424 |

# Annex 1

# Registrar of Corporations Information Sheet

**Page 41**

Israeli Corporations Authority

Annex 1

It is important for us to share with you that it is possible to issue a company/partnership extract at a cost of just NIS 12 at the Corporations Authority-Registrar of Companies website by entering the Issue Extract service or via the link: https://www.gov.il/he/service/company_extract

## Information about company details, including active and inactive liens

### Company details

Company number: **515422095** Legal status: **Active** Date registered: **03/13/2016**

Company name: **פאפאייה גיימינג בע"מ**

Company name in English**: PAPAYA GAMING LTD**.

Type of company: **Israeli** Company classification: **Private company** Shareholders liability: **Limited**
Company address: **35 Hamasger St., Tel Aviv** Postal code: **6721407**

Main company objectives: **To engage in all legal business**

Last annual reports was filed for the year: 2026 Registered on: **06/08/2026**

### Composition of Capital

1. Kind of share: **Ordinary** Par value: **0.01** Currency: **NIS**
   No. of shares: **401,240,000** Registered capital: **4,012,400** Allocated capital: **711,381.92**
2. Kind of share: **Preferred seed** Par value: **0.01** Currency: **NIS**
   No. of shares: **9,000,000** Registered capital: **90,000** Allocated capital: **83,955**
3. Kind of share: **Preferred seed 1** Par value: **0.01** Currency: **NIS**
   No. of shares: **32,750,000** Registered capital: **327,500** Allocated capital: **325,305**
4. Kind of share: **Ordinary A** Par value: **0.01** Currency: **NIS**
   No. of shares: **58,010,000** Registered capital: **570,100** Allocated capital: **570,100**

### Shareholders

1. Name: **Cloud Nine Ltd.** I.D. no: **513409094**
   Type of I.D.: **company** Date of appointment: **11/04/2020**

   Address: **29 Gaash at Danny Gabai** **Postal code: 6095000**
   Holds: 35,000 preferred seed shares of NIS 0.01 par value in an ordinary holding
   419,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

2. Name: **Gal Or Fishbain Architects Ltd.** I.D. no: **514075001**
   Type of I.D.: **company** Date of appointment: **06/26/2023**

   Address: **9 Tversky St., Tel Aviv** **Postal code: 6721010**
   Holds: 325,500 ordinary shares of NIS 0.01 par value in an ordinary holding

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

3. Name: **A.A.A. Argaman Ltd.** I.D. no: **514267616**
Type of I.D.: **Company** Date of appointment: **11/04/2020**
Address: **24 Dolev St., Ramat Efal, Ramat Gan at: Yuval Shalom**
Holds: 70,000 preferred seed shares of NIS 0.01 par value in an ordinary holding
837,500 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

4. Name: **Dror Ben Ari** I.D. no: **28545168**
Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
Address: **17 Bialik Blvd. apt. 4, Ramat Hasharon Postal code 4720611**
Holds: 35,000 preferred seed shares of NIS 0.01 par value in an ordinary holding
419,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

5. Name: **Shaul Eyal** I.D. no: **12368866**
Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
Address: **17 Aneilewicz St., Netanya Postal code: 4238951**
Holds: 35,000 preferred seed shares of NIS 0.01 par value in an ordinary holding
419,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

6. Name: **Omri Dan Kreigel** I.D. no: **40891442**
Type of I.D.: **Israeli citizen** Date of appointment: **02/04/2021**
Address: **96 Mordechai Namir Rd., Tel Aviv-Jaffa Postal code: 6233509**
Holds: 140,655 ordinary shares of NIS 0.01 par value in an ordinary holding

7. Name: **Boaz Benarosh** I.D. no: **29579372**
Type of I.D.: **Israeli citizen** Date of appointment: **10/27/2020**
Address: **47 Nahalat Binyamin St., Tel Aviv-Jaffa Postal code: 65163069**
Holds: 828,361 ordinary shares of NIS 0.01 par value in an ordinary holding

8. Name: **Ohad Ravid** I.D. no: **27380444**
Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
Address: **47 Hanadiv St. apt. 5, Herzliya Postal code: 4648561**
Holds: 11,500 preferred seed shares of NIS 0.01 par value in an ordinary holding
140,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

9. Name: **Andrei Birman** I.D. no: **310650387**
Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
Address: **7 HaIkarim Street, Azur Postal code: 5802073**
Holds: 17,251,000 ordinary A shares of NIS 0.01 par value in an ordinary holding
18,288,145 ordinary shares of NIS 0.01 par value in an ordinary holding

10. Name: **I.B.I. Trust Management** I.D. no: **515020428**
Type of I.D.: **Company** Date of appointment: **05/24/2026**
Address: **9 Ahad Ha'am St., Tel Aviv-Jaffa, at Tal Dori, CEO, P.O. Box 29161 Postal code: 6525101**
Holds: 4,148,000 ordinary A shares of NIS 0.01 par value in an ordinary holding
5,498,283 ordinary shares of NIS 0.01 par value in an ordinary holding

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

11. Name: **Shai Priel** I.D. no: **36552230**
    Type of I.D.: **Israeli citizen** Date of appointment: **02/28/2021**
    Address: **8 Hameyasdim St., Ness Ziona**
    Holds: 56,586 ordinary shares of NIS 0.01 par value in an ordinary holding

12. Name: **Papaya Gaming Ltd.** I.D. no: **515422095**
    Type of I.D.: **Company** Date of appointment: **09/02/2024**
    Address: **35 Hamasger St., Tel Aviv-Jaffa Postal code: 6721407**
    Holds: 22,914 ordinary shares of NIS 0.01 par value in an ordinary holding

13. Name: **Uriel Bachar** I.D. no: **201410008**
    Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
    Address: **4 Hayovel St., entrance A, Ra'anana Postal code: 4340103**
    Holds: 18,019,500 ordinary A shares of NIS 0.01 par value in an ordinary holding
    19,100,878 ordinary shares of NIS 0.01 par value in an ordinary holding

14. Name: **Amos Peled** I.D. no: **203246269**
    Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
    Address: **29 Ben Zion Blvd., apt. 4, Tel Aviv-Jaffa Postal code: 6428613**
    Holds: 79,00 preferred seed shares of NIS 0.01 par value in an ordinary holding

15. Name: **Daniel Sirota** I.D. no: **308050673**
    Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
    Address: **35 Saadia Gaon St.., apt. 14, Tel Aviv-Jaffa Postal code: 671326**
    Holds: 79,000 preferred seed shares of NIS 0.01 par value in an ordinary holding

16. Name: **Alexander Liachovetsky** I.D. no: **310520036**
    Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
    Address: **21 Frishman St., Tel Aviv-Jaffa Postal code: 6356105**
    Holds: 17,591,500 ordinary A shares of NIS 0.01 par value in an ordinary holding
    18,648,243 ordinary shares of NIS 0.01 par value in an ordinary holding

17. Name: **Michael Weinstein** I.D. no: **314542150**
    Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
    Address: **39 Pines St., apt. 1050., Tel Aviv-Jaffa Postal code: 6684703**
    Holds: 79,000 preferred seed shares of NIS 0.01 par value in an ordinary holding

18. Name: **Oren Wiessenstern** I.D. no: **32445603**
    Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
    Address: **3 Harotem St., Herzliya Postal code: 4663011**
    Holds: 11,500 preferred seed shares of NIS 0.01 par value in an ordinary holding
    140,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

19. Name: **Oren Bar Nir Geyer** I.D. no: **38946760**
Type of I.D.: **Israeli citizen** Date of appointment: **10/27/2020**
Address: **13 Emek Yizrael St., Modiin-Maccabim-Reut**
Holds: 828,361 ordinary shares of NIS 0.01 par value in an ordinary holding

20. Name: **Omer Shenhar** I.D. no: **38741773**
Type of I.D.: **Israeli citizen** Date of appointment: **03/04/2021**
Address: **2 Harav Uziel St., Tel Aviv-Jaffa Postal Code: 6233302**
Holds: 33,000 ordinary shares of NIS 0.01 par value in an ordinary holding

21. Name: **Homeward Ventures Limited** I.D. no: **65607**
Type of I.D.: **Foreign corporation** Date of appointment: **08/04/2023**
Address: **Guernsey**
Holds: 1,265,466 preferred seed shares of NIS 0.01 par value in an ordinary holding
2,504,247 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

22. Name: **Eran Price** I.D. no: **38352027**
Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
Address: **16 Modiin St., Hod Hasharon Postal code: 4524617**
Holds: 35,000 preferred seed shares of NIS 0.01 par value in an ordinary holding
419,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

23. Name: **PGF Synergy Limited Partnership** I.D. no: **540297603**
Type of I.D.: **Partnership** Date of appointment: **11/04/2020**
Address: **96 Mordechai Namir Rd., Tel Aviv-Jaffa Postal code: 6233509**
Holds: 1,419,500 preferred seed shares of NIS 0.01 par value in an ordinary holding

24. Name: **RAINFALL VENTURES I, LP** I.D. no: **6660596**
Type of I.D.: **Foreign corporation** Date of appointment: **11/04/2020**
Address: **United States**
Holds: 1,064,500 preferred seed shares of NIS 0.01 par value in an ordinary holding

25. Name: **NFX Capital Fund II LP** I.D. no: **7393079**
Type of I.D.: **foreign corporation** Date of appointment: **11/04/2020**
Address: **United States**
Holds: 1,892,500 preferred seed shares of NIS 0.01 par value in an ordinary holding
29,573,599 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding
94,500 ordinary shares of NIS 0.01 par value in an ordinary holding

26. Name: **ISV Capital LP** I.D. no: **7609092**
Type of I.D.: **foreign corporation** Date of appointment: **11/04/2020**
Address: **United States**
Holds: 118,500 preferred seed shares of NIS 0.01 par value, in an ordinary holding.

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

27. Name: **Sweetwood Venture PAP, Partnership** I.D. no: **540303989**
Type of I.D.: **Partnership** Date of appointment: **03/04/2021**
Address: **35 Ahad Ha'am St., Tel Aviv-Jaffa Postal code: 6520206**
Holds: 378,500 ordinary shares of NIS 0.01 par value in an ordinary holding

28. Name: **NOA.TW LLC** I.D. no: **3360274**
Type of I.D.: **Foreign corporation** Date of appointment: **11/04/2020**
Address: **United States**
Holds: 1,538,000 preferred seed shares of NIS 0.01 par value in an ordinary holding

29. Name: **Bonale Foundation** I.D. no: **FL0015403681**
Type of I.D.: **Foreign corporation** Date of appointment: **11/04/2020**
Address: **Liechtenstein**
Holds: 236,500 preferred seed shares of NIS 0.01 par value in an ordinary holding

30. Name: **Mantra PE** I.D. no: **B190290**
Type of I.D.: **Foreign corporation** Date of appointment: **03/04/2021**
Address: **Luxembourg**
Holds: 1,226,304 ordinary shares of NIS 0.01 par value in an ordinary holding
118,500 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

31. Name: **Israel Secondary Fund II LP** I.D. no: **MC84094**
Type of I.D.: **Foreign corporation** Date of appointment: **07/14/2021**
Address: **United States**
Holds: 667,500 ordinary shares of NIS 0.01 par value in an ordinary holding

32. Name: **Proof II LLC** I.D. no: **5663670**
Type of I.D.: **Foreign corporation** Date of appointment: **03/04/2021**
Address: **United States**
Holds: 1,042,855 ordinary shares of NIS 0.01 par value in an ordinary holding
45,000 preferred seed 1 shares of NIS 0.01 par value in an ordinary holding

33. Name: **Rainfall Ventures II LP** I.D. no: **3962401**
Type of I.D.: **Foreign corporation** Date of appointment: **05/16/2021**
Address: **United States**
Holds: 161,500 ordinary shares of NIS 0.01 par value in an ordinary holding

34. Name: **Piton Capital Ventures Fund IV LP** I.D. no: **LP020590**
Type of I.D.: **Foreign corporation** Date of appointment: **03/04/2021**
Address: **United Kingdom - England**
Holds: 978,000 ordinary shares of NIS 0.01 par value in an ordinary holding

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

35. Name: **DBDK Venture Fund I, LP** I.D. no: **4852579**
Type of I.D.: **Foreign corporation** Date of appointment: **07/27/2021**
Address: **United States**
Holds: 236,500 preferred seed shares of NIS 0.01 par value in an ordinary holding

36. Name: **GLORY DAYS VENTURES LIMITED PARTNERSHIP** I.D. no: **CO122826**
Date of appointment: **06/12/2023**
Type of I.D.: **Foreign corporation**
Address: **Cayman Islands**
Holds: 154,034 preferred seed shares of NIS 0.01 par value in an ordinary holding
304,819 ordinary shares of NIS 0.01 par value in an ordinary holding

37. Name: **Itay Pazner** I.D. no: **542682929**
Type of I.D.: **Foreign citizen** Date of appointment: **06/08/2026**
Address: **United Kingdom - England**
Holds: 9,041 ordinary shares of NIS 0.01 par value in an ordinary holding

## Directors

1. Name: **Omri Dan Kreigel** I.D. no: **40891442**
Type of I.D.: **Israeli citizen** Date of appointment: **11/04/2020**
Address: **96 Mordechai Namir Rd., Tel Aviv-Jaffa Postal code: 6233509**

2. Name: **Andrei Birman** I.D. no: **310650387**
Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
Address: **7 Ha'Ikarim St., Azor Postal code: 5802073**

3. Name: **Uriel Bachar** I.D. no: **201410008**
Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
Address: **4 Hayovel St., entrance A, Ra'anana Postal code: 4340103**

4. Name: **Alexander Liachovetsky** I.D. no: **310520036**
Type of I.D.: **Israeli citizen** Date of appointment: **03/13/2016**
Address: **21 Frishman St., Tel Aviv-Jaffa Postal code: 6356105**

5. Name: **Gigi Levy-Weiss** I.D. no: **28917854**
Type of I.D.: **Israeli citizen** Date of appointment: **04/30/2019**
Address: **18 Hakfar St., Rishpon Postal code: 4691500**

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

## Company officers

Type of I.D.: **Partnership** I.D. no: **540041241** 1. Name: **Kost Forer Gabbay and Kaiserer**
Type of position: **Accountants**
Address: **144 Begin Rd., Tel Aviv-Jaffa** **Postal code**: **6492102**

***The company has no active debts in payment of the annual fee***

## Active liens

Liens registered before 11/12/2017 – for an updated status, read the collateral description together with the list of changes to the lien.
Liens registered after 11/12/2017 – the description of the collateral reflects the up-to-date collateral status, including subsequent changes as of the collateral registration day. The list of changes to the lien states the date of the changes update and the kind of changes made.

**Lien no. 14** Date registered: **03/06/2025** Date created: **02/02/2025**

**General details of the lien**

Date registered: **03/06/2025** Nature of the lien: **Fixed (specific)**
Lien rank: **First degree** Guaranteed amount: **USD 2,000,000.00**

**Special conditions**

Provision in the agreement with respect to another lien.
There is a restriction on making deals with the asset without the consent of the lien holder.

Description of the conditions: The company undertook not to mortgage, encumber, sell, assign and/or transfer the accounts and deposits without obtaining prior written consent of the bank to do so.

**Encumbered assets**

Date registered: **03/06/2025** Type of asset: **Other**
Asset description: Fixed-first degree lien on all the rights and funds set forth in foreign currency deposits: Serial no.: 0003 in the currency US dollar, Account type: 095, Corporate foreign currency deposit managed in foreign currency account no. 56840097 under Customer no. 56840097 managed at Branch 864 LeumiTech Business Center at Bank Leumi Le'Israel Ltd. and/or any account and/or deposit that will come in lieu therefrom, all the funds that will be deposited from time to time in the aforesaid accounts and/or deposits, and all the consideration, proceeds, income, and rights derived or which will be derived from the aforesaid funds or related to them, located and/or which be located under the aforesaid customer number and/or any customer number that will come lieu thereof.

**Lender/Trustee**

Date registered: **03/06/2025** Bank/corporation no: **10-864**
Name of bank/trustee: **Bank Leumi Le'Israel Ltd., Business Herzliya**

## Inactive liens

**Lien no. 1** Date registered: **04/18/2016** Date created: **04/10/2016** Date cleared: **03/27/2018**
Nature of the lien: **bond** Guaranteed amount: **NIS 20,000.00**

**Lien no. 2** Date registered: **03/06/2019** Date created: **11/26/2018** Date cleared: **05/17/2023**
Nature of the lien: **Floating/specific lien** Guaranteed amount: **NIS 50,000.00**

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

**Lien no. 3** Date registered: **08/23/2020** Date created: **08/11/2020** Date cleared: **01/02/2023**
Nature of the lien: **Floating/specific lien** Guaranteed amount: **Unlimited**

**Lien no. 4** Date registered: **08/23/2020** Date created: **08/11/2020** Date cleared: **01/02/2023**
Nature of the lien: **Floating/specific lien** Guaranteed amount: **Unlimited**

**Lien no. 5** Date registered: **12/25/2020** Date created: **12/15/2022** Date cleared: **05/17/2023**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 3,720,000.00**

**Lien no. 6** Date registered: **05/11/2023** Date created: **05/03/2023** Date cleared: **05/17/2023**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 950,000.00**

**Lien no. 7** Date registered: **05/17/2023** Date created: **05/10/2023** Date cleared: **03/17/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 6,550,000.00**

**Lien no. 8** Date registered: **05/21/2023** Date created: **05/03/2023** Date cleared: **03/17/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 950,000.00**

**Lien no. 9** Date registered: **08/03/2023** Date created: **07/31/2023** Date cleared: **09/20/2023**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 234,524.00**

**Lien no. 10** Date registered: **09/13/2023** Date created: **09/06/2023** Date cleared: **03/17/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 234,524.00**

**Lien no. 11** Date registered: **09/13/2023** Date created: **09/06/2023** Date cleared: **03/17/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **NIS 914,688.00**

**Lien no. 12** Date registered: **10/22/2023** Date created: **09/20/2023** Date cleared: **10/29/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **Unlimited**

**Lien no. 13** Date registered: **10/31/2023** Date created: **09/20/2023** Date cleared: **10/29/2025**
Nature of the lien: **Fixed (specific)** Guaranteed amount: **Unlimited**

## Changes at the company

**Changes in the capital composition – shares**

1. Date registered: **01/14/2021** Date of the resolution: **11/04/2020**
2. Date registered: **05/11/2023** Date of the resolution: **10/07/2021**

**Modifications to the Article of Incorporation**

1. Date registered: **01/14/2021** Date of the resolution: **11/04/2020**
2. Date registered: **07/15/2021** Date of the resolution: **05/27/2021**
3. Date registered: **05/11/2023** Date of the resolution: **10/07/2021**

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

4. Date registered: **06/15/2023** Date of the resolution: **04/10/2021**

*** No change in status ***

This synopsis was prepared from information saved in the Registrar of Companies computer on 07/19/2026 at 2:50 PM

## Expanded company profile – Information about the company from other sources

**The information in the expanded company profile includes information obtained from various state authorities and public authorities. This information is provided as a public service and may be partial or out of date. Do not rely on it; you should contact and review the information at the certified public authority or state authority.**

### Information about intellectual property rights from the Patent Office

Information obtained from the Patent Office with respect to patents, trademarks, and designs

1. Trademark:
   Name in English: **PAPAYA**
   Expiration date: **--** Expiry date: **08/18/2032** Application date: **08/18/2022**
   Status: **Registered** Percent ownership: **Wholly owned**

   http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=410037

2. Trademark:
   Name in English: **PAPAYA GAMING Challenge is Everything**
   Expiration date: **--** Expiry date: **09/01/2032** Application date: **09/01/2022**
   Status: **Registered** Percent ownership: **Wholly owned**

   http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=410428

3. Trademark:
   Name in English: **SKY FOR THE STARS**
   Expiration date: **--** Expiry date: **09/21/2032** Application date: **09/21/2022**
   Status: **Registered** Percent ownership: **Wholly owned**

   http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=411141

4. Trademark:
   Name in English: **TIME TO SHINE**
   Expiration date: **--** Expiry date: **01/16/2033** Application date: **01/16/2023**
   Status: **Registered** Percent ownership: **Wholly owned**

   http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=417973

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

5. Trademark:
Name in English:
Expiration date: **--** Expiry date: **01/23/2033** Application date: **01/23/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=418210

6. Trademark:
Name in English: **COOKIE CASH**
Expiration date: **--** Expiry date: **05/01/2033** Application date: **05/01/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=421538

7. Trademark:
Name in English:
Expiration date: **--** Expiry date: **06/11/2033** Application date: **06/11/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=422757

8. Trademark:
Name in English: **COOKIE CASH**
Expiration date: **--** Expiry date: **07/18/2033** Application date: **07/18/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=427440

9. Trademark:
Name in English: **AJ 21**
Expiration date: -- Expiry date: **08/08/2033** Application date: **08/08/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=428017

10. Trademark:
Name in English: **$**
Expiration date: **--** Expiry date: **08/08/2033** Application date: **08/08/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/Reportview?tmCaseID=428018

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

11. Trademark:
Name in English: **$ BINGO 7 5**
Expiration date: **--** Expiry date: **08/08/2033** Application date: **08/08/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=428019

12. Trademark:
Name in English: **$A**
Expiration date: **--** Expiry date: **08/08/2033** Application date: **08/08/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=428020

13. Trademark:
Name in English: **Solitaire CASH**
Expiration date: **--** Expiry date: **08/08/2033** Application date: **08/08/2023**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=428021

14. Trademark:
Name in English: **$**
Expiration date: **--** Expiry date: **02/26/2034** Application date: **02/26/2024**
Status: **Registered** Percent ownership: **Wholly owned**

http://trademarks.justice.gov.il/TrademarkSearch/ReportView?tmCaseID=435529

The company or partnership extract is a synopsis of information from the computerized database of the Israeli Corporations Authority, provided as a public service, on the basis of information received by the Authority. The information in this extract may be incomplete, inaccurate, or out of date. Do not rely on the extract data, which is not one of the registries managed by the Israeli Corporations Authority by law.
To clarify the information and reports filed with the Registrar of Companies or the Registrar of Partnerships as required by law, review the company file (for means of reviewing: taagidim.justice.gov.il). . It is emphasized that the information in the company file with respect to the company shareholders and directors, as well as other items of information, is only declarative and does not constitute an alternative to reviewing the Registry of Shareholders and the Registry of Directors managed by the company, which are open to review by the public at its registered offices.
In addition, the extract is also liable to include a summary of information obtained from government authorities (such as the Insolvency and Economic Rehabilitation Proceedings Commissioner, the Enforcement and Collection Authority, the courts), and it has been entered according to the applicable law and is reflected in the extract a public service. Also, the extract may contain additional public information received from additional authorities of state (such as: the Patents Authority, the Bank of Israel and others). The information may be partial or out of date and should not be relied on. Contact the authorized public authority or state agency to review the information.

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

[logo: Corporations Authority]
Confirmation that this electronically signed copy constitutes a copy of the document (original or copy) found in the corporation's file at the Corporations Authority on the day it is signed

# Annex 2

# Debt Settlement

**Page 46**

Annex 2

**Debt Settlement between Papaya Gaming Ltd. and Papaya Gaming Inc. and their creditors**

**Pursuant to the provisions of Chapter J of the Insolvency and Financial Rehabilitation Law, 5778-2018**

**A. Interpretation and definitions**

In this settlement, the following terms will have the meanings set forth next to them hereinbelow, unless explicitly stated otherwise:

| | |
|---|---|
| **"The Law"** | Insolvency and Financial Rehabilitation Law, 5778-2018 |
| **"The Regulations"** | Insolvency and Financial Rehabilitation Regulations, 5779-2019 |
| **"The Court"** | Tel Aviv-Jaffa District Court, which is hearing the motion to approve the settlement |
| **"Motion to approve the settlement"** | The motion to issue an order to convene meeting for the purpose of approving this Debt Settlement filed with the Court |
| **"The Supervisor"** | The Supervisor for Insolvency and Financial Rehabilitation |
| **"The Settlement or the Debt Settlement"** | This debt settlement proposal, and if possible, certain modifications – if approved |
| **"The Companies"** | Papaya Gaming Ltd., company no. 515422095 ("**Papaya Gaming**"), and Papaya Gaming Inc., company no. 32-0533649 (**"Papaya US"**) (jointly: "**the Companies**"). |
| **"Date the Settlement comes in effect"** | The date when the conditional precedent for coming into effect is fulfilled (as the terms are defined in the Settlement) |
| **"Proof of debt date"** | The date for filing debt claims (hereinafter, also: "**Proof of Debt**") as prescribed in Section 22 of Article 6 hereinbelow, or another date, if decided by the Court. |
| **"Excluded Creditors"** | Each of the following:<br>(a) All the suppliers and employees of the Company;<br>(b) All the gamers, except on grounds related to past use of bots practices and everything with respect to and derived therefrom, directly or indirectly;<br>(c) Israel Tax Authority, National Insurance Institute, provident funds and pension funds;<br>(d) The Attorney General of the State of New Jersey |
| **"Conditional Creditor"** | A creditor who is not among the Excluded Creditors and who:<br>(a) As of the day the motion for filing the Settlement for approval, is managing legal proceedings pending litigation against some or all of the Companies with respect to the past use of bots and everything derived therefrom or involved therein, directly or indirectly; or<br>(b) As of the day the motion for filing the Settlement for approval, has grounds for enacting legal proceedings on said grounds; or<br>(c) As of the day the motion for filing the Settlement for approval, has a judgment of a foreign court in his favor |

| | |
|---|---|
| | against some or all of the Companies, which is still subject to an appeal and therefore has not yet become an enforceable financial judgment in Israel. |

| | |
|---|---|
| **"Conditional Debt"** | A debt argued by virtue of one of the grounds set for in the conditional creditor definition. |
| **"Enforceable financial judgment"** | An enforceable financial judgment in Israel, as follows:<br>(a) With respect to a judgment issued in a foreign country – a foreign judgment that meets all the conditions for enforcing a foreign ruling as meant by Section 3 of the Foreign Judgments Enforcement Law, 5718-1958;<br>(b) With respect to a judgment issued in the State of Israel – a judgment issued by an authorized court in Israel, which no stay of execution order has been issued. |
| **"Eligible Conditional Creditor"** | A conditional creditor in whose favor an enforceable financial judgement has been issued in Israel against any of the Companies. |
| **"Settlement Administrator Deposit"** | Funds deposited under the Settlement in the account of the Settlement Administrator and used as a special financial source for paying debts of the Companies to eligible conditional creditors as set forth in this Settlement and for the salary of the Settlement Administrator only. |
| **"Court order"** | An order under Chapter 4 of this Settlement. |
| **"Conditional precedent for the Settlement to come into effect"** | The conditional precedent for the Settlement set forth in Chapter 4 of this Settlement. |
| **"Shareholders"** | Any person or corporation who holds, directly or indirectly, shares of the Companies on the date the Settlement comes into effect. |
| **"Free cash balance"** | The cash balance held in the bank accounts of Papaya Israel, after deducting only (a) the encumbered amounts in favor of the banks where the balances are held, as follows: deposits to guarantee bank guarantees to property lessors and for payments for credit cards and hedge transactions; and (b) after deducting credit balances of gamers; and (c) after deducting the sum of USD 30 million, intended for managing current operations. |
| **"Dollar" or "$"** | United States dollar |

**B. <u>The Debt Settlement – General</u>**

1. The objective of this Debt Settlement is to: (1) ensure the ability to pay all the precedent debts if they become enforceable debts in Israel and pursuant to the terms of the Settlement, and (2) to enable the continued business activity of the Companies.
2. The Companies have a precedent debt to the precedent creditors, the scope of which exceeds their cash balances, because of a foreign judgment (not peremptory and subject to an appeal)

issued in favor of Skillz Platform Inc.[1]

3. From the date the Settlement comes into effect, this Settlement will be the sole, final, and fulfilling structure for settling the relationship, rights, and commitments between the Companies and the Conditional Creditors.
4. The Settlement will not apply to the Excluded Creditors, and approval of the Settlement will not result in a change in the rights or clarification of the rights of the Excluded Creditors, and the current commitments of the Companies to the Excluded Creditors will continue to be paid as usual and on time.
5. Accordingly, the Excluded Creditors are not required to file debt claims. The sums accruing to them, as set forth in the motion to approve the Settlement and its annexes, will continue to be paid as usual and on time. A list of the amounts in Form 1 is solely derived from the legal requirements and it is made clear that they will not prevent an excluded creditor from sharing in the amounts set forth therein in the course of ordinary business.
6. Similarly, gamers who deposited or will deposit funds while using the platform of the Companies may add to and activate these amounts either for use in games or to withdraw them, everything during the course of ordinary business in accordance with the Terms of Use.
7. The rule of pending litigation proceedings against the Companies or any of them on the day the motion to approve the Settlement is filed, which will be stayed by virtue of a motion for a stay of proceedings at the same time as this motion, will only be stayed until the Settlement comes into effect. When the Settlement comes into effect, the stay of proceedings order will expire, and these proceedings will resume and continue to be managed as usual. Payment of any judgment in favor an Eligible Conditional Creditor will be executed, if required, pursuant to the terms of this Settlement.
8. During the Settlement period, the Companies will continue to operate during the course of ordinary business, and the management of the Companies and the boards of directors of the Companies will remain in their posts, with the Settlement Administrator alongside them, for the purpose of ensuring the optional continuation of their business activity.

## C. <u>Proposed Settlement Terms to the Creditors</u>

9. **General:**
   (a) All the current commitments to all the Excluded Creditors will be paid according to their terms of payment through ordinary business during the Settlement period.
   (b) The Conditional Debts will only be paid to the Eligible Conditional Creditors; i.e., only after the Conditional Creditor has an enforceable financial judgment and pursuant to the terms hereinbelow.
10. **The Conditional Debts will be paid in the following way:**
   (a) An Eligible Conditional Creditor in whose favor an enforceable financial judgment has been issued against one of the Companies in an amount that does not exceed $5,000,000 (five million dollars), will be paid the full amount of the judgment during the course of ordinary business and not from the Settlement Administrator's Deposit.
   (b) An Eligible Conditional Creditor in whose favor an enforceable financial judgment has been issued against one of the Companies in an amount that exceeds $5,000,000 (five

[1] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y)

million dollars), will be eligible to receive the full amount from the Settlement Administrator's Deposit as set forth in Section 12 hereinbelow.

11. **Establishment of the Settlement Administrator's Deposit and the deposits into it**
   (a) Within 14 days from the date the Settlement comes into effect, Papaya Israel will deposit into a special bank account, which the Settlement Administrator will manage, an initial sum of $60 million (sixty million dollars).
   (b) In addition to the initial deposit set forth in subsection (a), each year, Papaya Israel will deposit to the account of the Settlement Administrator's Deposit each year, no later than January 15 (January fifteenth), an amount equal to the free cash balance as of 1.3 (January third) of that year, but in any event not more than the amounts set forth in Annex 1 of this Settlement.
   (c) The Settlement Administrator shall have the right to contact the Court with a motion to reduce or increase the amount that Papaya Israel is required to deposit at the aforesaid deposit dates, compared with the amounts denominated in said annex, paying attention to the total free cash balance and including the figures before him. The Honorable Court will decide on the motion of the Settlement Administrator after giving the Parties a right to argue with respect to the matter.
   (d) The funds found in the Settlement Administrator's Deposit will be invested in One-Year U.S. Treasury Securities, or in a bank deposit bearing an annual interest rate equal to the yield of said securities. All the profits, yields, and/or income accumulated with respect to the deposit and/or investment of these funds will be credited to the Settlement Administrator's Deposit and will be used solely for the purpose of the payments pursuant to this Settlement and solely pursuant to its provisions.

12. **Use of the Settlement Administrator's Deposit and payments from it**
   (a) A Conditional Creditor may contact the Settlement Administrator following the issue of an enforceable financial judgment in his favor in an amount that exceeds $5,000,000, and he will issue all the documents necessary to establish his claim to the Settlement Administrator. The Settlement Administrator will examine the document issued to him and will pay the Eligible Conditional Creditor the amount of the enforceable financial judgment from the deposit in his possession within thirty days, subject to what is set forth hereinbelow.
   (b) As aforesaid, an Eligible Conditional Creditor, who has an enforceable financial judgment in his favor in an amount that exceeds the amount paid him in a particular calendar year, shall be eligible to add and receive from the Settlement Manager annual payments until the full amount of the enforceable financial judgment in his favor is cleared.
   (c) If, at any date when a payment from Settlement Administrator's Deposit is paid, the Settlement Administrator has more than enforceable financial judgment to pay, the Settlement Administrator will proportionately (pro rata) divide the amount paid between said eligible creditors for payment, according to the ratio between the amounts of the enforceable financial judgments available for payment at that date.
   (d) The amount of each enforceable financial judgment will be converted in US dollars according to the shekel/dollar representative exchange rate on the date when the financial judgment becomes enforceable in Israel. If the judgment, or part thereof, is not paid by the Settlement Administrator within 30 days as set forth in subsection (a) hereinabove, the

unpaid part will bear an annualized interest rate at the rate set forth in Section 11 (d) hereinabove, starting at the end of the 30 days and until the actual date of payment.

(e) If the eligibility of all the Conditional Creditors is cancelled, either because their debt has been paid or because of stay and/or settlement and/or deletion of your claims, etc., and/or if Papaya Israel can prove an ability to pay during the course of ordinary business, then the annual obligation to deposit into the Settlement Administrator's Deposit will expire, and the Settlement Administrator will transfer the balance of the deposit, if any, to Papaya Israel.

13. This Settlement will expire after the execution of all the commitments in full and the actions prescribed therein are completed, pursuant and subject to the provisions of this Settlement.

## D. Condition precedent for executing the Debt Settlement

14. A condition precedent for this Debt Settlement to come into effect is obtaining Court approval for this Settlement ("**Court Order**"), including obtaining an order ordering full, final, and absolute and binding exemption of the Companies as set forth in this Settlement, pursuant to Chapter G of this Settlement, whether as part of approval of the Settlement or as part of an accompanying judicial decision.

15. If the condition precedent for the coming into effect of this Debt Settlement, or if this Debt Settlement does not come into effect for any reason, then, without derogating from any pending right or claim of the Companies by law, the following provisions will apply:

(a) This Settlement, with all its provisions and annexes, agreements, proposals, waivers, presentations, declarations, commitments, and positions raised, were provided or considered as part thereof or with respect thereto, will be null and invalid and will not be binding on the Companies in any way;

(b) This Settlement, judgments or proceedings to approve this Settlement, and in related proceedings or in any part of them will not serve as evidence, admission, presentation, estoppel, waiver, consent, grounds for a claim on the scope of a debt, validity, rate, classification, preference or method of its payment, or grounds for any claim, demand, lawsuit, or proceedings of any type or kind;

(c) No Party shall have a right to rely on anything set forth in this Settlement, judgments or proceedings to approve this Settlement, or related proceedings in any judicial, quasi-judicial, administrative, or other arbitration in Israel or overseas;

(d) In said case, the Parties shall accept, to the extent possible, their legal, judicial, and commercial standing on the eve of filing the motion to approve the settlement.

## E. The Settlement Administrator

16. The Honorable Court is requested to appoint, as part of this Debt Settlement, a Settlement Administrator pursuant to the provisions of Section 326 of the Law, who will act pursuant to the provisions of the law and the provisions of this Settlement and the decisions of the Honorable Court.

17. The salary of the Settlement Administrator and his expenses approved by the Honorable Court will be decided and adjudicated by the Honorable Court pursuant to the provisions of the law.

18. Notwithstanding what is set forth anywhere else in this Settlement, the salary of the Settlement Administrator will be paid from the Settlement Administrator's Deposit and will have priority

standing compared with any other payment that will be paid from the Settlement Administrator's Deposit.

19. The Settlement Administrator will be authorized to execute any action necessary to implement, administer, execute, and enforce this Settlement, everything pursuant to the provisions of the law, provisions of this Settlement, and the decisions of the Honorable Court.
20. Without derogating from the generality of the aforesaid, the Settlement Administrator will be authorized, *inter alia*, to:
    (a) Accept, examine, clarify, and decide the proofs of debt and debt claims, in whole or in part;
    (b) Demand from any creditor, the Companies, or any other relevant party any document, reference, figure, affidavit, clarification, or information that he deems fit for the purpose of fulfilling his duty;
    (c) Approve, reject, or amend proofs of debt, in whole or in part, and to decide the rate, standing, and classification of any debt for this purpose of this Settlement;
    (d) Administer the Settlement Administrator's Deposit, including taking possession of funds, holding them, investing them pursuant to the provisions of the Settlement, to the extent permitted by law or in accordance with orders of the Court, and executing payments from it pursuant to the provisions of this Settlement;
    (e) Decide the manner of filing documents and inquiries with him, including times, format, method of issue, and formal requirements;
    (f) Contact the Honorable Court, from time to time, with a request to issue instructions, approve an action, settle disputes, and clarify provisions of this Settlement or any other required relief, at his discretion, for the purpose of performing his duty;
    (g) Obtain the assistance of consultants, experts, accounts, attorneys, and other professionals as he deems fit for the purpose of fulfilling his duty, and said expenses will be considered expenses of the Settlement Administrator.

**F. <u>The proof of debt mechanism</u>**

21. Because the Settlement prescribes that all the current commitments of the Companies and Excluded Creditors will continue to be paid as usual and on time, the Excluded Creditors are not required to file proof of debt as a continuance for further payment of current amounts accruing to them, as set forth in Form 1 attached to the motion to approve the Settlement, and they will be paid as usual and on time.
22. Inviting a Conditional Creditor to file proof of debt is intended to enable clarification of conditional debts of claims of conditional creditors who are unknown to the Companies at the date the motion to approve the Settlement is filed. Therefore, any Conditional Creditor claiming that he is owned a Conditional Debt by one of the Companies, whether because he is not mentioned in Form 1 or because he disputes the amount denominated next to his name in Form 1, is required to file proof of debt with the Settlement Administrator within 21 days of the date of appointment of the Settlement Administrator ("**proof of debt date**").
23. The Settlement Administrator shall have the right to obtain proof of debt filed after the proof of debt date only if he is persuaded that there is special justification for the late filing; however, under no circumstances will proof of debt be accepted after the date the Court approves the Settlement. A Conditional Creditor who is required to file proof of debt pursuant to the provisions of this Settlement and who did not file the proof of debt on time, or if the proof or

debt he filed is not approved, will not have the right to vote with respect to this Debt Settlement, and he will not have any claim, demand, or lawsuit against any of the Companies with respect to the conditional debts.

24. The Settlement Administrator shall have the right to demand any document and/or figure at his discretion for the purpose of deciding the proof of debt of conditional creditors who file debt claims, whether for the purpose of voting or for the purpose of thoroughly clarifying them.

**Deciding debt claims for voting purposes:**

25. Any Conditional Creditor listed in Form 1 who does file proof of debt by the proof of debt date will be considered for the purpose of voting on this Settlement as agreeing to the amount of the debt denominated next to his name in Form 1, as filing proof of debt in said amount, and as someone whose proof of debt was approved in that amount for the purpose of voting on the debt settlement.
26. The proof of debt for voting purposes will not constitute a decision on the proof of debt itself.
27. A creditor who is interested in appealing a debt decision for the purpose of voting shall have the right to do so before the court within fourteen (14) days from the date he received the debt decision in writing (including by email or facsimile). An appeal filed after that date will not be accepted unless the court orders otherwise.

**Deciding the merits of debt claims for the purpose of distribution:**

28. It is not necessary to file additional proof of debt for the purpose of clarifying the merits of debt claims, and the proof of the debt filed for voting purposes will also serve for this purpose.
29. Deciding the merits of proof of the debt will be carried out as follows: (a) to the extent that a debt of a Conditional Creditor is subject to pending legal proceedings in Israel or overseas, the decision in the matter or his eligibility of that creditor to payment under this Settlement will be made in accordance to an enforceable financial judgment, as that is meant in the Settlement; (b) to the extent that proof of debt of the Conditional Creditor is not subject to pending legal proceedings in Israel or overseas, the Settlement Administrator will decide the debt claim on the basis of the proof of the debt, the documents and figures issued to him, and any other relevant material that he deems fit;
30. A creditor who is interested in appealing the merits of a debt decision shall have the right to do so by contacting the court within thirty (30) days of the date he received the debt decision on its merits in writing (including by email or facsimile). An appeal filed after this date will not be accepted, unless the court decides otherwise.
31. Any provable debt for which proof of debt is not filed by the proof of debt date, where the filing of proof of debt is required pursuant to the provisions of this Settlement, or which was not approved as part of the proof of debt mechanism, will not grant the creditor any right of claim, demand, offset, or payment against any of the Companies, and it will be considered as cleared for the purpose of this Settlement.
32. From the date the Settlement comes into effect, it will not be possible to receive payment for a Conditional Debt from any of the Companies, except pursuant to the provisions of this Settlement.

## G. <u>Exemption and waiver</u>

33. This Settlement will draw and express the final, sole, and absolute relationship, rights, and commitments between the Companies and the Conditional Creditors, and it will fulfill and

regulate the standing of all the conditional debts of the Companies. Therefore, when this Settlement comes into effect, the following provisions will apply:

(a) None of the Conditional Creditors will have any grounds, claim, demand, or lawsuit of any type or kind and any grounds against the Companies and/or anyone on their behalf in any matter derived from and/or with respect to the conditional debts, unless they are approved as debt claims;

(b) Conditional Creditors will not be eligible to take any self-relief of any type or kind with respect to conditional debts against the Companies or anyone on their behalf, including offset, lien, foreclosure, seizure of assets, realization of collateral or guarantee, debt assignment, exercise of right of stay, or any other independent action the objective of which is collection, enforcement, or payment;

(c) Any letter of exemption, letter of indemnification, right of indemnification, company officer insurance, or any right of defense, indemnification, or exemption issued or pending in the favor of company officers, directors, and officers in the Companies pursuant to the documents of incorporation of the Companies, agreement, insurance policy, or under any law will remain in full effect, and nothing will be proscribed from them because of the approval or execution of this Settlement;

(d) Subject to the provisions of the law and the provisions of this Settlement, a full, final, and irrevocable exemption will come into effect in favor of the Companies, their company officers, directors, employees, emissaries, consultants, representatives, shareholders, and any person or entity that acted or acts on their behalf or in their name against any grounds, claim, demand, or lawsuit of any type or kind, known or unknown, existing, conditional, or future with respect to the conditional debts.

## H. <u>General provisions</u>

34. The preamble and annexes to this Settlement are an integral part thereof; the section headlines are solely for the purpose of convenience and will be relied on for interpreting or clarifying this Settlement.
35. For the purpose of interpreting this Settlement, the provisions of this Settlement and the provisions of any of its annexes will be considered as supplementing each other and as a single thing.
36. Any modification, amendment, or supplement to the Settlement will have no validity and will not be considered as made, unless made in writing, signed by the Companies, and approved by the Honorable Court.
37. Reference to this Settlement or to a specific provision therein or to any other document will be interpreted as reference to this Settlement and said provision or said document as valid at that time and nonetheless as occasionally amended, modified, or completed, at the relevant time.
38. In this Debt Settlement, the singular includes the plural and vice versa; the male gender includes the female and vice versa; the term “person” includes any private individual, corporation, companies, partnerships (whether or not registered), association, trust, incorporated or unincorporated entity, and any other legal entity.
39. This Settlement, jointly with its annexes, fulfills all the agreement, conditions, and declarations between the Companies and the Conditional Creditors with respect to the matters arranged therein, and no proposal, summary, understanding, presentation, or promise with respect to

them made or issued by any of the Parties before the coming into effect of this Settlement, whether in writing or verbally, explicit or implicit, will have any validity, except as set forth in this Settlement.

40. If any of the Parties refrains from exercising any right granted to it under this Settlement or by law, or postpones or stays said exercising, this will not be considered as waiving said right, and a partial or one-time exercise of said right will not prevent further or later exercising it, or any other right. Deferment or easement grant, or a waiver or compromise made in any case by any of the Parties will not be interpreted as a precedent or waiver in another case and will preclude the right of that Party under this Settlement or by law.
41. No draft of this Settlement and its annexes will be admissible as evidence before judicial and/or quasi-judicial bodies, including arbitrators and/or adjudicators, and shall not be used to interpret this Settlement, its terms, or its annexes.
42. Only the laws of the State of Israel will apply to this Settlement, and it will be interpreted pursuant and in accordance with them.
43. The local, exclusive, and sole authority in any matter with respect to this Settlement, will be granted to the authorized court in Tel Aviv-Jaffa. The aforesaid does not prevent taking proceedings under Chapter 15 of the U.S. Bankruptcy Code. However, said request will not be considered as consent to the judicial authority of foreign litigation with respect to any dispute with respect to the interpretation, application, and execution of this Settlement.
44. The cumulative interest under this Settlement on the conditional debts will be lieu of any other interest by law or agreement.
45. In case of a contradiction or discrepancy between the provisions of this Settlement and the provisions of any of its annexes, the provisions of this Settlement will supersede, unless explicitly set forth otherwise.
46. Without derogating from the provisions of this Settlement, the Settlement Administrator and each of the Parties may contact the court with a motion to issue instructions in any matter with respect to the interpretation, implementation, execution, or enforcement of this Settlement.
47. The provisions of this Settlement will be binding and applicable to the Parties to it and on their replacements, assignees, transferees, heirs, and anyone by virtue thereof as applicable and subject to the provisions of the law.

# Annex 3

# Selected Pages from the Financial Statements of Skillz

**Page 58**

decline in revenue and Gross Marketplace Volume ("GMV") and may not achieve the anticipated return on our development efforts. Any such decline in the growth of the mobile market or in the use of mobile devices for games could harm our business, financial condition, results of operations and prospects.

The substantial majority of users access the games featured on our platform through the direct download on their mobile devices of apps developed by our developer partners. Our business model depends upon the continued compatibility between these apps and the major mobile operating systems, technologies, networks and standards that we do not control, such as the Android and iOS operating systems, and any changes, bugs, security, technical or regulatory issues in such systems, changes to our relationships with mobile manufacturers or carriers, or in their terms of service or policies that degrade our offerings' functionality, reduce or eliminate our ability to distribute our offerings, give preferential treatment to competitive products, limit our ability to deliver high quality offerings, or impose fees or other charges related to delivering our offerings, could adversely affect our product usage and monetization on mobile devices. Third parties with whom we do not have any formal relationships control the design of mobile devices and operating systems. These parties frequently introduce new devices, and from time to time they may introduce new operating systems or modify existing ones. Network carriers may also impact the ability of users to download apps or access specified content on mobile devices.

In addition, we rely upon third-party platforms, such as the Apple App Store, for distribution of the games featured on our platform. The promotion, distribution and operation of apps are subject to the respective distribution platforms' standard terms and policies for application developers, which are very broad and subject to frequent changes and differing interpretations. Furthermore, the distribution platforms may not enforce their standard terms and policies for application developers consistently and uniformly across all applications and with all publishers. A platform provider may also change its fee structure, add fees associated with access to and use of its platform and alter how developers and publishers are able to advertise on the platform. Such terms and policy changes may decrease the visibility or availability of the games featured on our platform, which could adversely affect our business, financial condition or results of operations. In addition, we may be subject to changes in the policies or structures of online platforms for purchase and download mobile applications that may negatively impact the number of organic downloads of our games.

If the growth of high-bandwidth capabilities, particularly for mobile devices, is slower than we expect, end-user growth, retention, and engagement may be seriously harmed. Additionally, to deliver high-quality content over mobile cellular networks, the games offered through our platform must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control. In addition, the adoption of any laws or regulations that adversely affect the growth, popularity, or use of the Internet, including laws governing Internet neutrality, could decrease the demand for our platform and increase our cost of doing business. Specifically, any laws that would allow mobile providers in the United States or abroad to impede access to content, or otherwise discriminate against our content, such as providing for faster or better access to our competitors, over their data networks, could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We are subject to risks associated with disruptive technologies, including AI.***

Presently, we employ AI, machine learning technologies, and automated decision-making technologies, including proprietary AI and machine learning algorithms and models (collectively, "AI Technologies") throughout our business, and are making significant investments in this area. AI technologies present risks related to data quality, bias, cybersecurity, intellectual property, regulatory compliance, and market acceptance. If our AI systems are improperly designed, trained on inadequate or biased data, or used without sufficient oversight, our products, operations, and reputation could be adversely affected.

We also rely on third-party AI providers and infrastructure, and any disruption, cost increase, or change in terms could adversely affect our operations.

***Historically, a limited number of games have accounted for a substantial portion of our revenue. If these games were to become less popular or be removed from our platform and we are unable to identify and market suitable replacements, our business and prospects could suffer.***

Historically, our top games and related developers have accounted for a substantial portion of our revenue earned from the Skillz platform. For the year ended December 31, 2025, Tether accounted for 51% of our revenue and Big Run accounted for 23% of revenue. These games, and the related developers, have historically been subject to our terms of service, which include, among other things, developer exclusivity for certain periods of time, as modified by negotiated agreements. The negotiated agreements provide Skillz with the discretion, but not the obligation, to provide marketing support for specified games and for

revenue sharing with the developers that is more favorable to Skillz than our standard terms. These negotiated agreements restrict the removal of the applicable games from our platform for at least 12 months following termination.

As previously disclosed, on August 29, 2025, we received a notice ("Notice") from Tether indicating that Tether is terminating all of its various agreements with us (the "Tether Agreements"), including our terms or services, effective as of September 1, 2025. Tether's Notice provides that Tether is terminating the Tether Agreements for convenience, while also asserting grounds for termination for cause (effective as of September 28, 2025) in the event its termination for convenience is not held as effective by a competent tribunal. We believe the termination notice to be invalid and in breach of Tether's obligations under the Tether Agreements.

Certain of the Tether Agreements restrict the removal of two games covered thereby, Solitaire Cube and 21 Blitz, from the Company's platform for at least 18 months following termination. During the post-termination period, Skillz has the option, but not the obligation, to host paid competitions for such games on the platform.

Following receipt of the Notice, on September 1, 2025, we filed suit in the Court of Chancery of the State of Delaware, seeking injunctive and declaratory relief in relation to Tether's breach of the Tether Agreements. The Company is also disputing Tether's allegations with respect to the grounds for termination of the Tether Agreements for cause. We intend to defend our position, but can provide no assurances regarding the outcome of the claim and the impact it may have on our business. See "–We have been and continue to be party to litigation and we may be subject to future litigation in the operation of our business. An adverse outcome in one or more proceedings could adversely affect our business" below for additional information related to risks associated with our litigation.

If we are unable to negotiate new terms with Tether (or, when necessary, with any other top developers) or any new terms are less favorable to us, or if our litigation against Tether is unsuccessful, and games were to be removed from our platform and we are unable to identify and market suitable replacements, there may be a material adverse effect on our business and results of operations.

***We rely on our third-party developer partners to develop and update all of the game features on our platform not tied to our SDK. The decision of developers to remove the SDK from their games or changes in the terms of our commercial relationship with third-party developers could adversely impact our financial condition, results of operations and prospects. In addition, the failure of developers to provide timely and reliable updates to their games could adversely impact our financial condition, results of operations and prospects.***

We rely significantly on third-party developers to create and maintain the games offered on our platform, and our success depends on our ability to establish and sustain favorable commercial relationships with these developers, including through initiatives such as our Developer Accelerator program. These relationships are generally governed by standard terms of service, and in some cases, negotiated agreements. However, competition for high-quality developers is intense, and there can be no assurance that existing developers will continue to support our platform or provide new content.

If we are unable to attract or retain developers, if the terms of these relationships become less favorable, or if developers remove or fail to update their games, including timely integration of our SDK, our platform performance, user engagement, and financial results could be adversely affected. In addition, we may not realize a return on capital deployed to support developer initiatives.

We may also make strategic investments or adjust developer terms to support long-term relationships, which could adversely impact our short-term operating results. These efforts may not yield the anticipated long-term benefits, and our business, financial condition, and results of operations could be harmed.

***It may become increasingly difficult and more expensive for us to acquire players for our games and we may not achieve a positive return on investment on our user acquisition efforts.***

User acquisition is critical to our business and may become more difficult and costly due to increasing competition in mobile and real-money gaming. We rely primarily on digital advertising networks, developers, and affiliate partners, and depend on paid marketing to drive user growth. If new game launches or marketing efforts fail to attract sufficient users, our revenue and operating results could be adversely affected.

inferior or costlier technologies into our platform or harm our reputation or brand and business, financial condition and results of operations. In addition, we may be required to license additional technology from third parties to develop and market new offerings or platform features, which may not be on commercially reasonable terms or at all and could adversely affect our ability to compete.

Although we take measures to protect our intellectual property, if we are unable to prevent the unauthorized use or exploitation of our intellectual property, the value of our brand, content, and other intangible assets may be diminished, competitors may be able to more effectively mimic our service and methods of operations, the perception of our business and service to our third party developer partners, potential developer partners and end game users may become confused, and our ability to attract new developers and users may be adversely affected. Any inability or failure to protect our intellectual property could adversely impact our business, results of operations, financial condition, reputation and prospects.

Our commercial success also depends in part on our ability to operate without infringing, misappropriating or otherwise violating the intellectual property rights of others. We may face allegations that we have infringed, misappropriated or otherwise violated the trademarks, copyrights, patents and other intellectual property rights of third parties, including from our competitors and non-practicing entities. We may also be subject to claims that our employees, consultants or other advisors have wrongfully used or disclosed alleged trade secrets of their former employers or claims asserting ownership of what we regard as our intellectual property. Intellectual property litigation may be protracted and expensive, and the results are difficult to predict. As the result of any court judgment or settlement, we may be obligated to stop offering certain features of our platform in a particular geographic region or worldwide, pay significant royalties, settlement costs or damages (including treble damages and attorneys' fees if we are found to have willfully infringed intellectual property rights), obtain licenses (which may not be available on acceptable terms or at all), modify our platform and features, or develop substitutes. Even if we were able to obtain a license, it could be non-exclusive, thereby giving our competitors and other third parties access to the same technologies licensed to us. Furthermore, even if intellectual property disputes do not result in litigation, the time and resources necessary to resolve them could harm our business, results of operations, financial condition and reputation.

**Risks Related to Financial Matters**

***Our operating history and our history of operating losses make it difficult to evaluate our current business and prospects and may increase the risks associated with your investment.***

Our operating history makes it difficult to evaluate our current business and our future prospects, including our ability to plan for and model future growth. We have encountered and will continue to encounter risks and difficulties frequently experienced by growth companies in constantly evolving industries, including companies in the technology sector. If we do not address these risks successfully, our business may be harmed.

We have experienced net losses in each period since inception. As of December 31, 2025, we had an accumulated deficit of $1,091.7 million. The industry in which we operate is highly competitive, rapidly changing (including changes with respect to advancements in AI), and relies heavily on continually introducing compelling content, products and services. As such, if we, in combination with our third-party developers, fail to deliver such content, products and services, do not execute our strategy successfully or if our new content launches are delayed, our revenue growth, overall revenue or user metrics may decline, and our operating results will suffer.

In addition, our operating margin may experience downward pressure as a result of increasing competition, increased user acquisition costs and the other risks discussed in this Annual Report. We expect to continue to expend substantial financial and other resources on expanding our developer and consumer base, our technology, the expansion of our platform, and marketing. Our operating costs will increase and our operating margins may decline if we do not effectively manage costs, launch new products on schedule that monetize successfully and enhance the games featured on our platform. We rely primarily on digital advertising networks to acquire new users to the platform. Increases in digital advertising costs, including on a per user basis, could have a material adverse effect on our business, financial condition and results of operations, including on our ability to achieve profitability. Neither our user acquisition costs nor our lifetime customer value are assured, and thus we cannot assure you that this ratio will not further decline over time. In addition, we cannot assure you that digital advertising costs will not continue to increase in 2026 or any other future period.

If our revenue does not increase to offset any additional expenses, if we fail to manage or experience unexpected increases in operating expenses or if we are required to take additional charges related to impairments or restructurings, our business, financial condition, results of operations and prospects may be materially adversely affected.

TABLE OF CONTENTS

**Risks Related to Our Indebtedness**

***Our indebtedness could adversely affect our financial health and our ability to execute our business strategy.***

As of December 31, 2025, the aggregate indebtedness under our senior secured notes was $129.7 million, which matures in December 2026. We expect to maintain significant levels of indebtedness going forward. Our indebtedness could have important consequences including:

- making it more difficult for us to satisfy our obligations with respect to our debt, and any failure to comply with the obligations under our debt instruments, including restrictive covenants, could result in an event of default under the indenture governing our senior secured notes or agreements governing future indebtedness;
- increasing our vulnerability to adverse general economic and industry conditions;
- limiting our flexibility in planning for, or reacting to, changes in the economy and our industry;
- placing us at a competitive disadvantage compared to our competitors with less indebtedness;
- making it more difficult to borrow additional funds in the future to fund growth, acquisitions, working capital, capital expenditures and other purposes; and
- potentially requiring us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund our other business needs.

***The instruments governing our indebtedness impose certain restrictions on our business, and future such instruments could impose new restrictions on our business.***

The indenture governing our senior secured notes, contains certain covenants imposing restrictions on our business. These restrictions may affect our ability to operate our business, to plan for, or react to, changes in the market conditions or our capital needs and may limit our ability to take advantage of potential business opportunities as they arise. The credit facility and the indenture governing the senior secured notes include covenants restricting, among other things, our ability to do the following under certain circumstances:

- incur or guarantee additional indebtedness or issue certain disqualified or preferred stock;
- pay dividends or make other distributions on, or redeem or purchase any equity interests or make other restricted payments;
- make certain acquisitions or investments;
- create or incur liens;
- transfer or sell assets;
- incur restrictions on the payment of dividends or other distributions from our restricted subsidiaries;
- alter the business that we conduct;
- enter into transactions with affiliates;
- conduct buy-back or share repurchase programs; and
- consummate a merger or consolidation or sell, assign, transfer, lease or otherwise dispose of all or substantially all our assets.

In addition, the instruments contain customary events of default upon the occurrence of which, after any applicable grace period, the indebtedness could be declared immediately due and payable.

***Servicing our debt requires a significant amount of cash, and we may not have sufficient cash flow from our business to service or repay our substantial debt.***

Our ability to make scheduled payments of the principal of, to pay interest on, and to refinance our debt, depends on our future performance, which is subject to economic, financial, competitive and other factors. Our business may not generate cash flow from operations in the future sufficient to satisfy our obligations under our current indebtedness and any future indebtedness we may incur and to make necessary capital expenditures. Our ability to refinance our outstanding indebtedness or future indebtedness will depend on market conditions and our financial position at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms when needed, which could result in a default on our indebtedness.

TABLE OF CONTENTS

**Repurchases**

The following table provides information about the purchases of our common stock made through the three months ended December 31, 2025:

| Periods | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (in millions)[a] |
|---|---|---|---|---|
| October 1, 2025 through October 31, 2025 | 1,584 | $ 6.62 | 1,584 | $ 24.9 |
| November 1, 2025 through November 30, 2025 | 145,301 | $ 5.84 | 145,301 | $ 24.1 |
| December 1, 2025 through December 31, 2025 | 117,960 | $ 5.67 | 117,960 | $ 23.4 |
| **Total** | 264,845 | $ 5.77 | 264,845 | |

(a) In August 2023, our Board of Directors approved a share repurchase authorization for up to $65.0 million of our common stock. The share repurchase authorization had a term of 12 months and may be suspended or discontinued by our Board of Directors at any time. On December 5, 2024, our Board of Directors re-approved the Company's share repurchase program, pursuant to which the Company is authorized to purchase up to $41.1 million of its Class A Common Stock remaining under the Company's legacy repurchase program and extended the expiration date until otherwise suspended, terminated or modified at any time for any reason by the Board.

**ITEM 6. [Reserved]**

We recorded a gain on legal settlement of $7.5 million and $46.0 million in 2025 and 2024, respectively, in connection with the AviaGames litigation.

Interest expense was $5.8 million in 2025, as compared to interest income, net of $0.3 million in 2024. This was primarily due to lower amounts earned from reduced interest rates, together with lower investment balances.

The provision for income taxes was $0.1 million in 2025 and 2024. This was primarily due to a book loss, state taxes and equity award activities, mostly offset by a full valuation allowance on our deferred tax assets.

Primarily as a result of the factors described above, we had a net loss of $70.4 million in 2025, as compared to a net loss of approximately $46.8 million in 2024.

**Non-GAAP Financial Measures**

In addition to our results determined in accordance with GAAP, we believe the following non-GAAP measure is useful in evaluating our operational performance. We use the following non-GAAP financial information to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that non-GAAP financial information, when taken collectively with GAAP financial information, may be helpful to investors in assessing our operating performance. These results should be considered in addition to, not as a substitute for, results reported in accordance with GAAP.

***Adjusted EBITDA***

"Adjusted EBITDA" is defined as net loss, excluding interest expense (income), net; change in fair value of common stock warrant liabilities; other (expense) income, net; provision for income taxes; depreciation and amortization; stock-based compensation; and certain other non-cash or non-recurring items impacting net loss from time to time, including, but not limited to charges related to impairment of goodwill and long-lived assets, litigation accruals, loss contingency accruals, gains on extinguishment of debt, gains from litigation settlements, restructuring charges and one-time nonrecurring expenses, as they are not indicative of business operations. Adjusted EBITDA is intended as a supplemental measure of our performance that is neither required by, nor presented in accordance with, GAAP. Our management believes Adjusted EBITDA is useful in evaluating its operating performance and is a similar measure reported by publicly-listed U.S. competitors, and regularly used by security analysts, institutional investors, and other interested parties in analyzing operating performance and prospects. By providing this non-GAAP measure, we intend to provide investors with an additional tool to use in evaluating ongoing operating results and trends and in comparing the Company's financial measures with those of comparable companies, which may present similar non-GAAP financial measures to investors. However, you should be aware that when evaluating Adjusted EBITDA, we may incur future expenses similar to those excluded when calculating this measure. In addition, our presentation of this measure should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items. Our computation of Adjusted EBITDA may not be comparable to other similarly titled measures computed by other companies, as all companies may not calculate Adjusted EBITDA in the same manner.

In light of these limitations, Adjusted EBITDA should not be considered in isolation or as a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and using Adjusted EBITDA on a supplemental basis.

The following table reconciles net loss to Adjusted EBITDA for the periods indicated (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2025** | **2024** |
| Net loss | $ (70,408) | $ (46,790) |
| Interest expense (income), net | 5,815 | (298) |
| Provision for income taxes | 108 | 66 |
| Depreciation and amortization | 1,381 | 1,665 |
| Stock-based compensation | 19,580 | 30,015 |
| Change in fair value of common stock warrant liabilities | — | (11) |
| Gain from litigation settlement[(1)] | (7,500) | (46,000) |
| Other expense (income) | 567 | 530 |
| **Adjusted EBITDA** | $ (50,457) | $ (60,823) |

(1) Represents a gain on legal settlement recorded in connection with proceeds received under the terms of a settlement agreement entered into with AviaGames in connection with certain bot misuse litigation. Refer to Note 9, Commitments and Contingencies, in Part II, Item 8 of this Annual Report.

**Liquidity and Capital Resources**

As of December 31, 2025, our principal sources of liquidity are our cash and cash equivalents in the amount of $194.5 million, which are primarily invested in money market funds with maturities of less than three months.

During fiscal year 2021, the Company offered $300.0 million in aggregate principal senior secured notes due 2026. The notes were sold in a private placement to qualified institutional buyers. Interest accrues at an annual interest rate is 10.25% and is payable semiannually on June 15 and December 15 of each year. The notes mature on December 15, 2026. We used the net proceeds from the offering for general corporate purposes. The notes contain customary covenants restricting our and certain of our subsidiaries' ability to incur debt, incur liens, make distributions to holders of our stock, enter into certain transactions with our affiliates, as well as certain financial covenants specified in the indentures. After giving effect to open market repurchases of our senior secured notes, $129.7 million of the senior secured notes remained outstanding as of December 31, 2025. We were in compliance with all covenants applicable to our secured notes as of December 31, 2025 and 2024.

We believe our existing sources of liquidity are sufficient to fund our operating activities on a short- and long-term basis. Our future cash requirements will depend on many factors, including revenue growth and additional sales and marketing spending activities in addition to funds needed to invest in or acquire complementary businesses, applications or technologies. However, we cannot assure you that cash provided by operating activities or cash and cash equivalents will be sufficient to meet our future needs. If we are unable to generate sufficient cash flows from operations in the future, we may have to obtain additional financing. If we obtain additional capital by issuing equity, the interests of our existing stockholders will be diluted. If we incur additional indebtedness, that indebtedness may contain significant financial and other covenants that may significantly restrict our operations. We cannot assure you that we could obtain additional financing on favorable terms or at all.

The following table provides a summary of cash flow data (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Net cash used in operating activities | $ (68,927) | $ (7,074) |
| Net cash used in investing activities | $ (6,137) | $ (1,377) |
| Net cash used in financing activities | $ (10,975) | $ (21,654) |

***Cash Flows from Operating Activities***

Our cash flows from operating activities are significantly affected by the growth of our business primarily related to research and development, sales and marketing, and general and administrative activities. Our operating cash flows are also affected by working capital needs to support growth in personnel-related expenditures and fluctuations in accounts payable and other current assets and liabilities.

Net cash used in operating activities was $68.9 million for the year ended December 31, 2025, which was primarily due to changes in operating assets and liabilities. In addition, the changes in operating assets and liabilities were related to cash receipts and disbursements in the normal course of business.

***Cash Flows from Investing Activities***

Net cash used in investing activities was $6.1 million for the year ended December 31, 2025, which was primarily due to $4.7 million of capitalized software development costs and $1.4 million for purchases of property and equipment.

TABLE OF CONTENTS

***Cash Flows from Financing Activities***

Net cash used in financing activities was $11.0 million for the year ended December 31, 2025, which was primarily due to $9.3 million for repurchases of common stock and $1.3 million of payments for net proceeds from the exercise of common stock options and issuance of common stock.

**Contractual Obligations and Commitments**

Our material cash requirements include the following contractual and other obligations.

***Leases***

We have operating lease arrangements for office space, and finance lease agreements for certain network equipment. As of December 31, 2025, we had lease payment obligations of $1.3 million, with $0.6 million payable within 12 months (see Note 8, Leases, in Part II, Item 8 of this Annual Report).

***Long-Term Debt***

The Company's long-term debt consists of the senior secured notes due in 2026. The total principal amount of $129.7 million, gross of discount and issuance costs, net, is due on December 15, 2026 (see Note 7, Long-Term Debt, in Part II, Item 8 of this Annual Report).

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Estimates**

Our consolidated financial statements have been prepared in accordance with GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the consolidated financial statements, as well as the reported expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources (see Note 2, Summary of Significant Accounting Policies, in Part II, Item 8 of this Annual Report for additional information). Actual results may differ from these estimates under different assumptions or conditions.

***End-User Incentive Programs***

To drive traffic to the platform, the Company provides promotions and incentives to end-users in various forms, including Ticketz and Bonus Cash. Evaluating whether a promotion or incentive is a payment to a customer may require significant judgment.

Our primary end-user incentive is Bonus Cash, which is a promotional incentive that cannot be withdrawn and can only be used by end-users to enter paid-entry fee contests. Bonus Cash used as entry fees for paid Competitions (as defined below) can include newly issued Bonus Cash or Bonus Cash returned to end-users from prior winnings. We recognize the cost of Bonus Cash as sales and marketing expenses or a reduction of revenue (as discussed below). When Bonus Cash is used towards entry fees for a paid Competition and is returned to an end-user as winnings, we do not record any additional sales and marketing expenses or reductions to revenue. Likewise, if Bonus Cash is returned to an end-user and is used to enter subsequent competitions, which they continue to win, we do not record any additional sales and marketing expenses or reductions to revenue.

TABLE OF CONTENTS

**SKILLZ INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**

(In thousands, except for number of shares and per share amounts)

| | Year Ended December 31, | |
|---|---|---|
| | **2025** | **2024** |
| **Revenue** | $ 104,496 | $ 92,865 |
| **Costs and expenses:** | | |
| Cost of revenue | 13,050 | 13,405 |
| Research and development | 20,621 | 16,747 |
| Sales and marketing | 71,125 | 76,360 |
| General and administrative | 71,118 | 78,856 |
| Gain from litigation settlement | (7,500) | (46,000) |
| **Total costs and expenses** | 168,414 | 139,368 |
| **Loss from operations** | (63,918) | (46,503) |
| Interest (expense) income, net | (5,815) | 298 |
| Change in fair value of common stock warrant liabilities | — | 11 |
| Other expense, net of other income | (567) | (530) |
| **Loss before income taxes** | (70,300) | (46,724) |
| Provision for income taxes | 108 | 66 |
| **Net loss** | $ (70,408) | $ (46,790) |
| **Net loss per share attributable to common stockholders:** | | |
| Basic and diluted | $ (4.51) | $ (2.62) |
| **Weighted average shares outstanding:** | | |
| Basic and diluted | 15,605,220 | 17,845,771 |
| | | |
| **Other comprehensive loss:** | | |
| Change in unrealized gain on available-for-sale investments, net of tax | $ — | $ 7 |
| Foreign currency translation loss | (371) | — |
| **Total other comprehensive (loss) income** | (371) | 7 |
| **Total comprehensive loss** | $ (70,779) | $ (46,783) |

See accompanying Notes to the Consolidated Financial Statements.

TABLE OF CONTENTS



The following table presents the estimated useful lives of the Company's property and equipment:

| Property and Equipment | Useful Life |
|---|---|
| Buildings | 39 years |
| Computer equipment and servers | 3 years |
| Capitalized internal-use software | 3 years |
| Furniture and fixtures | 5 years |
| Leased equipment and leasehold improvements | Shorter of estimated useful life or remaining lease term |

***Leases***

The Company accounts for leases in accordance with Accounting Standards Update Topic 842 ("ASC 842"). Under ASC 842, the Company determines if an arrangement is a lease at inception. Right of Use ("ROU") assets and lease liabilities are recognized at commencement date based on the present value of remaining lease payments over the lease term. For this purpose, the Company considers lease payments that are fixed at the time of commencement. As most of the Company's leases do not provide an implicit rate, it uses its incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments. The determination of an appropriate incremental borrowing rate requires judgment. The Company determines its incremental borrowing rate based on publicly available data for instruments with similar characteristics, including recently issued debt, as well as other factors. The ROU asset also includes any lease payments made prior to commencement and is recorded net of any lease incentives received. The Company has elected to account for short-term leases by recognizing lease payments in profit or loss on a straight-line basis over the lease term, and variable lease payments in the period in which the obligation for those payments is incurred.

The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise such options. When determining the probability of exercising such options, the Company considers contract-based, asset-based, entity-based, and market-based factors. The Company's lease agreements may contain variable costs such as common area maintenance, insurance, real estate taxes or other costs. Variable lease costs are expensed as general and administrative expenses as incurred on the consolidated statements of operations and comprehensive loss. The Company's lease agreements generally do not contain any residual value guarantees or restrictive covenants.

ROU assets related to the Company's operating leases are included in operating lease ROU assets, while the corresponding lease liabilities are included in current and non-current operating lease liabilities on the Company's consolidated balance sheets. ROU assets related to the Company's finance leases are included in property and equipment, while the corresponding lease liabilities are included in other current liabilities and other non-current long-term liabilities on the Company's consolidated balance sheets.

***Interest (Expense) Income, Net***

Interest (expense) income, net consisted of the following for the year ended December 31, 2025 and 2024.

| | Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Interest expense | $ (15,245) | $ (15,108) |
| Interest income | 9,430 | 15,406 |
| **Interest (expense) income, net** | $ (5,815) | $ 298 |

**SKILLZ INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Amounts in tables are in thousands, unless otherwise noted)*

**7. Long-Term Debt**

Components of long-term debt were as follows as of December 31, 2025 and 2024:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| 2021 Senior Secured Notes | $ 129,671 | $ 129,671 |
| Unamortized discount and issuance costs | (2,082) | (4,017) |
| **Total debt after discount and issuance costs** | 127,589 | 125,654 |
| Current portion of long-term debt | (127,589) | — |
| **Long-term debt, net** | $ — | $ 125,654 |

***2021 Senior Secured Notes***

On December 20, 2021, the Company entered into $300 million of 10.25% secured notes (the "2021 Senior Secured Notes") in a private placement to certain institutional buyers. The 2021 Senior Secured Notes are guaranteed by the Company's domestic restricted subsidiaries. The interest is payable semiannually on June 15 and December 15 of each year, beginning on June 15, 2022. At issuance, the effective interest rate on the 2021 Senior Secured Notes was 12.14%, and will mature on December 15, 2026, unless repurchased or redeemed earlier.

On April 13, 2023, the Company repurchased approximately $159.8 million of its 2021 Senior Secured Notes. After giving effect to the 2023 and other previous open market repurchases, effective interest rate on the 2021 Senior Secured Notes was 12.09%.

The 2021 Senior Secured Notes contain customary covenants restricting the Company's ability to incur debt, incur liens, make distributions to stockholders, make certain transactions with the Company's affiliates and public filings of our financial statements. We were in compliance with all covenants applicable to the 2021 Senior Secured Notes as of December 31, 2025 and 2024, respectively.

In light of delays in the filing of our annual financial statements on this Form 10-K and the interim financial statements on Form 10-Q for the quarters ended March 31, 2025 and June 30, 2025, the Company fell out of compliance with the reporting covenants under the Indenture governing its senior secured notes that require the Company provide to the trustee and holders of the senior secured notes all quarterly and annual reports required to be filed with the SEC within the time periods specified under the Exchange Act. As such, on September 30, 2025, the Company received a notice of default from the trustee of the senior secured notes.

The Notice of Default provided that the Company was not in compliance under the terms of the Indenture as a result of the Company's failure to timely provide the required quarterly and annual reports within the time periods required under the Exchange Act. Pursuant to the terms of the Indenture, the receipt of the Notice of Default did not result in an Event of Default (as such term is defined under the Indenture) unless the Company remained out of compliance with this reporting covenant for 120 days following receipt of the Notice of Default.

Pursuant to the Indenture, the Company regained compliance with these reporting covenants as it cured all applicable delayed filings within 120 days of receipt of the Notice of Default.

Voluntary prepayments are permitted in whole, or in part, in minimum amounts as set forth in the Indenture Agreement governing the 2021 Senior Secured Notes, with prior notice, and with a prepayment premium of 3.417% on, or during, the twelve-month period that began on December 15, 2024. Voluntary prepayments made on, or during, the twelve-month period beginning December 15, 2025 are not subject to a prepayment premium.

**9. Commitments and Contingencies**

***Legal Matters***

The Company is a party to certain claims, suits, and proceedings which arise in the ordinary course and conduct of its business and has certain unresolved claims pending, the outcomes of which are not determinable at this time. The Company records a liability when it believes that it is probable that a loss will be incurred and the amount can be reasonably estimated. If the Company determines that a loss is reasonably possible and the loss or range of loss can be reasonably estimated, the Company discloses the possible loss or range of loss. Given the unpredictable nature of legal proceedings, there is a reasonable possibility that an unfavorable resolution of one or more such proceedings could in the future materially affect the results of operations, cash flows, or financial position in a particular period. The Company records legal fee expenses associated with such matters when the relevant services are provided.

*Skillz v. AviaGames*

On February 9, 2024, a federal jury in San Jose, California issued a verdict in favor of Skillz in a patent infringement action Skillz brought against a privately-held mobile gaming company, AviaGames, on April 5, 2021 ("Patent Case"). The jury found in favor of Skillz on all issues, determining AviaGames willfully infringed Skillz's U.S. Patent No. 9,649,564, entitled "Peer-to-Peer Wagering Platform" (the "'564 patent") and awarding Skillz its full damages request of $42.9 million. After the jury verdict was issued, Skillz requested certain post-trial relief, including that the Court permanently enjoin AviaGames from continuing to infringe the '564 patent, award Skillz its attorneys' fees due to the exceptional nature of the case, and treble the damages awarded by the jury. In addition, Skillz, along with game developer Big Run Studios, Inc. ("Big Run"), brought a separate case against AviaGames for false advertising, copyright infringement, and violations of California's state unfair competition law in federal court in San Francisco, California ("Unfair Competition Case"). On April 13, 2024, Skillz, Big Run, and AviaGames entered into a settlement agreement with respect to both the Patent Case and Unfair Competition Case pending against AviaGames (the "Litigation Settlement"). In exchange for dismissal of both actions and other settlement terms, AviaGames agreed to pay Skillz and Big Run a total of $80.0 million. On April 12, 2024, the Company and Big Run Studio entered into a Side Letter Agreement providing that a portion of the AviaGames settlement funds allocated to Big Run Studio be utilized to repay the outstanding principal and accrued interest under a loan and security agreement totaling $2.0 million.

During the year ended December 31, 2024, the Company and Big Run collectively received $50.0 million from AviaGames pursuant to the settlement agreement. Of the $50.0 million received, Skillz received $48.0 million, $2.0 million of which was for settlement of the amount outstanding under the loan and security agreement with Big Run. Of the $4.0 million allocated to Big Run under the Side Letter Agreement, Big Run received $2.0 million net of the settlement of the loan and security agreement. Beginning in March of 2025, AviaGames is required to pay Skillz an additional $7.5 million annually over a four-year period as royalty payments for AviaGames' license of the '564 patent and its patent family; no portion of these payments are due to Big Run.

During the year ended December 31, 2024, the Company recorded a gain from the Litigation Settlement netting to $46.0 million consisting of the gross payment of $48.0 million less the $2.0 million received for satisfaction and settlement of the loan and security agreement.

During the year ended December 31, 2025, the Company recorded a gain from the Litigation Settlement of $7.5 million when payment was received, and it will record a gain during fiscal 2026 for the $7.5 million payment received in March 2026 (see Note 18, Subsequent Events). The Company expects to record the $7.5 million payments to be received in March 2027 and 2028 as a gain upon receipt of each amount.

*Skillz v. Tether Litigation*

On August 29, 2025, the Company received a notice ("Notice") from Tether indicating that Tether is terminating all of Tether Agreements, including the Company's Developer Terms and Conditions of Service, as amended, effective as of September 1, 2025. The Company believes the termination notice for cause is invalid and that Tether breached its obligations under the

Tether Agreements. Certain of the Tether Agreements restrict the removal of two games covered thereby, Solitaire Cube and 21 Blitz, from the Company's platform for at least 18 months following termination.

Following receipt of the Notice, on September 1, 2025, the Company filed suit in the Court of Chancery of the State of Delaware, seeking injunctive and declaratory relief in relation to Tether's breach of the Tether Agreements. On October 3, 2025, the Company filed a first amended complaint in the Court of Chancery of the State of Delaware alleging additional breaches of contract and damages. On October 10, 2025, Tether filed its answer to Skillz's first amended complaint and also asserted counterclaims against Skillz for breach of contract, breach of the implied covenant of good faith trademark infringement, and under Delaware's deceptive trade practices act. On March 3, 2026, Skillz filed a second amended complaint, adding Aim Games, LLC ("Aim Games") to the complaint, which Skillz alleges is an alter ego or controlled affiliate of Tether. Skillz alleges that Aim Games impermissibly hosted monetization services for Tether's games in violation of the Tether Agreements. Skillz asserted breach of contract claims against both Tether and Aim Games, and tortious interference claims against Aim Games. Skillz seeks equitable relief and damages arising out of its claims. The case is currently scheduled for trial on August 25-27, 2026. Based on the information known by the Company, any such estimated loss range is not possible to determine.

*Hanna v. Paradise, et. al.*

In March 2024, an alleged stockholder filed a putative derivative complaint, *Hanna v. Paradise, et al*., No. 2024-0228-KSJM, in the Delaware Court of Chancery, purportedly on behalf of Skillz against certain of Skillz's current and former officers, directors, and certain stockholders. The complaint alleges breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, and unjust enrichment arising out of Skillz's March 2021 underwritten secondary public offering. The complaint asserts that certain of the director and officer defendants breached fiduciary duties to Skillz by allegedly inappropriately selling stock as part of the public offering while in possession of material, non-public information, that the stockholder defendants aided and abetted these alleged breaches of fiduciary duties, and that all defendants were unjustly enriched by their sales in the public offering. The complaint seeks unspecified damages and restitution for Skillz from the defendants and the payment of costs and attorneys' fees. Defendants moved to dismiss the complaint on June 6, 2024. Plaintiffs responded by voluntarily dismissing 55 of the stockholder defendants but opposing the motion as to all remaining defendants. Briefing on the motion to dismiss was completed at the end of August 2024. The court heard oral arguments on the motion to dismiss on January 7, 2025. On July 3, 2025, the court issued a ruling converting defendants' motion to dismiss on demand futility grounds to a motion for summary judgment and ordered limited discovery on the independence of a former Skillz director. The court stayed consideration of defendants' other dismissal arguments given its ultimate ruling on the demand futility issue could moot these other dismissal arguments. Plaintiff has issued certain subpoenas following this ruling, and certain non-parties have produced documents in response to those subpoenas. Further briefing in support of summary judgment on demand futility grounds is expected, but no schedule is currently in place for such briefing. Based on the information known by the Company, any such estimated loss range is not possible to determine.

*Skillz vs. Voodoo SAS et. al.*

On July 1, 2024, Skillz filed suit against Voodoo SAS and two affiliate entities, Esport Newco SAS and Esport Newco US Corp. (collectively, "Voodoo") in the United States District Court for the Southern District of New York. In its complaint, Skillz asserts violations of the Lanham Act's prohibition of false advertising and New York's General Business Law § 349 based on, inter alia, Skillz's allegations that Voodoo advertises its mobile games offered through the "Blitz Win Cash" application as "fair," "skill-based," and for "real players only" when in reality Voodoo is fixing the outcome of its tournaments through the use of computer algorithms or "bots." On August 22, 2024, Skillz brought a motion for a preliminary injunction, and on September 18, 2024, Voodoo moved to dismiss the complaint or, in the alternative, to strike certain allegations. Skillz's and Voodoo's motions were both mooted when Skillz amended its complaint on October 2, 2024. On October 8, 2024, Skillz renewed its motion for a preliminary injunction and expedited discovery based on the amended complaint, and Voodoo moved to dismiss the amended complaint on October 16, 2024. Voodoo's motion to dismiss is fully briefed and awaiting a decision by the court. The court denied Skillz's motion for preliminary injunction. The parties are currently participating in discovery.

*Skillz vs. Papaya Gaming, Ltd., et al.*

In March 2024, Skillz sued Papaya Gaming, Ltd. and Papaya Gaming, Inc. (collectively, "Papaya") in the United States District Court for the Southern District of New York alleging false advertising under the Lanham Act and unfair business practices in

connection with Papaya's marketing of its mobile games as "fair" and "skill-based" despite Papaya's deployment of algorithmic competitors ("bots") in its games that win cash prizes for Papaya's benefit. In June 2024, the court denied Papaya's motion to dismiss Skillz's complaint in its entirety. In September 2024, Papaya filed amended counterclaims against Skillz alleging that Skillz also engaged in false advertising and unfair business practices for purportedly allowing bots in games on Skillz's platform, defamation for Skillz's alleged involvement in a non-profit organization that collected and published data related to customer complaints to state attorney generals related to Papaya's and other companies' alleged fraudulent bot use, and purported trademark and copyright infringement of design elements of certain games, among other things. In March 2025, the court dismissed Papaya's defamation counterclaims and severed Papaya's intellectual property claims. Following the court's rulings, Papaya voluntarily dismissed its intellectual claims against Skillz. The parties submitted to the Court summary judgment filings and motions to exclude various experts. On October 27, 2025, the court denied Papaya's motion for summary judgment on Skillz's claims. The court also denied Papaya's motion to exclude Skillz's damages and survey experts. On November 21, 2025, the court granted Skillz's motion for summary judgment of all of Papaya's remaining counterclaims and affirmative defenses. On February 12, 2026, the court granted in part and denied in part Skillz's motion to exclude Papaya's damages and technical experts. The court also granted in part and denied in part Papaya's motion to exclude Skillz's technical expert. The trial is currently scheduled to begin on April 13, 2026.

*Lien, et al. v. Eagle Equity Partners II, LLC, et al.*

On October 31, 2022, a class action was filed, Darcy Lien v. Eagle Equity Partners II, LLC, et al., Case No. 2022-0972-PAF, in the Delaware Court of Chancery against Eagle Equity Partners II, LLC and certain of the former officers and directors (the "Individual D&O Defendants") of Flying Eagle Acquisition Corp. ("Flying Eagle"). This litigation does not name Skillz or any of Skillz's current directors in their capacity as such. Plaintiffs allege that the Individual D&O Defendants (i) failed to exercise proper due diligence and process in connection with Flying Eagle's transaction with Skillz and (ii) made misleading statements in Form S-4 filed with the U.S. Securities & Exchange Commission in connection with the transaction. Defendants filed their initial motion to dismiss on February 17, 2023. Plaintiffs then filed an amended complaint on April 12, 2023. Defendant's motion to dismiss the amended complaint was filed on June 2, 2023. Plaintiff's opposition was filed July 17, 2023, and defendant's reply was filed August 21, 2023. Oral argument was held on the motion to dismiss on January 5, 2024, and on May 29, 2024 the court denied Defendants' motion to dismiss. In November 2024, Skillz filed suit against its insurance carrier for D&O insurance coverage and on January 17, 2025, the insurance carrier agreed to pay a total of $9.8 million to the Company in connection with this matter's settlement agreement. Following certain discovery, on March 27, 2025, the parties executed a term sheet to settle the action in principle for $10.0 million, subject to completing settlement documentation and obtaining court approval. On May 19, 2025, the parties executed a settlement stipulation, subject to court approval. As the successor to Flying Eagle, Skillz is obligated to indemnify and pay legal costs of the Individual D&O Defendants of Flying Eagle in their capacities as such in connection with this action and, as such recorded an expense of $10.0 million, offset by the insurance proceeds of $9.8 million. Of those insurance proceeds, Skillz used $1.3 million to pay defense costs, and Skillz used the remaining balance of those funds, $8.5 million (plus interest earned thereon), to help fund the $10.0 million settlement. Under the terms of the proposed settlement, Skillz funded $10.0 million into Plaintiffs' escrow account on July 10, 2025. The court granted final approval of the settlement on September 2, 2025.

*Mitchell, et al. v. Skillz Platform Inc.*

On January 21, 2026, a putative class action was filed in the Northern District of California, Kel Mitchell et al., v. Skillz Platform Inc., Case No. 3:26-cv-00674-AMO. Plaintiff Kel Mitchell individually and on behalf of all others similarly situated, alleges that Skillz violated California's Unfair Competition Law, made negligent misrepresentations, and is liable for unjust enrichment. Plaintiff Giovanni Garza, individually and on behalf of all others similarly situated, alleges that Skillz engaged in deceptive trade practices under Texas law, made negligent misrepresentations, and is liable for unjust enrichment. Plaintiffs' claims arise out of allegations that Skillz purportedly made misrepresentations about not using bots in competitions on Skillz's platform, misrepresented the evenness of Skillz's matchmaking, and made misrepresentations about a user's ability to withdraw cash. Plaintiffs seek declaratory relief that Skillz's conduct violates applicable state law, compensatory and economic damages, damages for mental anguish, statutory, treble, and punitive damages, restitution of the money lost by the class, interest, costs, and attorneys' fees, and injunctive relief. Skillz filed a motion to dismiss Plaintiffs' complaint on March 10, 2026. Based on the information known by the Company, any such estimated loss is immaterial.

*Vendor Disputes*

Between November 2022 and March 2023, the Company and a vendor entered into several agreements in which the vendor would perform defined professional services. Of the $7.2 million in invoices from the vendor, the Company paid $3.2 million and claimed that the vendor expanded the scope of work without authorization, over billed for its services, performed poorly and unilaterally refused to perform certain agreed upon deliverables. The vendor, in turn, claimed it received proper authorization for the work it performed, completed its contracted-for tasks and that the Company breached the agreements and failed to pay outstanding invoices. The vendor sought $4.0 million in damages, plus interest, attorney fees and costs of litigation. The Company sought counterclaims from the vendors for breach of contract, breach of implied covenant of good faith and fair dealing, and fraudulent inducement and sought approximately $15.0 million in damages, plus interest, attorney fees and costs of litigation. In March 2025, the vendor and the Company settled the dispute. In exchange for mutual releases of all claims, the Company paid the vendor $2.8 million.

In April 2022, the Company and a vendor entered an agreement to license certain rights to develop vendor branded mobile games. In consideration, the Company agreed to pay the vendor certain monetary amounts over three years and the vendor, in turn, would use good faith efforts to promote the games. In December 2024, the vendor filed a complaint in Nevada seeking damages of $1.3 million for breach of contract, failure to pay royalties and unjust enrichment. In April 2025, the Company and the vendor agreed to mediate the matter that resulted in a settlement where the Company agreed to and paid the vendor $0.5 million in fiscal 2025, which represented the past due balances for year one and year two of the agreement that were fully accrued as of December 31, 2024.

*Termination of Operating Lease*

In May 2019, the Company leased its former headquarters with a landlord, (the “Landlord”). From February 2024 to April 2025, the Landlord served demand letters and notices of default on the Company asserting that the Company failed to pay the lease obligations. In April 2025, the Company and the Landlord executed a settlement dismissing with prejudice the dispute and fully resolving the matter. In exchange for the mutual releases, the Company paid the Landlord a lump sum payment of $14.0 million. The Company recorded a loss on termination of the operating lease of $0.4 million representing the difference between the settlement amount and the carrying value of the lease obligation, which was recorded as a component of other expense, net of other income in the statement of operations for the year ended December 31, 2024.

*Former Employee*

On May 15, 2019, a former employee of the Company filed a suit against the Company in the San Francisco Superior Court in California for claims including breach of contract, retaliation and wrongful termination. The case was tried in August and September 2021. The jury found in favor of the former employee and rendered a verdict against the Company for $11.6 million in compensatory damages, and the Company recorded a loss contingency accrual of $7.1 million and corresponding general and administrative expenses in such amount in the third quarter of 2021. In April 2022, the judge in the case determined, in light of the Company’s post-verdict motions, that the instructions given to the jury at trial were defective. Accordingly, the judge ordered a new trial on damages or, alternatively, permitted the plaintiff to accept a reduced verdict in the amount of $4.4 million, which the plaintiff subsequently levied from the Company’s bank account. On May 25, 2022, the Company filed an appeal from the judgment seeking, in part, entry of judgment in the Company's favor notwithstanding the verdict. The plaintiff accepted the reduced verdict, and filed an appeal from the judgment on June 7, 2022, seeking in part, to reinstate the jury's original verdict (or an award less than the original verdict but greater than the $4.4 million final judgment) and challenge the trial court’s conclusion that stock options are not “wages,” which was the basis for dismissing his wrongful termination and retaliation claims. Skillz filed its response and reply brief on July 7, 2023. On April 8, 2024, the Court of Appeals issued its decision, affirming the judgment of $4.4 million, with an additional $2.3 million for a total award of $6.7 million. The Court of Appeals also affirmed the dismissal of the wrongful termination and retaliation claims, holding that stock options are not wages. The Court of Appeal’s decision became final, non-appealable and enforceable on May 20, 2024.

On October 11, 2024, the Court issued preliminary legal rulings on post-judgment interest and ordered parties to meet and confer to determine whether an agreement could be reached. The Company and former employee agreed that post-judgment interest of $733 thousand was owed, but the Company objected to any additional amounts as requested by the former employee.

On November 21, 2024, the Court adopted the amount of interest owed and denied additional amounts of post-judgment interest that the former employee claimed. On December 9, 2024, the former employee filed a Notice of Appeal challenging the Court's denial of a substantial amount of post-judgment interest in excess of $733 thousand. On January 8, 2025, the former employee filed an Abandonment of Appeal, thereby terminating the appeal. The Company considered this matter resolved.

***Indirect Taxes***

The Company is subject to indirect taxes, including sales and use tax in the United States and value-add tax in certain foreign jurisdictions. The Company has indirect tax liabilities totaling $12.6 million and $14.9 million as of December 31, 2025 and 2024, respectively, associated with indirect taxes based on currently available information and assumptions that the Company believes are reasonable based on an evaluation of relevant factors. Indirect tax liabilities are adjusted considering changing facts and circumstances, such as the closing of a tax examination, further interpretation of existing tax law, or new tax law. The Company recognizes changes to its estimate if it is estimable and probable that its position would not be sustainable upon examination by tax authorities. Although management believes the Company's recorded liabilities are reasonable, no assurance can be given that the final tax outcomes of these matters will not be different from that which its liabilities are based on. The Company's application of the revenue code for indirect taxes in certain jurisdictions, including those within the United States, may be challenged by taxing authorities in those jurisdictions. The Company is in the process of filing self-disclosure returns in unregistered jurisdictions. Any associated assessments may result in additional tax liabilities. The Company does not currently anticipate that any such assessments will result in a material increase in the liabilities (see Note 2, Summary of Significant Accounting Policies).

The Company is currently undergoing an examination in the State of Washington regarding its indirect tax liability.

**11. Common Stock Warrants**

As of December 31, 2025, the Company had no Private Warrants outstanding as they all expired in fiscal 2025.

As of December 31, 2024, the Company had 226,786 Private Warrants outstanding.

During the years ended December 31, 2025 and 2024, there were no Private Warrants exercised.

In connection with the closing of our special purpose acquisition company, Flying Eagle Acquisition Company ("FEAC") and its initial public offering, FEAC completed the private sale of 501,667 warrants to FEAC's sponsor at a purchase price of $30.00 per warrant. In connection with the FEAC Business Combination, FEAC's sponsor agreed to forfeit 250,833 Private Warrants. Each Private Warrant allows the sponsor to purchase one share of Class A common stock at $230.00 per share.

Private Warrants and the shares of Class A common stock issuable upon exercise of the Private Warrants are not transferable, assignable or sellable until 30 days after the completion of the FEAC business combination, subject to certain limited exceptions. Additionally, the Private Warrants are not non-redeemable so long as they are held by the initial purchasers or such purchasers' permitted transferees. If the Private Warrants are held by someone other than their initial purchasers or their permitted transferees, the Private Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the public warrants.

## 12. Stockholders' Equity

### *Common Stock*

The Company's amended and restated certificate of incorporation authorizes the issuance of Class A common stock and Class B common stock. The rights of the holders of Class A common stock and Class B common stock are identical, except with respect to voting and conversion. Holders of Class A common stock are entitled to one vote per share and holders of Class B common stock are entitled to 20 votes per share. Shares of Class B common stock are convertible into an equivalent number of shares of Class A common stock and generally convert into shares of Class A common stock upon transfer. Any dividends paid to the holders of Class A common stock and Class B common stock will be paid on a pro rata basis. The payment of dividends is restricted under the terms of the Company's 2021 Senior Secured Notes. On a liquidation event, any distribution to common stockholders is made on a pro rata basis to the holders of the Class A common stock and Class B common stock.

As of December 31, 2025 and 2024, the Company has authorized a total of 41.3 million shares, consisting of (i) 31.3 million shares of common stock, par value $0.0001 per share ("Common Stock"), including 25.0 million shares of Class A common stock, par value $0.0001 per share ("Class A Common Stock"), 6.3 million shares of Class B common stock, par value $0.0001 per share, and (ii) 10.0 million shares of preferred stock, par value $0.0001 per share.

We own 82.4% of the combined equity of RZR (formerly Aarki), consisting of preferred stock and common stock. The equity in RZR (formerly Aarki) not owned by Skillz consists of share-based payment awards made to employees. The resulting non-controlling interest related to these shares is not material. Under our Series A Preferred Stock Purchase Agreement with RZR (formerly Aarki), they may undertake funding transactions via the sale of its preferred stock. The investment agreement stipulates that Skillz has right of first refusal to match offer terms of any proposed sale of RZR (formerly Aarki) stock to a third party. We did not purchase RZR stock in 2025 and we purchased $5.0 million in exchange for Series B preferred stock of RZR in 2024, which was eliminated upon consolidation.

### *Share Repurchase Program*

On August 18, 2023, the Board authorized a share repurchase program (the "Share Repurchase Program") pursuant to which the Company may repurchase, at any time or from time to time, but for a period no longer than one year from the date of authorization, shares of Class A Common Stock up to an aggregate purchase price of $65.0 million. Such purchases may be made on the New York Stock Exchange or any other national securities exchange on which the Class A Common Stock is then traded. The Share Repurchase Plan is pursuant to Rule 10b5-1 promulgated under the Exchange Act and/or pursuant to accelerated share repurchase arrangements, tender offers, privately negotiated transactions or otherwise. On December 5, 2024, the Board re-approved the Share Repurchase Program and extended the expiration date until otherwise suspended, terminated or modified at any time for any reason by the Board.

Under the Share Repurchase Program, the Company repurchased 1.7 million and 3.1 million shares at a weighted average price of $5.45 and $6.24 per share for an aggregate value of $9.3 million and $19.4 million during the years ended December 31, 2025 and 2024, respectfully. Included in the 3.1 million shares repurchased during the year ended December 31, 2024 is a total of 979,848 shares repurchased in a private transaction from two shareholders, deemed to be related parties to the Company, at $7.00 per share, a 35% premium to the Company's share price at the time of the transaction (see Note 15, Related-Party Transactions).

TABLE OF CONTENTS



A reconciliation of the Company's effective tax rate is as follows for the year ended December 31, 2024:

| | Year Ended December 31, |
|---|---|
| | 2024 |
| **Income tax rate reconciliation** | **%** |
| At statutory rate | 21.0 % |
| State taxes | (0.1)% |
| Valuation allowance | (7.8)% |
| Stock-based compensation | (12.7)% |
| Permanent differences related to fair value adjustments | (0.5)% |
| **Effective income tax rate** | (0.1)% |

***Deferred Tax Assets and Liabilities***

Deferred income taxes reflect the net tax effects of loss and credit carryforwards and temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities for federal and state income taxes are as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| **Deferred tax assets:** | | |
| Net operating loss carryforwards | $ 170,229 | $ 151,015 |
| Stock-based compensation | 863 | 952 |
| Reserves and accruals | 4,768 | 5,394 |
| Property and equipment | 351 | 604 |
| Lease liabilities | 31 | 2,542 |
| Capitalized research and development | 9,693 | 12,961 |
| Sec. 163(j) interest carryforwards | 8,015 | 6,445 |
| Other | 29 | 36 |
| **Total deferred tax assets** | 193,979 | 179,949 |
| Less: valuation allowance | (193,949) | (179,877) |
| **Deferred tax assets, net of valuation allowance** | 30 | 72 |
| **Deferred tax liabilities:** | | |
| Right-of-use assets | (30) | (72) |
| **Total deferred tax liabilities** | (30) | (72) |
| **Net deferred tax assets (liabilities)** | $ — | $ — |

A valuation allowance is required to be established when it is more likely than not that all or a portion of a deferred tax asset will not be realized. Realization of deferred tax assets is dependent upon future earnings, the timing and amount of which are uncertain. A full review of all positive and negative evidence needs to be considered. As of December 31, 2025 and 2024, the Company has provided a full valuation allowance on its net deferred tax assets.

Changes to the valuation allowance were related to the following:

| | Year Ended December 31, 2025 |
|---|---|
| **Valuation allowance** | |
| Beginning balance | $ 179,877 |
| Change related to continuing operations | 14,072 |
| Change related to acquisitions | — |
| Change related to other comprehensive income | — |
| **Valuation allowance ending balance** | $ 193,949 |

As of December 31, 2025, the Company had net operating loss carryforwards for U.S. Federal and state income tax purposes of approximately $701.6 million and $280.0 million. The U.S. Federal and state net operating loss carryforwards, if not utilized, will expire beginning in 2033 and 2032, respectively. Approximately $665.6 million of our U.S. Federal net operating loss carryforwards are not subject to expiration. Utilization of some of the U.S. Federal and state net operating loss and credit carryforwards may be subject to annual limitations due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state provisions. The annual limitations may result in the expiration of net operating losses and credits before utilization. The Company has performed a Section 382 study as of December 31, 2024 and does not expect any net operating losses to expire unused due to Section 382 limitations.

The Company files tax returns in the U.S. and various local, state and foreign jurisdictions. The Company is not currently under examination in any of these jurisdictions and all its tax years remain open to examination due to net operating loss carryforwards. The Company does not have any material reserves for uncertain tax positions.

### 15. Related-Party Transactions

On December 10, 2024, the Company entered into Share Repurchase Agreements (the "Share Repurchase Agreements") with Wildcat Capital Management, LLC and Wildcat Partner Holdings, LP (the "Wildcat Parties"). Prior to the transaction, the Wildcat Parties owned more than 6% of our Class A Common Stock in the aggregate. Pursuant to the Share Repurchase Agreements, the Company agreed to repurchase 961,532 shares of its Class A Common Stock from Wildcat Partner Holdings, LP at a price of $7.00 per share, for a total purchase price of $6.7 million, and 18,316 shares of its Class A Common Stock from Wildcat Capital Management, LLC at a price of $7.00 per share, for a total purchase price of $0.1 million (collectively, the "Share Repurchase Transactions"), which in the aggregate comprised all of the shares of Class A Common Stock beneficially owned by the Wildcat Parties. The Share Repurchase Agreements contain customary representations and warranties, and closed on December 10, 2024.

At a repurchase price of $7.00 per share, the shares of Class A Common Stock were repurchased at a 35% premium to the Company's share price at the time of the transaction. The Company recorded the purchase price of the Share Repurchase Transactions as treasury stock.

In December 2024, in light of interest shown by certain institutional shareholders to sell their shares back to the Company, including the Wildcat Parties, the Board formed a special transactions committee comprised solely of independent directors (the "Special Transactions Committee"). The Special Transactions Committee was charged with evaluating and approving any share repurchases from such institutional investors.

Aside from Share Repurchase Transactions and the Executive grants discussed in Note 13, Stock-Based Compensation, the Company did not have any other significant related party transactions during the years ended December 31, 2025 and 2024.

TABLE OF CONTENTS

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our CEO and CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2025. The term "disclosure controls and procedures" means controls and other procedures of a company that are designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated, recorded, processed, summarized, reported and communicated within the time periods specified in the U.S. Securities and Exchange Commission's ("SEC") rules and forms.

Based on the evaluation of our disclosure controls and procedures, management has concluded that, as of December 31, 2025, our disclosure controls and procedures were not effective due to the material weaknesses in internal control over financial reporting described below. In light of this determination, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the consolidated financial statements for the periods covered by, and included in, this Annual Report on Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP. In light of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate in light of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

The Company's management, including the CEO and CFO, conducted an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2025 based on the criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the results of this assessment, management concluded that internal control over financial reporting was not effective as of December 31, 2025, due to the existence of material weaknesses described below.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

As previously reported, the following material weaknesses continued to exist as of December 31, 2025:

1. Risk assessment: The Company did not maintain a sufficiently formalized and documented enterprise-level risk assessment process aligned with the 2013 Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As a result, the Company did not appropriately reassess and adequately design and implement controls over financial reporting, including with respect to identification and review of disclosures and monitoring controls, and with respect to providing the appropriate evidence of review of reconciliations, budgets, and key elements of the financial close process.

2. Information technology general controls ("ITGCs"): As of December 31, 2025, ITGCs in the areas of access and program change management over IT systems that support the Company's financial reporting processes were not designed or operating effectively. Specifically, the Company did not maintain sufficient: (a) user access controls to ensure appropriate segregation of duties and adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel; (b) program change management controls to ensure that IT program and data changes affecting financial information technology applications and underlying records are identified, tested, authorized, and implemented appropriately; and (c) program operations controls. As a result, the Company's related IT dependent manual and application controls that rely upon the affected ITGCs, or information coming from IT systems with affected ITGCs were also deemed ineffective.

3. Internal control over financial reporting: As of December 31, 2025, controls related to properly evaluating accounting processes were not adequately designed, implemented or operating effectively including the lack of sufficient documentation or evidence retained to demonstrate management's sufficient review over several financial statement areas, as it relates to the Company's reconciliations, budgets, key elements of the financial reporting process, and IT-dependent controls. Additionally, there was an inadequate review of complex accounting assumptions, together with a lack of qualified accounting personnel employed during the year.

The material weaknesses described above were identified during management's assessment in prior years and confirmed by our independent registered public accounting firm. Although these material weaknesses did not result in any identified material misstatements of the Company's previously or currently issued financial statements, there is a reasonable possibility that a material misstatement to the consolidated financial statements might not be prevented or detected on a timely basis.

**Remediation Efforts**

Management has been actively engaged in developing and implementing remediation plans to address these material weaknesses as described below.

During fiscal year 2025, management made the following progress on its remediation efforts:

- Made significant investment in hiring more appropriately skilled accounting resources to enhance the financial close process, technical accounting, tax accounting and internal control over financial reporting capabilities, together with engaging qualified consultants, as appropriate.
- Redesigned certain controls in financial reporting processes and implemented additional internal control procedures in our financial reporting processes.
- Trained finance, accounting, operations and engineering personnel, together with other key roles across the organization in the design and execution of internal controls under required standards.

While we have implemented changes to our control environment, we require additional time to complete the implementation of our remediation plans and demonstrate the effectiveness of our efforts. The material weaknesses cannot be considered remediated until the underlying remediated controls operate for sufficient time, and management has concluded, through testing, that these controls are operating effectively.

Management, with oversight from the Audit Committee, will continue to work to remediate the Company's material weaknesses, and reinforce the overall design and operating effectiveness of our internal control environment. The following has been planned for implementation in management's ongoing efforts to remediate the identified material weaknesses:

- Management will continue to enhance and standardize policies and procedures across the Company to ensure consistency and performance of internal controls;
- Management will continue to make strategic investments in qualified personnel, external consultants, together with deploying available tools and systems to streamline and automate the execution and documentation of internal controls throughout the Company; and
- Management will continue to employ, engage, educate and train personnel, including external consultants, throughout the Company on the importance of documenting and following internal controls.

We expect to complete remediation during fiscal year 2026, subject to successful testing of operating effectiveness.

# Annex 4

# The Cash Flow Forecast of Skillz

**Page 80**

# SKILLZ INC. — SENIOR SECURED NOTES: DEBT TERMS & INTEREST SCHEDULE

## KEY DEBT TERMS

| | | |
|---|---|---|
| Instrument | 10.25% Senior Secured Notes | *Source: Skillz 8-K Dec 2021; S&P Global Market Intelligence Dec 16, 2021* |
| Issuer | Skillz Inc. (NYSE: SKLZ) | |
| Original Principal | $300,000,000 | *Source: Skillz 8-K Dec 15, 2021 — private offering via Citi* |
| Outstanding Principal (Dec 2025) | $129,700,000 | *Source: Skillz Q4 2025 Earnings 8-K, Dec 31 2025* |
| Coupon Rate | 10.3% | *10.25% per annum, semi-annual payments* |
| Maturity Date | December 15, 2026 | *Bullet maturity — full principal due in single payment* |
| Issue Date | December 20, 2021 | |
| Security | First-lien senior secured | |
| Guarantors | All subsidiaries (excl. certain excluded) | |
| Amortization | None — bullet maturity | *No scheduled principal repayment before Dec 15, 2026* |
| Covenant Breach | Default notice received Sep 30, 2025 (late SEC filings); cured within 120-day period | *Source: Skillz 10-Q Q3 2025* |
| Current Classification | ~$127.6M classified as current as of Dec 31 2025 | *Source: Skillz Q4 2025 8-K* |

## KEY DERIVED METRICS

| | | |
|---|---|---|
| Annual Interest Expense | $13,294,250 | *Outstanding principal × 10.25% coupon* |
| Semi-annual Interest Payment | $6,647,125 | *Paid in June and December each year* |
| Interest as % of Dec-2025 Cash | 6.8% | *Annual interest / $194.5M cash on hand Dec 2025* |
| **Total Obligation (Principal + 1 yr int** | **$142,994,250** | *Full bullet + one additional year of coupon payments* |

## SEMI-ANNUAL INTEREST PAYMENT SCHEDULE (2026)

| Payment Date | Type | Principal (Start) | Coupon Rate | Payment Amount | Notes |
|---|---|---|---|---|---|
| June 15, 2026 | Interest | $129,700,000 | 10.3% | $6,647,125 | *Semi-annual coupon payment* |
| **December 15, 2026** | **Interest + Principal** | $129,700,000 | 10.3% | **$136,347,125** | *FINAL PAYMENT: coupon + full bullet principal* |
| **TOTAL 2026 CASH OUTFLOW (Interest + Principal)** | | | | **$142,994,250** | |

## SKILLZ INC. — SEGMENT P&L: SKILLZ vs RZR | FY2024A FY2025A FY2026E | $000s

*Source: Skillz 10-K FY2025, Notes to Financial Statements — Segment Information (exact actuals). FY2026E uses assumptions in yellow cells below.*

### KEY ASSUMPTIONS — FY2026E (yellow = inputs)

| Assumption | Value | Rationale |
|---|---|---|
| Skillz revenue growth YoY | (3.0%) | *Tether protected until Mar-2027 but platform decay* |
| RZR revenue growth YoY | 12.0% | |
| Skillz OpEx as % Of rev(excl. litigation) | 12.0% | *As % Of Rev 2024 2025* |
| RZR OpEx change YoY | 20.0% | *RZR reinvesting in growth. OpEx grows slower than revenue → improving EBITDA margin.* |

| | FY2024 Actual | | | FY2025 Actual | | | 2026E | | | Rationale |
|---|---|---|---|---|---|---|---|---|---|---|
| **Line Item ($000s)** | Skillz | RZR | Total | Skillz | RZR | Total | Skillz | RZR | Total | |
| REVENUE | | | | | | | | | | |
| **Revenue** | **$82,442** | **$10,876** | **$93,318** | **$78,154** | **$26,790** | **$104,944** | **$75,809** | **$30,005** | **$105,814** | *See assumptions on top* |
| COSTS (LESS:) | | | | | | | | | | |
| **Cost of revenue** | **($9,522)** | **($3,883)** | **($13,405)** | **($8,532)** | **($4,246)** | **($12,778)** | **($10,600)** | **($3,901)** | **($14,501)** | RZR: 13% of Rev (in 2025: 16%) - improving as scale SKILLZ: As Q1 2026 actual * |
| EUEM | ($37,164) | | ($37,164) | ($34,046) | | ($34,046) | ($30,324) | | ($30,324) | 40% of Rev (in 2025: 43%) |
| UA — new user acquisition | ($15,891) | | ($15,891) | ($15,744) | | ($15,744) | ($18,194) | | ($18,194) | 24% of Rev (in 2025: 20%) |
| **Marketing & UA subtotal (Skillz)** | **($53,055)** | | | **($49,790)** | | | **($48,518)** | | | |
| Headcount expenses | ($26,709) | | ($26,709) | ($26,301) | | ($26,301) | ($30,324) | | ($30,324) | 40% of Rev (in 2025: 34%) |
| Consulting fees | ($4,194) | | ($4,194) | ($11,305) | | ($11,305) | ($12,888) | | ($12,888) | 17% of Rev (in 2025: 14%) |
| Vendor and software expenses | ($12,852) | | ($12,852) | ($8,204) | | ($8,204) | ($9,855) | | ($9,855) | 13% of Rev (in 2025: 10%) |
| Legal fees (non-litigation) | ($6,836) | | ($6,836) | ($3,105) | | ($3,105) | ($3,790) | | ($3,790) | 5% of Rev (in 2025: 4%) |
| Litigation expenses | ($13,087) | | ($13,087) | ($16,193) | | ($16,193) | ($16,678) | | ($16,678) | 22% of Rev (in 2025: 21%) - Continue of litigation with Papaya and Voodoo |
| Office and operations expenses | ($5,659) | | ($5,659) | ($5,589) | | ($5,589) | ($5,307) | | ($5,307) | 7% of Rev (in 2025: 7%) |
| RZR operating expenses (single cost block) | | ($14,611) | ($14,611) | | ($20,998) | ($20,998) | | ($22,804) | ($22,804) | 76% of Rev (in 2025: 78%) - improving as scale |
| Other segment items | ($3,733) | | ($3,733) | ($1,138) | | ($1,138) | | | - | As Q1 2026 actual |
| **Adjusted EBITDA** | ($53,205) | ($7,618) | **($60,823)** | ($52,003) | $1,546 | **($50,457)** | ($62,150) | $3,301 | **($58,850)** | |
| *Adj. EBITDA margin %* | *(64.5%)* | *(70.0%)* | *(65.2%)* | *(66.5%)* | *5.8%* | *(48.1%)* | *(82.0%)* | *11.0%* | *(55.6%)* | |

## TETHER STUDIOS AGREEMENT — TERMINATION RISK ANALYSIS

Source: Skillz 10-K FY2025 filed March 31, 2026 — "For the year ended December 31, 2025, Tether accounted for 51% of our revenue."

8-K filed September 2, 2025: Termination notice received August 29, 2025. Skillz filed suit in Delaware Court of Chancery, September 1, 2025.

| AGREEMENT OVERVIEW | | |
|---|---|---|
| Developer | Tether Studios LLC / Tether Games Inc. | *Source: Skillz 8-K Sep 1, 2025 (Form 8-K, Item 1.02)* |
| Games Covered | Solitaire Cube, 21 Blitz (and 11 others) | *Tether's catalog generated $250M+ in lifetime revenue on Skillz platform* |
| Agreement Type | Revenue share on entry fees + SDK license | *Skillz provides SDK; both parties share revenue from user entry fees* |
| Revenue Share | ~50% to Tether, ~50% retained by Skillz | *Typical Skillz developer split per platform terms* |
| Tether % of FY2025 Revenue | 51.0% | *Source: Skillz 10-K FY2025 (sklz-20251231.htm) — "For the year ended December 31, 2025, Tether accounted for 51% of our revenue"* |
| Tether Implied Revenue (FY2025) | **$39,858,540** | *51% ×( $78.2M FY2025 revenue) = $39.8M at risk* |
| Termination Notice Date | August 29, 2025 | *Source: Skillz 8-K filed Sep 1, 2025* |
| Stated Effective Date | September 1, 2025 (convenience) / Sep 28, 2025 (cause) | |
| Skillz Position | Notice is invalid and in breach of Tether's obligations | *Skillz filed suit in Delaware Court of Chancery, Sep 1, 2025* |
| 18-Month Protection | Solitaire Cube + 21 Blitz must remain on platform | *Post-termination clause in original agreement* |
| Protection Expiry | | |
| Risk Classification | CRITICAL — largest single revenue concentration risk | *Stock dropped 12.7% on announcement (Benzinga, Sep 3 2025)* |

### TETHER DISPUTE TIMELINE

| Date | Event | Notes | | Implication |
|---|---|---|---|---|
| Sep 2021 | Tether games among top revenue drivers | | | |
| Aug 29, 2025 | Tether sends termination notice (convenience) | | *Stock -12.7% pre-market* | |
| Sep 1, 2025 | Skillz files suit in Delaware Court of Chancery | | *Seeking injunctive + declaratory relief* | |
| Sep 28, 2025 | Alternative 'cause' termination date (if conv. fails) | | *Disputed by Skillz* | |
| ~Mar 2027 | 18-month protection period expires | | *CRITICAL: Solitaire Cube + 21 Blitz at risk* | |
| Post Mar 2027 | | | | |

## AVIAGAMES PATENT SETTLEMENT — CASH INFLOW SCHEDULE

*Source: Skillz Q4 2025 Earnings Call — "the annual .5M payment was received in Q1 2026, bringing total payments received from AviaGames to 5M to date. Expects two additional .5M payments in March 2027 and March 2028."*

### SETTLEMENT BACKGROUND

| | | |
|---|---|---|
| Counterparty | AviaGames Inc. / Big Run Studios | *Source: Skillz Q4 2024 Earnings Call transcript; GamesBeat Jun 18, 2025* |
| Nature of Claim | Patent infringement (competitive gaming IP) | |
| Jury Award (Feb 2024) | $42,900,000 | *Source: Skillz Wikipedia / GamesBeat — $42.9M jury verdict Feb 2024* |
| Settlement Structure | Lump sum + annual royalty payments | |
| Initial Lump Sum | $50,000,000 | *Source: Skillz Q4 2024 Earnings Call — '$50M received April 2024'* |
| Annual Royalty | $7,500,000 | *Source: GamesBeat Jun 2025 — '$7.5M per year for 4 years starting 2025'* |
| Royalty Period | 2025 – 2028 (4 annual payments) | |
| Total Settlement Value | $80,000,000 | *$50M + (4 x $7.5M) = $80M total* |
| FY2024 Recognition | $46,000,000 | *Source: Skillz Q4 2025 8-K — '$46M gain from litigation settlement in 2024'* |
| FY2025 Recognition | 7,500,000 | *Source: Skillz 10-K FY2025 — "We recorded a gain on legal settlement of .5M in 2025"* |

### PAYMENT SCHEDULE — CUMUL

| Period | Payment Type | Amount | Cumulative Received | Notes |
|---|---|---|---|---|
| **April 2024** | Lump sum — initial settlement | **50,000,000** | **50,000,000** | RECEIVED — April 2024 |
| **March 2025** | Annual royalty payment #1 | **7,500,000** | **57,500,000** | RECEIVED — March 2025 (per 10-Q Q1 2025) |
| **March 2026** | Annual royalty payment #2 | **7,500,000** | **65,000,000** | **RECEIVED — Q1 2026 (Q4 2025 Earnings Call, Apr 2026)** |
| **March 2027** | Annual royalty payment #3 | **7,500,000** | **72,500,000** | EXPECTED — per Q4 2025 Earnings Call |
| **March 2028** | Annual royalty payment #4 — FINAL | **7,500,000** | **80,000,000** | EXPECTED — final payment under settlement |
| **TOTAL SETTLEMENT (all cash)** | | | | |

**ADJ. EBITDA → OPERATING CASH FLOW BRIDGE | FY2024A FY2025A FY2026E ($M)**

*Source: Skillz 10-K FY2025 — Segment Note (Adj. EBITDA) + CF Statement (OCF). FY2026E: estimates in blue*

| Line Item | FY2024A | FY2025A | FY2026E | Notes |
|---|---|---|---|---|
| **Adjusted EBITDA (from segment note: Skillz + RZR)** | **($60.8)** | **($50.5)** | **($58.8)** | *Exact per 10-K FY2025 Segment Note* |
| + Re-include AviaGames gain (EBITDA removed; OCF reflects cash receive | $46.0 | $7.5 | $7.5 | *EBITDA strips one-time gains. OCF includes the actual cash. 2026E: $7.5M received March 2026.* |
| ± Reverse EBITDA add-backs (interest, taxes, other expense) | ($0.3) | ($6.5) | ($13.3) | *2024: net interest income of $0.3M. 2025: net interest expense $5.8M + tax $0.1M + other $0.6M. 2026E: full year coupon ~$13.3M* |
| + Non-cash items (accretion of debt discount, lease expense, bad debt) | $1.9 | $2.2 | $0.8 | *2024: accretion $1.7M + bad debt $0.2M. 2025: accretion $1.9M + lease $0.3M. 2026E: lower accretion as notes approach Dec 2026 maturity.* |
| ± Working capital changes (AR, AP, prepaid, lease liabilities, accruals) | $10.4 | ($21.7) | ($5.0) | *2024: +$10.4M (accruals built, AP extended). 2025: -$21.7M (lease payouts + accrual unwind). 2026E: normalizing to ~-$5M as one-time 2025 items clear.* |
| ± Other reconciling items | ($4.3) | $0.1 | | *2024 only: ~$4.3M unidentified gap between sum of items and reported OCF. Likely Avia settlement cost reimbursements or legal escrow not separately disclosed.* |
| **Operating cash flow (reported)** | **($7.1)** | **($68.9)** | **($68.8)** | |
| *Less: AviaGames cash received (one-time)* | *($50.0)* | *($7.5)* | *($7.5)* | *Stripped to isolate recurring business performance.* |
| **Operating cash burn (ex-Avia one-time)** | **($57.1)** | **($76.4)** | **($76.3)** | |

**SOLVENCY PROJECTION — 3 SCENARIOS (2026E – 2029E) | All figures in $M**

*SHARED ASSUMPTIONS: Opening cash Jan 2026 =$194.5M Dec-2025. Debt = $129.7M due Dec 15, 2026 (bullet). Avia: $7.5M in March 2026 2027 and March 2028.*

**Scenario B — FY2025 exact burn: $76.4M/yr (2026), $63.1M/yr from 2027 | Tether 50% lost mid-2027**

| Line Item | 2024A | 2025A | 2026E | 2027 Q1 E | Notes |
|---|---|---|---|---|---|
| **Opening cash balance** | $279.0 | $271.9 | $194.5 | ($4.0) | |
| Core operating cash burn | ($57.1) | ($76.4) | ($76.3) | ($19.1) | *see PL Tab. 2027 - 2026 Run-rate divded by 4* |
| AviaGames royalty received | $50.0 | $7.5 | $7.5 | $7.5 | *$7.5M in March 2026 + March 2027 + March 2028. Ends after 2028.* |
| Tether revenue loss | - | - | - | - | *51% ×( $78.2M FY2025 revenue) = $39.8M at risk from Mar 2027* |
| Debt repayment (bullet) | - | - | ($129.7) | - | *$129.7M principal due December 15, 2026 — bullet payment, no amortization.* |
| **Net cash change in year** | **($7.1)** | **($68.9)** | **($198.5)** | **($11.6)** | |
| **Closing cash balance** | **$271.9** | **$194.5** | **($4.0)** | **($15.6)** | |

# Annex 5

# 90-Day Cash Flow Forecast

**Page 87**

| Actual Cash Flow (in K $) | Week 31 | July 29-31 | Week 32 | Week 33 | Week 34 | Week 35 | August | Week 36 | Week 37 | Week 38 | Week 39 | September | Week 40 | Week 41 | Week 42 | Week 43 | Week 44 | October |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 29/07/2026 | | 01/08/2026 | 09/08/2026 | 16/08/2026 | 23/08/2026 | | 01/09/2026 | 06/09/2026 | 13/09/2026 | 20/09/2026 | | 01/10/2026 | 04/10/2026 | 11/10/2026 | 18/10/2026 | 25/10/2026 | |
| Weekly | 31/07/2026 | | 08/08/2026 | 15/08/2026 | 22/08/2026 | 31/08/2026 | | 05/09/2026 | 12/09/2026 | 19/09/2026 | 30/09/2026 | | 03/10/2026 | 10/10/2026 | 17/10/2026 | 24/10/2026 | 31/10/2026 | |
| | Month end Forecast | | Forecast | Forecast | Forecast | Month end Forecast | | Forecast | Forecast | Forecast | Month end Forecast | | Forecast | Forecast | Forecast | Forecast | Month end Forecast | |
| Collection PSP | 3,287 | 3,287 | 9,441 | 8,261 | 8,261 | 10,621 | 36,582 | 6,264 | 8,769 | 8,769 | 13,780 | 37,583 | 3,886 | 9,177 | 9,067 | 9,067 | 9,067 | 40,264 |
| Collection Ads | | 0 | | | 0 | 369 | 369 | 71 | 60 | 0 | 469 | 600 | 71 | 60 | 0 | 0 | 469 | 600 |
| **Total Cash Receipts** | **3,287** | **3,287** | **9,441** | **8,261** | **8,261** | **10,990** | **36,951** | **6,335** | **8,829** | **8,769** | **14,250** | **38,183** | **3,957** | **9,237** | **9,067** | **9,067** | **9,536** | **40,864** |
| Payroll (including Fringe, Payroll tax & Social security) | (3,811) | (3,811) | 0 | (1,423) | (61) | (3,904) | (5,388) | 0 | 0 | (1,417) | (3,452) | (4,869) | 0 | 0 | (1,269) | (61) | (3,303) | (4,633) |
| Travel | 0 | 0 | 0 | 0 | 0 | (19) | (19) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (16) | (16) |
| UA Direct | (18,669) | (18,669) | 0 | (6,328) | 0 | (14,765) | (21,092) | 0 | 0 | (6,505) | (15,179) | (21,684) | 0 | 0 | (6,348) | 0 | (14,813) | (21,161) |
| UA Indirect | (117) | (117) | 0 | (54) | 0 | (54) | (108) | 0 | 0 | (49) | (49) | (98) | 0 | 0 | (149) | 0 | (149) | (298) |
| Software Tools | (563) | (563) | 0 | 0 | 0 | (625) | (625) | 0 | 0 | 0 | (623) | (623) | 0 | 0 | 0 | 0 | (624) | (624) |
| Conferences and Seminars | (30) | (30) | 0 | 0 | 0 | (30) | (30) | 0 | 0 | 0 | (30) | (30) | 0 | 0 | 0 | 0 | (30) | (30) |
| Consultancy | (296) | (296) | 0 | 0 | (118) | (236) | (353) | 0 | 0 | (107) | (214) | (321) | 0 | 0 | (136) | 0 | (271) | (407) |
| Hosting | (683) | (683) | 0 | 0 | 0 | (522) | (522) | 0 | 0 | 0 | (369) | (369) | 0 | 0 | 0 | 0 | (392) | (392) |
| Legal | (104) | (104) | 0 | 0 | 0 | (2,182) | (2,182) | 0 | 0 | 0 | (327) | (327) | 0 | 0 | 0 | 0 | (222) | (222) |
| Recruitment | (25) | (25) | 0 | 0 | 0 | (25) | (25) | 0 | 0 | 0 | (25) | (25) | 0 | 0 | 0 | 0 | (25) | (25) |
| Rent and Utilities | (375) | (375) | 0 | (46) | 0 | (328) | (375) | 0 | (45) | 0 | (330) | (375) | (450) | (495) | (100) | 0 | (418) | (1,463) |
| Shine related | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Welfare | (92) | (92) | 0 | 0 | (156) | (106) | (262) | 0 | 0 | (178) | (128) | (306) | 0 | 0 | (198) | 0 | (148) | (345) |
| Credit Cards/Mesh Expenses | (80) | (80) | (20) | 0 | 0 | (80) | (100) | (20) | 0 | 0 | (80) | (100) | (20) | 0 | 0 | 0 | (80) | (100) |
| PSP Fees | (214) | (214) | (1,200) | (224) | (224) | (224) | (1,872) | (1,200) | (237) | (237) | (237) | (1,910) | (1,200) | (207) | (207) | (207) | (207) | (2,028) |
| Samsung Fees | (1,222) | (1,222) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,277) | (1,277) |
| Taxes | 0 | 0 | 0 | (531) | 0 | 0 | (531) | 0 | 0 | (544) | 153 | (391) | 0 | 0 | (544) | (25) | 0 | (569) |
| Sales Taxes | (975) | (975) | 0 | (880) | 0 | (266) | (1,146) | 0 | 0 | (898) | (266) | (1,165) | 0 | 0 | (898) | 0 | (2,559) | (3,457) |
| Other Payments | (41) | (41) | 0 | 0 | 0 | (43) | (43) | 0 | 0 | 0 | (43) | (43) | 0 | 0 | 0 | 0 | (43) | (43) |
| VAT Refund | 0 | 0 | 0 | 0 | 780 | 25 | 805 | 0 | 0 | 170 | 805 | 975 | 0 | 0 | 0 | 780 | 25 | 805 |
| **Total Operating Activity** | **(27,298)** | **(27,298)** | **(1,220)** | **(9,485)** | **221** | **(23,383)** | **(33,867)** | **(1,220)** | **(282)** | **(9,766)** | **(20,392)** | **(31,659)** | **(1,670)** | **(702)** | **(9,849)** | **487** | **(24,550)** | **(36,284)** |
| **Capex** | **(100)** | **(100)** | **0** | **0** | **0** | **(100)** | **(100)** | **0** | **0** | **0** | **(100)** | **(100)** | **0** | **0** | **0** | **0** | **(100)** | **(100)** |
| Bank Charges | (2) | (2) | 0 | 0 | 0 | (179) | (179) | (10) | (3) | 0 | (4) | (16) | (10) | 0 | 0 | 0 | (4) | (13) |
| Revaluation of investments portfolio | 0 | 0 | 20 | 0 | 0 | 111 | 131 | 0 | 19 | 0 | 0 | 19 | 0 | 21 | 21 | 0 | 0 | 42 |
| Interest Income (on deposits) | 116 | 116 | 0 | 0 | 25 | 400 | 425 | 0 | 0 | 25 | 400 | 425 | 0 | 0 | 25 | 0 | 400 | 425 |
| **Total Financial Activity** | **114** | **114** | **20** | **0** | **25** | **332** | **377** | **(10)** | **16** | **25** | **396** | **428** | **(10)** | **21** | **46** | **0** | **396** | **453** |
| **Total Cash Change** | **(23,997)** | **(23,997)** | **8,241** | **(1,225)** | **8,507** | **(12,161)** | **3,361** | **5,105** | **8,563** | **(971)** | **(5,846)** | **6,851** | **2,277** | **8,555** | **(736)** | **9,554** | **(14,717)** | **4,933** |

# Annex 6

# Papaya Israel Form 1

**Page 89**

תקנות חדלות פירעון ושיקום כלכלי, התשע"ט-2019
טופס 1
(תקנה 13)
בבית המשפט המחוזי בתל אביב-יפו תיק ______

## דין וחשבון מפורט בדבר חובות ונכסים

**חלק א' – פרטי התאגיד**

תאגיד שהפרטים המופיעים בנסח שצירף אינם תואמים את פרטי התאגיד או מרשמיו ימלא את הפרטים שאינם תואמים כאמור בחלק א' לטופס זה.

(1) **שם התאגיד**
פאפאיה גיימינג בע"מ

**(2) מספר התאגיד**
515422095

| (3) מען המשרד הרשום של התאגיד | | | |
|---|---|---|---|
| יישוב | רחוב | מספר בית | מיקוד |
| תל אביב | המסגר | 35 | 6721407 |

| (4) סיווג התאגיד |
|---|
| חברה / שותפות / אחר – פרט: חברה |
| האם התאגיד הוא תאגיד מדווח? לא |

(5) פרטי חבר/י התאגיד
יש לציין את פרטיו של כל חברי התאגיד לפי המספר המתאים בצד השורה

**העתק פרטיהם וזכויותיהם של חברי התאגיד מצורף בטבלה נפרדת כנספח "1"**

| שם פרטי ושם משפחה/שם תאגיד | מספר זיהוי***** | | מען | | | | |
|---|---|---|---|---|---|---|---|
| | ב | מספר סודר | מדינה | יישוב | רחוב | מספר בית | מיקוד |
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

(6) פרטי הזכויות של חבר התאגיד
(א) אם התאגיד הוא חברה, יש לציין את פרטי המניות שהוקצו לבעל המניות לפי המספר בצד השורה שבה צוינו פרטיו

| סוג המניה | הערך הנקוב | מספר המניות שהוקצו מאותו סוג לבעל המניה | סוג ההחזקה: רגילה / נאמנות | בהחזקה משותפת – יש למלא את מספרי השורות המציינות את פרטי מחזיקי |
|---|---|---|---|---|

| | | | | המניות במשותף לפי טבלת "פרטי חבר/י התאגיד" שבפסקה (5) לעיל |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

(ב) אם התאגיד הוא שותפות יש לציין, לפי המספר בצד השורה שבה צוינו פרטיו, האם הוא שותף כללי או מוגבל ומה הסכום שהכניס כל שותף מוגבל:

| | שותף כללי | שותף מוגבל | לגבי שותף מוגבל – הסכום שהכניס |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

(7) פרטים בדבר הון התאגיד:

(א) לגבי תאגיד שהוא חברה:

סך הכל ההון הרשום של החברה:

סך הכל ההון המוקצה של החברה:

| סוג מניה | הערך הנקוב של המניה*** | מספר המניות מסוג זה בהון המניות הרשום | מספר המניות מסוג זה שהוקצו |
|---|---|---|---|
| רגילות | 0.01 ש"ח | 401,240,000 | 71,115,278 |
| בכורה סיד | 0.01 ש"ח | 9,000,000 | 8,395,500 |
| בכורה סיד 1 | 0.01 ש"ח | 35,750,000 | 32,530,500 |
| רגילות א' | 0.01 ש"ח | 57,010,000 | 57,010,000 |

הערה: *** יש לציין את סוג המטבע בערך הנקוב ובסך הכל ההון הרשום; אם המניה היא ללא ערך נקוב יש לציין "0".

(ב) לגבי תאגיד שהוא שותפות: פרטים בדבר הון השותפות.

**<u>חלק ב' – נכסים וזכויות</u>**

1. נכסי מקרקעין

יש לצרף נכס רישום עדכני / חוזה חכירה / חוזה שכירות

**-אין לחברה נכסי מקרקעין-**

| | טור א' | טור ב' | | | |
|---|---|---|---|---|---|
| מספר | פרטים | נכס 1 | נכס 2 | נכס 3 | נכס 4 |
| (1) | סוג נכס | | | | |
| (2) | גוש/ספר | | | | |
| (3) | חלוקה ותת חלקה/דף | | | | |
| (4) | מהות הזכות | | | | |
| (5) | החלק בזכות באחוזים | | | | |
| (6) | בעלים רשומים | | | | |
| (7) | כתובת הנכס | | | | |
| (8) | תאריך הרכישה | | | | |
| (9) | סכום הרכישה בשקלים חדשים | | | | |
| (10) | שווי משוער בשקלים חדשים כיום | | | | |

nevo.co.il

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (11) | בעלים נוספים וכתובתם | שם (1) | | | | | |
| (12) | | כתובת | | | | | |
| (13) | | שם (2) | | | | | |
| (14) | | כתובת | | | | | |
| (15) | שעבודים | | | | | | |
| (16) | מקום רישום השעבוד | | | | | | |
| (17) | לטובת | | | | | | |
| (18) | כתובת | | | | | | |
| (19) | הסכום | | | | | | |
| (20) | מתאריך | | | | | | |

2. מניות וזכויות בתאגידים

בתאגיד שהוא חברה, יש לצרף תמצית מרשם החברות

העתק תרשים רשם החברות של Papaya Stars Ltd. מצורף **כנספח "2"**

| | טור א' | טור ב' | טור ג' | טור ד' |
|---|---|---|---|---|
| מספר | שם התאגיד | בעל המניות / הזכויות | פרוט המניות / הזכויות | שם ותואר של נושא משרה בתאגיד מטעם התאגיד מגיש הבקשה |
| 1. | Papaya Gaming Inc. | Papaya Gaming Ltd. | 100% | אוריאל בכר, אנדריי בירמן, אלכסנדר ליאכובצקי - דירקטורים |
| 2. | Papya Gaming India Private Limited | Papaya Gaming Ltd. | 99.99% | אוריאל בכר, אנדריי בירמן, אלכסנדר ליאכובצקי - דירקטורים |
| 3. | Papaya Poland sp. Z.o.o. | Papaya Gaming Ltd. | 100% | אוריאל בכר - President of the Management Board |
| 4. | Papaya Gaming UK Ltd. | Papaya Gaming Ltd. | 100% | אוריאל בכר - דירקטור |
| 5. | Papaya Gaming Brazil LTDA | Papaya Gaming Ltd. | 100% | - |
| 6. | Papaya Stars Ltd. | Papaya Gaming Ltd. | 100% | אוריאל בכר - דירקטור |
| 7. | Papaya Payments Inc. | Papaya Gaming Ltd. | 100% | אוריאל בכר, אנדריי בירמן, אלכסנדר ליאכובצקי - דירקטורים |
| 8. | Mobius Technologies Inc. | Papaya Gaming Ltd. | השקעה SAFE (טרם) | - |

nevo.co.il

| | | | | |
|---|---|---|---|---|
| | | | הומר (למניות) | |

3. מלאי עסקי

פרט את כל המלאי העסקי שיש לתאגיד נכון להיום

***-החברה לא מחזיקה במלאי עסקי-***

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| מספר | שם הפריט | יחידה | כמות | מחיר רכישה בשקלים חדשים | עלות כוללת | האם הפריט משועבד | הערות |
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

4. כלי רכב

יש לצרף את מסמכי הבעלות ומסמכי השעבוד

(יש לפרט גם רכבים בליסינג, וכן ציוד כבד הרשום אצל רשם הציוד ההנדסי)

| | טור א' | טור ב' | | | |
|---|---|---|---|---|---|
| מספר | | רכב 1 | רכב 2 | רכב 3 | רכב 4 |
| (1) | פרטים | | | | |
| (2) | מספר רישוי | | | | |
| (3) | שם היצרן | | | | |
| (4) | שנת יצור | | | | |
| (5) | הבעלים הרשומים | | | | |
| (6) | שימוש הרכב | | | | |
| (7) | שעבודים/משכון | | | | |
| (8) | מקום רישום השעבוד | | | | |
| (9) | לטובת | | | | |
| (10) | להבטחת חוב בסכום | | | | |
| (11) | מתאריך | | | | |
| (12) | שווי הרכב | | | | |

5. זכויות התאגיד לקבל כספים ונכסים אחרים (לקוחות, דמי שכירות וכיוצא באלה)

העתק זכויות התאגיד לקבל כספים ונכסים אחרים מצורף בטבלה נפרדת כנספח **"3"**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | | |
|---|---|---|---|---|---|---|---|---|
| מספר | שם מלא של החייב | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום | סכום החוב בשקלים חדשים נכון | ממה נובע החוב | בטוחות שבידי התאגיד להבטחת החוב | | |
| | | | | | | פרטי הנכס המשועבד | תאריך יצירת השעבוד | הסכום המובטח בשקלים |

nevo.co.il

| | | | היווצרו ותאריך היווצרו | ליום הגשת הבקשה | | | | חדשים |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |

6. חשבונות בנק

יש לפרט את כל החשבונות (מטבעות חוץ, ניירות ערך, קופות גמל, חסכונות וכיוצא באלה); יש לצרף דף חשבון אחרון

העתק דפי חשבונות אחרונים מצורפים **כנספח "4"**.

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| | שם הבנק | מספר הסניף | סוג החשבון | מספר החשבון | בעל החשבון | בעלי זכות חתימה נוספים | יתרה בשקלים חדשים לתאריך הבקשה |
| 1. | לאומי | 864 | עו"ש- דולר ושקל | 56840097 | פאפאייה גיימינג בע"מ | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 91,269,447 |
| 2. | דיסקונט | 10 | עו"ש- דולר, שקל ויורו | 147803 | פאפאייה גיימינג בע"מ | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 270,858,007 |
| 3. | Silicon Valley Bank, a division of First-Citizens Bank & Trust Company | Santa Clara | עו"ש- דולר, ליש"ט, דולר אוסטרלי, דולר קנדי ויורו | 3302933838<br>10026347<br>0050054814<br>0050054829<br>0050054833 | פאפאייה גיימינג בע"מ | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 3,967,007 |
| 4. | Silicon Valley Bank, a division of First-Citizens Bank & Trust Company | Santa Clara | MMA Business -ו Interest Sweep Account (צוברי ריבית) | 3303666735<br>3304310894 | פאפאייה גיימינג בע"מ | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 34,916,170 |
| 5. | PayPal | IL | דולר, ליש"ט, יורו, שקל, כתר נורווגי וקרונה שבדית | QDBX2AZN6WY26 | פאפאייה גיימינג בע"מ | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 3,257,341 |

היתרות נכונות ליום 28 ביולי 2026

nevo.co.il

7. ביטוחים

יש לצרף את כל סוגי הביטוחים של התאגיד (וכן ביטוחים של נושאי משרה ועובדים) ולצרף צילום הפוליסות

העתק פוליסות ביטוח של המבקשות מצורף **כנספח "5"**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | שם חברת הביטוח | שם סוכן הביטוח | סוג הביטוח | מספר הפוליסה | תקופת הביטוח |
| .1 | Nexus Underwriting Limited | Howden | ביטוח נושאי משרה - Primary layer | B0180FN2613071 | 7.4.26-6.4.27 |
| .2 | Endurance Worldwide Insurance Limited (trading as Sompo International) | Howden | ביטוח נושאי משרה - 1st excess layer | B0180FN2613103 | 7.4.26-6.4.27 |
| .3 | AIG Europe S.A. / AIG | Howden | ביטוח נושאי משרה - 2nd excess layer | B0180FN2616701 | 7.4.26-6.4.27 |
| .4 | Accredited Insurance (Europe) Limited (UK Branch) (via K2 International) | Howden | ביטוח נושאי משרה - 3rd excess layer | B0180FN2624561 | 7.4.26-6.4.27 |
| .5 | מנורה | אמנון גור | צד ג', חבות מעסיקים, רכוש | 00-08-290623-25-0 | 1.1.25-30.6.26 |
| .6 | מנורה | אמנון גור | ציוד אלקטרוני | 00-89-986561-25-4 | 1.1.25-30.6.26 |
| .7 | הפניקס | אמנון גור | ביטוח נסיעות | 26/007/377/1012842 | 22.4.26-21.4.27 |
| .8 | הראל | גיל ורדי סוכנות לביטוח בע"מ | ביטוח בריאות לעובדים | | 22.10.25-31.12.26 |

8. הסכמים מהותיים שהתאגיד צד להם

העתק הסכמים מהותיים שהתאגיד צד להם **מצורף בטבלה נפרדת כנספח "6"**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | סוג ההסכם (שכירות, ליסינג, העסקה, זכיון וכיוצא באלה) | הצדדים להסכם | נחתם בתאריך | תאריך סיום החוזה | שווי בשקלים חדשים / הערות ועוד |
| .1 | | | | | |
| .2 | | | | | |
| .3 | | | | | |
| .4 | | | | | |
| .5 | | | | | |

9. האם התאגיד מחזיק נכסים בנאמנות?

לא.

10. תביעות והליכי גביה שמנהל התאגיד

(א) תביעות שהגיש התאגיד

יש לצרף עותק מכתב התביעה, כתב הגנה וכל פסק דין או החלטה מהותית אחרת שניתנה

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| מספר | בית המשפט | מספר התיק | הנתבע ושם בא | מהות ההליך | השלב שבו מצוי | סכום החוב | בטחונות שניתנו |

nevo.co.il

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | כוחו | | ההליך | בשקלים חדשים | להבטחת החוב |
| .1 | | | | | | | |
| .2 | | | | | | | |
| .3 | | | | | | | |
| .4 | | | | | | | |

(ב) הליכי הוצאה לפועל שנקט התאגיד

יש לצרף תדפיס מלשכת ההוצאה לפועל

**-אין הליכי הוצאה לפועל שנקט התאגיד-**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ |
|---|---|---|---|---|---|---|
| מספר | לשכת ההוצאה לפועל | מספר התיק | החייב ושם בא כוחו | פסק דין או שטרות | סכום החוב בשקלים חדשים | בטחונות שניתנו להבטחת החוב |
| .1 | | | | | | |
| .2 | | | | | | |
| .3 | | | | | | |
| .4 | | | | | | |

.11 זכויות ונכסים אחרים

פירוט זכויות ונכסים אחרים של התאגיד

**-אין זכויות ונכסים אחרים של התאגיד-**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ |
|---|---|---|---|---|
| מספר | מהות הזכות / הנכס | מועד רכישת הנכס / יצירת הזכות | סכום הרכישה / שווי הזכות בשקלים חדשים | האם הנכס / הזכות משועבדים |
| .1 | | | | |
| .2 | | | | |
| .3 | | | | |
| .4 | | | | |
| .5 | | | | |

**<u>חלק ג׳ – חובות ובטוחות</u>**

יש לפרט כל חוב כהגדרתו בחוק חדלות פירעון ושיקום כלכלי, התשע״ח-2018 (להלן – החוק), כולל חוב מותנה וחוב שטרם הגיע מועד פירעונו

.1 פירוט החובות המובטחים

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ | | |
|---|---|---|---|---|---|---|---|---|
| מספר | השם המלא של הנושה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב | בטוחות שנתן התאגיד להבטחת החוב | | |
| | | | | | | פרטי הנכס המשועבד | תאריך יצירת השעבוד | הסכום המובטח בשקלים חדשים |
| .1 | בנק לאומי | יהודה הלוי 34, | 7,154,000 | 7,154,000 | חוב מותנה נובע | (*) | 2/2/2025 | 7,154,000 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | לישראל בע"מ | ת"א 6513616 | | | מהוצאת ערבות בנקאית למשכיר | | | |
| סך כל החובות המובטחים : 7,154,000 | | | | | הסכום הכולל של השעבודים : 7,154,000 | | | |

(*) שעבוד קבוע ראשון בדרגה על כל הזכויות והכספים המפורטים בפיקדונות מט"ח : מספר סידורי 0003 במטבע דולר ארה"ב סוג חשבון 095 פמח תאגידים המתנהל/ים בחשבון מסוג מט"ח שמספרו 56840097 תחת מספר לקוח 56840097 המתנהל/ים בסניף 864 מרכז עסקים לאומיטק בבנק לאומי לישראל בע"מ ו/או כל חשבון ו/או פיקדון שיבוא במקומם, כל הכספים שיופקדו מפעם לפעם בחשבונות ו/או בפיקדונות הנ"ל, וכן כל התמורות, הפירות, ההכנסות והזכויות הנובעים או שינבעו מהכספים הנ"ל או הקשורים אליהם, המצויים ו/או שיהיו מצויים תחת מספר הלקוח הנ"ל ו/או כל מספר לקוח שיבוא במקומו.

2. פירוט החובות בדין קדימה

**-אין חובות בדין קדימה-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של הנושה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| סך כל החובות בדין קדימה : | | | | | |

פירוט חובות לעובדי התאגיד

**העתק פירוט חובות לעובדי התאגיד וחובות כללים ונדחים מצורף בטבלה נפרדת כנספח "7".**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' | | |
|---|---|---|---|---|---|---|---|---|---|
| מספר | השם המלא | כתובת מלאה ומיקוד | תאריך תחילת העבודה בחברה ותאור התפקיד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים ליום הגשת הבקשה | ממה נובע החוב (שכר, פיצויים, דמי הבראה וכיוצא באלה) | בטוחות שנתן התאגיד לעובד להבטחת החוב | | |
| | | | | | | | פרטי השעבוד | תאריך יצירת השעבוד | הסכום המובטח בשקלים חדשים |
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |
| 3. | | | | | | | | | |
| 4. | | | | | | | | | |
| סך כל החובות לעובדי התאגיד : | | | | | | | הסכום הכולל של השעבודים : | | |

3. פירוט החובות הכלליים והנדחים

**-פירוט חובות לעובדי התאגיד וחובות כללים ונדחים מצורף בטבלה נפרדת כנספח "7".**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של | כתובת | סכום החוב | סכום החוב | ממה נובע |

| | הנושה ובא כוחו | מלאה ומיקוד | בשקלים חדשים ביום היווצרו ותאריך היווצרו | בשקלים חדשים נכון ליום הגשת הבקשה | החוב |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| סך כל החובות הכללים והנדחים : | | | | | |

*החברה מצויה במגעים ובהליכים מול פקיד השומה בקשר עם שומת מס לשנות המס 2020-2023. לשם מניעת התיישנות השומה, הוצאה בשלב זה, שומה זמנית ובלתי סופית לשנת המס 2020, והצדדים מוסיפים ומנהלים דיונים ביחס לקביעת סכום השומה הסופית.*

4. פירוט מכתבי התראה לגבי חיוב שעולה כדי חוב מהותי שלא נמנה ברשימת החובות

***-אין מכתבי התראה-***

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של שולח מכתב ההתראה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב שצוין במכתב ההתראה בשקלים חדשים ביום שליחתו, ומועד פירעונו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| סך כל החובות המהותיים המצויינים במכתבי ההתראה : | | | | | |

5. ערבויות שנתן התאגיד

יש לצרף צילום הערבויות שניתנו

***-אין ערבויות שנתן התאגיד-***

| | טור א' | | טור ב' | | |
|---|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 | ערבות 3 |
| (1) | שם הנושה | | | | |
| (2) | כתובת | | | | |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | | | |
| (4) | תאריך החתימה | | | | |
| (5) | הנערב (החייב העיקרי) | | | | |
| (6) | כתובת הנערב | | | | |
| (7) | ערבים נוספים | (1) שם | | | |
| | | כתובת | | | |
| | | (2) שם | | | |
| | | כתובת | | | |

6. ערבויות שנתנו נושאי משרה בתאגיד או חברי התאגיד להבטחת חובות התאגיד

יש לצרף צילום הערבויות שניתנו

nevo.co.il

**-אין ערבויות שנתנו נושאי משרה להבטחת חובות התאגיד-**

| | טור א׳ | | טור ב׳ | |
|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 |
| (1) | שם הנושה | | | |
| (2) | כתובת | | | |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | | |
| (4) | תאריך החתימה | | | |
| (5) | הנערב (החייב העיקרי) | | | |
| (6) | כתובת הנערב | | | |
| (7) | ערבים נוספים | (1) שם | | |
| | | כתובת | | |
| | | (2) שם | | |
| | | כתובת | | |

7. ערבויות שנתנו צדדים שלישיים להבטחת חובות התאגיד

העתק ערבויות שנתנו צדדים שלישיים מצורף **כנספח "8"**.

| | טור א׳ | | טור ב׳ | | | | |
|---|---|---|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 | ערבות 3 | ערבות 4 | ערבות 5 |
| (1) | שם הנושה | | היי פלור בע״מ | כלל חברה לביטוח | עתודות - קרן פנסיה לשכירים ועצמאיים בע״מ | כלל פנסיה וגמל בע״מ | יוטפו בע״מ |
| (2) | כתובת | | קלוזנר 10, רמלה | ראול ולנברג 36, ת״א | מיטב 11, ת״א | ראול ולנברג 36, ת״א | המסגר 35, ת״א |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | 1,859,165 | 925,864 | 81,803 | 851,498 | 914,687 |
| (4) | תאריך החתימה | | 15/12/22 | 15/12/22 | 15/12/22 | 15/12/22 | 7/9/23 |
| (5) | ערבים נוספים | (1) שם | בנק לאומי | בנק לאומי | בנק לאומי | בנק לאומי | בנק לאומי |
| (6) | | כתובת | יהודה הלוי 34, ת״א | יהודה הלוי 34, ת״א | יהודה הלוי 34, ת״א | יהודה הלוי 34, ת״א | יהודה הלוי 34, ת״א |
| (7) | | (2) שם | | | | | |
| (8) | | כתובת | | | | | |

יש לצרף צילום הערבויות שניתנו

8. כרטיסי חיוב

יש לפרט את כל כרטיסי החיוב המחייבים את חשבון התאגיד, וכן שמות האוחזים בכרטיסים אלה והרשאים לחייב את התאגיד לפיהם; יש לצרף דף חיוב אחרון

העתק דפי חיוב אחרונים של כל חשבון בנק מצורף **כנספח "9"**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ |
|---|---|---|---|---|---|
| מספר | שם בעל הכרטיס | החברה המנפיקה | מספר הכרטיס | מועד פקיעת הכרטיס | מספר הבנק, הסניף וחשבון הבנק המחויב |
| .1 | אנדרי בירמן | לאומי - MAX | 3711 | 28/02/2029 | בנק לאומי (10) סניף 864 מספר חשבון 56840097 |
| .2 | אנדרי בירמן | לאומי - כאל | 7369 | 31/05/2031 | בנק לאומי (10) סניף 864 מספר חשבון 56840097 |
| .3 | אלכסנדר ליאכובצקי | לאומי - MAX | 8214 | 28/02/2029 | בנק לאומי (10) סניף 864 מספר חשבון 56840097 |
| .4 | אלכסנדר ליאכובצקי | לאומי - כאל | 7344 | 31/05/2031 | בנק לאומי (10) סניף 864 מספר חשבון 56840097 |
| .5 | אוריאל בכר | לאומי - MAX | 3612 | 28/02/2029 | בנק לאומי (10) סניף 864 מספר חשבון 56840097 |

nevo.co.il

| | | | | | |
|---|---|---|---|---|---|
| .6 | אוריאל בכר | לאומי - כאל | 7377 | 31/05/2031 | בנק לאומי (10) סניף 864<br>מספר חשבון 56840097 |

.9 תביעות והליכי גביה המתנהלים נגד התאגיד

תביעות נגד התאגיד

העתק תביעות והליכי גביה המתנהלים נגד התאגיד מצורף בטבלה נפרדת כנספח "**10**".

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| מספר | בית המשפט | מספר תיק | הנושה- התובע ושם בא כוחו | מהות ההליך | השלב שבו מצוי ההליך | סכום החוב בשקלים חדשים | בטחונות שניתנו להבטחת החוב |
| .1 | | | | | | | |
| .2 | | | | | | | |
| .3 | | | | | | | |
| .4 | | | | | | | |

.10 הליכי הוצאה לפועל נגד התאגיד

יש לצרף תדפיס מלשכת ההוצאה לפועל על כלל התיקים המתנהלים כנגד התאגיד

**-אין הליכי הוצאה לפועל נגד התאגיד-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' |
|---|---|---|---|---|---|---|
| מספר | לשכת ההוצאה לפועל | מספר התיק | הנושה- הזוכה ושם בא כוחו | פסק דין, שטרות או אחר | סכום החוב בשקלים חדשים | ביטחונות שניתנו להבטחת החוב |
| .1 | | | | | | |
| .2 | | | | | | |
| .3 | | | | | | |
| .4 | | | | | | |

תצהיר

אני החתום מטה _____ תעודת זהות _____, מצהיר בזה כי הדו"ח שאני מגיש לבית המשפט על נספחיו הוא מדויק, מלא ומעודכן בכל חלקיו לתאריך היום.

______________________

שם וחתימת המצהיר

אני החתום מטה _____, עורך דין מאשר בזה כי ביום _____ הופיע בפני ב_____ מר _____, שזיהיתי אותו לפי תעודת זהות מספר / המוכר לי אישית _____ ולאחר שהזהרתיו כי עליו לומר את האמת בלבד כי אם לא יעשה כן יהיה צפוי לעונשים הקבועים בחוק, אישר נכונות הצהרתו דלעיל וחתם עליה בפניי.

______________________

_____, עורך דין

nevo.co.il

# תוכן עניינים



| מס׳ | שם הנספח | עמ׳ |
|---|---|---|
| 1 | חלק א סעיפים 5 ו-6 - פרטיהם וזכויותיהם של חברי התאגיד | 3 |
| 2 | חלק ב סעיף 2 - רשם החברות של Papaya Stars Ltd. | 5 |
| 3 | חלק ב סעיף 5 - זכויות התאגיד לקבל כספים ונכסים אחרים | 9 |
| 4 | חלק ב סעיף 6 - דפי חשבונות אחרונים | 12 |
| 5 | חלק ב סעיף 7 - פוליסות ביטוח של המבקשות | 42 |
| 6 | חלק ב סעיף 8 - הסכמים מהותיים שהתאגיד צד להם | 222 |
| 7 | חלק ג סעיפים 2 ו-3 - פירוט חובות לעובדי התאגיד וחובות כלליים ונדחים | 226 |
| 8 | חלק ג סעיף 7 - ערבויות שנתנו צדדים שלישיים | 230 |
| 9 | חלק ג סעיף 8 - דפי חיוב אחרונים של כל חשבון בנק | 250 |
| 10 | חלק ג - סעיף 9 - תביעות והליכי גביה המתנהלים נגד התאגיד | 271 |

# נספח 1

# חלק א סעיפים 5 ו-6 - פרטיהם וזכויותיהם של חברי התאגיד

עמ׳ 3

| Stakeholder | Outstanding | Outstanding (%) | Ordinary shares | Preferred seed | Preferred seed-1 |
|---|---|---|---|---|---|
| Boaz Benrush | 197,000 | 0.176% | 197,000 | | |
| Gal-Or Fishbain Architects Ltd. | 325,500 | 0.291% | 325,500 | | |
| Nir Jackson | 16,926 | 0.015% | 16,926 | | |
| Gal Lerman | 236,500 | 0.211% | 236,500 | | |
| Lilach Romano | 72,000 | 0.064% | 72,000 | | |
| Guy Yarkoni | 221,429 | 0.198% | 221,429 | | |
| Itay Milis | 23,698 | 0.021% | 23,698 | | |
| Ben Knoll | 87,500 | 0.078% | 87,500 | | |
| Lital Parush - David | 4,120 | 0.004% | 4,120 | | |
| Chantelle Russak | 49,000 | 0.044% | 49,000 | | |
| Matias Wainstein | 2,880 | 0.003% | 2,880 | | |
| Roni Maman | 25,915 | 0.023% | 25,915 | | |
| Shira Yehuda | 29,167 | 0.026% | 29,167 | | |
| Tomer Elya | 2,880 | 0.003% | 2,880 | | |
| Boris Vulikh | 32,812 | 0.029% | 32,812 | | |
| Ben Kazael | 87,500 | 0.078% | 87,500 | | |
| Orit Stern | 2,083 | 0.002% | 2,083 | | |
| Uri Pearl Stein | 197,500 | 0.176% | 197,500 | | |
| Adel Berebi | 576 | 0.001% | 576 | | |
| Omri Galor | 8,333 | 0.007% | 8,333 | | |
| Shiran Ahdut | 2,000 | 0.002% | 2,000 | | |
| Ariel Feldman | 21,875 | 0.020% | 21,875 | | |
| Gilad Schenker | 8,593 | 0.008% | 8,593 | | |
| Ilan Rosen | 162,177 | 0.145% | 162,177 | | |
| Valentin Khais | 2,700 | 0.002% | 2,700 | | |
| Yaniv Kaldor | 2,520 | 0.002% | 2,520 | | |
| Tali Bouskila Cohen | 432 | 0.000% | 432 | | |
| Yarin Kaplan | 576 | 0.001% | 576 | | |
| Tom Abargil | 5,297 | 0.005% | 5,297 | | |
| Andrew Tofler | 23,333 | 0.021% | 23,333 | | |
| Gil Aharonov | 216 | 0.000% | 216 | | |
| Ido Haviv | 6,392 | 0.006% | 6,392 | | |
| Itai Satati | 3,744 | 0.003% | 3,744 | | |
| Ori Naor | 197,500 | 0.176% | 197,500 | | |
| Ohad Goldberg | 2,880 | 0.003% | 2,880 | | |
| Yoni Zvik | 3,797,617 | 3.389% | 3,797,617 | | |
| Ofer Tenne | 2,112 | 0.002% | 2,112 | | |
| Omri Krigel | 157,500 | 0.141% | 157,500 | | |
| Itai Pazner | 9,041 | 0.008% | 9,041 | | |
| Oren Bar-nir Gayer | 197,000 | 0.176% | 197,000 | | |
| Shay Priel | 56,586 | 0.051% | 56,586 | | |
| A.A.D Argaman Ltd. | 907,500 | 0.810% | | 70,000 | 837,500 |
| Alex Liakhovetsky | 18,648,243 | 16.644% | 18,648,243 | | |
| Amos Peled | 79,000 | 0.071% | | 79,000 | |
| Andrey Birman | 18,288,145 | 16.323% | 18,288,145 | | |
| Boaz Benrush | 631,361 | 0.564% | 631,361 | | |
| Bonale Foundation | 236,500 | 0.211% | | 236,500 | |
| Cloud Nine Ltd. | 454,000 | 0.405% | | 35,000 | 419,000 |
| Daniel Sirota | 79,000 | 0.071% | | 79,000 | |
| DBDK Venture Fund I, LP | 236,500 | 0.211% | | 236,500 | |
| Dror Ben Ari | 454,000 | 0.405% | | 35,000 | 419,000 |
| Einav Navon | 227,000 | 0.203% | | 17,500 | 209,500 |
| Eran Price | 227,000 | 0.203% | | 17,500 | 209,500 |
| Glory Days Ventures L.P. | 458,853 | 0.410% | 304,819 | 154,034 | |
| Homeward Ventures Limited | 3,769,713 | 3.365% | 2,504,247 | 1,265,466 | |
| Israel Secondary Fund II L.P | 667,500 | 0.596% | 667,500 | | |
| ISV Capital LP | 118,500 | 0.106% | | 118,500 | |
| MANTRA PE - MANTRA SECONDARY OPPORTUNITIES III SCA-SIF | 1,344,804 | 1.200% | 1,226,304 | | 118,500 |
| Michael Vainshtein | 79,000 | 0.071% | | 79,000 | |
| NFX Capital Fund I, LP | 31,560,500 | 28.169% | 94,500 | 1,892,500 | 29,573,500 |
| NOA.TW LLC | 1,538,000 | 1.373% | | 1,538,000 | |
| Ohad Ravid | 151,500 | 0.135% | | 11,500 | 140,000 |
| Omer Shenhar | 33,000 | 0.029% | 33,000 | | |
| Omri Krigel | 140,655 | 0.126% | 140,655 | | |
| Oren Bar-nir Gayer | 631,361 | 0.564% | 631,361 | | |
| Oren Weisenstern | 151,500 | 0.135% | | 11,500 | 140,000 |
| Oriel Bachar | 19,100,878 | 17.048% | 19,100,878 | | |
| PGF Synergy Limited Partnership | 1,419,500 | 1.267% | | 1,419,500 | |
| Piton Capital Ventures Fund IV LP | 978,000 | 0.873% | 978,000 | | |
| PROOF II, LLC | 1,087,855 | 0.971% | 1,042,855 | | 45,000 |
| Rainfall Ventures I, LP | 1,064,500 | 0.950% | | 1,064,500 | |
| Rainfall Ventures II, LP | 161,500 | 0.144% | 161,500 | | |
| Shaul Eyal | 454,000 | 0.405% | | 35,000 | 419,000 |
| Sweetwood Ventures Pap, LP | 378,500 | 0.338% | 378,500 | | |
| **Total** | **112,041,278** | **100.000%** | **71,115,278** | **8,395,500** | **32,530,500** |

# נספח 2

# חלק ב סעיף 2 - רשם החברות של Papaya Stars Ltd.

עמ׳ 5

חשוב לנו לשתף אותך שאפשר להפיק נסח חברה/שותפות בעלות של 12 ₪ בלבד
באתר "רשות התאגידים-רשם החברות" בכניסה לשירות "הפקת נסח"
או באמצעות הקישור: https://www.gov.il/he/service/company_extract

# מידע על פרטי חברה, כולל שיעבודים פעילים

## פרטי חברה

**מספר חברה:** 517031357 סטאטוס משפטי: **פעילה** תאריך רישום: **22/08/2024**

**שם חברה:** **פאפאייה סטארס בע"מ**

שם חברה באנגלית: **PAPAYA STARS LTD**

סוג חברה: **ישראלית** סיווג חברה: **חברה פרטית** אחריות בעלי מניות: **מוגבלת**

כתובת התאגיד: **המסגר 35 תל אביב - יפו מיקוד: 6721407**

עיקרי מטרות התאגיד: **לעסוק בכל עיסוק חוקי**

לא הוגשו דוחות שנתיים

## הרכב הון

סוג מניה: **רגילות** ערך נקוב: **ללא**

כמות מניות: **12,000,000** הון רשום: **12,000,000** הון מוקצה: **10,000,000**

## בעלי מניות

שם: **פאפאייה ג'יימינג בע"מ** מס' זיהוי: **515422095**

סוג זיהוי: **חברה** תאריך מינוי: **22/08/2024**

כתובת: **המסגר 35 תל אביב - יפו מיקוד: 6721407**

מחזיק ב: 10,000,000 מניות מסוג רגילות, בהחזקה רגילה

## דירקטורים

שם: **בכר אוריאל** מס' זיהוי: **201410008**

סוג זיהוי: **אזרח ישראלי** תאריך מינוי: **22/08/2024**

כתובת: **כלנית 6 רמת השרון מיקוד: 4724364**

***אין לתאגיד חובות פעילים לתשלום אגרה שנתית***

## שעבודים פעילים

בשעבודים שנרשמו לפני 12/11/2017 - למצב עדכני, יש לקרוא את תיאור הבטוחה יחד עם רשימת השינויים לשעבוד.
בשעבודים שנרשמו אחרי 12/11/2017 - תיאור הבטוחה משקף את מצב הבטוחה העדכני וכולל את השינויים המאוחרים ליום רישום הבטוחה. רשימת שינויים לשעבוד מציינת את תאריכי עדכון השינויים ואת סוג השינויים שבוצעו.

**מס' שעבוד: 1** תאריך רישום: **25/05/2025** תאריך יצירה: **29/04/2025**

**פרטים כלליים לשעבוד**

רשות התאגידים
אישור שמסמך זה החתום אלקטרונית, מהווה העתק של מסמך (מקור או העתק) המצוי ביום החתימה בתיק התאגיד ברשות התאגידים

תאריך רישום: **25/05/2025** מהות השעבוד: **קבוע (ספציפי)**
דרגת השעבוד: **דרגה ראשונה** הסכום המובטח: **60000.00 דולר ארה"ב**

### תנאים מיוחדים

קביעה בהסכם לגבי שעבוד נוסף.
קיימת מגבלה על ביצוע עסקאות בנכס ללא הסכמת בעל השעבוד.

### הנכסים המשועבדים

תאריך רישום: **25/05/2025** סוג הנכס: **פקדונות כספיים/ כספים/ ניירות ערך**
תיאור הנכס: שעבוד קבוע ראשון בדרגה על כל הזכויות הכספיות, לרבות כספים מופקדים ואשר יופקדו בחשבון/ות פקדון מס' 1000039139 בסניף ראשי ת"א 010 של הבנק הכל כמפורט באגרת החוב ומסמכי השעבוד.

### מלווה/נאמן

תאריך רישום: **25/05/2025** מס' בנק/תאגיד: **11-438**
שם המלווה/נאמן: **בנק דיסקונט לישראל בעמ, מרכז שירות בנקאי**

***אין שינויים בתקנון***

***אין שינויי סטאטוס***

תמצית זו הוכנה מתוך המידע המצוי במאגר מרשם החברות נכון ליום 09/03/2026 שעה 08:17

## פרופיל חברה מורחב - מידע על החברה ממקורות נוספים

**המידע בפרופיל החברה המורחב כולל מידע שהתקבל מרשויות מדינה ורשויות ציבוריות שונות. מידע זה ניתן כשירות לציבור והוא עשוי להיות חלקי או לא מעודכן, אין להסתמך עליו ויש לפנות ולעיין במידע אצל הרשות הציבורית או רשות המדינה המוסמכת**

***לא נמצא מידע נוסף לחברה זו***

רשות התאגידים
אישור שמסמך זה החתום אלקטרונית, מהווה העתק של מסמך (מקור או העתק) המצוי ביום החתימה בתיק התאגיד ברשות התאגידים

נסח החברה או השותפות מהווה תמצית מידע ממאגר הנתונים הממוחשב של רשות התאגידים, הניתן כשירות לציבור, על פי מידע שהתקבל ברשות. המידע בנסח עלול להיות חסר, בלתי מדויק או בלתי מעודכן, משאינו מהווה אחד מהמרשמים שמנהלת רשות התאגידים על פי דין.
לבירור המידע והדיווחים שהוגשו לרשם החברות או לרשם השותפויות כנדרש בחוק, יש לעיין בתיק התאגיד (לדרכי העיון: taagidim.justice.gov.il). יודגש כי המידע המצוי בתיק החברה ביחס לבעלי מניות ודירקטורים בחברה, כמו גם פרטי מידע נוספים, הינו בעל אופי דקלרטיבי בלבד ואינו מהווה תחליף לעיון במרשם בעלי המניות ובמרשם הדירקטורים שמנהלת החברה אצלה, הפתוחים לעיון הציבור במשרדה הרשום.
בנוסף, הנסח עשוי לכלול גם תמצית מידע שהתקבל מרשויות המדינה (כדוגמת הממונה על הליכי חדלות פירעון ושיקום כלכלי, רשות האכיפה והגביה, מערכת בתי המשפט ועוד) והוא נרשם על פי הדין החל ומשוקף בנסח כשירות לציבור. כמו כן הנסח עשוי לכלול מידע פומבי נוסף שהתקבל מרשויות מדינה נוספות (כגון: רשות הפטנטים, בנק ישראל ועוד). המידע עשוי להיות חלקי או לא מעודכן, אין להסתמך עליו ויש לפנות ולעיין במידע אצל הרשות הציבורית או רשות המדינה המוסמכת.

רשות התאגידים
אישור שמסמך זה החתום אלקטרונית, מהווה העתק של מסמך (מקור או העתק) המצוי ביום החתימה בתיק התאגיד ברשות התאגידים

# <u>נספח 3</u>

# חלק ב סעיף 5 - זכויות התאגיד לקבל כספים ונכסים אחרים

עמ' 9

**חלק ב - סעיף 5 – זכויות התאגיד לקבל כספים ונכסים אחרים**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ |
|---|---|---|---|---|---|---|
| **מספר** | **שם מלא של החייב** | **כתובת מלאה ומיקוד** | **סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו** | **סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה** | **ממה נובע החוב** | **בטוחות שבידי התאגיד להבטחת החוב** |
| 1 | Papaya Gaming Inc | 106 WEST 32ND STREET, NEW YORK, NY 10001, USA | 14,757,249 | 14,757,249 | גביה משחקנים | אין |
| 3 | Papaya Poland sp. Z o.o. | Prosta 67, 00-838 Warszawa | 214,000 | 214,000 | פעילות שוטפת - החברה מממנת את החברה הבת | אין |
| 4 | Papaya Stars Ltd. | המסגר 35, ת״א, 6721407 | 3,335,613 | 3,335,613 | פעילות שוטפת - החברה מממנת את החברה הבת | אין |
| 5 | רשות המיסים בישראל - מע״מ | | 7,275,896 | 7,275,896 | לחברה החזרי מע״מ בגין פעילות שוטפת | אין |
| 6 | רשות המיסים בישראל - מס הכנסה | | 11,428,878 | 11,428,878 | עודף מקדמות בגין דוח מס 2024 | אין |
| 7 | IronSource Mobile LTD | דרך מנחם בגין 121, ת״א, 6701203 | 788,063 | 788,063 | הכנסות מפרסום | אין |
| 8 | Liftoff Inc | 900 Middlefield Rd, Redwood City, | 200,979 | 200,979 | הכנסות מפרסום | אין |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | CA 94063, USA | | | | |
| 9 | Unity Technologies | 30 3rd Street, San Francisco, California, 94103, USA | 285,329 | 285,329 | הכנסות מפרסום | אין |
| 10 | Applovin Corp. | 1100 Page Mill Road, Palo Alto, CA 94304, USA | 1,080,728 | 1,080,728 | הכנסות מפרסום | אין |
| 11 | Google | Gordon House, 4 Barrow Street, Grand Canal Dock, Dublin 4, D04 V4X7, Ireland | 51,227 | 51,227 | פעילות שוטפת- הכנסות מהפניית שחקנים | אין |
| 12 | Nixon Peabody LLC | 53 State Street, Boston, Massachusetts 02109. | 7,349,618 | 7,349,618 | החזר מספק- תשלום מקדמה | אין |

היתרות נכונות ליום 30 ביוני 2026

# נספח 4

# חלק ב סעיף 6 - דפי חשבונות אחרונים

עמ' 12

# תוכן עניינים



| מס׳ | שם הנספח | עמ׳ |
|---|---|---|
| 1 | בנק לאומי - 56840097 | 3 |
| 2 | בנק דיסקונט - 147803 | 9 |
| 3 | Silicon Valley Bank - 3302933838; 10026347; 0050054814; 0050054829; 0050054833; 3303666735; 3304310894 | 17 |
| 4 | PayPal - QDBX2AZN6WY26 | 24 |

# בנק לאומי - 56840097

**בנק לאומי** | תאריך הנפקה 29.07.2026

## חשבונות מט"ח - עובר ושב

יתרת עובר ושב נכונה לתאריך 29.07.2026

היתרות משוערכות לתאריך 29.07.2026 ע"פ שערים יציגים מתאריך 28.07.2026

**החשבון של פאפאייה גיימינג בע"מ - 864-568400/97** **מטבע** דולר ארה"ב $ **יתרה** $ 4,009,100.62

| תאריך | תנועות | אסמכתא | חובה | זכות | יתרה מצטברת | |
|---|---|---|---|---|---|---|
| 27.07.2026 | עמ.יצוא שרתם | 151594705 | $ 13.00 | | $ 4,009,100.62 | |
| 27.07.2026 | יצוא ישיר<br>TRANSFER FROM: 514643626, IRONSOURCE MOBILE LTD INVOICES BILL00912152,BILL00929220,; BILL00945910,BILL00962123,BILL00968; 849 IRONSOURCE ADVERTISEMENTS MONET; IZATION PAYMENT | 151594705 | | $ 226,615.92 | $ 4,009,113.62 | מסמך מצורף |
| 27.07.2026 | עמ.יצוא שרתם | 151591726 | $ 13.00 | | $ 3,782,497.70 | |
| 27.07.2026 | יצוא ישיר<br>TRANSFER FROM: 264516105, UNITY TECHNOLOGIES SF REF NO:2026072700551071INVOICE BILL01019610 UNITY MONETIZA; TION PAYMENT | 151591726 | | $ 94,900.09 | $ 3,782,510.70 | מסמך מצורף |
| 27.07.2026 | פר.המר.מיידי | 79881089 | $ 490,196.08 | | $ 3,687,610.61 | |
| 27.07.2026 | פר.המר.מיידי | 79880817 | $ 169,319.34 | | $ 4,177,806.69 | |
| 27.07.2026 | פקדון במט"ח | 24002 | $ 9,000,000.00 | | $ 4,347,126.03 | |
| 27.07.2026 | פרעון פקדון | 4217 | | $ 10,512,594.25 | $ 13,347,126.03 | |
| 27.07.2026 | פרעון פקדון | 4216 | | $ 2,400,000.00 | $ 2,834,531.78 | |
| 27.07.2026 | ריבית מט"ח | 4216 | | $ 80,957.59 | $ 434,531.78 | |
| 16.07.2026 | עמ.יצוא שרתם | 151531159 | $ 13.00 | | $ 353,574.19 | |
| 16.07.2026 | יצוא ישיר<br>TRANSFER FROM: 453264542, APPLOVINCORPORATION INVOICE UI 652011 VENDOR PAYMENT | 151531159 | | $ 362,721.48 | $ 353,587.19 | מסמך מצורף |
| 16.07.2026 | פקדון במט"ח | 44003 | $ 10,500,000.00 | | $ -9,134.29 | |
| 16.07.2026 | פרעון פקדון | 3337 | | $ 10,000,000.00 | $ 10,490,865.71 | |
| 16.07.2026 | ריבית מט"ח | 3337 | | $ 7,287.67 | $ 490,865.71 | |
| 13.07.2026 | פרמיה אופציה | 79275923 | $ 8,600.00 | | $ 483,578.04 | |
| 13.07.2026 | פרמיה אופציה | 79275922 | | $ 8,600.00 | $ 492,178.04 | |
| 13.07.2026 | פרמיה אופציה | 79275498 | | $ 3,700.00 | $ 483,578.04 | |
| 13.07.2026 | פרמיה אופציה | 79275496 | $ 3,700.00 | | $ 479,878.04 | |
| 13.07.2026 | פרמיה אופציה | 79275446 | $ 3,300.00 | | $ 483,578.04 | |
| 13.07.2026 | פרמיה אופציה | 79275445 | | $ 3,300.00 | $ 486,878.04 | |

בנק לאומי | תאריך הנפקה 29.07.2026

## חשבונות שקליים - עובר ושב

**החשבון של פאפאייה גיימינג בע"מ - 864-568400/97**

יתרת עובר ושב נכונה לתאריך 29.07.2026

**₪ 2,555,716.37**

בחשבון זה לא קיימת מסגרת אשראי

| תאריך | תנועות | אסמכתא | חובה | זכות | יתרה מצטברת |
|---|---|---|---|---|---|
| 27.07.2026 | פר.המרה מיידי | 9881089 | | ₪ 1,500,000.00 | ₪ 2,555,716.37 |
| 27.07.2026 | פר.המרה מיידי | 9880817 | | ₪ 500,000.00 | ₪ 1,055,716.37 |
| 22.07.2026 | מסיטיבנק ס-.י<br>העברה מאת: גוגל אירלנד בעמ 22-001-620107042 000000000000GG104GCGIB | 99022 | | ₪ 11,880.28 | ₪ 555,716.37 |
| 19.07.2026 | עמלת מטח | 25002 | ₪ 9.76 | | ₪ 543,836.09 |
| 15.07.2026 | הראל בטוח-י | 608 | ₪ 440.37 | | ₪ 543,845.85 |
| 08.07.2026 | ויגן פרנדלי-י | 58394 | ₪ 200.00 | | ₪ 544,286.22 |
| 05.07.2026 | 10 ביס.קו.אי-י | 35666 | ₪ 3,499.00 | | ₪ 544,486.22 |
| 05.07.2026 | הראל בטוח-י | 608 | ₪ 680.79 | | ₪ 547,985.22 |
| 05.07.2026 | ע.אישור יתרות | 16320 | ₪ 42.00 | | ₪ 548,666.01 |
| 02.07.2026 | דיינרס קלאב | 7377 | ₪ 31.90 | | ₪ 548,708.01 |
| 02.07.2026 | דיינרס קלאב | 7369 | ₪ 31.90 | | ₪ 548,739.91 |
| 02.07.2026 | דיינרס קלאב | 7344 | ₪ 185.90 | | ₪ 548,771.81 |
| 02.07.2026 | לאומי ויזה | 708214 | ₪ 5,316.17 | | ₪ 548,957.71 |
| 02.07.2026 | לאומי ויזה | 693711 | ₪ 249.99 | | ₪ 554,273.88 |
| 02.07.2026 | לאומי ויזה | 683612 | ₪ 18,027.78 | | ₪ 554,523.87 |
| 01.07.2026 | העברה דיגיטל<br>העברה אל: 10-800-033572306 | 174201 | ₪ 1,455,452.00 | | ₪ 572,551.65 |
| 01.07.2026 | עמ.העברה גל"י | 174201 | ₪ 2.43 | | ₪ 2,028,003.65 |
| 30.06.2026 | דנ"ח פעולות | 401534 | ₪ 42.90 | | ₪ 2,028,006.08 |
| 30.06.2026 | העברת זה"ב | 76307 | ₪ [illegible]4,900,000.00 | | ₪ 2,028,048.98 |

## חשבונות מט"ח - עובר ושב

יתרת עובר ושב נכונה לתאריך 29.07.2026

היתרות משוערכות לתאריך 29.07.2026 ע"פ שערים יציגים מתאריך 28.07.2026

**החשבון של פאפאייה גיימינג בע"מ - 864-568400/97** **מטבע** אירו € **יתרה** 998.99 €

| תאריך | תנועות | אסמכתא | חובה | זכות | יתרה מצטברת | |
|---|---|---|---|---|---|---|
| 01.06.2026 | עמלת רישום | 8351 | € 1.01 | | € 998.99 | |
| 06.05.2026 | המרה-אינטרנט<br>המרה מ: 1182.70 דולר,שע"ח: 1.1827 | 700080859 | | € 1,000.00 | € 1,000.00 | מסמך מצורף |
| 04.05.2026 | כיסוי חובה | 1657 | | € 50.00 | € 0.00 | |
| 04.05.2026 | חיוב דיינרס | 7344 | € 50.00 | | € -50.00 | |

# פיקדונות וחסכונות

**החשבון של פאפאייה גיימינג בע"מ - 864-568400/97**

נתוני פיקדונות נכונים ליום עסקים קודם

| פיקדון | תאריך פירעון | קרן נוכחית | ריבית לפירעון | תקופת פיקדון | תאריך פתיחה |
|---|---|---|---|---|---|
| USD (5) \| שער 3.05 | | **$ 25,000,000.00** | | | |
| פיקדון מט"ח בריבית קבו... 095-568400/97- | 03.08.2026 | $ 9,000,000.00 | 3.75% | 7 ימים | 27.07.2026 |
| פיקדון מט"ח בריבית קבו... 095-568400/97- | 25.09.2026 | $ 2,000,000.00 | 4.7% | 301 ימים | 28.11.2025 |
| פיקדון מט"ח בריבית קבו... 095-568400/97- | 30.10.2026 | $ 1,000,000.00 | 4.7% | 336 ימים | 28.11.2025 |
| פיקדון מט"ח בריבית קבו... 095-568400/97- | 30.10.2026 | $ 11,000,000.00 | 4.85% | 364 ימים | 31.10.2025 |
| פיקדון מט"ח בריבית קבו... 095-568400/97- | 22.01.2027 | $ 2,000,000.00 | 4.37% | 364 ימים | 23.01.2026 |

## חשבונות מט"ח - עובר ושב

יתרת עובר ושב נכונה לתאריך 29.07.2026

היתרות משוערכות לתאריך 29.07.2026 ע"פ שערים יציגים מתאריך 28.07.2026

**החשבון של פאפאייה גיימינג בע"מ - 864-568400/97** **מטבע** דולר קנדי $ **יתרה** 198.00 $

| תאריך | תנועות | אסמכתא | חובה | זכות | יתרה מצטברת |
|---|---|---|---|---|---|
| 19.07.2026 | שיק במט"ח | 25002 | | $ 198.00 | $ 198.00 |

# בנק דיסקונט - 147803

דיסקונט

29/07/2026

**לכבוד** פאפאייה גיימינג בע"מ
**כתובת:** המסגר 00035 תל אביב - יפו
**מס' חשבון:** 200725108
**מס' חשבון קודם:** 0-00-147803
חברות גדולות מכשירים פיננסיים

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** אח"מ **טל':**
**מ.עסקים:** **טל':**

# מט"ח

1,661,616.52 ₪

יתרה משוערכת בחשבונות מט"ח ללא תנועות עתידיות

**פירוט חשבונות מט"ח**

כל החשבונות

| מספר חשבון | יתרה במט"ח | יתרה משוערכת בש"ח | שער יציג | IBAN ופרטי החשבון |
|---|---|---|---|---|
| USD- 0200921705 | $543,275.37 | ₪1,661,336.08 | 3.058 | להצגה |
| EUR- 0250838933 | €80.69 | ₪280.44 | 3.4755 | להצגה |

**USD-0200921705**

| תאריך פעולה | יום ערך | תיאור הפעולה | אסמכתה | זכות / חובה $ | יתרה $ |
|---|---|---|---|---|---|
| 28/07/2026 | 27/07/2026 | הפקדה לפיקדון | 971 | -81,000,000.00 | 543,275.37 |
| 27/07/2026 | 27/07/2026 | רווח מפיקדון שנפרע | 970 | 100,374.25 | 81,543,275.37 |
| 27/07/2026 | 27/07/2026 | פירעון פיקדון מט"ח -7 30 יום | 969 | 78,000,000.00 | 81,442,901.12 |
| 27/07/2026 | 27/07/2026 | רווח מפיקדון שנפרע | 968 | 90,095.35 | 3,442,901.12 |
| 27/07/2026 | 27/07/2026 | פירעון פיקדון מט"ח -1 12 חודש | 967 | 2,600,000.00 | 3,352,805.77 |
| 17/07/2026 | 16/07/2026 | הפקדה לפיקדון | 966 | -78,000,000.00 | 752,805.77 |
| 16/07/2026 | 15/07/2026 | עמלת תקבול מטח 48 1162368379 | 965 | -13.00 | 78,752,805.77 |
| 16/07/2026 | 15/07/2026 | PAP תקבול מטח מחול AYA GAMING L | 964 | 9,999,980.00 | 78,752,818.77 |
| 16/07/2026 | 16/07/2026 | רווח מפיקדון שנפרע | 963 | 56,239.73 | 68,752,838.77 |
| 16/07/2026 | 16/07/2026 | פירעון פיקדון מט"ח -7 30 יום | 962 | 69,000,000.00 | 68,696,599.04 |
| 15/07/2026 | 15/07/2026 | חיוב עס' המרה ערך הי ום 11113393 | 961 | -1,838,542.54 | -303,400.96 |
| 10/07/2026 | 10/07/2026 | AL העברת מטח לחול MEDIA UG | 960 | -1,229,227.80 | 1,535,141.58 |
| 10/07/2026 | 10/07/2026 | IFR העברת מטח לחול AH PLLC | 959 | -5,000.00 | 2,764,369.38 |
| 10/07/2026 | 10/07/2026 | עמלת העברת מטח 48 1069710585 | 958 | -13.00 | 2,769,369.38 |
| 10/07/2026 | 10/07/2026 | עמלת העברת מטח 48 1069710594 | 957 | -13.00 | 2,769,382.38 |
| 10/07/2026 | 09/07/2026 | הפקדה לפיקדון | 956 | -69,000,000.00 | 2,769,395.38 |

דיסקונט

29/07/2026

| | |
|---|---|
| **לכבוד** פאפאייה גיימינג בע"מ | **סניף** 010 |
| **כתובת:** המסגר 00035 תל אביב - יפו | **כתובת:** יהודה הלוי |
| **מס' חשבון:** 0200725108 | **טלפון:** 0768050505 **פקס:** 0768890787 |
| **מס' חשבון קודם:** 0-00-147803 | **צוות:** אח"מ **טל':** |
| חברות גדולות | **מ. עסקים:** **טל':** |

## עובר ושב

₪ 93,142.32

מסגרת אשראי ₪0.00

| תאריך | יום ערך | תיאור התנועה | אסמכתה | זכות/חובה ₪ | יתרה ₪ |
|---|---|---|---|---|---|
| 01/07/2026 | 01/07/2026 | ד.נ לתקופה 30/09/26-01/07/26 | 1400 | -258.00 | 946,769.73 |
| 01/07/2026 | 30/06/2026 | עמלת רישום פעולה במט"י | 1401 | -61.50 | 946,708.23 |
| 01/07/2026 | 01/07/2026 | עמלת בקשה להפקת מסמך זמין | 19 /1402 | -10.00 | 946,698.23 |
| 01/07/2026 | 01/07/2026 | עמלת בקשה להפקת מסמך זמין | 19 /1403 | -10.00 | 946,688.23 |
| 01/07/2026 | 01/07/2026 | הפניקס השת | 1404 | 43.40 | 946,731.63 |
| 01/07/2026 | 01/07/2026 | הראל השתלמ | 1405 | 2.72 | 946,734.35 |
| 03/07/2026 | 03/07/2026 | ע.ת"א-מסים חיוב | 1406 | -3,402.58 | 943,331.77 |
| 05/07/2026 | 06/07/2026 | העברת תשלומים שונים | 99219/1407 | -9,150.00 | 934,181.77 |
| 05/07/2026 | 06/07/2026 | עמלת העברות בקובץ (לרבות משכורות) | 99219/1408 | -1.00 | 934,180.77 |
| 06/07/2026 | 06/07/2026 | חברת החשמל חיוב | 1409 | -12,514.48 | 921,666.29 |
| 09/07/2026 | 09/07/2026 | זיכוי ע.סוואפ 10888181 | 99 /1410 | 2,700,000.00 | 3,621,666.29 |
| 10/07/2026 | 10/07/2026 | הוט מערכות חיוב | 1411 | -4,130.00 | 3,617,536.29 |
| 10/07/2026 | 10/07/2026 | הוט מערכות חיוב | 1412 | -120.78 | 3,617,415.51 |
| 10/07/2026 | 10/07/2026 | כלל-עתודות חיוב | 1413 | -1,455,452.00 | 2,161,963.51 |
| 12/07/2026 | 12/07/2026 | סנטרל פארק חיוב | 1414 | -156,460.00 | 2,005,503.51 |
| 13/07/2026 | 14/07/2026 | ביטוח לאומ | 1415 | 132,574.00 | 2,138,077.51 |
| 15/07/2026 | 15/07/2026 | זיכוי מעסקת המרה 11113393 | 99 /1416 | 5,500,000.00 | 7,638,077.51 |
| 15/07/2026 | 15/07/2026 | העברת תשלומים שונים | 99219/1417 | -1,420,564.50 | 6,217,513.01 |
| 15/07/2026 | 15/07/2026 | עמלת העברות בקובץ (לרבות משכורות) | 99219/1418 | -20.00 | 6,217,493.01 |
| 15/07/2026 | 15/07/2026 | תשלום שוברי גביה | 99219/1419 | -2,322,151.00 | 3,895,342.01 |
| 15/07/2026 | 15/07/2026 | תשלום שוברי גביה | 99219/1420 | -1,513,022.00 | 2,382,320.01 |
| 15/07/2026 | 15/07/2026 | העברה לפאפאייה סטארס בע"מ | 99219/1421 | -250,000.00 | 2,132,320.01 |
| 15/07/2026 | 15/07/2026 | עמלת העברה בבנק מח-ן עסקי | 99219/1422 | -4.00 | 2,132,316.01 |
| 15/07/2026 | 15/07/2026 | העברת תשלומים שונים | 99219/1423 | -133,856.25 | 1,998,459.76 |
| 15/07/2026 | 15/07/2026 | עמלת העברות בקובץ (לרבות משכורות) | 99219/1424 | -1.00 | 1,998,458.76 |
| 15/07/2026 | 15/07/2026 | העברת תשלומים שונים | 99219/1425 | -133,586.00 | 1,864,872.76 |
| 15/07/2026 | 15/07/2026 | עמלת העברות בקובץ (לרבות משכורות) | 99219/1426 | -1.00 | 1,864,871.76 |
| 15/07/2026 | 15/07/2026 | ביט' לאומי חיוב | 1427 | -1,644,812.00 | 220,059.76 |
| 15/07/2026 | 15/07/2026 | ביט' לאומי חיוב | 1428 | -659.00 | 219,400.76 |
| 15/07/2026 | 15/07/2026 | ביט' לאומי חיוב | 1429 | -28,386.00 | 191,014.76 |
| 15/07/2026 | 15/07/2026 | ביט' לאומי חיוב | 1430 | -36.00 | 190,978.76 |
| 15/07/2026 | 15/07/2026 | ביט' לאומי חיוב | 1431 | -2,106.00 | 188,872.76 |

| תאריך | יום ערך | תיאור התנועה | אסמכתה | זכות/חובה ₪ | יתרה ₪ |
|---|---|---|---|---|---|
| 22/07/2026 | 22/07/2026 | ביט' לאומי חיוב | 1432 | -97,000.00 | 91,872.76 |
| 24/07/2026 | 24/07/2026 | מגדל חיים | 1433 | 634.78 | 92,507.54 |
| 24/07/2026 | 24/07/2026 | מגדל חיים | 1434 | 634.78 | 93,142.32 |

היתרה המוצגת עשויה לא לכלול חלק מהתנועות המקוונות שבוצעו במהלך יום העסקים האחרון.
בכל מקרה של סתירה בין הרשום לעיל ובין הרשום בספרי הבנק, הרישום בספרי הבנק הוא הקובע.
סכום החיוב הקרוב בכרטיס אשראי אינו סופי, משום שאינו כולל רכישות שטרם דווחו על ידי בתי העסק. כמו כן, בעסקאות מט"ח שמועד חיובן עתידי, שער המטבע ייקבע במועד החיוב. המידע באחריות חברות האשראי.

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

דיסקונט

29/07/2026

**לכבוד** פאפאייה גיימינג בע"מ
**כתובת:** המסגר 00035 תל אביב - יפו
**מס' חשבון:** 200725108
**מס' חשבון קודם:** 0-00-147803
חברות גדולות מכשירים פיננסיים

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** אח"מ **טל':**
**מ.עסקים:** **טל':**

# מט"ח

₪ 1,661,616.52

יתרה משוערכת בחשבונות מט"ח ללא תנועות עתידיות

**פירוט חשבונות מט"ח**

EUR-0250838933

| | מספר חשבון | יתרה במט"ח | יתרה משוערכת בש"ח | שער יציג | IBAN ופרטי החשבון |
|---|---|---|---|---|---|
| X | EUR- 0250838933 | €80.69 | ₪280.44 | 3.4755 | להצגה |

**EUR-0250838933**

| תאריך פעולה | יום ערך | תיאור הפעולה | אסמכתה | זכות / חובה € | יתרה € |
|---|---|---|---|---|---|
| 01/07/2026 | 30/06/2026 | עמלת רישום פעולה במט"ח | 44 | -2.06 | 80.69 |
| 01/06/2026 | 31/05/2026 | עמלת רישום פעולה במט"ח | 43 | -2.02 | 82.75 |
| 01/05/2026 | 30/04/2026 | עמלת רישום פעולה במט"ח | 42 | -2.01 | 84.77 |
| 01/04/2026 | 31/03/2026 | עמלת רישום פעולה במט"ח | 41 | -2.05 | 86.78 |
| 01/03/2026 | 27/02/2026 | עמלת רישום פעולה במט"ח | 40 | -1.99 | 88.83 |
| 01/02/2026 | 30/01/2026 | עמלת רישום פעולה במט"ח | 39 | -1.97 | 90.82 |
| 01/01/2026 | 31/12/2025 | עמלת רישום פעולה במט"ח | 38 | -2.00 | 92.79 |
| 01/12/2025 | 30/11/2025 | עמלת רישום פעולה במט"ח | 37 | -2.03 | 94.79 |
| 27/11/2025 | 27/11/2025 | PA העברת מטח בארץ PAYA STARS | 36 | -3,500.00 | 96.82 |
| 27/11/2025 | 27/11/2025 | העברה מפאפאייה גיימינג בע"מ | 35 | 3,000.00 | 3,596.82 |
| 02/11/2025 | 31/10/2025 | עמלת רישום פעולה במט"ח | 34 | -2.03 | 596.82 |
| 30/10/2025 | 30/10/2025 | PA העברת מטח בארץ PAYA STARS | 33 | -3,500.00 | 598.85 |
| 30/10/2025 | 30/10/2025 | העברה מפאפאייה גיימינג בע"מ | 32 | 4,000.00 | 4,098.85 |
| 03/10/2025 | 30/09/2025 | עמלת רישום פעולה במט"ח | 31 | -2.00 | 98.85 |

דיסקונט

29/07/2026

**לכבוד** פאפאייה גיימינג בע"מ
**כתובת:** המסגר 00035 תל אביב - יפו
**מס' חשבון:** 200725108
**מס' חשבון קודם:** 0-00-147803
חברות גדולות מכשירים פיננסיים

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** אח"מ **טל':**
**מ.עסקים:** **טל':**

| | |
|---|---|
| שווי נוכחי | $5,173,736.99 |
| תחנת היציאה הקרובה | ללא תחנת יציאה |
| שווי לתחנה | -- |
| מועד הפירעון | 26/08/2026 |
| שווי לפירעון | $5,191,687.67 |
| % ריבית שנתית | 4.68% |

## מט"ח לתקופה 1-12 חודשים בריבית קבועה

מספר החשבון: 1003685171-1
פיקדון מט"ח לתקופה 1-12 חודשים בריבית קבועה

| | |
|---|---|
| סוג הריבית | ריבית קבועה |
| סכום הקרן | $5,000,000.00 |
| יום ערך להפקדה | 31/10/2025 |
| סוג החידוש | ללא חידוש |
| מספר החידושים שנותרו | ללא חידוש |
| שער הUSD | 3.05 |
| ערוץ ביצוע | נפתח בסניף ב-31/10/2025 |

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

דיסקונט

29/07/2026

**לכבוד** פאפאייה גיימינג בע"מ
**כתובת:** המסגר 00035 תל אביב - יפו
**מס' חשבון:** 200725108
**מס' חשבון קודם:** 0-00-147803
חברות גדולות מכשירים פיננסיים

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** אח"מ **טל':**
**מ.עסקים:** **טל':**

| | |
|---|---|
| שווי נוכחי | $2,052,356.17 |
| תחנת היציאה הקרובה | ללא תחנת יציאה |
| שווי לתחנה | -- |
| מועד הפירעון | 25/09/2026 |
| שווי לפירעון | $2,066,816.44 |
| % ריבית שנתית | 4.55% |

## מט"ח לתקופה 1-12 חודשים בריבית קבועה

מספר החשבון: 1005008118-1
פיקדון מט"ח לתקופה 1-12 חודשים בריבית קבועה

| | |
|---|---|
| סוג הריבית | ריבית קבועה |
| סכום הקרן | $2,000,000.00 |
| יום ערך להפקדה | 31/12/2025 |
| סוג החידוש | ללא חידוש |
| מספר החידושים שנותרו | ללא חידוש |
| שער הUSD | 3.05 |
| ערוץ ביצוע | נפתח בסניף ב-31/12/2025 |

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

דיסקונט

29/07/2026

**לכבוד** פאפאייה גיימינג בע"מ
**כתובת:** המסגר 00035 תל אביב - יפו
**מס' חשבון:** 200725108
**מס' חשבון קודם:** 0-00-147803
חברות גדולות מכשירים פיננסיים

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** אח"מ **טל':**
**מ.עסקים:** **טל':**

| | |
|---|---|
| שווי נוכחי | $81,019,084.93 |
| תחנת היציאה הקרובה | ללא תחנת יציאה |
| שווי לתחנה | -- |
| מועד הפירעון | 03/08/2026 |
| שווי לפירעון | $81,066,797.26 |
| % ריבית שנתית | 4.30% |

## מט"ח לתקופה 7-30 יום בריבית קבועה

מספר החשבון: 1008955819-1
פיקדון מט"ח לתקופה 7-30 יום בריבית קבועה

| | |
|---|---|
| סוג הריבית | ריבית קבועה |
| סכום הקרן | $81,000,000.00 |
| יום ערך להפקדה | 27/07/2026 |
| סוג החידוש | ללא חידוש |
| מספר החידושים שנותרו | ללא חידוש |
| שער הUSD | 3.05 |
| ערוץ ביצוע | נפתח בסניף ב-27/07/2026 |

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

# Silicon Valley Bank - 3302933838; 10026347; 0050054814; 0050054829; 0050054833; 3303666735; 3304310894

svb Silicon Valley Bank
A Division of First Citizens Bank



Run by Igal Livshits on Jul 29 2026 at 12:41 AM PDT

# Balances & Transactions Report (Jul 28 2026)

## USD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 10,883,013.35 USD | 10,883,013.35 USD |
| Total Credits (2) | 1,569,944.74 USD | 1,569,944.74 USD |
| Total Debits (2) | -784,982.37 USD | -784,982.37 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 11,667,975.72 USD | 11,667,975.72 USD |

## Analysis Checking - 3302933838

Papaya Gaming Ltd. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 250,000.00 USD | 250,000.00 USD |
| Total Credits (1) | 784,982.37 USD | 784,982.37 USD |
| Total Debits (2) | -784,982.37 USD | -784,982.37 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 250,000.00 USD | 250,000.00 USD |

### Transaction Details

### Credits (1) — 784,982.37 USD

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **TRANSFER CREDIT**<br>SWEEP FROM DDA 3302747345 | **784,982.37 USD** |

### Debits (2) — -784,982.37 USD

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **ZERO BAL TRF DEBIT**<br>TF TO INT SWP 003304310894 | **-784,962.37 USD** |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **ACH DEBIT**<br>ANTHROPIC* CLAUD PURCHASE A ST-R8T5G8Q9L8K3 PAPAYA GAMING | **-20.00 USD** |

## BUSINESS INTEREST SWEEP - 3304310894

Papaya Gaming Ltd. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 10,632,451.92 USD | 10,632,451.92 USD |
| Total Credits (1) | 784,962.37 USD | 784,962.37 USD |
| Total Debits (0) | 0.00 USD | 0.00 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 11,417,414.29 USD | 11,417,414.29 USD |

### Transaction Details

### Credits (1) — 784,962.37 USD

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **TRANSFER CREDIT**<br>SWEEP FROM DDA 3302933838 | **784,962.37 USD** |

## MMA - 3303666735

Papaya Gaming Ltd. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 561.43 USD | 561.43 USD |
| Total Credits (0) | 0.00 USD | 0.00 USD |
| Total Debits (0) | 0.00 USD | 0.00 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 561.43 USD | 561.43 USD |

### Transaction Details

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

No transactions available for the account or date(s) selected.

## AUD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 3,176.33 AUD | 3,176.33 AUD |
| Total Credits (0) | 0.00 AUD | 0.00 AUD |
| Total Debits (0) | 0.00 AUD | 0.00 AUD |
| One Day Float | -- | 0.00 AUD |
| 2+ Day Float | -- | 0.00 AUD |
| **Closing Balance**<br>As of Jul 28 2026 | 3,176.33 AUD | 3,176.33 AUD |

## BUSINESS ACCOUNT - 0050054814

Papaya Gaming Ltd. | AUD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 3,176.33 AUD | 3,176.33 AUD |
| Total Credits (0) | 0.00 AUD | 0.00 AUD |
| Total Debits (0) | 0.00 AUD | 0.00 AUD |
| One Day Float | -- | 0.00 AUD |
| 2+ Day Float | -- | 0.00 AUD |
| **Closing Balance**<br>As of Jul 28 2026 | 3,176.33 AUD | 3,176.33 AUD |

### Transaction Details

No transactions available for the account or date(s) selected.

## CAD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 1,946.18 CAD | 1,946.18 CAD |
| Total Credits (0) | 0.00 CAD | 0.00 CAD |
| Total Debits (0) | 0.00 CAD | 0.00 CAD |
| One Day Float | -- | 0.00 CAD |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

| | | |
|---|---|---|
| 2+ Day Float | -- | 0.00 CAD |
| **Closing Balance**<br>As of Jul 28 2026 | 1,946.18 CAD | 1,946.18 CAD |

## BUSINESS ACCOUNT - 0050054829

Papaya Gaming Ltd. | CAD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 1,946.18 CAD | 1,946.18 CAD |
| Total Credits (0) | 0.00 CAD | 0.00 CAD |
| Total Debits (0) | 0.00 CAD | 0.00 CAD |
| One Day Float | -- | 0.00 CAD |
| 2+ Day Float | -- | 0.00 CAD |
| **Closing Balance**<br>As of Jul 28 2026 | 1,946.18 CAD | 1,946.18 CAD |

### Transaction Details

No transactions available for the account or date(s) selected.

## EUR Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 1,138.17 EUR | 1,138.17 EUR |
| Total Credits (0) | 0.00 EUR | 0.00 EUR |
| Total Debits (0) | 0.00 EUR | 0.00 EUR |
| One Day Float | -- | 0.00 EUR |
| 2+ Day Float | -- | 0.00 EUR |
| **Closing Balance**<br>As of Jul 28 2026 | 1,138.17 EUR | 1,138.17 EUR |

## BUSINESS ACCOUNT - 0050054833

Papaya Gaming Ltd. | EUR | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance** | 1,138.17 EUR | 1,138.17 EUR |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

| | | |
|---|---|---|
| As of Jul 28 2026 | | |
| Total Credits (0) | 0.00 EUR | 0.00 EUR |
| Total Debits (0) | 0.00 EUR | 0.00 EUR |
| One Day Float | -- | 0.00 EUR |
| 2+ Day Float | -- | 0.00 EUR |
| **Closing Balance** As of Jul 28 2026 | 1,138.17 EUR | 1,138.17 EUR |

**Transaction Details**

No transactions available for the account or date(s) selected.

## GBP Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance** As of Jul 28 2026 | 784,670.37 GBP | 784,670.37 GBP |
| Total Credits (0) | 0.00 GBP | 0.00 GBP |
| Total Debits (0) | 0.00 GBP | 0.00 GBP |
| One Day Float | -- | 0.00 GBP |
| 2+ Day Float | -- | 0.00 GBP |
| **Closing Balance** As of Jul 28 2026 | 784,670.37 GBP | 784,670.37 GBP |

## BUSINESS ACCOUNT - 0010026347

Papaya Gaming Ltd. | GBP | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance** As of Jul 28 2026 | 784,670.37 GBP | 784,670.37 GBP |
| Total Credits (0) | 0.00 GBP | 0.00 GBP |
| Total Debits (0) | 0.00 GBP | 0.00 GBP |
| One Day Float | -- | 0.00 GBP |
| 2+ Day Float | -- | 0.00 GBP |
| **Closing Balance** As of Jul 28 2026 | 784,670.37 GBP | 784,670.37 GBP |

**Transaction Details**

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

No transactions available for the account or date(s) selected.

*End of Report*

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

# PayPal - QDBX2AZN6WY26

## Statement for 26 July 2026 to 28 July 2026

Papaya Gaming LTD
LockSmith 35 D G
Tel Aviv
6721407 Jaffa

## Balance Summary (26/07/2026 - 28/07/2026)

| | Available beginning | Available ending | Withheld beginning | Withheld ending |
|---|---|---|---|---|
| USD | 519,061.14 | 455,677.94 | 0.00 | 0.00 |
| CAD | 0.00 | 0.00 | 0.00 | 0.00 |
| DKK | 0.00 | 0.00 | 0.00 | 0.00 |
| EUR | 253,566.27 | 276,935.76 | 0.00 | 0.00 |
| GBP | 197,709.89 | 221,889.61 | 0.00 | 0.00 |
| ILS | 4.50 | 4.50 | 0.00 | 0.00 |
| NOK | 3.48 | 3.48 | 0.00 | 0.00 |
| SEK | 0.74 | 0.74 | 0.00 | 0.00 |

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

PayPal

Merchant Account ID: QV5BLGZ94RS68 PayPal ID: pay@papaya.com 26/07/2026 - 28/07/2026

## Activity Summary (26/07/2026 - 28/07/2026)

| | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| **Beginning Available Balance** | **519,061.14** | **0.00** | **253,566.27** | **197,709.89** |
| Payments received | 4,862.54 | 0.00 | 39,160.72 | 36,429.30 |
| Payments sent | -65,755.60 | -31.00 | -8,314.59 | -5,437.74 |
| Withdrawals and Debits | -731.21 | 0.00 | -4,200.14 | -4,216.50 |
| Deposits and Credits | 125.47 | 0.00 | 0.00 | 2.00 |
| Fees | -1,830.71 | -0.73 | -2,840.98 | -2,575.35 |
| Chargeback | 0.00 | 0.00 | -435.52 | -21.99 |
| Releases | 67,336.50 | 0.00 | 8,480.66 | 5,565.85 |
| Transfers | -53.69 | 31.73 | 0.00 | 0.00 |
| Withheld | -67,336.50 | 0.00 | -8,480.66 | -5,565.85 |
| **Ending Available Balance** | **455,677.94** | **0.00** | **276,935.76** | **221,889.61** |

| | NOK | SEK |
|---|---|---|
| **Beginning Available Balance** | **3.48** | **0.74** |
| Payments received | 0.00 | 0.00 |
| Payments sent | -152.00 | -294.00 |
| Withdrawals and Debits | 0.00 | 0.00 |
| Deposits and Credits | 0.00 | 0.00 |
| Fees | -3.58 | -6.94 |
| Chargeback | 0.00 | 0.00 |
| Releases | 0.00 | 0.00 |
| Transfers | 155.58 | 300.94 |
| Withheld | 0.00 | 0.00 |
| **Ending Available Balance** | **3.48** | **0.74** |

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

PayPal

Merchant Account ID: QV5BLGZ94RS68 PayPal ID: pay@papaya.com 26/07/2026 - 28/07/2026

## Payments received

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Payment Bill User Payment | 4,862.54 | 0.00 | 39,160.72 | 36,429.30 |
| Total | 4,862.54 | 0.00 | 39,160.72 | 36,429.30 |

| Description | NOK | SEK |
|---|---|---|
| Payment Bill User Payment | 0.00 | 0.00 |
| Total | 0.00 | 0.00 |

## Payments sent

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Mass Pay payment | -65,728.75 | -31.00 | -8,314.59 | -5,437.74 |
| Subscription Payment | -26.85 | 0.00 | 0.00 | 0.00 |
| Total | -65,755.60 | -31.00 | -8,314.59 | -5,437.74 |

| Description | NOK | SEK |
|---|---|---|
| Mass Pay payment | -152.00 | -294.00 |
| Subscription Payment | 0.00 | 0.00 |
| Total | -152.00 | -294.00 |

## Withdrawals and Debits

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Payment Refund | -731.21 | 0.00 | -4,200.14 | -4,216.50 |
| Total | -731.21 | 0.00 | -4,200.14 | -4,216.50 |

| Description | NOK | SEK |
|---|---|---|
| Payment Refund | 0.00 | 0.00 |
| Total | 0.00 | 0.00 |

## Deposits and Credits

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Payment Reversals | 125.47 | 0.00 | 0.00 | 2.00 |
| Total | 125.47 | 0.00 | 0.00 | 2.00 |

| Description | NOK | SEK |
|---|---|---|
| Payment Reversals | 0.00 | 0.00 |
| Total | 0.00 | 0.00 |

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

PayPal

Merchant Account ID: QV5BLGZ94RS68 PayPal ID: pay@papaya.com 26/07/2026 - 28/07/2026

## Fees

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Dispute Fee | 0.00 | 0.00 | -66.08 | -7.08 |
| Fee Credits | 53.13 | 0.00 | 328.46 | 304.77 |
| Payment Fee | -1,883.84 | -0.73 | -3,103.36 | -2,873.04 |
| **Total** | **-1,830.71** | **-0.73** | **-2,840.98** | **-2,575.35** |

| Description | NOK | SEK |
|---|---|---|
| Dispute Fee | 0.00 | 0.00 |
| Fee Credits | 0.00 | 0.00 |
| Payment Fee | -3.58 | -6.94 |
| **Total** | **-3.58** | **-6.94** |

## Chargeback

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Chargeback Activity | 0.00 | 0.00 | -435.52 | -21.99 |
| **Total** | **0.00** | **0.00** | **-435.52** | **-21.99** |

| Description | NOK | SEK |
|---|---|---|
| Chargeback Activity | 0.00 | 0.00 |
| **Total** | **0.00** | **0.00** |

## Releases

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Release | 67,336.50 | 0.00 | 8,480.66 | 5,565.85 |
| **Total** | **67,336.50** | **0.00** | **8,480.66** | **5,565.85** |

| Description | NOK | SEK |
|---|---|---|
| Release | 0.00 | 0.00 |
| **Total** | **0.00** | **0.00** |

## Transfers

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Currency Conversion | -53.69 | 31.73 | 0.00 | 0.00 |
| **Total** | **-53.69** | **31.73** | **0.00** | **0.00** |

| Description | NOK | SEK |
|---|---|---|
| Currency Conversion | 155.58 | 300.94 |
| **Total** | **155.58** | **300.94** |

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

PayPal

Merchant Account ID: QV5BLGZ94RS68 PayPal ID: pay@papaya.com 26/07/2026 - 28/07/2026

## Withheld

| Description | USD | DKK | EUR | GBP |
|---|---|---|---|---|
| Account Holds | -67,336.50 | 0.00 | -8,480.66 | -5,565.85 |
| **Total** | **-67,336.50** | **0.00** | **-8,480.66** | **-5,565.85** |

| Description | NOK | SEK |
|---|---|---|
| Account Holds | 0.00 | 0.00 |
| **Total** | **0.00** | **0.00** |

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

*-- Note: Due to the high volume of transactions for the requested month, this document contains only an account-level summary. For more detailed transaction history, please access the CSV download feature. --*

This account statement is not an invoice within the meaning of the EU VAT Directive 2006/112/EC. PayPal?s services are in scope of the exemption from VAT for financial services. This statement may serve as a receipt for accounting and tax related purposes.

Copyright © 1999-2026 PayPal. All rights reserved.

# נספח 5

# חלק ב סעיף 7 - פוליסות ביטוח של המבקשות

עמ' 42

5

# **תוכן עניינים**


| מס' | שם הנספח | עמ' |
|---|---|---|
| 1 | העתק ביטוח נושאי משרה - Primary layer | 2 |
| 2 | העתק ביטוח נושאי משרה - 1st excess layer | 37 |
| 3 | העתק ביטוח נושאי משרה - 2nd excess layer | 60 |
| 4 | העתק ביטוח נושאי משרה - 3rd excess layer | 75 |
| 5 | העתק ביטוח צד ג', חבות מעסיקים, רכוש | 88 |
| 6 | העתק ביטוח ציוד אלקטרוני | 104 |
| 7 | העתק ביטוח נסיעות | 109 |
| 8 | העתק ביטוח בריאות קבוצתי לעובדים | 116 |

# העתק ביטוח נושאי משרה -
# Primary layer

HOWDEN

# MARKET REFORM CONTRACT

| | | |
|---|---|---|
| **UMR / Policy No.** | **B0180FN2613071** | **180 HOW** |
| **Reinsured:** | **N/A** | |
| **Insured:** | **Papaya Gaming Ltd** | |
| **Period:** | **From :** | **7th April 2026** |
| | **To:** | **6th April 2027** |

| | |
|---|---|
| *Contract Order:* | % |
| *No. Of Contract Documents:* | |
| *Hereto Written:* | % |
| *Total Written:* | % |
| *Signing Percentage:* | % |

UMR: B0180FN2613071

## RISK DETAILS

**Unique Market Reference:** B0180FN2613071

**Type:** **Description:** Directors & Officers Liability
**Contract Classification:** **I**nsurance

**Proposal Form Date:** 25th March 2026

**Name of Insured:** Papaya Gaming Ltd

**Address of Insured:**

| | |
|---|---|
| Street No. and Street: | 35 HaMasger Street. |
| City: | Tel Aviv- Yafo, |
| Country: | Israel |

**Period of Insurance:** From: 7th April 2026
To: 6th April 2027
both days inclusive Local Standard Time at the Address of the Original Insured.

**Interest:** Reinsurance of the Reinsured’s liability under the original policy.

**Limit(s) of Liability:** USD 5,000,000 in the aggregate for the ***policy period*** for all ***loss***

**Retentions:**

| | |
|---|---|
| NIL | each ***claim*** under Insuring Agreement I(A) and any other **non-indemnifiable loss** |
| USD 50,000 | each ***claim*** under Insuring Agreement I(B) and any other indemnifiable ***loss,*** other than a ***securities claim*** |
| Not Applicable | each ***claim*** under Insuring Agreement I(C) and any indemnifiable ***loss*** payable with respect to a ***securities claim*** |

With respect only to ***claims*** made, or ***loss*** incurred, in the United States of America the following retentions shall apply:

| | |
|---|---|
| NIL | each ***claim*** under Insuring Agreement I(A) and any other **non-indemnifiable loss** |
| USD 75,000 | each ***claim*** under Insuring Agreement I(B) and any other indemnifiable ***loss,*** other than a ***securities claim*** |
| Not Applicable | each ***claim*** under Insuring Agreement I(C) and any indemnifiable ***loss*** payable with respect to a ***securities claim*** |

**Automatic Extensions of Cover:**

| | |
|---|---|
| Parent company board special excess limit: | USD 1,000,000 |
| Non-executive director special excess limit: | USD 1,000,000 |

UMR: B0180FN2613071

| | |
|---|---|
| Regulatory Crisis Costs sub-limit: | USD 100,000 |
| Crisis Consultant Costs sub-limit: | USD 100,000 |
| Prosecution Costs sub-limit: | USD 100,000 |
| Emergency Costs sub-limit: | USD 100,000 |
| Environmental Liability sub-limit: | USD 100,000 |

Discovery: (A) Length of discovery period: 1 year
Premium for discovery period: 100% of expiring premium

It is specifically understood and agreed that the sub-limits stated above shall be a part of and not in addition to the ***limit of liability***.

**Claims Basis:**

**Claims Basis:**
- Claims Made Basis – Retroactive: None
- Claims Made Basis – Extended Reporting
- Claims Made Basis – Pending and Prior Litigation Date: 1st November 2016

As more fully defined within the wording(s) attached

**Territorial Limits:** This contract provides cover for work carried out worldwide.

**Legal Action:** This contract provides cover for claims made against you worldwide.

**Choice of Law & Jurisdiction:**

**Choice of Law:**
This insurance shall be governed by and construed in accordance with the laws of Israel

**Choice of Jurisdiction:**
The parties shall submit to the jurisdiction of the Courts of Israel

**Service of Suit Clause:**
The parties agree to appoint Ms Sigal Schlimoff Rechtman to accept service of suit as set out in the Service of Suit Clause NMA2349a.

**Conditions:** As per NextPro Commercial Management Liability Insurance wording, as attached, plus the following endorsements:
1. Service of Suit, as attached
2. Absolute professional Services Exclusion( failure to supervise carve back) as attached
3. LMA 3100A Sanctions Clause as attached
4. Entity Employment Practice Exclusion as attached
5. Money Laundering Exclusion as attached
6. Specific Matters Exclusion as attached
7. Wording Amendments as attached
8. General Condition (A5) is amended to read “All notices must be sent by certified mail or the equivalent to the following address:

The insurer via:
Howden Insurance Brokers Limited
One Creechurch Place
London, EC3A 5AF
Tel: +44 (0)20 7623 3806

Email: FLnewclaims@howdengroup.com
9. VIII. General Conditions clause (M) JURISDICTION AND GOVERNING LAW/ARBITRATION is hereby deleted from this policy

**USA New Offering of Equity Securities Market Capitalisation Threshold:** Not Applicable

**Notices Required to be given to the Insurer:** Via:

Howden Insurance Brokers Limited
One Creechurch Place
London, EC3A 5AF
Tel: +44 (0)20 7623 3806
Email: FLnewclaims@howdengroup.com

**Express Warranties:** None, other than as may exist in the policy wording or attached clauses.

**Conditions Precedent:** None, other than as may exist in the policy wording or attached clauses.

**Subjectivities:** None

**Premium:** **Premium:** USD 10,916 per annum

**Fees Payable To Reinsurers:**

| | |
|---|---|
| **Type:** | Underwriting Fee |
| **Amount:** | USD 500.00 |
| **Payable to:** | (Re) Insurers |
| **Payable:** | At inception |

**Premium Payment Terms:**

PREMIUM PAYMENT CLAUSE (LSW 3001) - 90 Days
Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 90 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 90 day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**Taxes Payable and Administered by the Insured or Their Agent:** None

**Taxes Payable by Insured and Administered by Insurers:** None

**Taxes Payable by the Insurers and Administered by the Insured or Their Agent:** None

**Insurer Contract Documentation:**

In accordance with the Contract Certainty Code of Practice, Final Evidence of Cover within 30 days will be as follows:

☒ This document details the contract terms entered into by the Insurer(s) and constitutes the contract document.

Any further documentation changing this contract, which has been appropriately agreed by Insurer(s) hereon, shall form the evidence of such change(s) and will be deemed to form an integral part of the contract.

UMR: B0180FN2613071

## INFORMATION

The following information has been seen, read, understood and noted by Reinsurers hereon:

(1) as held on file by Howden Insurance Brokers Ltd.

UMR: B0180FN2613071

HOWDEN

## SECURITY DETAILS

**Insurer's Liability:** **(RE)INSURERS LIABILITY CLAUSE (LMA 3333)**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:** 100% of 100%

**Basis of Written Lines:**
X Of Whole
□ Of Order
□ Part of Whole

□ Part of Order

**Basis of Signed Lines:**

X Of Whole
□ Of Order
□ Part of Whole
□ Part of Order

**Signing Provisions:**

**Without Disproportionate Signing**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full. All other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order, without further agreement of any of the (re)insurers.
However:

a) in the event that the placement of the order is not completed by the commencement date of the period of (re)insurance, then all lines written by that date will be signed in full;
b) the signed lines resulting from the application of the above provisions can be varied - before or after the commencement date of the period of (re)insurance - by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the MRCs will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**Written Lines:**

As detailed in PPL Signing pages

UMR: B0180FN2613071

**Endorsements Attaching to this Policy Wording**

**SERVICE OF SUIT CLAUSE (ISRAEL)**

This Insurance shall be governed by Israeli law and the Israeli Courts shall have jurisdiction in any dispute arising hereunder.

In this event Ms Sigal Schlimoff Rechtman of Gibor Sport Building, 7 Menachem Begin Road, Ramat Gan 52521, Israel, Lloyd's Representative in Israel, is authorised to accept service of suit on behalf of Underwriters.

20/01/11
NMA2349A

**SANCTION LIMITATION CLAUSE**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America

LMA3100A

5 October 2023

**ABSOLUTE PROFESSIONAL SERVICES EXCLUSION (FAILURE TO SUPERVISE CARVE BACK)**

It is understood and agreed that **insurers** shall not be liable for any **Loss** or any investigation costs arising from or attributable to, whether directly or indirectly, based upon or is in any manner related to the **Insured** carrying out, or failing to carry out professional services other than a failure to manage or supervise such services.

Except as otherwise provided in this endorsement, all terms, provisions and conditions of this Policy shall have full force and effect.

**ENTITY EMPLOYMENT PRACTICE EXCLUSION**

In consideration of the premium charged, it is agreed that the Insurer shall not be liable for any Claim based upon, arising from, or in consequence of any actual or alleged Wrongful Act in respect of a Entity Employment Practice violation.

UMR: B0180FN2613071

## MONEY LAUNDERING EXCLUSION

It is hereby understood and agreed that the Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged behavior constituting money laundering (as defined under any statute, law, regulation, international treaty or international convention regarding the movement of illicit cash or assets representing illicit monies) which any **Insured Individual(s)** knew or ought reasonably to have known constituted money laundering, either directly or indirectly.

## SPECIFIC MATTERS EXCLUSION

It is hereby understood and agreed that the *insurer* shall not be liable to make any payment for *loss* in connection with any *claim* made against the *insured* arising out of based upon or attributable to the matters referred to in answer to Question(s) 7b of the proposal form dated 29th January 2023

## WORDING AMENDMENTS:

It is hereby noted and agreed that the following amendments are applicable:

1. It is hereby noted and agreed that part **(I)** under **VI. Limit of Liability, Indemnification and Retentions (I)** within the **NextPro Commercial Management Liability Insurance wording** is deleted in its entirety and replaced with the following:

(I) Notwithstanding the above and solely in respect of a ***claim*** filed against an ***insured***, it is agreed that in the event of a ***loss***, including ***defence costs***, exceeding the total aggregate limit of liability for ***loss***, then this policy shall cover reasonable ***defence costs*** excess of the limit of liability provided that;

(1) the limit of liability of this Policy; and

(2) any written excess layer Policy over the limit of liability of this Policy
have been exhausted.

In respect of ***claims*** filed against an ***insured*** outside Israel this policy shall cover reasonable ***defence costs*** excess of the limit of liability for ***loss.***

2. II. Automatic Extensions of Cover (C ) Investigation Costs capped at 20% of the limit

3. II. Automatic Extensions of Cover (O) Run-Off for Retired Directors is amended to read 84 months as follows:
**Run-Off for *Retired Insured Persons***
If this Policy is not renewed or replaced, and if the total premium for this Policy has been paid in full, the ***insurer*** shall provide 84 months ***discovery period*** for any ***retired insured person***.

4. It is hereby noted and agreed that the following is added under the **(N)** ***insured person*** definition:
*(*9) any member of a supervisory or advisory board, including de facto
members of the management bodies (including interim managers) and of the supervisory bodies;

UMR: B0180FN2613071

# NextPro:
# Commercial Management Liability Insurance
## Schedule

---

**Item 1.** **Name and address of *parent company*: As per Risk Details**

**Item 2.** **Policy period: per Risk Details**

**Item 3.** **Limit of liability: As per Risk Details**

**Item 4.** **Retentions: As per Risk Details**

**Item 5.** **Automatic Extensions of Cover (excess limits and sub-limits set out as applicable): As per Risk Details**

**Item 6.** **USA New Offering of Equity Securities Market Capitalisation threshold: As per Risk Details**

**Item 7.** **Pending and Prior Litigation Date: As per Risk Details**

**Item 8.** **Notices required to be given to the *insurer* must be addressed via:**

Howden Insurance Brokers Limited
One Creechurch Place
London, EC3A 5AF
Tel: +44 (0)20 7623 3806
Email: FLnewclaims@howdengroup.com

**Item 9.** **Endorsements attached at issuance: As per Risk Details**

---

UMR: B0180FN2613071

# NextPro:
# Commercial Management Liability Insurance

**THIS IS A CLAIMS MADE POLICY WITH *DEFENCE COSTS* INCLUDED IN THE *LIMIT OF LIABILITY*. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium or the undertaking of the *policyholder* to pay the premium, and subject to all of the terms, conditions and limitations of this Policy, the *insurer*, the *insured persons* and the *company* agree as follows:**

**I. Insuring Agreements**

(A) **Insured Person Cover**

The ***insurer*** shall pay on behalf of the ***insured persons*** any ***loss*** resulting from a ***claim*** first made against the ***insured persons*** during the ***policy period***, for a ***wrongful act*** or ***employment practices wrongful act***, except for ***loss*** which the ***company*** has paid on behalf of the ***insured persons*** as indemnification.

(B) **Company Reimbursement Cover**

The ***insurer*** shall reimburse or pay on behalf of the ***company*** any ***loss*** which the ***company*** is required or permitted to pay as indemnification to any of the ***insured persons*** resulting from a ***claim*** first made against the ***insured persons*** during the ***policy period***, for a ***wrongful act*** or ***employment practices wrongful act***.

(C) **Company Securities Claim Cover**

The ***insurer*** shall pay the ***loss*** of the ***company*** resulting from any ***securities claim*** first made against the ***company*** during the ***policy period***, for a ***company wrongful act***.

**II. Automatic Extensions of Cover**

(A) **Additional Excess Protection for *Parent Company* Board**

In addition to the cover provided under this Policy to members of the ***parent company*** board as ***insured persons***, in the event that:

(1) the ***limit of liability*** of this Policy;

(2) all other applicable management liability insurance, whether or not specifically written as excess over the ***limit of liability*** of this Policy; and

(3) all other sources of indemnification for ***loss*** available to any such ***insured person****;*

have been exhausted, the ***insurer*** shall pay the ***loss*** of such ***insured person*** arising out of an ***unrelated claim*** first made against them during the ***policy period**,* up to the "parent board special excess limit" set out in Item 5 of the Schedule, which limit shall be in the aggregate for all such ***insured persons*** during the ***policy period***.

(B) **Additional Excess Protection for *Non-Executive Directors***

In addition to the cover provided under this Policy to ***non-executive directors*** as ***insured persons***, in the event that:

(4) the ***limit of liability*** of this Policy;

(5) all other applicable management liability insurance, whether or not specifically written as excess over the ***limit of liability*** of this Policy; and

(6) all other sources of indemnification for loss available to any ***non-executive director;***

have been exhausted, the ***insurer*** shall pay the ***loss*** of ***non-executive directors*** arising out of a ***claim*** first made against them during the ***policy period,*** up to the **"**non-executive director special excess limit" set out in Item 5 of the Schedule, which limit shall be in the aggregate for all ***non-executive directors*** during the ***policy period***.

(C) **Investigation Costs**

Whether or not there has been a ***claim***, the ***insurer*** shall pay the reasonable fees, costs and expenses, necessarily incurred, with its prior written consent, such consent not to be unreasonably withheld or delayed, relating to the legal representation of any ***insured person*** at any ***investigation*** commenced during the ***policy period***, once an ***insured person***:

(1) is requested or required to attend the ***investigation***; or

(2) is identified in writing by the ***official entity*** conducting the ***investigation*** as a target, or as a person against whom a proceeding described in the definition of ***Claim*** may be commenced

An ***investigation*** shall be deemed to be first made when the ***insured person*** is first requested, required, identified, given notice or served.

The fees, costs and expenses covered by this extension shall not include any remuneration of any ***insured person*** , the cost of their time or costs or overheads of any ***company***.

(D) **Regulatory Crisis Costs**

The ***insurer*** shall pay the reasonable fees, costs and expenses of any consultant chosen by the ***insured*** with the prior written consent of the ***insurer***, which are necessarily incurred in responding to:

(1) a raid or on-site visit to any ***company*** which first takes place during the ***policy period***, by any ***official entity*** that involves the production, review, copying or confiscation of files or interviews of any ***insured persons***;

(2) a public announcement relating to an event in sub-paragraph (1) above; or

(3) the receipt by any ***insured*** during the ***policy period***, from any ***official entity*** of a formal notice which legally compels the ***insured*** to produce documents to, or answer questions by or attend interviews with that ***official entity***,

irrespective of whether the events in sub-paragraphs (1), (2) and (3) above fall within the definition of ***claim***. For the avoidance of doubt, this extension shall not be subject to any retention.

This extension shall apply up to the sub-limit in Item 5 of the Schedule.

Routine regulatory supervision, inspection or compliance reviews, or any investigation which focuses on an industry rather than an ***insured*** will fall outside of the scope of this extension.

(E) **Crisis Consultant Costs**

The ***insurer*** shall pay reasonable ***crisis consultant costs***, necessarily incurred by the ***insured*** with the prior written consent of the ***insurer***, in order to contain or limit the potentially adverse effects, including negative publicity, resulting from a ***claim*** first made against them during the ***policy period***, or from circumstances which can reasonably give rise to a ***claim***. This extension shall apply up to the sub-limit in Item 5 of the Schedule.

This extension of cover shall apply regardless of whether a ***claim*** is ever made against an ***insured person*** arising from such crisis and, in the case where such a ***claim*** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the ***claim****.* For the avoidance of doubt, this extension shall not be subject to any retention.

(F) **Extradition Proceedings**

The ***insurer*** shall pay the reasonable fees, costs and expenses necessarily incurred by an ***insured person*** with the prior written consent of the ***insurer*** in connection with an ***extradition proceeding*** first commenced against them during the ***policy period***.

(G) **Prosecution Costs (restriction of assets and liberty)**

Whether or not there has been a ***claim***, the ***insurer*** shall pay the reasonable legal and other professional fees, costs and expenses, necessarily incurred by an ***insured person*** with the prior written consent of the ***insurer*** to bring legal proceedings to obtain the discharge or revocation of:

i. an order disqualifying such ***insured person*** from holding office as a company director or officer; or

ii. an interim or interlocutory order:

(i) confiscating, controlling, suspending or freezing rights of ownership of real property or personal assets of such ***insured person***; or

(ii) imposing a charge over real property or personal assets of such ***insured person***; or

(iii) imposing a restriction of the ***insured person*****'s** liberty; or

(iv) for the deportation of an ***insured person*** following revocation of an otherwise proper, current and valid immigration status for any reason other than the ***insured person*****'s** finally adjudicated conviction for a crime.

In each case above, cover will only be available under this extension for orders (whether final, interim or interlocutory) issued during the ***policy period*****.**

This extension shall apply up to the sub-limit in Item 5 of the Schedule. For the avoidance of doubt, this extension shall not be subject to any retention.

(H) **Emergency Costs**

If the ***insurer's*** written consent cannot be obtained within a reasonable time before ***defence costs*** are incurred with respect to any ***claim*** first made against an ***insured*** during the ***policy period***, or before costs are incurred which would otherwise fall under Extensions II (C) Investigation Costs, (D) Regulatory Crisis Costs, (E) Crisis Consultant Costs, (F) Extradition Proceedings or (G) Prosecution Costs, then *the* ***insurer*** shall provide retrospective approval for such reasonably incurred costs up to, in the aggregate, the sub-limit in Item 5 of the Schedule, provided that the ***insurer*** is notified by the ***insured*** of such costs as soon as is reasonably practicable, and before the expiration of ten working days from when such costs were first incurred.

(I) **Outside Directorships**

The ***insurer*** shall reimburse or pay on behalf of any ***outside director***, or the ***company*** in the event it indemnifies such ***outside director***, ***loss*** resulting from a ***claim*** first made against them during the ***policy period***, for a ***wrongful act*** or ***employment practices wrongful act***, in their capacity as an ***outside director***.

(J) **Environmental Liability**

The ***insurer*** shall pay ***defence costs*** incurred by any ***insured person*** in connection with a ***claim*** first made against them during the ***policy period***, arising out of an ***environmental violation*** if and to the extent such ***claim***:

(7) is against an ***insured person*** in connection with the obligations under any legislation or regulation relating to ***environmental violations***; or

(8) results in a ***non-indemnifiable loss*** to any ***insured person***,

up to the sub-limit set forth in Item 5 of the Schedule. The sub-limits shall form part of and not be in addition to the ***limit of liability***.

(K) **Health and Safety**

The ***insurer*** shall pay the ***defence costs*** of any ***insured person*** with respect to any ***claim*** first made against them during the ***policy period,*** alleging a breach of health and safety legislation or any similar legislation in any jurisdiction including any legislation relating to involuntary manslaughter, or corporate manslaughter.

(L) **Fines and Penalties**

The ***insurer*** shall pay any civil fines and penalties resulting from a ***claim*** first made against the ***insured persons*** during the ***policy period***, for a ***wrongful act*** or ***employment practices wrongful act***, unless uninsurable as a matter of applicable law.

Fines and penalties covered by this extension shall include, where insurable, civil penalties assessed against an ***insured person*** pursuant to the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd) (USA), the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246) (USA) and the Bribery Act of 2010 (UK) or any foreign equivalent of any of the foregoing

(M) **Personal Liability of *Insured Persons* for Corporate Taxes**

The ***insurer*** shall pay the amount arising from the personal liability of the ***insured persons*** resulting from a ***claim*** first made against them during the ***policy period***, for unpaid taxes of the ***company*** following the appointment of a Receiver, Administrator, Administrative Receiver, Liquidator or any comparable or analogous authority or appointment with respect to the ***company***, unless uninsurable as a matter of applicable law.

(N) **Discovery Period**

(1) If this Policy is not renewed or replaced, and if the total premium for this Policy has been paid in full, the ***insured*** will be entitled:

(i) to an automatic ***discovery period*** of 60 days; and

(ii) to purchase an optional ***discovery period*** for a longer period as specified in Item 5 of the Schedule, provided that written notice is provided to the ***insurer*** by the ***parent company*** within 30 days after the end of the ***policy period*** and any additional premium specified by the ***insurer*** is paid within 45 days of the end of the ***policy period***. The automatic ***discovery period*** shall be part of and not in addition to any optional ***discovery period*** purchased by the ***insured***.

iii. The ***discovery period*** is non-cancellable and the premium for the optional ***discovery period*** is deemed fully earned at the inception date of the optional ***discovery period***.

iv. The purchase of the optional ***discovery period*** will not in any way increase the ***limit of liability***, and any payments made with respect to ***claims*** first made during the ***discovery period*** (or any other matter for which coverage is provided during the ***discovery period*** under one of the extensions) shall be part of and not in addition to the limit of liability for all ***claims*** made during the ***policy period***.

**v.** No ***discovery period*** shall apply in the event that a ***change in control*** takes place in respect of the ***parent company*** during the ***policy period****.* In that event, as set out in the provisions of Section III (B) (1) (ii) herein, the ***company*** can request that the ***insurer*** provide runoff cover.

(O) **Run-Off for *Retired Insured Persons***

If this Policy is not renewed or replaced, and if the total premium for this Policy has been paid in full, the ***insurer*** shall provide an unlimited ***discovery period*** for any ***retired insured person***.

(P) **Heirs, Representatives, and Spouses**

In the event of the death, incapacity or bankruptcy of an ***insured person***, any ***claim*** first made during the ***policy period***, against the estate, heirs, legal representatives or assigns of such individual for a ***wrongful act*** or ***employment practices wrongful act*** of such individual, will be deemed to be a ***claim*** made against such ***insured person***.

Coverage shall also extend to the lawful spouse or domestic partner of any ***insured person*** but only to the extent the spouse or domestic partner is a party to any ***claim*** solely in their capacity as a spouse or domestic partner of such ***insured person*** and only for the purposes of any ***claim*** seeking damages recoverable from, or in respect of, marital community property, property jointly held by any such ***insured person*** and the spouse or domestic partner, or property transferred from any such ***insured person*** to the spouse or domestic partner.

(Q) **Enforcement Proceedings Efficiency Law Extension**

The ***insurer*** agrees to indemnify the ***insured person*** in respect of

1. ***Defence costs***
2. Compensation payable to damaged third parties

arising from administrative proceedings under the Enforcement Proceedings Efficiency Law 5771-2011.

This extension shall only be in force if the articles of association of the ***company*** have been specifically amended to provide for insurance and indemnity for administrative proceedings under the law.

(R) **Class Certification Event Study Expenses-**

This policy is extended to cover ***Class Certification Event Study Expenses*** .If any Counsel firm (approved by the ***insurer***) defending a ***Securities Claim*** recommends to the ***Insured*** a specific expert witness to conduct an event study in the defense of such ***Securities Claim***, then the ***Insured*** may hire such expert witness to perform such event study without further approval by the ***Insurer***.

*a.* For the purpose of this extension the following definition will be added - ***Class Certification Event Study Expenses-*** means the reasonable fees, costs and expenses of an expert witness incurred by an *Insured* to conduct an event study regarding class certification in a ***Securities Claim***
b. The definition of ***Loss*** shall include ***Class Certification Event Study Expenses***.
c. This extension specifically is not subject to any retention.

(S) **Derivative Investigation Costs Extension** - The following extension will be added: Derivative investigation costs

The **insurer** shall pay the **loss** of any **company** incurred as derivative investigation costs. .

The following definitions are added to the policy:

**Derivative Demand**

a written demand by any shareholder of a **company** upon the board of directors (or equivalent management body) of such **company** to commence a civil action on behalf of the **company** against any **insured person** of the **company** for any actual or alleged wrongdoing on the part of such **insured person**.

**Derivative Investigation**

after receipt of any **insured person** or the **company** of a **claim** that is either a **derivative suit** or a **derivative demand**, any investigation conducted by the **company** or on behalf of the **company** by its board of directors (or equivalent management body) or any committee of the board of directors (or equivalent management body), as to how the company will respond.

**Derivative Investigation Costs**

reasonable and necessary costs, charges, fees and expenses consented to by the **insurer** and incurred by the **company**, or on behalf of the **company** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), in connection with a **derivative investigation**. **Derivative investigation costs** shall not include the compensation of any insured person.

**Derivative Suit**

a lawsuit purportedly brought derivatively on behalf of a **company** by a shareholder of such **company** against any **insured person** of the **company**

This extension will apply in a sub-limit of USD250,000

(T) **Mitigation Costs**

**Insured Person** may request advice in relation to any Circumstance notified in accordance with this policy as to your legal position in relation to the same and in relation to any steps that might be taken or be appropriate to avert or minimise the risk of a **Claim** arising from such Circumstance.

**Insurer** agree to pay the cost of obtaining any such advice from a lawyer retained by **Insured Person** or the **company** with **Insurer** consent up to the limit of USD 25,000 per request and subject to an aggregate limit of USD 250,000. Any such Costs will not be regarded as part of the **defence *Costs*** of any subsequent **Claim**.

This extension specifically is not subject to any **retention**.

## III. Changes in Risk

(A) **New Subsidiaries**

vi. If during the ***policy period***, the ***company*** acquires a ***subsidiary***, or acquires any entity by merger, consolidation or otherwise, coverage shall be provided with respect to such new ***subsidiary*** or entity for any ***loss*** resulting from a ***claim*** involving acts or conduct committed after the completion of such acquisition.

vii. If, however, the newly acquired entity or ***subsidiary***:

1. exceeds twenty five percent (25%) of the total assets of the **Parent Company**, as represented in the ***company's*** most recent audited consolidated financial statements; or
2. has equity securities issued or traded in the United States of America;

then, coverage under this Policy with respect to such entity or ***subsidiary*** shall be provided for a period of sixty (60) days in respect of acts or conduct that occurred after the completion of the acquisition. Coverage beyond the sixty (60) day period will be provided only if:

(i) the ***insurer*** receives written notice containing full details of the acquisition; and

(ii) the ***insurer*** at its sole discretion, agrees in writing to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

viii. With respect to the acquisition, merger, consolidation or otherwise of any entity, or ***subsidiary*** as described in III(A)vi and vii above, there will be no coverage available under this Policy in connection with such entity, ***subsidiary***, or any act or conduct allegedly committed at any time during which such entity or ***subsidiary*** is not an ***insured***.

(B) **Change in Control**

(1) If, during the ***policy period***, there is any ***change in control***, the coverage provided under this Policy shall continue to apply but only with respect to a ***claim*** against an

***insured*** in respect of acts or conduct committed or allegedly committed up to the time of the ***change in control.*** In addition:

(a) the ***insurer*** may agree to provide run-off cover by providing a ***discovery period*** in respect of ***claims*** brought against ***insured persons*** for 84 months from the expiry of the ***policy period*** or for such other period as the ***insurer*** may, in its absolute discretion decide. The terms of any such ***discovery period*** are at the ***insurer's*** sole and absolute discretion, including whether to provide such additional coverage and what additional premium may be required.

(2) If, during the ***policy period*** any entity ceases to be a ***subsidiary***, the coverage provided under this Policy shall continue to apply to the ***insured persons*** who, because of their service with such ***subsidiary***, were covered under this Policy, but only with respect to acts or conduct that occurred or allegedly occurred prior to the time such ***subsidiary*** ceased to be a ***subsidiary***.

(C) **New Outside Directorships**

If, during the ***policy period***, the ***company*** requests, directs or consents that a natural person serve either:

(a) as a director, officer, or trustee (or functionally equivalent role); or

(b) in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an ***insured person*** of the ***company***, regardless of the name or title by which such position is designated;

of an organisation that does not currently fall within the definition of an ***outside entity***, then coverage shall apply as if such natural person is an ***outside director*** for a period of sixty (60) days from the commencement of such position, unless the ***insurer***, at its sole and absolute discretion, accepts in writing by endorsement to this Policy, that such organisation shall be a ***scheduled outside entity***.

(D) **New Offering of *Securities***

If, during the ***policy period***, the ***company*** undertakes an offering of equity securities in the United States of America where the total value of such offering exceeds the percentage of the company's market capitalisation set forth in Item 6 of the Schedule, then the ***insurer*** shall not be liable to make any payment for ***loss*** in connection with any ***claim*** based upon, arising out of or in consequence of such offering unless:

(1) the ***insurer*** receives prior written notice containing details of the offering; and

(2) the ***insurer*** at its sole discretion, has agreed in writing to provide such additional coverage upon the terms, conditions, limitations, and additional premium which it deems appropriate.

(3) for the avoidance of any doubt, initial public offering of securities or initial registration of equity on any US exchange is not covered under this extension

## IV. Definitions

In this Policy the following words shall have the definitions that follow:

(A) "***bail bond costs***" means the reasonable premium (not including collateral) for a bond or other financial instrument to guarantee an ***insured person's*** contingent obligation for bail required by a court**.**

(B) "***change in control***" means:

UMR: B0180FN2613071

(1) the merger or acquisition of the ***parent company***, or
of all or substantially all of its assets by another entity such that the ***parent company*** is not the surviving entity;

**(1)** the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the ***parent company***; or

**(2)** the appointment of a Receiver, Administrator, Administrative Receiver Conservator, Liquidator, Provisional Liquidator, Trustee, or any comparable or analogous authority or appointment, with respect to the ***parent company*** or the entry by the ***parent company*** into a company voluntary arrangement or scheme of arrangement.

(C) "***claim***" means:

(1) a written or oral demand or notice for monetary or non-monetary relief including injunctive relief from any person or organization, that according to the ***Insured's*** judgment, it is the intention of the person or organization to hold the ***Insured*** responsible for the result of a ***wrongful act***;;

(2) any civil proceeding in a court of law or equity, or arbitration, mediation or or any other alternative dispute resolution proceeding any other administrative proceedings

(3) any criminal proceeding which is commenced by, filing or return of an indictment, filing or service of information, criminal compalint or similar proceeding; or

(4) the receipt by an ***insured*** of any written request to toll or waive a period or statute of limitations;

(5) any derivative demand or derivative suit;

(6) in respect of an ***insured person*** only, a formal civil, criminal, administrative regulatory proceeding or formal investigation of an ***insured person*** which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such ***insured person*** as a person or entity against whom a proceeding as described in this Definition, subsections IV(C)(2) or (3) above may be commenced, including with respect to any ***employment practices wrongful act*** any proceeding before any government authority regulating employment practices.

(7) any foreign proceeding equivalent of any of the above

for a ***wrongful act. Claim*** shall include a ***securities claim*** or an ***employment practices claim***.

(D) "***company***" means the ***parent company*** and any ***subsidiary*** created or acquired on or before the Inception Date set forth in Item 2 of the Schedule or during the ***policy period*****,** subject to the provisions of Clause III(A).

(E) "***company wrongful act***" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the ***company*** in connection with a ***securities claim.***

(F) "***crisis consultant costs***" means any reasonable professional fees, costs or expenses of any reputable, specialist, or professionally qualified:

(2) public relations firm or consultant;

(1) crisis management firm; or

(2) law firm or tax advisor.

(G) **"*defence costs*"** means reasonable fees, costs, charges and expenses (including but not limited to legal, accounting, consulting and experts' fees and fees of an arbitrator or mediator) necessarily incurred in the defence investigation, adjustment and/or appeal of any ***claim***,

including ***bail bond costs***. ***Defence costs*** does not include the ***company's*** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

For the avoidance of doubt it is agreed that should a conflict of interest exist between any of the ***insured persons***, then at their request and always subject to the written consent of the ***insurer***, which shall not be unreasonably withheld or unduly delayed, separate counsel may be appointed to protect their respective interests.

(H) "***discovery period***" means a period following the end of the ***policy period*** during which this Policy will provide coverage:

(3) with respect to any ***claim*** first made during such period, or

(1) with respect to any of the Extensions under this Policy, for any matter or event taking place, or ***claim*** first made during such period,

but only with respect to a ***wrongful act, company wrongful act***, or ***employment practices wrongful act***, occurring prior to the end of the ***policy period***.

(I) "***employment practices claim***" means a ***claim*** alleging an **e*mployment practices wrongful act***.

(J) "***employment practices wrongful act***" means any employment related actual or alleged tortious act or omission, breach of statutory provision or breach of common law relating to an employee, including but not limited to:

(1) failure to provide equal opportunity of employment or pay;
(2) discrimination;
(3) harassment (sexual or otherwise, and including but not limited to harassment in the form of workplace bullying, or by way of electronic communication including social networking internet sites);
(4) wrongful dismissal or treatment;
(5) retaliation;
(6) inducement to become or remain as an employee based upon an erroneous job description;
(7) defamation, misrepresentation, negligent misstatement, wrongful failure to employ or promote, deprivation of a career opportunity, or wrongful discipline;
(8) violation of an employee's civil or human rights, or violations of any similar statutory provision arising out of acts or omissions by an insured or a person for whom the insured is legally responsible;
(9) breach of data protection or privacy obligations;
(10) failure to allow an employee to exercise a statutory right; or
(11) failure to provide or enforce corporate policies or procedures to prevent or address any of the above.

(K) "***environmental violation***" means the discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind, including nuclear material or waste or any actual or alleged direction, or request to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralise pollutants, contaminants or waste of any kind including nuclear material or waste**.**

(L) "***extradition proceeding***" means any proceeding against an ***insured person*** including any related appeal, any judicial review applications or any challenge or appeal of any extradition decision by any governmental authority, or any application to the European Court of Human Rights or similar court in respect of any proceedings to remove an ***insured person*** to another territory against their will.

(M) "***insured***" means the ***insured persons*** and the ***company*.**

(N) "***insured person***" means:

(4) any past, present or future director or office or manager or board observer member of the Board of Managers, or ***non-executive director*** of the ***company***, or the equivalent in any jurisdiction;

(1) any past, present or future de facto or shadow director while acting in a capacity as a director or officer of the ***company*** as defined in sections 250 and 251 of the Companies Act 2006 (UK) (or equivalent in any jurisdiction), other than a person acting in the capacity of external auditor, administrative receiver, administrator, receiver or liquidator (or equivalent in any jurisdiction);

(2) any past, present or future employee of the ***company*** to the extent:

(a) the subject ***claim*** is a ***securities*** **claim**;

(b) the subject ***claim*** is an ***employment practices claim***;

(c) such employee is acting in a managerial or supervisory capacity; or

(d) such employee is named as a co-defendant along with an ***insured person*** as defined in this Definition IV(N) subsections (4) or (1) above;

or

(3) any ***outside director***;

but only when and to the extent that such ***insured person*** is acting for and on behalf of the ***company*** in any of the capacities referred to in this Definition (N) subsections (4) to (3) above; or, for and on behalf of the ***outside entity*** at the specific request of the ***company*** in their capacity as an ***outside director***.

(5) any natural person in his capacity as a non-salaried director and/or officer of the ***company*** in accordance with management agreement between the ***company*** and or any of its ***subsidiaries*** and the entity on behalf of the natural person that receives the payment for the services of the natural person under an invoice.

(6 ***insured person*** shall also include , but not limited to, chairman, president, vice president, general manager, chief executive officer, deputy general manager, vice general manager, tax director, internal legal adviser, internal auditor, director of finance, controller, scientific advisor, analyst, company's entrepreneur, treasurer, company's entrepreneur secretary of the company, and any other manager directly subordinate to the president, general manager or chief executive officer, or any person who fulfils one of the said positions in the ***company*** even if his title is different. (or any equivalent position or any person found to have acted in such positions under applicable law).

(7) any corporation serving as a director pursuant to article 235 of the Companies Law -1999 (Israel) (or equivalent in any jurisdiction)"

(8) any persons serve in the compensation and/or investments committees and/or scientific advisory board or any other committee appointed by the board.

(O) "***insurer***" means those Insurance companies and/or Underwriters at Lloyds detailed in the schedule.

(P) "***interrelated wrongful acts***" means any ***wrongful act(s), company wrongful act(s)***, or **employment practices wrongful act(s)** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same originating cause(s), the same or related facts, series of related facts, or circumstances.

(Q) "***investigation***" means any hearing, inquiry or examination by any ***official entity*** regarding the affairs of the ***company.***

(R) ***"joint venture"*** means any corporation, partnership***,*** joint venture***,*** association or other entity, other than a ***subsidiary***, in which the ***parent company***, either directly or through one or more ***subsidiary(ies)*** owns or controls not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an ***insured person*** of the ***company***, regardless of the name or title by which such position is designated.

(S) "***limit of liability***" means the amount set out in Item 3 of the Schedule**.**

(T) "***loss***" means amounts which the ***insured*** is legally obligated to pay as ***defence costs***, damages, judgments, settlements or other amounts payable under the extensions to this policy, including interest and punitive or exemplary damages, and the multiplied portion of any damage award, in excess of the ***retention***. ***Loss*** shall not include:

(5) fines, penalties or taxes imposed by law, except for punitive or exemplary damages and as provided in Extension II (L) Fines and Penalties and in Extension II (M) Personal Liability of ***Insured Persons*** for Corporate Taxes;

(1) employment-related compensation, wages or benefits; or

(2) matters which are uninsurable under applicable law.

The ***insurer*** shall not assert that ***loss*** attributable to allegations of violations of Section 11 or 12 of the Securities Act of 1933 (US) (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of such Act) constitute uninsurable ***loss***.

With respect to the insurability of fines, penalties, punitive, exemplary and multiplied damages, the law of the jurisdiction most favourable to the insurability of such fines, penalties, damages shall be applied, and such jurisdictions shall include, but not be limited to, the jurisdictions where (a) the damages or fines were awarded or imposed, (b) the ***wrongful act***(s) giving rise to such damages or matters occurred, (c) the ***claim*** for such damages or fine was brought, (d) where the ***company*** is incorporated or has its principal place of business, or (e) where the ***insured persons*** or the ***Insurer*** is located.

(U) "***non-executive director***" means any natural person who serves as a director of the ***company*** and who is not an employee of the ***company*.**

(V) "***non-indemnifiable loss***" means ***loss*** in respect of which the ***company*** or ***outside entity*** is not legally required or permitted to indemnify the ***insured person***.

(W) "***non-profit entity***" means any corporation trust, fund, foundation, community or industry association or registered charity other than the ***parent company*** or any ***subsidiary***, and whose governing documents prevent it from distributing profits or assets for the benefit of members, whether or not it is exempt from the payments of income tax under any law, regulation or bye-law, whether national, federal, state, territorial, provincial or local, anywhere in the world.

(X) "***official entity***" means any regulator, government, government body, governmental or administrative agency, any self regulatory body recognised as such under applicable law or official trade body.

(Y) "***outside director***" means any natural person who at the specific request of the ***company*** is serving**:**

(6) as a director, officer, trustee, regent or governor of a ***non-profit entity***; or

(1) in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an ***insured person*** of the ***company***, regardless of the name or title by which such position is designated, of an ***outside entity***.

(Z) "***outside entity*"** means:

(7) any ***non-profit entity***;

(1) any ***joint venture***; or

(2) any ***scheduled outside entity***.

(AA) "***parent company"*** means the entity named in Item 1 of the Schedule.

(BB) "***policy period***" means the period specified in Item 2 of the Schedule.

(CC) "***proposal***" means**:**

(8) the proposal deemed attached to and forming part of this Policy; and/or

(1) any materials submitted to the ***insurer*** prior to placement, which shall be retained on file by the ***insurer*** and shall be deemed to be physically attached to this Policy.

(DD) "***retention***" means the amounts specified in Item 4 of the Schedule.

(EE) "***retired insured person"*** means any ***insured persons*** who have ceased to act in their insured capacity prior to expiry of the ***policy period*** for reasons other than (a) disqualification by regulator or the court on grounds of fitness or propriety, from holding office or from managing a company;.

(FF) "***securities***" means any equity or debt instrument issued including any bond, debenture, note, share, stock or other equity or security for debt.

(GG) "***securities claim***" means a ***claim*** made against an ***insured***:

(1) for any actual or alleged act, error, omission, misleading statement, breach of duty or violation of any rules, regulations or laws (whether statutory or common law), relating to ***securities***, which is:

(a) brought by any person or entity based upon, arising out of, directly or indirectly resulting from, or in any way involving the purchase or sale of, or offer to purchase or sell, ***securities*** of the ***company***; or

(b) brought by a ***security*** holder of the ***company*** with respect to such ***security*** holder's interest in the ***securities*** of the ***company*** or

(iii) brought derivatively on behalf of the company by a security holder of such ***company***.

(2) for any administrative or regulatory proceeding against the ***Company***, or a formal investigation of the ***Company***, but only if and only during the time that such formal investigation or proceeding is also maintained against an ***Insured Person***

(HH) "***scheduled outside entity***" means any organisation listed in a Scheduled Outside Directorship Endorsement attached to this Policy.

(II) "***subsidiary***" means any entity during any time in which the ***parent company***, directly or through one or more ***subsidiary*****(ies)**:

(9) owns fifty percent (50%) or more of the issued and outstanding share capital,

(1) controls fifty percent (50%) or more of the voting rights, or

(2) controls the right to vote for the election or removal of such entity's directors.

***Subsidiary*** shall include any entity which is a tax-exempt non-profit entity, trade association, foundation, political action committee or a registered charity, controlled, established or maintained by the ***company****.*

The cover provided under this Policy with respect to any ***subsidiary*** shall only apply with respect to ***wrongful acts***, events or conduct occurring or committed during the time when such entity is or was a ***subsidiary*** of the ***company***.

(JJ) "***unrelated claim***" means any ***claim*** which neither alleges nor arises from any ***interrelated wrongful acts*** alleged in a ***claim*** previously made during the ***policy period***.

(KK) "***wrongful act***" means any act, error, omission, misstatement, misleading statement, neglect, or breach of duty actually or allegedly committed, breach of contract, attempted or proposed to be committed by any ***insured person*** while acting in his or her capacity as an:

(10) ***insured person*** of the ***company*** or a person serving in a functionally equivalent role for the ***parent company*** or any ***subsidiary***; or

(3) ***outside director***.

For the avoidance of any doubt and without derogation from the generality of the above, but only to the extent that such definition does not derogate from the coverage granted by this policy, ***wrongful act*** shall also include the following:

i) A breach of duty of care towards the ***company*** or any other person;

ii) A breach of fiduciary duty towards the ***company*** provided that the ***insured person*** acted in good faith and had reasonable grounds to believe that such act should not prejudice the interests of the ***company***;

iii) Financial obligations imposed on ***insured person*** in favour of a "third party", in respect of any act committed by them in their capacity as directors or officers or employees of the ***company***".

For the avoidance of any doubt and without derogation from the generality of the above, Financial obligations imposed on ***insured person*** in favour of a "third party", will include those imposed on him due to the Efficiency of Enforcement Procedures in the Securities Authority Act (legislation amendments), 5771-2011.

## V. Exclusions

The ***insurer*** shall not be liable to make any payment in connection with any ***claim*** made against an ***insured*** or in connection with any matter covered by an extension to this Policy:

(A) for any actual or alleged bodily injury, sickness, disease or death of any person, or any damage or destruction of any tangible property including loss of use thereof; however, this exclusion shall not apply to:

(11) any allegations of mental anguish or emotional distress, or

(1) ***defence costs*** payable under Extensions II(J) and (K);

(B) arising out of, based upon or attributable to an ***insured*** acting as a trustee, fiduciary or administrator of the ***company's*** own pension, profit sharing or employee benefits programme, including any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) (USA) and/or the Pensions Act of 1995 (UK) as amended or any regulations promulgated thereunder, or any similar law or regulation in any other jurisdiction;

(C) arising out of, based upon or attributable to any fact, circumstance, situation, transaction, event or ***wrongful act, company wrongful act*** or ***employment practices wrongful act:***

(1) underlying or alleged in any prior and/or pending litigation, or arbitration proceeding, administrative or regulatory proceeding which was brought prior to the Pending and Prior Litigation Date set forth in Item 7 of the Schedule; or

(2) which was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy, unless such notice was provided to the ***insurer*** under an earlier policy but which was not accepted by the ***insurer*** as a valid notification, and where cover has been maintained continuously with the ***insurer*** from the inception date of the earlier policy to the end of the ***policy period***.

(D) brought about or contributed to by any:

(1) dishonest, fraudulent or criminal act or omission of any ***insured*** or any wilful violation of any statute, rule or law; or

(2) Personal profit or remuneration gained by any ***insured*** to which such ***insured*** is not legally entitled;

as determined by a final non-appealable adjudication in the underlying action, or any formal written admission by or on behalf of such ***insured***, that such conduct did in fact occur.

To the extent permitted by law, Exclusion 0(2) above will not apply to allegations in a ***claim*** against any ***insured person*** under Section 11 and/or 12 of the Securities Act of 1933 (USA), as amended, arising out of an initial or subsequent public offering of the ***company's securities*** (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 (USA) by a Controlling Person pursuant to Section 15 of such Act).

For the purpose of determining the applicability of Exclusion 0(1) to the ***company*, **only knowledge or information possessed by the Chairman, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer or General Counsel (or equivalent in any jurisdiction) of the ***company*** will be imputed to the ***company***.

(E) brought by, on behalf of, or at the direction of the ***company***, or an ***outside entity***, in the United States of America, its territories or possessions, except and to the extent such ***claim***:

(1) is brought derivatively by a security holder of the ***company*** or an ***outside entity*** who, when such **claim** is made and maintained, is acting independently of, and without the voluntary solicitation, assistance, participation or intervention of an ***insured person*** (other than an insured person engaged in whistleblowing)**,** the ***company*** or any ***outside entity***; or

(2) is brought by any receiver, administrator or other insolvency practitioner (or equivalent in any other jurisdiction) of the ***company*** or an ***outside entity***, or any assignee of such person.

(3) an *employment practices claim*.

(4) a claim that is brought and maintained by an insured person (i) who is expressly required by statute, rule or regulation to bring such claim, whether or not falling within protected "whistleblower" activity, or (ii) who is engaged in any protected "whistleblower" activity;

This Exclusion V (E) shall not apply with respect to ***defence costs***.

No knowledge, or act, error or omission, of any ***insured person*** will be imputed to any other ***insured person*** to determine the application of any of the exclusions above.

## VI. *Limit of Liability*, Indemnification and *Retentions*

(A) Save as set out in any applicable sub-limit, the ***insurer*** shall pay the amount of ***loss*** in excess of the applicable ***retention***(s) set forth in **Item** 4 of the Schedule up to the ***limit of liability***.

(B) The amount set forth in Item 3 of the Schedule shall be the maximum aggregate ***limit of liability*** of the ***insurer*** under this Policy (except with respect to the special excess limits specified in Extensions II (A) and (B)). Any payment by the ***insurer*** shall reduce the ***limit of liability*** accordingly by the paid amount*.* The sub-limits of liability specified in Section 5 of the Schedule are part of and not in addition to the ***limit of liability*** and is the maximum amount the ***insurer*** will pay with respect to the cover to which it applies.

(C) With respect to the ***company's*** indemnification of ***insured persons***, the certificate of incorporation, charter, by-laws, articles of association, or other organisational documents of the ***parent company***, each ***subsidiary*** and each ***outside entity***, will be deemed to permit indemnification of the ***insured persons*** to the fullest extent allowable by law.

(D) ***Claims*** arising from the same ***interrelated wrongful acts*** shall be deemed to constitute a single ***claim*** and shall be deemed to have been made at the time at which the earliest such ***claim*** is

made or deemed to have been made pursuant to General Condition VIII (A) (1) to (3) below, if applicable.

(E) The ***retention*** applicable to Insuring Agreement I (B) shall apply to any ***loss*** as to which indemnification by the ***company*** or ***outside entity*** is legally required or permitted, whether or not actual indemnification is made unless such indemnification is not made by the ***company***, or ***outside entity*** solely by reason of its financial insolvency in which case no ***retention*** shall apply.

(F) If a payment is made by the ***insurer*** to any ***insured person*** under this Policy as to which indemnification by the ***company*** was legally required or permitted but not made by the ***company***, the ***company*** agrees to pay to the ***insurer*** the amount of the ***retention*** applicable to I. Insuring Agreement (B). The ***insurer*** shall be entitled to set off such amounts against any sums due from the ***insurer*** to the ***company***.

(G) If different ***retentions*** are applicable to different parts of any ***loss***, the applicable ***retention***(s) will be applied separately to each part of such ***loss***, and the sum of such ***retention***(s) will not exceed the largest applicable ***retention*** set forth in Item 4 of the Schedule.

(H) No ***retention*** shall apply to such claim and the ***insurer*** will reimburse those ***defence costs*** incurred by the ***insured*** if:

(2) the ***securities claim*** is dismissed, or there is an agreement to dismiss the ***securities claim*** and without any payment by the ***insured***; or

(1) there is a final judgment in favour of the ***insured***, including, by reason of a motion to dismiss or summary judgment, after the exhaustion of all appeals.

Any reimbursement under this Section VI (H) will only occur ninety (90) days after the date of such dismissal, stipulation, or final judgment of no liability. The ***insured*** shall reimburse such funds in the event the ***securities claim*** (or a ***securities claim*** containing ***interrelated wrongful acts***) is brought after the ninety (90) day period.

(I) Notwithstanding the above and solely in respect of a ***claim*** filed against an ***insured***, it is agreed that in the event of a ***loss***, including ***defence costs***, exceeding the total aggregate limit of liability for ***loss***, then this policy shall cover reasonable ***defence costs*** excess of the limit of liability provided that;

(3) the limit of liability of this Policy; and

(4) any written excess layer Policy over the limit of liability of this Policy

have been exhausted.

In respect of ***claims*** filed against an ***insured*** outside Israel this policy shall cover reasonable ***defence costs*** excess of the limit of liability up to 20% of the total aggregate limit of liability for ***loss.***

**VII. Defence, Settlement and Allocation of *Loss***

(A) It shall be the duty of the ***insured*** to defend any ***claim***. The ***insurer*** shall have the right and be given the opportunity to participate with each ***insured*** in the defence and settlement of any ***claim*** that appears likely to involve the ***insurer***.

(B) Except as provided for in Extension II (H) Emergency Costs, the ***insurer*** shall not be obliged to pay any ***defence costs*** unless the ***insurer*** has provided prior written consent to the ***defence costs*** being incurred, such consent not to be unreasonably withheld, delayed or denied.

(C) The ***insurer*** shall not be obliged to make any payment in connection with any liability admitted by the ***insured,*** nor any settlement agreed by the ***insured,*** unless the ***insurer*** has provided prior written consent to the liability being admitted or settlement being agreed, such consent not to be unreasonably withheld, delayed or denied.

(D) Upon the written request of an ***insured***, the ***insurer*** will advance ***defence costs*** on a current basis in excess of the applicable ***retention***, if any, before the disposition of the ***claim*** for which this Policy provides coverage. If it is finally determined that the ***loss*** incurred is not covered under this Policy, then the ***insured*** shall repay such ***loss,*** including ***defence costs,*** paid to or on behalf of the ***insured***.

(E) In the event the ***company*** or the ***outside entity*** refuses to indemnify the ***insured persons*** even if it is legally required or permitted to do so, the ***insurer*** shall advance ***defence costs*** to the ***insured persons*** and the provisions of Clauses VI (E) and (F) above shall apply. A "refusal to indemnify" shall mean a written refusal by the ***company*** or the ***outside entity*** to indemnify the ***insured persons.***

(F) If both ***loss*** covered by this Policy and loss not covered by this Policy are incurred, either because a ***claim*** made against the ***insured*** contains both covered matters and matters not covered by this Policy, or because a ***claim*** is made against both the ***insured*** and others (including the ***company*** for ***claims*** other than ***securities claims***) not insured under this Policy, the ***insured*** and the ***insurer*** will use their best efforts to determine a fair and appropriate allocation of ***loss*** between that portion of ***loss*** that is covered under this Policy and that portion of ***loss*** that is not covered under this Policy. Additionally, the ***insured*** and the ***insurer*** agree that in determining a fair and appropriate allocation of ***loss***, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defence and/or settlement of the ***claim*** by, the ***insured*** and others.

(G) **Allocation**

If **Insured Person** incur both **loss** covered by this policy and loss not covered by this policy, either because a **claim** includes both covered and uncovered matters or because a **claim** is made both against **Insured Person** and the **company**, **Insurer** shall advance 100% of the **defence costs**.

**I nsurer** shall pay only that proportion of **loss** (not including **Defence costs**) that can be allocated to **Insured P**

Any allocation of **loss** (not including **Defence costs**) shall be agreed between **Insurer** and **Insured Person** or the **Company** (as applicable) or, in the absence of such agreement, shall be determined by a member of the Bar Council (or local equivalent in the place of registration of the policyholder) as arbitrator to be mutually agreed upon by **Insurer** and **Insured Person** or the **company** (as applicable) or in default of such agreement to be nominated by the Chairman of the Bar Council (or local equivalent). Such determination will be based upon the written submissions of **Insurer** and **Insured Person** or the **Company** (as applicable) and will be final and binding. The fees charged by the arbitrator for providing such determination will be borne by **Insurer**.

## VIII. General Conditions

(A) **NOTICE**

(1) The ***insured*** must give the ***insurer*** written notice of any ***claim*** first made against the ***insured*** during the ***policy period***, as soon as practicable and, in any event, within sixty (60) days of the end of the ***policy period***, or within such additional ***discovery period*** as may apply. If the ***insured*** does not give notice to the ***insurer*** in compliance with this clause, the ***insurer*** shall not be entitled to deny coverage for the ***claim*** based solely upon late notice unless the ***insurer*** can demonstrate its interests were materially prejudiced by reason of such late notice.

(2) During the ***policy period***, the ***insured*** may also give the ***insurer*** written notice of any ***investigation***, event, or proceeding which could give rise to cover under any Extension in Section II of this Policy. If the ***insured*** does not give notice to the ***insurer*** in compliance with this Clause VIII (A) (2), the ***insurer*** shall not be entitled to deny coverage for in respect of any such ***investigation***, event or proceeding unless the ***insurer*** can demonstrate its interests were materially prejudiced by reason of such late notice.

(3) During the ***policy period***, the ***insured*** may also notify the ***insurer*** of any fact or circumstance which may reasonably give rise to a ***claim***. Such notice must include the reasons why the ***insured*** reasonably anticipates that the fact or circumstance may give rise to a ***claim*** with full particulars of the dates, acts and persons involved.

(4) Any ***claim*** made after expiry of the ***policy period*** which alleges, arises out of, is based upon or attributable to any ***interrelated wrongful act*** which was the basis of:

(i) a ***claim*** first made during the ***policy period*** (or applicable ***discovery period***) which has been notified to the ***insurer*** in accordance with clause VIII (A) (1) above; or

(ii) a fact or circumstance, ***investigation***, event, or proceeding, which has been notified to the ***insurer*** in accordance with clauses VIII (A) (2) or (3) above;

will be treated by the ***insurer*** as having been notified during the ***policy period***,

(5) All notices must be sent by certified mail or the equivalent to the address set forth in Item 8 of the Schedule: Attention: Professional Lines Claims Department.

(B) **OTHER INSURANCE**

(1) All ***loss*** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including any insurance that would have been valid and collectable in the absence of this insurance. This Policy will not be subject to the terms of any other insurance policy.

(2) All coverage under this Policy for ***loss*** from ***claims*** made against the ***insured persons*** while acting in their capacity as an ***outside director***, will be specifically excess of and will not contribute with, any other valid and collectable insurance or indemnification available to such ***insured person*** from such ***outside entity*** or its insurers by reason of their service as such.

(C) **PRIORITY OF PAYMENTS**

If ***loss***, including ***defence costs***, shall be payable under more than one of the Insuring Agreements, then the ***insurer*** shall, to the maximum extent practicable and subject at all times to the ***insurer****'s* maximum aggregate ***limit of liability*** as set forth in Item 3 of the Schedule, pay such ***loss*** as follows:

(1) first, the ***insurer*** shall pay that ***loss***, if any, which the ***insurer*** may be liable to pay on behalf of the ***insured persons*** under Insuring Agreement I (A); and

(2) second, the ***insurer*** shall pay that ***loss***, if any, which the ***insurer*** may be liable to pay on behalf of the ***company*** under Insuring Agreements I (B), (C) or otherwise.

(D) **CANCELLATION**

This Policy may only be cancelled for non-payment of premium. If the premium is not paid within (60) days after inception of the ***policy period***, the ***insurer*** may cancel this Policy, with effect from inception, by providing ~~twenty (20)~~ forty five (45) days written notice of cancellation to the ***parent company*** as the agent of record for the ***insured***. The insurer many not otherwise cancel this Policy. If premium is paid during the 20 day notice period, the notice of cancellation will be revoked.

(E) **REMEDIES FOR MISREPRESENTATION AND/OR NON-DISCLOSURE**

The ***insurer*** irrevocably waives any and all rights and remedies it may have as a result of any misrepresentation or non-disclosure including, but not limited to, any right it may have to rescind or avoid this Policy, except with respect to:

(1) an ***insured person*** who was fraudulent in relation to the misrepresentation or non-disclosure in question; or

(2) the ***company*** in respect of Insuring Agreement I (C).

(F) **SEVERABILITY**

The ***proposal*** shall be construed as a separate ***proposal*** by each ***insured***. With respect to the information and statements contained in such ***proposal*** or otherwise provided to the ***insurer*** when the Policy was placed, no statement or knowledge possessed by any one ***insured*** shall be imputed to any other ***insured*** for the purpose of determining the availability of cover for any other ***insured***. The acts, omissions, knowledge, or warranties of any ***insured*** shall not be imputed to any other ***insured*** with respect to the cover available under this Policy.

Only the knowledge or information possessed by the past, present or future Chairman, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer or General Counsel (or equivalent in any jurisdiction) of the ***company*** will be imputed to such ***company***.

The *insurer* irrevocably waives any right it may have to rescind or avoid this policy, or any severable part of this policy pursuant to the above, on the grounds of innocent or negligent non-disclosure, or innocent or negligent misrepresentation by any *insured*

(G) **ASSISTANCE, COOPERATION AND SUBROGATION**

(1) The ***insured*** agrees to provide the ***insurer*** with all information, assistance and cooperation that the ***insurer*** may reasonably request, and further agrees that they will do nothing which in any way increases the ***insurer's*** exposure under this Policy or in any way prejudices the ***insurer's*** potential or actual rights of recovery.

(2) In the event of any payment under this Policy, the ***insurer*** shall be subrogated to all of the potential or actual rights of recovery of the ***insured***. The ***insured*** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the ***insurer*** to bring suit in their name, and will provide all other assistance and cooperation which the ***insurer*** may reasonably require.

In addition, the ***insurer*** waives its right of subrogation against any ***insured person*** and /or employees unless the above mentioned persons have been convicted of a deliberate criminal act, or been determined to have committed a deliberate fraudulent act.

(H) **EXHAUSTION**

If the ***limit of liability*** and the special excess limits specified in Extensions II (A) and (B), are exhausted by the payment of ***loss***, the premium for this Policy will be deemed fully earned, and all obligations of the ***insurer*** under this Policy will be completely fulfilled and exhausted, and the ***insurer*** will have no further obligations of any kind whatsoever under this Policy.

(I) **ASSIGNMENT AND CHANGES TO THE POLICY**

(1) Assignment of interest under this Policy shall not bind the ***insurer*** unless the ***insurer*** has given prior written consent.

(2) Notice to any agent of the ***insurer*** or knowledge possessed by any agent or other person acting on behalf of the ***insurer*** will not cause a waiver or change in any part of this Policy or prevent the ***insurer*** from asserting any right under the terms, conditions and limitations of this Policy.

(3) The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(J) **AUTHORISATION AND NOTICES**

It is understood and agreed that the ***parent company*** will act on behalf of the ***company*** and the ***insured persons*** with respect to:

(1) the payment of premium;

(2) the receiving of any return premium that may become due under this Policy;

(3) the giving of all notices to the ***insurer***; and

(4) the receiving of all notices from the ***insurer***.

Subject to the other provisions of this Policy, this General Condition (J) does not preclude an ***insured person*** from notifying the ***insurer*** in accordance with General Condition (A).

(K) **CONFIDENTIALITY**

(1) The ***insurer*** will treat as confidential all information provided to it by the ***insured*** in connection with this Policy and will not, without the prior consent of the ***parent company***, disclose any such information to any third party. However, the ***insurer*** shall be entitled, without the consent of the ***parent company***, to disclose any confidential information to:

(i) any director, officer, employee, agent, reinsurer or adviser of the ***insurer*** and/or its group companies in dealing with the insurance of the ***insured***, including underwriting and claims handling purposes;

(ii) to any person in order to comply with any legal or regulatory requirement; or

(iii) a court, mediator, or arbitrator to whom matters are referred in connection with this Policy or with any reinsurance of this Policy.

(2) The ***insurer*** will not be required to treat as confidential any information provided to it by an ***insured*** if that information:

(a) is in the public domain, other than by means of the ***insurer*** having disclosed it; or

(b) was in the ***insurer's*** possession prior to it being provided by the ***insured***.

(L) **CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999**

A person who is not a party to this contract has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this contract but this does not affect any right or remedy of a third party which exist or is available apart from that Act.

(M) **JURISDICTION AND GOVERNING LAW / ARBITRATION**

~~This Policy shall be governed by and construed in accordance with the laws of England and Wales.~~

~~All matters in difference between the parties arising under, out of or in connection with this Policy, including formation and validity, and whether arising during or after the period of this Policy, shall be referred to an arbitration tribunal. The seat and place of arbitration shall be London.~~

~~The arbitration shall be conducted in accordance with the latest UK ARIAS Rules published at the time that arbitration is commenced by the claimant (the party requesting arbitration), unless the rules conflict with this clause, in which case this clause will prevail.~~

~~Unless the parties agree to appoint a sole arbitrator within 14 days of one receiving a written request from the other for arbitration, the claimant shall appoint his arbitrator and give written notice to the respondent. Within 14 days of receiving such notice the respondent shall appoint his arbitrator and give written notice to the claimant.~~

~~If the respondent refuses to, or fails to appoint an arbitrator within 14 days of receiving written notice of the appointment of the claimant's arbitrator, the claimant may give notice in writing to the respondent that he proposes to appoint his arbitrator to act as the sole arbitrator. If the respondent does not within 7 clear days of that notice being given make the required appointment and notify the claimant that he has done so, the claimant may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.~~

~~Where two arbitrators have been appointed by the claimant and the respondent, those arbitrators shall appoint a third arbitrator. Should they fail to appoint such a third arbitrator within 28 days of the appointment of the respondent's arbitrator then either of them or either of the parties may apply to the appointor for the appointment of the third arbitrator. The appointor shall be the Chairman for the time being of ARIAS (UK) or if he is unavailable or it is inappropriate for him to act for any reason, such person as may be nominated by the Committee of ARIAS (UK). If for any reason such persons decline or are unable to act, then the appointor shall be the Judge of the appropriate Courts having jurisdiction at the place of arbitration.~~

~~The three arbitrators shall decide by majority. If no majority can be reached the verdict of the third arbitrator shall prevail. He shall also act as chairman of the tribunal.~~

~~Unless the parties otherwise agree the arbitration tribunal shall consist of persons (including those who have retired) with not less than ten years' experience of insurance or reinsurance as persons engaged in the industry itself or as lawyers or other professional advisers.~~

**JURISDICTION AND GOVERNING LAW / ARBITRATION**

Any interpretation of this policy relating to its construction, validity or operation shall be made in accordance with the laws of the State of Israel.
The parties agree to submit to the exclusive jurisdiction of the courts in the State of Israel (Tel Aviv or Jerusalem).
Any dispute between the Insured and Insurers concerning the interpretation of this Policy shall be subject to the Laws of Israel and to the exclusive jurisdiction of any competent court within Israel.
However, for the avoidance of doubt it is agreed that the liability of the insured shall be determined in accordance with the applicable law of the jurisdiction wherein the *claim* arises or is filed.

(N) **BANKRUPTCY**

In the event of a liquidation or reorganization proceeding is commenced by or against a ***company*** pursuant to the United States Bankruptcy Code, as amended, or any similar state or local law, the
***company*** and the ***insured person*** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeded under such Bankruptcy Code or
law, and (ii) agree not to oppose to object to any efforts by the ***insurer*****,** the ***company*** or any ***insured person*** to obtain relief from any such stay or injunction.
In the event the ***company*** becomes a debtor in possession under United States bankruptcy law or
an equivalent status under the law of any other country and the aggregate ***loss*** due under this policy
exceeds the remaining ***limit of liability*****,** the ***insurer*** shall**:**
a) First pay such ***loss*** allocable **to** ***wrongful acts*** that are actually or allegedly cause, committed or attempted prior to the *company* becoming a debtor in possession, then
b) With respect to whatever remaining amount of the ***limit of liability*** is available after payment under (a) above, pay such ***loss*** allocable to ***wrongful acts*** that are actually or alleged caused, committed or attempted after the ***company*** became a debtor in possession.

Policy Number: (UMR) B0180FN2613071

# SECURITY DETAILS

## REFERENCES

UMR (Unique Market Reference): B0180FN2613071
Date contract printed to PDF: 09:16 08 April 2026

# SIGNED UNDERWRITERS

**Nexus** **Slip Leader**

| | | |
|---|---|---|
| 100% **Written** | I M 1 5 1 0 D O A 2 6 3 | Nexus via Allianz |
| 100% **Signed** | 09:06 08 April 2026<br>Nexus Underwriting Limited B0509JFILR2150033 2021 - Allianz Global Corporate & Specialty SE UK Branch (100%). Premium/claims to be settled directly with Nexus Underwriting Limited.<br>Tom Jordan<br>**Bound** | |

Policy Number: (UMR) B0180FN2613071

# SETTLEMENT INFORMATION

### Terms of Settlement

| | |
|---|---|
| Settlement Due Date: | 01 June 2026 |
| Instalment Premium Period of Credit: | 0 |
| Adjustment Premium Period of Credit: | 0 |

Nexus

**Non-Bureau Leader**

Tom Jordan

# העתק ביטוח נושאי משרה - 1st excess layer

HOWDEN

# Market Reform Contract

| | | |
|---|---|---|
| **UMR / Policy No.** | **B0180FN2613103** | **180 HOW** |

| | | |
|---|---|---|
| **Reinsured:** | **N/A** | |
| **Insured:** | **Papaya Gaming Ltd** | |
| **Period:** | **From :** | **7th April 2026** |
| | **To:** | **6th April 2027** |

| | |
|---|---|
| *Contract Order:* | % |
| *No. Of Contract Documents:* | |
| *Hereto Written:* | % |
| *Total Written:* | % |
| *Signing Percentage:* | % |

UMR; B0180FN2613103

## RISK DETAILS

| | |
|---|---|
| **Unique Market Reference:** | B0180FN2613103 |
| **Attaching to Delegated Underwriting Contract Reference:** | B0180FNF260017DO |
| **Type:** | **Description:** 1st Excess Layer Directors and Officers, as detailed in the Policy Wording.<br>**Contract Classification:** Insurance |
| **Name of Insured:** | Papaya Gaming Ltd |
| **Address of Insured:** | Street No. and Street: 35 HaMasger Street<br>City: Tel Aviv-Yafo<br>Country: Israel |
| **Period of Insurance:** | From: 7th April 2026<br>To: 6th April 2027<br>both days inclusive Local Standard Time at the Address of the Insured. |
| **Interest:** | As detailed herein |
| **Limit(s) of Liability:** | USD 15,000,000 in the annual aggregate.<br>In excess of<br>USD 5,000,000 in the annual aggregate. |
| **Underlying Insurance** | Primary Policy<br>Limit: USD 5,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2613071<br>Underlying Insurers: Nexus Underwriting Limited |
| **Claims Basis:** | **Claims Basis:**<br>As more fully defined within the wording(s) attached |
| **Territorial Limits:** | This contract provides cover for work carried out worldwide. |
| **Legal Action:** | This contract provides cover for claims made against the Insured worldwide. |
| **Choice of Law & Jurisdiction:** | **Choice of Law:**<br>This insurance shall be governed by and construed in accordance with the laws of Israel<br>**Choice of Jurisdiction:**<br>The parties shall submit to the jurisdiction of the Courts of Israel |

**Conditions:** Howden Excess Layer Policy Wording amended as attached

**Any conditions shown below are in addition to the conditions contained in the contract wording(s)**

- To the extent provided by the contract, the Contract Leader is authorised to issue such notice on behalf of all participating insurers; or
- If the Contract Leader is not so authorised or has not issued notice, any insurer may issue such notice in respect of its own participation.

Premium Payment Clause (LSW 3001) – 90 days
Service of Suit, as attached
Specific Matters Exclusion, as attached
Complaints procedure, as attached, only for Markets Bound under the B0180FNF260017DO line slip
Privacy Policy, as attached, only for Markets Bound under the B0180FNF260017DO line slip
LMA3100A Sanctions Limitation Clause as attached

**Notices:** EWIL Complaints Handling Summary clause R C 1.1 0323 EWIL (ENG) (attached)
EWIL FSCS Clause R F 1.1 0323 EWIL (ENG) (attached)
EWIL Privacy Notice Data Protection Notice R P 1.1 0323 EWIL (ENG) (attached)
EWIL Status Disclosure R S 1.1 0524 EWIL (ENG) (attached)

**Notification to Insurers to be given to:** Howden, One Creechurch Place, London EC3A 5AF

**Express Warranties:** None, other than as may exist in the policy wording or attached clauses.

**Conditions Precedent:** None, other than as may exist in the policy wording or attached clauses.

**Subjectivities:** None

**Premium:** USD 29,000 per annum

**Premium Payment Terms:**

PREMIUM PAYMENT CLAUSE (LSW 3001) - 90 Days
Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 90 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 90 day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**Taxes Payable and Administered by the Insured or Their Agent:** None

**Taxes Payable by Insured and Administered by Insurers:** None

**Taxes Payable by the Insurers and Administered by the Insured or Their Agent:** None

**Insurer Contract Documentation:** In accordance with the Contract Certainty Code of Practice, Final Evidence of Cover within 30 days will be as follows:

☒ This document details the contract terms entered into by the insurer(s) and constitutes the contract document.

Any further documentation changing this contract, which has been appropriately agreed by insurer(s) hereon, shall form the evidence of such change(s) and will be deemed to form an integral part of the original contract.

**UMR; B0180FN2613103**

**INFORMATION**

The following information has been seen, read, understood and noted by insurers hereon:

(1) As held on file by Howden Insurance Brokers Limited.

UMR; B0180FN2613103

## SECURITY DETAILS

**Insurer's Liability:**

**(RE)INSURERS LIABILITY CLAUSE (LMA 3333)**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:** 100% of 100%

**Basis of Written Lines:**

x Of Whole
□ Of Order
□ Part of Whole
□ Part of Order

| | |
|---|---|
| **Basis of Signed Lines:** | x Of Whole<br>□ Of Order<br>□ Part of Whole<br>□ Part of Order |
| **Signing Provisions:** | **Without Disproportionate Signing**<br><br>In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full. All other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order, without further agreement of any of the (re)insurers.<br>However:<br>a) in the event that the placement of the order is not completed by the commencement date of the period of (re)insurance, then all lines written by that date will be signed in full;<br>b) the signed lines resulting from the application of the above provisions can be varied - before or after the commencement date of the period of (re)insurance - by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the MRCs will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement. |
| **Written Lines:** | As detailed in PPL Signing pages. |

UMR; B0180FN2613103

**Endorsements Attaching to this Policy Wording**

## SERVICE OF SUIT CLAUSE (ISRAEL)

This Insurance shall be governed by Israeli law and the Israeli Courts shall have jurisdiction in any dispute arising hereunder.

In this event Ms Sigal Schlimoff Rechtman of Gibor Sport Building, 7 Menachem Begin Road, Ramat Gan 52521, Israel, Lloyd's Representative in Israel, is authorised to accept service of suit on behalf of Underwriters.

20/01/11
NMA2349A

## SANCTIONS LIMITATION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations' resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100A
5 October 2023

## SPECIFIC MATTERS EXCLUSION

It is hereby understood and agreed that the *insurer* shall not be liable to make any payment for *loss* in connection with any *claim* made against the *insured* arising out of based upon or attributable to the matters referred to in answer to Question(s) 7b of the proposal form dated 29th January 2023

**UMR; B0180FN2613103**

**For markets bound under the B0180FNF250017DO line slip:**

## COMPLAINTS:

If you wish to make a complaint you may do so by contacting any member of our staff by whatever means is convenient to you. If you cannot settle your complaint with us to your satisfaction, you may be entitled to escalate your complaint. In the UK, this may be to the Financial Ombudsman Service (FOS) who can be contacted by accessing the website www.financial-ombudsman.org.uk or telephoning 0800 0234567 or 0300 1239123.

With regard to other jurisdictions, please refer to the Complaints Procedure document contained in the Schedule or in the wording itself within this contract, or alternatively, simply inform your usual Howden contact who will be able to advise you of the escalation process.

## PRIVACY POLICY

In line with the new data protection laws which came into force on 25th May 2018, we have made changes to our Privacy Policy. You can view this policy on our website; www.howdengroup.com/en/privacy-policy or you may request a copy from your usual Howden contact.

Some of our third parties, who may be your Insurers, will also be Data Controllers, and will handle your personal data in accordance with their own privacy policies. On specific request we will be able to provide you with web links to your

UMR; B0180FN2613103

**Sompo Notices:**

## Status Disclosure (for EWIL inc Sompo)

This **Policy** is underwritten by Endurance Worldwide Insurance Limited, a wholly owned subsidiary of Sompo International Holdings Ltd., registered in England and Wales, Registration Number 04413524, home state, United Kingdom. Registered Office: 2 Minster Court, 1st Floor, Mincing Lane, London, EC3R 7BB.

Endurance Worldwide Insurance Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulatory Authority under registration number 219654. This can be found on the Financial Services Register at www.fca.org.uk.

## Status Disclosure (for EWIL only)

This **Policy** is underwritten by Endurance Worldwide Insurance Limited, which is registered in the United Kingdom at: 2 Minster Court, 1st Floor, Mincing Lane, London, EC3R 7BB. Endurance Worldwide Insurance Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority under reference 219654. Our Firm Reference Number and other details can be found on the Financial Services Register at www.fca.org.uk.

**UMR; B0180FN2613103**

## COMPLAINTS HANDLING SUMMARY

**How to make a complaint**

We aim to provide a high and effective standard of service to our policyholders and treat them fairly at all times. If you have a complaint about the service provided to you by Sompo International, please let us know immediately. You can contact us in one of the following ways:

Head of Compliance
2 Minster Court, 1st Floor
Mincing Lane
London
EC3R 7BB

Email: Complaints@sompo-intl.com
Website: http://www.sompo-intl.com/

**If your complaint can be resolved within three business days:**

We will aim to resolve your concerns within three business days, following receipt of your complaint. A written Summary Resolution Communication will be provided to you if the complaint is resolved to your satisfaction.

In the unlikely event that you remain dissatisfied, you may be entitled to refer the matter to the Financial Ombudsman Service, free of charge.

**If your complaint cannot be resolved within three business days:**

We will send you an acknowledgement letter to explain your complaint has been escalated to the Head of Compliance, who will investigate your complaint and keep you informed throughout the process.

We will investigate your complaint and provide one of the following within 8 weeks of receipt of your complaint:

- A final response letter explaining the outcome of our investigation, the reason for our decision and information on how to steps to take, should you remain dissatisfied; or

- A holding letter confirming when we anticipate we will have concluded our investigation.

**Referring to the Financial Ombudsman Service:**

Should you remain dissatisfied with the outcome of our investigation or we are unable to conclude our investigation within 8 weeks, you may be able to refer your complaint to the Financial Ombudsman Service (*if eligible), provided you do so within 6 months of the date of the Final Response.

The Financial Ombudsman Service contact details:

Financial Ombudsman Service
Exchange Tower
London
E14 9SR

Email: complaint.info@financialombudsman.org.uk
Telephone: 0800 023 4567 or 0300 123 9123
Website: www.financial-ombudsman.org.uk

* The Financial Ombudsman Service may not be able to consider a complaint if you have not provided us with the opportunity to resolve it first, or if you are:

- a small business which has an annual turnover of more than £6.5 million; and has annual balance sheet of more than £5 million; or employs more than 50 persons.
- a trustee of a trust with a net asset value of more than £5 million; or
- a charity with an annual income of more than £6.5 million.

UMR; B0180FN2613103

## FINANCIAL SERVICES COMPENSATION SCHEME (FSCS) CLAUSE

Endurance Worldwide Insurance Limited is covered by the Financial Services Compensation Scheme. You may be entitled to compensation from the scheme if we are unable to meet our obligations to you under this insurance. If you were entitled to compensation under this Scheme, the level and extent of the compensation would depend on the nature of this insurance. Further information about FSCS is available on their website: www.fscs.org.uk or you can write to them at PO Box 300, Mitcheldean, GL17 1DY.

UMR; B0180FN2613103

## Data Protection & Privacy Notice

The Insurer, Endurance Worldwide Insurance Limited ("**We/Us/Our**") is the Data Controller of the data collected about you. As such, **We** are responsible for the way in which this data is processed and will use personal information and, to the extent applicable, special category data given by you, together with other information for, amongst other things, the administration of this **Policy,** the handling of claims, the provision of customer services, credit checks and to prevent and detect fraud, as described more fully below in the Sompo International General Privacy Policy. **We** are a member of the Sompo International[1] group; as such, the information you provide may also be disclosed to **Our** affiliates or parent, service providers and agents for these purposes. It may also be disclosed to the insured's insurance advisor, where appointed.

**We** may need to collect and process information relating to individuals who may benefit from this Policy, which may include both personal data and special category data (such as medical history). You must ensure that you have explicit verbal or written consent from these individuals to such information being processed by **Us**.

In collecting or processing personal data, including special category data, about the insured or related third parties under this **Policy**, **We** shall comply with applicable data protection legislation. **We** are committed to protecting your personal information and respecting the data protection and privacy rights you have under applicable law and regulations.

When you submit any information to **Us** for the purpose of requesting information from **Us** about, or obtaining, **Our** products or services, **We** will use the information you provide, including any personal information, in its insurance business to conduct its business and perform its legal obligations, including:

(i) verifying your identity;
(ii) preventing, investigating or reporting fraud or potential fraud, money laundering, terrorism, misrepresentation, security incidents, sanctions violations or any crime, all in accordance with applicable law and regulations;
(iii) assessing, establishing and managing claims and arranging or entering into any appropriate settlements;
(iv) managing, reporting and auditing **Our** business operations;
(v) recovering debt;
(vi) developing, improving and protecting **Our** products, services, website, systems and relationships with you;
(vii) carrying out research, risk management and statistical analyses;
(viii) establishing, exercising or defending legal claims; and
(ix) meeting regulatory and compliance requirements.

[1] The term "Sompo International" refers to and includes each and every subsidiary of Sompo International Holdings Ltd., a Bermuda exempted company ("SIHL"). To the extent, however, that an affiliate of SIHL that is not a subsidiary of SIHL receives or uses personal information that is covered by this Policy and requires protection under the Data Protection Legislation, then such affiliate is included within "Sompo International" for purposes of protecting the data that such affiliate receives or uses. For a list of Sompo International offices, please see https://www.sompo-intl.com/location/corporate. For a list of affiliates that are included in the Sompo Group, please see https://www.sompo-hd.com/en/group/group_list/.

**We** will ensure that your personal data is processed in a manner consistent with the purposes set out above. **We** will retain your personal data for as long as it is necessary for the purposes mentioned above or as long as required by law.

To the extent applicable, **We** may also use your contact details (including email address(es)) to send you information about related products and services or other products and services provided by **Us** or one of **Our** group companies.

**We** may share your information for the purposes outlined above with:

(i) **Our** group companies;
(ii) brokers, other insurers and underwriters;
(iii) healthcare professionals;
(iv) law enforcement authorities;
(v) other government authorities;
(vi) fraud prevention agencies; and
(vii) third parties involved in any aspect of claims management including surveyors, loss adjusters, claims agents, solicitors and private investigators;
(viii) parties that may have a financial interest in the insurance policy or claim;
(ix) other service providers that may process your personal information on **Our** behalf (for example, IT service providers that host or support **Our** business and may have data that includes your personal information); and
(x) others with your consent or in accordance with applicable law and regulations.

**If you have provided information about another person, in doing so you confirm that you have such person's consent to provide the personal information to Us, that you have told such person that you have provided the information to Us and how We will use the personal information as described in this notice.**

To the extent you have provided your consent, and your consent provides the basis for **Our** use of the information, you may withdraw your consent at any time by contacting **Us** as described below.

More details about how **We** use your personal information may be found in the Sompo International General Privacy Policy, available on **Our** website at: https://www.sompo-intl.com/privacy-policies/.

The website also provides additional information about your data protection rights, how you may access and update your personal information and other choices you have about how **We** use your personal information (including how to object to processing or withdrawing your consent at any time). If you have any questions regarding this notice, please contact **Us** at:

Attn: Chief Compliance Officer Sompo International
1221 Avenue of the Americas
New York City, NY 10020
Email: Privacy@sompo-intl.com

UMR; B0180FN2613103

HOWDEN

**Wording**

# Howden Excess Layer Wording 1.1

**Costs Inclusive**

To indemnify the Insured for claim or claims first made against the Insured, or losses discovered by the Insured, during the Period of Insurance hereon up to this Policy's amount of liability (as hereinafter specified) in the aggregate, the excess of the Underlying Policy(ies) limits (as hereinafter specified) in the aggregate, the latter amount being the subject of Indemnity Policy(ies) (as hereinafter specified) or any Policy(ies) issued in substitution or renewal thereof for the same amount effected by the Insured and hereinafter referred to as "the Underlying Policy(ies)".

| | |
|---|---|
| **This Policy's amount of liability:** | Per Schedule |
| **Underlying Policy(ies) limits:** | Per Schedule |
| **Underlying Policy(ies) Number(s):** | Per Schedule |

1. It is a condition of this Policy that the Underlying Policy(ies) or any policy(ies) issued in substitution thereof shall be maintained in full effect during the currency of this Policy except for any reduction of the aggregate limits contained therein solely by payment of claims/losses or of costs and expenses incurred in defence or settlement of such claims/losses or as provided in Condition 2 below. The Insured's failure to maintain such Underlying Policy(ies) will not invalidate this Policy but in no event shall Insurers of this Policy be liable to any greater extent than if the Underlying Policy(ies) had been fully maintained.

2. (a) Liability to pay under this Policy shall not attach unless and until the Insurers of the Underlying Policy(ies) shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses.

   (b) If by reason of the payment of any claim or claims, loss or losses, or costs and expenses by the Insurers of the Underlying Policy(ies) during the Period of Insurance hereon, the amount of indemnity provided by such Underlying Policy(ies) is:-

      (i) Partially reduced, then this Policy shall apply in excess of the reduced amount of the Underlying Policy(ies) for the remainder of the Period of Insurance;

      (ii) Totally exhausted, then this Policy shall continue in force as Underlying Policy until expiry hereof.

   (c) If the Underlying Policy(ies) are subject to any Sub-Limit(s) of Liability then Insurers of this Policy shall be liable in respect of such Sub-Limit(s) of Liability but only to the extent that any such Sub-Limit of Liability had not been exhausted by payments made by an Underlying Policy.

   Notwithstanding the foregoing:

   i) if as part of any agreement to pay claims, losses or costs and expenses under an Underlying Policy, an insurer of an Underlying Policy agrees to pay an amount which is less than the applicable limit of liability thereunder on terms that such payment shall be treated as or equivalent to payment in full of such limit of liability, the Insurers will pay claims/losses under this Policy as if such insurer of an Underlying Policy had paid the applicable limit of liability in full. However, in such circumstances the insurers of this Policy shall pay claims/losses only to the extent that, in the absence of agreement of the kind referred to in the previous

sentence, the claim, claims, loss, losses or costs and expenses of the Insured would have exceeded the Underlying Limit.

ii) if any insurer of an Underlying Policy is or becomes insolvent with the result that it does not pay, or is unable to agree to pay, or is unable to participate in proceedings by which the liability of other insurers of the Underlying Policy is established, then the relevant insurer(s) will be deemed to have paid or to have agreed to pay or to have had their liability established, but only in the event that either:

(a) any other insurer participating on the relevant Underlying Policy pays, agrees to pay or has its liability established by judgment, arbitration award or other final binding adjudication (whichever shall occur first); or

(b) the Insured establishes that the insurers of the Underlying Policies would be liable hereunder but for the Insolvency.

iii) Insurers will recognise the erosion of an Underlying Policy Limit by any payment made in respect of claims/losses or costs and expenses by reason of cover provided by any Underlying Policy whether or not such cover is also provided by this Policy.

iv) where any Underlying Policy (other than the Primary Policy) provides cover which is more restrictive than the cover provided hereunder then, notwithstanding the absence of any liability on the part of the insurers of such Underlying Policy for part or all of any loss, such Underlying Policy shall, for the purposes of the operation of this Policy, be deemed to have been eroded by such claim/loss to the extent it constitutes claim or loss under the Primary Policy.

v) Insurers will recognise the erosion of an Underlying Policy as a result of a provision in an Underlying Policy which reduces the limit of liability in that Underlying Policy by reason of any amount paid of payable under another policy of insurance.

3. In the event of a claim arising or loss discovered to which the insurers of this Policy may be liable to contribute, no costs or expenses shall be incurred on their behalf without their consent being first obtained unless the conditions of the Primary Policy waive the requirement for prior consent. Where insurers' prior consent is required, such consent shall not be unreasonably withheld or unduly delayed. No settlement of a claim shall be effected by the Insured for such a sum as will involve this Policy without the consent of insurers hereon.

4. Any claim(s) made against the Insured or the discovery by the Insured of any loss(es) or any circumstances of which the Insured becomes aware during the subsistence hereof which are likely to give rise to such a claim or loss, shall, if it appears likely that such claim(s) plus costs and expenses may exceed the indemnity available under the Policy(ies) of the Primary and Underlying Excess Insurers, be notified as soon as reasonably practicable by the Insured in writing to the insurers hereon. It is expressly noted that the foregoing requirements shall only apply in respect of knowledge possessed by those persons specified in the Primary Policy as being persons whose knowledge of claims, circumstances or losses requires notification to insurers.

5. All recoveries or payments recovered or received subsequent to a claim or loss settlement under this Policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insured and the insurers provided always that nothing in this Policy shall be construed to mean that claim or loss settlements under this Policy are not payable until the Insured's ultimate net loss has been finally ascertained.

6. Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Primary Policy. No amendment to the Primary Policy during the period of this Policy in respect of which the Primary insurers require an additional premium or a deductible shall be effective in extending the scope of this Policy until agreed in writing by the insurers of this Policy.

Policy Number: (UMR) B0180FN2613103

# SECURITY DETAILS

## REFERENCES

UMR (Unique Market Reference): B0180FN2613103

Date contract printed to PDF: 10:05 08 April 2026

# SIGNED UNDERWRITERS

**Sompo International** **Slip Leader**

**Master Facility for SOMMPO - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

SOMPO INTERNATIONAL

**XIS**
**LIRMA E9105**

33.34%
**Written**

| L | M | L | 3 | 1 | 4 | 2 | 1 | 0 | 6 | 0 | 0 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

09:23 08 April 2026

33.34%
**Signed**

Endurance Worldwide Insurance Ltd, LIRMA E9105, London, England
Anna Beer
**Bound**

**Participant Role:** Leader

**Aviva Insurance Limited**

**Written** 33.33%

**Signed** 33.33%

**Master Facility for AVIVA - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

AVIVA

**XIS**
**LIRMA V2035**

8.3325%
**Written**

| M | L | 2 | 6 | 1 | 6 | 0 | 7 | C | M | L | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

10:04 08 April 2026

8.3325%
**Signed**

Aviva Insurance Ireland DAC, LIRMA V2035, UK Branch
Alice Sheringham
**Bound**

**Participant Role:** Leader

Policy Number: (UMR) B0180FN2613103

**Master Facility for AVIVA - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

AVIVA

**XIS**
**LIRMA V2001**

8.3325%
**Written**

| M | L | 2 | 6 | 1 | 6 | 0 | 7 | C | M | L | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Aviva Non EEA

10:04 08 April 2026
Aviva Insurance Limited, LIRMA V2001, London, England
Alice Sheringham
**Bound**

8.3325%
**Signed**

**Participant Role:** Leader

**Line Conditions**

Agreement Party for all Claims
Agreement Party for all Endorsements

---

**Master Facility for AVIVA - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

AVIVA

8.3325%
**Written**

| M | L | 2 | 6 | 1 | 6 | 0 | 7 | C | M | L | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

10:04 08 April 2026
Aviva Insurance Ireland DAC, UK Branch
Alice Sheringham
**Bound**

8.3325%
**Signed**

**Participant Role:** Leader

---

**Master Facility for AVIVA - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

AVIVA

8.3325%
**Written**

| M | L | 2 | 6 | 1 | 6 | 0 | 7 | C | M | L | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

10:04 08 April 2026
Aviva Insurance Limited, London, England
Alice Sheringham
**Bound**

8.3325%
**Signed**

**Participant Role:** Leader

Policy Number: (UMR) B0180FN2613103

---

**AIG**

**Written** 33.33%

**Signed** 33.33%

**Master Facility for AIG - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 3 | 3 | 0 | 2 | 8 | 4 | 3 | 9 | | | | | |

16.665%
**Written**

16.665%
**Signed**

09:45 07 April 2026
AIG Europe S.A.
Andrew Owen on behalf of Khalid Abdi
**Bound**

**Participant Role:** Leader

**<u>Line Conditions</u>**

AIG Europe S.A. or American International Group UK Limited acting on its behalf to collect EEA taxes.
All contract amendments and claims to be agreed by AIG Europe S.A. AIG Europe S.A. not bound by any general underwriters agreement or class of business schedule, bureau or Lloyd's agreements contained herein.
In respect of the share(s) of the (re)insurance (re)insured by AIG Europe SA (AESA) and American International Group UK Ltd (AIG UK): (i) Risks located in any: territory in the European Economic Area are (re)insured by AESA, and other territory including the UK, are (re)insured by AIG UK; (ii) Condition (i) does not increase or affect the amount, operation or erosion of any limit of indemnity/sums insured or other similar term, sub-limit or retention/deductible/excess, which shall each be as stated in the Policy and apply jointly and simultaneously to the liability of both AIG UK and AESA as if there were only one insurer; (iii) The rights, obligations and liabilities of AIG UK and AESA are separate and not joint; (iv) Notices/information provided to AIG UK shall be deemed provided to both AIG UK and AESA or one individually as required by the Policy terms. Notices from AIG UK/AESA shall be deemed provided by both unless the content relates specifically to risks (re)insured by one only

---

**Master Facility for AIG - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 3 | 3 | 0 | 2 | 8 | 4 | 3 | 9 | | | | | |

16.665%
**Written**

16.665%
**Signed**

09:45 07 April 2026
American International Group UK Limited
Andrew Owen on behalf of Khalid Abdi
**Bound**

**Participant Role:** Leader

Policy Number: (UMR) B0180FN2613103

**Line Conditions**

American International Group UK Limited to collect UK taxes.
All contract amendments and claims to be agreed by American International Group UK Limited. American International Group UK Limited not bound by any General Underwriters Agreement or class of business schedule, bureau or Lloyd's agreement contained herein.

Policy Number: (UMR) B0180FN2613103

# SETTLEMENT INFORMATION

### Terms of Settlement

| | |
|---|---|
| Settlement Due Date: | 30 June 2026 |
| Instalment Premium Period of Credit: | 0 |
| Adjustment Premium Period of Credit: | 0 |

Sompo International

**XIS Company Leader**

Anna Beer

# העתק ביטוח נושאי משרה - 2nd excess layer

HOWDEN

# Market Reform Contract

| | | |
|---|---|---|
| **UMR / Policy No.** | **B0180FN2616701** | **180 HOW** |

| | | |
|---|---|---|
| **Reinsured:** | **N/A** | |
| **Insured:** | **Papaya Gaming Ltd** | |
| **Period:** | **From :** | **7th April 2026** |
| | **To:** | **6th April 2027** |

| | |
|---|---|
| *Contract Order:* | % |
| *No. Of Contract Documents:* | |
| *Hereto Written:* | % |
| *Total Written:* | % |
| *Signing Percentage:* | % |

HOWDEN

UMR; B0180FN2616701

## RISK DETAILS

| | |
|---|---|
| **Unique Market Reference:** | B0180FN2616701 |
| **Attaching to Delegated Underwriting Contract Reference:** | B0180FNF260017DO |
| **Type:** | **Description:** 2nd Excess Layer Directors and Officers, as detailed in the Policy Wording.<br>**Contract Classification:** Insurance |
| **Name of Insured:** | Papaya Gaming Ltd |
| **Address of Insured:** | Street No. and Street: 35 HaMasger Street<br>City: Tel Aviv-Yafo<br>Country: Israel |
| **Period of Insurance:** | From: 7th April 2026<br>To: 6th April 2027<br>both days inclusive Local Standard Time at the Address of the Insured. |
| **Interest:** | As detailed herein |
| **Limit(s) of Liability:** | USD 5,000,000 in the annual aggregate.<br><br>In excess of<br><br>USD 20,000,000 in the annual aggregate. |
| **Underlying Insurance** | Primary Policy<br>Limit: USD 5,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2613071<br>Underlying Lead Insurer: Nexus Underwriting Limited<br><br>Primary Policy<br>Limit: USD 15,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2613103<br>Underlying Lead Insurer: Sompo International |
| **Claims Basis:** | **Claims Basis:**<br>As more fully defined within the wording(s) attached<br><br>**Pending and Prior Litigation Date:**<br>24 February 2024 |
| **Territorial Limits:** | This contract provides cover for work carried out worldwide. |
| **Legal Action:** | This contract provides cover for claims made against the Insured worldwide. |

UMR; B0180FN2616701

| | |
|---|---|
| **Choice of Law & Jurisdiction:** | **Choice of Law:**<br>This insurance shall be governed by and construed in accordance with the laws of Israel<br><br>**Choice of Jurisdiction:**<br>The parties shall submit to the jurisdiction of the Courts of Israel |
| **Conditions:** | Howden Excess Layer Policy Wording amended as attached<br><br>**Any conditions shown below are in addition to the conditions contained in the contract wording(s)**<br><br>- To the extent provided by the contract, the Contract Leader is authorised to issue such notice on behalf of all participating insurers; or<br>- If the Contract Leader is not so authorised or has not issued notice, any insurer may issue such notice in respect of its own participation.<br><br>Premium Payment Clause (LSW 3001) – 90 days<br>Service of Suit, as attached<br>Specific Matters Exclusion, as attached<br>Complaints procedure, as attached, only for Markets Bound under the B0180FNF260017DO line slip<br>Privacy Policy, as attached, only for Markets Bound under the B0180FNF260017DO line slip<br>LMA3100A Sanctions Limitation Clause as attached |
| **Notification to Insurers to be given to:** | Howden, One Creechurch Place, London EC3A 5AF |
| **Express Warranties:** | None, other than as may exist in the policy wording or attached clauses. |
| **Conditions Precedent:** | None, other than as may exist in the policy wording or attached clauses. |
| **Subjectivities:** | None |
| **Premium:** | USD 8,550 per annum |
| **Premium Payment Terms:** | PREMIUM PAYMENT CLAUSE (LSW 3001) - 90 Days<br>Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.<br><br>The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 90 days of inception of this contract (or, in respect of instalment premiums, when due).<br><br>If the premium due under this contract has not been so paid to (Re)Insurers by the 90 day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period |

that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**Taxes Payable and Administered by the Insured or Their Agent:** None

**Taxes Payable by Insured and Administered by Insurers:** None

**Taxes Payable by the Insurers and Administered by the Insured or Their Agent:** None

**Insurer Contract Documentation:** In accordance with the Contract Certainty Code of Practice, Final Evidence of Cover within 30 days will be as follows:

☒ This document details the contract terms entered into by the insurer(s) and constitutes the contract document.

Any further documentation changing this contract, which has been appropriately agreed by insurer(s) hereon, shall form the evidence of such change(s) and will be deemed to form an integral part of the original contract.

UMR; B0180FN2616701

## INFORMATION

The following information has been seen, read, understood and noted by insurers hereon:

(1) As held on file by Howden Insurance Brokers Limited.

UMR; B0180FN2616701

## SECURITY DETAILS

**Insurer's Liability:**

**(RE)INSURERS LIABILITY CLAUSE (LMA 3333)**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:** 100% of 100%

**Basis of Written Lines:**

x Of Whole
□ Of Order
□ Part of Whole
□ Part of Order

| | |
|---|---|
| **Basis of Signed Lines:** | x Of Whole<br>□ Of Order<br>□ Part of Whole<br>□ Part of Order |
| **Signing Provisions:** | **Without Disproportionate Signing**<br><br>In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full. All other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order, without further agreement of any of the (re)insurers.<br>However:<br>a) in the event that the placement of the order is not completed by the commencement date of the period of (re)insurance, then all lines written by that date will be signed in full;<br>b) the signed lines resulting from the application of the above provisions can be varied - before or after the commencement date of the period of (re)insurance - by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the MRCs will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement. |
| **Written Lines:** | As detailed in PPL Signing pages. |

UMR; B0180FN2616701

**Endorsements Attaching to this Policy Wording**

## SERVICE OF SUIT CLAUSE (ISRAEL)

This Insurance shall be governed by Israeli law and the Israeli Courts shall have jurisdiction in any dispute arising hereunder.

In this event Ms Sigal Schlimoff Rechtman of Gibor Sport Building, 7 Menachem Begin Road, Ramat Gan 52521, Israel, Lloyd's Representative in Israel, is authorised to accept service of suit on behalf of Underwriters.

20/01/11
NMA2349A

## SANCTIONS LIMITATION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations' resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100A
5 October 2023

## SPECIFIC MATTERS EXCLUSION

It is hereby understood and agreed that the *insurer* shall not be liable to make any payment for *loss* in connection with any *claim* made against the *insured* arising out of based upon or attributable to the matters referred to in answer to Question(s) 7b of the proposal form dated 29th January 2023

HOWDEN

**For markets bound under the B0180FNF250017DO line slip:**

## COMPLAINTS:

If you wish to make a complaint you may do so by contacting any member of our staff by whatever means is convenient to you. If you cannot settle your complaint with us to your satisfaction, you may be entitled to escalate your complaint. In the UK, this may be to the Financial Ombudsman Service (FOS) who can be contacted by accessing the website www.financial-ombudsman.org.uk or telephoning 0800 0234567 or 0300 1239123.

With regard to other jurisdictions, please refer to the Complaints Procedure document contained in the Schedule or in the wording itself within this contract, or alternatively, simply inform your usual Howden contact who will be able to advise you of the escalation process.

## PRIVACY POLICY

In line with the new data protection laws which came into force on 25th May 2018, we have made changes to our Privacy Policy. You can view this policy on our website; www.howdengroup.com/en/privacy-policy or you may request a copy from your usual Howden contact.

Some of our third parties, who may be your Insurers, will also be Data Controllers, and will handle your personal data in accordance with their own privacy policies. On specific request we will be able to provide you with web links to your

UMR; B0180FN2616701

**Policy Wording**

# Howden Excess Layer Wording 1.1

**Costs Inclusive**

To indemnify the Insured for claim or claims first made against the Insured, or losses discovered by the Insured, during the Period of Insurance hereon up to this Policy's amount of liability (as hereinafter specified) in the aggregate, the excess of the Underlying Policy(ies) limits (as hereinafter specified) in the aggregate, the latter amount being the subject of Indemnity Policy(ies) (as hereinafter specified) or any Policy(ies) issued in substitution or renewal thereof for the same amount effected by the Insured and hereinafter referred to as "the Underlying Policy(ies)".

| | |
|---|---|
| **This Policy's amount of liability:** | Per Schedule |
| **Underlying Policy(ies) limits:** | Per Schedule |
| **Underlying Policy(ies) Number(s):** | Per Schedule |

1. It is a condition of this Policy that the Underlying Policy(ies) or any policy(ies) issued in substitution thereof shall be maintained in full effect during the currency of this Policy except for any reduction of the aggregate limits contained therein solely by payment of claims/losses or of costs and expenses incurred in defence or settlement of such claims/losses or as provided in Condition 2 below. The Insured's failure to maintain such Underlying Policy(ies) will not invalidate this Policy but in no event shall Insurers of this Policy be liable to any greater extent than if the Underlying Policy(ies) had been fully maintained.

2. (a) Liability to pay under this Policy shall not attach unless and until the Insurers of the Underlying Policy(ies) shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses.

   (b) If by reason of the payment of any claim or claims, loss or losses, or costs and expenses by the Insurers of the Underlying Policy(ies) during the Period of Insurance hereon, the amount of indemnity provided by such Underlying Policy(ies) is:-

   (i) Partially reduced, then this Policy shall apply in excess of the reduced amount of the Underlying Policy(ies) for the remainder of the Period of Insurance;

   (ii) Totally exhausted, then this Policy shall continue in force as Underlying Policy until expiry hereof.

   (c) If the Underlying Policy(ies) are subject to any Sub-Limit(s) of Liability then Insurers of this Policy shall be liable in respect of such Sub-Limit(s) of Liability but only to the extent that any such Sub-Limit of Liability had not been exhausted by payments made by an Underlying Policy.

   Notwithstanding the foregoing:

   i) if as part of any agreement to pay claims, losses or costs and expenses under an Underlying Policy, an insurer of an Underlying Policy agrees to pay an amount which is less than the applicable limit of liability thereunder on terms that such payment shall be treated as or equivalent to payment in full of such limit of liability, the Insurers will pay claims/losses under this Policy as if such insurer of an Underlying Policy had paid the applicable limit of liability in full. However, in such circumstances the insurers of this Policy shall pay claims/losses only to the extent that, in the absence of agreement of the kind referred to in the previous sentence, the claim, claims, loss, losses or costs and expenses of the Insured would have exceeded the Underlying Limit.

ii) if any insurer of an Underlying Policy is or becomes insolvent with the result that it does not pay, or is unable to agree to pay, or is unable to participate in proceedings by which the liability of other insurers of the Underlying Policy is established, then the relevant insurer(s) will be deemed to have paid or to have agreed to pay or to have had their liability established, but only in the event that either:

(a) any other insurer participating on the relevant Underlying Policy pays, agrees to pay or has its liability established by judgment, arbitration award or other final binding adjudication (whichever shall occur first); or

(b) the Insured establishes that the insurers of the Underlying Policies would be liable hereunder but for the Insolvency.

iii) Insurers will recognise the erosion of an Underlying Policy Limit by any payment made in respect of claims/losses or costs and expenses by reason of cover provided by any Underlying Policy whether or not such cover is also provided by this Policy.

iv) where any Underlying Policy (other than the Primary Policy) provides cover which is more restrictive than the cover provided hereunder then, notwithstanding the absence of any liability on the part of the insurers of such Underlying Policy for part or all of any loss, such Underlying Policy shall, for the purposes of the operation of this Policy, be deemed to have been eroded by such claim/loss to the extent it constitutes claim or loss under the Primary Policy.

v) Insurers will recognise the erosion of an Underlying Policy as a result of a provision in an Underlying Policy which reduces the limit of liability in that Underlying Policy by reason of any amount paid of payable under another policy of insurance.

3. In the event of a claim arising or loss discovered to which the insurers of this Policy may be liable to contribute, no costs or expenses shall be incurred on their behalf without their consent being first obtained unless the conditions of the Primary Policy waive the requirement for prior consent. Where insurers' prior consent is required, such consent shall not be unreasonably withheld or unduly delayed. No settlement of a claim shall be effected by the Insured for such a sum as will involve this Policy without the consent of insurers hereon.

4. Any claim(s) made against the Insured or the discovery by the Insured of any loss(es) or any circumstances of which the Insured becomes aware during the subsistence hereof which are likely to give rise to such a claim or loss, shall, if it appears likely that such claim(s) plus costs and expenses may exceed the indemnity available under the Policy(ies) of the Primary and Underlying Excess Insurers, be notified as soon as reasonably practicable by the Insured in writing to the insurers hereon. It is expressly noted that the foregoing requirements shall only apply in respect of knowledge possessed by those persons specified in the Primary Policy as being persons whose knowledge of claims, circumstances or losses requires notification to insurers.

5. All recoveries or payments recovered or received subsequent to a claim or loss settlement under this Policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insured and the insurers provided always that nothing in this Policy shall be construed to mean that claim or loss settlements under this Policy are not payable until the Insured's ultimate net loss has been finally ascertained.

6. Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Primary Policy. No amendment to the Primary Policy during the period of this Policy in respect of which the Primary insurers require an additional premium or a deductible shall be effective in extending the scope of this Policy until agreed in writing by the insurers of this Policy.

Policy Number: (UMR) B0180FN2616701

# SECURITY DETAILS

## REFERENCES

UMR (Unique Market Reference): B0180FN2616701
Date contract printed to PDF: 09:46 07 April 2026

# SIGNED UNDERWRITERS

**AIG** **Slip Leader**

**Written** 100%
**Signed** 100%

**Master Facility for AIG - Excess Facility 2026 - D&O Section**
Master Reference: **B0180FNF260017DO**

| | |
|---|---|
| 50% **Written** | 0 0 3 3 0 2 8 7 4 5 |
| 50% **Signed** | 09:46 07 April 2026<br>AIG Europe S.A.<br>Andrew Owen on behalf of Khalid Abdi<br>**Bound** |

**Participant Role:** Leader

**Line Conditions**

AIG Europe S.A. or American International Group UK Limited acting on its behalf to collect EEA taxes.
In respect of the share(s) of the (re)insurance (re)insured by AIG Europe SA (AESA) and American International Group UK Ltd (AIG UK): (i) Risks located in any: territory in the European Economic Area are (re)insured by AESA, and other territory including the UK, are (re)insured by AIG UK; (ii) Condition (i) does not increase or affect the amount, operation or erosion of any limit of indemnity/sums insured or other similar term, sub-limit or retention/deductible/excess, which shall each be as stated in the Policy and apply jointly and simultaneously to the liability of both AIG UK and AESA as if there were only one insurer; (iii) The rights, obligations and liabilities of AIG UK and AESA are separate and not joint; (iv) Notices/information provided to AIG UK shall be deemed provided to both AIG UK and AESA or one individually as required by the Policy terms. Notices from AIG UK/AESA shall be deemed provided by both unless the content relates specifically to risks (re)insured by one only
All contract amendments and claims to be agreed by AIG Europe S.A. AIG Europe S.A. not bound by any general underwriters agreement or class of business schedule, bureau or Lloyd's agreements contained herein.

Policy Number: (UMR) B0180FN2616701

**Master Facility for AIG - Excess Facility 2026 - D&O Section**

Master Reference: **B0180FNF260017DO**

| | |
|---|---|
| 50%<br>**Written** | 0 0 3 3 0 2 8 7 4 5 |
| 50%<br>**Signed** | 09:46 07 April 2026<br>American International Group UK Limited<br>Andrew Owen on behalf of Khalid Abdi<br>**Bound** |

**Participant Role:** Leader

**Line Conditions**

American International Group UK Limited to collect UK taxes.
All contract amendments and claims to be agreed by American International Group UK Limited. American International Group UK Limited not bound by any General Underwriters Agreement or class of business schedule, bureau or Lloyd's agreement contained herein.

Policy Number: (UMR) B0180FN2616701

## SETTLEMENT INFORMATION

### Terms of Settlement

| | |
|---|---|
| Settlement Due Date: | 06 July 2026 |
| Instalment Premium Period of Credit: | 0 |
| Adjustment Premium Period of Credit: | 0 |

AIG

**Non-Bureau Leader**

Khalid Abdi

# העתק ביטוח נושאי משרה - 3rd excess layer

HOWDEN

# Market Reform Contract

| | | |
|---|---|---|
| **UMR / Policy No.** | **B0180FN2624561** | **180 HOW** |
| **Reinsured:** | **N/A** | |
| **Insured:** | **Papaya Gaming Ltd** | |
| **Period:** | **From :** | **7th April 2026** |
| | **To:** | **6th April 2027** |

| | |
|---|---|
| *Contract Order:* | % |
| *No. Of Contract Documents:* | |
| *Hereto Written:* | % |
| *Total Written:* | % |
| *Signing Percentage:* | % |

UMR; B0180FN2624561

## RISK DETAILS

| | |
|---|---|
| **Unique Market Reference:** | B0180FN2624561 |
| **Type:** | **Description:** 3rd Excess Layer Directors and Officers, as detailed in the Policy Wording.<br>**Contract Classification:** Insurance |
| **Name of Insured:** | Papaya Gaming Ltd |
| **Address of Insured:** | Street No. and Street: 35 HaMasger Street<br>City: Tel Aviv-Yafo<br>Country: Israel |
| **Period of Insurance:** | From: 7th April 2026<br>To: 6th April 2027<br>both days inclusive Local Standard Time at the Address of the Insured. |
| **Interest:** | As detailed herein |
| **Limit(s) of Liability:** | USD 5,000,000 in the annual aggregate.<br><br>In excess of<br><br>USD 25,000,000 in the annual aggregate. |
| **Underlying Insurance** | Primary Policy<br>Limit: USD 5,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2613071<br>Underlying Lead Insurer: Nexus Underwriting Limited<br><br>Primary Policy<br>Limit: USD 15,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2613103<br>Underlying Lead Insurer: Sompo International<br><br>Primary Policy<br>Limit: USD 5,000,000 each and every loss and in the annual aggregate<br>Policy No.: FN2616701<br>Underlying Lead Insurer: AIG |
| **Claims Basis:** | **Claims Basis:**<br>As more fully defined within the wording(s) attached<br><br>**Pending and Prior Litigation Date:**<br>7th April 2026 |
| **Territorial Limits:** | This contract provides cover for work carried out worldwide. |
| **Legal Action:** | This contract provides cover for claims made against the Insured worldwide. |

HOWDEN

UMR; B0180FN2624561

**Choice of Law & Jurisdiction:**

**Choice of Law:**
This insurance shall be governed by and construed in accordance with the laws of Israel

**Choice of Jurisdiction:**
The parties shall submit to the jurisdiction of the Courts of Israel

**Conditions:**

Howden Excess Layer Policy Wording amended as attached

**Any conditions shown below are in addition to the conditions contained in the contract wording(s)**

- To the extent provided by the contract, the Contract Leader is authorised to issue such notice on behalf of all participating insurers; or
- If the Contract Leader is not so authorised or has not issued notice, any insurer may issue such notice in respect of its own participation.

Premium Payment Clause (LSW 3001) – 90 days
Service of Suit, as attached
Specific Matters Exclusion, as attached
LMA3100A Sanctions Limitation Clause as attached

**Notification to Insurers to be given to:**

Howden, One Creechurch Place, London EC3A 5AF

**Express Warranties:** None, other than as may exist in the policy wording or attached clauses.

**Conditions Precedent:** None, other than as may exist in the policy wording or attached clauses.

**Subjectivities:** None

**Premium:** USD 8,000 per annum

**Premium Payment Terms:**

PREMIUM PAYMENT CLAUSE (LSW 3001) - 90 Days
Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 90 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 90 day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**Taxes Payable and Administered by the Insured or Their Agent:** None

**Taxes Payable by Insured and Administered by Insurers:** None

**Taxes Payable by the Insurers and Administered by the Insured or Their Agent:** None

**Insurer Contract Documentation:** In accordance with the Contract Certainty Code of Practice, Final Evidence of Cover within 30 days will be as follows:

☒ This document details the contract terms entered into by the insurer(s) and constitutes the contract document.

Any further documentation changing this contract, which has been appropriately agreed by insurer(s) hereon, shall form the evidence of such change(s) and will be deemed to form an integral part of the original contract.

UMR; B0180FN2624561

## INFORMATION

The following information has been seen, read, understood and noted by insurers hereon:

(1) As held on file by Howden Insurance Brokers Limited.

UMR; B0180FN2624561

## SECURITY DETAILS

**Insurer's Liability:**

**(RE)INSURERS LIABILITY CLAUSE (LMA 3333)**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:** 100% of 100%

**Basis of Written Lines:**

x Of Whole
□ Of Order
□ Part of Whole
□ Part of Order

**Basis of Signed Lines:**
x Of Whole
□ Of Order
□ Part of Whole
□ Part of Order

**Signing Provisions:** **Without Disproportionate Signing**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full. All other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order, without further agreement of any of the (re)insurers.
However:

a) in the event that the placement of the order is not completed by the commencement date of the period of (re)insurance, then all lines written by that date will be signed in full;
b) the signed lines resulting from the application of the above provisions can be varied - before or after the commencement date of the period of (re)insurance - by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the MRCs will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**Written Lines:** As detailed in PPL Signing pages.

**Endorsements Attaching to this Policy Wording**

## SERVICE OF SUIT CLAUSE (ISRAEL)

This Insurance shall be governed by Israeli law and the Israeli Courts shall have jurisdiction in any dispute arising hereunder.

In this event Ms Sigal Schlimoff Rechtman of Gibor Sport Building, 7 Menachem Begin Road, Ramat Gan 52521, Israel, Lloyd's Representative in Israel, is authorised to accept service of suit on behalf of Underwriters.

20/01/11
NMA2349A

## SANCTIONS LIMITATION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations' resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100A
5 October 2023

## SPECIFIC MATTERS EXCLUSION

It is hereby understood and agreed that the *insurer* shall not be liable to make any payment for *loss* in connection with any *claim* made against the *insured* arising out of based upon or attributable to the matters referred to in answer to Question(s) 7b of the proposal form dated 29th January 2023

UMR; B0180FN2624561

**Policy Wording**

# Howden Excess Layer Wording 1.1

**Costs Inclusive**

To indemnify the Insured for claim or claims first made against the Insured, or losses discovered by the Insured, during the Period of Insurance hereon up to this Policy's amount of liability (as hereinafter specified) in the aggregate, the excess of the Underlying Policy(ies) limits (as hereinafter specified) in the aggregate, the latter amount being the subject of Indemnity Policy(ies) (as hereinafter specified) or any Policy(ies) issued in substitution or renewal thereof for the same amount effected by the Insured and hereinafter referred to as "the Underlying Policy(ies)".

| | |
|---|---|
| **This Policy's amount of liability:** | Per Schedule |
| **Underlying Policy(ies) limits:** | Per Schedule |
| **Underlying Policy(ies) Number(s):** | Per Schedule |

1. It is a condition of this Policy that the Underlying Policy(ies) or any policy(ies) issued in substitution thereof shall be maintained in full effect during the currency of this Policy except for any reduction of the aggregate limits contained therein solely by payment of claims/losses or of costs and expenses incurred in defence or settlement of such claims/losses or as provided in Condition 2 below. The Insured's failure to maintain such Underlying Policy(ies) will not invalidate this Policy but in no event shall Insurers of this Policy be liable to any greater extent than if the Underlying Policy(ies) had been fully maintained.

2. (a) Liability to pay under this Policy shall not attach unless and until the Insurers of the Underlying Policy(ies) shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses.

   (b) If by reason of the payment of any claim or claims, loss or losses, or costs and expenses by the Insurers of the Underlying Policy(ies) during the Period of Insurance hereon, the amount of indemnity provided by such Underlying Policy(ies) is:-

   (i) Partially reduced, then this Policy shall apply in excess of the reduced amount of the Underlying Policy(ies) for the remainder of the Period of Insurance;

   (ii) Totally exhausted, then this Policy shall continue in force as Underlying Policy until expiry hereof.

   (c) If the Underlying Policy(ies) are subject to any Sub-Limit(s) of Liability then Insurers of this Policy shall be liable in respect of such Sub-Limit(s) of Liability but only to the extent that any such Sub-Limit of Liability had not been exhausted by payments made by an Underlying Policy.

   Notwithstanding the foregoing:

   i) if as part of any agreement to pay claims, losses or costs and expenses under an Underlying Policy, an insurer of an Underlying Policy agrees to pay an amount which is less than the applicable limit of liability thereunder on terms that such payment shall be treated as or equivalent to payment in full of such limit of liability, the Insurers will pay claims/losses under this Policy as if such insurer of an Underlying Policy had paid the applicable limit of liability in full. However, in such circumstances the insurers of this Policy shall pay claims/losses only to the extent that, in the absence of agreement of the kind referred to in the previous sentence, the claim, claims, loss, losses or costs and expenses of the Insured would have exceeded the Underlying Limit.

ii) if any insurer of an Underlying Policy is or becomes insolvent with the result that it does not pay, or is unable to agree to pay, or is unable to participate in proceedings by which the liability of other insurers of the Underlying Policy is established, then the relevant insurer(s) will be deemed to have paid or to have agreed to pay or to have had their liability established, but only in the event that either:

(a) any other insurer participating on the relevant Underlying Policy pays, agrees to pay or has its liability established by judgment, arbitration award or other final binding adjudication (whichever shall occur first); or

(b) the Insured establishes that the insurers of the Underlying Policies would be liable hereunder but for the Insolvency.

iii) Insurers will recognise the erosion of an Underlying Policy Limit by any payment made in respect of claims/losses or costs and expenses by reason of cover provided by any Underlying Policy whether or not such cover is also provided by this Policy.

iv) where any Underlying Policy (other than the Primary Policy) provides cover which is more restrictive than the cover provided hereunder then, notwithstanding the absence of any liability on the part of the insurers of such Underlying Policy for part or all of any loss, such Underlying Policy shall, for the purposes of the operation of this Policy, be deemed to have been eroded by such claim/loss to the extent it constitutes claim or loss under the Primary Policy.

v) Insurers will recognise the erosion of an Underlying Policy as a result of a provision in an Underlying Policy which reduces the limit of liability in that Underlying Policy by reason of any amount paid of payable under another policy of insurance.

3. In the event of a claim arising or loss discovered to which the insurers of this Policy may be liable to contribute, no costs or expenses shall be incurred on their behalf without their consent being first obtained unless the conditions of the Primary Policy waive the requirement for prior consent. Where insurers' prior consent is required, such consent shall not be unreasonably withheld or unduly delayed. No settlement of a claim shall be effected by the Insured for such a sum as will involve this Policy without the consent of insurers hereon.

4. Any claim(s) made against the Insured or the discovery by the Insured of any loss(es) or any circumstances of which the Insured becomes aware during the subsistence hereof which are likely to give rise to such a claim or loss, shall, if it appears likely that such claim(s) plus costs and expenses may exceed the indemnity available under the Policy(ies) of the Primary and Underlying Excess Insurers, be notified as soon as reasonably practicable by the Insured in writing to the insurers hereon. It is expressly noted that the foregoing requirements shall only apply in respect of knowledge possessed by those persons specified in the Primary Policy as being persons whose knowledge of claims, circumstances or losses requires notification to insurers.

5. All recoveries or payments recovered or received subsequent to a claim or loss settlement under this Policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insured and the insurers provided always that nothing in this Policy shall be construed to mean that claim or loss settlements under this Policy are not payable until the Insured's ultimate net loss has been finally ascertained.

6. Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Primary Policy. No amendment to the Primary Policy during the period of this Policy in respect of which the Primary insurers require an additional premium or a deductible shall be effective in extending the scope of this Policy until agreed in writing by the insurers of this Policy.

Policy Number: (UMR) B0180FN2624561

# SECURITY DETAILS

## REFERENCES

UMR (Unique Market Reference): B0180FN2624561
Date contract printed to PDF: 10:47 10 April 2026

# SIGNED UNDERWRITERS

**K2 International**

**Slip Leader**

K2 INTERNATIONAL

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P | 0 | 0 | 1 | 4 | 8 | 1 | 4 | 2 | 6 | A | A | | | |

Policy reference

100%
**Written**

100%
**Signed**

10:05 10 April 2026
K2UKUCA022026 2026 (Non-EEA D&O), Accredited Insurance(Europe) Limited(UK Branch)100%. Prem/Claims settled w/K2 K2ExecutiveRisk.claims@K2insinternational.com K2ExecutiveRisk.premiums@K2insinternational.com
Eleanor Eglintine
**Bound**

Policy Number: (UMR) B0180FN2624561

## SETTLEMENT INFORMATION

### Terms of Settlement

| | |
|---|---|
| Settlement Due Date: | 31 May 2026 |
| Instalment Premium Period of Credit: | 0 |
| Adjustment Premium Period of Credit: | 0 |

K2 International

**Non-Bureau Leader**

Eleanor Eglintine

# העתק ביטוח צד ג', חבות מעסיקים, רכוש

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 1 P#
ב ת י ע ס ק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| 101,165 | | | 101,165 | 6,282 | 107,447 ש.ח. |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

```
+------------------------------------------------------------------------+
| שם סוכן: אמנון גור ס.ביטוח בע''מ  טלפון: 03-6142121  פקס: 03-6142120  |
| כתובת  : מצדה 7 מגדלי בסר 4         ב"ב                                  |
| E-MAIL: GVIA-RISKS1@AMNONGUR.ONMICROSOFT                                |
+------------------------------------------------------------------------+
```

פוליסה לביטוח בתי עסק
================================

*********************************************************************
פוליסה לביטוח בתי עסק מנוביט 2015, מהדורה 01/2024
*********************************************************************

קוד/י עסק :
5140 תאור העסק : בית תוכנה

שם המבוטח המלא :
================
פאפאייה גיימינג בע"מ

עיסוקו של המבוטח לעניין פוליסה זו:
==================================
בית תוכנה

המקום/ות המשמש/ים את המבוטח לצורך ניהול עסקו:
רחוב: המסגר מספר: 35 ישוב: תל אביב

קומות: 29 , 30 , 31 , 32

===
===

מו"מ כי בניגוד לרשום בכל מקום אחר בדף הרשימה
הפוליסה כפופה לתנאי
פוליסה לביטוח בתי עסק מנוביט 2015
ותנאי מפרט HI TECH - GUR LUXURY INSURANCE 2023 MENORA

===

פרק 1 - תכולת בית העסק
======================
סכום הביטוח לתכולה

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאן
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 2
ב ת י ע ס ק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

-------------------
בכתובת: ריהוט וציוד ו2סימולטורים
ציוד ומכונות 3,000,000
ציוד ומכונות - שיפור דיור
מלאי

סה"כ סכום ביטוח לתכולת
בית העסק בכתובת הנ"ל 3,000,000 6,386

בכתובת: מחשבים נייחים וציוד נלווה
ציוד ומכונות 2,300,000
ציוד ומכונות - שיפור דיור
מלאי

סה"כ סכום ביטוח לתכולת
בית העסק בכתובת הנ"ל 2,300,000 4,896

בכתובת: מחשבים ניידים
ציוד ומכונות 5,000,000
ציוד ומכונות - שיפור דיור
מלאי

סה"כ סכום ביטוח לתכולת
בית העסק בכתובת הנ"ל 5,000,000 10,644

הרחבות אופציונליות לפרק 1 - תכולת בית העסק
==========================================

פריצה ושוד - על בסיס נזק ראשון
------------------------------
הרחבת פריצה ושוד הינה על בסיס נזק ראשון
שאינו כפוף לביטוח חסר

השווי המלא של הרכוש המבוטח 10,300,000
סכום הביטוח לפריצה על בסיס
נזק ראשון 600,000 50.000 1,677

סכום הבטוח לפריצה על בסיס נזק ראשון לעיל, הינו אחד בלבד,
משותף לכל הכתובות בהם נרכשה הרחבת פריצה

אמצעי מיגון ואמצעים אחרים להקלת הסיכון-בנוגע להרחבת פריצה ושוד בפרק 1
=================================================================
המבוטח נוקט באמצעים הבאים:
1. בבית העסק מותקנת מערכת אזעקה שמחוברת למוקד שמירה וסיור אזרחי המגנה
על בית העסק (אם בוצע סקר מטעם המבטח, פרטי המערכת והחיבור למוקד הם

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

בתי עסק

דף מספר 3
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

כפי שמפורט בדו"ח הסקר) אשר מוחזקת במצב תקין במהלך תקופת הביטוח,
ומופעלת בכל עת שבית העסק אינו מאויש.
2. בכל אחד מהמקרים המפורטים להלן, המבוטח או מי שמחזיק במפתחות בית
העסק מטעמו, יגיע לבית העסק המבוטח, בתוך זמן סביר לאחר שקיבל הודעה
מהמוקד על קריאה שהתקבלה, יפתח את בית העסק ויבצע בתוכו ביקורת
פנימית ביחד עם הסייר מטעם המוקד:
(במקרה שכאשר המבוטח מגיע לעסק, סייר המוקד איננו במקום, המבוטח יתקשר
עם משטרת ישראל וימתין בסמוך לבית העסק עד הגעתה):
א. כאשר מתעורר חשד מכל סיבה שהיא כי אירעה חדירה לבית העסק.
ב. כאשר הפעלת מערכת האזעקה נעשתה לפחות משני אזורי גילוי.
ג. כאשר מערכת האזעקה לא העבירה "קוד רגיעה" למוקד.
ד. כאשר לסייר אין גישה לכל היקף חצרי בית העסק.
המבוטח מעגן את האמור לעיל בהסכם ההתקשרות בינו לבין המוקד.

פרק 2 - מבנה בית העסק
======================
סכום ביטוח למבנה בית העסק
-------------------------
| | | | |
|---|---|---|---|
| בכתובת: שיפורי מבנה | 24,000,000 | | 51,090 |

הרחבות אופציונליות לפרקים 1ו-2 תכולת ומבנה בית העסק
-----------------------------------------------------
| | | | |
|---|---|---|---|
| נזקי טבע כולל רעידת אדמה | 34,300,000 | | 58,413 |

------------------------
הפוליסה מורחבת לכסות נזקי טבע כולל רעידת אדמה,
סערה וסופה, גשם ושבר ענן, שלג וברד ושיטפון,
לתכולת ומבנה בית העסק

| | | | |
|---|---|---|---|
| הנחת אש | | -98.00 | -71,556 |

פרק 4 - אחריות מעבידים
======================

גבול האחריות למקרה ביטוח אחד 20,000,000

גבול האחריות לכל הפיצויים בגין כל מקרי
הביטוח שאירעו בתקופת הביטוח 20,000,000

מספר עובדים
-----------
עובדים לא מנהלתיים:
עובדים מנהלתיים: 360
סה"כ עובדים בעסק המבוטח: 360

53,389

פרמיה זו הינה פרמיה ארעית המחושבת על סמך אומדן מספר העובדים הצפוי

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 4
בתי עסק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

במשך תקופת הביטוח.
בתום תקופת הביטוח, תערך התאמת הפרמיה בהתאם למספר העובדים בפועל
במשך תקופת הביטוח.
ע"פ דרישת המבטח ,מתחייב המבוטח להמציא הצהרות בדבר מספר העובדים בתום
תקופת הביטוח בהתאם לדווח למוסד לביטוח לאומי ע"פ טופס 126 או
מחליפו.

תקנות ארגון הפיקוח על העבודה (ממונים על הבטיחות)
בעסק המעסיק מעל 50 עובדים
---------------------------------------------
מוצהר ומוסכם בזה כי אחריות המבטח בגין פרק 4 - חבות
המעביד כפופה בכך כי המבוטח עומד בתקנות הפיקוח על
העבודה (הממונים על הבטיחות) התשנ"ו - 1996 , במידה
והן חלות עליו, לרבות מינוי ממונה על הבטיחות, הגיהות
ובריאות העובדים, בעל "אישור כשירות" לתפקידו עפ"י
התקנות, המוודא במסגרת תפקידיו המפורטים בתקנות האמורות
- הכנה וביצוע תוכנית בטיחות.

פרק 5 - אחריות כלפי צד שלישי 6,897
============================
גבול האחריות לנזק 25,000,000
גבול האחריות לכל הפיצויים בגין כל
הנזקים שאירעו במשך תקופת הביטוח 25,000,000

עדכון פרמיה - צד ג' 17,227

הנחה חבויות ואחרים -37.00 -19,754

*****************************************************************

פירוט הכיסויים על-פי הפרקים:
============================

| | |
|---|---|
| תכולה בית העסק: | כן בתוקף |
| מבנה בית העסק: | כן בתוקף |
| פריצה שוד: | כן בתוקף |
| נזקי טבע תכולה: | כן בתוקף |
| רעידת אדמה תכולה: | כן בתוקף |
| נזקי טבע מבנה: | כן בתוקף |
| רעידת אדמה מבנה: | כן בתוקף |
| הכנסות בית העסק/ אובדן רווחים: | לא בתוקף |
| אחריות מעבידים: | כן בתוקף |
| אחריות כלפי צד שלישי: | כן בתוקף |
| סחורה בהעברה: | לא בתוקף |
| כספי בית העסק: | לא בתוקף |
| ציוד אלקטרוני: | לא בתוקף |

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

ת*=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 5
בתי עסק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

שעבוד
============
תגמולי בטוח עקב מקרה בטוח המכוסה לפי פוליסה זו, ישולמו לבעל/י השעבוד כמפורט להלן, לפי שעור זכות ההנאה שיש לו/להם ברכוש המבוטח עפ"י פוליסה זו ובהתאם לכל תנאי וסעיפי הפוליסה.

למרות כל הרשום בפוליסה ו/או בתוספת כלשהי לפוליסה, בדבר ביטול הביטוח עקב אי תשלום של פרמיה או חלק ממנה, או בדבר זכות ביטול הפוליסה על ידי המבטח בתוקף תנאי הפוליסה, לא יהיה תוקף לביטול הבטוח אלא ביום ובשעה הנקובים בהודעה שתימסר בכתב לבעל/י זכות ההנאה בפוליסה, לפחות 30 יום לפני מועד הביטול.

בעל/י השעבוד
============
בנק/מוסד: בנק דיסקונט
סניף : ראשי תל אביב
כתובת : יהודה הלוי 27 תל אביב

הרכוש המשועבד :
===============

**********************************************************************

כאשר מתבצעות עבודות בגובה- המבוטח נוקט באמצעים הבאים:
==============================================================

א. לא תבוצענה "עבודות בגובה" בתחום העסק אלא בהתאם למפורט בנוהל זה. המונח "עבודות בגובה" פירושו: עבודות על סולמות ו/או טיפול בעצים וגיזומם ו/או עבודות מתוך סלים להרמת האדם ו/או בימות ההרמה ו/או בתוך המקום המקיף. כל זאת לא מעבר לגובה של 2.5 מטר.
ב. האיזור בו מתבצעת העבודה, ברדיוס של 5 מטרים לפחות,יהיה פנוי מאנשים ומציוד ויוצב תיחום ושילוט ברור למניעת גישה. כמו כן, אם נדרש הדבר על פי הוראות רשמיות, יותקנו מעברים מקורים שרק דרכם יתאפשר מעבר אנשים וציוד.
ג. במקרה שהעבודה היא בטיפול ו/או בתחזוקה של מעטפת בניין, העבודה תתבצע על גבי מעלית חיצונית המיועדת לכך. הציוד והחומרים המשמשים לביצוע העבודה בגובה יהיו מקובעים למשטח העבודה.

**********************************************************************
**********************************************************************

כאשר מתבצעות עבודות בחום - המבוטח נוקט באמצעים הבאים:
=======================================================

לא תבוצענה "עבודות בחום" בתחום העסק אלא בהתאם למפורט בנוהל

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292
צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול



מנורה מבטחים ביטוח בע"מ
ת.ד. 927, תל אביב, מיקוד 6100802 03-7107777 03-7107788 *2000 www.menoramivt.co.il

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 6
ב ת י  ע ס ק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

זה. המונח "עבודות בחום" פירושו: עבודת הכרוכות בריתוך ו/או בחיתוך ו/או
בשימוש בתהליך או בפעילות מכל סוג ותיאור המבוצעים באמצעות חום או
היוצרים חום או ניצוצות בעת ביצועם:
1. הרחקת חומרים דליקים ברדיוס של 10 מ' ממקום הריתוך. חפצים דליקים
קבועים אשר אינם ניתנים להזזה, יכוסו במעטה בלתי דליק.
2. ליד מבצע העבודה יוצב "צופה אש" המצויד באמצעי כיבוי המתאימים
לכיבוי החומרים הדליקים הנמצאים בסביבת מקום ביצוע עבודות בחום
כהגדרתן לעיל. תפקידו של "צופה האש" הוא להשקיף על ביצוע העבודות
ולפעול באופן מיידי לכיבוי התלקחות כלשהי העלולה לנבוע מעבודות
הנ"ל. "צופה האש" יהיה נוכח במקום העבודה החל מתחילתה ולפחות
שעתיים לאחר סיומה, על מנת לוודא שלא נותרו כל מקורות התלקחות.

*****************************************************************

אמצעי מיגון ואמצעים אחרים להקלת הסיכון:
========================================
אמצעי המיגון ואמצעים אחרים להקלת הסיכון המפורטים להלן חלים על כל
פרקי הפוליסה. במידה ויש אמצעי מיגון ואמצעים אחרים להקלת הסיכון
שכתובים בכל פרק, הם באים בנוסף על האמצעים המפורטים להלן:

הכיסוי על פי הפוליסה או היקפו כפוף לקיומם, תקינותם
והפעלתם של האמצעים להקלת הסיכון כפי שנמצאו ותוארו
בסקר מס' 169205
מיום 11122023 , שם הסוקר אחר
כמפורט להלן:

מו"מ כי מבוטל מלל אמצעי הקלת הסיכון המתייחס
לפריצה ושוד כפי שרשום מעלה בדף הרשימה
ובמקומו ייקרא המלל שלהלן בהתאם להמלצות הסוקר:

מיגון קיים בעת ביצוע הסקר
ושאותו יש לשמר כמפורט להלן ובאופן תקין במשך כל תקופת הביטוח:

דלתות כניסה, עשויות זכוכית במסגרת אלומיניום, כל דלת ננעלת במנעול צילינדר.

דלתות כניסה לחדרי ממ"ד, עשויות עץ, כל דלת ננעלת במנעול צילינדר.

דלתות נוספות בקומה 29, עשויות ברזל, כל דלת ננעלת במנעול צילינדר.

חלונות זכוכית במסגרת אלומיניום, ננעלים בבריחים פנימיים.

חלונות קבועים, זכוכית במסגרת אלומיניום.
שמירה: שומר חברת שמירה מצוי בלובי הכניסה לבניין 24/7 בכל ימות השנה.
מצלמות: מותקנות מספר מצלמות פנימיות - אפשרות צפייה מרחוק באמצעות אפליקציה.
מספר מטפי כיבוי מסוג אבקה במשקל 6 ק"ג.

בשטח הציבורי 2 עמדות כיבוי אש, כל עמדה כוללת גלגלון " 3/4, ברז כיבוי הידרנט

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292
צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 7
ב ת י ע ס ק

סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

"2, שני זרנוקים ומזנק.

בקומות 30, 31 ו - 32 מותקנת עמדת כיבוי אש הכולל גלגלון כיבוי "3/4, ברז כיבוי הידרנט "2, שני זרנוקים ומזנק.
מותקנים גלאי עשן המחוברים למערכת גילוי אש / עשן הכללית במבנה.
מותקנת מערכת כיבוי אש אוטומטית במים, ספרינקלרים המהווה חלק ממערכת הכללית במבנה.
בלוח חשמל ראשי מותקנים גלאי עשן.

בנוסף
המבוטח יחזיק בהעתק מאישורי מיגון וינקוט באמצעי הקלת הסיכון כמפורט להלן:

**עבור סיכוני אש:

1 - המצאת אישור תחזוקה שנתי לאמצעי כיבוי אש ידניים ע"י חברה מוסמכת.

2 - המצאת אישור תחזוקה שנתי למערכת גילוי אש ועשן בהתאם לתקן 1220 חלק 11.

3 - המצאת אישור לתקינות מערכת החשמל כולל תאורת חרום
על ידי חשמלאי בודק מוסמך.

4 - המצאת אישור תחזוקה שנתי למערכת כיבוי אש אוטומטית מתזים (ספרינקלרים)
לפי תקן 1928.

**עבור סיכוני חבויות:

5 - כל דלתות המילוט אינן נעולות, ניתנות לפתיחה תקינה
וכל דרכי המילוט נקיות ממכשולים.

ה ש ת ת פ ו ת ע צ מ י ת
===========================
פרק 1 - תכולת בית העסק (למעט לעניין הכיסויים לנזקי טבע ו/או
רעידת אדמה, ו/או טרור אם נרכשו ע"י המבוטח): 2.5% מהנזק אך לא
פחות מ- 6,929 מכל מקרה ביטוח.
למרות האמור לעיל, לגבי הרחבת "שבר זכוכית" בלבד ההשתתפות העצמית
היא 1,000 מכל מקרה ביטוח.
-----------------------------------------------------------------
פרק 2 - מבנה בית העסק (למעט לעניין הכיסויים לנזקי טבע ו/או
רעידת אדמה, ו/או טרור אם נרכשו ע"י המבוטח):2.5% מהנזק אך
לא פחות מ- 6,929 מכל מקרה ביטוח.
למרות האמור לעיל, לגבי הרחבת "שבר זכוכית" בלבד ההשתתפות העצמית
היא 1,000 מכל מקרה ביטוח.
-----------------------------------------------------------------
פרק 4 - חבות המעביד:
1. מחלת מקצוע 27,720 לגבי כל נפגע ונפגע
2. כל מקרה ביטוח אחר 6929 לגבי כל מקרה ביטוח

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292
צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 8
בתי עסק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 0-26-290623-08-00 | 00 | | |

פרטי המבוטח: שם פפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

---

פרק 5 - אחריות כלפי צד ג': 6929 לגבי כל נזק

---

נזקי טבע (לא כולל רעידת אדמה) למבנה ותכולה:

5% מהנזק, כמפורט במהדורת הפוליסה, אך לא פחות מהמינימום ולא יותר מהמקסימום כמפורט להלן:
א. כשסכום הביטוח הוא עד 3,000,000 דולר:
מינימום 2,500 דולר, מקסימום 25,000 דולר

ב. כשסכום הביטוח הוא מעל 3,000,000 דולר:
מינימום 5,000 דולר, מקסימום 50,000 דולר

---

רעידת אדמה למבנה ותכולה

המבוטח יישא בהשתתפות עצמית בכל אבדן או נזק בגובה של 10% מסכום הביטוח לאתר בו נגרם הנזק, ובכל מקרה לא פחות מסך של מינימום 7,500 $ ולא יותר מסך של מקסימום 1,250,000 $ .

---

מו"מ כי למרות הרשום בכל מקום אחר בדף הרשימה ו/או במפרט ההשתתפות העצמית בפרקי הפוליסה הינה כמפורט להלן:

---

פרק 1 - תכולת בית העסק (למעט לעניין הכיסויים לנזקי טבע ו/או

רעידת אדמה,ו/או טרור אם נרכשו ע"י המבוטח): 6,000 ש"ח מכל מקרה ביטוח.

למרות האמור לעיל, לגבי הרחבת "שבר זכוכית" בלבד ההשתתפות העצמית

היא 1,000 מכל מקרה ביטוח.

פרק 2 - מבנה בית העסק (למעט לעניין הכיסויים לנזקי טבע ו/או

רעידת אדמה, ו/או טרור אם נרכשו ע"י המבוטח): 6,000 ש"ח מכל מקרה ביטוח.

למרות האמור לעיל, לגבי הרחבת "שבר זכוכית" בלבד ההשתתפות העצמית

היא 1,000 מכל מקרה ביטוח.

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

ב ת י  ע ס ק

דף מספר 9
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

פרק 3 - הכנסות בית העסק (למעט לעניין הכיסויים לנזקי טבע ו/או רעידת אדמה, ו/או טרור אם נרכשו ע"י המבוטח):

אבדן רווחים: 5 ימי העבודה הראשונים מכל מקרה ביטוח

פרק 4 - חבות המעביד:

1. מחלת מקצוע 20,000 ש"ח לגבי כל נפגע ונפגע

2. כל מקרה ביטוח אחר 10,000 ש"ח לגבי כל מקרה ביטוח.

פרק 5 - אחריות כלפי צד ג': 8,000 ש"ח לגבי כל נזק.

נזקי טבע (לא כולל רעידת אדמה) למבנה ותכולה:
--------------------------------------------------

5% מהנזק, כמפורט במהדורת הפוליסה, אך לא פחות מהמינימום ולא יותר מהמקסימום כמפורט להלן:

א. כשסכום הביטוח הוא עד 3,000,000 דולר:
מינימום 2,500 דולר, מקסימום 25,000 דולר

ב. כשסכום הביטוח הוא מעל 3,000,000 דולר:
מינימום 5,000 דולר, מקסימום 50,000 דולר

--------------------------------------------------

רעידת אדמה למבנה ותכולה:
------------------------------

המבוטח יישא בהשתתפות עצמית בכל אבדן או נזק בגובה של 10% מסכום הביטוח לאתר בו נגרם הנזק, ובכל מקרה לא פחות מסך של מינימום 7,500 $ ולא יותר מסך של מקסימום 1,250,000 $ .

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 10
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

ב ת י ע ס ק

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

===

**********************************

הרחבת גבולות טריטוריאליים ושטח שיפוט:
==========================================

גבולות טריטוריאליים ושטח שיפוט הפוליסה:
· מוסכם ומובהר כי הכיסוי עפ"י פוליסה זו אינו מוגבל לכתובות המצוינות ו/או שבוטחו תחת פרק הרכוש והכיסוי עפ"י הפוליסה הינו לכל מקום בו פועל המבוטח.
· בניגוד לאמור בסייג 2.12 ובהרחבה 3.1 לתנאי הפוליסה,
מוסכם כי פרק זה מכסה את אחריותו של המבוטח בגין נזקים שנגרמו בחו"ל על ידי עובדיו הנשלחים מטעמו בעת שהותם הזמנית מחוץ לגבולות המדינה, לרבות חבותם האישית של אנשים אלה.

הכיסוי לעניין הרחבה זו יהיה עפ"י הדין והשיפוט במקום הגשת התביעה.

לגבי תביעות שיוגשו בארה"ב ו/או קנדה ו/או
תביעות שתידונה בהתאם לחוק בארה"ב ו/או קנדה
יחולו התנאים והסייגים הבאים:

א. פרשנות הפוליסה תהיה על פי הדין הישראלי בלבד ובבתי משפט בישראל בלבד.

ב. הוצאות סבירות להגנה בפני תביעה לפיצוי המתנהלת בפני בית משפט בארה"ב ו/או קנדה ו/או בהתאם לחוק בארה"ב ו/או קנדה תחולנה אף מעבר לגבול האחריות של הפוליסה, אך תיבחנה

בהתאם להוצאות הנהוגות בבתי משפט בישראל ובהתאם לדין הישראלי.

ג. אין כיסוי בגין פעילות יצרנית מכל סוג למעט שיווק, מכירה, עבודות הרכבה, תיקונים ומעבדות

ד. חריג זיהום מוחלט

ה. כיסוי זה אינו מכסה אחריות כלשהי בגין קנסות, פיצויי ענישה ופיצויים לדוגמא.

השתתפות עצמית עבור הרחבה זו הינה 30,000 שקלים לכל מקרה ביטוח

===

***
הרחבות על בסיס נזק ראשון שאינו כפוף לביטוח חסר - בנוסף לסכומי הביטוח

הכיסוי על פי הרחבה זו מורחב לכלול
הוצאות מוגדלות וקבועות ע"ב נזק ראשון שאינו כפוף לביטוח חסר

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

ב ת י  ע ס ק

דף מספר 11
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|
| | | | צמוד למדד בש"ח |

עד לסך 5,000,000 ש"ח
מבלי לגרוע מכלליות האמור לרבות הוצאות לשעות נוספות של עובדים,
שכר עובדים מושבתים, שכירות ציוד ורכוש עד לרכישת ציוד חדש וכו'

***

הנחה -1
תוספת 61

תוספת 61 -18,143

*****************************************************************

לענפי הרכוש (במידה ונרכשו) יתווסף חריג בנוסח כדלקמן:

בניגוד לאמור בכל מקום אחר ולמען הסר ספק, יובהר כי הפוליסה מחריגה מכיסוי תביעות ו/או אירועים ו/או דרישות ו/או נזקים בקשר עם כל הפסד, נזק, חבות, תביעה, תשלום או הוצאה שנגרמה, נתרמה על ידי, תוצאה של, נובעת מ-, או בקשר עם, מחלה מדבקת כלשהי, בין אם באופן ישיר ובין אם עקיף, לרבות פחד או איום (אמיתי או לא) של ו/או ממחלה מדבקת.

לעניין זה, "מחלה מדבקת" תכלול כל מחלה מדבקת שהיא, לרבות וירוס, בקטריה, חיידק או מיקרואורגניזם וכן מגיפה, בין אם מוצהרת ו/או שאינה מוצהרת על ידי כל רשות מוסמכת, הכל בין אם מלווה בסימפטומים ובין אם לאו.

לתשומת לבך, ככל שחברתנו תדחה תביעה בהתבסס על קיומו של החריג, חובת ההוכחה לכך שהתקיימו הנסיבות המפורטות בחריג מוטלת על חברתנו.

לענפי החבויות (במידה ונרכשו) יתווסף חריג בנוסח כדלקמן:

בניגוד לאמור בכל מקום אחר ולמען הסר ספק, יובהר כי הפוליסה מחריגה מכיסוי תביעות ו/או אירועים ו/או דרישות ו/או נזקים בקשר עם כל הפסד, נזק, חבות, תביעה, תשלום או הוצאה שנגרמה, נתרמה על ידי, תוצאה של, נובעת מ-, או בקשר עם מגפה, בין אם באופן ישיר ובין אם עקיף, לרבות פחד או איום (אמיתי או לא) של ו/או ממגפה.

לעניין זה, "מגפה" תכלול מגיפה שהוצהרה ע" ארגון הבריאות העולמי ו/או כל רשות ממשלתית מוסמכת אחרת, בין אם מלווה בסימפטומים ובין אם לאו.

לתשומת לבך, ככל שחברתנו תדחה תביעה בהתבסס על קיומו של החריג, חובת ההוכחה לכך שהתקיימו הנסיבות המפורטות בחריג מוטלת על חברתנו.

למען הסר ספק, במקרה של הצהרת מגפה כאמור, החריג המפורט לעיל יחול אף על מקרים שאירעו קודם להצהרה זו.

*****************************************************************

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 12
בתי עסק
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 0-26-290623-08-00 | 00 | | |

פרטי המבוטח: שם פפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

******************************************************************
בניגוד לאמור בכל מקום אחר ולמען הסר ספק, יובהר כי פוליסה זו אינה מכסה כל אבדן ו/או נזק ו/או תביעה ו/או דרישה ו/או חבות, ככל שמתן כיסוי בגינם או תשלום בגינם יחשפו את המבטח ו/או את מבטחי המשנה שלו להפרת סנקציות ו/או הגבלות ו/או איסורים שהוטלו ע"י ממשלת ארה"ב ו/או ממשלת בריטניה ו/או האיחוד האירופי ו/או ארגון האומות המאוחדות.
******************************************************************
******************************************************************

ככל שנרכש כיסוי לרכוש - יופיע הנוסח שלהלן:
-------------------------------------------

1 - בניגוד לאמור בכל מקום אחר, פוליסה זו מחריגה כל אובדן, נזק, חבות, עלות, תביעה, קנס או הוצאה מכל סוג, שנובעים, בין במישרין בין בעקיפין, על ידי ו/או בקשר עם ו/או כתוצאה מ:

1.1 - אובדן, נזק, שינוי, ירידה בתפקודיות, זמינות או פעולה של מערכות מחשב

1.2 - הרס, עיוות, מחיקה, השחתה, אובדן שימוש, ירידה בתפקודיות, תיקון, החלפה, שחזור או שכפול של נתונים, לרבות כל סכום הנוגע לערך נתונים אלו.

2 - בכפוף לשאר תנאי וחריגי הפוליסה, חריג זה לא יחול בגין נזק פיזי לרכוש המבוטח תחת הפוליסה או בגין אובדן תוצאתי (במידה ונרכש במסגרת הפוליסה), שנגרם כתוצאה ישירה מהתממשות אחד או יותר מהסיכונים המבוטחים תחת הפוליסה.

הגדרות:
--------

1 - מערכות מחשב - כל מחשב, חומרה, תוכנה, מערכת תקשורת, מכשיר אלקטרוני (לרבות אך לא מוגבל לטלפון חכם, מחשב נייד, לאפטופ, התקן לביש), שרת, ענן או בקר זעיר כולל כל מערכת דומה או תצורה של האמור לעיל, וכולל כל קלט, פלט, התקן אחסון נתונים, ציוד רשת או ציוד גיבוי.

2 - נתונים - מידע, עובדות, מושגים, קודים או כל מידע אחר מכל סוג שהוקלט או הוסב לצורה לצורך שימוש, גישה, עיבוד, שידור או איחסון באמצעות מערכת מחשב.

ככל שנרכש כיסוי חבויות - יופיע הנוסח שלהלן:
---------------------------------------------

1 - בניגוד לאמור בכל מקום אחר, פוליסה זו מחריגה כל אובדן, נזק, חבות, עלות, תביעה, קנס או הוצאה מכל סוג, שנובעים, בין במישרין בין בעקיפין, על ידי ו/או בקשר עם ו/או כתוצאה מ:

1.1 - אירוע סייבר או פעולת סייבר, לרבות כל פעולה הנעשית לצורך שליטה, מניעה, תיקון או תמיכה עקב אירוע סייבר או פעולת סייבר.

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

בתי עסק

דף מספר 13
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|
| | | | צמוד למדד בש"ח |

1.2 - הרס, עיוות, מחיקה, השחתה, אובדן שימוש, ירידה בתפקודיות, תיקון, החלפה, שחזור, שכפול, אובדן או גניבה של נתונים, לרבות כל סכום הנוגע לערך נתונים אלו.

הגדרות:
-------

1 - מערכות מחשב - כל מחשב, חומרה, תוכנה, מערכת תקשורת, מכשיר אלקטרוני (לרבות אך לא מוגבל לטלפון חכם, מחשב נייד, לאפטופ, התקן לביש), שרת, ענן או בקר זעיר כולל כל מערכת דומה או תצורה של האמור לעיל, וכולל כל קלט, פלט, התקן אחסון נתונים, ציוד רשת או ציוד גיבוי אשר נמצא בבעלות המבוטח או המופעל על ידו או על ידי צד שלישי כלשהו.

2 - פעולת סייבר - פעולה בלתי מורשית, זדונית או פלילית, או סידרה של מעשים לא מורשים זדוניים או פליליים, ללא תלות בזמן או במקום או איום או תרמית הנוגעים לגישה, עיבוד או הפעלה של מערכת מחשב כלשהי, לרבות אך לא מוגבל להחדרת תוכנות רוגלה, תוכנות זדוניות, תולעים, סוסים טרויאניים, פגיעה בפרטיות, פגיעה באוטונומיה של הרצון, הפרת חוק הפרטיות, חשיפה ופרסום לא מורשים של נתונים ומידע אישי ועיסקי של לקוחותו /או צדדים שלישיים.

3 - אירוע סייבר - כל טעות, או מחדל או סידרה של טעויות או מחדים הנוגעים לגישה, עיבוד, שימוש או הפעלה של מערכת מחשב או אי נגישות או כשל חלקי או מוחלט לגישה, עיבוד, שימוש או הפעלה של מערכת מחשב כלשהי.

4 - נתונים- מידע, עובדות, מושגים, קודים או כל מידע אחר מכל סוג שהוקלט או הוסב לצורה לצורך שימוש, גישה, עיבוד, שידור או איחסון באמצעות מערכת מחשב.

*****************************************************************
*****************************************************************
הנחיות כלליות בנוגע לעמדות טעינה לכלי רכב חשמליים:
הכיסוי הביטוחי או היקפו כפוף לקיומם, תקינותם והפעלתם של האמצעים הבאים להקלה בסיכון:
1. בידי המבוטח הצהרת יבואן או הצהרת יצרן המאמתת שעמדת/מערכת/התקן הטעינה עומדים בדרישות תקן מס' 61851.
2. בידי המבוטח טופס בדיקה חתום ע" חשמלאי בודק המאשר כי עמדת/מערכת/התקן הטעינה מותקנים בהתאם להנחיות מינהל החשמל בדבר התקנת מערכת טעינה לרכב חשמלי ושהם מאושרים לחיבור לרשת.
3. הטענת כלי הרכב מתבצעת תוך שימוש בציוד תקני של יצרן המתקן ונעשה שימוש בכבל המקורי של היצרן המותאם לסוג הרכב הנטען.
4. חל איסור על שימוש בכבל מאריך או על הטענת יותר מכלי רכב אחד בכל בית תקע.
5. עמדת/מערכת/התקן הטעינה מותקן באופן קבוע על משטח יציב ובטיחותי.
*****************************************************************

באפשרותך לפנות לחברתנו בבקשה לרכישת פוליסה זו ללא דרישות לאמצעי

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

ב ת י ע ס ק

דף מספר 14
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 00-08-290623-26-0 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

מיגון ואמצעים להקלת הסיכון המפורטים ברשימה זו, כאמור לעיל, ובמידה ולאחר תהליך חיתום ובדיקה של חברתנו, תאושר פוליסה שכזו - יהיה באפשרותך לרכוש אותה בתעריף שלא יפחת מ-% 0.47 .
אם הפוליסה כוללת גם כיסוי לפריצה, יתווסף לכך תעריף שלא יפחת מ- 0.74% לכיסוי פריצה.
אם הפוליסה כוללת גם כיסוי לכספים, יתווסף לכך תעריף שלא יפחת מ- 1.5% לכיסוי כספים.
אם הפוליסה כוללת גם כיסוי לסחורה בהעברה, יתווסף לכך תעריף שלא יפחת מ- 5.5% לכיסוי סחורה בהעברה.
אם הפוליסה כוללת גם כיסוי לציוד אלקטרוני, יתווסף לכך תעריף שלא יפחת מ-% 2.65 לכיסוי ציוד אלקטרוני.
אם הפוליסה כוללת גם כיסוי לאחריות מעבידים, בפרמיה שלא תפחת מ-1,097 ש"ח לכל עובד לגבולות אחריות של 6,000,000 ש"ח למקרה ביטוח אחד ו-20,000,000 ש"ח לכל הפיצויים בגין כל מקרי הביטוח שארעו במשך תקופת הביטוח.
אם הפוליסה כוללת גם כיסוי לאחריות כלפי צד שלישי, בפרמיה שלא תפחת מ-3,500 ש"ח לגבולות אחריות של 500,000 ש"ח לנזק ולכל הפיצויים בגין כל הנזקים שארעו במשך תקופת הביטוח.
אישור הבקשה וגובה הפרמיה יושפעו, בין היתר, ממידת הסיכון (לרבות ניסיון התביעות) של הרכוש או החבות המבוטחים.

***********************************************************************
מבוטח/ת יקר/ה,
הנך מתבקש לקרוא היטב את דף הרשימה ואת תנאי הפוליסה שנשלחים אליך כעת.
בכל שאלה, הבהרה, תיקון או שינוי, אנא פנה לסוכן הביטוח שלך ו/או לחברתנו.
ט.ל.ח.
***********************************************************************
***********************************************************************
רשות שוק ההון, ביטוח וחסכון הקימה אתר אינטרנט מאובטח שיאפשר לך לראות במרוכז את מוצרי הביטוח שלך בכל חברות הביטוח בישראל, וזאת על בסיס נתונים שיועברו אליהם ע"י חברות הביטוח,במידה ואינך מעוניין שנעביר הנתונים לרשות שוק ההון, ניתן לפנות לחברתנו בבקשה להסרה מהדיווח בכתובת המייל Har.bit@menora.co.il.
לידיעתך, אי העברת הנתונים לרשות שוק ההון תמנע ממך לראות במרוכז באתר האינטרנט המאובטח את מוצרי הביטוח שלך בכל חברות הביטוח בישראל.
כמו כן, רשות שוק ההון הקימה מאגר נוסף, המאפשר למבוטחים ולמוטבים של מבוטחים שנפטרו, לאתר חסכונות פנסיוניים. במידה והנך מעוניין שבקשת ההסרה תחול גם על הנתונים המועברים למאגר זה אנא ציין זאת בבקשתך.
***********************************************************************

***********************************************************************
מידע אישי אודותיך יעובד במאגר בשליטת מנורה מבטחים ביטוח ומנורה מבטחים פנסיה וגמל ("מנורה")* לצורך התקשרות וטיפול בביטוחים ובחשבונות במוצרים הפנסיוניים והפיננסיים שלך ובכל העניינים הקשורים לאלה, לרבות בכלים מתקדמים, לצורך מתן השירות ושיפורו, ניתוחים ומחקרים סטטיסטיים; וכן לצורכי שווק (ככל דיוור

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# רשימה לביטוח (מפרט)

מנורה מבטחים

דף מספר 15
סוכנות טל. סוכן: 03-6142121
שם הסוכן אמנון גור ס.ביטוח בע''
מס' הסוכן 503292 מס' תא: 164
מועד תחילת הביטוח 01/07/26
מועד תום הביטוח 30/11/27 חצות
סה"כ ימי ביטוח:518 ימים

ב ת י  ע ס ק

| מספר פוליסה | תוספת | מספר הוראת קבע | מספר לקוח |
|---|---|---|---|
| 0-26-290623-08-00 | 00 | | |

פרטי המבוטח: שם פאפאייה גיימינג בע"מ
המען המסגר 35 תל אביב מיקוד 6721407
פרטים חברה: 51542209-5

| דמי ביטוח לתקופה | דמי רישום והטלים | דמי פוליסה תוספות | סה"כ דמי ביטוח | דמי אשראי | סה"כ לתשלום |
|---|---|---|---|---|---|
| | | | | | |

| תאור הכיסוי | סכום ביטוח | תעריף % | דמי ביטוח לתקופה |
|---|---|---|---|

צמוד למדד בש"ח

ישיר). אלא אם בקשת אחרת לעניין זה מקום שהדין מאפשר זאת. המידע עשוי לעבור לספקים ולצדדים שלישיים לצורך מימוש המטרות לעיל ובכפוף להוראות הדין. ברוב המקרים אין חובה חוקית למסור את המידע אך בלעדיו לא נוכל לספק לך את השירות/ המוצר המבוקש. לפרטים על זכויותיך לעיון ותיקון מידע אישי ולדרכי פנייה לממונה על הגנת הפרטיות, מצורף קישור למדיניות הפרטיות.
HTTPS://www.menoramivt.co.il/general/privacy-policy.
*לרבות שומרה חברה לביטוח בע"מ, אי.אר.אן ישראל בע"מ וחברות אחרות בקבוצה.
**********************************************************************

תשלום דמי הביטוח:
-----------------

1. דמי הביטוח ישולמו ב- 12 תשלומים.
2. התשלומים יהיו חודשיים, שווים ורצופים ויסתיימו עד תום תקופת הביטוח.
3. דמי האשראי ישולמו לפי ריבית שנתית בשיעור 12%, ויחושבו בהתאם למספר הימים ממועד תחילת הביטוח ועד למועד תחילת הגבייה על ידי החברה.
4. בפוליסות שהופקו עד לחודש מתחילת הביטוח ומשולמות בהוראת קבע, במזומן, או בשיקים ב-1 עד 4 תשלומים, או פוליסות המשולמות בכרטיס אשראי ב-1 עד 3 תשלומים, לא ישולמו דמי אשראי. במקרה כזה ישלם המבוטח את דמי הביטוח כמפורט בכותרת הפוליסה ברכיב "סה"כ דמי ביטוח".
5. תשלום דמי הביטוח בפוליסה שקלית יהיו צמודים למדד המחירים לצרכן הידוע ביום תחילת הביטוח.

מבוטח/ת נכבד/ת, נא הקפד/י על תשלום דמי ביטוח במועד.
פיגור בתשלום דמי הביטוח עלול להביא לביטול הפוליסה.

המסמך בוצע ע"י
תאריך
מקום סוכן מרכז: 503292

צוות מטפל: צוות פרט - מירב שי מאנ
609 גיל ברמן
30/06/26
מחוז מרכז אלמנטרי

מס' אסמכתא

*ת=תוספת ב=ביטול

# העתק ביטוח נסיעות

הפניקס

# smart group

**שלום רב,**

## דף פרטי הביטוח למבוטחי **פאפאייה גיימינג בע"מ**

## פוליסה מס' **26/007/377/1012842**

החל מתאריך- **22.04.2026** ועד לתאריך **21.04.2027** מבוטחי **פאפאייה גיימינג בע"מ -** היוצאים לחו"ל מטעם החברה מבוטחים בביטוח נסיעות לחו"ל קבוצתי באמצעות הפניקס חברה לביטוח בע"מ.

להלן לינק להורדת אפליקציה של אייר דוקטור המאפשרת בעת הצורך למבוטח לאתר רופא בהתאם לסוג ההתמחות הנדרש, בקרבת המקום בו הוא נמצא, לבחור איך המבוטח מעוניין לקבל את הטיפול האם להגיע לקליניקה של הרופא, להזמין את הרופא למלון או לקיים שיחת וידאו עם רופא מקומי לקבלת מרשם או הפנייה, וכמובן אפילו לדלג על התשלום.

התשלום לרופא מועבר ישירות על ידי הפניקס ללא צורך של המבוטח לשלם ואח"כ לתבוע החזר.

כל זה בממשק ידידותי ופשוט, בעברית, 24/7 וללא כל מאמץ.

לינק להורדת האפליקציה : https://www.air-dr.com/webapp/?data=eyJjIjoiMSJ9#policy

**להסבר אודות השימוש באפליקציה לחץ כאן**

במקרה שנדרש אשפוז יש לפנות למוקד הסיוע **הפועל 24 שעות ביממה**

בטלפון **+972-74-7897016**

כל התשלומים לבתי החולים וההתחייבויות הכספיות ייעשו על ידי מוקד הסיוע בלבד בכפוף לתנאי הפוליסה.

הפניקס

**אנחנו מקווים שתהיה לך נסיעה רגועה בדיוק כמו שתכננת,**
אנחנו זמינים עבורך בכל מקום

## מוקד סיוע לשוהים בחו״ל במקרה חירום 24/7

**טלפון:** 972-74-7897016
**מייל:** info@medassis.org
**וואטסאפ:** 972-50-2241953

במידה והמבוטח אושפז בבית חולים בחו״ל יש ליידע מיידית את מוקד הסיוע לקבלת הנחיות להמשך טיפול

**שעות פעילות:** 24 שעות, 7 ימים בשבוע

SOS
24/7

## מוקד שירות לקוחות הפניקס

**חיוג מישראל:** 03-7338141
**חיוג מחו״ל:** 972-3-7338141
**וואטסאפ:** 054-9893455
**מייל:** tr@fnx.co.il

**שעות פעילות:** ימים א׳-ה׳, 8:00-16:00

## מוקד שירות לקוחות לאפליקציה, ניתן באמצעות חברת Airdoctor

**טלפון:** 972-3-5457547
**מייל:** support@air-dr.com

**וואטסאפ:** 054-9958615

**שעות פעילות:** 24 שעות, 7 ימים בשבוע

הפניקס

# להלן עיקרי הכיסויים:

| הכיסוי | הסעיף בפוליסה | תקרת גבול אחריות המבטח | השתתפות עצמית |
|---|---|---|---|
| תקרת גבול אחריות כוללת לפוליסה UNLIMITED | | | |
| הוצאות רפואיות בעת אשפוז בחו"ל | 2.1 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הוצאות העברה ברכב יבשתי ממקום האירוע לבי"ח קרוב | 2.2 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| פינוי אווירי או ימי ממקום האירוע בחו"ל לבי"ח קרוב באמצעות המבטח | 2.2 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הטסה רפואית מחו"ל למדינת האם/מוצא של המבוטח בקרות אירוע באמצעות המבטח | 2.3 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הוצאות רפואיות שלא בעת אשפוז בחו"ל | 3.1 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| תרופות מרשם שלא בעת אשפוז בחו"ל | 3.2 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| טיפול חירום בשיניים בחו"ל | 3.3 | עד $1000 | ללא |
| הוצאות איתור וחילוץ (למעט אם פרק זה לא צוין בדף פרטי הביטוח) | פרק 4 | עד 250,000 $ לנפאל ודרום מרכז אמריקה<br>עד 500,000 $ לשאר העולם | ללא |
| החזר הוצאות מיוחדות בחו"ל | פרק 5 | | |
| החזר הוצאות עקב שהות בחו"ל מעבר לתקופת הביטוח, בעקבות אירוע בתקופת הביטוח | 5.1 | כרטיס נסיעה למבוטח ו/או למלווה עד $2,000 במחלקת תיירים בלבד | ללא |
| | | מלון בחו"ל עד $100 ללילה למבוטח ו/או למלווה | |
| הוצאות הטסת מלווה למקום אשפוזו של המבוטח בחו"ל | 5.2 | כרטיס נסיעה למקום אשפוזו של המבוטח בחו"ל במחלקת תיירים בלבד עד לסך של $2,000 | ללא |
| | | הוצאות נסיעה משדה התעופה למקום האשפוז בחו"ל וחזרה עד לסך של $150 | ללא |
| | | הוצאות לינה בחו"ל עד $100 ללילה ועד $2000 | ללא |
| הוצאות העברת גופה מחו"ל למדינת האם/מוצא של המבוטח באמצעות המבטח | 5.3 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הוצאות רפואיות שלא בעת אשפוז כתוצאה מהריון עד שבוע 12 שאובחן לראשונה בחו"ל | 5.4.1 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הוצאות רפואיות בעת אשפוז כתוצאה מהריון עד שבוע 12 שאובחן לראשונה בחו"ל | 5.4.2 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| | פרק 6 | $ 250,000 | ללא |

הפניקס

| | | | |
|---|---|---|---|
| חבות כלפי צד שלישי בשל אירוע בחו"ל (למעט אם פרק זה לא צוין בדף פרטי הביטוח) | | | |
| כבודה (שיפוי בגין אובדן/גניבה בקיזוז שיפוי/פיצוי ממוביל אווירי/יבשתי/ימי/גורם אחראי צד ג') | פרק 9 | $ 3,000 | |
| ערך פריט | 9.2.1 | $300 | ללא |
| דברי ערך | 9.2.2 | $ 550 | ללא |
| גניבה של מזוודה/ תרמיל/ תיק גב/ ארנק | 9.2.3 | $ 150 | ללא |
| שיפוי בגין פריטים חיוניים עקב איחור בהגעת כבודה בחו"ל | 9.2.4 | $ 200 | ללא |
| הוצאות לשחזור מסמכים | 9.2.5 | $ 300 | ללא |
| הפסד תשלומים בגין ביטול/קיצור נסיעה | פרק 10 | | |
| הפסד תשלומים בגין ביטול נסיעה | 10.1 | עד $6,000 מתוכם כרטיסי טיסה עד $2,000 במחלקת תיירים בלבד | ללא |
| הפסד תשלומים בגין קיצור נסיעה | 10.2 | עד $6,000 מתוכם כרטיסי טיסה עד $2,000 במחלקת תיירים בלבד | ללא |
| ספורט אתגרי | פרק 11 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| ספורט חורף | פרק 12 | כלול בתקרת גבול האחריות לפוליסה- בתנאי שקיים הצהרה לפני הוצאת ההסכם . | ללא |
| גניבה של מחשב נייד/מחשב לוח (טאבלט) בחו"ל | פרק 16 | עד $1,500, מכלי רכב עד $300 | $100 |
| הוצאות בגין החמרה בחו"ל בלתי צפויה של מהלך הריון שגרתי עד שבוע 32 של מבוטחת שגילה עד 46 | פרק 17 | עד $ 250,000 | ללא |
| החמרה בלתי צפויה של מצב רפואי קודם | פרק 18 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| Smart international group | פרק 19 | כלול בתקרת גבול האחריות לפוליסה | ללא |
| הוצאות מיוחדות לפני ואחרי היציאה לחו"ל עקב מגיפה | פרק 20 | | |
| הפסד תשלומים בגין ביטול נסיעה | 20.1 | עד $6000 מתוכם כרטיסי טיסה עד $2000 במחלקת תיירים בלבד. | ללא השתתפות עצמית |
| החזר הוצאות הארכת שהות בחו"ל מעבר לתקופת הביטוח עקב מגיפה | 20.4 | כרטיסי נסיעה למבוטח ו/או למלווה עד $3000 במחלקת תיירים בלבד.<br>מלון בחו"ל עד$100 ללילה למבוטח ו/או למלווה.<br>החזר הפסד הוצאות בגין אשפוז עקב מגיפה עד $1500 לכל תקופת הביטוח.<br>במקרה של הוצאות מילוט עקב התראה לפני סגר על רקע מגיפה במדינת היעד לא תעלה על $250 לכל תקופת הביטוח. | ללא השתתפות עצמית |

- **הפסד תשלומים בגין קיצור/ביטול נסיעה-** מוסכם כי הרחבה זו לא תחול ביחס למבוטח אשר "בן משפחה קרוב" כהגדרתו בפוליסה שלו הנו ב"מצברפואי קודם" כהגדרתו להלן/ בהיריון, אלא אם כן המבוטח מטעם בעל

הפניקס

הפוליסה מילא את הצהרת הבריאות המצורפת כנספח ג' להסכם זה והתקבל לביטוח על ידי המבטח לאחר חיתום רפואי כאמור, לרבות קבלה בהחרגות ו/או תוספות רפואיות כלשהן אשר עברו את אישורו של המועמד לביטוח ולפיכך, המעסיק מתחייב לעדכם את המבוטחים בעניין זה כדי שאם קיים להם בן משפחה קרוב במצב רפואי קודם, יידעו שעליהם למלא את הצהרת הבריאות ולהעבירו למבטח לצורך חיתום רפואי

- בן משפחה קרוב: בן/בת זוגו של המבוטח כולל בן או בת זוג מאותו מין, הורה, ילד/ה (גם אם מי מהם בבחינת חורג/ת ו/או מאומץ/ת), אח/ות , סבא/סבתא, נכד/ה .

- מצב רפואי קודם: מחלה שבשלה היה בן משפחה קרוב בטיפול או בהשגחה בעת צאתו לחו"ל של המבוטח או במשך ששת החודשים שקדמו לצאתו.

- החמרה של מצב רפואי קודם: שינוי לרעה, פתאומי ובלתי צפוי, במצב בריאותו של בן משפחה קרוב מחמת מצב רפואי קודם.

**<u>הערות כלליות:</u>**

- הכיסוי הביטוחי הינו בכפוף לתנאי הפוליסה המלאים "הפניקס SMART GROUP מהדורה אפריל 2021 " לרבות רשימת הסייגים והחריגים ובכפוף להסכם ההתקשרות בין המבטח לבעל הפוליסה.

- הכיסוי הביטוחי יינתן למבוטחים עד גיל 75 כולל בלבד.

- הכיסוי הביטוחי יינתן עד 180 ימים ברצף לכל נסיעה אחת של מבוטח.

- דמי הבטוח ישולמו למבטח על ידי בעל הפוליסה

- הכיסוי יינתן לעובדי בעל הפוליסה ו/או בני זוג/ ו/או ילדיו המתלווים לעובד שיצא לחו"ל ו/או נותני/ספקי שירותים לבעל הפוליסה **לצורך נסיעה עסקית <u>בלבד</u> (עבודה עבור/מטעם בעל הפוליסה בלבד)** ו/או **נסיעה עסקית המשולבת עם נסיעה פרטית שהינה ברצף ולאחר תום הנסיעה העסקית.** לעניין סעיף זה המונח "חו"ל" מתייחס ליציאת המבוטחים אל מחוץ לארץ מגוריהם הקבועה.

- לא ישלם המבטח תגמולי ביטוח לפי פוליסה זו במידה ומקרה הביטוח ארע באחד מהיעדים שהפוליסה לא תקפה בהן: שטחים בשליטה או ניהול הרשות הפלסטינאית ובמדינות אויב לפי הגדרת משרד החוץ הישראלי.

הפניקס

2399-00 גור אמנון 2000 בע"מ עותק למבוטח דף-1

ת ו ס פ ת ל ב י ט ו ח - ביטוח נסיעות לחו"ל (06)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ענף: 377 פוליסה:26/007/377/1012842 תוספת: 1 | דולר ארה"ב
| פרמיה נטו .00
| דמי רישום .00
בעל הפול.: פאפאייה גיימינג בע"מ | דמי פוליסה .00
| הטלים .00
כתובת : המסגר 36 |
תל אביב - יפו מיקוד: 67211 | --------------
מס. מזהה : 515422095/ח | לתשלום במזומן .00
תקופת הביטוח: מ-22/04/2026 שעה: 00:01 | 0.00% דמי אשראי .00
עד-21/04/2027 שעה: 24:00 | --------------
| סה"כ לתשלום .00

---------------------------------------------+----------------------------

כל הסכומים נקובים בדולר ארה"ב
----------------------------

| תאור הכסוי | השינוי | סכום מעודכן | שעור הפרמיה | הפרש פרמיה שנתית |
|---|---|---|---|---|
| | | | | |

חדש
איתור וחילוץ- דרום אמריקה /נאפל 250,000$ שאר העולם 500,000$
כיסוי כבודה- 3000$

**********************************************************************

בשם החברה: זיו שרעבי
הפניקס
חברה לביטוח בע"מ

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

תאריך הדפסה: 20/04/2026 זהוי לקוח: 515422095/ח
פוליסה קודמת:25/007/377/1012842 זהוי משני:5804750
קולקטיב:15857
חודש בורדרו:04/2026 מקיש:76019 מאשר:76019

חתם:אוחנה הני צוות:בריאות שיניים וקולקט אשכול:בריאות
עותק למבוטח שם הסוכן : גור אמנון 2000 בע"מ

1

# העתק ביטוח בריאות קבוצתי לעובדים




# ביטוח בריאות קבוצתי

## לעובדי פאפאיה גיימינג
## ובני משפחותיהם

הראל
ביטוח ופיננסים

גיל ורדי סוכנות לביטוח בע"מ
לוקחים את הבריאות שלך באופן אישי
מקבוצת "אלון-אשכנזי"

**עובדי פאפאיה ובני משפחותיהם היקרים,**

אנו שמחים להציג בפניכם את פוליסת ביטוח הבריאות של פאפאיה.

תוכנית זו נבנתה במיוחד עבורכם כחבילת בריאות אחידה, מקיפה ומתקדמת, המעניקה מענה לצרכים הבריאותיים המגוונים שעלולים להתעורר, ואשר אינם מכוסים במלואם על ידי קופות החולים.

בריאותכם ובריאות יקיריכם עומדות בראש סדר העדיפויות שלנו. ביטוח הבריאות נועד להעניק לכם שקט נפשי - לכל מצב בהווה ולכל צורך רפואי בעתיד.

בחוברת זו תמצאו מידע מפורט ומעודכן שיסייע לכם למצות את כל הזכויות המגיעות לכם.

**שירות ותפעול**

לצורך הצטרפות לביטוח, בירורים, התייעצויות וקבלת שירות אישי ומקצועי למימוש זכויותיכם, אנו מזמינים אתכם לפנות אל סוכנות "גיל ורדי".

הסוכנות זמינה לכל שאלה או בקשה בנושאי הצטרפות לביטוח, בירור זכויות, הגשת תביעות וכל צורך נוסף.

בברכת בריאות שלמה,

משאבי אנוש

פאפאיה

# תוכן עניינים


**גילוי נאות** ..... **4**

**פוליסה לביטוח בריאות קבוצתי לעובדי פאפאייה גיימינג ובני משפחותיהם** ..... **18**

פרק א׳: השתלות וטיפולים מיוחדים מחוץ לישראל ..... 32

פרק ב׳: ביטוח תרופות מחוץ לסל הבריאות ..... 36

פרק ג׳: ביטוח לניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל ..... 40

פרק ד׳: ניתוחים משלים שב״ן ללא השתתפות עצמית ..... 44

פרק ה׳: ניתוחים וטיפולים מחליפי הניתוח בישראל ..... 49

פרק ו׳: ביטוח לשירותים רפואיים אמבולטוריים ..... 53

פרק ז׳: שיפוי בגין הוצאות לגילוי מחלה קשה ..... 58


סטודיוהראל 47538.1 גרסה 001 01/2025

# גילוי נאות

| כתובת אתר האינטרנט | אבא הלל 3, | כתובת הדואר האלקטרוני | טלפון 2735* |
|---|---|---|---|
| www.harel-group.co.il | ת"ד 10951, רמת גן 5252202 | polisotbs@harel-ins.co.il | פקס 037348178 |

## תמצית תנאי הביטוח - ביטוח בריאות קבוצתי לעובדי פאפאייה גיימינג ובני משפחותיהם

| תמצית פרטי הפוליסה | |
|---|---|
| שם הביטוח | ביטוח בריאות קבוצתי לעובדי פאפאייה גיימינג ובני משפחותיהם |
| סוג הביטוח | **פרק א'** - השתלות וטיפולים מיוחדים מחוץ לישראל<br>**פרק ב'** - תרופות מחוץ לסל הבריאות<br>**פרק ג'** - ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל<br>**פרק ד'** - ניתוחים משלים שב"ן ללא השתתפות עצמית<br>**פרק ה'** - ניתוחים וטיפולים מחליפי הניתוח בישראל (ניתוחים שקל ראשון ללא השתתפות עצמית)<br>**פרק ו'** - שירותים רפואיים אמבולטוריים<br>**פרק ז'** - שיפוי בגין הוצאות לגילוי מחלה קשה, |
| תקופת הביטוח | 5 שנים, החל מיום 01.01.2025 ועד ליום 31.12.2029. |

| תמצית פרטי הפוליסה | |
|---|---|
| תיאור הביטוח | **השתלות וטיפולים מיוחדים מחוץ לישראל**<br>כיסוי לשיפוי בגין הוצאות רפואיות ונלוות הקשורות בהשתלה או לטיפול המיוחד כמפורט בפרק, לרבות הוצאות לצוות הרפואי, הוצאות טיסה ושהיה, קצבה חודשית למועמד להשתלה וגמלת החלמה על פי תנאי הפוליסה.<br>**תרופות מחוץ לסל הבריאות**<br>כיסוי לרכישת תרופות שאינן כלולות בסל שירותי הבריאות או שאינן מכוסות בסל הבריאות למצבו הרפואי של המבוטח בגין התוויה וכל זאת על פי סוגי התרופות המפורטות בפרק זה. כמו כן, ניתן כיסוי לטיפול רפואי הכרוך בנטילת תרופה כמפורט בפרק זה.<br>**ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל**<br>כיסוי להוצאות רפואיות בחו"ל הקשורות בניתוחים וטיפול מחליף ניתוח שבוצעו בחו"ל וכן כיסוי להוצאות הנלוות להן.<br>**כיסוי לניתוחים משלים שב"ן ללא השתתפות עצמית**<br>מיועד לבעלי שב"ן - כיסוי מעל הזכאות בשב"ן בגין הוצאות רפואיות בישראל הקשורות בניתוח, התייעצויות וטיפול מחליף ניתוח שבוצעו בישראל באמצעות רופא ו/או מוסד רפואי, אשר יש למבטח עמו הסדר ניתוח או הסדר התייעצות, לפי העניין.<br>**ניתוחים וטיפולים מחליפי הניתוח בישראל - ניתוחים שקל ראשון ללא השתתפות עצמית**<br>כיסוי להוצאות רפואיות בישראל הקשורות בניתוח, התייעצויות וטיפול מחליף ניתוח שבוצעו בישראל באמצעות רופא ו/או מוסד רפואי, אשר יש למבטח עמו הסדר ניתוח או הסדר התייעצות, לפי העניין.<br>**ביטוח לשירותים רפואיים אמבולטוריים**<br>השתתפות בהוצאות בהן נשא בפועל מבוטח הנזקק עקב בעיה רפואית לאחד מהשירותים האמבולטוריים כגון חוות דעת רפואית, בדיקות אבחנתיות, טיפולים פיזיותרפיים והידרותרפיים, בדיקות מניעה, בדיקות היריון, טיפולים בכאב ועוד.<br>**שיפוי בגין מחלה קשה**<br>שיפוי בגין מקרה של גילוי מחלה קשה המפורט בפוליסה. |

| תמצית פרטי הפוליסה | |
|---|---|
| הפוליסה אינה מכסה את המבוטח במקרים הבאים (חריגים בפוליסה) | באירוע ביטוחי בגין מצב רפואי קודם וכן, ביתר המקרים המפורטים בסעיפים בתנאי הפוליסה:<br>חריגים כללים לפוליסה - סעיף 9<br>**פרק א':** השתלות וטיפולים מיוחדים מחוץ לישראל- סעיף 6<br>**פרק ב':** תרופות מחוץ לסל הבריאות - סעיף 5<br>**פרק ג':** ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל - סעיף 4<br>**פרק ד':** ניתוחים משלים שב"ן ללא השתתפות עצמית - סעיף 6<br>**פרק ה':** ניתוחים וטיפולים מחליפי הניתוח בישראל - שקל ראשון- סעיף 4<br>**פרק ו':** שירותים רפואיים אמבולטוריים - סעיף 2.21.2, סעיף 3<br>**פרק ז':** שיפוי בגין הוצאות לגילוי מחלה קשה - סעיף 4<br>באפשרותך לפנות לחברה לקבלת מידע מפורט בעניין זה. |
| גובה הפיצוי הכספי שאקבל | **פרק א': השתלות וטיפולים מיוחדים מחוץ לישראל,** סעיף 4.3.3 השתלה שלא במימון החברה בחו"ל, פיצוי בגובה 350,000 ₪.<br>**פרק ג': ניתוחים פרטיים וטיפולים מחליפי ניתוח מחוץ לישראל,** פיצוי בסך 150,000 ₪ במקרה של מוות כתוצאה ישירה מהניתות. |
| אחרי כמה זמן מתחילת הביטוח ניתן לתבוע ולקבל תגמול (אכשרה)[1] | **פרק א': השתלות וטיפולים מיוחדים מחוץ לישראל -** תקופת אכשרה של 90 יום.<br>**פרק ב': תרופות מחוץ לסל הבריאות -** תקופת אכשרה של 90 יום.<br>**פרק ג': ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל -** תקופת אכשרה של 90 יום.<br>**בפרק ד' ניתוחים משלים שב"ן ובפרק ה' ניתוחים וטיפולים מחליפי ניתוח בישראל - שקל ראשון -** תקופת אכשרה של 90 ימים לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות. תקופת האכשרה לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות בנוגע להריון או לידה תהיה 12 חודשים.<br>**פרק ו' שירותים רפואיים אמבולטוריים,** תקופת אכשרה של 60 ימים. במקרה של כיסוי הקשור בהריון ו/או גרידה ו/או לידה ו/או פיריון תהא תקופת אכשרה של 180 ימים. |
| השתתפות עצמית | **פרק ב' תרופות מחוץ לסל הבריאות,** עבור מקרי הביטוח המפורטים בסעיפים 2.1.1-2.1.4 לעיל - 300 ₪ לתרופה, לאותו חודש.<br>עבור מקרה ביטוח המפורט בסעיף 2.1.5 - 500 ₪ לתרופה, לאותו חודש.<br>עבור מקרה ביטוח המפורט בסעיף 2.2 השתתפות של 20%.<br>לא תיגבה השתתפות עצמית עבור תרופה שעלותה החודשית גבוהה מ-5,000 ₪.<br>**פרק ג' ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל,** 20% מההוצאה בפועל עבור הוצאות שיקום בישראל עקב ניתוח מורכב, כמפורט בסעיף 3.5.6.3.<br>**פרק ו' שירותים רפואיים אמבולטוריים,** השתתפות עצמית של 20%.<br>עבור טיפולי רפואה משלימה השתתפות של 40%.<br>**פרק ז' שיפוי בגין הוצאות לגילוי מחלה קשה,** השתתפות של 20%. |

[1] תקופת אכשרה - תקופה המתחילה במועד תחילת הביטוח. בקרות מקרה ביטוח במהלך תקופה זו, לא יהיה זכאי מבוטח (או מוטב) לתגמולי ביטוח.

<table dir="rtl">
<tr><th colspan="2">תמצית פרטי הפוליסה</th></tr>
<tr><td>האם קיימים כיסויים חופפים בביטוח המשלים של קופות החולים</td><td>חלק מהכיסויים קיימים גם בשירותי בריאות נוספים של קופת החולים.</td></tr>
<tr><td>עלות הביטוח</td><td>דמי הביטוח החודשיים בש"ח ואופן תשלומם דמי הביטוח יהיו כדלקמן:
<table dir="rtl">
<tr><th></th><th>מסלול ניתוחים מלא ("מהשקל הראשון") פרקים א'-ג', ה'-ז'</th><th>אופן התשלום</th><th>מסלול ניתוחים משלים שב"ן פרקים א'-ד', ו'-ז'</th><th>אופן התשלום</th></tr>
<tr><td>עובד/ת</td><td>180</td><td>במימון בעל הפוליסה כולל שווי מס</td><td colspan="2">לא רלוונטי</td></tr>
<tr><td>בן/ת זוג</td><td>180</td><td rowspan="3">משולם ישירות על ידי המבוטח באמצעי גבייה אישי</td><td>145</td><td rowspan="3">משולם ישירות על ידי המבוטח באמצעי גבייה אישי</td></tr>
<tr><td>ילד/ה עד גיל 24 כולל*</td><td>55</td><td>25</td></tr>
<tr><td>ילד מעל גיל 25 שנה</td><td>180</td><td>145</td></tr>
</table>
*מהילד השלישי ואילך - ללא תוספת פרמיה, ובלבד שקיימים לפחות שני ילדים (עד גיל 24 כולל) משלמים.<br>
דמי הביטוח צמודים למדד שפורסם ביום 15.12.2024.</td></tr>
<tr><td>שינוי הפרמיה במהלך תקופת הביטוח</td><td>לאחר 30 חודשים מיום תחילת הפוליסה תיתכן אפשרות לבצע התאמת דמי הביטוח על פי תנאי הפוליסה.</td></tr>
</table>

| תמצית תיאור הכיסויים בפוליסה | | | |
|---|---|---|---|
| פרק א': השתלות וטיפולים מיוחדים מחוץ לישראל | | | |
| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע | ההשתתפות העצמית |
| ביצוע השתלה בחו"ל | השתלה לפי סעיף 1.1.1 - ריאה, לב, כליה, לבלב, כבד שחלה, מעי וכל שילוב ביניהם, או השתלה של מח עצם מתורם אחר, שנלקחו מגופו של אדם אחר.<br>השתלה תכלול גם השתלת לב מלאכותי. | סעיף 3.2.1 עבור סעיף 1.1.1 - כיסוי מלא אצל נותן שירות שבהסכם להוצאות המפורטות בסעיף 4.1 או עד לסך של 5,000,000 ₪ למקרה ביטוח אצל נותן שירות שלא בהסכם עבור ההוצאות המפורטות. | |
| | השתלה לפי סעיף 1.1.2 - ריאה, לב, כליה, לבלב, כבד וכל שילוב ביניהם שנלקח מבעלי חיים. | סעיף 3.2.2 עבור סעיף 1.1.2 כיסוי מלא להוצאות המפורטות בסעיף 4.1 אצל נותן שירות שבהסכם או עד לסך של 3,000,000 ₪ למקרה ביטוח אצל נותן שירות שלא בהסכם עבור ההוצאות המפורטות. | |
| | השתלה לפי סעיף 1.1.3 - השתלת מח עצם או תאי גזע מדם טבורי או מדם פריפרי שמקורם במבוטח עצמו.<br>בגין ביצוע השתלה יכוסו הוצאות רפואיות והוצאות נלוות לרבות אשפוז בחו"ל עד 180 יום לפני ועד 365 יום לאחר הביצוע, דיאליזה, הטסה רפואית טיפולי המשך ועוד. | סעיף 3.2.3 עבור סעיף 1.1.3 כיסוי מלא אצל נותן שירות שבהסכם להוצאות המפורטות בסעיף 4.1, או עד לסך של 150,000 ₪ למקרה ביטוח אצל נותן שירות שלא בהסכם עבור ההוצאות המפורטות.<br>וכן כיסוי עד לתקרה להוצאות נוספות כגון:<br>סעיף 4.2.1 - הוצאות בדיקות לאיתור מח עצם, עד 300,000 ₪<br>סעיף 4.2.2 - הוצאות בשל הערכה רפואית - עד 200,000 ₪<br>סעיף 4.2.3 - הוצאות טיפולים רפואיים מחוץ לישראל לרבות דיאליזה - עד 250,000 ₪.<br>סעיף 4.2.4 - הטסה רפואית עד 100,000 ₪. אם החברה תיאמה את ההטסה הרפואית המיוחדת - כיסוי מלא.<br>סעיף 4.3.1 - קצבה חודשית למועמד להשתלה כמפורט בתוכנית. | |
| | סעיף 4.3.3 - פיצוי חד פעמי להשתלה שבוצעה בחו"ל והחברה לא השתתפה במימונה בתשלום לגורם כלשהו, למעט השתלת מח עצם עצמית. | סעיף 4.3.3 - פיצוי חד פעמי להשתלה שבוצעה בחו"ל ללא השתתפות המבטח בסך 350,000 ₪. | |

| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע | ההשתתפות העצמית |
|---|---|---|---|
| טיפול רפואי מיוחד בחו״ל | סעיף 1.3 - תשלום בגין הוצאות רפואיות לביצוע טיפול מיוחד בחו״ל כמפורט בתנאי הפוליסה. | סעיף 3.3-3.4 עבור סעיף 1.3 - כיסוי מלא אצל נותן שירות שבהסכם להוצאות המפורטות בסעיפים קטנים 4.1.2 עד 4.1.7 וכן שיפוי מוגבל להוצאות המפורטות בסעיפים קטנים 4.2.2 עד 4.2.7 או עד לסך של 1,000,000 ₪ למקרה ביטוח אצל נותן שירות שלא בהסכם, עבור ההוצאות המפורטות. | |
| גמלת החלמה לאחר ביצוע השתלה | סעיף 4.3.2 - גמלת החלמה חודשית לאחר ביצוע השתלה, למעט השתלת מח עצם עצמית. | סעיף 4.3.2 - סכום חודשי בסך 5,500 ₪ לתקופה של עד 24 חודשים. | |
| **הערות** | **חברת הביטוח תשלם את ההוצאות בפועל וזאת עד לתקרה הקבועה בפוליסה. שים לב, במידה ויש לך כיסוי זהה בפוליסה אחרת לא תהיה זכאי להחזר כפול מעבר לגובה ההוצאות בפועל ובכפוף לתנאי הפוליסה.** | | |

| פרק ב׳ - תרופות מחוץ לסל הבריאות | | | |
|---|---|---|---|
| **שם הכיסוי** | **תיאור הכיסוי** | **מה הסכום המקסימלי שניתן לתבוע** | **ההשתתפות העצמית** |
| תרופות שאינן נכללות בסל שירותי הבריאות | סעיף 2 בפרק - שיפוי בגין רכישת תרופה שהינה אחת או יותר מהתרופות להלן: תרופה שאיננה כלולה ושהרשות המוסמכת באחת המדינות המוכרות אישרה לשימוש על פי התוויה רפואית למצבו של המבוטח. תרופה הכלולה בסל שהרשות המוסמכת באחת המדינות המוכרות אישרה לטיפול במצבו הרפואי של המבוטח אך אינה מוגדרת לפי ההתוויה הרפואית הקבועה בסל לטיפול במצבו הרפואי של המבוטח.<br>תרופות, OFF LABAL תרופת יתום, תרופה מיוחדת ותרופת IND כהגדרתן פרק זה. | סכום ביטוח מרבי עבור סעיפים 2.1.1 עד 2.1.4 הינו עד לסך של 3,000,000 ₪.<br>סכום ביטוח מרבי עבור סעיפים 2.1.5-2.1.6 הינו עד לסך 1,000,000 ₪ ולא יותר מ-200,000 ₪ בחודש.<br>הסכום יתחדש אחת לשנתיים. | עבור תרופות על פי סעיפים 2.1.1-2.1.4 לפרק זה - 300 ₪, למעט בגין תרופה שעלותה החודשית עולה על סכום של 5,000 ₪ שבהן לא תחול השתתפות עצמית. |
| תרופה מיוחדת | סעיף 2.1.5 - תרופה מיוחדת | סכום ביטוח מרבי בשל כל מקרי הביטוח על פי סעיף זה הנו עד לסך של 1,000,000 ₪ ולא יותר מ-200,000 ₪ בחודש. הסכום יתחדש אחת לשנתיים. | עבור תרופות על פי סעיף 2.1.5 - 500 ₪ למעט בגין תרופה שעלותה החודשית עולה על סכום של 5,000 ₪ שבהן לא תחול השתתפות עצמית. |
| בדיקה גנטית להתאמת הטיפול התרופתי למחלת הסרטן | סעיף 2.2 - ביצוע בדיקה גנטית להתאמת הטיפול התרופתי למחלת הסרטן. | סעיף 3.1.4 - עד 80% מההוצאות ולא עד יותר מ-40,000 ₪ עבור כל מקרה ביטוח. הסכום יתחדש אחת לשנתיים. | 20% מההוצאות |
| הוצאות טיפול רפואי הכרוך בנטילת תרופה | סעיף 3.1.3 בפרק - שיפוי בגין טיפול רפואי או שירות רפואי הכרוך בנטילת תרופה המכוסה בהגדרת מקרה הביטוח | עד לסך של 250 ₪ ליום ועד לתקופה שלא תעלה על 60 ימים. | |
| הערות | **חברת הביטוח תשלם את ההוצאות בפועל וזאת עד לתקרה הקבועה בפוליסה. שים לב, במידה ויש לך כיסוי זהה בפוליסה אחרת לא תהיה זכאי להחזר כפול מעבר לגובה ההוצאות בפועל ובכפוף לתנאי הפוליסה.** | | |

| פרק ג' - ניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל | | |
|---|---|---|
| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע |
| הוצאות הקשורות בניתוח שבוצע בחו"ל או בטיפול מחליף ניתוח מחוץ לישראל | סעיף 3 בפרק - שיפוי עבור הוצאות רפואיות בביצוע ניתוח בחו"ל, עד לתקרה של 40 ימים, כולל הוצאות חדר ניתוח, שכר הרופא המנתח, עלות הטסת גופה, שתל שהושתל במהלך ניתוח ועוד. | במקרה של ביצוע ניתוח אצל נותן שירות שבהסדר עם המבטח - שיפוי מלא עבור הוצאות רפואיות הקשורות בניתוח.<br>במקרה של ביצוע ניתוח אצל נותן שירות שאינו בהסדר עם המבטח, יינתן שיפוי עד 250% מעלות אותו הניתוח בישראל. הכיסוי כולל החזר הוצאות עבור שתל - עד 60,000 ₪. |
| התייעצות בקשר לניתוח | סעיף 3.5.1 לפרק - שתי התייעצויות בקשר לניתוח עם רופא מומחה בישראל או התייעצות אחת עם מומחה מחוץ לישראל | עד לסך של 1,200 ₪ לכל התייעצות עם רופא מומחה בישראל או עד 4,000 ₪ עבור התייעצות עם רופא מומחה מחוץ לישראל. |
| הבאת מומחה רפואי לישראל | סעיף 3.5.4 לפרק - הוצאות הבאת מומחה רפואי לישראל לביצוע הניתוח בישראל | עד 200,000 ₪ |
| הוצאות בשל ניתוח מורכב, שבעקבותיו אושפז המבוטח במשך 7 ימים ברצף לפחות. | סעיף 3.5.6 לפרק - במקרה של אשפוז בשל ניתוח מורכב יינתן כיסוי בגין הוצאות שהייה מחוץ לישראל, המשך מעקב רפואי מחוץ לישראל עקב הניתוח והוצאות עבור מוסד החלמה. | אחות פרטית - עד 8 ימים, מתוך 30 ימים ממועד ביצוע הניתוח ועד 650 ₪ ליום.<br>הוצאות החלמה - עד 10 ימים תוך 3 חודשים ממועד הניתוח, ועד לסך של 400 ₪ ליום.<br>המשך מעקב רפואי בחו"ל - תוך 90 יום מהניתוח ועד לסך של 100,000 ₪.<br>עד 16 טיפולי שיקום שיבוצעו בישראל תוך 90 יום מהניתוח, ועד לסך של 250 ₪ לטיפול ובהשתתפות עצמית של 20% מעלות הטיפול. |
| מוות כתוצאה מניתוח | סעיף 3.6 לפרק - פיצוי חד פעמי בגין מוות כתוצאה מניתוח במהלך 14 ימים מיום הניתוח. | פיצוי חד פעמי בסך 150,000 ₪. |
| טיפול מחליף ניתוח בחו"ל | סעיף 3.3 בפרק - הוצאות (כמפורט בסעיף) בגין טיפול מחליף ניתוח המבוצע בחו"ל | כיסוי עבור ההוצאות המפורטות בתכנית ועד 250% מעלות הניתוח החלופי בישראל. |
| הערות | **חברת הביטוח תשלם את ההוצאות בפועל וזאת עד לתקרה הקבועה בפוליסה. שים לב, במידה ויש לך כיסוי זהה בפוליסה אחרת לא תהיה זכאי להחזר כפול מעבר לגובה ההוצאות בפועל ובכפוף לתנאי הפוליסה.** | |

| פרק ד' - ניתוחים משלים שב"ן ללא השתתפות עצמית | | |
|---|---|---|
| **שם הכיסוי** | **תיאור הכיסוי** | **מה הסכום המקסימלי שניתן לתבוע** |
| התייעצות אגב ניתוח או אגב טיפול מחליף ניתוח | סעיף 4.1 לפרק - התייעצות שבוצעה בישראל באמצעות רופא ו/או מוסד רפואי שיש למבטח עמו הסדר התייעצות. | שלוש התייעצויות בכל שנת ביטוח ועד לסך של 1,500 ₪ להתייעצות, אצל רופא שאין לגביו הסדר ניתוח או הסדר התייעצות, לפי העניין. |
| ניתוח שבוצע בישראל באמצעות רופא ו/או מוסד רפואי שיש למבטח עמו הסדר ניתוח | סעיפים 4.2-4.3 לפרק - שכר מנתח, ניתוח בבית חולים פרטי או במרפאה כירורגית. | כיסוי מעל ומעבר לזכאות במסגרת השב"ן (כללית מושלם/פלטינום, לאומית זהב, מאוחדת עדיף/שיא, מגן זהב) - ההוצאות הרפואיות הנדרשות במהלך ניתוח ואשפוז עד 30 יום הנלווה לביצועו בבית חולים פרטי/ מרפאה כירורגית פרטית **ובתנאי שיש למבטח לגביהם הסדר ניתוח. לא ניתן כיסוי לניתוח, שאין למבטח לגביו הסדר ניתוח.** |
| טיפול מחליף ניתוח שבוצע בישראל | סעיף 4.4 לפרק - טיפול מחליף ניתוח | טיפול מחליף ניתוח וזאת עד לתקרת עלות הניתוח המוחלף בישראל. |
| הערות | **לתשומת לבך, חברות הביטוח משווקות פוליסה אחידה לביטוח ניתוחים. כלומר, חברות הביטוח שמציעות פוליסה זו מציעות את אותו המוצר. בכפוף להתאמות שבוצעו בפוליסה קבוצתית זו. למימוש כיסוי בגין ניתוח, עליך לפנות לקופת החולים למימוש זכויותיך על פי השב"ן (שירותי בריאות נוספים). חברת הביטוח תעניק כיסוי מעבר לזכאותך בתכנית השב"ן בקופת החולים במקרה של ביצוע ניתוח.** | |

| פרק ה' - ניתוחים וטיפולים מחליפי הניתוח בישראל<br>(ניתוחים שקל ראשון ללא השתתפות עצמית) | | |
|---|---|---|
| **שם הכיסוי** | **תיאור הכיסוי** | **מה הסכום המקסימלי שניתן לתבוע** |
| התייעצות אגב ניתוח או אגב טיפול מחליף ניתוח | סעיף 3.1 לפרק - התייעצות שבוצעה בישראל באמצעות רופא ו/או מוסד רפואי שיש למבטח עמו הסדר התייעצות | שלוש התייעצויות בכל שנת ביטוח ועד לסך של 1,500 ₪ להתייעצות, אצל רופא שאין לגביו הסדר ניתוח או הסדר התייעצות, לפי העניין. |
| ניתוח שבוצע בישראל באמצעות רופא ו/או מוסד רפואי שיש למבטח עמו הסדר ניתוח | סעיפים 3.2-3.3 לפרק - שכר מנתח, ניתוח בבית חולים פרטי או במרפאה כירורגית. | ההוצאות הרפואיות הנדרשות במהלך ניתוח ואשפוז עד 30 יום הנלווה לביצועו בבית חולים פרטי/ מרפאה כירורגית פרטית **ובתנאי שיש למבטח לגביהם הסדר ניתוח. לא ניתן כיסוי לניתוח, שאין למבטח לגביו הסדר ניתוח.** |
| טיפול מחליף ניתוח שבוצע בישראל | סעיף 3.4 לפרק - טיפול מחליף ניתוח. | טיפול מחליף ניתוח וזאת עד לתקרת עלות הניתוח המוחלף בישראל. |
| הערות | **לתשומת לבך, חברות הביטוח משווקות פוליסה אחידה לביטוח ניתוחים. כלומר, חברות הביטוח שמציעות פוליסה זו מציעות את אותו המוצר. בכפוף להתאמות שבוצעו בפוליסה קבוצתית זו. אם ברצונך לעבור לפוליסת ניתוחים מסוג משלים שב"ן, תוכל לעשות זאת ברצף ביטוחי תוך שמירה על זכויותיך. ביטוח ניתוחים וביטוח ניתוחים מסוג משלים שב"ן הם מוצרים דומים, אך ביטוח ניתוחים מאפשר התנהלות מול חברת הביטוח בלבד וביטוח ניתוחים מסוג משלים שב"ן מחייב פניה לקופת החולים טרם פניה לחברת הביטוח.** | |

| פרק ו' - ביטוח לשירותים רפואיים אמבולטוריים<br>בפרק קיימים כיסויים נוספים על פי המפורט בתנאי הפוליסה | | | | |
|---|---|---|---|---|
| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע | אחרי כמה זמן מתחילת הביטוח ניתן לתבוע ולקבל תגמול (אכשרה)[2] | השתתפות עצמית |
| חוות דעת רפואית בישראל | סעיף 2.1 לפרק - החזר בגין התייעצות עם רופא מומחה לגבי בעיה רפואית פעילה בתחום הרלוונטי (לא כולל רופא משפחה, רופא ילדים, רופא נשים המטפל בשגרה, יכוסה רופא ילדים בדרגת סגן מנהל מחלקה ומעלה). | כיסוי עד ל-1,100 ₪ להתייעצות ועד סה"כ 4 התייעצויות לשנת ביטוח למבוטח. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |
| בדיקות רפואיות אבחנתיות | סעיף 2.3 לפרק - החזר בגין בדיקות מעבדה, צילומי רנטגן, בדיקות הדמיה, מיפוי וכל בדיקה אחרת הנדרשת לאבחון ו/או מניעה ו/או למעקב ו/או לקביעת דרכי טיפול. | כיסוי עד 10,000 ₪ למבוטח לשנת ביטוח. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |
| טיפולים פיזיותרפיים והידרותרפיים | סעיף 2.4 לפרק - החזר בגין טיפולים פיזיותרפיים והידרותרפיים לפי הוראת רופא. | כיסוי עד 16 טיפולים ועד 220 ₪ לטיפול עבור למצב רפואי אחד ובכל מקרה לא יותר מ-3,520 ₪ למבוטח לשנת ביטוח. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |
| בדיקות מיוחדות לנשים בהריון | סעיף 2.8 לפרק - החזר בגין בדיקות לנשים בהריון, כגון סקירת מערכות מוקדמת ומאוחרת, סיקור גנטי, שקיפות עורפית, מי שפיר (לרבות בדיקת דם מסוג NIPT), סיסי שיליה. ו/או כל בדיקת הריון הקיימת היום או שתהיה קיימת בעתיד. | כיסוי עד 5,500 ₪ הריון ולהריון מרובה עוברים תוגדל התקרה ל-7,000 ₪. | סעיף 4 - 180 ימים | 20% מההוצאה בפועל |

[2] תקופת אכשרה - תקופה המתחילה במועד תחילת הביטוח. בקרות מקרה ביטוח במהלך תקופה זו, לא יהיה זכאי מבוטח (או מוטב) לתגמולי ביטוח.

| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע | אחרי כמה זמן מתחילת הביטוח ניתן לתבוע ולקבל תגמול (אכשרה)[2] | השתתפות עצמית |
|---|---|---|---|---|
| אבחון בעיות התפתחות הילד/ ליקויי למידה | סעיף 2.9 לפרק - החזר בגין אבחון בעיות התפתחות הילד ו/או ליקוי למידה אצל ילד מגיל 4 ועד גיל 16 על ידי רופא מומחה בתחום ו/או ע"י מכון אבחון מוכר ו/או מאבחן המתמחה בין השאר באבחון פסיכו/דידקטי, אבחון הפרעות קשב וריכוז ובדיקות TOVA. | כיסוי עד 2,200 ₪ לתקופת ביטוח. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |
| טיפול בבעיות התפתחות הילד/ ליקויי למידה | סעיף 2.10 לפרק - החזר בגין בעיות התפתחות הילד ו/או ליקוי למידה אשר אובחנו כמפורט להלן אצל ילד מגיל 4 ועד גיל 16 המחייבות טיפול על ידי אחד מאלה: פיזיותרפיסט/ טיפול רגשי באמצעות בעלי חיים ו/או מרפא בעיסוק ו/או קלינאי תקשורת. הכיסוי לטיפול בעיות התפתחות/ ליקוי למידה אשר אובחנו על ידי אחד מאלה: רופא מומחה בתחום ו/או ע"י מכון אבחון מוכר ו/או מאבחן המתמחה בין השאר באבחון פסיכו/ דידקטי, אבחון הפרעות קשב וריכוז ובדיקות TOVA. | כיסוי עד 1,800 ₪ לשנת ביטוח אך לא יותר מ-150 ₪ לטיפול ועד 12 טיפולים. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |

| שם הכיסוי | תיאור הכיסוי | מה הסכום המקסימלי שניתן לתבוע | אחרי כמה זמן מתחילת הביטוח ניתן לתבוע ולקבל תגמול (אכשרה)[2] | השתתפות עצמית |
|---|---|---|---|---|
| אביזרים רפואיים | סעיף 2.11 לפרק - החזר בגין אביזר רפואי כמפורט להלן בכפוף להפניה מרופא מומחה המאשר את הצורך הרפואי באביזר. החזר לאביזרים הבאים: מכשיר אלקטרוני ליישור גב למבוטחים שגילם עד 18 שנה בלבד (Ararscol 10 Nevrogar. Agrelief), מכשיר CPAP, מכשיר BPAP, מגביר קול לנפגעי לרינגס, מכשיר TNS, חבישות לחץ, פרוטזה חיצונית לשד, רצועות ומכשיר בדוקציה לתינוקות, עדשות קורטוקונוס, שתל קוכלארי, בניה מיוחדת של נעליים לחולי סוכרת הסובלים מנמק או חסר אצבעות, לחולים לאחר כריתה חלקית של כף הרגל ו/או שיתוק שרירים, פאה לחולה אונקולוגי, תותב לאין אונות, משאבת אינסולין. | כיסוי עד 2,000 ₪ לשנת ביטוח. | סעיף 4 - 60 ימים | 20% מההוצאה בפועל |
| הערות | חברת הביטוח תשלם את ההוצאות בפועל וזאת עד לתקרה הקבועה בפוליסה. שים לב, במידה ויש לך כיסוי זהה בפוליסה אחרת לא תהיה זכאי להחזר כפול מעבר לגובה ההוצאות בפועל ובכפוף לתנאי הפוליסה. | | | |

| פרק ז׳ - שיפוי בגין הוצאות לגילוי מחלה קשה | | | | |
|---|---|---|---|---|
| **שם הכיסוי** | **תיאור הכיסוי** | **מה הסכום המקסימלי שניתן לתבוע** | **השתתפות עצמית** | **אחרי כמה זמן מקרות מקרה הביטוח אהיה זכאי לתגמול (תקופת המתנה)[3]** |
| מחלות קשות | אי ספיקת כליות סופנית, אי ספיקת כבד פולמיננטית, מחלת כבד סופנית (שחמת), השתלת אברים, טרשת נפוצה, עמילואידוזיס ראשונית, תרדמת, ניוון שרירים, פגיעה מוחית מתאונה, דלקת מוח, דלקת חיידקית של קרום המוח, מחלת ריאות חסימתית כרונית, יתר לחץ דם ריאתי ראשוני, פרקינסון, אוטם חריף בשריר הלב, ניתוח מעקפי לב, ניתוח לב פתוח להחלפה או לתיקון מסתמי לב, ניתוח אבי העורקים, קרדיומיופטיה, שבץ מוחי, סרטן, אנמיה אפלסטית חמורה, גידול שפיר של המוח/יותרת המוח/קרומי מוח, שיתוק, פוליו (שיתוק ילדים), איבוד גפיים, עיוורון, כוויות קשות, אובדן דיבור, חירשות. | כיסוי עד 15,000₪ לכל תקופת הביטוח. | 20% מההוצאה בפועל | סעיף 1.5 טרשת נפוצה - 2 חודשים;<br>סעיף 1.7 - תרדמת - 96 שעות;<br>סעיף 1.8 ניוון שרירים - 3 חודשים;<br>סעיף 1.11 דלקת חיידקית של קרום המוח - 3 חודשים;<br>סעיף 1.20 שבץ מוחי - 8 שבועות;<br>סעיף 1.29 אובדן דיבור - 6 חודשים; |

סכומי הביטוח צמודים למדד הפוליסה שפורסם ביום 15.12.2024.

**מידע נוסף:**

**סכומים שאינם בערך נקוב:** יובהר כי תגמולי ביטוח מרביים שאינם בערך נקוב, אם קיימים בפוליסה שברשותך, מבוססים על מחירי הסכם המתעדכנים מעת לעת על פי המפורט באתר החברה.

לבירור גובה תגמולי הביטוח האמורים הנכללים בתכנית הביטוח שברשותך, ניתן לפנות למוקד הראל, בטלפון ‎*‎הראל (‎*2735‎) או באתר האינטרנט של החברה שכתובתו http://www.harel-group.co.il/wps/portal.

**התנאים המלאים והמחייבים הינם התנאים המפורטים בפוליסה.**

# פוליסה לביטוח בריאות קבוצתי
# לעובדי פאפאייה גיימינג ובני משפחותיהם

**1. הגדרות כלליות**

בפוליסה ובפרקיה/ נספחיה תהיה למונחים הבאים המשמעות אשר מפורשת בצדם:

1.1. **"בית חולים"** - מוסד רפואי המוכר על ידי הרשויות המוסמכות בישראל או בחו"ל כבית חולים כללי בלבד, להוציא מוסד שהוא גם סנטוריום, בית החלמה, בית הבראה.

1.2. **"בית חולים פרטי"** - אחת מההגדרות שלהלן:

- בית חולים בישראל שהוא בבעלות פרטית ושאינו בית חולים ציבורי כללי כהגדרתו בסעיף 19 בחוק לשינוי סדרי עדיפויות לאומיים (תיקוני חקיקה להשגת יעדי התקציב לשנים 2013 ו-2014), התשע"ג-2013.
- בית חולים ציבורי כללי כהגדרתו בסעיף 19 לחוק האמור שהרשויות המוסמכות לספק שירות בחירת רופא בתשלום.

1.3. **"בית חולים ציבורי"** - בית חולים המוגדר כבית חולים ציבורי במאגרי המידע של משרד הבריאות.

1.4. **"בעל הפוליסה"** - פאפאייה גיימינג בע"מ.

1.5. **"גיל"** - גיל המבוטח ייחשב לפי הראשון לחודש במועד יום הולדתו.

1.6. **"דמי הביטוח"/ "הפרמיה"** - הסכום בגין פוליסה זו שעל בעל הפוליסה ו/או המבוטח לשלם לחברה, על פי תנאי הפוליסה

1.7. **"דף פרטי הביטוח"** - דף המצורף לפוליסה שכולל את הפרטים והתנאים הדרושים לשם התאמת פוליסת הביטוח לתנאי חוזה הביטוח של המבוטח.

1.8. **"החברה או המבטח"** - הראל חברה לביטוח בע"מ.

1.9. **"המבוטח"** - עובד/ת פעיל אצל בעל הפוליסה ו/או בן או בת זוגו ו/או ידוע/ה בציבור ו/או בן/בת זוג מאותו המין ו/או ילדי עובד ו/או ילדי בן/בת זוג, לרבות ילדים מאומצים והכל בהתאם להגדרות המונחים בפוליסה, אשר הצטרפו ו/או יצטרפו לפוליסה.

1.10. **"הסכם הביטוח"** - הסכם מיום 1.1.25 בין בעל הפוליסה לבין המבטח לעריכת פוליסה לביטוח בריאות קבוצתי לעובדי בעל הפוליסה ובני משפחותיהם.

1.11. **"הפוליסה"** - חוזה ביטוח זה, כולל תנאים כלליים המתייחסים לכל פרקי הפוליסה, לרבות דף פרטי הביטוח וכל הנספחים המצורפים לו וכאלה שיצורפו בעתיד, אם יצורפו, בהסכמת בעל הפוליסה והמבטח.

1.12. **"השתתפות עצמית"** - חלקו של המבוטח בהוצאה בגין מקרה ביטוח. מובהר בזאת כי חבות החברה לתשלום כלשהו עפ"י פרק או נספח המצורף לפוליסה תהיה רק לגבי הוצאות המבוטח שמעבר להשתתפות זו על ידי המבוטח ורק לגבי הוצאות המבוטח שמעבר להשתתפות זו

1.13. **"ועדת הלסינקי"** - ועדה הפועלת על סמך נוהל לניסויים רפואיים בבני אדם בהתאם לתקנות בריאות העם (ניסויים רפואיים בבני אדם, התשמ"א 1980, על תוספותיהן ותיקוניהן 1999).

1.14. **"חו"ל"** - כל מקום או מדינה מחוץ למדינת ישראל, למעט מדינות אויב.

1.15. **"חוק הביטוח"** - חוק חוזה הביטוח תשמ"א-1981.

1.16. **"חוק הבריאות"** - חוק ביטוח בריאות ממלכתי תשנ"ד-1994.

1.17. **"ישראל"** - מדינת ישראל, כולל השטחים המוחזקים ע"י ישראל.

1.18. **"מבוטחים קיימים" -** מבוטחים אשר היו מבוטחים במועד תחילת הפוליסה במסגרת הפוליסה הקודמת.

1.19. **"מדד" -** מדד המחירים לצרכן המתפרסם על ידי הלשכה המרכזית לסטטיסטיקה.

1.20. **"מדד הבסיס" -** המדד הידוע במועד תחילת הפוליסה כהגדרתו בסעיף 1.37 לעיל.

1.21. **"מקרה הביטוח" -** מערך עובדתי ונסיבתי, כמוגדר בכל אחד מפרקי או נספחי הפוליסה, אשר קיומו מקנה למבוטח זכות לתגמולי ביטוח על פי הפוליסה. טיפול רפואי חוזר או המשכי אשר נדרש בעקבות טיפול ו/או ריפוי רפואי המהווה ו/או כתוצאה ממקרה ביטוח הנו חלק מאותו מקרה ביטוח.

1.22. **"נותן שירות/ספק שבהסכם" -** בית חולים פרטי, מרפאה, מעבדה, מנתח שהינו רופא מומחה (כהגדרתו לעיל) או רופא אשר הוסמך בחו"ל כמומחה מנתח וכל רופא או גוף אחר עמם קשורה או תתקשר החברה בהסכם, ובלבד שהיו צד להסכם עם החברה במועד ביצוע הפרוצדורה/מתן השירות הרלוונטי.

1.23. **"סייג בשל מצב רפואי קודם" -** חריג כללי בפוליסה הפוטר את החברה מחבותה, או מפחית את חבות החברה או היקף הכיסוי, בשל מקרה ביטוח אשר גורם ממשי לו היה מהלכו הרגיל של מצב רפואי קודם, ואשר ארע למבוטח בתקופה שבה חל הסייג.

1.24. **"ספורט אתגרי" -** ענפי ספורט הנחשבים למסוכנים במיוחד והדורשים מהעוסקים בהם רמות גבוהות של קושי, מאמץ גופני ורגשי. ספורט אתגרי יכלול בדרך כלל אחד או יותר מהמרכיבים הבאים: מהירות, גובה וסכנה. רשימת ענפי הספורט האתגרי תעודכן מעת לעת על פי הרשימה המופיעה באתר החברה - www.harel-group.co.il.

1.25. **"עובד חדש" -** עובד שלא היה מועסק אצל בעל הפוליסה במועד תחילת הפוליסה ויועסק אצל בעל הפוליסה לאחר מועד תחילת הביטוח.

1.26. **"עובד קיים" -** כל מי שהינו עובד אצל בעל הפוליסה במועד תחילת הפוליסה, המועסק על ידי בעל הפוליסה, בכלל זה מי שנמצא/ת בחופשת לידה ו/או מי שהינו בחופשה ללא תשלום שאינה עולה על 6 חודשים.

1.27. **"צירוף אוטומטי" -** צירוף אובליגטורי ע"י בעל הפוליסה המתאפשר מאחר ובעל הפוליסה מממן את עלות הביטוח באופן מלא כולל גילום שווי המס עבור המבוטחים עפ"י פירוט דמי הביטוח ו/או במקרה של צירוף אובליגטורי עבור מבוטחים המבוטחים בביטוח קודם שהיה בתוקף למעלה מ-3 שנים.

1.28. **"צירוף בהסכמה" -** צירוף וולונטרי הדורש את הסכמתו מראש של המבוטח על רצונו להצטרף לביטוח (מאחר והמבוטח נושא בעלות כלשהיא עבור הביטוח) או להמשיך את הביטוח (מאחר ונדרשת הסכמת המבוטח לפי תקנות ביטוח בריאות קבוצתי).

1.29. **"קופת חולים" -** תאגיד כהגדרתו בחוק הבריאות לרבות שירותי בריאות כללית, מכבי שירותי בריאות, קופת חולים מאוחדת וקופת חולים לאומית.

1.30. **"רופא מומחה" -** רופא אשר אושר לו בידי הרשויות המוסמכות בישראל תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל"ג-1973, ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות או רופא שהינו בעל רישיון מומחה בתחום רפואי מסוים על ידי הרשויות המוסמכות לכך על פי הדין במדינה הרלוונטית בחו"ל בה ניתן השירות

1.31. **"רופא מרדים" -** רופא אשר הוסמך ואושר ע"י השלטונות המוסמכים בישראל או בחו"ל כמרדים.

1.32. **"רצף ביטוחי" -** הצטרפות מביטוח קודם (פרטי או קבוצתי) ללא חיתום, ללא הצהרת בריאות ו/או ללא תקופת אכשרה, ולעניין מצב רפואי קודם יראו כמועד הצטרפותו של המבוטח לביטוח את מועד הצטרפותו לביטוח הקודם, ותנאי קבלתו לביטוח זה יהיו על פי תנאי קבלתו לביטוח הקודם, לא יחול סייג בשל מצב רפואי קודם והכיסוי

לגבי המבוטחים לא יוגבל גם אם חלה הרעה במצבם הרפואי במהלך תקופת הביטוח הקודמת. כמו כן, לא תחול תקופת אכשרה כלשהי, ולא תיגבה פרמיה נוספת בגין הרעה במצב הרפואי.

מובהר כי רצף ביטוחי מלא יחול לגבי כיסויי וסכומי ביטוח חופפים בלבד. יובהר כי לא יינתן כיסוי בגין מקרה ביטוח שארע בתקופת הביטוח הקודמת.

1.33. **"תאריך הצטרפות"** - התאריך בו הצטרף המבוטח לביטוח זה.

1.34. **"שירותי בריאות נוספים (שב"ן)"** - תכנית למתן שרותי בריאות נוספים על שירותי הבריאות על פי סל השירותים והתשלומים כהגדרתו בחוק הבריאות, המנוהלת על ידי קופת החולים בה חבר המבוטח, או על ידי ישות משפטית שהוקמה לשם כך.

1.35. **"שנת ביטוח"** - תקופה של כל 12 חודשים רצופים, שהראשונה תחילתה בתאריך תחילת הביטוח.

1.36. **"תאונה"** - חבלה גופנית שנגרמה עקב הפעלת כוח פיזי בלבד, כתוצאה מאירוע פתאומי חד פעמי ובלתי צפוי מראש, הנגרם במישרין על ידי גורם חיצוני וגלוי לעין, המהווה ללא תלות בכל סיבה אחרת את הסיבה היחידה הישירה והמידית לקרות מקרה הביטוח. **למען הסר ספק, אלימות מילולית ו/או לחץ נפשי ו/או הצטברות של פגיעות זעירות חוזרות לאורך תקופה הגורמים לנכות לא ייחשבו כ"תאונה".**

1.37. **"תאריך תחילת הביטוח"/ "המועד הקובע"** - 1.1.2025.

1.38. **"תותבת/שתל"** - כל אביזר, איבר טבעי או חלק מאיבר טבעי, או איבר מלאכותי, מפרק מלאכותי או טבעי המושתלים או המורכבים בגופו של המבוטח במהלך ניתוח המכוסה במסגרת הביטוח, למעט תותבת שיניים ושתל דנטלי.

1.39. **"תקופת אכשרה"** - תקופת זמן רצופה, המתחילה לגבי כל מבוטח מתאריך הצטרפותו לביטוח ותסתיים בתום התקופה שצוינה בכל פרק או נספח שצורף לפוליסה. תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות, ותחול מחדש בכל פעם בה צורף המבוטח לביטוח מחדש, בתקופות ביטוח בלתי רצופות. מקרה ביטוח שארע בתקופת האכשרה דינו כמקרה ביטוח שארע לפני תחילת הביטוח למעט מקרה ביטוח שארע כתוצאה מתאונה כהגדרתה בסעיף 1.37.

מודגש, כי מקרה ביטוח שארע בתקופת האכשרה (למעט מקרה ביטוח עקב תאונה), דינו כמקרה ביטוח שארע ו/או התגלה לפני תחילת הביטוח, והחברה לא תהא אחראית לתשלום תגמולי ביטוח כלשהם בגינו על פי פוליסה זו.

1.40. **"תקופת המתנה"** - תקופת זמן רציפה המתחילה לגבי כל מבוטח במועד קרות מקרה הביטוח ומסתיימת לאחר מנין הימים שצוינו כתקופת המתנה באותו פרק או נספח שצורף לפוליסה.

במהלך תקופת ההמתנה לא יהיה זכאי המבוטח לכיסוי הביטוחי הרלוונטי, ורק אם בתום תקופת ההמתנה נמצא המבוטח במצב המזכה בכיסוי הביטוחי, תחל זכאותו ממועד זה. תקופת המתנה תחול רק אם צוינה מפורשות בנספח ו/או בפרק הרלוונטי.

1.41. **"תקנות ביטוח בריאות קבוצתי"** - תקנות הפיקוח על שירותים פיננסיים (ביטוח) (ביטוח בריאות קבוצתי), תשס"ט-2009.

1.42. **"תקרת כיסוי"/ "סכום ביטוח"** - הסכום המרבי לתשלום תגמולי ביטוח כמפורט בתנאי הפוליסה לרבות בכל פרק או נספח שצורף לפוליסה. למען הסר ספק ועל אף האמור בפוליסה, הגבלת סכום הביטוח, אם קיימת, רלוונטית אך ורק לאותו פרק או נספח בלבד ולא תהא מגבלה ו/או מניעה לסכום מרבי בגין הפוליסה או על פי מספר נספחים ו/או פרקים.

## 2. תוקף הפוליסה, אופן ההצטרפות ומבנה הביטוח

2.1. **תוקף הפוליסה** - פוליסה זו תכנס לתוקפה החל מתאריך תחילת הביטוח.

2.2. **אופן ההצטרפות:**

2.2.1. עובדים (קיימים וחדשים) יצורפו לביטוח למסלול ניתוחים מלא באופן אובליגטורי (צירוף אוטומטי).

2.2.2. בני משפחה (חדשים או קיימים) של העובד יוכלו להצטרף לביטוח באופן וולונטרי (צירוף בהסכמה) לאחר מילוי טופס הצטרפות והצהרת בריאות אשר תקבע את תנאי קבלתו לביטוח. למרות האמור לעיל, בני משפחה כאמור לעיל יוכלו להצטרף ללא הצהרת בריאות וללא תקופת אכשרה תוך 90 ימים מתאריך תחילת הביטוח ו/או תחילת עבודה ו/או יום נישואין ו/או יום לידה ו/או אימוץ, לפי העניין. יובהר כי עבור תינוקות מועד הצירוף לביטוח יהיה רטרו מיום הלידה ובתנאי שהבקשה הוגשה תוך 90 יום מיום הלידה. למען הסר ספק לאחר 90 ימים כאמור הצרוף יהיה בכפוף למילוי הצהרת בריאות וחיתום רפואי.

2.2.3. יובהר, כי ילדים שצורפו לביטוח ובמהלך תקופת הביטוח יהפכו לילדים בוגרים על פי תנאי הפוליסה ימשיכו בביטוח בתעריף ילד בוגר בגבייה אישית וללא שינוי אמצעי גביה אישי (ככל שלא התקבלה בקשה בעניין).

2.2.4. מבוטח אשר יגרע את עצמו מהביטוח ויבקש להצטרף לביטוח לאחר מועד גריעתו, יצטרף לאחר מילוי הצהרת בריאות אשר תקבע את תנאי קבלתו לביטוח.

2.2.5. ביטוח בתקופת חל"ד: עובד/ת המבוטח/ת במסגרת תכנית ביטוח זו, יהיה זכאי לביטוח בתקופה בה נמצא/ת בחופשת לידה, כהגדרתה בחוק עבודת נשים תשי"ד 1954, בתנאי שבמהלך חופשת הלידה שמו/ה יופיעו ברשימת המבוטחים המדווחת מאת בעל הפוליסה אל המבטח וכן, כי הפרמיה החודשית בגינם משולמת כסדרה ע"י בעל הפוליסה. במידה ויחד עם העובד/ת מבוטחים בני משפחה, הם ימשיכו לשלם באמצעי גבייה אישית מידי חודש. יובהר, כי גם בעת מעבר לחל"ת (עקב חופשת לידה שהוארכה מעבר לזמן הקבוע בחוק) יהיה זכאי העובד/ת לביטוח, בכפוף להימצאותם של העובדים ברשימת המבוטחים כאמור לעיל וכן, בתנאי שהפרמיה החודשית בגינם משולמת כסדרה ע"י בעל הפוליסה. במידה ויחד עם העובד/ת מבוטחים בני משפחה, הם ימשיכו לשלם באמצעי גבייה אישית מידי חודש.

2.2.6. רצף ביטוחי - עובד חדש ובני משפחתו אשר היו מבוטחים בפוליסת ביטוח פרטית או קבוצתית אצל המבטח או אצל מבטח אחר יהיו זכאים לעבור ברצף ביטוחי לפוליסה זו ובתנאי שיגישו את בקשתם ואת המסמכים הנדרשים בתוך 90 ימים מיום צירופם לביטוח זה. מובהר כי רצף ביטוחי מלא יחול לגבי כיסויי וסכומי ביטוח חופפים בלבד. במידה ובביטוח הקיים שלהם ישנן החרגות, הן תתבטלנה בתום שנה ממועד ההצטרפות לביטוח הקבוצתי. יובהר כי לא יינתן כיסוי בגין מקרה ביטוח שארע בתקופת הביטוח הקודמת.

2.2.7. מבוטח שהוא עמית בתכנית שב"ן, מסוג "כללית מושלם/פלטינום", "מגן זהב", "מאוחדת עדיף/שיא", "לאומית זהב" יוכל לרכוש תכנית בעלת כיסוי ביטוחי משלים לביצוע ניתוחים פרטיים בישראל, היינו תוכנית המתחשבת בזכויות הניתנות במסגרת תוכנית השב"ן לביצוע ניתוחים פרטיים (להלן: "כיסוי ביטוחי משלים לניתוחים").

מבוטח אשר בחר בתוכנית זו יהיה מבוטח בכיסוי ביטוחי משלים לשב"ן עפ"י פרק ד' לפוליסה במקום כיסוי מהשקל הראשון לניתוחים (פרק ה'), וישלם את דמי הביטוח הנקובים בסעיף 6 להלן.

למען הסר ספק, אין באמור כדי לגרוע מכך שבעת צירוף מבוטחים קיימים הם יצורפו לרובד בו בוטחו בפוליסה הקודמת כמפורט לעיל.

2.2.8. שולמו לחברה כספים על חשבון דמי ביטוח, לפני שניתנה הסכמת החברה לעריכת הביטוח, לא ייחשב התשלום כהסכמת החברה לעריכת הביטוח. במקרה זה תשלח החברה בתוך 90 יום מיום קבלת דמי הביטוח לראשונה, החלטה בדבר קבלתו **או** אי קבלתו של המועמד לביטוח, ותשלח לו, לפי העניין, פוליסת ביטוח לרבות דף פרטי ביטוח, **או** הודעת דחייה על פיה המבוטח לא מתקבל לביטוח ואין לו כיסוי ביטוחי בתוקף **או** פנייה להשלמת נתונים או הצעת ביטוח נגדית. לא שלחה החברה תוך 90 יום מיום קבלת דמי הביטוח לראשונה, הודעת דחייה כאמור לעיל או פנייה להשלמת נתונים, או הצעת ביטוח נגדית, ייחשב המבוטח כמי שצורף לביטוח בתנאים הקבועים בהצעת הביטוח. ארע למועמד לביטוח מקרה ביטוח בתקופה שבין קבלת דמי הביטוח לראשונה לבין החלטת החברה בדבר קבלתו או אי קבלתו לביטוח, ועל פי הוראות החיתום הרפואי הקיימות בחברה לגבי מועמדים לביטוח בעלי מאפיינים דומים, הייתה החברה מודיעה למועמד לביטוח, בתום הליך החיתום, על קבלתו לביטוח (אלמלא קרה מקרה הביטוח), יהיה זכאי המועמד לביטוח לכיסוי במסגרת הפוליסה בגין מקרה הביטוח וזאת, בכפוף לכל יתר הוראות הפוליסה ותנאיה.

2.2.9. **צירוף מבוטח - סעיף 4 בתקנת ביטוח בריאות קבוצתי:**

2.2.9.1. מוטלת על מבוטח לפי תנאי פוליסה לביטוח בריאות קבוצתי חובה אחת מאלה:

2.2.9.1.1. לשלם, במועד תחילת תקופת הביטוח, דמי ביטוח, או חלק מהם, לרבות אם גבייתם חלה לאחר אותו מועד, למעט לעניין ניכוי מהשכר בעד דמי ביטוח רפואי לפי סעיף 1ד(ג) לחוק עובדים זרים;

2.2.9.1.2. לשלם מס או תשלום אחר בשל הפוליסה לביטוח קבוצתי;

לא תצרף החברה לאותו ביטוח, אלא על פי הסכמתו המפורשת מראש, אשר תועדה, ובלבד שהוצגה למבוטח רשימת כל הפרקים הנכללים בפוליסה הכוללים כיסויים ביטוחיים מסוגים מסוימים (בסעיף זה- פרקי כיסוי) ואת דמי הביטוח בעבור כל פרק כאמור בנפרד; במקרים שבהם ניתנת למבוטח אפשרות לבחור להצטרף לביטוח הכולל כמה פרקי כיסוי אשר נמכרים יחד כחבילה, בלי שניתן לבחור רק חלק מהפרקים, יוצגו למבוטח דמי הביטוח בעד כל חבילת פרקי כיסוי ולא בעד כל פרק כיסוי בנפרד; ואם המבוטח הוא ילדו או בן-זוגו של חבר בקבוצת המבוטחים - החברה רשאית לצרפו לאחר שניתנה הסכמת אותו חבר לצירוף ילדו או בן-זוגו.

2.2.9.2. סעיף 2.2.9 לעיל לא יחול על פוליסה לביטוח בריאות קבוצתי שתחודש לתקופה נוספת אצל אותה חברה או אצל חברה אחרת, אם התקיימו תנאים אלה:

2.2.9.2.1. הפוליסה הקבוצתית הייתה בתוקף לגבי קבוצת המבוטחים שלוש שנים לפחות לפני מועד חידושה;

2.2.9.2.2. חידוש הפוליסה הקבוצתית נעשה, בין באותם תנאים ובין בתנאים שונים, תוך שמירה על רצף ביטוחי לגבי כיסוי ביטוחי שהיה בתוקף עד מועד החידוש ושנכלל

בפוליסה הקבוצתית לאחר אותו מועד; לעניין זה, "שמירה על רצף ביטוחי" - שמירת הרצף ללא בחינה מחודשת של מצב רפואי קודם וללא תקופת אכשרה.

2.2.9.2.3. לא בוטלו אחד או יותר מפרקי כיסוי בסיסיים שהיו קיימים בפוליסה טרם חידושה; לעניין זה, "פרק כיסוי בסיסי" - פרק הכולל אחד או יותר מכיסויים האלה:

(א) ניתוחים

(ב) תרופות

(ג) השתלות

(ד) מחלות קשות

(ה) שיניים

(ו) תאונות אישיות

2.2.10. פטירת עובד/ת - נפטר עובד/ת שהיה מבוטח/ת בפוליסה, בני משפחתו זכאים להמשיך להיות מבוטחים בפוליסה זו, בתנאי שהיו מבוטחים בפוליסה זו במועד הפטירה, בכפוף להסדרת התשלום בגביה אישית בתוך 90 יום ממועד הפטירה.

**2.3. מבנה הביטוח:**

| | **מסלול ניתוחים מלא** | **מסלול ניתוחים משלים שב"ן** |
|---|---|---|
| **אופן הצטרפות עובדים** | **צירוף אוטומטי** | **-** |
| **אופן הצטרפות בני/בנות זוג וילדים** | **צירוף בהסכמה** | **צירוף בהסכמה** |
| **אופן הצטרפות ילדים בוגרים** | **צירוף בהסכמה** | **צירוף בהסכמה** |
| **פרקי הכיסוי** | **א'-ג',ה'-ז'** | **א'-ד', ו'-ז'** |

## 3. תקופת הביטוח:

3.1. תקופת הביטוח תהיה החל מ-1.1.2025 ל-60 חודשים ועד 31.12.2029.

3.2. תקופת הביטוח לא תוארך באופן אוטומטי אלא רק לאחר הסכמת הצדדים.

3.3. פוליסה לביטוח בריאות קבוצתי לא תפקע לגבי מבוטח לפני תום תקופת הביטוח כאמור בסעיף 3.1 לעיל, ויחולו כל הכיסויים הביטוחים על פיה עד תום תקופת הביטוח, אם קיבלה החברה דמי ביטוח בעד המבוטח בשל כיסויים אלה - **סעיף 9 (ב) לתקנות ביטוח בריאות קבוצתי.**

3.4. פחת מספר המבוטחים בקבוצה מ-50, לא תחודש הפוליסה הקבוצתית במועד פקיעתה או בתום תקופת הביטוח, לפי המוקדם. **סעיף 4(ג) לתקנות ביטוח בריאות קבוצתי.**

## 4. חובת גילוי:

4.1. (א) הציג המבטח למבוטח לפני כריתת החוזה, אם בטופס של הצעת ביטוח ואם בדרך אחרת שבכתב, שאלה בעניין שיש בו כדי להשפיע על נכונותו של מבטח סביר לכרות את החוזה בכלל או לכרותו בתנאים שבו (להלן - ענין מהותי), על המבוטח להשיב עליה בכתב תשובה מלאה וכנה.

(ב) שאלה גורפת הכורכת עניינים שונים, ללא אבחנה ביניהם, אינה מחייבת תשובה כאמור אלא אם הייתה סבירה בעת כריתת החוזה.

(ג) הסתרה בכוונת מרמה מצד המבוטח של ענין שהוא ידע כי הוא ענין מהותי, דינה כדין מתן תשובה שאינה מלאה וכנה.

4.2. ניתנה לשאלה בעניין מהותי תשובה שלא היתה מלאה וכנה, רשאית החברה, תוך שלושים ימים מהיום שנודע לה על כך וכל עוד לא קרה מקרה הביטוח, לבטל את הפוליסה בהודעה בכתב למבוטח.

4.3. ביטלה החברה את הפוליסה מכוח סעיף זה, זכאי המבוטח להחזר דמי הביטוח ששילם בעד התקופה שלאחר הביטול, בניכוי הוצאות החברה, זולת אם פעל המבוטח בכוונת מרמה.

4.4. קרה מקרה הביטוח לפני שנתבטלה הפוליסה מכוח סעיף זה, אין החברה חייבת אלא בתגמולי ביטוח מופחתים בשיעור יחסי, שהוא כיחס שבין דמי הביטוח שהיו משתלמים כמקובל אצלה לפי המצב לאמיתו לבין דמי הביטוח המוסכמים, והחברה פטורה כליל בכל אחת מאלה:

4.4.1. התשובה ניתנה בכוונת מרמה.

4.4.2. מבטח סביר לא היה מתקשר באותו חוזה, אף בדמי ביטוח מרובים יותר, אילו ידע את המצב לאמיתו; במקרה זה זכאי המבוטח להחזר דמי הביטוח ששילם בעד התקופה שלאחר קרות מקרה הביטוח בניכוי הוצאות החברה.

4.5. המבטח אינו זכאי לתרופות האמורות בסעיפים 4.3-4.1 בכל אחת מאלה, אלא אם התשובה שלא הייתה מלאה וכנה ניתנה בכוונת מרמה:

4.5.1. הוא ידע או היה עליו לדעת את המצב לאמיתו בשעת כריתת החוזה או שהוא גרם לכך שהתשובה לא הייתה מלאה וכנה.

4.5.2. העובדה שעליה ניתנה תשובה שלא הייתה מלאה וכנה חדלה להתקיים לפני שקרה מקרה הביטוח, או שלא השפיעה על מקרהו, על חבות המבטח או על היקפה.

4.6. במידה שמדובר בתגמולי ביטוח מסוג פיצוי, המבטח אינו זכאי לתרופות האמורות בסעיפים 4.3-4.1 לאחר שעברו שלוש שנים ממועד תחילת הביטוח של המבוטח, זולת אם המבוטח פעל בכוונת מרמה.

## 5. תום תקופת הביטוח וברות ביטוח

### 5.1. הפסקת תקופת הביטוח:

הפסקת ביטוח תכנס לתוקפה לפי המוקדם מבין המועדים הבאים:

5.1.1. במועד תום תקופת הביטוח כמפורט בסעיף 3.1 לעיל;

5.1.2. לפי המוקדם במקרים המנויים בסעיף 5.2.2 להלן;

5.1.3. על פי בקשת המבוטח בכתב למבטח;

5.1.4. במועד סיום עבודתו של המבוטח אצל בעל הפוליסה - הביטוח יסתיים הן לגבי המבוטח העובד והן לגבי בני משפחתו המבוטחים.

### 5.2. המשכיות בפוליסת פרט:

5.2.1. במקרים המנויים בסעיף 5.2.2 להלן יתאפשר לעבור לפוליסת פרט (להלן - פוליסת המשך), שלהלן תנאיה:

5.2.1.1. פוליסת ההמשך תהיה בהיקף כיסויים דומים (אך לא זהים) לאלה הקבועים למבוטח בפוליסה הקבוצתית שברשותו, המקובלות אצל המבטח במועד החתימה על טופס ההצטרפות לפוליסה הפרטית ("מועד המעבר"), בכפוף להוראות הדין לרבות הוראות המפקח על הביטוח.

5.2.1.2. דמי הביטוח יהיו דמי הביטוח שיהיו נהוגים במועד המעבר לכלל המבוטחים אצל המבטח בפוליסה דומה על פי גיל המבוטח. באותו

מועד ועל תעריפים אלה תינתן הנחה של 5% למשך 10 שנים החל ממועד תחילת הביטוח בפוליסת ההמשך.

5.2.1.3. במעבר לפוליסת ההמשך יינתן רצף ביטוחי לכיסויים החופפים ללא בחינה מחודשת של מצב רפואי קודם וללא תקופת אכשרה.

5.2.2. האפשרות למעבר לפוליסת המשך כאמור בסעיף 5.2.1, יינתן במקרים ובתנאים המפורטים להלן:

5.2.2.1. סיום היחסים בין המבוטח לבין בעל הפוליסה או סיום תקופת הביטוח של המבוטח, שבשלם מאבד את זכאותו להיכלל בפוליסה הקבוצתית;

5.2.2.2. הפוליסה הקבוצתית אינה מתחדשת בחברה או אצל מבטח כלשהו לגבי כלל המבוטחים או לגבי חלק מהם;

5.2.2.3. גירושין שבשלם המבוטח מאבד את זכאותו להיכלל בפוליסה הקבוצתית;

5.2.3. במקרים המפורטים בסעיף קטן 5.2.2.1-5.2.2.4, תפנה החברה בכתב לכל מבוטח שהביטוח הקבוצתי הופסק לגביו או אינו מתחדש לגביו, ותציע לו לעבור לפוליסת המשך בתוך 60 ימים ממועד הודעת החברה. תחילת תקופת הביטוח בפוליסות ההמשך תהיה למפרע מיום הפסקת הביטוח הקבוצתי. המעבר לפוליסת ההמשך יתבצע בכפוף לכך שבמועד המעבר, הביטוח הקבוצתי לא חודש למבוטח אצל מבטח אחר או שהמבוטח אינו זכאי עוד להיכלל בפוליסה הקבוצתית אצל אותו מבטח, לפי העניין.

5.2.4. ייתכן שהמעבר לפוליסת המשך יהיה כרוך בהעלאת פרמיה משמעותית למבוטח.

**6. דמי הביטוח:**

6.1. דמי הביטוח החודשיים בש"ח ואופן תשלום דמי הביטוח יהיו כדלקמן:

| | **מסלול ניתוחים מלא (פרקים א'-ג', ה'-ז')** | **אופן התשלום** | **מסלול ניתוחים משלים שב"ן (פרקים א'-ד', ו'-ז')** | **אופן התשלום** |
|---|---|---|---|---|
| עובד/ת | 180 | מרוכז ע"י בעל הפוליסה, במימון בעל הפוליסה כולל שווי מס | לא רלוונטי | |
| בן/בת זוג | 180 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי | 145 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי |
| ילד/ה עד גיל 24 כולל* | 55 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי | 25 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי |
| ילד מעל גיל 25 שנה | 180 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי | 145 | ישולם ישירות ע"י המבוטח באמצעי גבייה אישי |

*מהילד השלישי ואילך (כהגדרתו בפוליסה) - ללא תוספת פרמיה, ובלבד שבפוליסה קיימים לפחות שני ילדים (עד גיל 24 כולל) משלמים.

6.2. מועד פירעון דמי הביטוח יהיה עד ל-10 בכל חודש לגבי בעל הפוליסה ובראשית כל חודש לגבי המבוטח המשלם את דמי הביטוח באמצעות אמצעי גביה אישי.

6.3. לדמי ביטוח אשר לא שולמו במועד יתווספו הפרשי הצמדה וריבית על פי הקבוע בחוק פסיקת ריבית והצמדה תשכ"א 1961 מיום היווצר הפיגור ועד לפירעון בפועל של דמי הביטוח אצל החברה.

6.4. **התאמת פרמיה:** לאחר 30 חודשים מיום תחילת הביטוח, תבוצע התאמת הפרמיה. התאמת דמי הביטוח תבוצע בהתאם לנוסח התאמת הפרמיה הקיים בהסכם בין בעל הפוליסה לבין המבטחת. במקרה שבו לא ישולמו על ידי בעל הפוליסה ו/או המבוטחים, לפי העניין, דמי הביטוח המותאמים, החברה תהיה רשאית לבטל את ההסכם והפוליסה, בהתאם להוראות הדין.

6.5. **קביעת דמי ביטוח - תקנה 5(ב) לתקנות ביטוח בריאות קבוצתי:**

על אף האמור בכל מקום בפוליסה זו ו/או בהסכם הביטוח, מבטח לא יבצע במהלך תקופת הביטוח או במועד חידוש הביטוח הקבוצתי, העלאה של דמי הביטוח שנושא בתשלומם המבוטח בסכום העולה על 15 שקלים חדשים במצטבר לכל מבוטח או בשיעור העולה על 50 אחוזים מהם, הנמוך ביניהם, אלא על פי הסכמתו המפורשת של המבוטח בטרם מועד העלאת דמי הביטוח, אשר תועדה, ואם המבוטח הוא ילדו או בן זוגו של חבר בקבוצת המבוטחים- המבטח רשאי להעלות את דמי הביטוח לאחר שניתנה הסכמת אותו חבר להעלאת דמי הביטוח שהוא נושא בהם לגבי ילדו או בן זוגו; לעניין זה, "העלאה של דמי ביטוח" -

(1) לרבות הפחתה בהיקף הכיסוי הביטוחי שנעשתה כתחליף להעלאה של דמי הביטוח והעלאה בחלק היחסי מדמי הביטוח שנושא בהם המבוטח;

(2) לרבות העברת חובת תשלום דמי הביטוח מבעל הפוליסה למבוטח במלואה או בחלקה או הרחבתה;

(3) למעט העלאה בדמי הביטוח הנובעת מהצמדה למדד שנקבע בפוליסה או העלאה בדמי הביטוח הנובעת ממעבר בין קבוצות גיל שפורטו בטבלת דמי הביטוח שנכללה בפוליסה;

(4) במהלך תקופת הביטוח - בנוגע לדמי הביטוח שמשלם המבוטח מתחילת תקופת הביטוח עד מועד העלאת דמי הביטוח;

(5) במועד חידוש הביטוח הקבוצתי - בנוגע לדמי הביטוח ששילם המבוטח ערב מועד חידוש הביטוח.

## 7. תביעות ותגמולי ביטוח

7.1. החברה תשלם למבוטח את תגמולי הביטוח לפי פוליסה זו או תעבירם ישירות לנותני השירות שבהסכם בכפוף להתקיימותם של כל אלה:

7.1.1. המבוטח/ מוטב הודיע לחברה על קרות מקרה הביטוח מיד לאחר שנודע לו על קרות מקרה הביטוח ועל זכותו לתגמולי הביטוח וקיבל אישור החברה לחבותה על-פי פוליסה זו. **לא פנה המבוטח לחברה לצורך קבלת אישורה, לפני ביצועו של הטיפול הרפואי, כאמור לעיל, תהא רשאית החברה להפחית את סכום תגמולי הביטוח להם יהיה זכאי המבוטח לגובה הסכום שהייתה משלמת החברה לו היה פונה המבוטח לחברה בבקשה לקבלת אישור כאמור לפני ביצועו של הטיפול הרפואי.** האמור לא יחול במקרה שהמבוטח/מוטב פנה לחברה באיחור מסיבות מוצדקות או אם אי הפניה או הפניה באיחור לא מנעו מהחברה את בירור חבותו, לא הכביד על הבירור או לא מנעו את הקטנת ההוצאה הוא הנזק בגינם מתבקש תשלומם של תגמולי הביטוח.

7.1.2. המבוטח חתם על כתב וויתור סודיות רפואית ומסר לחברה את כל הקבלות, הפרטים והמסמכים הרפואיים הסבירים והאחרים הדרושים לחברה לברור תביעתו. המבוטח רשאי להגיש את המסמכים בין היתר באמצעות דואר אלקטרוני, מסרון או חשבון אישי מקוון.

7.2. החברה תהא זכאית לנהל על חשבונה כל חקירה באופן סביר ולבדוק את המבוטח על ידי רופא אחד או יותר מטעמה כפי שתמצא לנכון ובלבד שהבדיקה תהיה סבירה בנסיבות העניין ועל חשבון החברה. יובהר כי אין בכך כדי לגרוע מיכולתו של המבוטח למצות בכל עת את זכויותיו המוקנות לו מכח הפוליסה בבית המשפט.

7.3. החברה תהא רשאית על-פי שיקול דעתה, לשלם את תגמולי הביטוח או חלק מהם, ישירות לנותני השרות, או לשלמם למבוטח.

7.4. תגמולי ביטוח מכוח פוליסה זו ישולמו במטבע ישראלי.

תגמולי ביטוח בגין החזר הוצאות ששולמו במטבע ישראלי יוצמדו למדד המחירים לצרכן ממועד תשלומם על-ידי המבוטח ועד למועד תשלום תגמולי הביטוח. תגמולי ביטוח בגין החזר הוצאות ששולמו במטבע זר, ישולמו לפי שער החליפין היציג של המטבע הישראלי, ביום תשלום תגמולי הביטוח.

המבוטח לא יהיה זכאי לתגמולי ביטוח העולים על סכום הביטוח המרבי.

7.5. נפטר מבוטח, תשלם החברה את יתרת תגמולי הביטוח להם זכאי ספק השירות הרפואי, בהתאם להתחייבות החברה.

7.6. נפטר המבוטח, והיה זכאי לקבלת תגמולי ביטוח נוספים, תשלם החברה לעיזבונו ו/או ליורשיו החוקיים.

7.7. היה המבוטח זכאי לכיסוי ההוצאות המשולמות על-פי ביטוח זה, במלואן או חלקן, במסגרת פוליסה אחרת בחברת ביטוח אחרת, תהא החברה אחראית ביחד ולחוד עם חברת הביטוח האחרת ביחס להוצאות המכוסות החופפות. המבטחים ישאו בנטל החיוב בינם לבין עצמם לפי היחס שבין סכומי הביטוח.

7.8. הוראות לעניין חבות משותפת וזכות שיבוב - סעיף 10 בתקנת ביטוח בריאות קבוצתי:

7.8.1. החברה תהיה אחראית, לחוד, כלפי המבוטח על מלוא סכום תגמולי הביטוח עד לגובה התקרה הקבועה בפוליסה הקבוצתית, אף אם היה המבוטח זכאי לכיסוי ההוצאות המשולמות בעד מקרה ביטוח גם לפי פוליסה לביטוח בריאות אחרת בין אצל אותה חברה ובין אצל חברה אחרת.

7.8.2. בפוליסות שתגמולי ביטוח לפיהן משולמים בהתאם לשיעור הנזק שנגרם, יישאו המבטחים בנטל החיוב בינם לבין עצמם, לפי היחס שבין תקרות תגמולי הביטוח הנוגעות למקרה הביטוח כפי שהן קבועות בפוליסות הביטוח.

## 8. תחלוף:

8.1. הייתה למבוטח בשל מקרה הביטוח גם זכות פיצוי או שיפוי כלפי אדם שלישי, שלא מכח חוזה ביטוח, עוברת זכות זו לחברה משלמה לומטב תגמולי ביטוח וכשיעור התגמולים ששילמה.

8.2. החברה אינה רשאית להשתמש בזכות שהועברה אליה לפי סעיף זה באופן שיפגע בזכותו של המבוטח לגבות מן האדם השלישי פיצוי או שיפוי מעל לתגמולים שקיבל מהחברה.

8.3. קיבל המבוטח מן האדם השלישי פיצוי או שיפוי שהיה מגיע לחברה על-פי סעיף זה, עליו להעבירו לחברה; עשה המבוטח פשרה, ויתור או פעולה אחרת הפוגעת בזכות שעברה לחברה, עליו לפצותה בשל כך.

8.4. המבוטח מתחייב לשתף פעולה, ככל שיידרש ממנו, לשם מימוש זכותה של החברה כאמור.

8.5. הוראות סעיף זה לא יחולו אם מקרה הביטוח נגרם שלא בכוונה בידי אדם שמבוטח סביר לא היה תובע ממנו פיצוי או שיפוי, מחמת קרבת משפחה או יחס של מעביד ועובד שביניהם.

**9. חריגים כלליים לכלל פרקי הפוליסה**

**החברה לא תהא אחראית ולא תהא חייבת לשלם תגמולי ביטוח בגין מקרה ביטוח, כולו או מקצתו, בכל אחד מהמקרים הבאים ו/או שנגרם במישרין ו/או בעקיפין כתוצאה מהמקרים הבאים:**

**9.1. מקרה הביטוח אירע למבוטח טרם הצטרפותו לפוליסה.**

**9.2. מקרה הביטוח אירע לאחר תום תקופת הביטוח.**

**9.3. מקרה הביטוח אירע במהלך תקופת האכשרה, למעט מקרה ביטוח שארע מתאונה לגביו לא תחול תקופת אכשרה.**

**9.4. מקרה ביטוח שגורם ממשי לו היה מהלך רגיל של מצב רפואי קודם. דהיינו; מערכת נסיבות רפואיות שאובחנו במבוטח לפני מועד הצטרפותו לביטוח, לרבות בשל מחלה או תאונה; לעניין זה, "אובחנו במבוטח" - בדרך של אבחנה רפואית מתועדת, או בתהליך של אבחון רפואי מתועד שהתקיים בששת החודשים שקדמו למועד ההצטרפות לביטוח. חריג זה יהא מוגבל בזמן על-פי גיל המבוטח בעת תחילת תקופת הביטוח כדלקמן:**

**1. פחות מ-65 שנים - החריג יהיה תקף לתקופה שלא תעלה על שנה אחת מתאריך תחילת הביטוח של אותו מבוטח.**

**2. 65 שנים או יותר - החריג יהיה תקף לתקופה שלא תעלה על חצי שנה מתאריך תחילת הביטוח של אותו מבוטח.**

**על אף האמור בסעיפים קטנים 9.4 א' ו-9.4 ב' לעיל, סייג לחבות החברה או להיקף הכיסוי בשל מצב רפואי מסוים שפורט בדף פרטי הביטוח לגבי מבוטח מסוים, יהיה תקף לתקופה שצוינה בדף פרטי הביטוח לצד אותו מצב רפואי מסוים. סייג בשל מצב רפואי קודם לא יהיה תקף אם המבוטח הודיע לחברה על מצב בריאותו הקודם, והחברה, לא סייגה במפורש בדף פרטי הביטוח את המצב הרפואי המסוים הנזכר בהודעת המבוטח.**

**הוראות בהתאם לתקנות ביטוח בריאות קבוצתי:**

**10. מתן מסמכים והודעות למבוטח - סעיפים 6, 7 בתקנת ביטוח בריאות קבוצתי**

10.1. מבטח ימסור עם תחילת תקופת הביטוח, לכל יחיד מקבוצת המבוטחים, בין בהצטרפותו לראשונה ובין במועד חידוש הביטוח לתקופה נוספת, העתק פוליסה, טופס גילוי נאות לפי הנחיות המפקח, דף פרטי ביטוח וכן מסמכים נוספים שיורה עליהם המפקח;

10.2. על אף האמור בסעיף 10.1 לעיל, חודש הביטוח הקבוצתי לתקופה נוספת אצל אותו מבטח או הוארך הביטוח לתקופה שאינה עולה על שלושה חודשים, שבמהלכה מתקיים משא ומתן בין בעל הפוליסה ובין המבטח על חידוש הביטוח לתקופה נוספת, בלא שינוי בדמי הביטוח ובשאר תנאי הכיסוי הביטוחי, ימסור המבטח לכל יחיד מקבוצת המבוטחים הודעה על חידוש הביטוח בלבד ויציין -

(1) כי הוארכה תקופת הביטוח ולא חלו שינויים בתנאי הכיסוי הביטוחי;

(2) את האפשרות של המבוטח לקבל העתק ממסמכי הפוליסה;

(3) את האפשרות של המבוטח לעיין במסמכי הפוליסה תוך מתן פירוט היכן הדבר ניתן.

10.3. חלה על מבוטח חובה לשלם דמי ביטוח או חלק מהם, ישלח המבטח למבוטח, לפי דרישתו, העתק מהחוזה שבין המבטח ובין בעל הפוליסה, תוך 30 ימים מן המועד שהתקבלה בו בקשת המבוטח.

10.4. נקבע כי בעל הפוליסה ישלם את דמי הביטוח, במלואם, ישלח המבטח למבוטח, לפי דרישתו, העתק מן החוזה שבין המבטח ובין בעל הפוליסה, בתוך 30 ימים מן המועד שהתקבלה בו בקשת המבוטח, ואולם המבטח רשאי שלא לשלוח למבוטח הוראות בחוזה האמור לעניין גובה דמי הביטוח, התאמת דמי הביטוח והשתתפות ברווחים.

10.5. חל שינוי בדמי הביטוח או בתנאי הכיסוי הביטוחי, במועד חידוש ביטוח הבריאות הקבוצתי או במהלך תקופת הביטוח (בסעיף זה - מועד תחילת השינוי), ימסור המבטח לכל יחיד בקבוצת המבוטחים שהיה מבוטח בה ערב מועד תחילת השינוי, עד 60 ימים לפני מועד תחילת השינוי, הודעה בכתב הכוללת פירוט של אותו שינוי; נדרשה הסכמתו המפורשת של מבוטח, כאמור בסעיף 2.2.9 או בסעיף 6.4 לעיל, תיכלל בהודעה כאמור פסקה לעניין ההסכמה המפורשת הנדרשת של המבוטח ובהעדרה המשמעות של העדר הרצף הביטוחי כאמור בסעיף 2.2.9.2.2 לעיל; לא התקבלה הסכמתו המפורשת של המבוטח כאמור עד למועד תחילת השינוי, ימסור המבטח למבוטח בתוך 21 ימים, ולא יאוחר מ-45 ימים לפני מועד תחילת השינוי, הודעה שנייה בדבר הצורך בקבלת הסכמתו המפורשת של המבוטח; הודעה שנייה תמסר באמצעים אחרים משליחה בדואר רגיל, לרבות, בדואר רשום או שיחת טלפון.

10.5.1. חודשה פוליסה לקבוצת מבוטחים אצל מבטח אחר, אשר לא ביטח את הקבוצה ערב החידוש- ימסור המבטח האחר לכל יחיד בקבוצת המבוטחים הודעה בכתב בדבר חידוש כאמור, לא יאוחר מ-30 ימים ממועד חידוש הביטוח.

10.5.2. הסתיימה הפוליסה ולא חודשה, בין אם אצל אותו מבטח ובין אם אצל מבטח אחר, לכלל או לחלק מהמבוטחים, ימסור המבטח לכל יחיד בקבוצת המבוטחים שהסתיימה או לא חודשה הפוליסה כאמור, לא יאוחר מ-30 ימים ממועד סיום תקופת הביטוח, הודעה בכתב בדבר סיום הביטוח, ויציין בה את זכות ההמשכיות של היחיד לפוליסת פרט לביטוח בריאות ואת זכות היחיד להנחה בדמי הביטוח, ככל שכל אחת מזכויות אלה נוגעות בדבר, וכן יפרט בהודעה כאמור כל זכות נוספת של היחיד הנובעת מסיום הפוליסה.

10.5.3. פסקה הזיקה בין המבוטח לבין בעל הפוליסה כאמור בסעיף 11.3 להלן ימסור המבטח לכל יחיד בקבוצת המבוטחים, בתוך 30 ימים מיום שנודע לו על הפסקת הזיקה כאמור או לכל המאוחר בתוך 90 ימים מיום הפסקת הזיקה כאמור, הודעה בכתב בדבר סיום הביטוח, הכוללת פירוט של זכויות המבוטח לפי הפוליסה הקבוצתית.

10.5.4. חלה על מבוטח במועד ההצטרפות לביטוח הבריאות הקבוצתי החובה לשלם דמי ביטוח, אשר לפי תנאי הפוליסה תחל גבייתם לאחר המועד האמור, ימסור המבטח למי שמשלם את דמי הביטוח שאינו בעל הפוליסה, הודעה בכתב בדבר המועד שבו תחל הגבייה של דמי הביטוח; הודעה כאמור תימסר למי שמשלם את דמי הביטוח במהלך שלושת החודשים שקדמו למועד הגבייה האמור.

## 11. ביטול הפוליסה ע"י המבוטח - סעיף 8 בתקנת ביטוח בריאות קבוצתי

11.1. חודש הביטוח או שונו תנאיו במהלך תקופת הביטוח ולא נדרשה הסכמה מפורשת של המבוטח כאמור בסעיף 2.2.9.2 לעיל והודיע המבוטח למבטח או לבעל הפוליסה, במהלך 60 הימים שלאחר מועד חידוש הביטוח או מועד השינוי, לפי העניין, על ביטול הביטוח לגבי אותו מבוטח, יבוטל הביטוח לגביו החל במועד חידוש הביטוח או במועד השינוי, לפי העניין, ובלבד שלא הוגשה תביעה למימוש זכויות לפי הפוליסה בשל מקרה ביטוח שארע בתקופת 60 הימים כאמור.

11.2. חודש הביטוח או שונו תנאיו במהלך תקופת הביטוח ונדרשה הסכמה מפורשת של המבוטח כאמור בסעיף 2.2.9 או בסעיף 6.4 לעיל, ולא התקבלה הסכמה כאמור עד

מועד חידוש הביטוח, יבוטל הביטוח לגביו החל במועד חידוש הביטוח או במועד השינוי, לפי העניין; בוטל הביטוח כאמור בסעיף זה ופנה מבוטח אל מבטח בבקשה להצטרף חזרה לביטוח הבריאות הקבוצתי בתוך 45 ימים ממועד מסירת ההודעה השנייה ונתן את הסכמתו המפורשת לחידוש הביטוח או לשינוי, לפי העניין, יצורף המבוטח לביטוח הקבוצתי תוך שמירה על רצף ביטוחי כאמור בסעיף 2.2.9.2.2 לעיל; לעניין סעיף זה, "לא התקבלה הסכמה" - למעט סירוב המבוטח במפורש לחידוש הביטוח או שינוי תנאיו ולרבות מבוטח שההודעה השנייה נמסרה לו באמצעות שיחה טלפונית ובמהלכה המבוטח לא הביע את הסכמתו המפורשת.

11.3. על אף האמור בסעיף 3.3 לעיל, פסקה הזיקה בין המבוטח לבין בעל הפוליסה כאמור בתקנה 2 לתקנות ביטוח בריאות קבוצתי, שבשלה הוא התקשר בחוזה לביטוח בריאות קבוצתי, יבוטל הביטוח לגבי אותו מבוטח, לכל היותר בתוך 90 ימים ממועד ביטול הזיקה; ואולם אם בעל הפוליסה הוא מעביד, כאמור בתקנה 2(1) לתקנות אלו, מבטח יהיה רשאי שלא לבטל את הביטוח כאמור עד תום תקופת הביטוח הנקובה בפוליסה, בכפוף להסכמת המבוטח.

### 12. הצמדה

12.1. סכומי הביטוח הקובעים, וגובה ההשתתפות העצמית, אם קיימת, שיש לשלם על פי תנאי הפוליסה על ידי החברה ו/או המבוטח, לפי העניין, צמודים למדד הידוע ביום שבו בוצע התשלום בפועל.

12.2. דמי הביטוח, שיש לשלם על פי תנאי הפוליסה על ידי בעל הפוליסה ו/או המבוטח הכל לפי העניין, צמודים למדד הידוע בראשון לחודש עבורו מבוצע תשלום דמי הביטוח.

12.3. חישוב ההצמדה יהא היחס שבין המדד הידוע ביום שבו בוצע התשלום בפועל או המדד הידוע בראשון לחודש עבורו מבוצע התשלום, לפי העניין, לבין המדד הידוע בתאריך תחילת הביטוח.

### 13. התיישנות

תקופת התיישנות של תביעה לתשלום תגמולי ביטוח בגין מקרה ביטוח על -פי פוליסה זו, היא חמש שנים מיום קרות מקרה הביטוח. אם עילת התביעה הנה נכות שנגרמה למבוטח ממחלה או מתאונה, תימנה תקופת ההתיישנות מיום שקמה למבוטח זכות לתבוע תגמולי ביטוח לפי תנאי חוזה הביטוח.

### 14. חוק הביטוח וחוק הבריאות

14.1. הוראות חוק חוזה הביטוח תשמ"א-1981 יחולו על פוליסה זו.

14.2. למען הסר ספק, הוראות פוליסה זו כפופות להוראות החוק והרגולציה ואין בהם כדי לגרוע מזכויותיו של המבוטח.

14.3. אם יחולו שינויים בחוק הבריאות או בסל שירותי הבריאות על פי חוק הבריאות, תהא החברה רשאית לערוך את השינויים המתבקשים מכך בפוליסה.

### 15. הצהרת בעל הפוליסה - סעיף 3 א' 1 לתקנות ביטוח בריאות קבוצתי

בעל הפוליסה מצהיר ומתחייב בזאת כי הינו פועל באמונה ובשקידה לטובת המבוטחים בלבד ואין ולא תהיה לו כל טובת הנאה מהיותו בעל הפוליסה.

### 16. שינויים

16.1. החברה תהיה רשאית לשנות מעת לעת את רשימת נותני השירות שבהסכם.

16.2. בעל הפוליסה מצהיר בזאת כי מודע לכך שגובה דמי הביטוח הקבועים בהסכם זה נקבעו על ידי החברה ואושרו על ידו וזאת על בסיס המצב החוקי והרגולטורי כפי שהיה

במועד החתימה על ההסכם. לאור האמור לעיל, מוסכם ומוצהר בין הצדדים כי במידה ויחול שינוי מהותי בשוק ביטוחי הבריאות בישראל - הציבורי והפרטי, לרבות אך לא רק, הגבלה של מתן שירותים על ידי ספקים שבהסדר בלבד ו/או קביעת השתתפות עצמית, תהיה חברת הביטוח רשאית להתאים את הפרמיה במהלך תקופת הביטוח ו/או להפסיק את תקופת הביטוח בתוך 60 יום מהיום בו יחול השינוי.

**17. מיסים והיטלים**

17.1. בעל הפוליסה או המבוטח, חייב בתשלום כל המיסים הממשלתיים והאחרים החלים על ביטוח זה או המוטלים על דמי הביטוח ועל תגמולי הביטוח ועל כל התשלומים האחרים, בין אם מיסים אלה קיימים ביום היכנס הביטוח לתוקף ובין אם יוטלו במועד מאוחר יותר.

17.2. המבטח רשאי, על פי שיקול דעתו הבלעדי, לשלם המיסים, ההיטלים וההוצאות, כאמור או חלקם במקום המבוטח ובמקרה זה, יהיה הסכום ששולם, כאמור, חלק מתגמולי הביטוח.

**18. הבהרה לזמן השירות הצבאי**

יובהר כי השימוש בעת השירות הצבאי בפוליסת ביטוח הבריאות שברשותך, כפוף להוראות הצבא כפי שישתנו מעת לעת.

# פרק א': השתלות וטיפולים מיוחדים מחוץ לישראל

**1. הגדרות**

1.1. **השתלה:** השתלת איבר או חלק מאיבר העונה על אחת החלופות הבאות כמפורט באחד מסעיפים 1.1.1-1.1.3:

1.1.1. כריתה כירורגית או הוצאה מגוף המבוטח, של ריאה, לב, כליה, לבלב, כבד, שחלה, מעי וכל שילוב ביניהם, והשתלת איבר שלם או חלק מאיבר שרופא מומחה בתחום הנוגע לעניין בישראל אישר כי מצבו הרפואי של המבוטח מחייב את ביצועה, לאחר הכריתה או ההוצאה, שנלקחו מגופו של אדם אחר במקומם או השתלה של מח עצם מתורם אחר בגוף המבוטח; השתלה תכלול גם השתלת לב מלאכותי; במקרה שבו יושתל לב מלאכותי לפני השתלת לב מגופו של אדם אחר, יחשב הדבר כמקרה ביטוח אחד;

1.1.2. כריתה כירורגית או הוצאה מגוף המבוטח, של ריאה, לב, כליה, לבלב, כבד, וכל שילוב ביניהם, והשתלת איבר שלם או חלק מאיבר, לאחר הכריתה או ההוצאה, שנלקח מבעל חיים, במקומם;

1.1.3. השתלת מח עצם או תאי גזע מדם טבורי או מדם פריפרי, שמקורם במבוטח עצמו;

1.2. **טיפול חלופי בישראל:** טיפול רפואי שנועד לטפל במצבו הרפואי של מבוטח הניתן לביצוע בישראל, שלפי אמות מידה רפואיות מקובלות מאפשר להשיג למבוטח אותה תוצאה רפואית המושגת באמצעות טיפול רפואי אחר, שאינו ניתן לביצוע בישראל, ובלבד שאינו כרוך בתופעות לוואי חמורות יותר או בתוצאות גופניות חמורות יותר או נזק למבוטח, הפוגע באיכות חייו.

**טיפול מיוחד מחוץ לישראל:** טיפול רפואי מחוץ לישראל לרבות ניתוח **(למעט השתלה כהגדרתה לעיל),** שרופא מומחה בישראל בתחום הנוגע לעניין הוציא לגביו חוות דעת בכתב, כי מצבו הרפואי של המבוטח מחייב את ביצועו ומתקיימים בו אחד מהתנאים הבאים המפורטים בסעיפים 1.2.1-1.2.4 לפחות:

1.2.1. שירותי הרפואה בישראל אינם מספקים את הטיפול המיוחד ואין לו טיפול חלופי בישראל;

1.2.2. הטיפול המיוחד חיוני להצלת חיי המבוטח ומניעתו מהווה סכנה משמעותית לחיי המבוטח או לפגיעה קשה באיכות חייו ובריאותו;

1.2.3. זמן ההמתנה המקובל בישראל לטיפול מאותו סוג, ארוך באופן שעלול לגרום להחמרה משמעותית המסכנת את חיי המבוטח;

1.2.4. סיכויי ההצלחה בביצוע הטיפול המיוחד מחוץ לישראל גבוהים משמעותית, לפי אמות מידה רפואיות מקובלות, מסיכויי ההצלחה של ביצוע טיפול זה בישראל;

1.3. **רופא מומחה בישראל:** רופא שהרשויות המוסמכות בישראל אישרו לו תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל"ג-1973, ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות;

1.4. **תקופת אכשרה:** תקופה המתחילה בתאריך הצטרפות המבוטח לפרק זה בפוליסה והמסתיימת בתום התקופה שצוינה לכל כיסוי, שבה המבוטח עדיין אינו זכאי לכיסוי ביטוחי מכוח הפוליסה; תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות אצל אותו מבטח.

**2. מקרה הביטוח**

מקרה הביטוח הוא מצבו הרפואי של המבוטח המחייב ביצוע השתלה או ביצוע טיפול מיוחד מחוץ לישראל.

**3. כיסוי ביטוחי**

פרק זה להשתלות וטיפולים מיוחדים מחוץ לישראל תכלול כיסוי ביטוחי בהתאם למפורט להלן:

3.1. **להשתלה שבוצעה או צפויה להתבצע אצל נותן שירות שבהסכם עם המבטח -** כיסוי מלא להוצאות המפורטות בסעיף קטן 4.1, שיפוי מוגבל להוצאות המפורטות בסעיף 4.2 וכן פיצוי כמפורט בסעיף קטן 4.3.

3.2. **להשתלה שבוצעה או צפויה להתבצע אצל נותן שירות שלא בהסכם עם המבטח -** כיסוי מלא להוצאות המפורטות בסעיף קטן 4.1, שיפוי מוגבל להוצאות המפורטות בסעיף קטן 4.2 וכן פיצוי כמפורט בסעיף קטן 4.3 ובלבד שסכום הכיסוי המירבי לכל מקרה ביטוח לא יעלה על הסכומים המפורטים להלן:

3.2.1. עבור השתלה כהגדרתה בחלופה בסעיף 1.1.1 - עד 5,000,000 ₪;

3.2.2. עבור השתלה כהגדרתה בחלופה בסעיף 1.1.2 - עד 3,000,000 ₪;

3.2.3. עבור השתלה כהגדרתה בחלופה בסעיף 1.1.3 - עד 150,000 ₪.

3.3. **עבור טיפול מיוחד מחוץ לישראל שבוצע אצל נותן שירות שבהסכם -** כיסוי מלא להוצאות המפורטות בסעיפים קטנים 4.1.2 עד 4.1.7 וכן שיפוי מוגבל להוצאות המפורטות בסעיפים קטנים 4.2.2 עד 4.2.7.

3.4. **עבור טיפול מיוחד מחוץ לישראל שבוצע אצל נותן שירות שאינו בהסכם -** כיסוי מלא להוצאות המפורטות בסעיפים קטנים 4.1.2 עד 4.1.7 וכן שיפוי מוגבל להוצאות המפורטות בסעיפים קטן 4.2.2 עד 4.2.7 ובלבד שסכום הכיסוי המרבי לכל מקרה ביטוח לא יעלה על 1,000,000 ₪.

**4. התחייבות החברה**

יובהר כי בטרם מתן שיפוי או פיצוי למימון ביצוע השתלה יבחן המבטח אם ההשתלה בוצעה בהתאם להוראות חוק השתלת איברים, התשס"ח.

4.1. בקרות מקרה הביטוח החברה תשלם תגמולי ביטוח בגין ההוצאות המפורטות להלן - **שיפוי מלא,** בכפוף להוראות ולתקרות סכומי הביטוח המפורטים בסעיפים קטנים 3.1-3.4 לעיל:

4.1.1. הוצאות לביצוע הפעילות הרפואית הנדרשת לקציר האיבר המושתל, שימורו והעברתו למקום ביצוע ההשתלה;

4.1.2. הוצאות אשפוז מחוץ לישראל עד 180 יום לפני ביצוע ההשתלה או הטיפול המיוחד ועד 365 ימים לאחר ביצוע ההשתלה או הטיפול המיוחד;

4.1.3. הוצאות שכר הצוות הרפואי ועלות חדר הניתוח במהלך ביצוע ההשתלה או הטיפול המיוחד מחוץ לישראל;

4.1.4. הוצאות כרטיס טיסה מחוץ לישראל במחלקת תיירים להשתלה או ביצוע טיפול מיוחד מחוץ לישראל של המבוטח ומלווה אחד, או שני מלווים אם המבוטח הוא קטין, והוצאות שיבתם לישראל;

4.1.5. הוצאות נסיעה יבשתיות של המבוטח ומלוויו, משדה התעופה לבית החולים מחוץ לישראל וחזרה;

4.1.6. הוצאות הטסת גופת המבוטח לישראל אם נפטר בעת שהותו מחוץ לישראל לצורך ההשתלה או לצורך הטיפול המיוחד מחוץ לישראל;

4.1.7. הוצאות בשל מיסים, היטלים והמרת סכום הביטוח למטבע חוץ;

4.2. להוצאות המפורטות להלן - **שיפוי** לפי תקרות הסכומים המופיעות לצדן, ובכפוף לסעיפים קטנים 3.1-3.4 לעיל:

4.2.1. הוצאות בדיקות לאיתור תרומת מח עצם, או הוצאות רפואיות הכרוכות בהפקת מח עצם או תאי גזע מדם טבורי או דם פריפרי, הנדרשים להשתלה ובכלל זה רישום במאגרים מחוץ לישראל - עד 300,000 ₪;

4.2.2. הוצאות בשל הערכה רפואית או תפקודית לפני ביצוע השתלה או טיפול מיוחד מחוץ לישראל לרבות טיסות הלוך ושוב לחו"ל של המבוטח ומלווה אחד לצורך ביצוע בדיקות, בטיסה מסחרית במחלקת תיירים - עד 200,000 ₪;

4.2.3. הוצאות טיפולים רפואיים במבוטח מחוץ לישראל שקשורים באופן ישיר לביצוע ההשתלה או הטיפול המיוחד מחוץ לישראל, לרבות טיפולי דיאליזה - עד 250,000 ₪;

4.2.4. הוצאות הטסה רפואית במקרה שבו עלה צורך רפואי - עד 100,000 ₪; על אף האמור, אם החברה תיאמה את ההטסה הרפואית המיוחדת - כיסוי מלא;

4.2.5. הוצאות שהייה מחוץ לישראל הנחוצות לצורך השתלה או טיפול מיוחד מחוץ לישראל- עד 1,000 ₪ ליום למבוטח ולמלווה אחד או במקרה שבו המבוטח הוא קטין עד 1,500 ₪ ליום למבוטח ולשני מלווים;

4.2.6. הוצאות לטיפולי המשך בתוך 12 חודשים ממועד ביצוע ההשתלה או הטיפול המיוחד מחוץ לישראל- עד 200,000 ₪ אם הם נובעים מביצוע ההשתלה, ועד 150,000 ₪ אם הם נובעים מביצוע טיפול מיוחד מחוץ לישראל;

4.2.7. הוצאות הבאת מומחה רפואי לישראל לביצוע השתלה או טיפול מיוחד בישראל, עד תקרת כיסוי בגובה 200,000 ₪;

4.3. להוצאות המפורטות להלן - **פיצוי** לפי סכומים המופיעים לצדן, ובכפוף להוראות סעיפים קטנים 3.1-3.4 לעיל:

4.3.1. קצבה חודשית למועמד להשתלה אשר בשל מצבו הרפואי מרותק למיטתו - 4,500 ₪; לחלופין אם שהה באשפוז בבית חולים - 2,000 ₪ לתקופה שבה היה מאושפז, וכל זאת עד מועד ביצוע ההשתלה בפועל ולא יותר מ-9 חודשים; לעניין זה "מועמד להשתלה" - מבוטח שקיבל אישור של המרכז הלאומי להשתלות בישראל על הצורך בביצוע ההשתלה;

4.3.2. גמלת החלמה חודשית לאחר ביצוע השתלה, למעט השתלת מח עצם עצמית - 5,500 ₪ למשך תקופה של 24 חודשים;

4.3.3. השתלה שבוצעה מחוץ לישראל בהתאם לתנאי חוק השתלת איברים התשס"ח-2008, למעט השתלת מח עצם עצמית, ללא השתתפות המבטח - פיצוי חד פעמי בסך 350,000 ₪;

## 5. תקופת אכשרה

תקופת האכשרה תהיה 90 ימים, למעט אם מקרה הביטוח נגרם בשל תאונה.

## 6. חריגים

**בנוסף לחריגים המפורטים בתנאים הכלליים בפוליסה, פרק זה להשתלות וטיפולים מיוחדים מחוץ לישראל מחריג מכיסוי את המקרים הבאים:**

**6.1. מקרה ביטוח שאירע למבוטח טרם הצטרפותו לפוליסה, לאחר תום תקופת הביטוח או במהלך תקופת האכשרה;**

**6.2. מקרה ביטוח שאירע באופן ישיר עקב פעילות מלחמתית, פעולת איבה או שארע במהלך שירות צבאי הנובע באופן ישיר מפעילות בעלת אופי צבאי;**

6.3. מקרה ביטוח שארע עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבנציונלי או זיהום רדיואקטיבי;

6.4. מקרה ביטוח שארע עקב מצב רפואי קודם, בכפוף לתקנות הפיקוח על עסקי ביטוח (תנאים בחוזי ביטוח) (הוראות לעניין מצב רפואי קודם), התשס"ד-2004;

6.5. השתלות או טיפולים מיוחדים מחוץ לישראל למטרות מחקר או המבוססים על טכנולוגיות רפואיות ניסיוניות, לרבות השתלות וטיפולים מיוחדים מחוץ לישראל שנדרש אישור של ועדת הלסינקי עליונה או כל גורם אחר שבא במקומה לביצועם; לעניין זה: "ועדת הלסינקי עליונה" - "הוועדה העליונה" כהגדרתה בתקנות בריאות העם (ניסויים רפואיים בבני אדם), התשמ"א-1980;

6.6. השתלה או טיפול מיוחד שאינם נובעים מצורך רפואי ונועדו למטרות אסתטיקה, קוסמטיקה או תיקון קוצר ראייה;

6.7. מקרה ביטוח שארע למבוטח השוהה רוב ימות השנה (183 ימים לפחות) מחוץ למדינת ישראל;

6.8. טיפולי רפואה משלימה;

6.9. טיפולים נפשיים;

6.10. לגבי טיפולים מיוחדים מחוץ לישראל-

6.10.1. טיפול מיוחד מסיבה של היריון, לידה, עקרות, פוריות, עיקור מרצון והפלה;

6.10.2. טיפול מיוחד הקשור בשיניים או בחניכיים.

# פרק ב': ביטוח תרופות מחוץ לסל הבריאות

**1. הגדרות מיוחדות נוספות לפרק זה**

1.1. **בדיקה גנטית** - בדיקה גנומית מולקולרית או צביעות מיוחדות (אימונוהיסטוכימיות) שאינן מכוסות בסל שירותי הבריאות;

1.2. **טיפול תרופתי** - נטילת תרופה לפי מרשם, באופן חד-פעמי או מתמשך;

1.3. **מדינות מוכרות** - ישראל, ארצות הברית, קנדה, אוסטרליה, ניו זילנד, שוויץ, נורבגיה, איסלנד, אחת מהמדינות החברות באיחוד האירופי לפני מאי 2004, או במסלול הרישום המרכזי של האיחוד האירופי (EMEA);

1.4. **מרשם** - מסמך רפואי חתום ביד רופא מומחה או רופא בית חולים, לפי בחירת המבוטח, המאשר את הצורך בטיפול התרופתי ומורה על אופן השימוש בתרופה, את המינון ומשך הטיפול הנדרש;

1.5. **סל שירותי הבריאות** - מכלול השירותים הרפואיים והתרופות שנותנות קופות החולים לחבריהן, לפי חוק ביטוח בריאות ממלכתי, התשנ"ד-1994, או מכוח מחויבות אחרת שבין הקופה לכלל מבוטחיה, למעט מחויבויות שבמסגרת תכנית השב"ן;

1.6. **רופא מומחה** - רופא שהרשויות המוסמכות בישראל אישרו לו תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל"ג-1973, ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות, ובלבד שתחום מומחיותו הוא בתחום הנוגע לטיפול בתרופה;

1.7. **רשות מוסמכת** - הגורמים ו/או המוסדות אשר להם הסמכות למתן רישיון או היתר לשיווק תרופות חדשות לפי הדין החל במדינה בה משווק התרופה.

1.8. **תקופת אכשרה** - תקופה המתחילה בתאריך הצטרפות המבוטח לביטוח והמסתיימת בתום התקופה שצוינה לכל כיסוי, שבה המבוטח אינו זכאי לכיסוי ביטוחי מכוח הפוליסה; תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות אצל אותו מבטח;

1.9. **המחיר המירבי המאושר לתרופה** - הסכום המאושר מעת לעת על ידי הרשויות המוסמכות בישראל לגביה בגין תרופה.

1.10. **תרופה** - חומר כימי או ביולוגי, שנועד לטיפול במצב רפואי, מניעת החמרתו (לרבות מניעת התפתחותם של מצבים רפואיים נוספים) או מניעת הישנותו, כתוצאה ממחלה או תאונה;

1.11. **תרופת יתום** - תרופה לטיפול במחלה נדירה;

1.12. **תרופה מיוחדת** - תרופה שאינה כלולה בסל שירותי הבריאות, שהרשות המוסמכת באחת מהמדינות המוכרות אישרה אותה להתוויה רפואית כלשהי והמבוטח קיבל אישור לייבוא אישי של תרופה, מכוח סעיף 29א(3) לתקנות הרוקחים (תכשירים), התשמ"ו-1986.

1.13. **תרופה ניסיונית** - תרופה שאינה תרופה מיוחדת, תרופת יתום או תרופה off label ושמתקיים לגביה אחד מהבאים:

1.13.1. תרופה שרשות מוסמכת באף אחת מהמדינות המוכרות לא אישרה אותה לשימוש כפלשהו;

1.13.2. תרופה שרשות מוסמכת באחת מהמדינות המוכרות אישרה אותה לשימוש כלשהו, אך השפעותיה על מצבו הרפואי של המבוטח אינן ידועות, והמתווה הטיפולי המבוקש, לרבות מינון התרופה, אינו נתמך באמות מידה רפואיות מקובלות ולא הוכח כיעיל לטיפול במצבו הרפואי של המבוטח;

1.13.3. תרופה שנמצאת בהליך ניסוי קליני;

1.14. **תרופה Off Label** - תרופה, שהרשויות המוסמכות באחת מהמדינות המוכרות אישרה אותה לשימוש, אך לא להתוויה הרפואית לטיפול במצבו הרפואי של המבוטח, ובלבד שאחד מהמפורטים להלן הכיר ביעילות התרופה לטיפול במצבו הרפואי של המבוטח:

1.14.1. פרסומי ה-FDA;

1.14.2. American Hospital Formulary Service Drug Information;

1.14.3. US Pharmacopoeia - Drug Information;

1.14.4. Drugdex (Micromedex), ובלבד שהתרופה עונה על שלושת התנאים הבאים במצטבר, כפי שמופיעים בטבלת ההמלצות:

1.14.4.1. עוצמת המלצה (Strength of Recommendation) - נמצאת בקבוצה I או IIa;

1.14.4.2. חוזק הראיות - (Strength of Evidence) נמצאת בקטגוריה A או B;

1.14.4.3. יעילות - (Efficacy) נמצאת בקבוצה I או IIa.

1.14.5. תרופה שהטיפול בה מומלץ, באחד מה-National Guidelines שמפרסם אחד מהבאים לפחות:

1.14.5.1. NCCN;

1.14.5.2. ASCO;

1.14.5.3. NICE;

1.14.5.4. Esmo Minimal.Recommendation

1.15. **תרופת Investigational New Drug (IND)"-** תרופה שהרשות המוסמכת באחת המדינות המוכרות אישרה כי הינה IND.תרופה המצויה על סף סיום תהליכי אישור ברשויות המוסמכות במדינות המוכרות אך עדיין לא נרשמה להתוויה בהתאם להמלצת הרופא המטפל ובתנאי שמוצו טיפולים תרופתיים קיימים/זמינים למחלתו והתרופה אינה ניתנת למבוטח במסגרת ניסוי קליני.

## 2. מקרה הביטוח

מקרה הביטוח הוא אחד או יותר משני המצבים האלה:

2.1. מצבו הרפואי של המבוטח מחייב אותו, לפי הוראות רופא מומחה או רופא בית חולים, לקבל טיפול תרופתי, באמצעות אחת או יותר מהתרופות המפורטות להלן:

2.1.1. תרופה שאינה כלולה בסל שירותי הבריאות שהרשות המוסמכת באחת המדינות המוכרות אישרה לשימוש לפי ההתוויה הרפואית לטיפול במצבו הרפואי של המבוטח;

2.1.2. תרופה הכלולה בסל שירותי הבריאות שהרשות המוסמכת באחת המדינות המוכרות אישרה לטיפול במצבו הרפואי של המבוטח אך אינה מוגדרת לההתוויה הרפואית הקבועה בסל שירותי הבריאות לטיפול במצבו הרפואי של המבוטח;

2.1.3. תרופה OFF LABEL;

2.1.4. תרופת יתום שאינה כלולה בסל שירותי הבריאות שהרשויות המוסמכות בישראל או באחת או יותר מהמדינות המוכרות אישרה או הכירה בה כתרופת יתום להתוויה הנדרשת לטיפול במבוטח, **למעט תרופה המפותחת לאדם מסוים, לפי קוד גנטי מסוים, פרופיל גנטי מסוים או מבנה מסוים של המולקולות והתאים של אותו אדם;**

2.1.5. תרופה מיוחדת;

2.1.6. תרופת Investigational New Drug (IND).

2.2. מצבו הרפואי של המבוטח מצריך לפי המלצת רופא אונקולוג המטפל במבוטח ביצוע בדיקה גנטית להתאמת הטיפול התרופתי למחלת הסרטן במבוטח, וזאת לפי פרוטוקולים מקובלים בישראל, באירופה או בארצות הברית.

**3. הכיסוי הביטוחי ותגמולי הביטוח**

3.1. פרק זה לתרופות מחוץ לסל שירותי הבריאות יכלול כיסוי לכל תקופת הביטוח, עד סכומי השיפוי המפורטים להלן:

3.1.1. בשל כל מקרי הביטוח המפורטים בסעיפים 2.1.1 עד 2.1.4 - עד 3,000,000 ₪.

3.1.2. בשל כל מקרי הביטוח כמפורט בסעיף 2.1.5-2.1.6 - עד 1,000,000 ₪, ולא יותר מ-200,000 ₪ בחודש.

3.1.3. סכום שיפוי נוסף בשל כל אחד ממקרי הביטוח המפורטים בסעיפים 2.1, אם נטילת התרופה כרוכה בהוצאות לשירות רפואי או טיפול רפואי - עד 250 ₪ ליום ועד 60 ימים.

3.1.4. בשל מקרה הביטוח המפורט בסעיף 2.2 - עד 80% מההוצאות ולא יותר מ-40,000 ₪ עבור כל מקרה ביטוח.

3.1.5. תקרות הסכומים המפורטות בסעיפים 3.1.1-3.1.4 לעיל יתחדשו אחת לכל תקופה של שנתיים, שתחילתה במועד תאריך תחילת הביטוח של הפוליסה לכלל המבוטחים.

3.2. סכום השיפוי המירבי לתרופה לא יעלה על המחיר המירבי המאושר לתרופה. תרופה אשר לא נקבע לה מחיר מאושר על ידי הרשויות המוסמכות בישראל, יקבע סכום לאותה תרופה, על פי המחיר המירבי המאושר בהולנד, על פי שער הדולר (ארה"ב) הידוע במועד רכישת התרופה בפועל. במידה ולתרופה אין מחיר מירבי מאושר בהולנד, ייקבע סכום שיפוי לפי המחיר המירבי המאושר לאותה תרופה באנגליה על פי שער הדולר (ארה"ב) הידוע במועד רכישת התרופה בפועל.

**4. השתתפות עצמית**

4.1. סכום ההשתתפות העצמית החודשית בשל מקרי הביטוח המפורטים בסעיפים 2.1.1-2.1.4 לעיל - 300 ₪ לתרופה, לאותו חודש.

4.2. סכום ההשתתפות העצמית החודשים בשל מקרה הביטוח המפורט בסעיף 2.1.5 - 500 ₪ לתרופה, לאותו חודש.

4.3. על אף האמור בסעיפים קטנים 5.1 ו-5.2 לעיל, לא תיגבה השתתפות עצמית עבור תרופה שעלותה החודשית גבוהה מ-5,000 ₪.

**5. חריגים**

בנוסף לחריגים המפורטים בתנאים הכלליים בפוליסה, פרק זה **לתרופות מחוץ לסל שירותי הבריאות מחריג מכיסוי את המקרים האלה ואת התרופות האלה:**

**5.1. מקרה ביטוח שאירע למבוטח טרם הצטרפותו לפוליסה, לאחר תום תקופת הביטוח או במהלך תקופת האכשרה;**

**5.2. טיפול תרופתי שניתן מסיבות של היריון, לידה, עקרות, אין אונות, פוריות, עיקור מרצון והפלה;**

**5.3. תרופה הקשורה בשיניים או בחניכיים;**

**5.4. מקרה ביטוח שאירע באופן ישיר עקב פעילות מלחמתית, פעולת איבה או פעילות ישירה בעלת אופי צבאי;**

**5.5. מקרה ביטוח שארע עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבנציונלי או זיהום רדיואקטיבי;**

5.6. מקרה ביטוח שארע עקב מצב רפואי קודם, בכפוף לתקנות הפיקוח על עסקי ביטוח (תנאים בחוזי ביטוח) (הוראות לעניין מצב רפואי קודם), התשס"ד-2004;

5.7. תרופה ניסיונית;

5.8. תרופה שאינה נובעת מצורך רפואי ונועדה למטרות אסתטיקה או קוסמטיקה;

5.9. טיפול תרופתי מונע במסגרת שירות רפואה מונעת, רפואה משלימה, טיפול בוויטמינים, חיסונים, תוספי מזון או Anti-Aging;

5.10. טיפול תרופתי מניעתי לתסמונת הכשל החיסוני (איידס), למעט למבוטחים שהם נשאים או חולים;

5.11. תרופה לירידה במשקל, למעט אם המבוטח נמצא עם יחס BMI מעל 36 הסובל בנוסף מבעיות של סכרת או לחץ דם או מבוטח עם יחס BMI גבוה מ-40;

5.12. שתל, אביזר או אמצעי אחר להחדרת תרופה או אביזר מצופה תרופה.

5.13. מקרה ביטוח שארע למבוטח השוהה רוב ימות השנה (183 ימים לפחות) מחוץ למדינת ישראל.

5.14. קנבוס - כהגדרתו בתוספת הראשונה לפקודת הסמים המסוכנים (נוסח חדש), התשל"ג-1973; יובהר כי החריג לא יכלול תרופה הנכללת ברשימת התרופות המאושרות באחת מהמדינות המוכרות, שמכילה אחד או יותר מרכיבי הקנבוס או נגזרות קנבוס.

### 6. תקופת אכשרה

תקופת האכשרה לכיסוי תרופות מחוץ לסל שירותי הבריאות תהיה 90 ימים, למעט אם מקרה הביטוח נגרם בשל תאונה.

# פרק ג׳: ביטוח לניתוחים וטיפולים מחליפי ניתוח מחוץ לישראל

1. **הגדרות**

**התייעצות:** התייעצות עם רופא מומחה אגב ניתוח או אגב טיפול מחליף ניתוח, בין אם בוצעה לפני הניתוח או הטיפול מחליף הניתוח ובין אם בוצעה אחריו;

**טיפול מחליף ניתוח:** טיפול רפואי או סדרת טיפולים שמבצע רופא מומחה כתחליף לביצוע ניתוח, שלפי אמות מידה רפואיות מקובלות נועד להשיג מטרה דומה למטרת הניתוח שאותו הוא מחליף;

**ניתוח:** פעולה פולשנית-חדירתית החודרת דרך רקמות ומטרתה טיפול במחלה, פגיעה, תיקון פגם או עיוות אצל המבוטח, או מניעה של כל אחד מאלה, לרבות פעולה המתבצעת באמצעות קרן לייזר, לאבחון או לטיפול, ראיית אברים פנימיים בדרך אנדוסקופית, צנתור, אנגיוגרפיה וכן ריסוק אבני כליה או מרה על ידי גלי קול;

**ניתוח מורכב:** ניתוח שבעקבותיו אושפז המבוטח במשך 7 ימים ברצף לפחות;

**רופא מומחה:** רופא בעל התמחות בתחום הנוגע לעניין המורשה לפי כל דין במדינה שבה מתבצע הניתוח או הטיפול לבצע את הניתוח או הטיפול מחליף הניתוח;

**רופא מומחה בישראל:** רופא שהרשויות המוסמכות בישראל אישרו לו תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל"ג-1973 ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות;

**שתל:** כל אבזר, איבר טבעי או חלק מאיבר טבעי, או איבר מלאכותי, מפרק מלאכותי או טבעי המושתל או המורכב בגופו של המבוטח במהלך ניתוח המכוסה במסגרת הביטוח, למעט תותבת שיניים ושתל דנטלי;

**תקופת אכשרה:** תקופה המתחילה בתאריך הצטרפות המבוטח לביטוח והמסתיימת בתום התקופה שצוינה לכל כיסוי, שבה המבוטח עדיין אינו זכאי לכיסוי ביטוחי מכוח הפוליסה; תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות אצל אותו מבטח.

2. **מקרה הביטוח**

ביצוע ניתוח או טיפול מחליף ניתוח שהמבוטח בחר לבצעו בבית חולים מחוץ לישראל, **ובלבד שרופא מומחה נתן חוות דעת על צורך בביצוע הניתוח או בטיפול מחליף הניתוח, טרם נסיעתו של המבוטח מחוץ לישראל ובלבד שהרופא המבצע את הניתוח או שותף לביצועו, אינו מנתח בישראל בששת החודשים שקדמו לניתוח.**

לעניין זה, ביצוע טיפול מחליף ניתוח לא ישלול מהמבוטח את הזכאות לניתוח אם לאחר הטיפול החלופי יזדקק המבוטח לטיפול נוסף.

3. **כיסוי ביטוחי**

בקרות מקרה הביטוח יכלול פרק זה כיסוי ביטוחי בהתאם למפורט להלן:

3.1. **לניתוח מחוץ לישראל שבוצע אצל נותן שירות שבהסכם עם המבטח -** כיסוי מלא להוצאות המפורטות בסעיף קטן 3.4, שיפוי מוגבל להוצאות המפורטות בסעיף קטן 3.5 ופיצוי כמפורט בסעיף קטן 3.6.

3.2. **עבור ניתוח מחוץ לישראל שבוצע אצל נותן שירות שאינו בהסכם עם המבטח -** כיסוי מלא להוצאות המפורטות בסעיף קטן 3.4, שיפוי מוגבל להוצאות המפורטות בסעיף קטן 3.5 ופיצוי כמפורט בסעיף קטן 3.6 **ובלבד שסכום הכיסוי המירבי למקרה ביטוח לא יעלה על 250% מעלות אותו הניתוח בישראל;**

לעניין זה, "עלות הניתוח בישראל" - הסכום המפורסם באתר האינטרנט של המבטח לאותו הניתוח בישראל; במקרה שבו הניתוח אינו מוזכר באתר האינטרנט של המבטח,

תחושב עלות הניתוח לפי עלות ניתוח דומה המופיע באתר החברה, מאותו סדר גודל, סוג ניתוח, מורכבות ניתוח, לפי החלטת רופא החברה ולפי אמות מידה רפואיות מקובלות;

3.3. לטיפול מחליף ניתוח מחוץ לישראל, בין שבוצע אצל נותן שירות שבהסכם עם המבטח ובין שבוצע אצל נותן שירות שאינו בהסכם עם המבטח - כיסוי מלא להוצאות המפורטות בסעיפים קטנים 3.4.1 ו-3.4.2 **ובלבד שסכום הכיסוי המירבי למקרה ביטוח לא יעלה על 250% מעלות הניתוח החלופי בישראל.**

לעניין זה, "עלות הניתוח החלופי בישראל" - הסכום המפורסם באתר האינטרנט של המבטח לניתוח שאותו החליף הטיפול מחליף הניתוח מחוץ לישראל, במקרה שבו הניתוח אינו מוזכר באתר האינטרנט של המבטח, תחושב עלות הניתוח לפי עלות ניתוח דומה המופיע באתר החברה, מאותו סדר גודל, סוג ניתוח, מורכבות ניתוח, לפי החלטת רופא החברה ולפי אמות מידה רפואיות מקובלות.

**תגמולי ביטוח בגין מקרה ביטוח**

3.4. בקרות מקרה הביטוח יינתן **שיפוי מלא** עבור ההוצאות המפורטות להלן ובכפוף להוראות סעיפים 3.1-3.3 לעיל:

3.4.1. שכר הרופא המבצע את הניתוח או הטיפול מחליף הניתוח מחוץ לישראל;

3.4.2. כל ההוצאות הרפואיות הנדרשות לשם ביצוע הניתוח או הטיפול מחליף הניתוח מחוץ לישראל ולאשפוז הנלווה לביצועו כולל הוצאות אשפוז **עד לתקרה של 40 ימים** כולל אשפוז טרום ניתוח או טרום הטיפול מחליף הניתוח, ובכלל זה שכר רופא מרדים, הוצאות חדר ניתוח, ציוד מתכלה, תרופות במהלך הניתוח והאשפוז או הטיפול מחליף הניתוח והאשפוז, בדיקות פתולוגיות, בדיקות שבוצעו כחלק מהניתוח או הטיפול מחליף הניתוח;

3.4.3. עלות הטסת גופת המבוטח אם נפטר בעת שהותו מחוץ לישראל לצורך הניתוח;

3.4.4. הוצאות טיסה לניתוח מורכב - כיסוי מלא לטיסות במחלקת תיירים למבוטח ולמלווה; במקרה שהמבוטח קטין - כיסוי מלא לטיסות במחלקת תיירים למבוטח ולשני מלווים;

3.4.5. הוצאות נסיעה יבשתיות בגין ניתוח מורכב של המבוטח ומלוויו, משדה התעופה לבית החולים מחוץ לישראל וחזרה;

3.5. בקרות מקרה הביטוח יינתן **שיפוי עד לגובה הכיסוי** ותקרת הסכומים המפורטים לצדן עבור ההוצאות המפורטות להלן ובכפוף להוראות סעיפים 3.1 ו-3.2 לעיל:

3.5.1. הוצאות שתי התייעצות בקשר לניתוח עם רופא מומחה בישראל - עד 1,200₪ לכל התייעצות;

3.5.2. הוצאות התייעצות אחת בקשר לניתוח עם רופא מומחה מחוץ לישראל - עד 4,000₪.

3.5.3. הוצאות הטסה רפואית במקרה שבו עלה צורך רפואי - עד 100,000₪; אם החברה תיאמה את ההטסה הרפואית המיוחדת על ידי החברה - כיסוי מלא;

3.5.4. הוצאות הבאת מומחה רפואי לישראל לביצוע הניתוח בישראל במקרה שלא ניתן להטיס את המבוטח מחוץ לישראל מסיבות רפואיות - עד 200,000₪;

3.5.5. הוצאות עלות שתל שהושתל במהלך ניתוח - עד 60,000₪;

3.5.6. הוצאות נוספות בשל ניתוח מורכב:

3.5.6.1. עלות שכירת שירותי אחות פרטית לתקופה שלא תעלה על 8 ימים בתוך 30 ימים ממועד ביצוע הניתוח המורכב - עד 650₪ ליום;

3.5.6.2. הוצאות שהייה מחוץ לישראל הנחוצות לצורך ניתוח מורכב - עד 1,000₪ ליום למבוטח ולמלווה אחד או במקרה שבו המבוטח

הוא קטין עד 1,500 ₪ ליום למבוטח ולשני מלווים, לתקופה מרבית של 30 יום;

3.5.6.3. הוצאות טיפולי פיזיותרפיה, ריפוי בעיסוק התעמלות שיקומית ושיקום כושר הדיבור, שיבוצעו בישראל שנדרשו עקב ניתוח מורכב מחוץ לישראל ושבוצעו בתוך 90 ימים מיום ביצוע הניתוח המורכב - עד 250 ₪ לטיפול ועד 16 טיפולים לכל סוגי הטיפולים לכל היותר, ובלבד שהמבוטח נושא בהשתתפות עצמית בגובה 20% מעלות הטיפול;

3.5.6.4. הוצאות עבור מוסד החלמה המוכר בישראל לאחר ניתוח מורכב, בתוך תקופה של 3 חודשים ממועד ביצוע הניתוח המורכב ולמשך תקופה של עד 10 ימים רצופים, אם רופא מומחה בתחום הרלבנטי החליט על הצורך בהחלמה - עד 400 ₪ לכל יום;

3.5.6.5. הוצאות לבדיקות והתייעצויות רפואיות מחוץ לישראל, שדרש הרופא המנתח, ושבוצעו לאחר ביצוע הניתוח המורכב וכהמשך ישיר ממנו, ובלבד שבוצעו בתוך 90 ימים מיום ביצוע הניתוח - עד 100,000 ₪;

3.6. נפטר המבוטח בתוך 14 ימים ממועד ביצוע הניתוח וכתוצאה ישירה מהניתוח תשלם החברה למוטב, אותו קבע המבוטח, או אם לא נקבע מוטב ליורשיו החוקיים של המבוטח, פיצוי בגובה 150,000 ₪.

## 4. חריגים מיוחדים

בנוסף לחריגים בתנאים הכלליים בפוליסה, **החברה לא תהא חייבת בתשלום תגמולי ביטוח על-פי פרק זה במקרים הבאים:**

**4.1. מקרה ביטוח שאירע למבוטח טרם הצטרפותו לפוליסה, לאחר תום תקופת הביטוח או במהלך תקופת האכשרה;**

**4.2. ניתוח או טיפול מחליף ניתוח הקשורים בשיניים או בחניכיים או ניתוחים שמבצעים רופאי שיניים;**

**4.3. מקרה ביטוח שארע באופן ישיר עקב פעילות מלחמתית, פעולת איבה או שארע במהלך שירות צבאי הנובע באופן ישיר מפעילות בעלת אופי צבאי;**

**4.4. מקרה ביטוח שארע עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבנציונלי או זיהום רדיואקטיבי;**

**4.5. מקרה ביטוח שארע למבוטח השוהה רוב ימות השנה (183 ימים לפחות) מחוץ למדינת ישראל;**

**4.6. מקרה ביטוח שארע עקב מצב רפואי קודם, בכפוף לתקנות הפיקוח על עסקי ביטוח (תנאים בחוזי ביטוח) (הוראות לענין מצב רפואי קודם), התשס"ד-2004;**

**4.7. ניתוח או טיפול מחליף ניתוח מסיבות של היריון, לידה, עקרות, פוריות, עיקור מרצון, והפלה;**

**4.8. ניתוח או טיפול מחליף ניתוח או טיפול שאינו נובע מצורך רפואי ונועד למטרות אסתטיקה, קוסמטיקה או תיקון קוצר ראיה, למעט הניתוחים הבאים:**

**4.8.1. ניתוח שיקום השד לאחר כריתת שד;**

**4.8.2. ניתוח בריאטרי למבוטח עם יחס BMI מעל 36 הסובל בנוסף מבעיות של סכרת או לחץ דם או מבוטח עם יחס BMI גבוה מ-40.**

**4.9. טיפולי רפואה משלימה;**

**4.10. טיפולים נפשיים;**

4.11. השתלת איברים בישראל או מחוץ לישראל, או טיפולים מיוחדים מחוץ לישראל כהגדרתם בפוליסת השתלות וטיפולים מיוחדים מחוץ לישראל;

4.12. ניתוחים או טיפולים מחליפי ניתוח למטרות מחקר או ניתוחים וטיפולים מחליפי ניתוח המבוססים על טכנולוגיות רפואיות ניסיוניות, לרבות ניתוחים וטיפולים מחליפי ניתוח שנדרש אישור של ועדת הלסינקי עליונה או כל גורם אחר שבא במקומה לביצועם; לעניין זה, "ועדת הלסינקי עליונה" - "הוועדה העליונה" כהגדרתה בתקנות בריאות העם (ניסויים רפואיים בבני אדם), התשמ"א-1980;

4.13. בדיקות, בדיקות מעבדה, רנטגן, הקרנות, טיפולים כימותרפיים או אונקולוגיים, טיפול היפרתרמי, זריקה, הזלפות, בדיקות ופעולות הדמיה כגון: CT ו-MRI, אם הן אינן חלק ממהלך הניתוח או טיפול מחליף הניתוח.

## 5. תקופת אכשרה

תקופת האכשרה לכיסוי נתוחים וטיפולים מחליפי ניתוח מחוץ לישראל תהיה 90 ימים, למעט אם מקרה הביטוח נגרם בשל תאונה.

# פרק ד': ניתוחים משלים שב"ן ללא השתתפות עצמית

(לבעלי שב"ן - "כללית מושלם/פלטינום", "מכבי מגן זהב", "מאוחדת עדיף/שיא", "לאומית זהב")

**1. הגדרות**

בפרק זה יחולו ההגדרות המפורטות בתנאים הכלליים ובנוסף, יחולו ההגדרות שלהלן:

**1.1. בית חולים פרטי:**

על אף האמור בתנאים הכלליים, לצורכי תכנית זו, תחול ההגדרה שלהלן:

אחד מאלה:

- בית חולים בישראל שהוא בבעלות פרטית ושאינו בית חולים ציבורי כללי כהגדרתו בסעיף 19 בחוק לשינוי סדרי עדיפויות לאומיים (תיקוני חקיקה להשגת יעדי התקציב לשנים 2013 ו-2014), התשע"ג-2013;
- בית חולים ציבורי כללי כהגדרתו בסעיף 19 לחוק האמור שהרשויות המוסמכות לספק שירות בחירת רופא בתשלום.

**1.2. התייעצות:**

התייעצות עם רופא מומחה אגב ניתוח או אגב טיפול מחליף ניתוח, בין אם בוצעה לפני הניתוח או הטיפול מחליף הניתוח ובין אם בוצעה אחריו.

**1.3. טיפול מחליף ניתוח:**

טיפול רפואי המבוצע בידי רופא מומחה כתחליף לביצוע ניתוח, אשר על פי אמות מידה רפואיות מקובלות נועד להשיג מטרה דומה למטרת הניתוח שאותו הוא מחליף.

**1.4. מרפאה כירורגית פרטית:**

מרפאה, כהגדרתה בסעיף 34(ג) לפקודת בריאות העם, הטעונה רישום בהתאם להוראות שלפי סעיף 34(א)(2) לפקודה האמורה, שאינה בבעלות ממשלתית, ואשר מתבצעות בה פעולות כירורגיות.

**1.5. ניתוח:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

פעולה פולשנית - חדירתית החודרת דרך רקמות ומטרתה טיפול במחלה, פגיעה, תיקון פגם או עיוות אצל המבוטח, או מניעה של כל אחד מאלה, לרבות פעולה המתבצעת באמצעות קרן לייזר, לאבחון או לטיפול, הראיית אברים פנימיים בדרך אנדוסקופית, צנתור, אנגיוגרפיה וכן ריסוק אבני כליה או מרה על ידי גלי קול.

**1.6. קופת חולים:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

כהגדרתה בסעיף 2 לחוק ביטוח בריאות ממלכתי, התשנ"ד-1994.

**1.7. רופא מומחה:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

רופא אשר אושר לו בידי הרשויות המוסמכות בישראל תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל"ג-1973, ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות.

**1.8. שתל:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

כל אבזר, איבר טבעי או חלק מאיבר טבעי, או איבר מלאכותי, מפרק מלאכותי או טבעי המושתלים או המורכבים בגופו של המבוטח במהלך ניתוח המכוסה במסגרת הביטוח, **למעט תותבת שיניים ושתל דנטלי.**

**1.9. תקופת אכשרה:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

תקופה המתחילה בתאריך הצטרפות המבוטח לביטוח והמסתיימת בתום התקופה שצוינה עבור כל כיסוי, ובה המבוטח עדיין אינו זכאי לכיסוי ביטוחי מכוח הפוליסה, למעט אם מקרה הביטוח נגרם בשל תאונה; תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות אצל אותו מבטח.

**2. מקרה הביטוח**

ניתוח או טיפול מחליף ניתוח שבוצע בישראל במבוטח במהלך תקופת הביטוח או התייעצות שבוצעה בישראל במהלך תקופת הביטוח באמצעות רופא ו/או מוסד רפואי, **אשר יש למבטח עימו הסדר ניתוח או הסדר התייעצות כמוגדר להלן, לפי העניין.**

**3. תגמולי ביטוח**

**הסדר ניתוח -** הסדר ניתוח כהגדרתו בחוק ביטוח בריאות ממלכתי התשנ"ד-1994 - הסכם בין החברה לבין רופא או מוסד רפואי לפיו מלוא התשלומים הקשורים לניתוח שבוצע בישראל, לרבות התשלומים לרופא ולמוסד הרפואי וכן התשלומים בעבור הציוד, האביזרים והתכשירים המשמשים בביצוע הניתוח ובמהלך הטיפול, ישולמו על ידי החברה למעט השתתפות עצמית ככל שנקבעה.

**הסדר התייעצות -** הסדר התייעצות כהגדרתו בחוק ביטוח בריאות ממלכתי התשנ"ד-1994 - הסכם בין החברה לבין רופא או מוסד רפואי, לפיו מלוא התשלום המגיע לרופא או למוסד רפואי בעד התייעצות רפואית נקבע באותו הסכם, ימומן על ידי חברת הביטוח, למעט השתתפות עצמית ככל שנקבעה ויכול שישולם על ידי החברה או על ידי המטופל.

בקרות מקרה ביטוח המבוטח יהיה זכאי כדלקמן:

3.1. החברה תשפה את המבוטח בשל ניתוח פרטי בישראל, **רק במקרים הבאים:**

3.1.1. שיפוי בשל ניתוח פרטי בישראל, ובכלל זה כיסוי הוצאות הניתוח, הניתן רק אם תוכנית השב"ן שהמבוטח עמית בה אינה כוללת כיסוי ביטוחי להוצאות הניתוח או אם הרופא המנתח אינו נמצא בהסדר ניתוח עם קופת החולים ונמצא בהסדר ניתוח עם החברה;

3.1.2. שיפוי בשל ההשתתפות העצמית ששילם המבוטח לפי תוכנית שב"ן שהוא עמית בה, בעד ניתוח שמומן באמצעות תוכנית השב"ן, אף אם הרופא לא ברשימת ההסדר עם החברה;

3.1.3. שיפוי בגין רכישת אביזר במקרה בו קיים אביזר שלא נמצא בכיסוי השב"ן, אך נמצא בכיסוי פוליסת הביטוח בחברה, כאשר מימון הניתוח יהיה על ידי השב"ן.

3.2. במקרים בהם אין השב"ן מכסה מקרה ביטוח למבוטח, בשל נסיבות מסויימות הנוגעות למבוטח מסויים (כגון פיגור בתשלום דמי החברות לשב"ן או הפסקת החברות בשב"ן, כהגדרתה בסעיף 5 להלן, או מכל סיבה אחרת) יהיה המבוטח זכאי לכיסוי על פי האמור בסעיף 3.1 לעיל, ויראו אותו כמי שחברותו בשב"ן לא הופסקה והוא יכוסה (כתשלום לנותני שירות שבהסדר כאמור לעיל) לפחות על פי ההפרש שבין סך ההוצאות בפועל לבין ההוצאות שהיו משולמות לו במקרה של מימון ההוצאות על ידי תכנית השב"ן שבה הוא היה חבר **ובכפוף לכך שיש למבטח עם הרופא ו/או המוסד הרפואי הסדר ניתוח או הסדר התייעצות, לפי העניין.** יובהר, לצורך חישוב ההפרש האמור בסעיף 3.2 זה, יידרש המבוטח להוכיח מהן הזכויות הניתנות לחברי השב"ן לאותו מקרה ביטוח. במקרים שבהם לא יוכח מהן הזכויות הניתנות לחברי השב"ן, תיקבע השתתפות החברה על פי המידע הקיים בחברה לגבי ההשתתפות הנדרשת באותו סוג ניתוח ובאותה תוכנית שב"ן.

3.3. במקרים שבהם השב"ן שבו חבר המבוטח אינו מכסה את מקרה הביטוח לכלל העמיתים בשב"ן, לרבות במהלך תקופת אכשרה/המתנה בשב"ן (כהגדרתה בשב"ן) וכן במקרים בהם המבוטח הינו חייל בשירות סדיר, יינתן כיסוי בגין ההוצאות המוכרות המפורטות בסעיף 4 להלן בהתאם לניתן בביטוח לניתוחים מסוג "מהשקל הראשון" **ובכפוף לכך שלמבטח קיים הסדר ניתוח עם הרופא ו/או המוסד הרפואי, והוראות סעיף 3.1 לעיל לא יחולו על מקרה הביטוח.**

## 4. הכיסוי הביטוחי

בקרות מקרה הביטוח ובכפוף להוראות סעיף 3 לעיל, יהיה זכאי המבוטח כדלקמן:

4.1. **שלוש התייעצויות בכל שנת ביטוח; שלוש התייעצויות בכל שנת ביטוח** ועד לסך של 1500₪ להתייעצות (צמוד למדד) אצל רופא שאין לגביו הסדר ניתוח או הסדר התייעצות, לפי העניין. לעניין זה יובהר כי התייעצות תכוסה גם אם בסופו של דבר לא בוצע הניתוח או הטיפול מחליף הניתוח שההתייעצות נערכה לגביו;

4.2. **שכר מנתח;**

4.3. **ניתוח בבית חולים פרטי או במרפאה כירורגית פרטית;** כיסוי זה יכלול את כל ההוצאות הרפואיות הנדרשות לשם ביצוע הניתוח ולאשפוז הנלווה לביצועו, לרבות שכר רופא מרדים, הוצאות חדר ניתוח, ציוד מתכלה, שתלים, תרופות במהלך הניתוח והאשפוז, בדיקות שבוצעו כחלק מהניתוח והוצאות אשפוז עד לתקרה של 30 ימי אשפוז כולל אשפוז טרום-ניתוח.

4.4. **טיפול מחליף ניתוח;** וזאת עד לתקרת עלות הניתוח המוחלף בישראל. לעניין זה, עלות הניתוח המוחלף בישראל הנה על פי הסכום המפורסם במועד קרות מקרה הביטוח באתר האינטרנט של החברה בכתובת www.harel-group.co.il כיסוי זה לא ישלול מהמבוטח את הזכאות לניתוח אם לאחר הטיפול החלופי יזדקק המבוטח לטיפול נוסף.

**יובהר כי התשלומים בגין סעיפים 3, 4.2 ו-4.3 לעיל, ישולמו לנותני השירות שבהסדר התייעצות או הסדר ניתוח בלבד ולא ישולם למבוטח החזר בגין הוצאות שהוציא, אף אם שולמו על ידיו לנותני שירות שבהסדר כאמור.** יובהר כי במקרה ששילם המבוטח לנותן שירות שבהסדר, יהיה זכאי לכיסוי (באמצעות תשלום לנותן השירות שבהסדר) עד הסך שהיה משולם לנותן שירות שבהסדר התייעצות או הסדר ניתוח, לפי העניין.

## 5. זכאות לברות ביטוח

הופסקה ו/או בוטלה ו/או תמה חברותו ו/או זכאותו של המבוטח בשב"ן מסיבה כלשהי (לעיל ולהלן: **"הפסקת החברות בשב"ן"**) ו/או קיבל המבוטח מהחברה תגמולי ביטוח על פי סעיף 3.1 לעיל, בגין קרות מקרה הביטוח הראשון, יהא המבוטח רשאי לבקש בתוך 60 יום מיום הפסקת החברות בשב"ן או בתוך 90 יום מיום קבלת תגמולי הביטוח בגין מקרה הביטוח הראשון בלבד, להצטרף לביטוח לכיסוי לניתוחים מסוג "מהשקל הראשון" שלא יפחת בהיקפו מתנאי הכיסוי לניתוחים הנהוג בחברה באותה עת, עם הגשת בקשה, תשלום דמי ביטוח מלאים וכנהוג בחברה באותה עת. במקרה זה, יהיה המבוטח זכאי לברות ביטוח שמשמעותה הצטרפות ברצף ביטוחי ללא כל תקופת אכשרה וללא הצהרת בריאות חדשה. תחילת הביטוח לכיסוי לניתוחים "מהשקל הראשון" תהא למפרע על פי מועד הפסקת החברות בשב"ן.

## 6. חריגים

בנוסף לחריגים בתנאים הכלליים בפוליסה, **החברה לא תהא אחראית ולא תהא חייבת לשלם תגמולי ביטוח לפי פרק זה בכל אחד מהמקרים הבאים:**

6.1. **מקרה הביטוח אירע למבוטח טרם הצטרפותו לפוליסה, לאחר תום תקופת הביטוח או במהלך תקופת האכשרה;**

**6.2.** **ניתוח או טיפול מחליף ניתוח מסיבות של עקרות, פוריות, עיקור מרצון והפלה, למעט הפלה הנדרשת מסיבה רפואית;**

**6.3.** **ניתוח או טיפול מחליף ניתוח או טיפול שאינו נובע מצורך רפואי ונועד למטרות אסתטיקה, קוסמטיקה או תיקון קוצר ראיה, למעט הניתוחים הבאים:**

**6.3.1.** **ניתוח שיקום השד לאחר כריתת שד;**

**6.3.2.** **ניתוח בריאטרי למבוטח עם יחס BMI מעל 36 הסובל נוסף על כך מבעיות של סכרת או לחץ דם או מבוטח עם יחס BMI גבוה מ-40.**

**6.4.** **ניתוח או טיפול מחליף ניתוח הקשור בשיניים או בחניכיים או ניתוחים המבוצעים על ידי רופא שיניים;**

**6.5.** **השתלה: לעניין זה, השתלה כהגדרתה בהוראות הפיקוח על שירותים פיננסים (ביטוח) (תנאים בחוזה ביטוח לפוליסת בריאות בסיסית), התשפ"ג-2023.**

**6.6.** **ניתוחים או טיפולים מחליפי ניתוח למטרות מחקר או ניתוחים וטיפולים מחליפי ניתוח המבוססים על טכנולוגיות רפואיות ניסיוניות, לרבות ניתוחים וטיפולים מחליפי ניתוח שנדרש אישור של ועדת הלסינקי עליונה או כל גורם אחר שבא במקומה לביצועם; לעניין זה, "ועדת הלסינקי עליונה" - "הוועדה העליונה" כהגדרתה בתקנות בריאות העם (ניסויים רפואיים בבני אדם), התשמ"א-1980;**

**6.7.** **מקרה ביטוח שארע באופן ישיר עקב פעילות מלחמתית או פעולת איבה או שארע במהלך שירות צבאי הנובע באופן ישיר מפעילות בעלת אופי צבאי;**

**6.8.** **מקרה ביטוח שארע עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבנציונלי או זיהום רדיואקטיבי;**

**6.9.** **מקרה ביטוח שארע עקב מצב רפואי קודם, בכפוף להוראות תקנות הפיקוח על עסקי ביטוח (תנאים בחוזי ביטוח) (הוראות לעניין מצב רפואי קודם), התשס"ד-2004.**

**6.10.** **מקרה ביטוח שאין לחברה לגביו הסדר ניתוח, עם הרופא ו/או המוסד הרפואי. קרי הזכאות לכיסוי ביטוחי הנה רק אם לחברה קיים הסדר ניתוח עם הרופא וגם עם המוסד הרפואי למעט כאמור בסעיף 3.1.2 לעיל**

## 7. הודעה לחברה על קרות מקרה הביטוח

קרה מקרה הביטוח, על המבוטח להודיע על כך לחברה מיד לאחר שנודע לו, ולפנות לחברה בבקשה לקבלת אישור מוקדם לקבלת הטיפול הרפואי. על המבוטח למסור לחברה, תוך זמן סביר לאחר שנדרש לכך, את המידע והמסמכים הדורשים לבירור חבות החברה, ואם אינם ברשותו, עליו לעזור לחברה, ככל שיוכל, להשיגם.

לא פנה המבוטח לחברה לצורך קבלת אישורה, לפני ביצועו של הטיפול הרפואי, כאמור לעיל, או לא מסר המבוטח לחברה מידע ומסמכים או לא עזר להשיגם, כאמור לעיל, תהא רשאית החברה להפחית את סכום תגמולי הביטוח להם יהיה זכאי המבוטח לגובה הסכום שהייתה משלמת החברה לו היה פונה המבוטח לחברה בבקשה לקבלת אישור כאמור לפני ביצועו של הטיפול הרפואי. האמור לא יחול במקרה שהמבוטח פנה למבטח באיחור מסיבות מוצדקות או אם אי הפניה או הפניה באיחור לא מנעו מהחברה את בירור חבותה ולא הכביד על הבירור.

## 8. התחייבות המבוטח

המבוטח נדרש לפעול למימוש מלוא זכויותיו בשב"ן ולשתף לשם כך פעולה עם החברה, וכן להודיע לחברה בהקדם, ככל שניתן, על כל החלטה של השב"ן הרלוונטי לבירור תביעתו וכן על כל התחייבות ו/או תשלום שבוצעו לגביו על ידי השב"ן.

**9. שינויים, ויתורים או סטיות בתנאי הפוליסה**

9.1. פרק זה כפוף לכל התנאים הכלליים.

9.2. כל שינוי ו/או ויתור ו/או סטייה מהאמור בתנאים הכלליים, יחייב לעניין פרק זה רק אם נכלל במפורש בפרק.

9.3. במקרה של סתירה בין האמור בפרק זה לבין האמור בפרק אחר של הפוליסה ואו בתנאים הכלליים, יחייבו לעניין מקרי הביטוח המפורטים בפרק זה הוראות פרק זה.

**10. תקופת אכשרה**

10.1. תקופת האכשרה לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות תהיה 90 ימים למעט אם מקרה הביטוח נגרם בשל תאונה.

10.2. על אף האמור בסעיף 10.1 לעיל, תקופת האכשרה לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות בנוגע להריון או לידה תהיה 12 חודשים.

# פרק ה׳: ניתוחים וטיפולים מחליפי הניתוח בישראל (ניתוחים שקל ראשון ללא השתתפות עצמית)

**1. הגדרות**

בפרק זה יחולו ההגדרות המפורטות בתנאים הכלליים ובנוסף, יחולו ההגדרות שלהלן:

**1.1 בית חולים פרטי:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

אחד מאלה:

(1) בית חולים בישראל שהוא בבעלות פרטית ושאינו בית חולים ציבורי כללי כהגדרתו בסעיף 19 בחוק לשינוי סדרי עדיפויות לאומיים (תיקוני חקיקה להשגת יעדי התקציב לשנים 2013 ו-2014), התשע״ג-2013;

(2) בית חולים ציבורי כללי כהגדרתו בסעיף 19 לחוק האמור שהרשויות המוסמכות לספק שירות בחירת רופא בתשלום.

**1.2 התייעצות:**

התייעצות עם רופא מומחה אגב ניתוח או אגב טיפול מחליף ניתוח, בין אם בוצעה לפני הניתוח או הטיפול מחליף הניתוח ובין אם בוצעה אחריו.

**1.3 טיפול מחליף ניתוח:**

טיפול רפואי המבוצע בידי רופא מומחה כתחליף לביצוע ניתוח, אשר על פי אמות מידה רפואיות מקובלות נועד להשיג מטרה דומה למטרת הניתוח שאותו הוא מחליף.

**1.4 מרפאה כירורגית פרטית:**

מרפאה, כהגדרתה בסעיף 34(ג) לפקודת בריאות העם, הטעונה רישום בהתאם להוראות שלפי סעיף 34(א)(2) לפקודה האמורה, שאינה בבעלות ממשלתית, ואשר מתבצעות בה פעולות כירורגיות.

**1.5 ניתוח:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

פעולה פולשנית - חדירתית החודרת דרך רקמות ומטרתה טיפול במחלה, פגיעה, תיקון פגם או עיוות אצל המבוטח, או מניעה של כל אחד מאלה, לרבות פעולה המתבצעת באמצעות קרן לייזר, לאבחון או לטיפול, הראיית אברים פנימיים בדרך אנדוסקופית, צנתור, אנגיוגרפיה וכן ריסוק אבני כליה או מרה על ידי גלי קול.

**1.6 קופת חולים:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

כהגדרתה בסעיף 2 לחוק ביטוח בריאות ממלכתי, התשנ״ד-1994.

**1.7 רופא מומחה:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

רופא אשר אושר לו בידי הרשויות המוסמכות בישראל תואר מומחה בתחום רפואי מסוים לפי תקנה 2 לתקנות הרופאים (אישור תואר מומחה ובחינות), התשל״ג-1973, ושמו כלול ברשימת הרופאים המומחים שפורסמה לפי תקנה 34 לתקנות האמורות.

**1.8 שתל:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן: כל אבזר, איבר טבעי או חלק מאיבר טבעי, או איבר מלאכותי, מפרק מלאכותי או טבעי המושתלים או המורכבים בגופו של המבוטח במהלך ניתוח המכוסה במסגרת הביטוח, למעט תותבת שיניים ושתל דנטלי.

**1.9. הסדר ניתוח:**

הסדר ניתוח כהגדרתו בחוק ביטוח בריאות ממלכתי התשנ"ד-1994 - הסכם בין החברה לבין רופא או מוסד רפואי לפיו מלוא התשלומים הקשורים לניתוח שבוצע בישראל, לרבות התשלומים לרופא ולמוסד הרפואי וכן התשלומים בעבור הציוד, האביזרים והתכשירים המשמשים בביצוע הניתוח ובמהלך הטיפול, ישולמו על ידי החברה למעט השתתפות עצמית ככל שנקבעה.

**1.10. הסדר התייעצות:**

הסדר התייעצות כהגדרתו בחוק ביטוח בריאות ממלכתי התשנ"ד-1994 - הסכם בין החברה לבין רופא או מוסד רפואי, לפיו מלוא התשלום המגיע לרופא או למוסד רפואי בעד התייעצות רפואית נקבע באותו הסכם, ימומן על ידי חברת הביטוח, למעט השתתפות עצמית ככל שנקבעה ויכול שישולם על ידי החברה או על ידי המטופל.

**1.11. תקופת אכשרה:**

על אף האמור בתנאים הכלליים, לצורכי פרק זה, תחול ההגדרה שלהלן:

תקופה המתחילה בתאריך הצטרפות המבוטח לביטוח והמסתיימת בתום התקופה שצוינה עבור כל כיסוי, ובה המבוטח עדיין אינו זכאי לכיסוי ביטוחי מכוח הפוליסה, למעט אם מקרה הביטוח נגרם בשל תאונה; תקופת האכשרה תחול לגבי כל מבוטח פעם אחת בלבד בתקופות ביטוח רצופות אצל אותו מבטח.

## 2. מקרה הביטוח

מקרה הביטוח הוא ניתוח או טיפול מחליף ניתוח, שבוצע בישראל במבוטח במהלך תקופת הביטוח או התייעצות שבוצעה בישראל במהלך תקופת הביטוח באמצעות רופא ו/או מוסד רפואי, אשר יש למבטח עימו הסדר ניתוח או הסדר התייעצות, לפי העניין.

## 3. הכיסוי הביטוחי

בקרות מקרה ביטוח יהיה זכאי המבוטח לכיסוי מקרים אלה:

3.1. **שלוש התייעצויות בכל שנת ביטוח** ועד לסך של 1500₪ להתייעצות אצל רופא שאין לגביו הסדר ניתוח או הסדר התייעצות, לפי העניין. לעניין זה יובהר כי התייעצות תכוסה גם אם בסופו של דבר לא בוצע הניתוח או הטיפול מחליף הניתוח שההתייעצות נערכה לגביו;

3.2. **שכר מנתח;**

3.3. **ניתוח בבית חולים פרטי או במרפאה כירורגית פרטית;** כיסוי זה יכלול את כל ההוצאות הרפואיות הנדרשות לשם ביצוע הניתוח ולאשפוז הנלווה לביצועו, לרבות שכר רופא מרדים, הוצאות חדר ניתוח, ציוד מתכלה, שתלים, תרופות במהלך הניתוח והאשפוז, בדיקות שבוצעו כחלק מהניתוח והוצאות אשפוז עד לתקרה של 30 ימי אשפוז כולל אשפוז טרום- ניתוח.

3.4. **טיפול מחליף ניתוח;** וזאת עד לתקרת עלות הניתוח המוחלף בישראל. לעניין זה, עלות הניתוח המוחלף בישראל הנה על פי הסכום המפורסם במועד קרות מקרה הביטוח באתר האינטרנט של החברה בכתובת www.harel-group.co.il. כיסוי זה לא ישלול מהמבוטח את הזכאות לניתוח אם לאחר הטיפול החלופי יזדקק המבוטח לטיפול נוסף.

**התשלומים בגין סעיפים 3.2 ו-3.3, ישולמו לנותני השירות שבהסדר ניתוח בלבד ולא ישולם למבוטח החזר בגין הוצאות שהוציא, אף אם שולמו על ידיו לנותני שירות שבהסדר כאמור.** יובהר כי במקרה ששילם המבוטח לנותן שירות שבהסדר, יהיה זכאי לכיסוי (באמצעות תשלום לנותן השירות שבהסדר) עד הסך שהיה משולם לנותן שירות שבהסדר התייעצות או הסדר ניתוח, לפי העניין.

**4. חריגים**

בנוסף לחריגים בתנאים הכלליים בפוליסה, **החברה לא תהא אחראית ולא תהא חייבת לשלם תגמולי ביטוח לפי פרק זה בכל אחד מהמקרים הבאים:**

**4.1. מקרה הביטוח שאירע למבוטח טרם הצטרפותו לפוליסה, לאחר תום תקופת הביטוח או במהלך תקופת האכשרה;**

**4.2. ניתוח או טיפול מחליף ניתוח מסיבות של עקרות, פוריות, עיקור מרצון והפלה, למעט הפלה הנדרשת מסיבה רפואית;**

**4.3. ניתוח או טיפול מחליף ניתוח או טיפול שאינו נובע מצורך רפואי ונועד למטרות אסתטיקה, קוסמטיקה או תיקון קוצר ראיה, למעט הניתוחים הבאים:**

**4.3.1. ניתוח שיקום השד לאחר כריתת שד;**

**4.3.2. ניתוח בריאטרי למבוטח עם יחס BMI מעל 36 הסובל נוסף על כך מבעיות של סכרת או לחץ דם או מבוטח עם יחס BMI גבוה מ-40.**

**4.4. ניתוח או טיפול מחליף ניתוח הקשור בשיניים או בחניכיים או ניתוחים המבוצעים על ידי רופא שיניים;**

**4.5. השתלה: לעניין זה, השתלה כהגדרתה בהוראות הפיקוח על שירותים פיננסים (ביטוח) (תנאים בחוזה ביטוח לפוליסת בריאות בסיסית), התשפ"ג-2023.**

**4.6. ניתוחים או טיפולים מחליפי ניתוח למטרות מחקר או ניתוחים וטיפולים מחליפי ניתוח המבוססים על טכנולוגיות רפואיות ניסיוניות, לרבות ניתוחים וטיפולים מחליפי ניתוח שנדרש אישור של ועדת הלסינקי עליונה או כל גורם אחר שבא במקומה לביצועם; לעניין זה, "ועדת הלסינקי עליונה" - "הוועדה העליונה" כהגדרתה בתקנות בריאות העם (ניסויים רפואיים בבני אדם), התשמ"א-1980;**

**4.7. מקרה ביטוח שארע באופן ישיר עקב פעילות מלחמתית או פעולת איבה או שארע במהלך שירות צבאי הנובע באופן ישיר מפעילות בעלת אופי צבאי;**

**4.8. מקרה ביטוח שארע עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבנציונלי או זיהום רדיואקטיבי;**

**4.9. מקרה ביטוח שארע עקב מצב רפואי קודם, בכפוף להוראות תקנות הפיקוח על עסקי ביטוח (תנאים בחוזי ביטוח) (הוראות לעניין מצב רפואי קודם), התשס"ד-2004.**

**4.10. ניתוח שבוצע בישראל ושאין לחברה לגביו הסדר ניתוח עם הרופא ו/או המוסד הרפואי. קרי הזכאות לכיסוי ביטוחי הנה רק אם לחברה קיים הסדר ניתוח עם הרופא וגם עם המוסד הרפואי.**

**5. הודעה לחברה על קרות מקרה הביטוח**

קרה מקרה הביטוח, על המבוטח להודיע על כך לחברה מיד לאחר שנודע לו, ולפנות לחברה בבקשה לקבלת אישור מוקדם לקבלת הטיפול הרפואי. על המבוטח למסור לחברה, תוך זמן סביר לאחר שנדרש לכך, את המידע והמסמכים הדורשים לבירור חבות החברה, ואם אינם ברשותו, עליו לעזור לחברה, ככל שיוכל, להשיגם.

לא פנה המבוטח לחברה לצורך קבלת אישורה, לפני ביצועו של הטיפול הרפואי, כאמור לעיל, או לא מסר המבוטח לחברה מידע ומסמכים או לא עזר להשיגם, כאמור לעיל, תהא רשאית החברה להפחית את סכום תגמולי הביטוח להם יהיה זכאי המבוטח לגובה הסכום שהייתה משלמת החברה לו היה פונה המבוטח לחברה בבקשה לקבלת אישור כאמור לפני ביצועו של הטיפול הרפואי. האמור לא יחול במקרה שהמבוטח פנה למבטח באיחור מסיבות מוצדקות או אם אי הפניה או הפניה באיחור לא מנעו מהחברה את בירור חבותה ולא הכביד על הבירור.

**6. שינויים, ויתורים או סטיות בתנאי הפוליסה**

6.1. פרק זה כפוף לכל התנאים הכלליים.

6.2. כל שינוי ו/או ויתור ו/או סטייה מהאמור בתנאים הכלליים, יחייב לעניין פרק זה רק אם נכלל במפורש בפרק.

6.3. במקרה של סתירה בין האמור בפרק זה לבין האמור בפרק אחר של הפוליסה ו/או בתנאים הכלליים, יחייבו לעניין מקרי הביטוח המפורטים בפרק זה הוראות פרק זה.

**7. תקופת אכשרה**

7.1. תקופת האכשרה לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות תהיה 90 ימים, למעט אם מקרה הביטוח נגרם בשל תאונה.

7.2. על אף האמור בסעיף 7.1 לעיל, תקופת האכשרה לכיסוי ניתוחים, טיפולים מחליפי ניתוח או התייעצויות בנוגע להריון או לידה תהיה 12 חודשים.

# פרק ו׳: ביטוח לשירותים רפואיים אמבולטוריים

**1. מקרה ביטוח**

שירותים רפואיים שבוצעו במהלך תקופת הביטוח.

**2. תגמולי ביטוח בגין מקרה ביטוח**

החברה תשלם למבוטח 80% מההוצאות בהן נשא בפועל (למעט אם מפורט אחרת בסעיף), בגין מקרי הביטוח המפורטים בפרק זה, אך לא יותר מהסכום המרבי לכל טיפול כמפורט להלן.

2.1. **חוות דעת רפואית בישראל** עד 1,100 ₪ להתייעצות עם רופא מומחה לגבי בעיה רפואית פעילה בתחום הרלוונטי (לא כולל רופא משפחה, רופא ילדים, רופא נשים המטפל בשגרה. יכוסה רופא ילדים בדרגת סגן מנהל מחלקה ומעלה) ועד סה״כ 4 התייעצויות לשנת ביטוח למבוטח.

2.2. **חוות דעת רפואית שניה בחו״ל** (לאחר חוות דעת ראשונה כמוגדר להלן)- מבוטח יהא זכאי לחוות דעת בחו״ל, לאחר קבלת חוות דעת רפואית ראשונה, כמוגדר לעיל, עד 8,000 ₪ למקרה ביטוח.

״חוות דעת ראשונה״ - דו״ח רפואי מלא בכתב, הכולל, מסקנת רופאו של המבוטח וכן כל מידע רפואי רלוונטי אחר לרבות; צילומי רנטגן, M.R.I., C.T, U.S., בדיקות הדמיה אחרות, ביופסיות, תוצאות בדיקות ציטולוגיות, היסטולוגיות וכיוצא בזה.

2.3. **בדיקות רפואיות אבחנתיות -** המבטחת תשפה את המבוטח בעבור עלות ביצוע בדיקות אבחנתיות להלן: בדיקות מעבדה, בדיקות הדמיה, מיפוי וכל בדיקה אחרת הנדרשת על פי אמות מידה רפואיות מקובלות לאבחון ו/או מניעה ו/או למעקב ו/או לקביעת דרכי טיפול, ועד סך של 10,000 ₪ לשנת ביטוח ובכפוף להשתתפות עצמית של 20% ובלבד שהבדיקה בוצעה על-פי הפניית רופא מומחה בכתב, המפרטת את הבעיה הרפואית.

2.4. **טיפולים פיזיותרפיים והידרותרפיים** לפי הוראת רופא, עד 16 טיפולים ועד 220 ₪ לטיפול עבור למצב רפואי אחד ובכל מקרה לא יותר מ-3,520 ₪ למבוטח לשנת ביטוח.

2.5. **טיפול משקם לאחר ניתוח -** המבטח ישפה את המבוטח בגין טיפולי שיקום על פי הוראת רופא כמפורט להלן: פיזיותרפיה, הידרותרפיה,ריפוי בעיסוק,בתנאי שמבוצע על ידי מטפל מוסמך (פיזיותרפיסט או מרפה בעיסוק בעל תעודת הסמכה), ועד 10 טיפולים ועד 300 לטיפול בכפוף להשתתפות עצמית של 20%.

2.6. **טיפולי פיריון -** המבטחת תשפה את המבוטח/ת ב-80% מהסכום ששילם/ה בפועל, בארץ או בחו״ל, תמורת בדיקות ו/או טיפולי פריון של המבוטח/ת, לרבות הפריה חוץ גופית (IVF) ו/או הזרעה ו/או שאיבה ו/או הקפאה של ביציות המבוצעת במבוטחת לצורך שימור, ו/או פעולות חודרניות ברחמה של המבוטחת או בחצוצרות ו/או פעולות חדרניות באשך, לרבות עלות ההקפאה ו/או קבלת תרומת ביצית ו/או זרע, בתנאי שהטיפול יבוצע על-פי הפניית רופא מומחה בתחום לקויי פריון בישראל, וזאת עד תקרה בסך 20,000 ₪ לכל ילד ועד שני ילדים.

2.7. **בדיקות לרפואה מונעת -** למבוטח מעל גיל 50, הכוללות: ממוגרפיה, בדיקת פאפ סמיר, בדיקת צפיפות עצם, בדיקת PSA, בדיקת לחץ תוך עיני, עד 300 ₪ לבדיקה, אחת ל-3 שנים (לכל בדיקה).

2.8. **השתתפות בבדיקות מיוחדות לנשים בהריון -** מבוטחת או אם פונדקאית תהיה זכאית להחזר בגין בדיקות הריון, לרבות הבדיקות הבאות:

סקירת מערכות מוקדמת ומאוחרת, וסיקור גנטי, שקיפות עורפית, מי שפיר (לרבות בדיקת דם מסוג NIPT), סיסי שיליה. ו/או כל בדיקת הריון הקיימת היום או שתהיה קיימת בעתיד.

תקרת ההחזרים עבור הכיסויים הנ"ל למבוטחת בפוליסה זו תהיה 80% עד 5,500 ₪ להריון, ולהריון מרובה עוברים תוגדל התקרה ל-7,000 ₪.

2.9. **אבחון בעיות התפתחות הילד/ ליקויי למידה -** שיפוי בגובה 80% מההוצאה בפועל ולא יותר מ-2,200 ₪ לתקופת ביטוח. החזר הוצאות בגין אבחון בעיות התפתחות הילד ו/או ליקוי למידה אצל ילד מגיל 4 ועד גיל 16 על ידי רופא מומחה בתחום ו/או ע"י מכון אבחון מוכר ו/או מאבחן המתמחה בין השאר באבחון פסיכו/דידקטי, אבחון הפרעות קשב וריכוז ובדיקות TOVA.

2.10. **טיפול בבעיות התפתחות הילד/ ליקויי למידה -** סכום הביטוח המרבי יהיה שיפוי בגובה 80% בגין הוצאה בפועל, עד לתקרה בסך 1,800 ₪ לשנת ביטוח אך לא יותר מ-150 ₪ לטיפול ועד 12 טיפולים.

החזר הוצאות בגין בעיות התפתחות הילד ו/או ליקוי למידה אשר אובחנו כמפורט להלן אצל ילד מגיל 4 ועד גיל 16 המחייבות טיפול על ידי אחד מאלה: פיזיותרפיסט/ טיפול רגשי באמצעות בעלי חיים ו/או מרפא בעיסוק ו/או קלינאי תקשורת. הכיסוי לטיפול בעיות התפתחות/ ליקוי למידה אשר אובחנו על ידי אחד מאלה: רופא מומחה בתחום ו/או ע"י מכון אבחון מוכר ו/או מאבחן המתמחה בין השאר באבחון פסיכו/דידקטי, אבחון הפרעות קשב וריכוז ובדיקות TOVA.

2.11. **כיסוי לאביזרים רפואיים -** המבטחת תשתתף בהוצאות המבוטח לאביזר רפואי כמפורט להלן בכפוף להפניה מרופא מומחה המאשר את הצורך הרפואי באביזר. החזר עד 80% ולא יותר מ-2,000 ₪ לשנת ביטוח. החזר לאביזרים הבאים: מכשיר אלקטרוני ליישור גב למבוטחים שגילם עד 18 שנה בלבד (Nevrogar. Agrelief 10, Ararscol), מכשיר CPAP, מכשיר BPAP, מגביר קול לנפגעי לרינגס, מכשיר TNS,חבישות לחץ, פרוטזה חיצונית לשד, רצועות ומכשיר בדוקציה לתינוקות, עדשות קורטוקונוס, שתל קוכולארי, בניה מיוחדת של נעליים לחולי סוכרת הסובלים מנמק או חסר אצבעות, לחולים לאחר כריתה חלקית של כף הרגל ו/או שיתוק שרירים, פאה לחולה אונקולוגי, תותב לאין אונות, משאבת אינסולין.

2.12. **ביקור רופא אצל המבוטח -** החברה תשפה את המבוטח בגין הוצאה הכספית בה נשא המבוטח עבור שירות ביקור רופא הניתן למבוטח על ידי אחת מחברות הנותנות שרות בתחום ביקורי הבית, אך לא רק: פמ"י וביקורופא (להלן: "הספק"), בביתו או בכל מקום אחר בו הוא נמצא, או במרכז רפואה מידי (מר"מ) המופעל ע"י הספק, וזאת עד 150 ₪ עד 3 פעמים בשנת ביטוח.

2.13. **טיפול בתא לחץ -** בכפוף להפניה של רופא מומחה, שיפוי בגובה 80% מההוצאה בפועל ועד לסך של 10,000 ₪ לכל תקופת הביטוח ובתנאי כי קיים צורך רפואי בטיפול והטיפול אינו נחשב ניסיוני.

2.14. **טיפול בדום נשימה והפרעות נשימה בשינה -** שיפוי עבור עלות אביזרים ו/או טיפולים הנדרשים לטיפול בדום נשימה והפרעות נשימה בשינה ולא יותר מהסכום 5,000 ₪ לתקופת ביטוח ובכפוף להשתתפות עצמית של 20% ובלבד שהבדיקה לצורך התאמת האביזר או הטיפול בוצעו על פי הפניית רופא מומחה.

2.15. **הוצאות בגין בדיקה פתולוגית -** בדיקות מעבדה הנעשות על רקמת ביולוגית שמטרתן בין היתר: אבחון מחלה, סיוע בקבלת החלטה טיפולית לרבות סוג הטיפול ו/או כדאיות הטיפול, ו/או המינון ו/או שינוי בטיפול. המבטח ישפה את המבוטח לא יותר מהסכום של 2,000 ₪ לתקופת ביטוח ובכפוף להשתתפות עצמית של 20% ובלבד שהבדיקה/ טיפול בוצעו על-פי הפניית רופא מומחה בכתב.

2.16. **בדיקות גנטיות מניעתיות ולצורך אבחון -** מבוטח זכאי להחזר עד 80% מההוצאה בפועל ועד תקרה של 4,000 ₪ לכל תקופת הביטוח.

2.17. **הפסקת הריון באמצעות גלולת מייפגין או טכנולוגיה דומה -** המבטחת תשפה את המבוטח בגין הפסקת הריון הנדרשת על רקע רפואי, עד לשבוע השביעי להריון, באמצעות גלולת מייפגין או טכנולוגיה דומה עד סכום 3,500 ₪ למקרה ביטוח ובכפוף להשתתפות עצמית של 20%

2.18. **טיפולים בכאב -** המבטחת תשפה את המבוטח בגין טיפולים הנדרשים להקלת בכאב, לרבות הזרקות או הזלפות של חומרים נוגדי כאב לגוף ישירות או תחת אמצעי הדמיה, משאבה להזלפת נוגדי כאב ובלבד שהטיפול המומלץ על ידי רופא מומחה בתחום הנוירולוגיה או הכאב ומבוצע על ידי רופא מומחה ועד תקרה של 1,500 ₪ לשנת ביטוח ובהשתתפות עצמית של 20%. מובהר כי טיפול שישולם במסגרת הפוליסה בפרק זה לא יכוסה בפרק אחר ולא יהיה כפל תשלום בגין טיפול זהה. מובהר כי במקרה בו הטיפול יוכר כתחליף לניתוח הוא ישולם דרך פרק תחליפי ניתוח.

2.19. **טיפול בגלי הלם, לייזר, גלי קול, גלי רדיו ושדות מגנטיים לריסוק הסתיידויות במפרקים (לרבות בפרקי החוליות), בעצמות (אוטופיסטים, דורבן) וברקמות הרכות -** המבטחת תשפה את המבוטח, בעבור עלות הטיפול לרבות החומר המוזרק והאביזרים הנלווים (אם קיים), עד סכום מרבי של 1,500 ₪ לשנת ביטוח, ובכפוף להשתתפות עצמית של 20%. מובהר כי טיפול שישולם במסגרת הפוליסה בפרק זה לא יכוסה בפרק אחר ולא יהיה כפל תשלום בגין טיפול זהה. מובהר כי במקרה בו הטיפול יוכר כתחליף לניתוח הוא ישולם דרך פרק תחליפי ניתוח.

2.20. **שיקום הדיבור ו/או הראיה ו/או ריפוי בעיסוק למבוטח לאחר אירוע מוחי -** או טיפול ב-amblyopia המבטח ישתתף בהוצאות טיפול לשיקום כושר הדיבור או הראיה או ריפוי בעיסוק בהיות המבוטח במצב של אבדן מלא או חלקי של כושר הדיבור או הראיה בעקבות אירוע מוחי (C.V.A) או בעקבות ניתוח או מחלה שפגעו בכושר הדיבור או הראיה ושניתן לשפרו ע"י טיפול מיוחד לשיקום הדיבור או הראיה וזאת עד הסכום 200 ₪ לטיפול בכפוף להשתתפות עצמית של 20% ועד 12 טיפולים לשנת ביטוח.

2.21. **רפואה משלימה (אלטרנטיבית)**

בקרות מקרה הביטוח ישפה המבטח את המבוטח בגין הוצאותיו עבור שירותי רפואה משלימה המפורטים בסעיף זה:

**2.21.1. התחייבות המבטח:**

החברה תשלם למבוטח 60% מההוצאות הממשיות בפועל שהיו לו עבור שירותי רפואה משלימה (אלטרנטיבית) ועד 15 טיפולים בשנת ביטוח, בכפוף להגדרות ולסכומי השיפוי המרבי המפורטים להלן:

תחומי רפואה משלימה שיכוסו על פי הסכם זה:

2.21.1.1. "אקופונקטורה" - טיפול אשר במהלכו נעשה דיקור במחטים דקות בנקודות מיוחדות בגוף.

2.21.1.2. "הומיאופתיה" - שיטת טיפול כוללנית, העושה שימוש בתרופות המופקות מחומרים טבעיים שנמהלו או דוללו פעמים רבות.

2.21.1.3. "ביו פידבק" - טכניקה טיפולית העושה שימוש במכשור אלקטרוני לצורך מדידה מידית של שינויים פיזיולוגיים בגוף המטופל.

2.21.1.4. "כירופרקטיקה" - שיטת טיפול בה משתמש המטפל בידיו לשם הפעלת לחצים על עמוד השדרה וחוליותיו במטרה להשיב את הגוף לאיזון.

2.21.1.5. "אוסטאופתיה" - טיפול להשגת הקלה בהפרעות במערכות השרירים והשלד על ידי שיפור הזרימה במערכות כלי הדם, הלימפה והעצבים.

2.21.1.6. "פלדנקרייז" - טיפול ביכולת התנועה ויציבת הגוף, תוך פיתוח מודעות להרגלי התנועה והקניית הרגלי תנועה נכונים.

2.21.1.7. "רפלקסולוגיה" - טיפול באמצעות לחיצות ועיסוי בעיקר בכפות הרגליים לאבחון ושיפור תפקודן של מערכות הגוף השונות.

2.21.1.8. "שיאצו" - לחיצות ועיסוי, בעיקר על ידי אצבעות הידיים, לאורך קווי זרימת האנרגיה בגוף לצורך שחרור ואיזון הזרימה.

2.21.1.9. "נטורופתיה" - טיפול בגוף בשיטות טבעיות, המותאמות באופן אישי לכל מטופל.

2.21.1.10. "שיטת טווינא" - טיפול במגע מקומי ומערכתי המשלב מסז' רקמות עמוק.

2.21.1.11. סכום השיפוי המרבי שישולם למבוטח על פי פרק זה בגין כל טיפול לא יעלה על 180₪. סכום השיפוי המרבי הכולל שישלם המבטח למבוטח על פי פרק זה לא יעלה על 2,700₪ לכל שנת ביטוח.

2.21.1.12. הטיפול נעשה על רקע מצב רפואי שיוגדר על ידי רופא מטעם המבוטח.

2.21.1.13. לא יינתן שיפוי במסגרת פרק זה בגין תשלומים עבור טיפולים שעדיין לא ניתנו למבוטח בפועל ו/או התחייבות נותן שירות לטיפולים עתידיים.

**2.21.2. הגבלות לאחריות המבטח לכיסוי לרפואה משלימה**

**המבטח לא ישפה את המבוטח בגין טיפולים או ייעוץ בתחומים הבאים:**

**2.21.2.1. טיפולים שאינם כלולים בסעיף 2.21.1.**

**2.21.2.2. טיפולים ו/או ייעוץ הקשורים בגמילה מהרגלים ו/או התמכרות (כגון סמים, עישון, אלכוהוליזם וכו').**

**2.21.2.3. הוצאות עבור תרופות/ חומר מרפא ו/או חומרים אחרים שהומלצו לצורך טיפול.**

## 3. חריגים מיוחדים

**סעיף החריגים הכלליים בפוליסה שאליה צורף פרק זה, חל גם על פרק זה. בנוסף לאמור לעיל, החברה לא תהא חייבת בתשלום תגמולי ביטוח על פי פרק זה במקרים הבאים:**

**3.1. בדיקות תקופתיות ו/או בדיקות שגרה ו/או טיפולים שאינם עקב בעיה רפואית, למעט בדיקות הריון.**

**3.2. ניתוחים וטיפולים הקשורים בשיניים.**

**3.3. התאבדות או ניסיון לכך, וכן פגיעה עצמית.**

**3.4. מקרה ביטוח שאירע עקב שירות המבוטח בגוף בטחוני (שאינו צבאי) או משטרתי רק אם זכאי המבוטח לשיפוי ו/או לטיפול מגורם ממשלתי. בנסיבות בהם הגורם הממשלתי ישתתף בעלות הטיפול באופן חלקי, יישא המבטח ביתרת העלות ועד תקרת חבותו על פי פרק זה.**

**3.5. מקרה ביטוח שארע עקב פעילות מלחמתית, או בשל השתתפות המבוטח בפעילות משטרתית (למעט התנדבות במשמר האזרחי) או מקרה ביטוח במהלך שירות צבאי הנובע באופן ישיר מפעילות בעלת אופי צבאי לרבות תרגילים/ אימונים צבאיים או טרום צבאיים מכל סוג שהוא, צבא קבע, שירות במילואים או צבא סדיר שבגינם זכאי לתגמול/מימון מהגוף הרלוונטי. בנסיבות בהם הגורם הרלוונטי ישתתף בעלות הטיפול באופן חלקי, יישא המבטח ביתרת העלות ועד תקרת חבותו על פי פרק זה.**

3.6. מקרה ביטוח שנגרם או הינו תוצאה של עקרות.למעט הכיסויים המפורשים בפרק זה.

3.7. מקרה ביטוח שאינו נובע מצורך רפואי לרבות מקרה ביטוח הקשור באופן ישיר או עקיף במטרת יופי ו/או אסתטיקה, לרבות ניתוחי תשבורת (תיקון ראייה) וניתוח להפחתת משקל.

3.8. מקרה ביטוח שנגרם עקב ביקוע גרעיני, היתוך גרעיני, פגיעה מנשק לא קונבציונלי או זיהום רדיואקטיבי.

3.9. מקרה הביטוח הינו טיפולים נפשיים ו/או טיפולים פסיכולוגיים ו/או טיפולים פסיכיאטריים.

3.10. מקרה הביטוח הינו ביצוע בדיקות או טיפולים ניסיוניים או טיפולים שאינם מקובלים לפי אמות מידה רפואיות מקובלות באחת או יותר מהמדינות המוכרות. לעניין זה המדינות המוכרות הנן - ארצות הברית, קנדה, אוסטרליה, ניו זילנד, שוויץ, נורבגיה, איסלנד, אחת מהמדינות החברות באיחוד האירופי לפני מאי 2004, או במסלול הרישום המרכזי של האיחוד האירופי (EMEA).

לעניין זה טיפול ניסיוני הינו טיפול רפואי ניסיוני ו/או טיפולים רפואיים הדורשים אישור וועדת הלסינקי ו/או אישור מכל גורם אחר שבא במקום ועדת הלסינקי ו/או אשר ממומנים על ידי גורם חיצוני המעוניין בתוצאות המחקר/ הטיפול.

## 4. תקופת אכשרה

תקופת האכשרה היא בת 60 יום.

במקרה של כיסוי הקשור בהיריון ו/או גרידה ו/או לידה ו/או פריון תהא תקופת אכשרה של 180 יום.

למען הסר ספק, תקופת אכשרה לא תחול על מקרה ביטוח שארע מתאונה.

# פרק ז': שיפוי בגין הוצאות לגילוי מחלה קשה

הגדרת מחלה קשה - **אחת או יותר מההגדרות המופיעות בחוזר 2015-1-17 "עריכת תכנית לביטוח מחלות קשות" או בהוראה רגולטורית אחרת שתבוא במקום,** למעט הגדרת סרטן כמפורט להלן.

**1. להלן פירוט המחלות הקשות המבוטחות:**

**1.1. אי ספיקת כליות סופנית -** (end stage renal failure)

חוסר תפקוד כרוני, בלתי הפיך של שתי הכליות המחייב חיבור קבוע להימודיאליזה או לדיאליזה תוך-צפקית (פריטונאלית) או לצורך בהשתלת כליה.

**1.2. אי ספיקת כבד פולמיננטית -** (FULMINANT HEPATIC FAILURE)

אי ספיקת כבד חריפה, פתאומית, באדם בריא, או המסבכת חולה עם מחלה כרונית יציבה, הנובעת מנמק מפושט של תאי הכבד כתוצאה מזיהום חריף ו/או מהרעלת תרופות או מסיבות אחרות והמאופיינות על ידי כל הסימנים הבאים:

1. הקטנה חדה של נפח הכבד;
2. נמק מפושט בכבד, המותיר רק רשת רטיקולרית המוכח בהיסטולוגיה;
3. ירידה חדה בבדיקות דם הבאות בתפקודי הכבד - **pt** או רמות פקטורים 5 ו-7;
4. צהבת, מעמיקה.

**1.3. מחלת כבד סופנית (שחמת) -** (cirrhosis) (terminal liver disease)

מאופיינת בנוכחות שלושה מן הסימנים הבאים:

1. צהבת.
2. מיימת המצריכה שימוש קבוע בתרופות משתנות.
3. שחמת שהוכחה בביופסיה כבדית.
4. אנצפלופתיה כבדית.
5. יתר לחץ דם שערי המאובחן על ידי דליות בוושט, הגדלת טחול מאושרת על ידי בדיקת us דופלר או מדידה ישירה של הלחץ הפורטלי או היפרספלניזם.

**1.4. השתלת אברים -** (organ transplantation) **לב, ריאה, לב-ריאות, כליה, לבלב, כבד, מוח עצמות, מעי.**

קבלת אישור רשמי של המרכז הלאומי להשתלות בישראל על הצורך בהשתלת איבר ובטרם ביצוע ההשתלה בפועל או ביצוע ההשתלה בפועל בין אם מגוף של תורם אחר (למען הסר ספק, השתלת מח עצם עצמית אינה מכוסה) או על ידי איבר מלאכותי, עקב הפסקת תפקודו של אותו איבר, ובתנאי שההשתלה בוצעה בתאם לחוק השלת איברים, התשס"ח-2008, וכן בתנאי שנטילת האיבר והשתלת האיבר נעשתה על פי הדין החל באותה מדינה בה בוצעה ההשתלה וכי מתקיימות הוראות החוק לעניין סחר באיברים.

**1.5. טרשת נפוצה -** (MULTIPLE SCLEROSIS)

דמיאלינציה במוח או בחוט השדרה הגורמת לחסר נוירולוגי הנמשך לפחות חודשיים. האבחנה תיקבע על ידי עדות קלינית ליותר מאירוע בודד של דמיאלינציה (פגיעה במעטפות המיאלין) במערכת העצבים המרכזית (מוח, חוט שדרה, עצב אופטי), אשר נמשך לפחות 24 שעות, בהפרש של יותר מחודש בין אירוע לאירוע, והוכחה בבדיקת MRI למספר מוקדי פגיעה בחומר הלבן במערכת העצבים המרכזית. האבחנה תיקבע על ידי נוירולוג מומחה.

**1.6. עמילואידוזיס ראשונית - (primary amyloidosis)**

מחלה המאופיינת על ידי שקיעת עמילואיד al ברקמות שונות בגוף והמאובחנת על ידי בדיקה פתולוגית המעידה על שקיעת העמילואיד ברקמות או באיברים כגון: לב, כליה, דפנות כלי דם וכו'. קביעת קיום המחלה תעשה על ידי פנימאי מומחה.

**1.7. תרדמת - (coma)**

מצב של אובדן הכרה וחוסר תגובה מוחלט לגירויים חיצוניים ולצרכים פנימיים, אשר נגרם עקב נזק נוירולוגי הנמשך ברציפות יותר מ-96 שעות והמצריך שימוש במערכות תומכות חיים.

**1.8. ניוון שרירים - (MUSCULAR DISTROPHY)**

עדות לפגיעה משולבת בנוירון המוטורי העליון והתחתון במערכת העצבים הפירמידלית הנתמכת בבדיקת **emg** אופיינית המוכיחה דנרבציה מפושטת, מתקדמת ומחמירה על פני 3 חודשים.

האבחנה תיקבע על ידי נוירולוג מומחה.

**1.9. פגיעה מוחית מתאונה - (BRAIN DAMAGE BY ACCIDENT)**

פגיעה מוחית בלתי הפיכה אשר ארעה כתוצאה מתאונה שגרמה לירידה תפקודית שאינה ניתנת לריפוי ואשר אושרה ע"י רופא נוירולוג מומחה בהתאם לאמות המידה הסטנדרטיות לפגועי מח. לדוגמא: גלזקו קומה 5 או פחות (glazgow COMA SCALE).

**1.10. דלקת מוח - (encephalitis)**

דלקת מוח המלווה בסיבוכים הנמשכים לפחות 3 חודשים ואשר לדעת נוירולוג מומחה, יותירו נזק נוירולוגי חמור, קבוע ובלתי הפיך, אשר בעקבותיהם המבוטח אינו מסוגל לבצע באופן עצמאי וללא עזרת הזולת לפחות שלוש מתוך שש הפעולות הבאות:

לקום ולשכב, להתלבש ולהתפשט, להתרחץ, לאכול ולשתות, לשלוט על הסוגרים, ניידות, כהגדרתן בחוזר המפקח על הביטוח 5-1-2013.

**הכיסוי אינו כולל דלקת מוח הקשורה לזיהום בנגיפי HIV או הרפס.**

**1.11. דלקת חיידקית של קרום המוח - (BACTERIAL MENINGITIS)**

דלקת קרום המוח, בה בודד חיידק כמחולל מחלה דלקתית בקרומי המוח או בחוט השידרה אשר לדעת נוירולוג מומחה, יותירו נזק חמור קבוע ובלתי הפיך ואשר בעקבותיה המבוטח אינו מסוגל לבצע באופן עצמאי וללא עזרת הזולת, לפחות שלוש מתוך שש הפעולות הבאות:

לקום ולשכב, להתלבש ולהתפשט, להתרחץ, לאכול ולשתות, לשלוט על סוגרים, ניידות, כהגדרתן בחוזר המפקח על הביטוח 5-1-2013.

מצבים אלה חייבים להיות מתועדים רפואית לפחות למשך 3 חודשים.

הכיסוי אינו כולל דלקת קרום המוח הקשורה לזיהום בנגיפי **HIV** או הרפס.

**1.12. מחלת ריאות חסימתית כרונית - (CHRONIC OBSTRUCTIVE PULMONARY DISEASE)**

מחלת ריאות סופנית המאופיינת באופן קבוע, על ידי שני הקריטריונים הבאים:

1.12.1. נפח **FEV1** של פחות מ-1 ליטר או מתחת ל-30% מהצפוי לפי מין וגובה ו/או הפחתה קבועה בנפח הנשימה לדקה (**MVV**) מתחת ל-50% או פחות מ-35 ליטר לדקה או המצריכה טיפול בחמצן או סיוע נשימתי תומך.

1.12.2. הפחתה קבועה בלחץ החמצן העורקי מתחת ל-55 ממ"כ ועליה בלחץ העורקי של דו תחמוצת הפחמן מעל 50 ממ"כ.

**1.13. יתר לחץ דם ריאתי ראשוני - (primary pulmonary hypertension)**

עליה בלחץ הדם של עורקי הריאה הנגרמת על ידי עליה בלחץ בנימיות הריאה, עליה בנפח הדם הריאתי או עליה בתנגודת בכלי הדם הריאתיים. האבחנה חייבת לכלול הוכחה בצנתור לב של לחץ ריאתי סיסטולי מעל 30 ממ"כ או לחץ ריאתי עורקי - ממוצע מעל 20 ממ"כ, היפרטרופיה של חדר ימין וסימני הרחבה ואי ספיקת לב ימנית.

**1.14. פרקינסון - (Parkinson's Disease)**

האבחנה מתבטאת בתופעות של רעד, נוקשות איברים, חוסר יציבה ותגובות איטיות שאינן מוסברות ע"י סיבה פתולוגית אחרת, ואשר אובחנו ע"י נוירולוג מומחה, כמחלת פרקינסון. המחלה צריכה להתבטא בחוסר יכולת לבצע באופן עצמאי וללא עזרת הזולת, לפחות שלוש מתוך שש הפעולות הבאות: לקום ולשכב, להתלבש ולהתפשט, להתרחץ, לאכול ולשתות, לשלוט על סוגרים, ניידות, כהגדרתן בחוזר המפקח על הביטוח 5-1-2013.

**1.15. אוטם חריף בשריר הלב - (ACUTE MYOCARDIAL INFRACTION)**

נמק של חלק משריר הלב כתוצאה מהיצרות או מחסימה בכלי דם כלילי המגבילה את אספקת הדם לאותו חלק. האבחנה חייבת להיתמך ע"י הקריטריונים הבאים:

1.15.1. בדיקה ביוכימית, המציינת עליה באנזימי שריר הלב או עליה בטרופונין לרמה של 1 **ng/ml** או רמה גבוהה יותר או בסטייה מהערך התקין על פי אמות מידה רפואיות המקובלות להגדרת אוטם, זאת בהתייחס לערכי המעבדה הבודקת, או בכל דרך אחרת של בדיקה שמבוצעת בבתי החולים עבור כלל החולים, אשר תחליף בעתיד את הבדיקה הביוכימית האמורה.

1.15.2. בנוסף לבדיקה הביוכימית כאמור בסעיף 2.2.1.1 לעיל, האבחנה חייבת להיתמך על ידי קיום של אחת משתי האינדיקציות הבאות: כאבי חזה אופייניים או שינויים בא.ק.ג. האופייניים לאוטם.

**למען הסר ספק, מובהר כי תעוקת חזה (אנגינה פקטוריס) אינה מכוסה.**

**1.16. ניתוח מעקפי לב - (CABG)**

ניתוח לב פתוח לשם ביצוע מעקף של חסימה או היצרות בעורק כלילי.

**למען הסר ספק, מובהר כי צנתור העורקים הכליליים אינו מכוסה.**

**1.17. ניתוח לב פתוח להחלפה או לתיקון מסתמי לב -**

(open heart surgery FOR VALVE REPLACEMENT OR REPAIR)

ניתוח לב פתוח לשם תיקון או החלפה כירורגית של אחד או יותר ממסתמי הלב במסתם מלאכותי.

**1.18. ניתוח אבי העורקים - (aorta)**

ניתוח בו מתבצעת החלפת קטע או ניתוח לתיקון מפרצת באבי העורקים, בחזה או בבטן או ביצוע צנתור במקרה של מפרצת באבי העורקים בגודל 5 ס"מ או יותר.

**1.19. קרדיומיופטיה - (cardiomyopathy)**

מחלת לב כרונית המתבטאת בתפקוד לקוי של חדרי הלב עם הפרעה תפקודית של לפחות דרגה 3 לפי פרוטוקול New York Heart Association Classification of Cardiac Impairment.

**1.20. שבץ מוחי - (CVA)**

כל אירוע מוחי (צרברווסקולרי), המתבטא בהפרעות נוירולוגיות או חוסר נוירולוגי, הנמשכים מעל 24 שעות והכולל נמק של רקמת מוח, דימום מוחי, חסימה או תסחיף ממקור חוץ מוחי ועדות לנזק נוירולוגי קבוע ובלתי הפיך הנתמך בשינויים בבדיקת ct או mri הנמשך לפחות 8 שבועות והנקבע על ידי נוירולוג מומחה. **כל זאת להוציא T1A.**

**1.21 סרטן -** (cancer)

נוכחות גידול של תאים ממאירים הגדלים באופן בלתי מבוקר וחודרים ומתפשטים לרקמות הסביבה או לרקמות אחרות.

מחלת הסרטן תכלול לויקמיה, לימפומה ומחלת הודגיקין.

**מקרה הביטוח אינו כולל:**

1. גידולים המאובחנים כשינויים ממאירים של **carcinoma in situ** כולל דיספלזיה של צוואר הרחם C1N3, cin2, **cini** או גידולים המאובחנים בהיסטולוגיה כטרום ממאירים.
2. מלנומה ממאירה בעובי פחות מ-0.75 מ"מ, עם פחות ממיטוזה אחת למ"מר וללא אולצרציות (התכייבויות);
3. מחלות עור מסוג:
   - 3.1 Hyperkeratosis ו-Basal Cell Carcinoma;
   - 3.2 מחלות עור מסוג **Squamous Cell Carcinoma** אלא אם כן התפשטו לאיברים אחרים.
4. מחלות סרטניות מסוג סרקומה ע"ש קפושי בנוכחות מחלת ה-AIDS;
5. סרטן הערמונית המאובחן בהיסטולוגיה עד ל-**TNM Classification T2 No Mo** (כולל) או לפי **Gleason Score** עד ל-6 (כולל);
6. לויקמיה לימפוציטית כרונית (C.L.L) עם ספירה של פחות מ-**B cell 10,000/ul lymphocytes** ובלבד שהמבוטח לא מקבל טיפול תרופתי;
7. סרטן תירואיד שבו לא הוסרה כל הבלוטה;
8. פוליפים במעי או בכיס השתן שאינם מחייבים פעולה רפואית מעבר לכריתה מקומית ו/או צריבה מקומית ו/או מעבר לטיפולי שטיפה מקומית;
9. גמופתיה מוקדמת **MGUS** ובלבד שהמבוטח לא מקבל טיפול תרופתי;
10. **T cell lymphoma** של העור, ובלבד שמדובר בנגעים שטחיים על פני העור בלבד, המחלה הקשה תכוסה בשלב בו הגיעה ל-T CELL LY.

**1.22 אנמיה אפלסטית חמורה -** (SEVERE APLASTIC ANEMIA)

כשל של מח העצם המאובחן כאנמיה אפלסטית והמתבטא באנמיה, נויטרופניה וטרומבוציטופניה המצריכים לפחות אחד מהטיפולים הבאים:

1. עירוי מוצרי דם.
2. מתן חומרים/תרופות המעודדים צמיחת מוח עצם.
3. מתן חומרים/תרופות המדכאים את המערכת החיסונית (אימונו- סופרסיביים).
4. השתלת מוח עצם.

**1.23 גידול שפיר של המוח/יותרת המוח /קרומי המוח -** (BENIGN BRAIN TUMOR)

תהליך שפיר תופס מקום במוח, הדורש ניתוח להוצאתו או במידה ואינו ניתן לניתוח, גורם לנזק נוירולוגי קבוע המסכן את חיי המבוטח, ובתנאי שאושר ע"י בדיקת **mri** או **ct**.

**הכיסוי אינו כולל ציסטות, גרנולומות, מלפורמציות של כלי הדם המוחיים.**

**1.24 שיתוק (פרפלגיה קוודריפלגיה) -** (paralysis)

איבוד מוחלט ובלתי הפיך של יכולת השימוש בשתי גפיים או יותר כתוצאה מנתק בלתי הפיך מכל סיבה שהיא של חוט השדרה, (או כשל קבוע של ההולכה במוח השדרה בעקבות חיתוך או ניתוק של מוח השדרה).

**1.25. פוליו (שיתוק ילדים) - (poliomyelitis)**

שיתוק שרירים קבוע ותמידי, הנובע מנגיף הפוליו, אשר אובחן באמצעות בידוד וזיהוי הנגיף בנוזל עמוד השדרה.

**1.26. איבוד גפיים - (loss of limbs)**

איבוד תפקוד קבוע ומוחלט או קטיעה מעל פרק שורש כף היד או הקרסול של שתיים או יותר גפיים כתוצאה מתאונה או מחלה.

**1.27. עיוורון - (blindness)**

איבוד מוחלט ובלתי הפיך של כושר הראיה בשתי העיניים העיניים (קרי: בדיקת חדות ראיה מרבית בשתי העיניים של 60/3 או פחות מזה), כפי שנקבע ע"י רופא עיניים מומחה.

**1.28. כוויות קשות - (severe burns)**

כוויות מדרגה שלישית המערבות לפחות 20% משטח הגוף.

**1.29. אובדן דיבור - (LOSS OF SPEECH)**

איבוד מוחלט ובלתי הפיך של יכולת הדיבור אשר נגרם כתוצאה מנזק אורגני למיתרי הקול ואשר נמשך תקופה רצופה של לפחות 6 חודשים.

**1.30. חירשות - (deafness)**

אובדן מוחלט ובלתי הפיך של חוש השמיעה בשתי האוזניים, על פי קביעה של רופא א.א.ג מומחה ובהסתמך על בדיקת שמיעה שתוצאתה ירידה של מעל DB 90 בכל התדרים.

2. **מקרה הביטוח** - הוצאות רפואיות במקרה של גילוי אחת המחלות המפורטות בפוליסה בתוך תקופת הביטוח או התייעצויות בגין גילוי אחת המחלות המפורטות בפוליסה בתוך תקופת הביטוח.

3. **סכום הביטוח - עד 15,000 ₪ לכל תקופת הביטוח אותם שילם המבוטח ובכפוף להמצאת קבלות או העתק קבלות על אחת או יותר מההוצאות הרפואיות הקשורות באופן ישיר למקרה הביטוח ובכפוף לתשלום השתתפות עצמית בגובה 20%.**

4. הגבלת אחריות המבטח

**בנוסף לקבוע בחריגים הכלליים הקבועים בפוליסה, אשר יחולו במלואם על נספח זה, לא יהא המבטח אחראי ולא ישלם תגמולי ביטוח למבוטח במקרים הבאים:**

**4.1. אם קיום מקרה הביטוח התגלה לראשונה לאחר מות המבוטח.**

**4.2. מקרה הביטוח הנוגע לעיוורון, חירשות וניוון שרירים כהגדרתם לעיל, נתגלו או אירעו במלואם או בחלקם לפני הגיע המבוטח לגיל 3 שנים.**

**4.3. אם נפטר המבוטח תוך 30 יום מיום גילוי המחלה**

5. **ביטול הכיסוי על פי פרק זה:**

פרק זה יבוטל בכל אחד מהמקרים הבאים, המוקדם מבניהם:

5.1. מות המבוטח.

5.2. תום תקופת הביטוח כהגדרתה ע"פ הסכם זה.

5.3. בהגיע המבוטח לתאריך בו מלאו לו 60 שנה.

5.4. עם תשלום תגמולי הביטוח למבוטח.

# פרטי התקשרות

## גיל ורדי סוכנות לביטוח

הסדנה 6, כפר סבא
09-7663000 שלוחת מבוטחי הראל
papaya@gilvardi.co.il
www.gilvardi.co.il
סיסמא: 409755



## מוקד שירות לקוחות הראל

1-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
וואטסאפ 052-7544589
ניתן להגיע אלינו גם באמצעות הלינק:
www.harel-group.co.il/t/WWVZXMECW2AQ
אבא הלל 3, בית הראל,
ת"ד 10951, רמת גן 5252202

סטודיוהראל 47538.2

אולי יש לך ביטוח בריאות,
**אבל אין לך הראל...**

אתר הראל:
www.harel-group.co.il

הראל ביטוח ופיננסים

# נספח 6

# חלק ב סעיף 8 - הסכמים מהותיים שהתאגיד צד להם

עמ' 222

## חלק ב - סעיף 8 – הסכמים מהותיים

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ |
|---|---|---|---|---|---|
| מספר | סוג ההסכם (שכירות, ליסינג, העסקה, זכיון וכיוצא באלה) | הצדדים להסכם | נחתם בתאריך | תאריך סיום החוזה | שווי בשקלים חדשים / הערות ועוד |
| 1 | AWS DC Hosting Services | Papaya Gaming Ltd<br>Matrix I.T. CloudZone Ltd | 25/10/2024 | 24/10/2027 | כ-11.3 מיליון ש"ח |
| 2 | שירותי פרונטינג (תעתיק) וסליקת תשלומים | Papaya Gaming Ltd,<br>Papaya Gaming Inc | 04/02/2023 | אין. מתחדש כל שנה | כ-60 אלף ש"ח בשנה |
| 3 | שירותי הפצה ושיווק בשוק המקומי (UK) | Papaya Gaming Ltd,<br>Papaya Gaming UK Limited | 28/08/2025 | ללא הגבלת זמן | כ-2 מיליון ש"ח בשנה (הערכה לפי 2025) |
| 4 | פלטפורמה - חנות אפליקציות | Papaya Gaming Ltd<br>Apple | | ללא הגבלת זמן | |
| 5 | פלטפורמה - חנות אפליקציות | Papaya Gaming Ltd<br>Samsung | 1/1/2023 | ללא הגבלת זמן | כ-19 מיליון ש"ח בשנה (הערכה לפי 2025) |
| 6 | פרסום | Papaya Gaming Ltd<br>Meta | | ללא הגבלת זמן | כ-130 מיליון ש"ח בשנה (הערכה לפי 2025) |
| 7 | פרסום | Papaya Gaming Ltd<br>Adikteev SA | 19/11/2023 | ללא הגבלת זמן | כ-40 מיליון ש"ח בשנה (הערכה לפי 2025) |
| 8 | פרסום | Papaya Gaming Ltd<br>Youappi | 26/3/2023 | ללא הגבלת זמן | כ-99 מיליון ש"ח בשנה (הערכה לפי 2025) |

| | | | | | |
|---|---|---|---|---|---|
| 9 | פרסום | Papaya Gaming Ltd<br>Apple Search ads | 24/3/2020 | ללא הגבלת זמן | כ-50 מיליון ש"ח בשנה<br>(הערכה לפי 2025) |
| 10 | פרסום | Papaya Gaming Ltd<br>Applovin | 7/9/2020 | ללא הגבלת זמן | כ-112 מיליון ש"ח בשנה<br>(הערכה לפי 2025) |
| 11 | פרסום | Papaya Gaming Ltd<br>Arpeely | 29/5/2023 | ללא הגבלת זמן | כ-65 מיליון ש"ח בשנה<br>(הערכה לפי 2025) |
| 12 | פרסום | Papaya Gaming Ltd<br>Persona | 15/2/2021 | ללא הגבלת זמן | כ-25 מיליון ש"ח בשנה<br>(הערכה לפי 2025) |
| 13 | פרסום | Papaya Gaming Ltd<br>Fluent | 10/3/2024 | ללא הגבלת זמן | כ-34 מיליון ש"ח בשנה<br>(הערכה לפי 2025) |
| 14 | השכרת משרדים | Papaya Gaming Ltd<br>היי פלור בע"מ<br>כלל חברה לביטוח בע"מ<br>כלל פנסיה וגמל בע"מ<br>"עתודות" – קרן פנסיה לשכירים ועצמאיים בע"מ | 28/11/2021<br>תוספת להסכם מיום<br>14/12/22 | 3/7/2027 | כ-7.4 מיליון ש"ח |
| 15 | השכרת משרדים | Papaya Gaming Ltd<br>Yotpo | 24/8/2023 | 30/9/2027 | כ-2.2 מיליון ש"ח |
| 16 | דמי ניהול משרדים | Papaya Gaming Ltd<br>סי.בי.אר.אי ניהול סקיי בע"מ | 25/1/2021<br>תוספת להסכם מיום<br>11/1/2026 | ללא הגבלת זמן | כ-0.9 מיליון ש"ח |
| 17 | Data Warehouse | Papaya Gaming Ltd<br>Snowflake Computing Netherlands B.V | 1/2/2026 | 1/2/2029 | כ-8.8 מיליון ש"ח |
| 18 | שירותי מנב"לות | Papaya Gaming Ltd<br>בלו סקיי 11 בע"מ | 1/1/2018<br>עדכון 1 להסכם<br>4/11/2020<br>עדכון 2 להסכם<br>5/1/2022 | ללא הגבלת זמן | כ-3 מיליון ש"ח |

| | | | | | |
|---|---|---|---|---|---|
| 19 | שירותי מחקר ופיתוח | Papaya Gaming Ltd<br>האנצ' פתרונות בע"מ | 1/1/2018<br>עדכון 1 להסכם<br>4/11/2020<br>עדכון 2 להסכם<br>5/1/2022 | ללא הגבלת זמן | כ-3 מיליון ש"ח |
| 20 | שירותי מחקר ופיתוח | Papaya Gaming Ltd<br>אומגה פתרונות תכנה בע"מ | 1/1/2018<br>עדכון 1 להסכם<br>4/11/2020<br>עדכון 2 להסכם<br>5/1/2022 | ללא הגבלת זמן | כ-3 מיליון ש"ח |

* למעט חוזי השכירות ודמי ניהול, יתר החוזים הינם בדולר ותורגמו לפי שע"ח שקל/ דולר 3.1

# נספח 7

# חלק ג סעיפים 2 ו-3 - פירוט חובות לעובדי התאגיד וחובות כלליים ונדחים

עמ' 226

## Supplier Payment Schedule – As of June 30, 2026

*Papaya Gaming | Cut-off Date: June 30, 2026 | Amounts in USD*

| # | | Supplier Name | Total Balance ($) |
|---|---|---|---|
| 1 | Vendor | Settlement (Milberg Provision) | 14,712,492 |
| 2 | Vendor | Kirkland Ellis LLP | 4,851,672 |
| 3 | Vendor | ARPEELY | 2,026,189 |
| 4 | Vendor | Next Financial Inc | 42,956 |
| 5 | Vendor | Almedia UG | 2,825,447 |
| 6 | Vendor | Applovin | 2,001,503 |
| 7 | Vendor | Affle MEA FZ-LLC | 1,620,589 |
| 8 | Vendor | Adikteev | 1,363,556 |
| 9 | Vendor | Meta Platforms Ireland Limited | 1,273,068 |
| 10 | Vendor | Apple | 1,269,643 |
| 11 | Vendor | Unity | 1,167,788 |
| 12 | Vendor | Samsung | 1,161,911 |
| 13 | Vendor | Adjoe GmbH | 1,130,622 |
| 14 | Vendor | ADLOGIC TECHNOLOGY PTE. LTD. | 1,120,411 |
| 15 | Vendor | LaunchPotato | 1,113,548 |
| 16 | Vendor | Persona.ly | 850,978 |
| 17 | Vendor | Compass Lexecon | 705,721 |
| 18 | Vendor | Besitos Corporation LLC | 656,396 |
| 19 | Vendor | Fluent | 633,474 |
| 20 | Vendor | SMADEX S L U | 604,146 |
| 21 | Vendor | Exmox GmbH | 571,245 |
| 22 | Vendor | Herzog Fox Neeman | 292,187 |
| 23 | Vendor | Vungle SEA Pte. Ltd.(Liftoff) | 462,641 |
| 24 | Vendor | BigaBid | 416,862 |
| 25 | Vendor | MATRIX I.T. CLOUDZONE LTD | 382,545 |
| 26 | Vendor | Wideops | 301,447 |
| 27 | Vendor | MONEY GROUP LLC | 286,144 |
| 28 | Vendor | TikTok Pte. Ltd. | 266,288 |
| 29 | Vendor | Moloco | 261,726 |
| 30 | Vendor | remerge GmbH | 260,236 |
| 31 | Vendor | Wasserman EMEA LLP t/a Wasserman hospita | 232,052 |
| 32 | Vendor | קוסט פורר גבאי את קסיר | 193,003 |
| 33 | Vendor | יוטפו בע"מ | 232,389 |
| 34 | Vendor | Clear Link Technologies, LLC | 199,373 |
| 35 | Vendor | Vibe Advertising Inc | 191,195 |
| 36 | Vendor | נגיעה עיסקית ופיננסית (אורן בר ניר) | 188,100 |
| 37 | Vendor | רות יצירה עסקית בע״מ (בועז) | 188,100 |
| 38 | Vendor | Mistplay Inc. | 181,937 |
| 39 | Vendor | HEEB | 160,000 |
| 40 | Vendor | פיד יור מיינד | 137,005 |
| 41 | Vendor | Goodwin Procter | 135,758 |

| | | | |
|---|---|---|---|
| 42 | Vendor | Kamir+Rani | 130,000 |
| 43 | Vendor | Kost Forer Gabay-EY | 129,122 |
| 44 | Vendor | Benjamin Capital Partners, Inc. | 128,038 |
| 45 | Vendor | Meitar | 66,396 |
| 46 | Vendor | פלאקסי ישראל בע"מ | 119,879 |
| 47 | Vendor | Cooly | 109,000 |
| 48 | Vendor | NARRATIVE GROUP LLC | 21,500 |
| 49 | Vendor | Skadden,Arps,SlateSkadden,Arps,Slate | 100,000 |
| 50 | Vendor | Brown Boots Inc | 98,819 |
| 51 | Vendor | Samsung Electronics America, Inc. | 90,975 |
| 52 | Vendor | Snap | 78,675 |
| 53 | Vendor | FTI Consulting, Inc. | 78,101 |
| 54 | Vendor | BlackRome (DE) | 75,000 |
| 55 | Vendor | Prodege | 73,410 |
| 56 | Vendor | EY-Ernst Young Australia | 13,101 |
| 57 | Vendor | Prograd Limited | 62,676 |
| 58 | Vendor | אומגה פתרונות בע"מ | 427,053 |
| 59 | Vendor | בלו סקיי | 427,053 |
| 60 | Vendor | האנצ' פתרונות בע"מ | 427,053 |
| 61 | Vendor | גיסין ושות', עורכי-דין | 19,011 |
| 62 | Vendor | Aragon Advertising | 56,359 |
| 63 | Vendor | רן רהב תקשורת ויחסי ציבור בע"מ | 13,768 |
| 64 | Vendor | Schertler Onorato Mead  Sears | 52,985 |
| 65 | Vendor | DLA Piper LLP (US) | 48,789 |
| 66 | Vendor | DENTSU | 44,029 |
| 67 | Vendor | Keystone Law Limited | 43,231 |
| 68 | Vendor | Taboola.com LTD | 36,057 |
| 69 | Vendor | Somekh Chaikin-KPMG | 32,320 |
| 70 | Vendor | App Samurai Inc | 30,538 |
| 71 | Vendor | ברונשטיין ילנה | 27,199 |
| 72 | Vendor | השתתפויות בנכסים | 26,629 |
| 73 | Vendor | Unity RD | 24,246 |
| 74 | Vendor | Twilio Inc | 24,000 |
| 75 | Vendor | נוטצ' בע"מ | 43,926 |
| 76 | Vendor | RELIASOURCING INC. | 22,711 |
| 77 | Vendor | סנטרל פארק בע"מ | 22,028 |
| 78 | Vendor | הראל בטוח-י | 18,967 |
| 79 | Vendor | PWC קסלמן קסלמן | 54,220 |
| 80 | Vendor | National Arbitration & Mediation, LLC | 20,625 |
| 81 | Vendor | TGM Games B.V | 19,406 |
| 82 | Vendor | AdAction | 19,192 |
| 83 | Vendor | Paypal | 18,844 |
| 84 | Vendor | גולדפרב גרוס זליגמן | 18,494 |
| 85 | Vendor | Google Ireland Limited | 17,128 |
| 86 | Vendor | Taylor Wessing LLP EURO | 16,963 |
| 87 | Vendor | קמיר אסטרטגיה בע"מ | 16,790 |
| 88 | Vendor | אמנון גור סוכנות לביטוח 2000 בע"מ | 16,723 |

| | | | |
|---|---|---|---|
| 89 | Vendor | Airtraffic LLC | 15,000 |
| 90 | Vendor | חברת חשמל | 23,361 |
| 91 | Vendor | PRT Technologies | 13,956 |
| 92 | Vendor | Zorka AdTech UAB | 13,500 |
| 93 | Vendor | Mykola Vovk | 12,608 |
| 94 | Vendor | וואלט אנטרפריזס ישראל בע"מ | 12,424 |
| 95 | Vendor | Mobsuccess | 11,935 |
| 96 | Vendor | Prime Insights AB | 11,704 |
| 97 | Vendor | Verifi, Inc. | 10,592 |
| 98 | Vendor | Customer Audiences LLC | 10,000 |
| 99 | Vendor | Hecker Fink LLP | 10,000 |
| 100 | Vendor | Papaya Gaming UK | 1,262,264 |
| 101 | Vendor | Other (< $10,000) -67 suppliers | 178,927 |
| 102 | Employees | Liability for vacation, recuperation, bonus, national insurance, tax payments, advance notice | 11,255,105 |
| | | **GRAND TOTAL** | **62,974,752** |

# נספח 8

# חלק ג סעיף 7 - ערבויות שנתנו צדדים שלישיים

עמ' 230

# תוכן עניינים



| מסי | שם הנספח | עמי |
|---|---|---|
| 1 | ערבות מקור היי פלור בע״מ | 3 |
| 2 | ערבות מקור כלל חברה לביטוח | 5 |
| 3 | ערבות מקור עתודות - קרן פנסיה לשכירים ועצמאיים בע״מ | 7 |
| 4 | ערבות מקור כלל פנסיה וגמל בע״מ | 9 |
| 5 | ערבות מקור יוטפו בע״מ | 11 |

# ערבות מקור חיי פלור בע״מ

**** העתק ****

**2151450**

**ערבות מספר : 864-568400/97-30-1534-0002/8** **תאריך : 15/12/2022**

**לכבוד**
**היי פלור בע"מ**

**הנדון: עברות בנקאית מס' 864-568400/97-30-1534-0002/8**

1. אנו ערבים כלפיכם לתשלום כל סכום עד לסכום של 1,859,165 ₪ (במילים: מיליון שמונה מאות חמישים ותשעה אלף מאה שישים וחמישה ₪ בלבד) להלן: "**סכום ערבות**") שתדרשו מאת פאפאייה גיימינג בע"מ, ח.פ. 515422095 (להלן: "**הנערב**") בקשר לביצוע התחייבויות הנערב לפי חוזה השכירות שבינכם לבין הנערב בקשר עם שכירות בפרויקט סקייטאור, לרבות כל תוספת, ארכה או שינוי לחוזה השכירות הנ"ל.

   סכום הערבות יהיה צמוד למדד המחירים לצרכן כפי שהוא מתפרסם מפעם לפעם על ידי לשכה המרכזית לסטטיסטיקה ולמחקר כלכלי, בתנאי ההצמדה שלהלן.

   "המדד היסודי" לעניין ערבות זו יהא מדד חודש אוקטובר 2021 שהתפרסם ב- 15/11/2021 בשיעור 102.4 נקודות.

   הפרשי ההצמדה לעניין ערבות זו יחושבו כדלקמן:

אם יתברר כי המדד החדש, הידוע בעת תשלום סכום הערבות, עלה לעומת המדד היסודי, יהיו הפרשי ההצמדה – הסכום השווה למכפלת ההפרש בין המדד החדש למדד היסודי בסכום הדרישה, מחולק במדד היסודי. אם המדד החדש נמוך מהמדד היסודי, נשלם לכם את הסכום הנקוב בדרישתכם עד לסכום הערבות, ללא כל הפרשי הצמדה.

2. לפי דרישתכם ראשונה בכתב, ולא יאוחר מ-7 ימי עסקים מתאריך התקבל דרישתכם על ידינו לפי כתובתנו המפורט לעיל, אנו נשלם לכם כל סכום הנקוב בדרישה, ובלבד שלא יעלה על סכום הערבות, בתוספת הפרשי הצמדה כאמור לעיל, מבלי להטיל עליכם חובה להוכיח את דרישתכם ומבלי שתהיו חייבים לדרוש את התשלום תחילה מאת הנערב.

3. ערבות זו תישאר בתוקפה עד ליום 7 לחודש אוגוסט שנת 2027 (כולל) בלבד ולאחר תאריך זה תהיה בטלה ומבוטלת. על כל דרישה על פי ערבות זו להתקבל על ידינו לא יאוחר מהתאריך הנ"ל.

4. עברות זו אינה ניתנה להעברה או להסבה.

בכבוד רב,
בנק לאומי לישראל בע"מ

טופס זה חייב בחתימה וחותמת אישית

# ערבות מקור כלל חברה לביטוח

**** העתק ****

**2151449**

**ערבות מספר : 864-568400/97-30-1534-0003/6** **תאריך : 15/12/2022**

**לכבוד**
**כלל חברה לביטוח בע"מ**

**הנדון: עברות בנקאית מס' 864-568400/97-30-1534-0003/6**

1. אנו ערבים כלפיכם לתשלום כל סכום עד לסכום של 925,864 ₪ (במילים: תשע מאות עשרים וחמישה אלף שמונה מאות שישים וארבעה ₪ בלבד) להלן: "**סכום ערבות**") שתדרשו מאת פאפאייה גיימינג בע"מ, ח.פ. 515422095 (להלן: "**הנערב**") בקשר לביצוע התחייבויות הנערב לפי חוזה השכירות שביניכם לבין הנערב בקשר עם שכירות בפרויקט סקייטאוור, לרבות כל תוספת, ארכה או שינוי לחוזה השכירות הנ"ל.

   סכום הערבות יהיה צמוד למדד המחירים לצרכן כפי שהוא מתפרסם מפעם לפעם על ידי לשכה המרכזית לסטטיסטיקה ולמחקר כלכלי, בתנאי ההצמדה שלהלן.

   "המדד היסודי" לעניין ערבות זו יהא מדד חודש אוקטובר 2021 שהתפרסם ב- 15/11/2021 בשיעור 102.4 נקודות.

   הפרשי ההצמדה לעניין ערבות זו יחושבו כדלקמן:

אם יתברר כי המדד החדש, הידוע בעת תשלום סכום הערבות, עלה לעומת המדד היסודי, יהיו הפרשי ההצמדה – הסכום השווה למכפלת ההפרש בין המדד החדש למדד היסודי בסכום הדרישה, מחולק במדד היסודי. אם המדד החדש נמוך מהמדד היסודי, נשלם לכם את הסכום הנקוב בדרישתכם עד לסכום הערבות, ללא כל הפרשי הצמדה.

2. לפי דרישתכם ראשונה בכתב, ולא יאוחר מ-7 ימי עסקים מתאריך התקבל דרישתכם על ידינו לפי כתובתנו המפורט לעיל, אנו נשלם לכם כל סכום הנקוב בדרישה, ובלבד שלא יעלה על סכום הערבות, בתוספת הפרשי הצמדה כאמור לעיל, מבלי להטיל עליכם חובה להוכיח את דרישתכם ומבלי שתהיו חייבים לדרוש את התשלום תחילה מאת הנערב.

3. ערבות זו תישאר בתוקפה עד 7 לחודש לאוגוסט שנת 2027 (כולל) בלבד ולאחר תאריך זה תהיה בטלה ומבוטלת. על כל דרישה על פי ערבות זו להתקבל על ידינו לא יאוחר מהתאריך הנ"ל.

4. ערבות זו אינה ניתנה להעברה או להסבה.

בכבוד רב,
בנק לאומי לישראל בע"מ

טופס זה חייב בחתימה וחותמת אישית

# ערבות מקור עתודות - קרן פנסיה לשכירים ועצמאיים בע״מ

** העתק **

2151448

ערבות מספר : 864-568400/97-30-1534-0005/2 תאריך : 15/12/2022

**לכבוד**
**עתודות - קרן פנסיה לשכירים ועצמאיים בע"מ**

**הנדון: ערבות בנקאית מס' 864-568400/97-30-1534-0005/2**

1. אנו ערבים כלפיכם לתשלום כל סכום עד לסכום של 81,803 ₪ (במילים: שמונים ואחד אלף שמונה מאות ושלושה ₪ בלבד) להלן: "**סכום ערבות**") שתדרשו מאת פאפאייה גימינג בע"מ, ח.פ. 515422095 (להלן: "**הנערב**") בקשר לביצוע התחייבויות הנערב לפי חוזה השכירות שביניכם לבין הנערב בקשר עם שכירות בפרויקט סקייטאור, לרבות כל תוספת, ארכה או שינוי לחוזה השכירות הנ"ל.

סכום הערבות יהיה צמוד למדד המחירים לצרכן כפי שהוא מתפרסם מפעם לפעם על ידי לשכה המרכזית לסטטיסטיקה ולמחקר כלכלי, בתנאי ההצמדה שלהלן.

"המדד היסודי" לעניין ערבות זו יהא מדד חודש אוקטובר 2021 שהתפרסם ב- 15/11/2021 בשיעור 102.4 נקודות.

הפרשי ההצמדה לעניין ערבות זו יחושבו כדלקמן:

אם יתברר כי המדד החדש, הידוע בעת תשלום סכום הערבות, עלה לעומת המדד היסודי, יהיו הפרשי ההצמדה – הסכום השווה למכפלת ההפרש בין המדד החדש למדד היסודי בסכום הדרישה, מחולק במדד היסודי. אם המדד החדש נמוך מהמדד היסודי, נשלם לכם את הסכום הנקוב בדרישתכם עד לסכום הערבות, ללא כל הפרשי הצמדה.

2. לפי דרישתכם ראשונה בכתב, ולא יאוחר מ-7 ימי עסקים מתאריך התקבל דרישתכם על ידינו לפי כתובתנו המפורט לעיל, אנו נשלם לכם כל סכום הנקוב בדרישה, ובלבד שלא יעלה על סכום הערבות, בתוספת הפרשי הצמדה כאמור לעיל, מבלי להטיל עליכם חובה להוכיח את דרישתכם ומבלי שתהיו חייבים לדרוש את התשלום תחילה מאת הנערב.

3. ערבות זו תישאר בתוקפה עד ליום 7 לחודש אוגוסט שנת 2027 (כולל) בלבד ולאחר תאריך זה תהיה בטלה ומבוטלת. על כל דרישה על פי ערבות זו להתקבל על ידינו לא יאוחר מהתאריך הנ"ל.

4. ערבות זו אינה ניתנה להעברה או להסבה.

בכבוד רב,
בנק לאומי לישראל בע"מ

טופס זה חייב בחתימה וחותמת אישית

# ערבות מקור כלל פנסיה וגמל בע״מ

**** העתק ****

**2158483**

**ערבות מספר : 864-568400/97-30-1534-0006/0** **תאריך : 15/12/2022**

**לכבוד**
**כלל פנסיה וגמל בע״מ**

**הנדון: עברות בנקאית מס׳ 864-568400/97-30-1534-0006/0**

1. אנו ערבים כלפיכם לתשלום כל סכום עד לסכום של 851,498 ₪ (במילים: שמונה מאות חמישים ואחד אלף ארבע מאות תשעים ושמונה ₪ בלבד) להלן: ״**סכום ערבות**״) שתדרשו מאת פאפאייה גיימינג בע״מ, ח.פ. 515422095 (להלן: ״**הנערב**״) בקשר לביצוע התחייבויות הנערב לפי חוזה השכירות שבינכם לבין הנערב בקשר עם שכירות בפרויקט סקייטאור, לרבות כל תוספת, ארכה או שינוי לחוזה השכירות הנ״ל.

   סכום הערבות יהיה צמוד למדד המחירים לצרכן כפי שהוא מתפרסם מפעם לפעם על ידי לשכה המרכזית לסטטיסטיקה ולמחקר כלכלי, בתנאי ההצמדה שלהלן.

   ״המדד היסודי״ לעניין ערבות זו יהא מדד חודש אוקטובר 2021 שהתפרסם ב- 15/11/2021 בשיעור 102.4 נקודות.

   הפרשי ההצמדה לעניין ערבות זו יחושבו כדלקמן:

   אם יתברר כי המדד החדש, הידוע בעת תשלום סכום הערבות, עלה לעומת המדד היסודי, יהיו הפרשי ההצמדה – הסכום השווה למכפלת ההפרש בין המדד החדש למדד היסודי בסכום הדרישה, מחולק במדד היסודי. אם המדד החדש נמוך מהמדד היסודי, נשלם לכם את הסכום הנקוב בדרישתכם עד לסכום הערבות, ללא כל הפרשי הצמדה.

2. לפי דרישתכם ראשונה בכתב, ולא יאוחר מ-7 ימי עסקים מתאריך התקבל דרישתכם על ידינו לפי כתובתנו המפורט לעיל, אנו נשלם לכם כל סכום הנקוב בדרישה, ובלבד שלא יעלה על סכום הערבות, בתוספת הפרשי הצמדה כאמור לעיל, מבלי להטיל עליכם חובה להוכיח את דרישתכם ומבלי שתהיו חייבים לדרוש את התשלום תחילה מאת הנערב.

3. ערבות זו תישאר בתוקפה עד 7 לחודש לאוגוסט שנת 2027 (כולל) בלבד ולאחר תאריך זה תהיה בטלה ומבוטלת. על כל דרישה על פי ערבות זו להתקבל על ידינו לא יאוחר מהתאריך הנ״ל.

4. עברות זו אינה ניתנה להעברה או להסבה.

בכבוד רב,
בנק לאומי לישראל בע"מ

טופס זה חייב בחתימה וחותמת אישית

# ערבות מקור יוטפו בע״מ

בנק לאומי - ענף ערבויות , רח' אבא הילל סילבר 3, לוד

57676225

**** ט י ו ט ה ** - (פרטי) צמודה למדד המחירים לצרכן עם רצפה**

**ערבות מספר : 864-568400/97-30-0801-0002/8** **תאריך : 24/08/2023**

לכבוד
יוטפו בע״מ

מספר ערבות : 864-568400/97-30-0801-0002/8

הננו ערבים בזה כלפיכם לסילוק כל סכום עד לסך 914,687.00 ש״ח (במילים : תשע מאות ארבעה עשר אלף שש מאות שמונים ושבעה ש״ת בלבד) (להלן-״סכום הערבות״), כשהוא צמוד למדד כמפורט להלן, המגיע או עשוי להגיע לכם מאת : פפאייה גיימינג בע״מ (להלן-״החייב״) בקשר עם התחייבויות החייב לפי הסכם שכירות משנה בלתי מוגנת מיום 24/08/23 .

לצרכי ערבות זו, המונח ״מדד״ משמעו : מדד המחירים לצרכן הכולל ירקות ופירות המתפרסם ע״י הלשכה המרכזית לסטטיסטיקה ולמחקר כלכלי כולל אותו מדד אף אם יתפרסם ע״י מוסד ממשלתי אחר וכן כולל כל מדד רשמי שיבוא במקומו, בין אם יהיה בנוי על אותם נתונים עליהם בנוי המדד הקיים ובין אם לאו.
סכום הערבות הצמוד למדד יחושב לפי האפשרויות המפורטות להלן :

(א) אם יתברר מהמדד שיתפרסם לאחרונה לפני התשלום עפ״י ערבות זו - (להלן-״המדד החדש״), כי המדד החדש עלה לעומת המדד בגין חודש יולי 2023 שפורסם ביום 15/08/2023, היינו 104.5 נקודות (להלן-״המדד היסודי״), אזי, יחושב סכום הערבות כשהוא מוגדל בשיעור זהה לשיעור עליית המדד החדש לעומת המדד היסודי.

(ב) אם יתברר כי המדד החדש שווה או נמוך מהמדד היסודי, אזי לא יהיה שינוי בסכום הערבות.
סכום הערבות המחושב על פי אחת האפשרויות הנ״ל, לפי העניין, ייקרא להלן : ״סכום הערבות הצמוד״.

אנו נשלם לכם מפעם לפעם, בכל מקרה, תוך 7 ימים לאחר יום קבלת דרישתכם הראשונה בכתב, כל סכום בגבול סכום הערבות הצמוד, מבלי להטיל עליכם לבסס את דרישתכם או לדרוש תחילה תשלום מהחייב, ובלבד שהסכום הכולל שיהיה עלינו לשלמו עפ״י כל דרישותיכם גם יחד לא יעלה על סכום הערבות הצמוד.
ערבות זו תישאר בתוקפה עד ליום 30/11/2027 ועד בכלל וכל דרישה על פיה צריכה להגיע בכתב למשרדי ענף ערבויות שמענו הוא ענף ערבויות , רח' אבא הילל סילבר 3, לוד, לא יאוחר מאשר בתאריך הנ״ל, בשעות הפעילות למסירת דרישות על פי ערבות בנקאית.

דרישה שתגיע אלינו לאחר המועד הנ״ל, לא תיענה. מודגש בזה, כי ״דרישה בכתב״ כאמור לעיל, אינה כוללת דרישה שתגיע לבנק באמצעות הפקסימיליה, מיברק או כל אמצעי אלקטרוני אחר וזו לא תחשב כ״דרישה״ בהתאם לכתב ערבות זה.

הוצאה ערבות זו לטובת שניים או יותר, כי אז, כל תשלום על פיה ייעשה לכולם יחד.

ערבות זו אינה ניתנת להעברה.

בכבוד רב,
בנק לאומי לישראל בע"מ

פפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

טופס זה חייב בחתימה וחותמת אישית

ת.עבודה : 24/08/2023 שעה : 10:07
סניף : 726/1 בוצע ע"י : 545085

תאריך :24/08/2023

שם לקוח : פאפאייה גיימ

לכבוד
בנק לאומי לישראל בע"מ
סניף : 864/1 מרכז עסקים לאומיטק הרצליה המנופים 15

**הנדון: בקשה להוצאת כתב ערבות בנקאית**

נא להוציא כתב ערבות/כתב התחייבות(להלן 'הערבות')בהתאם לנוסח לפי הפרטים הבאים:

שם המוטב: יוטפו בע"מ

מען המוטב :
סכום הערבות: 914,687.00 ש''ח
שם החייב: פאפאייה גיימינג בע"מ

בקשר עם(מטרת הערבות):התחייבויות החייב לפי הסכם שכירות משנה בלתי מוגנת מיום
תוקף הערבות :30/11/2027היהתנאי הצמדה :ים : 104.5 יולי 2023
מספר דגם : 0801/9 שם דגם : ערבויות להבטחת הלואות צמודות מדד

|_| כלקוח המצורף לבנקאות בתקשורת עם הרשאה לפעול בערוץ האינטרנט-נא להנפיק את נוסח הערבות באופן דיגיטלי באיזור האישי באתר האינטרנט של הבנק.

הערות/פרטים נוספים:
ידוע לנו ואנו מסכימים לכך,שאם המועד האחרון לתשלום על פי ערבות כלשהי שהוצאה לבקשתנו,יחול ביום בו סניף הבנק בו מתנהל החשבון סגור,כי אז יתבצע התשלום ביום העסקים הקודם,וזאת על אף האמור בתנאי אותה ערבות.

ידוע לנו ואנו מסכימים לכך כי בעת ביצוע הפעולה יחוייב חשבוננו מס' 568400/97 אצלכם בעלות השירות כמפורט להלן:

אחוייב בעמלת "ער.בנקאית המובטחת בפיקדון כספי ספציפי" בסך 9,155.77 ש"ח
לתקופה עד 24/08/24 לפי שיעור של 1.0000% לשנה
לאחר הטבה בשיעור של 50.0000%
מסך של 914,687.00 ש"ח עבור 366 ימים.
לידיעתכם בתום כל שנה כל עוד לא פקעה הערבות, תיגבה מראש עמלה לשנה נוספת בהתאם לתעריפון העמלות של הבנק ובכפוף להסכמים בעניין זה
אופן החישוב:
( 914,687.00 ש"ח ) * ( % 1.0000 )
* ( 130/365 + 236/366)

הסכומים,השיעורים והמועדים המפורטים לעיל נכונים לשעת ביצוע הפעולה,וכפופים לכל שינוי שיחול,אם יחול,לפני מועד גבייתם בפועל ולתנאים החלים על החשבון.

פאפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

האמור בחוברת תנאים כלליים לניהול חשבון שנחתמה ו/או תחתם על ידינו ו/או בכתב ההתחייבות שחתמנו לכם בקשר עם הוצאת ערבויות ו/או כתבי שיפוי על ידכם, יחול גם על הערבות הנ"ל (ועל הארכות תוקף - אם יהיו).
ככל שהבקשה הינה של תאגיד - בהתאם להוראת בנק ישראל אנו מתחייבים למסור לכם את הדוח הכספי שלנו, במתכונת שנקבעה על פי דין או על פי כללי חשבונאות מקובלים, וזאת מיד לאחר יום חתימתו.

חתימת הלקוח ____________

אישור הנהלת הסניף : ____________

**נזכירכם, כי על הלקוח לאשר בחתימתו (על פני עותק הערבות הנשאר בסניף) את נוסח הערבות.**

פאפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

בוצע ע"י : שרונה נוישטין 848 11:38 24/08/2023
מזהה : 100039252176315 פעולה : Hermesh
מספר בטחון : 3267014797

24 Aug 2023 11:38:10
leumi
cosign

**שמות הממשכנים:**

| שם | ת.ז/מספר רישום |
|---|---|
| פאפאייה גיימינג בע"מ | ח.פ. 515422095 |

(להלן - "**הממשכנים**")

שמענם המשותף, לצורך מסמך זה, הוא : אצל מר/גב' ______________________

**מען המסגר 35 תל אביב יפו 6721407 ישראל**

## תוספת "א" לאגרת חוב מובטחת/שטר משכון (כספים בחשבון/פיקדון/פיקדון וזכויות בגין ובקשר עם החשבון/פיקדון)

**לטובת בנק לאומי לישראל בע"מ ("הבנק")**

בהתאם לאמור בסעיף 3.1 לשטר המשכון/אגרת החוב, להלן פירוט הפיקדונות אליהם מתייחס שטר המשכון :

- כל פקדונות מט"י בדגם מספר **51486** המתנהלים ושיתנהלו בחשבון מסוג מט"י שמספרו **568400/97** תחת מספר לקוח **56840097** המתנהל בסניף **864 מרכז עסקים לאומיטק** של הבנק

כל החשבונות / הפקדונות הנ"ל ו/או כל חשבון ו/או פקדון שיבוא במקומם, כל הכספים שיופקדו מפעם לפעם בחשבונות ו/או בפקדונות הנ"ל וכן כל התמורות, הפירות, ההכנסות והזכויות הנובעים ו/או שינבעו מהכספים הנ"ל או הקשורים אליהם, המצויים ו/או שיהיו מצויים תחת מס' הלקוח הנ"ל ו/או מס' כל מס' לקוח שיבוא במקומו.

**ולראיה באו הממשכנים חברת פאפאייה גיימינג בע"מ ח.פ. 515422095 על החתום, בהתאם לדרישות תקנונה או החלטותיה, באמצעות מורשי החתימה של החברה כמפורט בטבלה להלן:**

| שם | מספר זיהוי | תאריך ושעת חתימה | מספר טלפון נייד | חתימה |
|---|---|---|---|---|

פאפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

בוצע ע"י : שרונה נוישטין 848 11:37 24/08/2023
מזהה : 100039252176307 פעולה : Hermesh
מספר בטחון : 3267014797

**שמות הממשכנים:**

| שם | ת.ז/מספר רישום |
|---|---|
| פאפאייה גיימינג בע"מ | ח.פ. 515422095 |

(להלן יחד ולחוד- "הממשכנים")

שמענם המשותף, לצורך שטר משכון זה, הוא : אצל
**המסגר 35 תל אביב יפו 6721407 ישראל**

# אגרת חוב מובטחת/שטר משכון
## (כספים בחשבון/פיקדון וזכויות בגין ובקשר עם החשבון/פיקדון)
## לכלל החובות וההתחייבויות (קרדיט)

לטובת : **בנק לאומי לישראל בע"מ** (להלן- "**הבנק**")
☐ ולטובת חברות בנות של הבנק בארץ ובחו"ל[1]
(אם סומנה חלופה זו, **בנק לאומי לישראל בע"מ** וכל חברות הבת שלו בארץ ובחו"ל ייקראו להלן יחד ולחוד - "**הבנק**")

**והמעיד על הדברים הבאים:**

**1. הסכומים המובטחים**

1.1. כתב זה ניתן להבטחת התשלום המלא והמדויק של כל הסכומים, בין במטבע ישראלי ובין במטבע חוץ כלשהו - קרן, ריבית מכל סוג שהוא, לרבות ריבית בשיעור המירבי (כולל הפרשי הצמדה), אם יהיו כאלה, עקב הצמדת הקרן והריבית או אחת מאלה לשער חליפין כלשהו או למדד המחירים לצרכן או לכל מדד אחר), עמלות, חיובים בנקאיים וכל מיני הוצאות - המגיעים או שיגיעו לבנק מפעם לפעם מאת הממשכנים בגין ו/או בקשר עם הסכומים המובטחים, כהגדרתם להלן.
המונח "**הסכומים המובטחים**" - משמעו :
א. הלוואות, אשראים או משיכות יתר, שהבנק נתן או יתן לממשכנים ; וכן
ב. כתבי התחייבות, כתבי ערבות או כתבי שיפוי, שהבנק הוציא או יוציא לבקשת הממשכנים ; וכן
ג. אשראים דוקומנטריים מכל מין או סוג שהם, שהבנק פתח או יפתח לפי בקשת הממשכנים ; וכן
ד. כתבי התחייבות, כתבי ערבות או כתבי שיפוי שהממשכנים חתמו או יחתמו לבנק או לטובתו ; וכן
ה. שטרות בחתימתם, הסבתם או בערבותם של הממשכנים שנמסרו או יימסרו לבנק, בין על ידי הממשכנים ובין על ידי צדדים שלישיים ; וכן
ו. כל שירות בנקאי אחר שניתן או יינתן לממשכנים ; וכן
ז. כל חוב / חבות של הממשכנים כלפי צדדים שלישיים, אשר הומחו ו/או יומחו לבנק ; וכן
ח. כל חבות אחרת מכל מין או סוג שהם של הממשכנים כלפי הבנק, בין שמקורה בעסקים בנקאיים ובין שמקורה אחר ;

בין שהסכומים הנ"ל או חלק מהם מגיעים או יגיעו מאת הממשכנים לבד או מהם יחד עם אחרים, בין שהם מגיעים או יגיעו מהממשכנים במישרין ובין בעקיפין, בין שמגיעים או שיגיעו באופן מסויים ובין על פי חבות מותנית כלשהי, בין שהסכומים הנ"ל או חלק מהם התגבשו בפסק דין של בית המשפט ובין אם לאו, בין שהם מגיעים עכשיו ובין שיגיעו בעתיד, בין שזמן פרעונם לפני מימושו של כתב זהו ובין אחריו ; כל זאת :

עד לסכום כולל של **914,688.00 ש"ח (תשע מאות וארבעה עשר אלף שש מאות שמונים ושמונה שקל חדש)** שיגדל ככל שיעלה המדד כמפורט להלן : אם יתברר מתוך מדד המחירים לצרכן הכולל פירות וירקות המתפרסם מידי פעם בפעם ע"י הלשכה המרכזית לסטטיסטיקה ולמחקר כלכלי ("**המדד**") האחרון הידוע בכל מועד שבו ייפרע הבנק על פי כתב זה ("**המדד החדש**") כי המדד החדש עלה לעומת המדד האחרון הידוע במועד בו נחתם כתב זה ("**המדד היסודי**"), כי אז יגדל הסכום הנקוב לעיל באופן יחסי למידת העליה של המדד החדש לעומת המדד היסודי. אם המדד החדש לא עלה לעומת המדד היסודי או ירד לעומתו, לא ישתנה הסכום הנקוב לעיל.

ובנוסף לכך כל ההוצאות והסכומים האחרים שהממשכנים חייבים או יהיו חייבים בתשלומם לפי תנאי כתב זה, לרבות הריבית כאמור בסעיף 1.2 להלן ;

1.2. הממשכנים מתחייבים בזה לשלם לבנק כל סכום מהסכומים המובטחים במועד פירעונו כפי שנקבע וייקבע מדי פעם בפעם, לרבות, אך לא רק, עקב העמדה לפרעון מיידי ו/או האצת פרעון על פי דין ו/או על פי המוסכם עם הממשכנים, או, במקרה שלא נקבע מועד פרעון, עם דרישה ; כל סכום מהסכומים האמורים בסעיף 1.1 לעיל שלא ישולם לבנק כאמור, ישא ריבית בשיעור המירבי, בגין תקופה שהחלה מהתאריך שבו היה על הממשכנים לשלמו ועד לתשלומו בפועל.

**2. פרעון מוקדם**

הממשכנים יהיו רשאים לפרוע את הסכומים המובטחים, או כל חלק מהם, לפני מועד פרעונם המוסכם (להלן בסעיף זה : "**פרעון מוקדם**"), בכפוף לתשלום עמלות פרעון מוקדם ולתנאים נוספים שיהיו מקובלים בבנק במועד ביצוע כל פרעון מוקדם כאמור.

אם במועד ביצוע הפרעון המוקדם תהיה קיימת הוראת דין כלשהי (לרבות הוראות בנק ישראל) המגבילה את גובה עמלות הפרעון המוקדם אותן רשאי לדרוש הבנק, או הקובעת תנאים אחרים לביצוע הפרעון המוקדם - ייעשה הפרעון המוקדם בכפוף להוראות אותו דין, והבנק יהיה רשאי להתנות את ביצוע הפרעון המוקדם בתשלום השיעור/ים ו/או הסכום/ים הגבוה/ים ביותר של עמלות פרעון מוקדם, המותרות על פי דין במועד ביצוע הפרעון המוקדם, לאותו סוג של אשראי

בכל מקרה אחר, יהיה הבנק רשאי להתנות את הפרעון המוקדם בתשלום עמלות פרעון מוקדם ותשלומים נוספים ובתנאים מוקדמים אחרים, אשר לפי שיקול דעת הבנק, מבטאים, באופן סביר, את הנזק שייגרם לו כתוצאה מביצוע הפרעון המוקדם באותו מועד.

מוסכם בזאת כי סעיף 13(ב) לחוק המשכון, תשכ"ז - 1967 וכן כל סעיף אחר שיבוא במקומו, לא יחול על הפרעון המוקדם

**3. הרכוש המשועבד**

[1] אם סומנה אפשרות זו, הכתוב בכתב זה לגבי הבנק יחול גם לגבי חברות בנות של הבנק בארץ ובחו"ל

פאפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

חתימה ____________

100039252176307


6.18 FN 311-14

כערובה לתשלומם המלא והמדוייק של הסכומים המובטחים ממשכנים בזה הממשכנים במשכון קבוע ראשון בדרגה, וממחים בזה לבנק על דרך שעבוד :

3.1. את כל הזכויות והכספים בפיקדונות ובחשבונות המצויינים **בתוספת "א"** לשטר משכון זה וכן את כל הזכויות לכספים ואת כל הכספים העומדים ואלו שיעמדו מפעם לפעם לזכות הממשכנים בפיקדונות ובחשבונות המצויינים בתוספת "א" הנ"ל. (החשבון/נות והפיקדון/ות הנ"ל, הכספים המופקדים ושיופקדו בהם והזכויות בגינם, ייקראו- **"הפיקדון"**).

3.2. את כל התמורות, הפירות, ההכנסות והזכויות הנובעים או שינבעו מהפיקדון ו/או מהכספים הנ"ל או הקשורים אליהם. הזכויות והכספים המפורטים בסעיפים 3.1 ו- 3.2 לעיל ייקראו להלן - **"כספי הפיקדון"** או **"כספי הפיקדונות"**.

3.3. במקרה שכספי הפיקדונות, כולם או חלקם, יועברו לזכות חשבון אחר של הממשכנים בבנק (להלן - "החשבון הנעבר") מכל סיבה שהיא, לרבות כתוצאה מחידוש, סיום, מכירה, השקעת המשך או השקעה מחדש של כספי הפיקדונות, כולם או מקצתם, בין מכח הדין, בין כתוצאה מהוראת הלקוח ובין מכל סיבה אחרת - יחולו תנאי כתב זה גם ביחס לכספים שיועברו כאמור ויראו את כספי החשבון הנעבר, בגובה הסכומים שהועברו ופירותיהם ו/או תמורתם לכל דבר ועניין ככספי הפיקדונות. מבלי לגרוע מהאמור לעיל, הבנק יהא רשאי לחייב את החשבון הנעבר בכל סכום, בגובה הסכומים שהועברו אליו כאמור ולהעבירו לפיקדון - וזאת בין אם החשבון הנעבר יהיה קרדיטורי או דביטורי או שייעשה דביטורי כתוצאה מהחיוב הנ"ל. מובהר בזאת כי האמור לעיל יחול בכל מקרה של העברה/ות נוספת/ות.

3.4. כל הזכויות והכספים כאמור בס"ק 3.1 - 3.3 לעיל יקראו להלן - **"הזכויות הממושכנות"**.

3.5. מוסכם בזאת שבכל מקרה שמספרו של הפיקדון או של החשבון או של החשבון הנעבר או סימני זיהוי/ים ישונו מסיבה כלשהי, יראו את האמור בכתב זה כמתייחס גם לפיקדון ולחשבון לפי מספרו/הם החדש/ים או סימני זיהוי/ים החדשים.

4. **הצהרות הממשכנים**

הממשכנים מצהירים בזה כי :-

4.1. הזכויות הממושכנות הינן בבעלותם הבלעדית.

4.2. הזכויות אינן ממושכנות, משועבדות, מעוקלות או מומחות לזכות צד שלישי כלשהו ואין כל הגבלה או תנאי החלים, לפי מהותן של הזכויות הממושכנות או לפי דין או הסכם כלשהם, על המחאתן, משכונן, שעבודן או על העברת הבעלות בהן.

4.3. לא ארע ארוע, אשר על פי תנאי כתב זה, או על פי מסמך אחר כלשהו שנחתם על ידם כלפי הבנק, מהווה עילה להעמדה לפרעון מיידי של הסכומים המובטחים, ולא ידוע להם על נסיבות העלולות להביא לקרותו של ארוע כנ"ל.

4.4. חתימתם של הממשכנים על כתב זה וביצוע ההתחייבויות הכלולות בו אינם עומדים בסתירה או בניגוד לפסק דין, צו, הנחיות או הוראות של בית משפט או של גוף מעין שיפוטי המופנים לממשכנים ו/או שהממשכנים צד להם או להנחיות או הוראות של רשות מינהלית כלשהי, וכן אינם בניגוד או בסתירה להסכם, התחייבות או הבטחה כלשהם שהממשכנים הינם צד להם.

4.5. במקרה שהממשכנים הינם תאגיד, כי אז בנוסף לכל ההצהרות המפורטות לעיל מצהירים בזה הממשכנים כי :

4.5.1. חתימתם של הממשכנים על כתב זה וביצוע ההתחייבויות הכלולות בו אינם עומדים בסתירה או בניגוד למסמכי ההתאגדות של הממשכנים;

4.5.2. מסמכי ההתאגדות של הממשכנים שנמסרו לבנק על ידם הינם המסמכים המלאים והמעודכנים.

5. **התחייבויות הממשכנים**

הממשכנים מתחייבים בזה :-

5.1. לא למכור, לא להעביר או להמחות ולא להעניק זכויות כלשהן, באיזה אופן שהוא, בזכויות הממושכנות, בלי הסכמת הבנק מראש בכתב.

5.2. להודיע מיד לבנק על כל מקרה של הטלת עיקול, נקיטת פעולת הוצאה לפועל או הגשת בקשה לבקשה למינוי כונס נכסים על או בקשר עם הזכויות הממושכנות וכן להודיע מיד, על דבר המשכון וההמחאה לטובת הבנק - לרשות שעיקלה או נקטה פעולת הוצאה לפועל או שנתבקשה למנות כונס נכסים כאמור - ולצד שלישי שיזם או ביקש את אלה או את חלק מאלה, וכן לנקוט מיד, על חשבונם של הממשכנים, בכל האמצעים הדרושים לשם ביטול העיקול, פעולת ההוצאה לפועל או מינוי כונס הנכסים, לפי המקרה.

5.3. לא למשכן, לא לשעבד ולא להמחות את הזכויות הממושכנות, באיזה אופן שהוא, בזכויות שיהיו קודמות, שוות או נחותות לזכויות הניתנות לבנק לפי כתב זה, בלי הסכמת הבנק לכך מראש בכתב.

5.4. להמציא לבנק, מיד לפי דרישתו הראשונה, בטוחה נוספת להנחת דעתו של הבנק - בכל מקרה, שהבנק ייווכח לדעת שאירע מאורע העלול לפגוע ביכולתם הכספית של הממשכנים או חלק מהם או אם לדעת הבנק שוויין של הזכויות הממושכנות פחת או עלול לפחות בשיעור ניכר משוויין ביום חתימת כתב זה, מכל סיבה שהיא;

5.5. לעשות, על חשבונם של הממשכנים כל שיהיה דרוש או רצוי, לפי החוק או לדעת הבנק, על מנת שכוחם של המישכון וההמחאה הנוצרים בזה יהיו יפים גם כלפי צדדים שלישיים, לרבות נושים אחרים - קיימים או עתידים - של הממשכנים; ובמיוחד, אך בלי לגרוע מכלליות האמור לעיל, לגרום לכך שהמישכון וההמחאה הנוצרים בזה לטובת הבנק וכן כל תיקון למישכון וההמחאה הנ"ל (ולשם מניעת ספק מובהר בזה ששום תיקון כאמור לא ייעשה אלא בהסכמת הבנק) יירשמו בלשכות הרישום המתאימות וכן לחתום על כל מסמך שלדעת הבנק יהיה דרוש לצורך ביצועו של כל רישום כאמור או בקשר עמו.

5.6. להודיע מיד לבנק על קרות כל מאורע המזכה או עשוי לזכות את הבנק להעמיד את הסכומים המובטחים לפרעון מיידי ו/או לממש את המשכון נשוא כתב זה.

6. **זכות עיכבון וקיזוז**

הממשכנים מסכימים ומתחייבים בזה :-

6.1. כי הבנק יהיה זכאי לעכב תשלום של כספי הפיקדונות עד לסילוק כל הסכומים המובטחים. הממשכנים לא יהיו זכאים למשוך את הכספים הנ"ל או לפעול בהם או ביחס אליהם בכל אופן אחר שהוא, בלי הסכמת הבנק בכתב ומראש.

6.2. כי חבות הבנק לשלם להם או לפקודתם את כספי הפיקדונות חדלה להיות חבות מקובלת של בנק כלפי לקוח והיא הופכת לחבות מותנית, בין היתר, בתנאי מוקדם שהסכומים המובטחים יסולקו לבנק במלואם בטרם יהיה הבנק חייב בכל תשלום שהוא ע"ח כספי הפיקדונות.

6.3. כמו כן, בלי לגרוע מזכות העיכבון של הבנק כאמור ומיתר זכויות הבנק כאמור בכתב זה, הבנק זכאי בכל עת - ואף לפני מועד פירעונם של סכומי הפיקדונות - לקזז את סכומי הפיקדונות או חלקם, ללא מתן הודעה מוקדמת לממשכנים וזאת כנגד הסכומים המובטחים, כולם או מקצתם, בין שמועד פירעונם הגיע ובין שטרם הגיע ובין שמועד פירעונם מותנה בקיום תנאי/ים כלשהו/ם (**"הסכומים המגיעים"**). להסרת ספק בלבד, הבנק זכאי לבצע קיזוז כאמור אף אם סכומי הפיקדונות והסכומים המגיעים אינם באותו מטבע.

6.4. לצורך הקיזוז האמור, הבנק זכאי לרכוש מכספי פיקדון כלשהו כל סכום במטבע חוץ שיהיה דרוש לשם סילוק ע"ח הסכומים המגיעים, או למכור מטבע חוץ כלשהו מכספי פיקדון כלשהו ולהשתמש בתמורת המכירה לשם סילוק ע"ח הסכומים המגיעים, או לפי המקרה לשם רכישת מטבע חוץ אחר שיהיה דרוש לשם סילוק ע"ח הסכומים המגיעים.
כל רכישה או מכירה כאמור לעיל תעשה לפי שער הבנק.

6.5. הממשכנים מצהירים בזאת שידוע להם, כי במקרים שבהם הבנק ישתמש בזכות הקיזוז לפני מועד פירעונו של פיקדון כלשהו, עלולים לחול שינויים לרעת הממשכנים בכל הנוגע לזכויותיהם בגין או בקשר עם אותו פיקדון (כגון לעניין שיעורי ריבית, הפרשי הצמדה, זכויות למענקים או הלוואות, פטור או הנחה ממס וניכויים במקור) וכן יהיה הבנק זכאי לנכות מסכומי הפיקדונות עמלות, הוצאות ונזקים שהוא נוהג לגבות מעת לעת בעת "שבירת" פיקדונות מאותו סוג ע"י לקוחות.

חברת פפאיה גיימינג בע"מ
Papaya Gaming Ltd
PAPAYA ח.פ. 515422095

חתימה ____________

6.6. הממשכנים פוטרים בזה את הבנק מכל אחריות לנזקים ולהפסדים שייגרמו או שעלולים להיגרם להם כתוצאה משימוש הבנק בזכות כלשהי מזכויותיו על פי כתב זה.

7. **חידוש אוטומטי**
כל זמן שכתב זה יהיה בתוקף, הממשכנים מתחייבים באופן בלתי חוזר לתת לבנק - מראש או מידי פעם בפעם - הוראות בכתב לחידוש הפיקדון וכספי הפיקדון. הממשכנים מסכימים לכך שבכל מקרה שמסיבה כלשהי הממשכנים לא יתנו הוראת חידוש כאמור או, בניגוד להוראת חידוש קודמת שלהם, יתנו הוראת משיכה של כספי הפיקדונות או חלקם במועד פירעונם; אזי הבנק יהיה רשאי להפקיד מפעם לפעם את כספי הפיקדון הנוגע לעניין בפיקדון נושא ריבית (שקלי או במטבע הפיקדון, לפי העניין) לתקופה דומה לתקופה שהסתיימה ערב החידוש ובתנאי ריבית ו/או הצמדה שיהיו מקובלים בבנק באותה עת לגבי פיקדונות מאותו סוג ובאותו סכום, או לפי בחירת הבנק לתקופה קצרה יותר שתהיה נהוגה באותה עת בבנק לגבי פיקדונות של לקוחותיו בשקלים או במטבע הפיקדון, לפי העניין. ידוע לממשכנים שבכל מקרה שהבנק יחדש כספי פיקדון מכח סעיף זה, יעמוד לרשות הממשכנים מידע לגבי שיעורי הריבית ו/או תנאי ההצמדה של כספי הפיקדון שחודש בסניף הבנק אשר בו מתנהל אותו פיקדון.

8. **ייפוי כח**
8.1. הממשכנים מייפים בזה - באופן בלתי חוזר - את כוחו של הבנק לעשות בשמם, במקומם ועל חשבונם של הממשכנים כל פעולה מהפעולות המנויות בסעיף 5.5 ובסעיף 7 לעיל; וכן לשלם במקום הממשכנים כל סכום שלפי תנאי כתב זה הממשכנים חייבים או יהיו חייבים לשלמו לצד שלישי כלשהו; אולם, אין במתן ייפוי הכח הנ"ל כדי לפטור את הממשכנים מלקיים התחייבות כלשהי מהתחייבויותיהם על פי כתב זה או כדי לחייב את הבנק להשתמש בייפוי הכח הנ"ל, כולו או מקצתו, או לגרוע מזכויות הבנק לעשות את כל האמור לעיל בשמו הוא בתוקף השעבוד על פי כתב זה;
8.2. הממשכנים פוטרים בזה את הבנק, מראש, מכל אחריות במקרה שהבנק לא ישתמש בסמכות מסמכויותיו על פי ייפוי הכח הנ"ל.

9. **עצמאות המשכון**
השעבודים הנוצרים בזה לטובת הבנק יהיו בלתי תלויים בכל הבטוחות או הערובות, שהבנק קיבל או יקבל מהממשכנים או בעבורם, ולא ישפיעו עליהן ולא יושפעו מהן.

10. **הליכים ומימוש**
10.1. בקרות אירוע כלשהו המאפשר לבנק, על פי כל מסמך שנחתם ו/או ייחתם על ידי הממשכנים – לרבות, ובלי לגרוע מכלליות האמור לעיל, על פי הוראות הסכם תנאים כלליים להעמדת אשראים במט"ח ובמט"י ו/או תנאים כלליים לניהול חשבון - להעמיד לפירעון מיידי את חובותיהם והתחייבויותיהם כלפי הבנק, כולם או חלקם, יהיה הבנק רשאי להשתמש בכל האמצעים שימצא לנכון כדי לגבות את הסכומים המובטחים מהממשכנים ולנקוט בכל הליך שיהיה דרוש לדעת הבנק לצורך שמירת זכויותיו לפי כתב זה, וכמו-כן, בלי לגרוע מכלליות זכויותיו, לממש את הזכויות הממושכנות, וכן יהיה רשאי לקזז את הסכומים המובטחים, כולם או חלקם, מכספי הפקדונות, בכל עת, גם לפני מועד פירעונם של הפקדונות. על כל קיזוז כאמור יחול האמור בסעיפים 6.3-6.6 לעיל.
10.2. כל הסכומים שייגבו על ידי הבנק ממימוש זכויותיו על פי כתב זה (לרבות סכומים כנ"ל שנזקפו לזכות איזה חשבון של הממשכנים) ישמשו, אם יספיקו לכך, למטרות המפורטות להלן לפי סדרן:
10.2.1. לשם סילוק ההוצאות שנגרמו כתוצאה ממימוש כאמור, וכן כל הוצאה שנגרמה כתוצאה מנקיטת הליכים כלשהם על ידי הבנק לצורך שמירה על זכויותיו על פי כתב זה, כאמור בסעיף 12 להלן;
10.2.2. לשם סילוק יתר ההוצאות, העמלות, החיובים הבנקאיים, הריבית והסכומים הנוספים עקב הצמדת הריבית, אשר מועד פרעונם הגיע ולא סולקו לבנק על-ידי הממשכנים;
10.2.3. לשם סילוק סכומי הקרן והסכומים הנוספים עקב הצמדת הקרן, אשר מועד פרעונם הגיע ולא סולקו לבנק על ידי הממשכנים;
10.2.4. לשם הפקדתם בחשבון מיוחד או חשבון אחר על שם הממשכנים אצל הבנק, אשר ישמש כערובה לסילוקם המלא של יתר הסכומים המובטחים; וזאת, בלי לגרוע מזכויות העכבון והקיזוז העומדות לבנק על פי סעיף 6 לעיל ו/או על פי כל מסמך שנחתם ו/או יחתם על ידי הממשכנים כלפי הבנק ו/או על פי כל דין.
זולת אם יוסכם אחרת בכתב בין הממשכנים לבין הבנק, יופקדו הסכומים הנ"ל בפקדון שקלי נושא ריבית, לפרעון עם דרישה, שיהיה נהוג בבנק באותה עת, ואם לא יהיה נהוג בבנק באותה עת פקדון כאמור, יופקדו הסכומים מפעם לפעם בפקדון שקלי נושא ריבית לתקופה הקצרה ביותר שתהיה נהוגה באותה עת בבנק לגבי פקדונות שקליים של לקוחותיו. הממשכנים לא יהיו זכאים למשוך את הסכומים שיופקדו בחשבון המיוחד או האחר כאמור, או לפעול בהם או ביחס אליהם בכל אופן אחר שהוא, אלא לגבי אותו חלק מהם שיעלה על הסכומים המובטחים ויראו אותם לכל דבר ועניין ככספי הפקדונות.
10.3. בכל מקרה שכתב זה מבטיח את התחייבויותיהם של הממשכנים על פי כתב/י ערבות/יות שחתמו ו/או יחתמו לטובת הבנק, יחולו הוראות סעיף 10 זה בקרות ארוע כלשהו המאפשר לבנק להעמיד לפרעון מיידי חובות והתחייבויות של החייבים הנערבים באותו/ם כתב/י ערבות/יות.

11. **ריבית בתביעות משפטיות**
במקרה שתוגש על ידי הבנק תביעה נגד הממשכנים לתשלום סכום כלשהו המגיע או שיגיע מהם לבנק על חשבון הסכומים המובטחים, ישא אותו סכום ריבית בשיעור המירבי בגין התקופה שהחלה מיום הגשת התביעה ועד התשלום המלא בפועל, והממשכנים מסכימים בזה שהרשות השיפוטית תפסוק לחובתם ריבית כנ"ל.
אם התביעה כאמור תהיה לתשלום סכום כלשהו במטבע ישראלי, הבנק יהיה רשאי - לפי בחירתו - לתבוע ריבית והפרשי הצמדה על פי חוק פסיקת ריבית והצמדה, תשכ"א - 1961, או כל חוק אחר שיבוא במקומו; הממשכנים מסכימים בזה שאם הבנק יתבע ריבית ו/או ריבית והפרשי הצמדה כאמור, הרשות השיפוטית תפסוק לחובתם ריבית או ריבית והפרשי הצמדה כנ"ל.

12. **הוצאות**
כל ההוצאות הקשורות ברישומו של כתב זה בלשכת הרישום המתאימה, במימושו או בביטולו (בכפוף לכל דין), כולו או מקצתו, או בכל תביעה שתוגש על-ידי הבנק בגין סכומים המגיעים או שיגיעו לבנק מאת הממשכנים על חשבון הסכומים המובטחים, הוצאות בגין פעולות שהבנק ינקוט במסגרת סמכויותיו לפי כתב זה וכל ההוצאות והתשלומים שהבנק יוציא בקשר עם שימוש בסמכויותיו על פי סעיף 8 לעיל וכן הוצאות בגין הליכים שיינקטו על ידי הבנק לצורך שמירת זכויותיו לפי כתב זה, ובכלל זה שכר טרחת עורך הדין של הבנק, יחולו על הממשכנים. סכום שכר טרחת עורך דין שיחול יהיה כפי שייקבע בפסק דין או החלטה של בית משפט או גוף מעין שיפוטי, ובהעדר פסק דין או החלטה כאמור - כפי שיוסכם בין הבנק לבין הממשכנים ובהעדר הסכם - לפי התעריף המינימלי של לשכת עורכי הדין, בין אם הוא מחייב ובין אם לאו, ואם לא יפורסם תעריף מינימלי כאמור - בסכום שכר טרחה סביר בנסיבות אותו עניין. בלי לגרוע מזכותו של הבנק על פי זכויות הקיזוז שעומדות לבנק על פי כל מסמך שנחתם ו/או שיחתם כלפיו על ידי הממשכנים ו/או על פי הדין, הממשכנים מתחייבים בזה לשלם לבנק, מיד לפי דרישתו הראשונה, כל הוצאה כאמור, בצירוף ריבית מירבית כהגדרתה להלן, בגין התקופה שהחלה מתאריך הוצאתה על ידי הבנק ועד לתשלומה בפועל. הבנק יהיה רשאי לחייב כל חשבון של הממשכנים בבנק בגין כל תשלום המגיע לו על פי סעיף זה, בין אם הוא קרדיטורי ובין אם דביטורי במועד החיוב, ובין אם יהיה לדביטורי עקב החיוב כאמור.

13. **צבירת ריבית**
כל ריבית הנזכרת בכתב זה, המגיעה מהממשכנים לבנק, כולל ריבית מירבית וריבית פיגורים, שתתרבה במשך כל חודש או, כפי שיהיה נהוג בבנק מפעם לפעם, במשך כל תקופה אחרת שבגינה תותר על פי הדין צבירת ריבית, תישא אף היא ריבית באותו שעור.

פפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

חתימה ____________

**14. רישומי הבנק**

14.1. הרישומים בספרי הבנק, העתק מהרישומים הנ״ל או מכל קטע של הרישומים הנ״ל או מהדף האחרון של הרישומים הנ״ל, יהוו ראיות קבילות להוכחת אמיתות תכנן.

14.2. הממשכנים יבדקו כל העתק חשבון, כל הודעה וכל מכתב שיימסרו או שיישלחו להם באופן כלשהו על ידי הבנק או באמצעות מכשיר אוטומטי או במסוף של מחשב וימציאו לבנק את הערותיהם בכתב לגביהם - אם תהיינה כאלה - תוך ששים ימים מתאריך המסירה או המשלוח על ידי הבנק. העתקי חשבון, הודעה או מכתב שנמסרו לממשכנים באמצעות מכשיר אוטומטי או במסוף של מחשב כאמור, מהווים מסירה לממשכנים על ידי הבנק.

**15. ויתורים**

ויתור הבנק לממשכנים על הפרה כלשהי או על אי קיום של אחת או יותר מהתחייבויותיהם כלפי הבנק, בין שאותה התחייבות כלולה בכתב זה ובין שהיא כלולה או תיכלל בכל מסמך אחר, לא ייחשב כהצדקה או כאמתלא להפרה נוספת או לאי קיום נוסף של איזו התחייבות כאמור; והימנעותו של הבנק משימוש בזכות כלשהי, הניתנת לו על פי כתב זה או על-פי כל מסמך אחר או על-פי כל דין, לא תפורש כויתור על אותה זכות. שום ויתור מצד הבנק או פשרה לא יחייבו את הבנק זולת אם נעשו בכתב.

**16. יחס למסמכים אחרים**

אין באמור בכתב זה בכדי לפגוע או לגרוע מהתחייבויות הממשכנים כלפי הבנק על פי מסמכים מכל סוג שהוא שהממשכנים חתמו ו/או יחתמו כלפי הבנק או מזכויות הבנק על פי המסמכים כנ״ל, לרבות ומבלי לגרוע מכלליות האמור לעיל, מזכויות העיכבון והקיזוז של הבנק על פי כל מסמך שנחתם ו/או ייחתם ע״י הממשכנים כלפי הבנק.

**17. מען והודעות**

מען הממשכנים לצורך המצאת דברי דואר, לרבות כתבי בית דין הוא המען שצויין לעיל כמען להמצאת דברי דואר, או כל מען אחר בישראל שהממשכנים יודיעו עליו לבנק בכתב.

בהסכמת הבנק, יוכלו הממשכנים למסור לבנק כמען לצורך המצאת דברי דואר גם כתובת תיבת דואר אלקטרונית (E-MAIL) אשר תחשב לכל דבר ועניין כמען הממשכנים.

כל הודעה, דרישה, העתק חשבון, או מסמך אחר מסוג כלשהו (ובכלל זה מסמך סחיר כלשהו) רשאי הבנק לשלוח או למסור לממשכנים בדואר רגיל או באופן אחר, לפי בחירתו (לרבות באמצעות מכשיר אוטומטי או מסוף של מחשב או דואר אלקטרוני), וכל מסמך שנשלח כאמור ייחשב כאילו נתקבל על ידי הממשכנים תוך 72 שעות ממועד המשלוח. אישור בכתב של הבנק על דבר משלוח או מסירה כלשהם ומועדם, ישמש הוכחה לכאורה כלפי הממשכנים על המשלוח, המסירה והמועד הנזכרים בו.

**18. הדין החל**

דיני מדינת ישראל יחולו על כתב זה ועל המסמכים הנזכרים בו או הקשורים לו, ועל פירושם.

**19. מקום שיפוט**

הבנק והממשכנים מסכימים בזה כי מקום השיפוט הייחודי לצורך כתב זה יהיה בית המשפט בעיר הקרובה ביותר - מבין הערים הבאות: ירושלים, תל-אביב, חיפה, באר שבע, נצרת או אילת - לסניף הבנק שבו מתנהל הפיקדון, או - לפי בחירת התובע - בית המשפט הקרוב ביותר לסניף בו מתנהל הפיקדון.

**20. מעמד החותמים על כתב זה**

20.1. האמור בכתב זה יחייב את כל החותמים עליו, ביחד ולחוד וזאת גם אם, מסיבה כלשהי, אחד או אחדים מאלה שהוגדרו לעיל בתור ״ממשכנים״ לא יחתמו עליו.

20.2. כל זכות המוקנית או שתהיה מוקנית לבנק כלפי הממשכנים על פי כתב זה, מוקנית לבנק, הן כלפי הממשכנים ביחד, הן כלפי אחדים מהם והן כלפי כל אחד מהם לחוד; וכל אזכור של הממשכנים בכתב זה - מתייחס הן לכל הממשכנים ביחד, הן לאחדים מהם והן לכל אחד מהם לחוד.

**21. לשון רבים ולשון יחיד**

נחתם כתב זה על ידי ממשכן אחד, יראו את כל האמור בו - עד כמה שהוא מתייחס לממשכנים - כתוב בלשון יחיד.

**22. כותרות**

הכותרות לסעיפים בכתב זה הינן לשם הנוחות בלבד ואין להתחשב בהן בפרוש תנאי כתב זה.

**23. הגדרות**

בכתב זה יתפרשו המונחים הבאים כמפורט בצידם, אלא אם ניתן להם פירוש אחר בסעיף הרלבנטי:

23.1. **״דין״**- כהגדרתו בחוק הפרשנות, התשמ״א 1981, וכן כל חוק, תקנה, צו, הוראה, דרישה או בקשה של רשות שלטונית לרבות הוראות, היתרים והנחיות של בנק ישראל, הכל כפי שיחולו ויהיו בתוקף מפעם לפעם.

23.2. **״הבנק״** - אף כל אחד מסניפיו או משרדיו - בין בישראל ובין מחוץ לישראל .

23.3. **״השער המקובל בבנק״** - משמעו - ״שער מוסכם״ או ״שער בל״ל״ כהגדרתם להלן, בהתאם לקביעת הבנק מעת לעת, בהתחשב בסוג ובסכום הרכישה או המכירה של מטבע החוץ הרלוונטי. על כל רכישה או מכירה כאמור יחולו עמלת חליפין וכל מס, היטל, תשלומי חובה או תשלומים אחרים כיוצ״ב. אולם הממשכנים יהיו רשאים לפנות לבנק זמן סביר מראש בבקשה שהרכישה או המכירה כאמור, יבוצעו לפי ״שער מוסכם״ במקום ״שער בל״ל״, ואם הבנק ינהג אותה עת לבצע פעולה מסוג ובסכום של פעולת הרכישה או המכירה של מטבע החוץ הרלוונטי לפי ״שער מוסכם״, תבוצע הרכישה או המכירה כאמור לפי ״שער מוסכם״.

23.4. **״ספרי הבנק״** - יתפרש ככולל גם כל ספר, פנקס, דף חשבון או פקדון, חוזה הלוואה, כתב התחייבות, שטר בחתימת הממשכנים, כרטסת, גיליון, סליל, כל אמצעי לאחסון נתונים לצורכי מחשבים אלקטרוניים וכן כל אמצעי אחר לאחסון נתונים, שנעשו במהלך העסקים הרגיל של הבנק.

23.5. **״ריבית מירבית״** או **״ריבית בשיעור המירבי״** - שיעור הריבית הגבוה ביותר שיהיה נהוג בבנק, מפעם לפעם (הכולל בתוכו גם את שיעור תוספת הריבית על חריגה) לגבי יתרות חובה באותה עת בחשבונות חש״ק/חח״ד/חח״ק או מט״ח (לפי סוג החשבון והמקרה), החורגות ממסגרת האשראי ו/או יתרות אשר לא שולמו לבנק במועדיהן. ואולם אם לגבי סכום כלשהו מהסכומים המובטחים נקבע בחיקוק שיעור מירבי של ריבית פיגורים למקרה שאותו סכום לא ישולם במועד, כי אז אותו סכום יישא ריבית בשיעור המירבי המותר על פי אותו חיקוק.

23.6. המונח **״רישומים״**- יתפרש ככולל גם כל רישום או העתק של רישום, בין שנרשם או הועתק בכתב יד או במכונת כתיבה ובין שנרשם או הועתק בדרך הדפסה, שיכפול, צילום (לרבות מיקרופילם או מיקרופיש) או באמצעות כל מכשיר מכני, ידני, מגנטי, אופטי, חשמלי או אלקטרוני או באמצעי רישום של מחשבים אלקטרוניים או בכל אמצעי אחר של רישום או הצגת מילים או ספרות או סימנים אחרים כלשהם הנהוגים בבנקים.

23.7. **״שער מוסכם״** - לגבי כל רכישה או מכירה של מטבע חוץ על ידי הממשכנים תמורת מטבע ישראלי – שער המכירה או הקניה, לפי המקרה,

חתימה ____________

פאפאייה גיימינג בע״מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

של העברות והמחאות או של בנקנוטים, לפי הענין, שייקבע על ידי הבנק לאחרונה לפני ביצוע הרכישה או המכירה כאמור לפעולות מאותו סוג וסכום, ושהממשכנים הסכימו שיחול לגבי אותה רכישה או מכירה.

23.8. **"שער בל"ל"** - לגבי כל מכירה של מטבע חוץ על ידי הממשכנים או זיכוי חשבונם של הממשכנים במטבע ישראלי בתמורה של מטבע חוץ - שער של העברות והמחאות או של בנקנוטים, לפי העניין, שייקבע על ידי הבנק במועד הרלוונטי כ"שער בל"ל", לפיו הבנק יקנה מלקוחותיו את מטבע החוץ הרלוונטי תמורת מטבע ישראלי;
ולגבי כל רכישה של מטבע חוץ על ידי הממשכנים או חיוב חשבונם של הממשכנים במטבע ישראלי בתמורה של מטבע חוץ - שער של העברות והמחאות או של בנקנוטים, לפי העניין, שייקבע על ידי הבנק במועד הרלוונטי כ"שער בל"ל", לפיו הבנק ימכור ללקוחותיו את מטבע החוץ הרלוונטי תמורת מטבע ישראלי.

23.9. **"פיקדון"** - תכנית חסכון, פקדון מכל סוג שהוא, בין במטבע ישראלי ובין במטבע חוץ, בין לתקופה קצובה ובין לתקופה שאינה קצובה, לרבות הריבית והפרשי הצמדה/שער, בגינו.

**ולראיה באו הממשכנים על החתום בתאריך דלהלן:**

| שם ממשכן | תאריך | חתימה |
|---|---|---|
| פאפאייה גיימינג בע"מ | | |

פאפאייה גיימינג בע"מ
Papaya Gaming Ltd.
PAPAYA ח.פ. 515422095

# נספח 9

# חלק ג סעיף 8 - דפי חיוב אחרונים של כל חשבון בנק

עמ' 250

# <u>תוכן עניינים</u>



| מס׳ | שם הנספח | עמ׳ |
|---|---|---|
| 1 | כרטיס שמספרו 3711 | 3 |
| 2 | כרטיס שמספרו 7369 | 6 |
| 3 | כרטיס שמספרו 8214 | 9 |
| 4 | כרטיס שמספרו 7344 | 12 |
| 5 | כרטיס שמספרו 3612 | 15 |
| 6 | כרטיס שמספרו 7377 | 19 |

# כרטיס שמספרו 3711

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 3711
לתקופה: יולי 2026

## עסקאות בש"ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 30/06/26 | דמי כרטיס | 40.00 | עסקה רגילה | | 40.00 |
| 06/06/26 | LinkedIn*P3030234180 LINKEDIN.COM | 209.99 | עסקה רגילה | | 209.99 |

סה"כ: 249.99

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 3711
לתקופה: יולי 2026

עסקאות במט"ח -חשבון לחיוב 864-568400/97 בדולר ארה"ב

| תאריך העסקה | שם בית העסק | סכום העסקה | מטבע העסקה | סוג העסקה | מועד החיוב | סכום חיוב |
|---|---|---|---|---|---|---|
| 08/06/26 | WWW.PERPLEXITY.AI WWW.PERPLEXIT | $ 40.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 40.00 |
| 03/06/26 | TWILIO SENDGRID WWW.TWILIO.CO | $ 19.95 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 19.95 |
| 01/06/26 | ZOOM.COM 888-799-9666 ZOOM.US | $ 33.98 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 33.98 |
| 01/06/26 | MIDJOURNEY INC. MIDJOURNEY.CO | $ 10.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 10.00 |
| 01/06/26 | POPSQL.COM POPSQL.COM | $ 48.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 48.00 |

סה"כ ב דולר ארה"ב$ 151.93

# כרטיס שמספרו 7369

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7369
לתקופה: יולי 2026

## עסקאות בש"ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 04/06/26 | דמי כרטיס | 31.90 | עסקה רגילה | | 31.90 |

סה"כ: 31.90

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7369
לתקופה: יולי 2026

עסקאות במט"ח -חשבון לחיוב 864-568400/97 בדולר ארה"ב

| תאריך העסקה | שם בית העסק | סכום העסקה | מטבע העסקה | סוג העסקה | מועד החיוב | סכום חיוב |
|---|---|---|---|---|---|---|
| 23/06/26 | HIGGSFIELD INC. | $ 316.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 316.00 |
| 23/06/26 | HIGGSFIELD INC. | $ 79.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 79.00 |
| 22/06/26 | HIGGSFIELD INC. | $ 79.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 79.00 |
| 22/06/26 | HIGGSFIELD INC. | $ 117.99 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 117.99 |
| 13/06/26 | SEEDANCE2 | $ 39.90 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 39.90 |
| 01/06/26 | ANTHROPIC* CLAUDE SUB | $ 100.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 100.00 |

סה"כ ב דולר ארה"ב$ 731.89

# כרטיס שמספרו 8214

בנק לאומי | הכרטיסים בחשבון שלי

מס׳ חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 8214
לתקופה: יולי 2026

## עסקאות בש״ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 22/06/26 | החברים של ג׳ורג׳ | 1,400.00 | עסקה רגילה | | 1,400.00 |
| 16/06/26 | Adobe Saggart, Dubl | 239.00 | עסקה רגילה | | 239.00 |
| 16/06/26 | Phtoshp Lightrm Bndl Saggart, Dubl | 50.00 | עסקה רגילה | | 50.00 |
| 16/06/26 | Adobe Saggart, Dubl | 2,748.00 | עסקה רגילה | | 2,748.00 |
| 09/06/26 | SOHO HOUSE TLV MEMBERS | 879.17 | עסקה רגילה | | 879.17 |
| | | | | | סה״כ: 5,316.17 |

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 8214
לתקופה: יולי 2026

עסקאות במט"ח -חשבון לחיוב 864-568400/97 בדולר ארה"ב

| תאריך העסקה | שם בית העסק | סכום העסקה | מטבע העסקה | סוג העסקה | מועד החיוב | סכום חיוב |
|---|---|---|---|---|---|---|
| 26/06/26 | LinkedIn Recruiter P30 LINKEDIN.COM | $ 119.95 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 119.95 |

סה"כ ב דולר ארה"ב$ 119.95

# כרטיס שמספרו 7344

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7344
לתקופה: יולי 2026

## עסקאות בש"ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 22/06/26 | עילא חנות אוכל | 32.00 | עסקה רגילה | | 32.00 |
| 10/06/26 | אנאגו בע"מ -אונמי | 72.00 | עסקה רגילה | | 72.00 |
| 10/06/26 | PAYBOX | 50.00 | עסקה רגילה | | 50.00 |
| 04/06/26 | דמי כרטיס | 31.90 | עסקה רגילה | | 31.90 |
| | | | | | סה"כ: 185.90 |

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7344
לתקופה: יולי 2026

עסקאות במט"ח -חשבון לחיוב 864-568400/97 בדולר ארה"ב

| | תאריך העסקה | שם בית העסק | סכום העסקה | מטבע העסקה | סוג העסקה | מועד החיוב | סכום חיוב |
|---|---|---|---|---|---|---|---|
| + | 23/06/26 | ANTHROPIC* CLAUDE SUB | $ 100.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 100.00 |
| + | 13/06/26 | ELEVENLABS.IO | $ 22.00 | דולר ארה"ב | סייקל חו"ל | 02.07.26 | $ 22.00 |

סה"כ ב דולר ארה"ב$ 122.00

# כרטיס שמספרו 3612

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 3612
לתקופה: יולי 2026

## עסקאות בש"ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 30/06/26 | אדמונד | 84.00 | עסקה רגילה | | 84.00 |
| 30/06/26 | דמי כרטיס | 40.00 | עסקה רגילה | | 40.00 |
| 28/06/26 | פדקס אקספרס ישראל | 274.00 | עסקה רגילה | | 274.00 |
| 26/06/26 | איתני מדרשה | 111.00 | עסקה רגילה | | 111.00 |
| 25/06/26 | פז YELLOW טופז | 512.11 | עסקה רגילה | | 512.11 |
| 25/06/26 | קבוצת צל מדבר | 1,062.00 | עסקה רגילה | | 1,062.00 |
| 25/06/26 | Google YouTubePremium 650-2530000 | 23.90 | עסקה רגילה | | 23.90 |
| 24/06/26 | רביבה וסיליה בע"מ | 189.00 | עסקה רגילה | | 189.00 |
| 24/06/26 | GETT | 84.20 | עסקה רגילה | | 84.20 |
| 24/06/26 | באקארו | 402.00 | עסקה רגילה | | 402.00 |
| 23/06/26 | WOLT | 186.90 | עסקה רגילה | | 186.90 |
| 22/06/26 | לחם הכפר רמה"ש | 79.00 | עסקה רגילה | | 79.00 |
| 22/06/26 | חומוס חמודות | 72.00 | עסקה רגילה | | 72.00 |
| 22/06/26 | Adobe Saggart, Dubl | 70.00 | עסקה רגילה | | 70.00 |
| 22/06/26 | יופיי פיטלי | 4,500.00 | עסקה רגילה | | 4,500.00 |
| 21/06/26 | החברים של ג'ורג' | 1,050.00 | עסקה רגילה | | 1,050.00 |
| 19/06/26 | נאייקס ישראל מכונות אוטומ | 8.70 | עסקה רגילה | | 8.70 |
| 18/06/26 | fika פיקה | 50.00 | עסקה רגילה | | 50.00 |
| 18/06/26 | WOLT | 235.80 | עסקה רגילה | | 235.80 |
| 17/06/26 | בראון דה ג'ורג' | 27.00 | עסקה רגילה | | 27.00 |
| 17/06/26 | דבוש קרליבך | 147.00 | עסקה רגילה | | 147.00 |
| 17/06/26 | business בזק בינלאומי | 70.68 | עסקה רגילה | | 70.68 |
| 17/06/26 | BIRD* PENDING.BIRD.CO AMSTERDAM | 30.00 | עסקה רגילה | | 30.00 |
| 16/06/26 | חומוס חמודות | 108.00 | עסקה רגילה | | 108.00 |
| 16/06/26 | LIME*RIDE C72E WWW.LI.ME | 36.80 | עסקה רגילה | | 36.80 |
| 16/06/26 | קניון רמת אביב | 21.00 | עסקה רגילה | | 21.00 |
| 15/06/26 | דגים וטעמים | 89.00 | עסקה רגילה | | 89.00 |
| 15/06/26 | בראון דה ג'ורג' | 886.00 | עסקה רגילה | | 886.00 |
| 14/06/26 | שוקא | 95.00 | עסקה רגילה | | 95.00 |
| 14/06/26 | BIRD* PENDING.BIRD.CO AMSTERDAM | 30.00 | עסקה רגילה | | 30.00 |
| 13/06/26 | CBA*Parallels Cologne | 630.38 | עסקה רגילה | | 630.38 |
| 11/06/26 | בראון דה ג'ורג' | 64.00 | עסקה רגילה | | 64.00 |
| 11/06/26 | GETT | 297.70 | עסקה רגילה | | 297.70 |
| 11/06/26 | BIRD* PENDING.BIRD.CO AMSTERDAM | 90.00 | עסקה רגילה | | 90.00 |
| 11/06/26 | רכבת ישראל-ת"א השלום | 11.50 | עסקה רגילה | | 11.50 |
| 11/06/26 | NOOCH | 511.00 | עסקה רגילה | | 511.00 |
| 10/06/26 | פון פלוס | 35.00 | עסקה רגילה | | 35.00 |
| 10/06/26 | רביבה וסיליה בע"מ | 493.00 | עסקה רגילה | | 493.00 |
| 10/06/26 | פלאפון חשבון תקופתי | 269.13 | עסקה רגילה | | 269.13 |
| 08/06/26 | BIRD* PENDING.BIRD.CO AMSTERDAM | 30.00 | עסקה רגילה | | 30.00 |

| | | | | |
|---|---|---|---|---|
| 1,469.00 | עסקה רגילה | 1,469.00 | קנטינה | 08/06/26 |
| 25.22 | עסקה רגילה | 25.22 | חברת פרטנר תקשורת בע"מ )ה | 07/06/26 |
| 741.00 | עסקה רגילה | 741.00 | בראון דה ג'ורג' | 07/06/26 |
| 421.21 | עסקה רגילה | 421.21 | פז YELLOW טופז | 06/06/26 |
| 466.00 | עסקה רגילה | 466.00 | סביונים שיווק פרחים בע"מ | 05/06/26 |
| 105.00 | עסקה רגילה | 105.00 | Adobe.com Saggart, Dubl | 05/06/26 |
| 85.25 | עסקה רגילה | 85.25 | חניון דיזינגוף - סנטרל פא | 05/06/26 |
| 190.00 | עסקה רגילה | 190.00 | מסעדת בועז | 04/06/26 |
| 168.00 | עסקה רגילה | 168.00 | אדמונד | 04/06/26 |
| 474.00 | עסקה רגילה | 474.00 | רביבה וסיליה בע"מ | 03/06/26 |
| 85.00 | עסקה רגילה | 85.00 | שוקא | 03/06/26 |
| 290.00 | עסקה רגילה | 290.00 | CALATA 15 | 02/06/26 |
| 74.00 | עסקה רגילה | 74.00 | דבוש קרליבך | 02/06/26 |
| 33.90 | עסקה רגילה | 33.90 | SpotifyIL Stockholm | 02/06/26 |
| 69.90 | עסקה רגילה | 69.90 | Netflix.com Los Gatos | 02/06/26 |
| 65.50 | עסקה רגילה | 65.50 | GETT | 01/06/26 |
| 258.00 | עסקה רגילה | 258.00 | עלמה בנמל | 01/06/26 |
| סה"כ: 18,027.78 | | | | |

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי ויזה 3612
לתקופה: יולי 2026

עסקאות במט"ח -חשבון לחיוב 864-568400/97 בדולר ארה"ב

| תאריך העסקה | שם בית העסק | סכום העסקה | מטבע העסקה | סוג העסקה | מועד החיוב | סכום חיוב |
|---|---|---|---|---|---|---|
| 30/06/26 | AMAZON MKTPL*3015U49O3 Amzn.com/bill | $ 95.37 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 95.37 |
| 30/06/26 | AMAZON MKTPL*R23HL9XC3 Amzn.com/bill | $ 285.92 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 285.92 |
| 30/06/26 | AMAZON MKTPL*LU9UD6OF3 Amzn.com/bill | $ 38.72 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 38.72 |
| 29/06/26 | AMAZON PRIME*FO5L73B53 Amzn.com/bill | $ 14.99 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 14.99 |
| 24/06/26 | Audible*5Y2P01AI3 Amzn.com/bill | $ 14.95 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 14.95 |
| 23/06/26 | TOPTAL.COM TOPTAL.COM | $ 5,803.55 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 5,803.55 |
| 21/06/26 | BLOOMBERG* BB-2269-780 BLOOMBERG.COM | $ 39.99 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 39.99 |
| 18/06/26 | TOPTAL.COM TOPTAL.COM | $ 5,662.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 5,662.00 |
| 16/06/26 | Kindle Svcs*146CP5BB3 888-802-3080 | $ 82.64 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 82.64 |
| 14/06/26 | ANTHROPIC* CLAUDE SUB ANTHROPIC.COM | $ 100.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 100.00 |
| 14/06/26 | TOPTAL.COM TOPTAL.COM | $ 3,397.20 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 3,397.20 |
| 14/06/26 | UBER *ONE MEMBERSHIP UBER.COM/BILL | $ 9.99 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 9.99 |
| 06/06/26 | ME-QR.COM CAMDEN | $ 69.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 69.00 |
| 04/06/26 | TOPTAL.COM TOPTAL.COM | $ 5,662.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 5,662.00 |
| 02/06/26 | TESTGORILLA AMSTERDAM | $ 204.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 204.00 |
| 02/06/26 | LINAS.SUBSTACK.COM VILNIUS | $ 170.00 | דולר ארה"ב | עסקה רגילה | 02.07.26 | $ 170.00 |

סה"כ ב דולר ארה"ב $ 21,650.32

# כרטיס שמספרו 7377

מס׳ חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7377
לתקופה: יולי 2026

## עסקאות בש"ח במועד החיוב

| תאריך העסקה | שם בית העסק | סכום העסקה | סוג העסקה | פרטים | סכום חיוב |
|---|---|---|---|---|---|
| 04/06/26 | דמי כרטיס | 31.90 | עסקה רגילה | | 31.90 |
| | | | | | סה"כ: 31.90 |

מס' חשבון : 864-568400/97
תאריך שמירה/הדפסה: 29/7/2026
פרוט עסקאות לכרטיס לאומי דיינרס 7377
לתקופה: יולי 2026



אין חיובים לתקופה המבוקשת

# נספח 10

# חלק ג - סעיף 9 - תביעות והליכי גביה המתנחלים נגד התאגיד

עמ' 271

**פאפאיה גיימינג בע"מ – תביעות והליכי גביה המתנהלים נגד התאגיד**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| **מספר** | **בית המשפט** | **מספר תיק** | **הנושה -התובע ושם בא כוחו** | **מהות ההליך** | **השלב שבו מצוי ההליך** | **סכום החוב בשקלים** | **בטחונות שניתנו להבטחת החוב** |
| .1 | מחוזי ת"א | ת"צ 16869-09-25 | קאסי רובינזון (עו"ד שיר אשכול) | בקשה לאישור תביעה ייצוגית שהוגשה על-ידי לקוחה של החברה בטענה למצגים מטעים. הבקשה הוגשה בשם כלל לקוחות החברה ברחבי העולם למעט לקוחות מארה"ב | טרם הוגשה תשובה לבקשת האישור; החברה הגישה בקשה לסילוק על הסף. | סכום התביעה לא כומת (מוערך במעל 2.5 מיליון ₪) | – |
| .2 | The United States District Court for the Southern District of New York | 1:24-cv-01646-DLC | Skillz Platform Inc. (King and Spalding) | תביעה שהוגשה על-ידי מתחרה עסקי של החברה בטענה שהחברה הציגה מצגים מטעים ללקוחותיה ובכך התחרתה בתובעת באופן בלתי הוגן בשוק. | החלטת שופטת בבקשות Post trial. | 719 מיליון דולר | – |
| .3 | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES CENTRAL DISTRICT | No. 24STCV32626 | JANE BARCELO and CHRISTINA ISERNIA (Milberg) | תביעה ייצוגית שהוגשה על-ידי לקוחות של החברה בטענה למצגים מטעים שהסתיימה בהסדר פשרה בסכום כולל של 15 מיליון דולר ארה"ב. | בית המשפט אישר את הסדר הפשרה באופן סופי. לאחר מתן אישור זה, הוגשה בקשה לביטול האישור, שעודנה תלויה ועומדת. | 15 מיליון דולר ארה"ב (בכפוף לאישור בית המשפט) | – |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| _ | לא מכומת בשלב זה | הליך הבוררות האינדיבידואלי מצוי בשלבים מוקדמים | תביעה ייצוגית שהוגשה על-ידי לקוחה של החברה בטענה למצגים מטעים, הסתיימה בהחלטה של בית המשפט לאכוף את תניית הבוררות שבתנאי השירות של החברה. בעקבות ההחלטה, הגישה הלקוחה תביעה אינדיבידואלית בבוררות | Kelly-Starkebaum<br><br>(Burns Charest) | 1:24-cv-02310-DLC | The United States District Court for the Southern District of New York / NAM Arbitration | .4 |
| | 308,880 דולר ארה"ב | התביעה טרם הומצאה לחברה | תביעה שהוגשה על-ידי לקוח של החברה נגד החברה ונגד חברה נוספת (Avia Games Inc.) בטענה למצגים מטעים | Dawn Pavlovich<br><br>(Geragos Law Group) | 26ST CV 11434 | California Superior Court, L.A. County | .5 |

# Annex 7

# Papaya US Form 1

**Page 373**

תקנות חדלות פירעון ושיקום כלכלי, התשע״ט-2019
טופס 1
(תקנה 13)
בבית המשפט המחוזי בתל אביב-יפו תיק ______

# דין וחשבון מפורט בדבר חובות ונכסים

**חלק א׳ – פרטי התאגיד**

תאגיד שהפרטים המופיעים בנסח שצירף אינם תואמים את פרטי התאגיד או מרשמיו ימלא את הפרטים שאינם תואמים כאמור בחלק א׳ לטופס זה.

(1) **שם התאגיד** Papaya Gaming Inc.

(2) **מספר התאגיד** 32-0533649

| (3) מען המשרד הרשום של התאגיד | | | |
|---|---|---|---|
| יישוב | רחוב | מספר בית | מיקוד |
| New York, USA | 106 West 32nd st. | 106 | 10001 |

| (4) סיווג התאגיד |
|---|
| חברה / שותפות / אחר – פרט : חברה |
| האם התאגיד הוא תאגיד מדווח? לא |

(5) פרטי חבר/י התאגיד

יש לציין את פרטיו של כל חברי התאגיד לפי המספר המתאים בצד השורה

| **שם פרטי ושם משפחה/שם תאגיד** | **מספר זיהוי******* | | **מען** | | | | |
|---|---|---|---|---|---|---|---|
| | **ב** | **מספר סודר** | **מדינה** | **ישוב** | **רחוב** | **מספר בית** | **מיקוד** |
| 1. פאפאייה גיימינג בע״מ | | 515422095 | ישראל | תל-אביב | המסגר | 35 | 6721407 |
| 2. | | | | | | | |
| 3. | | | | | | | |

(6) פרטי הזכויות של חבר התאגיד

(א) אם התאגיד הוא חברה, יש לציין את פרטי המניות שהוקצו לבעל המניות לפי המספר בצד השורה שבה צוינו פרטיו

| סוג המניה | הערך הנקוב | מספר המניות שהוקצו מאותו סוג לבעל המניה | סוג ההחזקה: רגילה / נאמנות | בהחזקה משותפת – יש למלא את מספרי השורות |
|---|---|---|---|---|

nevo.co.il

| | | | | |
|---|---|---|---|---|
| | | | | המציינות את פרטי מחזיקי המניות במשותף לפי טבלת "פרטי חבר/י התאגיד" שבפסקה (5) לעיל |
| 1. Common Stock | $0.001 | 100% | רגילה | |
| 2. | | | | |
| 3. | | | | |

(ב) אם התאגיד הוא שותפות יש לציין, לפי המספר בצד השורה שבה צוינו פרטיו, האם הוא שותף כללי או מוגבל ומה הסכום שהכניס כל שותף מוגבל:

| | שותף כללי | שותף מוגבל | לגבי שותף מוגבל – הסכום שהכניס |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

(7) פרטים בדבר הון התאגיד:

(א) לגבי תאגיד שהוא חברה:

סך הכל ההון הרשום של החברה:

סך הכל ההון המוקצה של החברה:

| סוג מניה | הערך הנקוב של המניה*** | מספר המניות מסוג זה בהון המניות הרשום | מספר המניות מסוג זה שהוקצו |
|---|---|---|---|
| Common Stock | $0.001 | 1,000,000 | 100% |

הערה: *** יש לציין את סוג המטבע בערך הנקוב ובסך הכל ההון הרשום; אם המניה היא ללא ערך נקוב יש לציין "0".

(ב) לגבי תאגיד שהוא שותפות: פרטים בדבר הון השותפות.

## <u>חלק ב' – נכסים וזכויות</u>

1. נכסי מקרקעין

יש לצרף נכס רישום עדכני / חוזה חכירה / חוזה שכירות

**-אין לחברה נכסי מקרקעין-**

| | טור א' | טור ב' | | | |
|---|---|---|---|---|---|
| מספר | פרטים | נכס 1 | נכס 2 | נכס 3 | נכס 4 |
| (1) | סוג נכס | | | | |
| (2) | גוש/ספר | | | | |
| (3) | חלוקה ותת חלקה/דף | | | | |
| (4) | מהות הזכות | | | | |
| (5) | החלק בזכות באחוזים | | | | |
| (6) | בעלים רשומים | | | | |
| (7) | כתובת הנכס | | | | |
| (8) | תאריך הרכישה | | | | |
| (9) | סכום הרכישה בשקלים חדשים | | | | |
| (10) | שווי משוער בשקלים חדשים כיום | | | | |
| (11) | בעלים (1) שם | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| (12) | נוספים וכתובתם | כתובת | | | | |
| (13) | | שם (2) | | | | |
| (14) | | כתובת | | | | |
| (15) | שעבודים | | | | | |
| (16) | מקום רישום השעבוד | | | | | |
| (17) | לטובת | | | | | |
| (18) | כתובת | | | | | |
| (19) | הסכום | | | | | |
| (20) | מתאריך | | | | | |

2. מניות וזכויות בתאגידים

בתאגיד שהוא חברה, יש לצרף תמצית מרשם החברות

| | טור א' | טור ב' | טור ג' | טור ד' |
|---|---|---|---|---|
| מספר | שם התאגיד | בעל המניות / הזכויות | פרוט המניות / הזכויות | שם ותואר של נושא משרה בתאגיד מטעם התאגיד מגיש הבקשה |
| 1. | Papaya Gaming India Private Limited | Papaya Gaming Inc. | 0.01% | |

3. מלאי עסקי

פרט את כל המלאי העסקי שיש לתאגיד נכון להיום

**-החברה לא מחזיקה במלאי עסקי-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| מספר | שם הפריט | יחידה | כמות | מחיר רכישה בשקלים חדשים | עלות כוללת | האם הפריט משועבד | הערות |
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

4. כלי רכב

יש לצרף את מסמכי הבעלות ומסמכי השעבוד

(יש לפרט גם רכבים בליסינג, וכן ציוד כבד הרשום אצל רשם הציוד ההנדסי)

**-אין לחברה כלי רכב בבעלותה-**

| | טור א' | טור ב' | | | |
|---|---|---|---|---|---|
| מספר | | רכב 1 | רכב 2 | רכב 3 | רכב 4 |
| (1) | פרטים | | | | |
| (2) | מספר רישוי | | | | |

nevo.co.il

| | | | | | |
|---|---|---|---|---|---|
| (3) | שם היצרן | | | | |
| (4) | שנת יצור | | | | |
| (5) | הבעלים הרשומים | | | | |
| (6) | שימוש הרכב | | | | |
| (7) | שעבודים/משכון | | | | |
| (8) | מקום רישום השעבוד | | | | |
| (9) | לטובת | | | | |
| (10) | להבטחת חוב בסכום | | | | |
| (11) | מתאריך | | | | |
| (12) | שווי הרכב | | | | |

5. זכויות התאגיד לקבל כספים ונכסים אחרים (לקוחות, דמי שכירות וכיוצא באלה)

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | | |
|---|---|---|---|---|---|---|---|---|
| מספר | שם מלא של החייב | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב | בטוחות שבידי התאגיד להבטחת החוב | | |
| | | | | | | פרטי הנכס המשועבד | תאריך יצירת השעבוד | הסכום המובטח בשקלים חדשים |
| .1 | Worldpay Gaming Solutions, LLC | 8500 Governors Hill Drive, Cincinnati, OH 45249, USA | 3,173,284 | 3,173,284 | סליקת תקבולים משחקנים | | | |
| .2 | SVB | 3003 Tasman Drive, Santa Clara, CA 95054, USA | 786,508 | 786,508 | סליקת תקבולים משחקנים | | | |
| .3 | Nuvei Technologiec Inc | 1100 Boulevard René-Lévesque West, Suite 900, Montreal, QC H3B 4N4, Canada | 3,550,731 | 3,550,731 | סליקת תקבולים משחקנים | | | |
| .4 | PayPal Inc | San Jose, California, | 1,637,855 | 1,637,855 | סליקת תקבולים | | | |

nevo.co.il

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | (Braintree) | USA | | | משחקנים | | | |

היתרות נכונות ליום 30 ביוני 2026.

6. חשבונות בנק

יש לפרט את כל החשבונות (מטבעות חוץ, ניירות ערך, קופות גמל, חסכונות וכיוצא באלה); יש לצרף דף חשבון אחרון

העתק דף חשבון אחרון של כל חשבון בנק מצורף כנספח "**1**".

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| | שם הבנק | מספר הסניף | סוג החשבון | מספר החשבון | בעל החשבון | בעלי זכות חתימה נוספים | יתרה בשקלים חדשים לתאריך הבקשה |
| .1 | בנק דיסקונט לישראל | 10 | עו"ש - דולר, שקל | 0253646954<br>0253666076 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 1,000,320 |
| .2 | Silicon Valley Bank, a division of First-Citizens Bank & Trust Company | Santa Clara | עו"ש - דולר, ליש"ט, דולר אוסטרלי, דולר קנדי ויורו | 3302747345<br>10026436<br>0050054772<br>0050054787<br>0050054791 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 5,049 |
| .3 | Silicon Valley Bank, a division of First-Citizens Bank & Trust Company | Santa Clara | Collateral- משועבד (צוברי ריבית) | 3304272855<br>3304272840 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 61,160 |
| .4 | Capital One, N.A. | Richmond, VA | עו"ש – דולר (צובר ריבית) | 2082544324 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 55,683,207 |
| .5 | Capital One, N.A | Richmond, VA | MMA (צובר ריבית) | 2082544367 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 0 |
| .6 | PayPal | USA | דולר, ליש"ט, יורו, דולר קנדי | ZS25FMCJMBJ58 | פאפאייה גיימינג אינק | אוריאל בכר, רז רווח, אנדרי בירמן, אלכסנדר ליאכובצקי, אוהד וגמן | 1,182,456 |

יתרות נכונות ליום 28 ביולי 2026.

7. ביטוחים

יש לצרף את כל סוגי הביטוחים של התאגיד (וכן ביטוחים של נושאי משרה ועובדים) ולצרף צילום הפוליסות

**אין לחברה פוליסות ביטוח. החברה מבוטחת במסגרת פוליסות ביטוח של החברה האם - פאפאייה גיימינג בע"מ שצורפו כנספח "5" לטופס 1 של פאפייה ישראל.**

| מספר | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| | שם חברת הביטוח | שם סוכן הביטוח | סוג הביטוח | מספר הפוליסה | תקופת הביטוח |
| .1 | | | | | |
| .2 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| .3 | | | | | |
| .4 | | | | | |
| .5 | | | | | |
| .6 | | | | | |
| .7 | | | | | |

.8 הסכמים מהותיים שהתאגיד צד להם

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ |
|---|---|---|---|---|---|
| מספר | סוג ההסכם (שכירות, ליסינג, העסקה, זכיון וכיוצא באלה) | הצדדים להסכם | נחתם בתאריך | תאריך סיום החוזה | שווי בשקלים חדשים / הערות ועוד |
| .1 | הסכם בין-חברתי למתן שירותי ייצוג וסליקה | Papaya Gaming Inc, Papaya Gaming Ltd | 04/02/2023 | אין. מתחדש כל שנה | כ-60 אלף ש״ח בשנה |
| .2 | שרותי סליקה | Papaya Gaming Inc, Worldpay Gaming Solutions, LLC | 02/02/2021 | אין. מתחדש כל שנה | כ-19 מיליון ש״ח בשנה (הערכה לפי 2025) |
| .3 | שרותי סליקה | Papaya Gaming Inc, SVB | 27/01/2022 | אין. מתחדש כל שנה | כ-19 מיליון ש״ח בשנה (הערכה לפי 2025) |
| .4 | שרותי סליקה | Papaya Gaming Inc, CyberSource Corporation | 10/03/2020 | אין. מתחדש כל שנה | 1.5 מיליון ש״ח בשנה (הערכה לפי 2025) |
| .5 | שרותי סליקה | Papaya Gaming Inc, Nuvei Technologiec Inc | 16/03/2023 | אין. מתחדש כל שנה | כ-7 מיליון ש״ח בשנה (הערכה לפי 2025) |
| .6 | שרותי סליקה | Papaya Gaming Inc, PayPal Inc | 10/2/2022 | אין. מתחדש כל שנה | כ-17 מיליון ש״ח בשנה (הערכה לפי 2025) |

.9 האם התאגיד מחזיק נכסים בנאמנות? לא.

.10 תביעות והליכי גביה שמנהל התאגיד

(א) תביעות שהגיש התאגיד

יש לצרף עותק מכתב התביעה, כתב הגנה וכל פסק דין או החלטה מהותית אחרת שניתנה

נבו nevo.co.il

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ | טור ז׳ |
|---|---|---|---|---|---|---|---|
| מספר | בית המשפט | מספר התיק | הנתבע ושם בא כוחו | מהות ההליך | השלב שבו מצוי ההליך | סכום החוב בשקלים חדשים | בטחונות שניתנו להבטחת החוב |
| .1 | | | | | | | |
| .2 | | | | | | | |
| .3 | | | | | | | |
| .4 | | | | | | | |

(ב) הליכי הוצאה לפועל שנקט התאגיד

יש לצרף תדפיס מלשכת ההוצאה לפועל

**-אין הליכי הוצאה לפועל שנקט התאגיד-**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ |
|---|---|---|---|---|---|---|
| מספר | לשכת ההוצאה לפועל | מספר התיק | החייב ושם בא כוחו | פסק דין או שטרות | סכום החוב בשקלים חדשים | בטחונות שניתנו להבטחת החוב |
| .1 | | | | | | |
| .2 | | | | | | |
| .3 | | | | | | |
| .4 | | | | | | |

.11 זכויות ונכסים אחרים

פירוט זכויות ונכסים אחרים של התאגיד

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ |
|---|---|---|---|---|
| מספר | מהות הזכות / הנכס | מועד רכישת הנכס / יצירת הזכות | סכום הרכישה / שווי הזכות בשקלים חדשים | האם הנכס / הזכות משועבדים |
| .1 | מס במקור שנוכה מהחברה ע״י חברת סליקה Fiserv (SVB), ומוחזק ב- IRS | ינואר 2022 | כ-3 מיליון ש״ח | לא |

## <u>חלק ג׳ – חובות ובטוחות</u>

יש לפרט כל חוב כהגדרתו בחוק חדלות פירעון ושיקום כלכלי, התשע״ח-2018 (להלן – החוק), כולל חוב מותנה וחוב שטרם הגיע מועד פירעונו

.1 פירוט החובות המובטחים

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ | | |
|---|---|---|---|---|---|---|---|---|
| מספר | השם המלא של הנושה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב | בטוחות שנתן התאגיד להבטחת החוב | | |
| | | | | | | פרטי הנכס המשועבד | תאריך יצירת השעבוד | הסכום המובטח בשקלים חדשים |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| .1 | First Citizen Bank & Trust Company | 239 Fayetteville Street, Raleigh, NC 27601, United States | 0 | 0 | חיובי כרטיסי אשראי שותפים | פיקדון כספי | 29/7/24 | 30,000 |
| .2 | First Citizen Bank & Trust Company | 239 Fayetteville Street, Raleigh, NC 27601, United States | 0 | 0 | חיובי כרטיסי אשראי שותפים | פיקדון כספי | 29/7/24 | 30,000 |
| .3 | | | | | | | | |
| .4 | | | | | | | | |
| סך כל החובות המובטחים : 60,000 | | | | | | הסכום הכולל של השעבודים : | | |

(*)

2. פירוט החובות בדין קדימה

**-אין חובות בדין קדימה-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של הנושה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב |
| .1 | | | | | |
| .2 | | | | | |
| .3 | | | | | |
| .4 | | | | | |
| סך כל החובות בדין קדימה: | | | | | |

פירוט חובות לעובדי התאגיד

**-החברה לא מעסיקה עובדים-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' | | |
|---|---|---|---|---|---|---|---|---|---|
| מספר | השם המלא | כתובת מלאה ומיקוד | תאריך תחילת העבודה בחברה ותאור התפקיד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים ליום הגשת הבקשה | ממה נובע החוב (שכר, פיצויים , דמי הבראה וכיוצא באלה) | בטוחות שנתן התאגיד לעובד להבטחת החוב | | |
| | | | | | | | פרטי השעבוד | תאריך יצירת השעבוד | הסכום המובטח בשקלים חדשים |
| .1 | | | | | | | | | |
| .2 | | | | | | | | | |
| .3 | | | | | | | | | |
| .4 | | | | | | | | | |
| סך כל החובות לעובדי התאגיד : | | | | | | | הסכום הכולל של השעבודים : | | |

nevo.co.il

3. פירוט החובות הכלליים והנדחים

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של הנושה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב בשקלים חדשים ביום היווצרו ותאריך היווצרו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב |
| .1 | פאפאייה גיימינג בע"מ | המסגר 35, ת"א, ישראל 6721407 | 14,757,249 | 14,757,249 | פעילות שוטפת |
| .2 | SVB | 3003 Tasman Drive, Santa Clara, CA 95054, USA | 1,327,112 | 1,327,112 | פעילות שוטפת |
| .3 | PayPal Inc. | San Jose, California, USA | 904,737 | 904,737 | פעילות שוטפת |
| .4 | Nuvei Technologiec Inc | 1100 Boulevard René-Lévesque West, Suite 900, Montreal, QC H3B 4N4, Canada | 792,938 | 792,938 | פעילות שוטפת |
| .5 | James Kong | 225 Central Park West, Apt # 1704 New York, N.Y. 10024 | 5,084 | 5,084 | פעילות שוטפת |
| .6 | EY | דרך מנחם בגין 144א, תל אביב | 152,500 | 152,500 | פעילות שוטפת |
| .7 | Worldpay Gaming Solutions, LLC | 8500 Governors Hill Drive, Symmes Township, OH 45249-1384, USA | 145,012 | 145,012 | פעילות שוטפת |
| סך כל החובות הכלליים והנדחים : 18,084,632 | | | | | |

היתרות נכונות ליום 30 ביוני 2026

4. פירוט מכתבי התראה לגבי חיוב שעולה כדי חוב מהותי שלא נמנה

nevo.co.il

ברשימת החובות

**-אין מכתבי התראה-**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' |
|---|---|---|---|---|---|
| מספר | השם המלא של שולח מכתב ההתראה ובא כוחו | כתובת מלאה ומיקוד | סכום החוב שצוין במכתב ההתראה בשקלים חדשים ביום שליחתו, ומועד פירעונו | סכום החוב בשקלים חדשים נכון ליום הגשת הבקשה | ממה נובע החוב |
| .1 | | | | | |
| .2 | | | | | |
| .3 | | | | | |
| .4 | | | | | |
| סך כל החובות המהותיים המצויינים במכתבי ההתראה : | | | | | |

5. ערבויות שנתן התאגיד

יש לצרף צילום הערבויות שניתנו

**-אין ערבויות שנתן התאגיד-**

| | טור א' | | טור ב' | | |
|---|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 | ערבות 3 |
| (1) | שם הנושה | | | | |
| (2) | כתובת | | | | |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | | | |
| (4) | תאריך החתימה | | | | |
| (5) | הנערב (החייב העיקרי) | | | | |
| (6) | כתובת הנערב | | | | |
| (7) | ערבים נוספים | (1) שם | | | |
| | | כתובת | | | |
| | | (2) שם | | | |
| | | כתובת | | | |

6. ערבויות שנתנו נושאי משרה בתאגיד או חברי התאגיד להבטחת חובות התאגיד

יש לצרף צילום הערבויות שניתנו

**-אין ערבויות שנתנו נושאי משרה להבטחת חובות התאגיד-**

| | טור א' | | טור ב' | |
|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 |
| (1) | שם הנושה | | | |
| (2) | כתובת | | | |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | | |
| (4) | תאריך החתימה | | | |
| (5) | הנערב (החייב העיקרי) | | | |
| (6) | כתובת הנערב | | | |
| (7) | ערבים נוספים | (1) שם | | |
| | | כתובת | | |
| | | (2) שם | | |

nevo.co.il

| | | | | |
|---|---|---|---|---|
| | | כתובת | | |

7. ערבויות שנתנו צדדים שלישיים להבטחת חובות התאגיד

| | טור א׳ | | טור ב׳ | | | | |
|---|---|---|---|---|---|---|---|
| מספר | פרטים | | ערבות 1 | ערבות 2 | ערבות 3 | ערבות 4 | ערבות 5 |
| (1) | שם הנושה | | | | | | |
| (2) | כתובת | | | | | | |
| (3) | סכום הערבות בשקלים חדשים ביום מתן הערבות | | | | | | |
| (4) | תאריך החתימה | | | | | | |
| (5) | ערבים נוספים | (1) שם | | | | | |
| (6) | | כתובת | | | | | |
| (7) | | (2) שם | | | | | |
| (8) | | כתובת | | | | | |

יש לצרף צילום הערבויות שניתנו

8. כרטיסי חיוב

יש לפרט את כל כרטיסי החיוב המחייבים את חשבון התאגיד, וכן שמות האוחזים בכרטיסים אלה והרשאים לחייב את התאגיד לפיהם ;

יש לצרף דף חיוב אחרון

**-אין חיובים קרובים לכן לא מצורף-**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ |
|---|---|---|---|---|---|
| מספר | שם בעל הכרטיס | החברה המנפיקה | מספר הכרטיס | מועד פקיעת הכרטיס | מספר הבנק, הסניף וחשבון הבנק המחויב |
| .1 | אוריאל בכר | SVB מאסטר - קארד | 5853 | 31/07/2027 | בנק SVB מספר חשבון 3302747345 |
| .2 | אוריאל בכר | SVB מאסטר - קארד | כרטיס וירטואלי | 31/07/2027 | בנק SVB מספר חשבון 3302747345 |

9. תביעות והליכי גביה המתנהלים נגד התאגיד

תביעות נגד התאגיד

**העתק טבלת תביעות והליכי גביה המתנהלים נגד התאגיד מצורף כנספח "2".**

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ | טור ז׳ |
|---|---|---|---|---|---|---|---|
| מספר | בית המשפט | מספר תיק | הנושה-התובע ושם בא כוחו | מהות ההליך | השלב שבו מצוי ההליך | סכום החוב בשקלים חדשים | בטחונות שניתנו להבטחת החוב |
| .1 | | | | | | | |
| .2 | | | | | | | |
| .3 | | | | | | | |
| .4 | | | | | | | |

10. הליכי הוצאה לפועל נגד התאגיד

יש לצרף תדפיס מלשכת ההוצאה לפועל על כלל התיקים המתנהלים כנגד התאגיד

**-אין הליכי הוצאה לפועל נגד התאגיד-**

nevo.co.il

| | טור א׳ | טור ב׳ | טור ג׳ | טור ד׳ | טור ה׳ | טור ו׳ |
|---|---|---|---|---|---|---|
| מספר | לשכת ההוצאה לפועל | מספר התיק | הנושה-הזוכה ושם בא כוחו | פסק דין, שטרות או אחר | סכום החוב בשקלים חדשים | ביטחונות שניתנו להבטחת החוב |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |

תצהיר

אני החתום מטה _____ תעודת זהות _____, מצהיר בזה כי הדו״ח שאני מגיש לבית המשפט על נספחיו הוא מדויק, מלא ומעודכן בכל חלקיו לתאריך היום.

___________________________

שם וחתימת המצהיר

אני החתום מטה _____, עורך דין מאשר בזה כי ביום _____ הופיע בפני ב_____ מר _____, שזיהיתי אותו לפי תעודת זהות מספר / המוכר לי אישית _____ ולאחר שהזהרתיו כי עליו לומר את האמת בלבד כי אם לא יעשה כן יהיה צפוי לעונשים הקבועים בחוק, אישר נכונות הצהרתו דלעיל וחתם עליה בפניי.

___________________________

_____, עורך דין

נבו nevo.co.il

# **<u>תוכן עניינים</u>**


| מס' | שם הנספח | עמ' |
|---|---|---|
| 1 | חלק ב סעיף 6 - דף חשבון אחרון של כל חשבון בנק | 3 |
| 2 | חלק ג סעיף 9 - טבלת תביעות והליכי גביה המתנהלים נגד התהליך | 26 |

# נספח 1

# חלק ב סעיף 6 - דף חשבון אחרון של כל חשבון בנק

עמ׳ 3

# נספח 1

## תוכן עניינים


| מס׳ | שם הנספח | עמ׳ |
|---|---|---|
| 1 | בנק דיסקונט לישראל - 0253646954; 0253666076 | 3 |
| 2 | Silicon Valley Bank - 3302747345 ;10026436; 0050054772; 0050054787; 0050054791; 3304272855; 3304272840 | 7 |
| 3 | Capital One - 2082544324; 2082544367 | 14 |
| 4 | PayPal - ZS25FMCJMBJ58 | 19 |

# בנק דיסקונט לישראל -
# 0253666076 ; 0253646954

דיסקונט

29/07/2026

**לכבוד** PAPAYA GAMING INC
**כתובת:** SOUTH DUPONT HIGHWAY DOVER 3500
**מס' חשבון:** 253646954
**מס' חשבון קודם:** 61-00-971581
תאגיד כללי

**סניף** ראשי ת"א 10
**כתובת:** יהודה הלוי
**טלפון:** 0768050505 **פקס:** 0768890787
**צוות:** עסקי **טל':**
**מ.עסקים:** **טל':**

# מט"ח

$ 326,988.63

יתרה משוערכת בחשבונות מט"ח ללא תנועות עתידיות

**פירוט חשבונות מט"ח**

כל החשבונות

| מספר חשבון | יתרה במט"ח | יתרה משוערכת בש"ח | שער יציג | IBAN ופרטי החשבון |
|---|---|---|---|---|
| USD- 0253666076 | $326,988.63 | ₪999,931.23 | 3.058 | להצגה |

**USD-0253666076**

| תאריך פעולה | יום ערך | תיאור הפעולה | אסמכתה | זכות / חובה $ | יתרה $ |
|---|---|---|---|---|---|
| 16/07/2026 | 16/07/2026 | BL העברת מטח לחול ANK ROME LLP | 24 | -37,500.00 | 326,988.63 |
| 16/07/2026 | 16/07/2026 | עמלת העברת מטח 48 1069725828 | 23 | -13.00 | 364,488.63 |
| 01/07/2026 | 30/06/2026 | עמלת רישום פעולה במ ט"ח | 22 | -2.35 | 364,501.63 |
| 30/06/2026 | 30/06/2026 | עמלת העברת מטח 48 1069685620 | 21 | -13.00 | 364,503.98 |
| 30/06/2026 | 30/06/2026 | הוצאות חו"ל 4810696 85611 | 20 | -1.50 | 364,516.98 |
| 30/06/2026 | 30/06/2026 | WO העברת מטח לחול RLDPAY LIMITE | 19 | -6,490.01 | 364,518.48 |
| 30/06/2026 | 30/06/2026 | עמלת העברת מטח 48 1069685611 | 18 | -13.00 | 371,008.49 |
| 30/06/2026 | 30/06/2026 | CY העברת מטח לחול BERSOURCE COR | 17 | -35,617.52 | 371,021.49 |
| 01/06/2026 | 31/05/2026 | עמלת רישום פעולה במ ט"ח | 16 | -2.35 | 406,639.01 |
| 01/05/2026 | 30/04/2026 | עמלת רישום פעולה במ ט"ח | 15 | -2.35 | 406,641.36 |
| 30/04/2026 | 30/04/2026 | PA העברת מטח לחול PAYA GAMING I | 14 | -11,700,000.00 | 406,643.71 |
| 30/04/2026 | 30/04/2026 | עמלת העברת מטח 48 1069546460 | 13 | -13.00 | 12,106,643.71 |
| 30/04/2026 | 30/04/2026 | תשלום ריבית על משיכ ת יתר- מינוס | 12 | -0.09 | 12,106,656.71 |
| 30/04/2026 | 30/04/2026 | ריבית החזר | 11 | 0.01 | 12,106,656.80 |
| 30/04/2026 | 30/04/2026 | החזר עמלת פקודת ת שלום מחו"ל | 10 | 237.00 | 12,106,656.79 |

| תאריך פעולה | יום ערך | תיאור הפעולה | אסמכתה | זכות / חובה $ | יתרה $ |
|---|---|---|---|---|---|
| 30/04/2026 | 30/04/2026 | העברה לPAPAYA GA MING INC | 9 | -338.43 | 12,106,419.79 |
| 27/04/2026 | 27/04/2026 | רווח מפיקדון שנפרע | 8 | 9,205.48 | 12,106,758.22 |
| 27/04/2026 | 27/04/2026 | פירעון פיקדון מט"ח -7 30 יום | 7 | 12,000,000.00 | 12,097,552.74 |
| 27/04/2026 | 27/04/2026 | חיוב מס בפרעון פיקדון | 6 | -2,117.26 | 97,552.74 |
| 26/04/2026 | 20/04/2026 | PA, תקבול מטח מחול PAYA GAMING | 5 | 6,599,960.00 | 99,670.00 |
| 21/04/2026 | 20/04/2026 | הפקדה לפיקדון | 4 | -12,000,000.00 | -6,500,290.00 |
| 12/04/2026 | 12/04/2026 | עמלת פקודת תשלום מ חו"ל | 3 | -250.00 | 5,499,710.00 |
| 12/04/2026 | 13/04/2026 | פקודת תשלום מPAPA YA GAMING, INC. OPERA | 2 | 5,499,960.00 | 5,499,960.00 |

מוצגות כלל התנועות בטווח התאריכים שבחרת

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

דיסקונט

29/07/2026

| | |
|---|---|
| **לכבוד** PAPAYA GAMING INC | **סניף** 010 |
| **כתובת:** SOUTH DUPONT HIGHWAY DOVER 3500 | **כתובת:** יהודה הלוי |
| **מס' חשבון:** 0253646954 | **טלפון:** 0768050505 **פקס:** 0768890787 |
| **מס' חשבון קודם:** 0-00-971581 | **צוות:** עסקי **טל':** |
| עסקי | **מ. עסקים:** **טל':** |

# עובר ושב

₪ 388.64

מסגרת אשראי ₪0.00

| תאריך | יום ערך | תיאור התנועה | אסמכתה | זכות/חובה ₪ | יתרה ₪ |
|---|---|---|---|---|---|
| 26/04/2026 | 23/04/2026 | עמלת תקבול מטח 481162276209 | 2 | -38,907.52 | -38,907.52 |
| 27/04/2026 | 27/04/2026 | ד.נ ל66 יום לפי 258 ש"ח לרבעון | 3 | -187.12 | -39,094.64 |
| 29/04/2026 | 29/04/2026 | החזר עמלה 481162276209 | 4 | 38,907.52 | -187.12 |
| 29/04/2026 | 29/04/2026 | עמלת תקבול מטח 481162276209 | 5 | -38.10 | -225.22 |
| 30/04/2026 | 30/04/2026 | העברה מPAPAYA GAMING INC | 99219/6 | 1,000.00 | 774.78 |
| 01/05/2026 | 30/04/2026 | עמלת רישום פעולה במט"י | 7 | -1.50 | 773.28 |
| 30/06/2026 | 30/06/2026 | תשלום ריבית על משיכת יתר- מינוס | 8 | -126.64 | 646.64 |
| 01/07/2026 | 01/07/2026 | ד.נ לתקופה 30/09/26-01/07/26 | 9 | -258.00 | 388.64 |

היתרה המוצגת עשויה לא לכלול חלק מהתנועות המקוונות שבוצעו במהלך יום העסקים האחרון.
בכל מקרה של סתירה בין הרשום לעיל ובין הרשום בספרי הבנק, הרישום בספרי הבנק הוא הקובע.
סכום החיוב הקרוב בכרטיס אשראי אינו סופי, משום שאינו כולל רכישות שטרם דווחו על ידי בתי העסק. כמו כן, בעסקאות מט"ח שמועד חיובן עתידי,
שער המטבע ייקבע במועד החיוב. המידע באחריות חברות האשראי.

**זמינים לשירותכם בערוצים הדיגיטליים 24 שעות ביממה ובטלבנק 6111* בשעות הפעילות**

# Silicon Valley Bank - 3302747345 ; 10026436; 0050054772; 0050054787; 0050054791; 3304272855; 3304272840

svb Silicon Valley Bank
A Division of First Citizens Bank



Run by Igal Livshits on Jul 29 2026 at 12:42 AM PDT

# Balances & Transactions Report (Jul 28 2026)

## USD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 20,000.00 USD | 0.00 USD |
| Total Credits (8) | 784,983.31 USD | 784,983.31 USD |
| Total Debits (2) | -784,983.31 USD | -784,983.31 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 20,000.00 USD | 0.00 USD |

## Analysis Checking - 3302747345

Papaya Gaming, Inc. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 0.00 USD | 0.00 USD |
| Total Credits (8) | 784,983.31 USD | 784,983.31 USD |
| Total Debits (2) | -784,983.31 USD | -784,983.31 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 0.00 USD | 0.00 USD |

### Transaction Details

### Credits (8) — 784,983.31 USD

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **ACH CREDIT**<br>BRAINTREE FUNDING JJY9W8 PAPAYAGAMING_INSTANT | **530,003.68 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208201358883 PAPAYA GAMING, INC. | **251,395.15 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208160823885 PAPAYA GAMING, INC. | **1,295.03 USD** |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208160821889 PAPAYA GAMING, INC. | **1,053.39 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208160824883 PAPAYA GAMING, INC. | **828.46 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208201562880 PAPAYA GAMING, INC. | **224.61 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208160822887 PAPAYA GAMING, INC. MC | **105.89 USD** |
| Jul 28 2026 | **ACH CREDIT**<br>SVB MERCHANT SVS DEPOSIT 208160820881 PAPAYA GAMING, INC. | **77.10 USD** |

## Debits (2) -784,983.31 USD

| Date | Description | Amount |
|---|---|---|
| Jul 28 2026 | **ZERO BAL TRF DEBIT**<br>SWEEP TO DDA 003302933838 | **-784,982.37 USD** |
| Jul 28 2026 | **ACH DEBIT**<br>SVB MERCHANT SVS FINCL ADJ 208160822887 PAPAYA GAMING, INC. | **-0.94 USD** |

## COLLATERAL MMA - 3304272840

Papaya Gaming, Inc. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 10,000.00 USD | 0.00 USD |
| Total Credits (0) | 0.00 USD | 0.00 USD |
| Total Debits (0) | 0.00 USD | 0.00 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 10,000.00 USD | 0.00 USD |

### Transaction Details

No transactions available for the account or date(s) selected.

## COLLATERAL MMA - 3304272855

Papaya Gaming, Inc. | USD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

| | | |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 10,000.00 USD | 0.00 USD |
| Total Credits (0) | 0.00 USD | 0.00 USD |
| Total Debits (0) | 0.00 USD | 0.00 USD |
| One Day Float | -- | 0.00 USD |
| 2+ Day Float | -- | 0.00 USD |
| **Closing Balance**<br>As of Jul 28 2026 | 10,000.00 USD | 0.00 USD |

**Transaction Details**

No transactions available for the account or date(s) selected.

## AUD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 0.00 AUD | 0.00 AUD |
| Total Credits (0) | 0.00 AUD | 0.00 AUD |
| Total Debits (0) | 0.00 AUD | 0.00 AUD |
| One Day Float | -- | 0.00 AUD |
| 2+ Day Float | -- | 0.00 AUD |
| **Closing Balance**<br>As of Jul 28 2026 | 0.00 AUD | 0.00 AUD |

## BUSINESS ACCOUNT - 0050054772

Papaya Gaming, Inc. | AUD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 0.00 AUD | 0.00 AUD |
| Total Credits (0) | 0.00 AUD | 0.00 AUD |
| Total Debits (0) | 0.00 AUD | 0.00 AUD |
| One Day Float | -- | 0.00 AUD |
| 2+ Day Float | -- | 0.00 AUD |
| **Closing Balance**<br>As of Jul 28 2026 | 0.00 AUD | 0.00 AUD |

**Transaction Details**

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

No transactions available for the account or date(s) selected.

## CAD Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 859.90 CAD | 859.90 CAD |
| Total Credits (0) | 0.00 CAD | 0.00 CAD |
| Total Debits (0) | 0.00 CAD | 0.00 CAD |
| One Day Float | -- | 0.00 CAD |
| 2+ Day Float | -- | 0.00 CAD |
| **Closing Balance**<br>As of Jul 28 2026 | 859.90 CAD | 859.90 CAD |

## BUSINESS ACCOUNT - 0050054787

Papaya Gaming, Inc. | CAD | Silicon Valley Bank - 121140399

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 859.90 CAD | 859.90 CAD |
| Total Credits (0) | 0.00 CAD | 0.00 CAD |
| Total Debits (0) | 0.00 CAD | 0.00 CAD |
| One Day Float | -- | 0.00 CAD |
| 2+ Day Float | -- | 0.00 CAD |
| **Closing Balance**<br>As of Jul 28 2026 | 859.90 CAD | 859.90 CAD |

### Transaction Details

No transactions available for the account or date(s) selected.

## EUR Totals

| Balances | Ledger | Available |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 916.45 EUR | 916.45 EUR |
| Total Credits (0) | 0.00 EUR | 0.00 EUR |
| Total Debits (0) | 0.00 EUR | 0.00 EUR |
| One Day Float | -- | 0.00 EUR |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

svb Silicon Valley Bank
A Division of First Citizens Bank



Run by Igal Livshits on Jul 29 2026 at 12:42 AM PDT

| | | |
|---|---|---|
| 2+ Day Float | -- | 0.00 EUR |
| **Closing Balance**<br>As of Jul 28 2026 | 916.45 EUR | 916.45 EUR |

BUSINESS ACCOUNT - 0050054791

Papaya Gaming, Inc. | EUR | Silicon Valley Bank - 121140399

| **Balances** | **Ledger** | **Available** |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 916.45 EUR | 916.45 EUR |
| Total Credits (0) | 0.00 EUR | 0.00 EUR |
| Total Debits (0) | 0.00 EUR | 0.00 EUR |
| One Day Float | -- | 0.00 EUR |
| 2+ Day Float | -- | 0.00 EUR |
| **Closing Balance**<br>As of Jul 28 2026 | 916.45 EUR | 916.45 EUR |

**Transaction Details**

No transactions available for the account or date(s) selected.

## GBP Totals

| **Balances** | **Ledger** | **Available** |
|---|---|---|
| **Opening Balance**<br>As of Jul 28 2026 | 0.00 GBP | 0.00 GBP |
| Total Credits (0) | 0.00 GBP | 0.00 GBP |
| Total Debits (0) | 0.00 GBP | 0.00 GBP |
| One Day Float | -- | 0.00 GBP |
| 2+ Day Float | -- | 0.00 GBP |
| **Closing Balance**<br>As of Jul 28 2026 | 0.00 GBP | 0.00 GBP |

BUSINESS ACCOUNT - 0010026436

Papaya Gaming, Inc. | GBP | Silicon Valley Bank - 121140399

| **Balances** | **Ledger** | **Available** |
|---|---|---|
| **Opening Balance** | 0.00 GBP | 0.00 GBP |

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

svb Silicon Valley Bank
A Division of First Citizens Bank



Run by Igal Livshits on Jul 29 2026 at 12:42 AM PDT

| | | |
|---|---|---|
| As of Jul 28 2026 | | |
| Total Credits (0) | 0.00 GBP | 0.00 GBP |
| Total Debits (0) | 0.00 GBP | 0.00 GBP |
| One Day Float | -- | 0.00 GBP |
| 2+ Day Float | -- | 0.00 GBP |
| **Closing Balance**<br>As of Jul 28 2026 | 0.00 GBP | 0.00 GBP |

**Transaction Details**

No transactions available for the account or date(s) selected.

*End of Report*

© 2026 First-Citizens Bank & Trust Company. All rights reserved. Silicon Valley Bank, a division of First-Citizens Bank & Trust Company. Member FDIC.

# Capital One - 2082544324; 2082544367

29-Jul-2026
05:31:28AM

# Running Balance Statement



**Bank:** Capital One, N.A. / 065000090
**Account:** 2082544324 / PAPAYA GAMING INC OP / USD
**For Period:** 27 Jul 2026 - 28 Jul 2026

| Summary | Amount | |
|---|---|---|
| OPENING LEDGER | 16,334,065.34 | |
| CLOSING LEDGER | 18,209,027.88 | |
| CLOSING AVAILABLE | 18,209,027.88 | |
| 1-DAY FLOAT | 0.00 | |
| 2 OR MORE DAYS FLOAT | 0.00 | |
| TOTAL CREDITS | 1,875,731.37 | (15) |
| TOTAL DEBITS | 768.83 | (2) |

| Date | Description | Reference | Deposits / Credits | Withdrawals / Debits | Balance |
|---|---|---|---|---|---|
| 27-Jul-2026 | ACH deposit | 26502931710227 | 265,689.72 | | 16,599,755.06 |
| WorldPay | Funds Disb Papaya Gaming Inc. 26502931710227 | | | | |
| 27-Jul-2026 | ACH deposit | 1051910103908 | 233,088.86 | | 16,832,843.92 |
| PAYPAL | TRANSFER PAPAYA GAMING INC. 1051910103908 | | | | |
| 27-Jul-2026 | ACH deposit | 1051928882346 | 214,357.38 | | 17,047,201.30 |
| PAYPAL | TRANSFER PAPAYA GAMING INC. 1051928882346 | | | | |
| 27-Jul-2026 | ACH deposit | 1051886363295 | 212,751.75 | | 17,259,953.05 |
| PAYPAL | TRANSFER PAPAYA GAMING INC. 1051886363295 | | | | |
| 27-Jul-2026 | ACH deposit | 000998300045773 | 107,271.26 | | 17,367,224.31 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING 000998300045773 | | | | | |
| 27-Jul-2026 | ACH deposit | 000998300046102 | 64.40 | | 17,367,288.71 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING TRIPLE C 000998300046102 | | | | | |
| 27-Jul-2026 | ACH deposit | 000998300045773 | 15.00 | | 17,367,303.71 |
| BANKCARD DEPOSITMERCH CHBK PAPAYA GAMING 000998300045773 | | | | | |
| 27-Jul-2026 | ACH deposit | 000998300045773 | 7.00 | | 17,367,310.71 |
| BANKCARD DEPOSITMERCH CHBK PAPAYA GAMING 000998300045773 | | | | | |
| 27-Jul-2026 | ACH Withdrawal | 000998300045773 | | 469.28 | 17,366,841.43 |
| BANKCARD DEPOSITMERCH CHBK PAPAYA GAMING 000998300045773 | | | | | |
| 28-Jul-2026 | ACH deposit | 26502933485919 | 294,320.56 | | 17,661,161.99 |
| WorldPay | Funds Disb Papaya Gaming Inc. 26502933485919 | | | | |

Note: All times displayed are in Eastern Time

29-Jul-2026
05:31:28AM

# Running Balance Statement



**Bank:** Capital One, N.A. / 065000090
**Account:** 2082544324 / PAPAYA GAMING INC OP / USD
**For Period:** 27 Jul 2026 - 28 Jul 2026

| Date | Description | Reference | Deposits /Credits | Withdrawals /Debits | Balance |
|---|---|---|---|---|---|
| 28-Jul-2026 | ACH deposit | 1051949334449 | 210,971.99 | | 17,872,133.98 |
| PAYPAL TRANSFER PAPAYA GAMING INC. 1051949334449 | | | | | |
| 28-Jul-2026 | ACH deposit | 000998300045773 | 117,009.77 | | 17,989,143.75 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING 000998300045773 | | | | | |
| 28-Jul-2026 | ACH deposit | 000998300045773 | 113,256.99 | | 18,102,400.74 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING 000998300045773 | | | | | |
| 28-Jul-2026 | ACH deposit | 000998300045773 | 106,910.69 | | 18,209,311.43 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING 000998300045773 | | | | | |
| 28-Jul-2026 | ACH deposit | 000998300046102 | 8.00 | | 18,209,319.43 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING TRIPLE C 000998300046102 | | | | | |
| 28-Jul-2026 | ACH deposit | 000998300046102 | 8.00 | | 18,209,327.43 |
| BANKCARD DEPOSITSETTLEMENT PAPAYA GAMING TRIPLE C 000998300046102 | | | | | |
| 28-Jul-2026 | ACH Withdrawal | 000998300045773 | | 299.55 | 18,209,027.88 |
| BANKCARD DEPOSITMERCH CHBK PAPAYA GAMING 000998300045773 | | | | | |
| | | **Account Totals** | 1,875,731.37 | 768.83 | |

Note: All times displayed are in Eastern Time

29-Jul-2026
05:31:28AM

# Running Balance Statement



**Bank:** Capital One, N.A. / 065000090
**Account:** 2082544367 / PAPAYA GAMING INC MMA / USD
**For Period:** 27 Jul 2026 - 28 Jul 2026

| Summary | Amount | |
|---|---|---|
| OPENING LEDGER | 0.00 | |
| CLOSING LEDGER | 0.00 | |
| CLOSING AVAILABLE | 0.00 | |
| 1-DAY FLOAT | 0.00 | |
| 2 OR MORE DAYS FLOAT | 0.00 | |
| TOTAL CREDITS | 0.00 | (0) |
| TOTAL DEBITS | 0.00 | (0) |

| | | |
|---|---|---|
| **Account Totals** | 0.00 | 0.00 |

Note: All times displayed are in Eastern Time

## Running Balance Statement



**Account Summary For Period:** 27 Jul 2026 - 28 Jul 2026

| | Starting Balance | Deposits /Credits | Withdrawals /Debits | Ending Balance |
|---|---|---|---|---|
| **USD Accounts:** | 16,334,065.34 | 1,875,731.37 | 768.83 | 18,209,027.88 |

Note: All times displayed are in Eastern Time

# PayPal - ZS25FMCJMBJ58

## Statement for 26 July 2026 to 28 July 2026

Papaya Gaming, Inc.
106 W 32nd St Fl 2
10001 New York

## Balance Summary (7/26/26 - 7/28/26)

| | Available beginning | Available ending | Withheld beginning | Withheld ending |
|---|---|---|---|---|
| USD | 214,357.38 | 191,151.40 | 0.00 | 0.00 |
| CAD | 0.00 | 0.00 | 0.00 | 0.00 |
| EUR | 40.40 | 40.40 | 0.00 | 0.00 |
| GBP | 780.78 | 826.96 | 0.00 | 0.00 |

PayPal

Merchant Account ID: ZS25FMCJMBJ58 PayPal ID: paypal@papayagaming.com 7/26/26 - 7/28/26

## Activity Summary (7/26/26 - 7/28/26)

| | USD | GBP |
|---|---|---|
| **Beginning Available Balance** | **214,357.38** | **780.78** |
| Payments received | 731,093.69 | 58.41 |
| Payments sent | 0.00 | 0.00 |
| Withdrawals and Debits | -722,282.12 | -8.72 |
| Deposits and Credits | 0.00 | 0.00 |
| Fees | -31,243.09 | -3.51 |
| Chargeback | -774.46 | 0.00 |
| **Ending Available Balance** | **191,151.40** | **826.96** |

PayPal



## Payments received

| Description | USD | GBP |
|---|---|---|
| Payment Bill User Payment | 731,093.69 | 58.41 |
| **Total** | **731,093.69** | **58.41** |

## Withdrawals and Debits

| Description | USD | GBP |
|---|---|---|
| Payment Refund | -102,572.35 | -8.72 |
| Transfer Withdrawal | -619,709.77 | 0.00 |
| **Total** | **-722,282.12** | **-8.72** |

## Fees

| Description | USD | GBP |
|---|---|---|
| Dispute Fee | -705.00 | 0.00 |
| Fee Credits | 136.67 | 0.00 |
| Payment Fee | -30,674.76 | -3.51 |
| **Total** | **-31,243.09** | **-3.51** |

## Chargeback

| Description | USD | GBP |
|---|---|---|
| Chargeback Activity | -4,814.97 | 0.00 |
| Chargeback Adjustments | -937.79 | 0.00 |
| Chargeback Hold | -3,308.55 | 0.00 |
| Chargeback Releases | 8,286.85 | 0.00 |
| **Total** | **-774.46** | **0.00** |

*-- Note: Due to the high volume of transactions for the requested month, this document contains only an account-level summary. For more detailed transaction history, please access the CSV download feature. --*

# <u>נספח 2</u>

# חלק ג סעיף 9 - טבלת תביעות והליכי גביה המתנהלים נגד התהליך

עמ' 26

## **תביעות והליכי גביה המתנהלים נגד התאגיד – Papaya Gaming Inc**

| | טור א' | טור ב' | טור ג' | טור ד' | טור ה' | טור ו' | טור ז' |
|---|---|---|---|---|---|---|---|
| **מספר** | **בית המשפט** | **מספר תיק** | **הנושה -התובע ושם בא כוחו** | **מהות ההליך** | **השלב שבו מצוי ההליך** | **סכום החוב בשקלים** | **בטחונות שניתנו להבטחת החוב** |
| .1 | The United States District Court for the Southern District of New York | 1:24-cv-01646-DLC | Skillz Platform Inc.<br><br>(King and Spalding) | תביעה שהוגשה על-ידי מתחרה עסקי של החברה בטענה שהחברה הציגה מצגים מטעים ללקוחותיה ובכך התחרתה בתובעת באופן בלתי הוגן בשוק. | החלטת שופטת בבקשות Post trial | 719 מיליון דולר | – |
| .2 | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES CENTRAL DISTRICT | No. 24STCV32626 | JANE BARCELO and CHRISTINA ISERNIA<br><br>(Milberg) | תביעה ייצוגית שהוגשה על-ידי לקוחות של החברה בטענה למצגים מטעים שהסתיימה בהסדר פשרה בסכום כולל של 15 מיליון דולר ארה"ב. | בית המשפט אישר את הסדר הפשרה באופן סופי. לאחר מתן אישור זה, הוגשה בקשה לביטול האישור, שעודנה תלויה ועומדת. | 15 מיליון דולר ארה"ב (בכפוף לאישור בית המשפט). | – |
| .3 | The United States District Court for the Southern District of New York / NAM Arbitration | 1:24-cv-02310-DLC | Kelly-Starkebaum<br><br>(Burns Charest) | תביעה ייצוגית שהוגשה על-ידי לקוחה של החברה בטענה למצגים מטעים, הסתיימה בהחלטה של בית המשפט לאכוף את תניית הבוררות שבתנאי השירות של החברה. בעקבות ההחלטה, הגישה הלקוחה | הליך הבוררות האינדיבידואלי מצוי בשלבים מוקדמים. | לא מכומת בשלב זה. | – |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | תביעה אינדיבידואלית בבוררות | | | | |
| | 308,880 דולר ארה״ב | התביעה טרם הומצאה לחברה. | תביעה שהוגשה על-ידי לקוח של החברה נגד החברה ונגד חברה נוספת (Avia Games Inc.) בטענה למצגים מטעים | Dawn Pavlovich<br><br>(Geragos Law Group) | 26ST CV 11434 | California Superior Court, L.A. County | .4 |

# Annex 8

# List of Company Officers at the Applicant and Company Officers Who Completed Their Positions in the 12 Months Preceding the Filing of the Motion

**Page 413**

**נושאי משרה פאפאיה גיימינג בע״מ**

| תפקיד | שם | תאריך מינוי | סיום מינוי | כתובת | שיעור החזקות בתאגיד |
|---|---|---|---|---|---|
| מנכ״ל ודירקטור | אוריאל בכר | 13/3/16 | | כלנית 6 רמת השרון | 17.048% |
| סמנכ״ל טכנולוגיות ודירקטור | אנדריי בירמן | 13/3/16 | | טרומפלדור 4, ת״א | 16.323% |
| מנהל פיתוח ומחקר ודירקטור | אלכס ליאכובצקי | 13/3/16 | | בר אילן 8, ת״א | 16.644% |
| דירקטור | גיגי לוי-ויס | 30/4/19 | | הפרחים 7 רשפון | 0% |
| דירקטור | עמרי קריגל דן | 4/11/20 | | ברנר 17, ת״א | 0.141% |
| סמנכ״ל כספים | רז רווח | 7/1/24 | | נחל ערוגות 7, גדרה | 0% |
| יועצת משפטית | יפעת שטיינמן | 6/7/22 | | קוממיות 23, רמת השרון | 0% |
| סמנ״ל פלטפורמה | שי גוטסדינר | 2/6/24 | | פרץ 34, גבעת שמואל | 0% |
| סמנכ״לית משאבי אנוש | רוית ברק | 28/9/25 | | הזמיר 7, קדימה | 0% |
| סמנכ״ל שיווק | אורי פרל שטיין | 1/8/19 | | נתן אלתרמן 46, הרצליה | 0.176% |
| סמנכ״ל שירות לקוחות | צביקה קורן | 20/4/25 | 4/5/26 | המלאכה 49, פרדס חנה כרכור | 0% |
| סמנכ״לית משאבי אנוש לשעבר | ליטל פרוש-דויד | 9/1/24 | 5/7/25 | הרצל 26, כפר סבא | 0.004% |
| סמנכ״ל משחקים לשעבר | יואב פילוסוף | 1/7/24 | 2/2/26 | יאיר רוזנבלום 5, רעננה | 0% |
| סמנכ״ל מוצרים | יהונתן צויק | 15/5/19 | 31/5/25 | בארי 8, הרצליה | 3.389% |

# Annex 9

# Financial statements for the last two years, prior to filing the petition

**Page 415**

Docusign Envelope ID: E0D979BC-3E55-42C1-9109-A5C9286D5CA8

**Appendix 9**

**PAPAYA GAMING LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED FINANCIAL STATEMENTS**

**AS OF DECEMBER 31, 2024**

**US DOLLARS IN THOUSANDS**

**INDEX**


| | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance sheets | 4 |
| Consolidated Statements of Comprehensive Income | 6 |
| Consolidated Statements of changes in shareholders' Equity | 7 |
| Consolidated Statements of cash flows | 8 - 9 |
| Notes to consolidated financial statements | 10 – 31 |


-----------------------------------------

EY
Shape the future with confidence

Kost Forer Gabbay & Kasierer
144 Menachem Begin Road, Building A,
Tel-Aviv 6492102, Israel

Tel: +972-3-6232525
Fax: +972-3-5622555
ey.com

## REPORT OF INDEPENDENT AUDITORS

**To the Board of Directors and Shareholders of**

**PAPAYA GAMING LTD. AND ITS SUBSIDIARIES**

### Opinion

We have audited the consolidated financial statements of Papaya Gaming Ltd. and its subsidiaries (the "Company"), which comprise the consolidated balance sheets as of December 31, 2024 and 2023, and the related consolidated statements of comprehensive income, changes in shareholders' equity and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements").

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2024 and 2023, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audits in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of the Company and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date that the financial statements are available to be issued.

EY
Building a better working world

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free of material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

Kost Forer Gabbay and Kasierer

Tel-Aviv, Israel
June 18, 2025

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

**CONSOLIDATED BALANCE SHEETS**

**U.S. dollars in thousands, except for per share data**

| | Note | December 31, 2024 | December 31, 2023 |
|---|---|---|---|
| ASSETS | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | 3 | $ 46,541 | $ 135,087 |
| Short-term deposits | | 16,500 | 1,202 |
| Short-term restricted deposits | | 548 | 1,159 |
| Marketable securities | 5 | 60,842 | 9,477 |
| Account receivable | | 3,781 | 5,356 |
| Shareholders' loan | 15 | - | 5,190 |
| Prepaid expenses and other current assets | 4 | 11,332 | 4,605 |
| Total current assets | | 139,544 | 162,076 |
| NON-CURRENT ASSETS: | | | |
| Long-term restricted deposits | | 1,635 | 1,735 |
| Property and equipment, net | 6 | 2,301 | 2,047 |
| Intangible assets | | 1,568 | 560 |
| Operating lease right-of-use asset | | 20,396 | 22,576 |
| Convertible note | 7 | 150 | 150 |
| Deferred tax assets | 14 | 4,711 | 3,568 |
| Total current assets | | 30,761 | 30,636 |
| Total assets | | $ 170,305 | $ 192,712 |

**PAPAYA GAMING LTD. AND ITS SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

**U.S. dollars in thousands, except for per share data**

| | Note | December 31, 2024 | December 31, 2023 |
|---|---|---|---|
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
| CURRENT LIABILITIES: | | | |
| Account payables | | $ 14,315 | $ 24,262 |
| Other accounts payable and accrued expenses | 8 | 42,429 | 62,005 |
| Deferred tax liabilities | 14 | - | 93 |
| Contract liability | | 8,815 | 8,673 |
| Operating lease liabilities, current | 12 | 2,681 | 1,849 |
| Dividend payable | 13,15 | 14,454 | 15,670 |
| Warrants liabilities | 10 | 2,514 | 1,886 |
| Total current liabilities | | 85,208 | 114,438 |
| NON-CURRENT LIABILITIES: | | | |
| Tax provision | | 6,515 | 4,881 |
| Operating lease liabilities, long-term | 12 | 17,158 | 19,241 |
| Total liabilities | | 108,881 | 138,560 |
| COMMITMENTS AND CONTIGEACIES | 11 | | |
| SHAREHOLDERS' EQUITY: | 13 | | |
| Ordinary Shares and Ordinary Shares A | | 349 | 348 |
| Convertible Preferred Seed Shares and Seed-1 Shares | | *) | *) |
| Accumulated other comprehensive income | | 750 | 803 |
| Treasury stock | | (154) | - |
| Additional paid-in capital | | 14,216 | 11,656 |
| Retained earnings | | 46,263 | 41,345 |
| Total shareholders' equity | | 61,424 | 54,152 |
| Total liabilities and shareholders' equity | | $ 170,305 | $ 192,712 |

*) Represents an amount less than $1.

The accompanying notes are an integral part of the consolidated financial statements.

June 18, 2025
Date of approval of the financial statements

Signed by:
CEO Oriel Bachar
2FAC463DBE284C9...
Oriel Bachar
Chairman of the Board and CEO

## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

**U.S. dollars in thousands, except for per share data**

| | Note | Year ended December 31, 2024 | Year ended December 31, 2023 |
|---|---|---|---|
| Revenues | | $ 533,120 | $ 461,297 |
| Cost of revenues | | 35,226 | 30,515 |
| Gross profit | | 497,894 | 430,782 |
| Research and development | | 45,263 | 36,109 |
| Sales and marketing | | 365,955 | 293,937 |
| General and administrative | | 41,129 | 13,970 |
| Total operating expenses | | 452,347 | 344,016 |
| Operating profit | | 45,547 | 86,766 |
| Financial income, net | | 3,093 | 2,690 |
| Other expenses, net | | (4) | (179) |
| Income before tax on income | | 48,636 | 89,277 |
| Income tax expense | 14 | 8,718 | 16,102 |
| Net income | | 39,918 | 73,175 |
| Other comprehensive income, net of tax | | | |
| Unrealized (loss) gain on qualifying cash flow hedge, net of tax | | (107) | 525 |
| Unrealized gain on marketable securities, net of tax | | 54 | 278 |
| Other comprehensive (loss) income, net of tax | 16 | (53) | 803 |
| Comprehensive income | | $ 39,865 | $ 73,978 |

The accompanying notes are an integral part of the consolidated financial statements.

## CONSOLIDATES STATEMENTS OF SHAREHOLDERS' EQUITY

**U.S. dollars in thousands, except for per share data**

| | Convertible preferred Shares | | Ordinary Shares | | Additional paid-in | | Accumulated other comprehensive | Retained | Total shareholders' |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | capital | Treasury stock | income | earnings | equity |
| **Balance as of January 1, 2023** | 40,926,000 | $ 5,636 | 125,987,255 | $ 344 | $ 2,840 | $ - | $ - | $ 26,170 | $ 34,990 |
| Exercise of options | - | - | 1,178,800 | 3 | 287 | - | - | - | 290 |
| Exercise of warrants | - | - | 325,500 | 1 | - | - | - | - | 1 |
| Share-based compensation | - | - | - | - | 2,893 | - | - | - | 2,893 |
| Other comprehensive income | - | - | - | - | - | - | 803 | - | 803 |
| Reclass of convertible preferred shares | - | (5,636) | - | - | 5,636 | - | - | - | - |
| Dividend | - | - | - | - | - | - | - | (58,000) | (58,000) |
| Net income | - | - | - | - | - | - | - | 73,175 | 73,175 |
| **Balance as of December 31, 2023** | 40,926,000 | *) | 127,491,555 | 348 | 11,656 | - | 803 | 41,345 | 54,152 |
| Exercise of options | - | - | 272,745 | 1 | 69 | - | - | - | 70 |
| Share-based compensation | - | - | - | - | 2,491 | - | - | - | 2,491 |
| Other comprehensive (loss) income | - | - | - | - | - | - | (53) | - | (53) |
| Treasury Stock | - | - | (22,914) | *) | - | (154) | - | - | (154) |
| Dividend | - | - | - | - | - | - | - | (35,000) | (35,000) |
| Net income | - | - | - | - | - | - | - | 39,918 | 39,918 |
| **Balance as of December 31, 2024** | 40,926,000 | $ *) | 127,741,386 | $ 349 | $ $14,216 | $ (154) | $ 750 | $ 46,263 | $ 61,424 |

*) Represents an amount less than $1.

The accompanying notes are an integral part of the consolidated financial statements.

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands, except for per share data**

| | Year ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| Cash flows from operating activities: | | |
| Net income | $ 39,918 | $ 73,175 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 586 | 428 |
| Amortization | 101 | 50 |
| Loss on sale and write-off of property and equipment | 5 | 179 |
| Share-based compensation | 2,491 | 2,893 |
| Remeasurement of warrants liabilities | 628 | 475 |
| Operating lease right-of-use assets | 2,180 | 28 |
| Operating lease liabilities | (1,251) | - |
| Exchange rate differences in respect of financial assets and liabilities | 209 | 753 |
| Interest income in respect of the Shareholders' loan | (279) | (180) |
| Accretion and capital gain | (3,493) | (1,545) |
| Changes in assets and liabilities items: | | |
| Change in shareholders loan | (77) | - |
| Change in accounts receivables | 1,575 | (2,688) |
| Change in prepaid expenses and other current assets | (6,849) | 97 |
| Change in deferred tax asset | (1,173) | (1,669) |
| Change in account payables | (9,947) | 15,529 |
| Change in other accounts payable and accrued expenses | (17,942) | 27,147 |
| Change in contract liability | 142 | (319) |
| Net cash provided by operating activities | 6,824 | 114,353 |
| Cash flows from investing activities: | | |
| Change in Short-term deposits | (15,298) | 29,064 |
| Change in Long-term restricted deposits | 100 | 1,931 |
| Investment in marketable securities | (47,907) | (7,831) |
| Investment in convertible note | - | (150) |
| Proceed from sales of property and equipment | 6 | 13 |
| Purchase of property and equipment | (851) | (1,007) |
| Capitalization of internal use software costs | (1,002) | - |
| Purchase of Intangible asset | (107) | (610) |
| Net cash provided by (used in) investing activities | (65,059) | 21,410 |
| Cash flows from financing activities: | | |
| Exercise of options | 70 | 290 |
| Repurchase of treasury stock | (154) | - |
| Loans provided to Shareholders | - | (5,010) |
| Cash dividend paid | (30,670) | (42,330) |
| Net cash used in financing activities | (30,754) | (47,050) |
| Exchange rate differences in respect of cash and cash equivalents | (168) | (665) |
| Change in cash and cash equivalents | (89,157) | 88,048 |
| Cash and cash equivalents at the beginning of the year | 136,246 | 48,198 |
| Cash, cash equivalents and short-term restricted deposits the end of the year | $ 47,089 | $ 136,246 |

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands, except for per share data**

| | Year ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| Non-cash financing activity | | |
| Dividend payable | $ 14,454 | $ 15,670 |
| Shareholders' loan | $ 5,546 | $ - |
| Right-of-use assets from operating leases | $ - | $ 4,337 |

The accompanying notes are an integral part of the consolidated financial statements.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

## NOTE 1: - GENERAL

a. Papaya Gaming Ltd. ("Papaya") was incorporated in Israel in March 2016 and commenced operations in July 2016. Papaya has wholly owned subsidiaries (collectively "the Company"): US, organized in July 2016 ("US Subsidiary"), India, organized in November 2021 ("Indian Subsidiary"), Poland, organized in January 2023 ("the Polish Subsidiary") UK, organized in June 2024 ("UK Subsidiary"), Brazil, organized in July 2024 ("Brazil Subsidiary") and an Israeli company, organized in August 2024 ("Papaya Stars").

b. The Company distributes its developed mobile games to the end customer through Digital Storefronts. Within these Digital Storefronts, users can download the Company's free-to-play games. The Company provides a free mobile gaming platform (the "Platform") that facilitates in-game short-duration tournaments for real and virtual money and allows players to win real cash prizes. The Company charges a fee for each tournament entry with real cash.

## NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements were prepared in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP").

a. Financial statements in U.S. dollars:

The Company's management believes that the United States dollar ("U.S. dollar") is the currency of the primary economic environment in which the Company operates. Thus, the functional and reporting currency of the Company is the U.S. dollar. Accordingly, monetary accounts maintained in currencies other than the U.S. dollars are re-measured into U.S. dollars in accordance with Accounting Standards Codification ("ASC") No. 830 "Foreign Currency Matters". All transaction gains and losses of the re-measurement of monetary balance sheet items are reflected in the statements of comprehensive income as financial income or expenses as appropriate.

b. Use of estimates:

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions. The Company's management believes that the estimates, judgments and assumptions used are reasonable based upon information available at the time they are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

c. Principles of consolidation:

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated upon consolidation.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

d. Cash and cash equivalents:

Cash and cash equivalents are comprised of highly liquid investments, including deposits in banks with original maturities of three months or less. Cash equivalents include investments in term deposits and money market instrument (U.S. treasury bills) that can be redeemed immediately at the current net asset value.

e. Short-term deposits:

Short-term deposits include bank deposits with maturities of more than three months but less than one year.

f. Short-term restricted deposits:

Short-term restricted deposits with maturities of less than a year. Short-term restricted deposits are short-term deposits which are restricted as collateral for financial institutions in respect of fulfillments of forward contract.

g. Long-term restricted deposits:

Long-term restricted deposits with maturities of more than a year. The restricted deposits are used as lease's agreements guarantees.

h. Investments in marketable securities:

The Company accounts for investments in debt securities in accordance with ASC 320, "Investments - Debt Securities" and ASC No. 326, "Financial Instruments - Credit Losses". Management determines the appropriate classification of its investments in debt securities at the time of purchase and re-evaluates such determinations at each balance sheet date.

Marketable securities classified as "available-for-sale" ("AFS") are carried at fair value. Unrealized gains and losses are reported in a separate component of shareholders' equity in accumulated other comprehensive income, net of taxes. Gains and losses are recognized when realized, on a specific identification basis, in the Company's consolidated statements of income.

For each reporting period, the Company evaluates whether declines in fair value below the amortized cost are due to expected credit losses, as well as the Company's ability and intention to hold the investment until a forecasted recovery occurs, in accordance with ASC 326. Allowance for credit losses on AFS debt securities are recognized as a charge in financial income, net, on the consolidated statements of comprehensive income, and any remaining unrealized losses, net of taxes, are included in accumulated other comprehensive income. As of December 31, 2024, no credit losses have been recorded.

All the Company’s securities are available to support current operations and the Company may sell these debt securities prior to their stated maturities.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

i. Concentration of credit risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, short-term and long deposits, account receivables, marketable securities and foreign currency derivative contracts.

The Company's cash, cash equivalents, short-term and long-term deposits are invested in deposits and money market instruments, mainly in dollars with major international banks. Generally, these deposits may be redeemed upon demand and therefore bear minimal risk.

The Company's account receivables are stated at the amount the Company expects to collect from payment processors, which include an allowance for credit losses, if appropriate. These receivables arise, primarily, due to process timing between when a user deposits and when the Company receives that deposit from the payment processor. The Company performs ongoing credit evaluations of its receivables and record an allowance for credit losses based on the Company's assessment of the probability of the non-payment of the receivable.

The Company's marketable securities include investment in U.S. Treasuries.

The Company enter into foreign currency forward contracts intended to protect cash flows resulting from payroll expenses against the volatility in value of forecasted non-dollar currency. The derivative instruments hedge a portion of the Company's non-dollar currency exposure.

j. Derivative Financial Instruments:

The Company's risk management strategy includes the use of derivative financial instruments to reduce the volatility of earnings and cash flows associated with changes in foreign currency exchange rates.

ASC 815, "Derivatives and Hedging" ("ASC 815"), requires the Company to recognize all of its derivative instruments as either assets or liabilities on the balance sheet at fair value. The accounting for changes in the fair value (i.e., gains or losses) of a derivative instrument depends on whether it has been designated and qualifies as part of a hedging relationship and further, on the type of hedging relationship. For those derivative instruments that are designated and qualify as hedging instruments, an entity must designate the hedging instrument, based upon the exposure being hedged, as a fair value hedge, cash flow hedge or a hedge of a net investment in a foreign operation.

Gains and losses on derivatives instruments that are designated and qualify as a cash flow hedge (i.e., hedging the exposure to variability in expected future cash flows that are attributable to a particular risk), are recorded in accumulated other comprehensive income (loss) and reclassified into the statement of income in the same accounting period in which the designated forecasted transaction or hedged item affects earnings.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

The Company entered into forward contracts to hedge a portion of anticipated New Israeli Shekel ("NIS") payroll and benefit payments. These derivative instruments are designated as cash flow hedges, as defined by ASC 815 and accordingly are measured at fair value. These transactions are effective and, as a result, gain or loss on the derivative instruments are reported as a component of accumulated other comprehensive income (loss) and reclassified as payroll expenses, at the time that the hedged income/expense is recorded.

The Company currently hedges its exposure to the variability in future cash flows for a maximum period of one year. As of December 31, 2024, the Company expects to reclassify all of its unrealized gains and losses from accumulated other comprehensive income to earnings during the next twelve months.

The fair value of the Company's outstanding derivative instruments at December 31, 2024 and 2023 is summarized below:

| | Balance sheet line item | Fair value of derivative instruments December 31, 2024 | 2023 |
|---|---|---|---|
| Derivative assets: | | | |
| Foreign exchange forward contracts | Prepaid expenses and other current assets | $ 733 | $ 597 |
| Derivative Liabilities: | | | |
| Foreign exchange forward contracts | Other accounts payable and accrued expenses | $ (187) | $ - |

Derivative instrument gains and losses

The following table sets forth the gains or (losses) from derivatives instruments included in the consolidated statements of comprehensive income:

| | December 31, 2024 | 2023 |
|---|---|---|
| Cost of revenues | 32 | (99) |
| Research and development | 191 | (567) |
| Sales and marketing | 41 | (123) |
| General and administrative | 48 | (147) |

k. Property and equipment:

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is calculated by the straight-line method over the estimated useful lives of the assets at the following annual rates:

| | % |
|---|---|
| Computers and electronic equipment | 33 |
| Office furniture and equipment | 7-15 |
| Leasehold improvements | Over the shorter of related lease period or the life of the improvement |

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

l. Intangible assets:

Intangible assets consist of domain name costs and capitalized costs related to internal-use software. Domain name costs are amortized over their useful lives of 10 years using the straight-line method. Capitalized internal-use software costs are amortized over their useful lives of 3 years using the straight-line method

m. Internal-use Software

For development costs related to internal use software projects, the Company capitalizes costs incurred during the application development stage. Costs related to preliminary project activities and post implementation activities are expensed as incurred. Amortization of the costs of software developed for internal use begins when the assets are placed in productive use and are amortized over a period of three years.

The Company capitalized $1,002 and $0 during the years ended December 31, 2024, and 2023, respectively.

The Company recognized $40 and $0 amortization expense during the years ended December 31, 2024 and 2023, respectively.

n. Impairment of long-lived assets:

The Company's long-lived assets include property and equipment, ROU assets and intangible assets which are reviewed for impairment in accordance with ASC 360, "Property Plant and Equipment ("ASC 360"), whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less selling costs.

During the years ended December 31, 2024, and 2023, no impairment losses have been identified.

o. Severance Pay:

Pursuant to Section 14 of Israel's Severance Compensation Law, 1963 ("Section 14"), all of the Company's employees in Israel are included under this section and entitled only to monthly deposits, at a rate of 8.33% of their monthly salary, made in their name with insurance companies. Payments in accordance with Section 14 release the Company from any future severance payments in respect of those employees.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

As a result, the related obligation and amounts deposited on behalf of such obligation are not stated on the balance sheet, as the Company is legally released from severance obligation to employees once the amounts have been deposited, and the Company has no further legal ownership on the amounts deposited.

Severance pay expenses for the years ended December 31, 2024 and 2023 amounted to $2,455 and $1,601, respectively.

p. Leases:

Under Topic 842, the Company determines if an arrangement is a lease at inception. ROU assets and lease liabilities are recognized at commencement date based on the present value of remaining lease payments over the lease term. For this purpose, the Company considers only payments that are fixed and determinable at the time of commencement. As most of the Company leases do not provide an implicit rate, the Company uses its incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments. The incremental borrowing rate is estimated to approximate the interest rate on a collateralized basis with similar terms and payments. The ROU asset is recorded net of any lease incentives received. The lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise such options. The Company's lease agreements may contain variable costs such as common area maintenance, insurance, real estate taxes or other costs. Variable lease costs are expensed as incurred on the consolidated statements of income.

The Company elected to combine its lease and non-lease components for car leases and to not recognize a lease liability and a right-of-use ("ROU") asset on the balance sheet for leases with a term of twelve months or less. The Company recognizes the associated lease payments in the consolidated statements of income on a straight-line basis over the lease term.

q. Revenues recognition:

Revenue is recognized in accordance with ASC Topic 606, "Revenue from Contracts with Customers" ("ASC 606") when, or as, control of the promised goods or services is transferred to the customer, and in an amount that reflects the consideration the Company is contractually due in exchange for those services or goods. The Company follows five steps to record revenue under ASC 606: (i) identify the contract with a customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, (iv) allocate the transaction price to the performance obligations in the contract, and (v) recognize revenue when (or as) the Company satisfies its performance obligations.

The Company primarily generates its revenues from entry fees collected associated with its online games. The Company concluded that a contract with a customer exists only when users pay an entry fee to enter a tournament. Contracts with Platform users are treated as day-to-day (or a tournament-to-tournament) contracts, as the parties do not have enforceable rights and obligations beyond the services already provided.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

To drive traffic to its Platform, the Company provides its Platform users with a Bonus Cash – a promotional incentive that cannot be withdrawn and can only be used by users to enter into paid entry fee contests (matches with cash entry fee).

The Company has identified the following performance obligations:

1. Hosting tournaments and awarding players - The Company's Platform facilitates in-game tournaments for real and virtual money and allows players to win real cash prizes. When users access the Company's Platform, they have a valid expectation that the Company will operate contests or games ("Tournaments") and award prizes or payouts to users based on the results ("Awards"). The Company recognized revenue at a point in time, at the end of the respective tournament.

2. Withdrawal of Funds from User's Balance - The Company provides its users with administration service for their deposit accounts, which includes presenting the user's cash balance (which consists of users' deposits, users' winnings, and any Bonus Cash amounts) on the Company's platform, as well as enabling users to withdraw any of their real-cash balance existing in their account (whether the balance consists of users' deposits or winnings, but excluding any Bonus Cash amounts). The Company collects a withdrawal fee upon each withdrawal. The Company recognized revenues upon users' withdrawal.

In some cases, the Company may host a tournament in which the total cost of prizes to be distributed is higher than the entry fees paid by users. The Company has concluded that tournaments hosted via its Platform shall be accounted for as gaming-related activities and therefore reported as a component of net gaming revenue.

The contract liability (i.e., deferred revenue) primarily relate to contracts where the Company has received payment from its users but has not yet satisfied the related performance obligations.

r. Research and development:

Research and development costs relate primarily to employee costs associated with game development and enhancement costs that do not meet internal-use software capitalization criteria. Therefore, such costs are expensed as incurred.

s. Warrants to purchase preferred shares:

The Company accounts for freestanding warrants to purchase shares of its convertible preferred stock as a liability on the statements of the financial positions at fair value pursuant to ASC 480. Following the guidance of ASC-480 the warrants were required to be classified as a liability.

The warrants to purchase preferred shares are subject to re-measurement to fair value at each statement of the balance sheet date and any change in fair value is recognized as a component of financial income, net, in the consolidated statements of comprehensive income.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

t. Income taxes:

The Company accounts for income taxes in accordance with ASC-740, "Income Taxes" ("ASC-740"). ASC-740 prescribes the use of the liability method whereby deferred tax assets and liability account balances are determined based on differences between the financial reporting and the tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company provides a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value, and if it is more likely than not that a portion or all of the deferred tax assets will not be realized.

The Company implements a two-step approach to recognize and measure uncertain tax positions. The first step is to evaluate the tax position taken or expected to be taken in a tax return by determining if the weight of available evidence indicates that it is more likely than not that, on an evaluation of the technical merits, the tax position will be sustained on audit, including resolution of any related appeals or litigation processes. The second step is to measure the tax benefit as the largest amount that is more than 50% (cumulative probability) likely to be realized upon ultimate settlement.

u. Share-based Compensation:

The Company accounts for Share-based compensation in accordance with ASC-718 "Compensation - Stock Compensation" ("ASC-718"), which requires the measurement and recognition of compensation expense based on estimated fair values for all share-based payment awards made to employees and directors. ASC-718 requires companies to estimate the fair value of equity-based payment awards on the date of grant using the Black-Scholes option pricing model. The Company records the resulting expense in the consolidated Statements of comprehensive income using the straight-line method over the period of service required to vest in the award. The Company accounts for forfeitures as they occur.
The Black-Scholes option pricing model requires the input of highly subjective assumptions, including the fair value of the underlying ordinary shares, the expected term of the option, the expected volatility of the price of the Company’s ordinary shares, risk-free interest rates, and the expected dividend yield of ordinary shares. The assumptions used to determine the fair value of the option awards represent management’s best estimates. These estimates involve inherent uncertainties and the application of management’s judgment. The related share-based compensation expense is recognized on a straight-line basis over the requisite service period of the awards, including awards with graded vesting where there are no additional conditions for vesting other than service conditions. Forfeitures are accounted for as they occur.

v. Fair Value of Financial Instruments:

The following methods and assumptions were used by the Company in estimating fair value disclosures for financial instruments.

The carrying amounts of cash and cash equivalents, short-term restricted deposit, short term deposit, accounts receivable, other receivable and prepaid expenses, accounts payables and other accounts payable approximate their fair value due to the short-term maturity of such instruments.

**NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

The Company applies ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820") for valuing financial instruments. Under this standard, fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

In determining fair value, the Company uses various valuation approaches. ASC 820 establishes a hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company.

Fair value measurements are classified and disclosed in one of the following three categories:

Level 1- Valuations based on quoted prices in active markets for identical assets that the Company has the ability to access. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

Level 2 - Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

w. Legal contingencies:

The Company is currently involved in various claims and legal proceedings. The Company reviews the status of each matter and assesses its potential financial exposure. If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss.

x. Sales and marketing expenses

Sales and marketing expenses are charged to expense as incurred. Sales expenses mainly consist of user acquisition costs which amounted to $341,654 and $275,811 for the years ended December 31, 2024 and 2023, respectively.

y. Comprehensive income:

The Company accounts for comprehensive income in accordance with ASC 220, "Comprehensive Income". Comprehensive income generally represents all changes in shareholders' equity during the period except those resulting from investments by, or distributions to, shareholders. Other comprehensive income for the Company relates to gains and losses on hedging derivative instruments and unrealized gains and losses on available for sale marketable securities.

## NOTE 2: - SIGNIFICANT ACCOUNTING POLICIES (Cont.)

z. Preferred Shares:

Until June 28, 2023, the Company classified issued Convertible Preferred Seed Shares outside of shareholders' equity in the accompanying consolidated balance sheets as the requirements of triggering a deemed liquidation event are not within the Company's control. In the event of a deemed liquidation event, the proceeds from the event are distributed in accordance with liquidation preferences.

On June 28, 2023, the Company declared a dividend amount of $28,000 which resulted in payment in full of the preferred shares liquidation preference and as such the preferred shares are no longer contingently redeemable. Therefore, as of June 28, 2023, the outstanding Preferred Seed Shares, amounting to $5,636, were reclassified to equity.

aa. Treasury stock:

The Company repurchased its ordinary shares from shareholder and holds such shares as Treasury shares. The Company presents the cost of repurchased treasury shares as a reduction of shareholders' equity.

ab. Recently adopted accounting pronouncements:

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments, which replaces the existing incurred loss impairment model with an expected credit loss model and requires a financial asset measured at amortized cost to be presented at the net amount expected to be collected. The guidance is effective for the Company beginning January 1, 2023, and interim periods therein. The guidance did not have a material effect on the consolidated financial statements.

## NOTE 3: - CASH AND CASH EQUIVALENTS

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Cash | $ 32,364 | $ 51,520 |
| Term deposits | 4,200 | 25,947 |
| Money market instruments | 9,977 | 57,620 |
| Total cash and cash equivalents | $ 46,541 | $ 135,087 |

## NOTE 4: - PREPAID EXPENSES AND OTHER CURRENT ASSETS

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Government institutions | $ 2,372 | $ 2,272 |
| Prepaid expenses | 7,982 | 1,658 |
| Receivables on account of shares | - | 20 |
| Derivative financial instruments | 733 | 597 |
| Others | 245 | 58 |
| Total prepaid expenses and other current assets | $ 11,332 | $ 4,605 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

## NOTE 5:- MARKETABLE SECURITIES

The following table summarizes amortized costs, gross unrealized gains and losses and estimated fair values of available-for-sale marketable securities as of December 31, 2024, and 2023:

| | Amortized cost | | Gross unrealized gains | | Gross unrealized losses | | Estimated fair value (Level 2 within the fair value hierarchy) | |
|---|---|---|---|---|---|---|---|---|
| | December 31, | | December 31, | | December 31, | | December 31, | |
| | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 |
| U.S. Treasuries | 70,442 | 66,726 | 377 | 371 | - | - | 70,819 | 67,097 |
| | 70,442 | 66,726 | 377 | 371 | - | - | 70,819 | 67,097 |

The scheduled maturities of available-for-sale marketable securities as of December 31, 2024, are as follows:

| | Amortized cost | Estimated fair value |
|---|---|---|
| Due within one year | 70,442 | 70,819 |
| Due after one year through five years | - | - |
| | 70,442 | 70,819 |

## NOTE 6: - PROPERTY AND EQUIPMENT, NET

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Computers and electronic equipment | $ 2,307 | $ 1,651 |
| Office furniture and equipment | 894 | 824 |
| Leasehold improvements | 399 | 285 |
| Property and equipment, cost | 3,600 | 2,760 |
| Accumulated depreciation | (1,299) | (713) |
| Total property and equipment, net | $ 2,301 | $ 2,047 |

Depreciation expenses related to property and equipment were $586 and $428 in the years ended December 31, 2024 and 2023, respectively. In 2023, the Company wrote off property and equipment amounting to $179, net, following a move into the Company's new offices. In 2024, the Company sold a property and recognized a capital loss of $5.

## NOTE 7: - INVESTMENT IN CONVERTIBLE NOTE

On April 3, 2023, the Company invested $150 in Mobius Ltd. (“Mobius”), a company incorporated in Israel. The investment was done as SAFE investment (Simple Agreement for Future Equity). The convertible notes have a maturity date of two years and do not bear interest.

The terms of the convertible notes provide that in the event of equity financing (a round of at least $2,000) the convertible notes will automatically convert into Safe Preferred Shares of Mobius at a 20% discount to the fair value of the shares. In the event of a liquidation before the SAFE's termination, the Company will be entitled to receive a portion of proceeds equal to the greater of: a) the invested amount in cash; or b) the amount payable on the number of Ordinary shares equal to the invested amount divided by the liquidity price (as defined in the agreement). If the SAFE has not been converted by the maturity date, thereafter, the Company may, at its sole discretion, convert the investment into the then most senior shares.

As Mobius is a private, closely held company, there is no active market for this investment. Therefore, the Company measures the investment at cost until there is a third-party evidence for change in value (i.e. new investment round).

## NOTE 8: - OTHER ACCOUNT PAYABLES AND ACCURED EXPENSES

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Accrued expenses | $ 23,121 | $ 5,162 |
| Employees and payroll accruals | 11,972 | 9,790 |
| Tax accruals | 1,741 | 8,760 |
| Derivative financial instruments | 187 | - |
| Sales tax provision | 5,408 | 8,293 |
| | $ 42,429 | $ 62,005 |

## NOTE 9: - CREDIT LINE

On September 20, 2023, the Company entered into a Line of Credit Agreement (“the Agreement”) with a banking institution (the “Bank”). Under the Agreement, the Bank provides the Company with a long-term line of credit of up to $20,000, subject to the terms and conditions outlined in the Agreement. The credit line is available for two years.

The credit line is to provide long-term loans, each with a minimum amount of $5,000, for a term of three years. The principal amount bears an annual interest rate of the SOFR interest rate plus 6%. The principal amount is to be repaid in 24 monthly installments, commencing 364 days after the provision of the respective long-term loan. Interest is to be paid in 36 monthly installments, starting from the date the long-term loan is provided. The facility commitment fees of $100 were recorded in the consolidated statements of comprehensive income under financial income, net.

As of December 31, 2024 and 2023, the Company has not utilized the credit line.

## NOTE 10: - WARRANTS LIABILITIES

On August 11, 2020, and November 4, 2020, as part of the Loan and Security Agreement and its Amendment from August 11, 2020, and March 11, 2021 respectively, the Company issued to Silicon Valley Bank (SVB) (hereinafter – "the Lender") warrants to purchase Preferred Seed shares of the Company in an aggregate amount of $96, subject to adjustments in accordance with the warrant agreement. Following the closing of the Preferred Seed Round, the warrants amount will be converted into Company's Preferred Seed Shares at a conversion price equals to the share price of the Preferred Seed Shares. The warrant will be available to the lender for 15 years with an option of early expiration in event of Company's insolvency.

As of December 31, 2024, and 2023, the Company evaluated the fair value of the warrant liability to amount of $2,514 and $1,886, respectively. During the years ended December 31, 2024, and 2023, the Company recorded finance expenses of $628 and $573, respectively due to the remeasurement of the warrant's liabilities.

## NOTE 11: - COMMITMENTS AND CONTINGENCIES

The commitments and contingencies of the Company's hosting services as of December 31, 2024, were as follows:

| | | |
|---|---|---|
| 2025 | $ | 5,258 |
| 2026 | | 4,779 |
| 2027 | | 2,422 |
| | $ | 12,459 |

Legal Proceeding:

On March 4, 2024, Skillz Platform Inc. ("Skillz"), a competitor of the Company, filed a suit against the Company in federal district court in New York, alleging that the Company engaged in false advertising. The Company disputes the allegations in Skillz's complaint. The Company filed an answer and counterclaims on August 5, 2024, and subsequently filed amended counterclaims on September 23, 2024. As the case is in the preliminary stages, the Company cannot estimate what impact, if any, the litigation may have on its results of operations, financial condition, or cash flows.

On March 27, 2024, a former Company's consumer filed a suit in a federal district court in New York on behalf of a purported class of similarly situated individuals, alleging that the Company made misrepresentations to consumers. The Company disputes the allegations in this complaint. On August 23, 2024, the Company filed a motion to compel arbitration, which was granted by the court on December 17, 2024. On February 13, 2025, the former consumer filed an individual arbitration demand against the Company. The Company filed its response on April 4, 2025. The parties are in the process of selecting an arbitrator. As the case is in the preliminary stages, the Company cannot estimate what financial impact, if any, the individual arbitration may have.

In April 2024, Kind Law, began soliciting mass arbitration claims against the Company on internet platforms regarding alleged false advertising. On June 5, 2024, following mediation, the Company and Kind Law reached an agreement in principle to resolve all claims in consideration for paying $0.195 in bonus cash per claimant and additional $350 in attorneys fee. The parties executed a settlement agreement on September 10, 2024. On November 26, 2024, the parties signed an amendment, under which each claimant could elect to receive either $0.195 in bonus cash or $0.121 in cash and additional approximately $330 in attorneys fees. The settlement has been paid (totaling $365), and the matter was closed.

**NOTE 11: - COMMITMENTS AND CONTINGENCIES (Cont.)**

In May 2024, Milberg Coleman Bryson Phillips Grossman ("Milberg") began soliciting mass arbitration claims against the Company on internet platforms regarding alleged false advertising. Milberg and the Company agreed to engage in mediation, which the parties held on September 5, 2024. The parties reached an agreement in principle to resolve U.S. consumer claims on a class-wide basis. On December 10, 2024, plaintiffs represented by Milberg filed a class action complaint against the Company in California Superior Court in the County of Los Angeles. On January 22, 2025, the plaintiffs filed an unopposed motion for preliminary approval of a class-wide settlement resolving all claims and issues in the action for a total settlement amount of US$15,000. The court scheduled a July 29, 2025, hearing on that motion. Third parties can object to the proposed settlement and the court has the discretion to approve, modify, or reject the settlement terms. The Company cannot predict with certainty whether third parties will raise objections and, if so, the substance of any objections (one law firm has already filed a motion for leave to intervene in this litigation); whether the court will approve the settlement terms and, if so, any conditions of approval; or the timing of the court's decision.

On March 14, 2025, the Company filed a complaint against Fair Play For Mobile Games, Josh Levin, Square Strategies LLC, Lacie Newton, and Assemble the Agency LLC. On April 4, 2025, the Company filed an amended complaint against those same defendants, as well as Mavan Group, Inc. and Valor Public Strategies LLC (collectively, "Defendants"). The amended complaint alleges that Defendants unlawfully fabricated and disseminated consumer complaints that falsely represented that consumers had complained about alleged misleading representations, as well as that Defendants improperly obtained confidential business information from former Company employees under false pretenses. On May 2, 2025, Defendants moved to dismiss the amended complaint. The Company's responses to those motions are due May 30, 2025, and Defendants' replies are due June 13, 2025. The court has scheduled a June 20, 2025, hearing on the motions. It is impossible to predict the outcome of the case.

On November 21, 2023, the Attorney General of New Jersey sent a subpoena to an affiliate of the Company (Papaya Gaming, Inc.) as part of a civil investigation under the New Jersey Consumer Fraud Act. The subpoena seeks documents and statements under oath. Since then, the Company has been cooperating with the NJ AG and provided it with document productions on a rolling basis. As the case is in the preliminary stages, the Company cannot estimate what impact, if any, the litigation may have on its results of operations, financial condition, or cash flows.

**NOTE 12: - LEASES**

The Company's leases include office real estate for its facilities, which are all classified as operating leases and the latest expire in June 2032 (including extension option that is reasonably certain to be exercised).

Operating lease expenses for the years ended December 31, 2024, and 2023 were $2,895 and $2,672, respectively. Cash paid for amounts included in the measurement of operating lease liabilities was $2,256 and $2,384 during the years ended on December 31, 2024, and 2023, respectively.

The following is a summary of weighted average remaining lease terms and discount rates for the Company's operating leases as of December 31, 2024:

| | |
|---|---|
| Weighted average remaining operating lease term (years) | 7.47 |
| Weighted average discount rate operating lease | 5.32% |

**NOTE 12: - LEASES (Cont.)**

On August 24, 2023, the Company entered into a new additional office floor lease agreement in Israel for a lease period ending September 30, 2027, with an extension option of an additional 5 years.

The maturities of lease liabilities as of December 31, 2024, are as follows:

| | | |
|---|---|---|
| 2025 | $ | 2,999 |
| 2026 | | 2,999 |
| 2027 | | 3,093 |
| 2028 | | 3,254 |
| 2029 and thereafter | | 11,566 |
| Total undiscounted cash flows | | 23,911 |
| Less: imputed interest | | (4,072) |
| Present value of lease liabilities | $ | 19,839 |

Supplemental balance sheet information related to leases was as follows:

| | | Year ended December 31, 2024 |
|---|---|---|
| Current maturities of operating leases | $ | 2,681 |
| Long-term operating leases | | 17,158 |
| Total operating lease liabilities | $ | 19,839 |

**NOTE 13: - CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' EQUITY**

a. Ordinary shares:

Ordinary shares confer upon their holders voting rights, rights to receive a distribution of assets upon liquidation and certain other rights, all as are specified in the Company's certificate of incorporation.

On August 13, 2024, the Company entered into a certain Ordinary Share Purchase agreement with existing shareholder (hereinafter “First Treasury Agreement”). In accordance with the First Treasury Agreement, the Company purchased 11,457 Ordinary Shares, par value NIS 0.01, in consideration for an aggregate amount of approximately $77.

On September 2, 2024, the Company entered into a certain Ordinary Share Purchase agreement with existing shareholder (hereinafter “Second Treasury Agreement”). In accordance with the Second Treasury Agreement, the Company purchased 11,457 Ordinary Shares, par value NIS 0.01, in consideration for an aggregate amount of approximately $77.

**NOTE 13: - CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' EQUITY (Cont.)**

b. Ordinary shares A:

Ordinary A Shares do not confer upon their owners voting rights, rights to receive distribution of assets upon liquidation or any other rights, except in the event of Company's IPO, they will be entitled to enhanced voting rights, all as are specified in the Company's Articles of Association.

On October 7, 2021, the Company issued to its founders 57,010,000 Ordinary shares A, NIS 0.01 per share, with no consideration.

c. Convertible Preferred Seed shares and convertible Preferred Seed-1 shares:

Preferred Seed shares and Preferred Seed-1 shares confer upon their holders the rights conferred by Ordinary shares and in addition, provide anti-dilution rights, dividend preference, veto rights in certain circumstances and other protective rights as specified in the agreements. The liquidation preferences formerly associated with these shares is no longer in effect.

d. Share based compensation

On July 10, 2019, the Board of Directors of the Company adopted the Company's Share Option Plan ("Plan"). Based on the Plan, options may be granted to officers, directors, employees, consultants, service providers and advisors of the Company, and each option will be exercisable for one ordinary share of the Company and will become exercisable at such terms and during such periods as determined by the Board on the date of the grant. Share options expire 10 years after the date of the grant. Based on the Plan, the Company entitle to grant up to 13,447,000 options for ordinary shares. On December 27, 2023, the Company's board of directors approved to increase of ESOP option pool by 1,200,000 options.

On September 16, 2024, the Board of Directors of Papaya Stars adopted the Papaya Stars' Share Option Plan ("Plan"). Based on the Plan, options may be granted to officers, directors, employees, consultants, service providers and advisors of the Papaya Stars, and each option will be exercisable for one ordinary share of the Papaya Stars and will become exercisable at such terms and during such periods as determined by the Board on the date of the grant. Share options expire 10 years after the date of the grant. Based on the Plan, Papaya Stars entitle to grant up to 1,111,111 options for ordinary shares of Papaya Stars.

The fair value for options granted to employees in 2024 and 2023 is estimated at the date of grant using a Black-Scholes-Merton options pricing model with the following weighted average assumptions:

| | Year ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Risk-free interest rate | 3.8%-4.6% | 3.6%-4.2% |
| Expected term (in years) | 5.7-6.1 | 5.13-6.10 |
| Dividend yield | 0% | 0% |
| Volatility | 39.5%-39.9% | 40.2%-30.1% |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

**NOTE 13: - CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' EQUITY (Cont.)**

Although the Company has issued dividends to ordinary shares in the past, it does not have a formal policy or obligation to issue dividends in the future and as such the dividend yield is 0%. The risk-free interest rate assumption is based on observed U.S. Treasury yield curve interest rates in effect at the time of grant appropriate for the expected term of the stock options granted. The expected volatility is based on implied volatility of other comparable publicly traded companies. The Company determined the expected life of the options according to the simplified method, average of vesting and the contractual term of the Company's stock options.

The share-based compensation expense by line item in the accompanying consolidated statements of comprehensive income is summarized as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Cost of revenues | $ 193 | $ 109 |
| Research and development | 1,303 | 1,193 |
| Sales and marketing | 227 | 136 |
| General and administrative | 768 | 1,455 |
| Total share-based compensation expense | $ 2,491 | $ 2,893 |

A summary of the Company's share option activity for the year ended December 31, 2024 and 2023, is as follows:

| | Year ended December 31, 2024 | | Year ended December 31, 2023 | |
|---|---|---|---|---|
| | Number of options | Weighted average exercise price | Number of options | Weighted average exercise Price |
| | Number of shares | | | |
| Outstanding at beginning of year | 2,769,212 | 3.62 | 2,598,432 | 1.68 |
| Granted | 750,772 | 4.63 | 1,444,800 | 4.40 |
| Exercised | (272,745) | 2.40 | (1,178,800) | 0.25 |
| Forfeited | (927,480) | 3.24 | (95,220) | 4.44 |
| Outstanding at end of year | 2,319,759 | 3.60 | 2,769,212 | 3.62 |
| Exercisable at end of year | 958,680 | 2.66 | 586,164 | 3.51 |

As of December 31, 2024, the Company’s unrecognized stock-based compensation expenses related to stock options was approximately $6,157 and are expected to be recognized over a period of up to 4 years.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

**NOTE 13: - CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' EQUITY (Cont.)**

e. The following table summarizes the share capital of the Company:

| | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | Authorized | Issued and outstanding | Authorized | Issued and outstanding |
| Ordinary Shares, 0.01 NIS par value | 401,240,000 | 70,731,386 | 401,240,000 | 70,481,555 |
| Ordinary Shares A, 0.01 NIS par value | 57,010,000 | 57,010,000 | 57,010,000 | 57,010,000 |
| Convertible Preferred Seed Shares, 0.01 NIS par value | 9,000,000 | 8,395,500 | 9,000,000 | 8,395,500 |
| Convertible Preferred Seed-1 Shares, 0.01 NIS par value | 32,750,000 | 32,530,500 | 32,750,000 | 32,530,500 |

f. Warrants:

In June 2023, one of the Company's suppliers had exercised his warrants to purchase 325,500 Ordinary shares at an exercise price of NIS 0.01.

As of December 31, 2024, and 2023, 227 thousands of warrants are outstanding and exercisable, subject to adjustments in accordance with the warrant agreement, as described in Note 10.

g. Dividends:

On June 28, 2023, the Company’s board of directors approved a dividend distribution of $28,000. The dividend was fully paid during 2023.

On September 4, 2023, the Company’s board of directors approved a dividend distribution of $20,000. The dividend was fully paid during 2024.

On December 27, 2023, the Company’s board of directors approved a dividend distribution of $10,000. The dividend was fully paid during 2024.

On June 26, 2024, the Company’s board of directors approved a dividend distribution of $15,000. The dividend was fully paid during 2024.

On December 29, 2024, the Company’s board of directors approved a dividend distribution of $20,000. The dividend was fully paid during 2024 and 2025.

**NOTE 14: - TAXES ON INCOME**

a. Basis of taxation:

The Company is taxed under the domestic tax laws of the jurisdiction of incorporation of each entity. Set out below are details in respect of the jurisdictions where the Company operates:

1. The Company is taxed under the Israeli tax laws.

   The corporate tax rates applicable to 2024 and 2023 is 23%. Capital gain is subject to capital gain tax according to the corporate tax rate in the year the assets are sold.

   The Company applies various benefits allotted to it under the revised Investment Law as per Amendment 73, which includes changes to the Investment Law regimes through regulations that have come into effect from January 1, 2017.

   Applicable benefits under the new regime include:

   - Introduction of a benefit regime for "Preferred Technology Enterprises" ("PTE"), granting a 12% tax rate in central Israel on Technological income deriving from Benefited Intangible Assets, subject to a number of conditions being fulfilled. PTE is defined as an enterprise which meets the aforementioned conditions, and for which total consolidated revenues of its parent company and all subsidiaries are less than NIS 10 billion.

   - A 12% capital gains tax rate on the sale of a preferred intangible asset to a foreign affiliated enterprise, provided that the asset was initially purchased from a foreign resident at an amount of NIS 200 million or more.

   - A withholding tax rate of 20% for dividends paid from PTE income or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be 4%.

   - The Company adopted the PTE status since 2021 and it believes that it is eligible for its tax benefits.

2. The US Subsidiary is taxed under the US tax laws. The Federal tax rates applicable to 2024 and 2023 is 21%.

b. Deferred taxes:

Deferred tax assets are recognized for temporary differences deriving from unrealized gain on marketable securities and hedging, employees' benefits provisions, intangible assets and research and development expenses that are tax deductible.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

**NOTE 14: - TAXES ON INCOME (Cont.)**

The following table presents the significant components of the Company's deferred tax assets:

| | 2024 | 2023 |
|---|---|---|
| Research and development expenses | $ 4,701 | $ 3,491 |
| Intangible assets | (126) | (1) |
| Unrealized gain on marketable securities | (45) | (93) |
| Unrealized gain on hedging | (57) | (72) |
| Accruals and reserves | 238 | 150 |
| Total Deferred tax assets, net | $ 4,711 | $ 3,475 |

c. Tax assessments:

At the time of the approval of these financial statements 2016-2019 are considered as final tax years of Papaya. Papaya is also undergoing a CIT audit for the years 2020 to 2023. As the audit is still in its early stages, the company cannot yet estimate the outcomes or the impact on the financial statements. In July 2023, Papaya signed a VAT assessment agreement with the Israeli VAT authorities for the tax years 2019-2022.

d. Uncertain tax positions:

A reconciliation of the opening and closing balances of total unrecognized tax benefits is as follows:

| | 2024 | 2023 |
|---|---|---|
| Balance as of January 1, 2024 | $ 4,881 | $ - |
| Increases in respect of tax positions related to the current year | 1,740 | 3,198 |
| Decreases in respect of tax positions related to the previous year | (106) | 1,683 |
| Balance as of December 31, 2024 | $ 6,515 | $ 4,881 |

The Company currently does not expect uncertain tax positions to change significantly over the next 12 months, except in the case of settlements with tax authorities, the likelihood and timing of which is difficult to estimate.

As of December 31, 2024, and 2023 the amount of accrued interest associated with these positions totaled $474 and $149, respectively.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

**NOTE 15: - RELATED PARTY**

a. Payables to related party as of December 31, 2024 and 2023 consist of the following:

| | Year ended December 31 | |
|---|---|---|
| | 2024 | 2023 |
| Payables – shareholders (1) | $ 2,438 | $ 3,018 |
| Shareholders' loan - shareholders (2) | $ - | $ 5,190 |
| Dividend payable | $ 14,454 | $ 15,670 |

(1) Trade payables and other accounts payable and accrued expenses balances are due on demand and include amounts for consulting agreements with the founders of the company for consulting services and annual bonuses.
(2) A loan to the shareholders, including interest incurred. (See also Note 15c)

b. Transactions with related parties as of December 31, 2024, and 2023 are due on demand and consist of the following:

| | Year ended December 31 | |
|---|---|---|
| | 2024 | 2023 |
| Consulting expenses - shareholders (1) | $ 4,001 | $ 5,235 |
| Interest income - shareholders (2) | $ 279 | $ 180 |

(1) The company's three founders are entitled to a monthly consulting fee and annual bonuses according to their agreements with the company.
(2) Interest income from a loan to the shareholders (See also Note 15c).

c. On September 18, 2022, the Company approved a loan in the total amount of $1,670 to each of its three founders (total of $5,010), the loan carries interest according to section 3(i) of the Israeli Tax Ordinance. In February 2023, the founders withdrew the maximum loan amount. As of December 31,2024, the loan was fully repaid.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**U.S. dollars in thousands, except for per share data**

## NOTE 16. ACCUMULATED OTHER COMPREHENSIVE INCOME

The following table shows a summary of changes in accumulated other comprehensive income, net of tax, for the respective periods:

| | Year ended December 31, 2024 | | |
|---|---|---|---|
| | Unrealized gains (losses) on marketable securities | Unrealized gains (losses) on cash flow hedges | Total |
| Beginning balance | 278 | 525 | 803 |
| Other comprehensive income before reclassifications | 3,222 | 190 | 3,412 |
| Amounts reclassified from accumulated other comprehensive income | (3,216) | (312) | (3,528) |
| Change in deferred taxes | 48 | 15 | 63 |
| Net current-period other comprehensive | 54 | (107) | (53) |
| Ending balance | 332 | 418 | 750 |

| | Year ended December 31, 2023 | | |
|---|---|---|---|
| | Unrealized gains (losses) on marketable securities | Unrealized gains (losses) on cash flow hedges | Total |
| Beginning balance | - | - | - |
| Other comprehensive income before reclassifications | 1,915 | (339) | 1,576 |
| Amounts reclassified from accumulated other comprehensive income | (1,545) | 936 | (609) |
| Change in deferred taxes | (92) | (72) | (164) |
| Net current-period other comprehensive | 278 | 525 | 803 |
| Ending balance | 278 | 525 | 803 |

\- - - - - - - - - - - - -

F:\W2000\w2000\12905601\M\24\E12-Papaya Gaming.docx

## Papaya gaming consolidated FS

| | K'$ 31/12/2025 Unaudited | K'$ 12/31/24 Audited |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 39,714 | $ 46,541 |
| Short-term deposits | 55,800 | 16,500 |
| Short-term restricted deposits | $ 80 | $ 548 |
| Marketable securities, current | 15,369 | 60,842 |
| Account receivable | $ 3,181 | $ 3,781 |
| Prepaid exepnses and other current assets | 12,108 | 11,337 |
| **Total current assets** | **126,252** | **139,549** |
| **NON-CURRENT ASSETS:** | | |
| Long-term restricted deposits | 2,000 | 1,635 |
| Property and equipment, net | 2,088 | 2,301 |
| Intangible assets | 1,447 | 1,568 |
| Operating lease right-of-use asset | 18,116 | 20,396 |
| Convertible note | 200 | 150 |
| Deferred tax assets | 6,006 | 4,711 |
| Marketable securities, non-current | 28,275 | - |
| **Total current assets** | **58,132** | **30,761** |
| **Total assets** | **$ 184,384** | **$170,310** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| AP, other accounts payable and accrued expenses | 57,752 | 56,749 |
| Contract liability | 11,612 | 8,815 |
| Operating lease liabilities, current | 3,107 | 2,681 |
| Dividend payable | 10,000 | 14,454 |
| Warrants liabilities | 2,514 | 2,514 |
| **Total current liabilities** | **84,985** | **85,213** |
| **NON-CURRENT LIABILITIES:** | | |
| Tax provision | 8,754 | 6,515 |
| Operating lease liabilities, long-term | 17,239 | 17,158 |
| **Total liabilities** | **110,978** | **108,886** |
| **SHAREHOLDERS' EQUITY:** | | |
| Ordinary Shares and Ordinary Shares A | 349 | 6 |
| Convertible Preferred Seed Shares and Seed-1 Shares | **) | **) |
| Accumulated other comprehensive income | 366 | 750 |
| Treasury stock | (154) | (154) |
| Additional paid-in capital | 16,602 | 14,558 |
| Capital note | 52 | - |
| Retained earnings | 56,190 | 46,263 |
| **Total shareholders' equity** | **73,405** | **61,423** |
| **Total liabilities and shareholders' equity** | **184,383** | **170,309** |

## Papaya gaming consolidated FS

| | K'$<br>31/12/2025<br>Unaudited | K'$<br>12/31/24<br>Audited |
|---|---|---|
| **Revenues** | 492,952 | 533,120 |
| Cost of revenues | 35,045 | 35,226 |
| **Gross profit** | **457,907** | **497,894** |
| Research and development | 58,966 | 45,263 |
| Sales and marketing | 322,490 | 365,955 |
| General and administrative | 54,062 | 41,129 |
| **Total operating expenses** | **435,518** | **452,347** |
| **Operating profit** | **22,389** | **45,547** |
| Financial income, net | 2,563 | 3,092 |
| Other expenses, net | -12 | (4) |
| **Income before tax on income** | **24,964** | **48,643** |
| Income tax expense | 5,038 | 8,718 |
| **Net income** | **19,926** | **39,925** |
| **Other comprehensive income, net of tax** | | |
| Unrealized gain on qualifying cash flow hedge, net of ta: | -54 | (751) |
| Unrealized gain on marketable securities, net of tax | -331 | - |
| **Other comprehensive income, net of tax** | **-385** | **-751** |
| **Comprehensive income** | **19,541** | **39,174** |