# EXHIBIT D

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/09/11**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Hebrew

To:

- English (USA)

The documents are designated as:

- 'Ex parte application for an order to convene a meeting of creditors - July 30 2026 (Hebrew).pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

**Filing date:** July 30, 2026

Tel Aviv–Jaffa District Court
Papaya Gaming Ltd. et al. v. Commissioner of Insolvency – Tel Aviv District
Corporate Insolvency Case 87154-07-26
Case type: Application for an arrangement under Part X of the Insolvency Law
Date opened: July 30, 2026
Confidentiality level: Closed to the public, accessible to Party A

**IN THE DISTRICT COURT**
**IN TEL AVIV–JAFFA**

Tel Aviv District Court
July 30, 2026
RECEIVED (100)

**In the matter of:** **Insolvency and Economic Rehabilitation Law, 5778-2018**
**the "Law";**

**And in the matter of:** **Insolvency and Economic Rehabilitation Regulations, 5779-2019**
**the "Regulations";**

**And in the matter of:** **1. Papaya Gaming Ltd., Company No. 515422095**
35 HaMasger Street, Tel Aviv–Jaffa 6721407

**2. Papaya Gaming Inc.**
A company incorporated in the State of Delaware, United States
Both represented by attorneys Pini Yaniv (Bar No. 15378) and/or Liron Sapir (Bar No. 66525) and/or Yarden Tal-Dahan (Bar No. 90826) and/or Yarin Nahaisi (Bar No. 102568) and/or others
of Meitar | Law Offices
16 Abba Hillel Silver Road, Ramat Gan 5250608
Tel.: 03-6103100; Fax: 03-6103111; Email: yardent@meitar.com
**the "Applicants";**

**And in the matter of:** **Commissioner of Insolvency Proceedings and Economic Rehabilitation – Tel Aviv–Jaffa District**
2 HaShlosha Street, Tel Aviv–Jaffa
Tel.: 073-3923222; Fax: 02-6467556
**the "Commissioner";**

Filing fee payable: NIS 1,656, pursuant to item 10A of the Schedule to the Courts Regulations (Fees), 5767-2007.

# Application for an Order Convening Meetings for Approval of a Debt Arrangement

**(Pursuant to Part X of the Insolvency and Economic Rehabilitation Law, 5778-2018)**

This application is submitted for approval of an arrangement between the Applicants, Papaya Gaming Ltd. ("Papaya Israel") and Papaya Gaming Inc. ("Papaya US") (collectively, the "Applicants"), and a particular class of creditors: (a) contingent, potential creditors pursuing legal proceedings against the Applicants that are pending before various courts, on causes of action related to or arising directly or indirectly from alleged practices involving the past use of bots; (b) a creditor that pursued proceedings and obtained a judgment in the United States, subject to an appeal to be filed shortly; and (c) creditors having grounds to pursue such proceedings.

The Applicants have ongoing, profitable business operations. Accordingly, the arrangement does not concern trade creditors arising in the ordinary course of business. Such creditors, including suppliers and employees, are excluded from the arrangement, and no meetings of creditors of this type are sought.

Accordingly, the Applicants respectfully request that this Court exercise its authority under the Insolvency and Economic Rehabilitation Law, 5778-2018 (the "**Law**"), the Insolvency and Economic Rehabilitation Regulations, 5779-2019 (the "**Regulations**"), and all applicable law, and grant the following relief:

**(a) Appoint an arrangement administrator and, at this stage, vest the administrator with the powers specified in Sections 319M and 326 of the Law.**

**(b) Direct all Contingent Creditors (as defined in the arrangement attached as an exhibit to this application) to file proofs of claim with the arrangement administrator within 21 days after the administrator's appointment.**

**(c) Direct that the notice inviting proofs of claim be published in the press in Israel and the United States, as specified in the body of this application, and on the Commissioner's website;**

**(d) Direct that the application be personally served only on the Known Contingent Creditors, as defined in the debt arrangement, and on the secured creditor; and exempt the Applicants from personal service of the application on the Excluded Creditors, even if they are material creditors, because they are not affected by this debt arrangement.**

**(e) Order that meetings of the Contingent Creditors (as defined in the arrangement) be convened within 14 days after the deadline set for filing proofs of claim, to put the proposed arrangement to a vote pursuant to Sections 321 and 322 of the Law.**

**(f) Order that a Contingent Creditor that fails to file a proof of claim by the above deadline shall not be entitled to file proofs of claim under the arrangement, participate in any distribution to creditors in these proceedings, or receive any dividend thereunder, and shall have no claim, demand, or cause of action against the Applicants in connection with its debt.**

| Yarin Nahaisi, Attorney<br>Bar No. 102568 | Yarden Tal-Dahan, Attorney<br>Bar No. 90826 | Liron Sapir, Attorney<br>Bar No. 66525 | Pini Yaniv, Attorney<br>Bar No. 15378 |
|---|---|---|---|

**Meitar | Law Offices**
Counsel for the Applicants

**The grounds for this application are as follows:**

## A. Introduction

1. The Applicants are Papaya Israel, an Israeli private company, and Papaya US, a wholly owned subsidiary of Papaya Israel. Papaya Israel develops and markets skill-based mobile games using a unique platform it developed that allows players to win real money. The platform serves approximately one million unique players daily and approximately four million unique players monthly, running approximately 15 million tournaments each day.

2. Papaya Israel consistently delivers impressive business and financial results, including annual revenues of approximately half a billion dollars (approximately $500,000,000). The Applicants meet all their obligations to suppliers, service providers, and employees in full and on time.

3. Despite this, and perhaps precisely because of it, a business competitor of the Applicants, Skillz Platform Inc. ("**Skillz**"), commenced legal proceedings against the Applicants, as it has against other competitors in this market, in an attempt to exert improper pressure on them and exclude them from the market.

4. Skillz's action against the Applicants was tried before a jury in New York. On April 23, 2026, the jury found that the Applicants were required to pay monetary damages to the plaintiff. On July 27, 2026, the court there issued a decision requiring the Applicants to pay Skillz more than $719 million (the "**Skillz Judgment**" or the "**Judgment**"). For clarity, the proceedings have not yet formally concluded, and the court must take several further steps for that decision to become an operative judgment. These steps are expected to be completed in the coming days.

5. The Applicants intend to appeal the Judgment to the US Court of Appeals. In the assessment of the Applicants and their legal advisers, the Judgment contains significant erroneous determinations, summarized below, such that their prospects of reversing the Judgment, or at least substantially reducing it, are high. There is a substantial legal basis for a successful appeal that could result in a very significant change in the outcome.

6. The amount of the Skillz Judgment exceeds the Applicants' current cash balances. However, the Judgment cannot be enforced in Israel because it does not satisfy the requirements of the Enforcement of Foreign Judgments Law, 5718-1958 (the "**Enforcement of Foreign Judgments Law**"), since it is subject to an appeal to be filed shortly and has not become final and nonappealable.

7. In this context, given the extraordinary amount of the Skillz Judgment—which, although unenforceable in Israel while it remains subject to appeal, exceeds the Applicants' cash balances and could, if and to the extent it becomes enforceable, render the Applicants insolvent—the Applicants are acting in accordance with their duty to take reasonable measures to reduce the extent of insolvency and prevent it. They therefore proactively and in advance seek to propose a debt arrangement under Part X of the Law—an arrangement ensuring full repayment to all creditors and the continuation of their operations—instead of passively awaiting crystallization of the debt and risking collapse.

8. If Skillz is indeed interested in repayment of the debt owed to it (insofar as any such debt remains after the appeal is decided), that is, if it is not motivated by the extraneous and

illegitimate consideration of removing a competitor from the market, then it too (and perhaps it in particular) has a clear and substantial interest in the Applicants' continuing their consistently profitable business operations so that those profits may be used to repay the debt owed to it.

9. In these circumstances, Skillz's potential rights to collect its debt should be preserved if and to the extent the Skillz Judgment becomes enforceable in Israel in the future. It should also be ensured that the Applicants can continue to operate and generate profits, and that those profits are retained to meet all obligations. To that end, the Applicants' profitable operations must be preserved, and the Applicants and their other stakeholders—employees, suppliers, players, Skillz itself, and other contingent creditors pursuing claims against the Applicants—must be protected from enforcement, asset realization, and collection measures that Skillz may take, including against assets outside Israel, and that would cause the Applicants' businesses to collapse.

10. The proposed arrangement appropriately balances these interests and ensures 100% repayment to all of the Applicants' creditors.

11. The Applicants are profitable companies that, as stated, generate very substantial profits each year. The proposed arrangement provides that their available cash balance will be allocated annually to a dedicated fund supervised and administered by an "officer of the court," the arrangement administrator, who will pay from that fund any Contingent Creditor (as defined in the arrangement) holding a judgment enforceable in Israel.

12. The proposed arrangement is the only way to achieve the Law's two overarching objectives, set out in Section 1: "to bring about, to the extent possible, the debtor's economic rehabilitation" and "to maximize the proportion of the debt repaid to creditors." The proposed arrangement provides for repayment of all (100%) of the Applicants' debts, even if over a number of years, under the court-appointed officeholder's supervision. It also ensures the Applicants' economic rehabilitation in a manner that permits their business operations to continue while ensuring continued performance of all their obligations to players, suppliers, service providers, and employees. The arrangement also ensures continued employment for hundreds of employees and the livelihood of many families; uninterrupted service to millions of the Applicants' players worldwide; and continued payment of tens of millions of shekels in taxes to the State treasury each year.

## B. Basic Background

13. Applicant 1, Papaya Israel, is a private company incorporated in Israel in 2016 that develops and markets mobile games based on its unique platform. The platform allows players to compete in multiplayer, prize-bearing tournaments involving games based on skill and ability.

14. These are classic, popular games (such as Solitaire, Bingo, and Bubble), which Papaya Israel turns into cash-prize tournaments, neutralizing the element of chance by creating equal starting and playing conditions for all players, so that the dominant factor determining game results is the player's skill. Players are assigned to tournaments automatically by the platform through an algorithm that allocates them to different tournaments based on their skill level.

15. The unique platform developed by Papaya Israel provides the technological foundation for various games. It serves approximately one million unique players daily and approximately four million unique players monthly in approximately 15 million tournaments a day. This scale of activity reflects its success and its position as the leading company in this market.

16. Papaya Israel delivers impressive business and financial results, including annual revenues of approximately half a billion dollars, operating profit, and net profit. Papaya Israel has met, and continues to meet, all its ongoing obligations to its suppliers, service providers, and employees in full and on time.

17. As part of its global operations, Papaya Israel owns subsidiaries, including a wholly owned subsidiary, Applicant 2, Papaya US, incorporated in Delaware, United States. Papaya US provides fronting services to Papaya Israel (that is, it is the entity that is the signatory to certain material agreements) and performs a technical and operational role in clearing and processing player payments (processing services).

18. Papaya US has no employees at all (other than one individual who serves as a director of Papaya US). Its physical presence in the United States consists solely of a registered mailing address, without offices, and, as stated, it performs only a technical payment-clearing function. It has a US bank account, a security deposit for payment-clearing purposes, and contractual relationships for its operations, and it is seeking a refund from the US tax authorities. In addition, it has a bank account in Israel, and all its activities, without exception, are performed, managed, and operated by Papaya Israel's employees.

19. Furthermore, all of the group's intellectual property, substantive operations, revenues, and tangible assets are owned by Papaya Israel, the Israeli company, and managed by its employees in Israel.

20. Papaya Israel employs approximately 300 employees in Israel who form the backbone of its business and technological operations, including software engineers, technology specialists, product personnel, designers, marketing personnel, and support staff. They have developed and continue to develop the unique platform and games. The livelihood of hundreds of families in Israel depends directly on Papaya Israel's continued existence and operations.

21. Despite their sound financial condition, business success, and consistent profitability, the Applicants' operations now face a significant risk following the Skillz Judgment rendered in the action brought against them by Skillz. After Skillz's attempts to compete fairly in the industry failed, due in part to an inferior product and business model, it began systematically pursuing a strategy of filing lawsuits against its major competitors (described below), with the aim of driving them out of the market and impairing competition.

22. In its action, Skillz alleged that Papaya Israel presented its games misleadingly and engaged in unfair competition (False Advertising). The action proceeded in a federal court in the State of New York. The case was tried before a jury in April 2026, and on April 23, 2026, the jury returned its verdict. On July 27, 2026, the presiding judge issued her decision, requiring the Applicants to pay an amount exceeding $719 million.

23. The Applicants intend to appeal the Judgment to the US Court of Appeals for the Second Circuit, in light of several determinations by the federal court in the State of New York that, in the Applicants' view, are erroneous. This is not the place to address the arguments to be

raised on appeal. However, in the assessment of the Applicants and their legal advisers, the appeal has very good prospects of success, and there is a substantial legal basis for the appeal to succeed.

24. Although Skillz cannot enforce the Judgment in Israel because the law requires a final judgment no longer subject to appeal, pursuant to Section 3(2) of the Enforcement of Foreign Judgments Law, it may try to paralyze the Applicants' operations and cause their collapse through collection and enforcement measures in the United States. In fact, it has already pursued an unsuccessful enforcement proceeding: shortly after the jury's verdict, Skillz aggressively sought a preliminary injunction in the United States to prevent the Applicants from transferring funds to Israel in the ordinary course of their operations. These transfers were intended, among other things, for ongoing payments, such as salaries for hundreds of Papaya Israel employees and payments to the tax authorities. The US court denied that motion, but Skillz may initiate similar proceedings again. Had Skillz, regrettably, succeeded in that unsuccessful enforcement proceeding, the result would have been an immediate halt to the Applicants' profitable operations and substantial harm to their creditors, hundreds of employees, and third parties, as well as to their ability to repay the debt owed to Skillz itself.

25. Hence this application, without, of course, detracting from the fact that the foreign Judgment is not enforceable in Israel at all.

26. In parallel, the Applicants intend to seek recognition in the United States of the Israeli proceeding as a "foreign main proceeding." To that end, a separate application concerning the appointment of a "foreign representative" (Foreign Representative) is being filed concurrently with this application.

27. It bears emphasis that, apart from their exposure under the Skillz Judgment, the Applicants are not insolvent or in financial distress; quite the contrary. They continue to operate very profitably and pay all obligations to suppliers, employees, and service providers regularly and on time, including after the Skillz Judgment was issued.

28. **As to this Court's jurisdiction over the Applicants**, this Court has jurisdiction to grant the requested orders under Section 319(1) of the Law, because both Applicants constitute a "corporation." The definition of "corporation" in the Law refers to the definition of "company" in the Companies Law, 5759-1999 (the "**Companies Law**"), in which "company" also includes a "foreign company," namely, a company incorporated outside Israel.

29. Alternatively and additionally, this Court's jurisdiction is also firmly grounded in Section 5(b) of the Law, since Papaya Israel is a company registered in Israel, while Papaya US conducts business and holds assets in Israel. As detailed above, Papaya US's business is managed from Israel; it has no employees, and all its activities, without exception, are performed by Papaya Israel's employees in Israel. Both Applicants' international financial activities are managed from Israel through local employees and financial advisers, principally through Israeli banks. Moreover, all the Applicants' intellectual property, substantive operations, revenues, and tangible assets are owned by Papaya Israel and managed by its employees in Israel. Although unnecessary to the foregoing, this Court is also the appropriate forum to hear this application in terms of the substantive connections. Given the facts described above, the Applicants' managerial, operational, and economic center of gravity is in Israel.

Accordingly, this Court is the appropriate, efficient, and proper forum to hear the debt arrangement proceeding and, consequently, the temporary stay of proceedings as well.

## C. General Background on the Applicants and the Circumstances Leading to Their Situation

**(As required by Regulation 14 of the Regulations)**

### C(1). Description of the Applicants and Their Industry

30. Papaya Israel was established and incorporated in Israel in 2016.

➢ A copy of the Registrar of Companies information sheet is attached and marked as **Exhibit "1."**

31. Papaya Israel has several subsidiaries established for operational and business purposes in various countries worldwide:

(a) Papaya US (wholly owned) provides Papaya Israel with payment clearing and processing services (Fronting and Processing) for players from the United States and other countries.

(b) A subsidiary in England (wholly owned), Papaya Gaming UK Ltd., is responsible for distributing Papaya Israel's games in England and for most payment-clearing activities involving players in that territory.

(c) For potential clearing and distribution activities in India and Brazil, Papaya Israel established subsidiaries in those countries: Papaya Gaming India Private Limited (Papaya Israel holds 99.99% of its shares, and Papaya US holds the remaining 0.01%) and Papaya Gaming Brazil LTDA (wholly owned by Papaya Israel). In practice, these subsidiaries have conducted no activities, and Papaya Israel is still evaluating entry into those countries (Papaya India was even declared a dormant company in October 2024).

(d) A subsidiary in Poland (wholly owned), Papaya Poland Sp. Z o.o, provides development services to Papaya Israel and the subsidiaries mentioned above through a development center established by Papaya Israel in Poland.

(e) An Israeli subsidiary (wholly owned), Papaya Stars Ltd., established a social network.

(f) A US subsidiary (wholly owned), Papaya Payments Inc., was established to support various payment-clearing solutions.

32. The Applicants operate in the gaming industry. Papaya Israel develops a mobile gaming platform and develops and markets the games based on it. The platform enables players to compete in prize-bearing tournaments involving skill-based games, with an opportunity to win money.

33. Papaya Israel is a significant participant in the skill-based gaming market and is the leading group in that market in terms of revenue. One of Papaya Israel's advantages is its

technological capability, namely, the unique platform it developed, which enables a gaming experience individually tailored to each player's playing ability.

34. Papaya Israel converts classic games into multiplayer skill-based tournaments in which players compete for prizes announced in advance. The platform assigns players to tournaments through an algorithm based on their estimated skill levels (such as strategy, memory, reflexes, coordination, and problem-solving).

35. In the app market, payment clearing is ordinarily performed by a third party. Papaya Israel, however, developed unique payment-clearing capabilities (which it operates through its subsidiaries), and it performs most payment clearing through companies it owns, including Papaya US.

36. Because players can win cash prizes, Papaya Israel also developed an internal system for managing players' funds according to game performance, allowing a player to see, at any given time, the balance of funds credited to the player and the most recent transactions affecting that balance.

**C(2). <u>The Applicants' Profitability and Success</u>**

37. Papaya Israel is a highly profitable company. A key reason is its revenue model, based on entry/service fees charged to players who pay to enter tournaments.

38. Papaya Israel's principal revenue model operates as follows: in tournaments that are not free and offer the possibility of winning money, prizes are announced in advance, and players pay entry fees that aggregate to an amount exceeding the total prizes. Papaya Israel's revenue derives from the difference between the total entry fees collected and the prizes distributed.

39. This structure has generated high gross profit margins over the years, with the gross profit margin exceeding 90% in each of the recent years.

40. In addition, Papaya Israel has recorded positive operating profit and substantial net profit over the years. Its most significant expense component is player acquisition costs (bringing new players to the platform), which form a central part of its operating cost structure and directly affect revenue and profitability.

41. A further advantage arises from operating a technological platform that provides shared infrastructure for all Papaya Israel games and enables more efficient development and use across additional games. Papaya Israel has significant development potential stemming from its ability to apply its technological assets beyond the existing platform and core games.

**C(3). <u>Revenue Forecast and Growth Trend</u>**

42. The proposed arrangement is based on Papaya Israel's revenue forecast for the coming years. The revenue forecast is based on actual operating data for recent years and conservative professional projections, based on trends in the relevant market and an

examination of the business environment in which Papaya Israel operates. The forecast is also based on development plans and actions to improve and expand its products.

43. Papaya Israel's financial results in 2024 and 2025 were materially affected by extraordinary legal expenses. During those years, the Applicants were compelled to spend tens of millions of dollars litigating in the United States (where, as is well known, litigation is very expensive). Those expenses are not part of Papaya Israel's ongoing expenses in the ordinary course of business, and now, with the conclusion of the litigation with Skillz, the picture is expected to change. Although the Applicants intend to appeal the Skillz Judgment, the stage involving most of the legal expenses has concluded. Legal expenses on a similar scale are not anticipated in the coming years.

44. By way of illustration, in 2024 these legal expenses reached approximately $25 million; without them, operating profit would have totaled approximately $70 million. In 2025, legal expenses rose to approximately $40 million; without them, the operating profit reported in the financial statements would have totaled approximately $62 million. Accordingly, the financial results for those years do not reflect Papaya Israel's profitability potential, but rather exceptional and unusual events imposed upon it.

45. The forecast reflects a continuing but conservative growth trend, taking into account, among other things, the extraordinary expenses described above.

46. The attached financial forecast therefore provides a responsible and substantiated basis for the proposed debt arrangement framework and supports the conclusion that the proposed arrangement is feasible and superior to every other alternative.

- A copy of the detailed financial forecast is attached as **Exhibit "2."**

47. The forecast data show that Papaya Israel operates at particularly high gross profit margins, exceeding 92% in 2022–2025. These margins are expected to remain at a similar level in the coming years and throughout the forecast period. The gross profit margin demonstrates a business model with strong financial resilience.

48. Papaya Israel shows a consistent revenue growth trend as follows: approximately $163 million in 2021; approximately $334 million in 2022; approximately $461 million in 2023; approximately $533 million in 2024; and approximately $493 million in 2025 (in that year, one game faced challenges due to increased competition in its segment, resulting in an approximately 7% decline in revenue that year). Thus, in 2021–2025, Papaya Israel grew by <u>an average of 32% per year</u>.

49. Despite this impressive average, the financial forecast presented is more conservative. It projects continued significant but moderate revenue growth of between 10% and 16% in the coming years throughout the arrangement period.

50. Accordingly, the proposed debt arrangement includes a mechanism for depositing funds into the arrangement administrator's deposit account according to the available cash balance (as of January 3 of each calendar year). This is the cash balance in Papaya Israel's bank

accounts, less certain amounts[1], but not exceeding the annual amounts specified in the arrangement. These amounts total close to $100 million for 2026 and many tens of millions of dollars in each subsequent year, as detailed in the proposed arrangement. Because actual figures may be better or worse than those included in the forecast, the arrangement provides that the arrangement administrator may apply for an increase or decrease in the annual amounts to be deposited with the administrator, based on the actual figures then available.

The annual deposits are intended to ensure that the Applicants can meet all their obligations while continuing their business operations without interruption.

**C(4). <u>Legal Proceedings Against the Applicants</u>**

51. The legal proceedings pending against the Applicants are detailed below. This section includes all Known Contingent Creditors to whom this arrangement is intended to apply.[2]

52. None of the proceedings described below has resulted in a final judgment no longer subject to appeal.

53. None of the pending claims described below, other than the Skillz Judgment, can materially affect the Applicants' financial capacity.

54. It should be noted that all the claims described below (including the Skillz Judgment) have been publicized and received media coverage, but this has had no adverse effect on the scale of the Applicants' operations.

**C(4).1. <u>The Skillz Action – Skillz Platform Inc. v. Papaya Gaming, Ltd et al.</u>[3]**

55. Skillz Platform Inc. is a publicly traded company incorporated in the United States and a business competitor of Papaya Israel. In March 2024, Skillz filed an action against the Applicants in a federal court in the State of New York, United States (the "**Skillz Action**"), as part of an improper strategy intended to address Skillz's continuing business failure and inability to compete with competing companies through customary means, after years of failing to improve its inferior product and business model.

56. As part of that strategy, Skillz also filed other actions against other competing companies in the industry, using the enormous amounts it had raised in the capital markets years earlier, which were intended to support business growth (not legal battles).

---

[1] Deducting only the amounts pledged to the banks holding the balances as security for bank guarantees to property landlords, credit card payments, and hedging transactions; player credit balances; and US $30 million to be allocated to ongoing operational management.

[2] This section also describes, at its conclusion, a civil investigation by the Attorney General of the State of New Jersey, to which the arrangement does not apply.

[3] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y.)

57. For example, Skillz filed the action Skillz vs. AviaGames, asserting various claims, including unfair competition, copyright infringement, and the use of bots, and alleging that AviaGames copied its platform.[4] That proceeding ended in a monetary settlement.

58. Skillz also filed the action Skillz vs. Voodoo, alleging false advertising and unfair competition on the ground that the defendant allegedly offered rigged games and used bots.[5] That proceeding remains pending and, to the best of the Applicants' knowledge, is at an early stage.

59. Skillz's action against the Applicants likewise alleged that the Applicants presented their games misleadingly (False Advertising) and created unfair competition in the market through the alleged use of bots. Skillz sought damages or, alternatively, restitution in the hundreds of millions of dollars (alleging that the Applicants had been unjustly enriched at its expense).

60. As is customary in the State of New York in actions of this kind, the Skillz Action was decided by a jury. As stated above, on July 27, 2026, the judge issued a decision requiring the Applicants to pay Skillz more than $719 million.

61. The Applicants intend to appeal the Skillz Judgment as of right to the Court of Appeals for the Second Circuit. Naturally, the Applicants are not challenging the Skillz Judgment in these proceedings. Nevertheless, with all due respect, the interlocutory decisions issued throughout the Skillz Action and the Skillz Judgment itself contain material errors of fact and law. Among other things, the Judgment proceeded from the erroneous premise that the use of bots is inherently improper, although it is a customary and accepted practice in the gaming industry, instead of examining whether the Applicants' advertisements were misleading. In addition, the Judgment did not address significant evidence presented by the Applicants negating a causal connection between their advertisements and the amount claimed. The Judgment is also based on "profits" allegedly earned by the Applicants in an astronomical amount many times greater than their net profit during the period relevant to the Skillz Action. Furthermore, Papaya Israel's counterclaims against Skillz, alleging that Skillz itself engages in practices similar to, and even more serious than, those it alleges against the Applicants, were dismissed without any factual inquiry. Among other things, **the court refused to allow the Applicants' witnesses to testify at trial**, substantially curtailed the Applicants' expert opinions (to the point of rendering them irrelevant and devoid of substance), limited the arguments the Applicants were permitted to present to the jury at trial, and more. The Applicants intend to present these and other matters in detail to the US appellate court. The Applicants believe their prospects of reversing the Judgment, or at least substantially reducing it, are high. In the assessment of the Applicants and their legal advisers, there is a substantial legal basis for a successful appeal resulting in a new trial or relief that would materially alter the outcome. Accordingly, the debt embodied in the Judgment is disputed and, in any event, is not currently enforceable in Israel. A situation must therefore not be permitted in which such a debt causes the collapse of a profitable Israeli company that provides a livelihood for hundreds of families in Israel.

---

[4] Blake Brittain, Reuters: Mobile gaming company Skillz wins $43 million patent verdict against AviaGames (Feb. 10, 2024) https://www.reuters.com/legal/litigation/mobile-gaming-company-skillz-wins-43-mln-patent-verdict-against-aviagames-2024-02-09/.

[5] Skillz Platform Inc. v. Voodoo SAS, 1:24-cv-04991, (S.D.N.Y.) (2024) https://cases.justia.com/federal/district-courts/new-york/nysdce/1%3A2024cv04991/624144/195/0.pdf

**C(4).2. The Milberg Action**[6]

62. After the Skillz Action was filed, a US law firm named Milberg began contacting Papaya Israel's US customers and encouraging them to initiate arbitration proceedings against it based on alleged false advertising. The parties subsequently entered mediation and reached an agreement in principle to resolve the US consumers' claims on a class-wide basis.

63. Following that agreement, a class action was filed in December 2024 in the court in Los Angeles County, California, in which the class representative moved for approval of a settlement between the parties. In March 2026, the court in California, United States, approved the settlement reached through mediation between the parties, which will resolve the dispute in the United States for $15 million. An appeal from the decision approving the settlement is pending.

**C(4).3. The Pavlovich Action**[7]

64. To the best of the Applicants' knowledge (since the pleadings have not yet been served), an individual action has been filed against the Applicants, as well as against AviaGames, in the court in Los Angeles, California, by a woman named Dawn Pavlovich, who opted out of the Milberg settlement. The plaintiff asserts claims against the Applicants and AviaGames similar to those in the other actions. This is an individual action for an immaterial amount of approximately $308,880.

**C(4).4. The Robinson Action – Class Action 16869-09-25, Cassie Robinson v. Papaya Gaming Ltd.**

65. In September 2025, a former Papaya Israel customer residing in Britain filed an application to certify a class action against it in the Tel Aviv–Jaffa District Court (before the Honorable Judge Amir Lukashinsky-Gal).

66. The certification application alleges misleading representations regarding Papaya Israel's past use of bots, with the proposed class comprising all Papaya Israel customers worldwide other than US customers.

67. Papaya Israel disputes the allegations on the merits and also argues that the action should be dismissed at the threshold on various grounds, including forum non conveniens, because the Israeli forum is inappropriate for adjudicating claims of non-Israeli class members. A pretrial hearing is scheduled for December 1, 2026.

[6] Barcelo et al. v. Papaya Gaming, Ltd. et al., No. 24STCV32626 (Cal. Super. Ct.)
[7] Pavlovich v. Papaya Gaming Ltd., (Cal. Super. Ct., L.A. Cnty. filed Apr. 2, 2026)

**C(4).5. The Kelly-Starkebaum Action**[8]

68. In March 2024, Brenna Kelly-Starkebaum filed an action against the Applicants in the federal court for the Southern District of New York, alleging misleading representations regarding the use of bots. In December 2024, the court granted the Applicants' motion to refer the dispute to arbitration and stayed the proceeding pending resolution of the arbitration.

69. In February 2025, the same plaintiff commenced an arbitration in which she argued that the arbitration agreement was unenforceable and that the case should return to court. In May 2025, the arbitrator determined that the arbitration agreement was enforceable and that the arbitration would continue before him.

**C(4).6. Civil Consumer Investigation by the Attorney General of the State of New Jersey**

70. In 2024, Papaya US received a request from the Attorney General of the State of New Jersey for documents for a civil consumer investigation being conducted by his office concerning past practices. The Applicants are cooperating fully, have produced the requested documents, and have maintained ongoing contact with the Attorney General's Office for approximately two and a half years. For clarity, the Attorney General of New Jersey is defined as an "Excluded Creditor" under the debt arrangement, and the debt arrangement does not apply to him, having regard to Sections 325 and 89(b) of the Insolvency Law.

**D. The Proposed Arrangement**

71. The idea underlying the arrangement is simple: given the amount of the Skillz Judgment, the only way to pay all potential debts to all creditors in full is to allow the Applicants to continue their profitable business operations while retaining the profits in a special fund administered by the arrangement administrator for distribution to the contingent creditors.

- A copy of the proposed debt arrangement is attached and marked as **Exhibit "3."**

72. The guiding principle is to continue ongoing payments to all trade creditors so that these obligations continue to be paid in the Applicants' ordinary course of business. The Applicants meet all their obligations and are expected to continue meeting and paying them regularly without difficulty. Accordingly, the arrangement is premised on suppliers, employees, and all ongoing business creditors continuing to receive the amounts due to them through normal working relationships and in the ordinary course of business.

73. These ongoing operations will generate profits that will enable payment, within a few years, of the full debt owed to the contingent creditors insofar as their debts crystallize into judgments enforceable in Israel (both the plaintiffs in the various proceedings and Skillz). Each year's available cash balances, other than a fixed amount for ongoing management, will be directed to a dedicated fund, up to the ceilings specified in the debt arrangement (the **"Arrangement Administrator's Deposit"**). The Arrangement Administrator's Deposit will be used to pay contingent liabilities if and to the extent they become judgments enforceable in Israel in the future, including in Skillz's case.

---

[8] Kelly-Starkebaum v. Papaya Gaming, Ltd. et al., No. 1:24-cv-02310-DLC (S.D.N.Y.)

74. Under the proposed debt arrangement, the Applicants will make annual deposits into the Arrangement Administrator's Deposit account based on the Applicants' available cash balance, up to fixed ceilings specified in the debt arrangement. Tens of millions of dollars (and generally close to $100 million) will be directed to the special fund each year.

75. As stated, the companies' profits will be retained in the Arrangement Administrator's Deposit until one of the contingent creditors holds a judgment enforceable in Israel. The arrangement administrator may make payments from that deposit only to a holder of such a judgment.

76. If, at any time, more than one enforceable money judgment is before the arrangement administrator for payment, the administrator will distribute the amount paid from the deposit among the eligible contingent creditors pro rata, in proportion to the amounts of the enforceable money judgments payable at that time.

77. More specifically, the arrangement provides for deposits on January 15 of each calendar year in amounts based on the available cash balance as of January 3 of that calendar year. This is the cash balance in the bank accounts, less certain amounts,[9] but not exceeding the annual amounts specified in the arrangement. These amounts total close to $100 million for 2026 ($60 million immediately and an additional amount at the end of 2026), followed by many tens of millions of dollars in each subsequent year, as detailed in the arrangement. Because the Applicants may actually have more or less money available than anticipated, the arrangement also provides that the arrangement administrator may apply for an increase or decrease in those annual amounts, based on the actual figures then available.

78. Unlike the customary practice in debt arrangements, which generally terminate the prosecution of applications for class action certification, it is proposed here that the application to certify a class action filed against Papaya Israel continue in the ordinary course. This component of the proposed arrangement demonstrates the Applicants' financial strength.

79. To ensure equal treatment, the arrangement does not permit payments from the Arrangement Administrator's Deposit to persons who do not hold judgments enforceable in Israel. Nevertheless, there is justification for retaining funds for them and ensuring the ability to pay "if and when."

80. Accordingly, the arrangement provides that no funds will actually be paid to Skillz until judgment is rendered on appeal, for several reasons:

    (a) **<u>First</u>,** the Judgment is a foreign judgment subject to appeal. It has therefore not become final and nonappealable, and Skillz cannot enforce it in Israel under the Enforcement of Foreign Judgments Law. It is settled case law that the Enforcement of Foreign Judgments Law cannot be circumvented through insolvency proceedings (see, for example, Application for Leave to Appeal 9071/20, **OOO BE ASH BEHA – Company Liquidator Mr. Pinchuk Sergey v. Tadbik-Pack Ltd.** (Nevo, April 12, 2021)).

---

[9] Deducting only the amounts pledged to the banks holding the balances as security for bank guarantees to property landlords, credit card payments, and hedging transactions; player credit balances; and US $30 million to be allocated to ongoing operational management.

(b) **Second,** as its financial statements show, Skillz is a loss-making public company on the brink of insolvency. A review of those public statements readily shows that Skillz has been a loss-making company from the outset and remains so.

Moreover, Skillz's attached financial statements contain a dramatic disclosure: its principal game developer, which accounted for approximately 51% of its revenues (!) in 2025 (a company named Tether), announced that it would stop marketing Skillz's games on its platform. This is a material fact concerning Skillz's ability to continue as a "going concern."

Furthermore, Skillz is in a critical financial condition, characterized, among other things, by cash burn of tens of millions of dollars annually, enormous debts of approximately $130 million owed to bondholders and due in December 2026, and dependence on revenues from a settlement agreement with AviaGames that are expected to end in early 2028.

➢ Copies of selected pages from Skillz's 2025 financial statements are attached and marked as **Exhibit "4."**

Once the bond debt is repaid, its cash balance is expected to become negative during 2027. In that situation, Skillz will be unable to meet its ongoing obligations and is expected to be unable to return funds paid to it.

➢ A copy of Skillz's cash flow forecast is attached and marked as **Exhibit "5."**

This forecast was prepared by the Applicants using the public information in Skillz's reports. Accordingly, there is a high probability that, if funds are paid to Skillz, it will be unable to return them if the Judgment is reversed or modified on appeal.

(c) **Third**, even if Skillz had sufficient financial strength to return funds received under the Judgment, recovery from an entity domiciled abroad whose principal activity is adversarial litigation would likely require lengthy and costly foreign litigation and international collection proceedings, imposing substantial and unnecessary expenses on the funds held by the arrangement administrator.

(d) **Finally**, leaving the funds on deposit with the arrangement administrator serves a further substantive purpose: preserving available funds for other contingent creditors, known and unknown. Considering the arrangement as a whole, retaining funds with the arrangement administrator for that purpose is also important, even though the Applicants believe those claims are unfounded and should be dismissed.

81. Depositing the funds in the Arrangement Administrator's Deposit, as proposed in the arrangement, sets aside and earmarks funds in advance for the contingent creditors, thereby benefiting Skillz, which may not enforce the Judgment in Israel while it remains subject to appeal. Furthermore, the arrangement provides for the accrual of interest so that the contingent debt arising from the Skillz Judgment will be paid in full in accordance with the mechanism proposed in the debt arrangement.

82. **Mechanism for filing proofs of claim:** The arrangement provides that all the Applicants' ongoing obligations (other than contingent debts) will continue to be paid regularly and on time, and the arrangement does not apply to them. Accordingly, only creditors defined as

"Contingent" will be required to file proofs of claim. Creditors defined as "Excluded" are unaffected by the arrangement; they are not required to file proofs of claim, and no meetings of those creditors will be convened. The details in Form 1 of debts owed to these creditors in the ordinary course of business are provided to comply with legal requirements. However, these creditors may dispute the amounts stated there in the ordinary course of business and will not be estopped from doing so.

## E. Service and Publication

83. An order is requested directing the Applicants to publish notices of the filing of the application for a debt arrangement in at least two financial newspapers in Israel and, additionally, in two newspapers with nationwide circulation in the United States.

84. In addition, the Applicants will promptly provide the Commissioner with a copy of the application and notice of its filing for publication, so that the Commissioner may publish notice of the filing of an application for a debt arrangement on the Ministry of Justice website (pursuant to Regulation 159D(a) of the Regulations).

85. Regulation 159E requires service of this application and its exhibits on all material creditors by registered mail with acknowledgment of receipt or by personal service, and posting of a notice of hearing in a prominent location at the workplace (hereinafter, "**Personal Service**").

86. The definition of "material creditor" in Section 319A of the Law includes secured creditors; creditors to whom the corporation owes more than NIS 75,000 or more than 10% of the corporation's total unsecured debts, whichever is lower; and a trustee for a series of the corporation's debt securities (which does not exist in this case).

87. Accordingly, under the wording of the Law, the creditors requiring Personal Service in this case are:

    (a) Hundreds of suppliers and service providers to each of whom the companies owe more than NIS 75,000;

    (b) Posting the notice of hearing at the workplace (the company has no employees' committee);

    (c) Persons pursuing legal proceedings against the companies that are pending before the courts;

    (d) The secured creditor, Bank Leumi Le-Israel.

88. Amounts due to suppliers, players, and employees in the ordinary course of business will continue to be paid regularly and on time. An exemption from Personal Service on those creditors is therefore requested.

89. As to suppliers and employees, these are not past debts in the usual sense but ongoing obligations at an arbitrary cutoff date. The amounts are detailed in Form 1 solely to comply with legal requirements and do not prevent an Excluded Creditor from disputing them in the ordinary course of business.

90. The requested exemption is based on several principal reasons:

(a) The purpose of Personal Service falls away: the Applicants will continue to pay their obligations to these creditors in the ordinary course of business. These creditors will not need to file proofs of claim, and there is no need to convene meetings of them.

(b) Unnecessary burden: as stated, the definition of a material creditor includes creditors whose debt exceeds NIS 75,000. For the Applicants, this encompasses dozens of suppliers (the material creditors are among the entities listed in Appendix 7 to Papaya Israel's Form 1). Requiring Personal Service on each of them would require an enormous investment of resources, which would likely serve no purpose.

(c) Business considerations: personally serving legal documents on hundreds of suppliers, employees, players, and service providers is likely to have a negative impact due to misunderstandings that may arise from service of legal documents, all unnecessarily.

## F. Advantages of the Proposed Arrangement over Other Alternatives

91. A long line of decisions holds that, where a debt arrangement and continued operation of a company as a going concern are realistically feasible, that solution should be preferred over liquidation. The same applies here. Aggressive enforcement of the Skillz Judgment could lead to the Applicants' insolvency and liquidation, the practical and economic meaning of which would be **the destruction of hundreds of millions in value for all stakeholders**. Israeli law favors the alternative that preserves the Applicants as a going concern.

92. As stated at the outset of this application, the Law's two overarching objectives, set out in Section 1, can be achieved only through the arrangement alternative: the Applicants' economic rehabilitation and maximization of the proportion of debt repaid to creditors.

93. See Corporate Liquidation Case (Tel Aviv District Court) 30593-09-19, **Habima National Theater Ltd. (Public Benefit Company) (Under a Stay of Proceedings) v. Official Receiver**, para. 14 (Nevo, October 29, 2020):

> "In keeping with its role, an insolvency court must balance the available practical alternatives to enable, to the extent possible, the corporation's continued operation; this is required by the law, the case law, and common sense. In this regard, the words of the Honorable Judge (as he then was) David Mintz in Corporate Liquidation Case (Jerusalem) 5235/08, Bankruptcy Case (Jerusalem) 59344-01-12, **Nidar Construction and Development Company Ltd. v. Official Receiver**, paragraph 35 (October 23, 2012), are apt. In his words: **'The court has noted more than once that this consideration—the advantage of the other "realistic alternative"—is an important consideration to be taken into account both in understanding the creditors' considerations and in deciding whether to approve the arrangement. The proposed arrangement and the benefit it affords creditors must be assessed not against an imaginary utopian reality of full repayment of all debts, but against the other realistic alternative at hand: the dividend rate creditors would obtain if the company entered liquidation in the absence of an arrangement. Such an assessment may, for example, justify the reasonableness of a low dividend where the other alternative would result in all the company's assets being absorbed by a secured creditor whose debt exceeds the realizable value of the assets in liquidation proceedings [...].'"**

94. Those observations concerned a low dividend to creditors and apply with even greater force where the arrangement is intended to enable payment of 100% of the debts to all creditors.

95. Also pertinent are the observations of the Honorable Justice Procaccia in Civil Appeal 10739/07, **Tax Authority, Liquidations, Receiverships and Difficult Collection Unit, Customs and VAT v. Clubmarket Marketing Chains Ltd.**, para. 28 (Nevo, June 16, 2011):

> "Where the company still has profit potential and its value as an operating going concern may exceed the aggregate value of its assets; and where rapid liquidation and dissolution may in themselves worsen the company's condition—in situations of this kind, rehabilitating the company instead of dissolving it may benefit creditors, as well as other parties, such as the company's employees and managers, businesses having commercial relationships with it, and sometimes even the economy as a whole."

96. Indeed, the Applicants in this case also have enormous profit potential, and their going-concern value exceeds the value of their assets many times over. There is no reason to kill the goose that lays the golden eggs (unless the true objective is to remove a business competitor from the market). The arrangement proposed here is <u>the only way</u> for all creditors to receive everything due to them, and it will also benefit the other stakeholders, including hundreds of Papaya Israel employees, suppliers, businesses having commercial relationships with the Applicants, players, and others.

97. Approval of the proposed arrangement is therefore appropriate, proper, and necessary, because it alone can ensure the continued regular payment of ongoing obligations, even assuming that the Skillz Judgment is not substantially reduced on appeal (an assumption the Applicants consider wholly unreasonable), and even if other actions result in substantial awards to their plaintiffs.

98. Clearly, if Skillz is indeed interested in repayment of the alleged debt owed to it, approval of the proposed arrangement is first and foremost in its own clear and substantial interest. Without this arrangement, which ensures that Papaya Israel continues its business operations and works to maximize profits, the Applicants are expected to be unable to make full payment to Skillz.

99. It must be borne in mind that Papaya Israel provides a livelihood for hundreds of households in Israel. Implementing the proposed arrangement will preserve its employees' source of livelihood, a decisive consideration in such matters. See, for example, Corporate Insolvency Case (Tel Aviv–Jaffa District Court) 45426-01-22, **Convexum Ltd. v. Commissioner of Insolvency Proceedings and Economic Rehabilitation**, para. 31 (Nevo, September 21, 2022):

> "A further consideration to be taken into account in approving the plan is that it ensures the preservation of the jobs of approximately 40 company employees for at least one year, and also provides for allocating 25% of the company's share capital to them. Section 86(b) of the Law provides that, when approving an economic rehabilitation plan, the court shall consider, among other things, considerations relating to the corporation's employees."

100. Over time, the courts have clarified that "economic rehabilitation" means protecting jobs and preserving businesses needed by the economy or society. See Corporate Insolvency Case (Jerusalem District Court) 15510-10-19, **Shayke Ella Ltd. (In Rehabilitation) v. Mishkenot**

**HaTechelet Ltd.**, para. 34 (Nevo, November 9, 2020):

> "**Economic rehabilitation in its classical sense means protecting jobs and preserving businesses needed by the economy or society** that have encountered temporary distress. Under the case law predating the Insolvency Law's entry into force, preference should be given to rehabilitating the business because of its contribution to creditors and the economy as a whole."

101. Skillz cannot pursue liquidation and enforcement proceedings in Israel because the Judgment it holds has not become final and nonappealable. Nevertheless, enforcement of the Skillz Judgment, even against assets and rights abroad, would block the Applicants' payment-clearing operations and choke off their operations entirely. From there, the road to the Applicants' dissolution and liquidation would be short.

102. There is serious concern that eliminating a competitor, whether through liquidation or other means, is Skillz's true intention; it has already demonstrated that its approach is to sue competitors in order to harm them financially.

103. Accordingly, the arrangement is the best alternative in the circumstances for the Applicants, the creditors, the employees, and the other stakeholders.

## G. Additional Particulars and Documents Required by Law

104. The remaining particulars and documents required by the Law and Regulations are set out below.

### G(1). Sources of Funding for the Proposed Continuation of the Applicants' Business Operations (Regulation 159B1(a)(3) of the Regulations)

105. No external funding is required to finance the continuation of ongoing business operations. The Applicants' business operations will continue in the ordinary course, as they have to date.

### G(2). Estimated Economic Value of the Release from Liability

106. The proposed arrangement includes a full, final, and irrevocable release from liability in favor of the companies and their officers, directors, employees, agents, advisers, representatives, shareholders, and any person or entity that has acted or acts on their behalf or in their name, in respect of any cause of action, allegation, or claim connected with the contingent debts. The estimated economic value of this release is negligible, since the proposed arrangement ensures full—100%—repayment of the Applicants' debts to eligible contingent creditors, so that no economic consideration is withheld from the creditors and they suffer no out-of-pocket loss.

### G(3). Pending Class Actions

107. Contrary to the customary practice in debt arrangements, it is proposed that, following approval of the arrangement, the pending class actions continue to be adjudicated in the courts where they are being heard. If and to the extent judgments are rendered in those actions, Papaya Israel will pay them in the manner described in the arrangement.

**G(4). <u>Shareholders' Rights</u>**

108. Under the proposed arrangement, shareholders' rights will be impaired. Papaya Israel will not distribute dividends to its shareholders throughout the arrangement period, including while the Skillz Judgment remains unenforceable in Israel.

**G(5). <u>Actions Required to Implement the Debt Arrangement (Regulation 159B1(a)(2))</u>**

109. No special actions are required to implement the debt arrangement other than establishing the Arrangement Administrator's Deposit.

110. No changes are required to the Applicants' structure, the structure of their business operations, their business areas, or their workforce structure, including Papaya Israel's board of directors and management, which will remain in office to ensure the group's continued growth and profitability.

111. The Applicants will operate in accordance with the law (see Sections 319M–319N of the Law regarding the arrangement administrator's authority to obtain information, restrictions on certain decisions, distributions, and similar matters).

**G(6). <u>Proposal for Classifying Creditors into Class Meetings (Regulation 159B1(a)(5))</u>**

112. Under the above regulation, a corporation seeking a debt arrangement under Part X may propose the classification of creditors into class meetings.

113. The proposed classification below follows from the wording and purpose of Section 84 of the Law and reflects the case law interpreting and applying it, under which the central question is the degree to which each creditor group's interest in the proposed arrangement is substantively distinct (see, for example, Corporate Insolvency Case (Tel Aviv–Jaffa District Court) 76604-07-24, **Jiffa Clothing and Footwear Ltd. v. Commissioner of Insolvency Proceedings and Economic Rehabilitation**, para. 23 (Nevo, January 20, 2025)).

114. The Applicants propose that two creditor class meetings be convened to vote on the arrangement, as follows:

    (a) A meeting of holders of pending claims and persons asserting a right of action (contingent creditors);
    (b) A meeting of Skillz as a creditor with a substantively distinct interest.

115. First, **it is proposed that no meetings be convened of creditors whose rights are entirely unaffected by the proposed arrangement**. This position rests on the principles established in the case law, which holds that there is no basis for convening meetings of creditors who are not impaired by a proposed arrangement. Ongoing business creditors, including suppliers, employees, and players in the ordinary course of business, are not impaired by the arrangement. Accordingly, no additional meetings beyond those proposed above are necessary. The court's observations in Corporate Insolvency Case (Jerusalem District Court) 32539-06-23, **A.R. Blue and White Construction, Development and Investments Ltd. v. Commissioner of Insolvency Proceedings and Economic Rehabilitation, Jerusalem District**, para. 24 (Nevo, December 11, 2023), are pertinent:

> "(...) Under the arrangement, these creditors are expected to receive a 100%

dividend, so that all the debt owed to them will be repaid under the arrangement. This issue raises the question of holders of rights that are legally unimpaired. In Professor David Hahn's view (Insolvency Law, second edition, 2018, pp. 740–741), **there is no basis, in the first place, for convening creditors who receive full repayment of their debts to ascertain their position on the arrangement, whether at a separate meeting or as part of the class meeting encompassing their legal rights.** In the United States, CHAPTER 11 expressly provides that such a class of creditors is not entitled to vote on a reorganization plan (Bankruptcy Code 1124). Participation in meetings is required where **the proposed arrangement reduces the full debt owed to creditors**."

116. Second, **all holders of contingent debts share a clear common economic interest**. They are all plaintiffs in individual actions or applicants seeking class action certification in pending legal proceedings, and they have common interests: they have an interest in the Applicants' remaining solvent and being able to pay them if and when they prevail in their claims; this Court is not called upon to assess the prospects of those proceedings; and all are unsecured and therefore rely on the Applicants' continued profitable operations as the source of repayment. This is thus a clear "common interest" within the meaning of Section 84 of the Law.

117. Third, **Skillz's interest is substantively distinct from that of the other creditors**, because it is the sole creditor holding a foreign judgment that is unenforceable in Israel while it remains subject to appeal. Its status as a business competitor also gives it an interest distinct from all the other creditors, so that it is driven by incentives different from those of other contingent creditors. As detailed above, the arrangement must also address an additional risk unique to Skillz: if funds are paid to it now and the Judgment is subsequently reversed or reduced on appeal, the arrangement administrator is likely to face substantial difficulty recovering the funds because of Skillz's own financial condition. For this reason as well, Skillz's incentives differ from those of the other creditors.

118. The proposed classification faithfully applies the "class" test set out in Section 84 of the Law, is consistent with the rationales established in the case law, and enables each creditor group to express its position within a framework reflecting its substantive common interest.

**G(7). <u>The Applicants' Assets and Liabilities</u>**

119. The Applicants' principal assets and debts are summarized below. Full details are provided in Form 1 attached below.

- A copy of Papaya Israel's Form 1 is attached and marked as **Exhibit "6."**
- A copy of Papaya US's Form 1 is attached and marked as **Exhibit "7."**

**G(7).1. <u>Principal Assets and Rights</u>**

120. **The Applicants' principal asset is their operations themselves**—operations that generate steady positive cash flow.

121. **<u>Papaya Israel's assets:</u>** (a) **Intangible assets:** Papaya Israel is a technology company. Its principal intellectual property consists of the technological platform, unique algorithms, clearing and payment systems, brand names, and the like. (b) **Cash:** Papaya Israel holds significant cash balances and liquid short-term investments in its bank accounts. Shortly

before the filing of this application, the Applicants' bank balances total approximately $151 million.

122. **Papaya US's assets:** Papaya US has various assets in the United States, such as bank accounts, a security deposit for payment-clearing purposes, a right to a tax refund from the US tax authorities, and contractual rights. Its principal assets are operational contracts entitling it to receive funds from US payment-clearing companies, which it is obligated to transfer to Papaya Israel. It also has assets in Israel, such as a bank account.

**G(7).2. Principal Debts and Obligations**

123. **Bank Leumi as a secured creditor:** Deposits held by Papaya Israel at Bank Leumi Ltd. are pledged to the bank as security for payment under bank guarantees issued to property landlords. The debt to the bank stated in this context in Form 1 is therefore a contingent debt that will arise only if a lawful demand is made to draw on the bank guarantee. Apart from this contingent debt, Papaya Israel owes no debt to Bank Leumi, and its accounts at the bank have credit balances.

124. **Lease agreement:** Papaya Israel entered into two long-term leases, one through July 2027 and the other through September 2027, for the offices from which it operates in the "Sky Tower" towers at 35 HaMasger Street, Tel Aviv. The company also entered into a management-fee agreement ancillary to the leases, with a term corresponding to the lease terms. The aggregate obligations remaining payable under these agreements through the end of those terms total approximately NIS 10.5 million. The debt stated in this context in Form 1 is **solely a future debt** through the end of the term. Rent is paid in advance, and the Applicants have no existing debt under these agreements.

125. **Priority creditors:** The Applicants have no priority creditors.

126. **General and subordinated creditors:** The Applicants have no "past" debts in the ordinary sense. They pay all their obligations to suppliers, employees, players, and service providers regularly and on time. Naturally, ongoing debts exist at any "cutoff" date, and those debts appear in Form 1 as the Applicants' "past debts." These include obligations to players on the platform. Any player with a credit balance in the player's Papaya Israel account may withdraw those funds at any time. As of June 30, 2026, Papaya Israel's outstanding liability to players totals approximately $12 million.

127. **List of the Applicants' officers (Regulation 13(5) of the Regulations):**

- A copy of the list of the Applicants' officers and officers who ceased serving during the 12 months preceding the filing of the application is attached and marked as **Exhibit "8."**

128. **Copies of financial statements for the last two years (Regulation 13(6) of the Regulations):**

- Copies of the financial statements for the two years preceding the filing of the application are attached and marked as **Exhibit "9."**

129. **Characteristics of the corporation's customers and degree of dependence on them (Regulation 14(4)(b) of the Regulations):** Papaya Israel's customers are the players who install the app and play its games. The Applicants are not dependent on specific customers.

130. **Dependence on suppliers and raw materials (Regulation 14(4)(c) of the Regulations):** Papaya Israel depends on technology service providers, such as payment-clearing providers, cloud service providers, advertising providers, and app stores, but does not depend on raw materials.

131. **Unique characteristics and risk factors (Regulation 14(4)(d) of the Regulations):** Papaya Israel's unique characteristic lies in its technological capabilities, which enabled development of its unique platform and allow it to provide a gaming experience tailored to each player. The principal risks to which it is exposed, like all companies operating in the global gaming market, include dependence on distribution platforms, operating systems, and app store policies; exposure to regulatory changes and enforcement in gaming and payments in various countries; product concentration (dependence on revenues from a few leading products); exchange-rate fluctuations; and competition for players' attention and consumers' leisure and entertainment budgets.

132. **Individual controlling the corporation (Regulation 14(4)(e) of the Regulations):** Under the definition of "control," the Applicants' founders, Mr. Uriel Becher, Mr. Andrey Birman, and Mr. Alexander Liakhovsky, control the Applicants.

133. **Shareholder register (Regulation 14(4)(f) of the Regulations):** An extract of the Applicants' records with the Registrar of Companies is attached as Exhibit "1" above. In addition, as required by Section 5 of Part A of Form 1, an up-to-date list of the corporation's members is attached as an appendix to Form 1.

134. **Material agreements to which the Applicants are parties (Regulation 14(4)(g) of the Regulations):** The Applicants' material agreements primarily consist of agreements with app stores, payment-clearing companies, intercompany agreements, service providers, a lease agreement, and advertising agreements, as detailed in the attached Form 1.

135. **Information on distributions made during the last three years (Regulation 14(4)(h) of the Regulations):** Papaya Israel distributed dividends totaling $103 million during the last three years. For clarity, no dividends were distributed shortly before, and of course none after, the jury's verdict in the Skillz Judgment.

136. **Number of employees (Regulation 14(4)(i) of the Regulations):** As stated above, Papaya US has no employees (other than one individual serving as a director of Papaya US). Papaya Israel, by contrast, employs approximately 300 employees and engages several additional service providers.

137. **Material creditors' position on the application (Regulation 14(4)(j) of the Regulations):** Unknown.

## H. Conclusion

138. The affidavit of Papaya Israel's Chief Executive Officer, Mr. Uriel Becher, is attached to this application in support of the facts underlying it.

139. Accordingly, the Court is requested to order that meetings be convened, approve the arrangement, and grant the relief requested at the outset of this application.

Docusign Envelope ID: 3AA84D6F-D854-894B-81B3-34534684724B

# Power of Attorney

We, the undersigned, **Papaya Gaming Ltd., Company No. 515422095, and Papaya Gaming Inc**, hereby appoint attorneys Pini Yaniv and/or Liron Sapir and/or Yarden Tal-Dahan and/or Yarin Nahaisi and/or any other attorney of Meitar Law Offices, 16 Abba Hillel Silver Road, Ramat Gan, all jointly and each severally, or anyone acting on their behalf, as our attorneys to appear and act for us in filing **an application to convene meetings for approval of a debt arrangement**, and any application or proceeding related or incidental to such proceeding, before any court, institution, or authority.

Without limiting the generality of the power of attorney granted above, the above attorneys are authorized to perform all or any of the following acts in our name and stead, all in connection with the proceeding and anything arising from it, as follows:

1. To sign and file in our name any claim or counterclaim and/or third-party notice and/or any application, statement of defense, response, objection, application for leave to appeal, appeal, further hearing, notice, contention, challenge, administrative appeal, affidavits, powers of attorney, action, or other proceeding relating to or arising from the above proceeding, without exception.
2. To summon witnesses, appoint experts, and perform all acts under the procedural rules currently in force or in force in the future, or perform any acts under any law or other procedure that applies or will apply to the above proceeding or litigation.
3. To appear in our name and represent us in connection with any of the above acts before all courts, tribunals of every kind, enforcement offices, or other authorities and institutions, governmental or otherwise, through their highest level.
4. To revoke previous powers of attorney given to attorneys in the matter at issue.
5. To settle any matter relating to or arising from the above matters at our attorney's discretion and to sign any such settlement in or out of court.
6. To collect the amount of the claim or any other amount in any of the above matters, including court costs and attorneys' fees. To receive in our name and stead any document or object and give receipts and releases as our attorneys deem proper and appropriate.
7. To enforce any judgment, decision, or order; seek orders of sale, attachments, realization and discharge of liens, or warrants of imprisonment; and perform all acts permitted under the Enforcement Law and/or the regulations thereunder.
8. To take all actions and sign any document or instrument, without exception, as our attorneys deem appropriate in any matter arising from the above matter.
9. To delegate all or any of the powers under this power of attorney to another attorney, with the right of further delegation.
10. To conduct our above affairs at their discretion and in such manner as they deem proper and beneficial in connection with our above affairs.
11. The undersigned approve in advance the acts of their attorneys or their substitutes pursuant to this power of attorney.
12. The singular above includes the plural and vice versa.

In witness whereof, we have signed today, July 29, 2026.

| | |
|---|---|
| DocuSigned by: Ifat Steinman<br>D50723ADC1BD4A3... | DocuSigned by: Ifat Steinman<br>D50723ADC1BD4A3... |
| **Papaya Gaming Ltd.** | **Papaya Gaming Inc** |

## Certification

**Pini Yaniv, Attorney**
**16 Abba Hillel Street, Ramat Gan**
**License No. 15378**

I, the undersigned, _______________, hereby certify the signatures of my above clients.

Date July 29, 2026 Signature and Stamp ____________________

פיני יניב, עו"ד
רח' אבא הלל 16, ר"ג
רשיון מס' 15378

**Pini Yaniv, Attorney**
**16 Abba Hillel Street, Ramat Gan**
**License No. 15378**

# Affidavit

I, the undersigned, Uriel Becher, holder of Identity Card No. 201410008, having been warned that I must tell the truth and that failure to do so will subject me to the penalties prescribed by law, hereby declare as follows:

1. I serve as a director and Chief Executive Officer of Papaya Gaming Ltd., Company No. 515422095 (hereinafter, "**Papaya Israel**"), and as a director of Papaya Gaming Inc. (hereinafter, "**Papaya US**," and together with Papaya Israel, the "**Applicants**").

2. I make this affidavit in support of the Applicants' application for an order convening meetings for approval of a debt arrangement.

3. The facts set forth in this affidavit are known to me personally or by virtue of my position as Chief Executive Officer of Papaya Israel.

## A. Basic Background

4. Papaya Israel is a private company incorporated in Israel in 2016 that develops and markets mobile games based on its unique platform. The platform allows players to compete in multiplayer, prize-bearing tournaments involving games based on skill and ability.

   ➢ A copy of the Registrar of Companies information sheet is attached and marked as **Exhibit "1."**

5. These are classic, popular games (such as Solitaire, Bingo, and Bubble), which Papaya Israel turns into cash-prize tournaments, neutralizing the element of chance by creating equal starting and playing conditions for all players, so that the dominant factor determining game results is the player's skill. Players are assigned to tournaments automatically by the platform through an algorithm that allocates them to different tournaments based on their skill level.

6. The unique platform developed by Papaya Israel provides the technological foundation for various games. It serves approximately one million unique players daily and approximately four million unique players monthly in approximately 15 million tournaments a day. This scale of activity reflects its success and its position as the leading company in this market.

7. Papaya Israel delivers impressive business and financial results, including annual revenues of approximately half a billion dollars, operating profit, and net profit. Papaya Israel has met, and continues to meet, all its ongoing obligations to its suppliers, service providers, and employees in full and on time.

8. As part of its global operations, Papaya Israel owns subsidiaries, including Papaya US, a wholly owned subsidiary incorporated in Delaware, United States. Papaya US provides fronting services to Papaya Israel (that is, it is the entity that is the signatory to certain material agreements) and performs a technical and operational role in clearing and processing player payments (processing services).

9. Papaya US has no employees at all (other than one individual who serves as a director of Papaya US). Its physical presence in the United States consists solely of a registered mailing address, without offices, and, as stated, it performs only a technical payment-clearing function. It has a US bank account, a security deposit for payment-clearing purposes, and contractual relationships for its operations, and it is seeking a refund from the US tax authorities. In addition, it has a bank account in Israel, and all its activities, without exception, are performed, managed, and operated by Papaya Israel's employees.

10. Furthermore, all of the group's intellectual property, substantive operations, revenues, and tangible assets are owned by Papaya Israel, the Israeli company, and managed by its employees in Israel.

11. Papaya Israel employs approximately 300 employees in Israel who form the backbone of its business and technological operations, including software engineers, technology specialists, product personnel, designers, marketing personnel, and support staff. They have developed and continue to develop the unique platform and games. The livelihood of hundreds of families in Israel depends directly on Papaya Israel's continued existence and operations.

12. Despite their sound financial condition, business success, and consistent profitability, the Applicants' operations now face a significant risk. This follows a decision issued on July 27, 2026, by the federal court in the State of New York in an action brought by a business competitor of the Applicants, Skillz Platform Inc ("**Skillz**"), requiring the Applicants to pay Skillz more than $719 million (the "**Skillz Judgment**" or the "**Judgment**") (for completeness, the proceedings have not yet formally concluded, and the court must take several further steps for that decision to become an operative judgment. These steps are expected to be completed in the coming days).

13. The Applicants intend to appeal the Judgment to the US Court of Appeals for the Second Circuit, in light of several determinations by the federal court in the State of New York that, in the Applicants' view, are erroneous, as summarized below. In the Applicants' assessment and based on legal advice I have received, the appeal has very good prospects of success, and there is a substantial legal basis for the appeal to succeed.

14. Based on legal advice I have received, Skillz cannot enforce the Judgment in Israel at this stage, but it may try to paralyze the Applicants' operations and cause their collapse through collection and enforcement measures in the United States. In fact, it has already pursued an **unsuccessful enforcement proceeding**: shortly after the jury's verdict, Skillz aggressively sought a preliminary injunction in the United States to prevent the Applicants from transferring funds to Israel in the ordinary course of their operations. These transfers were intended, among other things, for ongoing payments, such as salaries for hundreds of Papaya Israel employees and payments to the tax authorities. The US court denied that motion, but Skillz may initiate similar proceedings again. Had Skillz, regrettably, succeeded in that unsuccessful enforcement proceeding, the result would have been an immediate halt to the Applicants' profitable operations and substantial harm to their creditors, hundreds of employees, and third parties, as well as to their ability to repay the debt owed to Skillz itself.

15. In parallel, the Applicants intend to seek recognition in the United States of the Israeli proceeding as a "foreign main proceeding."

16. I emphasize that, apart from their exposure under the Skillz Judgment, the Applicants are not insolvent or in financial distress; quite the contrary. They continue to operate very profitably and pay all obligations to suppliers, employees, and service providers regularly and on time, including after the Skillz Judgment was issued.

## B. General Background on the Applicants and the Circumstances Leading to Their Situation

17. Papaya Israel has several subsidiaries established for operational and business purposes in various countries worldwide:

    (a) Papaya US (wholly owned) provides Papaya Israel with payment clearing and processing services (Fronting and Processing) for players from the United States and other countries.

    (b) A subsidiary in England (wholly owned), Papaya Gaming UK Ltd., is responsible for distributing Papaya Israel's games in England and for most payment-clearing activities involving players in that territory.

    (c) For potential clearing and distribution activities in India and Brazil, Papaya Israel established subsidiaries in those countries: Papaya Gaming India Private Limited (Papaya Israel holds 99.99% of its shares, and Papaya US holds the remaining 0.01%) and Papaya Gaming Brazil LTDA (wholly owned by Papaya Israel). In practice, these subsidiaries have conducted no activities, and Papaya Israel is still evaluating entry into those countries (Papaya India was even declared a dormant company in October 2024).

    (d) A subsidiary in Poland (wholly owned), Papaya Poland Sp. Z o.o, provides development services to Papaya Israel and the subsidiaries mentioned above through a development center established by Papaya Israel in Poland.

    (e) An Israeli subsidiary (wholly owned), Papaya Stars Ltd., established a social network.

    (f) A US subsidiary (wholly owned), Papaya Payments Inc., was established to support various payment-clearing solutions.

18. The Applicants operate in the gaming industry. Papaya Israel develops a mobile gaming platform and develops and markets the games based on it. The platform enables players to compete in prize-bearing tournaments involving skill-based games, with an opportunity to win money.

19. Papaya Israel is a significant participant in the skill-based gaming market and is the leading group in that market in terms of revenue. One of Papaya Israel's advantages is its technological capability, namely, the unique platform it developed, which enables a gaming experience individually tailored to each player's playing ability.

20. Papaya Israel converts classic games into multiplayer skill-based tournaments in which players compete for prizes announced in advance. Players are assigned to tournaments by

the platform through an algorithm based on their estimated skill levels (such as strategy, memory, reflexes, coordination, and problem-solving).

21. In the app market, payment clearing is ordinarily performed by a third party. Papaya Israel, however, developed unique payment-clearing capabilities (which it operates through its subsidiaries), and it performs most payment clearing through companies it owns, including Papaya US.

22. Because players can win cash prizes, Papaya Israel also developed an internal system for managing players' funds according to game performance, allowing a player to see, at any given time, the balance of funds credited to the player and the most recent transactions affecting that balance.

23. Papaya Israel is a highly profitable company. A key reason is its revenue model, based on entry/service fees charged to players who pay to enter tournaments.

24. Papaya Israel's principal revenue model operates as follows: in tournaments that are not free and offer the possibility of winning money, prizes are announced in advance, and players pay entry fees that aggregate to an amount exceeding the total prizes. Papaya Israel's revenue derives from the difference between the total entry fees collected and the prizes distributed.

25. This structure has generated high gross profit margins over the years, with the gross profit margin exceeding 90% in each of the recent years.

26. In addition, Papaya Israel has recorded positive operating profit and substantial net profit over the years. Its most significant expense component is player acquisition costs (bringing new players to the platform), which form a central part of its operating cost structure and directly affect revenue and profitability.

27. A further advantage arises from operating a technological platform that provides shared infrastructure for all Papaya Israel games and enables more efficient development and use across additional games. Papaya Israel has significant development potential stemming from its ability to apply its technological assets beyond the existing platform and core games.

28. The proposed arrangement is based on Papaya Israel's revenue forecast for the coming years. The revenue forecast is based on actual operating data for recent years, conservative professional projections based on trends in the relevant market, and an examination of the business environment in which Papaya Israel operates. The forecast is also based on development plans and actions to improve and expand its products.

29. Papaya Israel's financial results in 2024 and 2025 were materially affected by extraordinary legal expenses. During those years, the Applicants were compelled to spend tens of millions of dollars litigating in the United States (where, as is well known, litigation is very expensive). Those expenses are not part of Papaya Israel's ongoing expenses in the ordinary course of business, and now, with the conclusion of the litigation with Skillz, the picture is expected to change. Although the Applicants intend to appeal the Skillz Judgment, the stage involving most of the legal expenses has concluded. Legal expenses on a similar scale are not anticipated in the coming years.

30. By way of illustration, in 2024 these legal expenses reached approximately $25 million; without them, operating profit would have totaled approximately $70 million. In 2025, legal expenses rose to approximately $40 million; without them, the operating profit reported in the financial statements would have totaled approximately $62 million. Accordingly, the financial results for those years do not reflect Papaya Israel's profitability potential, but rather exceptional and unusual events imposed upon it.

31. The forecast reflects a continuing but conservative growth trend, taking into account, among other things, the extraordinary expenses described above.

32. The attached financial forecast therefore provides a responsible and substantiated basis for the proposed debt arrangement framework and supports the conclusion that the proposed arrangement is feasible and superior to every other alternative.

- ➢ A copy of the detailed financial forecast is attached as **Exhibit "2."**

33. The data in this exhibit show that Papaya Israel operates at particularly high gross profit margins, exceeding 92% in 2022–2025. These margins are expected to remain at a similar level in the coming years and throughout the forecast period. The gross profit margin demonstrates a business model with strong financial resilience.

34. Papaya Israel shows a consistent revenue growth trend as follows: approximately $163 million in 2021; approximately $334 million in 2022; approximately $461 million in 2023; approximately $533 million in 2024; and approximately $493 million in 2025 (in that year, one game faced challenges due to increased competition in its segment, resulting in an approximately 7% decline in revenue that year). Thus, in 2021–2025, Papaya Israel grew by <u>an average of 32% per year</u>.

35. Despite this impressive average, the financial forecast presented is more conservative. It projects continued significant but moderate revenue growth of between 10% and 16% in the coming years throughout the arrangement period.

36. Accordingly, the proposed debt arrangement includes a mechanism for depositing funds into the arrangement administrator's deposit account according to the available cash balance (as of January 3 of each calendar year). This is the cash balance in Papaya Israel's bank accounts, less certain amounts[1], but not exceeding the annual amounts specified in the arrangement. These amounts total close to $100 million for 2026 and many tens of millions of dollars in each subsequent year, as detailed in the proposed arrangement. Because actual figures may be better or worse than those included in the forecast, the arrangement provides that the arrangement administrator may apply for an increase or decrease in the annual amounts to be deposited with the administrator, based on the actual figures then available.

---

[1] Deducting only the amounts pledged to the banks holding the balances as security for bank guarantees to property landlords, credit card payments, and hedging transactions; player credit balances; and US $30 million to be allocated to ongoing operational management.

The annual deposits are intended to ensure that the Applicants can meet all their obligations while continuing their business operations without interruption.

## B(1). Legal Proceedings Against the Applicants

37. The legal proceedings pending against the Applicants are detailed below. Based on legal advice I have received, none of the proceedings described below has resulted in a final judgment no longer subject to appeal.

38. None of the pending claims described below, other than the Skillz Judgment, can materially affect the Applicants' financial capacity.

39. I emphasize that all the claims described below (including the Skillz Judgment) have been publicized and received media coverage, but this has had no adverse effect on the scale of the Applicants' operations.

### B(1).1. The Skillz Action – Skillz Platform Inc. v. Papaya Gaming, Ltd et al.,[2]

40. Skillz Platform Inc. is a publicly traded company incorporated in the United States and a business competitor of Papaya Israel. In March 2024, Skillz filed an action against the Applicants in a federal court in the State of New York, United States (the "**Skillz Action**"), as part of an improper strategy intended to address Skillz's continuing business failure and inability to compete with competing companies through customary means, after years of failing to improve its inferior product and business model.

41. As part of that strategy, Skillz also filed other actions against other competing companies in the industry, using the enormous amounts it had raised in the capital markets years earlier, which were intended to support business growth (not legal battles).

42. For example, Skillz filed the action Skillz vs. AviaGames, asserting various claims, including unfair competition, copyright infringement, and the use of bots, and alleging that AviaGames copied its platform.[3] That proceeding ended in a monetary settlement.

43. Skillz also filed the action Skillz vs. Voodoo, alleging false advertising and unfair competition on the ground that the defendant allegedly offered rigged games and used bots.[4] That proceeding remains pending and, to the best of the Applicants' knowledge, is at an early stage.

---

[2] Skillz Platform Inc. v. Papaya Gaming, Ltd. et al., No. 1:24-cv-01646-DLC (S.D.N.Y.)

[3] Blake Brittain, reuters: Mobile gaming company Skillz wins $43 million patent verdict against AviaGames (Feb. 10, 2024) https://www.reuters.com/legal/litigation/mobile-gaming-company-skillz-wins-43-mln-patent-verdict-against-aviagames-2024-02-09/.

[4] Skillz Platform Inc. v. Voodoo SAS, 1:24-cv-04991, (S.D.N.Y.) (2024) https://cases.justia.com/federal/district-courts/new-york/nysdce/1%3A2024cv04991/624144/195/0.pdf

44. Skillz's action against the Applicants likewise alleged that the Applicants presented their games misleadingly (False Advertising) and created unfair competition in the market through the alleged use of bots. Skillz sought damages or, alternatively, restitution in the hundreds of millions of dollars (alleging that the Applicants had been unjustly enriched at its expense).

45. As is customary in the State of New York in actions of this kind, the Skillz Action was decided by a jury. As stated above, on July 27, 2026, the judge issued a decision requiring the Applicants to pay Skillz more than $719 million.

46. As stated above, the Applicants intend to appeal the Skillz Judgment as of right to the Court of Appeals for the Second Circuit. Naturally, the Applicants are not challenging the Skillz Judgment in these proceedings. Nevertheless, I consider it appropriate to clarify to this Court that, in my view and with all due respect, the interlocutory decisions issued throughout the Skillz Action and the Skillz Judgment itself contain material errors of fact and law. Among other things, the Judgment proceeded from the erroneous premise that the use of bots is inherently improper, although it is a customary and accepted practice in the gaming industry, instead of examining whether the Applicants' advertisements were misleading. In addition, the Judgment did not address significant evidence presented by the Applicants negating a causal connection between their advertisements and the amount claimed. The Judgment is also based on "profits" allegedly earned by the Applicants in an astronomical amount many times greater than their net profit during the period relevant to the Skillz Action. Furthermore, Papaya Israel's counterclaims against Skillz, alleging that Skillz itself engages in practices similar to, and even more serious than, those it alleges against the Applicants, were dismissed without any factual inquiry. Among other things, **the court refused to allow the Applicants' witnesses to testify at trial**, substantially curtailed the Applicants' expert opinions (to the point of rendering them irrelevant and devoid of substance), limited the arguments the Applicants were permitted to present to the jury at trial, and more. We intend to present these and other matters in detail to the US appellate court. The Applicants believe their prospects of reversing the Judgment, or at least substantially reducing it, are high. In the assessment of the Applicants and their legal advisers, there is a substantial legal basis for a successful appeal resulting in a new trial or relief that would materially alter the outcome. Accordingly, the debt embodied in the Judgment is disputed and, in any event, based on legal advice I have received, is not currently enforceable in Israel. A situation must therefore not be permitted in which such a debt causes the collapse of a profitable Israeli company that provides a livelihood for hundreds of families in Israel.

**B(1).2. The Milberg Action[5]**

47. After the Skillz Action was filed, a US law firm named Milberg began contacting Papaya Israel's US customers and encouraging them to initiate arbitration proceedings against it based on alleged false advertising. The parties subsequently entered mediation and reached an agreement in principle to resolve the US consumers' claims on a class-wide basis.

[5] Barcelo et al. v. Papaya Gaming, Ltd. et al., No. 24STCV32626 (Cal. Super. Ct.)

48. Following that agreement, a class action was filed in December 2024 in the court in Los Angeles County, California, in which the class representative moved for approval of a settlement between the parties. In March 2026, the court in California, United States, approved the settlement reached through mediation between the parties, which will resolve the dispute in the United States for $15 million. An appeal from the decision approving the settlement is pending.

**B(1).3. <u>The Pavlovich Action</u>**[6]

49. To the best of my knowledge (since the pleadings have not yet been served), an individual action has been filed against the Applicants, as well as against AviaGames, in the court in Los Angeles, California, by a woman named Dawn Pavlovich, who opted out of the Milberg settlement. The plaintiff asserts claims against the Applicants and AviaGames similar to those in the other actions. This is an individual action for an immaterial amount of approximately $308,880.

**B(1).4. <u>The Robinson Action – Class Action 16869-09-25, Cassie Robinson v. Papaya Gaming Ltd.</u>**

50. In September 2025, a former Papaya Israel customer residing in Britain filed an application to certify a class action against it in the Tel Aviv–Jaffa District Court (before the Honorable Judge Amir Lukashinsky-Gal).

51. The certification application alleges misleading representations regarding Papaya Israel's past use of bots, with the proposed class comprising all Papaya Israel customers worldwide other than US customers.

52. Papaya Israel disputes the allegations on the merits and also argues that the action should be dismissed at the threshold on various grounds, including forum non conveniens, because the Israeli forum is inappropriate for adjudicating claims of non-Israeli class members. A pretrial hearing is scheduled for December 1, 2026.

**B(1).5. <u>The Kelly-Starkebaum Action</u>**[7]

53. In March 2024, Brenna Kelly-Starkebaum filed an action against the Applicants in the federal court for the Southern District of New York, alleging misleading representations regarding the past use of bots. In December 2024, the court granted the Applicants' motion to refer the dispute to arbitration and stayed the proceeding pending resolution of the arbitration.

54. In February 2025, the same plaintiff commenced an arbitration in which she argued that the arbitration agreement was unenforceable and that the case should return to court. In May 2025, the arbitrator determined that the arbitration agreement was enforceable and that the arbitration would continue before him. Civil consumer investigation by the Attorney General of the State of New Jersey.

55. In 2024, Papaya US received a request from the Attorney General of the State of New Jersey

---

[6] Pavlovich v. Papaya Gaming Ltd., (Cal. Super. Ct., L.A. Cnty. filed Apr. 2, 2026)
[7] Kelly-Starkebaum v. Papaya Gaming, Ltd. et al., No. 1:24-cv-02310-DLC (S.D.N.Y.)

for documents for a civil consumer investigation being conducted by his office concerning past practices that had been used. The Applicants are cooperating fully, have produced the requested documents, and have maintained ongoing contact with the Attorney General's Office for approximately two and a half years. Based on legal advice I have received, the debt arrangement does not apply to this matter.

## C. <u>The Proposed Arrangement</u>

56. The idea underlying the arrangement is simple: given the amount of the Skillz Judgment, the only way to pay all potential debts to all creditors in full is to allow the Applicants to continue their profitable business operations while retaining the profits in a special fund administered by the arrangement administrator for distribution to the contingent creditors.

➢ A copy of the proposed debt arrangement is attached and marked as **Exhibit "3."**

57. The guiding principle is to continue ongoing payments to all trade creditors so that these obligations continue to be paid in the Applicants' ordinary course of business. The Applicants meet all their obligations and are expected to continue meeting and paying them regularly without difficulty. Accordingly, the arrangement is premised on suppliers, employees, and all ongoing business creditors continuing to receive the amounts due to them through normal working relationships and in the ordinary course of business.

58. These ongoing operations will generate profits that will enable payment, within a few years, of the full debt owed to the contingent creditors insofar as their debts crystallize into judgments enforceable in Israel (both the plaintiffs in the various proceedings and Skillz). Each year's available cash balances, other than a fixed amount for ongoing management, will be directed to a dedicated fund, up to the ceilings specified in the debt arrangement (the **"Arrangement Administrator's Deposit"**). The Arrangement Administrator's Deposit will be used to pay contingent liabilities if and to the extent they become judgments enforceable in Israel in the future, including in Skillz's case, all as detailed in the debt arrangement.

59. Unlike the customary practice in debt arrangements, which, based on legal advice I have received, generally terminate the prosecution of applications for class action certification, it is proposed here that the application to certify a class action filed against Papaya Israel continue in the ordinary course. This component of the proposed arrangement demonstrates the Applicants' financial strength.

60. To ensure equal treatment, the arrangement does not permit payments from the Arrangement Administrator's Deposit to persons who do not hold judgments enforceable in Israel. Nevertheless, there is justification for retaining funds for them and ensuring the ability to pay "if and when."

61. Accordingly, the arrangement provides that no funds will actually be paid to Skillz until judgment is rendered on appeal, for several reasons:

(a) **<u>First</u>**, based on legal advice I have received, the Judgment is a foreign judgment subject to appeal. It has therefore not become final and nonappealable, and Skillz cannot enforce it in Israel at this stage.

(b) **Second**, as its financial statements show, Skillz is a loss-making public company on the brink of insolvency. A review of those public statements readily shows that Skillz has been a loss-making company from the outset and remains so.

Moreover, Skillz's attached financial statements contain a dramatic disclosure: its principal game developer, which accounted for approximately 51% of its revenues (!) in 2025 (a company named Tether), announced that it would stop marketing Skillz's games on its platform. This is a material fact concerning Skillz's ability to continue as a "going concern."

Furthermore, Skillz is in a critical financial condition, characterized, among other things, by cash burn of tens of millions of dollars annually, enormous debts of approximately $130 million owed to bondholders and due in December 2026, and dependence on revenues from a settlement agreement with AviaGames that are expected to end in early 2028.

- Copies of selected pages from Skillz's 2025 financial statements are attached and marked as **Exhibit "4."**

Once the bond debt is repaid, its cash balance is expected to become negative during 2027. In that situation, Skillz will be unable to meet its ongoing obligations and is expected to be unable to return funds paid to it.

- A copy of Skillz's cash flow forecast is attached and marked as **Exhibit "5."**

This forecast was prepared by the Applicants using the public information in Skillz's reports. Accordingly, there is a high probability that, if funds are paid to Skillz, it will be unable to return them if the Judgment is reversed or modified on appeal.

(c) **Third**, even if Skillz had sufficient financial strength to return funds received under the Judgment, recovery from an entity domiciled abroad whose principal activity is adversarial litigation would likely require lengthy and costly foreign litigation and international collection proceedings, imposing substantial and unnecessary expenses on the funds held by the arrangement administrator.

(d) **Finally**, leaving the funds on deposit with the arrangement administrator serves a further substantive purpose: preserving available funds for other contingent creditors, known and unknown. Considering the arrangement as a whole, retaining funds with the arrangement administrator for that purpose is also important, even though the Applicants believe those claims are unfounded and should be dismissed.

62. Depositing the funds in the Arrangement Administrator's Deposit, as proposed in the arrangement, sets aside and earmarks funds in advance for the contingent creditors, thereby benefiting Skillz, which, based on legal advice I have received, may not enforce the Judgment in Israel while it remains subject to appeal. Furthermore, the arrangement provides for the accrual of interest so that the contingent debt arising from the Skillz Judgment will be paid in full in accordance with the mechanism proposed in the debt arrangement.

63. The arrangement provides that all the Applicants' ongoing obligations (other than contingent debts) will continue to be paid regularly and on time, and the arrangement does not apply to them. Accordingly, only creditors defined as "Contingent" will be required to file proofs of claim. Creditors defined as "Excluded" are unaffected by the arrangement; they are not required to file proofs of claim, and no meetings of those creditors will be convened.

### D. Advantages of the Proposed Arrangement over Other Alternatives

64. Aggressive enforcement of the Skillz Judgment could lead to the Applicants' insolvency and liquidation, the practical and economic meaning of which, as stated, would be **the destruction of hundreds of millions in value for all stakeholders**.

65. The Applicants have enormous profit potential, and their going-concern value exceeds the value of their assets many times over. There is no reason to kill the goose that lays the golden eggs (unless the true objective is to remove a business competitor from the market). The arrangement proposed here is the only way for all creditors to receive everything due to them, and it will also benefit the other stakeholders, including hundreds of Papaya Israel employees, suppliers, businesses having commercial relationships with the Applicants, players, and others.

66. Approval of the proposed arrangement is therefore appropriate, proper, and necessary, because it alone can ensure the continued regular payment of ongoing obligations, even assuming that the Skillz Judgment is not substantially reduced on appeal (an assumption the Applicants consider wholly unreasonable), and even if other actions result in substantial awards to their plaintiffs.

67. Clearly, if Skillz is indeed interested in repayment of the alleged debt owed to it, approval of the proposed arrangement is first and foremost in its own clear and substantial interest. Without this arrangement, which ensures that Papaya Israel continues its business operations and works to maximize profits, the Applicants are expected to be unable to make full payment to Skillz.

68. It must also be borne in mind that Papaya Israel provides a livelihood for hundreds of households in Israel. Implementing the proposed arrangement will preserve its employees' source of livelihood.

69. Skillz cannot pursue liquidation and enforcement proceedings in Israel because the Judgment it holds has not become final and nonappealable. Nevertheless, enforcement of the Skillz Judgment, even against assets and rights abroad, would block the Applicants' payment-clearing operations and choke off their operations entirely. From there, the road to the Applicants' dissolution and liquidation would be short.

70. There is serious concern that eliminating a competitor, whether through liquidation or other means, is Skillz's true intention; it has already demonstrated that its approach is to sue competitors in order to harm them financially.

71. Accordingly, the arrangement is the best alternative in the circumstances for the Applicants, the creditors, the employees, and the other stakeholders.

## E. <u>The Applicants' Assets and Liabilities</u>

72. The Applicants' principal assets and debts are summarized below. Full details are provided in Form 1 attached.

- A copy of Papaya Israel's Form 1 is attached and marked as **Exhibit "6."**

- A copy of Papaya US's Form 1 is attached and marked as **Exhibit "7."**

### E(1).1. <u>Principal Assets and Rights</u>

73. **The Applicants' principal asset is their operations themselves**—operations that generate steady positive cash flow.

74. **<u>Papaya Israel's assets:</u>** (a) **Intangible assets:** Papaya Israel is a technology company. Its principal intellectual property consists of the technological platform, unique algorithms, clearing and payment systems, brand names, and the like. (b) **Cash:** Papaya Israel holds significant cash balances and liquid short-term investments in its bank accounts. Shortly before the filing of this application, the Applicants' bank balances total approximately $151 million.

75. **<u>Papaya US's assets:</u>** Papaya US has various assets in the United States, such as bank accounts, a security deposit for payment-clearing purposes, a right to a tax refund from the US tax authorities, and contractual rights. Its principal assets are operational contracts entitling it to receive funds from US payment-clearing companies, which it is obligated to transfer to Papaya Israel. It also has assets in Israel, such as a bank account.

### E(1).2. <u>Principal Debts and Obligations</u>

76. **<u>Bank Leumi as a secured creditor:</u>** Deposits held by Papaya Israel at Bank Leumi Ltd. are pledged to the bank as security for payment under bank guarantees issued to property landlords. The debt to the bank stated in this context in Form 1 is therefore a <u>contingent</u> debt that will arise only if a lawful demand is made to draw on the bank guarantee. Apart from this contingent debt, Papaya Israel owes no debt to Bank Leumi, and its accounts at the bank have credit balances.

77. **<u>Lease agreement:</u>** Papaya Israel entered into two long-term leases, one through July 2027 and the other through September 2027, for the offices from which it operates in the "Sky Tower" towers at 35 HaMasger Street, Tel Aviv. The company also entered into a management-fee agreement ancillary to the leases, with a term corresponding to the lease terms. The aggregate obligations remaining payable under these agreements through the end of those terms total approximately NIS 10.5 million. The debt stated in this context in Form 1 is **solely a future debt** through the end of the term. Rent is paid in advance, and the Applicants have no existing debt under these agreements.

78. **<u>Priority creditors:</u>** The Applicants have no priority creditors.

79. **<u>General and subordinated creditors:</u>** The Applicants have no "past" debts in the ordinary sense. They pay all their obligations to suppliers, employees, players, and service providers

regularly and on time. Naturally, at any "cutoff" date, ongoing debts exist, and those debts appear in Form 1 as the Applicants' "past debts." These include obligations to players on the platform. Any player with a credit balance in the player's Papaya Israel account may withdraw those funds at any time. As of June 30, 2026, Papaya Israel's outstanding liability to players totals approximately $12 million.

80. **List of the Applicants' officers:**

- A copy of the list of the Applicants' officers and officers who ceased serving during the 12 months preceding the filing of the application is attached and marked as **Exhibit "8."**

81. **Copies of financial statements for the last two years:**

- Copies of the financial statements for the two years preceding the filing of the application are attached and marked as **Exhibit "9."**

82. **Characteristics of the corporation's customers and degree of dependence on them:** Papaya Israel's customers are the players who install the app and play its games. The Applicants are not dependent on specific customers.

83. **Dependence on suppliers and raw materials:** Papaya Israel depends on technology service providers, such as payment-clearing providers, cloud service providers, advertising providers, and app stores, but does not depend on raw materials.

84. **Unique characteristics and risk factors:** Papaya Israel's unique characteristic lies in its technological capabilities, which enabled development of its unique platform and allow it to provide a gaming experience tailored to each player. The principal risks to which it is exposed, like all companies operating in the global gaming market, include dependence on distribution platforms, operating systems, and app store policies; exposure to regulatory changes and enforcement in gaming and payments in various countries; product concentration (dependence on revenues from a few leading products); exchange-rate fluctuations; and competition for players' attention and consumers' leisure and entertainment budgets.

85. **Individual controlling the corporation:** Based on legal advice I have received, under the definition of "control," the Applicants' founders, Mr. Uriel Becher, Mr. Andrey Birman, and Mr. Alexander Liakhovsky, control the Applicants.

86. **Material agreements to which the Applicants are parties:** The Applicants' material agreements primarily consist of agreements with app stores, payment-clearing companies, intercompany agreements, service providers, a lease agreement, and advertising agreements, as detailed in the attached Form 1.

87. **Information on distributions made during the last three years:** Papaya Israel distributed dividends totaling $103 million during the last three years. For clarity, no dividends were distributed shortly before, and of course none after, the jury's verdict in the Skillz Judgment.

88. **Number of employees:** As stated above, Papaya US has no employees (other than one individual serving as a director of Papaya US). Papaya Israel, by contrast, employs approximately 300 employees and engages several additional service providers.

This is my name, this is my signature, and the contents of this affidavit are true.

Uriel Becher

I certify that on 07/29/2006, Mr. Uriel Becher, holder of Identity Card No. 201410008/personally known to me, appeared before me, Attorney Ifat Steinman, and, after I warned him that he must declare the truth and that failure to do so would subject him to the penalties prescribed by law, he confirmed the accuracy of the above declaration and signed it before me.

**Ifat Steinman, Attorney**
Bar No. 23949

07/29/2006
Date