REDACTED VERSION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Papaya Gaming Ltd., *et al.*,[1] | Case No. 26-11217 (MFW) |
| Debtors in a foreign proceeding. | (Jointly administered) |

**THE FOREIGN REPRESENTATIVE'S REPLY TO THE OBJECTION OF SKILLZ PLATFORM INC. TO VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF THE ISRAELI PROCEEDING AS A FOREIGN MAIN OR, ALTERNATIVELY, A FOREIGN NONMAIN PROCEEDING**

[1] The Debtors in these Chapter 15 proceedings, together with the last four digits of their business number or employee identification number, as applicable, are: Papaya Gaming Ltd. (2095); and Papaya Gaming Inc. (3649). The location of the Debtors' headquarters and Foreign Representative's contact address is 35 HaMasger St., Tel Aviv-Yaffo 6721407, Israel.

REDACTED VERSION

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

- A. Papaya's Business and Operations Are Israeli-Based ..... 5
- B. All Management and Decision-Making Authority Reside in Israel ..... 6
- C. The Debtors' Principal Assets Are Located in Israel ..... 6
- D. The Debtors' Public-Facing Identity Is Israeli ..... 8
- E. The SDNY Judgment and the Appeal ..... 10
- F. The Israeli Proceeding ..... 10

ARGUMENT ..... 13

- A. The Israeli Proceeding Is a "Foreign Proceeding" ..... 14
- B. Papaya Israel's Center of Main Interests Is Israel ..... 15
  - i. Skillz' Theory That Revenue and Customer Location Determine COMI Fails as a Matter of Law ..... 16
  - ii. Papaya Israel's Primary Assets Are Located in Israel ..... 18
  - iii. Creditor Location Factor Favors Israel ..... 20
  - iv. Israeli Law Governs Papaya Israel's Corporate Affairs and Key Operational Arrangements ..... 21
  - v. Papaya Israel's Israeli Identity Is Readily Ascertainable ..... 22
- C. Papaya US's COMI Is Also Israel, and Alternatively, Papaya US Has an Establishment There ..... 24
  - i. Papaya US's COMI Is Israel ..... 24
  - ii. In the Alternative, Papaya US Has an Establishment in Israel ..... 28
- D. Israel Has Been the Debtors' COMI Since Their Founding ..... 31
  - i. Papaya Did Not Move or Manipulate its COMI, Which Has Always Been Israel ..... 31
  - ii. [redacted] ..... 32
  - iii. [redacted] ..... 34
- E. The Foreign Representative Is Entitled to the Requested Relief ..... 35
  - i. Section 1520(a) Automatically Provides the Relief Necessary for the Foreign Representative to Operate the Debtors' Business ..... 36

**TABLE OF CONTENTS**
(continued)

**Page**

ii. Section 1522(a) Is Satisfied: The Israeli Proceeding Provides Full Creditor Protection, and Skillz' Proposed Conditions Would Serve Only Its Own Competitive Interests ........ 38

iii. Should the Court Conclude That Papaya US's COMI Is Not Israel, Section 1521 Authorizes the Relief the Foreign Representative Has Requested ........ 42

F. Section 1506 Does Not Bar Recognition ........ 44

CONCLUSION ........ 48

## TABLE OF AUTHORITIES

Page(s)

### Cases

*In re ABC Learning Ctrs. Ltd.*,
728 F.3d 301 (3d Cir. 2013)....14

*In re Agrokor d.d.*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018)....36

*In re Atlas Shipping*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009)....38, 43, 44

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008)....27

*In re Betcorp Ltd.*,
400 B.R. 266 (Bankr. D. Nev. 2009)....14, 15

*In re Black Gold S.A.R.L.*,
635 B.R. 517 (B.A.P. 9th Cir. 2022)....45

*In re Blitz U.S.A., Inc.*,
475 B.R. 209 (Bankr. D. Del. 2012)....37

*In re British Am. Ins. Co.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010)....14, 28, 29, 31

*In re Cell C Proprietary Ltd.*,
571 B.R. 542 (Bankr. S.D.N.Y. 2017)....17

*In re Creative Fin. Ltd.*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016)....29, 30, 45

*In re Credito Real S.A.B. de C.V., SOFOM, E.N.R.*,
677 B.R. 192 (D. Del. 2026)....38, 44, 45

*In re Culligan Ltd.*,
No. 20-12192 (JLG), 2021 WL 2787926 (Bankr. S.D.N.Y. July 2, 2021)....21, 32

*In re ENNIA*,
596 B.R. 316 (Bankr. S.D.N.Y. 2019)....38

*In re Ephedra Prods. Liab. Litig.*,
349 B.R. 333 (S.D.N.Y. 2006)....44

*In re Fairfield Sentry Ltd.*,
539 B.R. 658 (Bankr. S.D.N.Y. 2015),
*aff'd*, 690 F. App'x 761 (2d Cir. 2017)....37

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Giftcraft Ltd.*,
No. 25-11030 (MG), 2025 WL 1583480 (Bankr. S.D.N.Y. June 4, 2025) ............................24

*Grogan v. Garner*,
498 U.S. 279 (1991)..........................................................................................................46

*In re Hanjin Shipping Co.*,
No. 16-27041 (JKS), 2016 WL 6679487 (Bankr. D.N.J. Sep. 20, 2016)...............................42

*In re Holm*,
75 B.R. 86 (Bankr. N.D. Cal. 1987) ...............................................................................41, 42

*In re IMV Inc.*,
No. 23-10589 (KBO) (Bankr. D. Del. June 2, 2023)...........................................................25

*In re Iovate Health Scis. Int'l Inc.*,
673 B.R. 516 (Bankr. S.D.N.Y. 2025)...............................................................24, 26, 28

*Jaffé v. Samsung Elecs. Co.*,
737 F.3d 14 (4th Cir. 2013) ................................................................................................42

*In re Li-Cycle Holdings Corp.*,
No. 25-10991 (PB) (Bankr. S.D.N.Y. May 23, 2025) .........................................................25

*In re Lighthouse Immersive Inc.*,
No. 23-11021 (LSS) (Bankr. D. Del. Aug. 28, 2023)...........................................................25

*In re Lion Elec. Co.*,
No. 24-18898 (DDC) (Bankr. N.D. Ill. Jan. 21, 2025) .........................................................25

*In re Markus*,
610 B.R. 64 (Bankr. S.D.N.Y. 2019)...............................................................................43, 44

*In re Marsch*,
36 F.3d 825 (9th Cir. 1994) ...........................................................................................41, 42

*Matal v. Tam*,
582 U.S. 218 (2017)..........................................................................................................18

*In re Mega Newco Ltd.*,
No. 24-12031 (MEW), 2025 WL 601463 (Bankr. S.D.N.Y. Feb. 24, 2025) ..........................31

*In re Mood Media Corp.*,
569 B.R. 556 (Bankr. S.D.N.Y. 2017)...............................................................................29, 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re NanoString Technologies, Inc.*,
Case No. 24-10160 (CTG) (Bankr. D. Del. Mar. 1, 2024)....................37

*In re Nexii Bldg. Sols. Inc.*,
No. 24-10026 (JKS) (Bankr. D. Del. Feb. 9, 2024)....................25

*In re NextPoint Fin. Inc.*,
No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023)....................25

*In re NFE Glob. Holdings Ltd.*,
No. 26-11268 (MG), 2026 WL 2032660 (Bankr. S.D.N.Y. July 14, 2026)....................32

*In re Ocean Rig UDW Inc.*,
570 B.R. 687 (Bankr. S.D.N.Y. 2017)....................17, 27

*In re Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicial*,
669 B.R. 457 (Bankr. S.D.N.Y. 2025)....................45

*In re Phoenix Services TopCo, LLC*,
Case No. 22-10906 (MFW) (Bankr. D. Del. June 13, 2023)....................37

*In re Prince Glob. Holdings Ltd.*,
No. 26-10769 (MG), 2026 WL 1694259 (Bankr. S.D.N.Y. June 11, 2026)....................38

*In re Qimonda AG Bankr. Litig.*,
433 B.R. 547 (E.D. Va. 2010)....................46, 47

*In re Rede Energia S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014)....................42

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019).................... *passim*

*In re Servicos de Petroleo Constellation S.A.*,
613 B.R. 497 (Bankr. S.D.N.Y. 2020)....................28

*In re SimEx Inc.*,
No. 24-10083 (TMH) (Bankr. D. Del. Feb. 20, 2024)....................25

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006),
*aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).................... *passim*

*In re Sunac China Holdings Ltd.*,
656 B.R. 715 (Bankr. S.D.N.Y. 2024)....................18, 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re The Hertz Corp.*,
Case No. 20-11218 (MFW) (Bankr D. Del. June 25, 2020) ....................37

*In re Thentia USA Inc.*,
No. 26-10222, slip op. (Bankr. D. Del. Sept. 23, 2026) (Goldblatt, J.) ....................45

*In re U.S. Steel Canada Inc.*,
571 B.R. 600 (Bankr. S.D.N.Y. 2017) ....................17

**Statutes**

11 U.S.C.
§ 101 ....................14
§ 363 ....................36, 42
§ 365 ....................42, 46
§ 523 ....................46
§ 552 ....................36
§ 1501 ....................47
§ 1502 ....................28, 29
§ 1506 .................... *passim*
§ 1507 ....................36
§ 1516 ....................15
§ 1517 ....................2, 15
§ 1519 ....................5, 10, 20
§ 1520 .................... *passim*
§ 1521 .................... *passim*
§ 1522 ....................36, 38, 41, 42

**Rules**

Bankruptcy Rule 1007 ....................20

**Other Authorities**

Eleanor Brennan Conlon, *An Analysis of Courts' Applications of the SPhinX Factors to Determine a Debtor's Center of Main Interests*, 34 Am. Bankr. Inst. L. Rev. 107 (Winter 2026) ....................16

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:3 (5th ed.) ....................18, 19

William F. Patry, *Patry on Copyright* § 17:77 ....................19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

UNCITRAL Model Law on Cross-Border Insolvency
with Guide to Enactment and Interpretation (2014) ....................................................43

Oriel Bachar, in his capacity as a duly authorized foreign representative (the "Foreign Representative") of Papaya Gaming Ltd. ("Papaya Israel") and Papaya Gaming Inc. ("Papaya US," and together with Papaya Israel, the "Debtors" or "Papaya"), through his undersigned counsel, respectfully submits this Reply to Skillz Platform Inc.'s ("Skillz") *Objection of Skillz Platform Inc. to Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding as a Foreign Main or, Alternatively, a Foreign Nonmain Proceeding* [Docket No. 107] (the "Opposition"). In support thereof, the Foreign Representative respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. Papaya commenced the Israeli Proceeding for the express purpose of paying every creditor, including Skillz, 100 cents on the dollar. It has not proposed to liquidate, sought to impair any claim, or attempted to evade its obligations. It has done the opposite: submitted itself to a court of competent jurisdiction in its center of main interests ("COMI"), accepted the appointment of an independent Arrangement Administrator with full access to its books, records, and accounts, and presented a restructuring framework that sets the stage for negotiations among Papaya, the Arrangement Administrator, and creditors, which is expected to result in an approved Debt Arrangement by November 24, 2026. Notwithstanding Papaya's good faith efforts to preserve its going concern operations and maximize value for creditors and all other stakeholders, Skillz has fought Papaya every step of the way. The only obstacle standing between Skillz and complete recovery on its judgment is Skillz itself.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition filed at D.I. 4. All references to "Ex." shall refer to the list of exhibits filed in the *Appendix to The Foreign Representative's Reply to the Objection of Skillz Platform Inc. to Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding As A Foreign Main Or, Alternatively, A Foreign Nonmain Proceeding*, filed contemporaneously herewith. All references to "DX" shall refer to the list of exhibits filed in the *Appendix to Objection of Skillz Platform Inc. to Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding As A Foreign Main Proceeding Or, Alternatively, A Foreign Nonmain Proceeding*, filed at D.I. 108.

2. The issue presently before this Court presents a single, narrow question: whether the Israeli Proceeding satisfies the criteria for recognition under section 1517 of the Bankruptcy Code. It does. No U.S. court has ever found that a debtor's COMI diverges from the jurisdiction in which it is headquartered and from which its management exercises decision-making authority. Here, both of these factors unequivocally point to Israel, and Skillz offers nothing to move this Court to reach a different result. But rather than engage fully with the legal standards that Chapter 15 imposes, Skillz asks the Court to deny recognition of the Israeli Proceeding based on a novel and unsupported theory that a debtor's COMI must be the jurisdiction where a majority of its customers live. Skillz' argument is plainly incorrect as a matter of law and flies in the face of twenty years of jurisprudence in cross-border insolvency cases.

3. Perhaps recognizing the inherent weakness of its central argument, Skillz' Opposition also contorts the *SPhinX* factors in a feeble effort to rebut the presumption (and common sense conclusion) that a company like Papaya, (i) which was founded in Israel, (ii) whose management and employees are all located in Israel, and (iii) whose primary assets are located in Israel, somehow does not have COMI in Israel. For the reasons set forth below, a true and accurate application of the *SPhinX* factors yields the unremarkable conclusion that Papaya—an Israeli enterprise in every sense of the word—properly commenced its insolvency proceeding in its home jurisdiction and, through its recognition motion, is appropriately seeking this Court's assistance under the well-accepted application of Chapter 15 standards and principles of comity. Each of Skillz' attacks, including its audacious contention that the Court should effectively ignore the straightforward application of the *SPhinX* factors, create new law, and deny recognition based on a purposeful misreading of the case law applying the section 1506 public policy exception, is nothing more than an attempt to undermine a competitor's rehabilitation and transform a run-of-

the-mill recognition hearing into an extension of its litigation against Papaya in the Southern District of New York.

4. Skillz' behavior makes plain that it does not want to be paid on account of its judgment won in that case. It wants to put Papaya out of business. This is because Skillz is not a traditional judgment creditor seeking orderly repayment. It is a direct competitor in the mobile gaming industry that has waged sustained, multi-front litigation against Papaya (and others in the same market), with the evident objective of eliminating Papaya (and other market rivals). Skillz is now deploying its judgment against Papaya as a weapon to further advance that same strategy in the Israeli proceeding and under Chapter 15. In Israel and in the United States, Skillz has fought against all of Papaya's efforts to maintain its ordinary course operations, which are the only way for Papaya to generate the funds necessary to satisfy claims asserted by Skillz and other creditors. Instead, Skillz has consistently impeded Papaya's efforts to reorganize. Its opposition to Papaya's Chapter 15 proceeding is the centerpiece of this misguided strategy.

5. What unifies Skillz' arguments and exposes their purpose is the relief Skillz seeks: a prohibition on the transfer of U.S.-generated cash from U.S. accounts to Israel and a bar on the ordinary course intercompany remittances which fund Papaya's operations. Skillz' request is based on a misapplication of section 1521, which is only implicated if the Court determines that Israel is not Papaya's COMI, and only requires "sufficient protection" on a showing that the Israeli Proceeding is somehow defective in vindicating Skillz' rights as a creditor. As set forth below, Skillz falls well short of meeting that strict burden, as even its own Israeli law expert acknowledges that the Part J proceedings currently under way in Israel are participatory and fair. Against that backdrop, Skillz' demands to materially interrupt Papaya's ordinary course cash management system can be viewed for what they are: an attempt to improperly destroy its competitor.

6. Skillz asks the Court to treat Papaya's primary U.S. asset—cash—as belonging to Skillz by virtue of its temporary location in the United States, rather than as part of a single, coordinated estate administered by a court of competent jurisdiction in the Debtors' COMI. Congress rejected precisely that approach when it enacted Chapter 15 to implement the UNCITRAL Model Law on Cross-Border Insolvency, which displaced the old territorialist model in favor of a universalist framework that recognizes a single foreign proceeding as the primary forum for the administration of a debtor's affairs, with ancillary courts deferring to that proceeding. Skillz' demand to freeze U.S.-generated cash in place and functionally prevent the Israeli Proceeding from serving as the primary administration of the estate assets is an invitation to do precisely what Congress and the U.S. courts applying Chapter 15 have foreclosed.

7. This Court should grant recognition of the Israeli Proceeding, overrule the Opposition, and authorize the Foreign Representative to continue operating the Debtors' business in the ordinary course so that Papaya can do what Skillz is trying to prevent: complete a restructuring that will enable it to preserve its going concern operations and pay its creditors—including Skillz—in full.

## BACKGROUND

8. Detailed information on the Debtors, their corporate structure, operations, assets and liabilities, the Israeli Proceeding and events leading thereto are contained in the Verified Petition[3] and are incorporated herein by reference.

[3] D.I. 4.

### A. Papaya's Business and Operations Are Israeli-Based

9. Papaya Israel centrally manages from Israel the entirety of the enterprise, including Papaya US. It has approximately 300 employees in total, all of whom are based in Israel.[4] Papaya Israel's principal offices occupy multiple floors of the TLV Sky Building at 35 Hamasger St., Tel Aviv.[5] The Debtors' CEO, Mr. Bachar, put it plainly: [redacted][6]

10. The day-to-day operations of Papaya US and its corporate governance are likewise all centered in Israel. Papaya US has no offices or facilities and no employees.[7] The day-to-day operations of this entity are performed by Israeli-based personnel, who hold positions at Papaya Israel, including, among others, [redacted].[8] Mr. Bachar confirmed as much: [redacted][9] Papaya US's board of directors consists of four directors, three of whom are located in Israel. Mr. Bachar, who is also located in Israel, serves as Papaya US's sole officer.[10] James Kong, Papaya US's sole U.S.-based director, serves as its only independent contractor for the limited[11] purpose [redacted]

---

4 D.I. 5 ¶ 10 (*Declaration of Oriel Bachar in Support of the (I) Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding as a Foreign Main Proceeding or, Alternatively, a Foreign Nonmain Proceeding, and (II) Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, the "Foreign Rep. Decl.").

5 *Id.* ¶ 15.

6 Ex. 1 at 61:12–14.

7 *See* D.I. 5 ¶ 11 (Foreign Representative Declaration).

8 *See* Ex. 3 at 8–9 ([redacted])

9 Ex. 1 at 115:5–6; 109:12–17.

10 *See* D.I. 5 ¶ 7 (Foreign Representative Declaration).

11 Mr. Kong [redacted]. Ex. 1 at 94:19–95:2.

[redacted][12] [redacted].[13]

**B. All Management and Decision-Making Authority Reside in Israel**

11. Every significant decision affecting the Debtors is made in Israel, including strategic, operational, and financial decisions. Papaya Israel's management team consists entirely of Israeli residents and nationals who exercise that authority from Israel.[14] Three of Papaya US's four directors are Israeli citizens and residents; Mr. Kong, Papaya US's remaining director, is an independent contractor with limited [redacted], as described above.[15] All decision-making concerning the direction, financing, and daily operations of the Debtors—including all decisions relating to the Israeli Proceeding, the Debt Arrangement, banking and treasury, and intellectual property—occurs in Israel.

**C. The Debtors' Principal Assets Are Located in Israel**

12. The asset that drives all of the Debtors' revenue is the gaming platform owned, developed, operated, and maintained entirely by Papaya Israel from Israel. That platform, built on source code, proprietary technology, and accumulated know-how created and housed in Israel, is

---

[12] *See* Ex. 3 at 8 ([redacted]); Ex. 1at 125:14–21 ([redacted]); Ex. 2 at 60:18–62:7 ([redacted]).

[13] *See* Ex. 1 at 112:22–113:15

[14] D.I. 5 ¶¶ 7, 36 (Foreign Rep. Decl.); *see also* Ex. 4 ([redacted]); Ex. 5 ([redacted]); Ex. 6 ([redacted]); Ex. 7 at -1214 –15 ([redacted]); Exs. 8–10 ([redacted]); Exs. 8–10 ([redacted]).

[15] *See* D.I. 5 ¶¶ 7, 36 (Foreign Rep. Decl.); *see also* Ex. 28 at 7–8 ([redacted]); Ex. 14 at -1447 ([redacted]; Ex. 15 at -993–94 ([redacted]).

what powers the games, attracts users, and generates every dollar of Papaya's revenue.[16] The platform's intellectual property is owned exclusively by Papaya Israel: it holds the copyrights in the Debtors' games, including *Solitaire Cash*, *Bingo Cash*, and *Bubble Cash* and the trademarks for PAPAYA GAMING as well as all trademarks associated with the Debtors' games.[17] Six of the Debtors' U.S. trademark registrations originated as international registrations under the Madrid Protocol, which identifies Israel as the home country, extending Papaya Israel's *Israeli* registrations into the United States.[18] Papaya US assigned the remaining U.S. trademark registrations to Papaya Israel in 2022, which was duly recorded with the USPTO.[19]

13. Papaya US's principal asset is its Intercompany Services Agreement with Papaya Israel,[20] [redacted].[21] Papaya US does not have any other intercompany agreements with Papaya Israel or any non-debtor affiliate. [redacted]

---

[16] *See* D.I. 5 ¶¶ 8–11 (Foreign Rep. Decl.); *see also* Ex. 16 at 141:7–17 ([redacted]).

[17] *See* D.I. 5 ¶ 8 (Foreign Rep. Decl.); *see also* Ex. 17 (U.S. Patent Office trademark filings for "COOKIE CASH," Money Ball design, Papaya's orange star logo, Papaya's black star logo, "PAPAYA," and Cookie Cash logo, each listing ownership by "Papaya Gaming Ltd" in "Tel Aviv "Tel Aviv _Yafo Israel" and accompanied by an international registration number).

[18] *See* Ex. 18 (World Intellectual Property Organization "WIPO" Madrid System reports for "COOKIE CASH," Money Ball design, Papaya's black and orange star logos, "PAPAYA," and Cookie Cash logos—in each case the trademark is owned by "Papaya Gaming Ltd" at "Tel Aviv - Yafo (IL)" and an international registration number is listed); *see also* Ex. 21 at -0049 (Certified translation of the Israeli Company Register showing "Information concerning intellectual property form (sic) the Patent Authority" as produced at PAPAYA_000000001).

[19] *Compare* Ex. 17 at 5 (USPTO registration noting international registration number 1742115) *with* Ex. 18 at 2 (International registration for trademark 1742115); Ex. 17 at 10 (USPTO registration noting international registration number 1780842) *with* Ex. 18 at 3 (International registration for trademark 1780842); Ex. 17 at 15 (USPTO registration noting international registration number 1729928 *with* Ex. 18 at 5 (International registration for trademark 1729928); Ex. 17 at 20 (USPTO registration noting international registration number 1742873) *with* Ex. 18 at 7 (International registration for trademark 1742873); Ex. 17 at 24 (USPTO registration noting international registration number 1732035) *with* Ex. 18 at 9 (International registration for trademark 1732035); Ex. 17 at 28 (USPTO registration noting international registration number 1750768) *with* Ex.18 at 10 (International registration for trademark 1750768).

[20] *See* Exs. 19, 20 [redacted]).

[21] *Id*.

[redacted].[22] [redacted].[23]

**D. The Debtors' Public-Facing Identity Is Israeli**

14. Papaya's public-facing identity is Israeli. When players download Papaya games, the Apple App Store, Google Play Store, and Samsung Galaxy Store identify Papaya Israel as the publisher and list Papaya's Tel Aviv address or direct users to Papaya's website.[24] The Debtors' Privacy Policy and Terms of Use likewise identify Papaya Israel as the operator and designate Israeli law and Israeli courts as the governing law and exclusive forum for user disputes, with

---

[22] *See* Ex. 19 [redacted].

[23] *See* Exs. 19, 20 ([redacted]); *see, e.g.* Ex. 22 at -0403 [redacted]); *see also* Ex. 26 ([redacted]).

[24] *See* Solitaire Cash: Win Real Money, Apple App Store, https://apps.apple.com/us/app/solitaire-cash-win-real-money/id1446254576 (last visited Sep. 16, 2026) (Listing Papaya Israel as "Seller"); Bubble Cash, Apple App Store, https://apps.apple.com/us/app/bubble-cash/id1475514684 (last visited Sep. 29, 2026) (same); Bingo Cash, Apple App Store, https://apps.apple.com/us/app/bingo-cash-win-real-money/id1522266397 (last visited Sep. 16, 2026) (same); Solitaire Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.solitairecash.play&hl=en_US (last visited Sep. 29, 2026) (Under "App support" lists the "developer" as "Papaya Gaming Ltd" at "35 Hamasger Tel Aviv-Jaffa[,] Israel"); Bingo Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.bingocash.play&hl=en_US (last visited Sep. 29, 2026) (same); Bubble Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.bubblecash.play&hl=en_US (last visited Sep. 29, 2026) (same); Solitaire Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.solitairecash (last visited Sep. 29, 2026) (Listing "Papaya Gaming Ltd." under "Seller Info" with an address at "Tel Aviv-Jaffa"); Bingo Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.bingocash (last visited Sep. 29, 2026) (same); Bubble Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.bubblecash (last visited Sep. 29, 2026) (same).

carveouts only for U.S. and U.K. users.[25] Other places where individuals may connect with Papaya are no different. Papaya Israel's Facebook page showcases the company's Tel Aviv headquarters, and posts include videos subtitled in Hebrew.[26] Papaya Israel's LinkedIn page reinforces the point, describing Papaya's Israeli headquarters as a recipient of Duns 100's "Top 50 Hi-Tech Companies in Israel To Work For" recognition.[27]

15. The same Israeli center of gravity characterizes the Debtors' relationships with their business counterparties and their players. Papaya's material vendor and third-party service contracts[28] [redacted].[29] [redacted].[30] Mr. Bachar confirmed that for Papaya US, "[redacted]

---

[25] *See* Ex. 27 at -1619 (Papaya's privacy policy, as produced at PAPAYA_000001610); DX 9 § 18 (noting for all users other than those residing in the U.S. or U.K., arbitration under Israeli law shall govern); *see also id.* DX 9 § 5 (Papaya Terms of Use expressly incorporating "Israel's Trading with the Enemy Ordinance of 1939" in its "Compliance with Laws" section).

[26] https://www.facebook.com/papayagaming/ (last visited Sep. 16, 2026) (noting "Papaya Gaming Ltd is responsible for this page"); *see also* Life at Papaya, Instagram, https://www.instagram.com/lifeatpapaya/ (last visited Sep. 16, 2026) (showcasing Papaya employees at Tel Aviv headquarters with many posts in Hebrew).

[27] *See Papaya - Overview*, LinkedIn, https://www.linkedin.com/company/papayaltd/home/ (last visited Sep. 29, 2026).

[28] Skillz deliberately misrepresents the record in saying [redacted]. *See* Opposition ¶ 6. As Skillz is well aware, Papaya has many other contracts with counterparties around the world, yet the Court noted that "contracts with respect to U.S.-based counterparties" was all that was necessary to a determination of Recognition. *See* D.I. 126 at 43:9–12. Even so, [redacted]. *See* Ex. 28 at 32 ([redacted]).

[29] *See* Ex. 29 at -1430 ([redacted]); *see also* Ex. 23 at -0143 ([redacted]); *Id.* Ex. 24 at -0153 ([redacted]).

[30] *See* Ex. 1 at 116:5–10 ([redacted]); *see also* Ex. 3 at 8-9 [redacted].

[redacted][31] [redacted]

[redacted][32]

## E. The SDNY Judgment and the Appeal

16. On July 31, 2026, the United States District Court for the Southern District of New York entered a final judgment in favor of Skillz against Papaya (the "SDNY Judgment"), which rendered Skillz a contingent creditor of Papaya. The Debtors have appealed the SDNY Judgment to the United States Court of Appeals for the Second Circuit (the "Appeal"), which remains pending. Notwithstanding this Court's prior admonition against relitigating the Skillz Litigation, Skillz continues to press the merits of the SDNY Judgment at every hearing in this case and in multiple written submissions, including the devotion of substantial portions of its Opposition to characterizations of the Foreign Representative and Papaya's principals. While the Debtors dispute those characterizations, they are also irrelevant to recognition and to the statutory criteria this Court must apply. Importantly, as Judge Cote's July 27, 2026, opinion and order confirms, the conduct complained of in the Skillz Litigation ceased years ago.[33]

## F. The Israeli Proceeding

17. The Israeli Proceeding is a collective, court-supervised restructuring under the Israeli Insolvency Law.[34] The Debtors commenced the Israeli Proceeding by application to the Israeli Court, seeking (i) a stay of enforcement actions and (ii) approval of a debt arrangement

---

[31] Ex. 1 at 116:5–10.

[32] *Id.* at 116:9–15 [redacted]).

[33] Ex. 30, Opinion and Order at 52, *Skillz Platform Inc. v. Papaya Gaming Ltd., et al.*, 24-cv-1646 (S.D.N.Y. Jul. 27, 2026), D.I. 1007 ("It appears that Papaya largely ceased its false advertising in late 2023 by discontinuing the use of bots in its tournaments and there is no realistic possibility that Papaya will return to its false advertising campaign now that the unlawful advertising has been publicly revealed and addressed in this judgment.").

[34] *See* D.I. 4 ¶¶ 45–54; D.I. 81-1 ¶ 1 (Certified translation of the August 26 Order); D.I. 6 (Declaration of Pinni Yaniv in Support of the (I) Verified Petition Under Chapter 15 for Recognition of the Israeli Proceeding as a Foreign Main Proceeding or, Alternatively, a Foreign Nonmain Proceeding, and (II) Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code, the "Foreign Counsel Decl.").

(the "Debt Arrangement") providing for payment in full of all allowed contingent debt claims over a defined payment schedule.

18. The Israeli Court has actively exercised its supervisory jurisdiction over the Debtors, the Debt Arrangement, and all administrative aspects of the proceeding.[35] On August 26, 2026, the Israeli Court granted a temporary stay of proceeding after finding the statutory conditions satisfied, including that the stay was necessary to formulate and approve a rehabilitative arrangement, that there was a reasonable prospect that a Debt Arrangement that would lead to the economic rehabilitation of the Debtors being approved, that continued operations during the stay posed no reasonable risk of harm to creditors, and that there are means to finance operations pending approval.[36] Through orders entered in the Israeli Proceeding, the Israeli Court (i) set a bar date for creditors to file proofs of debt, (ii) required expanded publication of notice, including direct email notice to foreign creditors in English, with the claims period extended accordingly.[37]

19. The Israeli Court has also appointed Adv. Gil Oren as the independent arrangement administrator (the "Arrangement Administrator") with statutory powers under Part J.[38] The Arrangement Administrator is an Israeli attorney-officer appointed by the Israeli Court and charged with ensuring the proper administration of a proceeding, the preservation of the corporation's assets during the proceeding, assisting the corporation and its creditors in conducting negotiations to formulate a Debt Arrangement, verifying claims, evaluating the fairness of the Debt Arrangement to creditors, and reporting to the Israeli Court.[39] Since his appointment, the Arrangement Administrator has reviewed the proposed arrangement, met with the Debtors and

---

[35] D.I. 6 at ¶ 6 [Foreign Counsel Decl.]; *see also* Ex. 16 at 81:21–25 ([redacted]).

[36] *See* D.I. 81-1 ¶¶ 8–9.

[37] *See id.* ¶ 12.

[38] *Id.*.

[39] D.I. 6 at ¶ 16 [Foreign Counsel Decl.]; *see also* Ex. 16 at 200:21–201:6; 202:22–204:7.

principal creditors, engaged with the Debtors to obtain clarifications and further financial information, received and reviewed ongoing performance data (including August 2026 results, which he reported as consistent with the framework presented to the Israeli Court), administered the claims process for voting purposes, responded to creditor inquiries and motions brought before the Israeli Court, and determined to engage an independent professional from a leading audit firm to (i) provide a valuation of Papaya Israel, (ii) verify its projected performance, and (iii) serve as a financial auditor, all to provide an additional layer of independent oversight over the Debtors' expenditures and operations during the stay period.[40]

20. The Debtors are proceeding on a strict timeline. [redacted][42] [redacted][43] The Debtors anticipate that the Arrangement Administrator will continue to refine the Debt Arrangement in consultation with the Debtors, their creditors, and the Commissioner of Insolvency, and that the version that is ultimately approved by the Israeli Court will be the culmination of these efforts.

21. Skillz' Israeli law expert, Mr. Yaron Elhawi, confirms that the Part J proceeding now underway is fair, participatory, and genuinely responsive to creditor input. When asked

[40] *See generally* Ex. 31 (Certified translation of the Sept. 17, 2026 Motion of the Arrangement Administrator to engage financial experts in the Israeli Proceeding); Ex.16 at 201:1–6 [redacted] ; D.I. 116–1 ¶ 2 (Sep. 10, 2026 official translation of Notice of Update from Administrator).

[41] Ex. 16 at 106:6–106:17, 106:18–22.

[42] Ex. 16 at 24:9–25:2; 26:4–8.

[43] *See* Ex. 16 at 200:21–202:7.

directly, Mr. Elhawi testified without qualification that [redacted][44] Mr. Elhawi has [redacted][45] Mr. Elhawi likewise [redacted][46]

## ARGUMENT

22. Recognition should be granted because the Israeli Proceeding satisfies the straightforward statutory requirements Chapter 15 imposes. Skillz' effort to manufacture a contrary result does not withstand scrutiny: the Israeli Proceeding is a collective foreign proceeding that binds and protects every creditor, not just Skillz; the COMI of both Papaya Israel and Papaya US is Israel, where the enterprise has always been headquartered, managed, and directed; there has been no manipulation of that COMI, now or at any point in the decade since Papaya's founding; the relief the Foreign Representative seeks is precisely what the statute already authorizes and no more; and nothing about recognizing this fair, transparent, court-supervised Israeli Proceeding that affords creditors notice, opportunities to be heard, and independent oversight is manifestly contrary to U.S. public policy. The following addresses each of these points in turn.

---

[44] Ex. 32 at 69:22; 70:1–6.
[45] Ex. 32 at 68:8–69:6.
[46] Ex. 32 at 33:22–24; 34:5–8; 34:15–18; 35:14–36:16.

### A. <u>The Israeli Proceeding Is a "Foreign Proceeding"</u>

23. Skillz' first argument is that the Israeli Proceeding is not a "foreign proceeding" for purposes of Section 101(23) of the Bankruptcy Code because it is purportedly not "collective," contending that the Debt Arrangement singles out Skillz as the only creditor whose claim is meaningfully impaired. Opposition ¶¶ 31–34. On this point, Skillz' argument fails at both the statutory and factual level.

24. To be "collective" for purposes of determining whether a proceeding is a "foreign proceeding," it must "consider[] the rights and obligations of all creditors." *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 307–08 (3d Cir. 2013) (a liquidation under Australian law was a collective proceeding because the liquidator "must consider the rights of all creditors"). A key factor in making this determination is the ability of creditors to "take part in" the proceeding, including notice to creditors. *See In re British Am. Ins. Co.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010).

25. The Debtors' creditor body includes Bank Leumi, trade creditors, employees, other contingent debt claimants, and Skillz. All of these creditors are within the Israeli Court's supervisory jurisdiction; all will be paid under the Debt Arrangement; and all are bound by the orders the Israeli Court has entered. Moreover, all creditors have the right to participate throughout the process—many, including Skillz, have already participated extensively—and the Israeli Court has required an extensive creditor noticing campaign.

26. As the Debtors' Israeli counsel, Pinni Yaniv, testified, the Israeli Court has in fact stated, on multiple occasions, [redacted]

[redacted][47] The presence of one creditor with a large, disputed claim does not render an otherwise collective proceeding with active creditor access non-collective.

### B. Papaya Israel's Center of Main Interests Is Israel

27. Skillz does not oppose recognition of the Israeli Proceeding as at least a foreign nonmain proceeding as to Papaya Israel, a position that necessarily recognizes that Papaya Israel has, at a minimum, an "establishment" there. The dispute as to Papaya Israel is therefore not whether Israel is a proper foreign forum, but whether it is the proper *primary* forum—determined by Papaya Israel's COMI. 11 U.S.C. § 1517(b).

28. Because the Bankruptcy Code does not define COMI, courts have developed a working standard rooted in substance over form and focused on the debtor's "real seat" or "principal place of business."[48] The analysis proceeds through the five *SPhinX* factors.[49] There is a rebuttable presumption that the jurisdiction of the Debtor's registered office is its COMI. For Papaya Israel, that is Tel Aviv.[50] 11 U.S.C. § 1516(c). Skillz has not come close to rebutting the presumption, as every objective factor the courts consider confirms Israel as Papaya Israel's COMI. Indeed, in the SDNY litigation, Skillz already stipulated to the fact that Papaya Israel "is a foreign limited liability company **with its principal place of business in Tel-Aviv-Yafo, Israel**."[51]

29. In its Opposition, Skillz concedes, and then attempts to ignore, the two most important facts bearing on Papaya Israel's COMI: that Papaya Israel is headquartered in Israel and

---

[47] Ex. 16 at 226:13–15.

[48] *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 279 (Bankr. S.D.N.Y. 2019) ("*Constellation I*"); *Betcorp*, 400 B.R. at 290.

[49] *In re SPhinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007). Papaya Israel's satisfaction of each factor is described in the Verified Petition. D.I.. 4 ¶¶ 69–74.

[50] *See* Ex. 21 at -0041 (Company Register filed with the Debtors' Convening Meeting Motion in the Israeli Proceeding).

[51] Ex. 64, Proposed Joint Pretrial Order ¶ 3, *Skillz Platform Inc. v. Papaya Gaming Ltd.*, No. 1:24-cv-01646-DLC (S.D.N.Y. Mar. 13, 2026), D.I. 663.

managed from Israel. *See supra* ¶¶ 9–11; Opposition ¶ 39. These are the two most determinative *SPhinX* factors, which **no U.S. court has ever held diverge from the COMI jurisdiction**. *See* Eleanor Brennan Conlon, *An Analysis of Courts' Applications of the SPhinX Factors to Determine a Debtor's Center of Main Interests*, 34 Am. Bankr. Inst. L. Rev. 107 (Winter 2026) (comprehensive empirical study reviewing twenty-nine U.S. Chapter 15 recognition decisions through 2024 and concluding that headquarters and management location are the most determinative factors, while creditor location and applicable law are the least). This alone could confirm that Papaya's COMI is Israel.

***i. Skillz' Theory That Revenue and Customer Location Determine COMI Fails as a Matter of Law***

30. Skillz concedes that Papaya Israel is incorporated in Israel and "is run by executives who reside there," yet contends that the Debtors' COMI is nevertheless the United States based on the percentage of Papaya's global revenues derived from U.S. customers, and further argues the U.S. portion of Papaya's customer base is itself the enterprise's "primary asset." Opposition ¶¶ 39, 40–42.[52] That theory has no foundation in statute, case law, or the UNCITRAL Model Law that Chapter 15 implements.

[52] Skillz retained Jim W. Bergman, who also served as Skillz' testifying expert in the SDNY litigation, to submit a declaration in support of this point in its Opposition. Mr. Bergman offers three opinions: (i) that substantially all of Papaya's "business activities," revenues, assets, and liabilities are U.S.-based; (ii) that the Debtors could continue to transact their business through U.S. bank accounts without transferring cash to Israel; and (iii) that the financial projections submitted by the Debtors in the Israeli Proceeding lack support, deviate from historical performance, and are not focused on near-term profitability for the benefit of creditors. None of these opinions withstand scrutiny. The first ignores the Debtors' organizational, operational, and legal structure. The second overemphasizes a narrow administrative observation about the mechanics of intercompany fund transfers while ignoring the multi-jurisdictional operational realities of a global business headquartered in Israel. The third rests on a foundational methodological error: Mr. Bergman selects starting points and historical benchmarks that are unrepresentative of Papaya's normalized financial condition and then faults the Debtors' revenue projections for departing from those distorted baselines. The Expert Report of Stuart Gleichenhaus, Senior Managing Director at FTI Consulting, filed simultaneously herewith, addresses and rebuts each of Mr. Bergman's three opinions in detail.

31. No court has ever held that the geography of a debtor's customers or the jurisdiction that contributes the largest share of its revenue determines—or even presumptively establishes—a debtor's COMI, and Skillz cites none. Consumer-facing companies routinely distribute their products across many jurisdictions, and their revenue mix may shift over time as they enter new markets, grow existing ones, and respond to changing consumer demand. A rule tethering COMI to the jurisdiction with the largest customer base or the greatest revenue contribution would render COMI not only unpredictable and unstable, but subject to involuntary migration whenever a company's target market or revenue source shifts.

32. Such outcomes are wholly inconsistent with the certainty and ascertainability that the universalist framework of Chapter 15 is designed to provide. The fact that U.S. customers generate revenue on Papaya's platform no more makes Papaya's COMI the U.S. than a French manufacturer's sales to U.S. customers would relocate its COMI across the Atlantic. *See Constellation I*, 600 B.R. at 280 (finding COMI in Luxembourg headquarters notwithstanding the majority of revenue was generated from drilling rigs located in Brazil chartered to Brazilian customers); *In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (finding COMI in the Cayman Islands for global drilling company with worldwide operations and revenues).

33. The rare cases that reference customer location in the COMI analysis have done so only where customer location reinforced other factors already pointing the same way, and never as an independent, much less dispositive, basis. *See In re Cell C Proprietary Ltd.*, 571 B.R. 542 (Bankr. S.D.N.Y. 2017) (finding South Africa was the location of the debtor's headquarters, employees, assets, decision-making, and operations, *and* substantially all of its major customers); *In re U.S. Steel Canada Inc.*, 571 B.R. 600 (Bankr. S.D.N.Y. 2017) (finding COMI in Canada for a Canadian debtor with Canadian registered office, senior management, all operations, all revenue,

payroll taxes, *and* customers). Skillz asks this Court to create new law and do what no court has done: elevate customer and revenue location into a new, independent, and dispositive COMI factor. The Court should decline that invitation.

***ii. Papaya Israel's Primary Assets Are Located in Israel***

34. Papaya Israel's primary asset is the technology platform that powers every game, attracts every user, and generates every dollar of revenue flowing through the enterprise. Skillz seems to suggest that Papaya's global intellectual property portfolio, with trademarks and copyrights registered by Papaya Israel in dozens of countries, including the U.S., points to a COMI in the U.S. Opposition ¶ 42. This is a fundamental misapprehension both of how intangible-asset situs is determined and of what U.S. registration of trademarks and copyrights actually accomplishes. The situs of an intangible asset is "highly context specific," turning on "which countries will creditors need judicial assistance to enforce a judgment against [the debtor's] assets." *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 728 (Bankr. S.D.N.Y. 2024) (locating intercompany receivables in the PRC because garnishment against PRC subsidiaries would require PRC court assistance, notwithstanding Hong Kong COMI).[53] Further, federal registration does not create intellectual property rights; it confers only certain procedural benefits. *See Matal v. Tam*, 582 U.S. 218, 224–26 (2017) ("[F]ederal law does not create trademarks;" rather, registration "confers important legal rights and benefits on trademark owners who register their marks.").

35. Trademark ownership arises from use, not registration, and "although a federal registration gives the owner of a mark very important and valuable legal rights and benefits, the registration does not create the trademark." *See* J. Thomas McCarthy, *McCarthy on Trademarks*

[53] Skillz' contention that Papaya's "customer base" is "itself an asset of the enterprise" collapses under *Sunac*'s own test. Opposition ¶ 41. A customer base is not an "asset" that a creditor can "enforce a judgment against." *Sunac*, 656 B.R. at 728. It is not possible to seize or garnish a customer. Skillz' argument is a category error, not a situs analysis.

*and Unfair Competition* § 19:3 (5th ed.); William F. Patry, *Patry on Copyright* § 17:77. Similarly, copyright registration does not create ownership. *Patry on Copyright* § 17:77 ("Registration does not create ownership (and has not for 100 years)"). A copyright exists automatically upon creation, and registration is required only as a prerequisite to filing suit for infringement in the U.S. Papaya's U.S. copyright registrations reflect where a rights-holder anticipates enforcement (against U.S. infringers), not any deliberate placement of the underlying asset in the United States. Critically, Israel has no domestic copyright registration system.[54] In other words, Papaya could not register its copyrights in its home country even if it wanted to.

36. As Skillz itself acknowledges, Papaya Israel's trademark portfolio comprises "roughly 150 registered trademarks spanning the United States, the European Union, the United Kingdom, Australia, Canada, Israel, India, Japan, Norway, and Brazil." Opposition ¶ 42. Under the territoriality doctrine, a trademark has a separate legal existence under each country's laws, and its function is to "symbolize the domestic goodwill of the domestic mark-holder" in each jurisdiction where it is registered. *See McCarthy on Trademarks and Unfair Competition* § 29:1 (5th ed.). This underscores the basic fact that registration follows the geography of potential infringers, not the location of the asset. U.S. trademark registrations do not mean the intellectual property is a U.S. asset; they mean the Israeli owner of those rights has secured protection for them in the U.S. market, exactly as any international brand would. And even those registrations disclose Papaya's Israeli identity and reflect Israeli ownership. *See supra* n. 17–19 (copyright and registrations indicating Papaya Israel).

---

[54] *See* Liad Whatstein & Oren Weiner, *Copyright 2025 – Israel*, Global Legal Group, https://liadwhatstein.com/wp-content/uploads/2024/11/International-Comparative-Legal-Guide-Copyright-2025-Israel.pdf (last visited Sep. 29, 2026) ("There is no system for registration of a copyright in Israel").

37. Thus, analyzing the Debtors' intellectual property under *Sunac*, the inquiry points squarely to Israel: Papaya's copyrights and trademarks are owned by Papaya Israel, an Israeli entity headquartered and managed in Tel Aviv, and any creditor seeking to enforce a judgment against those assets—or to compel their assignment—would need a court with *in personam* jurisdiction over the Israeli owner, *i.e.*, the Israeli Court. The USPTO, the Copyright Office, or the World Intellectual Property Organization International Bureau would then simply record the transfer, a purely ministerial act that does not create any right or asset. Papaya's intellectual property, its principal asset, sits in Israel.

***iii. Creditor Location Factor Favors Israel***

38. Skillz argues that the fourth *SPhinX* factor, the location of the Debtors' creditors, favors the U.S. by focusing primarily on itself and other U.S. tort claimants. Opposition ¶ 46. Even setting aside that creditor location is consistently treated as the least probative *SPhinX* factor, Skillz' insistence that its own U.S. location decides this factor conflates two distinct inquiries and elevates one creditor's preferred geography above the interests of an entire creditor body.

39. Skillz incorrectly asserts that the Israeli Proceeding does not address the claims of any Israeli creditors, citing the Debtors' Rule 1007 statements as support.[55] This misconstrues Rule 1007(a)(4), which does not require a comprehensive listing of all creditors impacted by a foreign proceeding, but instead requires a debtor to list "all parties to *litigation pending in the United States* in which the debtor was a party when the petition was filed" and "all entities against whom provisional relief is sought under § 1519." Rule 1007(a)(4)(B)(ii)-(iii). The Debtors listed U.S. parties because that is what the rules require, not because only U.S. parties exist as creditors. Skillz

[55] Opposition ¶ 44, n. 42 ("All four lawsuits identified in Exhibit A to the Lists and Statements Filed Pursuant to Bankruptcy Rule 1007(a)(4) [D.I. 1] were filed in the United States, and of the sixty-six creditors listed in Exhibit B, exactly one carries an Israeli address while forty-three are U.S. entities.")

also ignores the fact that Papaya is the defendant in a class action brought in Israel on behalf of non-U.S. individuals, that class and its members are contingent creditors whose claims are addressed by the Debt Arrangement.[56] The Israeli Proceeding binds every creditor of the Debtors, who are located throughout the world, with many key constituencies (Bank Leumi as secured creditor, all primary trade creditors and vendors, its 300 employees, and certain contingent creditors) in Israel.[57] All are subject to the same court-supervised claims process and the Debt Arrangement, including Skillz.

40. Even on Skillz' narrow, flawed framing, this factor does not tilt to the United States. Congress, in enacting Chapter 15, directed courts to focus on the interests of all creditors and other interested parties, not just those of U.S. parties, and not just the creditor with the largest claim.

***iv. Israeli Law Governs Papaya Israel's Corporate Affairs and Key Operational Arrangements***

41. Skillz next argues that the U.S. law governs the majority of claims against Papaya Israel. Opposition ¶ 46. But this argument suffers from the same flaw as its prior arguments: it is built entirely on Skillz' myopic focus on its own judgment claim. The proper inquiry here is what law applies to the Debtors' affairs generally, not what law governs the majority of claims against the Debtors pursuant to a tally of the choice-of-law provisions in the Debtors' contracts. *See Constellation I*, 600 B.R. at 262 (finding law of debtor's place of incorporation to be the most relevant law for purposes of the COMI determination even though New York law governed all prepetition debt); *In re Culligan Ltd.*, No. 20-12192 (JLG), 2021 WL 2787926, at *13 (Bankr. S.D.N.Y. July 2, 2021) (rejecting plaintiffs' argument that choice of law provisions and law governing their litigation with debtor governed this factor and holding that it favored Bermuda

[56] D.I. 5 ¶ 20 (Foreign Rep. Decl.).
[57] Ex. 28 at 31 [redacted]).

because debtor was subject to the Bermuda Companies Act and would be liquidated under Bermuda law).

42. Israeli law governs the entirety of Papaya Israel's corporate existence and affairs. Papaya Israel is incorporated under, and subject to, the Israeli Companies Law, and its corporate governance, capital structure, and internal affairs are all matters of Israeli law.[58] Israeli law likewise governs Papaya's key operational arrangements, [redacted],[59] the employment relationships of Papaya's approximately 300 Israel-based employees, the lease of its Tel Aviv headquarters, its tax and social-security obligations to the Israeli authorities, its material vendor and service-provider contracts, its public-facing Terms of Use,[60] and a plethora of other contracts (with U.S. and non-U.S. parties).[61] The Israeli Proceeding has consolidated the administration of the Debtors' affairs in the jurisdiction whose law already governs them.

***v. Papaya Israel's Israeli Identity Is Readily Ascertainable***

43. Skillz takes the position that "no U.S. player . . . would perceive an Israeli enterprise" and that creditor "expectations ran to the United States alone." Opposition ¶ 54. Skillz incorrectly conflates players with creditors. Nevertheless, the public record confirms the opposite, that either a reasonable creditor or a reasonable player would readily ascertain that Papaya is an

---

[58] *See* Ex. 7 (Papaya Israel Articles of Association); *see, e.g.*, Ex. 5 ([redacted]).

[59] *See* Ex. 20 at -977 ([redacted]).

[60] *See* Ex. 13, DX 9 at § 18 (Papaya's Terms of Use).

[61] *See* Ex. 33 [redacted]); Ex. 34 at -2718 ([redacted]; Ex. 21 at -0154 ([redacted]).

Israeli company. *See supra* ¶ 14 (public facing social media and app store pages clearly identifying Papaya as Israeli).

44. Skillz' claim that Papaya's public-facing website does not identify itself as an Israeli entity is also factually incorrect. The Privacy Policy, incorporated by reference into the Terms of Use, identifies Papaya Israel (not any subsidiary) as the contracting party and directs users to its Tel Aviv address.[62] The public-facing Terms of Use identify "*Papaya Gaming Ltd.* and its affiliates" as the contracting party in the introduction, cross-reference specific Israeli law, and default all disputes to arbitration in Tel Aviv under Israeli law, with carve-outs only for U.S. and U.K. residents.[63] These are the same policies linked from Papaya's Google Play, Apple App Store, and Samsung Galaxy store profiles.[64] Any creditor engaging with Papaya through any of these channels would readily and immediately ascertain that it is dealing with an Israeli company.

---

[62] *See* Ex. 27 (Papaya's privacy policy).

[63] *See* DX 9 at § 1, 5, 18 (noting for all users other than those residing in the U.S. or U.K. that "the Israeli Commercial Arbitration Law, 5784–2024, as amended, or, if the International Arbitration Law is deemed inapplicable, for any reason, the Israeli Arbitration Law, 5728–1968, shall govern the interpretation and enforcement of this agreement to arbitrate"; expressly incorporating "Israel's Trading with the Enemy Ordinance of 1939" in its "§ 5 Compliance with Laws" section).

[64] *See, e.g.,* Solitaire Cash: Win Real Money, Apple App Store, https://apps.apple.com/us/app/solitaire-cash-win-real-money/id1446254576 (last visited Sep. 29, 2026) (hyperlinking to Privacy Policy, Papaya, https://www.papaya.com/privacy-policy (last visited Sep. 29, 2026)); Bubble Cash, Apple App Store, https://apps.apple.com/us/app/bubble-cash/id1475514684 (last visited Sep. 29, 2026) (same); Bingo Cash, Apple App Store, https://apps.apple.com/us/app/bingo-cash-win-real-money/id1522266397 (last visited Sep. 29, 2026) (same); Solitaire Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.solitairecash.play&hl=en_US (last visited Sep. 29, 2026) (same); Bingo Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.bingocash.play&hl=en_US (last visited Sep. 29, 2026) (same); Bubble Cash, Google Play Store, https://play.google.com/store/apps/details?id=com.papaya.bubblecash.play&hl=en_US (last visited Sep. 29, 2026) (same); Solitaire Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.solitairecash (last visited Sep. 29, 2026) (same); Bingo Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.bingocash (last visited Sep. 29, 2026) (same); Bubble Cash, Samsung Galaxy Store, https://galaxystore.samsung.com/detail/com.papaya.bubblecash (last visited Sep. 29, 2026) (same).

### C. Papaya US's COMI Is Also Israel, and Alternatively, Papaya US Has an Establishment There

#### *i. Papaya US's COMI Is Israel*

45. Skillz argues that Papaya US's COMI is the United States. Opposition ¶ 65. Its argument rests on two pillars. First, it invokes the statutory presumption that, as a Delaware corporation, Papaya US's COMI is presumed to be the United States. *Id.* Second, Skillz contends that there is effectively nothing to manage in the first place. *Id.* ¶¶ 66–69. From this, Skillz draws the sweeping conclusion that, because there is "nothing to manage," the first two *SPhinX* factors (the headquarters and management location) cannot point to Israel. *Id.* ¶ 68–9. Skillz is wrong on both the law and the facts.

46. Where a foreign subsidiary has no independent business operations, no employees, and no autonomous management, its COMI follows the location from which the enterprise is actually directed. Courts determine this by examining the following factors: (1) where the companies maintain office space; (2) where they store books and records and inventory; (3) where managerial activities take place; (4) who is in charge of the assets and operation of the entire foreign debtor group; (5) whether the enterprise is managed on a consolidated basis; (6) where other members of the corporate group are incorporated; and (7) the extent of integration of the enterprise's international operations, including corporate, strategic, financial and management perspectives, and the existence of shared management. *See In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025) (finding COMI in Canada for Delaware-incorporated subsidiary, which employed 11 people and whose principal asset was accounts receivable from U.S.-based revenues swept daily to Canada); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *8–12 (Bankr. S.D.N.Y. June 4, 2025) (finding COMI in Canada for U.S. subsidiaries that shared officers with parent, employed no U.S. individuals, maintained no U.S. inventory, and

held only de minimis U.S. bank balances, despite being incorporated in the U.S. and generating U.S. revenue).[65] While the COMI of a business that functions as an independent business, with employees, operations, and management independent of its parent *may* be sufficient to establish an independent COMI, *see Constellation I*, 600 B.R. at 282, the COMI of a wholly owned passive subsidiary is the jurisdiction from which the parent directs its activities.

47. Every one of these factors points to Israel without exception. Papaya US is a pass-through entity with no independent function by design. It has no employees, no offices, and no operational departments;[66] it does not develop, market, sell, or service the Debtors' games; and [redacted][67] As set forth *supra* ¶¶ 9–11, all assets, offices, and employees are in Israel. Its sole U.S. director, Mr. Kong, [redacted].[68] Papaya US's sole role is to receive customer deposits from payment processors and remit those deposits to Papaya Israel in the ordinary course, [redacted].[69] While Skillz claims that Papaya US's directors and management sit in the United States (Opposition ¶ 67), three of Papaya US's four directors, the same three who made every material decision concerning Papaya US, are based in

---

[65] *See also, e.g.*, Ex. 35 (*In re SimEx Inc.*, No. 24-10083 (TMH) (Bankr. D. Del. Feb. 20, 2024), D.I. 29); Ex. 36 (*In re Nexii Bldg. Sols. Inc.*, No. 24-10026 (JKS) (Bankr. D. Del. Feb. 9, 2024), D.I. 44); Ex. 37 (*In re Lighthouse Immersive Inc.*, No. 23-11021 (LSS) (Bankr. D. Del. Aug. 28, 2023), D.I. 20); Ex. 38 (*In re NextPoint Fin. Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023), D.I. 54); Ex. 39 (*In re IMV Inc.*, No. 23-10589 (KBO) (Bankr. D. Del. June 2, 2023), D.I. 29); Ex. 40 (*In re Li-Cycle Holdings Corp.*, No. 25-10991 (PB) (Bankr. S.D.N.Y. May 23, 2025), D.I. 59); Ex. 41 (*In re Lion Elec. Co.*, No. 24-18898 (DDC) (Bankr. N.D. Ill. Jan. 21, 2025), D.I. 52).

[66] D.I. 5 ¶ 11 (Foreign Rep. Decl.).

[67] *Id.* ¶ 11, n. 5; *see also* Ex. 19 at -2641 ([redacted]).

[68] Ex. 28 at 8 ([redacted] Ex. 15 at -993–994; Ex. 2 at 112:22–113:15.

[69] *See* Exs. 19, 20 ([redacted]).

Israel.[70] It is a wholly-owned subsidiary that is a pass-through entity of an Israeli enterprise, entirely directed and controlled from Tel Aviv.

48. The Intercompany Services Agreement is not a peripheral document in this analysis. It is the source of Papaya US's entire revenue stream, the legal instrument that defines the totality of its commercial purpose, and its principal asset. [redacted].[71] The Israeli management team makes all decisions concerning it. The governing law of Papaya US's principal asset and primary commercial relationship point unambiguously to COMI in Israel.[72]

49. Skillz leans heavily on Mr. Bachar's acknowledgement that [redacted] Opposition ¶ 68. From this, Skillz incorrectly concludes that "there is nothing to manage in the US." *Id.* But the absence of entity-level management activity at Papaya US is not evidence of a U.S. COMI; it is evidence of a deliberate concentration of management at the Israeli parent. Papaya US was incorporated for a specific, narrow purpose: to contract with payment processors. Once the payment processing infrastructure was established, limited entity-level activity is precisely what one would expect. While Skillz strains to characterize Mr. Kong as management, he is a director, not an officer; that he is not involved in the operational details of Papaya US's daily functions is therefore neither surprising, nor legally significant. *See Iovate*, 673 B.R. at 533.

---

70 D.I. 5 ¶ 7; *see also* Ex. 2 at 69:21–70:4.
71 *See* Exs. 19, 20 ([redacted]).
72 *See SPhinX*, 351 B.R. at 117 (primary assets and the jurisdiction whose law that would apply to most disputes are two of the five key factors in determining COMI).

50. Skillz' argument regarding COMI of Papaya US fails for two additional and independent reasons. First, a Delaware-incorporated entity will by operation of law have a U.S. registration address, but the addresses Skillz relies upon (the New York, Delaware [redacted] addresses used in Papaya US's contracts) are purely mailing addresses used for administrative purposes and confer no COMI weight.[73] They are paradigmatic letterbox addresses. Papaya US [redacted].[74] That is a "letter box" presence, precisely the sort of nominal, administrative-only U.S. touchpoint that Chapter 15 courts have consistently held cannot establish *either* COMI or establishment in the jurisdiction. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 336 (S.D.N.Y. 2008) (affirming denial of recognition where the debtor funds' Cayman presence was limited to nominal registered offices and noting that the COMI presumption "may be overcome, particularly in the case of a 'letterbox company'"); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 695 (Bankr. S.D.N.Y. 2017) (distinguishing debtors with a "real establishment" from those with only a "letter box" presence).[75]

---

[73] Opposition. ¶ 54; Ex. 28 at 11.

[74] Ex. 42 at -918 ([redacted]; Ex. 44 ([redacted]); Ex. 45 (same); Ex. 46 ([redacted]); Ex. 47 (same).

[75] Skillz additionally insists that "every address" Papaya US has ever given a third party is a U.S. address, Opposition. ¶ 7, and that no "known document in Papaya US's files identifies Israel as Papaya US's location," *id.* ¶ 84. But counterexamples are in Skillz' own possession. [redacted]; and the [redacted] Ex. 48 ([redacted]

51. Second, Skillz points to Papaya US's bank accounts as evidence of a U.S. nerve center. But a payment-processing subsidiary incorporated in the United States necessarily maintains domestic bank accounts to receive the deposits it processes. The existence of such bank accounts is a structural requirement, not a marker of independent management or control. The fuller record confirms the point: Papaya US also holds a bank account with Israel Discount Bank,[76] [redacted].[77] On the correct legal standard and full factual record, Papaya US's COMI is Israel. *See Iovate* 673 B.R. at 533 (listing factors for determining COMI of a subsidiary without independent operations).

***ii. In the Alternative, Papaya US Has an Establishment in Israel***

52. Skillz argues that Papaya US has no establishment in Israel and, therefore, the Israeli Proceeding cannot be recognized as to this Debtor as a foreign nonmain proceeding. Opposition ¶¶ 91-99. Skillz further contends that a "place of operations" requires a place "from which economic activities are exercised on the market (i.e. externally)" and that Papaya US cannot meet this standard without "offices, facilities, or employees" of its own. *Id.* ¶ 91–2. This is not a correct statement of the law.

53. An establishment is "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). An "establishment" requires a "local effect on the marketplace." *British Am.*, 425 B.R. at 915. The threshold is not overly burdensome and "a base level of connection" beyond a mail drop suffices. *Constellation I*, 600 B.R. at 277. No physical office or employees are required. *See In re Servicos de Petroleo Constellation S.A.* ("*Constellation II*"), 613 B.R. 497, 512–13 (Bankr. S.D.N.Y. 2020).

---

[76] Ex. 49 (Papaya US account confirmation letter from Israel Discount Bank).
[77] Ex. 15 at -993–994 [redacted]).

54. Papaya US carries out its economic activity in Israel through the operations of Papaya Israel. [redacted] Papaya US's activity is nontransitory (it has continued uninterrupted for years), it is economic (it involves the collection and remittance of significant volumes of player deposits), and it is conducted at a "place of operations," namely, Papaya Israel's Tel Aviv headquarters. The requirements of section 1502(2) are met.

55. Skillz' premise that Papaya US has a U.S. establishment because its "customers" are in the United States misapprehends the nature of those customers. The end-users of Papaya's games are Papaya Israel's customers, not Papaya US's. Users download applications published by Papaya Israel, contract with Papaya Israel under the Terms of Use, and are directed to Papaya Israel's Tel Aviv address for support. *See supra* ¶ 14. [redacted] Its function under the Intercompany Services Agreement is limited to receiving payment processor deposits and remitting them to Papaya Israel.[78] Papaya US's only "customer," properly understood, is Papaya Israel, the single entity to which Papaya US provides payment processing services. That many end-users of Papaya's games happen to reside in the United States says nothing about where Papaya US's economic activity is directed or where that activity has "a local effect on the marketplace." *British Am*, 425 B.R. at 915. Papaya US's economic activity runs to, and has its effects in, Israel.

56. The two cases Skillz relies on to argue otherwise, *Mood Media* and *Creative Finance*, are readily distinguished. *Mood Media* denied establishment in Canada for U.S. subsidiaries whose only connections to Canada were intercompany debt obligations and guarantee

---

[78] Ex. 19 ([redacted]).

payments to the Canadian parent.[79] The subsidiary had 11 employees, and there was evidence of integrated enterprise features such as legal and accounting only "to some extent." *In re Mood Media Corp.*, 569 B.R. 556, 562 (Bankr. S.D.N.Y. 2017). Here, the integration is complete, as everything is managed from Israel, and there are no U.S. employees. The connections to the parent are three out of four directors and the core Intercompany Services Agreement, the entire reason for its existence and conduit for daily cash sweeps.

57. *Creative Finance* involved two BVI entities that had never conducted any business in the BVI, had no employees there, and whose sole director was based in Spain. *In re Creative Fin. Ltd.,* 543 B.R. 498, 503 (Bankr. S.D.N.Y. 2016). Although the debtors did most of their business in the UK and their operations were directed out of Spain and Dubai, they were organized under the law of a letterbox jurisdiction, the BVI, where they did not do business. *Id*. The court found that the debtors "never conducted any nontransitory economic activity in the BVI, did not conduct business in the BVI, and never had a seat of local business activity in the BVI." *Id.* at 512. The court accordingly denied recognition as both a foreign main proceeding and a foreign nonmain proceeding. *Id.* at 512. Papaya US's connections to Israel are categorically different in every respect. *See supra* ¶¶ 9–11 (Papaya US is entirely managed from Israel by Israeli personnel). *Creative Finance* supports recognition here, not denial.

58. Skillz contends that for recognition the market activity of the debtor must have external or public-facing features. Even accepting that framing, Papaya US's intercompany cash sweep to Papaya Israel readily satisfies it: [redacted]

[79] It was also "not even clear" whether the Canadian foreign representative had even been properly authorized to act on behalf of the U.S. debtors. *Mood Media Corp.*, 569 B.R. at 559.

[redacted][80] That is precisely the kind of "nontransitory economic activity" with "a local effect on the marketplace" that is the touchstone of establishment. *British Am. Ins.*, 425 B.R. at 914–15.

59. Whether Papaya US also has an establishment in the U.S. is beside the point. A debtor may have multiple establishments. The operative question is whether Papaya US has, at a minimum, an establishment in Israel. It does.

**D. <u>Israel Has Been the Debtors' COMI Since Their Founding</u>**

60. Unable to mount a credible argument that the Debtors' COMI is anywhere but Israel on the factors that actually govern the inquiry, Skillz resorts to the contention that the Debtors shifted their COMI to Israel in bad faith. Opposition ¶¶ 55–63, 90. These allegations of "bad-faith COMI manipulation" find no basis in the facts or the legal framework for determining COMI. Under any possible legal framework, these arguments fail for the simple and dispositive reason that Papaya was founded in Israel a decade ago and has been headquartered and operated from there without interruption ever since.

***i. Papaya Did Not Move or Manipulate its COMI, Which Has Always Been Israel***

61. Skillz' allegation of "bad-faith COMI manipulation" is unmoored from the record and the law. Papaya Israel was incorporated in Israel in March 2016 by Israeli nationals and has been headquartered in Tel Aviv continuously ever since; there is no "before Israel" from which COMI could have been shifted.[81] The cases Skillz invokes for the manipulation principle involve manufactured jurisdictional connections created on the eve of filing, not decade-old operational realities. *See* Opposition ¶ 63, *citing In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL

[80] *See* D.I. 5 ¶ 11.
[81] *See* Ex. 7 at -1188 ([redacted]); 21 at -0041 [redacted].

601463, at *2–4 (Bankr. S.D.N.Y. Feb. 24, 2025) (recognition granted despite English subsidiary being incorporated by Mexican parent only weeks pre-filing to secure U.K. jurisdiction); *In re NFE Glob. Holdings Ltd.*, No. 26-11268 (MG), 2026 WL 2032660 (Bankr. S.D.N.Y. July 14, 2026) (recognition granted despite debtor's U.K. incorporation by Delaware parent several months pre-filing to enable a U.K. restructuring). None of these cases resembles any debtors like Papaya, whose registered office, headquarters, employees, property, banking relationships, and management have been continuously in the jurisdiction of the foreign proceeding for its entire existence.

62. Nor does the timing of the filing of the foreign proceeding suggest manipulation. The Debtors did not move to Israel after the SDNY Judgment; they were already there. Filing an insolvency case in one's home jurisdiction promptly after an adverse judgment is neither uncommon nor bad faith.[82] Debtors regularly commence insolvency proceedings on the heels of such events, which is a paradigmatic situation the insolvency system is designed to address. What matters is whether the debtor's connection to the jurisdiction is real and long-standing. Papaya's connection to Israel is both.

***ii.*** [redacted]

63. Skillz points to Papaya Israel's [redacted] Opposition ¶¶ 56–57. The record tells a straightforward and well-documented story that is the opposite of what Skillz claims.

[82] Indeed, Chapter 15 imposes no good faith requirement as a condition of recognition, and courts have consistently declined to read one into the statute. *See In re Culligan Ltd.*, 2021 WL 2787926 at *14 (Bankr. S.D.N.Y. July 2, 2021) (collecting cases).

64. [redacted][83] [redacted].[84]

65. [redacted].[85] [redacted]

83 *See* Ex. 57 at -5152 [redacted]); *see also* Ex. 58 ([redacted]).

84 *See* Ex. 59 at -5158 [redacted]); Ex. 60 at -2776 ([redacted]).

85 *See* Ex. 59 at -5158 [redacted])

[redacted]).[86] Contrary to Skillz' conspiratorial thinking, [redacted].[87] [redacted][88]

66. [redacted],[89] [redacted]

*iii.* [redacted]

67. [redacted] Opposition ¶ 58. This theory fails from the outset because Papaya US

[86] *Id.* 59; Ex. 1 at 285:5–11 ([redacted]); Ex. 3 at 19 ([redacted]).
[87] *See* Ex. 59 at -5158 [redacted])
[88] Ex. 61 ([redacted]).
[89] *See* Ex. 62 at -4587 ([redacted]); Ex. 63 [redacted].

does not rely on [redacted]—it bases that position on the fact that its "nerve center" is the Papaya headquarters in Israel. *See* D.I. 4 ¶ 73.

68. [redacted].[90] [redacted]

**E. <u>The Foreign Representative Is Entitled to the Requested Relief</u>**

69. Faced with unmistakable reality that Papaya's main restructuring proceedings belong in Israel, Skillz makes a litany of demands designed to frustrate the Israeli Proceeding and Papaya's ordinary course operations, including:

(a) A prohibition of the transfer of any U.S.-generated cash outside of the United States (Opposition ¶¶ 100, 104);

(b) A prohibition of all intercompany transfers from Papaya US to Papaya Israel absent further order of this Court (Opposition ¶¶ 114–116);

(c) A requirement that the Debtors give notice and schedule a hearing to seek approval of any intercompany transfers they seek to make (*Id.*); and

(d) A requirement that the Debtors post a supersedeas-style bond in respect of the SDNY Judgment (Opposition ¶¶ 117–122).

70. Skillz' arguments in support are convoluted and lack any support in the law. Skillz is not entitled to any of this relief and, in any case, is sufficiently protected from the concerns it purports to have with the Debtors' continuing their ordinary course business operations.

---

[90] *See, e.g.*, Ex. 59 at -5158.

### *i. Section 1520(a) Automatically Provides the Relief Necessary for the Foreign Representative to Operate the Debtors' Business*[91]

71. Skillz contends that continued transfers from Papaya US to Papaya Israel cannot be presumed ordinary course transactions under section 363(c)(1) and attempts to impose an improper elevated burden on the Debtors to seek approval for each transfer under section 363(b)(1) following notice and a hearing. Opposition ¶ 116. Skillz further argues that even if the section 363(c)(1) threshold is met, the Foreign Representative must separately satisfy the requirement of section 1521(a)(5) and the balancing framework of section 1522. *Id.* Skillz also states that because the transfers move assets from Papaya US to Papaya Israel, the Debtors must make an additional showing under section 1521(b) that the interests of U.S. creditors are sufficiently protected. *Id.* Each step of that argument fails.

72. Upon recognition of the Israeli Proceeding as a foreign main proceeding, section 1520 automatically confers a defined set of protections and powers, including authority to "operate the debtor's business and . . . exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552." 11 U.S.C. § 1520(a)(3). Section 1520(a)(3) is dispositive of the principal operational question Skillz raises. On recognition, the Foreign Representative is authorized to operate the Debtors' business in the ordinary course, which encompasses the continued collection and remittance of U.S. deposits by Papaya US to Papaya Israel [redacted]. For transactions that fall within the ordinary course, no further order or evidentiary showing is required. *See In re Agrokor d.d.*, 591 B.R. 163, 187 (Bankr.

[91] Skillz devotes significant time in its Opposition to its argument that the Debtors are not entitled to relief under section 1507. For the avoidance of any doubt, the Foreign Representative does not require relief under section 1507. If the Israeli Proceeding is recognized as a foreign main proceeding with regard to both Debtors, section 1520 supplies every power necessary. If recognition is granted as a foreign nonmain proceeding as to either Debtor, section 1521 independently provides the same operational relief. The "additional assistance" of section 1507 is properly confined to exceptional cases involving relief unavailable under the Bankruptcy Code; this is not such a case. The reference to section 1507 in the Proposed Order is a precautionary placeholder, which the Court need not reach.

S.D.N.Y. 2018) (recognizing that section 1520 permits a foreign representative to continue a debtor's ordinary course operations without additional judicial authorization).

73. The intercompany remittances easily satisfy the established two-part ordinary course test. The test asks two questions: (i) whether the transaction subjects creditors to economic risks different from those they accepted when contracting with the debtor (the "vertical" or "creditor's expectation" prong); and (ii) whether the transaction is of a type similar businesses would ordinarily engage in (under the "horizontal" or "industry-wide" prong). *See In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *aff'd*, 690 F. App'x 761 (2d Cir. 2017); *In re Blitz U.S.A., Inc.*, 475 B.R. 209, 214 (Bankr. D. Del. 2012). Vertically, they are the same transactions Papaya has undertaken for years, on the same terms, pursuant to the same agreement—precisely the pattern that fixes creditors' reasonable expectations. Horizontally, intercompany remittances of this kind are typical in the complex cash management systems necessary to support multinational enterprises. As a reference, courts in the Chapter 11 context regularly approve the continued use of cash management systems involving ordinary course remittances like these from U.S. debtors to their foreign affiliates.[92]

74. Skillz' invocation of the Debtors' investment policy as evidence that the remittances fall outside the ordinary course misreads both the policy and the legal standard. The ordinary course inquiry focuses on the nature and consistency of the transactions as experienced by creditors, not on the Debtors' internal treasury guidelines. The investment policy governs the

[92] *See, e.g., In re NanoString Techs., Inc.*, Case No. 24-10160 (CTG) (Bankr. D. Del. Mar. 1, 2024) (entering a cash management order permitting a chapter 11 debtor to continue to engage in ordinary course cash transfers from U.S. bank accounts to foreign bank accounts, including accounts of non-debtor foreign affiliates); *In re Phoenix Servs. TopCo, LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. June 13, 2023) (same); *In re The Hertz Corp.*, Case No. 20-11218 (MFW) (Bankr D. Del. June 25, 2020) (same).

management of Papaya Israel's investment portfolio and has no bearing on the daily intercompany remittances.

### ***ii. Section 1522(a) Is Satisfied: The Israeli Proceeding Provides Full Creditor Protection, and Skillz' Proposed Conditions Would Serve Only Its Own Competitive Interests***

75. Skillz argues that the Debtors have failed to demonstrate that U.S. creditor interests are "sufficiently protected" under section 1522(a), as support for the extraordinary relief it seeks. Opposition ¶¶ 100–122. If the Court finds, as it should, that the Debtors' COMI is Israel, section 1520 automatically grants the relief Papaya seeks and section 1522 does not apply. But even if section 1521 relief is needed, the section 1522(a) balancing analysis, properly applied, confirms that U.S. creditor interests are sufficiently protected and that no additional conditions are warranted.

76. Courts assess sufficient protection under section 1522(a) by reference to three principles: (i) just treatment of all holders of claims; (ii) protection of U.S. claimants against prejudice and inconvenience; and (iii) distribution of proceeds substantially in accordance with U.S. priorities. *See In re Atlas Shipping*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009); *In re ENNIA*, 596 B.R. 316, 322 (Bankr. S.D.N.Y. 2019); *In re Credito Real S.A.B. de C.V., SOFOM, E.N.R.*, 677 B.R. 192, 203 (D. Del. 2026) (upholding sufficient-protection finding where bankruptcy court considered "the procedural and fundamental fairness of the [foreign] Proceeding, including the notice and opportunity to be heard afforded to creditors…and the arms-length nature of the negotiations leading to the [foreign] Plan"); *In re Prince Glob. Holdings Ltd.*, No. 26-10769 (MG), 2026 WL 1694259, at *19 (Bankr. S.D.N.Y. June 11, 2026) (finding sufficient protection where foreign proceeding sought to distribute proceeds in a manner broadly consistent with U.S. law).

77. The Israeli Proceeding satisfies each principle. [redacted]

[redacted][93] [redacted][94] [redacted][95] [redacted][96] [redacted][98] [redacted][99]

---

[93] Ex. 16 at 190:15–23. [redacted] Ex. 32 at 69:18–70:6. [redacted] Ex. 32 at 46:9–47:9.

[94] Ex. 16 at 179:1–4.

[95] Ex. 16 at 45:8–23.

[96] Ex. 16 at 200:23–201:6.

[97] Ex. 16 at 203:14–23; 204:2–7.

[98] Ex. 16 at 83:15–18. Mr. Elhawi's attempt to minimize the Arrangement Administrator's role is unavailing. He argues that the Arrangement Administrator's powers are materially narrower than those of a trustee under Chapter 2 (or Part B) of the Israeli Insolvency Law. D.I. 124 ¶¶ 13–15 (Declaration of Yaron Elhawi in Support of Skillz Platform Inc.'s Objection to the Debtors' Motion for Chapter 15 Recognition "Elhawi Decl."), but no one contends otherwise, and the comparison is beside the point. Mr. Elhawi himself concedes that the Arrangement Administrator performs substantial oversight functions: he adjudicates creditors' voting rights, receives regular reports on any material change in the company's business or financial condition, has the ability to attend board meetings and receives director-level information, and is charged with reporting to the Israeli Court if the company acts unfavorably to its own or creditors' interests. *Id.* ¶ 14. Those functions, performed by an independent, court-appointed third-party neutral with visibility into the Debtors' finances and governance, empowered to escalate concerns to the supervising court, are precisely what matters for sufficient protection. During his deposition, Mr. Elhawi [redacted] Ex. 32 at 33:22–24; 34:5–8. [redacted] Ex. 32 at 41:10–13; 63:9–23.

[99] Ex. 16 at 200:23–201:6; Ex. 31 ([redacted]).

78. [redacted][100] As confirmed by the Debtor's Israeli counsel during his deposition: [redacted][101] And those protections are enforceable: [redacted][102]

79. Skillz fundamentally misconstrues what "sufficient protection" means and what section 1522(a) is designed to accomplish. The evident purpose of Skillz' proposed conditions—a categorical prohibition on cash transfers out of the United States, blanket restrictions on intercompany remittances, and a supersedeas-style bond—is not to protect the creditor body from any real or perceived defects in the Israeli process. To provide those demands some legal footing, Skillz submits a declaration of its Israeli law expert, Mr. Elhawi, who opines that retaining U.S. generated revenue in U.S. accounts would not itself violate the Israeli statutory prohibitions on non-ordinary course dispositions or transactions during the stay. D.I. 124 ¶¶ 29-31 (Elhawi Decl.).[103] But that opinion addresses the wrong question. The real issue is whether any protections

[100] Mr. Elhawi devotes significant attention to arguing that the Debt Arrangement was vulnerable to cramdown challenge because equity retained value while a dissenting creditor class was not assured full repayment. D.I. 124 ¶¶ 20–28 (Elhawi Decl.). That argument is moot: the original Debt Arrangement is no longer on the table. The Arrangement Administrator has been expressly tasked with formulating a revised arrangement, and the Israeli Court has directed that any new arrangement incorporate additional sources of recovery before being put to a creditor vote. *See* D.I. 81–1 ¶¶ 12–14. If anything, Mr. Elhawi's analysis demonstrates the opposite of what Skillz intends: Part J is a fully functioning regime in which creditor objections are taken seriously, dissenting creditor protections are enforced, and the supervising court actively shapes the arrangement to ensure fairness.

[101] Ex. 16 at 178:21–179:6.

[102] Ex. 16 at 193:3–12.

[103] Mr. Elhawi's opinion is confined to a formalistic reading of isolated Israeli insolvency provisions and does not engage with, much less contradict, the operational reality that severing Papaya's centralized treasury function would disrupt the very cash management practice that both the Israeli Court and the Arrangement Administrator are actively supervising. Mr. Elhawi confirmed [redacted]

are necessary to protect creditors from defects in the Israeli process, of which Mr. Elhawi identifies none. On the other hand, the conditions Skillz seeks to impose on Papaya's business would require substantial deviations from its ordinary course practices and burden its ability to fund payroll, taxes, rent, and other essential operating expenses.

80. Skillz' sufficient protection theory is further weakened by the short duration of the Part J Debt Arrangement process. [redacted].[104] That limited, court-supervised runway does not create the kind of prospective, unremedied harm section 1522 is designed to address.

81. Skillz' reliance on *Marsch* and *Holm* to justify its bond demand is likewise misplaced. *See* Opposition ¶¶ 118–120 (citing *In re Marsch*, 36 F.3d 825 (9th Cir. 1994); *In re Holm*, 75 B.R. 86 (Bankr. N.D. Cal. 1987)). Both cases addressed whether an individual, non-business debtor's Chapter 11 filing was a bad faith litigation tactic where the debtor had the undisputed ability to satisfy the judgment from nonbusiness assets and no operating business to protect. Indeed, both courts expressly distinguished the different question presented where "enforcement of a judgment would cause severe business disruption," *Marsch*, 36 F.3d at 829, or where "the debtor is insolvent or would be rendered insolvent if a judgment against it [was] confirmed on appeal," *Holm*, 75 B.R. at 87, recognizing that a bankruptcy filing serves a legitimate purpose in that circumstance. That is precisely this case: the Israeli Court has recognized that the

---

[redacted] Ex. 32 at 75:22-78:1. He acknowledged [redacted] *Id.* at 78:21–23. He also testified [redacted] *Id.* at 85:22–86:5.

[104] Ex. 16 at 104:16–105:9.

SDNY Judgment has rendered the Debtors cash flow insolvent, and they are the subject of a genuine, multi-creditor collective insolvency proceeding designed to avoid business disruption.[105] Neither *Marsch* nor *Holm* has any relevance here.[106]

***iii. Should the Court Conclude That Papaya US's COMI Is Not Israel, Section 1521 Authorizes the Relief the Foreign Representative Has Requested***

82. Skillz raises three arguments regarding the Foreign Representative's discretionary relief under section 1521 of the Bankruptcy Code. First, it contends that the Proposed Order's blanket entitlement to the "full protections and rights enumerated under section 1521" is overbroad and impermissible, and that paragraph 8 of the Proposed Order should therefore be stricken. Opposition ¶¶ 100–101. Second, Skillz argues that any transfer of U.S.-generated cash to Israel constitutes a "distribution" under section 1521(b) subject to a heightened, creditor-centric standard that the Foreign Representative cannot satisfy. *Id.* ¶ 105. Third, Skillz argues that the Proposed Order should not be read to authorize intercompany transfers from Papaya US to Papaya Israel, contending that such transfers require specific authorization under sections 363, 1521(a)(5), and 1521(b) that the Foreign Representative has not sought nor obtained. *Id.* ¶¶ 114–116. Each of these arguments fails.

83. The Foreign Representative raises section 1521 solely as an alternative: should the Court conclude that Papaya US's COMI is not Israel, the Israeli Proceeding would qualify as a

[105] D.I. 81-1 ¶ 3, 8.

[106] The other authorities Skillz musters for its section 1521(b)/1522(a) argument involved requests for relief nothing like what the Foreign Representative seeks here. *See Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14, 20–22, 27–31 (4th Cir. 2013) (foreign administrator's request to cancel the U.S. cross-license agreements and force renegotiated royalties in violation of 11 U.S.C. § 365(n)); *In re Hanjin Shipping Co.*, No. 16-27041 (JKS), 2016 WL 6679487, at *7 (Bankr. D.N.J. Sep. 20, 2016) (denying request for bond or additional protections because "nothing in the record that would indicate that the [foreign court] will not provide due process to all parties," thus satisfying the standard); *In re Rede Energia S.A.*, 515 B.R. 69, 107 (Bankr. S.D.N.Y. 2014) (granting request to enforce restructuring because the foreign proceeding comported with due process). None supports the proposition that authorization to continue pre-existing, contractually governed, daily cash management practice requires the same level of judicial scrutiny as cancellation of statutory rights or compelled asset turnover.

foreign nonmain proceeding as to Papaya US, and therefore section 1521 would authorize the same relief. 11 U.S.C. § 1521(a). Section 1521 deliberately authorizes broad relief: the UNCITRAL Guide to Enactment of the Model Law, the authoritative interpretive guide to the provision Congress enacted as section 1521, confirms that the statutory list of available relief "is not exhaustive" and that courts are "not restricted unnecessarily" in their ability to grant any relief available under domestic law and needed in the circumstances of the case. *See* UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2014), ¶ 189 (the "Guide"). The Guide further provides that "it is in the nature of discretionary relief that the court may tailor it to the case at hand." *Id.* ¶ 191.

84. The relief the Foreign Representative seeks in this alternative posture is therefore unconstrained by whether it fits neatly within section 1521(a)(5) or 1521(b). It is simply "appropriate relief" within the Court's discretion, calibrated to the circumstances of a going concern operating debtor conducting ordinary course intercompany transfers under a long-standing services agreement, identical in substance to what section 1520 would automatically provide.

85. As Skillz acknowledges, any section 1521 relief is further conditioned by section 1522(a), which requires that the interests of creditors and other interested entities are sufficiently protected. 11 U.S.C. § 1522(a); Opposition ¶ 103. The Foreign Representative does not dispute that standard, and as set forth above that standard is satisfied here in any event. *See supra* ¶¶ 75–81. What the Foreign Representative disputes is Skillz' mischaracterization of the transactions at issue and its misapplication of the governing framework to those transactions.

86. Skillz relies on *Atlas Shipping* and *Markus* to argue that any transfer of assets not necessary to support immediate operating expenses constitutes a "distribution" under section 1521(b) subject to a heightened, creditor-centric standard. *See* Opposition ¶ 105; *Atlas Shipping*,

404 B.R. at 740; *In re Markus*, 610 B.R. 64, at 76–77 (Bankr. S.D.N.Y. 2019). But as set forth above, that argument fails at its premise for the independent reason that the intercompany remittances are ordinary course transactions that require no further authorization under section 1520(a)(3). *See supra* ¶¶ 71–74. And even if section 1521(b) were the applicable framework, the transactions at issue are not "distributions" within the meaning of that provision under any reasonable reading of that term or the cases construing it. *Atlas Shipping* concerned the turnover of specific bank funds seized through Rule B maritime attachments for distribution to creditors in a Danish liquidation. *Atlas Shipping*, 404 B.R. at 726. *Markus* involved the formal transfer of discrete, identifiable funds in U.S. accounts to a foreign trustee for distribution to creditors in a concluded foreign proceeding. *Markus*, 610 B.R. at 68–69. Each case involved a one-time, court-supervised transfer of a pre-identified pool of U.S. assets for the express purpose of satisfying creditor claims in a foreign proceeding at or near resolution: a typical section 1521(b) "distribution." The recurring, contractually governed remittances at issue here bear no resemblance to either. They are not distributions of estate assets to creditors; they are standard intercompany cash management transfers within a corporate enterprise.

**F. <u>Section 1506 Does Not Bar Recognition</u>**

87. Section 1506 provides that a court may deny relief under Chapter 15 only if the requested action "would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Courts have consistently emphasized the narrowness of the exception. It applies only to "the most fundamental policies of the United States" and "should be interpreted restrictively." *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006); *see also In re Crédito Real S.A.B. de C.V., SOFOM, E.N.R.*, 677 B.R. 192, 205 (D. Del. 2026) ("Section 1506's public policy exception provides a narrow remedy for genuine threats to core U.S. constitutional or statutory rights, as opposed to mere discrepancies between domestic and foreign

law."). Section 1506 asks whether *recognition itself* would be manifestly contrary to U.S. public policy by examining the characteristics of the foreign proceeding, not whether an objector alleges that the debtor is a bad actor. *See In re Black Gold S.A.R.L.*, 635 B.R. 517, 528 (B.A.P. 9th Cir. 2022); *Creative Fin.*, 543 B.R. at 516.

88. No court has invoked section 1506 to deny recognition of a foreign proceeding conducted under a well-established internationally recognized insolvency framework like Part J, where the debtor proposes to pay every allowed claim in full. To the contrary, courts have granted recognition even where the foreign restructuring modified claims, released third parties, or reordered priorities in ways that would be prohibited under U.S. law—far greater deviations from U.S. norms than anything the Israeli Proceeding contemplates—and even when the court expressed legitimate concerns about bad actors. *See Black Gold*, 635 B.R. at 521 (alleged debtor misconduct did not render Monegasque insolvency proceeding manifestly contrary to U.S. public policy); *In re Thentia USA Inc.*, No. 26-10222, slip op. (Bankr. D. Del. Sept. 23, 2026) (Goldblatt, J.) (granting recognition and enforcement of Canadian reverse vesting order containing third-party releases over section 1506 objection and holding that third-party releases, though not authorized in U.S. Chapter 11 proceedings outside of asbestos cases following *Purdue Pharma*, are not so repugnant to public policy as to bar recognition of a foreign proceeding conducted on fair terms); *Credito Real*, 677 B.R. at 205 (affirming recognition and enforcement of Mexican concurso plan that contained nonconsensual third-party releases that would be unavailable under U.S. law); *In re Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicial*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025) (granting recognition and enforcement of Brazilian *recuperação judicial* plan containing nonconsensual third-party releases and explaining that the "public policy exception is narrowly construed.").

89. Skillz has not identified a single feature of the Israeli Proceeding that is manifestly contrary to fundamental U.S. policy. Debtors regularly enter reorganization proceedings carrying tort liabilities and amounts owing to judgment creditors. The existence of a large adverse judgment does not transform an otherwise qualifying foreign proceeding into a public policy violation.[107] Part J is a court-supervised, collective insolvency-and-rehabilitation regime. It provides for notice, hearing, and creditor participation; it appoints an independent Arrangement Administrator; it applies claims priorities substantially in accordance with U.S. law (secured creditors first, unsecured creditors on par); and it produces a payment plan subject to court approval. *See supra* ¶¶ 17–22. Skillz' general dissatisfaction with the pace or terms of that process does not implicate any principle so fundamental that comity must yield.

90. Skillz' invocation of *Qimonda* is misplaced. That decision addressed whether a foreign administrator's proposed nullification of specific U.S. patent-licensee rights under 11 U.S.C. § 365(n)—a provision Congress enacted to protect substantial U.S. investment in cross-licensed technology—might "severely impinge the value and import" of that enumerated federal statutory right, warranting invocation of section 1506. *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 567–69 (E.D. Va. 2010). The concern in *Qimonda* was the direct displacement of a specific statutory right that could not be remedied through participation in the foreign proceeding. Recognition here raises no such concern. It would displace no statutory right; it would authorize a court-supervised repayment plan under which every allowed claim, including that of Skillz, is

---

[107] *Grogan v. Garner*, 498 U.S. 279 (1991), which Skillz again invokes for its oft-repeated allegation of "fraud," has no bearing on this case. *Grogan* addressed the standard of proof (preponderance vs. clear and convincing) for the fraud-based discharge exception under 11 U.S.C. § 523(a) in an individual debtor's Chapter 11 case. *Id.* at 280–81, 286. Section 523(a) applies by its terms only to an individual debtor, and Chapter 15 recognition—unlike a Chapter 7, 11, or 13 discharge—extinguishes nothing. The Israeli Proceeding does not discharge the SDNY Judgment; it proposes to pay it in full. *Grogan*'s balancing of a defrauded creditor's recovery interest against an individual debtor's "fresh start" is irrelevant to the question of whether recognition of a proceeding that pays every claim in full is manifestly contrary to U.S. public policy under section 1506.

paid in full. The SDNY Judgment is not being neutralized; it is being paid. Nothing in the Israeli Proceeding comes anywhere near the kind of specific statutory-right displacement that troubled the *Qimonda* court.

91. The Opposition's broader policy framing that recognition here will supply a "roadmap for foreign tortfeasors" to evade U.S. liability, Opposition ¶¶ 133–34, is equally unavailing. Recognition of a rehabilitation proceeding that pays every allowed claim in full is not a roadmap for evasion; it is a mechanism for satisfaction under coordinated court supervision. Nor does granting recognition on these facts establish any precedent that would invite abuse. It applies settled Chapter 15 principles to the straightforward case of a foreign debtor seeking administration of its debts in its home jurisdiction under which its creditors will be made whole. If recognition of a full-payment plan crossed the section 1506 line, the exception would swallow the rule.

92. Nothing about the Israeli Proceeding, or about the appointment of the Foreign Representative, is manifestly contrary to fundamental U.S. public policy. Chapter 15 itself embodies a Congressional policy of international cooperation and comity in cross-border insolvencies.[108] Refusing recognition here would fragment administration of the Debtors' case, destroy value, and impair the ability of the Debtors' creditors to receive the orderly and full repayment the Israeli Proceeding promises. Skillz' recourse to section 1506 is another effort to parade the SDNY Judgment through a doctrinal side door. The Court should decline to entertain it.

[108] 11 U.S.C. § 1501.

## CONCLUSION

**WHEREFORE**, the Foreign Representative respectfully requests that this Court grant the relief requested in the Verified Petition, overrule the Opposition, and grant such other and further relief as may be just and proper.

**REDACTED VERSION**

Dated: October 1, 2026
Wilmington, Delaware

**COOLEY LLP**

Matthew L. Kutcher (admitted *pro hac vice*)
Thomas P. Peabody (admitted *pro hac vice*)
Benjamin J. Thomson (admitted *pro hac vice*)
Mariah Young (admitted *pro hac vice*)
110 North Wacker Drive, Suite 4200
Chicago, IL 60606
Telephone: (312) 881-6500
Facsimile: (312) 881-6598
mkutcher@cooley.com
bthomson@cooley.com

Michael Klein (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
mklein@cooley.com

Erin Trenda (admitted *pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121-1117
Telephone: (858) 550-6000
Facsimile: (858) 550-6420
etrenda@cooley.com

Olya Antle (admitted *pro hac vice*)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
oantle@cooley.com

Matthew Oliver (admitted *pro hac vice*)
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Telephone: (617) 937-1337
Facsimile: (617) 937-2400
moliver@cooley.com

**BLANK ROME LLP**

By: */s/ Stanley B. Tarr*

Stanley B. Tarr (DE No. 5535)
Jennifer K. Malow (DE No. 7424)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Stanley.Tarr@BlankRome.com
Jennifer.Malow@BlankRome.com

Evan J. Zucker (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (917) 591-2726
Evan.Zucker@BlankRome.com

*Counsel to the Foreign Representative*