# EXHIBIT B

## Motion to Convene Creditors' Meeting
## (Hebrew)

**בית המשפט המחוזי**
**בתל אביב**

**חדל"ת 87154-07-26**
**בפני כב' השופטת איריס לושי עבודי**

**בעניין**: **חוק חדלות פירעון ושיקום כלכלי, התשע"ח, 2018** (להלן: "**החוק**")

**בעניין**: **תקנות חדלות פירעון ושיקום כלכלי, התשע"ט, 2019** (להלן: "**התקנות**")

**ובעניין**: **פאפאייה גיימינג בע"מ ח.פ. 515422095**
**Papaya Gaming Inc.**
שתיהן ע"י ב"כ עוה"ד פיני יניב (מ.ר. 15378) ו/או לירון ספיר (מ.ר. 66525) ו/או ירדן טל-דהן (מ.ר. 90826) ו/או ירין נחאיסי (מ.ר. 102568) ו/או אח'
ממשרד מיתר | עורכי דין
אריאל שרון 1 , גבעתיים
yardent@meitar.com
(להלן: "**החברות**")

**ובעניין**: **עו"ד גיל אורן בתפקידו כמנהל הסדר**
ממשרד ארנון, תדמור-לוי
מרכז עזריאלי המגדל המרובע
טל: 03-6087777 , פקס': 02-6239314
דוא"ל: gil@arnontl.com
(להלן: "**מנהל ההסדר**")

**ובעניין**: **נושי החברות – על-פי רשימה** (להלן: "**נושי החברות**")

**ובעניין**: **הממונה על הליכי חדלות פירעון ושיקום כלכלי – מחוז תל אביב**
באמצעות עו"ד גב' הדר נאות
רח' השלושה 3, תל אביב
טל': 073-3927000; פקס': 02-6467556
(להלן: "**הממונה**")

מועד חתימת המסמך: 20.10.2026

# בקשה לכינוס אסיפות נושים לצורך הצבעה על הסדר חוב מתוקן ובגדרה בקשה דחופה להורות על הארכת צו עיכוב ההליכים

פאפאייה גיימינג בע"מ ("**פאפאייה ישראל**" או "**החברה**") ו-.Papaya Gaming Inc ("**פאפאייה אינק**") (בעיכוב הליכים) (להלן יחד: "**החברות**"), יחד עם עו"ד גיל אורן, מנהל ההסדר ("**מנהל ההסדר**"), מתכבדים לפנות לבית המשפט הנכבד ולבקש כי יעשה שימוש בסמכותו לפי סעיף 319 יחד (ה') לחוק חדלות פירעון ושיקום כלכלי, תשע"ח-2018 (להלן: "**החוק**") ויורה כדלקמן:

(א) להורות על הארכת תוקפו של צו עיכוב ההליכים בעניינן של החברות, שעתיד לפוג היום, 20.10.2026, וזאת עד ליום 25.11.2026.

(ב) להורות למנהל ההסדר לכנס בתוך 14 ימים ממועד אישור בית המשפט הנכבד אסיפות נושים ואסיפת בעלי מניות לצורך אישור הסדר החוב המתוקן, וזאת בשים לב לפרק הזמן הקצר שנותר עד לתום התקופה המקסימלית בדין לתוקפו של צו עיכוב הליכים.

- העתק הסדר החוב המתוקן מצורף **כנספח "1"**.

(ג) לאשר כי ההשתתפות באסיפות תוכל להתקיים הן באמצעות הגעה לאסיפה באופן פיזי, הן באמצעות השתתפות באופן מקוון (ע"י קישור שישלח מראש לכל נושה או בעל מניות שיבקש להשתתף באמצעות היוועדות חזותית), והן במסירת כתבי הצבעה עד מועד שייקבע.

(ד) להורות כי נושים מותנים שפנו אל מנהל ההסדר עובר למועד הגשת בקשה זו, יוכלו להשלים את הגשת תביעת חובם לצרכי הצבעה לא יאוחר משבוע לפני מועד כינוס האסיפות, וכי יותר להם להשתתף באסיפות.

הערה: על אף העבודה המאוד מאומצת של המומחה שמינה מנהל ההסדר, לא עלה בידו להשלים את עריכת הערכת השווי (המצורפת כנספח להסדר), ואת חוות הדעת בדבר סבירות התחזיות (המצורפת כנספח לבקשה זו), והעבודה עליהן מסתיימת בשעות אלה ממש. על מנת שלא לדחות את הגשת הבקשה – ובשים לב ללוחות הזמנים הדוחקים – מוגשת הבקשה ועימה ההסדר המתוקן כבר עתה, ושתי חוות הדעת תוגשנה תוך 24 שעות.

| | |
|---|---|
| ______________ | ______________ |
| פיני יניב, עו"ד | גיל אורן, עו"ד |
| ב"כ המבקשות | מנהל ההסדר |

**<u>ואלו נימוקי הבקשה</u>**:

## א. <u>רקע</u>

1. המבקשת 1, פאפאייה ישראל, היא חברה פרטית שהתאגדה בישראל בשנת 2016, ועוסקת בפיתוח, בשיווק ובהפעלה של פלטפורמה טכנולוגית למשחקי סלולר מבוססי מיומנות. המבקשת 2, פאפאייה אינק, היא חברה בת של פאפאייה ישראל שהתאגדה במדינת דלאוור, אשר מספקת שירותי fronting וסליקת תשלומים.

2. ביום 30.7.2026 הגישו החברות "**בקשה דחופה (במעמד צד אחד) למתן צו עיכוב הליכים זמני לצורך כינוס אסיפות ואישור הסדר נושים לפי חלק י' לחוק חדלות פירעון**" וכן "**בקשה למתן צו לכינוס אסיפות לצורך אישור הסדר חוב**" ("**הבקשה המקורית**" ו-"**הסדר החוב המקורי**" בהתאמה). כזכור, ברקע הבקשה המקורית עמדה תביעה שהגישה המתחרה העסקית, .Skillz Platform Inc (להלן: "**Skillz**"), שבמסגרתה ניתנה ביום 27.7.2026, החלטה של בית המשפט הפדראלי בניו יורק, המחייבת את החברות לשלם למעלה מ-719 מיליון דולר ("**פסק דין Skillz**" או "**פסק הדין**"). בבקשה המקורית הבהירו החברות כי בכוונתן לערער על פסק הדין וכי להערכתן ולהערכת יועציהן המשפטיים קיימים סיכויים גבוהים לביטולו או לצמצומו המשמעותי. כן הובהרה עמדתן שלפיה פסק הדין אינו אכיף בישראל בהתאם לחוק אכיפת פסקי-חוץ, התשי"ח-1958 ("**חוק אכיפת פסקי חוץ**"), בהיותו כפוף לערעור ובלתי חלוט.

3. כפי שהוסבר בבקשה המקורית, הגם שהחברות מציגות הכנסות שנתיות של כחצי מיליארד דולר(!) ועומדות במלוא התחייבויותיהן השוטפות ובמועדן, הרי שלנוכח היקפו של פסק הדין, העולה על יתרות המזומנים של החברות, והסיכון הנשקף להמשך פעילותן מנקיטת צעדי אכיפה, פנו החברות באופן יזום להציע הסדר חוב לפי חלק י' לחוק חדלות פירעון ושיקום כלכלי, התשע"ח-2018 (להלן: "**החוק**").

4. ההסדר המקורי שהוצע מבוסס על המשך פעילותן העסקית הרווחית של החברות ועל הפרשה שנתית של יתרת המזומנים הפנויה לקרן ייעודית, בפיקוח ובניהול מנהל ההסדר, לשם תשלום לנושים המותנים שיהיה בידיהם פסק דין אכיף בישראל. מתווה זה נועד לאפשר פירעון מלא של החובות, גם אם על פני מספר שנים, תוך שימור הפעילות העסקית, מקומות העבודה וקיום ההתחייבויות השוטפות (לפירוט ראו פרק ד' לבקשה המקורית).

5. בהחלטה מיום 26 באוגוסט 2026 הורה בית המשפט הנכבד על מינוי מנהל ההסדר, בשים לב למאפייניו המיוחדים של ההליך, והצורך לשפר את ההסדר, בהקפדה על החובות הכרוכות בהפעלת החברות ובשימור פעילותן הרווחית בארה"ב. עוד נקבע כי סמכויות מנהל ההסדר יהיו בהתאם לסעיף 319ג לחוק חדלות פירעון ושיקום כלכלי, וכי עליו לפעול לגיבוש ולעיצוב הסדר החוב בהתאם להערות הנושים, הממונה ובית המשפט, ולהגיש בקשה לכינוס אסיפות נושים בלוח זמנים שיאפשר לנושים הזרים לגבש את עמדתם בין פרסום ההסדר לבין כינוס האסיפות. בכלל זה, התבקש מנהל ההסדר לפעול לצמצום ההסתמכות הבלעדית על הכנסות עתידיות מהמשך פעילות החברות, וקבע שעל החברות להציג מודל משופר המשלב הכנסות מהפעילות עם מקורות נוספים כגון ערבויות ותרומת בעלים.

6. מכאן בקשה זו, אליה צורף ההסדר המתוקן (נספח 1 לעיל).

7. כפי שיובהר להלן, ההסדר המתוקן שונה במידה רבה מההצעה המקורית ומשפר אותה באופן מהותי. בעוד שההצעה המקורית נשענה על הכנסות הפעילות בלבד, ללא מינימום הפקדות, ותוך אפשרות להקטין את סכומי ההפקדות, הרי שההסדר המתוקן מבהיר שהמבקשות מתחייבות לפירעון מלא, הוא כולל לוח הפקדות מוגדלות המבהיר שתשולם גם ריבית על החוב, ואף מקצר את תקופת ההסדר לשש שנים עם אפשרות בלעדית למנהל ההסדר לקיצור התקופה לחמש שנים. ההסדר המתוקן גם קובע רצפת תשלומים מחייבת (תשלומי מינימום שנתיים), וכן נוסף בו מנגנון השלמה מדורג למקרים של אי-עמידה במינימום. זאת ועוד. ההסדר המתוקן כולל חלוקה מיידית של 20 מיליון דולר לנושים הממתינים להיפרע מן הפיקדון, שלא תושב בכל מקרה. כמו כן, נוספו ביטחונות לנושים בדמות הקצאת 25% ממניות החברה כבטוחה, ושעבוד מניות פאפאייה אינק כבטוחה נוספת. בהסדר המתוקן נוספה תרומת בעלי מניות ובפרט המייסדים (בדרך של העמדת ערבויות ובטחונות ופגיעה בתנאי ההעסקה) בשווי של כ-35 מיליון דולר, וכן הוטמע מנגנון עונשי על מניות המייסדים המייצר תמריץ להישארותם בתפקידי המפתח לכל חמש השנים. ההסדר המתוקן מבהיר שהפטור לנושאי משרה מותנה בהצלחת ההסדר ואינו בלתי חוזר. בנוסף, נקבעו הוראות מפורטות לפיקוח הדוק של מנהל ההסדר על פעילות החברה והוטלו מגבלות על החברה ועל בעלי מניות. ועוד.

8. כל זאת נעשה תוך שימור החברות כעסק חי, שערכו נשען על המשך פעילותו הרווחית ועל ההון האנושי שבו, ושהוא מקור הפירעון הטוב ביותר העומד לרשות הנושים. ההסדר המתוקן מגשים את שני ערכי היסוד של החוק, שהם שיקום המבקשות והשאת שיעור הפירעון לנושים, וזאת תוך יישום ההערות וההמלצות שנתן בית המשפט הנכבד ותוך שילוב מרכיבים נוספים שהוצעו על ידי החברה, הנושים ועל ידי מנהל ההסדר. להלן נפרט.

## ב. <u>פעולות מנהל ההסדר לגיבוש ההסדר</u>

9. כאמור, מנהל ההסדר מונה לתפקידו ביום 26.8.2026. עם קבלת צו המינוי החלו מנהל ההסדר וצוותו ללמוד את מצבן של החברות ואת פעילותן, לעיין בחומרים שהועמדו לרשותם ולבחון את הרקע והנסיבות שהביאו להגשת הבקשה להסדר, לצורך גיבוש תכנית הסדר מתוקנת שניתן יהיה להביאה לאישור הנושים ובית המשפט הנכבד.

10. במסגרת זו קיימו מנהל ההסדר וצוותו מספר רב של פגישות עם הנהלת החברות ועורכי דינן, שבהן הוצגו הרקע להגשת הבקשה להסדר, מצב הפעילות והסוגיות הטעונות מענה במסגרת ההסדר. במהלך הפגישות הוצגו למנהל ההסדר נתונים וחומרים הנוגעים לפעילות החברות ולהסדר המוצע. נוסף על כך, השתתף מנהל ההסדר בישיבת דירקטוריון החברה.

11. מנהל ההסדר קיים גם שיחות עם עורכי הדין האמריקאיים המייצגים את החברות בהליכים המתנהלים בארצות הברית, הן בערעור על פסק הדין והן בהליך ההכרה. שיחות אלו נועדו לעמוד על מהות ההליכים, מצבם והשלכותיהם האפשריות על גיבוש תכנית ההסדר.

12. בד בבד עם איסוף הנתונים ולימוד פעילות החברות, קיים מנהל ההסדר שיחות עם נציגי שלושת הנושים המרכזיים ועם באי כוחם, וקיבל התייחסויות בעל פה לתכנית ההסדר המתוקנת המוצעת. השיחות עסקו, בין היתר, ברכיבי ההסדר, במידע הדרוש לבחינתו ובשינויים שהתבקשו בו.

13. בכלל זה קיים מנהל ההסדר שיחות עם עורכי הדין המייצגים את Skillz, הן בישראל והן בהליכים בארצות הברית, וכן עם הנושים המותנים האחרים ועם מייצגיהם, לצורך בירור עמדותיהם ובחינת המענה שניתן לתת להן במסגרת תכנית ההסדר המתוקנת.

14. במהלך התקופה עמדו מנהל ההסדר וצוותו בקשר עם גם נציגי הממונה על הליכי חדלות פירעון ושיקום כלכלי, עדכנו אותם בדבר עיקרי הפעולות והדיונים וקיבלו הבהרות ביחס לעמדת הממונה בנוגע לאלמנטים שונים בתכנית ההסדר. נוסף על כך, התקיימו התייעצויות בנושאים שהתעוררו במהלך העבודה, ובכלל זה בשאלת ההתקשרות עם מעריך השווי ובהיקף הבדיקות הנדרשות ממנו.

15. נוסף על האמור, ובהתאם להחלטת בית המשפט הנכבד מיום 26.8.2026, שבה נקבע כי תימסר הודעה בדבר ההליך דנן לשחקנים שהשתמשו בשירותי החברות, התקבלו אצל מנהל ההסדר עשרות פניות וכן תביעות חוב לצורכי הצבעה. מנהל ההסדר וצוותו טיפלו בקבלת תביעות החוב, במתן מענה לפונים ובהדרכתם באשר לאופן הגשת תביעות החוב לצורך השתתפות באסיפות הנושים. נוכח העובדה שהפניות התקבלו משחקנים מחוץ לישראל, ניתנו לפונים הבהרות בדבר דרישות ההגשה. במסגרת הטיפול בפניות ניתנה גם התייחסות למשמעות הגשת תביעות חוב לצורכי הצבעה בידי מי שעשויים להימנות עם הקבוצה בהליך הייצוגי המתנהל בישראל, ולזיקה שבין הגשתן לבין ההליך האמור.

16. לצורך בחירת מעריך השווי ניהל מנהל ההסדר דיאלוג עם החברות בדבר היקף העבודה הנדרש, הכולל הערכת שווי ומבחני רגישות, בחינת סבירות הנחות העבודה שבבסיס תכנית החברות ובחינת העמידה בתקציב תקופת הביניים. במסגרת תהליך הבחירה נערכו ראיונות עם מועמדים רלוונטיים, ולאחר קבלת הצעות נבחר משרד רואי החשבון פאהן קנה Grant Thornton. ביום 22.9.2026 אישר בית המשפט הנכבד למנהל ההסדר להתקשר עם המשרד לצורך ביצוע הערכת שווי, בקרה תקציבית ובדיקת סבירות תכנית הפירעון של החברות, המהווה בסיס להצעת ההסדר. ההתקשרות נועדה להעמיד לבחינה מקצועית את הנחות העבודה שבבסיס ההסדר ולספק להן תימוכין בחוות דעת כלכלית, ככל שיימצאו סבירות.

17. בגיבוש ההסדר המתוקן התייחס מנהל ההסדר למכלול עמדות הנושים, כפי שהובאו בכתבי הטענות שהוגשו לבית המשפט ובשיחות שקוימו עמם ועם מייצגיהם, וכן לעמדת נציגי הממונה ולהערות בית המשפט הנכבד, ובכלל זה להערות שעלו בדיון מיום 25.8.2026. על יסוד אלה קיים מנהל ההסדר דיונים עם החברות בנוגע למרכיבי התכנית, בחן חלופות שונות והעלה הצעות לשינויים ולתוספות.

18. במסגרת האמור נוהל הליך בחינה והידברות ממצה, שנועד למקסם את הערך לנושים, תוך בחינת עמדות הגורמים השונים והסתייעות ביועץ הכלכלי לבדיקת הנחות העבודה שבבסיס ההסדר ולבחינתן בחוות דעת מקצועית. בעקבות הדיונים והבחינות האמורים גובש מתווה המשמש בסיס לתכנית ההסדר המתוקנת.

## **ג. <u>הצעת ההסדר המתוקנת</u>**

### **ג(1). <u>כללי</u>**

19. על רקע האמור, העיקרון שביסוד ההסדר המקורי, שנותר בעינו גם בהסדר המתוקן, הוא שימור החברות כעסק חי וייעוד רווחי הפעילות לפירעון החובות המותנים. עניין זה יובטח באמצעות פיקדון ייעודי שינוהל בידי מנהל ההסדר. ההסדר חל על החובות הנובעים מפרקטיקות העבר הנטענות של שימוש בבוטים, כהגדרתם בהסדר, הן כלפי נושים המנהלים הליכים משפטיים והן כלפי בעלי עילות תביעה שטרם נקטו הליכים. הוא אינו חל על ההתחייבויות השוטפות כלפי הנושים המוחרגים, ובהם ספקים, עובדים ושחקנים במהלך העסקים הרגיל, והתחייבויות אלה יוסיפו להיפרע כסדרן ובמועדן.

20. מקורות הפירעון ירוכזו בפיקדון מנהל ההסדר באמצעות הפקדה ראשונית והפקדות שנתיות המבוססות על יתרות המזומנים הפנויות, ובשים לב לדרישות מינימום וליתר המנגנונים המעודכנים הקבועים בהסדר. מתווה זה נועד לייעד כספים לטובת הנושים המותנים, תוך הותרת המקורות הדרושים להמשך הפעילות העסקית המניבה אותם.

21. לצד הסדרת מקורות הפירעון ואופן התשלום, ההסדר מאפשר את המשך בירור התביעות שעליהן הוא חל, בהתאם להוראותיו, ובכלל זה את הערעור על פסק דין Skillz והמשך בירורן של התביעות הייצוגיות בערכאות שבהן הן מתנהלות. דבר זה נעשה, כפי שנקבע בהחלטת בית משפט נכבד זה, בהתאם לפסיקתות שהוגשו או יוגשו לבית המשפט. ההסדר אינו מבקש אפוא לגרוע מסכום החוב שייקבע כי החברות חבות בו, אלא להיפך: עיקרון יסודי בהסדר הוא לאפשר את פירעונם המלא של החובות כאשר יהפכו לאכיפים, תוך שמירה על הפעילות העסקית המהווה את מקור הפירעון המרכזי.

22. בהסדר הוכנסו תיקונים ותוספות רבים, וזה עיקרם:

22.1 הובהר כי יש התחייבות מפורשת של החברות לפירעון מלוא החובות המותנים אם יהפכו לחובות אכיפים, לרבות כל יתרה שתיוותר, אם תיוותר בתום תקופת ההסדר;

22.2 לוח ההפקדות (נספח 1 להסדר) תוקן כדי להבהיר שמלוא החובות האכיפים, כולל ריבית, ישולמו במלואם בתקופת ההסדר;

22.3 קוצרה תקופת ההסדר לשש שנים, וניתנה סמכות למנהל ההסדר לקצרה לחמש שנים בדרך של מימוש בטחונות;

22.4 נקבעה חובת הפקדת מינימום לפיקדון מנהל ההסדר בשיעור 85% מן הסכומים המצוינים בנספח 1 להסדר, ונקבע מנגנון לבדיקת העמידה בסכומי המינימום, וסנקציות בגין אי עמידה במינימום, כמו גם קביעת רף עליון לחריגה שמעבר לו הדבר מהווה ארוע הפרה;

22.5 נקבעו סנקציות של מנגנוני השלמה במקרה של אי עמידה במינימום השנתי, לרבות השתתפות של בעלי המניות והנפקת מניות נוספות למנהל ההסדר;

22.6 נוספו בטוחות בדמות שעבוד הפיקדון, שעבוד מניות פאפאייה אינק והקצאת מניות בחברה למנהל ההסדר;

22.7 נוספו ערבויות אישיות של בעלי מניות מגובות בבטחונות אישיים שיעמידו;

22.8 נוסף ויתור של המייסדים על בונוסים שנתיים בהיקף של כ-25 מיליון דולר, סכום שיועבר לפיקדון מנהל ההסדר;

22.9 נוספה חלוקה מיידית של 20 מיליון דולר לנושים המותנים שתביעת החוב שלהם אושרה לצורכי הצבעה בסכום העולה על 5 מיליון דולר, וסכום זה לא יוחזר בשום מקרה;

22.10 נקבעו מגבלות על החברות, על שאר חברות הקבוצה, ועל בעלי המניות לאורך כל תקופת ההסדר, לרבות איסור חלוקות ואיסור העברת מניות;

22.11 נקבע מנגנון reverse vesting ל-50% ממניות המייסדים, כדי לשמש תמריץ לכך שימשיכו לכהן בתפקידי מפתח בחברה;

22.12 נקבע כי הפטור לנושאי משרה ולבעלי מניות, שבהסדר המקורי היה סופי ובלתי חוזר, יהיה מותנה, ויתבטל אם ההסדר יבוטל בהחלטת בית המשפט בשל אירוע הפרה, או אם יתברר בתום תקופת ההסדר שהחברות לא עמדו בתשלומי המינימום;

22.13 ונקבעו זכויות רחבות של מידע, פיקוח ואכיפה למנהל ההסדר, וכי שכרו והוצאותיו ישולמו על ידי החברות ולא על חשבון הנושים.

23. התוצאה היא **הסדר רב-שכבתי, עם שכבות הגנה של כספים, בטחונות, ערבויות, הנפקת מניות** וכולי. מבנה זה משפר באופן מהותי את מצבם של הנושים המותנים. להלן יפורטו הדברים בהרחבה.

**ג(2). תיקונים ותוספות כלליים: פירעון מלוא החובות, מעגל הנושים המותנים, ההפקדות לפקדון**

24. ההסדר המתוקן קובע במפורש כי **החברות מתחייבות לפרוע את מלוא החובות המותנים שיהפכו לחובות אכיפים**. הפיקדון, הבטוחות וההקצאות של המניות, כמפורט בהרחבה להלן, נועדו להבטיח את הפירעון, וההסדר המתוקן מבהיר שאין בהם כדי לגרוע מחבותן של החברות מכוח ההסדר, כך שמובהר שהנושים יקבלו 100% מחובם.

25. **תקופת ההסדר קוצרה לשש שנים בלבד**. כפי שיפורט להלן, למנהל ההסדר הוקנתה גם האפשרות **לקיצור תקופת ההסדר לאחר תקופה של חמש שנים**.

26. בתום תקופת ההסדר תעמוד לפירעון מיידי כל יתרת חוב אכיף שלא נפרעה. חובות מותנים שיהפכו לאכיפים לאחר מכן ייפרעו, אם וכאשר יתגבשו לחוב אכיף, במהלך העסקים הרגיל. הכספים והבטוחות שהופקדו או נמסרו למנהל ההסדר ימשיכו לשמש בטוחה לפירעון חובות אלה עד לסיום ההליכים התלויים ועומדים, אלא אם בטלה זכאותם של כל הנושים המותנים, או שבית המשפט קבע כי החברות יכולות לפרוע את החובות במהלך העסקים הרגיל.

27. נוסף על ההפקדה הראשונית בסך 60 מיליון דולר, אשר תופקד בחשבון ייעודי של מנהל ההסדר בתוך 14 ימים ממועד כניסת ההסדר לתוקף, החברה מחויבת להפקיד בכל אחד ממועדי התשלום השנתיים סכום כך שסך התשלומים לא יפחת מ-85% מסכום היעד המצטבר עד לאותו מועד (להלן: "**תשלומי המינימום**"). מדי שנה יבדוק מנהל ההסדר את עמידת החברה בתשלומי המינימום המצטברים. בכל מקרה של פער יופעלו מנגנוני ההשלמה והאכיפה שיפורטו להלן.

28. **בסיס חישוב יתרת המזומנים הורחב**. בעוד שבהסדר המקורי הוא כלל רק את יתרת המזומנים של פאפאייה ישראל, עתה הובהר כי הוא כולל את המזומנים המוחזקים בכלל חברות הקבוצה, בישראל ומחוצה לה, בכפוף לניכויים הקבועים בהסדר.

29. **סכומי ההפקדות לפיקדון מנהל ההסדר המפורטים בנספח 1 להסדר הוגדלו באופן ניכר**, כך שסך ההפקדות על פיו עומד על עד כ-863 מיליון דולר, לעומת כ-730 מיליון דולר בנספח שצורף להסדר המוצע המקורי, ובפריסה על פני תקופה קצרה יותר. למען הסר ספק: הפקדות אלה מבוססות על אותן התחזיות ואותם הנתונים שעליהם מתבסס כושר ההחזר. סכום זה מכסה את מלוא החובות המותנים הידועים, דהיינו את מלוא החובות הקשורים לתביעת Skillz (אם פסק הדין יעמוד בערעור ללא שינוי) ולתביעת מילברג, ובנוסף גם ריבית בשיעור הקבוע בהסדר (תשואת אגרות חוב של ממשלת ארצות הברית לשנה)[1], ותוך התחשבות גם בתשואה שתצטבר על כספי הפיקדון. עוד נקבע בהסדר כי

---

[1] הריבית שנקבעה בהסדר המתוקן היא הריבית החוקית על פסקי דין פדרליים בארה"ב. לפי 28 U.S.C. § 1961, פסק דין כספי של בית משפט פדרלי נושא ריבית בשיעור התשואה על איגרות חוב של ממשלת ארה"ב לשנה אחת (one year constant maturity Treasury yield).

ככל שתאושר הבקשה לאישור תביעה ייצוגית התלויה ועומדת נגד המבקשות והשומה של מנהל ההסדר תהיה מעל לחמישה מיליון דולר, יוגדלו סכומי ההפקדות לשם הבטחת תשלום פסק הדין.

30. בהקשר זה רואה מנהל ההסדר חשיבות רבה בבחינה אובייקטיבית ונטולת פניות של תחזית תזרימי המזומנים הרב-שנתית שהציגה החברה. כאמור לעיל, משרד רואי החשבון פאהן קנה Grant Thornton מונה גם לצורך זה, ולעניין בחינת התחזיות הוא נעזר גם בחוות דעת מומחה בלתי תלויה נוספת שהוכנה עבור מנהל ההסדר, על ידי ד״ר טל מופקדי. בהמשך להלן יובא פירוט בהקשר זה.

**ג(3). <u>תרומת מייסדים ובעלים, הוספת בטוחות ומנגנוני השלמה</u>**

31. במסגרת ההסדר המתוקן נוספה **תרומת מייסדים**. שלושת המייסדים יוותרו על מלוא הבונוס השנתי המגיע להם, וסכום זה (כ-25 מיליון דולר לכל תקופת ההסדר) יתווסף לפיקדון מנהל ההסדר. הם יהיו זכאים לקבלו מן החברה רק לאחר תשלום מלוא החובות לנושים הזכאים והשלמת ההסדר.

32. להבטחת הישארות המייסדים כעובדים פעילים בחברה שימשיכו לתרום לה את מיטב מרצם וזמנם, נקבע **מנגנון של reverse vesting שלפיו 50% מאחזקותיו של כל אחד מהמייסדים יופקדו בנאמנות בידי מנהל ההסדר כמניות כפופות להבשלה**. המניות יבשילו על פני חמש שנים: בשנתיים הראשונות לא תהיה הבשלה, ולאחר מכן הבשלה על פני מספר שנים. מניותיו של מייסד שיעזוב ביוזמתו לפני תום תקופת ההבשלה, ושטרם הבשילו, יהפכו למניות רדומות, למעט באירועי האצה מוגדרים. סנקציות אלה נועדו להבטיח את המשך השתתפותם של המייסדים בפעילות החברה, ככלי חיוני להבטחת עמידה ביעדי ההסדר.

33. בנוסף, על פי ההסדר המתוקן, יוקצו למנהל ההסדר במועד כניסתו לתוקף, בנאמנות לטובת הנושים המותנים, **מניות חדשות שיהוו לאחר הקצאתן 25% מהון המניות** הרגילות המונפק והנפרע של החברה. לרבות מהאופציות למניות הבכורה החדשות שיונפקו לבעלי מניות שיעמידו ערבויות. המניות מהוות בטוחה נוספת להבטחת פירעון החובות המותנים, ותנאי מימושן מפורטים להלן.

34. על מנת להימנע ממחלוקות סביב סוגיית שווי מניות החברה, וכן בשים לב לכך שמדובר בחובות מותנים, עמד מנהל ההסדר על כך שהמניות שמונפקות לו יועמדו כבטוחה, אך לא כתמורה חלף תשלום פרעון חוב. רק עם מימושן של מניות אלו למזומן יראו אותן כמקיימות את חובת ההפקדה, למעט בנסיבות שמנהל ההסדר יבקש לראות את העמדתן כחלף תשלום פרעון חוב לאחר התייעצות עם הנושים.

35. בנוסף, פאפאייה ישראל **תשעבד לטובת מנהל ההסדר, בנאמנות עבור הנושים המותנים, את מלוא אחזקותיה במניות פאפאייה אינק**, בשעבוד קבוע, יחיד וראשון בדרגה, בסמוך לאחר כניסת ההסדר לתוקף וירשם בכל מרשם הנדרש בישראל ומחוצה לה. בתקופת השעבוד לא תיווצר במניות כל זכות נוספת. מנהל ההסדר יהיה רשאי לממש את השעבוד, באישור בית המשפט, במקרה של התרחשות אירוע הפרה שלא תוקן בתוך 60 ימים ממסירת הודעה בכתב. בדרך זו מוענקת לנושים בטוחה קניינית, תוך שמירה על המשך הפעילות העסקית.

36. בנוסף, ככל שייווצר פער בתשלומי המינימום, יופעל **מנגנון השלמה** תלת שכבתי כדלקמן:

36.1 ראשית, **יידרשו בעלי המניות להשלים את הפער כתרומת בעלים**. ככל שהפער לא יושלם על ידם, ייעשה שימוש בערבויות אישיות של בעלי מניות, אשר יופקדו בידי מנהל ההסדר, בסך כולל של עשרה (10) מיליון דולר, ושלהבטחתן יעמידו בעלי המניות בטוחה מסוג פיקדונות כספיים, ניירות ערך סחירים סולידיים או נדל״ן.

36.2 שנית, ככל שיוותר חסר, הוא יושלם על ידי **גיוס הון חיצוני** שתעשה החברה או ממקור מימון אחר, על ידי פאפאייה ישראל. אשראי שיגויס לשם כך יהיה נחות לחובות לנושים המותנים, ותנאיו כפופים לאישור מנהל ההסדר.

36.3 ושלישית, אם עדיין ייוותר חסר, **יוקצו למנהל ההסדר מניות נוספות בפאפאייה ישראל** כנגד יתרת החסר. ההקצאה של המניות הנוספות תבוצע לפי הנמוך מבין שני מחירים: (א) מחיר המניה בסבב הגיוס האחרון של החברה לאחר כניסת ההסדר לתוקף; (ב) המחיר הנגזר מהערכת השווי המצורפת להסדר החוב כנספח, מוכפלת בשיעור ההפקדות בפועל מתוך סכומי היעד המצטברים. לשם הדוגמה, אם הופקדו בפועל 82% מסכומי היעד, ייקבע המחיר לפי 82% מהערכת השווי. משמעות הדבר היא שככל שהחברה תפקיד פחות, הנושים יקבלו נתח גדול יותר ממנה. בנסיבות הקבועות בהסדר יהיה מנהל ההסדר רשאי אף להעביר לנושה זכאי שטרם נפרע חובו את חלקו היחסי במניות הנוספות, על חשבון חובו.

37. בהקשר של תרומת הבעלים (הערבויות המגובות) יש להסביר כי החברות אינן יכולות להסתמך על הזרמת הון גבוהה יותר מצד כלל בעלי המניות כמקור לפירעון. הטעם לכך הוא שחלק ניכר מבעלי המניות הם קרנות הון סיכון, הפועלות, ככלל, באמצעות כספים שמשקיעיהן התחייבו להעביר לקרן, ולא מכוח התחייבות ישירה למימון חברות הפורטפוליו או לפירעון חובותיהן. משקיעי הקרן אינם בעלי מניות ישירים בחברה, והקרנות, שהן בעלות המניות בחברה, אינן יכולות לכפות עליהם השקעה נוספת (תרומת בעלים). ההשקעות של הקרנות בחברה נעשו לפני שנים, ואותן קרנות כבר מיצו את מלוא "הקריאות לכסף" כלפי המשקיעים בקרן. על רקע זה, מי שיכולים להזרים כספים בפועל הם בעלי מניות פרטיים בלבד. דווקא משום כך יש ליתן משקל לכך שבעלי מניות נכונים להעמיד ערבויות אישיות מגובות בנכסים פרטיים ולשאת בסיכון אישי להבטחת פירעון חובות החברות. בנוסף, כדי לתמרץ השתתפות רחבה ככל הניתן מצד בעלי מניות, בעלי מניות שיעמידו ערבות אישית ובטוחה יהיו זכאים לאופציות הניתנות להמרה למניות בכורה חדשות. מניות אלה יקנו להם עדיפות בחלוקות ובאירוע מכירה או הנפקה, ביחס לגובה הבטוחה שהעמידו. מניות הבכורה החדשות תהיינה כפופות, כמובן, למגבלות החלוקה שבהסדר, ואופציות כאלה יונפקו גם למנהל ההסדר, כך שיחזיק ב-25% מכלל הזכויות שיוקצו לבעלי המניות.

38. **נקבעו אירועי הפרה כמותיים**: פער מצטבר מתשלומי המינימום העולה על 75 מיליון דולר או סטייה שנתית העולה על 30% מתשלומי המינימום השנתיים. אירועים אלה מקנים למנהל ההסדר זכויות אכיפה בהתאם להסדר ולדין, לרבות פנייה לבית המשפט לקבלת סעדים, ובכלל זה ביטול ההסדר, חילוט הערבויות האישיות ומימוש הבטוחות.

39. **קיצור תקופת ההסדר בשיקול דעת מנהל ההסדר**: אם בתום חמש שנים ממועד כניסת ההסדר לתוקף לא העבירה החברה לקופת מנהל ההסדר סכום השווה למלוא החובות האכיפים לנושים הזכאים, יהיה מנהל ההסדר רשאי, לאחר קבלת עמדת הנושים המותנים ובאישור בית המשפט, לממש את המניות שהוקצו לו, כולן או חלקן. המימוש ייעשה בהעברת המניות לנושים זכאים על חשבון חובם, לפי מנגנון התמחור של המניות הנוספות, או במכירתן לכל המרבה במחיר. קודם למימוש תינתן לחברה תקופה בת 90 ימים לגיוס הון או להשלמת היתרה בדרך אחרת. אם תמורת המימוש לא תספיק, החברה תמשיך להפקיד כספים עד לתשלום מלוא החובות לנושים המותנים.

## ג(4). <u>רשת ביטחון ראשונית לנושים המותנים</u>

40. ההסדר המתוקן מוסיף רשת ביטחון בדמות חלוקה מיידית לנושים המותנים הזכאים להשתתף בה, כמפורט להלן, בסך 20 מיליון דולר מתוך ההפקדה הראשונית. הסכומים ישולמו כמקדמה על חשבון זכאותם העתידית, אך לא יוחזרו בשום מקרה, גם אם יתברר כי זכאותו של מקבל התשלום נמוכה מסכום המקדמה או שאינה מתגבשת כלל.

41. החלוקה המיידית נועדה להעמיד כספים ממשיים לרשות הנושים המותנים, שתביעת החוב שלהם אושרה לצורכי הצבעה בסכום העולה על 5 מיליון דולר, אף בטרם ניתן לטובתם פסק דין כספי אכיף, ולמתן את הסיכון ואת ההמתנה הכרוכים בהתמשכות ההליכים ובקבלת תשלומים מתוך פיקדון מנהל ההסדר. היקף החלוקה נקבע במתינות, הואיל ועניינם טרם הוכרע באופן חלוט והחלוקה נעשית בלא זכות השבה. מדובר בהטבה שלא הייתה קיימת בהסדר המקורי.

42. החלוקה המיידית תתחלק באופן יחסי בין הנושים המותנים שתביעת החוב שלהם אושרה לצורכי הצבעה בסכום העולה על 5 מיליון דולר, לפי היחס שבין סכום תביעת החוב המאושרת של כל אחד מהם לבין סך תביעות החוב המאושרות לצורכי הצבעה של הנושים המשתתפים בחלוקה (נושים שתביעתם נמוכה מכך זכאים ממילא לתשלום מלא מן התזרים השוטף של החברה).

43. ההסדר המתוקן כולל גם מנגנון ייעודי ביחס לבקשה לאישור תביעה ייצוגית התלויה ועומדת בישראל: אם תאושר הבקשה לאישור התובענה כייצוגית, ישום מנהל ההסדר את סכום התביעה לאחר שיקבל מן התובע הייצוגי ומן החברה טיעונים ונתונים. ככל שהסכום שיישום יעלה על 5 מיליון דולר, יהיו התובעת הייצוגית וחברי הקבוצה זכאים לקבל חלק יחסי מן החלוקה המיידית, כמקדמה שאינה מוחזרת על חשבון סכום פסק הדין, וזאת עוד בטרם יהיה בידם פסק דין כספי. הסכום יחושב לפי החלק היחסי של סכום התביעה כפי שנישום, ביחס לחובות המותנים שהשתתפו בחלוקה המיידית, כאילו החוב המותנה הייצוגי היה קיים במועד אישור ההסדר, וישולם בפועל או יופקד בנאמנות בהתאם להוראות בית המשפט הדן בהליך הייצוגי ובכפוף לכל דין. בנוסף, עם קביעת השומה תחויב החברה להוסיף ללוח ההפקדות סכומים שישקפו את תוספת החוב המותנה, להבטחת תשלום פסק הדין לכשיינתן.

## ג(5). <u>מגבלות לשמירת מקורות הפירעון</u>

44. לאורך תקופת ההסדר יחולו על החברה ועל כלל חברות הקבוצה **מגבלות על יצירת שעבודים ונטילת אשראי**. החריגים הם אשראי ספקים, מסגרות אשראי שוטפות, ואשראי מובטח למימון הפעילות השוטפת, בתקרות שנקבעו, וכן שעבודים קיימים וחידושם בתנאים דומים. כל חריגה טעונה אישור מראש ובכתב של מנהל ההסדר. כמו כן, החברה תהיה רשאית לגייס הון או אשראי (מעבר למסגרות קיימות) רק לשם ביצוע הפקדות לפיקדון ההסדר, לרבות השלמת חוסרים, הקדמת הפקדות וקבלתן בחזרה של מניות נוספות, אלא אם אישרו אחרת מנהל ההסדר ובית המשפט. החברה מחויבת גם שלא לפגוע בכיסויים ביטוחיים קיימים.

45. כן נקבע **איסור על חלוקות, לרבות דיבידנד ורכישה עצמית**, ועל תשלומים ישירים או עקיפים לבעלי המניות או למי מטעמם, למעט שכר ותנאי העסקה של המייסדים. עסקאות בעלי עניין אסורות, למעט הסכמי ההעסקה הקיימים של המייסדים. כל עסקת בעל עניין אחרת טעונה אישור מראש ובכתב של מנהל ההסדר, נוסף על האישורים הנדרשים על פי דין.

46. ההסדר המתוקן קובע **איסור על העברת זכויות במניות**. מכוחו מנועים בעלי המניות, לאורך כל תקופת ההסדר, ממכירה, העברה, שעבוד או הענקת זכות אחרת במניותיהם, במישרין או בעקיפין,

והעברה בניגוד לכך תהיה בטלה כלפי החברה. האיסור לא יחול על גוף שעיסוקו בהשקעות המעביר את כלל השקעותיו לצד שלישי. הוא גם לא יחול על העברת אופציות או מניות בכורה חדשות במסגרת החלפת ערבות אישית שאישר מנהל ההסדר.

**ג(6). <u>פיקוח, בקרה ואכיפה</u>**

47. ההסדר המתוקן מקנה סמכויות נוספות למנהל ההסדר, ובהן חובת דיווח חצי-שנתית על מצב הקבוצה, זכות לקבלת דוחות כספיים ומידע נוסף בדבר העמידה בהתחייבויות, וכן זכות להשתתף, בעצמו או באמצעות נציג, כמשקיף בישיבות הדירקטוריון ולקבל את חומרי הישיבות, וזאת ללא זכות הצבעה ובכפוף לחובת סודיות.

48. בנוסף, החברה מחויבת להודיע למנהל ההסדר ללא דיחוי על כל הפרה קיימת או צפויה, על חשש לאי-עמידה בהפקדות ועל אירועים מהותיים אחרים.

49. נקבע כי שכר מנהל ההסדר והוצאותיו יחולו על החברה ולא על הנושים, ואם ישולמו מתוך הפיקדון, תהיה החברה מחויבת להשלים את הסכום בתוך 30 ימים.

**ג(7). <u>תנאי הפטור לבעלי מניות ונושאי משרה</u>**

50. ההסדר המתוקן מבהיר כי הפטור לטובת נושאי המשרה, הדירקטורים ובעלי המניות ייכנס לתוקף עם כניסת ההסדר לתוקף, אך יהיה מותנה. כניסתו המיידית לתוקף נדרשת כדי לאפשר להנהלה ולמייסדים להתמקד, לאורך כל תקופת ההסדר, בניהול החברה ובהשאת הכנסותיה, שמהן ייפרעו החובות, ולא בהתגוננות מפני תביעות. ואולם, הפטור יתבטל אם יבוטל ההסדר בהחלטת בית המשפט מחמת אירוע הפרה, או אם יתברר בתום תקופת ההסדר שהחברה לא עמדה בתשלומי המינימום. במקרה כזה התקופה שממועד כניסת ההסדר לתוקף ועד לסיומו לא תבוא במניין ההתיישנות. גם תנאי זה מחזק את הגנת הנושים.

## ד. <u>תביעות החוב לצרכי הצבעה שהוגשו בהליך</u>

51. בהתאם להחלטת בית המשפט הנכבד מיום 26.8.2026, החברות פעלו למשלוח הודעת דוא״ל לשחקנים מהתקופה הרלוונטית בעניין הגשת תביעות חוב. נוכח היקף הנמענים, נשלחו הודעות הדוא״ל במספר פעימות, שנפרשו על פני מספר ימים, והחברות אף הוסיפו וביצעו ניסיונות שליחה חוזרת להודעות הדוא״ל אשר חזרו (bounced) כדי לוודא שההודעות יגיעו לכמה שיותר נמענים (הודעה בענין נמסרה לבית המשפט הנכבד על ידי החברה ביום 3.9.2026).

52. בהתאם להחלטת בית המשפט הנכבד מיום 10.9.2026, המועד האחרון להגשת תביעות החוב לצרכי הצבעה חל ביום 19.9.2026.

53. לצורך השתתפות באסיפות הנושים הוגשו נגד החברה כמה עשרות תביעות חוב. תביעות החוב טרם נבדקו והוכרעו, ופירוטן כדלקמן:

53.1 97 תביעות חוב שהוגשו על ידי שחקנים באמצעות תיבת הדוא״ל הייעודית Papaya@ArnonTL.com.

53.2 תביעות שהוגשו על ידי Skillz ו-Milberg Coleman Bryson Phillips Grossman בסך כולל של 744,224,615.6 דולר.

53.3 תביעת חוב שמקורה בבקשה לאישור תובענה ייצוגית שהגישה קאסי רובינזון, בסכום של 562,030,000 ₪.

53.4 בנוסף ישנה תביעת חוב של ה״ה Pavlovich על סך 308,880 דולר. בהתאם לאמור בסעיף 25 להסדר החוב המקורי, כל נושה מותנה המפורט בטופס 1 שצורף שם, אשר לא הגיש הוכחת חוב, ייחשב, לצורכי הצבעה על ההסדר, כמי שהסכים לגובה החוב הנקוב לצד שמו, כמי שהגיש הוכחת חוב בסכום האמור וכמי שהוכחת החוב שלו אושרה בסכום זה לצורכי הצבעה על ההסדר. מכיוון שמסמך זה נשלח הן לפונים באמצעות תיבת המייל הייעודית והן לכלל הנושים הידועים, סבור מנהל ההסדר שההגינות מחייבת למנות גם תביעת חוס זו לצורך ההצבעה.

.54 נוסף על האמור, הוגשו תביעות שאינן נוגעות להסדר על ידי נושים מוחרגים, ובהם תביעה שהגישה רשות המסים – רשמ״ס אזור השרון, וכן תביעה שהגיש בנק לאומי לישראל בע״מ, ואלו יטופלו במהלך העסקים הרגיל, ככל שהסדר חוב זה יאושר.

.55 מנהל ההסדר בדעה כי נוכח העובדה שעדיין מתקבלות פניות בתיבת הדוא״ל הייעודית, גם נכון למועד הגשת בקשה זו, מן הראוי לאפשר לנושים מותנים שפנייתם הגיעה עד מועד הגשתה להשלים את הגשת תביעת חובם לא יאוחר משבוע לפני מועד כינוס האסיפות ולאפשר להם להשתתף באסיפות.

.56 למען הסר ספק יובהר, כי אין באמור כדי להודות בחובות הנטענים ו/או להכיר בתביעות חוב שהוגשו באיחור ואלו יבחנו בבוא העת על ידי מנהל ההסדר על פי דין.

## ה. <u>סיווג אסיפות הנושים ובעלי המניות והוראות בדבר כינוסן</u>

.57 לצורך ההסדר, הנושים נחלקים לנושים מוחרגים ולנושים מותנים. הנושים המוחרגים כוללים מי שהחברות מצויות עימו ביחסי עבודה ועסקים רגילים, ובכלל זה ספקי החברות ועובדיהן, רשויות המדינה, קופות גמל ופנסיה, וכן שחקנים - למעט ביחס לעילות הקשורות לפרקטיקות עבר של שימוש בבוטים. הללו אינם נדרשים להגיש תביעות חוב לפי ההסדר; התחייבויותיהן השוטפות של החברות כלפיהם יוסיפו להשתלם במהלך העסקים הרגיל.

.58 הנושים המותנים הם מי שטוענים לחוב שעילתו קשורה לפרקטיקות עבר של שימוש בבוטים, לרבות מי שמנהלים הליכים משפטיים בעניין, טוענים לעילה כאמור או מחזיקים בפסק דין זר שטרם הפך לפסק דין כספי אכיף בישראל. נושים אלה נדרשים להגיש הוכחת חוב, ותביעתם תוכרע בהתאם להסדר: ככל שהיא נושא להליך משפטי תלוי ועומד, הזכאות לתשלום תיקבע לפי פסק דין כספי אכיף; וככל שאינה נושא להליך כזה, יכריע בה מנהל ההסדר, בכפוף להוראות ההסדר. לעניין התשלום, נושה זכאי שפסק הדין הכספי האכיף שניתן לטובתו אינו עולה על 5 מיליון דולר יקבל את התשלום במהלך העסקים הרגיל, ואילו תשלום לנושה זכאי שפסק הדין הכספי האכיף שניתן לטובתו עולה על 5 מיליון דולר יבוצע מתוך פיקדון מנהל ההסדר.

.59 **נושים מוחרגים** – כאמור לעיל, ההסדר המוצע אינו חל על הנושים המוחרגים ואינו משנה את זכויותיהם. התחייבויות השוטפות כלפיהם יוסיפו להיפרע כסדרן ובמועדן. הנושים המוחרגים לא נדרשו להגיש תביעת חוב. בהתאם, מנהל ההסדר סבור כי **אין צורך לכנס אסיפה בעניינם**.

.60 **נושים מותנים** – המנהל המיוחד סבור שיש לכנס אסיפה אחת בה ישתתפו כלל הנושים המותנים. בהקשר זה שקל מנהל ההסדר את עמדת החברה כפי שהובעה בבקשה המקורית כי יש לכנס שתי

אספות נפרדות בשל האינטרס המובחן של סקילז כמתחרה, וכן שקל את השאלה אם יש לכנס שתי אספות נפרדות לנושים שתביעתם פחותה מ-5 מיליון דולר או גבוהה מ-5 מיליון דולר. מנהל ההסדר בא לכלל מסקנה כי אין לקבל עמדות אלה וכי ראוי לכנס אסיפת נושים אחת. הטעם לכך הוא שההסדר מחיל על כל הנושים המותנים מסגרת משותפת: חובותיהם המותנים ייפרעו במלואם ככל שיהפכו לחובות אכיפים, בכפוף להוראות ההסדר. ההבחנה הנוגעת לחובות העולים על 5 מיליון דולר מתייחסת לאופן ולמקור התשלום: נושה זכאי שפסק הדין הכספי האכיף שניתן לטובתו אינו עולה על 5 מיליון דולר יקבל את התשלום במהלך העסקים הרגיל, ואילו תשלום לנושה זכאי שפסק הדין הכספי האכיף שניתן לטובתו עולה על 5 מיליון דולר ייעשה מתוך פיקדון מנהל ההסדר ובהתאם למנגנון הקבוע בו. לשיטת מנהל ההסדר, הבדל זה במנגנון התשלום אינו מצדיק פיצול של אסיפת הנושים המותנים, נוכח המסגרת המשותפת והתחייבות החברות לפרוע את מלוא החובות שיהפכו לאכיפים. זאת ועוד. יתכן בהחלט שנושה מותנה שחובו לעת הזאת נמוך מ-5 מיליון דולר, יזכה לבסוף בפסק דין כספי העולה על 5 מיליון דולר, וגם מטעם זה ראוי ונכון לכנס את כלל הנושים לאסיפה אחת.

61. כן מבוקש להורות על כינוסה של **אסיפה נפרדת של בעלי המניות של החברה**. ההסדר כולל תיקון של תקנון החברה, הקצאת מניות למנהל ההסדר והטלת מגבלות על העברת מניות ועל פעולות בעלי המניות בתקופת ההסדר. לפיכך, נדרשת הצבעה של בעלי המניות על ההסדר ועל השינויים הנוגעים לזכויותיהם; בנוסף, ומטעמי זהירות, נדרש כינוס האסיפה גם לשם עמידה בדרישות סעיף 322(ב) לחוק.

62. תתאפשר השתתפות באסיפה בנוכחות פיזית, בהיוועדות חזותית, ובמסירת כתבי הצבעה עד מועד שייקבע.

63. מנהל ההסדר יהיה אמון, בין היתר, על ניהול אסיפות הנושים. ספירת קולות המצביעים באסיפות הנושים לסוגיהן תבוצע על ידי מנהל ההסדר ותוצאות ההצבעה בכל אחת מהאסיפות תפורטנה בדין וחשבון שיוגש על ידו לבית המשפט.

## ו. <u>העבודה הכלכלית</u>

64. לצורך בחינת התשתית הכלכלית לתכנית ההסדר, ערכה פאהן קנה יועצים עבור מנהל ההסדר עבודה כלכלית בעלת שלושה מרכיבים: (א) הערכת שווי לחברה (הערכת השווי מצורפת כנספח להסדר החוב המתוקן), (ב) בחינה של סבירות תחזית תזרימי המזומנים הרב-שנתית, ו-(ג) דוח פיקוח ובקרה פיננסית לחודש אוגוסט 2026 ("**העבודה הכלכלית**"). במסגרת העבודה הכלכלית נבחנו ארבעה תרחישים, הנבדלים זה מזה בהיקף ההשקעה ברכישת משתמשים, בקצב השקת משחקים ובהנחות הצמיחה: תרחיש הבסיס שעליו התבססה החברה, תרחיש קיצון שמרני ("קציר"), תרחיש ביניים ותרחיש אופטימי (כהגדרת מונחים אלו בעבודה הכלכלית). בהערכת השווי המצורפת כנספח להסדר המתוקן הוערך שווי החברה ליום 31.8.2026 בשיטת היוון תזרימי מזומנים ובהנחת המשך פעילות. שווי ההון העצמי נעשה על בסיס תרחיש ממוצע, המבוסס על תרחישי הבסיס, הביניים וה"קציר", ללא מתן משקל לתרחיש האופטימי. שווי זה נאמד בעבודה הכלכלית בכ-1.292 מיליארד דולר, לפני הפחתת ההתחייבות בגין הסדר החוב. בהקשר של העבודה הכלכלית, התבסס המומחה הכלכלי, כפי שהודיע מראש שיעשה, לא רק על בדיקות עצמאיות שערך אלא גם על חוות דעת עצמאית של **ד"ר טל מופקדי**, שבה הוא התבקש לבחון את סבירותה ואת תקפותה של תחזית ההנהלה, כבסיס לעבודה

הכלכלית. חוות דעתו של ד״ר מופקדי קובעת שהתחזית שהציגו החברות מהווה בסיס תקף ושמרני להערכת השווי.

- העתק חוות דעת המומחה בדבר בחינה של סבירות תחזית המזומנים הרב-שנתית, שאליה מצורפת גם חוות הדעת של ד״ר טל מופקדי מצורף **כנספח ״2״**.
- העתק דו״ח פיקוח ובקרה פיננסית לחודש אוגוסט 2026 **כנספח ״3״**.

65. העבודה הכלכלית בחנה כאמור גם את התחזית הרב-שנתית, ועשתה זאת מול התרחישים השונים. נמצא כי בכל ארבעת התרחישים שנבחנו נותרות יתרות מזומנים חיוביות לאורך תקופת התחזית, וכי **התזרימים החזויים תומכים במימון ההפקדות הנדרשות לפי לוח תשלומי ההסדר שנבחן עד תום תקופת ההסדר**. מסקנה זו אינה נשענת על תרומות בעלים, ערבויות ובטחונות, שלא נכללו בתחזית. במסגרת העבודה הכלכלית זוהתה על ידי המומחה, האפשרות של המבקשות לווסת הוצאות, ובפרט את הוצאות רכישת המשתמשים, כמפתח לגמישות תזרימית, תוך התייחסות להשפעת צמצומן על היקף הפעילות ועל יכולת ייצור המזומנים בעתיד. המומחה קובע בחוות דעתו, כי לא מצא אינדיקציות שהתחזית מבוססת על הנחות בלתי סבירות, וכי התחזית הוכנה על בסיס הנחות תפעוליות ועסקיות מפורטות. בהקשר של התחזית קובעת גם חוות דעתו של ד״ר מופקדי שאף לאחר שהוא הכניס בה שינויים, שכולם פועלים בכיוון של עודף שמרנות, ניתן להסתמך עליה כבסיס להסדר החוב המוצע, וכי התחזית מלמדת שהמבקשות מסוגלות לעמוד במלוא לוח התשלומים מתוך מקורותיהן העצמיים. שני המומחים סבורים כי תזרימי המזומנים החזויים תומכים ביכולת החברות לעמוד בהפקדות הנדרשות לקופת מנהל ההסדר.

66. במישור השלישי, מישור הפיקוח השוטף על פעילות החברה בתקופת עיכוב ההליכים (חודשים אוגוסט עד אוקטובר 2026), דוח הבקרה לחודש אוגוסט 2026 מצביע על גידול של כ-5.51 מיליון דולר ביתרת המזומנים, לעומת גידול חזוי של כ-3.36 מיליון דולר. השיפור ביחס לתחזית נבע בעיקר מתשלומים נמוכים מהצפוי, ובפרט בגין רכישת משתמשים, לצד תקבולים שהיו נמוכים מהתחזית. הבדיקות שבוצעו עד למועד העברת הטיוטה תומכות בשינוי המדווח במזומנים, ולא אותרו במסגרתן חריגות מהותיות בלתי מוסברות, בכפוף להשלמת הבדיקות וההתאמות שנותרו.

67. יצוין, כי ממצאי העבודות מספקים תשתית כלכלית לבחינת תכנית ההסדר ותומכים בהיתכנות מימון התשלומים על פי התחזיות והתרחישים שנבחנו.

68. לסיכום, העבודה הכלכלית שנעשתה על ידי שני מומחים כלכליים עצמאיים ובעלי שם, הן פאהן קנה Grant Thorenton והן ד״ר טל מופקדי תומכת בהנחות העבודה של החברה העומדות בבסיס הסדר החוב. כמו כן שווי החברה במתכונת פעילותה הנוכחית עולה על יתרת חובותיה לנושיה.

## ז. <u>הנימוקים להעדפת הסדר החוב על מתן צו לפתיחת הליכים</u>

69. בדומה לתעשיות אחרות מבוססות טכנולוגיה, גם בתעשיית הגיימינג, מימוש עסק במסגרת הליכי חדלות פירעון עלול לפגוע באופן ניכר בשוויו. מכירה בתנאי מצוקה או פירוק (Distressed/Liquidation Sale) עשויה להניב תמורה הנמוכה משמעותית משווי החברה כעסק חי (Going Concern). פער זה נובע ממספר גורמים מרכזיים:

69.1 <u>פגיעה בנכסים הבלתי מוחשיים עזיבת עובדים חיוניים (Brain Drain)</u>:

חלק ניכר משווי החברה טמון בצוותי הפיתוח, העיצוב וניהול המוצר. עזיבתם עקב אי-הוודאות עלולה להותיר את הרוכש ללא הידע והיכולות הדרושים לתפעול המשחקים, לתחזוקתם ולהמשך פיתוחם. המומחה הכלכלי קובע כי נכסים בלתי מוחשיים (כגון קניין רוחני, בסיסי משתמשים וכו') נמכרים בניכיון מהותי של 70% עד 90% (היינו שיעור מימוש של 10%–30% בלבד מהשווי הכלכלי של נכסים אלו), שכן ערכם נשען כמעט לחלוטין על המשכיות הפעילות, הנהלת החברה וצוות הפיתוח.

69.2 <u>שחיקת ערך המותג (Brand Equity)</u>:

חשש להפסקת התמיכה, העדכונים ופעילות השרתים עלול להביא לנטישת משתמשים (Churn), לירידה בהכנסות ולפגיעה במוניטין.

69.3 <u>לחץ זמן ופגיעה בכוח המיקוח (Fire Sale) צורך במימוש מהיר</u>:

מגבלות המימון והזמן עשויות לצמצם את האפשרות לאתר רוכשים, לנהל משא ומתן ממושך וליצור תחרות אפקטיבית ביניהם. המומחה הכלכלי קובע כי מגבלות זמן עשויות לצמצם את יכולת המוכר לנהל הליך תחרותי ומסודר ולהגדיל את שיעור ההפחתה בתמורה.

69.4 <u>ניצול המצוקה בידי רוכשים</u>:

מודעות הקונים למצבה הפיננסי של החברה ולחלופותיה המצומצמות מחלישה את כוח המיקוח שלה ועלולה להוביל להצעות נמוכות.

69.5 <u>אובדן פוטנציאל הצמיחה והערך המשולב</u>:

עצירת הפיתוח (Pipeline): הפסקת העבודה על משחקים חדשים, הרחבות (DLCs) וטכנולוגיות עלולה לפגוע בפוטנציאל ההכנסות העתידי ולהפחית את התמורה שהרוכש מוכן לשלם.

69.6 <u>מכירת נכסים לעומת מכירת מניות (Asset vs. Share Sale)</u>:

מכירת הקוד, זכויות הקניין הרוחני ויתר הנכסים בחלקים עלולה לנתקם מהצוות ומהתשתית התפעולית, ולהניב תמורה הנמוכה משוויים כחלק מעסק מתפקד.

69.7 <u>סיכונים משפטיים ותפעוליים</u>:

מכירה במצב הנכסים כפי שהם (As-Is), ללא מצגים והתחייבויות (No R&W) או בכפוף למצגים והתחייבויות מוגבלים, מגבירה את אי-הוודאות בדבר תקינות הקוד, זכויות הקניין הרוחני והיכולת להמשיך להפעיל את המוצר. המומחה הכלכלי קובע כי היעדר הגנות, אחריות ושיפוי מצד המוכר עשוי להצדיק ניכיון נוסף וכי אי-ודאות זו עשויה להתבטא בהפחתת המחיר המוצע.

70. גורמי סיכון אלו חלים גם ביחס לחברה ולפיכך, ניתן להניח ברמת סבירות גבוהה כי **שווי החברה בהליכי חדלות פרעון יהא נמוך באופן ניכר** לעומת שווייה הכלכלי של החברה במהלך עסקים רגיל, ובמקרה שלפנינו לעומת תרחיש של הסדר החוב המוצע. מסקנה זו אף נתמכת בעמדת המומחה הכלכלי מטעם מנהל ההסדר, לפיה שווי ההון העצמי של החברה בתרחיש של מימוש כפוי מוערך על ידו נמוך במאות מיליוני דולרים לעומת שוויה בתרחיש עסק חי. המומחה מנמק את השווי הנמוך

בנימוקים על פני שלושה מישורים: (א) תנאי המכירה במצוקה, (ב) אופי הנכסים של החברה (בעיקר נכסים בלתי מוחשיים), ו-(ג) נתונים מהספרות המקצועית. לנוכח גורמי הסיכון הרבים, וביניהם חוסר הוודאות כי ניתן יהיה לאתר רוכש, סיכוני שימור משתמשים, סיכוני התלות באנשי מפתח ועוד, הוא אף קובע שהשווי בתרחיש הפירוק הוא תיאורטי, ומטיל ספק באפשרות לממש בפועל את פעילות החברה בשווי זה או בכלל.

## ח. נימוקי מנהל ההסדר להעדפת הצעת הסדר החוב

.71 על רקע כל הדברים המתוארים לעיל, ובכלל זה העבודה הכלכלית של המומחה, מנהל ההסדר סבור כי חלופת הסדר חוב לפי חלק י׳ לחוק, כמוצע בהסדר החוב המתוקן נשוא בקשה זו, טובה לאין ערוך מחלופה של בקשה למתן צו לפתיחת הליכים ומכירת פעילותה ונכסיה של החברה במסגרת הליכי פירוק ופרסום הזמנה להציע הצעות[2]. כפי שכבר צוין הן בבקשה המקורית והן בבקשה זו, לא קיימת בנמצא חלופה של תשלום מיידי של מלוא חובות החברה לנושיה, מתוך מקורותיה הקיימים.

.72 לאור האמור בחן מנהל ההסדר את הצעת ההסדר המתוקן אל מול החלופה המעשית העומדת בפני הנושים אם לא יאושר, ולא אל מול אפשרות תיאורטית ובלתי ישימה לפירעון מידי ומלא.

.73 מנהל ההסדר בדעה כי ככל שההסדר לא יאושר ואם יינקט כנגד החברות הליך לפי חלק ב׳ לחוק, אשר יוביל למימוש נכסיהן ולפירוקן, יצטמצמו המקורות העומדים לפירעון החובות לתמורת המימוש. בהתאם לעבודה הכלכלית, שווי פעילות החברות ונכסיהן שבמצב דברים רגיל נאמד בכ-1.2 מיליארד ש״ח, צפוי לצנוח משמעותית בחלופת הפירוק ובתרחיש של מימוש מהיר במסגרת הליך חדלות פירעון במאות מיליוני ש״ח. בנסיבות אלה, ומהנימוקים שפורטו לעיל, ספק רב אם ניתן יהיה להשיג בחלופת הפירוק תמורה המתקרבת באופן כלשהו לזו שמציע ההסדר. על יסוד האמור, שיעור הפירעון הצפוי לנושים לפי ההסדר גבוה במידה ניכרת מזה הצפוי להם בחלופת הפירוק.

.74 זאת ועוד. שיעור הפירעון לנושים הוא שיקול חשוב, אך אינו היחיד. לצד הפגיעה הצפויה בשיעור הפירעון לנושים עקב בחירה בחלופת הפירוק, יש להביא בחשבון גם את הנזק הנלווה שעלול להיגרם לעובדים ולספקי החברות. פאפאייה ישראל מעסיקה בישראל כ-300 עובדים, כך שפרנסתן של מאות משפחות בישראל תלויה בהמשך קיומה ופעילותה. המבקשות משלמות במהלך העסקים הרגיל לספקים שונים בישראל סכומים בהיקף עצום של כ-70 מיליון דולר (מעל 200 מיליון ש״ח) בשנה. בעוד שההסדר המוצע מאפשר את המשך העסקת העובדים וההתקשרויות עם הספקים כסדרן, חלופת הפירוק תביא בסבירות גבוהה לפיטורי העובדים ולקטיעת ההתקשרויות עם ספקים. ברי אם כן, כי גם בהיבט זה, ההסדר מצמצם את הפגיעה הכרוכה בחלופת הפירוק.

.75 הדברים מקבלים משנה תוקף נוכח אופיין של החברות. מדובר בחברות אשר ערכן אינו טמון בטכנולוגיה כשלעצמה בלבד, אלא גם בידע, במומחיות ובניסיון של העובדים העוסקים בהפעלתן ובפיתוחן. להון אנושי זה ערך מוסף משמעותי במיוחד, וקיים קושי ממשי לשמרו בתנאי אי־הוודאות הנלווים להליך לפי חלק ב׳. לפיכך, ככל שיינתן צו פתיחת הליכים, ספק אם ניתן יהיה להמשיך ולהפעיל את החברות לאורך זמן, וקיים חשש לעזיבת אנשי מפתח ולאובדן ידע חיוני. המשך הפעילות תלוי גם ברציפות ההתקשרויות עם ספקים ונותני שירותים, ובהם ספקי שירותים טכנולוגיים, שירותי ענן וסליקה, ספקי פרסום וחנויות אפליקציות. הליך פירוק או מימוש מהיר עלולים להביא לקטיעת התקשרויות אלה, לפגוע ביכולת להפעיל את הפלטפורמה, לעבד תשלומים ולספק שירות

---

[2] יובהר, כי עמדת החברה היא שאין נושה הזכאי לפתוח נגדה בהליך לפי חלק ב׳ לחוק, וראו סעיף 80(א) לבקשה למתן צו לכינוס אספות לצורך אישור הסדר חוב, שהוגשה בהליך זה ביום 30.7.2026.

למשתמשים, ולגרום לנזק עסקי ותפעולי משמעותי. התפתחויות אלה עלולות לפגוע בערך שניתן יהיה להפיק מנכסי החברות, ובכך להקטין עוד יותר את התמורה שתעמוד לחלוקה לנושים בחלופת הפירוק.

## ט. **סוף דבר - חלופת ההסדר**

76. בנסיבות אלו הסדר החוב המתוקן הוא החלופה העדיפה לנושי החברות, שכן הוא משלב בין שימור הפעילות העסקית ומקורות ההכנסה הנובעים ממנה לבין העמדת מקורות לפירעון החובות ומנגנונים משופרים להגנת זכויות הנושים. ההסדר מציע מסגרת להפקדת כספים מדורגת ומותאמת ליכולות החברה בגובה מלוא החוב בפיקדון ייעודי, הכפוף לפיקוח, לבטוחות ולמנגנוני תשלום, תוך העדפה של חובות נושי החברות על פני בעלי המניות, והטלת מגבלות על בעלי המניות ומנהלי החברות שישמרו את מחוייבותם לחברות במהלך תקופת ההסדר. בכך נועד ההסדר להבטיח כי המשך פעילותן של החברות ישרת את פירעון חובותיהן, תוך הגנה על זכויות הנושים המותנים, ככל שחובותיהם יהפכו לחובות אכיפים.

77. לאור האמור לעיל, בית המשפט הנכבד מתבקש להורות כמבוקש ברישא לבקשה זו.