# EXHIBIT B-1

## Motion to Convene Creditors' Meeting
## (Machine English Translation)

**District Court**
**in Tel Aviv**

**Civil Case No. 87154-07-26**
**Before the Honorable Judge Iris Lushi Abudi**

| | | |
|---|---|---|
| **Re**: | **The Insolvency and Economic Rehabilitation Law, 5778, 2018** | (hereinafter: **"the Act"**) |
| **Re**: | **Insolvency and Economic Rehabilitation Regulations, 5779, 2019** | (hereinafter: **"the Regulations"**) |
| **And regarding**: | **Papaya Gaming Ltd., Company No. 515422095**<br>**Papaya Gaming Inc.**<br>Both represented by attorneys Pini Yaniv (License No. 15378) and/or Liron Sapir (License No. 66525) and/or Yarden Tal-Dahan (Bar No. 90826) and/or Yarin Nahaisi (Bar No. 102568) and/or others<br>from the law firm of Meitar \| Attorneys at Law<br>1 Ariel Sharon St., Givatayim<br>yardent@meitar.com | (hereinafter: **"the Companies")** |
| **And regarding**: | **Attorney Gil Oren, in his capacity as Settlement Administrator**<br>of the law firm Arnon, Tadmor-Levy<br>Azrieli Center, The Square Tower<br>Tel: 03-6087777, Fax: 02-6239314<br>Email: gil@arnontl.com | (hereinafter: **"Settlement Administrator")** |
| **Re**: | **Creditors of the Companies – as per the list** | (hereinafter: **"Creditors of the Companies"**) |
| **Re**: | **The Commissioner for Insolvency Proceedings and Economic Rehabilitation – Tel Aviv District**<br>represented by Attorney Ms. Hadar Naot<br>3 HaShlosha St., Tel Aviv<br>Tel.: 073-3927000; Fax: 02-6467556 | (hereinafter: **"the Administrator"**) |

Date of Signing: October 20, 2026

# Motion to convene creditors' meetings for the purpose of voting on an amended debt settlement and, as part thereof, an urgent motion to order an extension of the stay of proceedings

Papaya Gaming Ltd. (**"Papaya Israel"** or **"the Company"**) and Papaya Gaming Inc. ("**Papaya Inc**.") (in bankruptcy proceedings) (hereinafter collectively referred to as: "**the Companies"**), together with Attorney Gil Oren, the Arrangement Administrator ("**Arrangement Administrator"**), respectfully petition the Honorable Court to exercise its

authority under Section 319(h) of the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter: "**the Act**") and issue the following order:

(a) To order the extension of the validity of the stay of proceedings order in the matter of the Companies, which is set to expire today, October 20, 2026, until November 25, 2026.

(b) To direct the Arrangement Administrator to convene, within 14 days from the date of this Honorable Court's approval, creditors' meetings and a shareholders' meeting for the purpose of approving the amended debt arrangement, taking into account the short period of time remaining until the expiration of the maximum statutory period for the validity of the stay of proceedings order.

- A copy of the amended debt arrangement is attached **as Appendix 1**.

(c) To confirm that participation in the meetings may take place either by physically attending the meeting, by participating online (via a link to be sent in advance to any creditor or shareholder who requests to participate via video conference), or by submitting written ballots by a date to be determined.

(d) To direct that conditional creditors who contacted the Arrangement Administrator prior to the filing of this motion may complete the filing of their claims for voting purposes no later than one week before the date of the meetings, and that they be permitted to participate in the meetings.

Note: Despite the very strenuous efforts of the expert appointed by the Arrangement Administrator, he was unable to complete the valuation report (attached as an appendix to the Arrangement) and the opinion regarding the reasonableness of the projections (attached as an appendix to this motion), and work on them is being finalized at this very moment. In order not to delay the filing of the motion—and in light of the tight deadlines—the motion and the amended settlement agreement are being filed now, and the two expert opinions will be submitted within 24 hours.

| | |
|---|---|
| ________________ | ________________ |
| Pini Yaniv, Esq. | Gil Oren, Attorney at Law |
| Counsel for the Petitioners | Administrator of the Arrangement |

**<u>The grounds for the petition are as follows</u>**:

## A. <u>Background</u>

1. Petitioner 1, Papaya Israel, is a private company incorporated in Israel in 2016 that is engaged in the development, marketing, and operation of a technology platform for skill-based mobile games. Petitioner 2, Papaya Inc., is a subsidiary of Papaya Israel incorporated in the State of Delaware, which provides fronting and payment processing services.

2. On July 30, 2026, the companies filed **an "Urgent Motion (ex parte) for a Temporary Stay of Proceedings for the Purpose of Convening Creditors' Meetings and Approving a Creditors' Arrangement pursuant to Part X of the Insolvency Law"** as well as **a "Motion for an Order to Convene Creditors' Meetings for the Purpose of Approving a Debt Arrangement"** (**the** "**Original Petition"** and **the "Original Debt Arrangement**," respectively). As noted, the Original Petition was filed in response to a lawsuit brought by the business competitor, Skillz Platform Inc. (hereinafter: **"Skillz"**), in which a decision was rendered on July 27, 2026, by the Federal Court in New York, requiring the companies to pay over $719 million (**"the Skillz Judgment"** or **"the Judgment"**). In the original motion, the companies made clear that they intended to appeal the judgment and that, in their estimation and that of their legal counsel, there was a high likelihood that it would be overturned or significantly reduced. They also clarified their position that the judgment is not enforceable in Israel under the Enforcement of Foreign Judgments Law, 5718-1958 (**"Enforcement of Foreign Judgments Law")**, as it is subject to appeal and is not final.

3. As explained in the original petition, although the companies report annual revenues of approximately half a billion dollars and meet all their current obligations in full and on time, given the scope of the judgment, which exceeds the companies' cash balances, and the risk posed to their continued operations by enforcement measures, the companies have proactively approached us to propose a debt settlement under Part X of the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter: **"the Law")**.

4. The original proposed arrangement is based on the companies' continued profitable business operations and the annual allocation of their available cash balance to a special fund, supervised and managed by the Arrangement Administrator, for the purpose of

paying conditional creditors who hold an enforceable judgment in Israel. This framework is intended to enable full repayment of the debts—even if spread over several years—while preserving business operations, jobs, and the fulfillment of ongoing obligations (for details, see Chapter D of the original petition).

5. In a decision dated August 26, 2026, the Honorable Court ordered the appointment of the Arrangement Administrator, taking into account the unique characteristics of the proceedings and the need to improve the arrangement, while strictly adhering to the obligations involved in operating the companies and maintaining their profitable operations in the United States. It was further determined that the Arrangement Administrator's powers would be in accordance with Section 319(13) of the Insolvency and Economic Rehabilitation Law, and that he must work to formulate and structure the debt arrangement in accordance with the comments of the creditors, the Administrator, and the court, and to file a motion to convene creditors' meetings on a schedule that would allow foreign creditors to formulate their positions between the publication of the arrangement and the convening of the meetings. In this regard, the Arrangement Administrator was asked to work toward reducing the exclusive reliance on future revenues from the companies' continued operations, and it was determined that the companies must present an improved model that combines operating revenues with additional sources such as guarantees and owner contributions.

6. Hence this request, to which the amended arrangement is attached (Appendix 1 above).

7. As will be explained below, the amended arrangement differs significantly from the original proposal and substantially improves upon it. While the original proposal relied solely on operating revenues, with no minimum deposits, and allowed for the possibility of reducing the deposit amounts, the amended arrangement clarifies that the petitioners commit to full repayment; it includes a schedule of increased deposits that specifies that interest on the debt will also be paid; and it even shortens the term of the arrangement to six years, with the exclusive option for the arrangement administrator to shorten the term to five years. The amended arrangement also establishes a binding payment floor (minimum annual payments) and includes a graduated make-up mechanism for cases of failure to meet the minimum. Furthermore, the amended arrangement includes an immediate distribution of $20 million to creditors awaiting repayment from the escrow account, which will not be returned under any circumstances. Additionally, collateral has been provided to creditors in the form of 25% of the company's shares as security, and a pledge of Papaya Inc. shares as further security. The amended plan includes a

contribution from shareholders, particularly the founders (in the form of guarantees, collateral, and concessions regarding employment terms), valued at approximately $35 million, as well as a penalty mechanism applied to the founders' shares that creates an incentive for them to remain in key positions for the entire five-year period. The amended arrangement clarifies that the exemption for officers is contingent upon the success of the arrangement and is not irrevocable. In addition, detailed provisions were established for the arrangement administrator to closely monitor the company's operations, and restrictions were imposed on the company and its shareholders. And more.

8. All of this is done while preserving the company as a going concern, whose value is based on the continuation of its profitable operations and its human capital, and which is the best source of repayment available to the creditors. The amended arrangement fulfills the two fundamental principles of the law—the rehabilitation of the petitioners and maximizing the repayment rate to creditors—while implementing the comments and recommendations provided by the honorable court and incorporating additional elements proposed by the company, the creditors, and the arrangement administrator. Details are provided below.

## B. Actions Taken by the Arrangement Administrator to Formulate the Arrangement

9. As noted, the Arrangement Administrator was appointed to his position on August 26, 2026. Upon receiving the appointment order, the Arrangement Administrator and his team began to assess the companies' financial condition and operations, review the materials made available to them, and examine the background and circumstances that led to the filing of the arrangement petition, with the aim of formulating a revised arrangement plan that could be submitted for approval by the creditors and the honorable court.

10. In this context, the Reorganization Administrator and his team held numerous meetings with the companies' management and their attorneys, during which the background for filing the reorganization petition, the current state of operations, and the issues requiring resolution under the reorganization were presented. During the meetings, data and materials pertaining to the companies' operations and the proposed arrangement were presented to the Arrangement Administrator. In addition, the Arrangement Administrator participated in a meeting of the company's board of directors.

11. The Arrangement Administrator also held discussions with the U.S. attorneys representing the companies in the proceedings taking place in the United States, both in the appeal of the judgment and in the recognition proceedings. These discussions were intended to ascertain the nature of the proceedings, their status, and their potential implications for the formulation of the arrangement plan.

12. In parallel with gathering data and reviewing the companies' operations, the Arrangement Administrator held discussions with representatives of the three major creditors and their counsel, and received verbal feedback on the proposed amended arrangement plan. The discussions addressed, among other things, the components of the arrangement, the information required to review it, and the requested changes.

13. In this context, the Reorganization Administrator held discussions with the attorneys representing Skillz, both in Israel and in the proceedings in the United States, as well as with the other contingent creditors and their representatives, in order to clarify their positions and examine how these could be addressed within the framework of the amended reorganization plan.

14. During this period, the Arrangement Administrator and his team also maintained contact with representatives of the Administrator of Insolvency and Economic Rehabilitation Proceedings, updated them on the main actions and discussions, and received clarifications regarding the Administrator's position on various elements of the arrangement plan. In addition, consultations were held on issues that arose during the course of the work, including the matter of engaging the valuation expert and the scope of the examinations required of him.

15. Furthermore, in accordance with the Honorable Court's decision dated August 26, 2026, which stipulated that notice of these proceedings be given to parties who had used the companies' services, the Arrangement Administrator received dozens of inquiries as well as claims for the purpose of voting. The Settlement Administrator and his team handled the receipt of claims, responded to the inquirers, and provided guidance on how to file claims in order to participate in the creditors' meetings. Given that the inquiries were received from players outside Israel, the inquirers were provided with clarifications regarding the filing requirements. As part of the handling of these inquiries, attention was also given to the significance of filing claims for voting purposes by those who may be part of the class in the class action proceeding underway in Israel, and to the connection between such filings and that proceeding.

16. To select the valuation expert, the Settlement Administrator engaged in dialogue with the companies regarding the scope of work required, which includes a valuation and sensitivity analyses, an assessment of the reasonableness of the working assumptions underlying the companies' plan, and a review of compliance with the interim budget. As part of the selection process, interviews were conducted with relevant candidates, and following the receipt of proposals, the accounting firm Fahn Kanne Grant Thornton was selected. On September 22, 2026, the Honorable Court authorized the Arrangement Administrator to engage the firm to perform a valuation, budgetary oversight, and a review of the reasonableness of the companies' repayment plan, which forms the basis for the proposed arrangement. The engagement is intended to subject the working assumptions underlying the arrangement to professional scrutiny and to support them with an economic opinion, to the extent they are found to be reasonable.

17. In formulating the amended arrangement, the Arrangement Administrator took into account the full range of creditors' positions, as set forth in the pleadings filed with the court and in discussions held with them and their representatives, as well as the position of the Administrator's representatives and the comments of the Honorable Court, including those raised during the hearing on August 25, 2026. Based on these considerations, the Arrangement Administrator held discussions with the companies regarding the plan's components, examined various alternatives, and proposed changes and additions.

**18.** As part of this process, a thorough review and consultation process was conducted, aimed at maximizing value for the creditors, while taking into account the positions of the various parties and engaging an economic advisor to examine the working assumptions underlying the arrangement and evaluate them in a professional opinion. Following these discussions and reviews, an outline was formulated that serves as the basis for the amended arrangement plan.

## C. <u>The Amended Arrangement Proposal</u>

### C(1). <u>General Provisions</u>

19. In light of the foregoing, the principle underlying the original arrangement—which remains in effect under the amended arrangement—is to preserve the companies as going concerns and to allocate the proceeds from their operations toward the repayment of the contingent debts. This will be ensured through a dedicated escrow account to be managed

by the arrangement administrator. The arrangement applies to debts arising from the alleged past practices of using bots, as defined in the arrangement, both with respect to creditors who have initiated legal proceedings and with respect to those with causes of action who have not yet initiated proceedings. It does not apply to current obligations to excluded creditors, including suppliers, employees, and performers in the ordinary course of business; these obligations will continue to be paid in full and on time.

20. Sources of repayment will be pooled in the Arrangement Administrator's escrow account through an initial deposit and annual deposits based on available cash balances, subject to minimum requirements and the other updated mechanisms set forth in the Arrangement. This framework is designed to allocate funds for the benefit of the conditional creditors, while preserving the resources necessary to continue the business operations that generate those funds.

21. In addition to regulating the sources of repayment and the method of payment, the arrangement allows for the continued adjudication of the claims to which it applies, in accordance with its provisions, including the appeal against the Skillz judgment and the continued adjudication of the class-action lawsuits in the courts where they are pending. This is done, as determined in this honorable court's decision, in accordance with the pleadings that have been or will be filed with the court. The settlement therefore does not seek to reduce the amount of debt that will be determined to be owed by the companies; on the contrary, a fundamental principle of the settlement is to enable the full repayment of the debts once they become enforceable, while preserving the business operations that constitute the primary source of repayment.

22. Numerous amendments and additions have been made to the arrangement, the main points of which are as follows:

    22.1 It has been clarified that there is an explicit commitment by the companies to repay the full amount of the contingent debts if they become enforceable, including any remaining balance, if any, at the end of the arrangement period;

    22.2 The payment schedule (Appendix 1 to the arrangement) was amended to clarify that all enforceable debts, including interest, will be paid in full during the term of the arrangement;

    22.3 The arrangement period has been shortened to six years, and the arrangement administrator has been granted the authority to shorten it to five years by realizing collateral;

22.4 A minimum deposit requirement was established for the Arrangement Administrator's escrow account at a rate of 85% of the amounts specified in Appendix 1 to the Arrangement, and a mechanism was established to verify compliance with the minimum amounts, along with sanctions for non-compliance with the minimum, as well as the establishment of an upper threshold for deviation beyond which it constitutes a breach;

22.5 Penalties in the form of make-up mechanisms were established in the event of failure to meet the annual minimum, including shareholder contributions and the issuance of additional shares to the Arrangement Administrator;

22.6 Collateral was added in the form of a lien on the deposit, a lien on Papaya Inc. shares, and the allocation of company shares to the Arrangement Administrator;

22.7 Personal guarantees from shareholders, backed by personal collateral to be provided, have been added;

22.8 A waiver by the founders of annual bonuses totaling approximately $25 million has been added; this amount will be transferred to the Arrangement Administrator's escrow account;

22.9 An immediate distribution of $20 million was added to conditional creditors whose claims have been approved for voting purposes in an amount exceeding $5 million, and this amount will not be returned under any circumstances;

22.10 Restrictions have been imposed on the companies, the other companies in the group, and the shareholders throughout the term of the arrangement, including a prohibition on distributions and a prohibition on the transfer of shares;

22.11 A reverse vesting mechanism was established for 50% of the founders' shares, to serve as an incentive for them to continue serving in key positions within the company;

22.12 It was determined that the exemption for officers and shareholders—which, under the original arrangement, was final and irrevocable—would be conditional and would be revoked if the arrangement were annulled by a court order due to a breach, or if it were determined at the end of the arrangement period that the companies had not met the minimum payment requirements;

22.13 Broad rights regarding information, supervision, and enforcement were granted to the arrangement administrator, and it was stipulated that the administrator's compensation and expenses would be paid by the companies and not at the creditors' expense.

23. The result is **a multi-layered arrangement, with layers of protection involving funds, collateral, guarantees, stock issuances**, and so on. This structure substantially improves the position of the conditional creditors. These points will be detailed below.

## C(2). <u>General Amendments and Additions: Full Repayment of Debts, the Class of Conditional Creditors, and Deposits into Escrow</u>

24. The amended arrangement explicitly states that **the companies undertake to repay in full the contingent debts that will become enforceable**. The escrow, collateral, and stock allocations, as detailed below, are intended to ensure repayment, and the amended arrangement clarifies that they do not detract from the companies' obligations under the arrangement, thereby ensuring that creditors will receive 100% of their claims.

25. **The term of the arrangement has been shortened to just six years**. As detailed below, the arrangement administrator has also been granted the option **to shorten the term of the arrangement after a period of five years**.

26. At the end of the arrangement period, any outstanding enforceable debt will become immediately due and payable. Contingent debts that subsequently become enforceable will be repaid, if and when they crystallize into enforceable debt, in the ordinary course of business. The funds and collateral deposited or delivered to the Arrangement Administrator will continue to serve as security for the repayment of these debts until the pending proceedings are concluded, unless the claims of all contingent creditors are extinguished, or the court determines that the companies can repay the debts in the ordinary course of business.

27. In addition to the initial deposit of $60 million, which will be deposited into a designated account of the Arrangement Administrator within 14 days of the Arrangement's effective date, the Company is obligated to deposit, on each of the annual payment dates, an amount such that the total payments do not fall below 85% of the cumulative target amount up to that date (hereinafter: **"minimum payments")**. Each year, the Arrangement Administrator will verify the Company's compliance with the cumulative minimum

payments. In the event of any shortfall, the make-up and enforcement mechanisms detailed below will be activated.

28. **The basis for calculating the cash balance has been expanded**. While the original arrangement included only the cash balance of Papaya Israel, it has now been clarified that it includes cash held by all group companies, both in Israel and abroad, subject to the deductions specified in the arrangement.

29. **The amounts to be deposited with the Arrangement Administrator, as detailed in Appendix 1 to the Arrangement**, **have been significantly increased**, so that the total deposits under the Arrangement now amount to up to approximately $863 million, compared to approximately $730 million in the appendix attached to the original proposed Arrangement, and spread over a shorter period. For the avoidance of doubt: these deposits are based on the same projections and data upon which the repayment capacity is based. This amount covers all known contingent liabilities, namely all liabilities related to the Skillz claim (if the judgment stands on appeal without modification) and the Milberg lawsuit, as well as interest at the rate specified in the settlement (the one-year U.S. Treasury bill yield)[1] , and taking into account the interest that will accrue on the escrow funds. The settlement further provides that if the motion to certify a pending class action against the Respondents is granted and the Settlement Administrator's valuation exceeds $5 million, the deposit amounts will be increased to ensure payment of the judgment.

30. In this context, the Settlement Administrator attaches great importance to an objective and unbiased review of the multi-year cash flow forecast presented by the company. As noted above, the accounting firm Fahn Kanne Grant Thornton was also appointed for this purpose, and in reviewing the projections, it also relied on an additional independent expert opinion prepared for the Settlement Administrator by Dr. Tal Mofkadi. Further details on this matter are provided below.

## C(3). <u>Contributions by Founders and Owners, Addition of Collateral, and Top-Up Mechanisms</u>

31. Under the amended arrangement, **a founders' contribution** has been added. The three founders will forgo their full annual bonus, and this amount (approximately $25 million

[1] The interest rate set forth in the amended arrangement is the statutory interest rate on federal judgments in the United States. Pursuant to 28 U.S.C. § 1961, a monetary judgment of a federal court bears interest at the rate of the one-year constant maturity Treasury yield.

for the entire term of the arrangement) will be added to the Arrangement Administrator's escrow account. They will be entitled to receive it from the company only after all debts to eligible creditors have been paid in full and the arrangement has been completed.

32. To ensure that the founders remain active employees of the company and continue to devote their best efforts and time to it, **a reverse vesting mechanism** has been established, **under which 50% of each founder's holdings will be held in trust by the plan administrator as shares subject to vesting**. The shares will vest over a period of five years: there will be no vesting during the first two years, followed by vesting over several years thereafter. The shares of a founder who leaves of his own accord before the end of the vesting period, and which have not yet vested, will become dormant shares, except in the case of specific acceleration events. These sanctions are intended to ensure the founders' continued participation in the company's operations, as an essential tool for ensuring compliance with the plan's objectives.

33. In addition, under the amended arrangement, **new shares—which, upon allocation, will constitute 25% of** the company's issued and paid-up common **stock**—will be allocated to the Arrangement Administrator upon the arrangement's effective date, held in trust for the benefit of the conditional creditors. This includes options for the new preferred shares to be issued to shareholders who provide guarantees. The shares constitute additional collateral to secure repayment of the contingent debts, and the terms of their exercise are detailed below.

34. In order to avoid disputes regarding the value of the Company's shares, and given that these are contingent debts, the Arrangement Administrator insisted that the shares issued to him be provided as collateral, but not as consideration in lieu of debt repayment. Only upon the conversion of these shares into cash will they be deemed to satisfy the deposit obligation, except in circumstances where the Arrangement Administrator, after consulting with the creditors, requests that they be treated as a substitute for debt repayment.

35. In addition, Papaya Israel **will pledge to the Arrangement Administrator, in trust for the contingent creditors, its entire holdings in Papaya Inc**. **shares**, as a fixed, sole, and first-ranking lien, shortly after the Arrangement takes effect, and this lien will be registered in all required registries in Israel and abroad. No additional rights will be created in the shares during the term of the pledge. The Arrangement Administrator will be entitled to enforce the pledge, with the court's approval, in the event of a default that is

not remedied within 60 days of the delivery of written notice. In this way, creditors are granted a proprietary security interest, while business operations continue uninterrupted.

36. In addition, should a shortfall arise in the minimum payments, **a** three-tiered **make-up mechanism** will be activated as follows:

    36.1 First, **the shareholders will be required to make up the shortfall as an owner's contribution**. If the shortfall is not covered by them, the shareholders' personal guarantees—totaling ten (10) million dollars and deposited with the Arrangement Administrator—will be utilized, and the shareholders will provide collateral in the form of cash deposits, solid marketable securities, or real estate to secure these guarantees.

    36.2 Second, to the extent that a shortfall remains, it will be made up by **external capital raised** by the company or from another source of financing by Papaya Israel. Credit raised for this purpose will be subordinated to the claims of the conditional creditors, and its terms are subject to the approval of the Arrangement Administrator.

    36.3 Third, if a shortfall still remains**, additional shares in Papaya Israel will be allocated to the Arrangement Administrator** to cover the remaining shortfall. The allocation of the additional shares will be based on the lower of the following two prices: (a) the share price in the company's most recent funding round after the arrangement takes effect; (b) the price derived from the valuation report attached to the debt arrangement as an appendix, multiplied by the actual percentage of deposits made out of the cumulative target amounts. For example, if 82% of the target amounts were actually deposited, the price will be determined based on 82% of the valuation. This means that the less the company contributes, the larger a share of the company the creditors will receive. Under the circumstances set forth in the arrangement, the arrangement administrator will even be authorized to transfer to an eligible creditor whose debt has not yet been repaid their proportional share of the additional shares, against their debt.

37. With regard to the owners' contribution (the secured guarantees), it should be noted that companies cannot rely on a higher capital injection from all shareholders as a source of repayment. The reason for this is that a significant portion of the shareholders are venture capital funds, which generally operate using funds that their investors have committed to

the fund, rather than by virtue of a direct commitment to finance portfolio companies or repay their debts. The fund's investors are not direct shareholders in the company, and the funds—which are the shareholders in the company—cannot compel them to make additional investments (owner contributions). The funds' investments in the company were made years ago, and those funds have already exhausted all "calls for capital" from their investors. Against this backdrop, the only parties who can actually inject funds are private shareholders. Precisely for this reason, due weight must be given to the fact that shareholders are willing to provide personal guarantees backed by private assets and to bear personal risk to ensure the repayment of the companies' debts. In addition, to incentivize the broadest possible participation by shareholders, shareholders who provide a personal and secured guarantee will be entitled to options convertible into new preferred shares. These shares will grant them priority in distributions and in the event of a sale or offering, in proportion to the amount of the security they provided. The new preferred shares will, of course, be subject to the distribution restrictions set forth in the arrangement, and such options will also be issued to the arrangement administrator, who will hold 25% of all rights allocated to the shareholders.

38. **Quantitative breach events have been established**: a cumulative shortfall from the minimum payments exceeding $75 million, or an annual deviation exceeding 30% of the annual minimum payments. These events grant the Arrangement Administrator enforcement rights in accordance with the Arrangement and applicable law, including the right to petition the court for remedies, such as the cancellation of the Arrangement, the forfeiture of personal guarantees, and the realization of collateral.

39. **Shortening the Term of the Arrangement at the Discretion of the Arrangement Administrator**: If, at the end of five years from the date the arrangement takes effect, the company has not transferred to the Arrangement Administrator's account an amount equal to the full enforceable debts owed to eligible creditors, the Arrangement Administrator shall be entitled, after receiving the position of the conditional creditors and with the court's approval, to realize the shares allocated to it, in whole or in part. The realization shall be effected by transferring the shares to eligible creditors in satisfaction of their claims, in accordance with the pricing mechanism for the additional shares, or by selling them to the highest bidder. Prior to the realization, the company will be given a 90-day period to raise capital or to settle the balance in another manner. If the proceeds from the realization are insufficient, the company will continue to deposit funds until the full debts to the conditional creditors are paid.

**C(4). <u>Initial Safety Net for Conditional Creditors</u>**

40. The amended arrangement adds a safety net in the form of an immediate distribution to eligible contingent creditors, as detailed below, in the amount of $20 million from the initial deposit. The amounts will be paid as an advance against their future entitlement, but will not be refunded under any circumstances, even if it turns out that the recipient's entitlement is less than the advance amount or does not materialize at all.

41. The immediate distribution is intended to make actual funds available to conditional creditors whose claims have been approved for voting purposes in an amount exceeding $5 million, even before an enforceable monetary judgment is rendered in their favor, and to mitigate the risk and delay associated with the protracted proceedings and the receipt of payments from the Arrangement Administrator's escrow account. The scope of the distribution has been set conservatively, since their claims have not yet been definitively adjudicated and the distribution is made without the right of recoupment. This is a benefit that did not exist in the original arrangement.

42. The immediate distribution will be apportioned proportionally among the conditional creditors whose claims have been approved for voting purposes in an amount exceeding $5 million, based on the ratio of each creditor's approved claim amount to the total of approved claims for voting purposes among the creditors participating in the distribution (Creditors whose claims are lower than that amount are in any case entitled to full payment from the company's current cash flow).

43. The amended settlement also includes a specific provision regarding a pending motion to certify a class action in Israel: if the motion to certify the class action is granted, the settlement administrator will apply the settlement amount after receiving arguments and data from the lead plaintiff and the company. If the amount to be applied exceeds $5 million, the representative plaintiff and class members will be entitled to receive a proportional share of the immediate distribution as a non-refundable advance against the judgment amount, even before they have a monetary judgment in hand. The amount will be calculated based on the proportional share of the claim amount as determined, relative to the contingent liabilities participating in the immediate distribution, as if the representative contingent liability had existed as of the date the settlement was approved, and will be actually paid or deposited in escrow in accordance with the instructions of the court hearing the class action and subject to applicable law. In addition, upon determination of the assessment, the company will be required to add amounts to the

deposit schedule that reflect the increase in the contingent debt, to secure payment of the judgment when it is rendered.

## C(5). Restrictions on the Preservation of Sources of Repayment

44. Throughout the term of the arrangement, **restrictions on the creation of liens and the taking of credit** will apply to the Company and all group companies. Exceptions include supplier credit, revolving credit lines, and secured credit to finance ongoing operations, subject to established limits, as well as existing liens and their renewal under similar terms. Any deviation requires the prior written approval of the Arrangement Administrator. Furthermore, the Company may raise capital or credit (beyond existing credit lines) solely for the purpose of making deposits into the Arrangement Escrow Account, including making up shortfalls, making advance deposits, and receiving additional shares in return, unless otherwise approved by the Arrangement Administrator and the court. The company is also obligated not to compromise existing insurance coverage.

45. **A prohibition** has also been established **on distributions, including dividends and share buybacks**, and on direct or indirect payments to shareholders or their representatives, except for the founders' salaries and terms of employment. Related-party transactions are prohibited, except for the founders' existing employment agreements. Any other related-party transaction requires the prior written approval of the Arrangement Administrator, in addition to the approvals required by law.

46. The amended arrangement **prohibits the transfer of rights in shares**. Pursuant to it, shareholders are prohibited, throughout the term of the arrangement, from selling, transferring, encumbering, or granting any other right in their shares, directly or indirectly, and any transfer in violation thereof shall be null and void with respect to the company. The prohibition shall not apply to an investment entity that transfers all of its investments to a third party. Nor shall it apply to the transfer of options or new preferred shares as part of an exchange of a personal guarantee approved by the Arrangement Administrator.

## C(6). Supervision, Monitoring, and Enforcement

47. The amended arrangement grants additional powers to the Arrangement Administrator, including the obligation to submit a semi-annual report on the Group's status, the right to receive financial reports and additional information regarding compliance with

obligations, as well as the right to participate, either in person or through a representative, as an observer at board meetings and to receive meeting materials, without the right to vote and subject to a duty of confidentiality.

48. In addition, the company is obligated to notify the Arrangement Administrator without delay of any existing or anticipated breach, any concern regarding non-compliance with deposits, and other material events.

49. It has been determined that the Arrangement Administrator's compensation and expenses shall be borne by the Company and not by the creditors; if such compensation or expenses are paid from the escrow account, the Company shall be obligated to reimburse the amount within 30 days.

### C(7). Exemption Conditions for Shareholders and Officers

50. The amended arrangement clarifies that the exemption for officers, directors, and shareholders will take effect upon the arrangement's entry into force, but will be subject to certain conditions. Its immediate entry into force is necessary to allow management and the founders to focus, throughout the duration of the arrangement, on managing the company and generating revenue—from which the debts will be repaid—rather than on defending against lawsuits. However, the exemption will be revoked if the arrangement is rescinded by a court order due to a breach, or if it becomes apparent at the end of the arrangement period that the company has failed to meet the minimum payment requirements. In such a case, the period from the arrangement's effective date until its termination will not be counted toward the statute of limitations. This condition also strengthens the creditors' protection.

## D. Debt Claims Filed for Voting Purposes in the Proceedings

51. In accordance with the Honorable Court's decision dated August 26, 2026, the companies took steps to send an email to players from the relevant period regarding the filing of debt claims. Given the large number of recipients, the emails were sent in several batches, spread out over a number of days, and the companies also attempted to resend emails that had bounced to ensure that the messages reached as many recipients as possible (a notice to this effect was submitted to the Honorable Court by the company on September 3, 2026).

52. Pursuant to the Honorable Court's decision dated September 10, 2026, the deadline for filing claims for the purpose of voting is September 19, 2026.

53. Several dozen debt claims were filed against the Company for the purpose of participating in the creditors' meetings. The debt claims have not yet been reviewed or adjudicated, and their details are as follows:

    53.1 97 claims filed by players via the dedicated email address Papaya@ArnonTL.com.

    53.2 Claims filed by Skillz and Milberg Coleman Bryson Phillips Grossman totaling $744,224,615.60.

    53.3 A debt claim arising from a motion to certify a class action filed by Cassie Rubinson, in the amount of 562,030,000 NIS.

    53.4 In addition, there is a claim by Mr. and Mrs. Pavlovich in the amount of $308,880. Pursuant to Section 25 of the original debt settlement agreement, any conditional creditor listed in Form 1 attached thereto who has not submitted proof of debt shall be deemed, for the purposes of voting on the arrangement, to have agreed to the amount of debt stated next to their name, to have submitted proof of debt in the said amount, and to have had their proof of debt approved in that amount for the purposes of voting on the arrangement. Since this document was sent both to the petitioners via the designated email address and to all known creditors, the Arrangement Administrator believes that fairness requires that this claim also be included for the purposes of the vote.

54. In addition to the foregoing, claims unrelated to the arrangement have been filed by excluded creditors, including a claim filed by the Tax Authority—Sharon Regional Tax Office—and a claim filed by Bank Leumi of Israel Ltd., and these will be handled in the ordinary course of business, provided this debt arrangement is approved.

55. The Arrangement Administrator is of the opinion that, given the fact that inquiries are still being received in the designated email inbox—even as of the date of filing this motion—it is appropriate to allow conditional creditors whose inquiries were received by the date of filing to complete the submission of their claims no later than one week prior to the date of the meetings and to permit them to participate in the meetings.

56. For the avoidance of doubt, it is clarified that nothing herein constitutes an admission of the alleged debts and/or recognition of claims filed late, and these will be examined in due course by the Arrangement Administrator in accordance with the law.

## E. Classification of Creditors' and Shareholders' Meetings and Provisions Regarding Their Convening

57. For the purposes of the arrangement, creditors are divided into excluded creditors and conditional creditors. Excluded creditors include those with whom the companies have normal employment and business relationships, including the companies' suppliers and employees, government authorities, provident and pension funds, as well as players—except with respect to claims related to past practices involving the use of bots. These parties are not required to file claims under the arrangement; The companies' ongoing obligations to them will continue to be paid in the ordinary course of business.

58. Conditional creditors are those who claim a debt based on past practices involving the use of bots, including those who are conducting legal proceedings on the matter, asserting such a claim, or holding a foreign judgment that has not yet become an enforceable monetary judgment in Israel. These creditors are required to submit proof of debt, and their claims will be adjudicated in accordance with the arrangement: if the claim is the subject of pending legal proceedings, entitlement to payment will be determined by an enforceable monetary judgment; if it is not the subject of such proceedings, the arrangement administrator will decide the matter, subject to the provisions of the arrangement. With regard to payment, an eligible creditor whose enforceable monetary judgment does not exceed $5 million will receive payment in the ordinary course of business, whereas payment to an eligible creditor whose enforceable monetary judgment exceeds $5 million will be made from the Arrangement Administrator's escrow account.

59. **Excluded Creditors** – As stated above, the proposed arrangement does not apply to the excluded creditors and does not alter their rights. Current obligations to them will continue to be paid in full and on time. The excluded creditors were not required to file a claim. Accordingly, the Arrangement Administrator believes there **is no need to convene a meeting regarding them**.

60. **Conditional Creditors** – The Special Administrator believes that a single meeting should be convened in which all conditional creditors will participate. In this context, the Arrangement Administrator considered the Company's position, as expressed in the original motion, that two separate meetings should be convened due to Skills' distinct

interests as a competitor, and also considered whether two separate meetings should be convened for creditors whose claims are less than $5 million or greater than $5 million. The Plan Administrator concluded that these positions should not be accepted and that a single creditors' meeting should be convened. The reason for this is that the plan applies a common framework to all contingent creditors: their contingent claims will be paid in full once they become enforceable, subject to the provisions of the plan. The distinction regarding claims exceeding $5 million relates to the manner and source of payment: An eligible creditor whose enforceable monetary judgment does not exceed $5 million will receive payment in the ordinary course of business, whereas payment to an eligible creditor whose enforceable monetary judgment exceeds $5 million will be made from the Arrangement Administrator's escrow account in accordance with the mechanism set forth therein. In the Arrangement Administrator's view, this difference in the payment mechanism does not justify splitting the meeting of conditional creditors, given the common framework and the companies' commitment to repay the full amount of debts that will become enforceable. Furthermore, It is entirely possible that a conditional creditor whose debt is currently less than $5 million will ultimately be awarded a monetary judgment exceeding $5 million, and for this reason as well, it is appropriate and proper to convene all creditors into a single meeting.

61. It is also requested that **a separate meeting of the company's shareholders** be convened. The arrangement includes an amendment to the company's articles of incorporation, the allocation of shares to the arrangement administrator, and the imposition of restrictions on the transfer of shares and on shareholder actions during the term of the arrangement. Accordingly, a vote by the shareholders on the arrangement and on the changes affecting their rights is required; furthermore, as a precautionary measure, the meeting must also be convened to comply with the requirements of Section 322(b) of the Act.

62. Participation in the meeting will be permitted in person, via video conference, and by submitting written ballots by a date to be determined.

63. The Arrangement Administrator will be responsible, among other things, for conducting the creditors' meetings. The counting of votes cast at the various creditors' meetings will be performed by the Arrangement Administrator, and the results of the voting at each meeting will be detailed in a report submitted by the Arrangement Administrator to the court.

## F. <u>The Financial Work</u>

64. To examine the economic basis for the restructuring plan, Fahn Kanne Grant Thornton conducted a three-part economic analysis on behalf of the Arrangement Administrator: (a) a valuation of the company (the valuation is attached as an appendix to the amended debt settlement agreement), (b) an assessment of the reasonableness of the multi-year cash flow forecast, and (c) a financial oversight and monitoring report for August 2026 ("**the economic study**"). As part of the Economic Analysis, four scenarios were examined, differing in the scope of investment in user acquisition, the pace of game launches, and growth assumptions: the base-case scenario on which the Company relied, a conservative extreme scenario (**"Harvest"**), an intermediate scenario, and an optimistic scenario (as defined in the Economic Study). In the valuation report attached as an appendix to the amended agreement, the company's value as of August 31, 2026, was estimated using the discounted cash flow method and a going-concern assumption. The equity value was calculated based on an average scenario, derived from the base, intermediate, and "Harvest" scenarios, without assigning any weight to the optimistic scenario. This value was estimated in the economic study at approximately $1.292 billion, prior to the reduction of the liability arising from the debt settlement. In the context of the economic study, the economic expert, as he had previously announced, relied not only on his own independent analyses but also on an independent opinion by **Dr. Tal Mofkadi,** in which he was asked to examine the reasonableness and validity of management's forecast as the basis for the economic study. Dr. Mofkadi's opinion concludes that the forecast presented by the companies constitutes a valid and conservative basis for the valuation.

- ➤ A copy of the expert opinion regarding the review of the reasonableness of the multi-year cash flow forecast, to which Dr. Tal Mofkadi's opinion is also attached, is included **<u>as Appendix</u> "<u>2</u>** ."

- ➤ A copy of the financial supervision and control report for August 2026 is attached **<u>as Appendix "3</u>** ."

65. As noted, the economic analysis also examined the multi-year forecast, comparing it against the various scenarios. It was found that in all four scenarios examined, positive cash balances remain throughout the forecast period, and that **the projected cash flows support the financing of the required deposits according to the payment schedule of the arrangement under review until the end of the arrangement period**. This

conclusion does not rely on owner contributions, guarantees, or collateral, which were not included in the forecast. As part of the economic analysis, the expert identified the applicants' ability to adjust expenses—particularly user acquisition costs—as key to cash flow flexibility, while considering the impact of such reductions on the scope of operations and future cash generation capacity. The expert states in his opinion that he found no indications that the forecast is based on unreasonable assumptions, and that the forecast was prepared based on detailed operational and business assumptions. In the context of the forecast, Dr. Mofkadi's opinion also states that even after he made changes to it—all of which lean toward excessive conservatism—it can be relied upon as the basis for the proposed debt arrangement, and that the forecast indicates the petitioners are capable of meeting the full payment schedule from their own resources. Both experts believe that the projected cash flows support the companies' ability to meet the required deposits into the arrangement administrator's fund.

66. On the third level—the ongoing supervision of the company's operations during the stay of proceedings period (August through October 2026)— the August 2026 monitoring report indicates an increase of approximately $5.51 million in the cash balance, compared to a projected increase of approximately $3.36 million. The improvement relative to the forecast stemmed primarily from lower-than-expected payments, particularly for user acquisition, alongside lower-than-forecast revenue. The reviews conducted as of the date the draft was submitted support the reported change in cash, and no material unexplained discrepancies were identified, subject to the completion of the remaining reviews and adjustments.

67. It should be noted that the findings of the analyses provide an economic basis for evaluating the restructuring plan and support the feasibility of financing the payments according to the forecasts and scenarios examined.

**68.** In conclusion, the economic analysis conducted by two independent and renowned economic experts—both Fahn Kanne Grant Thornton and Dr. Tal Mofkadi—supports the Company's working assumptions underlying the debt restructuring. Furthermore, the Company's value in its current form of operation exceeds the balance of its debts to its creditors.

## G. Reasons for Preferring the Debt Restructuring Agreement Over Issuing an Order to Commence Insolvency Proceedings

69. As in other technology-based industries, in the gaming industry as well, the liquidation of a business through insolvency proceedings may significantly impair its value. A distressed or liquidation sale may yield proceeds significantly lower than the company's value as a going concern. This gap stems from several key factors:

69.1 Damage to Intangible Assets and the Departure of Key Employees (Brain Drain):

A significant portion of a company's value lies in its development, design, and product management teams. Their departure due to uncertainty may leave the purchaser without the knowledge and capabilities necessary to operate, maintain, and further develop the games. The economic expert determines that intangible assets (such as intellectual property, user bases, etc.) are sold at a substantial discount of 70% to 90% (i.e., a realization rate of only 10%–30% of the economic value of these assets), since their value relies almost entirely on the continuity of operations, the company's management, and the development team.

69.2 Brand Equity Erosion:

Concerns about the discontinuation of support, updates, and server operations may lead to user churn, a decline in revenue, and damage to reputation.

69.3 Time Pressure and Weakened Bargaining Power (Fire Sale): Need for Rapid Realization:

Funding and time constraints may limit the ability to identify buyers, conduct protracted negotiations, and foster effective competition among them. The economic expert states that time constraints may limit the seller's ability to conduct a competitive and orderly process and increase the rate of reduction in the sale price.

69.4 Buyers' Exploitation of the Seller's Distress:

Buyers' awareness of the company's financial situation and its limited alternatives weakens its bargaining power and may lead to low offers.

69.5 Loss of growth potential and combined value:

Halting development (Pipeline): Ceasing work on new games, expansions (DLCs), and technologies may harm future revenue potential and reduce the price the buyer is willing to pay.

69.6 Asset Sale vs. Share Sale:

Selling the code, intellectual property rights, and other assets in piecemeal fashion may sever them from the team and the operational infrastructure, and yield a price lower than their value as part of a functioning business.

69.7 Legal and Operational Risks:

Selling the assets "as-is," without representations and warranties (No R&W) or subject to limited representations and warranties, increases uncertainty regarding the soundness of the code, intellectual property rights, and the ability to continue operating the product. The economic expert determines that the absence of protections, warranties, and indemnification on the part of the seller may justify an additional discount and that this uncertainty may be reflected in a reduction of the offered price.

70. These risk factors also apply to the company; therefore, it can be reasonably assumed that **the company's value in insolvency proceedings will be significantly lower** than its economic value during the ordinary course of business, and in the present case, lower than under the proposed debt restructuring scenario. This conclusion is further supported by the position of the economic expert appointed by the administrator of the arrangement, who estimates that the company's equity value in a forced liquidation scenario is hundreds of millions of dollars lower than its value in a going-concern scenario. The expert explains the lower valuation based on three factors: (a) distress sale conditions, (b) the nature of the company's assets (primarily intangible assets), and (c) data from the professional literature. In light of the numerous risk factors—including uncertainty regarding the ability to find a buyer, risks related to retaining users, risks of dependence on key personnel, and more—he even states that the value in the liquidation scenario is theoretical and casts doubt on the possibility of actually liquidating the company's operations at that value, or at all.

## H. The Arrangement Administrator's Rationale for Preferring the Debt Arrangement Proposal

71. In light of all the matters described above, including the expert's economic analysis, the Arrangement Administrator believes that the debt arrangement alternative under Part X of the Law, as proposed in the amended debt settlement plan that is the subject of this motion, is vastly superior to the alternative of filing a motion for an order to commence proceedings and sell the company's operations and assets as part of liquidation

proceedings and the publication of an invitation to submit bids[2] . As already noted in both the original motion and this motion, there is no alternative available for the immediate payment of the company's full debts to its creditors from its existing resources.

72. In light of the foregoing, the Arrangement Administrator evaluated the amended arrangement proposal against the practical alternative available to the creditors should it not be approved, rather than against a theoretical and impractical possibility of immediate and full repayment.

73. The Arrangement Administrator is of the opinion that, should the arrangement not be approved and should proceedings be initiated against the companies under Part B of the Law—which would lead to the liquidation of their assets and their dissolution—the funds available to repay the debts would be reduced to the proceeds from the liquidation. According to the economic analysis, the value of the companies' operations and assets—which under normal circumstances is estimated at approximately 1.2 billion NIS—is expected to drop significantly in the liquidation alternative and, in the scenario of a rapid liquidation within the framework of insolvency proceedings, by hundreds of millions of NIS. Under these circumstances, and for the reasons detailed above, it is highly doubtful that the liquidation alternative will yield proceeds even remotely approaching those offered by the arrangement. Based on the foregoing, the expected recovery rate for creditors under the arrangement is significantly higher than that expected under the liquidation alternative.

74. Furthermore, while the recovery rate for creditors is an important consideration, it is not the only one. Alongside the expected reduction in the recovery rate for creditors resulting from choosing the liquidation alternative, one must also take into account the associated harm that may be caused to the companies' employees and suppliers. Papaya Israel employs approximately 300 workers in Israel, meaning that the livelihoods of hundreds of families in Israel depend on the company's continued existence and operations. In the ordinary course of business, the petitioners pay various suppliers in Israel enormous sums totaling approximately $70 million (over 200 million NIS) per year. While the proposed arrangement allows for the continued employment of workers and the maintenance of contracts with suppliers as usual, the liquidation alternative would, with a high degree of probability, result in the layoff of employees and the termination of contracts with

---

[2] It should be clarified that the Company's position is that no creditor is entitled to initiate proceedings against it under Part B of the Act; see Section 80(a) of the motion for an order to convene meetings for the purpose of approving a debt arrangement, filed in these proceedings on July 30, 2026.

suppliers. It is therefore clear that, in this regard as well, the arrangement minimizes the harm associated with the liquidation alternative.

75. This is particularly true given the nature of the companies. These are companies whose value lies not only in the technology itself, but also in the knowledge, expertise, and experience of the employees involved in their operation and development. This human capital has particularly significant added value, and there is a real difficulty in preserving it under the conditions of uncertainty associated with proceedings under Part B. Therefore, should an order to commence proceedings be issued, it is doubtful whether the companies will be able to continue operating over the long term, and there is a concern that key personnel will leave and that essential knowledge will be lost. Continued operations also depend on the continuity of contracts with suppliers and service providers, including technology service providers, cloud and payment processing services, advertising providers, and app stores. A liquidation or expedited realization process could result in the termination of these relationships, impair the ability to operate the platform, process payments, and provide services to users, and cause significant business and operational damage. These developments could diminish the value that can be derived from the companies' assets, thereby further reducing the proceeds available for distribution to creditors under the liquidation alternative.

## I. <u>Conclusion—The Arrangement Alternative</u>

76. Under these circumstances, the amended debt restructuring plan is the preferred alternative for the companies' creditors, as it combines the preservation of business operations and the resulting sources of income with the provision of resources for debt repayment and improved mechanisms for protecting creditors' rights. The arrangement offers a framework for the phased deposit of funds, tailored to the company's capabilities, in the full amount of the debt into a designated escrow account, subject to supervision, collateral, and payment mechanisms, while giving priority to the companies' creditors' claims over those of shareholders, and imposing restrictions on shareholders and company directors to ensure they maintain their commitment to the companies throughout the term of the arrangement. In this way, the arrangement is intended to ensure that the companies' continued operations will serve to repay their debts, while protecting the rights of contingent creditors to the extent that their claims become enforceable.

77. In light of the foregoing, the Honorable Court is requested to grant the relief sought in the preamble to this motion.