# EXHIBIT B-2

## Motion to Convene Creditors' Meetings
## (Certified English Translation)

**District Court** | **Insolvency Proceeding No. 87154-07-26**
**Tel Aviv** | **Before the Honorable Judge Iris Lushi-Abudi**

| | | |
|---|---|---|
| **In the matter of**: | **The Insolvency and Economic Rehabilitation Law, 5778-2018** | (hereinafter: **"the Law"**) |
| **In the matter of**: | **The Insolvency and Economic Rehabilitation Regulations, 5779-2019** | (hereinafter: "**the Regulations**") |
| **And in the matter of**: | **Papaya Gaming Ltd., Company Registration No. 515422095**<br>**Papaya Gaming Inc.**<br>Both represented by counsel: Adv. Pinni Yaniv (Bar No. 15378), and/or Adv. Liron Sapphire (Bar No. 66525), and/or Adv. Yarden Tal-Dahan (Bar No. 90826), and/or Adv. Yarin Nahaisi (Bar No. 102568), and/or others<br>of Meitar \| Law Offices<br>1 Ariel Sharon, Givatayim<br>yardent@meitar.com | (hereinafter: **"the Companies")** |
| **And in the matter of**: | **Gil Oren, Adv., in his capacity as Arrangement Administrator**<br>from Arnon, Tadmor-Levy Law Firm<br>Azrieli Center, Square Tower<br>Tel: +972 3-6087777, Fax: +972 2-6239314<br>Email: gil@arnontl.com | (hereinafter: **"the Arrangement Administrator")** |
| **And in the matter of**: | **The Companies' Creditors, as listed** | (hereinafter: "**the Companies' Creditors**") |
| **And in the matter of**: | **The Commissioner of Insolvency Proceedings and Economic Rehabilitation — Tel Aviv District**<br>Represented by Adv. Ms. Hadar Naot<br>3 HaShlosha St., Tel Aviv<br>Tel: +972 73-3927000; Fax: +972 2-6467556 | (hereinafter: **"the Commissioner"**) |

Date of Execution of Document: 10/20/2026

# MOTION TO CONVENE CREDITORS' MEETINGS FOR A VOTE ON AN AMENDED DEBT ARRANGEMENT, INCLUDING AN URGENT REQUEST FOR AN EXTENSION OF THE STAY OF PROCEEDINGS ORDER

Papaya Gaming Ltd. ("**Papaya Israel**" or "**the Company**") and Papaya Gaming Inc. ("**Papaya Inc.**") (subject to a stay of proceedings) (hereinafter collectively: "**the Companies**"), together with Attorney Gil Oren, the arrangement administrator ("the Arrangement Administrator"), respectfully move this Honorable Court to exercise its authority under Section 319r(e) of the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter: "**the Law**"), and order as follows:

(a) That the stay of proceedings order concerning the Companies, which is scheduled to expire today, 10/20/2026, be extended through 11/25/2026.

(b) That the Arrangement Administrator be directed to convene creditors' meetings and a shareholders' meeting within 14 days after this Honorable Court's approval, for the purpose of approving the amended debt arrangement, in view of the limited time remaining before the stay of proceedings order reaches the maximum duration permitted by law.

- A copy of the amended debt arrangement is attached **as Appendix "1"**.

(c) That participation in the meetings be permitted in person, remotely (through a videoconference link to be sent in advance to any creditor or shareholder requesting to participate by videoconference), or by submitting a voting ballot by a date to be specified.

(d) That contingent creditors who contacted the Arrangement Administrator before the filing of this Motion be permitted to complete the submission of their proofs of claim for voting purposes no later than one week before the meetings are convened and be permitted to participate in those meetings.

Note: Despite the intensive efforts of the expert retained by the Arrangement Administrator, the expert has been unable to complete the valuation report (which is to be attached as an appendix to the Arrangement) and the opinion addressing the reasonableness of the projections (which is to be attached as an appendix to this Motion). Work on both documents is being completed at this very moment. To avoid delaying the filing of this Motion, and given the extremely tight deadlines, this Motion and the amended arrangement are being filed now, and both expert opinions will be filed within 24 hours.

| | |
|---|---|
| ______________ | ______________ |
| Pinni Yaniv, Adv. | Gil Oren, Adv. |
| Counsel for the Applicants | Arrangement Administrator |

<u>**The grounds for this Motion are as follows:**</u>

## A. Background

1. Applicant No. 1, Papaya Israel, is a privately held company incorporated in Israel in 2016. It develops, markets, and operates a technology platform for skill-based mobile games. Applicant No. 2, Papaya Inc., is a subsidiary of Papaya Israel incorporated in the State of Delaware. It provides fronting and payment-processing services.

2. On 07/30/2026, the Companies filed an "**Urgent Ex Parte Motion for a Temporary Stay of Proceedings Order to Convene Meetings and Approve a Creditors' Arrangement under Part Ten of the Insolvency Law,"** as well as a **"Motion for an Order Convening Meetings for Approval of a Debt Arrangement"** ("**the Original Motion**" and "**the Original Debt Arrangement**," respectively). As the Court will recall, the Original Motion arose from a lawsuit filed by the Companies' business competitor, Skillz Platform Inc. (hereinafter: "**Skillz**"), in which, on 07/27/2026, a federal court in New York issued a judgment requiring the Companies to pay more than $719 million ("**the Skillz Judgment**" or "**the Judgment**"). In the Original Motion, the Companies explained that they intended to appeal the Judgment and that, in their assessment and that of their legal advisers, there was a strong likelihood that the Judgment would be vacated or substantially reduced. They also stated their position that, under the Enforcement of Foreign Judgments Law, 5718-1958 ("**the Enforcement of Foreign Judgments Law**"), the Judgment is not enforceable in Israel because it remains subject to appeal and is not final.

3. As explained in the Original Motion, although the Companies generate annual revenue of approximately half a billion dollars (!) and meet all their ongoing obligations in full and on time, the amount of the Judgment exceeds their cash reserves, and enforcement measures threaten the continued operation of their businesses. Accordingly, the Companies proactively proposed a debt arrangement under Part Ten of the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter: "**the Law**").

4. The Original Arrangement proposed to preserve the Companies' profitable business operations and allocate their annual excess available cash to a dedicated fund, under the supervision and administration of the Arrangement Administrator, to pay contingent creditors who obtain judgments enforceable in Israel. This structure was intended to permit all debts to be paid in full, even if over several years, while preserving the Companies' business operations and jobs and ensuring the continued fulfillment of their ongoing obligations (for further details, see Chapter D of the Original Motion).

5. In its decision dated 08/26/2026, this Honorable Court ordered the appointment of the Arrangement Administrator, taking into account the distinctive characteristics of these proceedings and the need to improve the Arrangement while ensuring compliance with the obligations associated with operating the Companies and preserving their profitable operations in the United States. The Court further held that the Arrangement Administrator's powers would be governed by Section 319m of the Insolvency and Economic Rehabilitation Law and that he must work to formulate and structure the debt arrangement in accordance with the comments of the creditors, the Commissioner, and the Court, and file a motion to convene creditors' meetings on a schedule that would allow foreign creditors sufficient time to formulate their positions between publication of the Arrangement and the meetings. In particular, the Arrangement Administrator was instructed to reduce the exclusive reliance on future revenues from the Companies'

continuing operations. The Court directed the Companies to present an improved model combining operating revenues with additional sources, such as guarantees and shareholder contributions.

6. This is the purpose of the present Motion, to which the amended arrangement is attached (Appendix 1, above).

7. As explained below, the amended arrangement differs substantially from the original proposal and constitutes a material improvement upon it. Whereas the original proposal relied solely on operating revenues, imposed no minimum deposit requirements, and permitted deposit amounts to be reduced, the amended arrangement expressly provides that the Applicants undertake to repay the debts in full. It establishes an increased deposit schedule under which interest will also be paid on the debt, and shortens the Arrangement Period to six years, with the Arrangement Administrator alone having the option to shorten it to five years. The amended arrangement also establishes a binding payment floor (annual minimum payments) and introduces a tiered shortfall-cure mechanism for instances in which the minimum payments are not met. Furthermore, The amended arrangement provides for an immediate $20 million distribution to creditors awaiting payment from the fund, which will under no circumstances be subject to repayment. Additional security has also been provided for the creditors in the form of an allocation of 25% of the Company's shares as collateral and a pledge of the shares of Papaya Inc. as further security. The amended arrangement also includes contributions from shareholders, particularly the founders, in the amount of approximately $35 million (through guarantees, collateral, and reductions in employment benefits), as well as a punitive mechanism affecting the founders' shares that creates an incentive for them to remain in their key positions throughout the five-year period. The amended arrangement clarifies that the release granted to officers is contingent upon the successful completion of the Arrangement and is not irrevocable. In addition, detailed provisions have been established for close supervision of the Company's operations by the Arrangement Administrator, and restrictions have been imposed on the Company and its shareholders. Moreover,

8. All of the foregoing will be accomplished while preserving the Companies as a going concern, whose value depends on the continuation of their profitable operations and their human capital, and which represents the best source of recovery available to creditors. The amended arrangement advances the Law's two fundamental objectives: rehabilitation of the Applicants and maximization of creditor recoveries. It does so by implementing the observations and recommendations of this Honorable Court and incorporating additional elements proposed by the Company, the creditors, and the Arrangement Administrator. The details follow.

## B. <u>Steps Taken by the Arrangement Administrator to Formulate the Arrangement</u>

9. As stated, the Arrangement Administrator was appointed on 08/26/2026. Upon receipt of the appointment order, the Arrangement Administrator and his team began reviewing the Companies' financial condition and operations, examining the materials made available to them, and assessing the background and circumstances that had led to the filing of the application for an arrangement, with a view to developing an amended arrangement plan that could be submitted for the approval of the creditors and this Honorable Court.

10. To that end, the Arrangement Administrator and his team held numerous meetings with the Companies' management and attorneys, during which they were briefed on the reasons for filing the application for an arrangement, the status of the Companies' operations, and the issues that needed to be addressed in the Arrangement.During these meetings, the Arrangement Administrator was presented with data and documents concerning the Companies' operations and the proposed Arrangement. In addition, the Arrangement Administrator attended a meeting of the Company's Board of Directors.

11. The Arrangement Administrator also spoke with the American attorneys representing the Companies in the U.S. proceedings, both in the appeal from the Judgment and in the recognition proceeding. These discussions were intended to clarify the nature and status of the proceedings and their potential implications for the formulation of the arrangement plan.

12. While gathering information and familiarizing himself with the Companies' operations, the Arrangement Administrator also held discussions with representatives of the three principal creditors and their attorneys and obtained oral feedback regarding the proposed amended arrangement plan. The discussions addressed, among other matters, the components of the Arrangement, the information needed to evaluate it, and the requested amendments.

13. In particular, the Arrangement Administrator spoke with the attorneys representing Skillz, both in Israel and in the U.S. proceedings, as well as with the other contingent creditors and their representatives, in order to ascertain their positions and consider how those positions could be addressed in the amended arrangement plan.

14. During this period, the Arrangement Administrator and his team also maintained contact with representatives of the Commissioner of Insolvency Proceedings and Economic Rehabilitation, updated them on the principal actions taken and discussions held, and obtained clarification of the Commissioner's position regarding various elements of the arrangement plan. They also consulted with the relevant parties on issues arising during this work, including the engagement of a valuation expert and the scope of the review to be performed by that expert.

15. In addition, in accordance with this Honorable Court's decision of 08/26/2026, which required that players who had used the Companies' services be notified of these proceedings, the Arrangement Administrator received dozens of inquiries and proofs of claim submitted for voting purposes. The Arrangement Administrator and his team received and processed the proofs of claim, responded to inquiries, and provided guidance on submitting proofs of claim for participation in the creditors' meetings. In light of the fact that the inquiries came from players outside Israel, the individuals concerned were given explanations of the filing requirements. In responding to these inquiries, the Arrangement Administrator also addressed the implications of submitting proofs of claim for voting purposes by persons who might be members of the putative class in the class action pending in Israel, as well as the relationship between such submissions and that proceeding.

16. In selecting a valuation expert, the Arrangement Administrator discussed with the Companies the required scope of work, including a valuation and sensitivity analyses, an assessment of the reasonableness of the assumptions underlying the Companies' business plan, and an examination of compliance with the budget for the interim period. Candidates were interviewed as part of the selection process, and, after proposals were received, the accounting firm Fahn Kanne Grant Thornton was selected. On 09/22/2026, this Honorable Court authorized the Arrangement Administrator to engage the firm to perform a valuation,

conduct budgetary oversight, and assess the reasonableness of the Companies' repayment plan, which serves as the basis for the proposed Arrangement. The engagement was intended to subject the assumptions underlying the Arrangement to professional scrutiny and, to the extent they were found reasonable, substantiate them through an economic expert opinion.

17. In formulating the amended arrangement, the Arrangement Administrator considered all the positions expressed by the creditors in pleadings filed with the Court and in discussions held with them and their representatives, as well as the views of the Commissioner's representatives and the observations of this Honorable Court, including those raised at the hearing on 08/25/2026. On that basis, the Arrangement Administrator held discussions with the Companies concerning the components of the plan, evaluated various alternatives, and proposed amendments and additions.

18. The foregoing involved a thorough review and consultation process intended to maximize value for creditors, while considering the positions of the various stakeholders and drawing on the assistance of the financial adviser to examine the assumptions underlying the Arrangement and evaluate them in a professional opinion. The discussions and evaluations described above resulted in the formulation of the framework underlying the amended arrangement plan.

## C. <u>The Amended Arrangement Proposal</u>

### C(1). <u>General</u>

19. Against this background, the fundamental principle of the Original Arrangement, which has been retained in the amended arrangement, is to preserve the Companies as a going concern and dedicate the profits generated by their operations to the repayment of contingent debts. This will be secured through a dedicated deposit administered by the Arrangement Administrator. The Arrangement applies to debts arising from alleged past practices involving the use of bots, as defined in the Arrangement, whether owed to creditors already engaged in litigation or to persons holding causes of action who have not yet commenced proceedings. It does not apply to current obligations owed to excluded creditors, including suppliers, employees, and players in the ordinary course of business. Those obligations will continue to be paid in the ordinary course and when due.

20. The sources of repayment will be concentrated in the Arrangement Administrator's fund through an initial deposit and annual deposits based on excess available cash, subject to the minimum requirements and other updated mechanisms specified in the Arrangement. This structure is intended to earmark funds for contingent creditors while retaining the resources required to continue the business operations that generate those funds.

21. In addition to establishing the sources and method of repayment, the Arrangement permits the continued adjudication of the claims to which it applies, in accordance with its provisions. This includes the appeal of the Skillz Judgment and the continued adjudication of the class actions in the courts where they are pending. As provided in the decision of this Honorable Court, this will be accomplished in accordance with the proposed orders that have been or will be submitted to the Court. The Arrangement therefore does not seek to reduce the amount of any debt ultimately determined to be owed by the Companies. Quite the opposite: A fundamental principle of the Arrangement is to enable full repayment of the debts once they

become enforceable, while preserving the business operations that constitute the principal source of repayment.

22. Numerous amendments and additions have been made to the Arrangement. The principal changes are as follows:

22.1 It has been expressly clarified that the Companies undertake to repay all contingent debts that become enforceable, including any balance remaining, if any, at the end of the Arrangement Period;

22.2 The deposit schedule (Appendix 1 to the Arrangement) has been revised to make clear that all enforceable debts, including interest, will be paid in full during the Arrangement Period;

22.3 The Arrangement Period has been shortened to six years, and the Arrangement Administrator has been granted authority to shorten it to five years through enforcement of the security interests;

22.4 An obligation has been established to make minimum deposits into the Arrangement Administrator's fund equal to 85% of the amounts specified in Appendix 1 to the Arrangement. A mechanism has also been established for monitoring compliance with these minimum amounts, imposing sanctions for noncompliance, and establishing a maximum permissible shortfall beyond which an Event of Default occurs;

22.5 Shortfall-cure mechanisms and sanctions have been established for failure to meet the annual minimum, including shareholder contributions and the issuance of additional shares to the Arrangement Administrator;

22.6 Additional security has been provided in the form of a pledge over the fund, a pledge of the shares of Papaya Inc., and an allocation of Company shares to the Arrangement Administrator;

22.7 Personal guarantees from shareholders, backed by collateral furnished from their personal assets, have been added;

22.8 The founders will waive annual bonuses totaling approximately $25 million, and this amount will be deposited into the Arrangement Administrator's fund;

22.9 An immediate $20 million distribution will be made to contingent creditors whose proofs of claim have been approved for voting purposes in amounts exceeding $5 million, and this distribution will not be repayable under any circumstances;

22.10 Restrictions will apply to the Companies, the other group companies, and the shareholders throughout the Arrangement Period, including prohibitions on distributions and share transfers;

22.11 A reverse-vesting mechanism has been established for 50% of the founders' shares to incentivize them to continue serving in key positions at the Company;

22.12 It has been provided that the release of officers and shareholders, which was final and irrevocable under the Original Arrangement, will be conditional and will terminate if the Arrangement is revoked by court order due to an Event of Default, or if, at the end of the Arrangement Period, the Companies are found not to have met the minimum payments;

22.13 The Arrangement Administrator has been granted extensive rights to information, supervision, and enforcement, and his fees and expenses will be paid by the Companies rather than by the creditors.

23. The result is a **multilayered arrangement comprising protections in the form of funds, collateral, guarantees, share issuances,** and other measures. This structure materially improves the position of the contingent creditors. The details are set forth below.

## C(2). General Amendments and Additions: Payment of All Debts, Scope of Contingent Creditors, and Deposits into the Fund

24. The amended arrangement expressly provides that **the Companies undertake to repay in full all contingent debts that become enforceable**. The fund, security interests, and share allocations, as detailed below, are intended to secure repayment. The amended arrangement clarifies that none of them diminishes the Companies' liability under the Arrangement, thereby making clear that creditors will receive 100% of the amounts owed to them.

25. **The Arrangement Period has been shortened to only six years.** As further detailed below, the Arrangement Administrator has also been given the option of **shortening the Arrangement Period after five years**.

26. At the end of the Arrangement Period, any unpaid balance of an enforceable debt will become immediately due and payable. Contingent debts that become enforceable thereafter will be paid in the ordinary course of business if and when they become enforceable. The funds and collateral deposited with or delivered to the Arrangement Administrator will continue to secure repayment of those debts until all pending proceedings have concluded, unless all contingent creditors lose their entitlement or the Court determines that the Companies are able to pay the debts in the ordinary course of business.

27. In addition to the initial deposit of $60 million, which will be deposited into a dedicated account maintained by the Arrangement Administrator within 14 days after the Arrangement takes effect, the Company will be required to make a deposit on each annual payment date sufficient to ensure that aggregate payments are no less than 85% of the cumulative target amount as of that date (hereinafter: "**the Minimum Payments**"). Each year, the Arrangement Administrator will review the Company's compliance with the cumulative Minimum Payments. If there is any shortfall, the cure and enforcement mechanisms detailed below will be triggered.

28. **The basis for calculating excess available cash has been expanded.** Whereas the Original Arrangement included only Papaya Israel's cash balances, the amended arrangement clarifies that the calculation includes cash held by all group companies, in Israel and abroad, subject to the deductions specified in the Arrangement.

29. **The deposit amounts to be paid into the Arrangement Administrator's fund, as detailed in Appendix 1 to the Arrangement, have been increased substantially**, so that total deposits under that schedule amount to as much as approximately $863 million, compared with approximately $730 million under the appendix attached to the original proposed arrangement, over a shorter period. For the avoidance of doubt: These deposits are based on the same projections and data underlying the Companies' repayment capacity. This amount covers all known contingent debts, namely all debts associated with the Skillz action (if the

Judgment is affirmed on appeal without modification) and the Milberg action, and also includes interest at the rate specified in the Arrangement (the yield on one-year U.S. Treasury securities)[1], taking into account the return that will accrue on the money held in the fund. The Arrangement further provides that, if the pending motion for class certification against the Applicants is granted and the Arrangement Administrator's assessment exceeds $5 million, the required deposit amounts will be increased to secure payment of the judgment.

30. In this connection, the Arrangement Administrator considers an objective and impartial evaluation of the Company's multiyear cash-flow forecast to be of great importance. As stated above, Fahn Kanne Grant Thornton was also appointed for this purpose. In evaluating the projections, it also relied on an additional independent expert opinion prepared for the Arrangement Administrator by Dr. Tal Mofkadi. Further details concerning this matter are provided below.

## C(3). <u>Contributions by Founders and Shareholders, Additional Security, and Shortfall-Cure Mechanisms</u>

31. The amended arrangement introduces **contributions by the founders**. All three founders will waive the entirety of the annual bonuses to which they are entitled, and the amount of those bonuses (approximately $25 million over the entire Arrangement Period) will be added to the Arrangement Administrator's deposit. They will be entitled to receive those amounts from the Company only after all debts owed to eligible creditors have been paid in full and the Arrangement has been completed.

32. To ensure that the founders remain active employees of the Company and continue to devote their full efforts and time to it, **a reverse-vesting mechanism has been established under which 50% of each founder's shareholdings will be placed in trust with the Arrangement Administrator as shares subject to vesting**. The shares will vest over a five-year period: No shares will vest during the first two years, and vesting will then occur over the following several years. Any shares that have not vested when a founder voluntarily leaves before the end of the vesting period will become dormant shares, except upon specified acceleration events. These sanctions are designed to ensure the founders' continued involvement in the Company's operations, which is essential to the achievement of the Arrangement's objectives.

33. In addition, under the amended arrangement, on its effective date, **new shares representing 25% of the Company's issued and outstanding common share capital** after the issuance will be issued to the Arrangement Administrator, to be held in trust for the benefit of the contingent creditors. This also includes the options for the new preferred shares to be issued to shareholders who provide guarantees. These shares constitute additional security for repayment of the contingent debts, and the conditions governing their realization are detailed below.

34. To avoid disputes over the valuation of the Company's shares, and in view of the contingent nature of the debts, the Arrangement Administrator insisted that the shares issued to him serve as collateral and not as consideration in lieu of repayment of the debts. Only when these shares are converted into cash will they be deemed to satisfy the deposit obligation, except in circumstances in which the Arrangement Administrator,

[1] The interest rate stipulated in the amended arrangement is the statutory interest rate applicable to judgments entered by U.S. federal courts. Under 28 U.S.C. § 1961, a money judgment entered by a federal court bears interest at a rate equal to the one-year constant maturity Treasury yield.

after consulting the creditors, elects to treat the provision of the shares as payment toward satisfaction of a debt.

35. In addition, shortly after the Arrangement takes effect, Papaya Israel **will grant the Arrangement Administrator, in trust for the contingent creditors, a fixed, exclusive, first-priority pledge over all its holdings of Papaya Inc. shares**. The pledge will be registered in every required registry in Israel and abroad. No additional rights in the pledged shares may be created during the term of the pledge. Subject to Court approval, the Arrangement Administrator may enforce the pledge if an Event of Default occurs and remains uncured for 60 days after written notice is given. In this way, the creditors are granted a proprietary security interest while the business continues to operate.

36. In addition, if there is a shortfall in the Minimum Payments, the following three-tier **cure mechanism** will apply:

36.1 First, **shareholders will be required to make up the shortfall through shareholder contributions**. If the shareholders do not fully cover the shortfall, recourse will be had to personal guarantees from shareholders, deposited with the Arrangement Administrator, in the aggregate amount of ten (10) million dollars. The shareholders will secure those guarantees with collateral consisting of cash deposits, conservative marketable securities, or real estate.

36.2 Second, any remaining shortfall will be covered through an **external equity raise** conducted by the Company or another source of financing obtained by Papaya Israel. Any credit obtained for this purpose will be subordinated to the debts owed to contingent creditors, and its terms will require the Arrangement Administrator's approval.

36.3 Third, if a shortfall still remains, **additional shares of Papaya Israel will be issued to the Arrangement Administrator** in consideration of the remaining deficiency. The additional shares will be issued at the lower of two prices: (a) the share price in the Company's most recent financing round after the Arrangement takes effect; or (b) the price derived from the valuation attached as an appendix to the debt arrangement, multiplied by the ratio of deposits actually made to the cumulative target deposit amounts. For example, if 82% of the target amounts have actually been deposited, the price will be determined using 82% of the valuation. Thus, the less the Company deposits, the larger the ownership interest the creditors will receive. In the circumstances specified in the Arrangement, the Arrangement Administrator will also be entitled to transfer to an eligible creditor whose debt has not yet been paid that creditor's proportionate share of the additional shares as payment toward the debt.

37. Regarding the shareholder contributions (the collateral-backed guarantees), it should be explained that the Companies cannot rely on larger capital infusions from all shareholders as a source of repayment. This is because a substantial portion of the shareholders are venture capital funds, which generally operate using capital that their investors have committed to contribute to the fund, rather than any direct commitment to finance the funds' portfolio companies or pay those companies' debts. The fund investors are not direct shareholders of the Company, and the funds, which do hold shares in the Company, cannot compel their investors to make additional investments (shareholder contributions). The funds invested in the Company years ago, and those funds have already exhausted their capital calls to their investors. Against that background, only individual shareholders are in a position to contribute additional funds. For that very reason, due weight should be given to the willingness of shareholders to provide personal guarantees

backed by their own assets and assume personal risk to secure repayment of the Companies' debts. In addition, to encourage the widest possible participation by shareholders, shareholders who provide a personal guarantee and collateral will be entitled to options exercisable for newly issued preferred shares. Those shares will entitle them to priority in distributions and upon a sale or public offering, in proportion to the value of the collateral they provide. The new preferred shares will, of course, remain subject to the distribution restrictions in the Arrangement. Similar options will also be issued to the Arrangement Administrator so that he will hold 25% of all rights allocated to shareholders.

38. **Quantitative Events of Default have been defined:** An aggregate shortfall exceeding $75 million relative to the Minimum Payments, or an annual shortfall exceeding 30% of the annual Minimum Payments. These events entitle the Arrangement Administrator to exercise enforcement rights under the Arrangement and applicable law, including petitioning the Court for relief such as termination of the Arrangement, enforcement of the personal guarantees, and realization of the collateral.

39. **Shortening the Arrangement Period at the Arrangement Administrator's Discretion:** If, at the end of five years after the Arrangement takes effect, the Company has not transferred to the Arrangement Administrator's fund an amount equal to all enforceable debts owed to eligible creditors, the Arrangement Administrator may, after obtaining the views of the contingent creditors and with Court approval, realize some or all of the shares allocated to him. The shares may be realized by transferring them to eligible creditors in satisfaction of their debts, using the pricing mechanism applicable to the additional shares, or by selling them to the highest bidder. Before any such realization, the Company will be given 90 days to raise capital or otherwise make up the remaining balance. If the proceeds of realization are insufficient, the Company will continue making deposits until all debts owed to the contingent creditors have been paid in full.

## C(4). <u>Initial Safety Net for Contingent Creditors</u>

40. The amended arrangement adds a safety net in the form of an immediate distribution of $20 million from the initial deposit to those contingent creditors eligible to participate in the distribution, as detailed below. The amounts will be paid as advances against their future entitlements, but will not be subject to repayment under any circumstances, even if it is ultimately determined that the recipient's entitlement is less than the advance or never arises at all.

41. The immediate distribution is intended to place actual funds in the hands of contingent creditors whose proofs of claim have been approved for voting purposes in amounts exceeding $5 million, even before they obtain enforceable money judgments, and to mitigate the risks and delays associated with prolonged litigation and receipt of payments from the Arrangement Administrator's fund. The amount of the distribution has been set conservatively because those creditors' claims have not yet been finally adjudicated and the distribution is made without any right of recovery. This benefit was not included in the Original Arrangement.

42. The immediate distribution will be allocated pro rata among contingent creditors whose proofs of claim have been approved for voting purposes in amounts exceeding $5 million, based on the ratio of each creditor's approved claim to the total claims approved for voting purposes of the creditors participating in the distribution (creditors with claims below that amount are, in any event, entitled to payment in full from the Company's ongoing cash flow).

43. The amended arrangement also includes a special mechanism relating to the pending motion for class certification in Israel: If the motion for class certification is granted, the Arrangement Administrator will assess the amount of the claim after receiving submissions and supporting data from the class representative and the Company. If the assessed amount exceeds $5 million, the class representative and class members will be entitled to a pro rata share of the immediate distribution, as a nonrefundable advance against the amount of the judgment, even before a money judgment is entered in their favor. The amount will be calculated based on the assessed claim's proportional share relative to the contingent debts participating in the immediate distribution, as though the contingent class claim had existed on the date the Arrangement was approved. The amount will be paid or deposited in trust in accordance with the directions of the court hearing the class action and subject to applicable law. In addition, once the assessment has been made, the Company will be required to add amounts to the deposit schedule reflecting the additional contingent debt, in order to secure payment of any judgment entered.

## C(5). Restrictions Designed to Preserve Sources of Repayment

44. Throughout the Arrangement Period, the Company and all group companies will be subject to **restrictions on granting security interests and obtaining credit**. Exceptions will apply to trade credit, revolving credit facilities, and secured financing for current operations, subject to specified limits, as well as existing security interests and their renewal on similar terms. Any departure from these restrictions will require the Arrangement Administrator's prior written approval. In addition, the Company may raise equity or obtain credit (beyond existing facilities) only for the purpose of making deposits into the Arrangement fund, including curing shortfalls, accelerating deposits, and redeeming additional shares, unless the Arrangement Administrator and the Court approve otherwise. The Company is also required not to impair its existing insurance coverage.

45. **Distributions, including dividends and share repurchases**, and direct or indirect payments to shareholders or persons acting on their behalf **are prohibited**, except for the founders' compensation and employment benefits. Related-party transactions are prohibited, except for the founders' existing employment agreements. Any other related-party transaction will require the Arrangement Administrator's prior written approval, in addition to any approvals required by law.

46. The amended arrangement **prohibits transfers of rights in shares**. Throughout the Arrangement Period, shareholders will accordingly be prohibited from selling, transferring, pledging, or granting any other interest in their shares, directly or indirectly. Any transfer in violation of this restriction will be void as against the Company. The prohibition will not apply to an investment entity that transfers its entire investment portfolio to a third party. Nor will it apply to a transfer of options or new preferred shares in connection with the replacement of a personal guarantee approved by the Arrangement Administrator.

## C(6). Supervision, Monitoring, and Enforcement

47. The amended arrangement grants the Arrangement Administrator additional powers, including the right to receive semiannual reports on the group's financial position, financial statements, and additional information regarding compliance with the obligations. It also grants him the right to attend Board of Directors meetings, personally or through a representative, as a nonvoting observer, and to receive meeting materials, subject to confidentiality obligations.

48. In addition, the Company must notify the Arrangement Administrator without delay of any actual or anticipated breach, any concern that the deposit obligations will not be met, and any other material developments.

49. The Arrangement Administrator's fees and expenses will be borne by the Company, not by the creditors. If any such amounts are paid from the fund, the Company will be required to replenish the fund within 30 days.

## C(7). Conditions of the Release Granted to Shareholders and Officers

50. The amended arrangement clarifies that the release in favor of officers, directors, and shareholders will take effect when the Arrangement becomes effective, but will remain conditional. Its immediate effectiveness is necessary to allow management and the founders to focus throughout the Arrangement Period on managing the Company and maximizing the revenues from which the debts will be repaid, rather than defending lawsuits. However, the release will terminate if the Court revokes the Arrangement because of an Event of Default, or if, at the end of the Arrangement Period, the Company is found not to have met the Minimum Payments. In that event, the period from the effective date of the Arrangement until its termination will be excluded from the calculation of the applicable statute of limitations. This condition likewise strengthens the protections afforded to creditors.

## D. Proofs of Claim Submitted for Voting Purposes in These Proceedings

51. In accordance with this Honorable Court's decision of 08/26/2026, the Companies arranged for email notices concerning the submission of proofs of claim to be sent to players from the relevant period. Given the number of recipients, the emails were sent in several batches over several days. The Companies also made additional attempts to resend emails that had bounced, to ensure that the notices reached as many recipients as possible (the Company notified this Honorable Court of these steps on 09/03/2026).

52. Pursuant to this Honorable Court's decision of 09/10/2026, the deadline for submitting proofs of claim for voting purposes was 09/19/2026.

53. Several dozen proofs of claim were filed against the Company for purposes of participation in the creditors' meetings. The proofs of claim have not yet been examined or adjudicated. They are detailed below:

53.1 97 proofs of claim filed by players through the dedicated email address, Papaya@ArnonTL.com.

53.2 Claims filed by Skillz and Milberg Coleman Bryson Phillips Grossman totaling $744,224,615.6.

53.3 A proof of claim arising from a motion for class certification filed by Cassie Robinson, in the amount of NIS 562,030,000.

53.4 In addition, the Pavlovich claimants submitted a proof of claim in the amount of $308,880. Under Section 25 of the Original Debt Arrangement, any contingent creditor identified in Form 1 attached thereto who did not file a proof of claim will, for purposes of voting on the Arrangement, be deemed to have agreed to the amount of the debt stated next to that creditor's name, to have filed a proof of claim in that amount, and to have had that proof of claim approved in the same amount for voting purposes. Because this document was sent both to individuals who

contacted the dedicated email address and to all known creditors, the Arrangement Administrator believes that fairness requires that this proof of claim also be counted for voting purposes.

54. In addition, proofs of claim unrelated to the Arrangement were filed by excluded creditors, including a claim submitted by the Israel Tax Authority — Sharon Regional Tax Office — and a claim submitted by Bank Leumi Le-Israel Ltd. These claims will be addressed in the ordinary course of business if this debt arrangement is approved.

55. The Arrangement Administrator believes that, because inquiries continue to arrive at the dedicated email address even as of the date this Motion is filed, contingent creditors whose inquiries were received by the filing date should be permitted to complete the submission of their proofs of claim no later than one week before the meetings are convened and to participate in those meetings.

56. For the avoidance of doubt, nothing stated above constitutes an admission of the alleged debts or recognition of proofs of claim submitted after the deadline. Those claims will be reviewed by the Arrangement Administrator in due course in accordance with applicable law.

## E. Classification of Creditors' and Shareholders' Meetings and Provisions Governing Their Convening

57. For purposes of the Arrangement, creditors are divided into excluded creditors and contingent creditors. Excluded creditors are persons and entities with which the Companies maintain ordinary employment and business relationships, including the Companies' suppliers and employees, government authorities, provident and pension funds, and players, other than with respect to causes of action relating to past practices involving the use of bots. These creditors are not required to submit proofs of claim under the Arrangement. The Companies' current obligations to them will continue to be paid in the ordinary course of business.

58. Contingent creditors are those who assert debts arising from past practices involving the use of bots, including persons pursuing litigation concerning such practices, persons asserting causes of action of that nature, or persons holding foreign judgments that have not yet become enforceable money judgments in Israel. These creditors must file proofs of claim, which will be adjudicated in accordance with the Arrangement: If the claim is the subject of pending litigation, entitlement to payment will be determined by an enforceable money judgment. If the claim is not the subject of such litigation, the Arrangement Administrator will decide it, subject to the provisions of the Arrangement. As to payment, an eligible creditor holding an enforceable money judgment in an amount not exceeding $5 million will be paid in the ordinary course of business, whereas an eligible creditor holding an enforceable money judgment exceeding $5 million will be paid from the Arrangement Administrator's fund.

59. **Excluded Creditors** – As stated above, the proposed Arrangement does not apply to excluded creditors and does not alter their rights. Current obligations to those creditors will continue to be paid in full and when due. Excluded creditors were not required to file proofs of claim. Accordingly, the Arrangement Administrator believes that **there is no need to convene a meeting of those creditors**.

60. **Contingent Creditors** – The Special Administrator believes that a single meeting should be convened for all contingent creditors. In this connection, the Arrangement Administrator considered the Company's position, expressed in the Original Motion, that two separate meetings should be held because Skillz, as a

competitor, has distinct interests. He also considered whether separate meetings should be convened for creditors with claims below $5 million and those with claims above $5 million. The Arrangement Administrator concluded that neither position should be adopted and that a single creditors' meeting should be convened. The reason is that the Arrangement establishes a common framework for all contingent creditors: Their contingent debts will be paid in full if they become enforceable, subject to the provisions of the Arrangement. The distinction concerning debts exceeding $5 million relates to the method and source of payment: An eligible creditor holding an enforceable money judgment in an amount not exceeding $5 million will be paid in the ordinary course of business, whereas an eligible creditor holding an enforceable money judgment exceeding $5 million will be paid from the Arrangement Administrator's fund in accordance with the mechanism established in the Arrangement. In the Arrangement Administrator's view, this difference in payment mechanisms does not justify dividing the contingent creditors into separate meetings, given the common framework and the Companies' undertaking to pay in full all debts that become enforceable. Furthermore, It is entirely possible that a contingent creditor whose claim is currently valued at less than $5 million will ultimately obtain a money judgment exceeding $5 million. For this reason as well, it is appropriate and proper to convene a single meeting of all creditors.

61. The Court is also requested to order that **a separate meeting of the Company's shareholders** be convened. The Arrangement provides for amendments to the Company's articles of association, an allocation of shares to the Arrangement Administrator, and restrictions on transfers of shares and on shareholder actions during the Arrangement Period. Accordingly, shareholders must vote on the Arrangement and the changes affecting their rights. In addition, as a precaution, the meeting must be convened to satisfy the requirements of Section 322(b) of the Law.

62. Participation in the meeting will be permitted in person, by videoconference, or by submitting voting ballots by a date to be specified.

63. The Arrangement Administrator will be responsible, among other things, for conducting the creditors' meetings. The Arrangement Administrator will count the votes cast at the various creditors' meetings and will set forth the voting results for each meeting in a report to be filed with the Court.

## F. <u>The financial analysis</u>

64. To evaluate the economic basis for the arrangement plan, Fahn Kanne Advisors conducted a financial analysis for the Arrangement Administrator consisting of three components: (a) a valuation of the Company (the valuation report is attached as an appendix to the amended debt arrangement); (b) an assessment of the reasonableness of the multiyear cash-flow forecast; and (c) a financial monitoring and oversight report for August 2026 ("**the financial analysis**"). The financial analysis examined four scenarios differing in the amount invested in user acquisition, the rate of new game releases, and growth assumptions: The base-case scenario used by the Company, a conservative downside scenario ("Harvest"), an intermediate scenario, and an optimistic scenario (as those terms are defined in the financial analysis). The valuation attached as an appendix to the amended arrangement assessed the Company's value as of 08/31/2026 using the discounted cash flow method and assuming continued operation as a going concern. Equity value was calculated using an average scenario based on the base-case, intermediate, and "Harvest" scenarios, without assigning any weight to the optimistic scenario. The financial analysis estimated that equity value at approximately $1.292 billion before deducting the liability arising from the debt arrangement. In

conducting the financial analysis, the financial expert relied not only on his own independent examinations but also, as he had previously indicated he would, on an independent opinion from **Dr. Tal Mofkadi**, who was asked to assess the reasonableness and validity of management's forecast as the basis for the financial analysis. Dr. Mofkadi's opinion concludes that the forecast presented by the Companies provides a valid and conservative basis for the valuation.

- A copy of the expert opinion assessing the reasonableness of the multiyear cash-flow forecast, together with Dr. Tal Mofkadi's opinion attached thereto, is attached **as Appendix "2"**.
- A copy of the Financial Monitoring and Oversight Report for August 2026 is attached **as Appendix "3"**.

65. As noted, the financial analysis also examined the multiyear forecast against the various scenarios. It found that cash balances remained positive throughout the forecast period under all four scenarios examined, and that **the projected cash flows supported funding the deposits required under the Arrangement's payment schedule through the end of the Arrangement Period**. This conclusion does not depend on shareholder contributions, guarantees, or collateral, none of which were included in the forecast. As part of the financial analysis, the expert identified the Applicants' ability to adjust expenditures, particularly user-acquisition expenditures, as a key source of cash-flow flexibility, while considering the impact that reducing such expenditures could have on the scale of operations and the ability to generate cash in the future. The expert states in his opinion that he found no indication that the forecast was based on unreasonable assumptions and that it was prepared using detailed operational and business assumptions. With regard to the forecast, Dr. Mofkadi's opinion further concludes that, even after he made adjustments that all introduced additional conservatism, the forecast could be relied upon as a basis for the proposed debt arrangement and demonstrated that the Applicants could meet the entire payment schedule from their own resources. Both experts believe that the projected cash flows support the Companies' ability to make the required deposits into the Arrangement Administrator's fund.

66. Regarding the third component, ongoing oversight of the Company's operations during the stay of proceedings (August through October 2026), the August 2026 monitoring report indicates an increase of approximately $5.51 million in cash balances, compared with a projected increase of approximately $3.36 million. The improvement relative to the forecast was primarily attributable to payments lower than anticipated, particularly for user acquisition, alongside receipts that were also below forecast. The examinations performed as of the date the draft was delivered support the reported change in cash balances, and no material unexplained variances were identified, subject to completion of the remaining examinations and reconciliations.

67. It should be noted that the findings of these analyses provide an economic basis for evaluating the arrangement plan and support the feasibility of funding the payments under the projections and scenarios examined.

68. In conclusion, the financial analysis conducted by two distinguished and independent financial experts, Fahn Kanne Grant Thorenton [sic: Thornton] and Dr. Tal Mofkadi, supports the Company's underlying assumptions on which the debt arrangement is based. Furthermore, the Company's value as currently operated exceeds the outstanding amount of its debts to creditors.

### G. Reasons for Preferring the Debt Arrangement over an Order Commencing Insolvency Proceedings

69. As in other technology-based industries, in the gaming industry as well, realizing the value of a business through insolvency proceedings can substantially impair its value. A distressed sale or liquidation sale may generate proceeds significantly below the Company's value as a going concern. This disparity stems from several principal factors:

69.1 Impairment of Intangible Assets and Departure of Essential Employees (Brain Drain):

A substantial portion of the Company's value resides in its development, design, and product-management teams. Their departure due to uncertainty could leave a purchaser without the knowledge and capabilities needed to operate, maintain, and continue developing the games. The financial expert concludes that intangible assets (such as intellectual property, user bases, etc.) are sold at substantial discounts of 70% to 90% (meaning realization proceeds of only 10%–30% of those assets' economic value), because their value depends almost entirely on the continuity of operations, Company management, and the development team.

69.2 Erosion of Brand Value (Brand Equity):

Concerns about the discontinuation of support, updates, and server operations could lead to user churn, declining revenues, and reputational harm.

69.3 Time Pressure and Diminished Bargaining Power (Fire Sale) — Need for Rapid Realization:

Financing and time constraints may limit the ability to identify purchasers, conduct prolonged negotiations, and foster effective competition among bidders. The financial expert concludes that time constraints may impair the seller's ability to conduct an orderly, competitive sale process and increase the discount reflected in the sale proceeds.

69.4 Purchasers Taking Advantage of the Distress:

Buyers' awareness of the Company's financial condition and limited alternatives weakens its bargaining power and may result in low offers.

69.5 Loss of Growth Potential and Integrated Enterprise Value:

Interruption of the Development Pipeline: Discontinuing work on new games, downloadable content (DLCs), and technologies could impair future revenue potential and reduce the price a purchaser is willing to pay.

69.6 Asset Sale Versus Share Sale:

Selling the source code, intellectual property rights, and other assets separately could sever them from the personnel and operational infrastructure and generate proceeds below their value as part of an operating business.

69.7 Legal and Operational Risks:

An as-is sale without representations and warranties (No R&W), or with only limited representations and warranties, increases uncertainty concerning the integrity of the code, ownership of intellectual property rights, and the ability to continue operating the product. The

financial expert concludes that the absence of seller protections, warranties, and indemnities may justify a further discount and that this uncertainty may be reflected in a reduction in the offered price.

70. These risk factors apply to the Company as well. It can therefore be assumed with a high degree of confidence that **the Company's value in insolvency proceedings would be substantially below** its economic value in the ordinary course of business and, in the present case, below its value under the proposed debt arrangement. This conclusion is also supported by the opinion of the financial expert engaged by the Arrangement Administrator, who estimates that the Company's equity value in a forced-sale scenario would be hundreds of millions of dollars lower than its value as a going concern. The expert attributes the lower valuation to three sets of factors: (a) distressed-sale conditions; (b) the nature of the Company's assets (primarily intangible assets); and (c) findings reported in the professional literature. Given the numerous risk factors, including uncertainty as to whether a buyer could be found, risks to user retention, dependence on key personnel, and other concerns, the expert further concludes that the value assigned in the liquidation scenario is theoretical and expresses doubt as to whether the Company's operations could actually be sold for that amount, or sold at all.

## H. The Arrangement Administrator's Reasons for Preferring the Proposed Debt Arrangement

71. In light of all the foregoing, including the expert's financial analysis, the Arrangement Administrator believes that the alternative of a debt arrangement under Part Ten of the Law, as proposed in the amended debt arrangement that is the subject of this Motion, is far preferable to filing an application for an order commencing insolvency proceedings, selling the Company's operations and assets in liquidation proceedings, and issuing an invitation for bids.[2] As already noted in both the Original Motion and this Motion, there is no available alternative that would permit immediate payment in full of all the Company's debts to its creditors from its existing resources.

72. Accordingly, the Arrangement Administrator evaluated the proposed amended arrangement against the practical alternative available to creditors if it is not approved, rather than against a theoretical and unworkable prospect of immediate payment in full.

73. The Arrangement Administrator believes that, if the Arrangement is not approved and proceedings are commenced against the Companies under Part Two of the Law, resulting in the realization of their assets and their liquidation, the sources available for repayment of the debts will be limited to the proceeds of realization. According to the financial analysis, the value of the Companies' operations and assets, estimated at approximately NIS 1.2 billion under ordinary circumstances, is expected to decline substantially—by hundreds of millions of shekels—under a liquidation alternative and a rapid-realization scenario in insolvency proceedings. Under these circumstances, and for the reasons detailed above, there is serious doubt that liquidation could produce proceeds approaching, to any meaningful degree, those offered by the Arrangement. Accordingly, the recovery rate expected by creditors under the Arrangement is substantially higher than the rate they could expect in a liquidation scenario.

---

[2] It should be clarified that the Company's position is that no creditor is entitled to commence proceedings against it under Part Two of the Law. See Section 80(a) of the Motion for an Order Convening Meetings for Approval of a Debt Arrangement, filed in these proceedings on 07/30/2026.

74. Furthermore, The rate of recovery by creditors is an important consideration, but it is not the only one. In addition to the anticipated reduction in creditor recoveries if liquidation is chosen, consideration must be given to the collateral harm that could be caused to the Companies' employees and suppliers. Papaya Israel employs approximately 300 people in Israel, meaning that the livelihoods of hundreds of Israeli families depend on its continued existence and operations. In the ordinary course of business, the Applicants pay various suppliers in Israel the substantial sum of approximately $70 million (more than NIS 200 million) annually. Whereas the proposed Arrangement would allow the Companies to continue employing their personnel and maintaining their relationships with suppliers in the ordinary course, liquidation would, in all likelihood, lead to employee layoffs and the termination of supplier relationships. It is therefore clear that the Arrangement also mitigates the harm associated with liquidation in this respect.

75. These considerations carry particular weight given the nature of the Companies. The Companies' value lies not only in the technology itself, but also in the knowledge, expertise, and experience of the employees responsible for operating and developing that technology. This human capital has particularly significant added value and would be genuinely difficult to retain amid the uncertainty accompanying proceedings under Part Two of the Law. Accordingly, if an order commencing proceedings is entered, it is doubtful that the Companies could continue operating over the long term, and there is a risk that key personnel would leave and essential knowledge would be lost. Continued operations also depend on the uninterrupted relationships with suppliers and service providers, including technology-service providers, cloud-service and payment-processing providers, advertisers, and app stores. Liquidation or rapid asset realization could disrupt these relationships, impair the ability to operate the platform, process payments, and provide services to users, and cause significant business and operational harm. These developments could impair the value obtainable from the Companies' assets and thereby further reduce the proceeds available for distribution to creditors under the liquidation alternative.

## I. <u>Conclusion - The Arrangement Alternative</u>

76. Under these circumstances, the amended debt arrangement is the preferable alternative for the Companies' creditors because it combines preservation of the business operations and the income sources they generate with the provision of funds for repayment of the debts and improved mechanisms for protecting creditors' rights. The Arrangement establishes a framework for gradual deposits, calibrated to the Company's financial capacity, of funds sufficient to cover the debts in full into a dedicated fund subject to supervision, security interests, and payment mechanisms. It also gives priority to the Companies' creditors over shareholders and imposes restrictions on the shareholders and the Companies' executives designed to ensure their continued commitment to the Companies throughout the Arrangement Period. The Arrangement is thus intended to ensure that the continued operation of the Companies serves to repay their debts, while protecting the rights of contingent creditors if their debts become enforceable.

77. In light of the foregoing, this Honorable Court is respectfully requested to grant the relief sought at the beginning of this Motion.

TRANSPERFECT

I, Victoria Costa, hereby certify that I am competent to translate from Hebrew to English (US) and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the document entitled "בקשה לכינוס אסיפות נושים להצבעה על ההסדר המתוקן 20.10.2026(16110093.4)" from Hebrew to English (US).

Victoria Costa Victoria Costa (Oct 21, 2026 20:50:43 GMT+3)
[name]

21 Oct 2026_
[Date]